IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MILLER, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-940-MEF-TFM |
| | ) | |
| HOUSTON COUNTY BOARD | ) | |
| OF EDUCATION, et al. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

DEFENDANTS PAUL STRANGE AND STACEY EZELL'S
BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

COME NOW the Defendants **PAUL STRANGE and STACEY EZELL** and submit

this Brief in support of their Motion for Summary Judgment. The defendants assert that their

Motion, this Brief, their Narrative Summary of Undisputed Facts and their Evidentiary

Submission show that they are entitled to Summary Judgment in their favor on all of the

plaintiff's claims.

STATEMENT OF FACTS

1.    Plaintiff Nancy Miller entered into an internship agreement with Troy University

Dothan for the fall 2004 semester.  (7/17/07 Depo. of Miller, p. 73, l. 6 - p. 74, l. 15)

2.    An internship was a part of the plaintiff's requirements for receiving her degree in

special education from Troy University Dothan.  (7/17/07 Depo. of Miller, p. 30, l. 17-24;

8/23/07 Depo. of Miller, p. 19, l. 19-23)

3.    The plaintiff also entered into a contract with the Houston County Board of Education

to be a collaborative special education teacher/ intern for the 2004-05 school year at Houston County High School (hereinafter "HCHS"). (7/17/07 Depo. of Miller, p. 71, l. 4-5, 12-17; p. 331, l. 9-10)

4.    As part of her internship at HCHS, the plaintiff was assigned a cooperating teacher, special education teacher Paul Strange. (Aff. of Strange)

5.    As the cooperating teacher, Mr. Strange supervised and evaluated the plaintiff as a teacher/intern. (Depo. of Strange, p. 134, l. 12-20; Aff. of Strange)

6.    Mr. Strange was not compensated for being Ms. Miller's cooperating teacher. (Depo. of Strange, p. 211, l. 11-13)

7.    Mr. Strange began teaching at HCHS at the same time that the plaintiff began her internship there, although he had seven years of teaching experience and his Master's degree in special education. (Depo. of Strange, p. 22, l. 11 - p. 24, l. 1; p. 93, l. 13-23; p. 95, l. 11-19; Aff. of Strange)

8.    Defendant Stacey Ezell had been a science teacher at HCHS for 15 years at the time of the plaintiff's internship. (Depo. of Ezell, p. 5, l. 17-25; p. 13, l. 3-7; Aff. of Ezell)

9.    As part of her internship in collaborative special education teaching, the plaintiff attended Ms. Ezell's class to assist the special education students with the classwork and tests. (Depo. of Ezell, p. 37, l. 21-25; Aff. of Ezell; 7/17/07 Depo. of Miller, p. 327, l. 23 -p. 332, l. 14)

10.    One of Ms. Ezell's duties as a science teacher is to supervise other teachers as part of the peer review process. (Aff. of Ezell)

11.    During the first few weeks of her internship, the plaintiff asked Mr. Strange if she could teach Ms. Ezell's class several days out of the week.  (Depo. of Strange, p. 172, l. 2 - p. 173, l. 11; Depo. of Andrews, p. 31, l. 23 - p. 32, l. 25; Depo. of Pitchford, p. 11, l. 10-25)

12.    As a non-certified special education teacher, Ms. Miller could not teach the class because, under No Child Left Behind, only a highly qualified teacher can teach a regular education class.  (Depo. of Andrews, p. 32, l. 1-16)

13.    Paul Strange fulfilled his requirements as the cooperating teacher by meeting with Ms. Miller periodically, evaluating her, meeting with Troy University evaluators about her, reviewing special education documents with her and answering any questions she had. (Depo. of Strange, p. 134, l. 12-20; p. 139, l. 10 - p. 140, l. 7; Aff. of Strange; 7/17/07 Depo. of Miller, p. 75, l. 9 - p. 76, l. 25; p. 337, l. 18 - p. 338, l. 25)

14.    Mr. Strange evaluated the plaintiff on August 30, 2004, and gave her performance average and above average scores.  (Depo. of Strange, p. 153, l. 1-5; p. 155, l. 13-25; 7/17/07 Depo. of Miller, p. 339, l. 4-12)

15.    At the time Mr. Strange evaluated Ms. Miller, he expected that her internship would be successful.  (Depo. of Strange, p. 156, l. 20 - p. 157, l. 6)

16.    At some point in the first few weeks of Ms. Miller's internship at HCHS, she expressed her concern to Paul Strange that the "inclusion model" being used at the school was not proper.  (Depo. of Strange, p. 18, l. 13-24; p. 20, l. 3-19; p. 32, l. 19-24)

17.    Mr. Strange brought this concern up to his supervisor, Tim Pitchford, the principal of HCHS, who, in turn, contacted the special education coordinator, Dr. Riley Joe Andrews,

who confirmed that the model being used was proper. (Depo. of Strange, p. 33, l. 1-8; p. 37, l. 7-9; p. 39, l. 4-8; Depo. of Pitchford, p. 11, l. 1 - p. 12, l. 6; p. 19, l. 12-25; p. 31, l. 14-25; p. 49, l. 8-25)

18.    This is the only concern that Ms. Miller brought to Mr. Strange about the special education program at HCHS.   (Depo. of Strange, p. 40, l. 8-13; p. 43, l. 1 - p. 46, l. 19)

19.    Ms. Miller never brought any concern about the special education program to Ms. Ezell. (Depo. of Ezell, p. 7, l. 5-15)

20.    Ms. Miller never took her concerns about the special education program at HCHS to any meeting of the Houston County Board of Education or any other public meeting. (7/17/07 Depo. of Miller, p. 340, l. 20 - p. 341, l. 1; 8/23/07 Depo. of Miller, p. 90, l. 10-21)

21.    She never prepared a petition to take out to the community to have people sign to join in her concerns about the special education program at HCHS. (7/17/07 Depo. of Miller, p. 341, l. 2-6)

22.    In fact, the plaintiff testified that she kept her concerns at the lowest level possible. (8/23/07 Depo. of Miller, p. 66, l. 6-9; p. 91, l. 1-3)

23.    It is within every Houston County Board of Education employee's right and official duty to report a perceived wrong at a school to his or her supervisor. (Depo. of Lord, p. 30, l. 25 - p. 31, l. 7; Depo. of Pitchford, p. 67, l. 22 - p. 68, l. 4 )

24.    During Ms. Miller's internship, Dr. Andrews asked Mr. Pitchford to write down observations and/or concerns about Ms. Miller which had been brought to his attention by HCHS staff and faculty. (Depo. of Pitchford, p. 74, l. 12 - p. 75, l. 24; p. 81, l. 22 - p. 82, l.

4

15)

25.    Mr. Pitchford then asked Mr. Strange and Ms. Ezell to write down their observations and/or concerns about the plaintiff's teaching and interaction with faculty and students. (Depo. of Pitchford, p. 75, l. 25 - p. 76, l. 2)

26.    Mr. Pitchford added to the written observations given to him by Mr. Strange and Ms. Ezell with information from other faculty and office staff.  (Depo. of Pitchford, p. 75, l. 25 - p. 76, l. 6)

27.    Mr. Pitchford compiled a list of observations from information brought to him by several teachers, including Mr. Strange and Ms. Ezell, and two of his office staff.  (Depo. of Pitchford, p. 75, l. 25 - p. 77, l. 11)

28.    Mr. Strange provided information for two of the nine paragraphs in the memo.  (Depo. of Strange, p. 68, l. 13-23; p. 76, l. 2-7)

29.    Ms. Ezell provided information for three of the paragraphs in the memo.   (Depo. of Ezell, p. 10, l. 8 - p. 11, l. 23)

30.    After this list was typed, Mr. Pitchford requested that Mr. Strange and Ms. Ezell sign it.  (Depo. of Pitchford, p. 76, l. 23 - p. 77, l. 2)

31.    Mr. Pitchford does not know why he did not ask any other faculty members or staff to sign the document, even though others contributed to it.  (Depo. of Pitchford, p. 77, l. 4-14)

32.    This document was then attached to a letter from Dr. Andrews to Pam Parris at Troy University Dothan about Dr. Andrews' concerns about the plaintiff.  (Depo. of Andrews, p.

39, l. 10-22)

33.    Neither Mr. Strange nor Ms. Ezell intended for there to be any adverse employment action to be taken against Ms. Miller in response to the document they each signed. (Depo. of Strange, p. 87, l. 17-20; Depo. of Ezell, p. 10, l. 1-10; p. 19, l. 19-22; p. 51, l. 1-8)

34.    Both Mr. Strange and Ms. Ezell testified that they understood that the document would be used as a tool to communicate to Ms. Miller which areas of her teaching methods needed work.  (Depo. of Strange, p. 87, l. 21 - p. 88, l. 12; Depo. of Ezell, p. 51, l. 1-8)

35.    Neither educator understood or meant for Troy University Dothan to take any adverse action in regard to Ms. Miller's internship because of the signed document.   (Depo. of Strange, p. 87, l. 9-20; Depo. of Ezell, p. 10, l. 1-10; p. 19, l. 19-22; p. 51, l. 1-8)

36.    Neither Mr. Strange nor Ms. Ezell has any ill will towards Ms. Miller.  (Aff. of Strange; Aff. of Ezell)

37.    Troy University Dothan withdrew Ms. Miller's internship on October 14, 2004.  (7/17/07 Depo. of Miller, p. 74, l. 16-19; p. 268, l. 3-25; p. 270, l. 15-19)

38.    The plaintiff does not know who decided to administratively withdraw her internship at Troy University Dothan.  (8/23/07 Depo. of Miller, p. 63, l. 20-23)

39.    Troy University's handbook declares that the university determines whether a student passes or fails his or her internship.  (7/17/07 Depo. of Miller, p. 266, l. 16-19)

40.    In response to the withdrawal of the internship, the Houston County Board of Education terminated Ms. Miller's contract.  (Depo. of Lord, p. 36, l. 4-23; 7/17/07 Depo. of Miller, p. 274, l. 5 - p. 275. l. 4)

41.    These defendants adopt and incorporate any other defendant's evidence and/or the factual conclusions derived therefrom, to the extent that they do not contradict any evidence or fact asserted in Mr. Strange and Ms. Ezell's Motion for Summary Judgment or Brief.

## **STANDARD OF REVIEW**

Summary judgment serves as a gatekeeper to block needless complaints. Jerome A. Hoffman & William A Schroeder, *Burdens of Proof*, 38 Ala. L. Rev. 31, 37 (1986).[1] "The mere existence of some alleged factual dispute between the parties will not defeat summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). The moving party is entitled to summary judgment when the pleadings and evidence show that there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law. F.R.C.P. 56(c).

On issues where the movant bears the burden of proof at trial, it must support its motion for summary judgment with admissible evidence on all essential elements of its case such that no reasonable finder of fact could find in favor of the non-moving party. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). On issues where the non-moving party bears the burden of proof at trial, the moving party may simply point out to the court the insufficiency or absence of evidence by the non-moving party on that issue. *Id.* at

---

[1] Hoffman cites *Tripp v. Humana, Inc.*, 474 So. 2d 88, 90 (Ala. 1985) (the motion for summary judgment tests the sufficiency of the evidence to determine if any real issues exist that warrants a trial); and accords *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct 2548, 2555 (1986) (motions for summary judgment have replaced motions to dismiss or to strike as the principle tools by which factually insufficient claims or defenses can be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources).

1115-16.

Once the moving party satisfies this burden, the non-moving party bears the burden of coming forward with evidence sufficient to create a genuine issue of material fact at trial. *Id.* at 1116. If the issue is one where the movant has the burden of proof, the movant may still be entitled to summary judgment if, in light of all the evidence, no reasonable finder of fact could find in favor of the non-moving party. *Id.* If, however, the issue is one in which the non-movant bears the burden at trial, it must respond as follows:

> First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Melissa L. Nelkin, *One Step Forward, Two Steps Back: Summary Judgment After Celotex*, 40 Hastings L.J. 53, 82-83 (1988).

*Fitzpatrick*, 2 F.3d at 1116-17. The non-moving party is required to present substantial evidence, that is:

> Evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions.

*Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291, 295 (11th Cir. 1988) (citing *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969)); *Reynolds v. CLP Corp.*, 812 F.2d 671, 674 (11th Cir. 1987); *Michigan Abrasive Co. v. Poole*, 805 F.2d 1001, 1004 (11th Cir. 1986)). Plaintiff bears the burden of coming forward with substantial evidence, sufficient to withstand a motion for judgment as a matter of law at trial, that demonstrates that Defendants Paul Strange and Stacey Ezell violated her rights under the First and Fourteenth Amendments

in order to defeat this motion for summary judgment. As demonstrated by the motion for summary judgment, this brief, the narrative statement of undisputed facts and the supporting evidence, plaintiff cannot meet her burden, and the defendant educators are entitled to judgment in their favor as a matter of law as to the plaintiff's claims against them.

## ARGUMENT

**I.    SINCE ONLY THE HOUSTON COUNTY BOARD OF EDUCATION CAN HIRE OR FIRE, THE INDIVIDUAL DEFENDANTS CANNOT BE LIABLE FOR THE BOARD'S TERMINATION OF THE PLAINTIFF'S CONTRACT.**

Under Alabama law, only Boards of Education, not their individual employees, have the power to hire or fire. The *Alabama Code* provides as follows:

> The ***county board of education*** shall appoint, upon the written recommendation of the county superintendent, all principals, teachers, clerical and professional assistants authorized by the board. The ***county board*** may suspend or dismiss for immorality, misconduct in office, insubordination, incompetency or willful neglect of duty, or whenever, in the opinion of the board, the best interests of the school require it, superintendents, principals, teacher or any other employees or appointees of the board . . .

*Alabama Code* § 16-8-24 (1975) (emphasis added). While individuals can, and do, make recommendations as to employment, the ultimate decision must be made by the Board. Therefore, Defendants Strange and Ezell cannot legally be held liable for the Board's decision to terminate the plaintiff's contract when her internship with Troy University was withdrawn.

**II.    DEFENDANTS PAUL STRANGE AND STACEY EZELL ARE ENTITLED TO QUALIFIED IMMUNITY.**

Qualified immunity "allows government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but

the plainly incompetent or one who is knowingly violating the federal law." *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1267 (11th Cir. 2003) (citations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 340, 341 (1986). Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities, so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1232 (11th Cir. 2003).

These individual defendants are being sued in their individual capacities only. (Complaint, ¶ 23) The Eleventh Circuit, in *Foy v. Holston*, 94 F.3d 1528 (11th Cir. 1996), held that:

> Claims for money damages against government officials in their individual capacity involve substantial costs not only for the individual official- who incidentally may be innocent- but for society in general. "These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (citations omitted).

> The qualified immunity defense is the public servant's (and society's) strong shield against these dangerous costs. Qualified immunity protects government officials performing discretionary functions from civil trials (and other burdens of litigation, including discovery) and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. at 817-19, 102 S. Ct. at 2738.

*Id.* at 1532-33.

The plaintiff who questions the claim of qualified immunity has the burden of proof and cannot rely on general, conclusory allegations to show that the right is clearly established. To be clearly established, "a right must be so particularized that in the light of preexisting law the unlawfulness must be apparent." *Hansen v. Soldenwagner*, 19 F.3d 573 (11th Cir. 1994). The plaintiff must establish that when the individual defendants acted, the law established the contours of that right so clearly that reasonable officials would have understood that their acts were unlawful. The relevant law must be from the U.S. Supreme Court, the Alabama Supreme Court, or the Eleventh Circuit. *Kelly v. Curtis*, 21 F.3d 1544 (11th Cir. 1994).

The question of whether a government official or employee acted within his or her discretion is two-fold. The first inquiry in determining whether a school official is entitled to qualified immunity is whether the official's alleged improper actions are of the type that fall within the official's job responsibilities. *Holloman v. Walker Co. Bd. of Educ.*, 370 F.3d 1252, 1265 (11th Cir. 2004). As applied to this case, this Court must ask whether special education teacher Paul Strange and science teacher Stacey Ezell were performing legitimate job-related functions through means that were within their power to utilize. In other words, to satisfy the first inquiry, the defendants simply have to establish that their actions fell within their legitimate job descriptions.

In this case, the individual defendants' job duties included the supervision of teachers. Mr. Strange testified that as the plaintiff's mentor he evaluated and supervised her. (Depo. of Strange, p. 134, l. 12-20; Aff. of Strange) Further, since Ms. Miller was an

intern/cooperating teacher in Ms. Ezell's science class, Ms. Ezell also supervised the plaintiff in order to provide peer evaluations. (Aff. of Ezell)  As such, the defendants have satisfied the first prong of the qualified immunity test.

The next question which must be asked is whether the government official executed his or her job-related functions in an authorized manner.  *Holloman*, 370 F.3d at 1266.  In considering this inquiry, this Court is to ask whether the defendants' actions (on a general level rather than in the specific application in this case) were legitimate prerogatives of their jobs.  In other words, would the defendants' actions in this case be considered part of their duties and legitimate exercises of their authority?  Once again, the defendants had the authority, and in fact had a duty, to supervise teachers and provide peer evaluations.  As such, their activities in relation to the supervision of the plaintiff were discretionary acts for which they are entitled to seek qualified immunity.  *See Holloman*, 370 F.3d at 1267.

