# TAB A

1

```
 1  IN THE U. S. DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3            SOUTHERN DIVISION
 4
 5  NANCY MILLER,
 6       PLAINTIFF,
 7       VS.           CASE NO.1:06-CV-940-MKW
 8  HOUSTON COUNTY BOARD
    OF EDUCATION, KENNETH
 9  LORD, RILEY JOE ANDREWS,
    TIM PITCHFORD, PAUL
10  STRANGE, STACY EZELL,
    TROY UNIVERSITY, DOTHAN,
11  SANDRA JONES, PAM PARRIS
    and GREG RUEDIGER,
12
13       DEFENDANTS.
14       The deposition of NANCY MILLER, taken
15  by the Defendants, pursuant to the Federal
16  Rules of Civil Procedure, before Stacey
17  Watkins, RPR, and Notary Public, State at
18  Large, at the offices of Hardwick, Hause,
19  Segrest & Walding, Dothan, Alabama, on the
20  17th day of July, 2007, at 10:10 a.m., CDT,
21  pursuant to notice.
22
23
24
25
```

2

```
 1  APPEARANCES:
 2
 3  FOR THE PLAINTIFF:
 4  MR. WINN FAULK
    Attorney at Law
 5  Montgomery, Alabama
 6  MR. THOMAS K. BRANTLEY
 7  Attorney at Law
    Dothan, Alabama
 8
 9  FOR HOUSTON COUNTY BOARD OF EDUCATION,
    KENNETH LORD, RILEY JOE ANDREWS AND
    TIM PITCHFORD:
10
11  MR. KEVIN WALDING
    MR. PATRICK B. MOODY
12  Attorneys at Law
    Dothan, Alabama
13
14  FOR PAUL STRANGE AND STACEY EZELL:
15  MS. KATHERINE HORTBERG
    Attorney at Law
16  Chelsea, Alabama
17  FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
    PAM PARRIS AND GREG RUEDIGER:
18
19  MR. JOSEPH V. MUSSO
    Attorney at Law
20  Birmingham, Alabama
21  ALSO PRESENT:
22  KENNETH LORD
    PAUL STRANGE
23  STACEY EZELL
24
25
```

3

```
 1            STIPULATION
 2
 3       It is stipulated by and between counsel
 4  for the parties that this deposition be taken
 5  at this time by Stacey Watkins, RPR, and
 6  Notary Public, State at Large, who is to act
 7  as commissioner without formal issuance of
 8  commission to her; that said deposition shall
 9  be taken down stenographically, transcribed,
10  and certified by the commissioner. The
11  signature of the witness is waived.
12       Except for objections as to the form of
13  questions, no objections need be made at the
14  time of the taking of the deposition by
15  either party, but objections may be
16  interposed by either party at the time the
17  deposition is read into evidence, which
18  shall be ruled upon by the Court on the
19  trial of the cause upon the grounds of
20  objection then and there assigned.
21
22
23
24
25
```

4

```
 1       (Defendant's Exhibits 1 through 28
 2       previously marked for
 3       identification.)
 4
 5            NANCY MILLER
 6  having been first duly sworn, testified as
 7  follows, to-wit:
 8
 9            EXAMINATION
10
11  BY MR. WALDING:
12       Q    Mrs. Miller, I'm Kevin Walding, and
13  my law firm represents the Houston County
14  Board of Education and various of the
15  individual defendants you have sued in this
16  case. Do you understand that?
17       A    Yes.
18       Q    I'm here to take your deposition
19  today as part of your lawsuit. Do you
20  understand that?
21       A    Yes.
22       Q    Have you ever given a deposition
23  before, ma'am?
24       A    No, ma'am -- no.
25       Q    Okay. Well, just so that you and I
```

5

1  are on the same page of the hymnbook, as I
2  like to say, because I'm just a country boy
3  myself, let me just kind of go over the
4  process with you, so that I can make sure you
5  and I are communicating well and you
6  understand how the process works.  Okay?
7      A    Yes.
8      Q    Basically, the process works -- and
9  let me stop myself.
10         MR. WALDING:  Do we have usual
11              stipulations?
12         MR. BRANTLEY:  Yes.
13         MR. MUSSO:  Yeah.
14         MS. HORTBERG:  (Nodding head.)
15         MR. BRANTLEY:  Do you want to
16              explain to her what those
17              usual --
18         MR. WALDING:  No.  I'll let you do
19              that.
20         MR. BRANTLEY:  Okay.
21      Q    (By Mr. Walding)  The basic
22  process, ma'am, is for me, as the attorney,
23  to ask you questions, one at the time, and
24  then, you to respond to those questions, one
25  at the time.

6

1      This lady here is a court reporter.  And
2  she's here to transcribe my questions and the
3  other lawyers' questions, because they will
4  all get a chance to ask you questions, and
5  your responses.  And the process is, of
6  course, that you are under oath, sworn to
7  tell the truth.
8      It's important, though, as part of the
9  process, that if you don't understand the
10  question that I'm asking, or you and I are
11  just not communicating very well, that you
12  let me know that in some way.  Okay?
13      A    Yes.
14      Q    Do you understand that?
15      Q    And will you agree that, if you
16  don't understand one of my questions -- and,
17  you know, sometimes lawyers just ask bad
18  questions -- that you'll let me know that in
19  some way?
20      A    Yes.
21      Q    Okay.  And can I assume that if you
22  answer the question, though, and you don't
23  tell me, "Listen, I didn't understand that,
24  Mr. Walding," that you did, in fact,

7

1  understand the question?
2      A    Yes.
3      Q    Okay.  Because you've agreed to
4  tell me if you didn't understand something.
5      A    Right.  Got you.
6      Q    All right.  It's also important, as
7  part of our process, that you answer the
8  question verbally, out loud.
9      A    (Witness nodding head in
10  affirmative.)
11      Q    Shaking your head up and down, just
12  like you're doing now --
13      A    Just like I'm doing.
14      Q    -- is good, and most people do it.
15  But it's more difficult for us to understand
16  at a later time exactly what you meant if you
17  don't answer the questions out loud.
18      So, if you can -- and I'll remind you as
19  we go through it, you know, if you're not
20  doing this for me -- can you answer the
21  questions out loud and with words, "yes,"
22  "no," or sentences?
23      A    (Witness nodding head in
24  affirmative.)
25      Q    Can you do that for me?

8

1      A    Yes.
2      Q    And do you understand why I'm
3  asking you to do that?
4      A    Yes.
5      Q    Okay.  Are you taking any sorts of
6  medications or drugs or substances of any
7  kind that might interfere with your ability
8  to listen to my questions, to understand
9  those, and then, to respond to them?
10      A    No.  I'm not on any medication
11  except an occasional Tylenol.
12      Q    Okay.  Well, now, the last time I
13  checked, Tylenol didn't interfere with your
14  ability to --
15      A    Correct.
16      Q    -- listen and understand and
17  answer.
18      A    That is correct.
19      Q    Okay.  Did you take some Tylenol
20  this morning?
21      A    No.
22      Q    Well, you may need some before
23  we're over.
24      A    That's what I've been told.
25      Q    Really, the process is not that

9

1 bad, but other people disagree with my
2 statement there. Are you suffering from any
3 sorts of medical conditions that might
4 interfere with your ability to listen to my
5 questions, understand those, and then,
6 respond to them?
7     A    No.
8     Q    Okay. Do you have a hearing
9 problem of any kind?
10    A    No, I don't.
11    Q    Do you have a problem reading?
12    A    No.
13    Q    Okay. I notice that you have
14 glasses with you today.
15    A    Right.
16    Q    Are those just reading glasses?
17    A    Yes.
18    Q    Okay. So, then, if we look at
19 documents, you may have to actually use your
20 reading glasses?
21    A    That's correct.
22    Q    Okay. Are you suffering from any
23 sorts of emotional or psychological problems
24 today that might keep you from listening to
25 my questions, understanding those, and

10

1 responding?
2     A    I've had a sister-in-law have
3 surgery, so my mind is a little bit, you
4 know, concerned about her. But I don't think
5 it will interfere.
6     Q    So, you might be slightly
7 distracted because of your sister-in-law?
8     A    Possibly.
9     Q    Okay. Well, will you do your best
10 to focus on what we're here for today?
11    A    Absolutely.
12    Q    And if you get distracted at some
13 point, would you tell me that, and maybe we
14 could take a break, and you could get some
15 caffeine or something?
16    A    Yes, I will.
17    Q    Will that be okay?
18    A    That will be fine.
19    Q    Because we have lots of caffeine in
20 this office.
21    A    Okay.
22    Q    Okay?
23    A    All right.
24    Q    And, ma'am, I do hate to ask you
25 this question. But, would you tell me how

11

1 old you are, please?
2     A    Oh, I don't mind a bit. I'm 53.
3     Q    Well, I have discovered in life
4 that that's not a pleasant question to ask,
5 especially females, and I've been slapped a
6 few times for asking it. So, I'd like to
7 apologize ahead of time. Okay? Where do you
8 live, ma'am?
9     A    100 Oak Manor Court, Midland City,
10 Alabama. That's my mailing address. We're
11 actually in the city limits of Dothan.
12    Q    Now, whereabouts is that?
13    A    Off Brannon Stand Road and
14 Bethlehem Road.
15    Q    Sure. How long have you lived
16 there?
17    A    We built our house in 1985. And
18 with the exception of being assigned to
19 several military assignments in a five-year
20 period, we've lived there the entire time.
21 We moved back here into our same home. So,
22 we've owned the home since 1985.
23    Q    But y'all actually physically moved
24 away for some time?
25    A    In 1989. Uh-huh.

12

1     Q    Where did you move to?
2     A    That was Fort Leavenworth, Kansas.
3 And then, we moved to Fort Lee, Virginia.
4 And then, my husband retired, and we moved
5 back here to our home.
6     Q    I take it that your husband is in
7 the military?
8     A    He's retired now. Uh-huh.
9     Q    Okay. Well, what branch of the
10 military was he in?
11    A    Army.
12    Q    And what rank did he obtain?
13    A    He retired as a major.
14    Q    All right. How long were y'all at
15 Fort Leavenworth, Kansas?
16    A    Let me see. From 1989 to May of
17 1992.
18         (Brief off-record.)
19    Q    You said that y'all also went to
20 Fort Lee, Virginia?
21    A    Uh-huh.
22    Q    When was that?
23    A    That was 1992. And then, when my
24 husband retired, we moved back here.
25    Q    And when did he retire?

13

1   A    1994.
2   Q    So, then, you have lived at 100 Oak
3   Manor Court continuously, then, since 1994?
4   A    That is correct.
5   Q    And you live there as we sit here
6   today?
7   A    That is correct.
8        (Brief off-record.)
9   Q    I take it that you are married?
10  A    Yes.
11  Q    And you spoke about your husband
12  earlier.
13  A    Uh-huh.
14  Q    To whom are you married?
15  A    Major Terry L. Miller.
16  Q    Have you been married to anyone
17  else?
18  A    No.
19  Q    When did you and he marry?
20  A    1972, December 2nd.
21  Q    And do you have any children?
22  A    We have three.
23  Q    And what are their names?
24  A    Jennifer is my oldest.  And then,
25  Quentin, Q-u-e-n-t-i-n.

14

1   Q    Yes, ma'am.
2   A    And Justin.
3   Q    How old is Jennifer?
4   A    Jennifer was born in '74, so she is
5   33.
6   Q    And does she live in Houston
7   County?
8   A    No.
9   Q    Does she live in southeast Alabama?
10  A    She lives in Montgomery, right now.
11  Q    What about Quentin?  How old is he?
12  A    Quentin is -- let's see.  Gosh.
13  That's terrible.  He is 27.
14  Q    Yes, ma'am.  And where does he
15  live?
16  A    He's in Tuscaloosa.  May I correct
17  that?  I believe he's 28.  Let me
18  double-check.
19  Q    That's all right, ma'am.  I won't
20  tell, if you don't.
21  A    That's terrible.  I tried to
22  forget that part of it there.  Makes me feel
23  old.
24  Q    Sure.  What about Justin?  How old
25  is he?

15

1   A    He is 26.
2   Q    And where does he live, ma'am?
3   A    He's actually living at home, right
4   now.
5   Q    Here in Houston County?
6   A    Actually, it's Dale County.
7   Q    Dale County?
8   A    Uh-huh.
9   Q    Now, is Justin married?
10  A    No.
11  Q    All right.  Ma'am, do you have any
12  relatives by blood or marriage, that are over
13  19 years of age, and that live in Houston,
14  Henry, Dale, Geneva or Coffee Counties,
15  Alabama?
16  A    No.  Only Justin.  Just Justin is
17  the only one.
18  Q    And that's one reason I asked you
19  if he was married.  So you understand that
20  question, I'm really asking that for purposes
21  of striking a jury in this case.
22  A    Okay.
23  Q    And those are the counties in this
24  district, or this part of the Middle District
25  of Alabama.  So, you don't have any relatives

16

1   by blood or marriage?
2   A    No.
3   Q    And your husband doesn't have any
4   relatives --
5   A    No.
6   Q    -- in those counties?
7   A    (Witness shaking head in negative.)
8   Q    Do I need to repeat the counties
9   for you?
10  A    No.
11  Q    Do you have any close friends that
12  are over 19 years of age that live in those
13  counties?  That's Houston, Henry, Dale,
14  Geneva and Coffee Counties.
15  A    No.
16  Q    You don't have any close friends
17  that live in this area?
18  A    Not particularly, no.
19  Q    Well, when you say "not
20  particularly," that means that you're
21  qualifying your answer.
22  A    I'm sorry.
23  Q    Do you have any close friends?
24  A    No.  I don't have any real close
25  friends here in this area.

17

1    Q    Okay.  So, you don't have anyone
2    that you interact with on a fairly regular
3    basis?
4    A    No.  My family.  And that's about
5    it, unless we go over to Georgia.  You know.
6    We have friends in Georgia, military friends.
7    Q    Yes, ma'am.  Okay.  So, do you
8    engage in any hobbies with other individuals
9    in this area?
10   A    No.
11   Q    Okay.  Like, play tennis or golf?
12   A    No.
13   Q    Bridge or cards of any kind?
14   A    No.
15   Q    All right.  Are you a member of any
16   church?
17   A    I'm not a member at this time.  I
18   occasionally have gone to Covenant United
19   Methodist Church, but haven't been there for
20   several years.
21   Q    Okay.  When you went to Covenant
22   Methodist Church, did you go to a Sunday
23   school class?
24   A    No.
25   Q    Well, did you interact with any

18

1    persons from Covenant on a regular basis?
2    A    No.
3    Q    So, you just went to church for
4    your service and went home?
5    A    Uh-huh.  Didn't attend any kind of
6    extra things, social things or anything like
7    that.  No.
8    Q    All right.  Are you a member of any
9    social or civic club?
10   A    At this point in time, no.
11   Q    I take it that you have been --
12   A    Yes, uh-huh, years ago.
13   Q    -- because of your qualifier?
14   A    Yes, years ago.
15   Q    Was that here in southeast Alabama?
16   A    Yes.
17   Q    And what civic or social clubs were
18   you a member of?
19   A    For instance, Wiregrass Arabian
20   Horse Association, which is no longer a
21   viable organization.
22   Q    Right.  Any others?
23   A    Let me see.  While I was in school,
24   going to Troy University, I was in the Gamma
25   Beta Phi, which is an honors organization.

19

1    Kappa Delta Pi, which was an education honors
2    association.  AEA, student AEA.  I'm trying
3    to think.  At this time, I just can't
4    remember.  If I think of some, I'll let you
5    know, though.
6    Q    Okay.  Did these organizations, the
7    Gamma Beta Phi --
8    A    Phi.  Uh-huh.
9    Q    -- and the Kappa Delta Pi --
10   A    Uh-huh.
11   Q    Am I saying those right?
12   A    Yes.
13   Q    Did they have meetings of some
14   kind?
15   A    Yes.
16   Q    Okay.  And were there persons in
17   those organizations with whom you regularly
18   engaged or interacted?
19   A    Just at the meetings.  We were all
20   involved in school, and so, it just left very
21   little time for much of anything.
22   Q    Well, were there any individuals
23   that you can name for me today that you
24   interacted with as part of those
25   organizations?

20

1    A    Brenda Patterson.  She happened to
2    be a fellow student in the teacher program.
3    Q    Yes, ma'am.
4    A    I'm trying to think of other
5    people.  I didn't really know that many of
6    them --
7    Q    Right.
8    A    -- 'cause some -- it wasn't
9    necessarily, as far as Gamma Beta Phi -- it
10   was a conglomerate of, you know, all
11   different of the -- like, business,
12   education.
13   Q    All of the colleges and
14   departments?
15   A    All of the different colleges.
16   Yes.
17   Q    It was an honor society, you said?
18   A    Uh-huh.
19   Q    But the Kappa Delta Pi --
20   A    Kappa Delta Pi -- Kappa Delta Pi
21   was an education organization.
22   Q    Yes, ma'am.  And did you interact
23   with people regularly in that organization?
24   A    I would see a couple of students
25   that I knew.  I didn't know everybody.  In

21

1  fact, I knew very few, because I was a
2  special education major, and there weren't
3  that many special education students at the
4  time.
5      Q    I understand. Can you name any of
6  those persons that you would interact with?
7      A    I'm trying to think of the girl's
8  last name. Jenny. I can't remember her last
9  name. I'm sorry.
10     Q    All right. What about the student
11 AEA? Did it have meetings?
12     A    Yes.
13     Q    And were there persons with whom
14 you regularly engaged or interacted?
15     A    Yes, when we would have meetings.
16     Q    Okay. Can you name me any of those
17 persons?
18     A    Gosh. I'm sorry. I just can't
19 recollect who all was in the organization.
20     Q    Sure. I understand.
21     A    It's been a while.
22     Q    Okay. So, you don't have any
23 relatives by blood or marriage in this area,
24 and you don't have any close friends. You
25 have attended a church, Covenant Methodist,

22

1  but you can't name any persons from that
2  organization that might be your friends or
3  close associates. Is that an accurate
4  statement?
5      A    That's pretty accurate. We didn't
6  attend that often.
7      Q    Okay. Well, I understand Dr. McKay
8  can be fairly boring sometimes. I
9  understand. That's a joke. That's a joke,
10 Mrs. Miller. Please don't go tell him I said
11 that.
12     A    When I actually went there, I
13 believe it was Dr. Harbour who was the
14 minister.
15     Q    That has been some time.
16     A    He married my daughter back then.
17     Q    He performed the ceremony?
18     A    Yes. I'm sorry. I said he married
19 my daughter. I'm sorry. He performed the
20 ceremony.
21     Q    Yes, ma'am. And I do hate to ask
22 you this next series of questions, ma'am, but
23 I need to ask them, regardless. Okay?
24     A    Uh-huh.
25     Q    Have you ever been arrested?

23

1      A    No.
2      Q    Have you ever been accused of a
3  crime?
4      A    A speeding ticket, and I believe I
5  ran a stop sign. I ran a stop sign.
6      Q    Other than traffic-related --
7      A    No.
8      Q    -- problems?
9      A    No.
10     Q    Have you ever lied under oath?
11     A    Not to my knowledge, no. No.
12     Q    Have you ever been involved in any
13 other lawsuits other than the one that we're
14 here about today?
15     A    No.
16     Q    This is the first lawsuit that you
17 have filed?
18     A    That is correct.
19     Q    Have you ever filed for bankruptcy?
20     A    No.
21     Q    Okay. If you would, ma'am, tell me
22 a little bit about your education. Where did
23 you go to high school?
24     A    New Philadelph High School, in
25 New Philadelphia, Ohio.

24

1      Q    And did you grow up in New
2  Philadelphia, Ohio?
3      A    Yes. I was born in Springfield,
4  but I grew up in New Philadelphia.
5      Q    Okay. And you took a high school
6  diploma there?
7      A    Yes.
8      Q    All right. And when was that?
9      A    I graduated in 1972.
10     Q    What did you do after graduating
11 from high school?
12     A    I worked --
13     Q    Yes, ma'am.
14     A    -- at a Kroeger store, and then, I
15 met my husband and got married.
16     Q    And did you continue to work after
17 you married Mr. Miller?
18     A    No.
19     Q    All right. So, you became a
20 homemaker then?
21     A    That's correct.
22     Q    And what was the next step, if any,
23 on your educational background?
24     A    When we moved to Fort Leavenworth,
25 Kansas, I attended the Johnson County

25

1  Community College. They had an equine
2  studies program there, and I jumped at the
3  chance.
4      Q    Pun intended, I'm sure.
5      A    Actually, I'm not a hunter jumper,
6  so, actually, not.
7      Q    And did they offer some sort of
8  certificate or degree at this --
9      A    Degree. An associate's.
10     Q    It's an associate's degree?
11     A    Uh-huh.
12     Q    Okay. And did you use that degree
13  in some way to work or earn a living?
14     A    I have given lessons before.
15  Uh-huh.
16     Q    Well, tell me the next step in your
17  education?
18     A    Okay. When we moved back down here
19  to Alabama, I went to real estate school.
20     Q    All right. And you moved back down
21  to Alabama -- would that have been in 1985?
22     A    I moved back down here in 1994.
23  1985 is when we first built our house.
24     Q    Yes, ma'am.
25     A    And then, my husband retired in

26

1  1994, and we moved back down here from Fort
2  Lee.
3      Q    Well, then, I just misunderstood
4  you. I assumed you had to be in this area
5  when you built the house, but I don't suppose
6  that's true.
7      A    No. That is true. In 1985, we
8  built our home. We were stationed from Fort
9  Meade, Maryland, down here to Dothan.
10     Q    Yes, ma'am.
11     A    We built our home. 1989, we kept
12  the house and rented it out and moved to Fort
13  Leavenworth, Kansas.
14     Q    I see. Okay. But when you said
15  earlier that you moved back to Alabama and
16  went to real estate school --
17     A    Right.
18     Q    -- that was roughly --
19     A    That was in 1994, after my husband
20  retired.
21     Q    Yes, ma'am. And did you use that
22  training or education to earn a living in
23  some way?
24     A    Yes. I was a realtor for several
25  years.

27

1      Q    With whom were you a realtor?
2      A    ERA Jack Hughes Realty.
3      Q    And how long were you with that
4  group?
5      A    Offhand -- I can't remember
6  exactly. Probably a yearish. Somewhere
7  around there.
8      Q    And, also, Mr. Strange standing up
9  reminds me that if you need to take a break
10  at any time, you just let me know that, and
11  we can do that at any time.
12     A    Thank you.
13         (Brief off-record.)
14     Q    Now, tell me the next step in your
15  education?
16     A    Okay. I went to Troy University.
17     Q    Yes, ma'am. So, you were a realtor
18  for about a year. That would put us around
19  1995?
20     A    Well, actually, I was a realtor at
21  that particular company for one year,
22  approximately a year. I was at a couple of
23  other real estate companies.
24     Q    What other companies?
25     A    Okay. Lummus Company, Better Homes

28

1  & Gardens.
2      Q    Lummus?
3      A    It's actually pronounced Lummus --
4      Q    Well, I told you that I was a
5  country boy.
6      A    -- according to Dave Lummus.
7  'Cause I always thought so, too.
8          MR. BRANTLEY: I've always said
9              Lummus.
10         THE WITNESS: Uh-huh. He said
11             there's no double "o." It's
12             only "u."
13     Q    Country folks call it Lummus.
14  Okay. How long were you with Dave Lummus?
15     A    Probably another -- maybe year and
16  a half or so. I don't remember exactly the
17  dates. I mean, I would have to look them up.
18     Q    Sure. I understand. All right.
19  And then, you indicated you were a realtor
20  with at least one other company?
21     A    That's correct. The Buyer's Agent.
22  It's no longer in business, unfortunately.
23     Q    Who was the principal in that?
24     A    Barbara Lewis purchased the
25  franchise from a lady in Enterprise.

29

1   Q   Okay. And who was that lady?
2   A   Becky -- I'm sorry.
3   Q   You don't know?
4   A   I can't remember her last name.
5   Q   Okay. And how long were you with
6   The Buyer's Agent?
7   A   I believe it was less than a year,
8   because she ended up selling the franchise
9   back to Becky. Becky Hancock.
10  Q   And you said Ms. Hancock was from
11  Enterprise?
12  A   Yes.
13  Q   Okay. Any other real estate
14  agencies you worked for?
15  A   No.
16  Q   Then you indicated that you started
17  at Troy University?
18  A   Uh-huh.
19  Q   And was that here in Dothan?
20  A   Yes.
21  Q   And approximately when would that
22  have been?
23  A   2001. Fall semester of 2001.
24  Q   And what sort of courses were you
25  taking then?

30

1   A   Special education. I was going to
2   be a special education major. So, I started
3   off with the normal core classes that you
4   have to take prior to.
5   Q   You started out with classes that
6   every college student would have to take?
7   A   Yes.
8   Q   But you had already made up your
9   mind at that time you wanted to be a special
10  education teacher?
11  A   Absolutely.
12  Q   And at the time that the incidents
13  that are the basis of this lawsuit, I don't
14  believe you had actually attained a
15  bachelor's degree? Is that right?
16  A   That is correct.
17  Q   So, when you were doing your intern
18  teaching, your internship out at Houston
19  County High School, you had not attained your
20  bachelor's?
21  A   That's correct.
22  Q   Did you eventually attain your
23  bachelor's degree?
24  A   Yes.
25  Q   And did you eventually become a

31

1   certified teacher?
2   A   Yes.
3   Q   When did you become certified?
4   A   I believe it was August of 2005, is
5   actually when my certificate came back from
6   the state.
7   Q   Okay. And when did you attain your
8   bachelor's degree?
9   A   On my birthday of 2005. May 6th.
10  Q   And, Mrs. Miller, do you hold a law
11  degree?
12  A   No, I do not.
13  Q   Have you ever been to law school?
14  A   No.
15  Q   Do you hold a degree of any kind in
16  a law-related or legal field?
17  A   No.
18  Q   Like, a paralegal-type certificate?
19  A   No.
20  Q   Do you have any other degrees or
21  certificates past the bachelor's degree?
22  A   No.
23  Q   Have you, yourself, ever read the
24  IDEA?
25  A   I've read certain sections of it in

32

1   college, when our instructor would give us a,
2   you know, handout.
3   Q   Okay. Have you ever sat down and
4   read the entire federal law called the IDEA?
5   A   No.
6   Q   Have you ever read the federal
7   regulations that interpret and expand on the
8   IDEA?
9   A   No.
10  Q   Have you ever read the state
11  regulations that interpret and expand on the
12  IDEA?
13  A   I would imagine that would be the
14  -- I'm not sure exactly what you're talking
15  about, I mean, specifically those terms. But
16  I have seen the information on the state
17  education web site concerning the state
18  rules.
19  Q   When you said the state web site,
20  you're talking about the Alabama Department
21  of Education web site?
22  A   That is correct.
23  Q   So, have you ever sat down and read
24  the state regulations that interpret and
25  expand on the IDEA?

33

1    A    I have read portions of, but I've
2   not sat down the read the entire thing.
3    Q    Okay. And the portions that you
4   read would have been on the web site for the
5   state education department?
6    A    No. That would probably -- let me
7   think. I'm not sure where I would have read
8   that from. I'm sorry.
9    Q    Okay. Have you ever read one of
10  the approximately three or four standard
11  legal treatises on special education law?
12   A    I'm not familiar with those -- with
13  that term.
14   Q    Which term are you not familiar
15  with?
16   A    The treatises.
17   Q    Okay. Treatise is a fancy word for
18  book. It's a law book.
19   A    Okay. I have not read -- to my
20  knowledge, I've not read a law book
21  pertaining to special education. A law book.
22  My understanding of what a law book would be.
23   Q    All right. And I'm not trying to
24  mislead you, or you and I not communicate
25  well. But there are approximately three or

34

1   four standard works in the special education
2   legal field. And I'm asking you if you have
3   read any of those?
4    A    To my knowledge, I don't think I
5   have.
6    Q    Okay. Have you ever attended one
7   of the national conventions on special
8   education law?
9    A    No.
10   Q    Have you ever taken any special
11  classes or courses that specifically taught
12  or were directed towards teaching the special
13  education laws?
14   A    Yes, at Troy University.
15   Q    Have you been specifically trained
16  in the special education laws?
17   A    I'm under the understanding that I
18  have been trained in terms of what the
19  special education program offers at Troy
20  University.
21   Q    Okay. Any training that you have
22  would have come from your education at --
23   A    That is correct.
24   Q    -- Troy University?
25   A    That is correct.

35

1    Q    And you mentioned a specific course
2   that you took at Troy University?
3    A    I believe it was called policies
4   and procedures. And, of course, in other
5   classes, we discussed, naturally, the federal
6   laws. We discussed IDEA, the Americans
7   Disabilities Act. And let me think what
8   else. No Child Left Behind.
9    Q    Yes, ma'am. So, those would have
10  come up during different sections in the
11  course work?
12   A    Yes.
13   Q    If I'm understanding you right --
14  and I want to make sure that I'm
15  understanding you right -- the only course
16  that specifically dealt with the law of
17  special education would be this policies and
18  procedures course you mentioned?
19   A    To my understanding, yes.
20   Q    And who taught that course?
21   A    That was Dr. Ruediger.
22   Q    Is that Dr. Greg Ruediger?
23   A    Yes.
24   Q    To your knowledge, is Dr. Greg
25  Ruediger an attorney?

36

1    A    No, not to my knowledge.
2    Q    And as part of the course on
3   policies and procedures -- I'm just going to
4   call that course that. Okay?
5    A    Uh-huh.
6    Q    And you'll understand the course
7   I'm talking about when I say that?
8    A    Yes.
9    Q    Okay. As part of that course, were
10  you required to read the federal law? You
11  called it IDEA. I call it I-D-E-A. It
12  stands for Individuals with Disabilities and
13  Education Act.
14   A    Uh-huh. Yes. We were not required
15  to sit there and read the entire thing.
16  Specific areas, he would print off excerpts
17  and that sort of thing.
18   Q    And how many weeks was this course
19  on policies and procedures?
20   A    It was a semester.
21   Q    Yes, ma'am. The question is the
22  same.
23   A    A semester. I'm not sure how many
24  weeks that involved, right off the top of my
25  head. I don't recall.

37

1    Q    So, you don't think it was nine or
2  twelve weeks? You don't have any idea?
3    A    I don't recall.
4    Q    How many times per week did you
5  attend the course?
6    A    I'm trying to think if that was an
7  independent study or if it wasn't.
8  Generally, we had either two days a week or
9  three days a week. I think it was two days a
10 week, but I'm not 100 percent sure.
11   Q    Okay. And then, the course was
12 taught for an hour each time?
13   A    I believe it was more than that,
14 but I'm not 100 percent sure. I'm sorry.
15   Q    And again, just so that you and I
16 are communicating well, this policies and
17 procedures class, that would have been the
18 only formal education you would have on the
19 special education laws?
20        MR. FAULK: The only course
21        specifically devoted to that?
22        MR. WALDING: Yes, sir. Formal
23        education.
24   A    I believe that's the only course
25 that was specifically addressing that.

38

1    Q    And did you undertake, yourself,
2  informally, let's say, outside of a classroom
3  setting, to become familiar with the special
4  education laws?
5    A    Yes.
6    Q    Okay. Tell me how you did that?
7    A    I did research on the computer. We
8  had been told that we could go to the
9  library, of course, and, you know, get books
10 on special education. Oftentimes, if I had
11 time in between classes, I would go to the
12 library and get books out. I wouldn't
13 actually, necessarily, take them home, you
14 know, check them out or whatever, but I would
15 read.
16   Q    All right. Anything else?
17   A    The computer. I did a lot of
18 computer work at home and at school.
19   Q    All right. And what sort of
20 research did you do on the computer to become
21 familiar with the special education laws?
22   A    There were articles. Oftentimes,
23 we would have to write articles about certain
24 topics, and sometimes it had to do with
25 different scenarios.

39

1        And so, let's say there was an article
2  that Dr. Ruediger or one of the other
3  instructors, Dr. Morin, would give us, and
4  then, we might have to do a little research,
5  and then, critique the article, and
6  interject, you know, things that we've
7  learned from outside sources and that sort of
8  thing into the information.
9    Q    Okay. So, if I'm understanding
10 you, the computer research that you did would
11 have been related to classes that you were
12 taking at the time, and not specifically
13 directed towards learning and having a good
14 and general understanding of the special
15 education laws and regulations?
16   A    I also did other types of research,
17 areas that I was not familiar with. Let's
18 say students with autism, you know, or
19 students with mental retardation. And, you
20 know, there are so many disabilities under --
21 that come under special education, that I
22 wanted to familiarize myself in case I
23 experienced any of those types of
24 disabilities.
25   Q    Okay. Can you tell me, according

40

1  to the IDEA, how many types of disabilities
2  are recognized?
3    A    There is SLD, which is specific
4  learning disabilities. Mental retardation.
5  OHI, which stands for other health
6  impairments. VI, which is visual impairment.
7  There's emotionally conflicted, or they used
8  to call it emotionally disturbed. I think
9  emotionally conflicted is the correct term
10 nowadays, the politically correct term.
11   Q    Yes, ma'am. Can you tell me the
12 number of disabilities that are accepted and
13 stated under the special education law known
14 as the IDEA? It's a very simple question,
15 ma'am.
16   A    Well, I'm not sure that -- there
17 are other -- I'm not sure how to phrase it.
18 I can't be specific with a certain number.
19 I'm just --
20   Q    Okay. You can't tell me that
21 number, because you've never read the IDEA?
22   A    I don't believe that's the reason
23 why. It's more like a memory sort of thing.
24   Q    Okay. But you would agree you
25 can't tell me that number?

41

1     A    I can't tell you a specific number,
2 but I've given you some of -- an idea of some
3 of the disabilities.
4     Q    Yes, ma'am. I wrote down five
5 disabilities that you named off.
6     A    Okay.
7     Q    I want to make sure you've answered
8 my question. Can you tell me the number of
9 disabilities that are listed and accepted
10 under the IDEA?
11     A    I'm not 100 percent sure of all of
12 them.
13     Q    And I am clear to the fact that
14 you've never actually read the federal law of
15 the IDEA?
16     A    Not totally.
17     Q    Okay. Do you have an
18 understanding, ma'am, of how the special
19 education process itself works?
20     A    I believe I do.
21     Q    All right. Good. I want you to
22 assume for me that you have a student who is
23 not labeled special education, and that
24 student is having problems either
25 academically or behaviorally, or both, in the

42

1 classroom, and that either a teacher or a
2 parent thinks that child may have some form
3 of disability and needs some special help.
4 What is the process that teacher or parent
5 would go through in order to get that child
6 help?
7     A    The first thing, my understanding,
8 is that they would go through the Building
9 Base Support Team and talk -- Building Base
10 Support Team, BBSST, would discuss the issues
11 and try to determine interventions that could
12 be done in the classroom. They would go back
13 to the classroom, try those interventions,
14 and if it didn't -- if they didn't work, or
15 if some did, they would report back to the
16 BBSST.
17     And if it was found that those
18 interventions did not help that student, they
19 would -- it's my understanding -- now, I've
20 never actually been involved in the BBSST.
21 But my understanding is that they would --
22 the BBSST would recommend that the student be
23 tested, and when the testing was finished,
24 they would determine eligibility.
25     Q    Who would do the testing?