Now that the defendants have established that they were engaged in discretionary functions at the time of the alleged incidents, this Court must apply the two-part analysis set forth by the U.S. Supreme Court in *Hope v. Pelzer*, 536 U.S. 730 (2002).  Under this analysis, "the threshold inquiry a court must undertake is whether [the] plaintiff's allegations, if true, establish a Constitutional violation." *Id.* at 736.  If a constitutional right would have been violated under the plaintiff's version of the facts, the next step is to ask whether the right was clearly established at the time of the alleged violation.  *Id.* at 739.  As previously discussed, the individual defendants acted within their discretion in supervising the plaintiff as a teacher/intern.  As such, the burden now shifts to the plaintiff to establish that Mr.

12

Strange and Ms. Ezell's actions rose to the level of a constitutional violation.

The plaintiff cannot satisfy this burden because there was no law at that time that clearly established: (a) that the plaintiff's speech was subject to constitutional protection and (b) that any action taken by Mr. Strange or Ms. Ezell had the effect of stifling the plaintiff's protected speech, as alleged in the Complaint. Because the plaintiff cannot satisfy her burden of showing that they are *not* so entitled, the defendants are entitled to qualified immunity and summary judgment.

Further, the plaintiff cannot defeat the qualified immunity possessed by these defendants. Qualified immunity protects those government officials who make decisions. *Hope v. Pelzer*, 536 U.S. 730 (2002), says that the law must give "fair warning" that the decision or action can result in the official's being sued. There was no such "fair warning" to either Mr. Strange or Ms. Ezell in this case. Thus, these defendant educators are entitled to the protection of qualified immunity from the plaintiff's allegations against them.

The plaintiff says she was discriminated and retaliated against for exercising her First Amendment right to free speech. However, because the plaintiff's speech did not involve a matter of public concern, the plaintiff's free speech rights under the First Amendment were never implicated and, as such, the defendants therefore could not have been on notice that their actions would violate the plaintiff's rights.

In *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), the United States Supreme Court stated that the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Id.* at 1957 (citing to *Pickering*

*v. Bd. of Educ. of Township High Sch. Dist. 205, Will Co.,* 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987); *U.S. v. Treasury Employees*, 513 U.S. 454, 466, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995)).  In considering the plaintiff's First Amendment claims, this Court must first determine whether the plaintiff's speech implicated a matter of public concern.  *See Pickering, supra,* at 568, 88 S. Ct. 1731; *see also Maples v. Martin*, 858 F.2d 1546, 1552 (11th Cir. 1988).  If not, the speech is not constitutionally protected.  *See Connick, supra,* at 147, 103 S. Ct. 1684.  *See also Maples, supra; Ferrara v. Mills,* 781 F.2d 1508, 1512 (11th Cir. 1986) ("If the employee's speech cannot fairly be characterized as constituting speech on a matter of public concern, the inquiry is at an end.").

The Supreme Court has stated, in distinguishing private matters from true matters of public concern:

> When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick,* at 147, 103 S. Ct. 1684 (1983).  If the employee spoke as a citizen on a matter of public concern, then the possibility of a First Amendment claim arises.  The Court in *Thampi v. Collier Co. Bd. of Comm.,* 510 F. Supp. 2d 838 (M.D. Fl. 2007), held that the controlling factor is whether the expressions were made pursuant to the employee's official duties.

In the case of *Gilder-Lucas v. Elmore Co. Bd. of Educ.*, 399 F. Supp. 2d 1267 (M.D.

14

Ala. 2005), this Court held that a teacher's response to a memorandum from the principal addressed the internal management of the school cheerleading tryouts, and thus, was not of public concern. This Court went on to state:

> The Eleventh Circuit has repeatedly differentiated between speech concerning the internal administration of public education such as personal grievances of public school employees that are matters of private concern, and speech that directly affects the public's perception of the quality of education in a specific school system, which is meant to be protected by the First Amendment. In differentiating between these two types of speech, the court must not allow public employees to "transform a personal grievance into a matter of public concern by invoking a supposed popular interest in a way public institutions are run."
>
> Here, [the teacher]'s speech does not pertain in any way to the educational quality of the school. It merely criticizes the procedures and criterion utilized by the coaches and judges in selecting members for the cheerleading squad....
>
> Further, the context in which [the teacher] produced her response to the memorandum supports its non-public designation. A critical element in analyzing the proper designation of a public employee's speech is "whether the speech at issue was made primarily in the employee's role as a citizen, or primarily in the role of employee." Here, [the principal] required [the teacher's] written response to a parent's complaints and she followed this command, addressing her speech to [the principal] alone. She made no effort to communicate her speech to the public. While speech already determined to discuss a matter of public concern does not lose its public character solely because it is privately expressed, a failure to make the public aware of a grievance can undermine its public nature.

*Gilder-Lucas v. Elmore Co. Bd. of Educ.*, 399 F. Supp. 2d 1267 (M.D. Ala. 2005) (internal citations omitted).

In this case, too, the plaintiff chose to only inform certain educators and administrators about her concerns. She never addressed the Houston County Board of Education during any of its public meetings or any other public meetings about her concerns. (7/17/07 Depo. of

Miller, p. 340, l. 20 - p. 341, l. 1; 8/23/07 Depo. of Miller, p. 90, l. 10-21)  She never spoke at a Parent Teacher Association meeting about her concerns.  (*Id.*)  The plaintiff never prepared a petition about her concerns about the special education department at Houston County High School.  (7/17/07 Depo. of Miller, p. 341, l. 2-6) The plaintiff testified that she kept her concerns at the lowest level possible.  (8/23/07 Depo. of Miller, p. 66, l. 6-8; p. 91, l. 1-3)

The plaintiff made Paul Strange aware of her concern about the "inclusion model" being used at HCHS.  (Depo. of Strange,  p. 18, l. 13-24; p. 20, l. 3-19; p. 32, l. 19-24)  Mr. Strange then discussed this concern with Tim Pitchford, the principal of the school, who in turn informed the special education coordinator for the school system.  (Depo. of Strange, p. 33, l. 1-8; p. 37, l. 7-9; p. 39, l. 4-8; Depo. of Pitchford, p. 11, l. 1 - p. 12, l. 6; p. 19, l. 12-25; p. 31, l. 14-25; p. 49, l. 8-25)  The plaintiff never took this concern to Stacey Ezell. (Depo. of Ezell, p. 7, l. 5-15)  Clearly, whether the high school was using the correct "inclusion model" was not a matter of public concern, but was instead a matter of the internal management of the school's special education program.

The United States Supreme Court held in *Garcetti* that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline."  *Garcetti, supra*, at 1960, 126 S. Ct. 1951.  The Court went on to declare that when the plaintiff "went to work and performed the tasks he was paid to perform, [the plaintiff] acted as a government employee."  *Id.*  In this case, the plaintiff was

16

a paid teacher employed by the Houston County Board of Education. Part of any teacher's official duty and right is to report perceived deficiencies at the school in which they teach. (Depo. of Lord, p. 30, l. 25 - p. 31, l. 7; Depo. of Pitchford, p. 67, l. 22 - p. 68, l. 4) Reporting to Mr. Strange that she thought that the inclusion model was not being properly followed at Houston County High School was well within her job responsibilities. She was acting in her capacity as a special education teacher at Houston County High School. Accordingly, her speech was not within the scope of First Amendment protection, and these defendants are entitled to the protection of qualified immunity.

III.  **THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS CLAIM.**

In Count I of the plaintiff's Complaint, the plaintiff alleges that she had a right under the First and Fourteenth Amendments to the Constitution of the United States to speak out and her free speech rights were violated by the defendants when they caused her either to lose her internship or her job, or both. This Fourteenth Amendment liberty interest violation claim is based upon an incident wherein the plaintiff alleges that Defendants Strange and Ezell signed a typed list of concerns about Ms. Miller's performance as an intern at HCHS, which the plaintiff claims led to her internship being withdrawn and her employment with the Board being terminated.[2] To prevail on this claim, the plaintiff must show: (1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4)

---

[2]Out of an abundance of caution, these defendants assume plaintiff is making a Fourteenth Amendment liberty interest violation claim even though the same is not specifically set out in the Complaint.

made public (5) by the governmental employer (6) without a meaningful opportunity for a name clearing hearing. *Buxton v. City of Plant City,* 871 F.2d 1037, 1042-43 (11th Cir. 1989). To satisfy the second element of her claim, the plaintiff must show that the alleged false and stigmatizing statement was "attending her discharge." *Id.* at 1042. In other words, she must show that the statement was the basis or reason for the discharge. *See Doe v. Garrett,* 903 F.2d 1455, 1462 (11th Cir. 1990) (stating, "[i]t is established that discharge or termination of a government employee *on the basis* of false and stigmatizing reasons publicized by the governmental employer implicates a protected liberty interest in the employee's reputation and ability to gain future employment") (emphasis added); *See also Blanton v. Griel Mem'l Psychiatric Hosp.,* 758 F.2d 1540, 1544 (11th Cir. 1985) ("plaintiff must show that his freedom to work was stigmatized *in or as a result of the discharge process*") (*emphasis added*).

In this case, the plaintiff's employment with the Houston County Board of Education was terminated because her internship was withdrawn by Troy University Dothan. (Depo. of Lord, p. 36, l. 4-23) There is no evidence that Troy University based its decision to withdraw the plaintiff's internship on the memo typed by Mr. Pitchford's office and signed by Mr. Strange and Ms. Ezell. According to Mr. Pitchford, other faculty and staff provided information which is contained in the memo, and he does not know why he did not ask them to sign it like he did Mr. Strange and Ms. Ezell. (Depo. of Pitchford, p. 75, l. 25 - p. 77, l. 11) Ms. Ezell provided the information in three of the paragraphs of the memo. (Depo. of Ezell, p. 10, l. 8 - p. 11, l. 23) Mr. Strange provided the information in only two of the

18

paragraphs. (Depo. of Strange, p. 68, l. 13-23; p. 76, l. 2-7) Mr. Pitchford received the information for the remaining paragraphs from other teachers and office staff. (Depo. of Pitchford, p. 75, l. 25 - p. 77, l. 11) Neither Mr. Strange nor Ms. Ezell intended for the memo to cause Ms. Miller to lose her internship or her job. (Depo. of Strange, p. 87, l. 17-20; Depo. of Ezell, p. 10, l. 1-10; p. 19, l. 19-22; p. 51, l. 1-8) They both thought that administrators or faculty of Troy would use the memo to discuss areas of improvement with the plaintiff. (Depo. of Strange, p. 87, l. 21 - p. 88, l. 12; Depo. of Ezell, p. 51, l. 1-8) Neither teacher had any ill will towards Ms. Miller. (Aff. of Strange; Aff. of Ezell)

There is *no* evidence that the memo played any role in the decision to withdraw the plaintiff's internship or to terminate the plaintiff's contract with the Board. Further, neither Mr. Strange nor Ms. Ezell had any authority to recommend that Ms. Miller's internship be withdrawn or her employment with the Board be terminated. Simply put, the defendants could not have been on notice that Troy's withdrawal of her internship or the Board's termination of her contract would violate the plaintiff's constitutional rights because the withdrawal and the termination were based upon reasons *other than* the alleged stigmatizing statement. Furthermore, holding teachers liable for violating another teacher's due process rights by providing peer evaluations will have a chilling effect on these types of valuable learning tools. Knowing that they could be sued for saying anything negative about a student teacher, why would an experienced educator offer any constructive criticism? The plaintiff was still earning her teaching degree and was not yet certified as a teacher at the time she

taught at HCHS. Accordingly, peer evaluations by the teachers in whose classroom she was a collaborative teacher were a valuable learning tool for Ms. Miller. Clearly, these defendant educators did not violate the plaintiff's rights under the Fourteenth Amendment, and are entitled to summary judgment in their favor.

**IV.    THE PLAINTIFF CANNOT PRESENT SUBSTANTIAL EVIDENCE THAT THE ALLEGED STIGMATIZING STATEMENT MADE ABOUT HER WAS "ATTENDING" HER DISCHARGE.**

Simply put, the alleged stigmatizing statement, the nine point memo signed by Mr. Strange and Ms. Ezell, was not made in the course of the termination of the plaintiff's contract. *See Andreau v. Sapp*, 919 F.2d 637 (11th Cir. 1990). In *Andreau*, the plaintiff, a deputy sheriff, was accused of wrongdoing and arrested and charged with several offenses. The case against the plaintiff was eventually dropped. However, the plaintiff was later fired, anyway. When the media asked the defendants about the matter, one of the defendants stated publicly that there were areas of the plaintiff's case that "troubled" him and another stated that he thought the plaintiff's actions were criminal "even if other agencies didn't." The Eleventh Circuit rejected the defendants' contention that the statements were not made in the course of the plaintiff's discharge, saying that the article made it clear that the defendants' statements were made while they were discussing the plaintiff's employment status.

In contrast, in this case, neither Paul Strange nor Stacey Ezell ever publicly stated a reason for the withdrawal of the plaintiff's internship or the termination of her contract with the Board. In fact, neither has the authority to take any action to either have Ms. Miller's internship withdrawn or have her contract with the Houston County Board of Education

20

terminated.    There is no evidence that shows that either institution considered the memo when making its decision to take any action against the plaintiff.  The plaintiff can present no evidence that the fact that a memo was sent to someone at Troy University Dothan with several concerns about her listed on it and signed by Mr. Strange and Ms. Ezell was in any way related to the withdrawal or termination of either contract.  Frankly, the plaintiff can present no evidence that the memo was not exactly what Mr. Strange and Ms. Ezell testified it was - a way to communicate areas of observation which would be addressed with the plaintiff in order to better her teaching abilities.  Because there is no evidence that the memo was related to any adverse employment action taken against the plaintiff, these defendants are entitled to summary judgment on the plaintiff's due process claim.   *See e.g., Brennan v. Hendrigan,* 888 F.2d 189, 196 (1st Cir. 1989) (information in newspaper article not related to the plaintiff's dismissal when there was no evidence that defendants made any statements to the press) and *Ewers v. Bd. of Co. Comm'rs of Curry County,* 802 F.2d 1242, 1248 (10th Cir. 1986) (alleged defamatory statement not made in connection with employment decision when statement did not in any way indicate that it was connected to the decision).

Plus, just the fact that either defendant signed a memo concerning areas where the plaintiff needed to improve does not equate to the plaintiff's <u>termination</u>.  Surely the decision- making body would consider <u>all</u> reviews and evidence, not just one document signed by these defendants.  For example, see the § 1983 case of *D.A.C. v. Thrasher*, 655 So. 2d 959 (Ala. 1995).[3]

---

[3] The Eleventh Circuit says the only courts which can clearly establish the law are the United States Supreme Court, the Alabama Supreme Court and the Eleventh Circuit.

## V.     DEFENDANT EDUCATORS PAUL STRANGE AND STACEY EZELL ARE ALSO PROTECTED BY FEDERAL IMMUNITY.

Educators are also protected by federal immunity from claims such as those made by the plaintiff in this case under the Paul D. Coverdell Teacher Protection Act of 2001, a part of the "No Child Left Behind" Act.   According to §2366, "Limitation on Liability for Teachers," teachers are immune for any act or omission done on behalf of the school if:

> (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;
> (2) the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;
> (3) if appropriate or required, the teacher was properly licensed, certified or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities;
> (4) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher....

Here, Mr. Strange and Ms. Ezell were acting within the scope of their employment with the Houston County Board of Education and were properly licensed to be teachers at all times.  (Aff. of Strange; Aff. of Ezell)  All of Mr. Strange and Ms. Ezell's actions in supervising the plaintiff were in conformity with federal, state and local laws.  (Aff. of Strange; Aff. of Ezell)  Furthermore, neither of these two educators acted willfully, criminally or recklessly, with gross negligence, or with a conscious flagrant indifference to the rights of the plaintiff. (Aff. of Strange; Aff. of Ezell) Accordingly, Mr. Strange and Ms. Ezell are also entitled to protection from all claims against them under federal statutory immunity.

## CONCLUSION

The plaintiff cannot present substantial evidence to defeat summary judgment on any of her claims against these two educators.  She cannot establish that she spoke about a matter of public concern.  As such, her speech while an intern at Houston County High School was not constitutionally protected.  Any alleged defamatory statements about her were not "attending her discharge" so as to constitute a federal due process violation.  Furthermore, both Paul Strange and Stacey Ezell are entitled to federal immunity.

Based upon the foregoing, these defendants are entitled to summary judgment in their favor.