43

1     A    My understanding is a psychometrist
2 is in charge of that.
3     Q    Do you understand the type testing
4 that's done?
5     A    They usually -- my understanding is
6 that they usually do intelligence tests and
7 achievement tests.
8     Q    But what if it's a behavior
9 problem?
10     A    Behavior alone is not -- my
11 understanding is that behavior alone is not
12 specifically under the criterion for a
13 student to be able to receive special
14 education services. It's my understanding
15 that that could be part of the problem. But
16 if they have a behavior problem, they would
17 take those things into consideration, and
18 that would be part of --
19     Q    Sure. My real question is, do you
20 understand that there's testing involved in
21 behavior problems, behavior issues?
22     A    I have not been -- I have not
23 actually seen any testing for behavior
24 problems other than someone on the outside, a
25 doctor of some sort, you know, having --

44

1 like, for instance, ADHD --
2     Q    Sure.
3     A    -- they would -- the doctor would
4 determine whether or not he had ADHD.
5     Q    You've never done testing,
6 yourself, have you?
7     A    No.
8     Q    All right. Tell me the remainder
9 of the process, as you understand it?
10     A    Once the eligibility team has
11 determined that the student does get -- is
12 eligible for special education services, then
13 it goes to the IEP team. Now, that's been my
14 experience.
15     Q    So, if the eligibility team
16 determines that the child does not fit into
17 one of the established categories of
18 disabilities, and is not entitled to special
19 education services, what happens?
20     A    To my knowledge, what I've seen, in
21 my experience --
22     Q    Yes, ma'am. That's what I'm
23 asking.
24     A    -- that student is -- if they're
25 not eligible for services, then the student

45

1  just goes back into the classroom, like
2  normal, and they can put that child up again
3  for BBSST at some other point in time.
4      Q   Okay. So, you recognize, then,
5  that there's a difference between this group
6  that determines eligibility for special
7  education services and the group that plans
8  programming once a child is determined to be
9  eligible for special education services?
10     A   That has been my experience.
11     Q   Yes, ma'am. And that's the process
12 you just told me about?
13     A   Uh-huh.
14     Q   I'm trying to make sure that you
15 and I are on the same page. You understand
16 there's something called the eligibility team
17 that determines whether a child is eligible
18 to get services, and then, there's something
19 called the IEP team that deals with
20 programming?
21     A   Technically speaking, my
22 understanding is that they could be one and
23 the same. But, in my experience, the
24 eligibility team has been separate until
25 they've been determined -- the student has

46

1  been determined eligible, and then, a special
2  education teacher will come into the
3  eligibility meeting with the parent, and sit
4  in, so that they can discuss some ideas for
5  eventually doing the IEP. Or if the notice
6  of proposal that is sent to the parent about
7  eligibility states on there -- is checked off
8  where the IEP team will also develop the IEP
9  at the same time, then that's okay, too.
10     But it has been rarely my experience --
11 I think I had one student that I can recall
12 where we actually did the IEP at the same
13 time that we did -- at the same meeting that
14 the parent was told the child was eligible.
15 And that was -- if I'm not mistaken, it was
16 -- he was up for re-eval.
17     Q   Re-evaluation?
18     A   Uh-huh.
19     Q   So, then, he had already been
20 identified --
21     A   Uh-huh.
22     Q   -- as a child in need of special
23 education services?
24     A   In that particular case.
25     Q   Okay. But, in general, where we

47

1  have the hypothetical I gave you earlier, a
2  child who has not been labeled special
3  education, would you agree with me that, in
4  general, we're talking about two steps in
5  this process? Eligibility, or
6  identification, and then, actual programming,
7  planning for the educational services?
8      A   As I understand you, yes.
9      Q   Okay. Good. Thank you, ma'am. To
10 the extent we've not already done so, I want
11 you to tell me about your work history. You
12 told me that you were a realtor, and you
13 talked about the three or four different
14 companies here locally that you worked.
15     We know about the internship, or we're
16 going to talk about it pretty extensively
17 today, which was part of your education and
18 training at Troy.
19     What has been your work history since
20 that time?
21     A   After I graduated, there were no
22 special education jobs in this area that I
23 applied for. I waited until a job opening
24 came at Beverlye Middle School. I had done
25 my internship at Beverlye, and had a

48

1  successful one, very much enjoyed working
2  with those people. And I applied for that
3  position and was hired. It was in January, I
4  believe, of 2006.
5      Q   Okay. And you're employed there
6  today?
7      A   I am looking for a job right now.
8      Q   When did you cease to be employed
9  at Beverlye Middle School?
10     A   The end of this school semester,
11 this past -- in May, the end of May.
12     Q   May of '07?
13     A   Uh-huh. Yes.
14     Q   So, if I'm understanding what you
15 just told me correctly, you worked as a
16 special education teacher at Beverlye Middle
17 School for the second semester of the '06-07
18 school year?
19     A   No. I'm sorry. I worked at
20 Beverlye Middle School from January '06 --
21     Q   Yes, ma'am.
22     A   -- through May of '07. I was there
23 a year and a half, basically.
24     Q   A year and a half.
25     A   At least.

49

1    Q    I'm sorry.
2    A    That would be two years, two school
3    years.
4    Q    I understand you now. The last
5    semester of one school year?
6    A    That's correct.
7    Q    And both semesters of the next
8    school year?
9    A    That's correct.
10    Q    Okay. You said, after graduating,
11    there weren't any special education positions
12    that you applied for.
13    A    Uh-huh.
14    Q    Are you saying there weren't any
15    special education positions in this area?
16    A    I wanted to stay in the Dothan City
17    School System, and preferably Beverlye, so I
18    did not apply.
19    Q    Is it your testimony this morning,
20    ma'am, that there were no special education
21    positions with the Dothan City Board of
22    Education that were not associated with
23    Beverlye Middle School?
24    A    Not to my knowledge.
25    Q    Okay. They didn't have a need for

50

1    a special education teacher in the Dothan
2    City system?
3    A    Not to my knowledge.
4    Q    Okay. And how long was it that you
5    were unemployed after doing this internship
6    at Beverlye Middle School?
7    A    I just stopped working at Beverlye.
8    So, it's been from May --
9    Q    No. No. No. No.
10    A    I'm sorry.
11    Q    Between your internship at Beverlye
12    Middle School --
13    A    Oh, okay.
14    Q    You did an internship at Beverlye
15    Middle School?
16    A    Okay. Internship. I'm sorry.
17    Yes.
18    Q    And I'm asking you how long you
19    were unemployed before you became a teacher
20    at Beverlye Middle School?
21    A    I see. I apologize. From -- let's
22    see. My internship and when I graduated was
23    May. So, from May until January.
24    MR. FAULK: May '05 to January '06?
25    THE WITNESS: Yes.

51

1    MR. FAULK: Excuse me.
2    MR. WALDING: That's fine. Thank
3    you.
4    Q    And you said that you are presently
5    looking for a job?
6    A    Yes.
7    Q    Does that just about cover your
8    work history? Have we covered everything?
9    A    To my recollection, yes.
10    Q    All right. And I thought we had,
11    honestly. But if there's something else
12    that's of importance in your work history, I
13    want to give you a chance to tell me about
14    it. You told me about selling real estate
15    and working at Kroeger and being a homemaker.
16    A    Okay. So, you would like for me to
17    -- let me understand you correctly. You
18    would like me to go back through my entire
19    time, not just --
20    Q    No.
21    A    Oh, okay.
22    Q    I'm really asking you, haven't we
23    just done that?
24    A    I did -- let me think what year it
25    was. 19 maybe 88, 89, I did work at Wallace

52

1    College. I did cake decorating. I was a
2    community -- oh, what's the term they call?
3    Community -- not community services. It was
4    just one of the extracurricular-type, you
5    know, classes that they offer.
6    Q    You taught a course --
7    A    Yes.
8    Q    -- on cake decorating?
9    A    Cake decorating. And prior to
10    that, I owned Nancy's Classic Cakes &
11    Decorating Supplies, which was a little cake
12    shop, and I had cake decorating supplies.
13    That was, like, 19 -- that was about during
14    the same time. 19 maybe 88 to 89.
15    And I'm an owner of Felicity Tiaras,
16    currently. I have a business license, but
17    I'm not really -- my daughter and I aren't
18    really involved in actually trying to get the
19    business going yet, because of a lot of
20    personal things that we've got going on at
21    this time. So, we own a company called
22    Felicity Tiaras. It's based out of our home.
23    Q    You and your daughter?
24    A    Yes.
25    Q    That's Jennifer?

53

1  A    Jennifer. Uh-huh.

2  Q    And what does Felicity Tiaras do?

3  A    We make Swarovski crystal wedding

4  tiaras, bridal tiaras, that sort of thing.

5  Q    And I am sorry, ma'am. You're

6  talking about those little crown things?

7  A    Yes. And bridal vails.

8  Q    Vails?

9  A    Uh-huh.

10  Q    Okay. How long have you and your

11  daughter been engaged in that business?

12  A    I think we started it up around

13  2001. We had a company that had some of our

14  tiaras in their shop locally, but we really

15  aren't pushing that right now.

16  Q    This company actually makes these

17  tiaras?

18  A    Yes. We actually hand make them.

19  Q    And then, allow other businesses to

20  sell them retail?

21  A    Yes. And we only had one

22  particular company that we approached, and

23  then, we decided, at a certain point, that we

24  were going to stop right then. But we still

25  continued to get our business license, in

54

1  case we -- we anticipate continuing at some

2  point in time.

3       MR. WALDING: All right. Good

4          enough. Why don't we take a

5          break now?

6       (Recess in deposition.)

7       MR. WALDING: We're back from a

8          break. And during the break,

9          the lawyers had a discussion

10          concerning circulating and

11          agreeing upon a protective

12          order, because, as the course

13          of this deposition proceeds, we

14          will probably need to discuss

15          some children's names, and

16          there, of course, is a concern

17          for their privacy.

18       And I believe what we have

19          agreed on is to circulate a

20          protective order and agree on

21          that, and ask the Court to

22          enter that protective order.

23          That would require all the

24          parties and counsel to keep the

25          transcript and the names of

55

1          these children confidential,

2          and only be used in the lawsuit

3          itself.

4       And I believe we have

5          agreed that the court reporter

6          will substitute initials for

7          the children's names, and that

8          if there are two children that

9          have the same initials, we'll

10          deal with that if it comes up.

11       I think we also agreed to

12          file under seal, if necessary.

13          And we can address that, I

14          suppose, in our protective

15          order that we're going to

16          circulate.

17       Just for our record, will

18          y'all all sort of indicate

19          that's what we talked about and

20          agreed on?

21       MR. MUSSO: That's what we talked

22          about and agreed on.

23       MR. FAULK: Yes. That's fine.

24       MR. BRANTLEY: Yes.

25       MR. WALDING: Good enough.

56

1  Q    Mrs. Miller, I want to show you --

2  one of my problems this morning was these

3  exhibits, and I apologize to you. Let me

4  show you what I have had marked Defendant's

5  Exhibit No. 5, and ask you if you recognize

6  that document?

7  A    (Witness reviewing document.) I am

8  familiar. I have seen this document before.

9  Q    Okay. You do recognize the

10  document?

11  A    Yes.

12  Q    And, Mrs. Miller, that is a copy of

13  your complaint --

14  A    Uh-huh.

15  Q    -- the lawsuit that you filed in

16  this case. Do you understand that?

17  A    Yes.

18  Q    Have you had a chance to review the

19  document today?

20  A    Not today. I mean, right now?

21  Q    Yes, ma'am.

22  A    I'm briefly looking over it.

23  Q    Okay. Well, what I'd like to ask

24  you, is, does that document accurately state

25  the problems and complaints you have against

57

1  the defendants, the people you have sued in
2  this case?
3      A    Yes.
4      Q    Now, as I read your complaint,
5  ma'am, you're saying that the defendants, the
6  people you've sued, have somehow violated
7  your constitutional right to freedom of
8  speech?
9      A    Yes.
10     Q    And is that what you contend in
11 this case?
12     A    Yes.
13     Q    Now, I actually read your complaint
14 to say that the defendants have somehow
15 violated your constitutional right to free
16 speech by stifling or squelching --
17 "squelching" is a word I use -- your right to
18 free speech. Do you make that contention?
19          MR. FAULK: Excuse me. I'm going
20             to object to the form just to
21             the extent that it might call
22             for a legal conclusion.
23          MR. WALDING: Sure.
24          MR. FAULK: On any of these
25             contention-seeking things, to

58

1             the extent they call for a
2             legal conclusion, we just want
3             to have a continuing objection,
4             and I won't be interrupting
5             you.
6          MR. WALDING: That's fine.
7          MR. FAULK: Unless you want me to.
8          MR. WALDING: I'd rather you not
9             interrupt me, Winn, but if you
10            need to, you go ahead.
11         MR. FAULK: If we could agree to
12            have a continuing objection to
13            any questions calling for a
14            legal conclusion, then she can
15            answer the best she can.
16         MR. WALDING: Sure.
17     Q    You agreed with me earlier, did you
18 not, Mrs. Miller, that this document
19 accurately reflects the problems and
20 complaints you have against the defendants?
21     A    Yes.
22     Q    Okay. I read your complaint to say
23 that one thing the defendants did was somehow
24 stifle, squelch, suppress your right to
25 freedom of speech. Is that one of the

59

1  contentions you're making? Is that one of
2  the allegations you're making?
3      A    Yes.
4      Q    Okay. And do you read that in this
5  document, Defendant's Exhibit 5? If you
6  would, look at paragraph 26. That's on page
7  six of Defendant's Exhibit 5. Would you
8  agree with me that the first part of that
9  sentence uses the verb "to stifle"?
10     A    Yes.
11     Q    Okay. Now, I read your complaint
12 to say, also, that, somehow, the various
13 defendants violated your constitutional right
14 to free speech by retaliating against you in
15 some way. Is that a contention or allegation
16 you're making?
17     A    Yes.
18     Q    And would you agree with me, also,
19 that paragraph 26 of Defendant's Exhibit 5
20 uses the verb "to retaliate"?
21     A    Yes.
22     Q    Okay. So, I want to make sure I'm
23 understanding. How I read your complaint is,
24 you're basically saying the various
25 defendants somehow tried to stifle or

60

1  suppress or squelch your right to speak
2  freely?
3      A    Yes.
4      Q    And then, that the various
5  defendants somehow retaliated against you for
6  speaking freely?
7      A    Yes.
8      Q    Okay. I'd like to show you what I
9  have marked as Defendant's Exhibit No. 2. If
10 you would, just put Defendant's 5 away for
11 right now. Defendant's Exhibit No. 2, do you
12 recognize that document?
13     A    I have seen this document.
14     Q    Okay. Have you seen it as part of
15 this lawsuit or this litigation?
16     A    Yes.
17     Q    Okay. This document appears to me
18 to be an e-mail of some kind from Victoria
19 Morin to Pam Parris. Would you agree with
20 that?
21     A    Yes.
22     Q    And would you agree that it appears
23 to be dated April 27, 2004?
24     A    Yes.
25     Q    And according to the document, at

61

1  least, that was a Tuesday?
2     A   Yes.
3     Q   Okay. Now, do you know Victoria
4  Morin?
5     A   Yes, I do.
6     Q   And do you know Pam Parris?
7     A   Yes, I do.
8     Q   And as a matter of fact, Ms. Parris
9  is one of the defendants in this case?
10    A   Yes.
11    Q   Now, is Dr. Morin a defendant?
12    A   No.
13    Q   All right. According to this
14 document, Dr. Morin had some reservations
15 about recommending you for an internship. Do
16 you read the document that way?
17    A   Yes.
18    Q   Okay. In fact, her reservations
19 seem to be that you do not take corrective
20 feedback well, and when things don't go well
21 for you, that you are quick to make excuses
22 and blame others. Would you agree the
23 document says that?
24    A   Yes, the document says that.
25    Q   Have you ever discussed with

62

1  Dr. Morin this opinion she has of you?
2     A   No. I was never made aware of it
3  until this lawsuit occurred.
4     Q   All right. Let me ask you this,
5  then. Let me show you Defendant's Exhibit 3,
6  and ask if you recognize that document?
7     A   Yes.
8     Q   And have you seen that document
9  before today?
10    A   No -- yes.
11    Q   As part of this litigation?
12    A   As part of this litigation. Yes.
13    Q   What is the document, Defendant's
14 Exhibit 3?
15    A   It's called "Faculty Recommendation
16 of Prospective Internship, College of
17 Education."
18    Q   And would you agree it relates to
19 you, Nancy Miller?
20    A   Yes, it does.
21    Q   And it appears to be dated 4-27-04.
22    A   Yes. The same date that she sent
23 the e-mail.
24    Q   So, Defendant's Exhibit 3 is dated
25 the same day as Defendant's Exhibit 2?

63

1     A   That's correct.
2     Q   April 27 of '04?
3     A   Yes.
4     Q   Okay. In fact, the last sentence
5  of Defendant's Exhibit 2 says, "I will send
6  on the recommendation to you today."
7  Correct?
8     A   Yes.
9     Q   And so, Defendant's Exhibit 3 is,
10 in fact, a copy of that recommendation?
11    A   Correct.
12    Q   All right. And does Dr. Morin
13 express her concerns about you as part of
14 this document, Defendant's 3?
15    A   Yes.
16    Q   Okay. And, in fact, she checks a
17 little box that says, "I have some
18 reservations regarding this student's
19 readiness for internship." Correct?
20    A   Yes.
21    Q   Okay. Let me show you Defendant's
22 Exhibit No. 4, and ask if you recognize that
23 document?
24    A   Yes.
25    Q   Okay. And did you receive the

64

1  original of that document?
2     A   Yes.
3     Q   You would agree with me it's
4  addressed to you?
5     A   Yes.
6     Q   Okay. Just for purposes of our
7  record, tell us what that appears to be,
8  Defendant's 4?
9     A   It is stating that there's going to
10 be a meeting of the TEP committee, and that
11 they are requesting me to attend.
12    Q   Okay. Would it be a letter from --
13 is it Dr. Parris?
14    A   No. It's Ms. Parris.
15    Q   Ms. Parris?
16    A   Uh-huh.
17    Q   -- dated June 1, 2004, addressed to
18 you, Nancy Miller?
19    A   Yes.
20    Q   And that letter informs you that at
21 least one of the faculty recommendation forms
22 indicated some reservations about you?
23    A   Yes.
24    Q   So, at least as of June 1, 2004,
25 you knew at least one of your faculty persons

65

1  had some reservations about recommending you
2  for an internship, did you not?
3      A     Yes.
4      Q     Okay. And so, in our sequence,
5  Defendant's Exhibit 2 follows into
6  Defendant's Exhibit 3, which then leads to
7  Defendant's Exhibit 4? Right?
8      A     Okay. Yes.
9      Q     These are all logical? Right?
10     A     Yes.
11     Q     Dr. Morin had some reservations.
12 She expressed those in her e-mail to Ms.
13 Parris.
14     A     Uh-huh.
15     Q     She then filled -- that's
16 Defendant's 2. She fills out this
17 recommendation form and expresses her
18 reservations about you. That's Defendant's
19 3? Correct?
20     A     Yes.
21     Q     And then, as a result, Ms. Parris
22 writes a letter to you, saying, we've got to
23 have a meeting. That's Defendant's 4?
24     A     That's correct.
25     Q     Okay. Did you, in fact, attend

66

1  some sort of meeting of this TEP committee on
2  or about June 15, 2004?
3      A     Yes, I did, along with many other
4  students.
5      Q     So, the meeting was held with lots
6  of students?
7      A     Yes. Each individual student would
8  have their little time frame.
9      Q     It was held privately for each
10 student, though?
11     A     Right.
12     Q     Okay. What is a TEP committee, if
13 you know?
14     A     The teacher education program at
15 Troy University.
16     Q     Oh. And do you recall this
17 meeting?
18     A     Yes.
19     Q     As it related to you, I mean?
20     A     Yes.
21     Q     Okay. Tell me what happened?
22     A     They asked some questions in terms
23 of, Mrs. Miller, you know, something similar
24 to, there is a reservation about you not
25 being able to receive constructive feedback.

67

1  And if I remember correctly, there was --
2  they asked me if I understood that. And I
3  said, no, not really. Because I've never
4  really had any problems with any of my
5  classes or my teachers, to my -- you know, to
6  my understanding. It's never been brought
7  across that way.
8      Dr. Morin is a very intense instructor.
9  I learned a whole lot from her. I mean, she
10 was just incredible. And she had actually
11 recommended me for a stipend, because, you
12 know, I was really --
13     Q     Yes, ma'am. If we could
14 concentrate on the TEP meeting, please.
15     A     Okay. I'm sorry. Okay. I
16 explained that I wasn't really sure what this
17 was about. And they just said concern to
18 receive corrective feedback.
19     And the only time that I can recall
20 getting corrective feedback from Dr. Morin
21 was when a project was due, and I turned it
22 in, and I got a "B" on the project, and other
23 students got "B's," maybe even, you know, a
24 different grade, and she suggested that we
25 redo the project.

68

1  And I was happy with my "B," and so, I
2  explained to her, "Well, I think I'll just go
3  ahead and keep this grade." That's the only
4  time that I could think of that was
5  constructive, you know, feedback that she
6  might have been upset with.
7      Q     Yes, ma'am. Let me ask some
8  questions about this meeting.
9      A     Okay.
10     Q     Who was present for the TEP meeting
11 as it related to you?
12     A     Several of the faculty at Troy
13 University. Ms. Parris was there. Of
14 course, Dr. Morin was there. I believe
15 Dr. Ruediger was there. And Dr. Ruediger did
16 give me a no hesitation recommendation.
17 There were probably several other teachers
18 from the education department there, but I
19 don't recollect offhand.
20     Q     And during this meeting, did
21 Dr. Morin, herself, express what her
22 reservations were?
23     A     I do not recall.
24     Q     Well, did they identify which of
25 the faculty members had the reservations

69

1  about you?
2      A    I do not recall. I do not remember
3  Dr. Morin having said this at that meeting.
4  Because this was really a surprise to me when
5  I saw this document.
6      Q    How long did the meeting take?
7      A    Maybe ten minutes. Not even ten
8  minutes.
9      Q    So, if I'm understanding you
10  correctly, we have a ten-minute meeting.
11  Someone identifies, you know, one of the
12  faculty thinks you have a problem taking
13  corrective feedback. You say, well, I really
14  don't know what y'all are talking about. Is
15  that the essence of it?
16      A    In the essence. And then, other
17  teachers, like, Dr. Ruediger, he -- I do
18  recall him saying that he had no
19  reservations, but that he would hope that if
20  there were any concerns that I had or
21  anything like that, that we would come back
22  to the supervisors and discuss those.
23      Q    Would you agree with me that it
24  would be good for a student or an intern to
25  be able to take and accept corrective

70

1  feedback?
2      A    Absolutely.
3      Q    Okay. That's part of the learning
4  process, is it not?
5      A    Absolutely. Absolutely.
6      Q    Okay. So, this was a short
7  meeting. In your mind, was the meeting
8  productive?
9      A    In my mind, the outcome was
10  acceptable.
11      Q    And what was the outcome?
12      A    I was approved for internship,
13  after the discussion amongst the faculty.
14      Q    All right. And I believe you said
15  Dr. Morin was present?
16      A    Yes. I believe she was. I don't
17  -- yes. I'm 99 percent sure.
18      Q    All right. According to your
19  complaint, you started your internship
20  through Troy, at Houston County High School,
21  on or about July 28 of '04. And I am
22  referring to --
23      MR. BRANTLEY: Paragraph 15?
24      MR. WALDING: Yes. Thank you, Tom.
25      Q    -- paragraph 15. Is that accurate?

71

1      A    Technically, I didn't start my
2  internship until -- I believe it was the 16th
3  of August. That's when the actual internship
4  started. I started my teaching contract
5  around July 28th.
6      Q    The internship did not start until
7  when?
8      A    I believe it was August 16th.
9      Q    And why is that date memorable?
10      A    Because that's when my internship
11  started.
12      Q    In other words, you actually
13  started going out to Columbia, to Houston
14  County High School, on August 16th?
15      A    No. That's when I had the dual
16  role starting. Okay. I was actually hired
17  by Mr. Andrews around the 28th of July. Ms.
18  Parris had recommended me to interview. Mr.
19  Andrews -- it's my understanding that Mr.
20  Andrews contacted Ms. Parris because he was
21  having a hard time getting a special ed
22  position filled, as well as an English
23  position.
24      And so, he called Ms. Parris, and she
25  arranged to have a couple of us students

72

1  interview for the position of -- me for
2  special education, and Amy Deese for English.
3      Q    Okay. Who did you interview with?
4      A    Mr. Andrews. I had not met Mr.
5  Pitchford at that point in time.
6      Q    Yes, ma'am. Mr. Andrews, at the
7  time, worked at the central office for
8  Houston County?
9      A    Correct.
10      Q    And you went to the central office
11  when you interviewed with him?
12      A    That's correct.
13      Q    Tell me about that interview?
14      A    He asked me some questions. He
15  told me about some of the things that he
16  expected, and said that he was going to
17  recommend me for the position.
18      Q    And you're thinking this occurred
19  before July 28?
20      A    The actual interview, I believe,
21  was before July 28th. I'm sorry. I don't
22  have a date in my mind exactly. I want to
23  say that Ms. Parris told me about the
24  position, like, the middle of the month or
25  something like that.

**73**

1    Q    Mid July?

2    A    I think so.

3    Q    Yes, ma'am.

4    A    Somewhere like that. But, anyway,

5 then I went and interviewed.

6    Q    Okay. Let me show you what I've

7 marked as Defendant's Exhibit No. 6, and ask

8 you if you recognize that document?

9    A    Yes.

10    Q    Would you agree with me that that

11 document is dated July 28, 2004?

12    A    Yes.

13    Q    And that is the very same date

14 identified in your complaint?

15    A    Yes.

16    Q    Okay. Would you agree with me that

17 Defendant's Exhibit 6 is -- the header states

18 "Internship agreement between Houston County

19 Schools and Troy University Dothan Campus"?

20    A    Yes.

21    Q    And that's a two-page document?

22    A    Yes, it is.

23    Q    And on the second page of the

24 document, bottom left-hand, is that your

25 signature?

**74**

1    A    Yes.

2    Q    And underneath your signature, what

3 does it say?

4    A    "Intern, Troy University, Dothan

5 campus."

6    Q    It also states your name, does it

7 not?

8    A    Yes.

9    Q    But it identifies you as an intern?

10 Correct?

11    A    Yes.

12    Q    Does the document that you hold

13 appear to be a true and correct copy of this

14 internship agreement?

15    A    It appears to be.

16    Q    Okay. Did you fulfill all the

17 obligations imposed on you by that agreement?

18    A    I was terminated from my

19 internship. So, some of -- let me see here.

20 So, I was not able to complete some of the

21 items.

22    Q    Okay. Before you were terminated

23 from the internship, did you complete all the

24 obligations imposed on you by that agreement?

25 The ones that could be completed without

**75**

1 completing the internship. The ones that

2 could be done. Does that question make sense

3 to you?

4    A    Just a moment. (Witness reviewing

5 document.) I was in the process of

6 completing things. Do you want me to explain

7 that?

8    Q    Sure.

9    A    Okay. For instance, the log that

10 was provided to record the time spent in Mr.

11 Strange's room, yes, I was doing that.

12    Q    Did you visit Mr. Strange's

13 classroom one period each week? Do you see

14 that in 3(b)?

15    A    I visited his class as often as he

16 gave me permission to. Because, some days,

17 he would be in a classroom when I -- let's

18 say, for instance, I had my planning period.

19 Okay. So, rather than go into his classroom

20 where he might have been -- you know, as an

21 inclusion teacher, I couldn't do that. So,

22 he would make arrangements with me when we

23 could meet.

24    Q    Okay. Would you agree with me that

25 Defendant's Exhibit 6, paragraph 3(b),

**76**

1 required you to visit Mr. Strange's classroom

2 one period each week?

3    A    Yes.

4    Q    That says that in plain, clear

5 English, doesn't it?

6    A    Yes. And what would happen there

7 is, Mr. Strange and I would make arrangements

8 for me to come when -- at a convenient time

9 for both of us.

10    Q    So, you did your best to comply

11 with that responsibility you had?

12    A    Yes, I did.

13    Q    Okay. And then, if I understood

14 you correctly earlier, you did your best to

15 use these log forms to record that time?

16    A    That is correct.

17    Q    Where are these log forms?

18    A    The log forms were no longer needed

19 when my internship was terminated, and so, I

20 wasn't required to turn those in.

21    Q    They were in your possession?

22    A    They were actually in Mr. -- no.

23 Excuse me. They were probably in my

24 possession, and then, when I would go to his

25 class, he would sign off.

---

77

1    Q    Was it your responsibility to turn
2   the log forms in to someone at Troy?
3    A    If I completed my internship, yes.
4    Q    Okay. What did you do with the log
5   forms?
6    A    Whatever I had, I turned in to Troy
7   University, if they requested it. So, if
8   they did not request, I didn't turn anything
9   in. I wasn't required -- in other words, I
10  was not required to, by Ms. Parris -- since
11  it was going to be terminated, I wasn't
12  required to turn in all my hours and that
13  sort of thing. As a paid intern, I got
14  credit for teaching every single day, is what
15  Ms. Parris had told me.
16   Q    All right. I'm just trying to
17  understand what happened to these documents.
18   A    Okay.
19   Q    They were in your possession. Your
20  internship was terminated. Did someone ask
21  you, point blank, "Turn those log forms in"?
22   A    No.
23   Q    Okay. What did you do with the log
24  forms?
25   A    I either left them at the school --

78

1   I did not bring them home, because I do not
2   have any kind of log forms.
3    Q    Okay. You either left them at the
4   school or you brought them home?
5    A    I had a notebook at school with the
6   log-in documents -- the log-in documents, the
7   paperwork that showed Ms. Parris my schedule,
8   and that sort of thing. She had to have
9   copies of those sent in. And so, I had a
10  copy of it, showing my schedule, so that when
11  Dr. Ruediger would come for an observation,
12  he would know when I -- you know, what
13  classes I had and that sort of thing.
14   Q    He would know where you were
15  supposed to be?
16   A    Right. Right. So, I had a copy of
17  that, too. But I had it in a notebook at the
18  high school.
19   Q    Okay. What happened to this
20  notebook?
21   A    Well, when I was terminated, I was
22  told I could, you know, get my personal
23  belongings, and that was left. I just did
24  not get that.
25   Q    Okay. That was part of your

79

1   personal belongings, was it not?
2    A    Yes. But I probably left a couple
3   of other things that were my personal
4   belongings. I didn't have that much time to
5   gather my things. I didn't have a list --
6    Q    Sure.
7    A    -- of things that were mine.
8    Q    Okay. This notebook, though, was
9   something you maintained for your internship
10  through Troy?
11   A    Uh-huh.
12   Q    All right. And I'm not trying to
13  beat a horse.
14   A    Okay.
15   Q    Whether it's dead or not, I'm not
16  sure. Did you prepare lesson plans, as is
17  required of you under Defendant's Exhibit 6?
18   A    Yes. When I had an observation by
19  Mr. Strange or by Dr. Ruediger, I was
20  required to make lesson plans, and they got a
21  copy of those.
22   Q    Okay. Did you complete this report
23  of internship form after each visit from
24  Dr. Ruediger?
25   A    Yes.

80

1    Q    Did you provide a daily schedule to
2   -- was it Ms. Parris you were supposed to
3   provide that to?
4    A    Yes.
5    Q    Did you provide it to her?
6    A    Yes.
7    Q    You did that through this notebook
8   you're talking about?
9    A    Not through the notebook. That was
10  my copy in my notebook.
11   Q    Okay. You gave her a copy of your
12  schedule?
13   A    I gave her -- yes.
14   Q    All right. Did you attend the
15  internship seminar classes?
16   A    Yes.
17   Q    How many classes were involved
18  there?
19   A    It was the whole semester. I
20  attended all of them through October 20th.
21   Q    This was a class, basically, for
22  everyone who was going through an internship
23  at that time?
24   A    Correct. And it was once a week.
25  We would also have assignments during the

81

1  week, computer assignments, where we would
2  have to answer certain questions or whatever
3  and respond. And those are in copies you
4  have as part of the exhibits.
5      Q    Yes, ma'am. We'll get to those
6  soon enough.
7      A    Yeah.
8      Q    Okay. Did you e-mail Dr. Parris
9  weekly?
10     A    Yes. And Dr. Jones.
11     Q    All right. So, then, if we go back
12  through all the records, we ought to see
13  e-mails from you to Dr. Parris and Dr. Jones
14  every week of this internship you had at
15  Houston County High School?
16     A    I had no control over whether or
17  not they printed them off or not. I printed
18  off ones that I felt were interesting. And
19  the program that we utilized -- it was called
20  Blackboard -- it wouldn't let you print
21  everything that you wanted to print. Some
22  nights, I would be able to print things off.
23  Some, I wouldn't.
24     Q    But it's your testimony under oath
25  today that you e-mailed Dr. -- Ms. Parris --

82

1  I'm sorry -- and Dr. --
2      A    Dr. Jones.
3      Q    -- Jones each week of your
4  internship?
5      A    Yes.
6      Q    Okay. Would you agree with me,
7  Mrs. Miller, that Defendant's Exhibit 6 kind
8  of governed the relationship between you,
9  Houston County Schools, and Troy University
10  Dothan as it related to your internship?
11     A    Yes. That's my understanding.
12     Q    Okay. In fact, that's what the
13  header of the document states, doesn't it?
14     A    Uh-huh. Yes.
15     Q    In pretty clear English.
16  "Internship Agreement Between Houston County
17  Schools and Troy University Dothan Campus."
18     A    Yes.
19     Q    That's clear enough?
20     A    That's right. Yeah.
21     Q    Would you agree with me that's
22  clear?
23     A    I would agree.
24     Q    Okay. So, this document,
25  Defendant's Exhibit 6, governed the

83

1  relationships between you? Would you agree
2  with that?
3           MR. FAULK: Excuse me.
4           MR. BRANTLEY: Object.
5           MR. FAULK: Yeah. Legal
6                conclusion. I just want that
7                to be readily apparent.
8           MR. WALDING: I don't think that's
9                a legal conclusion at all. I'm
10               asking for her understanding.
11          MR. FAULK: Well, you go ahead and
12               give him your best answer. I'm
13               just making an objection.
14     A    I understand that this agreement is
15  between Houston County Schools and Troy
16  University.
17     Q    Did you understand that this
18  document governed the relationships between
19  you?
20     A    Yes.
21     Q    Okay. And would you agree with me
22  that the second page of Defendant's Exhibit 6
23  is signed by basically all of the players in
24  this relationship?
25     A    Yes.