Respectfully submitted,

/s/ *Mark S. Boardman*
Mark S. Boardman (ASB-8572-B65M)

/s/ *Katherine C. Hortberg*
Katherine C. Hortberg (ASB-5374-B34K)
BOARDMAN, CARR, HUTCHESON, P.C.
400 Boardman Drive
Chelsea, AL 35043-8211
Telephone:  (205) 678-8000
Facsimile:  (205) 678-0000

## CERTIFICATE OF SERVICE

I hereby certify that I have on this **15**[th] day of **November, 2007**, submitted the foregoing via the CM/ECF system, and that counsel for the plaintiffs are registered to receive a **Notice of Electronic Filing**, to wit:

Thomas Kirven Brantley Esq.
Brantley & Amason
401 North Foster Street
Dothan, Alabama 36303

Winn Faulk, Esq.
Faulk & Reed
524 South Union Street
Montgomery, Alabama 36104

Jere Segrest, Esq.
James K. Walding, Esq.
Patrick Moody, Esq.
Hardwick, Hause & Segrest
Post Office Box 1469
Dothan, Alabama 36302-1469

James C. Pennington, Esq.
Joseph Musso, Esq.
Ogletree, Deakins, Nash, Smoak
& Stewart, PC
1819 5th Avenue North
One Federal Place, Suite 1000
Birmingham, Alabama 35203

*Katherine C. Hortberg*
Of Counsel

## INDEX OF EXHIBITS

1.    7/17/07 Deposition of Nancy Miller

2.    8/23/07 Deposition of Nancy Miller

3.    Deposition of Paul Strange

4.    Deposition of Tim Pitchford

5.    Deposition of Stacey Ezell

6.    Deposition of Kenneth Lord

7.    Deposition of Riley Joe Andrews

8.    Affidavit of Stacey Ezell

9.    Affidavit of Paul Strange

# 7/17/07 Deposition of Nancy Miller

1          IN THE U. S. DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3            SOUTHERN DIVISION

4

5 NANCY MILLER,

6     PLAINTIFF,

7    VS.             CASE NO.1:06-CV-940-WKW

8 HOUSTON COUNTY BOARD
  OF EDUCATION, KENNETH
9 LORD, RILEY JOE ANDREWS,
  TIM PITCHFORD, PAUL
10 STRANGE, STACY EZELL,
  TROY UNIVERSITY, DOTHAN,
11 SANDRA JONES, PAM PARRIS
  and GREG RUEDIGER,
12
    DEFENDANTS.
13

14     The deposition of NANCY MILLER, taken

15 by the Defendants, pursuant to the Federal

16 Rules of Civil Procedure, before Stacey

17 Watkins, RPR, and Notary Public, State at

18 Large, at the offices of Hardwick, Hause,

19 Segrest & Walding, Dothan, Alabama, on the

20 17th day of July, 2007, at 10:10 a.m., CDT,

21 pursuant to notice.

22

23        RECEIVED

24        JUL 2 0 2007     COPY

25

       BOARDMAN, CARR
       & HUTCHESON, P.C.

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4    MR. WINN FAULK
      Attorney at Law
 5    Montgomery, Alabama

 6    MR. THOMAS K. BRANTLEY
      Attorney at Law
 7    Dothan, Alabama

 8

      FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9    KENNETH LORD, RILEY JOE ANDREWS AND
      TIM PITCHFORD:
10
      MR. KEVIN WALDING
11    MR. PATRICK B. MOODY
      Attorneys at Law
12    Dothan, Alabama

13

      FOR PAUL STRANGE AND STACEY EZELL:
14
      MS. KATHERINE HORTBERG
15    Attorney at Law
      Chelsea, Alabama
16

17    FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
      PAM PARRIS AND GREG RUEDIGER:
18
      MR. JOSEPH V. MUSSO
19    Attorney at Law
      Birmingham, Alabama
20

21    ALSO PRESENT:

22    KENNETH LORD
      PAUL STRANGE
23    STACEY EZELL

24

25
```

1                         STIPULATION

2

3          It is stipulated by and between counsel

4     for the parties that this deposition be taken

5     at this time by Stacey Watkins, RPR, and

6     Notary Public, State at Large, who is to act

7     as commissioner without formal issuance of

8     commission to her; that said deposition shall

9     be taken down stenographically, transcribed,

10    and certified by the commissioner.  The

11    signature of the witness is waived.

12         Except for objections as to the form of

13    questions, no objections need be made at the

14    time of the taking of the deposition by

15    either party, but objections may be

16    interposed by either party at the time the

17    deposition is read into evidence, which

18    shall be ruled upon by the Court on the

19    trial of the cause upon the grounds of

20    objection then and there assigned.

21

22

23

24

25

```
 1              (Defendant's Exhibits 1 through 28

 2              previously marked for

 3              identification.)

 4

 5                    NANCY MILLER

 6    having been first duly sworn, testified as

 7    follows, to-wit:

 8

 9                    EXAMINATION

10

11    BY MR. WALDING:

12         Q    Mrs. Miller, I'm Kevin Walding, and

13    my law firm represents the Houston County

14    Board of Education and various of the

15    individual defendants you have sued in this

16    case.  Do you understand that?

17         A    Yes.

18         Q    I'm here to take your deposition

19    today as part of your lawsuit.  Do you

20    understand that?

21         A    Yes.

22         Q    Have you ever given a deposition

23    before, ma'am?

24         A    No, ma'am -- no.

25         Q    Okay.  Well, just so that you and I
```

1      A     Special education.  I was going to

2    be a special education major.  So, I started

3    off with the normal core classes that you

4    have to take prior to.

5      Q     You started out with classes that

6    every college student would have to take?

7      A     Yes.

8      Q     But you had already made up your

9    mind at that time you wanted to be a special

10   education teacher?

11     A     Absolutely.

12     Q     And at the time that the incidents

13   that are the basis of this lawsuit, I don't

14   believe you had actually attained a

15   bachelor's degree?  Is that right?

16     A     That is correct.

17     Q     So, when you were doing your intern

18   teaching, your internship out at Houston

19   County High School, you had not attained your

20   bachelor's?

21     A     That's correct.

22     Q     Did you eventually attain your

23   bachelor's degree?

24     A     Yes.

25     Q     And did you eventually become a

71

1    A    Technically, I didn't start my

2  internship until -- I believe it was the 16th

3  of August.  That's when the actual internship

4  started.  I started my teaching contract

5  around July 28th.

6    Q    The internship did not start until

7  when?

8    A    I believe it was August 16th.

9    Q    And why is that date memorable?

10    A    Because that's when my internship

11  started.

12    Q    In other words, you actually

13  started going out to Columbia, to Houston

14  County High School, on August 16th?

15    A    No.  That's when I had the dual

16  role starting.  Okay.  I was actually hired

17  by Mr. Andrews around the 28th of July.  Ms.

18  Parris had recommended me to interview.  Mr.

19  Andrews -- it's my understanding that Mr.

20  Andrews contacted Ms. Parris because he was

21  having a hard time getting a special ed

22  position filled, as well as an English

23  position.

24    And so, he called Ms. Parris, and she

25  arranged to have a couple of us students

73

```
 1         Q    Mid July?

 2         A    I think so.

 3         Q    Yes, ma'am.

 4         A    Somewhere like that.  But, anyway,

 5    then I went and interviewed.

 6         Q    Okay.  Let me show you what I've

 7    marked as Defendant's Exhibit No. 6, and ask

 8    you if you recognize that document?

 9         A    Yes.

10         Q    Would you agree with me that that

11    document is dated July 28, 2004?

12         A    Yes.

13         Q    And that is the very same date

14    identified in your complaint?

15         A    Yes.

16         Q    Okay.  Would you agree with me that

17    Defendant's Exhibit 6 is -- the header states

18    "Internship agreement between Houston County

19    Schools and Troy University Dothan Campus"?

20         A    Yes.

21         Q    And that's a two-page document?

22         A    Yes, it is.

23         Q    And on the second page of the

24    document, bottom left-hand, is that your

25    signature?
```

74

```
 1          A     Yes.
 2          Q     And underneath your signature, what
 3     does it say?
 4          A     "Intern, Troy University, Dothan
 5     campus."
 6          Q     It also states your name, does it
 7     not?
 8          A     Yes.
 9          Q     But it identifies you as an intern?
10     Correct?
11          A     Yes.
12          Q     Does the document that you hold
13     appear to be a true and correct copy of this
14     internship agreement?
15          A     It appears to be.
16          Q     Okay.  Did you fulfill all the
17     obligations imposed on you by that agreement?
18          A     I was terminated from my
19     internship.  So, some of -- let me see here.
20     So, I was not able to complete some of the
21     items.
22          Q     Okay.  Before you were terminated
23     from the internship, did you complete all the
24     obligations imposed on you by that agreement?
25     The ones that could be completed without
```

1    completing the internship.  The ones that

2    could be done.  Does that question make sense

3    to you?

4        A    Just a moment.  (Witness reviewing

5    document.)  I was in the process of

6    completing things.  Do you want me to explain

7    that?

8        Q    Sure.

9        A    Okay.  For instance, the log that

10   was provided to record the time spent in Mr.

11   Strange's room, yes, I was doing that.

12       Q    Did you visit Mr. Strange's

13   classroom one period each week?  Do you see

14   that in 3(b)?

15       A    I visited his class as often as he

16   gave me permission to.  Because, some days,

17   he would be in a classroom when I -- let's

18   say, for instance, I had my planning period.

19   Okay.  So, rather than go into his classroom

20   where he might have been -- you know, as an

21   inclusion teacher, I couldn't do that.  So,

22   he would make arrangements with me when we

23   could meet.

24       Q    Okay.  Would you agree with me that

25   Defendant's Exhibit 6, paragraph 3(b),

76

```
1   required you to visit Mr. Strange's classroom
2   one period each week?
3        A    Yes.
4        Q    That says that in plain, clear
5   English, doesn't it?
6        A    Yes.  And what would happen there
7   is, Mr. Strange and I would make arrangements
8   for me to come when -- at a convenient time
9   for both of us.
10       Q    So, you did your best to comply
11  with that responsibility you had?
12       A    Yes, I did.
13       Q    Okay.  And then, if I understood
14  you correctly earlier, you did your best to
15  use these log forms to record that time?
16       A    That is correct.
17       Q    Where are these log forms?
18       A    The log forms were no longer needed
19  when my internship was terminated, and so, I
20  wasn't required to turn those in.
21       Q    They were in your possession?
22       A    They were actually in Mr. -- no.
23  Excuse me.  They were probably in my
24  possession, and then, when I would go to his
25  class, he would sign off.
```

1    she didn't.  I'm just saying I do not recall

2    that.

3        Q    Okay.  Well, do you recall them

4    saying that persons at Troy State decided if

5    you passed or failed your internship?

6        A    Yes.  And technically, from the

7    internship handbook, yes, I mean, that was

8    what I was -- the understanding.

9        But when I was being threatened with

10   failing my internship, it was implied that

11   Mr. Pitchford -- I had better go back and

12   make Mr. Pitchford a happy camper, so that I

13   would pass my internship.  So, you know, he

14   was going to influence it one way or another,

15   naturally.

16       Q    You're saying that your internship

17   handbook indicates that that's a decision by

18   Troy State, whether you pass or fail?

19       A    That's correct.

20       Q    And you had access to this

21   handbook?

22       A    Yes.

23       Q    All right.  26.  26 is a letter

24   dated October 18, 2004, from Pamela Parris to

25   Kenneth Lord?

1      A    That's correct.  They informed me,
2  and then, I got a copy.
3      Q    And the second sentence of the
4  letter states, "The purpose of this letter is
5  to inform you that her internship" -- that's
6  your internship --
7      A    Correct.
8      Q    -- "was terminated effective
9  October 14, 2004."
10      A    Correct.
11      Q    "Mrs. Miller was notified of this
12  decision during a meeting at the university
13  on October 14, 2004."
14      A    That's correct.
15      Q    All right.  So, that gives us a
16  specific date for this meeting?  Correct?
17      A    That is correct.
18      Q    All right.  And that's the meeting
19  where you and your husband were present, and
20  you were informed that your internship had
21  been terminated?
22      A    Correct.
23      Q    And, again, that meeting involved
24  you, your husband, Ms. Parris, and who else?
25      A    Dr. Ruediger.

1    was the terminology that she used.  And

2    Dr. Jones -- it's my understanding that

3    Dr. Jones, rather than Ms. Parris, actually

4    made the decision to administratively

5    withdraw me from my internship, instead of

6    failing, that I had been threatened with.

7        Q   Well, what's your understanding of

8    who got to make the decision whether you

9    passed or failed?

10        A   Ordinarily, it's my understanding

11    that Ms. Parris made the decision, normally.

12        Q   Because she was the director of the

13    internship program?

14        A   Correct.  That's my understanding.

15        Q   All right.  Apparently, this

16    information there about you being

17    administratively withdrawn was communicated

18    to you on the 14th?

19        A   Yes.

20        Q   Okay.  You go on, in Defendant's

21    27, to request basically that you get another

22    internship?

23        A   Right.  I had choices that were

24    given to me.  It's rare that they offer a

25    student another opportunity for an

```
 1    at Beverlye Middle School?

 2         A    Yes, I did.

 3         Q    And successfully completed that?

 4         A    Fabulously successful.

 5         Q    28.   This is a letter from Kenneth

 6    Lord to you, dated October 19, 2004?

 7         A    That's correct.

 8         Q    Did you actually receive that

 9    letter?

10         A    Yes, in my hand.

11         Q    It says, right at the top, "hand

12    delivery."

13         A    Yes, absolutely.

14         Q    It does say that.

15         A    Yes.

16         Q    And you received that?

17         A    Yes, I did.

18         Q    And it informs you that because

19    your internship has been terminated or

20    whatever, administratively withdrawn -- it

21    uses the phrase "terminated" --

22         A    Right.

23         Q    -- that that terminates your

24    employment internship agreement with Houston

25    County Schools.
```

1      A      That's what they have written.

2  Yes.

3      Q      That's what the document says?

4      A      That is correct.

5      Q      Okay.  I take it, from your

6  sentence, that you disagree with that?

7      A      Yes.  And so did AEA.

8      Q      Yes, ma'am.  But I can't take AEA's

9  deposition.  When your internship was

10  terminated, or you were administratively

11  withdrawn, how many days of the internship

12  had you completed?

13      A      I don't know the exact number of

14  days.  It was from August 1st, when the

15  actual first day of school started, I

16  believe, through October 20th -- or to

17  October 20th.  I received this on the 20th,

18  the morning of the 20th, if I'm not mistaken.

19      Q      Did you complete all of the days of

20  the internship?

21      A      No.

22      Q      Okay.  Did you complete all 485

23  hours of the internship?

24      A      I'm not sure how many hours it

25  actually --

1  you only had between 19 and 22 students on

2  your roll?

3      A    On my roll.

4      Q    Going back to that planning period

5  you had first block.  Would that also be one

6  of the times that you would have your

7  meetings with Mr. Strange that you discussed

8  with us earlier?

9      A    Yes.  If he was available, yes.

10     Q    Okay.  And so, you had that first

11 block available every day on your schedule,

12 as your planning period?

13     A    Correct.

14     Q    So, you and Mr. Strange would just

15 coordinate which of those -- you know, which

16 day during the week you all could meet, and

17 it might be during your first block planning

18 period?

19     A    Correct.

20     Q    And just in coordination with his

21 schedule?

22     A    Correct.

23     Q    Second block, whose class were you

24 in?

25     A    That would have been -- let me

1    think -- Ms. Sims' class.

2         Q    English?

3         A    Yes.  Or Ms. Ezell's class.

4         Q    Science?

5         A    Correct.

6         Q    Were there particular grade levels

7    in the English class?  Was it, like, 9th

8    grade English or composition or --

9         A    Gosh.  I don't recall.  I'm sorry.

10        Q    What about the science class, Ms.

11   Ezell's second block?  Was it a particular

12   grade level?

13        A    Again, I don't recall.

14        Q    Okay.  Was there a reason why you

15   weren't specifically designated to be in Ms.

16   Sims' class every day during second block?

17        A    Because there were a number of

18   special ed students in her class as well as

19   Ms. Ezell's class.  So, we needed to serve as

20   many as possible.  So, that was the way they

21   asked me to take care of my teaching for that

22   second block.

23        Q    Okay.  And then, third block, whose

24   classroom were you in?

25        A    Ms. Towns.

```
 1          Q     She's math?

 2          A     Math.  Uh-huh.

 3          Q     And she's the class where you had

 4    at least one of your evaluations by

 5    Dr. Ruediger?

 6          A     Dr. Ruediger.  Yes, that's correct.

 7          Q     And then, fourth block, whose class

 8    were you in?

 9          A     Ms. Ezell's.

10          Q     Science?

11          A     Yes.

12          Q     Do you remember the grades that

13    were in that class?

14          A     I know one of the students was

15    classified as a senior.  I believe the other

16    one might not have been a senior.  I'm not

17    really sure.

18          Q     Okay.  The math class, was it a

19    particular grade level?