84

1      Q    Okay. It's signed by Tim
2  Pitchford, as the principal? Correct?
3      A    Yes.
4      Q    It's signed by Pam Parris, as the
5  director of professional internship for Troy
6  University?
7      A    Yes.
8      Q    Signed by Dr. Jones, dean for Troy
9  University?
10     A    Yes.
11     Q    Signed by Mr. Paul Strange, a
12  cooperating teacher?
13     A    Yes.
14     Q    And signed by you, also, an intern?
15     A    Yes.
16     Q    Okay. Does the document refer to
17  you as a certified teacher?
18     A    No.
19     Q    It refers to you as an intern, does
20  it not?
21     A    Yes, it does.
22     Q    In fact, it refers to Mr. Strange
23  as a teacher, does it not?
24     A    Yes.
25     Q    And at the time you signed this

85

1  agreement, on or about July 28, 2004, you
2  were not a certified teacher? Correct?
3      A   That is correct.
4          MR. BRANTLEY: Object on that.
5          MR. WALDING: That's a matter of
6          fact. She either was or she
7          wasn't.
8          MR. BRANTLEY: Disagree it's a
9          matter of fact.
10     Q   Did you hold a valid teaching
11 certificate through the Alabama State
12 Department of Education on or about July 28,
13 2004, ma'am?
14     A   No, I did not.
15         MR. BRANTLEY: Well, again, object.
16         Object to the term "valid."
17         MR. WALDING: All right. You
18         object to the form of my
19         question by the use of the term
20         "valid"?
21         MR. BRANTLEY: Yes.
22     Q   Did you hold an invalid certificate
23 on that date?
24     A   It's my understanding that there
25 was going to be an emergency certificate

86

1  requested by Mr. Andrews.
2      Q   Did you hold an emergency
3  certificate on that date?
4      A   I don't know. It would not have
5  come to me. It would have gone to central
6  office.
7      Q   Okay. Would you agree with me that
8  Defendant's Exhibit 6 states that the reason
9  for this agreement and this relationship was
10 because of the high demand and low
11 availability of special education teachers?
12     A   That is what it says.
13     Q   Yes, ma'am. Was it your
14 understanding, back in July 2004, that there
15 was a high demand for and low availability of
16 special education teachers?
17     A   That's what Ms. Parris had
18 indicated to me.
19     Q   That was your understanding?
20     A   That was my understanding.
21     Q   Okay. Because, would you agree
22 with me that this arrangement, this
23 relationship, was unusual?
24     A   I don't think I'd say unusual.
25 There have been a number of interns placed in

87

1  these positions.
2      Q   Okay. Wouldn't it be more normal,
3  more regular, a majority of teaching students
4  would do their internships without being
5  compensated?
6      A   That is true. Yes.
7      Q   And, yet, you were compensated for
8  this internship?
9      A   Yes. I, as well as others.
10     Q   Good. But I want to ask as to you
11 specifically.
12     A   Uh-huh.
13     Q   You were compensated?
14     A   Yes, I was.
15     Q   All right. Look at paragraph 3(c)
16 for me of Defendant's Exhibit 6.
17     A   Uh-huh.
18     Q   Would you agree with me that that
19 paragraph says that, "The school
20 administration is responsible for IEP
21 meetings"?
22     A   Yes.
23     Q   Would you agree that that paragraph
24 of Defendant's Exhibit 6 says that your
25 attendance at IEP meetings is simply as a

88

1  student intern?
2      A   Yes.
3          MR. BRANTLEY: Well --
4      A   At the meetings.
5          MR. BRANTLEY: Object. It doesn't
6          say "simply."
7      Q   The sentence says, "Mrs. Miller's
8  attendance is as that of a student intern."
9  Correct?
10     A   Yes.
11     Q   Does the sentence or any other part
12 of the paragraph indicate that your
13 attendance at an IEP meeting would be in any
14 other role other than as an intern?
15     A   No.
16     Q   Does the paragraph of Defendant's
17 Exhibit 6 also indicate that you cannot be
18 held legally responsible for the meetings?
19     A   Yes.
20     Q   And were you given an opportunity
21 to review this document before you signed it?
22     A   The document came the day that we
23 had the meeting with Mr. Pitchford. I don't
24 believe it was July 28th. I believe it was
25 after that date. And could you repeat the

89

1  question again?

2     Q    I want to know if you had an

3  opportunity to review the document?

4     A    I had an opportunity to review the

5  document at the same time everybody else did,

6  at the meeting.

7     Q    No one prevented you from reading

8  this document?

9     A    No.

10    Q    And you're able to read the English

11 language?

12    A    Yes.

13    Q    Let me show you what I have marked

14 as Defendant's Exhibit No. 7. Have you seen

15 that document before?

16    A    Yes, I have.

17    Q    I'm sorry. Your lawyer has it.

18 I'm sorry.

19        (Mr. Brantley handing document to

20        the witness.)

21    Q    What is that document?

22    A    This is an observation document

23 from Dr. Ruediger.

24    Q    Okay. So, this is one of the

25 requirements under Defendant's Exhibit 6, was

90

1  for him to do some observations on you in the

2  classroom setting?

3     A    Correct.

4     Q    Okay. And this is a document that

5  evidences that or documents it?

6     A    Correct.

7     Q    Let's see. And this one is dated

8  August 26, 2004?

9     A    Yes.

10    Q    And is that your signature under

11 "Intern's signature" on the document?

12    A    Yes.

13    Q    As a part of this observation and

14 rating -- is it true that he gives you

15 ratings as part of this observation?

16    A    Yes.

17    Q    And according to the coding scale,

18 5 is an excellent? Correct?

19    A    Uh-huh.

20    Q    4 is above average? Correct?

21    A    Uh-huh.

22    Q    If you could say "yes" or "no,"

23 ma'am.

24    A    I'm sorry. Yes.

25    Q    3 is average performance?

91

1     A    Yes.

2     Q    2 is minimally acceptable

3  performance?

4     A    Yes.

5     Q    And 1 is unsatisfactory?

6     A    Yes.

7     Q    And "no" means not observed?

8     A    Yes.

9     Q    All right. Would you agree that

10 Dr. Ruediger does not give you a rating above

11 average?

12    A    Yes.

13    Q    He does not?

14    A    That's correct.

15    Q    So, 3 is the highest rating you

16 get?

17    A    That's correct.

18    Q    And then, he apparently did not

19 observe you present the lesson introduction,

20 development, closure, evaluation, because he

21 has "no" next to those?

22    A    That's correct. He was late for

23 the observation.

24    Q    Well, he obviously didn't observe

25 other things, also, like managing class

92

1  behavior, number 11?

2     A    Well, my opinion is that he did

3  observe it, because he was in for some of the

4  lesson. So, I don't know why he didn't say

5  manages -- I don't know why he didn't rate

6  that.

7     Q    Okay. You would agree with me that

8  it says "no"?

9     A    Yes. I do agree with you. It does

10 say "no."

11    Q    And next to number 12, maintains

12 student involvement, it also says "no"?

13    A    Yes. It says "not observed."

14    Q    And under 13, manages class time,

15 it states "no"?

16    A    He says -- yes. That's correct.

17    Q    Not observed?

18    A    Not observed.

19    Q    Yes, ma'am. And would you agree

20 with me -- I think you just did earlier --

21 that that's your signature at the bottom of

22 the page?

23    A    Yes.

24    Q    So, you had an opportunity to

25 review this document --

93

1    A    Yes.
2    Q    -- before you signed it?
3    A    Yes.
4    Q    Okay. So, if you had issues with
5  his ratings or what he indicated here as his
6  score, you could have discussed that with him
7  at the time, could you not?
8    A    And I did. We did. Uh-huh.
9    Q    All right. Let me show you
10  Defendant's Exhibit 8. Do you recognize that
11  document?
12    A    Yes.
13    Q    You've seen that document before
14  today?
15    A    As part of this lawsuit. I did not
16  see it prior to then.
17    Q    You did not see it prior to the
18  lawsuit?
19    A    No. No.
20    Q    Okay. And just so I'm clear, I
21  assume -- and, of course, you know about
22  assumptions. But, I assume that Dr. Ruediger
23  typed this document some time after the
24  observation he made on August 26th. Did you
25  see him typing Defendant's Exhibit 8 while he

94

1  was observing you?
2    A    No.
3    Q    He didn't bring a laptop computer
4  or anything like that?
5    A    Not to my recollection.
6    Q    Okay. And you have not seen the
7  document until this lawsuit was filed --
8    A    That's correct.
9    Q    -- as part of the discovery
10  process?
11    A    That's correct.
12    Q    Okay. In the first paragraph of
13  Defendant's Exhibit 8, there is a sentence,
14  "Mrs. Miller stressed her concerns regarding
15  individualized education programs and the
16  general structure of the special education
17  program."
18    A    Uh-huh.
19    Q    Do you see that sentence?
20    A    Yes, I do.
21    Q    Do you know to what Dr. Ruediger is
22  referring by that sentence?
23    A    I do.
24    Q    Tell me what you believe he is
25  referring to?

95

1    A    I told him that -- I asked for his
2  advice, number one. I told him that there
3  were no IEPs for some students, that other
4  students' IEP's only reflected resource room,
5  rather than full inclusion into the general
6  classroom.
7        And there are different -- in order to
8  serve the students appropriately, there must
9  be certain things listed in the IEP when
10  they're in the general education classroom
11  versus the resource room. And so, I talked a
12  little in general about those types of
13  examples.
14    Q    Okay. Those were your concerns?
15    A    I expressed concern about the fact
16  that I was asked to write an IEP for a
17  student who did not have anything in her file
18  except a temporary services sheet that, if I
19  remember correctly, was dated January 14th of
20  '05. That was a very big concern.
21    Q    Would you agree with me that
22  Dr. Ruediger does not specifically mention
23  that concern in Defendant's Exhibit 8?
24    A    That is correct. He does not
25  specifically mention that.

96

1    Q    Yes, ma'am. Okay.
2    A    He doesn't specifically mention
3  anything.
4    Q    Well, he mentions that you stressed
5  concerns regarding individualized education
6  programs and the general structure of the
7  special education program.
8    A    That's very general. That's not
9  specific.
10    Q    Yes, ma'am. Well, tell me --
11  again, let's go back. What is your
12  understanding of what he means by that?
13    A    I believe that he means that there
14  are -- the IEP's were not written correctly,
15  that they were -- they needed to be at least
16  amended, if not rewritten totally, in order
17  for the students to be able to get their
18  needed services and get the education that
19  they deserve.
20        So, the general structure of how the
21  school was going about doing things, when I
22  told him that they had already had the
23  meetings in May, and that Mr. Strange told me
24  that the administrators were not going to,
25  you know, like the idea of having new

97

1  meetings for these students, because they had
2  already had them, that we were going to have
3  to write some of these IEP's all over again,
4  or write new ones for the ones who did not
5  have any. And I told him about these things,
6  so he knew about these things.
7      Q    Yes, ma'am. Let's go back. As of
8  August 26, 2004, how long had you been out at
9  Houston County High School?
10     A    I'm sorry. Say that again.
11     Q    How long had you been at Houston
12  County High School, as an intern, on August
13  26, 2004?
14     A    Approximately 24 days or so.
15     Q    24 school days?
16     A    I believe we started August 1st or
17  2nd, something like that, on.
18     Q    Are you telling me you were there
19  24 school days?
20     A    No. I don't believe it was 24
21  school days. If I could have a calendar, I'd
22  be glad to count the days, specifically, that
23  I was there. I do remember not being there
24  for two days because I was in Louisiana.
25     Q    Well, give me your best estimate of

98

1  how many school days, actual teaching days,
2  you were there when this document -- or
3  before August 26, 2004?
4      A    Anywhere from probably 15 to 20
5  days.
6      Q    And in those 15 to 20 days, how
7  many IEP's for students did you review?
8      A    As a team, Paul Strange, Paul Payne
9  and I, all together, were in a room, and we
10 got all the IEP's together. We looked at the
11 IEP's. We were determining who was going to
12 get which IEP's and that sort of thing. So,
13 we were able to look at just about every one
14 of them. We determined that there were
15 certain files that were missing. So, you
16 know, we made a list.
17     Q    Apparently, there was some sort of
18 meeting between you and Mr. Strange and Mr.
19 Payne -- it is Mr. Payne?
20     A    Correct.
21     Q    -- in which y'all had various
22 special education students' files in front of
23 you?
24     A    Correct.
25     Q    How many special education student

99

1  files did you have in front of you?
2      A    Approximately -- there were 57
3  students. There were some that did not have
4  files.
5      Q    How do you know that there were 57
6  students?
7      A    We had a list of students. I
8  believe central office provided that list of
9  the names of the students, and then --
10     Q    Provided it to whom?
11     A    I believe Mr. Payne, Mr. Strange.
12 Mr. Payne was already there at that school.
13 Mr. Strange, it was his first year. If I
14 remember correctly, it was his first year at
15 Houston County High School. He had come from
16 another county school.
17     Q    So, if I'm understanding you
18 correctly, central office provides a list of
19 what you think is approximately 57 student
20 names?
21     A    Uh-huh.
22     Q    Correct?
23     A    Correct.
24     Q    And it's your understanding that
25 these 57 students were special education

100

1  students?
2      A    That's my understanding, yes.
3      Q    Was it your understanding that they
4  had already been identified as students in
5  need of special education services?
6      A    Yes.
7      Q    So, they would already be past step
8  two of that process you and I talked about
9  earlier?
10     A    Correct.
11     Q    Okay. And then, you're saying
12 that, during this meeting you had with Mr.
13 Strange and Mr. Payne, that y'all had files
14 of some kind for each of these 57 students?
15     A    We were supposed to have files for
16 each one of the 57 students. As I said, some
17 files were missing. There were no files for
18 some students.
19     Q    You say they're missing. But what
20 you knew objectively, I think, is that you
21 had a list of 57 names, and you may or may
22 not have had 57 folders?
23     A    Correct.
24     Q    Okay. And you're assuming that
25 there was no file? Correct?

101

1    A    (No response.)
2    Q    Do you know for a fact that there
3  was no file for any of those 57 people?
4    A    There were no files for some
5  students. For instance, on my list --
6  eventually, I got a list of students that I
7  was supposed to -- that were on my caseload.
8  Okay. And as we checked through those files,
9  there were at least two students that did not
10  have a file at all, and so, there was no IEP.
11  Okay. Now, there could have been, like, a
12  folder. For instance, the one girl had a
13  folder with her temporary services page in
14  there, but no IEP.
15    Q    Okay. So, for purposes of me
16  understanding you, what girl are you
17  referring to?
18    THE WITNESS: Is it okay to say it?
19    MR. BRANTLEY: Well, I think we
20      have an agreement --
21    MR. WALDING: We've got an
22      agreement.
23    MR. BRANTLEY: -- don't we, to
24      disclose names here under seal?
25      Is that correct?

102

1    MR. WALDING: We do.
2    A    That would be R. S.
3    MR. BRANTLEY: Let the record
4      reflect everybody has agreed we
5      have an agreement on record
6      under seal. Did you give the
7      name?
8    THE WITNESS: Yes.
9    A    And then, there was another one,
10  C. A. She was a homebound student, but she
11  still -- according to my understanding of
12  law, she must have an IEP. And she did not
13  have an IEP.
14    Q    What you know objectively, though,
15  is that she was on some sort of list you had?
16    A    Yes.
17    Q    And that you couldn't find a
18  physical file?
19    A    That's correct. For two months.
20    Q    Yes, ma'am. How many names were on
21  this list of your caseload?
22    A    I believe there were approximately
23  19 students on my -- 19 to 22 students on my
24  caseload.
25    Q    Okay. And did you actually

103

1  interact with C. A.?
2    A    Yes, I did.
3    Q    Okay. I thought you said she was
4  on homebound?
5    A    That's correct. I wanted to meet
6  her. And Beverly Teat, who was the librarian
7  who was taking some information out to her,
8  some school work and that sort of thing,
9  invited me to come, and I jumped at the
10  chance to meet her.
11    Q    All right. So, this young lady,
12  who was on homebound services, Ms. Teat
13  obviously was part of her programming in some
14  way, because she was taking educational
15  materials to her?
16    A    That's correct.
17    Q    Okay. And so, you had the
18  opportunity to go with Ms. Teat and actually
19  visit C. A.?
20    A    Yes.
21    Q    Okay. Well, was it your
22  understanding it was part of your job to
23  provide educational services for C. A.?
24    A    According to the law, my
25  understanding of the law, is that she must

104

1  have an IEP and that we must provide her with
2  an education at home.
3    Q    Yes, ma'am. If you'll answer my
4  question.
5    A    I'm sorry. Perhaps I'm not
6  understanding.
7    Q    Was it part of your duties, as a
8  student intern, to provide educational
9  services for C. A.?
10    A    It was my duty, as a teacher, to --
11    MR. FAULK: I think he's asking you
12      was she part of your caseload.
13      Is that what you --
14    MR. WALDING: No, sir.
15    MR. BRANTLEY: Well, I don't
16      understand it.
17    THE WITNESS: I'm not
18      understanding.
19    MR. BRANTLEY: Would you rephrase
20      it?
21    MR. WALDING: I rephrased it twice.
22    Q    You told me that C. A., according
23  to your understanding, was on homebound
24  status.
25    A    That's correct.

105

1    Q    Was it part of your internship
2  duties to provide homebound status
3  educational services for C. A.? That's a
4  "yes" or "no," ma'am.
5    A    I don't know how to answer that.
6        MR. FAULK:  Did you have any
7            specific duties with respect to
8            this student?
9    A    She was on my caseload and -- I
10  don't know what else to say.
11    Q    If you'll answer my question,
12  ma'am.
13        MR. BRANTLEY:  She's trying to.
14    A    I am.
15    Q    Do you understand what homebound
16  means?
17    A    Yes.
18    Q    What does it mean?
19    A    It means that she has been, for
20  whatever reason, told -- kept from the high
21  school for -- it could be a behavior problem.
22  I don't know what the reason was.  Okay.  But
23  she's homebound.  She can't come to the
24  school.  But she's entitled to receive an
25  education.  And as an intern --

106

1    Q    Do you understand the term
2  "homebound" means that she's to receive her
3  educational services at home?
4    A    At home.  Correct.
5    Q    My question to you was very simple.
6  Were you the individual who was responsible
7  for providing those educational services to
8  C. A.?
9    A    On her schedule, it said I was her
10  English teacher, if I'm not mistaken, but I
11  was not teaching English -- the
12  administration had made other arrangements to
13  provide her her educational needs.  I went
14  out to visit her, to meet her.
15    Q    Yes, ma'am.  I understood that.
16  I'm asking if it was part of your duties, as
17  a student internship, to provide the
18  educational services for this homebound
19  student, C. A.?  And that is a "yes" or "no"
20  answer.
21    A    And since my name was on the
22  schedule for her, I would have to say yes.
23    Q    If it was part of your
24  duties, did you undertake to fulfill those
25  duties by teaching this young lady English?

107

1    A    I was told that someone else would
2  be taking the information to -- Ms. Teat, in
3  fact, I believe, was one of the people who
4  would take the information and work with her.
5    Q    Okay.  Did you provide English
6  information to Ms. Teat for C. A.?
7    A    Ms. Teat came to my room, and we
8  went through some of the books that were
9  there at school, in the resource room, and
10  she and I chose some things to take to her.
11    Q    Okay.  You undertook it also,
12  though, to go and visit C. A. yourself?
13    A    Yes.
14    Q    Tell me about that visit?
15    A    After being invited.
16    Q    By Ms. Teat?
17    A    Yes.
18    Q    Were you invited by C. A. or her
19  parents to their home?
20    A    It's my understanding that Ms. Teat
21  got permission.
22    Q    Yes, ma'am.  If you would listen to
23  my question, and then, respond to it.
24        MR. FAULK:  I think she is trying
25            to answer your question.

108

1        MR. BRANTLEY:  I do, too.
2        MR. FAULK:  We're going to be in it
3            here in a minute.
4        MR. WALDING:  That's fine.  If you
5            want to interpose an objection
6            to the form of my question --
7        MR. FAULK:  I'm telling you she's
8            trying to answer --
9        MR. WALDING:  -- that's fine.
10        MR. FAULK:  -- your question.
11        MR. WALDING:  Well, she's not doing
12            a very good job of listening to
13            it and answering it.
14        MR. BRANTLEY:  Well, I disagree.
15    Q    (By Mr. Walding)  My question was
16  simple.  Were you invited by Ms. A.'s parents
17  to visit her home?
18    A    She didn't extend the invitation to
19  me personally.
20    Q    Good.  What inquiry did you make,
21  if any, to find out whether there was an IEP
22  or other educational service document in
23  existence for C. A.?
24    A    I went directly to Paul Strange,
25  because he was my supervisor there at the

109

1  school.
2      Q    He was your mentor, was he not?
3      A    He was my mentor, my cooperating
4  teacher. All of those terms would be
5  applied.
6      Q    Okay. You went to Mr. Strange?
7      A    Yes.
8      Q    And what?
9      A    And gave him a list of the ones
10 that I did not have. In fact, we all got
11 together and made a list. He made a list of
12 the ones that we didn't have.
13     And, on occasion, there were maybe a
14 couple that were in Mr. Payne's drawer. Ms.
15 Keasler got one of them for me. She found
16 one of the files in his drawer, when he was
17 not there, and brought it to me. So, you
18 know, we were trying to find them. But there
19 ended up to be a list of certain ones that
20 did not have a file.
21     Q    Okay. And if I understood you
22 correctly, your list of students for whom you
23 could find no file contained two names?
24     A    I actually had several more. And I
25 can't remember exactly who they were, because

110

1  I wasn't prepared for names today. But there
2  were more than that.
3      Q    This list that you presented to Mr.
4  Strange, how many names were on it?
5      A    Probably approximately five, to my
6  recollection, on my own list. And then,
7  while we were meeting, we listed the other
8  ones -- for instance, Mr. Payne -- I believe
9  it was Mr. Payne that had two other homebound
10 boys, and there were no files for them, as
11 well.
12     Q    Okay. Do you know for a fact that
13 there were no files for these two homebound
14 boys?
15     A    From the time that I went to the
16 school and the time that I left the school,
17 no one informed me that those files, any of
18 those files, had been found.
19     Q    Okay. Do you know for a fact that
20 there were no files?
21     A    I know for a fact there were some
22 students that had no files, no IEP's.
23     Q    Which students do you know for a
24 fact had no IEP's?
25     A    C. A., R. S., the L. brothers.

111

1  One, I want to say, is N., but I'm not 100
2  percent sure of his name. And to my
3  recollection, at this time, that's all I can
4  actually, for sure, say.
5      Q    You said the L. brothers.
6      A    Uh-huh.
7      Q    Meaning two young men?
8      A    That's correct.
9      Q    One of whom was named N., you
10 think?
11     A    I believe it was N.
12     Q    But, then, there would have been
13 another one?
14     A    Yes. It was stated to me by Mr.
15 Payne that he had no files on those boys.
16     Q    All right. Then, for the L.
17 brothers, what you are relying on for that
18 fact is something that Mr. Payne told you?
19     A    Yes, for them.
20     Q    As to C. A. and R. S., you,
21 yourself, never saw a file containing an IEP?
22     A    That's correct.
23     Q    Okay. And C. A. was on homebound
24 status?
25     A    That's correct.

112

1      Q    Was R. S. to be educated on site?
2      A    Yes, at Houston County High School.
3      Q    So, to go back to Defendant's
4  Exhibit 8, if I can, what you're telling me
5  is that, during this meeting, what
6  Dr. Ruediger calls a debriefing --
7      A    Uh-huh.
8      Q    Would you agree that he uses that
9  term?
10     A    Yes.
11     Q    -- you expressed concerns to
12 Dr. Ruediger about certain students not
13 having IEP's, at least that you could find
14 copies of?
15     A    Yes, that's correct.
16     Q    Okay. Did you express other
17 concerns that he might be referring to with
18 this sentence, "Mrs. Miller stressed her
19 concerns regarding individualized education
20 programs and the general structure of the
21 special education program"?
22     A    I explained to him that the
23 meetings that had taken place in May, where
24 the IEP's were written for the resource room,
25 were totally inappropriate for the students

113

1  because they were placed in full inclusion
2  rooms, general education classes. And so,
3  the process by which we were supposed to do
4  that is send notice of proposed meeting to
5  the parents, and if they -- if you don't hear
6  back by them, you know, in a reasonable
7  amount of time, you send a second notice.
8      I was instructed in school that you
9  might even want to send a certified copy to
10  make sure that the parent got it and document
11  the fact that you sent it.
12      None of that was being done. We were
13  not holding IEP meetings at all. And that --
14  you know, the whole process was just not
15  being followed.
16      Q   All right. Let me make sure I'm
17  understanding this. One of your concerns was
18  that they weren't holding IEP meetings at
19  all?
20      A   That they had no intention of
21  holding new IEP meetings to amend -- at least
22  amend the current IEP's that were there at
23  the school.
24      Q   I'm somewhat confused, Mrs. Miller.
25  You had been at Houston County High School as

114

1  a student intern for -- I believe you told me
2  15 to 20 class days?
3      A   Uh-huh. Yes.
4      Q   And you were telling experienced
5  teachers that IEP's were inappropriate for
6  particular students?
7      A   Yes, I did.
8      Q   Okay. And you were giving advice
9  to experienced educators as to the special
10  education process and how they should follow
11  it?
12      A   Yes.
13      Q   Okay. Interesting. And all of
14  this advice that you were giving to these
15  experienced educators, it came from your one
16  class you took at Troy State University --
17      A   No.
18      Q   -- this policy and procedures
19  class?
20      A   No.
21      Q   Okay. You admitted to me earlier
22  that you had never read the IDEA? Correct?
23      A   I admitted that I had not read the
24  entire law.
25      Q   Okay. You admitted to me earlier

115

1  that you had never read any of the standard
2  legal treatises on special education law?
3  Correct?
4      A   And if I understand the books that
5  you're talking about, no, I have not.
6      Q   Okay. You have to understand what
7  I'm struggling with over here. You're a
8  student intern, who doesn't even have a
9  bachelor's degree --
10      A   Uh-huh.
11      Q   -- and, yet, you're telling
12  seasoned educators these IEP's are
13  inappropriate as to students?
14      A   Yes. Because when I took classes
15  at Troy University, it was very clear, very
16  clear, about the IEP's and how they should be
17  written and that there should be some for
18  special ed students. Yes.
19      Q   Okay. What, if any, advice did
20  Dr. Ruediger give you during this debriefing
21  about your concerns or your advice to these
22  seasoned educators at Houston County High
23  School?
24      A   Right after that sentence that says
25  Mr. Strange -- I'm sorry -- that Mrs. Miller

116

1  expressed -- or stressed her concerns, right
2  after that, it says that it was recommended
3  by him that she initiate attempts to comply
4  with the current special education law.
5      He recommended that I go back to Mr.
6  Strange and encourage him to initiate IEP
7  meetings, so that these students would be
8  able to receive the education that they
9  actually need and the accommodations that
10  they actually need in the general education
11  classroom.
12      Q   Okay. Which students are you
13  referring to that were not receiving the
14  services they needed, in your opinion?
15      A   The students whose IEP's reflected
16  the resource room versus the general
17  education room, which was nearly all of them.
18  There were very few students at that school
19  who were not in a resource room originally.
20  Okay? There were a couple -- I can think of
21  one on my list, B. G. She was a regular ed
22  student. But even her IEP should have had --
23  should have been better written. I'll just
24  put it that way.
25      Q   In your opinion?

117

1    A    In my opinion.
2    Q    And were you part of the IEP team
3  that developed these IEP's?
4    A    No.
5    Q    And had you interacted with these
6  children in any way other than this 15 or 20
7  school days you had been there?
8    A    No.
9    Q    All right.  Let me go back.  Did
10  you actually go to Mr. Strange and discuss
11  these concerns as was suggested by
12  Dr. Ruediger?
13    A    Oh, yes.  In fact, we went to Mr.
14  Pitchford, as well.  And --
15    Q    There's no question, ma'am.
16    A    I'm sorry.
17    Q    Was there a meeting, then, between
18  you and Mr. Strange and Mr. Pitchford?
19    A    Yes.
20    Q    And when did this meeting occur?
21    A    The day after this observation, on
22  the 27th.
23    Q    Where did it occur?
24    A    In the conference room.  If I
25  remember correctly, in the conference room of

118

1  the high school.
2    Q    How long did the meeting take?
3    A    Maybe -- I imagine, the best of my
4  knowledge, probably 10 or 15 minutes.
5    Q    What, if anything, did you say to
6  Mr. Pitchford?
7    A    I told Mr. Pitchford that I was
8  concerned that there were no IEP's for some
9  students.  That the IEP's that were written
10  in May did not reflect the central office's
11  decision over the summer to have all of the
12  students, the special ed students, be
13  included in the regular classroom.  And
14  because of the decision to put all of them in
15  the special education classroom, it required
16  that the IEP's for those students to be at
17  least amended, if not totally rewritten.
18    And I also explained to him that I had
19  been approached by Cathy Keasler to write an
20  IEP for R. S., when she knew very well that
21  we would have to go through an IEP process.
22    And also the fact that, in my contract,
23  it says that I'm not permitted to write the
24  IEP.  That was supposed to be the
25  responsibility of Paul Strange or whoever,

119

1  you know, else Mr. Pitchford would designate
2  to write until I after I graduated.
3    Q    Okay.  And you are referring to
4  Defendant's 6, this internship agreement?
5    A    That's correct.
6    Q    Okay.  What, if anything, did Mr.
7  Pitchford say to you?
8    A    He was very angry.  It came across
9  that way.  He said that he was angry because
10  Dr. Ruediger should have come to him with his
11  concerns rather than sending an intern to
12  explain the situation.
13    And Mr. Stephens was actually in the
14  room, as well.  And when Mr. Pitchford said
15  that he should have come himself, instead of
16  sending an intern, Mr. Stephens started
17  laughing so hard, he got up and left the
18  room.
19    Q    Okay.  Did Mr. Pitchford express
20  anything else to you?
21    A    He said he was going to call Ms.
22  Parris and central office, Mr. Andrews.
23    Q    Okay.  Anything else?
24    A    Not that I can recall at this point
25  in time.

120

1    Q    Okay.  So, apparently, in this
2  meeting on the 27th of August, there was you,
3  Mr. Strange, Mr. Stephens and Mr. Pitchford?
4    A    That's correct.
5    Q    And Mr. Stephens was the vice
6  principal?
7    A    At the time.
8    (Brief off-record.)
9    Q    During this 10 to 15-minute
10  conference with Mr. Pitchford, did you
11  identify the students who, in your opinion,
12  had no IEP's?
13    A    I don't recall whether I did or
14  not.
15    Q    Okay.  During this 10 to 15-minute
16  conference with Mr. Pitchford, Mr. Strange
17  and Mr. Stephens, did you indicate which of
18  the IEP's you felt were inappropriate, based
19  on this central office decision that all
20  special ed students would go in the regular
21  ed class?
22    A    I didn't elaborate.
23    Q    And it's your understanding that
24  the central office in some way decided that
25  all special education students were going to

121

1  be serviced in the general education
2  classrooms, regardless?
3      A    The law --
4      Q    Ma'am, the question was very
5  simple. Would you address the question,
6  please?
7      A    Could you repeat the question,
8  please? I'm sorry.
9          (Whereupon, requested portion of
10         record read back by the court
11         reporter.)
12     A    That's my understanding.
13     Q    Okay. Where did you come about
14 that understanding?
15     A    From Mr. Strange.
16     Q    Okay. He told you that?
17     A    He indicated to me that, over the
18 summer, the decision was made -- in previous
19 years, some students were in the regular
20 education classroom. Mr. Strange said that,
21 over the summer, the decision was made to
22 include all of the students into the general
23 education classroom.
24     Q    What is your understanding of what
25 the term "IEP" means?

122

1      A    It's an individualized program,
2  education program, for each student. And
3  each student has certain requirements.
4      Q    Yes, ma'am. What does the term "I"
5  stand for?
6      A    Individualized.
7      Q    So, does it not follow, then, that
8  if you form an individualized program for a
9  student, you cannot automatically say that
10 student is going to be taught in the regular
11 classroom?
12     A    The IEP's specifically said that --
13 in the accommodations, for instance, that the
14 students would spend the day in the resource
15 room. The resource room is totally different
16 than the general education class. The
17 resource room --
18     Q    Yes, ma'am.
19     A    -- would have a special education
20 teacher --
21     Q    Yes, ma'am.
22     A    -- in there providing the services
23 that individual child needed.
24     Q    Yes, ma'am. I am very familiar
25 with the special education laws.

123

1      A    Okay.
2      Q    Okay?
3      A    Uh-huh.
4      Q    What I asked you was, does it not
5  follow logically that, if the program has to
6  be individualized to that one child, that you
7  cannot automatically say that child is going
8  to receive services in the regular education
9  classroom? Yes or no?
10         MR. FAULK: Object.
11     A    I understand. I understand what
12 you're saying. That is correct.
13     Q    Good. Thank you. You expressed to
14 Mr. Pitchford, during this 10 to 15-minute
15 meeting on August 27, 2004, that a lady named
16 Cathy Keasler had asked you to write an IEP
17 for R. S.?
18     A    Yes.
19     Q    Who is Cathy Keasler?
20     A    She was a counselor at Houston
21 County High School.
22     Q    Tell me the circumstances under
23 which this request took place?
24     A    I was leaving the campus. It was
25 after school hours. And it was some time

124

1  between, say, 3:30 and 4:00. She approached
2  me in the hallway. And I had previously
3  asked her about the IEP, and told her, you
4  know, that there was none. That there was
5  only a temporary services sheet in the file.
6  And that, you know, we needed to, you know,
7  probably go through the whole process again,
8  in terms of eligibility, because there had
9  been such a long period of time between
10 January of '04, her not having an IEP, and
11 August, not having an IEP that whole time
12 frame.
13     So, when she stopped me in the hallway,
14 she said, "I know it's totally illegal, but
15 we're going to need to write the IEP for R."
16 And it shocked me, because she had a special
17 ed background, is what I recall from her.
18     And I proceeded to tell her that, I'm
19 sorry. Number one, my internship agreement
20 says that, you know, I'm not to be involved
21 with the IEP -- you know, writing IEP's, in
22 terms of being responsible for them. I can
23 go ahead and, you know, as a learning
24 situation, learn about, you know, how to
25 write an IEP and that sort of thing, and how

125

1  central office at Houston County may have
2  certain, you know, things that they want us
3  to do, incorporate, or whatever, but that I
4  couldn't do it because of the internship
5  seminar -- I'm sorry -- internship --
6      Q    Agreement.
7      A    -- agreement, and then, also
8  because it would be against the law not to
9  hold the meetings and have the parent there.
10     Q    Okay.  When did this -- I'm going
11 to call it a meeting -- take place?
12     A    It was, I want to say, around -- on
13 or around August 11.  It was right before --
14 it was on a Wednesday, if I'm not mistaken,
15 because, on Thursday and Friday, I was going
16 to be leaving for --
17     Q    This conference?
18     A    -- Louisiana.  Uh-huh.
19     Q    Okay.  So, this occurred on the
20 11th.  You were gone the 12th and 13th?
21     A    Uh-huh.
22     Q    Did you inform someone the next
23 week?
24     A    Yes, on Monday.
25     Q    Who did you inform?