20          A     I don't recall that, either.  But

21    the majority, if not all of -- the majority

22    of students, I believe, in that class, were

23    on my roll.  And, again, I had 7th, 8th, 9th

24    and 10th.  So, I know that's -- the classroom

25    of Ms. Towns was basically all special
```

1  education students.

2       Q    Okay.  I believe you testified just

3  a few minutes ago that you had 9th through

4  12th graders on your roll?

5       A    That's correct.

6       Q    And then, now, you just said you

7  had 7th, 8th, 9th and 10th.

8       A    I apologize.  That a mistake.

9  It's 9th, 10th, 11th and 12th.

10      Q    Okay.  Were there only four blocks

11 in a day?

12      A    Yes.

13      Q    Would the third block be the block

14 that you had your lunch period, also?

15      A    That is correct.

16      Q    So, that was sort of a split class?

17      A    Correct.

18      Q    So, the three teachers to whom you

19 were designated as sort of being assigned to

20 their classrooms during the day were Sims,

21 Towns and Ezell?

22      A    Yes.

23      Q    Then, your first period, you might

24 float between other teachers?

25      A    Correct.

1        Q    Or you might stay in your resource

2    room, and teachers would send students to

3    you?

4        A    Correct.

5        Q    And in all four of those blocks,

6    you were -- I think your term has been

7    essentially servicing or, I mean, teaching

8    special education students?  Correct?

9        A    Uh-huh.  I was in the role of a

10    collaborative special education teacher.  And

11    the general education teacher gives the

12    actual lesson, and then, I help the students.

13    On the days that I was designated to have an

14    observation, I would actually teach the

15    class.

16        Q    Okay.  And then, also, not only

17    being in the classroom as part of your

18    collaborative effort with the classroom

19    teachers, you also assisted the classroom

20    teachers by allowing the students who, I

21    assume, needed the accommodation, to be sent

22    to the resource room to take a particular

23    test?

24        A    That's correct.

25        Q    Would they come into the resource

1    room to do other things besides taking the

2    test?

3         A    Sometimes I would bring students in

4    to -- like, if Ms. Ezell had an assignment --

5    let me back up.  Did you actually mean just

6    first block?

7         Q    No, ma'am.  Any time during the

8    day.

9         A    Okay.  Good.  No.  There were times

10   when I would take students out of Ms. Ezell's

11   class to work on assignments, to read some of

12   the material, because some of them could not

13   read well, and that sort of thing.  What

14   else?  Generally just help the students.

15        Now, Ms. Towns' class, I didn't do that

16   initially.  It wasn't until -- let me think.

17   I want to say it wasn't until after

18   September, when I went to Mr. Andrews, that I

19   was requested to start taking students out of

20   Ms. Towns' class.

21        Q    And you took them to your resource

22   room to help them there?

23        A    Right.

24        Q    All of these activities you've just

25   discussed with us about how you assisted the

```
1    received --
2                MR. BRANTLEY:  Well, I would say
3                she does have personal
4                knowledge.
5            MS. HORTBERG:  She has personal
6                knowledge that there was money
7                being offered to some mentors.
8                But whether or not Paul Strange
9                accepted that money, no, sir,
10               she did not answer that she had
11               personal knowledge of that.
12           MR. FAULK:  Why don't we just cut
13               through.  I mean, do you have
14               any knowledge other than what
15               you've already told Ms.
16               Hortberg?
17           THE WITNESS:  No.
18       Q    (By Ms. Hortberg)  And I believe
19   you testified earlier that Paul Strange and
20   you coordinated to meet on a regular basis,
21   and you all just got together on your
22   schedules to do that, and that he also sat
23   down with you one day to discuss how to
24   prepare an IEP?
25       A    Yes.
```

1    Q    Okay.  What other sorts of things

2    did you and Mr. Strange discuss as far as his

3    mentoring you as a special education teacher?

4    A    One day, he had me come into his

5    room, and he was doing a math lesson.  I

6    believe it was for Ms. Pitchford's class,

7    some of the students in Ms. Pitchford's

8    class.  And I would observe that sort of

9    scenario.

10                    (Brief off-record.)

11    A    We discussed, not in great detail

12    or anything, how to write lesson plans and

13    that sort of thing.  When I was in school, we

14    wrote lesson plans, but they were specific

15    things.

16        And in this scenario, I wasn't given any

17    kind of lesson plans or anything on a regular

18    basis until we were able to work that out

19    with the teachers, requesting that sort of

20    thing.  So, he would try to show me what

21    needed to be included in a lesson plan and,

22    you know, things like that.

23    Q    Okay.  And he also did that

24    evaluation of you?

25    A    Yes.

1    Q And did you all have the same sort

2 of debriefing after that evaluation that you

3 had with Dr. Ruediger?

4    A Mr. Strange and I, yes, we would --

5 to my recollection, we would talk about the

6 observation.

7    Q Okay.  And I believe, of the two --

8 or of the three evaluations that you had

9 during the course of your internship, Mr.

10 Strange was the one that gave you the highest

11 ratings?  Correct?

12    A Yes, I believe so.

13    Q And none of those observations,

14 either by Dr. Ruediger or by Mr. Strange,

15 ever occurred in Stacey Ezell's class?

16 Correct?

17    A That's correct.

18    Q Do you know whether Dr. Ruediger

19 ever spoke with any of the other teachers

20 beyond the teacher in whose class you were

21 doing the teaching, as part of his

22 evaluation?

23    A No.  But I do know that he

24 conferenced -- the day that he came after I

25 had visited central office, he conferenced

1    with Mr. Pitchford during our lunch break.

2    That's what he told me he was going to do.

3        Q    Okay.  But, I guess, going back to

4    that original question, the day that

5    Dr. Ruediger came to evaluate you in Ms.

6    Towns' math class, as part of that evaluation

7    or as part of his rating, was he going to

8    talk to Ms. Sims or Ms. Ezell about your

9    teaching in their classes?

10       A    No.  It was my understanding that

11   it's only the observation done on that

12   particular day, at that particular time.

13       Q    And not in conjunction with any

14   input from any of the other teachers?

15       A    Correct.

16       Q    Okay.  And I know we've gone on ad

17   nauseam about your discussions with various

18   people about your concerns about alleged

19   deficiencies with the special education

20   program at Houston County High School.  Did

21   you ever take those concerns to any Houston

22   County Board of Education meeting?

23       A    No.

24       Q    Did you ever take those concerns to

25   any public meeting?

1          A    No.

2          Q    Did you ever prepare a petition to

3     take out to the community to get them to sign

4     to join with you in your concerns about the

5     special education program?

6          A    No.  I was only there such a short

7     time, I felt that I could --

8               MR. FAULK:  The answer is "no."

9               THE WITNESS:  Okay.  No.  Thank

10                   you.

11              MR. FAULK:  Sorry.

12              THE WITNESS:  It's okay.  Thank

13                   you.

14         Q    Have you told us today all of the

15    people with whom you've spoken about your

16    concerns about the special education program

17    at Houston County High School?

18         A    To my recollection?

19         Q    Yes.

20         A    Yes, to my recollection.

21         Q    And you do not have any knowledge

22    about how the special education programs were

23    being administered at any other school within

24    the Houston County system.  Just the Houston

25    County High School where you were?  Correct?

STATE OF ALABAMA

HOUSTON COUNTY


I, Stacey Watkins, RPR, and Notary

Public, State at Large, do hereby certify

that the foregoing transcript, pages 1

through 389, is a true and correct transcript

of the testimony and proceedings taken at

said time and place; and that the same was

taken down by me in stenograph shorthand,

and transcribed by me personally or under

my personal supervision.

I further certify that I have no

interest in this matter, financial or

otherwise, or how it may develop or what

its outcome may be.  I further certify that

I am not of counsel for any of the parties,

nor am I related to counsel or litigants or

associated with anyone connected with this

cause to my knowledge.

Witness my hand this 19th day of july,

2007.

_____
RPR, Notary Public,
State at Large

# 8/23/07 Deposition of Nancy Miller

1                IN THE U. S. DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                     SOUTHERN DIVISION

4

5   NANCY MILLER,

6        PLAINTIFF,

7      VS.                    CASE NO.1:06-CV-940-WKW

8   HOUSTON COUNTY BOARD
    OF EDUCATION, KENNETH
9   LORD, RILEY JOE ANDREWS,
    TIM PITCHFORD, PAUL
10  STRANGE, STACY EZELL,
    TROY UNIVERSITY, DOTHAN,
11  SANDRA JONES, PAM PARRIS
    and GREG RUEDIGER,

12
        DEFENDANTS.
13

14      The continuation of the deposition of

15  NANCY MILLER, taken by the Defendants,

16  pursuant to the Federal Rules of Civil

17  Procedure, before Stacey Watkins, RPR, and

18  Notary Public, State at Large, at the offices

19  of Hardwick, Hause, Segrest & Walding,

20  Dothan, Alabama, on the 23rd day of August

21  2007, at 10:15 a.m., CDT, pursuant to notice.

22

23

24                                    COPY

25

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4    MR. WINN FAULK
      Attorney at Law
 5    Montgomery, Alabama

 6    MR. THOMAS K. BRANTLEY
      Attorney at Law
 7    Dothan, Alabama

 8

      FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9    KENNETH LORD, RILEY JOE ANDREWS AND
      TIM PITCHFORD:
10
      MR. KEVIN WALDING
11    MR. PATRICK B. MOODY
      Attorneys at Law
12    Dothan, Alabama

13
      FOR PAUL STRANGE AND STACEY EZELL:
14
      MS. KATHERINE HORTBERG
15    Attorney at Law
      Chelsea, Alabama
16

17    FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
      PAM PARRIS AND GREG RUEDIGER:
18
      MR. JOSEPH V. MUSSO
19    Attorney at Law
      Birmingham, Alabama
20

21    ALSO PRESENT:

22    KENNETH LORD
      PAUL STRANGE
23    STACEY EZELL

24

25
```

```
 1                      STIPULATION

 2

 3          It is stipulated by and between counsel

 4     for the parties that this deposition be taken

 5     at this time by Stacey Watkins, RPR, and

 6     Notary Public, State at Large, who is to act

 7     as commissioner without formal issuance of

 8     commission to her; that said deposition shall

 9     be taken down stenographically, transcribed,

10     and certified by the commissioner.  The

11     signature of the witness is waived.

12          Except for objections as to the form of

13     questions, no objections need be made at the

14     time of the taking of the deposition by

15     either party, but objections may be

16     interposed by either party at the time the

17     deposition is read into evidence, which

18     shall be ruled upon by the Court on the

19     trial of the cause upon the grounds of

20     objection then and there assigned.

21

22

23

24

25
```

```
 1                    NANCY MILLER

 2   having been first duly sworn, testified as

 3   follows, to-wit:

 4

 5                    EXAMINATION

 6

 7   BY MR. MUSSO:

 8        Q    Mrs. Miller, my name is Joe Musso,

 9   and I was here at your last deposition.  I

10   represent Troy University, Dr. Ruediger, Pam

11   Parris and Dr. Jones.

12        Now, the same rules apply for this

13   deposition as the last one.  If you don't

14   understand one of my questions, please let me

15   know.  Otherwise, I would assume that you

16   would.  Is that fair?

17        A    That's fair.

18        Q    Is there any reason today why you

19   can't give complete, truthful, honest

20   answers?

21        A    No.

22        Q    Now, I'm going to do my best to try

23   not to repeat very much of the last

24   deposition.  I went through it yesterday very

25   carefully.  So, maybe we can get out of here
```

1    believe, as well.

2         Q    And do you have knowledge whether

3    any teacher had any access to read that?

4         A    The only person that I was aware of

5    was Dr. Jones.

6         Q    But you did have knowledge that she

7    had access to it?

8         A    Yes.  She was the head of the

9    class.

10        Q    Was she the actual teacher of the

11   class?

12        A    Yes.

13        Q    Was that the class that you

14   ultimately would receive a grade in for being

15   an intern?

16        A    No.  This was a separate --

17        Q    Separate class?

18        A    Separate class.  Uh-huh.

19        Q    Now, the internship, was that a

20   pass/fail type of course, or was it actually

21   a graded course, be it A, B, C or D?

22        A    I believe it was a pass/fail, but

23   I'm not 100 percent sure.

24        Q    And what about the separate class

25   that you had with Dr. Jones?

63

```
1   him leave in his car from campus.
2        Q    And Amy Deese was a fellow intern?
3        A    She was another situation like
4   mine, where she was a paid intern.  Yes.
5        Q    And what did she teach?
6        A    English.
7        Q    English.  Did anyone else at Troy
8   have any knowledge about anyone at the
9   Houston County School System leaving early?
10       A    I don't know.
11       Q    And Mr. Payne, do you know whether
12  he was on his lunch hour?
13       A    It was not lunchtime.
14       Q    It wasn't lunchtime?
15       A    No.
16       Q    Do you know one way or the other
17  whether he had asked for any permission to do
18  that?
19       A    Not to my knowledge.
20       Q    Now, as we sit here today, do you
21  know who actually made the decision to
22  administratively withdraw your internship?
23       A    I don't know for sure.
24       Q    Did anyone tell you that someone
25  made that decision?
```

```
 1        And, again, I'm not asking you to guess.
 2        But, did you ever go to Dr. Morin and
 3        complain about anything that Dr. Jones did,
 4        Dr. Ruediger did, or Pam Parris did?
 5             A    No.
 6             Q    Is there any specific reason you
 7        didn't?
 8             A    I tried to keep everything at the
 9        very lowest level.  And I figured she would
10        know about it, anyway.  Because, as a
11        military wife, the chain of command, I'm
12        familiar with.
13             Q    Do you know, one way or the other,
14        whether she did know about it?
15             A    From the times I've seen her since
16        my internship, I don't think she knows.
17                  MR. FAULK:  You're talking about
18                  Dr. Morin, now?
19                  MR. MUSSO:  Yes.
20                  THE WITNESS:  Yeah.  Dr. Morin.
21             A    I didn't get the impression that
22        she knew everything that had gone on.  I got
23        the impression that she knew what they wanted
24        her to know.  That was just my impression.
25             Q    And when you got that impression,
```

1    or administrative member, or a Troy

2    University student, anything with regard to

3    any noncompliance issues that occurred at

4    Houston County High?

5         A    Not to my recollection.

6              MR. BRANTLEY:  And you can take

7                   your time and think, if you

8                   want to.

9         A    Not to my recollection.

10        Q    So, you didn't go to any newspaper?

11        A    No.

12        Q    You didn't go to any parent/teacher

13   group?

14        A    No.

15        Q    You didn't call any parent of any

16   student?

17        A    No.  I did not call the department

18   of education.  No.

19        Q    You didn't go to any member of the

20   press, be it in print --

21        A    No.

22        Q    It's not something you put on the

23   internet for the world to see?

24        A    No.

25        Q    Did you actually go to any open

board meeting?

     A    No.  I tried to keep it on the lowest level possible.

     Q    And I think you said you've never met Mary -- is it Brazzelle?

     A    Brazzelle.  No, I've never met her.

     Q    And I know you said you kept it on the lowest possible.  So, that means you never complained to anyone above Dr. Jones, say, to the provost or anyone else?

     A    No.

     Q    The vice president over at Dothan or anyone like that?

     A    No.

                    (Recess for lunch.)

     Q    After you learned that your internship had been administratively withdrawn, did you ever return to the Houston County High School?

     A    Yes.

     Q    Okay.  And what did you do?  Did you actually do any teaching, or did you just pick up your materials and leave?  Explain what happened.

     A    No.  I was back teaching again.

```
 1   STATE OF ALABAMA

 2   HOUSTON COUNTY

 3

 4        I, Stacey Watkins, RPR, and Notary

 5   Public, State at Large, do hereby certify

 6   that the foregoing transcript, pages 1

 7   through 174, is a true and correct transcript

 8   of the testimony and proceedings taken at

 9   said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under my

12   personal supervision.

13        I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21        Witness my hand this 10th day of

22   September, 2007.

23

24   _____

25   RPR, Notary Public,
     State at Large
```

# Deposition of Paul Strange

1          IN THE U. S. DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5   NANCY MILLER,

6        PLAINTIFF,

7    VS.                    CASE NO.1:06-CV-940-WKW

8   HOUSTON COUNTY BOARD
    OF EDUCATION, KENNETH
9   LORD, RILEY JOE ANDREWS,
    TIM PITCHFORD, PAUL
10  STRANGE, STACY EZELL,
    TROY UNIVERSITY, DOTHAN,
11  SANDRA JONES, PAM PARRIS
    and GREG RUEDIGER,

12       DEFENDANTS.

13

14       The deposition of PAUL STRANGE, taken

15  by the Plaintiff, pursuant to the Federal

16  Rules of Civil Procedure, before Stacey

17  Watkins, RPR, and Notary Public, State at

18  Large, at the offices of Hardwick, Hause,

19  Segrest & Walding, Dothan, Alabama, on the

20  27th day of September 2007, at 9:00 a.m.,

21  CDT, pursuant to notice.

22

23

24                              COPY

25

```
 1    APPEARANCES:

 2


 3    FOR THE PLAINTIFF:

 4    MR. WINN FAULK
      Attorney at Law
 5    Montgomery, Alabama

 6    MR. THOMAS K. BRANTLEY
      Attorney at Law
 7    Dothan, Alabama

 8
      FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9    KENNETH LORD, RILEY JOE ANDREWS AND
      TIM PITCHFORD:
10
      MR. KEVIN WALDING
11    MR. PATRICK B. MOODY
      Attorneys at Law
12    Dothan, Alabama

13
      FOR PAUL STRANGE AND STACEY EZELL:
14
      MS. KATHERINE HORTBERG
15    Attorney at Law
      Chelsea, Alabama
16

17    FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
      PAM PARRIS AND GREG RUEDIGER:
18
      MR. JOSEPH V. MUSSO
19    Attorney at Law
      Birmingham, Alabama
20

21    ALSO PRESENT:

22    NANCY MILLER
      KENNETH LORD
23    STACEY EZELL

24

25
```

```
 1                    STIPULATION

 2

 3         It is stipulated by and between counsel

 4    for the parties that this deposition be taken

 5    at this time by Stacey Watkins, RPR, and

 6    Notary Public, State at Large, who is to act

 7    as commissioner without formal issuance of

 8    commission to her; that said deposition shall

 9    be taken down stenographically, transcribed,

10    and certified by the commissioner.  The

11    signature of the witness is waived.

12         Except for objections as to the form of

13    questions, no objections need be made at the

14    time of the taking of the deposition by

15    either party, but objections may be

16    interposed by either party at the time the

17    deposition is read into evidence, which

18    shall be ruled upon by the Court on the

19    trial of the cause upon the grounds of

20    objection then and there assigned.

21

22

23

24

25
```

```
1                        PAUL STRANGE

2      having been first duly sworn, testified as

3      follows, to-wit:

4

5                        EXAMINATION

6

7      BY MR. FAULK:

8           Q     State your full name for us,

9      please, sir?

10          A     Paul Wayne Strange.

11          Q     Mr. Strange, we've been introduced

12     in prior meetings, but I'm Winn Faulk.  Along

13     with Tom Brantley, I represent the plaintiff,

14     Nancy Miller.  You were present during both

15     phases of Mrs. Miller's deposition, weren't

16     you?

17          A     Yes, sir.

18          Q     Do you recall, in general, the

19     instructions that your attorney and the other

20     attorneys gave Mrs. Miller about the idea

21     this is not an endurance test, and if you

22     need a break or something like that, just let

23     us know, and we'll be glad to give you one?

24     I don't want to go through all that.  But, do

25     you understand that?
```

1    regulations governing special education?