126

1      A    Paul Strange.
2      Q    Maybe I misunderstood.  This
3  conference we're talking about occurred on
4  the 27th of August?
5      A    Right.  And what I'm saying is,
6  that's where I was telling Mr. Pitchford
7  about that situation.
8      Q    I understand.  Did you, yourself,
9  inform Mr. Pitchford about this meeting or
10 conversation with Ms. Keasler before the 27th
11 day of August?
12     A    No.  I talked with Mr. Strange
13 about it.
14     Q    And you said that there was some
15 sort of service plan in place for Ms. S.?
16     A    It's called a temporary services.
17 It just -- the parent gives permission for
18 the school to provide special education
19 services, you know, accommodations and that
20 sort of thing, until they get the IEP --
21 either get it from another school, or, if
22 that doesn't happen, then it's my
23 understanding that Houston County would have
24 to get information from the prior school,
25 and, you know, if it was acceptable to

127

1  Houston County, they would accept the IEP.
2  If it wasn't, then it would have to be
3  rewritten.
4      Q    So, was it your understanding that
5  R. S. had transferred from another school?
6      A    Yes.  That was my understanding.
7      Q    And then, the temporary service
8  plan you're talking about was basically using
9  the IEP from the other school on a temporary
10 basis?
11     A    I've not had experience with
12 temporaries, so -- too much experience.  It
13 was my understanding that, yes, we would be
14 looking at her IEP from the other school, and
15 teachers -- general education teachers could
16 go ahead and use other accommodations if they
17 felt they were appropriate for R., even if
18 they weren't listed on that other IEP.
19 Anything to help that young woman be
20 successful in a general education classroom.
21     Q    Okay.  Just so I'm understanding,
22 because, obviously, R. S. is fairly important
23 to this case, she transferred from another
24 system?
25     A    Uh-huh.

128

1      Q    And this was her first time as a
2  student at Houston County High School, as far
3  as you knew?
4      A    As far as I knew.
5      Q    And there was a temporary service
6  plan in place that you, yourself, saw?
7      A    A temporary service sheet.  It
8  wasn't really a plan.  It was just a sheet
9  that was signed by her parent, saying, yes,
10 she could receive services.
11     Q    And it's your testimony that Ms.
12 Keasler approached you on August the 11th and
13 said, "We need you to write an IEP"?
14     A    Yes.  She was on my caseload.
15     Q    Okay.  And is it your testimony
16 that she used the words, quote, I know it's
17 totally illegal?
18     A    Yes.
19     Q    But you did not, in fact, do that?
20     A    No, I did not.
21     Q    Okay.  And you told her that you
22 would not, in fact, do that?
23     A    I told her I would not do that.  I
24 told her I would not be able to do that.
25     Q    Yes, ma'am.  And one of the reasons

129

1  you told her you would not be able to do that
2  was because it was illegal?
3      A    Yes.
4      Q    And another was because of your
5  internship agreement?
6      A    Correct.
7      Q    That's Defendant's Exhibit 6?
8      A    Correct.
9      Q    Which specifically says that the
10 school administration is responsible for IEP
11 meetings, and your attendance is as that of a
12 student intern, and you cannot be held
13 legally responsible for meetings?
14     A    Correct. During my internship.
15     Q    Yes. And, in fact, one of the
16 things you discussed with Mr. Pitchford on
17 August 27 was that, according to your
18 internship contract or agreement, you were
19 not permitted to write IEP's?
20     A    Correct. That's an understanding
21 that he had. He signed the agreement.
22     Q    He's able to read the English
23 language, as far as you know?
24     A    Yes.
25     Q    All right. Were there any other

130

1  discussions during this 10 to 15-minute
2  meeting on August 27?
3      A    There may have been, but I don't
4  recall at this point in time.
5      Q    Mr. Pitchford, you said, was angry?
6      A    Yes.
7      Q    And Mr. Stephens apparently found
8  something you said to be funny?
9      A    Very, yes.
10     Q    Okay. Because he had to leave the
11 room, he laughed so hard?
12     A    Yes.
13     Q    After this meeting on August 27,
14 did you and Mr. Strange leave the room
15 together?
16     A    I don't recall.
17     Q    Okay. Do you recall y'all having
18 any conversations about the meeting?
19     A    Afterwards, yes. I mean, we just
20 discussed the fact that things needed to
21 change.
22     Q    Okay. Let's look at Defendant's --
23 did I hand you 9 already?
24          MR. BRANTLEY: Yeah. We've got 9.
25     Q    Defendant Exhibit 9, have you seen

131

1  that document before?
2      A    Yes.
3      Q    What is that document?
4      A    It is another observation by Mr.
5  Strange.
6      Q    And I'm sorry. Have we marked as
7  an exhibit another observation by Mr.
8  Strange?
9      A    No.
10     Q    Okay. Was there another one before
11 this date on August 30?
12     A    No. This was by Dr. Ruediger.
13     Q    Yes. And that's why I'm asking
14 those questions. You said this is another
15 one --
16     A    I'm sorry.
17     Q    -- by Mr. Strange.
18     A    This is another observation, but
19 this is by Mr. Strange rather than
20 Dr. Ruediger.
21     Q    Yes, ma'am. And, in fact, the
22 document itself indicates that it is the
23 first observation.
24     A    From Mr. Strange. That is correct.
25     Q    He has circled number 1 under

132

1  "number of observation"? Correct?
2      A    Yes.
3      Q    And this observation occurred on
4  what date?
5      A    That would be, according to the
6  document, August 30th.
7      Q    Okay. And would you agree that
8  most -- not all, but most of your scores by
9  Mr. Strange are average, 3's?
10     A    Yes. Very good.
11     Q    Okay. And, in fact, four of them
12 are 4's, or above average?
13     A    That's correct.
14     Q    He gave you above average on
15 provides practice and review?
16     A    Uh-huh.
17     Q    Correct?
18     A    Correct.
19     Q    He gave you an above average on
20 speaks standard, clear English?
21     A    Correct.
22     Q    He gave you an above average on
23 writes standard, clear English?
24     A    Correct.
25     Q    And an above average on exhibits a

133

1 professional demeanor?

2   A   Correct.

3   Q   And would you agree with me, also,

4 that as to the scores he gave you a 3, he has

5 provided you with some input or with some

6 suggestions?

7   A   Absolutely.

8   Q   And he's written those on this

9 form, hasn't he?

10  A   Yes.

11  Q   Okay. And would you agree with me,

12 also, that this document, Defendant's Exhibit

13 9, is dated after this meeting that happened

14 on August 27?

15  A   Yes. That's correct.

16  Q   Let me show you Defendant's Exhibit

17 No. 10, and ask you if you recognize that?

18  A   (Witness reviewing document.)

19      (Recess for lunch.)

20  Q   We are back from our lunch break.

21 And before the break, Mrs. Miller, we were

22 talking about this meeting that you had on

23 August 27th, 2004. And I had just handed

24 you, I believe, Defendant's Exhibit No. 10?

25 Is that right? Is that in front of you now?

134

1   A   This is the class introductions at

2 Troy University.

3   Q   This is a printout of some sort

4 that was produced during the discovery in

5 this case. Is this a printout of some sort

6 of communication you had with your classmates

7 in the internship seminar?

8   A   Correct.

9   Q   Okay. And you penned the words on

10 this document?

11  A   Yes.

12  Q   All right. And would you tell us,

13 for our record, the date of the information?

14  A   It was September 11th of 2004.

15  Q   Okay. According to the document

16 itself, Defendant's 10, that was a Saturday?

17  A   Apparently, yes.

18  Q   It says, right up there --

19  A   Uh-huh.

20  Q   -- "Saturday, September 11, 2004"?

21  A   Yes, it does.

22  Q   And it also says it was at 1:53

23 p.m.?

24  A   Uh-huh.

25  Q   Now, just so that I understand it,

135

1 up at the top, it says "discussion boards"?

2   A   Uh-huh.

3   Q   What is a discussion board?

4   A   Okay. I mentioned the Blackboard

5 Learning System --

6   Q   Yes, ma'am.

7   A   -- that Troy University

8 incorporates into their internship seminar

9 class. And this is a forum to discuss issues

10 that come up at the different schools that

11 each intern is at.

12  Q   All right. So, what is your

13 understanding of who has access to this --

14 I'm sorry -- you called it Blackboard?

15  A   Uh-huh.

16  Q   Is that some sort of software

17 program?

18  A   That's my understanding. I'm not

19 that computer savvy.

20  Q   Does each of the classes or the

21 seminars have its own little Blackboard or

22 discussion board?

23  A   I'm not sure how the system works.

24  Q   Before September 11, 2004, had you

25 used this Blackboard thing before?

136

1   A   Yes. As far as I know, yes. There

2 was a certain point in time when it wasn't up

3 and running for our particular class. If I'm

4 not mistaken, it takes time to get

5 everybody's names in and everything, it's my

6 understanding. And so -- but, yes. Each

7 week, you know, we had things that we were

8 supposed to do on this.

9   Q   I want to make sure I'm grasping

10 this. You had to take this internship class?

11  A   Uh-huh.

12  Q   Is that right?

13  A   Internship seminar class. Yes.

14  Q   And as part of that seminar class,

15 you had to log onto the internet? Is that

16 right?

17  A   Correct.

18  Q   And go to this message board?

19  A   Correct.

20  Q   And then, you had to interact with

21 the other students in the class in some way?

22  A   It wasn't what they call, I think,

23 realtime. But Dr. Jones would have a

24 discussion question. For instance, like, the

25 current forum was the class introductions.

137

1  So, each one of the students in that
2  particular internship class would go in and
3  tell a little bit about themselves.
4      Q   I see. And that's what you're
5  doing here on Defendant's 10?
6      A   Correct.
7      Q   You're just introducing yourself to
8  the other members of the internship seminar
9  class?
10      A   Right.
11      Q   Okay. And had y'all had class
12  meetings before this September 11?
13      A   I want -- to the best of my
14  knowledge, yes. I don't exactly recall when
15  we started actually meeting. But, yes.
16      Q   All right. I see a lot of personal
17  information in here about you --
18      A   Right.
19      Q   -- which would fit in with
20  introducing yourself to the class.
21      A   Uh-huh.
22      Q   Would you agree with me that you
23  tell your other classmates that you've been
24  married to your best friend, Terry, for 32
25  years?

138

1      A   At that time, yes, 32 years.
2      Q   That's there in the third
3  paragraph.
4      A   Yes.
5      Q   Do you see that?
6      A   Uh-huh.
7      Q   Do you tell them that you have
8  three children? That's in the fourth
9  paragraph.
10      A   Yes.
11      Q   You even name your children?
12      A   Yes.
13      Q   Tell a little bit about them?
14      A   Yes.
15      Q   You also talk about making wedding
16  cakes and stained glass windows, and you talk
17  about this business you've told me about this
18  morning.
19      A   Correct.
20      Q   Okay. I like your comment at the
21  end, that they deserve lots of points for
22  reading this.
23      A   Right.
24      Q   I like that. It appears to me --
25  and I want you to correct me if I'm wrong --

139

1  that really the only paragraphs that are
2  relevant to your internship or to this
3  lawsuit are the first two paragraphs of this
4  document. Would you agree with that?
5      A   I would agree with that.
6      Q   Okay. And in the first paragraph,
7  you seem to tell them, you know, this is who
8  I am, and here's what I'm doing.
9      A   Uh-huh.
10      Q   Is that right?
11      A   That's correct.
12      Q   In the second paragraph, you talk
13  about the number of students that you're
14  interacting with? Correct?
15      A   That's correct.
16      Q   And then, you tell about this one
17  particular student who recognized you and
18  called you by name?
19      A   Uh-huh.
20      Q   Is that right?
21      A   That's correct.
22      Q   All right. Now, it also seems that
23  you liked the third block math teacher?
24      A   Yes.
25      Q   Okay. You, in fact, said that she

140

1  was terrific?
2      A   Yes.
3      Q   Okay. Who is she?
4      A   Ms. Towns, Lisa Towns.
5      Q   Ms. Towns. And then, you say you
6  want to vent a little? Correct?
7      A   Let me find that.
8      Q   If you'll look for, "However, I'm
9  going to vent."
10      A   Okay. Got it.
11      Q   Do you see that?
12      A   Right. Uh-huh.
13      Q   Okay. Which person are you
14  referring to there, when you talk about one
15  teacher in particular?
16      A   In this particular case, I was
17  talking about Stacey Ezell.
18      Q   But you don't name her by name?
19      A   That's correct.
20      Q   And you complain, in essence, to
21  your other classmates that she uses
22  worksheets, quizzes and tests? Correct?
23      A   Uh-huh.
24      Q   And you complain that she doesn't
25  want special education students in her room?

141

1    A    Uh-huh.
2    Q    Correct?
3    A    Uh-huh.
4    Q    And then, you also complain that
5  she embarrasses and humiliates the special
6  education kids and you?
7    A    Uh-huh.
8    Q    Okay. Do you say anything else in
9  this communication that, you know, might be
10  relevant to this lawsuit or this dispute?
11    A    The fact that Mr. Strange and I had
12  discussed some of the problems and issues
13  that I was having, trying to make sure that
14  the special education students in her classes
15  were getting needed services.
16    Q    Okay. Where do you say that?
17    A    My mentor and I have discussed at
18  great length, and even though he has been
19  teaching for about eight years, blah, blah,
20  blah, any suggestions to help out with those
21  problem areas. You know.
22    Q    All right. The sentence actually
23  says, "My mentor and I have discussed this at
24  great length, and he, even though he's been
25  teaching for about eight years, he's at a

142

1  loss for any suggestions that are
2  diplomatic."
3        Now, Mrs. Miller, I read that sentence
4  to understand, and understood from it, that
5  you were referring to the problems you had
6  identified with Ms. Ezell above that. Is
7  that incorrect?
8    A    In addition to other things that I
9  did not specifically mention.
10    Q    Okay. Well, now, would you agree
11  that the people in your class, you know,
12  wouldn't know about anything you didn't
13  specifically mention to them?
14    A    Right.
15    Q    So, if you read that sentence, and
16  you were part of this class, you would think,
17  well, she's talking about this one teacher
18  who uses worksheets and intentionally
19  embarrasses and humiliates?
20    A    Uh-huh.
21    Q    Correct?
22    A    Yes. I can see your point.
23    Q    Okay. And according to what you
24  tell them, Mr. Strange -- you don't name him
25  by name. Would you agree with that?

143

1    A    That's correct.
2    Q    But, according to the sentence,
3  your mentor doesn't really have any
4  suggestions as to how you can do that
5  diplomatically?
6    A    Right.
7    Q    But he knows and understands your
8  dilemma? Correct?
9    A    Yes.
10    Q    All right. So, that's as specific
11  as you get?
12    A    That's as specific as I got with
13  that group of people. Yes.
14    Q    Yes. All right. To your knowledge
15  and recollection, did you ever get more
16  specific with this group, your classmates in
17  the internship seminar, about the problems
18  you saw at Houston County High School?
19    A    There's a possibility. But,
20  unfortunately, when I attempted to make
21  copies of my communications, sometimes the
22  Blackboard system would not let us print, for
23  whatever reason. I don't know why.
24    Q    Okay. There's a possibility, but
25  if it is, you weren't able to print it?

144

1    A    Right.
2    Q    Okay. Would you agree with me,
3  though, that Defendant's Exhibit 10, at
4  least, doesn't say the first thing about
5  students not having IEP's?
6    A    That is correct.
7    Q    Would you agree with me that
8  Defendant's Exhibit 10 doesn't say the first
9  thing about IEP's being inappropriate for
10  students?
11    A    That's correct.
12    Q    Would you agree with me that
13  Defendant's Exhibit 10 doesn't say the first
14  thing about the system needs to rewrite or
15  amend all of these IEP's?
16    A    That's correct.
17    Q    And would you agree with me again
18  that Defendant's Exhibit 10 doesn't say the
19  first thing about anybody asking you to,
20  allegedly, illegally write IEP's?
21    A    That's correct.
22    Q    Okay. Let's look at Defendant's
23  Exhibit 11. This document is similar to
24  Defendant's Exhibit 10. Would you agree with
25  that?

145

1  A   Yes.
2  Q   All right.  It's another message
3  board or discussion board entry?
4  A   Correct.
5  Q   And it's an entry by you?
6  A   Correct.
7  Q   You penned the information that's
8  here, or typed it?
9  A   Correct.
10  Q   The date of Defendant's Exhibit 11,
11  or the information contained in it, is
12  Saturday, September 11, 2004?
13  A   That's correct.
14  Q   Would you agree?
15  A   Yes.
16  Q   And it's at 2:52 p.m.?  Correct?
17  A   Correct.
18  Q   So, this is on the same day as
19  Defendant's Exhibit 10, just a little later
20  in time?
21  A   Correct.  It's a different forum,
22  different discussion.
23  Q   And the subject matter is
24  surprises?
25  A   Uh-huh.

146

1  Q   So, one of the items put up for
2  discussion, apparently, by Dr. Jones --
3  A   Uh-huh.
4  Q   -- was surprises?
5  A   Uh-huh.
6  Q   Is that "yes"?
7  A   Yes.  I'm sorry.
8  Q   Okay.  What is ISC?
9  A   That is the computer room over at
10  Troy University.
11  Q   Okay.  So, you were actually doing
12  this in a room at Troy University?
13  A   Correct.
14  Q   On that Saturday afternoon?
15  A   Correct.
16  Q   Okay.  So, in that first sentence,
17  you're saying you spent so much time doing
18  Defendant's Exhibit 10, the building you're
19  in is about to close?
20  A   That's correct.
21  Q   All right.  You mention, in
22  Defendant's 11, that your biggest surprise
23  was the teacher you talked about in
24  Defendant's Exhibit 10?  Correct?
25  A   Correct.

147

1  Q   And that would be Ms. Ezell again?
2  Correct?
3  A   Correct.
4  Q   But you don't name her by name?
5  A   Correct.
6  Q   And you state, if I'm correct, your
7  opinion that her disrespect for students and
8  colleagues alike simply floored you?
9  A   Uh-huh.
10  Q   Is that right?
11  A   That is correct.
12  Q   But you acknowledge that she's been
13  teaching for 15 years?
14  A   Yes.
15  Q   All right.  There's a sentence in
16  the second paragraph of Defendant's 11.  "I'm
17  having no ease -- I'm having to ease" --
18  excuse me -- "my way around the teachers,
19  because they are not happy with full
20  inclusion."
21  A   Correct.
22  Q   Okay.  And that was a surprise to
23  you?
24  A   That was a surprise to me.
25  Q   Okay.  Why?

148

1  A   I would have imagined that they
2  would see -- teachers would see having more
3  special education students in their classroom
4  as a welcome challenge, understanding that
5  special education students with mental
6  retardation and other types of disabilities
7  benefit from being in a general ed classroom
8  with other peers.
9  Q   But you're basically telling your
10  classmates that this is your opinion, first,
11  that they're not happy with full inclusion?
12  A   Yes.
13  Q   Had any teacher specifically told
14  you that?
15  A   Mr. Strange had said that a lot of
16  them were not happy about full inclusion
17  because they just found out about it days
18  before school started.
19  Q   And this goes back to the alleged
20  policy you're talking about from the central
21  office?
22  A   Of full inclusion, you mean?
23  Q   Yes, ma'am.
24  A   The change from partial inclusion
25  to full inclusion.  Yes.

149

1    Q    Okay. I'm just trying to make a
2  reference back to what you told me earlier.
3  You told me earlier, before the lunch break,
4  that Mr. Strange had indicated to you the
5  central office policy had changed, so that
6  all special ed students had to be educated in
7  the general education classroom, without
8  exception?
9    A    I did not say "without exception."
10  I said that he said to me that this was the
11  policy. He didn't specify "without
12  exception." He just told me that the central
13  office had made the decision to place all
14  students in the regular classroom. And I
15  personally do not know of any students that
16  were in the building -- not homebound, but in
17  the building -- who were not in full
18  inclusion regular education classes.
19    Q    Okay. So, at Houston County High
20  School, while you were there for your
21  internship, you don't know of any students
22  who were strictly in the resource room all
23  day long?
24    A    No, I don't.
25    Q    All right. Basically, here, you're

150

1  just telling your classmates, first, your
2  opinion that the teachers are not happy --
3  teachers out there in the field, not happy
4  with this full inclusion idea?
5    A    Uh-huh.
6    Q    And that surprised you?
7    A    It surprised me.
8    Q    All right. At the time you typed
9  or penned these words, how long had you been
10  interning at Houston County High School?
11    A    Since approximately the 1st of
12  August.
13    Q    All right. So, five weeks?
14    A    Approximately.
15    Q    Okay. Would you agree with me
16  that, in Defendant's Exhibit 11, you don't
17  say anything about all of these children not
18  having IEP's?
19    A    That's correct.
20    Q    You don't say anything about
21  allegedly being asked to write illegal IEP's?
22    A    That's correct.
23    Q    You don't say anything about all of
24  the IEP's are inappropriate and need to be
25  rewritten or amended?

151

1    A    That's correct.
2    Q    In fact, you don't even say
3  anything in Defendant's 11 or Defendant's 10
4  about being asked to write IEP's, when your
5  internship agreement doesn't permit you to do
6  that?
7    A    That's correct.
8    Q    Let's look at Defendant's Exhibit
9  12. Do you recognize this document?
10    A    Yes, I do.
11    Q    What is this document?
12    A    This is correspondence -- one that
13  I was able to print off -- correspondence
14  between myself and Ms. Parris and Dr. Jones.
15    Q    Okay. I assume that it was an
16  e-mail. Is it an e-mail?
17    A    Uh-huh.
18    Q    A printout of an e-mail?
19    A    Yes, it is.
20    Q    So, you electronically sent this
21  message to Ms. Parris and Dr. Jones?
22    A    Yes.
23    Q    And according to the document
24  itself, Defendant's 12, you did this on
25  Saturday, September 11, 2004, at 5:48 p.m.?

152

1    A    That's correct.
2    Q    So, I'm going to assume, based on
3  what you told me earlier, that you had to
4  send this message from another site other
5  than the computer center at Troy?
6    A    Yes, I believe so. I'm not sure if
7  it was from my computer or the school, Troy
8  University, computer.
9    Q    You had a computer at your home,
10  though?
11    A    I had one at one point in time, and
12  it stopped working, but I'm not sure exactly
13  when that was.
14    Q    You agree you told me earlier, when
15  we were looking at Defendant's 11, that the
16  computer building or center, the ISC, was
17  about to close?
18    A    Yes.
19    Q    You do remember that now?
20    A    Yes.
21    Q    All right. So, I'm making an
22  assumption that, from 2:52 p.m., Defendant's
23  11, to 5:48 p.m., Defendant's 12, you changed
24  your physical location to another internet
25  connection?

153

1   A    That is correct. That is correct.
2   Q    All right. And would it be your
3   recollection that you did this from your
4   home, or would you perhaps have done it from
5   somewhere else?
6   A    It must have been from my home.
7   Q    What sort of computer system did
8   you have at your home?
9   A    Just a regular tower computer.
10  Q    A desktop system?
11  A    Yes.
12  Q    But you had internet connection of
13  some kind?
14  A    Yes.
15  Q    Was that through your cable
16  company?
17  A    No. Phone.
18  Q    Through your phone company?
19  A    Uh-huh.
20  Q    So, it was dial-up?
21  A    Yes. I mean, it was -- I mean, it
22  attached to the phone. I'm not real computer
23  savvy. So, it attached to my phone line, so,
24  apparently, it was dial-up. I guess that's
25  what that's called.

154

1   Q    I'm not trying to trick you.
2   A    I know.
3   Q    I'm just trying to understand.
4   A    I'm not even sure what to call it.
5   Q    Well, according to Defendant's 12,
6   this is from NMMiller@aol.com?
7   A    Uh-huh. That's my aol address.
8   Yes.
9   Q    Would you agree with me that it
10  says it's from NMMiller@aol.com?
11  A    Correct.
12  Q    And that's your e-mail address?
13  A    Yes.
14  Q    And is that a personal e-mail
15  address?
16  A    Yes.
17  Q    Do you still have that e-mail
18  address?
19  A    Yes.
20  Q    All right. And do you have access
21  to it?
22  A    I'm not sure what you mean.
23  Q    Do you still have the address?
24  A    Yes, uh-huh.
25  Q    And do you have access or can you

155

1   send e-mails from that address, as we sit
2   here today?
3   A    Yes.
4   Q    Okay. And have you, yourself,
5   deleted e-mails from that e-mail address?
6   A    I have, on occasion, yeah.
7   Absolutely.
8   Q    Okay. Have you gone back to that
9   e-mail address and checked to see if there
10  were other e-mails that applied to this
11  lawsuit?
12  A    My e-mail service, after maybe a
13  month -- I don't know -- I don't think I can
14  get to any more. When I go to my screen, it
15  shows up blank. So, I wouldn't know how to
16  go about doing that.
17  Q    Okay. Well, my next question is,
18  have you tried?
19  A    No.
20  Q    All right. Well, if I can ask, did
21  you find this document?
22  A    Did I find it?
23  Q    Yes, ma'am.
24  A    No. This was -- usually, there's a
25  date. And, unfortunately, the date's missing

156

1   on here.
2   Q    All right. You don't recall
3   finding this document off of your home
4   computer system and turning it over to your
5   lawyers?
6   A    Oh, no. No. This was already
7   printed out when I did it, when I sent the
8   e-mail.
9   Q    This was already printed out when
10  you sent it?
11  A    When I sent the e-mail, I printed a
12  copy of it before I sent it or after I sent
13  it or whatever.
14  Q    Okay. At the same time that you
15  electronically sent it, you made yourself a
16  hard copy?
17  A    Yes. I was trying to collect a lot
18  of this stuff just as a -- in my internship
19  notebook. I mean, it wasn't specifically --
20  I wasn't specifically requested to do that or
21  anything like that. I just, you know, pulled
22  some --
23  Q    You took it on yourself to do it?
24  A    Yes.
25  Q    All right. Now, it appears to me

157

1  that you tell Ms. Parris and Dr. Jones about
2  going to this workshop.
3      A    Yes.
4      Q    Is that the one in Louisiana you
5  referred to earlier?
6      A    No. PEPE is -- I can't remember
7  exactly what the acronym stands for.  But
8  it's the evaluation method that the school
9  systems go by when they -- when your
10  principal comes in and does your, you know,
11  observations and that sort of thing.
12      Q    But, then, you're also telling them
13  that you only spent two days in your
14  internship that particular week?
15      A    Right.
16      Q    Okay.  And you said it was the
17  worst week emotionally?  Correct?
18      A    Uh-huh.  That's correct.
19      Q    All right.  You talk about this one
20  student who you asked her to put away her
21  food, and she did that, and said, "Oh, Mrs.
22  Miller, I love you."  Correct?
23      A    That's correct.
24      Q    And then, you talk about the
25  problems that upset you?

158

1      A    Uh-huh.
2      Q    That's the second paragraph?
3  Correct?
4      A    That's correct.
5      Q    Then we go back to the science
6  teacher who embarrasses, belittles and
7  humiliates you?  Correct?
8      A    Yes.
9      Q    And that's Ms. Ezell?
10      A    That's correct.
11      Q    Now, you say, in this e-mail
12  communication to Ms. Parris and Dr. Jones,
13  that you gave Ms. Ezell a list of
14  accommodations for special ed students, and
15  that she became aggravated by that and didn't
16  appreciate it?
17      A    Correct.  And the list of
18  accommodations can technically be used for
19  any student that might be having a problem.
20  But I gave them especially to her for some of
21  the students that might be experiencing
22  problems in her room.
23      Q    Okay.  And this list that we're
24  talking about, was it basically a list of
25  suggested techniques to deal with special ed

159

1  students with mental retardation and learning
2  disabilities?
3      A    If I remember correctly, it was
4  from one of the books that I had purchased.
5  Not necessarily a school book, but a book
6  that I had purchased that had ideas for
7  students with learning disabilities and that
8  sort of thing.
9      Q    And you say, in Defendant's 12,
10  that Ms. Ezell became aggravated because she
11  said she's been teaching a lot longer than
12  you?
13      A    Right.
14      Q    Okay.  And according to what you
15  said over in Defendant's 11, you were aware
16  that Ms. Ezell had been teaching for over 15
17  years back at that time?
18      A    That's correct.
19      Q    So, would you agree that she had
20  been teaching a lot longer than you?
21      A    Yes.
22      Q    Because you had only been teaching
23  a few weeks?
24      A    That's correct.
25      Q    You had only been interning for a

160

1  few weeks?
2      A    That's correct.  But she didn't
3  have that many special education students in
4  her room prior to when I started to intern --
5      Q    Yes, ma'am.
6      A    -- from my understanding.
7      Q    But can you understand how a
8  seasoned educator like Ms. Ezell might become
9  aggravated when an intern with only a few
10  weeks of experience hands her a list of
11  suggested methods for dealing with her
12  students?
13      A    No.  I disagree.  Because I was
14  still considered a professional teacher,
15  according to my contract.  And even if I was
16  just, in her eyes, an intern, I believe that
17  she had the obligation to treat me as a
18  professional, or at least with common
19  courtesy, rather than being disgusted or,
20  like, who-do-you-think-you-are sort of thing.
21  I think that she should have been much more
22  respectful and helpful to an intern or a
23  teacher.
24      Q    So, you can't even understand how
25  she would become aggravated?

161

1    A    No. No, I can't.

2    Q    Well, all right. Good enough. In

3 this communication, Defendant's 12, you don't

4 specifically mention that there are students

5 with no IEP's, do you?

6    A    No.

7    Q    You don't specifically mention, in

8 Defendant's 12, that, in your opinion, the

9 IEP's for students at Houston County High

10 School are inappropriate and need to be

11 amended or rewritten?

12    A    No.

13    Q    And in Defendant's 12, you don't

14 specifically mention this alleged incident

15 about Ms. Keagler allegedly asking you to

16 illegally do things, do you?

17    A    Ms. Keasler. No, I don't mention

18 that.

19    Q    All right. You don't mention it?

20    A    No.

21    Q    And I apologize for mispronouncing

22 her name. Keasler?

23    A    Keasler.

24    Q    Okay. And you also don't mention

25 anything about the fact that you're not

162

1 allowed to do these sorts of things under

2 your internship agreement, do you?

3    A    What sorts of things?

4    Q    Writing IEP's.

5    A    Okay. No. I don't mention that at

6 all.

7    Q    Okay. And would you agree with me

8 that this communication to Ms. Parris and

9 Dr. Jones is after this meeting of August 27

10 with Mr. Strange, Mr. Pitchford and Mr.

11 Stephens?

12    A    That's correct.

13    Q    Let me show you Defendant's 13,

14 Mrs. Miller.

15    A    (Witness reviewing document.)

16    Q    Are you ready?

17    A    Yes.

18    Q    Defendant's 13. That is another

19 e-mail communication from you, from your

20 personal e-mail account?

21    A    Correct.

22    Q    And it is addressed to Pam Parris

23 at Troy?

24    A    Correct.

25    Q    It is dated Monday, September 13,

163

1 2004, at 4:33 p.m.? Correct?

2    A    Correct.

3    Q    And the subject line is "Nancy

4 Miller week three"?

5    A    Correct.

6    Q    Does that mean we're talking about

7 the third week of your internship?

8    A    Correct.

9    Q    Go back to Defendant's 12 for me,

10 please.

11    A    May I say something first?

12 Actually, it says "week three." So, I don't

13 -- I can't really say for sure it was my

14 third week of internship, but it was our

15 third week of communication through the

16 internship, back and forth to Ms. Jones --

17 Dr. Jones and Ms. Parris.

18    Q    Would you agree with me that

19 Defendant's Exhibit 6 -- that's your

20 internship agreement -- required you to

21 communicate with Ms. Parris on a weekly

22 basis?

23    A    Uh-huh. Yes. And that was either

24 -- my understanding was either verbal or by

25 telephone. We did a lot of telephone

164

1 talking.

2    Q    Yes, ma'am. If you'll look at

3 Defendant's Exhibit 6 for me, please.

4    A    Okay.

5    Q    And if you'll look on the second

6 page thereof, that paragraph (k). Does it

7 not say, "Mrs. Miller is to e-mail Ms. Parris

8 weekly" --

9    A    Okay.

10    Q    -- "about the internship"? Yes or

11 no?

12    A    Yes. Yes, it does.

13    Q    All right. Again, Defendant's

14 Exhibit 13, the "wk3" in the subject line

15 refers to your third week of internship?

16    A    Okay.

17    Q    Correct?

18    A    I believe so.

19    Q    And Defendant's 12, the subject

20 line says "Nancy Miller week three," also?

21 Correct?

22    A    Yes.

23    Q    So, that would refer to the third

24 week of your internship?

25    A    Correct. That could have been a

165

1  mistake, in terms of -- it could have been
2  the fourth, and I just put third. That's a
3  possibility.
4      Q    You would admit the document says
5  what I just said?
6      A    Yes. I will admit that.
7      Q    Good. In this e-mail
8  communication, Defendant's 13, you state
9  that, "Paul went ahead and spoke to Mr.
10  Pitchford." Do you see that?
11      A    Yes, I do.
12      Q    Who is Paul?
13      A    Mr. Strange.
14      Q    Okay. You called him by his first
15  name?
16      A    Yes. We called each other by our
17  first names a lot.
18      Q    All right. And you say, in your
19  communication to Ms. Parris, that, "Mr.
20  Pitchford brought the teacher in with Mr.
21  Strange to discuss the problems. She
22  immediately sent the items Mr. Pitchford told
23  her I would need, and asked her to be more
24  cooperative."
25      A    Uh-huh.