2              MS. HORTBERG:  Object to the form.

3       A    I mean, what would she have

4    reported?

5       Q    Well, are you saying she didn't

6    report to you any concerns about possible

7    noncompliance with the special education laws

8    and regulations?  And let me be sure you're

9    understanding me, Mr. Strange.

10      A    I'm not.

11      Q    I'm not asking you whether you

12   agreed with her assertions, and I'm not

13   asking you to agree with her assertions.  I'm

14   just asking you, right now, is it a fact

15   that, from time to time during her

16   internship, she reported things to you that

17   she said she felt were somehow noncompliant

18   with the special education laws and

19   regulations?

20             MS. HORTBERG:  Object to the form.

21      A    She reported that the inclusion

22   strategies were not being followed.  She

23   reported that the model, the inclusion model,

24   was not being followed.

25      Q    And tell me, please, sir, what you

1       Q    Or who showed it to you?

2       A    No, sir.

3       Q    Was that the only concern of that

4 nature -- and by "that nature," I'm talking

5 about compliance with special education

6 program regulations -- that Mrs. Miller ever

7 expressed to you?

8            MS. HORTBERG:  Object to the form.

9       A    Yes, sir.

10          MR. FAULK:  May I ask the ground of

11              your objection, please?

12          MS. HORTBERG:  I don't know that

13              what you just categorized that

14              is a good categorization of

15              what he just testified to.

16       Q    Did she ever report anything else

17 to you concerning the special education

18 program?

19       A    I just -- I can't remember.

20       Q    Take a look at paragraph 17 of both

21 documents, please, sir.  In the complaint, it

22 reads, "Plaintiff reported, among other

23 shortcomings, individualized education

24 programs, IEP's, were being either not

25 prepared, wrongly prepared, or even

1      Q    Okay.  We're talking still about

2  the first part of paragraph 17 of the

3  complaint, and we're talking about -- well,

4  first, let me divert from this just a second.

5  Tell us, please, what your job is?

6      A    I'm assistant principal at

7  Cottonwood High School.

8      Q    And are you no longer involved

9  directly in special education?

10     A    I still attend meetings.

11     Q    At the time Mrs. Miller was serving

12 her internship at Houston County High School,

13 were you involved in special education?

14     A    I was.  Yes, sir.

15     Q    In what capacity?

16     A    Special ed teacher.

17     Q    Okay.  And how long had you been a

18 special ed teacher, not just at Houston

19 County High School, but anywhere,

20 approximately?

21     A    Seven years.

22     Q    Okay.  Was that all in Houston

23 County?

24     A    Yes.

25     Q    And what educational background did

```
1    you have to qualify you as a special ed

2    teacher, please?

3         A    College education.

4         Q    In what field?

5         A    Special ed.

6         Q    That was your major in college?

7         A    One of them.  Yes, sir.

8         Q    And where did you get that degree?

9         A    From Troy.

10        Q    And when did you get it?

11        A    Early 2000.

12        Q    Do you remember approximately what

13   your GPA was?

14        A    No, sir.

15        Q    Did you receive any academic honors

16   at that school in connection with special

17   education?

18        A    No, sir.

19        Q    You were, however, certified at

20   that time as a special education teacher?

21   Correct?

22        A    Yes, sir.

23        Q    And fully qualified, so far as you

24   know and so far as the State of Alabama was

25   concerned, to teach special education?
```

1           A     Yes.

2           Q     Tell us, please, sir -- and have I

3    correctly named this thing we've all been

4    calling IEP as individualized education

5    program?  Is that the correct name for it?

6           A     Individualized education plan.

7           Q     Plan.  Okay.  So, where we say

8    "program," it should say "plan."  Tell us,

9    please, for the Court, what an individualized

10   education plan is?

11          A     It's a plan that's developed for

12   special ed kids.

13          Q     Okay.  And to --

14          A     To help with their education.

15          Q     And you are familiar with those

16   plans and how they are to be prepared, aren't

17   you?

18          A     Yes, sir.

19          Q     And you were at the time Mrs.

20   Miller was an intern, weren't you?

21          A     Yes, sir.

22          Q     Okay.  And your testimony today is

23   that, at the time she was an intern, whether

24   she reported it to you or not, you never saw

25   any instances at Houston County High School

```
1              MR. WALDING:  Object to the form.
2              MS. HORTBERG:  Object to the form.
3      A    Yeah.  I have no recollection.
4      Q    Okay.  And is it also correct that
5  you -- I may be misremembering this.  You
6  testified as to your recollection as to what
7  Mrs. Miller told you on that subject?
8  Correct?  You've already told us about that?
9      A    On what subject?
10     Q    On this thing about full inclusion
11 versus keeping the kids in the resource room.
12 It seems to me I recall --
13             MS. HORTBERG:  I'm sure the
14                 transcript will indicate.
15     Q    Let me ask you --
16             MR. FAULK:  If you don't mind me
17                 asking him again, in case he
18                 hasn't testified to it.
19     Q    What do you recall, if anything,
20 about Mrs. Miller telling you about some
21 concern on this subject of full inclusion
22 versus the resource room for students?
23     A    That the model was not being
24 followed.  Yes, sir.
25     Q    And did you look into that concern
```

1    at all to see whether it was a valid concern?

2        A    I did.

3        Q    And what did you find?

4        A    That it was being followed

5    properly.

6        Q    Okay.  In looking into it, what did

7    you do to look into it?

8        A    I notified Mr. Pitchford.

9        Q    Then, was your basis for saying it

10   was being properly followed based on

11   information Mr. Pitchford gave you?

12       A    Yes.

13       Q    So, she came to you, and you went

14   to Pitchford, and Pitchford got back to you

15   and said, no, it's being followed, or words

16   to that effect?

17            MS. HORTBERG:  Object to the form.

18       Q    And don't let me put words in your

19   mouth.  I'm really not trying to trick you or

20   something.  If you want to tell me, then,

21   just in your own words, what happened, I'll

22   be glad to sit here and listen.

23            MS. HORTBERG:  I object to the

24            form.  I don't understand what

25            question is on the table.

1    something about looking into it to see

2    whether she was right or not?

3         A    No.  I did not --

4         Q    So, if I thought that --

5         A    I did not look into it to see if it

6    was right.  No.

7         Q    Did you ever discuss her concern

8    with Mr. Pitchford?

9         A    Yes.

10        Q    Okay.  And so, when I say "look

11   into it," am I just using confusing language?

12             MS. HORTBERG:  Object to the form.

13        Q    Did you do anything to investigate

14   her concern other than talk to Mr. Pitchford?

15             MS. HORTBERG:  Object to the form.

16        A    I can't remember if I did anything

17   or not.  I mean, I --

18        Q    When you talked to Mr. Pitchford

19   about this subject, was anyone else present?

20        A    I can't remember if anyone was

21   there or not.

22        Q    Okay.  Do you remember where you

23   talked to him?

24        A    No.  It was at school.

25        Q    And do you remember when you talked

```
 1   today, that the inclusion model was being
 2   properly followed?
 3             MR. WALDING:  Object to the form.
 4        A    Is it my opinion that it was being
 5   followed?
 6        Q    Yes, sir.  As a special education
 7   teacher at Houston County Board of Education?
 8        A    Yes.
 9        Q    Okay.  We're still looking at
10   paragraph 17 of the complaint, which is
11   Defendant's Exhibit 5.  The next item on here
12   -- and I'm at the top of page four now.
13   These are things that we allege Mrs. Miller
14   reported to you.  That eight students had not
15   been --
16             MS. HORTBERG:  I --
17             MR. FAULK:  I beg your pardon?
18             MS. HORTBERG:  I'm going to object.
19                  I don't believe it says in here
20                  that she reported this to Mr.
21                  Strange.  It says she reported
22                  it.  But that is not the
23                  wording of paragraph 17, if
24                  we're going by your complaint.
25             MR. FAULK:  Well, we disagree.  If
```

1          you read it in context with

2          paragraph 16 --

3          MS. HORTBERG:  We're looking at

4          paragraph 17, according to your

5          questions.

6          MR. FAULK:  Fine.  I'll ask it

7          another way.

8     Q    Mr. Strange, did Mrs. Miller ever

9  report to you that there were students who

10  had not been given special education history,

11  although their IEP's called for such a

12  course?

13     A    Not that I remember.

14     Q    Do you have any independent

15  knowledge of that situation, whether she

16  reported it to you or not?

17     A    No.

18     Q    Mr. Strange, have you looked at any

19  documents whatsoever to prepare yourself for

20  your deposition today?

21     A    I have.

22     Q    And what did you review in

23  preparation for it?

24     A    What did I review?

25     Q    Yes, sir.

1    about any students whose IEP's called for

2    special education history who were not

3    receiving that course?  You don't know any

4    more about that?

5        A    No.

6        Q    All right.  We allege that she

7    reported that two science teachers had

8    requested not to have a special education

9    teacher in their classes, although they both

10    had special education children in their

11    classrooms.  Do you see that allegation?

12        A    Yes, sir.

13        Q    All right.  Tell us what you know

14    about that, please?

15        A    I don't know anything about it.

16        Q    No one ever brought that

17    circumstance or anything of that nature to

18    your attention?

19        A    No.

20        Q    That at least one special education

21    student with mental retardation had been

22    failed because the teacher declared that the

23    child was, quote, Just lazy and didn't do his

24    work, close quote, despite such teacher's

25    knowledge from the child's file that the

1    A    Are you asking me were there 57
2  special ed students with no IEP's?
3    Q    Yes.
4    A    No, there were not 57 students.
5    Q    Okay.  Fine.  Were there some
6  special education students, to your
7  knowledge, at your school, in August of 2004,
8  who did not have IEP's, who should have had
9  them?
10    A    I don't remember that.
11    Q    Do you recall that there were some
12  special education students at your school,
13  that is, Houston County High School, who did
14  not have current IEP's in their files as of
15  August 2004?
16    A    No, I do not recall that.
17    Q    Do you recall Mrs. Miller ever
18  reporting anything to that effect to you?
19    A    No.
20    Q    And specifically going back to any
21  possible change in the full inclusion
22  expectations, if you will, of the Houston
23  County Board of Education -- well, let me ask
24  you this:  If a student at Houston County
25  High School had, for a period of time, simply

68

```
1    leaving school, do you acknowledge that she
2    informed you that she was leaving school?
3         A    She did not tell me she was leaving
4    school.
5         Q    How did you know she left school on
6    that day?
7         A    When students went to her room and
8    she was not in there, and we could not find
9    her.
10        Q    Okay.  That's the first you knew
11   about it?
12        A    Yes.
13        Q    Let's look at number 2.  I'm going
14   to read it.  "Mrs. Miller accused Paul
15   Strange of entering her locked filing cabinet
16   and placing an IEP in a student folder."  Do
17   you recall that accusation having been made?
18        A    Yes.
19        Q    Was it true?
20        A    No.
21        Q    Did you write this paragraph?  Do
22   you recall?
23        A    The general knowledge of it, yes.
24        Q    Did you report this to someone,
25   other than to put it in this letter?
```

1        A    No.

2        Q    Number 8.  "Not following

3   suggestions provided by Mr. Strange as

4   related to the resource room."  Do you recall

5   whether you added that statement to this

6   letter?

7        A    I did.

8        Q    Okay.  And tell us what the basis

9   for the statement is, please, the factual

10  basis?

11       A    Mrs. Miller came to me stating that

12  the students in biology class was having a

13  difficult time taking in the material, was

14  having a hard time in class.  She felt that

15  they were not learning as well as could be.

16       So, I told her that if she felt that

17  way, then, when the teacher's lesson was

18  over, that we had some AGS books that she

19  could go to and pull references and take them

20  to the resource room, so that they could get

21  their help.  And she refused to do so.

22       Q    Yes, sir.  Tell us what AGS means,

23  please?

24       A    It's a book company that produces

25  books for -- that's used by special ed kids.

```
 1                    understand that it could

 2                    adversely affect her.  I don't

 3                    know how you could properly

 4                    answer that question.

 5              MR. FAULK:  It's not a double

 6                    negative.

 7        Q    Go ahead.

 8        A    Would you --

 9        Q    All right.  Fine.  Did you

10   understand, when you signed this letter, that

11   it could adversely affect her standing as an

12   intern?

13        A    If you're asking me if I thought

14   that was going to affect her internship --

15        Q    Right.

16        A    -- the answer is no.

17        Q    Was your intention, in signing this

18   letter, to get rid of Mrs. Miller as an

19   intern?

20        A    No.

21        Q    Was it your impression that this

22   letter would help her somehow?

23        A    Possibly.

24        Q    In what way?

25        A    By listing my concerns, someone
```

1    would talk with her, and the concerns would

2    be concerns no more.

3        Q    And was that a thought in your head

4    at the time?  Was that your intention in

5    signing this?

6        A    My intention was to list my

7    concerns at the time.

8        Q    Period?

9        A    Yes.

10       Q    And that was your purpose in

11   signing this?

12       A    Yes.

13       Q    Did you send Mrs. Miller a copy of

14   this?

15       A    No.

16       Q    I'm sorry.  I said page seven.  I

17   meant page six in the answer, which is

18   Plaintiff's Exhibit 1, in particular, the

19   third affirmative defense, subparagraph (b).

20   The last sentence of that subparagraph.  And

21   I'll read it.  Do you see where it says, "Any

22   statements made by the plaintiff"?

23       A    Yes.

24       Q    "Any statements made by the

25   plaintiff regarding the special education

1    before this year, before this school year?

2         A    Yes, sir.

3         Q    And that's at Cottonwood High

4    School?

5         A    Yes, sir.

6         Q    And prior to this year, when did

7    you teach at Cottonwood High School?

8         A    Last year.  I mean, I don't --

9         Q    Is this your second year at

10   Cottonwood?

11        A    This is my -- this will be my third

12   full year at Cottonwood.

13        Q    And how many full academic years

14   were you employed at Houston County High

15   School?

16        A    I was not employed a full academic

17   year at Houston County High School.

18        Q    So, what was your tenure there,

19   please?

20        A    At Houston County High School?

21        Q    Right.

22        A    August or July of 2004 to January

23   2005.

24        Q    Okay.  And what was the occasion

25   for your being transferred?  What led to your

1      Q    Would it have been any different

2   than the form contract that any teacher

3   signs, other than it had your name on it and

4   the position on it?

5      A    No.

6      Q    You're not aware, then, of the

7   existence of any written job description for

8   special education teachers in the Houston

9   County system?  Is that fair to say?

10     A    Not that I recall.

11     Q    Okay.  With respect to your

12  education, in your answers to

13  interrogatories, number 5, you refer to Troy

14  University Alternative A Program, master's

15  degree in special education.  What does

16  Alternative A mean, please?

17     A    I entered the master's program, and

18  when I graduated, I had a master's degree.

19  That's the Alternative A.

20     Q    But your bachelor's was in business

21  administration from Auburn?

22     A    That's right.

23     Q    When you talked earlier about

24  having had a college degree in special

25  education, you're referring to your master's

1      Q    Would they be any closer than

2  second cousins, by blood or marriage?

3      A    It's very possible.

4      Q    Do you know of any first cousins

5  that you have in any of those counties?

6      A    First cousins, no.

7      Q    Do you know of any first cousins

8  your wife has in any of those counties?

9      A    No.

10     Q    Look at your answer to

11  interrogatory number 20, please, sir, which

12  begins, "I provided support to the plaintiff

13  prior to the withdrawal of her internship."

14  Do you see that?

15     A    I do.

16     Q    "Including meeting with the

17  plaintiff, evaluating her teaching abilities

18  and providing feedback, teaching her to

19  prepare lesson plans and certain special

20  education documents."  What special education

21  documents are you talking about?

22     A    We would go over pages of the IEP

23  to help her with a better understanding of

24  it.

25     Q    Okay.  Any other special education

```
 1                    This has already been put into
 2                    evidence.  So, what's the point
 3                    of just taking excerpts from
 4                    it?  He's provided the
 5                    information in his.  He didn't
 6                    provide this.  You did.
 7               MR.  FAULK:  The defense put it into
 8                    evidence.  And I don't want to
 9                    get off into a little contest.
10          Q    Is there anything you specifically
11     remember as being something expected of you
12     as a cooperating teacher that's not set out
13     in the excerpts I've handed you from
14     Defendant's Exhibit 29, which I'll go ahead
15     and mark as Plaintiff's Exhibit 2?
16               (Whereupon, Plaintiff's Exhibit 2
17                marked for identification.)
18          Q    And your answer may be, "I can't
19     remember."  And if it is, that's fine.  But,
20     if you do remember something else, I would
21     appreciate you telling me.
22          A    This handbook is what I went by.
23               MS.  HORTBERG:  This?
24          A    This handbook is what I went by.
25          Q    As far as you are concerned, you
```

1    followed it to the letter?  Is that fair to

2    say?