166

1      Q    "She seemed to respond."
2      A    Yes.
3      Q    Okay. Who is the teacher?
4      A    Ms. Ezell.
5      Q    Okay. And what items did she
6  immediately send?
7      A    I had mentioned that I would need
8  lesson plans, so that I would know where she
9  was going to be during the course of the
10  week, so that I could possibly plan things
11  for, for instance, one of the students with
12  mental retardation. That sort of thing.
13  Lesson plans, any kind of notes.
14      Oftentimes, in addition to the
15  worksheets and the book work and that sort of
16  thing, she would lecture a lot. And some of
17  my students, especially those with mental
18  retardation, have fine motor skill problems.
19  So, they weren't able to sit there even the
20  length of time that she would, you know,
21  maybe repeat part of a sentence, like, three
22  different times, and then, move on. They
23  still didn't have the -- number one, the
24  cognitive ability, nor the fine motor skills
25  in order to write, you know, her lecture down

167

1  on paper.
2      So, I had requested copies of her
3  lectures in advance, so that I could give
4  them to the students, and they could either
5  read, which was still hard for a student with
6  mental retardation -- but I could try and
7  make it more to where the students could
8  understand.
9      Q    You could translate it?
10      A    Yeah. On occasion -- not very
11  often, but on occasion, they were written in
12  script. And most of the students that I
13  worked with could not read handwriting. They
14  can only read printed material. So, I might
15  have to, you know, print them over and give
16  them to the students.
17      Q    But that was the problem that you
18  and Mr. Strange addressed to Mr. Pitchford?
19      A    Those sorts of things are what Mr.
20  Strange went to Mr. Pitchford about. Yes.
21      Q    Getting lesson plans and copies of
22  the lectures?
23      A    And things like that. Yes.
24      Q    What other things like that?
25      A    Clarification on when she's done

168

1  with a class, you know, with the lecture
2  part. She always wanted me to take the
3  students out of the room, the special ed kids
4  out of the room, if they were done. And that
5  would give me an opportunity to help them
6  one-on-one. So, you know, trying to work out
7  that sort of thing, when I could and when I
8  couldn't.
9      At one point in time -- I believe it was
10  on either the week of September 13th or maybe
11  even the week before -- I was required to
12  make a log of every time I went in her
13  classroom or any other teacher's classroom
14  and that sort of thing. So, I would have to
15  document what I was going to be doing with
16  those special ed students and that sort of
17  thing.
18      So, you know, I was hoping to get sort
19  of an idea of when I would be able to work
20  with the students and what to work on when I
21  took them out of the classroom.
22      Q    Okay. And then, you indicate to
23  Ms. Parris in this communication, Defendant's
24  14, that, after this meeting or discussion,
25  that Ms. Ezell was more cooperative, and she

169

1  seemed to respond?
2      A    Uh-huh.
3      Q    Is that "yes"?
4      A    Yes.
5      Q    Okay.  So, in this communication,
6  Defendant's Exhibit 13, again, you don't say
7  the first thing about there are students with
8  no IEP's?
9      A    No.
10     Q    You don't say the first thing
11  about, in your opinion, all of the IEP's are
12  inappropriate and need to be amended or
13  rewritten?
14     A    No.
15     Q    You don't say the first thing about
16  Cathy Keasler asking you to allegedly do an
17  illegal IEP?
18     A    No.
19     Q    And you don't say anything about
20  someone asking you to write an IEP or writing
21  an IEP not being permissible under your
22  internship agreement?
23     A    No.
24     Q    All right.  Look at Defendant's 14
25  for me, please.

170

1      A    (Witness reviewing document.)
2      Q    All right.  What is Defendant's 14?
3      A    This is a memo that I wrote to Mr.
4  Pitchford the morning that I left the high
5  school to go to central office to talk to Mr.
6  Andrews.
7      Q    Okay.  Would you agree with me that
8  the date of Defendant's 14 is September 24,
9  2004?
10     A    Yes.
11     Q    And you, yourself, typed this
12  document?
13     A    Yes.
14     Q    And in the document, you tell Mr.
15  Pitchford, "This memo is to inform you that
16  this morning, after I attended an IEP meeting
17  for T. T." --
18     A    T. T.  Uh-huh.
19     Q    -- "during second block, Starla,
20  the psychometrist, in Paul Strange's
21  presence, asked me to sign three documents
22  claiming that I was at IEP meetings."
23  Correct?
24     A    Yes.  That is correct.
25     Q    That's what it says?

171

1      A    Yes.  That is correct.
2      Q    And I realize I slaughtered the --
3      A    That's okay.
4      Q    -- student's name.  But that's what
5  it says?  Right?
6      A    That is correct.
7      Q    Who is Starla, the psychometrist?
8      A    She was the psychometrist from
9  Houston County Board of Education.  That's my
10  understanding.
11     Q    Yes, ma'am.  Do you know her full
12  name?
13     A    No.  I don't recall.
14     Q    Are you talking about Starla Smith?
15     A    I'm not sure what her name was.
16     Q    You don't know what her last name
17  is?
18     A    I don't now.  I did then, but I did
19  not -- I neglected to put it in the document.
20  I can see that.  I don't recall her last
21  name.
22     Q    Where did you produce this
23  document?
24     A    At Houston County High School.
25     Q    Yes.  Where?

172

1      A    At Houston County High School, in
2  my resource room.
3      Q    On a computer system?
4      A    That's correct.
5      Q    Okay.  And then, you printed it off
6  when you were done?
7      A    That's correct.
8      Q    Okay.  And then, in Defendant's 14,
9  you name the two students you're referring
10  to.  Three documents, two students?  Correct?
11     A    That's correct.
12     Q    And then, you tell Mr. Pitchford or
13  state to Mr. Pitchford, "As you know, signing
14  the documents when I was not present at a
15  meeting is unlawful."  Correct?
16     A    May I backtrack for a second?
17     Q    Is that what it says or not?
18     A    Two different documents, but --
19  there were three different documents, but it
20  wasn't for three different students.  It was
21  two students, but three documents.
22     Q    Yes, ma'am.  I understood that.
23     A    Oh, I'm sorry.  I thought --
24     Q    I think that's what I said.
25     A    I'm sorry.

173

1    Q    There were three documents, two
2  that applied to one student, and another
3  document that applied to another student?
4    A    That's correct.
5    Q    Three documents, two students?
6    A    That's correct.
7    Q    And you would agree with me that
8  your next sentence says, "Signing the
9  documents when I was not present at a meeting
10  is unlawful."
11    A    That was my understanding. Yes.
12    Q    And where did you come about that
13  understanding?
14    A    From my education at Troy
15  University.
16    Q    All right. And then, you state,
17  "You also know that this is not the first
18  time I have been approached about illegally
19  signing IEP documents."
20    A    Correct.
21    Q    And you're referring back to Cathy
22  Keasler?
23    A    Correct.
24    Q    Then you tell him again about
25  August 11, at 3:20, Keasler approached you,

174

1  all those things?
2    A    Yes.
3    Q    Correct?
4    A    That's correct.
5    Q    Okay. And then, your last
6  sentence, "I have informed Dr. Jones and Ms.
7  Parris of the situation, and I am leaving the
8  premises."
9    A    Correct.
10    Q    How did you inform Dr. Jones and
11  Ms. Parris of the situation?
12    A    I called and left a message at Troy
13  University, and asked them to give me a call
14  back. They never did. But I left a message
15  for them to inform them.
16    Q    So, then, you didn't actually
17  inform Dr. Jones and Ms. Parris of the
18  situation. You left messages for them to
19  call you?
20    MR. BRANTLEY: Object as to form.
21    Q    If you'll answer the question,
22  ma'am.
23    MR. BRANTLEY: Well, it's a
24      compound question. I mean, it
25      calls for two separate answers.

175

1    MR. WALDING: I don't think it
2      does.
3    MR. BRANTLEY: Well, there's two
4      different questions there.
5    Q    (By Mr. Walding) What did you say
6  in the message to Dr. Jones and Ms. Parris?
7    A    I told them that I was going to --
8  my recollection, that I was going to central
9  office to talk with Mr. Andrews about the
10  noncompliance issues or the illegal, you
11  know, things that were going on, and that if
12  they could call me back before I left, I
13  would appreciate it. That I was -- I planned
14  to go, but I wanted to -- I really wanted to
15  talk with them first.
16    Q    Okay. And then, you state, as your
17  last thought in this exhibit, "I am leaving
18  the premises."
19    A    Uh-huh. That's correct.
20    Q    Okay. Did you actually talk with
21  Mr. Pitchford on September 24, 2004?
22    A    No. Ms. Hamm was in the office,
23  and she said he was in a -- she didn't -- I
24  believe she said she didn't know where he
25  was, but that she would make sure that she

176

1  got the letter from me.
2    Q    You left the letter with the
3  secretary, Ms. Hamm?
4    A    That's correct.
5    Q    You did not get to talk to Mr.
6  Pitchford?
7    A    No, I did not.
8    Q    And before you left the premises at
9  Houston County High School on September 24,
10  2004, as far as you know, did Mr. Pitchford
11  get to read Defendant's Exhibit 14?
12    A    I don't know.
13    Q    Okay. As far as you know?
14    A    As far as I know, he did not read
15  it.
16    Q    You didn't see him read it?
17    A    I did not see him read it.
18    Q    Okay. Did you have Mr. Pitchford's
19  permission to leave the school campus on
20  September 24, 2004?
21    A    No, not specifically.
22    Q    Did you have the assistant
23  principal's permission to leave the premises?
24    A    No. I informed Mr. Strange and Ms.
25  Towns and Ms. Sims.

177

1    Q    And would you agree with me that,
2    as part of your duties as an intern at
3    Houston County High School, you were supposed
4    to be out there, in Columbia, at the high
5    school, performing work?
6    A    Yes.
7    Q    Okay.  Let's look at Defendant's
8    15.  Well, before we do that, I want to go
9    back to 14 just a moment.  The documents that
10   you refer to in 14, that Starla, the
11   psychometrist, asked you to sign, what sort
12   of documents were they?
13   A    I believe -- I didn't really look
14   really closely.  But I believe they had to do
15   with eligibility, which is part of the IEP
16   process.
17   Q    All right.  Did you look at the
18   documents or study the documents?
19   A    No.  No.  Mr. Strange was there.
20   He knew that I was not supposed to really be
21   legally involved in any of the IEP things,
22   and yet, he was standing there while Starla
23   was asking me to sign these documents.  And
24   my training taught me -- Dr. Morin and
25   Dr. Ruediger taught us that we don't sign if

178

1    we've not attended the meeting.
2    Q    Okay.  And in your experience, have
3    you never heard of a person signing an
4    IEP-related document when they were not
5    actually present at a meeting?
6    A    At this point in time, no, not that
7    I can recall.
8    Q    Can you tell me whether the federal
9    law, the IDEA, prints that?
10   A    I believe that a person who -- a
11   special ed teacher, a regular teacher, the
12   LEA, they are required to be at the meeting
13   and sign off.
14   Q    Are you telling me that you know
15   for a fact the federal law, IDEA, requires
16   the person to actually be at the meeting
17   before they can sign a document?
18   A    Yes.  From my school training, yes.
19   Q    Okay.  But did I understand you
20   correctly, you understood the documents were
21   as to eligibility --
22   A    Uh-huh.
23   Q    -- and not services?
24   A    The IEP process is the IEP process.
25   Q    Yes, ma'am.  And we discussed it

179

1    earlier.
2    A    And it was my understanding from my
3    supervisors that I was not to sign anything
4    unless I was at the meetings, and then, it
5    was as an intern.
6    Q    Okay.  And that's going back to
7    Defendant's Exhibit 6, isn't it?
8    A    Yes.
9    Q    Because Defendant's Exhibit 6
10   specifically says, "The school administration
11   is responsible for IEP meetings," does it
12   not?
13   A    Yes.
14   Q    And it specifically says that,
15   "Mrs. Miller's attendance is as that of a
16   student intern," doesn't it?
17   A    Uh-huh.
18   Q    Is that "yes"?
19   A    Yes.
20   Q    And Defendant's Exhibit 6
21   specifically says, "She," Mrs. Miller,
22   "cannot be held legally responsible for the
23   meetings."  Correct?
24   A    That's correct.
25   Q    And you had read Defendant's

180

1    Exhibit 6 before September 24, 2004?
2    A    Yes.
3    Q    Okay.  Defendant's 15, have you
4    seen this document before?
5    A    After, yes, the lawsuit.
6    Q    After the lawsuit?
7    A    Yes.
8    Q    Okay.  And this is a document
9    prepared by Virginia Singletary?
10   A    Uh-huh.
11   Q    Would you agree with that?
12   A    Yes.
13   Q    She has signed at the bottom of the
14   document?
15   A    Yes.
16   Q    Okay.  Do you know Virginia
17   Singletary?
18   A    I met her that day.
19   Q    Do you know who she is, what she
20   is?
21   A    I believe she was a secretary, to
22   my knowledge.
23   Q    She would be very unhappy for you
24   to say that.
25   A    I'm sorry.

181

1    Q    That's all right.  She was someone
2  with whom you interacted at the central
3  office?
4    A    That's correct.
5    Q    She states that, "At approximately
6  2:45 on Friday, September 24, 2004, Mrs.
7  Nancy Miller came to the central office."  Do
8  you see that?
9    A    Yes.
10   Q    And do you agree with that?
11   A    Yes.
12   Q    She states that you had an envelope
13 that you wanted to leave for Mr. Andrews.
14   A    That's correct.
15   Q    You did --
16   A    Since he was not there at the time,
17 yes, I was going to leave an envelope with
18 her.
19   Q    Okay.  And what was in the
20 envelope?
21   A    It was this memo to Mr. Pitchford.
22   Q    Defendant's 14?
23   A    Correct.
24        MR. FAULK:  Excuse me.  Are we
25            talking about Andrews or

182

1            Pitchford?  I can't see the
2            document.
3        MR. WALDING:  Andrews.
4        MR. BRANTLEY:  We're talking about
5            -- Virginia Singletary authored
6            this document, but it was given
7            to Andrews' secretary, I guess.
8            Is that what she is?  No.
9            She's central office, isn't
10           she?  She's central office.
11       MR. WALDING:  She is now the
12           special education director and
13           federal programs coordinator.
14       THE WITNESS:  Well, she wasn't at
15           the time.
16       MR. WALDING:  Yes, ma'am.  She
17           certainly wasn't a secretary.
18       THE WITNESS:  I don't know what she
19           was.  I'm sorry.
20       MR. WALDING:  That's all right.
21       MR. BRANTLEY:  Well, anyway, you
22           gave the envelope to her?
23       THE WITNESS:  Yes.
24       MR. WALDING:  That wasn't even the
25           question.  Let me go back to my

183

1            question.
2    Q    I'm asking you if -- really what I
3  want to ask you, if the statements that she
4  says in this document are true.  And you just
5  agreed with me that you showed up at the
6  central office at 2:45, Friday, September 24?
7    A    That is correct.
8    Q    Okay.  And that you had an envelope
9  or you made an envelope, and you wanted to
10 leave it for Mr. Andrews?
11   A    Since he was not there, yes, I
12 wanted to leave it for him.
13   Q    And then, what was in the envelope
14 was a copy of Defendant's 14?
15   A    That's correct.
16   Q    Because you had left the original
17 with Mr. Pitchford?
18   A    That's correct.
19   Q    Okay.  So, I take it that when you
20 produced Defendant's 14 at your computer at
21 Houston County High School, you kept a copy
22 for yourself and you made several other
23 copies?
24   A    Yes.
25   Q    Okay.  Because you're -- at this

184

1  juncture, at 2:45 in the afternoon, you're
2  giving a copy of this document or putting it
3  in an envelope for Mr. Andrews?
4    A    I actually put it in the envelope
5  at 11:30, when I left the high school.
6    Q    So, you made copies originally?
7    A    Yes.
8    Q    One for yourself, one for Mr.
9  Andrews?
10   A    Correct.
11   Q    Okay.  And one for Mr. Pitchford?
12   A    Yes.
13   Q    Okay.  She states, as her third
14 sentence of the first paragraph, "She also
15 requested to talk to me in my office."  Is
16 that true?
17   A    I don't remember asking to talk to
18 her.  I asked to talk to Mr. Andrews, and
19 whether or not he was going to be coming back
20 any time soon, 'cause I needed to talk.  She
21 said, "Well, come on in.  Let's talk," is my
22 recollection.
23   Q    And I can't tell you Ms.
24 Singletary's exact title on this date.  But,
25 in essence, she was the assistant special ed

185

1  director at the time.
2      A    Okay.  I didn't know that.
3      Q    The second paragraph states,
4  "Miller and I talked at length about her
5  concerns on various situations at Houston
6  County High School."
7      A    Uh-huh.
8      Q    Would you agree with that?
9      A    Yes.
10     Q    And you and she, in fact, had some
11 sort of conversation?
12     A    Yes.
13     Q    And would you agree that it was at
14 length?
15     A    Yes.
16     Q    Approximately how long?
17     A    I'm not sure about how long with
18 just her.  But by the time that Mr. Andrews
19 came, I believe it was close to 5:00 o'clock
20 before I left, if I'm not mistaken.
21 Somewhere around there.
22     Q    All right.  And in the third
23 paragraph of Defendant's 15, the third
24 sentence, it says, "At this time, Mr. Andrews
25 and I both met with Mrs. Miller about her

186

1  concerns."  Is that accurate?
2      A    I've not found it yet.
3      Q    Third paragraph, third sentence.
4      A    Yes.
5      Q    The sentence preceding that says,
6  "I contacted Mr. Andrews, and he returned to
7  the central office around 3:45."
8      A    Right.  That is correct.
9      Q    And then, the next sentence, the
10 one I was talking about, said, "At this time,
11 Mr. Andrews and I both met with Mrs. Miller
12 about her concerns."
13     A    Correct.
14     Q    So, do you agree with Ms.
15 Singletary, that, around 3:45 in the
16 afternoon, that Friday afternoon, you met
17 with both Ms. Singletary and Mr. Andrews?
18     A    That's correct.
19     Q    And talked about your concerns at
20 Houston County High School?
21     A    That is correct.
22     Q    Okay.  And then, Ms. Singletary
23 indicates, in the third paragraph, that you
24 requested Mr. Andrews to speak with or
25 communicate with Ms. Parris at Troy?

187

1      A    Right.  Right.
2      Q    Is that accurate?
3      A    Yes, that is accurate.
4      Q    Okay.  And according to Defendant's
5  15, Mr. Andrews indicated that he would
6  contact Ms. Parris on Monday morning?
7      A    Correct.
8      Q    Okay.  Because this was late Friday
9  afternoon?
10     A    Correct.
11     Q    All right.  Now, according to
12 Defendant's 15, you left the Houston County
13 High School campus around 11:30?
14     A    Correct.  I had called the Houston
15 County Board of Education and asked for Mr.
16 Pitchford.  He was at some sort of a
17 function, and he would be back.  And so, I
18 assumed that he would be back in a short
19 time.  So, that's when I left, at 11:30, to
20 go meet with him.
21     Q    Mr. Pitchford?
22     A    I'm sorry.  I'm sorry.  Excuse me.
23 Mr. Andrews.
24     Q    Okay.  My question is, did you
25 leave the campus of Houston County High

188

1  School around 11:30 a.m. on Friday, September
2  24, 2004?
3      A    Yes, I did.
4      Q    And you've already agreed with me
5  you did that without permission?
6      A    Without the teacher's -- or the
7  principal's permission.  Yes.
8      Q    Yes, ma'am.  All right.  According
9  to Defendant's Exhibit 15, you show up at the
10 central office of the Houston County Board of
11 Education around 2:45 p.m.?
12     A    That's correct.
13     Q    Okay.  What happened to the hours
14 in between?
15     A    I went by central office, and Mr.
16 Andrews' truck was not there.  They told me
17 that he was still at some function.  And so,
18 I went over to Dothan High School, because my
19 husband works there and it was close by.  So,
20 I waited there, thinking that I could use his
21 telephone to call and find out when he was --
22 Mr. Andrews was going to come back.
23     Q    Okay.  What was supposed to happen
24 to the students that you were interacting
25 with as part of your internship while you

189

1 were gone that afternoon?

2    A    Well, I was not their teacher of

3 record. So, the teacher of record had the

4 students in their classes. I notified each

5 one of them that I was going to be going to

6 central office, and that I would be leaving,

7 and they said they had no problem with that.

8 I also let Mr. Strange know, as well. And

9 the teachers that I informed at that point in

10 time were Ms. Towns and Ms. Sims.

11    Q    Okay. You didn't inform Ms. Ezell?

12    A    No. I'm not sure -- on my

13 schedule, I had several teachers that I would

14 go back and forth with, that I would cover

15 their classrooms. So, sometimes --

16    Q    Did you inform Ms. Ezell?

17    A    No, I did not inform Ms. Ezell.

18    Q    All right. Thank you. Defendant's

19 16, have you seen that document before today?

20    A    Yes. I have seen this as of the

21 lawsuit.

22    Q    Okay. And would you agree with me

23 that, at the foot of the document, Virginia

24 Singletary has signed her name?

25    A    Yes.

190

1    Q    And so, this document most likely

2 was generated by Virginia Singletary?

3    A    That would be my assumption.

4    Q    Okay. But the occurrences or the

5 events that are talked about in the document

6 are the things that happened on Friday,

7 September 24, 2004? Would you agree?

8    A    Some of the things, yes.

9    Q    Okay. The header of the document

10 is "Concerns expressed by Mrs. Nancy Miller."

11    A    Uh-huh.

12    Q    Would you agree?

13    A    Yes.

14    Q    Number 1 states, "Mr. Paul Strange,

15 Mrs. Miller's paid mentor, has made regular

16 comments to Ms. Pam Parris, TSUD advisor."

17 Do you see that?

18    A    Yes.

19    Q    "Mrs. Miller stated that she is in

20 jeopardy of failing her internship because of

21 Mr. Strange's comments." Do you see that?

22    A    Yes.

23    Q    "She referred several times to Mr.

24 Strange as her paid mentor." Do you see

25 that?

191

1    A    Yes.

2    Q    "Mrs. Miller stated that she had a

3 meeting with Ms. Parris on Wednesday,

4 September 22, 2004, at which time Ms. Parris

5 instructed her to request a meeting with Mr.

6 Tim Pitchford, principal at Houston County

7 High School, to 'make amends.'"

8    A    Yes.

9    Q    Okay. Did you refer to Mr. Strange

10 as your paid mentor?

11    A    Yes. He was under a -- I believe a

12 fairly new program, where Houston County was

13 going through an organization that paid their

14 mentors -- I want to say it was, if I

15 remember correctly, like, $500.00, for the

16 term that he was going to be my mentor, in

17 addition to a small payment from Troy

18 University. That's just --

19    Q    Okay. But, going back to my

20 question, did you refer to Mr. Strange as

21 your paid mentor?

22    A    Yes.

23    Q    Okay. And did you express to Ms.

24 Singletary and/or Ms. Singletary and Mr.

25 Andrews that Mr. Strange made regular

192

1 comments to Pam Parris?

2    A    I do not recall that.

3    Q    Do you have any evidence or

4 information that would indicate that Mr.

5 Strange made regular comments to Pam Parris?

6    A    No, I don't.

7    Q    Did you state to Ms. Singletary

8 and/or Ms. Singletary and Mr. Andrews that

9 you felt in jeopardy of failing your

10 internship because of comments Mr. Strange

11 had made?

12    A    I told her that I was -- that I

13 felt I was in jeopardy because Ms. Parris

14 actually told me that I was in jeopardy of

15 failing my internship.

16    Q    Okay. When did that occur?

17    A    When did she --

18    Q    Yes, ma'am.

19    A    Okay. Between the time that I

20 reported to Mr. Strange and Dr. Ruediger

21 about the illegal -- or shall we say

22 noncompliance issues at the school.

23    Q    And when?

24    A    Between August --

25    Q    No. You said between that time.

193

1  So, I was waiting to here the "and when," the
2  other time. And the date of this document?
3      A    When Dr. Ruediger had come to my
4  observation in August, and then, the next
5  day, Mr. Pitchford -- we had the meeting with
6  Mr. Pitchford on the 27th. Between those
7  days.
8      Q    So, between August 27 and September
9  24, both of '04 --
10      A    Uh-huh.
11      Q    -- you had some sort of
12  conversation with Pam Parris?
13      A    That's correct. If I remember
14  correctly, she came to the school the
15  following week, like, on a Wednesday, maybe.
16      Q    Okay. And doesn't Ms. Singletary's
17  paragraph one of Defendant's 16 indicate that
18  that was a Wednesday, September 22nd, 2004?
19      A    Yes.
20      Q    She says, "Mrs. Miller stated she
21  had a meeting with Ms. Parris on Wednesday,
22  September 22, 2004."
23      A    Uh-huh.
24      Q    Did you say that to Ms. Singletary?
25      A    Yes, I believe I did.

194

1      Q    Okay. Is that the meeting you're
2  referring to?
3      A    No. No. Ms. Parris would come
4  periodically to the school, but this was
5  before September 22nd.
6      Q    Okay. But we know it was after
7  August 27?
8      A    Yes.
9      Q    Between August 27 and before the
10  date that -- September 24, 2004?
11      A    September 22nd? Are you saying
12  between --
13      Q    September 24, 2004, is the Friday
14  you left school.
15      A    Okay.
16      Q    I'm not trying to trick you, Mrs.
17  Miller.
18      A    Okay.
19      Q    It's also the date that this
20  conversation happened in the central office.
21  Are you telling me that you had a
22  conversation with Ms. Parris between August
23  27, when you had the conversation with Mr.
24  Pitchford, Mr. Strange, Mr. Stephens, and the
25  date you had this conversation with Mr.

195

1  Andrews --
2      A    Yes.
3      Q    -- and Ms. Singletary?
4      A    Yes. Several times. There we go.
5  I understand.
6      Q    Okay. You told Ms. Parris this
7  information several times?
8      A    I had conversations with Ms. Parris
9  several times --
10      Q    Several times.
11      A    -- where she was threatening to
12  fail my internship.
13      Q    Okay. But we've been through
14  several e-mail communications --
15      A    Uh-huh.
16      Q    -- that you had with Ms. Parris --
17      A    Uh-huh.
18      Q    -- and/or Dr. Jones?
19      A    That's correct.
20      Q    You mention nothing about these
21  problems.
22      A    That's correct.
23      Q    We've covered all that?
24      A    That's correct.
25      Q    Okay. Tell me about this

196

1  conversation or this meeting where Ms. Parris
2  threatens to fail you in your internship?
3      A    It's my understanding that, from
4  what Dr. Ruediger told me, he was going to go
5  back on the 26th and discuss the problems
6  that I was having at Houston County High
7  School, express concern, and ask for support
8  for me from Dr. Jones and Ms. Parris. That
9  was my understanding. So, Ms. Parris and
10  Dr. Jones, was my understanding, already knew
11  about this situation from Dr. Ruediger.
12      Q    You don't know that they knew it?
13      A    I don't know. That was my
14  assumption, because he told me he was going
15  to go back and discuss these issues.
16      Q    Yes. Dr. Ruediger indicated to
17  you, on August 26th --
18      A    That's correct.
19      Q    -- when he made his observation,
20  and you and he had his discussion, where he
21  did his little debriefing --
22      A    He didn't do the debriefing with
23  me.
24      Q    I understand that.
25      A    Okay.

197

1    Q    But the events took place on the
2 26th?
3    A    That's correct.
4    Q    Okay. You understood he was going
5 to go back to Troy and discuss with Dr. Jones
6 and Ms. Parris these issues you had raised?
7    A    That's correct.
8    Q    But you don't know for a fact
9 whether he ever did that?
10    A    No. However, when we had phone
11 conversations -- she would call and get me
12 out of class and have phone conversations,
13 asking me to come in for a particular meeting
14 or something like that, or inform me of when
15 she was going to be coming or whatever -- you
16 know, whatever little things that she wanted
17 to talk about.
18    Q    Yes. This is Ms. Parris you're
19 talking about?
20    A    This is Ms. Parris.
21    Q    Yes.
22    A    She was quite aware of the
23 noncompliance issues, because I would mention
24 the noncompliance issues. She would ask how
25 things are going. And I said, "The

198

1 noncompliance issues are still not being
2 taken care of."
3    Q    And just so that we're clear on our
4 record, the noncompliance issues we're
5 talking about, we're going back to some
6 students not having IEP's?
7    A    Yes.
8    Q    We're talking about, in your
9 opinion, all of the IEP's being inappropriate
10 and needing to be amended or rewritten?
11    A    Yes.
12    Q    We're talking about you allegedly
13 being asked to write an IEP by Cathy Keasler?
14    A    Yes.
15    Q    And we're talking about the fact
16 that somebody is asking you to write an IEP
17 violates your internship agreement?
18    A    Yes.
19    Q    Okay. You told me that Ms. Parris
20 threatened to fail you in your internship.
21    A    That's correct.
22    Q    When did that happen?
23    A    After the meeting with Mr.
24 Pitchford and Mr. Strange and Mr. Stephens,
25 on the 27th.

199

1    Q    After August 27?
2    A    That's correct.
3    Q    And in what context did it happen?
4    A    There was a meeting where she came
5 out to the school and spoke with Mr.
6 Pitchford -- and I believe Mr. Andrews was
7 also there -- telling them that --
8    Q    Were you present for the meeting?
9    A    Yes, I was.
10    Q    You were with Ms. Parris, Mr.
11 Pitchford and Mr. Andrews?
12    A    And Mr. Strange.
13    Q    I want to understand who was
14 present at this meeting.
15    A    I believe that was all --
16    Q    Pitchford, Andrews --
17    A    -- to my recollection.
18    Q    -- Strange, Parris and you?
19    A    I believe that was all.
20    Q    Where did this meeting take place?
21 I know it happened at the school.
22    A    In the conference room.
23    Q    Can you pinpoint a date for me that
24 this conference happened?
25    A    I want to say it was the following

200

1 Wednesday, if I'm not mistaken.
2    Q    The Wednesday following what?
3    A    I would have to look at my little
4 calendar. Following the meeting on Friday,
5 the 27th.
6    Q    The meeting with Mr. Pitchford,
7 Strange and Stephens in the conference room?
8    A    Correct.
9    Q    Okay. Tell me what Ms. Parris said
10 when she threatened to fail you in your
11 internship?
12    A    She did not tell me that in that
13 meeting. When she went to leave, she asked
14 me to come out into the little stoop area of
15 the school. And she said, "Nancy, you are
16 not here to shake things up, and that you
17 better do everything possible to make your
18 principal happy, because you're in jeopardy
19 of failing your internship." Words to that
20 effect.
21    Q    Okay. But, now, you told me
22 earlier that she threatened to fail you in
23 your internship.
24    A    Yes.
25    Q    But, then, you just told me then

201

1  that she said you were in jeopardy of failing
2  your internship.
3      A    That was the first time she said
4  anything about failing my internship. And
5  there was at least another meeting -- and I
6  don't know what the dates were. I would have
7  to refer back to my calendar -- that she came
8  out again. On the phone, she threatened,
9  you're in -- you're going to fail your
10 internship if you don't stop doing what I'm
11 doing.
12     Q    So, you're telling me that there
13 was a phone conversation following this
14 meeting the Wednesday after August 27th --
15     A    Yes.
16     Q    -- where Ms. Parris says, "You are
17 going to fail your internship if you don't
18 stop doing what you're doing"?
19     A    Yes.
20     Q    Can you pinpoint for me when this
21 telephone conversation allegedly took place?
22     A    I'm sorry. I can't. My calendar
23 may have a date in there when one of the
24 conversations -- when the conversations that
25 I had with her.

202

1      There was one specific time when I was
2  called away from class, and Ms. Teat, who was
3  the librarian, she offered to -- she offered
4  to have me come into her library office and
5  use her phone in there because it was
6  private. And so, we had a conversation
7  there.
8      And I believe that that had to do -- I
9  believe, at that point in time, it had to do
10 with the fact that she was going to try and
11 change -- in fact, she had already changed my
12 internship advisor to Mary Brazzelle rather
13 than Dr. Ruediger, 'cause I believe -- my
14 opinion was that she was angry with
15 Dr. Ruediger.
16     Q    About what?
17     A    When Dr. Ruediger did my
18 observation, my first observation, on the
19 26th, when we discussed the noncompliance
20 issues, he had indicated to me that he would
21 like to pull me from my internship at Houston
22 County Schools because of the lack of support
23 and inappropriateness by the administrators
24 and my special education mentor, my
25 cooperating teacher. And he said, "The only

203

1  thing is, you're employed, so I don't know
2  how to handle the situation. I'll go back"
3  -- that's when he said he'd go back to Ms.
4  Parris and --
5      Q    Dr. Jones?
6      A    -- Dr. Jones, was my assumption,
7  both of them, and discuss the issues and
8  provide me with more support.
9      Q    Was it your understanding that he
10 was going to go back to them to discuss the
11 issues, these four concern areas that you
12 had, or was he going to go back to them and
13 discuss pulling you from the internship at
14 Houston County High School and placing you
15 somewhere else?
16     A    He said that he didn't think that
17 would be a possibility, since I was employed.
18 He didn't know. So, I was under the
19 assumption that he was going to go back and
20 talk about all of the above.
21     Q    Okay. But the immediate context of
22 his statement would be, my inclination is to
23 pull you from this internship, however,
24 you're being paid. I don't know exactly how
25 to handle this. Correct?

204

1      A    You have a teacher contract. So,
2  if you want to say "paid," that's fine. But
3  because --
4      Q    You were being paid?
5      A    -- I had a teacher contract, it was
6  not as simple as being able to take another
7  intern from another school, who wasn't in my
8  position, and making arrangements for that
9  intern to go to a different school.
10     Q    All right. Were there any other
11 incidents where Ms. Parris allegedly
12 threatened your internship?
13     A    There were several total. One
14 particular time, she also said that -- when I
15 told her that I take -- and, again, we were
16 out in the stoop. When I take --
17     Q    Is this the same incident?
18     A    I believe this was a different one.
19     Q    But in the same place?
20     A    I believe so.
21     Q    Okay.
22     A    I believe she was there twice, if
23 I'm not mistaken. I had explained to her
24 that, you know, being a military wife, 32
25 years at that point in time, that I take the

205

1  laws of the United States pretty seriously,
2  especially when it comes to special
3  education, and that I wasn't going to do
4  things that I wasn't supposed to do.
5      And she said that she was -- that my
6  military background did not intimidate her.
7  And I told her it wasn't meant to intimidate,
8  for heaven's sake. It was meant to explain
9  the fact that my husband and I, serving our
10  country, believe in doing the right thing,
11  especially when it comes to the law.
12      Q    Okay. Do you believe someone has
13  to be in the military to do the right thing
14  and follow the law?
15      A    No. I don't think that's
16  necessarily true. But I'm just saying that,
17  in my -- it just adds extra value to me, even
18  more value to me. My whole family had been
19  in the military. My father had been in the
20  military. And, you know, I just grew up --
21      Q    Yes, ma'am. Have you ever been in
22  the military?
23      A    No. I just grew up with respect
24  and love for the country.
25      Q    All right. And do you believe that

206

1  being married to a person in the military
2  somehow makes you more respectful for our
3  country than others?
4      A    No, not necessarily.
5      Q    Okay. Well, I'm just trying to
6  understand your statements.
7      A    I just wanted to emphasize to
8  her --
9      Q    That because you were married to a
10  man in the military, you were going to follow
11  the law?
12      A    No.
13      Q    And that made you special somehow?
14      A    No.
15      Q    Okay. Tell me about the incident
16  on the stoop, other than the fact that you
17  told her you were a military wife and you
18  were going to follow the law. Is that all
19  that was said? Did she threaten your
20  internship?
21      A    Yes.
22      Q    Tell me how she did that?
23      A    She said, if I don't go in and make
24  an appointment with Mr. Pitchford and try and
25  make him a happy camper, so to speak -- she

207

1  may not have used those particular words.
2  But if I did not make Mr. Pitchford happy,
3  then I was in jeopardy of -- I could fail my
4  internship.
5      And she implied that Mr. Pitchford had
6  control over that, when it's technically -- I
7  found out later that it was Troy University.
8  But it was an intimidation factor. I felt
9  that she was trying to intimidate me into
10  doing something that I really ought not to be
11  doing. That was the way I felt.
12      Q    What did you feel she was
13  intimidating you into doing?
14      A    She couldn't understand that a
15  50-year-old woman was not going to do what
16  some people wanted her to do.
17      Q    What was it that you thought people
18  wanted you to do, Mrs. Miller?
19      A    Write IEP's that were
20  inappropriate. That sort of thing.
21      Q    Okay. You didn't do that, did you?
22      A    Not advocate for those students.
23      Q    Did you write IEP's that were
24  inappropriate?
25      A    Not being concerned about the

208

1  education that these students were getting.
2  It was all about -- it seemed to me that it
3  was more about her ability to place interns
4  in the future than to actually have an intern
5  do the right thing.
6      When we were in the meeting with Mr.
7  Andrews and Mr. Pitchford and Ms. Parris, Mr.
8  Andrews said, "Mrs. Miller, we want you and
9  we need you here." And he said, "I've heard
10  good things about your teaching ability."
11  Mr. Pitchford said the same thing.
12      And Ms. Parris was telling Mr. Andrews
13  that she hoped that they would be able to
14  continue with the relationship that they've
15  had in the past, on into the future.
16      Q    Uh-huh.
17      A    And my impression was that she was
18  more concerned about getting new -- other
19  interns into the positions in Houston County,
20  'cause her job depends on that.
21      Q    Well, if that's part of your job
22  duties, shouldn't that be one of your
23  concerns?
24      A    To a certain degree.
25      Q    Yes, ma'am.