3              MS. HORTBERG:  Object to the form.

4        A    It's fair to say that I went by

5    this handbook.

6        Q    To the best of your ability?

7        A    Sure.

8        Q    And you're referring to the entire

9    handbook, Defendant's Exhibit 29?

10       A    Yes, sir.

11       Q    You did take a moment to look over

12   Plaintiff's Exhibit 2, didn't you?

13       A    I did.

14       Q    And, again, I will grant you that

15   if there are other duties of a cooperating

16   teacher in the full exhibit, Defendant's 29,

17   that I've overlooked, I'll take your word for

18   it that you did your best to follow them.

19            But, just as we sit here, does anything

20   come to your mind that I've excluded here?

21   Does it appear to you that I've left anything

22   out that you think was one of your duties as

23   cooperating teacher?

24       A    I do not know.

25            (Recess in deposition from 12:40

1    Exhibit 9.  And I'll ask you, as you're

2    looking at it, is that a copy of an

3    evaluation that you did concerning Mrs.

4    Miller, dated August 30, 2004?

5         A    It is.

6         Q    Do you see, down at the bottom,

7    where it indicates "Next observation,

8    September 13-17," right above her signature?

9    Do you see where I'm talking about?

10         A    I do.

11         Q    Did that mean what it said?  In

12    other words, it was anticipated that you

13    would do another evaluation during that

14    general time frame of September 13 to 17?

15         A    I don't know.  It says that her

16    next observation will be September the 13th

17    through 17th.

18         Q    Okay.  Is that your handwriting

19    that says "Sept."?

20         A    It is.

21         Q    And the dates are your handwriting?

22         A    Yes.

23         Q    The numerical date?

24         A    Yes.

25         Q    So, may we fairly infer from that,

1       A    No.

2       Q    I see, at the top, you circle the

3    number of observations, one through five.

4    Should we infer from that, that, during the

5    normal internship, it was anticipated there

6    would be five?

7            MS. HORTBERG:  Object to the form.

8       A    I don't know.

9       Q    This is a form you would have

10   gotten from Troy State or out of their

11   handbook?  Is that correct?

12      A    Yes, sir.

13      Q    Okay.  Her lowest grade on here was

14   a 3?  Correct?  In fact, most of them are

15   3's.

16      A    There are some 4's and -- 3's and

17   4's.

18      Q    The lowest is a 3?

19      A    Lowest is a 3.

20      Q    And that's average performance,

21   based on your evaluation?

22      A    Yes, sir.  That's what a 3 is.

23      Q    4's are above average performance?

24   Correct?

25      A    Yes.

1    Q    When it says "no," am I correct in

2    understanding that to mean that that was

3    simply an activity that was not observed in

4    the course of this evaluation?

5    A    That's right.

6    Q    And are you trained to do PEPE

7    evaluations, P-E-P-E?

8    A    I am.

9    Q    And were you, at the time you did

10    this evaluation, trained in PEPE?

11    A    No.

12    Q    Okay.  I want to be sure we're

13    clear on the "not observed" entry.  This

14    isn't saying that she should have been doing

15    something and you didn't see it being done.

16    Doesn't it mean that it just wasn't involved

17    in the activity that you observed, and so,

18    therefore, you couldn't evaluate it?

19    A    That's my understanding.

20    Q    Okay.  At the time you did this

21    evaluation, did you have any expectation that

22    Mrs. Miller's internship would turn out to be

23    unsuccessful?

24    A    Are you asking me if I expected her

25    internship to turn out unsuccessful?

1       Q      Right.

2       A      No.

3       Q      So, at least at this point in time,

4    August 30th, you felt like things were at

5    least going all right?

6       A      Yes.

7       Q      Did you, as her cooperating

8    teacher, ever actually observe her again in

9    the same manner that you observed her in

10   preparing this observation report, but just

11   not do a report?  I mean, did you ever have

12   occasion to observe her to this same extent,

13   in the same degree of detail again, after

14   August the 30th --

15      A      Sir, I don't --

16      Q      -- whether you did a report or not?

17      A      I don't remember.

18      Q      In doing this report -- and the

19   activity that leads up to preparing this

20   report is a conscious observation by you,

21   comparable to the type of observation you

22   might do under PEPE?  Is that fair?

23      A      Is it what, now?

24      Q      Where you actually visit a

25   classroom and watch what they're doing on a

1    Yes, that's untrue.

2        Q    Was there anything around that

3    time, mid September 2004, that you recall

4    telling Mrs. Miller that you would like to

5    get feedback from the Troy people about,

6    other than this?

7                MR. WALDING:  Object to the form.

8                He wasn't trying to get

9                feedback as to this.

10               MR. FAULK:  Thank you.

11       Q    Was there something else that she

12   may be talking about, that you recall?

13       A    That I wanted some feedback on?

14       Q    Right.

15       A    Yes.

16       Q    Tell us what that was, please?

17       A    Again, it was in Mrs. --

18   particularly, it was in Mrs. Ezell's class.

19   And Mrs. Miller had stated that she was a

20   collaborative teacher, and she wanted to go

21   into the classroom and teach Mrs. Ezell's

22   class either two or three days a week.

23       Q    She said this to you?

24       A    Yes.  And I wasn't sure -- I mean,

25   I wasn't sure if she was supposed to do that

173

1    that early on.  So, that was some things that

2    I had requested some feedback on.

3        Q    About whether Mrs. Miller could go

4    in and actually teach Mrs. Ezell's class two

5    or three days a week?

6        A    She wanted to teach Mrs. Ezell's

7    class -- say, like, this first week, she

8    wanted to teach Monday, Wednesday, Friday,

9    and Mrs. Ezell teach Tuesday, Thursday.  Then

10   the next week would be the two days, vice

11   versa.

12       Q    And your response to that was,

13   "Well, see what people at Troy have to say,"

14   or words to that effect?

15       A    Yes.

16       Q    But you're steadfast in your

17   testimony that it had nothing to do with Mrs.

18   Ezell ridiculing her students?

19       A    No.

20       Q    You are steadfast in your testimony

21   that it was not?

22       A    Yes.

23       Q    It had nothing to do with it?

24       A    That's right.

25       Q    Okay.  Good.  Did you ever tell

1    Miller fail to follow procedure, in your

2    opinion, on the day that she left campus and

3    went to the central office?

4         A    I don't know that.

5         Q    So, that's not necessarily your

6    opinion, that she failed to follow procedure

7    in leaving campus?

8         A    No.    That's not my opinion.

9              (Recess for lunch from 2:43 to

10               3:05.)

11        Q    Were you paid anything extra for

12   your mentoring of Mrs. Miller?

13        A    No, sir.

14        Q    Have you ever heard Mrs. Miller say

15   that it was her intention to take down

16   Houston County High School, or words to that

17   effect?

18        A    No, sir.

19        Q    Has anyone ever told you that Mrs.

20   Miller had said such a thing?

21        A    Not that I remember.

22        Q    Now, let me take us back to the

23   August 26, 2004 meeting between Dr. Ruediger

24   and Mrs. Miller that you had certain

25   involvement in.    His first observation of

1  STATE OF ALABAMA

2  HOUSTON COUNTY

3

4      I, Stacey Watkins, RPR, and Notary

5  Public, State at Large, do hereby certify

6  that the foregoing transcript, pages 1

7  through 232, is a true and correct transcript

8  of the testimony and proceedings taken at

9  said time and place; and that the same was

10  taken down by me in stenograph shorthand,

11  and transcribed by me personally or under

12  my personal supervision.

13      I further certify that I have no

14  interest in this matter, financial or

15  otherwise, or how it may develop or what

16  its outcome may be.  I further certify that

17  I am not of counsel for any of the parties,

18  nor am I related to counsel or litigants or

19  associated with anyone connected with this

20  cause to my knowledge.

21      Witness my hand this 8th day of

22  October, 2007.

23  _____

24  RPR, Notary Public,
    State at Large
25  ACCR# 155

# Deposition of Tim Pitchford

1          IN THE U. S. DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3            SOUTHERN DIVISION

4

5   NANCY MILLER,

6       PLAINTIFF,

7    VS.            CASE NO.1:06-CV-940-WKW

8   HOUSTON COUNTY BOARD
OF EDUCATION, KENNETH
9   LORD, RILEY JOE ANDREWS,
TIM PITCHFORD, PAUL
10  STRANGE, STACY EZELL,
TROY UNIVERSITY, DOTHAN,
11  SANDRA JONES, PAM PARRIS
and GREG RUEDIGER,
12
       DEFENDANTS.
13

14    The deposition of TIM PITCHFORD, taken

15 by the Plaintiff, pursuant to the Federal

16 Rules of Civil Procedure, before Stacey

17 Watkins, RPR, and Notary Public, State at

18 Large, at the offices of Hardwick, Hause,

19 Segrest & Walding, Dothan, Alabama, on the

20 10th day of October 2007, at 9:00 a.m., CDT,

21 pursuant to notice.

22

23

24                   COPY

25

```
 1    APPEARANCES:

 2


 3    FOR THE PLAINTIFF:

 4    MR. WINN FAULK
      Attorney at Law
 5    Montgomery, Alabama

 6    MR. THOMAS K. BRANTLEY
      Attorney at Law
 7    Dothan, Alabama

 8
      FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9    KENNETH LORD, RILEY JOE ANDREWS AND
      TIM PITCHFORD:
10
      MR. KEVIN WALDING
11    MR. PATRICK B. MOODY
      Attorneys at Law
12    Dothan, Alabama

13
      FOR PAUL STRANGE AND STACEY EZELL:
14
      MS. KATHERINE HORTBERG
15    Attorney at Law
      Chelsea, Alabama
16

17    FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
      PAM PARRIS AND GREG RUEDIGER:
18
      MR. JOSEPH V. MUSSO
19    Attorney at Law
      Birmingham, Alabama
20

21    ALSO PRESENT:

22    NANCY MILLER
      KENNETH LORD
23    RILEY JOE ANDREWS
      STACEY EZELL
24

25
```

3

```
1                    STIPULATION

2

3      It is stipulated by and between counsel

4   for the parties that this deposition be taken

5   at this time by Stacey Watkins, RPR, and

6   Notary Public, State at Large, who is to act

7   as commissioner without formal issuance of

8   commission to her; that said deposition shall

9   be taken down stenographically, transcribed,

10  and certified by the commissioner.  The

11  signature of the witness is waived.

12      Except for objections as to the form of

13  questions, no objections need be made at the

14  time of the taking of the deposition by

15  either party, but objections may be

16  interposed by either party at the time the

17  deposition is read into evidence, which

18  shall be ruled upon by the Court on the

19  trial of the cause upon the grounds of

20  objection then and there assigned.

21

22

23

24

25
```

```
1                    TIM PITCHFORD

2    having been first duly sworn, testified as

3    follows, to-wit:

4

5                    EXAMINATION

6

7    BY MR. FAULK:

8         Q    Mr. Pitchford, my name is Winn

9    Faulk, and I, along with Tom Brantley,

10   represent Mrs. Miller.  We haven't met 'til

11   today.  Now, you've not been present at any

12   prior depositions in this case, have you?

13        A    No, sir.

14        Q    Okay.  Have you ever had your

15   deposition taken before in other cases --

16        A    No, sir.

17        Q    -- for any reason?  Okay.  I'm sure

18   your lawyers talked to you, you know, about

19   what to expect in general, but I want to be

20   sure you and I kind of understand each other.

21        First of all, I want to know what you

22   know about this case.  Okay?  And I'm going

23   to ask you questions to try to find out.

24   It's important to you, as well as to me, that

25   you understand those questions.  So, if I ask
```

1      Q   Did Paul Strange never come to you

2  or communicate with you in some way and tell

3  you, "Mrs. Miller is saying these things

4  about the IEP's and about our special ed

5  program that she thinks are wrong," or words

6  to that effect?

7      A   He mentioned to me Mrs. Miller's

8  concern about what was termed to me as the

9  model, the inclusion model.

10     Q   And what did you understand him to

11  mean by that?

12     A   According to Mr. Strange, that Mrs.

13  Miller felt as though she should be able to

14  teach.  Her role in the classroom would be

15  able to teach two, three days a week, and not

16  as a -- to help students, the special

17  education students, individually there,

18  either at their desk or to pull them out, if

19  they're having difficulty, to the school

20  resource -- to the special education resource

21  room to help them, again, either individually

22  or small groups.

23     That that was her concern, was the model

24  was not what she was taught, and she didn't

25  think that that was correct, what was being

1    done there at Houston County High School.

2        Q    And to your understanding, that was

3    limited to whether she would be permitted to

4    teach the entire classroom two or three days

5    a week?

6        A    That was the way I understood it.

7        Q    Did Mr. Strange ever report any

8    other concerns to you that he understood Mrs.

9    Miller had expressed?

10       A    Late in the process, there was

11   something mentioned about IEP's.  But this

12   was very late in the process.  And --

13       Q    Do you recall -- I'm sorry.

14       A    And I don't recall exactly what was

15   said about the IEP's, that maybe late in the

16   process he mentioned.  But what was mentioned

17   to me on more than one occasion was the

18   model.  And that term kept being used, the

19   model.  That Mrs. Miller did not agree with

20   the model and did not think that that was

21   according to state and federal law, the type

22   model that was being used.

23       Q    Okay.  Can you tell us any other

24   particulars, other than what you've already

25   told us, about what you were told her

1    A    Statements that he had made to Mrs.

2  Miller.

3    Q    Okay.  Dr. Ruediger is reporting to

4  you the substance of a conversation he had

5  had with Mrs. Miller?

6    A    He had met with Mr. Strange.  I

7  believe they met in the library.  And then,

8  he came directly -- I say "directly."  I

9  don't know.  He came that day to meet --

10  asked to meet with me.  And we talked about

11  Mrs. Miller's situation.

12    And the things that stick out in my mind

13  about that conversation was that Mrs. Miller

14  had made accusations that Mr. Strange had

15  relayed to me that we were -- again, the

16  model that we were using was incorrect, was

17  not what she was taught at Troy State.

18    She felt that it was in violation of

19  state special education law and policy, and

20  that she -- again, this came from Mr. Strange

21  -- that she had talked to Dr. Ruediger about

22  it, he had agreed, and that he was going to

23  call the state department and check into it

24  and see -- you know, report that we were not

25  doing things correctly.

1  that Dr. Ruediger would go back and share

2  that information with Mrs. Miller, but that

3  obviously he did.  And Mrs. Miller came back

4  into her room, very upset, and told her,

5  "Thank you very much for what you told

6  Dr. Ruediger."

7        Q    Does that end the Towns

8  involvement?

9        A    As far as I can remember.

10       Q    Okay, sir.  And I don't want to

11  discourage you from --

12       A    Right.

13       Q    -- telling me everything you know.

14  I do want to know what you know.  What about

15  reports of the nature you're talking about

16  that you received from Mr. Strange?

17       A    Mr. Strange shared with me that

18  Mrs. Miller was constantly concerned about

19  the model.  I mean, I know I've referred to

20  that several times.  But that just really

21  sticks out in my mind, that she did not agree

22  with the model.  She wanted to teach, and

23  thought that the model we were using with the

24  special education students and mainstreaming

25  was -- he could not convince her that we were

49

1    don't remember everything that was said in

2    the meeting.  But the purpose of that meeting

3    was to tell her, okay, you're an intern.  You

4    don't have -- you have not even received --

5    you haven't graduated yet.  You haven't

6    received your teaching certificate yet, and

7    you've been here a short period of time.

8        We've got the state department of

9    education who has come down and monitored us

10    this past spring, previous spring of 2004,

11    and assured us that we're in full compliance.

12    They checked, and we got a passing grade.

13        We've got the superintendent, we've got

14    Mr. Andrews, that has assured myself and you

15    and everybody involved that we're in full

16    compliance.  And there is the principal, me,

17    with over 20 years experience.  You've got

18    Mr. Strange, your mentor, who is experienced,

19    has his degree, been teaching probably less

20    than ten years.  I'm estimating eight years.

21        You've got all these people that are

22    telling me and telling you that we're in full

23    compliance.  I believe we are.  And there is

24    a chain of command, and that's what we expect

25    you to follow.

1    reports that she made concerning doubts she

2    had, if you will, about the special education

3    program at your school, would have been part

4    of her official duties.  Do you understand

5    that?

6        A   I understand what you're asking.

7        Q   Okay.  Did you consider that the

8    reports she was making to Mr. Strange and to

9    Mr. Andrews and Ms. Singletary and to

10    Dr. Ruediger or to Ms. Parris, did you

11    consider those reports to be part of her

12    official duties at the school?

13           MR. WALDING:  Let me object to the

14               form of the question.  (b) of

15               the third defense of the answer

16               says part of her official

17               duties as a teaching intern.

18               And that's different from the

19               question you're asking this

20               gentleman.

21        Q   Adopt his language and take the

22    question.  In other words, did you consider

23    that to be part of her official duties as a

24    teaching intern?

25        A   I would think any employee would

1    have the right to any concern they have about

2    any policy, whether it be special education

3    or any other policy that we have, to ask

4    those questions.  Yes.

5        Q    And can you point us, as past

6    principal, now superintendent in the county,

7    to any written set of duties from which that

8    -- well, that actually states that teachers

9    in your system have such a duty?

10       A    Not at this time.  Not to my

11   knowledge.  That's not saying that there is

12   not one.  But, sitting here at this table, I

13   can't put my hands on one now.  No, sir.