209

1          (Brief off-record.)
2     Q     Have any of the defendants that
3  you've sued in this matter ever specifically
4  said to you, "I have the authority to fail
5  you in your internship"?
6     A     No.
7     Q     Have any of the defendants that you
8  have sued in this matter, other than Ms.
9  Parris -- and I believe she's a defendant.
10         MR. BRANTLEY:  She is.
11         MR. WALDING:  Sir?
12         MR. BRANTLEY:  She's a defendant.
13         MR. WALDING:  Okay.
14    Q     Have any other defendants
15 threatened to fail you in your internship?
16    A     No.
17    Q     Okay. So, as far as someone
18 threatening to fail you in your internship,
19 that was strictly Pam Parris?
20    A     That's correct.
21    Q     And none of the other -- well, none
22 of the defendants, if I heard you correctly,
23 specifically said to you, "I have authority
24 to fail you in your internship"?
25    A     That's correct.

210

1     Q     And more specifically, did anyone
2  on the Houston County Board of Education ever
3  say to you, "I have authority to fail you in
4  your internship"?
5     A     No.
6     Q     Okay. Or did any of the individual
7  defendants associated with the Houston County
8  Board of Education, Mr. Lord, Mr. Andrews,
9  say to you, "I have authority to fail you in
10 your internship"?
11    A     No.
12    Q     Okay. Let's go back to Defendant's
13 16. Paragraph 2, or the one that's numbered
14 paragraph 2, talks about this incident with
15 Cathy Keasler. Would you agree with that?
16    A     Yes.
17    Q     And did you express this
18 information about Cathy Keasler allegedly
19 asking you to write an allegedly illegal IEP
20 with Mr. Andrews and Ms. Singletary?
21    A     Yes.
22    Q     Okay. Number 3, the third
23 paragraph of Defendant's 16, seems to talk
24 about you indicating to Ms. Singletary and
25 Mr. Andrews that, at least at one juncture,

211

1  Mr. Pitchford was not very cordial to you.
2     A     That's correct.
3     Q     And did you communicate that
4  information to Ms. Singletary and Mr.
5  Andrews?
6     A     Yes, I did.
7     Q     Paragraph 4 of Defendant's 16 talks
8  about the incident earlier that day. Would
9  you agree?
10    A     Yes.
11    Q     And we're talking about the
12 incident where the psychometrist, Starla,
13 asked you to sign these three documents?
14    A     That's correct. Those were two
15 separate meetings, though. I had attended an
16 IEP. I want to clarify that. I had attended
17 an IEP meeting. And then, later on, Ms. --
18    Q     Starla?
19    A     -- Starla came in. Uh-huh.
20    Q     And basically what I am asking you,
21 Mrs. Miller -- the document says these
22 things. I'm asking you, did you communicate
23 this information to Ms. Singletary and Mr.
24 Andrews?
25    A     Yes, I did.

212

1     Q     So, Ms. Singletary has correctly
2  recorded the information you gave to them
3  that day?
4          MR. BRANTLEY:  With regard to
5                number 2.
6          MR. WALDING:  4.
7          MR. BRANTLEY:  I'm sorry. 4. Yes.
8          MR. WALDING:  I'm on number 4. And
9                I'm not trying to trick
10               anybody.
11    A     Yes.
12    Q     All right. Paragraph 5 says
13 something about Mr. Stephens doing a belly
14 laugh and leaving the room.
15    A     I had already talked about that
16 before. Yes.
17    Q     That goes back to the meeting on
18 August 27?
19    A     Correct.
20    Q     And did you communicate this
21 information to Ms. Singletary and Mr.
22 Andrews?
23    A     Yes, I did.
24    Q     And you felt he was acting
25 unprofessional?

213

1    A    Yes.

2    Q    Okay.  So, she's correctly recorded

3    the information you gave her and Mr. Andrews?

4    A    Yes.

5    Q    All right.  Paragraph 6 of

6    Defendant's 16 says that, "Mr. Pitchford has

7    had Mrs. Miller, according to her, quote,

8    doing a notebook, end quote, to verify her

9    activities."

10    A    That's correct.

11    Q    And you communicated this

12    information to Ms. Singletary and Mr.

13    Andrews?

14    A    That's correct.

15    Q    This notebook is the one you

16    referred to earlier about --

17    A    A log.

18    Q    -- a log of all your activities?

19    A    Correct.

20    Q    Okay.  And were you complaining

21    about having to do a notebook?

22    A    What I was mentioning to her is

23    that, according to Mr. Strange, he and Mr.

24    Payne were instructed to do the same, but

25    they weren't going to.  They didn't feel the

214

1    need to do that.

2        And so, I got the impression that it

3    was, like, we're going to make sure that

4    she's where she needs to be when she needs to

5    be there.  We're going to document

6    everything.  It was kind of -- to me, it felt

7    like an intimidation tactic.

8    Q    Okay.  Well, did anybody

9    specifically tell you what the purpose of

10    this notebook was?

11    A    No.

12    Q    Okay.  But Mr. Pitchford asked you

13    to keep a notebook of your activities?

14    A    Right.  But he never asked to see

15    it.

16    Q    Yes, ma'am.

17    A    Thought that was unusual.

18    Q    He asked you to keep one?  Correct?

19    A    Yes.  And so, I did.

20    Q    And he was the principal at Houston

21    County High School?

22    A    That's true.

23    Q    And you're stating to me, or

24    testifying today, under oath, that Mr.

25    Strange and Mr. Payne were also directed to

215

1    do something by their direct and immediate

2    supervisor, and they refused to do it?

3    A    I'm saying that Mr. Strange

4    indicated to me that they were all going to

5    be keeping a notebook, not necessarily that

6    Mr. Pitchford had told them that they had to.

7    But I got the impression that he was being

8    polite and saying, we're supposed to keep a

9    log, but it was really not -- they weren't

10    really required to do it.

11        I never saw -- in other words, I never

12    saw them keep a log.  Okay.  And, you know, I

13    was -- I kept mine with me wherever I went,

14    to all my classes and that sort of thing, and

15    I never saw them carry any kind of a log to

16    get any kind of signatures.  And we

17    interacted, you know, throughout the day,

18    passing each other and that sort of thing,

19    frequently.

20    Q    Okay.  Whose signatures were you

21    supposed to obtain on this?

22    A    The teachers with whom I was

23    included.

24    Q    Okay.  The teachers in whose class

25    you went?

216

1    A    Uh-huh.

2    Q    Okay.  Would you agree with me,

3    Mrs. Miller, that at the time this log

4    requirement was asked of you or imposed on

5    you, you were an intern?

6    A    Yes.

7    Q    And that would be different from

8    Mr. Strange and Mr. Payne, who were both

9    certified special education teachers?

10    A    The implication was that they were

11    supposed to, but they weren't going to, and

12    that I was -- they wanted me to do it.  And

13    this was all after the --

14    Q    Yes.  The question was --

15    A    -- meeting.

16    Q    -- do you acknowledge that there's

17    a difference?  You were an intern, and they

18    were certified special education teachers?

19    A    Yes.

20    Q    All right.  Thank you.  Defendant's

21    Exhibit 16, paragraph 7.  According to Ms.

22    Singletary's note, you stated that you had to

23    leave at 11:30 because you felt so

24    uncomfortable with the situation.

25    A    That is correct.

217

1     Q     And you expressed that to Ms.
2  Singletary --
3     A     Yes.
4     Q     -- and Mr. Andrews?
5     A     That is correct.
6     Q     Okay. She indicates here that you
7  stated you believe that the psychometrist --
8  that would be Starla? Correct?
9     A     Yes.
10    Q     -- was part of a sabotage plan to
11 set you up for failure, and that the
12 psychometrist holds meetings on students
13 without sending out notices?
14    A     That was her interpretation.
15    Q     Okay. Did you communicate that
16 information to Ms. Singletary --
17    A     What I --
18    Q     -- and Mr. Andrews? Let me finish
19 my question, please.
20    A     Pardon me.
21    Q     Did you communicate that
22 information?
23    A     I communicated that I felt that Mr.
24 Strange, being in the room with Starla, that
25 it seemed like it was a sabotage plan on his

218

1  part to have me sign things that I shouldn't
2  sign, that didn't need to sign, that I wasn't
3  permitted to sign, and he knew it. So, you
4  know, it was, like, well, why would Paul
5  Strange be standing there, when he knows I'm
6  not supposed to sign things, according to the
7  internship --
8     Q     Agreement?
9     A     -- agreement.
10    Q     Help me understand. Did you use
11 the words "sabotage plan"?
12    A     I may have. I may have used that
13 term.
14    Q     So, you were thinking, in your
15 mind, that at least Mr. Strange and -- I
16 believe her name is Ms. Smith, but whatever
17 Starla, the psychometrist's name is -- were
18 part of a scheme or plan to make you fail
19 your internship?
20    A     I can't say that Starla was a part
21 of it, cognitively, but I believe Mr. Strange
22 definitely. Yes.
23    Q     You believe Mr. Strange wanted you
24 to fail your internship?
25    A     Yes.

219

1     Q     He was your paid mentor?
2     A     Yes.
3     Q     And he wanted you to fail your
4  internship?
5     A     Yes.
6     Q     And why do you believe that?
7     A     Because throughout this -- up to
8  this point in time, I had gotten very little
9  support from him. I learned -- you know, he
10 was supposed to be teaching me all these
11 different things and showing me how to do
12 certain things and all this sort of thing.
13 And I was getting nothing -- very little.
14 I'm sorry. I should say very little in the
15 way of appropriate knowledge.
16    Q     Okay. Well, did you receive
17 inappropriate knowledge?
18    A     Yes.
19    Q     And what are you referring to? The
20 same problems you've identified already?
21    A     Yes. When Mr. Strange comes back
22 and tells me, yes, we are going to have to --
23 you are going to have to make up these IEP's,
24 without meetings and that sort of thing.
25 Yes. You don't teach an intern to do things

220

1  that they're not supposed to do. It's
2  supposed to be a positive, fun experience for
3  a new teacher, and a learning experience, a
4  positive learning experience. And it was a
5  nightmare instead.
6     Q     Okay. Would you agree with me that
7  the experience is a two-way street that
8  requires involvement on your part?
9     A     Absolutely. And I was there
10 wanting to learn as much as I possibly could.
11    Q     Did Mr. Strange ever specifically
12 threaten to fail you in your internship?
13    A     No.
14    Q     Did Mr. Strange ever specifically
15 state to you, "I have the authority to fail
16 you in your internship"?
17    A     No.
18    Q     Okay. Defendant's 16, paragraph 8,
19 Ms. Singletary records that you reported that
20 regular program teachers ridicule students
21 and make rude comments about students, such
22 as, quote, student failed because he did not
23 try, end quote, or, quote, failed because he
24 is lazy, end quote. Did you convey that
25 information to Ms. Singletary?

221

1  A    Yes, I did.
2  Q    And Mr. Andrews?
3  A    Yes.
4  Q    Am I correct that all this
5  information that's recorded on Defendant's 16
6  was conveyed to both Virginia Singletary and
7  Riley Joe Andrews?
8  A    Yes.
9  Q    Okay. And that would apply to all
10 these paragraphs?
11 A    Yes.
12 Q    All right. Did you state to Ms.
13 Singletary and Mr. Andrews that, as a child,
14 you had been ridiculed because of your large
15 chest?
16 A    I don't know that I put it that
17 way, but I said my physical appearance. Yes.
18 Q    Okay. You did communicate some
19 information about being ridiculed as a child?
20 A    Yes. So, I knew how it felt at
21 that age. Uh-huh.
22 Q    Do you see the sentence I'm
23 referring to in paragraph 8?
24 A    Yes.
25 Q    I mean, has she correctly recorded

222

1  the information you conveyed?
2  A    To my recollection, I just kind of
3  motioned to the upper part of my body. And
4  so -- but that's exactly what I meant. But I
5  don't think I actually said it, but that's
6  what I meant. Yes.
7  Q    Okay. She's correctly recorded the
8  information you meant to communicate --
9  A    Correct.
10 Q    -- whether you stated it in words
11 or not?
12 A    Correct. Yes.
13 Q    Paragraph 9. She has recorded that
14 you told her and Mr. Andrews that Mr. Strange
15 eavesdropped on your conversations with
16 Dr. Ruediger at Troy, and reported back to
17 Mr. Pitchford.
18 A    That's correct.
19 Q    Okay. How do you know Mr. Strange
20 eavesdropped on your conversations?
21 A    It was the day of Dr. Ruediger's
22 first observation.
23 Q    August 26th?
24 A    That's correct. And we were in the
25 library, doing our little debrief, we'll call

223

1  it. And Mr. Strange was there for part of
2  the meeting. Then Dr. Ruediger basically
3  told him that that was all he needed him for.
4  And so, Mr. Strange -- the questions that
5  Dr. Ruediger had asked in the debriefing, it
6  goes into a little bit of Dr. Ruediger's
7  perception of how Mr. Strange came across at
8  that meeting.
9  Anyway, he went to -- we were sitting at
10 a desk, and Dr. Ruediger and I were in
11 chairs. And the cases where the bookcases
12 were, were right beside the table. And Mr.
13 Strange, rather than leaving and giving us,
14 you know, some privacy to talk about the
15 actual observation, hung around right there
16 at the bookcase, so that he could -- it was
17 our opinion that he could hear some of the
18 information that we were talking about.
19 Q    Okay. Well, did you ask him to
20 leave?
21 A    No.
22 Q    Did Dr. Ruediger ask him to leave?
23 A    Well, it was nothing, really,
24 that --
25 Q    Yes, ma'am. Did Dr. Ruediger ask

224

1  him --
2  A    No.
3  Q    -- to leave?
4  A    No.
5  Q    How do you know that he reported
6  back to Mr. Pitchford?
7  A    After the observation, Mr. Strange
8  met with me in the library and said, "I
9  understand that he's, you know, got some
10 concerns." And we went over those.
11 Q    "He" who?
12 A    Dr. Ruediger. Dr. Ruediger had
13 asked him some questions about IEP's and that
14 sort of thing. And so, he knew that
15 Dr. Ruediger, you know, knew about some of
16 the noncompliance issues.
17 Q    Right.
18 A    And so, he said that, "We need to
19 probably talk to Mr. Pitchford about this."
20 And he said, "I'll go into the office and,
21 you know, talk to him about it." So, he went
22 into the office and talked. And that's when
23 he came back out and told me that Mr.
24 Pitchford wanted to see us in the morning.
25 Q    Okay. The sentence states that Mr.

225

1  Strange eavesdropped on your conversations
2  with Dr. Ruediger and reported back to Mr.
3  Pitchford, which, to me, sounds very cloak
4  and dagger. What you've just described to me
5  doesn't really sound that way.
6      You're saying you believe he
7  eavesdropped on your conversation because he
8  was nearby when you were having a
9  conversation with Dr. Ruediger? Correct?
10     A   Yes.
11     Q   You don't know for a fact that he
12  heard a word of your conversation with Dr.
13  Ruediger, do you?
14     A   It would be very hard not to.
15     Q   You don't know for a fact --
16     A   But I don't know for a fact.
17     Q   Okay. And the reporting back to
18  Mr. Pitchford was after he, Mr. Strange, had
19  a direct conversation with you?
20     A   Yes.
21         MR. WALDING: All right. Let's
22         take that break now, please.
23         (Recess in deposition.)
24     Q   All right, Mrs. Miller. Let me
25  show you what I've marked as Defendant's

226

1  Exhibit No. 17, and ask you if you've seen
2  that document?
3      A   Yes, I have.
4      Q   Did you see it before this lawsuit?
5      A   Yes, actually.
6      Q   Would you agree that this is a
7  letter from Riley Joe Andrews to Pam Parris?
8      A   Yes.
9      Q   All right. And I'm looking for a
10  date, but I certainly don't see one right
11  now.
12     A   There is no date. There was a fax
13  date that Troy University had, which was
14  after my appointment with Mr. Andrews,
15  discussing the issues.
16     Q   Okay. Just so I've got that clear
17  in my mind and it's clear on our record, we
18  just got done looking at Defendant's Exhibit
19  16 and Defendant's Exhibit 15, which are two
20  documents drafted by Virginia Singletary --
21     A   Correct.
22     Q   -- that talk about a meeting on
23  Friday, September 24, between you, Ms.
24  Singletary and Mr. Andrews?
25     A   That's correct.

227

1      Q   So, it's your understanding that
2  what I've marked as Defendant's 17 comes
3  after that meeting?
4      A   That's correct.
5          MR. BRANTLEY: Comes after what
6          meeting? I missed that.
7          THE WITNESS: The one on the 24th
8          with the central office.
9          MR. WALDING: The one on the 24th.
10     A   But I don't recall the date -- I'm
11  sorry -- on the fax.
12     Q   Yes, ma'am. And that's fine.
13  That's fine. It was not actually addressed
14  to you.
15     A   Correct. True.
16     Q   This document is not actually
17  addressed to you?
18     A   Correct.
19     Q   But you have seen it before --
20     A   Yes.
21     Q   -- before you filed this lawsuit?
22     A   That's correct.
23     Q   How did you see it?
24     A   Dr. Ruediger and Ms. Parris --
25  while we were having a meeting with my

228

1  husband about the fact that they were going
2  to terminate my internship at Houston County
3  High School, Dr. Ruediger pulled this
4  document out and showed me.
5      Q   All right. Let me skip ahead to
6  what I have marked as Defendant's 27, which
7  is a letter from you to Dr. Jones. Would you
8  agree?
9      A   Yes.
10     Q   And it's dated October 18 of '04?
11     A   That's correct.
12     Q   And in the letter, in the body of
13  the letter, it says, "Last week, Ms. Parris
14  and Dr. Ruediger indicated to my husband and
15  me that I have been administratively
16  withdrawn from my internship at Houston
17  County High School."
18     A   That's correct.
19     Q   So, is that the meeting that you're
20  referring to, where you saw this letter from
21  Mr. Andrews?
22     A   Yes.
23     Q   So, then, approximately -- well,
24  the week before October 18, 2004, there was a
25  meeting where you saw Mr. Andrews' letter,

229

1  which is undated?
2      A    Uh-huh.  That's correct.
3      Q    Okay.  Let's go back to 17.  And
4  I'll come back to 27.  It occurred to me that
5  the meeting you were talking about had to be
6  the same one referred to in 27.  Correct?
7      A    Yes.
8      Q    All right.  In Defendant's Exhibit
9  17, Mr. Andrews is conveying information to
10  Ms. Parris, and he talks about or conveys
11  information about four concerns.  Would you
12  agree with that?
13      A    Yes.
14      Q    And those concerns are following
15  school procedures when leaving campus.
16  That's the first one.
17      A    That's correct.
18      Q    Okay.  And you did, in fact, leave
19  the school campus without permission on the
20  24th?
21      A    Yes, I did.
22      Q    Okay.  He says that there's a
23  concern about working with peer teachers.
24      A    Yes.  It states that.
25      Q    Yes, ma'am.  He states that there's

230

1  a concern about developing positive
2  teacher-student relationships.
3      A    That's correct.  It states that.
4      Q    And he says that there's a concern
5  about developing a better understanding of
6  the special education process and required
7  forms (eligibility meeting and referral
8  meeting).
9      A    Yes.
10      Q    It states that.  Okay.  Does this
11  letter state, in any way, that Mr. Andrews or
12  Houston County Schools wants your internship
13  canceled?
14      A    No, it does not.
15      Q    Does this letter state, in any way,
16  that Mr. Andrews or Houston County Schools or
17  anybody associated with the Houston County
18  Schools wants you somehow punished because of
19  these concerns Mr. Andrews had?
20      A    No, it does not state that.
21      Q    Do you think there was no concern
22  about working with other teachers, with peer
23  teachers?
24      A    I think there was a concern with
25  Ms. Ezell and Mr. Strange.

231

1      Q    Okay.  You had a strained
2  relationship with Ms. Ezell.  Would you agree
3  with that?
4      A    Yes, I would.
5      Q    And at least as to the juncture
6  when this letter was written, which is after
7  September 24 of '04, you had something of a
8  strained relationship with Mr. Strange?
9      A    That's correct.
10      Q    And that's a tongue twister.  All
11  right.  And you've indicate to me at least
12  once, if not twice in your testimony thus
13  far, that Mr. Pitchford became aggravated or
14  upset at you during meetings?  Correct?
15      A    Yes.
16      Q    Okay.  So, that would indicate, at
17  least to me -- and if you disagree, please do
18  -- that there's some strain in that
19  relationship?
20      A    Yes.
21      Q    Okay.  So, then, do you think that
22  working with peer teachers is an invalid
23  concern on the part of Mr. Andrews or persons
24  at the Houston County School System?
25          MR. FAULK:  Form.

232

1          MR. BRANTLEY:  Object to form.
2      Q    I mean, there were these problems?
3  Yes?
4      A    There were problems.  Yes.
5      Q    It says that he has a concern or
6  they have a concern about developing positive
7  teacher-student relationships.  Did you have
8  any specific run-ins or problems with
9  students?
10      A    No, not to my knowledge.
11      Q    Were you aware of any students who
12  specifically asked not to have to deal with
13  you as an intern teacher?
14      A    No, not one.
15      Q    Okay.  Are you saying that there
16  were none or you're not aware of any?
17      A    I'm not aware of any student.
18      Q    And then, he says there are
19  concerns about developing a better
20  understanding of the special education
21  process and required forms.  Do you see that
22  there should be any concerns in that area as
23  to you?
24      A    No.
25      Q    Because you know all about the

233

1 special education process?
2   A   No.  Because I was in a learning --
3 it was supposed to be a learning experience.
4 And although I didn't have much experience,
5 per se, I learned a lot at school, and my
6 grades show that.
7   Q   And we're going back to the class
8 on policy and procedure that you took with
9 Dr. Ruediger?
10   A   I'm going back to all of the
11 special education classes that I took at Troy
12 University Dothan.
13   Q   What did you make in the class on
14 policy and procedure?  What was your grade?
15   A   I'm not quite sure.  I don't recall
16 specifically.  It was either an "A" or "B."
17   Q   All right.  Defendant's 18, have
18 you seen that document?
19       MR. FAULK:  That's undated, too.
20       MR. WALDING:  These were all
21       produced in discovery.
22   A   This was another document that I
23 saw at my meeting, that terminated my
24 internship.  And Dr. Ruediger also pointed
25 out the fact that it was after I had met with

234

1 Mr. Andrews and Ms. Singletary, the fax.
2   Q   Well, we've already established
3 that it was after your meeting with Ms.
4 Singletary and --
5   A   We established that this one was.
6   Q   Ma'am, I'm speaking.  And you and I
7 both can't talk at the same time.  Okay?
8   A   Pardon me.
9   Q   All right.  I thought we had
10 already established that this meeting was
11 identified in Defendant's 27 as the week
12 before October 18, 2004?
13   A   Yes.  That's correct.
14   Q   So, what you're telling me now is
15 that Defendant's 18, you also saw this
16 document at the meeting the week before
17 October 18, 2004?
18   A   That is correct.
19   Q   All right.  According to
20 Defendant's 18, paragraph 1, or the paragraph
21 numbered 1, we've talked about you leaving
22 the school campus already, have we not?
23   A   Yes.
24   Q   All right.  The paragraph numbered
25 2, did you accuse Mr. Strange of entering

235

1 your locked file cabinet and placing an IEP
2 in a student folder?
3   A   What I said was that the IEP for
4 R. S. was in my IEP file, cabinet file, in my
5 locked room.
6   Q   Okay.  You said that to Mr.
7 Strange?
8   A   I believe it might have not been
9 directly to him.  It might have been to Mr.
10 Pitchford or someone like that.
11   Q   Okay.  Well, according to the
12 paragraph, it says, "Mrs. Miller accused Paul
13 Strange of entering her locked filing cabinet
14 and placing an IEP in a student folder.  Mrs.
15 Miller claims it was an IEP written without
16 her knowledge.  Mr. Strange and Mrs. Miller
17 had written the IEP in her room approximately
18 one week earlier.  Mrs. Miller stated she had
19 no recollection of that event."
20   I mean, do you know at all what we're
21 talking about here?
22   A   I know what folder we're talking
23 about.  It was -- again, it was R. S.'s.  And
24 Paul Strange had -- he and I together
25 actually sat down to talk about how to write

236

1 IEP's.  And so, this was one time when I was
2 anticipating learning how he wanted -- or the
3 school wanted their IEP's written.  So, Mr.
4 Strange took out a blank form and wrote down
5 goals and a little bit about R. on the
6 profile sheet.
7   Q   Yes.
8   A   And a few accommodations and that
9 sort of thing.  And the next thing I know, a
10 couple of days later, it's in my filing
11 cabinet, like it's supposed to be her IEP.
12 Well, we had no meeting.  It was a practice
13 session.  But it was inappropriate to have it
14 in my file, like that was the IEP that I was
15 supposed to follow.
16   Q   Okay.  And how did it get there, if
17 you know?
18   A   I don't know for sure.  I do know
19 that Paul Payne had a master key to the
20 doors.  He used it several times and told me,
21 "Shhh.  Don't tell anybody, because I'm not
22 supposed to have this."  But he had indicated
23 to me that he had this master key, and opened
24 my door one day when I didn't have my key,
25 when I had forgotten my key at home.

237

1    Q    So, then, somehow, Mr. Payne had to
2    be involved?
3    A    I don't know for sure. It could
4    have been another teacher. A gentleman by
5    the name of -- he's, I believe, Lewis, Mr.
6    Lewis.
7    Q    Steve Lewis?
8    A    Steve Lewis. I'm not sure exactly
9    what he taught at Houston County High School.
10    But I know he had a master key, because there
11    were two occasions when he actually opened my
12    room, went into my special education room,
13    with his master key.
14    One time, I was actually sitting at my
15    computer. I didn't have my light on, 'cause
16    I was in a hurry, and I was just typing out
17    something for one of the students, maybe a
18    quiz or something like that. I don't even
19    remember what it was. But I was at my
20    computer, and my computer -- my door was
21    here. My computer was here. He unlocked the
22    door and came in and started walking around
23    my room.
24    Q    And is your point that he had a key
25    to your room?

238

1    A    Yes.
2    Q    All right. Well, let's try to
3    focus on --
4    A    So, I mean, I don't know who else
5    had a key.
6    Q    Yes, ma'am. And I'm not trying to
7    be rude to you. Really, I'm not.
8    A    I understand.
9    Q    But it's getting late in the day,
10    and I'd like us to focus. Okay?
11    A    Okay.
12    Q    Did you accuse Mr. Strange of
13    somehow entering your locked filing cabinet?
14    A    No. I did not accuse him, per se.
15    Q    Did you imply that he broke into
16    your room or entered your locked filing
17    cabinet and put this document there?
18    A    He may have taken that. I just
19    said the IEP was in my filing cabinet, and I
20    didn't put it there.
21    Q    And did you see this draft or this
22    practice IEP as a valid, legal document?
23    A    No.
24    Q    Okay. It says here that you claim
25    it was written without your knowledge.

239

1    A    No. That is not true.
2    Q    Because it was a practice session?
3    A    I was sitting there right beside
4    him. Yes. I was sitting there right beside
5    him.
6    Q    All right. Paragraph 3 of
7    Defendant's 18. "Mrs. Miller has difficulty
8    in communicating with faculty members." Do
9    you see that?
10    A    I see that.
11    Q    Okay. And do you deny that you had
12    difficulty communicating with faculty
13    members?
14    A    I don't think I had a problem
15    communicating with faculty members.
16    Q    Paragraph 4. "Mrs. Miller
17    questioned the lawfulness of the school
18    system's inclusion policies."
19    A    I have no idea what he means by
20    that.
21    Q    Okay. Paragraph 5. "Some students
22    have requested that Mrs. Miller not be their
23    inclusion teacher."
24    A    I have no knowledge of that at all.
25    Q    Okay. Do you know for a fact that

240

1    students didn't request for you not to be
2    their teacher?
3    A    No.
4    Q    Okay. So, that could have
5    happened?
6    A    It possibly could have happened.
7    Q    You just don't know?
8    A    No. It would be interesting to
9    find out who it was.
10    Q    Okay. Paragraph 6. "Classroom
11    teachers reported that Mrs. Miller has been
12    upset and crying during class time."
13    A    Absolutely.
14    Q    Okay. So, there were times during
15    your internship that you were upset and
16    cried?
17    A    Yes, a couple of times.
18    Q    During school hours?
19    A    Yes, definitely.
20    Q    So, that's a true statement?
21    A    Absolutely.
22    Q    Paragraph 7. "Office staff members
23    reported that Mrs. Miller was upset and
24    crying in the office lobby during school
25    hours." Is that true?

241

1    A    At one point in time, I could have
2 been in the office. I don't recall
3 specifically the incident. But it's a
4 possibility.
5    Q    Paragraph 8. "Not following
6 suggestions provided by Mr. Strange as
7 related to the resource room."
8    A    I'm not sure I understand that, as
9 far as the resource room is concerned. As
10 far as the IEP's are concerned, no, I did not
11 follow suggestions by Mr. Strange.
12    Q    And he was your paid mentor?
13    A    That's correct.
14    Q    Okay. Paragraph 9. Mrs. Miller
15 told a classroom teacher, quote, I don't like
16 being here any more than you do, but I have
17 to be in here a certain number of hours, end
18 quote. Did you tell a teacher that?
19    A    No.
20    Q    Did you tell a teacher something to
21 that import?
22    A    No. Even when I had a problem in
23 the classroom, I loved being there with those
24 kids. You know, with Ms. Ezell, okay, even
25 though the relationship was strained, I loved

242

1 being in there. I wanted to be in there with
2 those students.
3    Q    Would you agree with me that
4 Defendant's 18 is signed at the bottom by
5 Stacey Ezell and Paul Strange?
6    A    Yes.
7    Q    Defendant's 19, do you recognize
8 that document?
9    A    Yes, I do.
10    Q    Again, that's an e-mail from your
11 personal e-mail account?
12    A    That's correct.
13    Q    And it's dated Sunday, September
14 26, 2004, at 1:08 p.m.?
15    A    That's correct.
16    Q    And the subject line says it
17 concerns Nancy Miller 9/24.
18    A    That's correct.
19    Q    And does that mean September 24?
20    A    Yes.
21    Q    Okay. So, then, the subject of the
22 e-mail is the meeting -- or what happened on
23 September 24?
24    A    Correct.
25    Q    Which is when you left campus at

243

1 Houston County High School?
2    A    Correct.
3    Q    And when you had your meeting with
4 Mr. Andrews and Ms. Singletary?
5    A    Correct.
6    Q    And you say to Dr. Jones -- well,
7 let me ask you this: This document,
8 Defendant's 19, is actually to
9 sjones@troyst.edu? Correct?
10    A    Correct.
11    Q    That's Dr. Jones?
12    A    Correct.
13    Q    And it's also cc'd to pparris?
14    A    Correct.
15    Q    That's Ms. Parris?
16    A    Correct.
17    Q    And to ruediger -- or
18 gruediger@troyst.edu?
19    A    Correct.
20    Q    Is that Dr. Ruediger?
21    A    Correct.
22    Q    And then, you also sent it to
23 yourself?
24    A    Yes.
25    Q    Okay. And you sent it to

244

1 jrotc250924@aol.com?
2    A    That's correct.
3    Q    And who is that?
4    A    That's my husband.
5    Q    All right. This document, then,
6 just refers to those phone messages you told
7 me about earlier, before you left the campus
8 at Columbia?
9    A    Correct.
10    Q    Okay. But you didn't specify all
11 the problems and concerns you had in this
12 e-mail?
13    A    No. They already knew.
14    Q    Okay. Well, you're making
15 assumptions about what's in someone's head,
16 aren't you?
17    A    No, I don't think so.
18    Q    Well, they knew them if they
19 listened to your phone messages?
20    A    They knew about the noncompliance
21 issues from practically, you know, the
22 beginning of my internship, when I spoke with
23 Dr. Ruediger.
24    Q    Dr. Ruediger knew about them?
25    A    Dr. Ruediger. And when I spoke

245

1  with Ms. Parris on the phone several times, I
2  addressed -- when she asked me about how
3  things were going, I said, "The noncompliance
4  issues are still a problem."
5      Q    And that's how you put it?
6      A    Possibly. I mean, to my
7  recollection, that would be the terminology I
8  would have used. Something on the order of
9  that.
10     Q    Defendant's 20.
11     A    Yes.
12     Q    Have you seen this document before?
13     A    Yes.
14     Q    And is this the second internship
15  observation form by Dr. Ruediger?
16     A    Yes.
17     Q    Okay. And the date of it is what?
18     A    September 30th.
19     Q    Did Dr. Ruediger actually come out
20  to the campus at Houston County High School?
21     A    Yes, he did.
22     Q    And he made his observation?
23     A    Yes.
24     Q    Did you and he have some sort of
25  debriefing session after the observation?