14       Q    In one of the meetings you had with

15   her, with Mr. Stephens, I believe, didn't

16   you, in effect, tell her to just knock it off

17   and stop doing this?

18       A    No, sir.

19           MR. WALDING:  Object to the form.

20       A    No, sir.  That was not the intent

21   of what I told her.  I was trying to reassure

22   her that everybody from the state department

23   of education who had come down and evaluated

24   our program in the spring before, and you've

25   got a superintendent with 30 years

1     before?

2          A     I've seen it.  I don't know where

3     it came from, but I have seen it.

4          Q     Do you think you saw it in context

5     of the litigation, or do you think you saw it

6     prior to the litigation?

7          A     I've seen it within the last two

8     weeks.

9          Q     Okay.  And you don't recall seeing

10    it prior to that?

11         A     No, sir.

12         Q     With respect to Defendant's Exhibit

13    18, the letter from Ezell and Strange, what

14    can you tell us, please, sir, about the

15    origin or genesis of this letter?

16         A     In the conversation with Mr.

17    Andrews -- again, Mr. Andrews is special

18    education coordinator.  You've heard me refer

19    to, "I called Mr. Andrews.  I called Mr.

20    Andrews."  He's the expert.  I'm the

21    principal of the school, and I have general

22    knowledge about many things.  I have general

23    knowledge about chemistry.  I supervise

24    chemistry teachers.  But I know nothing about

25    chemistry.  I have general knowledge about

1    special education.  But, when there are

2    questions or concerns about special

3    education, I call the expert.

4         And in Houston County, at that time, in

5    the Houston County School System, Mr. Andrews

6    was the expert.  And I called him.  And

7    noting that the original conversation with

8    Troy and Mrs. Miller came through Mr.

9    Andrews, is how she ended up at Houston

10   County High School.  I requested a teacher.

11   I didn't request any particular teacher.  So,

12   when issues came up, and it being in the

13   special education department, I called Mr.

14   Andrews.

15        And somewhere during this process, he

16   said, "Get up a list of concerns.  You know,

17   y'all get up a list of concerns."  And when

18   he says "y'all," he's including me and

19   anybody else that has any concerns there.

20   "Get me a list of concerns."  That was how

21   this document -- the origination of this

22   document started.  That was instruction from

23   Mr. Andrews, to get him up a list of

24   concerns.

25        This is a combination of Mr. Strange --

1    I think Mrs. Ezell has a comment or two on

2    here.  Many of these are things that I've

3    already shared with you that I received from

4    other employees, other teachers that I've

5    shared with you.  That's what's included on

6    this document.

7        Q    Okay.  Did you draft the document?

8        A    Parts of it.  But, now, also, Mr.

9    Strange and, again, Mrs. Ezell, their

10   signatures are here.  Parts of this, they --

11   again, I don't remember how it was handed to

12   me, you know, their parts.  I would assume it

13   was handed to me handwritten.  And, now,

14   under normal circumstances, I would have had

15   my secretary type this.  But, do I recall

16   having her type it?  No.  But that would be

17   standard.  If I had something that I was

18   going to forward on to the central office, I

19   would have my secretary type it.

20       Q    Okay.  Do you know if any of the

21   underlying notes still exist?

22       A    No, sir, not that I'm aware of.

23       Q    Do you recall how they came to sign

24   the letter?

25       A    I'm sure I -- again, I don't

1  remember.  But I probably asked them to sign

2  it.  Since parts of this was coming from

3  them, I asked them to sign it.

4       Q    Did you ask anyone else to sign it

5  who declined to sign it?

6       A    No, sir.

7       Q    But some of these complaints didn't

8  just come from Mrs. Ezell and Mr. Strange?

9  Right?

10      A    Right.  There were things that were

11 shared with me.  Right.

12      Q    Why didn't you ask anybody else to

13 sign it?

14      A    I don't know.

15      Q    Then, once they had signed it,

16 what, if anything, did you do with it?

17      A    Gave that to Mr. Andrews.  Gave him

18 this copy.

19      Q    You didn't send it to Pam Parris?

20 You gave it to Mr. Andrews?

21      A    Mr. Andrews is who requested this.

22 Now, yeah, it's to Pam Parris.  I don't think

23 I sent her -- again, I don't think I sent her

24 this.  This document came as a request from

25 Mr. Andrews.  And I guess, us assuming that

1    conversation I had with her was, "Let's start

2    over.  Let's start over."  My hope, all

3    along, was to try to have a successful

4    internship and a good special education

5    teacher, which there was a shortage of.

6        Q    So, as of the time you participated

7    in the production of Defendant's Exhibit 18,

8    it was your belief or hope that this letter

9    would somehow straighten the matter out?

10            MR. WALDING:  Object to the form.

11        Q    Or salvage the internship?  Is that

12    your testimony?

13            MR. WALDING:  Again, object to the

14                form.

15        A    Originally, I didn't have any

16    expectations of what this is.  Now, if you're

17    asking me in general, not necessarily

18    specific to this document, was to always have

19    a successful internship and a successful

20    teaching career at Houston County High

21    School.  I had no expectations of what this

22    document -- this was a document that I was

23    asked to send on to Mr. Andrews.

24        Q    Did Mr. Andrews tell you why he

25    wanted it?

1        A    He just said, "Send me a list of

2    concerns."  Now, I don't know if Pam Parris

3    asked him for that, for that list.  I do not

4    know the answer to that.

5        Q    Do you recall whether you contacted

6    him, and he said, "Send me a list of

7    concerns," or whether he contacted you and

8    said, "Send me a list of concerns"?

9        A    I know that I called Mr. Andrews --

10    now, this was after the 24th.  I don't know

11    if he called me or I called him.  I don't

12    know the answer to that.  I know Mrs. Miller

13    had met with him on the 24th.  And that was

14    after the 24th.  So, I'm not sure if Mr.

15    Andrews did not call me and ask me for that.

16        Q    Take a look at Defendant's Exhibit

17    30.  There are some remarks here that would

18    appear to be attributed to you.  I'm not

19    saying you really made them.  Look at those,

20    please, and then, I'm going to talk to you

21    about them.

22        A    (Witness reviewing document.)

23    Okay.

24        Q    Do you ever recall stating to

25    anyone connected with Troy University that

1   STATE OF ALABAMA

2   HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5   Public, State at Large, do hereby certify

6   that the foregoing transcript, pages 1

7   through 104, is a true and correct transcript

8   of the testimony and proceedings taken at

9   said time and place; and that the same was

10  taken down by me in stenograph shorthand,

11  and transcribed by me personally or under

12  my personal supervision.

13       I further certify that I have no

14  interest in this matter, financial or

15  otherwise, or how it may develop or what

16  its outcome may be.  I further certify that

17  I am not of counsel for any of the parties,

18  nor am I related to counsel or litigants or

19  associated with anyone connected with this

20  cause to my knowledge.

21       Witness my hand this 23rd day of

22  October, 2007.

23  _____
                                   _Stacy Watkins_

24                                 RPR, Notary Public,
                                   State at Large
25                                 ACCR# 155

# Deposition of Stacey Ezell

1           IN THE U. S. DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3             SOUTHERN DIVISION


4

5    NANCY MILLER,

6         PLAINTIFF,

7      VS.                    CASE NO.1:06-CV-940-WKW

8    HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
9    LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,

12        DEFENDANTS.

13

14      The deposition of STACEY EZELL, taken

15   by the Plaintiff, pursuant to the Federal

16   Rules of Civil Procedure, before Stacey

17   Watkins, RPR, and Notary Public, State at

18   Large, at the offices of Hardwick, Hause,

19   Segrest & Walding, Dothan, Alabama, on the

20   27th day of September 2007, at 4:05 p.m.,

21   CDT, pursuant to notice.

22

23

24                           

25

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4    MR. WINN FAULK
      Attorney at Law
 5    Montgomery, Alabama

 6    MR. THOMAS K. BRANTLEY
      Attorney at Law
 7    Dothan, Alabama

 8

      FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9    KENNETH LORD, RILEY JOE ANDREWS AND
      TIM PITCHFORD:
10
      MR. KEVIN WALDING
11    MR. PATRICK B. MOODY
      Attorneys at Law
12    Dothan, Alabama

13

      FOR PAUL STRANGE AND STACEY EZELL:
14
      MS. KATHERINE HORTBERG
15    Attorney at Law
      Chelsea, Alabama
16

17    FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
      PAM PARRIS AND GREG RUEDIGER:
18
      MR. JOSEPH V. MUSSO
19    Attorney at Law
      Birmingham, Alabama
20

21    ALSO PRESENT:

22    NANCY MILLER
      KENNETH LORD
23

24

25
```

STIPULATION

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

```
1                     STACEY EZELL

2      having been first duly sworn, testified as

3      follows, to-wit:

4

5                      EXAMINATION

6

7      BY MR. FAULK:

8           Q    State your name for us, please,

9      ma'am?

10          A    Full name?

11          Q    Yes, please.

12          A    Stacey Christine Ezell.

13          Q    And, Mrs. Ezell, you've been

14     present throughout the depositions up 'til

15     now, haven't you?

16          A    I have.

17          Q    And I know you have other matters

18     to attend to.  I want to be sure you

19     understand the situation.  But, on the other

20     hand, I don't want to just belabor the point.

21          From having attended other depositions,

22     you understand if you need a break or don't

23     understand something, you just need to let us

24     know.  If you want a glass of water or

25     whatever.  Okay?
```

1      A    Okay.

2      Q    It's not an endurance contest.  You

3  know, I'm not here to boss you around or

4  trick you or anything like that.  If you

5  don't understand what I say, or if it doesn't

6  make sense, tell me, and I'll try it again.

7  Okay?  Have you got any questions about that?

8      A    Not at this moment.

9                (Brief off-record.)

10      Q    This morning, we kind of went

11  through the complaint and answer with Mr.

12  Strange.  I need to do a little of that with

13  you, if we can find them.  And there's one of

14  them.

15      In number 9, I believe they alleged

16  insufficient knowledge as to who you were.

17  Do you admit that you're Stacey Ezell, an

18  adult resident citizen of Houston County,

19  Alabama?

20      A    I am.

21      Q    And do you admit that, at the time

22  Mrs. Miller was an intern at Houston County

23  High School, you were employed there as a

24  teacher?

25      A    I am.

1    as expressions of concern about

2    irregularities or compliance issues at the

3    Houston County High School special education

4    program.

5         Now, do you have any personal knowledge

6    of Mrs. Miller having made complaints or

7    expressed concerns to other people, or to

8    you, for that matter, about asserted

9    deficiencies or noncompliance issues with the

10   Houston County High School special education

11   program?

12        A    I do not have any personal

13   knowledge of her complaints, nor did she ever

14   speak to me about any deficiencies in the

15   special ed program.

16        Q    Have other people told you that she

17   had complained to them or others about

18   specific issues that you recall having to do

19   with special ed?

20        A    No.

21        Q    So, any knowledge on that subject

22   that you have would be general, possibly

23   secondhand hearsay-type information?

24             MS. HORTBERG:  And as you've

25             already stated, she sat in on

1    Q    Was it your intention to convey to

2    any reader, Pam Parris, Tim Pitchford, for

3    example, that you, in fact, agreed with these

4    nine assertions?

5    A    No.  That was not my intent.

6    Q    What was your intent, then, please?

7    A    To provide observations.

8    Q    Can you explain that to me?

9    A    To provide observations of Mrs.

10   Miller's behavior.  And I can only really

11   answer to three of those nine.

12   Q    Let's just run through them.

13   A    Sure.

14   Q    At the time you signed this, did

15   you understand that it was going to Pam

16   Parris at Troy University?

17   A    No.

18   Q    Do you see where it says, at the

19   top of the thing --

20   A    I see that.

21   Q    -- directed to her?  Do you recall

22   that not being there when you signed it?

23   A    It was three years ago.  I really

24   don't recall.

25   Q    You say there are only three of the

1    nine that you have personal knowledge of?

2        A    Correct.

3        Q    Which of those?

4        A    Number 3.  And I can only speak for

5    my personal experience.

6        Q    And that one reads, "Mrs. Miller

7    has difficulty in communicating with faculty

8    members."

9        A    Uh-huh.  Number 6.

10       Q    Okay.  Which reads, "Classroom

11   teachers reported that Mrs. Miller has been

12   upset and crying during class time."

13       A    And number 9.

14       Q    And number 9.  "Mrs. Miller told a

15   classroom teacher, 'I don't like being here

16   any more than you do, but I have to be here a

17   certain number of hours.'  This is in

18   response to the classroom teacher telling her

19   that she could leave the room because the

20   lesson was over.  Mrs. Miller said this in

21   front of students in the class."  Did I read

22   it correctly?  Close enough?

23       A    Close enough.

24       Q    Now, let's just go through each of

25   these.  What is your basis, your personal

1  think I repeated myself twice during that

2  meeting.

3      And she also needed copies of my lecture

4  notes, which wasn't a problem for me, because

5  I had done that in years past with several of

6  my special ed students that I've taught over

7  the 15 years.  And copies of my tests, which,

8  again, I've always provided for the previous

9  special ed teachers, as well as the keys to

10  the tests.

11      Q    Okay.  And then, what happened?

12  How did it become an issue, once you had told

13  her to go to the office and get them?

14      A    I don't know.

15      Q    Well, help me.  At some point,

16  apparently, did Mr. Pitchford or Mr. Strange

17  somehow get involved in this issue?

18      A    Yes.

19      Q    Tell me what you know about how

20  that came about and what became of it?

21      A    I would say mid September, early

22  September, I was called in to Mr. Pitchford's

23  office.  And Mr. Strange was there.  And he

24  asked me was I providing Nancy Miller with

25  the lesson plans.  And I repeated to him what

1    anyone, prior to signing this letter, about

2    number 3, number 6 or number 9?

3        A    No.  I don't recall.

4        Q    And you can't tell us how in the

5    world the typist could have gotten that

6    information?

7        A    No.

8        Q    Were any of those events witnessed

9    by anyone else, other than perhaps the -- I

10   mean, by any other faculty member, other than

11   number 3, about the lesson plans?

12       A    Students.

13       Q    Okay.  So, you don't know.  Did you

14   understand that this document, Defendant's

15   Exhibit 18, would likely be used to undermine

16   her internship?

17           MR. WALDING:  Object to the form.

18           MS. HORTBERG:  Object to the form.

19       Q    Did you have any idea that this

20   could be used to hurt her?

21           MS. HORTBERG:  Object to the form.

22       A    No.

23       Q    What did you think it was for?

24       A    As I said earlier, I don't recall.

25       Q    Have you ever been involved in any

1    Q    You've heard, I guess, my efforts

2    to understand what full inclusion means.  Can

3    you tell me what that term means to you,

4    please?

5    A    To me, would mean that the students

6    with learning disabilities are to be in the

7    classroom, in a regular classroom, in a

8    regular classroom setting, with the special

9    ed teacher there to aid in any problem they

10   may have, whether it might be lecture notes

11   or what have you.

12   Q    And were there students who were

13   subject to inclusion in your classroom who

14   were special ed students?

15   MS. HORTBERG:  Object to the form.

16   Are you talking about during

17   the time period that Mrs.

18   Miller --

19   MR. FAULK:  Right.  Yeah.

20   A    Could you restate that?

21   Q    You did have some special ed

22   students in your biology or science classroom

23   of some sort while Mrs. Miller was at the

24   school, didn't you?

25   A    I'm sure I did.  I do every year.

1      Q      At the time you contributed to

2    Defendant's 18, you didn't have any personal

3    reason to feel badly toward Mrs. Miller?  You

4    were just making professional observations --

5      A      That is correct.

6      Q      -- that you considered to be

7    truthful and objective?

8      A      That is correct.

9      Q      If you would, please, look at

10    Defendant's Exhibit 13.

11              (Ms. Hortberg reviewing documents.)

12      Q      While she's looking for Defendant's

13    Exhibit 13, let me ask you this:  Did anyone

14    else, other than whoever asked for your

15    information on Defendant's Exhibit 18,

16    contact you or solicit information from you

17    concerning Mrs. Miller's performance?

18      A      Did anyone else contact me about

19    what, now?

20      Q      And solicit information from you

21    concerning Mrs. Miller's performance.

22      A      No.

23      Q      You've got Defendant's 13 there.

24    If you would, please, ma'am, read the first

25    paragraph there, and let me know when you've

```
 1   STATE OF ALABAMA

 2   HOUSTON COUNTY

 3

 4        I, Stacey Watkins, RPR, and Notary

 5   Public, State at Large, do hereby certify

 6   that the foregoing transcript, pages 1

 7   through 61, is a true and correct transcript

 8   of the testimony and proceedings taken at

 9   said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under

12   my personal supervision.