246

1      A    Yes, at Troy University.
2      Q    Oh, okay.
3      A    Instead of at the high school, like
4  the previous one.
5      Q    Okay. And is that your signature
6  there at the foot of the page, Defendant's
7  20?
8      A    Yes.
9      Q    Let's look at 21, then. So, if I
10  understood you correctly, what you told me
11  just a few minutes ago is that this
12  debriefing session that, the previous time,
13  y'all had right there at Columbia, at the
14  high school --
15     A    Correct.
16     Q    -- this time, on September 30, it
17  occurred at Troy?
18     A    Correct.
19     Q    All right. And it looks as though
20  this Dr. Lumpkin also attended this
21  debriefing?
22     A    That's correct.
23     Q    Who is Dr. Lumpkin?
24     A    I never had Dr. Lumpkin for any
25  classes, but she was one of the education

247

1  professors there. I believe, at some point
2  in time, if I remember correctly, reading one
3  of the past Troy books that, you know, have
4  the listings of classes and all that sort of
5  thing in it, I believe she used to be the
6  education department head or something like
7  that. That's what I recall for some reason.
8      Q    Okay. The first sentence says,
9  "Dr. Lumpkin was asked to attend the
10  meeting." Do you see that?
11     A    Yes.
12     Q    Did you ask Dr. Lumpkin to attend
13  the meeting?
14     A    No. Dr. Ruediger did.
15     Q    Okay. Second paragraph indicates
16  that -- well, did Dr. Ruediger lead this
17  meeting?
18     A    Yes.
19     Q    Second paragraph says, "I began the
20  meeting by asking Mrs. Miller to discuss her
21  relationship with her supervisor and
22  principal." Is that accurate?
23     A    That is accurate.
24     Q    All right. "She indicated that she
25  was interacting well with her students and

248

1  other teachers. She stated, quote, I am
2  getting along well with Mr. Strange, end
3  quote."
4      A    Uh-huh. That's correct.
5      Q    Did you state that?
6      A    Yes, I did. I felt, at that time,
7  I was getting along with him, because he had
8  indicated to Ms. Parris that he regretted,
9  you know, what had happened and all, and that
10  he was going to try to make sure that I had a
11  successful internship.
12     So, after I had gone to central office,
13  Ms. Parris called me and indicated to me that
14  Mr. Strange had said that he wanted to make
15  sure I had a successful internship.
16     Q    All right. So, the basis of you
17  saying, "I am getting along well with Mr.
18  Strange" is something Ms. Parris said to you?
19     A    Because his attitude and his
20  demeanor changed toward me at that point in
21  time, the last few days since the day I went
22  to talk with Mr. Andrews.
23     Q    Okay. Would you agree with me that
24  Defendant's 18 is a document signed by Mr.
25  Strange, and it expresses various concerns

249

1 about you?

2    A   Yes, uh-huh. Odd.

3    Q   The next sentence says, "She was

4 asked why she left the school campus the

5 previous week during school hours. Miller

6 stated that she felt that she was required to

7 do something which she did not feel was

8 appropriate."

9    Did they ask you about leaving the

10 campus the previous week?

11    A   Yes, they did. And I went into

12 detail why, again. But he does not address

13 exactly what I said. He just kind of glosses

14 over it, in my opinion.

15    Q   Okay. And did you, in fact, state

16 that you felt you were required to do

17 something you didn't feel was appropriate?

18    A   Yes.

19    Q   And that's sign those three

20 documents?

21    A   That's correct.

22    Q   Who required you to sign those

23 three documents?

24    A   They were asking me to sign those

25 documents, and I said "No." So, I didn't

250

1 feel like I was -- anybody was -- nobody

2 actually said, "I'm requiring you to do

3 this." But just by Mr. Strange's appearance

4 in the room at that time, requesting for me

5 to sign these documents, that was

6 inappropriate, in my opinion.

7    Q   So inappropriate that you should

8 leave the campus?

9    A   It was a continuation of all of the

10 stuff that had been going on prior to, and

11 this was -- it had just come to the head, and

12 I just needed to talk to somebody about it.

13 This was supposed to be a positive --

14    Q   It was so inappropriate --

15    A   Yes.

16    Q   -- that you had to leave the

17 campus?

18    A   Yes.

19    Q   You couldn't have just said, "No,

20 Starla, the psychometrist, I'm not going to

21 sign those"?

22    A   I told her that, too.

23    Q   And you couldn't have gone about

24 your merry way in your internship that day?

25    A   No. I decided not to.

251

1    Q   Okay. I understand that. The next

2 sentence states that, "Dr. Lumpkin and I

3 stressed" -- and this is Dr. Ruediger -- "the

4 importance of demonstrating professional

5 behavior and the correct protocol to follow

6 when difficulties arise. She apologized for

7 leaving the school campus."

8    A   Yes.

9    Q   Did you?

10    A   Yes, I did.

11    Q   Okay. So, at least on September

12 30, 2004, you realized that leaving the

13 school campus because Starla, the

14 psychometrist, asked you to sign three

15 documents was perhaps a little extreme?

16    A   No. I decided that because Mr.

17 Pitchford -- I couldn't get ahold of Ms.

18 Parris and Dr. Ruediger or Dr. Jones to

19 discuss the situation. Because I had called

20 them earlier than 11:30.

21    I decided that, even though I left the

22 campus, I would have liked to have had the

23 opportunity to speak with one of my

24 supervisors. But since I didn't have that

25 opportunity, I felt -- personally, I felt

252

1 backed into a corner. So, I decided -- I

2 apologized for leaving, but I do not regret

3 leaving.

4    Q   Why were you backed into a corner,

5 ma'am?

6    A   For two months -- for two months, I

7 was asked to do all these different things.

8 My students that I had on my roll were not

9 getting the education that they deserved or

10 they required. They were not getting any

11 kind of accommodations that were appropriate

12 for them. They were not getting any kind of

13 lessons that were appropriate for them.

14    When you have a student with mental

15 retardation, and he's told to answer critical

16 thinking questions, and that it doesn't take

17 a genius to answer those questions, that's

18 totally inappropriate.

19    I had had it. You can only take so

20 much, seeing that these kids are suffering

21 for the, in my opinion, abuse that some of

22 these teachers are putting on them.

23    Q   Okay. And Starla asking you to

24 sign these three documents was just the straw

25 that broke the camel's back?

253

1    A    No. The straw that broke the
2    camel's back was Mr. Strange standing in that
3    room, knowing that, on my contract, it says
4    that I don't -- I'm not legally responsible
5    for these things. I was not in one of the
6    meetings. And just, you know, standing
7    there, instead of saying, "Oh, Starla, she
8    doesn't need to sign them. I'll go ahead and
9    sign them."
10        Because he was, technically, in my
11   opinion, in my understanding of my
12   internship, that he was the one who should
13   have been signing the documents, not Nancy
14   Miller.
15       Q    I understand you. You were just
16   backed into a corner?
17       A    I felt like backed into a corner.
18   Two months of this sort of thing.
19       Q    Sure. I understand. The document
20   then indicates -- well, why did you
21   apologize?
22       A    Because that was the appropriate
23   thing to do.
24       Q    Okay. Well, did Dr. Ruediger and
25   Dr. Lumpkin indicate to you that the

254

1    appropriate thing to do would have been to
2    stay at school?
3        A    To my recollection, they never said
4    anything like that. They just questioned why
5    I left, to my recollection.
6        Q    Okay. The next sentence says, "I
7    further asked Mrs. Miller if, at any other
8    times during her internship, if she had
9    demonstrated inappropriate professional
10   behavior." Do you see that?
11       A    Yes.
12       Q    And do you recall Dr. Ruediger
13   inquiring of you as to whether you exhibited
14   what, in his opinion, apparently, other types
15   of inappropriate professional behavior?
16       A    I don't recall him asking that.
17       Q    Well, did you glean, from
18   Dr. Ruediger and Dr. Lumpkin, during this
19   debriefing session, that leaving the school
20   campus that day was inappropriate
21   professional behavior?
22       A    Yes. That was the impression that
23   I got from them. Yes.
24       Q    Good. Another sentence, it says,
25   "After some hesitation, she indicated she had

255

1    not." And then, the next sentence states,
2    "She later indicated that she could
3    understand how her behavior may have been
4    interpreted as unprofessional."
5        A    Yes.
6        Q    Did you state that?
7        A    I probably did. I don't recall
8    that specifically. But, in so many words, I
9    may have stated that. Yes.
10       Q    Okay. And then, the second
11   paragraph talks about you all discussing
12   lesson plannings and things of that nature?
13   Correct?
14       A    Yes.
15       Q    All right. And this meeting lasted
16   approximately an hour?
17       A    I have no recollection, but
18   apparently. That's what they've got
19   indicated on there, so --
20       Q    It says 3:10 to 4:10.
21       A    I would have to say yes.
22       Q    Okay. Look at Defendant's 22. Do
23   you recognize that document?
24       A    Yes, I do.
25       Q    And this is a document that you

256

1    typed or penned?
2        A    That's correct.
3        Q    And what, if anything, did you do
4    with this document?
5        A    This was part of the observation
6    report for --
7        Q    The 30th?
8        A    Yes, uh-huh. And I was required to
9    write after-action, so to speak, reports, and
10   this was it.
11       Q    What are after-action reports?
12       A    After the observation, it's, like,
13   a reflection. Interns are required to, you
14   know, naturally, sit back and look at things
15   that happened during your -- during the
16   observation, and note things that you did
17   that were strong and note things that you
18   might have been able to do better and that
19   sort of thing.
20       Q    Okay. Reflect on the feedback
21   you've been given and comment on it?
22       A    Correct.
23       Q    And hopefully take the feedback and
24   use it in a positive manner to better
25   yourself?

257

1    A    Correct.
2    Q    Okay. You begin Defendant's 22 by
3  saying that you disagree with what
4  Dr. Ruediger concludes?
5    A    Yes, I say that.
6    Q    And then, you go on to say a great
7  many things about the problems you perceive,
8  don't you?
9    A    According to each one of the areas
10  that he observed.
11    Q    Okay. Show me, in this document,
12  any reflection on what Dr. Ruediger saw as
13  either unprofessional behavior or areas that
14  you needed to improve, that you then took as
15  positive and tried to better yourself with?
16    A    It would take me a while to review
17  and remind myself of what I actually said,
18  because I haven't really looked at this in
19  depth. This was after going to Mr. Andrews.
20  And Mr. Strange and Ms. Towns --
21    Q    Yes, ma'am. If you could address
22  my question.
23    A    I'm trying to.
24    Q    Actually, you're just talking right
25  now.

258

1    A    They helped me pre --
2    Q    Mrs. Miller, the process works by
3  me asking you a question, and then, you
4  responding to the question.
5    My question is, can you identify any
6  parts of this document where you take the
7  feedback that Dr. Ruediger gave you, and
8  reflect on it and try to better yourself?
9  Can you do that?
10    MR. FAULK: Take your time and
11      review the document. Take
12      whatever time you need.
13    THE WITNESS: Okay.
14    A    (Witness reviewing document.)
15  Okay. I would say that, no, it addressed
16  more of the positive things that I had done
17  as far as the -- and the reflection is
18  supposed to include strengths and weaknesses.
19  I did not address the weaknesses, in terms of
20  comments that he made.
21    I've always been told, through our
22  special education classes at school, that
23  these items are supposed to be scored on the
24  basis of what he actually sees. Okay. Now,
25  when he gives me the 2's in the "Presents the

259

1  lesson," Mr. Strange and Ms. Towns are the
2  ones who provided information for me, and I
3  used the IEP's to create the lesson.
4    Q    It wasn't your fault? It was
5  theirs?
6    A    No. I'm not saying it's a fault.
7  It's actually a positive.
8    Q    You're saying he gave you 2's in
9  areas that you didn't have control over?
10    A    No. I'm saying he gave me 2's as a
11  direct reflection from my reporting to Mr.
12  Andrews the situation that was going on, and
13  this was his reprimand to me.
14    Q    This observation form?
15    A    Yes. The scores that he gave me.
16  And he admitted, in his debriefing, that some
17  of the scores were for my unprofessional
18  behavior by leaving the school on Friday.
19    Q    Okay. For your behavior, ma'am?
20    A    For my behavior. When I've been
21  told by Dr. Morin and Dr. Ruediger that these
22  are for when you're at the observation, what
23  you specifically observe. He did not observe
24  any of this at that observation.
25    Q    Okay. So, you can't find one

260

1  instance on Defendant's 22 where you take his
2  critical feedback and apply it positively to
3  yourself in a way that might better yourself
4  as a professional?
5    A    Not in my observation critique.
6    Q    Good. 23. This is an observation
7  form by Mr. Strange, dated August 30, '04?
8  Correct?
9    A    That's correct.
10    MR. FAULK: Haven't we already
11      looked at that?
12    MR. BRANTLEY: One earlier. This
13      is August 30th.
14    MR. FAULK: I was thinking we
15      already saw that.
16    MR. WALDING: No, sir.
17    THE WITNESS: No. That's from --
18    MR. WALDING: We saw the one from
19      Ruediger.
20    THE WITNESS: -- Mr. Strange.
21    MR. BRANTLEY: You've got Exhibit 2
22      at the top, now.
23    MR. WALDING: I don't. Y'all did.
24      This was one of y'alls initial
25      disclosure documents.

261

1    Q    All right. Would you agree that
2    that document is dated August 30, 2004?
3    A    Yes.
4    Q    And that it was an observation form
5    completed by Paul Strange?
6    A    Yes.
7    Q    And is that your signature at the
8    foot of the document?
9    A    Yes.
10    Q    Okay. And would you agree with me
11    that Mr. Strange gives you mostly average
12    ratings?
13    A    Yes. And I was thrilled.
14        MR. FAULK: Could I interrupt? I'm
15        sorry.
16        MR. WALDING: Sure.
17        MR. FAULK: Just looking at my
18        notes, at one point, you showed
19        a document marked as
20        Defendant's Exhibit 9, which
21        was dated August 30th, and it
22        was an observation by Strange.
23        MR. WALDING: Oh. Is it the same?
24        MR. FAULK: And I wondered if it
25        may be two different documents.

262

1        MR. WALDING: I don't know. Maybe
2        I'm confused. No. You're
3        right, Winn. They are the
4        same.
5        MR. BRANTLEY: 23 and what? 9?
6        MR. WALDING: Yeah. Let's just
7        pull 23 out. That just means
8        my document debacle continues.
9        I thought it was after -- I
10        thought there was one after.
11        And I apologize. Again, it is
12        late in the day.
13        THE WITNESS: We all make mistakes.
14        MR. WALDING: Sure, we do. Sure.
15    Q    All right. Let's look at 24.
16    That's another e-mail from you to Dr. Jones,
17    that's cc'd to Ms. Parris?
18    A    Right. That's one of those weekly
19    things.
20    Q    All right. And you indicated it
21    had been a rough week, and it was good that
22    it was behind you?
23    A    Yes.
24    Q    All right. There's a sentence that
25    reads, "We both regret the events of the week

263

1    and look forward to meeting again."
2    A    Uh-huh.
3    Q    What are the events of the week
4    you're referring to?
5    A    Mr. Strange and I had a
6    conversation that we both regret that -- you
7    know, I regretted that I felt compelled to go
8    to central office, but that I was concerned
9    for the students. And he said he regretted
10    the events of the week. Of course, at that
11    time, I did not know he had sent -- he and
12    Ms. Ezell had sent the --
13    Q    What are the events of the week?
14    A    -- exhibit.
15    Q    You leaving the campus?
16    A    Leaving the campus and -- yes. I
17    would say leaving the campus.
18    Q    All right. Thank you. Defendant's
19    25, have you seen this document before?
20    A    Yes, after the --
21    Q    Lawsuit.
22    A    -- lawsuit was filed.
23    Q    And this purports to be an e-mail
24    from Cynthia Lumpkin -- is that Dr. Lumpkin?
25    A    Yes.

264

1    Q    -- to Pam Parris?
2    A    Yes.
3    Q    And it purports to be dated
4    Wednesday, October 6, 2004, at 12:15 p.m.?
5    A    Correct.
6    Q    But the subject matter of the
7    e-mail, if you'll look at the first
8    paragraph, indicates that, "As requested, I
9    met with Dr. Greg Ruediger and Mrs. Nancy
10    Miller on Thursday, September 30, at 3:10
11    p.m." Correct?
12    A    Correct.
13    Q    All right. That's the debriefing
14    session we talked about already?
15    A    Correct.
16    Q    Skip down, if you will, to the
17    third paragraph. It indicates that you
18    thought Mr. Pitchford had some authority to
19    pass or fail you in your internship.
20    A    Correct.
21    Q    You told me earlier, though, that
22    he never directly stated to you he had
23    authority to pass or fail you in your
24    internship?
25    A    Correct. Ms. Parris implied that

265

1  he had the ability to say "yea" or "nay."
2  You know.
3      Q    And then, it says, "We explained to
4  her the TSUD decides that, but that Mr.
5  Pitchford decides if she is allowed in his
6  school."
7      A    That's correct. Yes.
8      Q    Was that information conveyed to
9  you by Dr. Ruediger and Dr. Lumpkin on
10  September 30?
11      A    No, not to my recollection.
12      Q    So, you're saying they didn't
13  explain to you that Troy State decided
14  whether you passed or failed your internship?
15      A    I'm not sure if that was addressed.
16      Q    You do see that she says that in
17  the third paragraph?
18      A    Yes.
19      Q    You're saying she didn't or they
20  didn't address that?
21      A    No. I'm saying that I don't recall
22  exactly her specifically saying that Mr.
23  Pitchford would decide whether or not I'm
24  allowed to stay at his school. I do not
25  recall her saying that. I'm not saying that

266

1  she didn't. I'm just saying I do not recall
2  that.
3      Q    Okay. Well, do you recall them
4  saying that persons at Troy State decided if
5  you passed or failed your internship?
6      A    Yes. And technically, from the
7  internship handbook, yes, I mean, that was
8  what I was -- the understanding.
9          But when I was being threatened with
10  failing my internship, it was implied that
11  Mr. Pitchford -- I had better go back and
12  make Mr. Pitchford a happy camper, so that I
13  would pass my internship. So, you know, he
14  was going to influence it one way or another,
15  naturally.
16      Q    You're saying that your internship
17  handbook indicates that that's a decision by
18  Troy State, whether you pass or fail?
19      A    That's correct.
20      Q    And you had access to this
21  handbook?
22      A    Yes.
23      Q    All right. 26. 26 is a letter
24  dated October 18, 2004, from Pamela Parris to
25  Kenneth Lord?

267

1      A    Uh-huh. Yes.
2      Q    Have you seen that letter before
3  today?
4      A    Yes.
5      Q    Did you also see this letter during
6  this meeting that we talked about earlier,
7  along with Defendant's, I think, 27?
8      A    No. Actually, I was hand given --
9  oh, I'm sorry. No. I'm sorry. I'm
10  mistaken. This is from Ms. Parris. Right?
11  I saw this -- I might have received a copy of
12  it in the mail, is what happened, I believe
13  is what happened. I don't think I actually
14  saw it at the meeting we were at. I think I
15  received a copy of it in the mail.
16      Q    Okay. The meeting that y'all were
17  at was on October 18 of '04?
18      A    The meeting that I had with Troy
19  University was actually prior to the 18th.
20      Q    You're right. And I apologize. It
21  was the week before, according to Defendant's
22  27. All right. You did receive a copy of
23  this?
24      A    Yes, in the mail.
25      Q    Some time after the 18th?

268

1      A    That's correct. They informed me,
2  and then, I got a copy.
3      Q    And the second sentence of the
4  letter states, "The purpose of this letter is
5  to inform you that her internship" -- that's
6  your internship --
7      A    Correct.
8      Q    -- "was terminated effective
9  October 14, 2004."
10      A    Correct.
11      Q    "Mrs. Miller was notified of this
12  decision during a meeting at the university
13  on October 14, 2004."
14      A    That's correct.
15      Q    All right. So, that gives us a
16  specific date for this meeting? Correct?
17      A    That is correct.
18      Q    All right. And that's the meeting
19  where you and your husband were present, and
20  you were informed that your internship had
21  been terminated?
22      A    Correct.
23      Q    And, again, that meeting involved
24  you, your husband, Ms. Parris, and who else?
25      A    Dr. Ruediger.

269

1    Q    Okay. No one from Houston County
2  Schools was present at that meeting?
3    A    No.
4    Q    No member of the Houston County
5  school board present for that meeting?
6    A    No.
7    Q    Okay. We've looked at 27 already,
8  I believe. Do you still have your --
9    A    (Witness reviewing document.)
10   Q    That's a copy of a letter from you
11 to Dr. Jones, dated October 18, '04?
12   A    That's correct.
13   Q    Okay. And that first sentence
14 indicates y'all had this meeting on -- we now
15 know the 14th? Right?
16   A    That's correct.
17   Q    Where you were told that your
18 internship had been terminated?
19   A    That's correct.
20   Q    Now, you state, in Defendant's 27,
21 that your internship was administratively
22 withdrawn.
23   A    That's correct.
24   Q    What does that mean?
25   A    Well, according to Dr. Jones, that

270

1  was the terminology that she used. And
2  Dr. Jones -- it's my understanding that
3  Dr. Jones, rather than Ms. Parris, actually
4  made the decision to administratively
5  withdraw me from my internship, instead of
6  failing, that I had been threatened with.
7    Q    Well, what's your understanding of
8  who got to make the decision whether you
9  passed or failed?
10   A    Ordinarily, it's my understanding
11 that Ms. Parris made the decision, normally.
12   Q    Because she was the director of the
13 internship program?
14   A    Correct. That's my understanding.
15   Q    All right. Apparently, this
16 information there about you being
17 administratively withdrawn was communicated
18 to you on the 14th?
19   A    Yes.
20   Q    Okay. You go on, in Defendant's
21 27, to request basically that you get another
22 internship?
23   A    Right. I had choices that were
24 given to me. It's rare that they offer a
25 student another opportunity for an

271

1  internship. Normally, they fail or you can
2  -- and you get to choose -- like, you can
3  still get your degree, but you can't be a
4  teacher. You can get your collaborative
5  degree, but you'll never be a teacher. And I
6  think there was a couple of other options
7  that they offer.
8        But they also indicate, in the
9  paperwork, that there could be other options.
10 And Dr. Jones made the decision to give me
11 the opportunity to have another internship.
12   Q    Okay. Were these other options or
13 other choices discussed with you at the
14 meeting on October 14?
15   A    Yes.
16   Q    What were the other options or
17 choices?
18   A    Well, the first thing -- I don't
19 recall specifically what's in the handbook.
20 But, in the handbook, it specifically says I
21 can get my degree, my special education
22 degree, but not a teaching degree, not be
23 able to get a teacher's certificate. It says
24 I can pursue some other -- I believe it says
25 I can pursue something else.

272

1    Q    (Handing document to the witness.)
2    A    Thank you.
3    Q    Just for our record, I've handed
4  you a copy of the Professional Internship
5  Program Handbook?
6    A    That is correct. Okay. It comes
7  under the evaluation of the internship.
8        MR. FAULK: What page are you on?
9        THE WITNESS: I'm on page 11.
10   Q    And does it list these other
11 options somehow?
12   A    Yes.
13   Q    Could I see it, please?
14   A    Yes. (Handing document to Mr.
15 Walding.)
16   Q    Thank you, ma'am.
17       (Whereupon, Defendant's Exhibit 29
18        marked for identification.)
19   Q    I'm going to mark this Defendant's
20 29. Page 11 of Defendant's 29 is where you
21 were referring to?
22   A    Yes.
23   Q    And it states that, "If the student
24 is removed from the internship experience,
25 options include but are not limited to the

273

1  following: 1. The internship will be
2  terminated with a grade of 'F.'"
3      A    Correct.
4      Q    "2. The student will participate
5  in a remediation program."
6      A    Correct.
7      Q    "3. The student may select a
8  noncertifiable degree option."
9      A    Correct. And not limited to just
10  those three. There were other options.
11      Q    Right. Did they discuss the other
12  options, other than these three?
13      A    Yes. They told me that I would be
14  able to do another internship to become a
15  teacher.
16      Q    All right. So, then, this being
17  administratively withdrawn and given the
18  opportunity to do another internship would be
19  one of these other options?
20      A    Correct. That's my understanding.
21      Q    All right. And that's what
22  happened for you?
23      A    Exactly.
24      Q    Okay. And then, you actually did,
25  if I understood you correctly, an internship

274

1  at Beverlye Middle School?
2      A    Yes, I did.
3      Q    And successfully completed that?
4      A    Fabulously successful.
5      Q    28. This is a letter from Kenneth
6  Lord to you, dated October 19, 2004?
7      A    That's correct.
8      Q    Did you actually receive that
9  letter?
10      A    Yes, in my hand.
11      Q    It says, right at the top, "hand
12  delivery."
13      A    Yes, absolutely.
14      Q    It does say that.
15      A    Yes.
16      Q    And you received that?
17      A    Yes, I did.
18      Q    And it informs you that because
19  your internship has been terminated or
20  whatever, administratively withdrawn -- it
21  uses the phrase "terminated" --
22      A    Right.
23      Q    -- that that terminates your
24  employment internship agreement with Houston
25  County Schools.

275

1      A    That's what they have written.
2  Yes.
3      Q    That's what the document says?
4      A    That is correct.
5      Q    Okay. I take it, from your
6  sentence, that you disagree with that?
7      A    Yes. And so did AEA.
8      Q    Yes, ma'am. But I can't take AEA's
9  deposition. When your internship was
10  terminated, or you were administratively
11  withdrawn, how many days of the internship
12  had you completed?
13      A    I don't know the exact number of
14  days. It was from August 1st, when the
15  actual first day of school started, I
16  believe, through October 20th -- or to
17  October 20th. I received this on the 20th,
18  the morning of the 20th, if I'm not mistaken.
19      Q    Did you complete all of the days of
20  the internship?
21      A    No.
22      Q    Okay. Did you complete all 485
23  hours of the internship?
24      A    I'm not sure how many hours it
25  actually --

276

1      Q    Assume for me that the entire
2  internship was 485 hours.
3      A    But I was a different scenario,
4  according to Ms. Parris. I was getting
5  credit for every day, every hour that I was
6  there of school hours, because I was a paid
7  intern. Whereas, for interns, they have
8  certain times when they can claim hours.
9  Whereas, because I was hired as a teacher, I
10  got credit for all the hours that I was
11  there.
12      So, I don't know how many hours from
13  August 1st through August 19th that there
14  were, class hours, offhand. I would have to
15  have a calculator.
16      Q    All right. But you indicated to me
17  just a few moments ago that you disagreed
18  with the statement that the effect of this
19  termination or administrative withdrawal of
20  your internship was to terminate this
21  agreement?
22      A    That's my understanding.
23      Q    No. I'm asking you -- well, I
24  thought you told me earlier that you
25  disagreed with that statement, that the

277

1  effect of the termination or withdrawal of
2  your internship was to terminate this
3  internship agreement.
4     A    That is correct.
5     Q    Okay. Tell me why you disagree
6  with that statement?
7     A    Because nowhere in that contract
8  does it say that my teaching contract for a
9  whole year that I signed was contingent upon
10 my being an intern at, you know -- although
11 it said that the -- in the contract, it says
12 that Mrs. Miller should -- will be employed
13 for the entire time from the internship. I
14 believe it is right up there.
15    Q    (Handing document to the witness.)
16    A    Let me read it. Sorry.
17    Q    That's all right.
18    A    In other words, "Mrs. Miller will
19 continue to be employed throughout the
20 internship period, August 16 through December
21 7." But it doesn't say that, upon
22 termination of an internship, that she
23 terminates her job. My other contract, my
24 school contract, doesn't say that at all.
25    Q    All right. Defendant's Exhibit 5

278

1  is your complaint. And I think I clarified
2  with you, to begin with, that your complaints
3  and problems with the various defendants you
4  have sued are constitutional issues regarding
5  your free speech? Correct?
6     A    Yes.
7        MR. BRANTLEY: Object to the form.
8        MR. WALDING: Good. Object.
9     Q    Okay. Do you understand that you
10 have somehow made a claim under your
11 so-called contract with the Houston County
12 Board of Education?
13    A    I'm not understanding.
14       MR. BRANTLEY: Just ask him to
15       repeat it.
16    Q    Well, if you don't understand it --
17 you don't understand my question?
18    A    No, I don't understand it.
19    Q    As part of this lawsuit, are you
20 contending that, on the basis of that alleged
21 contract of employment, you know, you've got
22 some sort of breach of contract claim against
23 the Houston County Board of Education?
24       MR. FAULK: Same objection. Go
25       ahead and answer it, if you're

279

1        able to answer it, or tell him
2        what you think, if you think
3        you know the answer. But, you
4        know, I'm not telling you not
5        to answer.
6     A    I think there's a valid claim. I
7  believe there is.
8     Q    A valid claim for what?
9     A    That the contract should have still
10 been in effect.
11    Q    Okay. Even though your internship
12 program was terminated?
13    A    That's correct.
14    Q    And even though you were not a
15 certified teacher?
16    A    Correct. Because it was my
17 understanding that Mr. Andrews was ordering
18 an emergency teacher certificate in my name,
19 which would allow me to continue to be the
20 teacher for that one year. That's my
21 understanding.
22    Q    Yes, ma'am. I understand exactly
23 what you're saying. Can you show me, in
24 Defendant's 5, where you're making some sort
25 of claim in this lawsuit for breach of

280

1  contract?
2        MR. FAULK: Same objection. He
3        wants you to look --
4        MR. WALDING: To my form, I think.
5        MR. FAULK: He wants you to look at
6        Defendant's Exhibit 5. And if
7        you see a breach of contract
8        claim in it, tell him. If you
9        don't, tell him that.
10       MR. WALDING: Well, I mean, I don't
11       think I'm being unfair. It's
12       not there. Are y'all saying
13       it's there, and I've just
14       missed it?
15       MR. FAULK: I'm not saying it's --
16    Q    (By Mr. Walding) I mean, you
17 agreed with me earlier, this was a
18 constitutional claim. Yes?
19    A    It's a constitutional claim.
20 That's my understanding.
21    Q    Can you show me, in Defendant's 5
22 -- that's your complaint -- a claim for
23 breach of contract?
24    A    I don't see one in there.
25    Q    Very well. Thank you, ma'am. I'm

281

1  not trying to beat a dead horse, again.
2      A    You're doing a good job.
3      Q    Doing a good job of beating a dead
4  horse?
5          MR. FAULK:  Trying to beat him to
6              death.
7      Q    Do you need a break, ma'am?
8      A    No.  I'm fine.  Do you need a
9  break?
10     Q    No.  I can go all day.
11         (Brief off-record.)
12     Q    Mrs. Miller?
13     A    Sir?
14     Q    Tell me, in your own words, if you
15  would, what the Houston County Board of
16  Education has done to deprive you of your
17  First Amendment right to freedom of speech?
18         MR. FAULK:  Form.  I'm just talking
19             to her.  Don't pay any
20             attention.
21         THE WITNESS:  Okay.
22     A    I hope I'm answering the question
23  correctly.
24     Q    I don't know, ma'am.  It's your
25  lawsuit.

282

1      A    Students, the students at Houston
2  County High School, the special ed students,
3  particularly, are entitled to a wonderful
4  education.  They are entitled to specific
5  accommodations to make them successful,
6  successful in the general education
7  classroom.
8          And when I voiced my concerns to Paul
9  Strange and to Mr. Pitchford and to Mr.
10  Andrews and to Ms. Parris and to
11  Dr. Ruediger, I felt that all of them
12  combined were trying to shut me up.
13         I am a parent.  I would be appalled if I
14  had a special education student who was, the
15  last meeting that I knew, in May, stated that
16  that student was going to be in a resource
17  room, and then, by the time school starts, in
18  August, those students are put into an
19  inclusion class, with no specific
20  accommodations, no appropriate goals, no
21  information for teachers to know what grade
22  level that student reads at --
23     Q    Yes, ma'am.
24     A    -- what math level that child is
25  at.  Students don't have a science

283

1  disability.  They have a math and reading
2  disability.  Reading goes over into every
3  single area that they have a class in.
4  English, math, science, social studies,
5  agriculture.  Even, you know, when they play
6  sports, they're going to have to learn to
7  read the plays and that sort of thing.
8      Q    Yes, ma'am.  And I don't mean to
9  interrupt your speech.  But if you could
10  focus on the question I've asked you, which
11  is, tell me how the Houston County Board of
12  Education -- do you understand that the
13  Houston County Board of Education is a body
14  of elected officials?  Yes or no?  Do you
15  understand that?
16     A    Yes.
17     Q    Okay.  It's made up of members who
18  are elected by the voters and taxpayers.  Do
19  you understand that?
20     A    Yes.
21     Q    Okay.  Tell me what those people
22  did -- and I can give you their names, if you
23  would like to hear them -- what those people
24  did, either individually or as a group, that
25  somehow deprived you of your First Amendment

284

1  right to free speech?
2          MR. FAULK:  Object.
3          MR. WALDING:  Object to the form?
4          MR. FAULK:  Same objection.
5      Q    Yes, ma'am.  I'm waiting on an
6  answer, not a speech.  I want to know what
7  the board members -- the board, acting as a
8  public entity, did to violate your rights to
9  freedom of speech?
10         MR. FAULK:  Same objection.
11     A    I don't know what to say.
12     Q    Can you tell me that Ken Lane,
13  Jimmy Kilgore, Dorothy Butts, Scott Thomas,
14  Bobby Harrell, Donnie Smith and Doyle Bond,
15  either individually or acting together, did
16  one thing to violate your First Amendment
17  right to free speech?
18         MR. FAULK:  Same objection.
19     A    (No response.)
20     Q    Can you, ma'am?
21     A    I don't know how to answer that
22  question.
23     Q    Can you tell me that either of
24  those individuals, either acting individually
25  or acting together, as a body, did something

285

1  that violated your rights to free speech?
2        MR. FAULK: Same objection.
3    A    (Witness shaking head in negative.)
4    Q    Is the answer "no"?
5    A    I don't know how to answer that
6  question.
7    Q    Why not?
8    A    I don't understand the question.
9    Q    You understand that the Houston
10  County Board of Education is one of the
11  people or entities that you have sued in this
12  lawsuit? Do you understand that, ma'am?
13    A    Yes.
14    Q    And one of the first things I told
15  you this morning -- and I realize it's been a
16  long day. But one of the first things I told
17  you this morning is that my law firms
18  represents the Houston County Board of
19  Education. Do you remember that?
20    A    Yes.
21    Q    So, one of my clients is the
22  Houston County Board of Education.
23    A    Okay. And my understanding of the
24  Houston County Board of Education includes
25  teachers and administrators and central

286

1  office hierarchy in that whole group.
2    Q    All right. But focus on my
3  question. I asked you did you understand
4  that the Houston County Board of Education
5  was a public body, elected by the people, and
6  you said "yes."
7    A    Yes.
8    Q    I just named you the names of those
9  people elected by the taxpayers and voters of
10  Houston County, back at the time frame we're
11  talking about. What did they do, if
12  anything, that violated your rights to free
13  speech?
14        MR. FAULK: Just a moment, please.
15          For the record, we're not suing
16          any of these board members
17          individually.
18        MR. WALDING: I understand that.
19        MR. FAULK: We're suing the board
20          as an entity --
21        MR. WALDING: Yes, sir.
22        MR. FAULK: -- among certain
23          individuals who are not members
24          of the board, so far as I know.
25        MR. WALDING: And I'm going to get

287

1          to those, Mr. Faulk. The day
2          is young. I'd like her to
3          answer the question as to the
4          Houston County Board of
5          Education.
6        MR. FAULK: She's not contending
7          that any individual member of
8          the board of education
9          individually took any action to
10          violate her First Amendment
11          rights.
12        MR. WALDING: Okay. Well, then,
13          why can't she answer that
14          question?
15        MR. BRANTLEY: She doesn't
16          understand it. She's not a
17          lawyer.
18        THE WITNESS: I don't understand.
19          I'm not.
20        MR. FAULK: I'm her lawyer. I'm
21          telling you what she's
22          contending in her lawsuit.
23        MR. WALDING: I understand what
24          she's contending, because I can
25          read your complaint.