13        I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21        Witness my hand this 8th day of

22   October, 2007.

23

24                  RPR, Notary Public,
                    State at Large
25                  ACCR# 155
```

# Deposition of Kenneth Lord

1          IN THE U. S. DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3               SOUTHERN DIVISION

4

5    NANCY MILLER,

6         PLAINTIFF,

7       VS.                    CASE NO.1:06-CV-940-WKW

8    HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
9    LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,

12
          DEFENDANTS.
13

14        The deposition of KENNETH LORD, taken

15   by the Plaintiff, pursuant to the Federal

16   Rules of Civil Procedure, before Stacey

17   Watkins, RPR, and Notary Public, State at

18   Large, at the offices of Hardwick, Hause,

19   Segrest & Walding, Dothan, Alabama, on the

20   10th day of October 2007, at 4:10 p.m., CDT,

21   pursuant to notice.

22

23

24

25                              COPY

```
 1    APPEARANCES:

 2


 3    FOR THE PLAINTIFF:

 4    MR. WINN FAULK
      Attorney at Law
 5    Montgomery, Alabama

 6    MR. THOMAS K. BRANTLEY
      Attorney at Law
 7    Dothan, Alabama

 8
      FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9    KENNETH LORD, RILEY JOE ANDREWS AND
      TIM PITCHFORD:
10
      MR. KEVIN WALDING
11    MR. PATRICK B. MOODY
      Attorneys at Law
12    Dothan, Alabama

13
      FOR PAUL STRANGE AND STACEY EZELL:
14
      MS. KATHERINE HORTBERG
15    Attorney at Law
      Chelsea, Alabama
16

17    FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
      PAM PARRIS AND GREG RUEDIGER:
18
      MR. JOSEPH V. MUSSO
19    Attorney at Law
      Birmingham, Alabama
20

21    ALSO PRESENT:

22    NANCY MILLER

23

24

25
```

STIPULATION

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

1                    KENNETH LORD

2    having been first duly sworn, testified as

3    follows, to-wit:

4

5                    EXAMINATION

6

7    BY MR. FAULK:

8        Q    State your full name, please?

9        A    Kenneth Jackie Lord.

10        Q    Until recently, you were

11    superintendent of education in Houston

12    County?

13        A    Yes, sir.

14        Q    When did you retire, if you

15    retired?

16        A    I believe it was -- yes, sir, I

17    did.  I didn't run again.  I retired -- I

18    believe it was December 31st of '04, I think.

19    I'm horrible with dates, but I think that was

20    it.

21        Q    And superintendents here are

22    elected?

23        A    Yes, sir.

24        Q    You have heard, I assume, several

25    times, the basic instructions about making

1           (Off-record discussion held.)

2      Q    It's contended on your behalf, Mr.

3 Lord, as well as the other defendants, that

4 the reports that Mrs. Miller made to Mr.

5 Andrews and to the Troy people about what she

6 considered to be irregularities in the

7 special ed program at the high school were

8 somehow part of her official duties.  Can you

9 shed any light on that, as to what the source

10 of that duty might be?

11      A    If you will, clear me up about --

12 what reports are we talking about she made?

13      Q    Well, were you not aware, at the

14 time you terminated her employment, that she

15 had previously made some reports and

16 complaints to Mr. Andrews, among others,

17 Dr. Ruediger at Troy, about things that she

18 considered to be not in compliance with

19 special ed regulations and laws?

20      A    No, sir.  I have never been aware

21 that she made any kind of reports on any kind

22 of irregularities that were taking place in

23 our special education program, or that she

24 alluded to were taking place in our program.

25      Q    Assuming that she made such

1    reports, would she, in your judgment, have

2    had some official duty to make those reports?

3        A    As an employee of the Houston

4    County Board of Education, if she saw

5    something that was wrong that was going on in

6    our system, I would think she would certainly

7    be within her right to do that.

8        Q    But you can't point me to any job

9    description or set of duties or board policy

10   that said she must do that, can you?

11       A    I'm not sure if that's in the

12   Houston County board policy or not.  It's

13   been so long since I've looked at it, I

14   really don't know.

15       Q    So, it might or might not be?

16   We'll just have to go look?

17       A    Yes, sir.

18           MR. FAULK:  All right.  Thank you

19               very much.  I don't know if

20               your lawyer has any follow-up

21               or not.

22           THE WITNESS:  If he does, I'm going

23               to object to the form.

24           (Recess in deposition from 4:42 to

25               4:48.)

```
1                    EXAMINATION

2

3    RESUMED BY MR. WALDING:

4         Q    Does Defendant's No. 28 state the

5    reason that you recommended to the board of

6    education that Mrs. Miller's employment be

7    terminated?

8         A    Is this 28?

9         Q    Yes, sir.

10        A    No, sir.

11        Q    Well, doesn't it say because her

12   internship --

13        A    Oh, yes, sir.

14        Q    -- was terminated?

15        A    Yes, sir.  I'm sorry.  I'm sorry.

16   Yes, sir.  I didn't read it.  I'm sorry.

17        Q    So, this letter does, in fact,

18   state the reason that her employment was

19   terminated?

20        A    That's correct.  I'm sorry.

21        Q    And, again, did you have any

22   control over terminating her internship?

23        A    No, sir.

24             MR. WALDING:  All right.  Thank

25                  you.
```

```
 1    STATE OF ALABAMA

 2    HOUSTON COUNTY

 3

 4         I, Stacey Watkins, RPR, and Notary

 5    Public, State at Large, do hereby certify

 6    that the foregoing transcript, pages 1

 7    through 37, is a true and correct transcript

 8    of the testimony and proceedings taken at

 9    said time and place; and that the same was

10    taken down by me in stenograph shorthand,

11    and transcribed by me personally or under

12    my personal supervision.

13         I further certify that I have no

14    interest in this matter, financial or

15    otherwise, or how it may develop or what

16    its outcome may be.  I further certify that I

17    am not of counsel for any of the parties,

18    nor am I related to counsel or litigants or

19    associated with anyone connected with this

20    cause to my knowledge.

21         Witness my hand this 24th day of

22    October, 2007.

23    _____

24                       RPR, Notary Public,
                         State at Large
25                       ACCR# 155
```

# Deposition of Riley Joe Andrews

1                 IN THE U. S. DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                      SOUTHERN DIVISION

4

5    NANCY MILLER,

6          PLAINTIFF,

7       VS.                    CASE NO.1:06-CV-940-WKW

8    HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
9    LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,

12          DEFENDANTS.

13

14       The deposition of RILEY JOE ANDREWS,

15   taken by the Plaintiff, pursuant to the

16   Federal Rules of Civil Procedure, before

17   Stacey Watkins, RPR, and Notary Public, State

18   at Large, at the offices of Hardwick, Hause,

19   Segrest & Walding, Dothan, Alabama, on the

20   10th day of October 2007, at 1:35 p.m., CDT,

21   pursuant to notice.

22

23

24                              COPY

25

```
 1     APPEARANCES:

 2


 3     FOR THE PLAINTIFF:

 4     MR. WINN FAULK
       Attorney at Law
 5     Montgomery, Alabama

 6     MR. THOMAS K. BRANTLEY
       Attorney at Law
 7     Dothan, Alabama

 8
       FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9     KENNETH LORD, RILEY JOE ANDREWS AND
       TIM PITCHFORD:
10
       MR. KEVIN WALDING
11     MR. PATRICK B. MOODY
       Attorneys at Law
12     Dothan, Alabama

13
       FOR PAUL STRANGE AND STACEY EZELL:
14
       MS. KATHERINE HORTBERG
15     Attorney at Law
       Chelsea, Alabama
16

17     FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
       PAM PARRIS AND GREG RUEDIGER:
18
       MR. JOSEPH V. MUSSO
19     Attorney at Law
       Birmingham, Alabama
20

21     ALSO PRESENT:

22     NANCY MILLER
       KENNETH LORD
23

24

25
```

```
1                    STIPULATION

2

3         It is stipulated by and between counsel

4    for the parties that this deposition be taken

5    at this time by Stacey Watkins, RPR, and

6    Notary Public, State at Large, who is to act

7    as commissioner without formal issuance of

8    commission to her; that said deposition shall

9    be taken down stenographically, transcribed,

10   and certified by the commissioner.  The

11   signature of the witness is waived.

12        Except for objections as to the form of

13   questions, no objections need be made at the

14   time of the taking of the deposition by

15   either party, but objections may be

16   interposed by either party at the time the

17   deposition is read into evidence, which

18   shall be ruled upon by the Court on the

19   trial of the cause upon the grounds of

20   objection then and there assigned.

21

22

23

24

25
```

```
 1              RILEY  JOE  ANDREWS

 2   having been first duly sworn, testified as

 3   follows, to-wit:

 4

 5                  EXAMINATION

 6

 7   BY MR. FAULK:

 8        Q     State your full name for us,

 9   please, sir?

10        A     Riley Joe Andrews.

11        Q     And, Mr. Andrews, I guess you know

12   I'm Winn Faulk, and I represent Mrs. Miller

13   in this case.

14        A     I do.

15        Q     And I know you've attended some

16   depositions?  Right?

17        A     Yes, I have.

18        Q     I'll just kind of touch on it

19   briefly.  The main thing I want you to

20   understand is, if you need a break, if you're

21   uncomfortable with anything, you want to talk

22   to your lawyer or whatever, just tell us, and

23   we'll take a break.

24        Secondly, if you don't understand a

25   question I ask you for some reason, for any
```

1    on September the 1st?  I'd like to go back to

2    that for a minute.

3         A    At the school.  Yes.

4         Q    And that included Ms. Parris and

5    Mr. Pitchford, Mr. Strange?

6         A    I don't know if Mr. -- he might

7    have been -- yeah.  Mr. Strange was there.

8    Yeah.

9         Q    And Mrs. Miller?

10        A    Right.

11        Q    Did y'all have any premeeting, that

12   didn't include Mrs. Miller?

13        A    Not to my knowledge.  I did not,

14   no.

15        Q    Did you participate in any prior

16   telephone meetings or anything about it?

17        A    I don't recall if there was any

18   phone calls.  I feel like there had been some

19   phone calls.  I can't recollect the date or

20   anything of that nature.  There were some

21   concerns with her and the other teachers

22   there at Houston County High School.  Yes.

23        Q    Can you give me any more detail on

24   that?

25        A    Well, it's just that -- things that

1    -- she wanted to do things in the classroom.

2    She wanted to be a teacher.  She wanted to

3    teach in the regular classroom, you know,

4    with the special ed students that were being

5    included in those classrooms.  She wanted to

6    participate in that.  And, you know, I

7    understand that, her being a professional

8    person, wanting to teach in those classrooms.

9         But, at the same time, we were

10   confronted with No Child Left Behind.  This

11   was the high school students.  And the only

12   person that can give grades to a high school

13   student, regular ed or special ed, in the

14   core classes, is a highly qualified teacher.

15   And that's a mandate under the No Child Left

16   Behind Act.

17        And so, that is the reason that we had

18   talked about collaborative teaching, so that

19   the special ed teacher and the regular ed

20   teacher could get together, and they could

21   teach the children, meet the needs of the

22   students that held an IEP, and they could

23   then collaborate, get together, come up with

24   grades, and assess the progress of the

25   students' IEP's, according to the goals on

1    A    I called to tell him that I had met

2    with Mrs. Miller that Friday afternoon, and

3    she had expressed some concerns to me, and

4    that I had those concerns.  And I believe, at

5    that same time, I asked him to express his

6    concerns or their concerns to me, so that I

7    could make Ms. Parris aware of those

8    concerns, so that we could provide some help

9    to Mrs. Miller in those areas.

10    Q    And then, did that list of concerns

11    come to you in the form of Defendant's

12    Exhibit 18 that I'm showing you?

13    A    That is correct.

14    Q    And was it based on Defendant's

15    Exhibit 18 that you prepared Defendant's

16    Exhibit 17?

17    A    That is correct.

18    Q    And then, I gather you sent

19    Defendant's Exhibit 17 and 18 to Ms. Parris?

20    A    That is correct.

21    Q    What?  Did you fax it to her?

22    A    I mailed it to her.

23    Q    Do you know how soon that was after

24    Mrs. Miller coming to your office?

25    A    No, sir.  I don't recall.  But I

1  STATE OF ALABAMA

2  HOUSTON COUNTY

3

4       I, Stacey Watkins, RPR, and Notary

5  Public, State at Large, do hereby certify

6  that the foregoing transcript, pages 1

7  through 66, is a true and correct transcript

8  of the testimony and proceedings taken at

9  said time and place; and that the same was

10 taken down by me in stenograph shorthand,

11 and transcribed by me personally or under

12 my personal supervision.

13      I further certify that I have no

14 interest in this matter, financial or

15 otherwise, or how it may develop or what

16 its outcome may be.  I further certify that

17 I am not of counsel for any of the parties,

18 nor am I related to counsel or litigants or

19 associated with anyone connected with this

20 cause to my knowledge.

21      Witness my hand this 23rd day of

22 October, 2007.

23 _____

24                RPR, Notary Public,
                State at Large
25                ACCR# 155

# Affidavit of Stacey Ezell

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MILLER, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-940-MEF-TFM |
| | ) | |
| HOUSTON COUNTY BOARD | ) | |
| OF EDUCATION, et al. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

### AFFIDAVIT OF STACEY EZELL

COMES NOW the affiant, Stacey Ezell, having been duly sworn and deposes and says the following:

My name is Stacey Ezell. I am a defendant in the above action. At all times relevant to this suit, I was employed by the Houston County Board of Education as a science teacher at Houston County High School.

I received a Bachelor of Science degree in education from Auburn University in 1989. I then received a master's degree in secondary education from Troy University in 1995, and an education specialist's degree from Auburn University in Montgomery in 1999. I was first certified as a school teacher by the State of Alabama in 1989. Since obtaining this certification, I have met or exceeded the continuing education requirements for school teachers in Alabama in every year in which I was required to obtain such continuing education credits.

As of the current school year, I have been employed as an educator for 18 years.

During the 2004-05 school year, Plaintiff Nancy Miller was an intern/special education teacher in my classroom. As part of her internship in collaborative special education teaching, Ms. Miller attended my class to assist the special education students with their classwork and tests. One of my duties as a teacher at Houston County High School is to supervise other teachers and interns as part of the peer review process.

As a result of my education, certification, training and experience, I am familiar with the standards of care required of school teachers in Houston County and in the State of Alabama. I met those standards of care at all times relevant to this litigation with regard to Nancy Miller. I was acting within the line and scope of my employment with the Houston County Board of Education at all times relevant to this lawsuit. I believe that all of my actions with regard to Nancy Miller were carried out in conformity with all applicable federal, Alabama, and local laws, as I understand them. I acted with the Houston County High School students and faculty's best interests in mind at all times. I never acted willfully, criminally or recklessly, with gross negligence, or with a conscious flagrant indifference to the rights of Ms. Miller.

The foregoing affidavit is based upon my personal knowledge and is true and accurate. I am over nineteen years of age and not otherwise disqualified from giving testimony under oath.

2

This the __14th__ day of _November_, 2007.

Stacey Ezell

STATE OF ALABAMA    )
                    )
HOUSTON COUNTY      )

    I, the undersigned, a Notary Public in and for said County in said State, hereby certify that Stacey Ezell, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, she executed the same voluntarily on the day the same bears date.

    Given under my hand this __14__ day of _November_, 2007.

Notary Public

My commission expires:

My Commission Expires January 21, 2009

3

# Affidavit of Paul Strange

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MILLER, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-940-MEF-TFM |
| | ) | |
| HOUSTON COUNTY BOARD | ) | |
| OF EDUCATION, et al. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## AFFIDAVIT OF PAUL STRANGE

COMES NOW the affiant, Paul Strange, having been duly sworn and deposes and says the following:

My name is Paul Strange. I am a defendant in the above action. At all times relevant to this suit, I was employed by the Houston County Board of Education as a special education teacher at Houston County High School. I received a Bachelor of Science degree in business administration from Auburn University in 1993. I also received a master's degree in special education from Troy University in Dothan in 1997 and an education leadership degree in administration from Troy University Dothan in early 2000. I was first certified as a school teacher by the State of Alabama in 1997. Since obtaining this certification, I have met or exceeded the continuing education requirements for school teachers in Alabama in every year in which I was required to obtain such continuing education credits.

As of the current school year, I have been employed as an educator for 10 years. I am currently assistant principal of Cottonwood High School, a school in the Houston County

school system. Prior to being employed as the assistant principal, I was a special education teacher at Houston County High School. During the fall 2004 semester, I agreed to mentor a special education teaching intern at Houston County High School. That intern was the plaintiff, Nancy Miller. As the cooperating teacher, I supervised and evaluated Ms. Miller as a teacher/intern. I fulfilled my requirements as a cooperating teacher by meeting with Ms. Miller periodically, evaluating her, meeting with Troy University evaluators about her, reviewing special education documents with her and answering any questions she had. I never asked Ms. Miller to sign IEP documents when she did not attend the IEP meeting. I did, however, go through some of the information contained in an IEP with Ms. Miller so that she would be familiar with the process.

As a result of my education, certification, training and experience, I am familiar with the standards of care required of school teachers in Houston County and in the State of Alabama. I met those standards of care at all times relevant to this litigation with regard to Nancy Miller. I was acting within the line and scope of my employment with the Houston County Board of Education at all times relevant to this lawsuit. I believe that all of my actions with regard to Nancy Miller were carried out in conformity with all applicable federal, Alabama, and local laws, as I understand them. I acted with the Houston County High School special education students and faculty's best interests in mind at all times. I never acted willfully, criminally or recklessly, with gross negligence, or with a conscious flagrant indifference to the rights of Ms. Miller.

The foregoing affidavit is based upon my personal knowledge and is true and accurate. I am over nineteen years of age and not otherwise disqualified from giving testimony under oath.

This the ___13___ day of ___November___, 2007.

_Paul Strange_
Paul Strange

STATE OF ALABAMA    )
                    )
HOUSTON COUNTY      )

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that Paul Strange, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily on the day the same bears date.

Given under my hand this ___13th___ day of ___November___, 2007.

_Brenda Halford_
Notary Public

My commission expires:        MY COMMISSION EXPIRES
                              APRIL 5, 2009

3