288

1    Q    I want to know, can you tell me
2  whether the Houston County Board of
3  Education, acting together as a public body,
4  did some act that you think violated your
5  constitutional right to free speech?
6        MR. FAULK: Object to the form
7          again.
8    A    I have no idea.
9    Q    Okay. So, you can't tell me
10  anything that they did as a body?
11    A    I have no knowledge that I can
12  express "yes" or "no," either way. I have no
13  understanding of that question.
14    Q    You have no evidence or information
15  in your possession or in your head that
16  indicates they did something to violate your
17  freedom of speech?
18        MR. BRANTLEY: Object to the form.
19    Q    And I'm talking about the board,
20  acting as a public body.
21        MR. BRANTLEY: Object to the form.
22    Q    If you have such evidence or
23  information, I'd like to know what it is,
24  ma'am.
25        MR. BRANTLEY: I'm going to

289

1  instruct my client not to
2  answer that. She's not a
3  lawyer. And, you know, I know
4  what you're going to do.
5  You're going to come back in
6  front of the jury and say, "She
7  said she didn't have any
8  evidence." It's the oldest
9  trick in the book.
10  MR. WALDING: I'm not trying to
11  trick anybody, Tom.
12  MR. BRANTLEY: Well, she's not a
13  lawyer. She doesn't know how
14  to answer that.
15  Q    (By Mr. Walding) Do you have any
16  information, any facts, that the Houston
17  County Board of Education, acting as a public
18  body, did anything to violate your rights to
19  free speech?
20  MR. BRANTLEY: Again, object to the
21  form. And it's redundant.
22  She's just given you --
23  MR. WALDING: It's not at all
24  redundant.
25  MR. BRANTLEY: We've been here all

290

1  day.
2  MR. WALDING: She's yet to answer
3  my question.
4  MR. BRANTLEY: Well, here's what
5  I'm saying. She's given seven
6  hours of information already.
7  MR. WALDING: No, sir, she hasn't.
8  MR. BRANTLEY: Six. So, that's
9  redundant.
10  MR. WALDING: Are you instructing
11  her not to answer my question?
12  MR. BRANTLEY: Yes.
13  MR. WALDING: And what's your
14  grounds for doing that?
15  MR. BRANTLEY: It's redundant.
16  She's already given you six
17  hours of information.
18  MR. FAULK: I think her answer is
19  that she does not -- she's not
20  aware of any individual acts by
21  any board members or the board
22  acting as a body, as such.
23  MR. WALDING: Okay. And that's
24  what I want to hear.
25  Q    Do you have any evidence or

291

1  information? I'm not talking about these
2  other individuals you've sued, because you've
3  sued virtually everybody. Okay? I'm talking
4  about the Houston County Board of Education.
5  A    (No response.)
6  Q    Are you going to answer my
7  question?
8  MR. WALDING: Are you going to
9  instruct her not to answer the
10  question?
11  MR. BRANTLEY: I think it's a legal
12  question to be brought out by
13  pleadings.
14  MR. WALDING: No, sir. The
15  attorneys for Mrs. Miller have
16  sued the Houston County Board
17  of Education. And your
18  complaint says, defendants
19  violated her constitutional
20  rights to free speech. We've
21  covered that already. I'd like
22  to know what evidence or
23  information she's got to
24  support that defendant, the
25  Houston County Board of

292

1  Education, did something to
2  violate her rights to free
3  speech. And if she's got it, I
4  want to hear it today. And if
5  she doesn't, she can say that,
6  and I'll move on to the next
7  defendant.
8  MR. BRANTLEY: Well, I think the
9  explanation there is going to
10  be more in line of a legal
11  argument and theory or
12  doctrine, as it is.
13  MR. WALDING: The two of you can
14  make whatever legal arguments
15  and espouse whatever theories
16  you like. But I'd like to know
17  what Mrs. Miller, as a witness,
18  knows. She's the plaintiff.
19  MR. BRANTLEY: I don't know that
20  she understands how to answer
21  that question. Isn't that what
22  you've said?
23  THE WITNESS: That is correct.
24  Q    (By Mr. Walding) Do you know or
25  are you aware of the Houston County Board of

293

1  Education, acting a body, having done
2  anything that you say violated your right to
3  free speech? Did they take any act that you
4  say violated your right to free speech?
5      MR. FAULK: Acting as a body?
6      MR. WALDING: That's what the
7          question said, Mr. Faulk.
8      MR. FAULK: Just say "no," and
9          let's move on.
10  A    Not that I know of.
11  Q    Very well. You told me earlier
12  that the students of Houston County Schools
13  were entitled to an education, and when you
14  voiced your concerns, Mr. Strange, Mr.
15  Pitchford, Mr. Andrews, Ms. Parris and
16  Dr. Ruediger all combined to shut you up.
17  A    That's my opinion.
18  Q    Okay. Tell me what all of these
19  individuals or any of these individuals did
20  to shut you up?
21  A    By, for instance, Ms. Parris
22  threatening my internship, failing it,
23  telling me that I was going to -- I could
24  fail my internship because I was basically
25  speaking out for these kids. I'm advocating

294

1  for these students. There were -- I received
2  no reprimand in terms of any kind of written
3  statements or anything like that while I was
4  there at Houston County High School, from Mr.
5  Pitchford or Mr. Strange, saying that I had
6  done anything wrong in terms of my teaching
7  ability and that sort of thing.
8      Ms. Ezell even came up and said one day,
9  "I hear you could be -- you might fail your
10  internship." And I replied back to her that
11  Sandy Jones -- I'm sorry. The way I said it
12  was, "Dr. Jones, from what I understand, is
13  going to make a determination," because Ms.
14  Parris had just told me that.
15      And that was one of the days that I was
16  kind of teary.   When she mentioned, you
17  know, "I hear you could fail," that upset me.
18  You know. It was ridiculous to me, because I
19  had not had any bad type of experiences in
20  terms of written things saying, this is what
21  you did wrong, this is what you did wrong, or
22  anything like that.
23      It was just -- anyway, I told Ms. Ezell
24  that it was Dr. Jones who was going to make
25  the determination. And she said, "Oh, you

295

1  mean Sandy Jones, Dr. Sandy Jones? Sandy and
2  I are good ole buddies," you know, or
3  something to that effect, implying that, oh,
4  all she had to do is give ole Sandy a call,
5  her buddy, and, you know, boot me out. You
6  know. That was the implication.
7      And, you know, to me, that was -- you
8  know, it's one thing to have a personality
9  conflict, but it's another to be vicious and
10  try to intimidate and try to come across as,
11  you know, oh, I've got connections, honey.
12  And, you know, that sort of thing is what
13  continually happened.
14      Mr. Strange, when he would tell me, yes,
15  I need to write an IEP. I'm not going to --
16  because I said "no" to him, he does not need
17  to go back and say that was unprofessional,
18  that was inappropriate, or anything like
19  that. It would be inappropriate of me to do
20  these things that they were asking me to do.
21      There are many instances that happened
22  to where I felt like they were trying to shut
23  me up. Because, two months after I was
24  there, from August 1st through August -- or
25  October 19th, the majority of IEP's, there

296

1  were only a couple that they actually held
2  meetings for, and the rest of them were still
3  in the condition that they were on the first
4  day of school. And there were still IEP's
5  that were not there.
6      And I kept getting threatened that I was
7  going to fail my internship because I'm
8  advocating for these students.
9  Q    Okay. And the person, as I
10  understood your testimony earlier, that
11  allegedly threatened you was Pam Parris?
12  A    That's correct.
13  Q    And you specifically told me --
14  because I asked you. I beat the horse deader
15  than all get-out -- that none of the other
16  defendants specifically threatened you.
17  A    No. But they did intimidation
18  tactics.
19  Q    Intimidation tactics?
20  A    Yes. Collusion. When you get Ms.
21  Ezell and Mr. Strange together, after I go to
22  central office, and they write these little
23  complaints that had to do with me going to
24  central office and the reports that I
25  actually said to central office, I believe

297

1  that's collusion. That is specifically
2  saying, I'm mad. I want this girl out of
3  here. She's trouble, and let's get rid of
4  her.
5      And then, Mr. Andrews did the same
6  thing. He was very cordial and said, you
7  know, he had heard good things about my
8  teaching. He said that, we're glad to have
9  you here at this high school, and that we
10  need you here, Mrs. Miller, in front of Ms.
11  Parris and Mr. Pitchford and -- Mr. Pitchford
12  said that he had no problems with my teaching
13  ability. Okay? He claimed to Ms. Parris
14  that I was causing dissension among the
15  faculty.
16      Well, when I specifically went to Mr.
17  Strange and told him that Ms. Monday had --
18  asked why Ms. Monday had failed E. S., who
19  has mental retardation, failed him in science
20  the year before, and he was in Ms. Ezell's
21  class this next year, with me in there trying
22  to help him, with no appropriate IEP -- you
23  know, what do you do?
24      Q   Tell me what intimidation tactics
25  you're referring to, Mrs. Miller?

298

1      A   For instance, Ms. Ezell saying,
2  "Oh, Sandy Jones. She and I are good
3  buddies." Okay. That's intimidation.
4      Q   What other intimidation tactics?
5      A   When I would walk through the hall,
6  Mr. Pitchford would stand there and glare.
7  Mr. Strange comes in my room and has Starla
8  trying to get me to sign paperwork.
9      You know, it's, like, if you don't do
10  this, or if you do do this, either way,
11  you're going to be messed up. Because, if
12  you do it, then you're part of the problem.
13  If you don't do it, then we're going to get
14  rid of you. You know. That is the
15  impression that I got.
16      Q   Yes, ma'am. Any other intimidation
17  tactics?
18      A   Ms. Parris. Ms. Parris saying
19  frequently that I was going to fail my
20  internship.
21      Q   No, ma'am. No, ma'am. You
22  indicated that there were three times where
23  there was an implication of a threat, and you
24  and I have talked about those.
25      MR. BRANTLEY: Object, now. You're

299

1      arguing with her. And that's
2      not what I heard her say
3      initially.
4      MR. WALDING: Well, I'm going to
5      ask her.
6      Q   Are there other times, other than
7  those three occasions that you and I have
8  talked about already?
9      A   Those are the occasions I'm talking
10  about.
11      Q   Are there any others?
12      MR. BRANTLEY: That's what she's
13      given you.
14      MR. WALDING: I want to know if
15      there are more than the ones
16      we've talked about, Tom, so I
17      can cover them also.
18      MR. BRANTLEY: Well, this
19      transcript is --
20      A   Those are the three that --
21      MR. BRANTLEY: Excuse me. Excuse
22      me. Let me object.
23      THE WITNESS: I'm sorry.
24      MR. BRANTLEY: This transcript is
25      going to come out of your

300

1      question with you saying, "Tell
2      me all the times you've been
3      intimidated." Now, if she
4      doesn't go back and list all of
5      them under your question,
6      you're going to say she didn't
7      say that at the deposition.
8      MR. WALDING: I'm taking issue with
9      her statement that there were
10      frequent threats. She told me
11      about three incidents. And I'd
12      like to know if there are more
13      than the three. If there's
14      more than those three, let's
15      talk about them.
16      A   As far as I recollect, there were
17  three specific times. Okay?
18      Q   Okay. And you're listing --
19      MR. FAULK: Are you through with
20      your answer? I couldn't tell
21      whether you were hiccuping or
22      fixing to say "however."
23      A   I'm trying to come up with some
24  other ones for the other -- you know, I can't
25  come up with all of them, because of the fact

301

1  it was a two-month period. And, you know, my
2  memory is pretty darn good, but it's not
3  perfect. Okay?
4      And, you know, when Mr. -- I can give
5  you another example. When Mr. -- I go to Mr.
6  Andrews because, when I interviewed with him
7  -- my husband happened to see him one day,
8  and, oh, you're so-and-so's dad. Because my
9  son, one of my sons, played ball with his
10  son. Okay? So, we were acquainted barely.
11  Okay?
12      So, when I have a conversation with him,
13  and he says, "You come to me. If you have
14  any problems whatsoever, you come to me."
15  And I said, "Fine," not anticipating anything
16  at all. You know. But when he told me to do
17  that, I did that.
18      But the next thing you know, he's
19  sending all these -- or sending this one
20  particular message to -- fax to Ms. Parris,
21  with, you know, items that he perceived to be
22  a problem, after he called in Ms. Ezell and
23  Mr. Strange. You know. If that isn't
24  collusion, I'm not sure what is. You know.
25      Q    That's what you're referring to?

302

1      A    Those types of things are what I'm
2  referring to.
3      Q    All right. My question was, tell
4  me what were these intimidation tactics.
5  Okay? And I'm trying to be fair.
6      A    And I explained some of these.
7      Q    Yes, ma'am. If I could finish my
8  question.
9      A    Certainly.
10      Q    You have identified for me Ms.
11  Ezell mentioning Sandy Jones, and them being
12  friends of some kind. Right?
13      A    Uh-huh. That's correct.
14      Q    You've mentioned that you walked
15  down the hall, and Mr. Pitchford glared at
16  you.
17      A    Correct.
18      Q    You've mentioned the incident about
19  Starla, the psychometrist, asking you to sign
20  papers, and Mr. Strange being there.
21      A    Correct.
22      Q    You've mentioned the perceived
23  threats by Pam Parris that you would fail
24  your internship.
25      A    Correct.

303

1      Q    And now you've mentioned Mr.
2  Andrews' letter that he sent to Pam Parris.
3      A    Correct.
4      Q    Are there any other incidents or
5  occurrences that you're referring to when you
6  say "intimidation tactics"?
7      A    When I started having to use the
8  notebook, the log, Ms. Ezell, in front of the
9  class, says, "Hey, you know, what's this
10  about Pitchford keeping track of you?" And I
11  had to explain to her, you know, what was
12  going on.
13      I mean, it was an intimidation thing
14  where, oh, I know this is going on, because
15  -- the only person that I can think of who
16  would have told her would be either Strange
17  or -- Mr. Strange or Mr. Pitchford.
18      And that's fine and dandy to tell,
19  inform, because they only saw me as an
20  intern, not as a professional teacher with
21  the same respect that they ought to -- I
22  mean, I had gone through all my course work
23  except for the internship itself. So, a
24  first-year teacher should have gotten more
25  respect, and not had to put up with the

304

1  intimidation items, you know, little comments
2  and that sort of thing, that they would make.
3      Q    Okay. Are there any other?
4      A    At this time, I can't think of
5  anything.
6      Q    What would you do to refresh your
7  memory?
8      A    Maybe take a break. I don't know
9  how long it will take, though.
10      Q    Is there a specific document you
11  might look at to refresh your memory?
12      A    There are lots of documents to go
13  through for specifics. I don't know what to
14  tell you.
15      Q    Yes, ma'am. I asked if there was
16  something specific you could look at that it
17  might refresh your memory.
18      A    I don't know specifically. I can't
19  think of anything specifically, right this
20  minute.
21      Q    All right. Can you tell me what,
22  if anything, Kenneth Lord did that you think
23  violated your rights to free speech?
24      A    I'm not sure how to answer that
25  question.

305

1    Q    You've yet to mention his name all
2  day long.
3            MR. FAULK:  Well, I think she
4              testified about a letter he had
5              signed.
6            MR. WALDING:  I agree with you.
7              It's an exhibit.
8    Q    Ma'am?
9    A    He sent a letter --
10   Q    Sent a letter?
11   A    -- terminating my employment.
12   Q    Okay.  So, other than that letter,
13  did Kenneth Lord do anything that you think
14  violated your rights to free speech?
15           (Brief off-record.)
16           MR. FAULK:  Were you asking what
17             Kenneth Lord did to violate her
18             free speech rights?
19           MR. WALDING:  Kenneth Lord.
20           MR. FAULK:  We object to the form.
21           MR. WALDING:  Very well.
22   Q    Ma'am?
23           MR. FAULK:  To the extent that it
24             calls for a legal conclusion.
25             Now, if she can tell you

306

1              something, fine.
2    Q    Do you have any information about
3  Kenneth Lord doing anything that you think
4  violated your right to free speech?
5    A    At this time, I have no knowledge.
6    Q    I want to know what's in your head.
7  Anything --
8    A    I haven't --
9    Q    -- about Kenneth Lord?  You
10  understand you've sued Kenneth Lord?
11   A    Yes.
12   Q    Okay.  What did he do to violate
13  your rights to free speech?
14           MR. FAULK:  Object to form.
15   Q    He's just objecting for the record,
16  Mrs. Miller.  You can answer that question.
17   A    I personally do not know.  I don't
18  know the law of the First Amendment.
19   Q    All right.  You don't know.
20           MR. BRANTLEY:  She said she didn't
21             know the law.
22           MR. WALDING:  Well, I would agree
23             with that.  She's not a lawyer.
24             But she is the plaintiff in
25             this lawsuit.

307

1    Q    What has Riley Joe Andrews done
2  that you believe violated your right to free
3  speech?  Is that the letter that he sent to
4  Ms. Parris?
5    A    I think that is.
6            MR. FAULK:  Same objection.
7    Q    Anything else that Riley Joe
8  Andrews has done?
9            MR. FAULK:  Same objection.
10   A    Not to my knowledge at this time.
11   Q    Is there some document or
12  information you could look at to refresh your
13  memory, that might change what you've just
14  told me?
15   A    Not that I know of.
16   Q    All right.  Tim Pitchford.  What
17  has he done to violate your rights to free
18  speech?
19           MR. FAULK:  Same objection.
20   A    The items that I reported to him, I
21  did report, but as a result, I believe that
22  he was responsible for having my internship
23  terminated.
24   Q    Now, you told me earlier that your
25  internship was academically withdrawn.

308

1    A    That's correct.
2            MR. BRANTLEY:  Administratively.
3            MR. WALDING:  I'm sorry.
4    A    Administratively.
5    Q    Administratively withdrawn.
6    A    Administratively withdrawn.  But
7  Pam Parris -- I'm using Pam Parris'
8  terminology.
9    Q    Yes, ma'am.  And you told me
10  earlier that Dr. Sandra Jones made that
11  decision.
12   A    That's correct.
13   Q    What evidence or information do you
14  have that would connect Tim Pitchford with
15  this decision made by Sandra Jones to
16  terminate or administratively withdraw your
17  internship?
18   A    Because Ms. Parris said that Mr.
19  Pitchford would be the person to decide
20  whether he wanted me in that school or not.
21   Q    Okay.  How does that connect you to
22  the internship?
23           MR. BRANTLEY:  Object.  We haven't
24             taken his deposition yet.
25           MR. WALDING:  I'm asking what this

309

1    lady knows. That's what I'm
2    entitled to do, Mr. Brantley.
3    A    Would you repeat the question,
4    please?
5    Q    I don't know that I can, Mrs.
6    Miller. I'll try, or this lady can.
7         (Whereupon, requested portion of
8         record read back by the court
9         reporter.)
10   A    How did Mr. Pitchford connect me to
11   the internship?
12        MR. WALDING: Let's go back to the
13        question before that.
14        (Whereupon, requested portion of
15        record read back by the court
16        reporter.)
17   A    It would be my logical way of
18   thinking that if my internship was
19   terminated, that Mr. Pitchford had made some
20   sort of a request or had some influence in
21   that decision.
22   Q    Okay. And do you know for a fact
23   that he made that request or had some
24   influence in that decision?
25   A    I don't know for a fact.

310

1    Q    How did Paul Strange violate your
2    rights to free speech?
3    A    The same sort of thing. As my
4    mentor and cooperating teacher, he had the
5    ability to go to Ms. Parris and say whatever
6    he wanted to say.
7    Q    In other words, he had the right to
8    free speech that you filed your very lawsuit
9    about?
10        MR. FAULK: Object to the form.
11   Q    Would you agree? Does he enjoy the
12   same rights under the United States
13   Constitution that you do, Mrs. Miller?
14        MR. FAULK: We'll stipulate that
15        Mr. Strange has a right to free
16        speech. That doesn't include
17        defamation and that sort of
18        thing.
19        THE WITNESS: Thank you.
20        MR. WALDING: Certainly. Thank
21        you, Mr. Faulk, for your
22        speech. There is a tort of
23        defamation.
24   Q    Yes, ma'am?
25   A    Could you repeat the question,

311

1    please?
2    Q    Tell me how he violated your rights
3    to free speech, Paul Strange?
4         MR. FAULK: Same objection.
5    A    As I understand the question, I
6    would have to say that it was the same way
7    that Mr. Pitchford was able to influence --
8    Q    The decision Dr. Jones made?
9    A    Yes.
10   Q    Okay. And do you have any direct
11   knowledge or information that Mr. Paul
12   Strange actually influenced the decision that
13   Dr. Sandra Jones made?
14   A    I would pretty much believe that
15   one of the exhibits that you showed here --
16   in fact, there are two exhibits that we have
17   that indicate that he could very well have
18   been partially responsible. Yes.
19   Q    Okay. You're talking about
20   Defendant's Exhibit 18?
21   A    Yes. That's one of them. Uh-huh.
22   Q    What is the other?
23   A    I don't -- I've not seen it here
24   today. But there's another communication.
25   Q    A communication between Paul

312

1    Strange and Dr. Sandra Jones?
2    A    I don't know that it's Sandra
3    Jones, per se. I don't know who it was to,
4    because it did not indicate -- on the
5    paperwork I saw, it didn't indicate to whom
6    it was sent, to my recollection. It was just
7    a list from Mr. Pitchford, Mr. Strange and, I
8    believe, Ms. -- I believe Ms. Towns. Yes.
9    It was Ms. Towns.
10   Q    A list of what?
11   A    Professional comments.
12   Q    Okay. And do you possess a copy of
13   this list?
14   A    I don't right this minute. But it
15   was part of --
16        MR. BRANTLEY: Initial disclosures?
17   A    -- the initial disclosures from
18   either Houston County or from Troy
19   University.
20        (Whereupon, Defendant's Exhibit 30
21        marked for identification.)
22   Q    If we could go back. I'll show you
23   what I've marked as Defendant's Exhibit No.
24   30. Is that the document that you're
25   referring to?

313

1    A    That is correct. I don't know who
2  this was sent to. I don't know.
3    Q    As you sit here today, do you know
4  for a fact that Defendant's Exhibit 30, or a
5  copy of it, was sent to Dr. Sandra Jones?
6    A    This was in my file at school. So,
7  I don't know if it was specifically given to
8  her. I don't know that for a fact.
9    Q    Okay. Do you know for a fact that
10  Dr. Sandra Jones reviewed Defendant's Exhibit
11  30 before making her decision to terminate or
12  administratively withdraw your internship?
13    A    I don't know for a fact.
14    Q    Tell me what Stacey Ezell did to
15  violate your right to free speech?
16        MR. FAULK: Same objection.
17    A    She also was part of the exhibit
18  right there.
19    Q    That's Defendant's 18?
20    A    That's correct.
21    Q    Anything else?
22    A    At this point, not that I can think
23  of.
24    Q    Is there some document or piece of
25  information you would look at to refresh your

314

1  memory?
2    A    I don't know.
3    Q    I'm sorry?
4    A    I don't know. I can't recall if
5  there was another document or not. I have a
6  lot more documents than this, you know, from
7  the initial disclosures. So, there could be
8  something, but it would take a while to find.
9    Q    All right. Tell me, in your own
10  words, how you've been hurt or damaged by
11  what you say the defendants have done wrong?
12    A    Well, number one, I did not get to
13  complete my internship with my other fellow
14  classmates. It was embarrassing to -- if I
15  did happen to see them out in public, and
16  they said, "Well, you know, what happened?
17  You know. Did you graduate? Are you working
18  somewhere," that sort of thing. And I had to
19  tell them, "No. I have to have another
20  internship."
21    I ended up having to spend quite a bit
22  more money. I didn't have to actually pay
23  for tuition or books or anything. But, of
24  course, extending another internship ends up
25  to be more expensive. I didn't have the

315

1  income that one expects when they're hired as
2  a teacher. Of course, that was the way it
3  goes.
4    When I was able to go trough the next
5  internship, Dr. Morin had called Beverlye
6  Middle School and said that I had had a
7  problem with my previous internship, and that
8  -- could I go there.
9    Actually, Ms. Parris had set up a
10  different internship with me over at
11  Northview High School, but for some reason or
12  other, that didn't work out, so she arranged
13  -- either she or Dr. Morin -- I'm not sure
14  who it was. But it's my understanding that
15  Dr. Morin talked to the principal and the
16  vice principal and asked if I could be an
17  intern there, and they said "yes." But as
18  soon as I had my first conference with them,
19  they asked me, you know, "What kind of
20  problems did you have?"
21    So, you know, I mean, it's, like,
22  totally embarrassing, humiliating, not to
23  have gone -- gotten to graduate and all. It
24  was embarrassing to my family. I was
25  embarrassed to my family because, you know, I

316

1  had gotten all these "A's," all these "B's."
2  You know. I graduated magna cum laude.
3    And I had substituted in Dothan City
4  Schools and been well received, well liked.
5  My husband is at ROTC in Dothan High School.
6  I'm known as Major Mom and Momma Miller and
7  that sort of thing. I get along with the
8  teachers there. You know. I get along with
9  the students there. I get along with,
10  generally, most people.
11    Q    Yes, ma'am.
12    A    But to --
13    Q    If you could focus on my question,
14  please.
15        MR. BRANTLEY: That's what she's
16        doing.
17    A    Embarrassment is part of the
18  question, is my opinion, I believe.
19    Q    Let me take issue with what your
20  lawyer just said. You're sort of focusing,
21  but not really. What you're saying is that,
22  one way that you've been hurt or damaged by
23  what you say the defendants did wrong to you
24  is that you were embarrassed?
25    A    And humiliated. Yes.

317

1    Q    Okay. Good.
2    A    I was intimidated. I'm 53 years
3  old now. At the time, I was around 50. And,
4  you know, for a 50-year-old woman who has,
5  you know, helped do all kinds of community
6  service projects for the police department
7  and the fire department and all these
8  different places, and for the association of
9  realtors and that sort of thing, I mean, it's
10  humiliating to have all this sort of thing
11  happen, all because somebody is trying to
12  shut you up because you're talking -- you're
13  advocating for students.
14    Intimidation. I felt -- I honestly felt
15  intimidated by some of the things that were
16  going on. The glaring. My husband and I
17  went to a football game. And even my husband
18  was shocked at the way Mr. Pitchford behaved.
19  I mean, he said "Hello" and shook hands.
20  But, I mean, you know, he kept looking over.
21  And, you know, my husband just couldn't
22  understand that.
23    Even when I applied at Beverlye Middle
24  School for the job that came open, they asked
25  me again, you know, "How's things going, you

318

1  know, with this lawsuit?" You know, at the
2  time, the lawsuit hadn't been filed. But,
3  you know, I don't know if Dr. Morin mentioned
4  something about it or, you know, the
5  possibility or something like that. But it's
6  haunting me. Let's put it like that. I
7  mean, it's haunting me everywhere I go.
8    I am no longer at Beverlye Middle
9  School. I'm looking for a job. And I went
10  to Girard Middle School and interviewed with
11  Greg Yance. And the first thing out of his
12  mouth was, "Well, Mrs. Miller, I understand
13  you've got a lawsuit." You know. I mean,
14  that is ridiculous.
15    Q    Your lawsuit is haunting you?
16    A    The lawsuit -- the fact that I had
17  to resort to something like this to draw
18  attention to inappropriateness, illegal
19  things that are going on at that high school.
20  And if it's happening at that high school,
21  I'm afraid it possibly could be happening at
22  other schools in that Houston County area.
23  So, if I don't do something, I'm part of the
24  problem. And I accept that. But it makes me
25  sick, I mean, literally sick to my stomach.

319

1    Q    What does?
2    A    The way they treated me. I went in
3  there as an intern, so excited about having
4  the opportunity to teach these special ed
5  kids. And it's like they didn't care about
6  the kids' education. If they cared about
7  their education, they would do the right
8  thing and have the correct type of IEP that
9  they need for those students. They need to
10  have services for those students.
11    And so, it just makes me literally sick.
12  Tears, okay, for the past two years. I get
13  very emotional because I think to myself,
14  what if this had been my child? What if my
15  children had special education needs, and
16  they were not getting the treatment that they
17  needed? What if they were being ridiculed?
18  Okay?
19    Americans with Disabilities Act says
20  you're not supposed to ridicule students.
21  You know. They're entitled to have an
22  appropriate education. Teachers are
23  appropriately to be looked at as advocates
24  for these students, because there's nobody
25  else that's going to do anything for them. A

320

1  teacher needs to stand up for these kids, and
2  that's what I did.
3    And I'm just glad that I was not a young
4  intern who was easily malleable and so
5  frightened that they were going to fail their
6  internship that they didn't speak up. I'm
7  glad it was me. I'm glad it was me.
8    Q    So, then, all of this is a good
9  thing.
10    A    I want to make sure that these kids
11  get an education. And I worry today -- I
12  still worry about the students that were on
13  my rolls and the students that I was in
14  classes with and knew to say "Hi." I'm
15  worried about how they've been able to cope,
16  what did they learn.
17    Q    All right. My question was, how
18  have you been -- you, personally, how have
19  you been hurt or damaged by what you say the
20  defendants in this case did wrong, which is
21  to violate -- allegedly violate your rights
22  to free speech.
23    You've told me that you didn't complete
24  your internship with your class, and that
25  that was embarrassing to you.

321

1  A    That's correct.
2  Q    You did complete your internship,
3  however?
4  A    Eventually, yes.
5  Q    And you did eventually graduate
6  from college?
7  A    Eventually, yes.
8  Q    And you did eventually receive your
9  teaching certificate?
10  A    That's correct.
11  Q    Okay. You told me that you were
12  embarrassed when people ask about your
13  lawsuit.
14  A    Yes. And Mr. Yance, Greg Yance,
15  told me that he was glad that the person who
16  called him recommending me had called, but
17  that, you know, he would have to take into
18  consideration what's best for his school.
19      So, the lawsuit -- you know, in my
20  opinion, that statement or something similar
21  to what, you know, he actually said there,
22  was an indication to me that I'm going to
23  have a problem -- I might have a problem
24  getting a job.
25  Q    Might?

322

1  A    Might.
2  Q    All right. Are you aware, Mrs.
3  Miller, that your lawsuit is a public record
4  and public document?
5  A    Yes.
6  Q    Okay. You told me another way that
7  you've been hurt or damaged was that you had
8  to spend more money, but then you also said
9  you didn't have to pay any tuition or books
10  for your internship.
11  A    That's correct.
12  Q    Okay. Tell me about this money
13  that you're talking about. What money are
14  you talking about?
15  A    Well, out of my husband's pay,
16  rather than a paycheck that I would be
17  getting -- I have the habit of purchasing
18  things for my students. And so, rather than,
19  you know, purchasing them with my money that
20  I've made from a job, I've asked him if he
21  minds that I go ahead and spend some of the
22  money on resources and that sort of thing for
23  the students.
24  Q    Okay. So, you essentially either
25  got money from your husband or borrowed money

323

1  from your husband to spend on your children
2  that were involved in this second internship?
3  A    Yes.
4  Q    How much money are we talking
5  about?
6  A    I didn't keep track.
7  Q    Give me your best estimate?
8  A    Probably at least a couple of
9  hundred dollars.
10  Q    What else do you mean when you're
11  talking about money? Anything else?
12  A    Basically, lack of money. You
13  know. I had three kids in college, and I
14  have things to pay for. So, you know, I
15  anticipated having a little bit of income to
16  help pay for those -- for my college, as well
17  as my children. I still have a student loan
18  that, you know, I have to pay.
19  Q    Let me make sure I understand this.
20  Let's assume that your internship had gone
21  just perfectly. Were you guaranteed a job
22  after your internship?
23  A    No, not necessarily.
24  Q    Okay. So, what money are you
25  talking about?

324

1  A    Well, I've already told you.
2  Q    You said a couple of hundred
3  dollars that you --
4  A    And then, I would have to go to the
5  school and back and that sort of thing. Just
6  normal expenses for another internship.
7  Q    Okay. Can you give me your best
8  estimate of how much you're talking about?
9  A    Probably a total of -- I don't know
10  for sure, but I'll just say $500.00.
11  Q    All right. Are there any other
12  ways that you've been hurt or damaged by what
13  you say the defendants have done wrong other
14  than these things we've already talked about?
15  A    At this time, I just can't think of
16  anything.
17      MR. WALDING: Okay. And I pass the
18          witness.
19      (Recess in deposition.)
20
21          EXAMINATION
22
23  BY MS. HORTBERG:
24  Q    Mrs. Miller, I didn't get a chance
25  to introduce myself earlier. My name is Kate

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MILLER, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) |   1:06-CV-940-WKW |
| TROY UNIVERSITY, et al., | ) | |
| | ) | |
|    Defendants. | ) | |

---

**EVIDENTIARY SUBMISSION IN SUPPORT OF
THE MOTION FOR SUMMARY JUDGMENT FILED
BY DEFENDANTS TROY UNIVERSITY, DR. SANDRA JONES,
DR. GREG RUEDIGER, AND PAM PARRIS**

---

Peyton Lacy, Jr.
James C. Pennington
Joseph V. Musso
Attorneys for Defendants
Troy University, et al

OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 328-1900
Facsimile:  (205) 328-6000

# INDEX

**TAB**

1.    Nancy Miller Deposition & Exhibits (July 17, 2007)..........................A

2.    Nancy Miller Deposition & Exhibits (August 28, 2007)....................B

3.    Sandra Lee Jones Affidavit.................................................C

4.    Complaint....................................................................D

5.    Kenneth Lord Deposition....................................................E

6.    Riley Joe Andrews Deposition & Exhibit............................................F

7.    Virginia Singletary Deposition & Exhibit ..........................................G

8.    Tim Pitchford Deposition....................................................H

9.    Paul Strange Deposition & Exhibits ......................................I

10.   Stacey Ezell Deposition .......................................................J

11.   Answer by Defendant Troy University – Dothan ..............................K

Respectfully submitted,

s/ Joseph V. Musso
Bar No:  ASB-4825-O40J

Peyton Lacy, Jr.
James C. Pennington
**_Attorneys for Defendants Troy University, et al_**
Ogletree, Deakins, Nash,
    Smoak & Stewart, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North

Birmingham, Alabama  35203-2118
Telephone:  (205) 328-1900
Facsimile:  (205) 328-6000
Email:joseph.musso@ogletreedeakins.com


## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/EDF system which will send notification of such filing to the following:

Thomas Kirven Brantley
Brantley & Amason
E-mail:  brantleymcle@graceba.net

Winn Faulk
Faulk & Reed
E-mail:  winnfaulk@bellsouth.net

James K. Walding
Hardwick, Hause & Segrest
E-mail:  kwalding@graceba.net

Jere C. Segrest
Hardwick Hause & Segrest
E-mail:  jerecs@aol.com

Katherine C. Hortberg
Boardman, Carr & Hutcheson
E-mails:  khortberg@boardmancarr.com
               mail@bcwhlaw.com


s/ Joseph V. Musso
OF COUNSEL

3