# EVIDENTIARY SUBMISSION
# (PART 3)

TAB B

**Page 1**

```
              IN THE U. S. DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF ALABAMA
                   SOUTHERN DIVISION


   NANCY MILLER,

         PLAINTIFF,

     VS.                   CASE NO.1:06-CV-940-WKW

   HOUSTON COUNTY BOARD
   OF EDUCATION, KENNETH
   LORD, RILEY JOE ANDREWS,
   TIM PITCHFORD, PAUL
   STRANGE, STACEY EZELL,
   TROY UNIVERSITY, DOTHAN,
   SANDRA JONES, PAM PARRIS
   and GREG RUEDIGER,

         DEFENDANTS.

       The continuation of the deposition of
   NANCY MILLER, taken by the Defendants,
   pursuant to the Federal Rules of Civil
   Procedure, before Stacey Watkins, RPR, and
   Notary Public, State at Large, at the offices
   of Hardwick, Hause, Segrest & Walding,
   Dothan, Alabama, on the 23rd day of August
   2007, at 10:15 a.m., CDT, pursuant to notice.
```

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:
MR. WINN FAULK
Attorney at Law
Montgomery, Alabama

MR. THOMAS K. BRANTLEY
Attorney at Law
Dothan, Alabama

FOR HOUSTON COUNTY BOARD OF EDUCATION,
KENNETH LORD, RILEY JOE ANDREWS AND
TIM PITCHFORD:

MR. KEVIN WALDING
MR. PATRICK B. MOODY
Attorneys at Law
Dothan, Alabama

FOR PAUL STRANGE AND STACEY EZELL:

MS. KATHERINE HORTBERG
Attorney at Law
Chelsea, Alabama

FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
PAM PARRIS AND GREG RUEDIGER:

MR. JOSEPH V. MUSSO
Attorney at Law
Birmingham, Alabama

ALSO PRESENT:

KENNETH LORD
PAUL STRANGE
STACEY EZELL

**Page 3**

STIPULATION

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

**Page 4**

NANCY MILLER

having been first duly sworn, testified as follows, to-wit:

EXAMINATION

BY MR. MUSSO:

Q    Mrs. Miller, my name is Joe Musso, and I was here at your last deposition. I represent Troy University, Dr. Ruediger, Pam Parris and Dr. Jones.

Now, the same rules apply for this deposition as the last one. If you don't understand any of my questions, please let me know. Otherwise, I would assume that you would. Is that fair?

A    That's fair.

Q    Is there any reason today why you can't give complete, truthful, honest answers?

A    No.

Q    Now, I'm going to do my best to try not to repeat very much of the last deposition. I went through it yesterday very carefully. So, maybe we can get out of here

**5**

1  a little quicker today.  But, you know, there
2  still are going to be some things I need to
3  cover.  The same rules apply.  If you need to
4  take a break, let us know.  We'll accommodate
5  that.
6      It's always important that we don't talk
7  on top of each other.  Otherwise, it makes
8  life for her difficult, and she'll throw
9  something at us.  It's also important that
10  you always give some type of verbal response,
11  because if you shake your head or say
12  "huh-uh," then, again, that's hard for her to
13  put that down.  Is that okay?
14      A    Yes.
15      Q    Now, I think the last time we were
16  here, you were currently unemployed as a
17  teacher?  Is that correct?
18      A    That is correct.
19      Q    Is that still the case?
20      A    That is still the case.
21      Q    Have you had any job interviews
22  between the last deposition and this
23  deposition for a teaching job?
24      A    No.
25      Q    Have you had any job interviews for

**6**

1  any other type of job?
2      A    No.
3      Q    Have you made any applications
4  between the last deposition and this one for
5  a teaching job?
6      A    Yes.
7      Q    Okay.  And where have you made
8  those applications?
9      A    Dothan City Schools.
10      Q    Do you know of any job openings
11  that have come open, from the time of your
12  last deposition up until now, that you would
13  be interested in being a teacher in that
14  position?
15      A    Yes.
16      Q    And which jobs are those?
17      A    There were two special education
18  positions at Dothan High School.
19      Q    Do you know if those have been
20  filled yet?
21      A    Yes, they have.
22      Q    Do you know who filled them?
23      A    No.
24      Q    And did you ever actually interview
25  for either of those?

**7**

1      A    No, unfortunately.
2      Q    Now, I know last time we were here,
3  you had mentioned that you were interested in
4  working at the Dothan City School System.
5      A    Correct.
6      Q    Okay.  Do you have any interest in
7  returning to the Houston County system?
8      A    No.
9      Q    In your last deposition, you had
10  mentioned you graduated from Troy University
11  in May of 2005.  Am I correct?
12      A    That is correct.
13      Q    Okay.  Have you considered applying
14  to any of Troy's graduate programs?
15      A    I have considered it.
16      Q    Okay.  Have you made any
17  determination whether you're going to do that
18  or not?
19      A    At this point in time, no, I have
20  not.
21      Q    Okay.  And have you made any
22  decision as to what type of graduate program
23  at Troy you'd like to --
24      A    If I did, it would have to be with
25  special education.

**8**

1      Q    Okay.  And would it be at the
2  Dothan campus?
3      A    I haven't really determined that.
4      Q    Okay.  Has it got to the point
5  where you've actually filled out any type of
6  application?
7      A    No.
8      Q    Made any phone calls to any
9  professors to ask about classes?
10      A    No.
11      Q    Have you read any bulletins or
12  anything like that?
13      A    Yes.
14      Q    Okay.  Now, under the master's
15  program, would you need to take any further
16  types of internships?
17      A    I believe it's -- I don't know
18  exactly what they call it.  I don't know for
19  sure.  That would be a ways on.
20      Q    Do you ever have any desire to try
21  to get a Ph.D. in education?
22      A    I would -- I've always thought I
23  would.  But I'd have to get my master's
24  first, of course.
25      Q    Do you know whether Troy offers a

9

1  Ph.D. in an education field that you would be
2  interested in?
3      A    No.  I haven't really looked into
4  that.
5      Q    Now, you began working at the
6  Beverlye Middle School in January of 2006?
7  Am I correct?
8      A    That's correct.
9      Q    Was there an opening for a special
10 education position in the fall of 2005 at
11 Beverlye?
12     A    Not that I'm aware of.
13     Q    Now, I know that you were an intern
14 there in the spring of 2005.  Am I correct?
15     A    That is correct.
16     Q    Okay.  Is it while you were an
17 intern at Beverlye that you learned that
18 there was going to be a position opening for
19 a full-time job, or did you learn that
20 somewhere else?
21     A    No.  I didn't learn that until it
22 actually happened.
23     Q    And when did it happen?
24     A    As far as I can recall, in January
25 of '06.

10

1      Q    Okay.  And let me go ahead and say
2  I always talk loud in depositions, so she can
3  hear me.  Don't think I'm yelling at you.
4  Okay?  And, plus, there's a room full of
5  lawyers.
6      A    Sure.
7      Q    Who told you that that position was
8  going to be open?  Was it someone at Beverlye
9  Middle School?
10     A    No.  I found it on the internet,
11 going to the Dothan site.
12     Q    Did you approach someone at
13 Beverlye and tell them that you were
14 interested?
15     A    I don't recall actually speaking
16 with anybody.  I think I just applied for the
17 position when I found out it was open.
18     Q    Did anyone at Troy University write
19 you any letters of recommendation for that
20 Beverlye job?
21     A    Not that I'm aware of.
22     Q    Did you ever ask anyone at Troy to
23 write you any letters of recommendation?
24     A    I don't recall.
25     Q    And that would include anyone at

11

1  Troy writing you letters of recommendation
2  for any job, at any time, not just the
3  Beverlye job.
4      A    No, not that I can recall.
5      Q    Now, since your last deposition,
6  have you worked in any job anywhere?
7      A    No.
8      Q    I know you had mentioned that you
9  and your daughter had that tiara company.
10     A    Right.
11     Q    Have you been pursuing that any
12 more?
13     A    No, not right at this time.
14     Q    Now, when you were an intern at the
15 Houston County High School -- and it was at
16 Houston County High School?  Correct?
17     A    Yes.
18     Q    -- you were compensated for that?
19     A    Yes.
20     Q    And you actually signed that
21 internship agreement?
22     A    Yes.
23     Q    That was something we talked about
24 at the last deposition.  Do you know of any
25 other interns at Troy University in Dothan

12

1  who also were compensated when they were an
2  intern?
3      A    Amy Deese, who was at Troy -- or
4  Houston County.
5          MR. FAULK:  Who is that?  Did you
6          say a name?
7          THE WITNESS:  Yes.
8          MR. MUSSO:  Yes, a name.  Amy
9          Deese.
10         MR. FAULK:  Excuse me.
11     A    There were several others, but I
12 don't recall their names.
13     Q    Okay.  Do you know whether any of
14 them signed agreements the way you did?
15     A    I don't know for sure.
16     Q    Did any of these -- Ms. Deese or
17 any of the other students whose names you
18 don't recall, do you know whether any of
19 those individuals' internships were
20 terminated before they were finished?
21     A    I do not know.
22     Q    And do you know of any other
23 students whose internships were terminated
24 before they were finished, whether these
25 students were compensated or not?

13

1    A    I do not know of any.
2    Q    Now, I know you had a meeting with
3 Dr. Ruediger on August 26th with regard to
4 his observation of you.
5    A    Yes.
6    Q    Okay.  And that was something that
7 was covered in your last deposition.  I guess
8 I just have a few more questions.  Do you
9 recall how long that meeting lasted?
10    A    It was probably 45 minutes to an
11 hour, if I remember correctly.
12    Q    Did Dr. Ruediger, in that meeting,
13 say anything to you that you disagreed with?
14    A    Not that I can recall.
15    Q    Now, I know you communicated a lot
16 of things to Dr. Ruediger in that meeting,
17 and that was something that was discussed in
18 your last deposition.  In your last
19 deposition, you stated some things that
20 Dr. Ruediger communicated to you.  And
21 correct me if I'm wrong.  But, if I remember
22 correctly, he had asked you to approach some
23 of the members at the Houston County High
24 School regarding some of your concerns?  Is
25 that correct?

14

1    A    Yes.  He suggested I go to Mr.
2 Strange.
3    Q    Okay.  And did you have any problem
4 with him making that suggestion?
5    A    No.
6    Q    Now, as an employee at Houston
7 County High School, as well as an intern at
8 Troy University -- in your last deposition,
9 you had mentioned a lot of communications you
10 made to members of Houston County, be it the
11 principal, the assistant principal, central
12 office, Mr. Strange, regarding concerns you
13 had at Houston County High School.
14      Do you consider that that was part of
15 your job that you raised these concerns with
16 them, because that you saw problems that you
17 considered that were happening?
18    A    No.
19    Q    It wasn't part of your job as an
20 employee at Houston County High School?
21    A    I didn't think so.
22    Q    And why did you not think so?
23    A    Well, I think that, as just a
24 person -- well, as an intern, I was given
25 information.  Okay.  As an employee, I was

15

1 given information.  And as a person, I was
2 given information.  The information I had,
3 and I asked questions and that sort of thing
4 about, they had already given me answers.
5 And so, as a person, I'm questioning some of
6 these things.
7      Through my schooling, I know it's wrong.
8 But I pretty much feel that I just --
9 because, like, for instance, Mr. Strange and
10 Mr. Pitchford are my supervisors, they are
11 the ones who know -- or were supposed to know
12 what was supposed to be done.  And since it
13 was okay with them, that's just the way
14 things were.
15    Q    Okay.  But I guess my question
16 really is, do you not feel that an employee,
17 regardless of their position, any teacher at
18 that school, if they determine that something
19 is not being done properly -- and I think
20 what you said in your deposition, it wasn't
21 legal -- do you not think that they have a
22 duty, as part of their job, to go report that
23 to their supervisors or someone else?
24    A    No.
25    Q    You don't think they have a duty?

16

1    A    I don't think so.
2    Q    So, if there's a situation where a
3 student is being mistreated, even if the
4 supervisor knows that, you don't think that
5 the teacher would still have a duty to try to
6 report that to somebody?
7      MR. BRANTLEY:  Object to the form.
8      MR. FAULK:  Excuse me.
9      MR. BRANTLEY:  Define "mistreated."
10      MR. FAULK:  Are you talking about,
11         like, sex abuse reporting laws
12         or something?
13    Q    Let's just say a student is being
14 physically abused in the classroom.  Okay?
15 Say, slapped by another teacher.  Even if you
16 know that the supervisor, the principal,
17 knows that, do you not feel that the teacher
18 has a duty to go off and try to report that
19 to the central office or somewhere else?
20    A    It's not my understanding that she
21 has a duty to do that.
22    Q    And is that some understanding you
23 have by something you read in any handbook or
24 official policy?
25    A    No.

17

1  Q   Do you know where you came to that
2  understanding?
3  A   That's just my opinion.
4      MR. FAULK:  Are we still talking
5          about physical -- excuse me
6          just a minute.
7      MR. MUSSO:  No.  We're talking
8          about --
9      MR. FAULK:  We're not talking about
10         physical abuse any more?
11     MR. MUSSO:  Let's just go back to
12         -- she says that she didn't
13         have a duty, as an employee, to
14         report any of the things that
15         she reported.
16 Q   My question is, is there anything
17 in any type of handbook that says that you
18 didn't have that duty as an employee?
19     A   I've never seen anything.
20 Q   Now, did you have a duty, as an
21 intern, to report any of the things that you
22 reported?
23     A   Not that I'm aware of.
24 Q   Okay.  Then, when Dr. Ruediger
25 suggested that you report it, why did you

18

1  then report it, if you didn't have a duty?
2  A   I didn't report it.  I had already
3  talked about it with Mr. Strange.
4  Q   Now, last time in your deposition,
5  you had mentioned something called the
6  Blackboard discussion forums.
7  A   Uh-huh.
8  Q   Do you recall those?
9  A   Yes.
10 Q   The individuals who participated in
11 that discussion forum, were those members in
12 your internship class?
13 A   Internship seminar class.  Yes.
14 Q   And was everyone in that internship
15 seminar class a special education specialist?
16 A   No.
17 Q   Was anyone participating in those
18 discussion forums with regard to the
19 Blackboard who were not members of your
20 internship seminar class?
21 A   Not that I'm aware of.
22 Q   Did you have to have a special
23 password or something to get in?
24 A   Yes.  You had to have a -- you had
25 to go under your name and have a password, I

19

1  believe, as well.
2  Q   And do you have knowledge whether
3  any teacher had any access to read that?
4  A   The only person that I was aware of
5  was Dr. Jones.
6  Q   But you did have knowledge that she
7  had access to it?
8  A   Yes.  She was the head of the
9  class.
10 Q   Was she the actual teacher of the
11 class?
12 A   Yes.
13 Q   Was that the class that you
14 ultimately would receive a grade in for being
15 an intern?
16 A   No.  This was a separate --
17 Q   Separate class?
18 A   Separate class.  Uh-huh.
19 Q   Now, the internship, was that a
20 pass/fail type of course, or was it actually
21 a graded course, be it A, B, C or D?
22 A   I believe it was a pass/fail, but
23 I'm not 100 percent sure.
24 Q   And what about the separate class
25 that you had with Dr. Jones?

20

1  A   As far as I know, it was an A, B, C
2  type of thing, if I'm not mistaken.
3  Q   And did you actually receive a -- I
4  know, for the internship, there was an
5  administrative withdrawal?  Correct?
6  A   Correct.
7  Q   Did you actually receive a grade
8  for that class with Dr. Jones?
9  A   No.  I was withdrawn with that, as
10 well, from that class.
11 Q   And were you allowed to take that
12 class again in the spring?
13 A   Yes.
14 Q   And did you receive a grade in that
15 class?
16 A   Yes.
17 Q   Do you recall what it is?
18 A   I don't remember.
19 Q   But, do you recall it being a --
20 A   Oh, it was definitely a pass of
21 some sort.
22 Q   Okay.  It wasn't an F?
23 A   No.
24 Q   Do you recall being disappointed in
25 that grade?

21

1    A    No.
2    Q    And did Dr. Jones teach that class
3  again?
4    A    No.  I don't believe it was
5  Dr. Jones.
6    Q    Now, for your internship, when you
7  enrolled for it, was there actually a
8  professor assigned to be your professor?
9    A    To be the one that comes out to the
10  school to observe me, you mean?
11    Q    Yes.
12    A    Yes.  Actually, the first one was
13  Dr. Morin.
14    Q    I'm sorry.  Dr. Morin?
15    A    Dr. Morin.
16    Q    Okay.  And then, it became
17  Dr. Ruediger?  Correct?
18    A    That's correct.
19    Q    Do you know why --
20    A    No.
21    Q    -- it went from Dr. Morin to
22  Dr. Ruediger?
23    A    No clue.  I don't know if it was a
24  scheduling problem or what.
25    Q    I think, in your last deposition,

22

1  you mentioned -- how do you pronounce her
2  last name?  Brazzelle?
3    A    Brazzelle.
4    Q    Brazzelle?
5    A    Yes.
6    Q    I never would have got that.
7    A    Mary Brazzelle.
8    Q    Did she actually ever officially
9  become your internship professor?
10    A    I never met her.  I never saw her.
11  No.  Ms. Parris called me back and said she
12  wasn't going to be after all.
13    Q    When she called you back and said
14  she wasn't going to be after all, at that
15  point, did you have knowledge that your
16  internship was going to be terminated?
17    A    No.  No, not at all.
18    Q    At that point, you just thought it
19  was going to continue to be Dr. Ruediger?
20    A    Ms. Parris had called me at -- I
21  believe at school, and told me Mary Brazzelle
22  was going to be my advisor, new advisor.
23  Then, a day or several days or whatever
24  later, she called me back and said that
25  Dr. Ruediger had requested that he continue

23

1  to be my advisor.
2    Q    Did you ever tell anyone at Troy
3  that you didn't want Dr. Ruediger to be your
4  advisor?
5    A    No.
6    Q    Did you ever tell anyone at Troy
7  that you didn't want Dr. Morin to be your
8  advisor?
9    A    No.
10    Q    You liked Dr. Morin?  Correct?  Or
11  you thought she was a good teacher?
12    A    Yes.
13    Q    And did you ever tell anyone that
14  you didn't want Mary Brazzelle to be your --
15    Q    And when you were at Beverlye, who
16    Q    And when you were at Beverlye, who
17  was your internship advisor?
18    A    Dr. Morin.
19    Q    Dr. Morin.  Now, is there anything
20  Dr. Morin did as your internship advisor at
21  Beverlye that has anything to do with this
22  lawsuit?  I mean, did she violate your rights
23  in any way while you were at Beverlye?
24    A    No.
25    Q    Now, I know that you've sued

24

1  Dr. Ruediger, Dr. Jones and Ms. Parris
2  individually.  Is there anyone else at Troy,
3  other than those three individuals, who
4  specifically did anything wrong to you for
5  which you're complaining in this lawsuit?
6    A    No.
7    Q    Let's go back to the discussion
8  forum on the Blackboard.  Did anyone at Troy
9  ever tell you -- or criticize anything that
10  you wrote on that Blackboard discussion
11  forum?
12        MR. FAULK:  Including students,
13        when you say "anyone at Troy"?
14    Q    Well, let's just say any faculty
15  member.
16    A    Mine personally?
17    Q    Yeah.
18    A    Not that I can really -- not that I
19  can recall.
20    Q    Did any student criticize anything
21  you wrote on any of the Blackboards?
22    A    Not that I recall.
23    Q    Did any faculty member or any
24  administrative member at Troy try to censor
25  anything you wrote on the Blackboard

**25**

1    A    I do remember a general message
2 from Dr. Jones that warned everyone to be
3 careful what they said.  It might be -- I
4 believe the idea was that it might be
5 construed as unprofessional.  But I did not
6 get anything specific that I can recall.
7    Q    I mean, did you have any problem
8 with her giving that message?
9    A    No.
10    Q    And was the discussion forum
11 basically for individuals to communicate
12 their dealings with their internship?
13    A    That's my -- yes -- understanding.
14    Q    It wasn't something personal for
15 them to express their political views or
16 anything like that?
17    A    Unless something like that would
18 come up.  I don't think it was, specifically.
19 No.
20    Q    I've never been on one of those
21 discussion forums, but I understand some of
22 them you get kicked off if you ever veer from
23 -- I know there's a rose forum my wife
24 belongs to, and if you talk about anything
25 but roses, they send you to Disneyland.  You

**26**

1 can't even say, you know, you had a good day
2 with your family.
3         Before I leave the board, describe to me
4 what you believe the purpose of the board was
5 for?
6    A    Okay.  To discuss issues that might
7 be arising in the different school systems,
8 gain advice from each other, bounce ideas off
9 each other.  That sort of thing.
10    Q    Were you required to participate in
11 the board?
12    A    Yes.
13    Q    Does that mean you were required to
14 read the notes?
15    A    Yes.
16    Q    And were you required to post
17 anything?
18    A    Yes.
19    Q    And was that requirement because of
20 the class?
21    A    Yes.  To my recollection, yes.
22    Q    Did you find it a useful teaching
23 tool?
24    A    Yes, very much.
25    Q    Now, I understand that there was a

**27**

1 day at the Houston County High School that
2 you left early?
3    A    Yes.
4    Q    I believe you left at 11:30.  And
5 from reading your last deposition, there was
6 an attempt by you to contact Dr. Jones that
7 day -- I think -- was it Ms. Parris and
8 Dr. Ruediger?  Did you try to contact all
9 three?
10    A    I believe it was all three.
11    Q    And that you were unsuccessful?
12    A    I left messages.
13    Q    Left messages.  So, you were not
14 able to talk to them before the end of the
15 day?
16    A    That's correct.  And it was Friday.
17 And they had indicated to us that someone
18 would be there 'til noon, but, after noon --
19    Q    When did you try to reach them?
20    A    I want to say maybe 9:30.
21 Something like that.
22    Q    And when you say they indicated
23 someone would be there before noon, who
24 indicated that?
25    A    Well, we were just told, when we

**28**

1 had our internship classes, that there would
2 be people at the university until noon.
3    Q    Did they specifically say it would
4 be Dr. Ruediger or --
5    A    No.
6    Q    -- Dr. Jones --
7    A    No.
8    Q    -- or Ms. Parris?
9    A    Nobody specifically.
10    Q    I, at one time, was a professor,
11 and Fridays, period, were not known to be
12 high attendance days for professors.  Would
13 that kind of be a fair assessment?
14    A    That might be a fair assessment.
15         (Whereupon, Defendant's Exhibit 32
16         marked for identification.)
17    Q    I'm handing your attorney a
18 document.  I'm going to hand you what's
19 marked as Defendant's Exhibit 32.
20    A    (Witness reviewing document.)
21    Q    Tell me when you've had a chance to
22 finish reading that.
23    A    Yes, I have.
24    Q    And could you identify Defendant's
25 Exhibit 32?

29

1    A    Yes.  It is an e-mail that I sent
2  to Dr. Jones, Ms. Parris and Dr. Ruediger, as
3  well as myself and my husband, to document
4  the fact that I had left phone messages at
5  the university on Friday morning.  And I
6  believe it was Saturday evening that I left a
7  message at Dr. Ruediger's home phone number.
8    And I mentioned that, as Mr. Andrews
9  indicated to me at our interview that if I
10  had any problems at all, to come to him, and
11  so, that's what I did.
12    Q    And it says, "If you wish to
13  contact me on Monday, you can reach me at
14  "HCHS."
15    A    Correct.
16    Q    Did they ever contact you about
17  your discussion with Mr. Andrews?
18    A    No one contacted me at all until I
19  had talked with AEA rep, and there was a
20  meeting scheduled for Monday, if I'm not
21  mistaken.
22    Q    Okay.  Now, was that AEA rep an
23  attorney?
24    A    No.  It was Sharon Cole.
25    Q    And do you recall what her job

30

1  title was?
2    MR. BRANTLEY:  UniServe director.
3    THE WITNESS:  Thank you.
4    A    And I talked to her on Friday, and
5  then, I believe it was Monday, as well.
6    MR. FAULK:  Excuse me.  I just want
7      to be clear.  Are we talking
8      about the same Friday that you
9      went to see Mr. Andrews, or a
10      day that happened to be Friday?
11    THE WITNESS:  It happened to be
12      Friday, the day that I went to
13      Mr. Andrews' office.
14    MR. FAULK:  Okay.  I just wanted to
15      be sure.
16    Q    (By Mr. Musso)  And that's the day
17  you talked with someone from AEA?
18    A    Yes.
19    Q    And when did you first talk to
20  either Dr. Ruediger, Dr. Jones or Ms. Parris
21  with regard to your meeting with Mr. Andrews?
22    A    The only person that ended up
23  coming out to the school, to Houston County
24  High School, was Ms. Parris.
25    Q    And when did she come out?

31

1    A    Do you mind if I look at my
2  calendar?
3    Q    No.  That's fine.
4    A    Because I don't recall the exact
5  date.
6    (Off-record discussion held.)
7    A    Ms. Parris came out on the 27th, in
8  the morning, of the Monday after the Friday
9  that I went to Mr. --
10    Q    Okay.  And do you know how it was
11  that it was communicated to her to be out
12  there?  I mean, was she out there for a
13  normal visit, or do you know whether --
14    A    Oh, no.
15    Q    -- somebody called her and asked
16  her to come?
17    A    Apparently, somebody -- she -- to
18  my knowledge, she started getting phone
19  calls, is what she told me, early Monday
20  morning.
21    Q    Did she tell you who she got the
22  phone calls from?
23    A    Not specifically.
24    Q    Did she say whether it was someone
25  from the AEA, or someone from Houston County

32

1  High School, someone from Troy?
2    A    I got the impression that somebody
3  from Houston County School.  I don't know if
4  Sharon Cole actually called her or not.
5    MR. MUSSO:  Let me go ahead and
6      mark Defendant's Exhibit 33,
7      which is the copy of, I
8      believe, some calendar notes.
9      I'll let you actually tell me
10      what they are.
11    (Whereupon, Defendant's Exhibit 33
12      marked for identification.)
13    Q    Just take a moment to look at
14  Defendant's Exhibit 33, and after you finish
15  looking at it, let me know.  And my first
16  question is simply going to be for you to
17  identify what it is.
18    MR. BRANTLEY:  Do you want to take
19      this off?
20    MR. MUSSO:  It was --
21    MR. BRANTLEY:  That's what we gave
22      you?
23    MR. MUSSO:  That's what you gave
24      me.  I don't know -- I know it
25      certainly doesn't have any

33

1      information on it.
2      A    It actually says "Troy State
3  calendar" or something -- university calendar
4  or something like that.
5          MR. BRANTLEY:  Tell him what 33 is.
6          Is it 33?
7          THE WITNESS:  Yeah.
8          MR. BRANTLEY:  Tell him what that
9          is.
10     A    This was a monthly calendar that I
11  took with me to Troy University to mark dates
12  and that sort of thing.
13     Q    Okay.  Now, this calendar has
14  writing on it.
15     A    Uh-huh.
16     Q    Take a moment and look and tell me
17  if there is any handwriting on here that is
18  anyone else's other than yours?
19     A    (Witness reviewing document.)  No.
20     Q    Okay.  So, all the handwriting on
21  here is your handwriting?
22     A    Yes.
23     Q    And is there anything written on
24  here that someone else told you to write?
25     A    No.

34

1      Q    So, you wrote everything on here of
2  your own volition?
3      A    Yes.
4      Q    Now, the notes that appear on the
5  certain dates, were those written
6  contemporaneously on the dates that the
7  events occurred?
8      A    Yes.  If I ran out of room, I might
9  go over to, let's say, on Sunday, and kind of
10  put arrows to myself, so I would remember.
11     Q    Just looking, for instance, on
12  August the 9th --
13     A    Okay.
14     Q    -- did you actually write that note
15  on August the 9th?
16     A    Yes.
17     Q    And that would be true of every
18  date except the situations where you may have
19  ran out of space and had to write over a
20  date?  Correct?
21     A    Would you repeat the question?
22     Q    Okay.  Is that true of every date
23  that has writing in it?
24     A    Is what true?
25     Q    That you actually wrote that note

35

1  on the date that the writing appears.
2      A    Yes.
3      Q    Okay.  Now, I know you said
4  earlier, sometimes -- for instance, if you
5  look at the 29th, you have an arrow on the
6  30th, into the 29th.  And that appears that
7  it occurred on the 29th, but you ran out of
8  space on the 29th.
9      A    That occurred, actually, on the
10  30th, and I put the arrow over to the 29th.
11  So, it actually happened on the 30th, but
12  because I ran out of room, I would go over
13  and put an arrow to myself.
14     Q    Oh, okay.  So, that occurred on the
15  20th -- I mean, on the 30th --
16     A    30th.
17     Q    -- and you drew an arrow because
18  you ran out you space on the 30th?
19     A    Right.
20     Q    Let me see if there's any other
21  type of arrows like that.  Okay.  Look on
22  September the 23rd.  There's an arrow.
23     A    Right.
24     Q    What's going on there with the
25  asterisk and the arrow?

36

1      A    Right.  Okay.  On the 23rd, I
2  requested an appointment with Mr. Pitchford,
3  for example, at 8:15.  And then, right down
4  that arrow, it says -- okay.  Ms. Hamm said
5  Mr. Pitchford is not in right now, and that
6  he'll let him -- or she'll let him know that
7  I need to meet with him, and he'll get back
8  to me.  That sort of thing.
9      Q    So, you just ran out of space on
10  the 23rd, and that's why you --
11     A    Right.  It wasn't a very big
12  calendar.
13     Q    Now, is this a calendar that you
14  personally purchased?
15     A    Yes.
16     Q    And you said, if it wasn't black on
17  the front, it may say something like "Troy
18  University"?
19     A    Yes.
20     Q    So, you bought it at the bookstore?
21     A    I bought it at the bookstore.
22     Q    Were you required, as part of your
23  class, to keep these notes?
24     A    No.
25     Q    Did you keep such a calendar when

37

1  you went to Beverlye?

2  A  Yes.

3  Q  I have a question about -- I think

4  it's Defendant's Exhibit No. 12.  If you can

5  go to that, please?

6  A  Okay.

7  Q  When I refer to No. 12, that's 12

8  that was entered in your prior deposition.

9  A  All righty.

10  Q  Okay.  And this has been discussed

11  already.  But I did notice at the -- and

12  correct me if I'm wrong.  This is just an

13  e-mail from you to Pam Parris, cc'd to

14  Dr. Jones?  Correct?

15  A  Correct.

16  Q  Okay.  Now, at the end -- and, you

17  know, please take the time to read this

18  through carefully.  But, at the end, you have

19  the words "please advise."  And my question

20  here is going to be whether either Dr. Jones,

21  Ms. Parris, or anyone else at Troy

22  University, a faculty member, administrative

23  member, advised you pursuant to your "please

24  advise"?

25  A  No.

38

1  Q  Now, in your prior deposition, you

2  had mentioned Ms. Parris threatening to fail

3  your internship.

4  A  Yes.

5  Q  Did you complain to anyone at Troy

6  University, not a student, but any faculty

7  member, administrative member, that Ms.

8  Parris was doing that?

9  A  Just Dr. Ruediger.

10  Q  And when did you tell Dr. Ruediger

11  that?

12  A  Probably after -- the first meeting

13  after --

14  Q  Do you want to look at your --

15  A  Here we go.

16  Q  And you're looking at your

17  Defendant's Exhibit 33?

18  A  33.  Okay.  It was some time after

19  the 27th.

20  Q  And what month would that be?

21  A  August 27th.

22  Q  When you say it was after August

23  27th, do you have any recollection as to when

24  after the 27th?  Whether it was still in

25  August or September or October?

39

1  A  It was probably -- 'cause the only

2  time I ever really saw him was when he came

3  to observe.  So, it had to have been, I would

4  say, the day he gave me his second

5  observation.  And that was September --

6  Q  I believe that was September 30th.

7  A  Yes.

8  Q  Was anyone else present at that

9  meeting with Dr. Ruediger on September 30th?

10  A  No.

11  Q  Okay.  And what did you tell him

12  with regard to Ms. Parris?

13  A  That, you know, I was being

14  threatened that I was going to fail my

15  internship.

16  Q  And did he say anything to you

17  about that?

18  A  No, not that I can recall.  He was

19  upset that I had gone to central office and

20  all that sort of thing.  So, he was not in a

21  pleasant mood.

22  Q  How long did that September 30th

23  meeting with Dr. Ruediger take place?

24  A  Well, he was there for the

25  observation, which was in Ms. Towns' class,

40

1  and it was a split class.  So, I spoke to him

2  before he went to Mr. Pitchford's office to

3  speak with Mr. Pitchford.  And so, I

4  mentioned it to him in that time frame.

5  Because the observation debriefing actually

6  took place -- instead of at the school this

7  time, it took place at Troy University.

8  Q  So, when you mentioned it to him

9  while he was still at Houston County High

10  School, how long did that meeting with him

11  take place?

12  A  We were just standing out in the

13  hallway until the students all came out.  And

14  he left to go to Mr. Pitchford's office while

15  we went to the lunchroom with the students,

16  while Ms. Towns and I went to the lunchroom.

17  So, it was just a couple of minutes.

18  Q  And did he or you address that

19  again during the observation debriefing at

20  Troy?

21  A  I don't recall.  There are some

22  notes that he took and Dr. Lumpkin took, but

23  I don't recall that that was mentioned.

24  Q  And Dr. Lumpkin was at that

25  debriefing at Troy?  Correct?

41

1   A   Yes. And if I remember correctly,
2   it probably didn't get mentioned, because
3   they were pretty adamant about discussing the
4   observation, and that was about it.
5   Q   Now, when you were in the hallway
6   with Dr. Ruediger, was anyone else present
7   that could have heard you speaking with him?
8   Ms. Towns or anyone else?
9   A   It was so loud with all the kids
10  around. It was lunch period. So, I doubt
11  it.
12  Q   Now, in that hallway -- I'll just
13  call it hallway meeting, for lack of a better
14  term.
15  A   Okay.
16  Q   Did Dr. Ruediger say anything to
17  you at that point about anything?
18  A   I wanted to try to explain why I
19  had left Houston County. And he said, "You
20  know, we're just not going to talk about that
21  right now." Something to that effect.
22  Q   Now, did y'all talk about your
23  leaving the Houston County High School at the
24  debriefing?
25  A   With Dr. Lumpkin present?

42

1   Q   Yes.
2   A   Yes.
3   Q   Okay. Now, did Dr. Lumpkin do
4   anything to you that you're complaining about
5   in this lawsuit?
6   A   No.
7   Q   And Dr. Lumpkin's first name?
8   A   Cynthia, if I remember correctly.
9   Q   I just don't know if that's in the
10  record or not. If I remember, you said that
11  she may have been a prior dean or a prior
12  head, department head?
13  A   I want to say I read that
14  somewhere.
15  Q   And I don't know. I'm just
16  saying --
17  A   But I don't know for sure.
18  Q   I thought I read that in your
19  deposition. Have you ever had any classes
20  with Dr. Lumpkin?
21  A   No.
22  Q   Did she play any role in your
23  Beverlye --
24  A   No.
25  Q   And, again, how long did that

43

1   observation debriefing at Troy take place?
2   A   I believe the paperwork said an
3   hour. I just didn't recall.
4   Q   And did Dr. Ruediger say anything
5   at that debriefing about your leaving school?
6   A   Yes. That was one of the critiques
7   that he mentioned. He gave me a 1 on
8   professional behavior.
9   Q   And did he say he was giving you
10  that 1 because of your leaving?
11  A   Yes. If I remember correctly, yes,
12  that was what he indicated.
13  Q   Did he say he was giving you the 1
14  for any other reason?
15  A   Not that I recall.
16  Q   Did you get any other scores on
17  your observation that day that you would
18  consider too low?
19  A   Yes.
20  Q   Okay. What scores were those?
21  A   There were some -- mostly 2's.
22  Q   Now, did you consider all of the
23  2's that you received too low?
24  A   I felt that it was a reflection of
25  my trying to get help for the kids by going

44

1   to Mr. Andrews.
2   Q   Did Dr. Ruediger ever say that that
3   was the case?
4   A   I don't recall if he said yes or
5   no.
6   Q   Now, did you disagree with
7   Dr. Ruediger giving you that 1 for
8   professional behavior?
9   A   Yes. Because it was my
10  understanding that whenever an observation
11  was being done, it is on that given moment in
12  time in the classroom, not outside the
13  classroom.
14  Q   And where did you get that
15  understanding from?
16  A   From all of my teachers at Troy
17  University who had anything to do with any
18  kind of education program. It's based on the
19  PEPE, that Dothan City Schools, for instance,
20  uses as their way of measuring, you know, how
21  a teacher is doing in the classroom.
22  Q   Now, did you ever communicate to
23  Dr. Ruediger that you were not pleased with
24  both the 1 and the 2's?
25  A   Yes.

45

1    Q    And when did you communicate that
2  to him?
3    A    At that meeting, as well as in the
4  written response, the reflection.
5    Q    And when you communicated it to him
6  at that meeting, Dr. Lumpkin would have heard
7  that? Correct?
8    A    Yes.
9    Q    And do you know whether Dr. Lumpkin
10  or anyone else read your written statement,
11  other than Dr. Ruediger?
12    A    I have no idea.
13    Q    Did you complain to anyone else,
14  other than Dr. Ruediger or Dr. Lumpkin, who
15  was sitting there that day?
16    A    No.
17    Q    Now, I know that you had said that
18  you told Dr. Ruediger in that hallway meeting
19  that Ms. Parris was threatening to fail your
20  internship. Did you tell Dr. Ruediger that
21  at any other time?
22    A    No, I don't believe so. Mainly
23  because he was only there twice, and the
24  first time, I was not being threatened. It
25  wasn't until after I went and talked to Mr.

46

1  Pitchford about the concerns.
2    Q    So, Ms. Parris didn't threaten you
3  until you went and talked to Mr. Pitchford
4  about the concerns?
5    A    After I had talked to him and he
6  had called her. Yes.
7    Q    What date would that be? Would you
8  be able to look at your calendar and tell me?
9    A    Yes. Okay. The conference was on
10  Friday, August 27th. And so, Monday, the
11  30th, was when she claimed that I was not
12  there to shake things up at the school and
13  all that sort of thing.
14    Q    And did there ever come a time that
15  Ms. Parris stopped threatening to fail your
16  internship?
17    A    Well, I guess that would be around
18  the 14th of October, when she actually told
19  me that it had been administratively
20  withdrawn.
21    Q    Did she ever threaten to fail your
22  internship when anyone else was present that
23  could hear that?
24    A    No, not to my recollection.
25    Q    Now, reading your deposition, you

47

1  stated that she made that threat in phone
2  conversations.
3    A    At least one phone conversation,
4  but in person, as well.
5    Q    So, at least one phone
6  conversation. And how many times in person?
7    A    I believe it was at least two, that
8  I can recall.
9    Q    And once would have been on the
10  30th of August? Am I correct?
11    A    Yes.
12    Q    And when would the other in-person
13  threat be?
14    A    Okay. That would have been -- let
15  me make sure I've got that. The 30th would
16  have been a phone call, I believe. I'm
17  sorry.
18    Q    I'm sorry. Would that be August
19  the 30th?
20    A    I believe August the 30th was a
21  phone call.
22    Q    Okay. Do you know who initiated
23  that call?
24    A    Originally, Ms. Teat, who is the
25  librarian, had come to my room, wherever I

48

1  was, and told me that she was on the phone,
2  and that I could use -- or that she had
3  called. And she let me use her phone in the
4  library.
5    Q    So, was it Ms. Parris who called
6  you first?
7    A    Yes.
8    Q    Okay. And you returned her call?
9    A    I returned her call. September 1st
10  was the first time she actually told me in
11  person. And that was in a meeting at about
12  8:30 that morning.
13    Q    Was anyone else present at that
14  meeting?
15    A    Yes. Mr. Andrews came, Paul
16  Strange, Mr. Pitchford, Pam Parris, and my
17  AEA rep, I believe. No. That was a
18  different meeting. So, September 1st was the
19  first time she told me in person.
20    The second time she told me in person, I
21  believe, would have been after -- the Monday
22  after the 24th of September. So, that would
23  have been --
24    Q    The 27th of September?
25    A    Yes.

49

1    Q    Was anyone else present at that
2  meeting?
3    A    I believe that -- I'm sorry.  I'm
4  not sure.  Let me think here.
5        MR. FAULK:  You're not sure about
6            the date or not sure who was
7            present?
8        THE WITNESS:  I'm not sure about
9            the date.  I'm sorry.
10    Q    Take your time with your calendar.
11        MR. BRANTLEY:  Just take your time.
12    A    (Witness reviewing document.)
13  Okay.  It was September 27th.
14    Q    Okay.  That Monday after the 24th?
15    A    Right.  And that's when Sharon Cole
16  had told me that she would come to that
17  meeting, as well, but she didn't.
18        (Recess in deposition.)
19    Q    Now, you had referred to that
20  August 30 phone call with Ms. Parris as a
21  situation where she had threatened to fail
22  your internship.
23    A    Yes.
24    Q    How long did that phone call take
25  place?

50

1    A    Probably 15 minutes or so, I would
2  imagine.
3    Q    And what did Ms. Parris tell you in
4  this phone call?
5    A    She told me that I was not there to
6  shake things up.  I told her that there were,
7  you know, illegal things going on.  Some of
8  the students -- I may have -- I don't know
9  for sure that I specifically told her that
10  there were no IEP's for some students, for
11  instance.  But, that I was concerned for the
12  students and their educational needs.
13        And, again, she just said that it was
14  not my place to come in and shake things up,
15  and that if I didn't stop, I was in jeopardy
16  of failing my internship.
17    Q    Did she say anything else?
18    A    I don't recall what else.  That was
19  just the main part of the conversation.
20    Q    Now, on the September 1st
21  person-to-person meeting, what did Ms. Parris
22  say to you that was a threat to fail your
23  internship?
24    A    She said that there had been a
25  complaint that I was causing dissension among

51

1  the faculty.  And I didn't interact with the
2  faculty that much.  The only people that I
3  interacted with were mainly the teachers that
4  I was in their room with.  And that would
5  have been Ms. Sims, Ms. Ezell and Ms. Towns.
6        But I understood that Ms. Monday had
7  made a complaint about a statement that I had
8  -- or she had made to me.  And she didn't
9  particularly want me in -- any special ed
10  teacher in her class.
11        But, that I needed to get in line with
12  what she had been telling me before, make Mr.
13  Pitchford happy, or else I was in jeopardy of
14  losing my -- or failing my internship.
15    Q    And what she said to you, would
16  that have been heard by the other individuals
17  at that meeting on September 1st?
18    A    No.  She took me -- she had me walk
19  out with her into the little vestibule to
20  have a little private chat.
21    Q    Did she say anything else in that
22  September 1st meeting?
23    A    Specifically about my failing my
24  internship --
25    Q    Yes.

52

1    A    -- or other things?  No, not that I
2  can recall.
3    Q    What else did she say in that
4  September 1st meeting?
5    A    She was in the meeting trying to
6  reassure Mr. Pitchford and Mr. Andrews that
7  she valued their relationship, being able to
8  put interns into the county system, and hoped
9  that they would continue -- be able to
10  continue that for a long time.
11    Q    Did she say anything else?
12    A    Not that I can recall.  I'm sure
13  she probably did.
14    Q    Now, in the September 27th --
15    A    Yes.
16    Q    -- meeting, what did Ms. Parris say
17  with regard to a threat toward your failing
18  the internship?
19    A    Well, she was very, very angry.
20  Because I was waiting out in the -- I was
21  waiting for Ms. Cole to come, to show up.
22  And she got to the point where she said that,
23  "You've really done it now."  When she first
24  came in, she told me, in the conference room
25  -- and, unfortunately, we were just by

53

1    ourselves. But she said, "You've really done
2    it now. I told you that you weren't supposed
3    to shake things up here. And I've had phone
4    calls starting early in the morning, phone
5    call after phone call," type thing.
6        And then, she also -- after the meeting
7    was over, again, she had me walk out in the
8    vestibule, and that's where she again
9    threatened that I would -- I could -- I was
10   in jeopardy of failing my internship.
11       Q    What did she say to you in the
12   vestibule?
13       A    She told me that I was in jeopardy
14   of failing my internship. And I told her --
15   that's where I -- when I told her that, as a
16   military wife, you know, I take the laws of
17   the land pretty seriously, and that I wasn't
18   going to do anything illegal. And she told
19   me that she wasn't intimidated by the fact
20   that I was a military wife.
21       And I told her it wasn't intended to be
22   any kind of intimidation. Just I wanted to
23   stress to her that it's very important to me,
24   as a citizen, as a military wife, that I do
25   the right thing.

54

1        She also indicated to me that she knew
2    Sharon Cole -- that I had been waiting for
3    Sharon Cole, who never showed up. But she
4    said, "Sharon Cole doesn't intimidate me,
5    either, because she has nothing to do with
6    Troy University."
7        Q    And would anyone have heard the
8    vestibule conference?
9        A    Unfortunately, no.
10       Q    Do you know whether Ms. Cole ever
11   communicated with anyone at Troy?
12       A    I know she called -- I know she
13   talked to Mr. Pitchford. I do not know if
14   she talked to anybody else.
15       Q    And when did you first contact the
16   AEA?
17       A    On that Friday.
18       Q    That Friday, the 24th of September?
19       A    Yes.
20       Q    So, prior to September 24th, you
21   hadn't contacted them?
22       A    No.
23       Q    And when did you first become a
24   member of the AEA?
25       MR. FAULK: Objection. You're

55

1        getting into her rights of
2        association. And what
3        relevance of discovery, I don't
4        understand. What's the idea of
5        the question?
6        MR. MUSSO: I just want to know
7        when she became a member of the
8        AEA. If she said certain
9        things to the AEA that are
10       relevant to this lawsuit,
11       they're certainly discoverable.
12       MR. FAULK: Well, that's not
13       necessarily true. But,
14       anyway --
15       MR. MUSSO: I mean, unless they
16       were said to a lawyer, they're
17       completely discoverable.
18       MR. FAULK: That's not necessarily
19       true.
20       MR. MUSSO: And whether they can
21       lead to discovery is also
22       what's important. I mean, if
23       she has a right to association,
24       she also filed a lawsuit, and
25       she has to provide

56

1        communication in this lawsuit,
2        called discovery.
3        MR. FAULK: Well, she has to
4        respond to appropriate
5        discovery. Now, I don't
6        particularly care if she tells
7        you when she joined the AEA.
8        But, I mean, we're just heading
9        in a direction that's going to
10       lead to a dispute, if what
11       you're trying to do is get at
12       her private communications when
13       she's seeking legal assistance
14       through her professional
15       organization.
16       MR. MUSSO: And I'm not going to
17       ask her what she talked to with
18       regard to a lawyer at the AEA.
19       Q    But I'm asking you, when did you
20   first become a member of the AEA?
21       MR. BRANTLEY: Object.
22       MR. FAULK: No. You can answer
23       that.
24       A    Well, I was a student AEA when I
25   became an intern. Then, when I became

57

1   employed by Houston County, student AEA said
2   I was not eligible to them. I would have to
3   join the regular AEA.
4       Q   And did you do that?
5       A   Yes. So, that would have been some
6   time in August, whenever they came around and
7   gave me the information.
8       Q   Was your membership dual? Were you
9   still student and regular, or were you just
10  regular?
11      A   According to my information, it was
12  just regular.
13      Q   And at any time you met with any
14  Troy representative, be it Dr. Ruediger,
15  Dr. Lumpkin, Ms. Parris, Dr. Jones,
16  Dr. Morin, was there ever an AEA
17  representative present?
18      A   No.
19      Q   Now, you made reference to this
20  August 30th phone call. Do you have any
21  specific recollection of any other phone
22  calls with Ms. Parris where she threatened to
23  fail your internship?
24      A   She would call me at school every
25  now and again, but I don't recall

58

1   specifically any dates.
2       Q   So, was there any time after
3   September the 27th that Ms. Parris threatened
4   to fail your internship?
5       A   I believe, but I did not document
6   it, that there might have been another time.
7   Because she talked to me about Dr. Jones will
8   probably make the decision. And if I
9   remember correctly, it was about a week
10  before. And I said, "So, what does that
11  mean? Am I going to fail the internship?"
12  And she said that Dr. Jones will make the
13  final decision.
14      Q   And where were you at? Was this a
15  phone conversation or face-to-face?
16      A   I'm sorry. I don't -- I don't
17  know. I did not document that.
18      Q   Did you say it was a week before a
19  certain date or certain event?
20      A   I want to say it was about a week
21  before I was actually administratively
22  withdrawn. Somewhere a week or two, max.
23      Q   In your prior deposition -- let me
24  ask you this: Do you recall when you learned
25  that Ms. Parris was not going to be making

59

1   the decision whether you failed or not?
2       A   The final decision? I don't know a
3   specific date. She just indicated that
4   Dr. Jones would be making the final decision.
5       Q   Do you know what Ms. Parris'
6   official title was?
7       A   I've got it written down somewhere.
8       Q   If you know today?
9       A   Internship advisor or something.
10  No. It's something different, I think.
11      Q   Do you know whether she was
12  actually a faculty member or not?
13      A   She taught a class.
14      Q   Which class did she teach?
15      A   I don't recall the name of it. I
16  would have to look on my records. But it was
17  an introductory class to the education
18  program.
19      Q   Do you know whether that class was
20  a pass or fail or actual graded class?
21      A   I believe it was an actual graded
22  class.
23      Q   And did she also administer
24  internships for individuals who were not part
25  of the special ed program?

60

1       A   Yes. She was over all the interns.
2   But she would specifically make visits to the
3   interns that had -- that were being paid by a
4   school system.
5       Q   Do you know if she ever made visits
6   to any other interns who weren't being paid?
7       A   Not that I'm aware of.
8       Q   Do you know whether she had any
9   types of degrees, and what they were?
10      A   I don't know for sure.
11      Q   She wasn't called doctor, though,
12  was she?
13      A   No.
14      Q   Do you know whether she did or
15  didn't have a Ph.D.?
16      A   I don't believe she had a Ph.D.
17      Q   Do you know whether she had ever
18  had any type of training in special
19  education?
20      A   Not to my knowledge.
21      Q   Do you know whether she ever had
22  any type of training in special education
23  law?
24      A   Not to my knowledge.
25      Q   Do you know whether she ever had

61

1    any special training in the IDEA?
2        A    Not to my knowledge.
3        Q    Any special training in the ADA?
4        A    Not to my knowledge.
5        Q    Any special training on how to do
6    an IEP?
7        A    Not to my knowledge.
8        Q    Now, in the September 30th
9    observation debriefing when Dr. Lumpkin was
10    present, did Dr. Lumpkin or Dr. Ruediger say
11    anything about your going to the central
12    office that Friday before?
13        A    About leaving the school to go.
14        Q    Did they say anything about your
15    actual discussion, anything you said with Mr.
16    Andrews?
17        A    I don't recall.
18        Q    They did refer to your leaving the
19    school?
20        A    Yes.  Yes.
21        Q    Did Dr. Ruediger note disapproval
22    that you left the school?
23        A    Yes.
24        Q    And did Dr. Lumpkin note
25    disapproval that you were leaving the school?

62

1        A    Yes.
2        Q    Did they state why that they
3    disapproved that?
4        A    I don't recall specifically.
5        Q    Do you know of any other intern,
6    whether they were paid or not, who ever left
7    the school during school hours?
8        A    I'm not sure of interns, but other
9    teachers did.
10        Q    When you say "other teachers," were
11    these other teachers at Houston County?
12        A    Yes.
13        Q    Did you communicate to anyone at
14    Troy about these other teachers at Houston
15    County School System who had left early?
16        A    The only person that I think knew
17    about it was Amy Deese, because she was the
18    first person to actually tell me that she had
19    seen Paul Payne, who was a special education
20    teacher assigned to her room -- she saw him
21    leave the campus in his vehicle.  She had a
22    huge window grouping.  And watched him leave
23    and come back with some food.
24        And one day when I was in her room, she
25    said, "There he goes again."  And so, I saw

63

1    him leave in his car from campus.
2        Q    And Amy Deese was a fellow intern?
3        A    She was another situation like
4    mine, where she was a paid intern.  Yes.
5        Q    And what did she teach?
6        A    English.
7        Q    English.  Did anyone else at Troy
8    have any knowledge about anyone at the
9    Houston County School System leaving early?
10        A    I don't know.
11        Q    And Mr. Payne, do you know whether
12    he was on his lunch hour?
13        A    It was not lunchtime.
14        Q    It wasn't lunchtime?
15        A    No.
16        Q    Do you know one way or the other
17    whether he had asked for any permission to do
18    that?
19        A    Not to my knowledge.
20        Q    Now, as we sit here today, do you
21    know who actually made the decision to
22    administratively withdraw your internship?
23        A    I don't know for sure.
24        Q    Did anyone tell you that someone
25    made that decision?

64

1        A    I don't know that they actually
2    told me.  I got a letter from Dr. Jones that
3    said my internship had been administratively
4    withdrawn.
5        Q    What was Dr. Jones' position at
6    that time, when your internship was
7    administratively withdrawn?
8        A    Dean of education.
9        Q    Was there a chairperson there at
10    Dothan --
11        A    I'm sorry?
12        Q    -- at the education department?
13    Actual chairperson of the education
14    department?
15        A    In Dothan?
16        Q    Yes.
17        A    I'm not sure what you mean.
18        Q    Just, you know, when I was a
19    teacher, you had the chairperson of the
20    English department, and then, you had a dean
21    over the chairperson.
22        A    I don't know how -- I mean, I know
23    -- well, at Dothan High School, I believe
24    they have theirs departmentalized.  But other
25    schools, like Beverlye, they didn't have --

65

1  Q   I'm sorry. I meant Troy. Troy
2  University.
3  A   Oh, Troy.
4  Q   I'm sorry. Do you know if there
5  was a chairperson over the education
6  department?
7  A   I don't know that. I believe
8  Dr. Morin was called the chair of special
9  education.
10  Q   Was there someone at Troy
11  University who, at that time, you considered
12  the head of the special education group?
13  A   I guess that would be Dr. Morin.
14  Q   When you say you guess, do you
15  know? I'm not trying to --
16  A   Right.
17  Q   -- ask you to guess.
18  A   I believe that was her title.
19  Q   So, would Dr. Jones have been over
20  Dr. Morin?
21  A   Yes. That's my understanding.
22  Q   And Dr. Ruediger would have been
23  under Dr. Morin?
24  A   One would assume that.
25  Q   And that's just an assumption.

66

1  And, again, I'm not asking you to guess.
2  But, did you ever go to Dr. Morin and
3  complain about anything that Dr. Jones did,
4  Dr. Ruediger did, or Pam Parris did?
5  A   No.
6  Q   Is there any specific reason you
7  didn't?
8  A   I tried to keep everything at the
9  very lowest level. And I figured she would
10  know about it, anyway. Because, as a
11  military wife, the chain of command, I'm
12  familiar with.
13  Q   Do you know, one way or the other,
14  whether she did know about it?
15  A   From the times I've seen her since
16  my internship, I don't think she knows.
17  MR. FAULK: You're talking about
18      Dr. Morin, now?
19  MR. MUSSO: Yes.
20  THE WITNESS: Yeah. Dr. Morin.
21  A   I didn't get the impression that
22  she knew everything that had gone on. I got
23  the impression that she knew what they wanted
24  her to know. That was just my impression.
25  Q   And when you got that impression,

67

1  what caused you to have that impression?
2  A   She invited me to be a consultant,
3  along with another teacher from Beverlye
4  Middle School, a consultant to the
5  university, a year ago or so, in September,
6  last year.
7  And I got the impression that she was
8  under the impression that I had turned around
9  in terms of not causing dissension. You
10  know, like this -- you know, the dissension
11  that had been previously mentioned, that I
12  was causing dissension among the faculty at
13  Troy -- excuse me -- Houston County High
14  School. I got the impression that that was
15  what she was speaking about.
16  Q   Did she actually say something to
17  you that caused you to have that impression?
18  A   She was introducing me to the group
19  of educators, principals. I believe it was
20  principals and some other people from the
21  education field around the Wiregrass area.
22  And she just kept telling everybody how proud
23  she was of me, and that I had just come such
24  a long way, or something to that effect.
25  Q   And did you have any complaints

68

1  about what she was saying about you that day?
2  A   No.
3  Q   I mean, were you honored by what
4  she was saying about you, then?
5  A   Yes. I was delighted.
6  Q   And do you know whether her opinion
7  has changed at all from that speech she gave
8  about you that day?
9  A   I don't know.
10  Q   And were you pleased to be a part
11  of that panel that day?
12  A   I enjoyed it very much.
13  Q   Was that the first time you had
14  been back on the Dothan campus since your
15  graduation?
16  A   I believe it was.
17  Q   And have you been back since then?
18  A   No, except to get my -- excuse me.
19  Except to get a copy of my transcript.
20  That's it.
21  Q   And that day when you were on that
22  panel, what exactly did you do? Did you give
23  a speech?
24  A   This other general education
25  teacher, she was a history teacher. And I

69

1    love history.  And we did -- we presented a
2    -- oh, gosh.  I'm trying to remember what the
3    word is.  We presented on the topic of
4    collaboration.  We did a --
5        Q    Powerpoint?
6        A    Thank you.  -- Powerpoint
7    presentation.  And one of our fellow teachers
8    had taped us collaborating and that sort of
9    thing.  So, we had that presented.
10       Q    So, you were talking about the
11   special education element?
12       A    Yes.  Collaboration.
13       Q    Okay.  And she was a teacher who
14   you worked with to incorporate the special
15   education students into her general
16   classroom?
17       A    Right.  Yes.
18       Q    How long did your presentation
19   last?
20       A    Oh, probably 20 minutes or so.
21   Maybe a little longer.
22       Q    And it was Dr. Morin who invited
23   you to do that?
24       A    Yes.
25       Q    Did you have any hesitation on

70

1    doing it?
2        A    No.
3        Q    When you were there, did you see
4    Dr. Ruediger?
5        A    Yes.  He was present.
6        Q    Did you speak to him or he speak to
7    you?
8        A    We nodded.  That's about all.  When
9    I got there -- she had told me to be there at
10   a certain time.  And so, things were already
11   kind of starting.  And so, it wasn't like we
12   had a big opportunity to go around and speak
13   to each other.
14       Q    Did you see Dr. Jones there?
15       A    No.  I don't believe she was there.
16       Q    Did you see Ms. Parris there?
17       A    No.
18       Q    And this is while you were a
19   full-time teacher at Beverlye?  Correct?
20       A    Correct.
21       Q    You had already graduated?
22       A    Correct.
23       Q    Is that something you put on your
24   resume?
25       A    I would probably put it on.  I

71

1    haven't done it yet, but I would.
2        Q    I just reminded you.
3        A    Thank you.
4        Q    Now, I know in this lawsuit you've
5    said that Pam Parris threatened to fail your
6    internship, and that Dr. Ruediger gave you
7    low scores on that observation.
8        A    Uh-huh.
9        Q    What I'm a little confused at,
10   reading your complaint and hearing your
11   testimony so far, is, what did Dr. Jones do
12   to you?
13       A    Dr. Jones is part of the chain of
14   command.  And it's my understanding that
15   she's responsible for the actions of her
16   professors.
17       Q    Any other reason that you sued her?
18       MR. FAULK:  She's, of course,
19            acting on legal advice.  But,
20            other than that, whatever you
21            know, go ahead and tell him
22            your personal knowledge.
23       A    Not that I can think of at the
24   time.
25       Q    Did Dr. Jones ever tell you not to

72

1    communicate anything to the Houston County
2    Board of Education?
3        A    No.
4        Q    Did you ever go to her and complain
5    to her about anything that Ms. Parris or
6    Dr. Ruediger did to you?
7        A    No.
8        Q    Did she ever tell you that she was
9    going to take any action against you that you
10   didn't like because of anything you did at
11   the Houston County Board of Education?
12       A    No.  The only time I talked to
13   Dr. Jones specifically about a situation was,
14   I believe, after -- I think it was after I
15   completed my internship, my second
16   internship.  Dr. Morin had suggested that I
17   go and talk to her.
18       Q    And when you talked to her, was
19   anyone else present?
20       A    No.
21       Q    Was this in her office?
22       A    In her office.
23       Q    And what did you tell her at that
24   point?
25       A    That I was disappointed with the

73

1 way things were handled the first time, with
2 my first internship, and that -- I can't
3 recall specifically.
4    Q    Do you recall anything that she
5 told you at that time?
6    A    Not particularly. She pretty much
7 listened.
8    Q    Was anyone else present?
9    A    No.
10    MR. FAULK: I'm sorry. You may
11        have done it, but I'm not quite
12        clear when that conversation
13        was.
14    MR. MUSSO: It happened at the end
15        of her Beverlye internship.
16    THE WITNESS: I believe it was at
17        the end of my Beverlye
18        internship, when I was assured
19        that I was going to graduate.
20    Q    (By Mr. Musso) How did it come
21 about that you actually were assigned to
22 Beverlye?
23    A    I'm not exactly sure, but I -- all
24 I know is that, ordinarily, Pam Parris
25 arranges that sort of thing. I was

74

1 originally assigned, for my second
2 internship, to go to Northview. And then, I
3 got a call -- I think it was from Ms. Parris,
4 but I'm not 100 percent sure -- that I was
5 going to be going to Beverlye. That Mr.
6 Norris had been delighted to have me there.
7 He knew me from Dothan High School.
8    Q    And Mr. Norris, was he the
9 principal at Beverlye?
10    A    Yes.
11    Q    And what grades are actually at
12 Beverlye?
13    A    It's middle school. It's 6th, 7th
14 and 8th.
15    Q    And which school system is
16 Northview with?
17    A    Dothan City.
18    Q    Dothan City. Were you disappointed
19 that you were going to have to go to Beverlye
20 instead of Northview?
21    A    No.
22    Q    Were you given a choice?
23    A    No. They assigned me.
24    Q    But you were pleased to be at
25 Beverlye?

75

1    A    I was excited. Yes. Only because
2 I knew people over there. I would have been
3 fine over at Northview. I just didn't know
4 anybody over there any more.
5    Q    What was closer to your home?
6    A    Actually, Northview would have been
7 closer.
8    Q    How much further away was Beverlye?
9    A    Oh, just -- it's on the south side,
10 whereas -- on the south side of the Circle a
11 little bit, and Northview is on the north
12 side.
13    Q    And did Beverlye have a good
14 special education program?
15    A    I learned a lot from them. Yes.
16    Q    I don't even think this has been
17 asked yet. But, what is the purpose of a
18 student internship at Troy University at
19 Dothan?
20    A    My understanding, it's the
21 culmination of all your learning. It's an
22 exciting and fun, yet stressful period in
23 which you are able to experiment with, you
24 know, things that you've learned, get help
25 and advice and just try to learn as much as

76

1 you can about your profession.
2    Q    And did you get all of that at your
3 Beverlye internship?
4    A    Absolutely.
5    Q    And was your internship at Houston
6 County High School exciting or fun?
7    A    Absolutely not. It was torture.
8    Q    Torture. Okay.
9    A    The only pleasurable thing were the
10 children.
11    Q    Was your internship at Houston
12 County High School, during the period you
13 were there, was it a valuable learning tool?
14    A    Oh, I learned what not to do.
15    Q    But, at Beverlye, did you learn
16 what to do?
17    A    Yes.
18    Q    And again -- and I asked you this.
19 I'm sorry to repeat it. Was the internship
20 pass or fail?
21    A    And, again, I'm thinking it was
22 pass or fail, but I'm not 100 percent sure.
23    Q    But you know that, regardless of
24 what it was, you passed or made a grade that
25 was passing, because you did graduate?

77

1    A    Right.
2    Q    And from reading your last
3    deposition, I believe that, pursuant to your
4    being administratively withdrawn from the
5    internship in the fall of 2005, you were not
6    charged tuition again in the spring of 2006?
7    Is that correct?
8    A    That is correct.
9    Q    Okay.  Were you charged any student
10   fees?
11   A    No.
12   Q    Did you have to buy any additional
13   books that you didn't already have?
14   A    I don't believe so.
15   Q    Okay.  And you took that student
16   intern class again in the spring of 2006?
17   A    Yes.
18   Q    Did you take any other classes
19   other than that student intern class and your
20   internship?
21   A    Those were the only two that I had
22   left in order to get my degree.
23   Q    And those were the two classes you
24   had taken the fall of 2005?
25   A    That is correct.

78

1    Q    Now, in the fall of 2005, you were
2    employed at the Houston County High School?
3    Correct?
4    A    Yes.
5    Q    Okay.  Was it your anticipation, if
6    you had been reappointed -- well, I guess I
7    should ask you this.  Did you have any job
8    offerings from any other school for the fall
9    of 2006?
10   A    For the fall of 2006?
11   Q    Of 2006.  Yeah.  So, in other
12   words, here you were working at Houston
13   County High in the fall of 2005.  Had you
14   made any decisions then as to whether you
15   wanted to work in another school or try to
16   work again at Houston County High?
17   A    I pretty much figured that working
18   at Houston County Schools at all were
19   probably not ever going to happen.  You know.
20   Me teaching there would probably never
21   happen.
22   Q    But, let me ask you before there
23   were any problems with your internship.
24   A    Oh, okay.
25   Q    Before there were any problems with

79

1    your internship, had you made any decisions
2    as to whether you wanted to work in the
3    Houston County School System on a full-time
4    basis after your graduation?
5    A    That would have been fine with me.
6    Q    Okay.  But I guess my question is,
7    had you started looking for employment in any
8    other place, other than Houston County High
9    School, in the fall of 2005 --
10   A    No.
11   Q    -- before your internship was --
12   A    No.  I was approached by Ms. Parris
13   about this particular paid internship.  I had
14   no anticipation of getting paid at all.  This
15   was just kind of out of the blue.
16   Q    Beverlye Middle School is a part of
17   which system?
18   A    Dothan City.
19   Q    Dothan City Schools?
20   A    Uh-huh.
21   Q    Okay.  Did you apply for any other
22   schools in the Dothan City system other than
23   Beverlye?
24   A    To my recollection, there were no
25   special education middle school or high

80

1    school job openings.
2    Q    And is it my understanding that you
3    would only want to teach middle school or
4    high school, and not elementary?
5    A    That's all I'm qualified to teach.
6    Q    Are you qualified to teach anything
7    other than special education?
8    A    No.
9    Q    I had asked you about graduate
10   programs.  Have you ever decided whether you
11   wanted to go back to Troy University for any
12   other type of bachelor program?
13   A    No.  That would not be an option.
14   Q    Is that something you just wouldn't
15   want to do?
16   A    No.  I've got my degree in special
17   education.  And that was my chosen field, my
18   chosen profession that I wanted to be in, and
19   I still want to be in it.
20   Q    There are some people who just love
21   to get degrees.  I've got four of them.
22   A    Well, I'd love to stay --
23   Q    Some I've never used.
24   A    -- a college student.  I love it.
25   Q    And I did until I went broke.  Then

81

1    I went to law school, and I'm still broke.
2    You would like to work for the Dothan City
3    School System now?  Correct?
4       A    Yes.
5       Q    And I think I've asked you before.
6    You do not want to go work for the Houston
7    County System?  Correct?
8       A    No.
9       Q    Okay.  And is there any other
10   school system within your residential area
11   that you would consider working for?
12      A    Yes.
13      Q    Which ones?
14      A    Probably Dale County, Henry County.
15   I'm just not much of a driver.  I don't like
16   to drive.
17      Q    Have you applied at any of those?
18      A    I have gotten online and started to
19   fill out an application, but I have not
20   finished it.
21      Q    And would that be for both Dale and
22   Henry?
23      A    Yes, it will be.
24      Q    Any other county?
25      A    Let me think.  No.  Not right this

82

1    minute, that I can think of.
2       Q    Now, do you know of any special
3    education jobs that may be coming open in the
4    next year or two at the Dothan City system?
5       A    No one would really know that, that
6    far in advance.
7       Q    Sometimes you know people who may
8    be close to retirement or --
9       A    No.
10      Q    -- you've heard them say, one more
11   year, and I'm out of here.
12      A    And they never go.
13      Q    I guess one of the things, how many
14   types of those jobs are available at the
15   Dothan City System?
16      A    Gosh.
17      Q    Would it be a dozen?
18          MR. FAULK:  You mean how many
19          positions?
20      Q    I'm sorry.  Special education.  It
21   doesn't have to be a specific number.  But
22   you're just kind of aware of how many of
23   those special education jobs that you would
24   be qualified for and be interested in are
25   there out there in the Dothan City system?

83

1       A    There were only the ones that I
2    knew of prior to the beginning of this school
3    year.  I believe there were, like, maybe four
4    or five.
5       Q    I'm sorry.  The four open --
6          MR. FAULK:  Excuse me.  I don't
7          think it's clear whether you're
8          talking about vacancies or
9          existing positions.
10      Q    Let's just say existing positions.
11   I'm just trying to get an idea of how many
12   are out there.
13      A    To my knowledge, there's none open
14   now.  They've all been filled.
15      Q    Yeah.  None open.  But, what about,
16   just how many positions are there, period?
17      A    Oh, I don't even know.
18      Q    But, I mean, would it be dozens or,
19   like, less than ten?
20      A    Oh, no.  There's -- I think
21   there's, like, maybe nine or so at Dothan
22   High School alone.
23      Q    Okay.  I just wanted to kind of get
24   an idea of --
25      A    Right.  But I'm collaborative.  So,

84

1    you know, if there's a special ed position
2    open, let's say, at Northview, and it was
3    working with the severe disabilities or
4    whatever, I'm not really trained to do that.
5    You know.  I'm trained to go into the
6    classroom with the general education teacher.
7       Q    In order to be trained to, say,
8    work with the severely disabled, and not do
9    the collaborative stuff, would that require
10   more course work?
11      A    Oh, absolutely.
12      Q    Do you have any desire to do that?
13      A    Well, there's nowhere around here
14   that -- to my knowledge, that I'd be able to
15   do that.
16      Q    So, Dothan Troy does not offer
17   that?
18      A    No.  They offer the collaborative.
19      Q    Now, I know, in your other
20   deposition, you had mentioned about Ms.
21   Ezell, there, saying something to the effect
22   that she knew Dr. Jones?
23      A    Yes.
24      Q    Do you know whether Ms. Ezell had
25   any conversations with Dr. Jones about

85

1  anything that happened to you at Houston
2  County High?
3      A    I do not know.
4      Q    Now, in any of these conversations
5  you had with anyone at Troy University or at
6  the Houston County Board of Education, did
7  you ever tape any of those?
8      A    No.
9      Q    Do you know of anyone who taped any
10 of those?
11     A    No.
12     Q    And I've always got to ask these
13 questions or get burned at trial. Do you
14 have any video recordings of any of these
15 conversations?
16     A    No.
17     Q    Do you know of any video
18 recordings?
19     A    No, I do not.
20     Q    Do you know of any audio
21 recordings?
22     A    I don't know of any audio.
23     Q    Now, I know that you've given me
24 Defendant's Exhibit 33, which is some notes
25 that you took contemporaneously on the dates

86

1  they occurred. Do you have any other type of
2  notes -- I'm not asking you things that your
3  attorney told you to do. But, any other
4  types of notes or journals or diaries that
5  you took with regard to any facts in this
6  case?
7      A    Not that I've been able to locate
8  at this time.
9      Q    But, do you know of any?
10     A    There was a log that I was required
11 to keep.
12     Q    And I think we talked about that in
13 your last deposition? Right?
14     A    Right.
15     Q    Anything other than that log?
16     A    Not -- no.
17     Q    Now, do you BLOG on the internet?
18     A    No.
19     Q    So, you never put anything on a web
20 page or My Space or anything like that --
21     A    No.
22     Q    -- regarding this lawsuit?
23     A    No.
24     Q    Now, I know that you stated that
25 Pam Parris threatened to fail your

87

1  internship. You told me a couple of
2  instances where that happened. Did her doing
3  that ever stop you from going to anyone at
4  Houston County High School or the board of
5  education and making any of your complaints?
6      A    No. Because, as a citizen, I'm
7  outraged at what was happening there, and I
8  was -- I would have done it even if I wasn't
9  a teacher or an intern, if somebody had come
10 to me, a neighbor or something like that, and
11 said something was going on or whatever.
12     Q    Did you ever communicate that to
13 anyone other than a -- let me see. I know
14 you talked to your husband about what was
15 going on at Houston County High? Correct?
16     A    Yes.
17     Q    And I know, from the Blackboard,
18 you talked about some of the instances with
19 regard to what happened to some of your
20 classmates.
21     A    Yes.
22     Q    Okay. And I know that you said you
23 communicated some of the things that you
24 considered were improper to members of the
25 Houston County Board -- I mean, individuals

88

1  who worked at the Houston County High School?
2  Correct?
3      A    Yes.
4      Q    And you communicated that to some
5  of the people who worked at Troy University?
6      A    Yes.
7      Q    Did you communicate any of the
8  disagreement you had with what was going on
9  at the school to anyone else?
10     MR. BRANTLEY: Object to the form.
11     Q    A neighbor or friend or anyone?
12     MR. BRANTLEY: Object to the form.
13         Disagreement.
14     Q    Well, okay. For instance, did you
15 tell anyone else that the IEP's were not
16 being done properly?
17     A    I don't recall telling anybody that
18 specifically.
19     MR. FAULK: Excuse me. Do you
20         realize that, as phrased, your
21         question would exclude Andrews?
22         First you said anybody with the
23         Houston County Board, and then,
24         you said anybody at Houston
25         County High School.

89

1    Q    What I'm looking for are people who
2  don't work for the Houston County Board,
3  people who don't work for Houston County High
4  School, people who don't work for Troy
5  University, people who weren't your
6  classmates in that class. And I know you've
7  spoken to your husband about it.
8    A    Right.
9    Q    My question, is there anyone else
10 in the history of the world that you talked
11 to about the IEP's not being done properly?
12   A    Not to my recollection.
13   Q    Did you talk to anyone with regard
14 to students not receiving the instruction
15 that they should be receiving?
16   A    I had a neighbor who was in the
17 teacher program, as well, in the master's.
18 And I may have mentioned to her something
19 about I was in jeopardy of losing -- or
20 failing my internship because of some
21 noncompliance issues or something to that
22 effect.
23   Q    Did you communicate to anyone other
24 than any member of the Houston County Board,
25 Houston County High, Troy University faculty

90

1  or administrative member, or a Troy
2  University student, anything with regard to
3  any noncompliance issues that occurred at
4  Houston County High?
5    A    Not to my recollection.
6         MR. BRANTLEY: And you can take
7              your time and think, if you
8              want to.
9    A    Not to my recollection.
10   Q    So, you didn't go to any newspaper?
11   A    No.
12   Q    You didn't go to any parent/teacher
13 group?
14   A    No.
15   Q    You didn't call any parent of any
16 student?
17   A    No. I did not call the department
18 of education. No.
19   Q    You didn't go to any member of the
20 press, be it in print --
21   A    No.
22   Q    It's not something you put on the
23 internet for the world to see?
24   A    No.
25   Q    Did you actually go to any open

91

1  board meeting?
2    A    No. I tried to keep it on the
3  lowest level possible.
4    Q    And I think you said you've never
5  met Mary -- is it Brazzelle?
6    A    Brazzelle. No, I've never met her.
7    Q    And I know you said you kept it on
8  the lowest possible. So, that means you
9  never complained to anyone above Dr. Jones,
10 say, to the provost or anyone else?
11   A    No.
12   Q    The vice president over at Dothan
13 or anyone like that?
14   A    No.
15        (Recess for lunch.)
16   Q    After you learned that your
17 internship had been administratively
18 withdrawn, did you ever return to the Houston
19 County High School?
20   A    Yes.
21   Q    Okay. And what did you do? Did
22 you actually do any teaching, or did you just
23 pick up your materials and leave? Explain
24 what happened.
25   A    No. I was back teaching again.

92

1    Q    And how long did you continue
2  teaching?
3    A    Until October 20th.
4    Q    Until you received a letter saying
5  that your employment was ending?
6    A    Until, yes, I was handed that
7  letter.
8    Q    We've talked about that in your
9  last deposition. Now, from the time you
10 learned that you were administratively
11 withdrawn, up until today, have you ever
12 complained to anyone at the Houston County
13 Board of Education or Houston County High
14 School, Houston County education system,
15 about anything that happened to you while you
16 were at Houston County High?
17   A    No.
18        MR. FAULK: Pardon me. Just to
19             make sure we don't appear to be
20             hiding the ball, there were
21             some communications between AEA
22             representatives and the Houston
23             County Board and I guess their
24             attorney. I think I saw
25             something from Jere Segrest.

93

1　　　　　But, anyway, I mean, she did,
2　　　　　through representatives, in any
3　　　　　event.
4　　　　MR. WALDING: But not directly.
5　　Q　　Other than something that would
6　have been through any complaint you made with
7　the AEA, did you discuss with anybody at the
8　Houston County Board of Education, Houston
9　County education system, Houston County High
10　School, anything that happened to you at
11　Houston County High?
12　　A　　No, I don't believe so.
13　　Q　　Now, did you ever complain about
14　anything that you felt was not being done
15　properly at the Houston County High School
16　before your internship started?
17　　A　　Just to Mr. Strange, when we were
18　discussing the fact that we didn't have IEP's
19　for some of the students, didn't have files
20　for some of them, some of the IEP's were
21　written for the resource room instead of the
22　general education room. That sort of thing.
23　　Q　　And that would have been before
24　your internship started?
25　　A　　Yes.

94

1　　Q　　At that time, you were employed
2　by --
3　　A　　Yes.
4　　Q　　-- Houston County?
5　　A　　Yes.
6　　Q　　Now, was Dr. Ruediger the first
7　individual from Troy University who you said
8　anything with regard to anything being wrong
9　at Houston County High School?
10　　A　　Yes.
11　　Q　　And, at that time, you were an
12　intern?
13　　A　　Yes.
14　　Q　　Now, did anyone at Troy University
15　ever tell you -- and by "anyone at Troy
16　University," I'm not talking about a student,
17　not a fellow classmate. But, anyone at Troy
18　University tell you that you were wrong in
19　how you were interpreting the special
20　education law?
21　　A　　No.
22　　Q　　Did anybody tell you you were
23　right?
24　　A　　Yes.
25　　Q　　Who told you that?

95

1　　A　　Mr. Strange.
2　　Q　　No. I'm talking about --
3　　A　　Oh, at Troy.
4　　Q　　-- at Troy.
5　　A　　Oh, I'm sorry.
6　　Q　　Yeah.
7　　A　　Dr. Ruediger.
8　　Q　　Anybody other than Dr. Ruediger?
9　　A　　No.
10　　Q　　Now, I guess I should back up with
11　that other question, because you answered
12　Strange. Did anyone from Troy University
13　ever say that you were wrong in how you
14　interpreted the special education law?
15　　A　　No.
16　　Q　　And you said Dr. Ruediger said you
17　were right?
18　　A　　That's correct.
19　　Q　　Specifically, did he do that one
20　time, in one meeting, or when did that occur?
21　　A　　At the observation, when we
22　discussed the issues.
23　　Q　　Was that the August 24th
24　observation?
25　　A　　Yes. That was the first.

96

1　　Q　　Any other time?
2　　A　　Not that I can recall right now.
3　　Q　　And what did Dr. Ruediger
4　specifically say about that?
5　　A　　That I was correct, in that there
6　should have been IEP's for the homebound
7　students, there should be IEP's for all
8　students. That one of the students who had
9　not had an IEP since what I was told was her
10　first day at Houston County, which was in
11　January of '05, that she --
12　　　　MR. BRANTLEY: '05 or '04?
13　　　　MR. WALDING: She said '05, Tom.
14　　　　THE WITNESS: January -- let me
15　　　　see. '04. Excuse me. Thank
16　　　　you. Yes. January of '04.
17　　A　　That there should have been an
18　eligibility -- the IEP process should have
19　been started over. That the IEP's should
20　reflect being in the general education
21　classroom instead of the resource room. That
22　accommodations should be listed specific to
23　the general education room, and goals should
24　be listed specific to the general education
25　room, and that testing materials should be

97

1  available in order to help make those
2  decisions.
3      Q    And did he say anything else other
4  than what you've told me?
5      A    Not that I can recall.
6      Q    And was there any other time that
7  he talked to you about whether you were right
8  in your assessment as to the special
9  education law other than this August 24?
10     A    Not that I can recall.
11     Q    And did he actually look at any of
12 the student files?
13     A    No.
14     Q    So, the information he would have
15 received with regard to what was happening at
16 Houston County High, would that have been
17 through you?
18     A    Yes. And he also questioned Mr.
19 Strange, as well.
20     Q    Were you present when he questioned
21 Mr. Strange?
22     A    Yes.
23     Q    And what did he ask Mr. Strange?
24     A    About the noncompliance issues.
25     Q    But, what did he say to Mr.

98

1  Strange?
2      A    He asked about the noncompliance
3  issues, and if they were being addressed, and
4  asked him if he was under the impression they
5  should be addressed, and would anything be
6  remedied.
7      Q    And did he do this on the 24th?
8      A    Yes.
9      Q    And what did Mr. Strange say, if
10 anything?
11     A    I don't recall specifically. I
12 know he was uncomfortable. Dr. Ruediger had
13 made a comment to me afterward that, you
14 know, he did not maintain any kind of eye
15 contact, so he felt that Mr. Strange was
16 uncomfortable with the situation, you know,
17 being asked questions about those issues.
18     Q    Now, I know you didn't like the
19 scores that Dr. Ruediger gave you in that
20 September observation. Correct?
21     A    Uh-huh.
22     Q    I'm sorry. That was a "yes"?
23     A    Yes. That was a "yes."
24     Q    Is there anything else that
25 Dr. Ruediger did that you did not like with

99

1  regard to him being your advisor?
2      A    Not that I can think of at this
3  time. I respected his opinion, and asked for
4  his advice, and appreciated, you know, what
5  help he could give me.
6      Q    Did you ever take any classes with
7  Dr. Ruediger --
8      A    Yes.
9      Q    -- at any other time?
10     A    Uh-huh.
11     Q    And in any of those other classes,
12 do you recall your grades?
13     A    I got A's and B's.
14     Q    Did you ever question any of the
15 grades he gave you?
16     A    No.
17     Q    Did you ever disagree with any of
18 the grades he gave you in those classes?
19     A    Probably, on occasion. Maybe on a
20 paper that I wrote or something like that.
21 But I certainly accepted, you know, and
22 appreciated his critique.
23     Q    Did you have any classes with
24 Dr. Jones?
25     A    Only the internship seminar class,

100

1  that I can recall.
2      Q    And did you take any classes with
3  Dr. Parris?
4      A    Ms. Parris.
5      Q    Ms. Parris. I'm sorry.
6      A    Yes. Just that first class, when
7  we were getting into the teacher education
8  program.
9      Q    Was that the first education class
10 you took at Troy?
11     A    I don't recall. It was probably
12 one of them.
13     Q    And you took classes with
14 Dr. Morin?
15     A    Yes.
16     Q    And did you ever take classes with
17 Dr. Lumpkin?
18     A    No.
19     Q    Who were some of your other
20 professors at Troy-Dothan in the education
21 department?
22     A    Right. Dr. Fell. I don't remember
23 her first name, right offhand.
24     Q    How do you spell her last name?
25     A    F-e-l-l. Dr. Davis. I believe it

101

1 was Kirk Davis. Kirk. I think it's Kirk.
2 And let me see who else. A Mr. Miller for
3 math. I can't remember all of them.
4     Q    Okay. That's fine. Now, earlier,
5 I think you had mentioned a neighbor that you
6 had spoken to.
7     A    Yes.
8     Q    What was that neighbor's name?
9     A    Oh, let me think. Vandergeest.
10 Carol Vandergeest. She's moved away, and I
11 have no clue where she is.
12     Q    And what were the circumstances
13 that you were talking to her?
14     A    If I remember correctly, it was
15 when I had been administratively withdrawn.
16 And she thought that was highly unusual. And
17 I just said there were some noncompliance
18 issues at the school I was at.
19     Q    Did you tell her what those
20 noncompliance issues were?
21     A    No.
22     Q    Give her any details about what
23 actually happened other than you had been
24 administratively withdrawn?
25     A    No.

102

1     Q    Where were you at when you told her
2 this?
3     A    I believe I was at her house.
4     Q    Anyone else present?
5     A    Her children might have been.
6     Q    Were they minor children?
7     A    Yes.
8     Q    And how long were you speaking to
9 her about your situation at Troy and Houston
10 County High School?
11     A    Not long at all.
12     Q    And you said she was also an
13 educator?
14     A    Yes. She was getting her master's.
15     Q    At Troy?
16     A    Yes.
17     Q    And was she also teaching at a
18 school?
19     A    No, not to my knowledge.
20     Q    Do you know whether she worked
21 anywhere?
22     A    I think, eventually, she might
23 have, but I don't know where it was.
24     Q    But, at that time, was she a
25 homemaker?

103

1     A    Yes, I believe so.
2     Q    Now, for your second internship,
3 did you have another TEP meeting?
4     A    Yes.
5     MR. FAULK: What kind of meeting?
6     THE WITNESS: TEP, T-E-P.
7     MR. MUSSO: T-E-P. Teacher
8          education --
9     THE WITNESS: Program.
10     MR. MUSSO: -- program meeting.
11     (Whereupon, Defendant's Exhibit 34
12          marked for identification.)
13     Q    (By Mr. Musso) Take as much time
14 as you need to read this. Let me know when
15 you've finished looking at it. I'm going to
16 give a copy to your lawyer.
17     A    (Witness reviewing document.)
18     Q    And I'll kind of go ahead and let
19 you know where I'm heading with this. I'm
20 basically just wanting to know if there's
21 going to be anything in here you disagree
22 with.
23     A    (Witness reviewing document.)
24 Okay.
25     Q    First of all, let me ask you, did

104

1 you actually have a TEP meeting on November
2 30th?
3     A    Yes.
4     Q    Do you recall having any other TEP
5 meeting before your Beverlye internship?
6     A    Yes. We had one before my
7 internship, that we discussed last time.
8     Q    I'm sorry. That was before your
9 Houston County High?
10     A    Yes.
11     Q    Okay. And this one was before your
12 Beverlye?
13     A    That's correct.
14     Q    Did you have any other TEP meetings
15 other than those two?
16     A    No.
17     Q    Now, who is Jim Windle? Do you
18 know?
19     A    I have no clue.
20     Q    Okay. Victoria Morin, that would
21 be Dr. Morin? Correct?
22     A    Correct.
23     Q    And Elizabeth Fell, you had
24 mentioned, was a professor?
25     A    Yes.

105

1    Q    Cynthia Lumpkin, that would be
2  Dr. Lumpkin?
3    A    Yes.
4    Q    What about Cynthia Hicks?
5    A    I don't recall who that is.
6    Q    Gary Manfready?
7    A    Manfready.  He was a newer
8  professor, and I -- he was the one who was
9  the professor for the new internship seminar
10  class that I would be attending when I was at
11  Beverlye.
12    Q    Oh, okay.  So, he was your
13  instructor for that?
14    A    Right.  He was one of them.  And
15  then, JoAnn McFarland, if I remember
16  correctly, was the second one.  There were
17  two.
18    Q    And what about Rita Farver?
19    A    Rita Farver.  I never had her for a
20  class, but she was -- I believe she taught
21  classes there.
22    Q    And I may have already asked you
23  this, and I apologize if I have.  But, who
24  basically held the role that Dr. Ruediger
25  held when you were at Beverlye, and was your

106

1  advisor?
2    A    Who was my advisor at Beverlye?
3    Q    Yes.
4    A    Dr. Morin.
5    Q    Dr. Morin.  Now, I guess probably
6  the most efficient way is, in this first
7  paragraph, do you disagree with anything
8  that's written in this first paragraph?
9        MR. FAULK:  Excuse me.  Are you
10        asking her if it accurately
11        reports what was said --
12        MR. MUSSO:  I'm going to get to
13        that.
14        MR. FAULK:  -- or are you asking
15        her whether she agrees with the
16        assertions that were made by
17        them at the meeting?
18    Q    Okay.  Let me put it this way.
19  First of all, do you know who actually
20  prepared this document?
21    A    No.
22    Q    Okay.  Now, in this meeting, did
23  Ms. Parris say that it would be a new
24  beginning in this internship?
25    A    Yes.

107

1    Q    And did she ask you to tell her
2  what kind of support she felt you needed and
3  would like to have?
4    A    Yes.
5    Q    Okay.  And did you respond that you
6  would like the normal support, answers to
7  e-mails, and if you have a question, you
8  would like it answered directly?
9    A    Yes.
10    Q    And was there anything else that
11  you said with regard to her question that's
12  not listed here?
13    A    I don't really recall.
14    Q    Okay.  Now, Dr. Morin said that
15  Mrs. Miller had indicated that she didn't get
16  support.  Is that something that you had
17  indicated to Dr. Morin?
18    A    I had actually indicated that to
19  Dr. Ruediger and Ms. Parris.
20    Q    Do you ever recall indicating that
21  to Dr. Morin?
22    A    I had not seen Dr. Morin until that
23  TEP minutes since the last class I had with
24  her, if I remember.
25    Q    During this TEP, did you indicate

108

1  to her or anyone else that you didn't get
2  support in your first internship?
3    A    At that meeting?  If I remember
4  correctly, I elaborated a little bit on that.
5  Yes.
6    Q    So, there would be a reason for
7  Dr. Morin to have knowledge that you had
8  indicated you didn't get support?
9    A    Somebody must have told her.  Yes.
10    Q    Now, did you ever respond that this
11  school, meaning Troy University Dothan, told
12  you one thing, and the other school told you
13  another?
14    A    They didn't ask me to elaborate on
15  that.
16    Q    But, did you tell them something to
17  that effect?
18    A    Yes.
19    Q    But that's not something you
20  elaborated on during that meeting?
21    A    Correct.
22    Q    As we sit here today, what did Troy
23  tell you on one hand, and the other school
24  tell you on the other?
25    A    Okay.  Troy University tells me

109

1 that there are certain things that need to be
2 done with the students' IEP's and the whole
3 IEP process sort of thing. And the other
4 school is basically saying, hey, look, you
5 know, they've already been done last May.
6 The administration is not going to want to
7 hold the meetings all over again. So, this
8 is the way it is for now.
9     Q    And the other school being Houston
10 County High?
11     A    Houston County High School.
12     Q    Was there some discussion at this
13 TEP meeting with regard to the inability of
14 anyone -- let me just put it this way.
15 September 24th, you tried to contact some
16 folks at Troy?
17     A    That's correct.
18     Q    And they did not get back with you
19 on the 24th? Right?
20     A    That's correct.
21     Q    And I think you said they didn't
22 get back with you that Saturday?
23     A    That's correct.
24     Q    And that the first person you spoke
25 to was Ms. Parris that following Monday?

110

1     A    That's correct.
2     Q    Okay. So, at this TEP meeting on
3 November 30th, was it discussed with regard
4 to your being able to communicate with people
5 in your next internship?
6     A    Yes.
7     Q    And were there any types of
8 understanding or agreements reached?
9     A    Yes.
10     Q    Okay. And what were those?
11     A    That I would need to know that,
12 probably on Fridays, it would not be a good
13 day to contact anybody, although, previous to
14 that, they had indicated the fact that they
15 try to check their e-mails and their phone
16 calls and that sort of thing, but sometimes
17 they don't.
18     Q    Now, in a couple of places here, it
19 says Dr. Ruediger explained that -- "He
20 emphasized that our faculty wants her to be
21 successful, and part of that is our wanting
22 to support her." Did he say that at this
23 meeting, or something to that effect?
24     A    He must have.
25     Q    But, do you recall one way or the

111

1 other?
2     A    I don't really recall.
3     Q    But you don't have any reason to
4 doubt that he said it?
5     A    No, I don't.
6     Q    Do you recall how long this meeting
7 lasted?
8     A    No. Probably 10, 15 minutes.
9     Q    Do you see the bottom paragraph on
10 the first page that says, "Dr. Lumpkin asked
11 Mrs. Miller if there was anything new that
12 she had learned in this internship that she
13 would carry into the next one. After a long
14 pause, Mrs. Miller said that she will never,
15 when asked, do illegal or unethical things."
16 Do you recall that conversation taking place?
17     A    Yes.
18     Q    And that accurately reflects what
19 happened?
20     A    Yes. At that point in time, I
21 didn't feel that I could say a whole lot,
22 because, to be honest, I didn't trust anybody
23 too much. You know. I mean, I just didn't
24 have a whole lot of trust.
25     Q    When you say you didn't have a

112

1 whole lot of trust, was there anyone in
2 specific you didn't have a whole lot of
3 trust?
4     A    Well, Dr. Ruediger, like, here,
5 he's explaining that he went back to his
6 deleted e-mails, and there weren't any. But
7 as part of the exhibits, there is an e-mail
8 addressed to him stating that I was leaving
9 the campus. And he says that he received
10 none. Just little things like that.
11     Q    Anyone other than Dr. Ruediger you
12 had a lack of trust?
13     A    Pam Parris.
14     Q    Anyone other than Dr. Ruediger and
15 Pam Parris?
16     A    No. Because I did not feel that
17 they were privy to the information that Pam
18 Parris and Dr. Ruediger were privy to.
19     Q    When you say "they," that would be
20 the other individuals at the meeting?
21     A    Correct.
22     MR. BRANTLEY: When you asked her
23        is there anybody else she
24        trusts or does not trust --
25     MR. MUSSO: And I was talking about

113

1    at the meeting.
2        MR. BRANTLEY:  You were just
3    talking about at the meeting.
4    Okay.  I just wanted to clear
5    that up.
6    Q    I guess that just leads me to say,
7    is there anyone you don't trust at Troy who
8    wasn't at the meeting?
9        MR. BRANTLEY:  At Troy?
10        MR. MUSSO:  At Troy.  Yeah.  I'm
11    not talking about Houston
12    County.
13    A    Well, Dr. Jones.
14    Q    Anyone other than Dr. Jones,
15    Dr. Ruediger and Ms. Parris?
16    A    No.
17    Q    And then, it says, "Dr. Morin
18    stated that she does not know the
19    particulars, but that Mrs. Miller needed to
20    figure out a way to work with people."
21    A    Right.  I found that interesting,
22    that she didn't know the particulars, her
23    being the special education department head.
24    But, again, you know, that goes back to what
25    Ms. Parris was indicating, my inability -- or

114

1    my causing dissension among the faculty.
2        And I'd like to clarify that.  It wasn't
3    dissension -- that was what Mr. Pitchford had
4    told her, is what she told me.  And it wasn't
5    dissension among the faculty.  It was
6    dissension between perhaps me and Ms. Ezell,
7    maybe a personality conflict there, or Mr.
8    Strange, and the fact that, you know, he's
9    asking me to do things that I'm not supposed
10    to be doing.  So, you know, it wasn't amongst
11    the whole entire faculty or anything like
12    that.  It was just that I was pissing people
13    off.  Excuse me.
14    Q    Now, Dr. Morin.  Do you have any
15    knowledge, one way or the other, whether
16    Dr. Morin knew any of the particulars?
17    A    I don't know that she did or
18    didn't.  All I can say is, in this particular
19    TEP minutes, she says that she doesn't know
20    the particulars.
21    Q    Did she say that at the meeting,
22    that you recall?
23    A    Yes.
24    Q    Did you, at any time, try to take
25    her aside to tell her any of the particulars?

115

1    A    Not at that particular point in
2    time.  No.
3    Q    At any particular point in time,
4    did you?
5    A    I actually had wanted to do that,
6    but it didn't really -- it was past news.
7    You know.
8    Q    I know you said you wanted to do
9    that, but did you?
10    A    No.
11    Q    And she, Dr. Morin, stressed that
12    she wanted this to be a successful internship
13    for her.  Did she say that at the meeting?
14    A    Yes.
15    Q    Did you believe her?
16    A    Yes, I did believe her.
17    Q    Did she do everything she could to
18    try to make it successful?
19    A    Yes.
20    Q    Did Dr. Lumpkin say that she wanted
21    to be positive and go from there?
22    A    I don't recall Dr. Lumpkin saying
23    that, but I have no reason to doubt it.
24    Q    And did Dr. Ruediger ask if you
25    felt comfortable with what is expected of

116

1    you?
2    A    I do recall.  Yes.
3    Q    And do you recall responding "yes"?
4    A    Yes.
5    Q    Did Ms. Parris invite you to come
6    to orientation?
7    A    I believe she did.
8    Q    In reading this document, No. 34,
9    was this an accurate reflection, to the best
10    of your memory, as to what happened at this
11    November 30th, 2004, TEP meeting?
12    A    Yes.
13    Q    Is there anything you recall
14    happening at this meeting that, if you were
15    writing the minutes, you would have put in?
16    A    No, I don't believe so.
17    Q    Now, did Dr. --
18        MR. FAULK:  I'm sorry.  Did she
19        answer?
20        MR. MUSSO:  Yeah.  She said, "No, I
21        don't believe so."
22    Q    Am I correct?
23    A    Yes.
24    Q    Now, did Dr. Morin actually come
25    and do observations when you were at

117

1 Beverlye?
2     A    Yes.
3     Q    And what were your scores?
4     A    The first one, she comes in, and
5 she's extremely hard. That's the mentality
6 of the process. You know. You come in
7 there. This person, no matter how good they
8 are, is not a perfect teacher, so we're going
9 to start a little lower. So, she gave me, I
10 believe it was, one or two 2's, which means
11 needs work and needs improvement, and 3's and
12 4's. And, eventually, I believe by probably
13 the third time she was there, maybe even
14 second, I was getting 4's -- 3's, 4's and
15 5's.
16     Q    Did you have any problems with the
17 1's and 2's that she may have given you?
18     A    No.
19     Q    So, you thought that they were
20 fair, whether you agreed with them or not?
21     A    Right. That was her call.
22     Q    Did she have a reputation as being
23 a hard teacher?
24     A    Absolutely.
25     Q    I can't remember if I asked you

118

1 this. Did you request her to be your --
2     A    No.
3     Q    She was just assigned to you?
4     A    Yes.
5     Q    And did you have any trepidation
6 going in, the fact that she was going to be
7 it?
8     A    A little nervous. Yes.
9     Q    She had done it for other students,
10 too? Right?
11     A    Oh, yes.
12     Q    Now, do you know whether Dr. Jones
13 still teaches out there or whether she's
14 retired?
15     A    I believe someone told me that they
16 thought she had retired.
17     Q    And do you know if Ms. Parris is
18 still employed at Troy?
19     A    I believe she had moved on, as
20 well.
21     Q    Do you know why she moved on?
22     A    No.
23     Q    And Dr. Ruediger, do you know
24 whether he's still teaching there?
25     A    I believe he's still there.

119

1     Q    Now, if you had to go out there and
2 take any graduate courses, would you take any
3 of these courses with Dr. Ruediger?
4     A    No, not any more.
5     Q    If Dr. Jones, say, were teaching a
6 course out there, if she wasn't retired, or
7 came back to teach a one-time special course,
8 would you take a course from Dr. Jones?
9     A    I've never really thought about it.
10 Don't know that I would really have an
11 opinion on that.
12     Q    Is there any professor, if you go
13 back to take any graduate courses, that you
14 would not have them as a teacher because of
15 anything that happened to you at Houston
16 County High?
17     A    Not that I can think of.
18     Q    Or anything that happened to you
19 because of your internship?
20     A    Not that I can think of.
21     Q    I mean, there may be some teachers
22 you just don't want to take, period, for
23 whatever reason, that doesn't have to do with
24 your internship or Houston County High.
25     A    I enjoyed all of my teachers that I

120

1 had. And may I also say that I very much
2 enjoyed Dr. Ruediger's classes, too. I had a
3 lot of respect for him then.
4     Q    Do you need to take a break?
5     A    (Witness shaking head in negative.)
6     Q    Are you sure? We can take a break
7 if you want to.
8     A    (Witness shaking head in negative.)
9     Q    Now, you understand that I
10 represent Dr. Ruediger, Ms. Parris and
11 Dr. Jones? Correct?
12     A    Yes.
13     Q    I need to ask you a damages
14 question. Do you want money from any of
15 those three people?
16     MR. FAULK: I think we're suing
17     them for money.
18     Q    Well, you know, the question now
19 I'm asking today, do you want money from any
20 of those people? If you win the lawsuit, do
21 you want them to write you a check?
22     MR. BRANTLEY: I'm going to object
23     to form.
24     MR. MUSSO: You can object, but she
25     can answer. It's her lawsuit.

121

1    MR. WALDING: He didn't ask y'all.
2    MR. BRANTLEY: And I'm objecting.
3         I'm not testifying.
4    A    I don't know of any other way that
5    these people can be held responsible for
6    their behavior towards people who want to
7    become a teacher.
8    Q    So, you do want money if you win?
9    A    I want them --
10   MR. BRANTLEY: She's not through.
11        She's trying to answer your
12        question.
13   A    I want them to compensate somehow
14   for their behavior. And that may be the only
15   recourse I have.
16   Q    Can you think of any other recourse
17   that you would have with those three
18   individuals?
19   A    At this point in time, I've never
20   really given it any thought. So, I just
21   don't know what to say at this time.
22   Q    But I guess the question still is,
23   do you want money from them?
24   MR. BRANTLEY: Object. Asked and
25        answered.

122

1    MR. MUSSO: No. She still hasn't
2         said whether she wanted money
3         or not.
4    MR. BRANTLEY: I think she has.
5    MR. MUSSO: No.
6    A    I want them to compensate me in
7    some manner.
8    Q    And would you want part of that
9    compensation to be monetary?
10   A    If that's what's deemed
11   appropriate, then, yes.
12   Q    So, if that's what a jury says,
13   you'll take the money?
14   A    I hope that wouldn't be all that
15   the jury would say.
16   Q    Can you think of any other way they
17   could compensate you, other than monetarily?
18   A    I'm not a lawyer, so I don't know
19   what other kinds of compensation I would be
20   entitled to.
21   MR. FAULK: That would call for a
22        legal conclusion.
23   Q    Well, you've graduated? Right?
24   A    Yes.
25   Q    So, they can't do anything with

123

1    regards to helping you graduate. You've
2    already graduated.
3    A    Correct.
4    Q    You would agree that they can't get
5    you your job back at Houston County High?
6    A    I wouldn't think so.
7    Q    I mean, as far as you know, they
8    don't work there? Right?
9    A    Correct.
10   Q    They don't get to make the
11   decisions as to who works at Houston County
12   High? Right?
13   A    Correct.
14   Q    Did Dr. Ruediger or Dr. Jones or
15   Pam Parris ever tell you that they wanted you
16   to take the internship again?
17   MR. FAULK: You're talking about at
18        Houston County?
19   MR. MUSSO: No. At Beverlye.
20   Q    Let me put it this way. I think,
21   in your other deposition, you said, at the
22   point where your internship at Houston County
23   High was going to end, you had to make some
24   decisions? Correct?
25   A    Correct.

124

1    Q    Okay. One of those decisions would
2    be that, you know, I've had enough. I'm not
3    going to do this internship again, if you had
4    chosen to do that? Correct?
5    A    Right. The offering of another
6    internship was not offered to me initially.
7    It wasn't until my husband made some comments
8    to Ms. Parris and Dr. Ruediger. And then, he
9    questioned, would another internship -- what
10   about another internship. And I believe
11   that's when she said that I would have to
12   request that through Dr. Jones.
13   Q    And did you request that through
14   Dr. Jones?
15   A    Yes, I did.
16   Q    And was that a formal request in
17   writing?
18   A    Yes.
19   Q    And did Dr. Jones grant that
20   request?
21   A    Yes.
22   Q    Did Dr. Jones ever tell you that
23   she wasn't going to grant that request?
24   A    No.
25   Q    Did anyone ever tell you they

125

1  weren't going to grant that request?
2      A    No.
3      Q    But that was a choice you had to
4  make? Right?
5      A    Yes.
6      Q    That you wanted to take the --
7      A    They had several options that they
8  read in the handbook. And I don't believe
9  another internship was one of the options.
10  But they eventually --
11      Q    But I think one of the options was
12  basically a catch-all, what we deem
13  appropriate? Am I correct?
14      A    They had actually listed things,
15  and it said that it was not limited to.
16      Q    So, being not limited to means that
17  they have kind of options to --
18      A    Other possibilities. But, from
19  what I understand, it was highly irregular.
20      Q    And did you ever consider not doing
21  that other internship at Beverlye?
22      A    Absolutely not.
23      Q    So, it's something you wanted to
24  do?
25      A    Absolutely. I want to be a special

126

1  education teacher.
2      Q    Now, did Dr. Jones, Dr. Ruediger or
3  Ms. Parris ever tell you not to do the
4  Beverlye internship?
5      A    No.
6      Q    Did either of them ever encourage
7  you to go ahead and do that internship, and
8  not take any of those other options?
9      A    No.
10      Q    Did any of them recommend the other
11  options instead of this internship?
12      A    Ms. Parris listed them, here are
13  your options. And then, when my husband --
14  and that was all she said. And then, my
15  husband, if I remember correctly, after he
16  said a few things, asked about another
17  internship.
18      Q    After you had decided that you
19  wanted this other internship, did Dr. Jones
20  ever tell you that she wanted you to be
21  successful with that?
22      A    I never had any communication with
23  her after that.
24      Q    Did Dr. Ruediger ever tell you he
25  wanted you to be successful?

127

1      A    Not until this TEP meeting.
2      Q    And did he ever tell you anything
3  to that effect after the TEP meeting?
4      A    I never -- I don't believe I saw
5  him after that TEP meeting.
6      Q    Did you ever talk to him at all,
7  other than maybe that one time you nodded at
8  him when you gave the presentation?
9      A    No.
10      Q    And the same for Pam Parris. After
11  this TEP meet, did you ever have any
12  communication with Pam Parris?
13      A    Yes.
14      Q    Was that with regard to your
15  Beverlye internship?
16      A    It was at the end of my internship.
17  It was the day when we all were to bring our
18  paperwork.
19      Q    And did you have any problems with
20  Ms. Parris during your Beverlye internship?
21      A    No. I didn't have any
22  communication with her at all.
23      Q    Now, I think earlier you used the
24  term "past news" with regard to your
25  situation at Houston County High, by the time

128

1  you were having this TEP meeting on November
2  the 30th?
3      A    Right. They told me that it was a
4  forgotten thing. It would be in a file. No
5  one would ever see any of that information.
6      Q    Do you know whether anyone did see
7  that information from that file?
8      A    I don't know. I would have no way
9  of knowing that.
10      Q    And did you have any problem with
11  them saying it's going to be a forgotten
12  thing?
13      A    No.
14      MR. FAULK:  I'm sorry. Who are
15        "they"?
16      MR. MUSSO:  "They" being the Troy
17        people at the TEP meeting.
18      MR. FAULK:  Okay.
19      MR. BRANTLEY:  And, also, if you
20        would, please, define the
21        phrase "Did you have any
22        problem with."
23      MR. MUSSO:  Well, okay.
24      Q    They said it's a forgotten thing?
25      A    The first internship, yes.

129

1    Q    Okay.  So, you didn't disagree with
2  them saying, "Hey, this is a forgotten thing.
3  We're going to put it in a file.  It's not
4  going to affect your further internship"?
5    A    Right.
6    Q    You didn't want it to affect your
7  further internship?  Right?
8    A    No.
9    Q    And as far as you know, it's not
10  something that was ever communicated to
11  anyone else --
12    A    I don't know.
13    Q    -- outside of the Troy department?
14    A    I have no clue.
15    Q    Okay.  When you apply for jobs, do
16  you list references?  Any of your teachers at
17  Troy as references?
18    A    I haven't applied for a job since I
19  had my initial application in.  I've started
20  them on the internet, but I haven't gotten
21  that far to where they need references.
22    Q    Do you know whether any of them do
23  need references?
24    A    I don't know, offhand.
25    Q    When you applied at Beverlye, did

130

1  you have to list any references of teachers?
2    A    No.
3    Q    Did you have to list any
4  references, period?
5    A    I had already turned in my resume.
6  They had that at the central office.  So,
7  they just used that.
8    Q    And they had already known about
9  your work, because you were an intern?
10  Correct?
11    A    Yes, as far as I know.
12    Q    And you weren't reappointed at
13  Beverlye?
14    A    I was there for a semester, kept on
15  for the next year, and then, was not renewed.
16    Q    Do you know why you weren't
17  renewed?
18    A    I know what I was told.  I mean,
19  not by Mr. Norris or anybody.
20    Q    What were you told?
21    A    That there was -- things were going
22  to change, and that there was just going to
23  be some new people coming in.
24    Q    And who told you that?
25    A    Gosh.  I'm not real sure.  I'm not

131

1  real sure who it was.
2    Q    But, when they say "new people
3  coming in," do you know who those new people
4  were?
5    A    They had an idea.
6    Q    And do you know why there were
7  going to be changes?
8    A    No.
9    Q    Do you have any idea what those
10  changes were going to be?
11    A    No.
12    Q    Is there someone there now at
13  Beverlye doing that same job you were doing?
14    A    There's been a couple of new hires
15  over there.
16    Q    Anyone doing the collaborative
17  special ed?
18    A    I don't know about collaborative.
19  I don't know.
20    MR. MUSSO:  That's it, gentlemen.
21    MR. FAULK:  Thank you.
22    (Recess in deposition.)
23
24
25

132

1             EXAMINATION
2
3  RESUMED BY MR. WALDING:
4    Q    Mrs. Miller, I apologize, but I've
5  got some more questions for you.
6    A    That's all right.
7    Q    I'm going to try not to beat a dead
8  horse, though.
9    A    I hate to see dead horses.
10    Q    Now, during your first deposition,
11  or the first part of your deposition,
12  whichever it is, you identified about four
13  different concerns or problems that you saw
14  in the Houston County system, special ed
15  related, one of which was that students did
16  not have IEP's.
17        Another was that, in your opinion, IEP's
18  that you looked at were inappropriate for the
19  students.
20        Another was that a lady named Cathy
21  Keasler asked you to actually write an IEP,
22  and that you were not permitted to do that
23  under your internship agreement.
24        And I believe another was, you became
25  somewhat upset when a lady named Starla asked

133

1 you to sign on a document when you had not
2 actually been present for the meeting.
3      Are those the concerns that you talked
4 to me about during your first deposition?
5      A    Yes.
6      Q    All right.  Now, for the rest of my
7 questions, I'm going to use the phrase
8 "concerns" or "problems."  And those are the
9 things I'm referring to.  Okay?
10     A    Okay.
11     Q    Is that all right with you?
12     A    Yes.
13     Q    And you'll know what I'm talking
14 about when I say that?
15     A    Yes.
16     Q    Okay.  Now, in listening to your
17 testimony today, it appears that you
18 expressed those concerns, problems, to
19 various people associated with the Houston
20 County School System.  Is that true?
21     A    Yes.
22     Q    All right.  I'd like you to
23 identify for me who with the Houston County
24 School System you identified those problems
25 to?

134

1      A    That would be my supervisor, my
2 cooperating teacher, Paul Strange.
3      Q    Okay.
4      A    Principal Tim Pitchford.
5      Q    All right.
6      A    Riley Joe Andrews.
7      Q    All right.
8      A    And to my recollection, I believe
9 -- actually, I spoke to Ms. Monday about one
10 of the boy's IEP's.  Well, not the IEP
11 exactly.  The fact that she had failed him,
12 and he was having to take a science class
13 again.  And this was a student with mental
14 retardation.  So, I did ask her some
15 questions about those concerns.
16     Q    Are those all the persons
17 associated with the Houston County School
18 System that you addressed your concerns or
19 problems to?
20     A    In a roundabout way, I guess you
21 could say I discussed them with Ms. Towns,
22 because she being the teacher of record for,
23 for instance, the math classes, I discussed
24 IEP's with her and the lack of, you know,
25 accommodations, as well as with Ms. Ezell.

135

1      In fact, all of the students that I had
2 on my roll, I went to each one of the
3 teachers to discuss their IEP's, what was
4 there, if there was one there.  If there
5 wasn't one there, I indicated that, and told
6 them that we would have to make sure that
7 when we did get some sort of IEP for that
8 student, we would come around to them and
9 explain any kind of accommodations that might
10 be needed, the goals and that sort of thing,
11 for those students.
12     Q    Okay.  I want to make sure I'm
13 understanding every person within the Houston
14 County School System you identified your
15 problems or concerns with.  You told me Paul
16 Strange?
17     A    Yes.
18     Q    Tim Pitchford?
19     A    Yes.
20     Q    Riley Joe Andrews?
21     A    Yes.
22     Q    Ms. Monday?
23     A    Ms. Monday.
24     Q    Ms. Towns?
25     A    Ms. Towns.

136

1      Q    Ms. Ezell?
2      A    Yes.
3      Q    And then, you mentioned teachers
4 for students who were on your roll?
5      A    Right.  And Ms. Sims was another
6 one.
7      Q    Was she one of the teachers?
8      A    Yes.
9           MR. BRANTLEY:  That you had a
10               problem with or a concern?
11          THE WITNESS:  These were --
12          MR. WALDING:  My question was very
13               clear.
14     Q    Did you misunderstand my question?
15     A    I don't believe so.  You asked me
16 who I discussed the IEP's --
17     Q    Your problems and concerns.
18     A    Right.
19     Q    You agreed you would understand
20 what I meant when I said that.
21     A    And you said the IEP's, not having
22 them and inappropriate ones.  So, those are
23 what I spoke to them about.
24     Q    Right.
25     A    Yes.

137

1   Q    All right.  Are those all the
2   persons that you expressed your problems or
3   concerns to?
4   A    If they were on -- if the students
5   were on --
6           MR. FAULK:  Connected with the
7               Houston County Board?
8           MR. WALDING:  Yes.  I'm sorry.
9               Connected with the Houston
10              County School System.
11  A    If the students were on my roll, I
12  went to each one of those teachers with their
13  IEP's and showed them the information that I
14  had at that time with those IEP's, to let
15  them know.
16  Q    So, there may be some name that you
17  just don't remember that was a teacher with
18  the system?
19  A    Correct.
20  Q    All right.  Now, I want to ask you
21  this:  When you went to those teachers whose
22  names you may not remember, would you have
23  done that during school hours?
24  A    Generally, yes.
25  Q    And would you have done that as

138

1   part of your duties as an intern and a
2   teacher?
3   A    Some aspects, yes.
4   Q    Okay.  Let's go to Paul Strange.
5   When you talked with Paul Strange, did you do
6   that during school hours?
7   A    Yes.  Sometimes after school.
8   Q    Okay.  Well, was it at the school
9   facility?
10  A    Generally, yes.
11  Q    What about Tim Pitchford?  Did you
12  speak with him during school hours?
13  A    Yes.
14  Q    And was that also at the school
15  facility?
16  A    Yes.
17  Q    Riley Joe Andrews.  When you spoke
18  with him, you spoke with him at the central
19  office location?
20  A    Yes.
21  Q    And that was also during school
22  hours, was it not?
23  A    Yes.
24  Q    Ms. Monday.  You talked with her
25  during school hours?

139

1   A    Yes.
2   Q    And was that also at a school
3   facility?
4   A    Yes.
5   Q    Ms. Towns.  Did you talk with her
6   during school hours?
7   A    Yes.
8   Q    And at a school facility?
9   A    Yes.
10  Q    Ms. Ezell?
11  A    Yes.
12  Q    During school hours?
13  A    Yes.
14  Q    And at a school facility?
15  A    Yes.
16  Q    You mentioned, during the
17  questioning by Mr. Musso, that you had a very
18  short conversation with your neighbor, Carol
19  Vandergeest.
20  A    Uh-huh.
21  Q    Am I saying that last name right?
22  A    Yes.
23  Q    But you did not give her any
24  specifics about your problems or concerns?
25  A    No.

140

1   Q    All right.  You basically just told
2   her that your internship was in jeopardy
3   because of some noncompliance issues?
4   A    Yes.  And the illegal things that
5   they were doing at the school, which are
6   basically noncompliance issues.  Yes.
7   Q    Okay.  But, have I accurately
8   stated what you told Ms. Vandergeest?
9   A    Yes.  I would say that, to my
10  recollection, yes.
11  Q    You didn't specify these four or
12  five problems and concerns?
13  A    Not that I recall.
14  Q    All right.  Good.  And did you say,
15  during your answers to Mr. Musso, that this
16  conversation you had with Ms. Vandergeest
17  happened after you had been administratively
18  withdrawn?
19  A    I believe that was one of the
20  times, yes, that I spoke with her.
21  Q    All right.  Now, you also indicated
22  that you called Sharon Cole at one point.
23  A    Yes.
24  Q    When did you call Sharon Cole?
25  A    When I went to central office on --

141

1  let me look at my calendar to make sure of
2  the date.
3          MR. MUSSO: I think the 24th.
4          THE WITNESS: I think so.
5      A    On the 24th, I called her.
6      Q    And I'm sorry. That's of
7  September?
8      A    Let me double-check. I believe it
9  is. Yes.
10     Q    Just for our record, you're
11 referring to Defendant's what over there?
12         MR. MUSSO: It's 33.
13     A    33. And, yes, the 24th of
14 September.
15     Q    And, again, for our record, what
16 year are we talking about?
17     A    2004.
18     Q    Thank you, ma'am. Okay. I'm
19 sorry. You called her before you went to the
20 central office or after you went to the
21 central office?
22     A    I called her -- let me think. I
23 believe it was before I was at the central
24 office. I believe I called from Dothan High
25 School.

142

1      Q    And if I recall correctly, what you
2  testified to in your first deposition is that
3  you left the school at Columbia, Houston
4  County High School --
5      A    Yes.
6      Q    -- and you went to Dothan High,
7  where your husband has a position?
8      A    I went to central office, and
9  Mr. --
10     Q    Andrews?
11     A    -- Andrews' truck was not there.
12 And I believe -- I'm not 100 percent sure,
13 but I believe I called Mr. Andrews' office --
14 well, central office, and got the message
15 that he was not there, and so -- he was
16 expected back.
17         And so, I figured by the time I got to
18 the central office, he would be there. So,
19 that's why I swung by central office. And
20 his truck was not there. So, I went to
21 Dothan High School to call from there,
22 because it was the closest place that I could
23 get to a phone.
24     Q    And your husband has a position
25 there?

143

1      A    Yes.
2      Q    At Dothan High School, I mean.
3      A    That's correct.
4      Q    All right. Tell me what it is you
5  communicated to Sharon Cole?
6      A    I --
7          MR. FAULK: Whoa. Excuse me just a
8          minute. We're going to object
9          to any inquiry about her
10         efforts to obtain -- you know,
11         any actual communications
12         between her and her
13         professional representative, in
14         particular, anything involving
15         a request for legal assistance.
16             We may have to do this in
17         some kind of motion for a
18         protective order or something.
19         But I'm not going to let you
20         inquire into, and I'm going to
21         instruct her not to answer,
22         concerning any communications
23         she had with AEA
24         representatives in the nature
25         of seeking legal assistance.

144

1          MR. WALDING: And your basis for
2          that is what, Mr. Faulk?
3          MR. FAULK: Attorney/client
4          privilege, as well as her right
5          to association and to have
6          support through a professional
7          organization.
8          MR. WALDING: Are you saying that
9          Ms. Cole is a lawyer?
10         MR. FAULK: No, I'm not.
11         MR. WALDING: Because my
12         understanding is that she is
13         not.
14         MR. FAULK: She is, in fact, a
15         conduit to the legal staff at
16         the AEA. And it wound up with
17         the legal staff, and was
18         referred out to Mr. Brantley
19         after those negotiations
20         failed.
21         MR. WALDING: I'm not trying to get
22         into negotiations, but I do
23         want to know about this
24         conversation she had with Ms.
25         Cole.

145

1     MR. FAULK:  We need to take a
2         break.
3     MR. WALDING:  That's fine.
4     (Recess in deposition.)
5     MR. FAULK:  I called and checked.
6         She first sought legal
7         assistance October 20th, 2004.
8     MR. WALDING:  Okay.
9     MR. FAULK:  So, anything from that
10        point forward, we would contend
11        is privileged and not subject
12        to discovery, and would move
13        for a protective order
14        concerning it, whether it went
15        through a paralegal or UniServe
16        director or who, as long as
17        she's in process of seeking
18        legal representation.
19        In any event, up to that
20        point, if you want to talk to
21        her about what she told AEA,
22        that's fine.  And then, when we
23        get to that point, if there's
24        any dispute about it, we might
25        have to make some kind of

146

1         motion.
2     MR. WALDING:  Give me that date
3         again.
4     MR. FAULK:  October 20th, which I
5         think was the day she was
6         actually told to leave the
7         campus, I think.
8     MR. WALDING:  That may be.  I don't
9         know.  Let's go back to my
10        original question, then, which
11        was -- Stacey?
12    (Whereupon, requested portion of
13        record read back by the court
14        reporter.)
15  A     Okay.  On -- let me check the date
16  -- September 24th, I left a message with
17  Sharon Cole.  She did not return my call, I
18  don't believe, until later that evening or
19  maybe the next day.
20        I just told her I was experiencing some
21  problems at Houston County High School
22  concerning IEP's, lack of, inappropriate,
23  being asked to write IEP's.  Concerns that we
24  previously discussed.
25  Q     Those four or five concerns or

147

1  problems?
2  A     Correct.
3  Q     Did you specifically address those
4  four or five concerns or problems with Sharon
5  Cole?
6  A     Yes.
7     MR. FAULK:  You're talking about in
8         the phone message, now?
9     THE WITNESS:  I'm talking about
10        when she finally got back with
11        me.
12    MR. FAULK:  Let's keep it straight.
13        Keep it straight, now.
14    THE WITNESS:  Okay.
15    MR. WALDING:  I was straight.
16    MR. FAULK:  I'm not.
17  A     When she returned my call --
18  Q     Hold on.  I was understanding what
19  you said.  You left Ms. Cole a message the
20  day you went to see Riley Joe Andrews?
21  A     Correct.
22  Q     And she did not call you back until
23  later that evening or the next day?
24  A     Correct.
25  Q     And now you're telling me about a

148

1  telephone conversation you actually had with
2  Sharon Cole, which was later that same -- the
3  evening of that day or the next day?
4  A     Or on that weekend, at some point,
5  when she was able to get back with me.  Yes.
6  And so, I told her that Mr. Andrews had given
7  me permission to not go back to the school
8  until Monday.
9         She said, "That's fine.  Just make sure
10  you go back to the school."
11        I said, "Of course.  I planned on doing
12  that."
13        And that was pretty much the extent of
14  the conversation then.  I did tell her that
15  we were going to have the meeting.  Come to
16  think of it, she did say that she would come
17  to that meeting on the following Monday.
18  Q     And which meeting are you referring
19  to?
20  A     This is the meeting where Mr.
21  Andrews was going to set it up with Ms.
22  Parris, Mr. Pitchford, Mr. Strange, myself.
23  And then, Sharon was going to come, as well.
24  Q     And did this meeting actually take
25  place?

149

1    A   Yes.

2    Q   And where did the meeting take

3  place?

4    A   In the conference room at Houston

5  County High School.

6    Q   Okay. You and I talked about that

7  during your first deposition?

8    A   Yes.

9    Q   What was your purpose in calling

10  Ms. Cole?

11    A   I was an employee, and I felt that

12  I needed some advice from her.

13    Q   And what's your understanding of

14  Ms. Cole's position?

15    A   She is a liaison-type person

16  between the school district and AEA.

17    Q   And is it your understanding that

18  AEA is, in essence, a labor union?

19        MR. FAULK: Oh, bull. Objection.

20        Move to strike.

21        MR. WALDING: I think she can

22        answer that question.

23        MR. FAULK: And it calls for a

24        legal conclusion, among other

25        things, and is utterly

150

1        irrelevant.

2        MR. WALDING: I don't think it's

3        irrelevant at all.

4        MR. FAULK: You know it's not a

5        labor union.

6        MR. WALDING: I don't know anything

7        of the sort, Mr. Faulk.

8        MR. FAULK: You're trying to muddy

9        up the record. We're going to

10        move to strike any such thing.

11        I'm going to go ahead and start

12        my motion in limine now.

13        MR. WALDING: That's great.

14    Q   Would you answer my question?

15    A   I don't know what, in that respect.

16    Q   You were a member of AEA at the

17  time you made the call?

18    A   Yes.

19    Q   What's your understanding of what

20  the organization is?

21    A   It helps teachers with all kinds of

22  benefits and help and advice.

23    Q   Employment-related benefits?

24  Correct?

25    A   I guess that is my understanding.

151

1    Q   Okay. And that's what I'm asking

2  you for, Mrs. Miller, is your understanding.

3  You're a member of this organization?

4    A   Yes.

5    Q   So, I wanted to know what your

6  understanding of what the organization is.

7  Your attorney is objecting to me calling it a

8  labor union, and I understand that. What

9  would you characterize it as?

10    A   An organization that promotes

11  education, rights for their teachers,

12  providing benefits for the teachers, that

13  sort of thing.

14    Q   And you agree with me that it helps

15  to promote employment-related benefits for

16  teachers?

17    A   I believe so.

18    Q   Okay. Did Ms. Cole attend a

19  meeting of any kind between the time you

20  called her on September 24th and when you

21  first sought legal representation on August

22  20?

23    A   She did not attend any meetings.

24        MR. FAULK: Excuse me. Did I say

25        August 20?

152

1        THE WITNESS: No. October.

2        MR. WALDING: You said October 20.

3        I'm sorry. Did I say August?

4        MR. FAULK: Yes.

5        MR. WALDING: Let me restate the

6        question, so we're a little

7        clearer.

8    Q   Between the time you called Ms.

9  Cole, on September 24 of '04, okay, and

10  October 20 of '04, when your attorney is

11  telling me you sought legal representation,

12  did Ms. Cole attend with you a meeting of any

13  kind related to these problems or concerns

14  you had?

15    A   No.

16    Q   To your knowledge, did Ms. Cole

17  ever have any meeting with Tim Pitchford or

18  Kenneth Lord or Riley Joe Andrews between

19  September 24 and October 20?

20    A   It's my understanding she had a

21  phone conversation, at least one phone

22  conversation, but I don't know. I don't

23  know. You would have to ask her.

24    Q   Sure. How did you come about your

25  understanding that she had one phone

153

1　conversation?
2　　　A　　Monday or -- the meeting on Monday,
3　in which she was going to attend, she called
4　me later and apologized that she couldn't
5　make it, but that she had talked to Mr.
6　Pitchford.
7　　　Q　　And what, if anything, did she tell
8　you about that conversation?
9　　　A　　She did not tell me anything, that
10　I can recall.
11　　　Q　　She just said, "I called and talked
12　to Tim Pitchford"?
13　　　A　　That's what I recall.
14　　　Q　　All right.  You and I talked about
15　several communications that you made on this
16　Blackboard system at Troy during your first
17　deposition.  And do you have the exhibits
18　there in front of you?
19　　　A　　(Witness reviewing documents.)
20　　　Q　　I would ask you to look at
21　Defendant's Exhibit No. 10.
22　　　A　　Yes.
23　　　Q　　That's one of the communications
24　you had on the Blackboard system?
25　　　A　　Yes.

154

1　　　Q　　Look over at Defendant's Exhibit
2　No. 11.
3　　　A　　Yes.
4　　　Q　　That's another of the
5　communications you had on this Blackboard
6　system?
7　　　A　　Yes.
8　　　Q　　And I have a notation, Defendant's
9　Exhibit No. 31.  It should be the last
10　exhibit, Mrs. Miller, in that stack.
11　　　A　　Yes.
12　　　Q　　And that is also one of those
13　Blackboard communications?
14　　　A　　Yes.
15　　　Q　　To your knowledge, were there any
16　other communications you made over this
17　Blackboard system that might be related to
18　this lawsuit?
19　　　A　　There could be.
20　　　Q　　And have you seen such?
21　　　A　　I don't have copies of them, but
22　they could -- I don't know if they could
23　still be in the program that they have at the
24　school or what.
25　　　Q　　Have you seen hard copies of them

155

1　produced during the course of this lawsuit?
2　　　A　　No.
3　　　Q　　Would these be the only three that
4　we have hard copies of?
5　　　A　　Yes, to my knowledge.
6　　　Q　　All right.  Let me go back and ask
7　you to look at Defendant's Exhibit No. 17.
8　And I'm going to ask you to look at 18, also,
9　if you want to put a sticky on that, Tom.
10　Let's go with 17 first, though.  Does 17
11　specifically ask Ms. Parris to terminate your
12　internship?
13　　　A　　No, it does not.
14　　　Q　　Okay.  In fact, does it
15　specifically ask Troy to take any action
16　against you?
17　　　A　　No.
18　　　Q　　Look at Defendant's No. 18 for me.
19　Does that letter or document specifically ask
20　Ms. Parris or Troy to terminate your
21　internship?
22　　　A　　No.
23　　　Q　　Does it specifically ask Ms. Parris
24　or Troy to take any action against you?
25　　　A　　No.

156

1　　　Q　　Now, Mr. Musso asked you, as to
2　each of his clients, whether you wanted to be
3　compensated from them and whether you wanted
4　to be paid money.  I want to ask you the same
5　question as to each of my clients.
6　　　Are you asking a judge or a jury to
7　award you money by Kenneth Lord?
8　　　A　　If that's the only compensation or
9　if that's part of a compensation or if that's
10　the appropriate compensation, yes.
11　　　Q　　Same question as to Riley Joe
12　Andrews?
13　　　A　　Yes.
14　　　Q　　It's part of an appropriate award?
15　　　A　　Yes.  They need to be -- they need
16　to be made an example of.  They need to be
17　discouraged from doing this kind of behavior
18　to anybody else that comes into their school
19　as a teacher or even an aide or anything like
20　that.  They need to be discouraged from
21　behaving the way they behaved.  So, that
22　could be.
23　　　Q　　Same question as to Tim Pitchford?
24　　　A　　Yes.
25　　　Q　　The same questions as to Mr.

157

1  Strange?
2  A    Same answer as before.  Yes.
3  Q    And how about Ms. Ezell?
4  A    Yes.
5  Q    How about the Houston County Board,
6  as a body?
7  A    Yes.
8  Q    And when you say they need to be
9  made an example of and discouraged from this
10  type of behavior, you're referring back to
11  the behavior you told me about in your first
12  deposition?
13  A    I'm talking about the
14  inappropriateness of not having appropriate
15  IEP's for students, treating employees or
16  even interns, for that matter, the way they
17  treated me.  Yes.
18  Q    What, in your mind, have Mr. Lord,
19  Mr. Andrews, Mr. Pitchford, Mr. Strange and
20  Ms. Ezell and the Houston County Board, as a
21  body, done that would merit them being
22  punished in some way?
23  MR. FAULK:  Excuse me.  You've
24      already been over that in your
25      last seven-hour deposition, and

158

1      we object.
2  MR. WALDING:  I don't think so.
3  MR. FAULK:  I don't see that it
4      raises any new issues on
5      redirect.  You've gone over
6      this.  You asked it as to every
7      one of them, and so did this
8      lady, Ms. Hortberg.
9  MR. WALDING:  I asked what they did
10      to merit being punished,
11      speaking to punitive damages,
12      which I believe your complaint
13      asks for.  And I've got a right
14      to cross-examine this lady.
15  MR. FAULK:  All right.  You didn't
16      ask her about punitive damages
17      before, I suppose.
18  MR. WALDING:  I used the term
19      "punished."
20  MR. FAULK:  She may not understand
21      the connection.
22  MR. WALDING:  I understand that.  I
23      understand she's not a lawyer.
24      Y'all have made that abundantly
25      clear.

159

1  Q    Would you answer my question,
2  please, ma'am?
3  A    Okay.
4  MR. BRANTLEY:  Do you understand
5      the question?
6  A    Perhaps it would be best if you
7  asked it again.
8  MR. WALDING:  And I was trying --
9      y'all are not objecting to me
10      lumping them all together?
11      Because I can make eight
12      questions, if that was what you
13      want.
14  MR. FAULK:  As I understand --
15  MR. WALDING:  I understand it's
16      compound.
17  MR. FAULK:  As I now understand
18      your question, you're asking
19      her what, in her view, did each
20      of these people that you
21      represent --
22  MR. WALDING:  Right.
23  MR. FAULK:  -- and I presume, also,
24      Ms. Ezell and Mr. Strange --
25  MR. WALDING:  Yes.

160

1  MR. FAULK:  -- what did they do for
2      which they --
3  MR. WALDING:  Merit punishment.
4  MR. FAULK:  -- merit some type of
5      punishment.  And by that, he's
6      talking about monetary
7      damage-type punishment --
8  MR. WALDING:  Yes, sir.
9  MR. FAULK:  -- if that's your
10      question.
11  MR. BRANTLEY:  Would you explain to
12      her what punitive damages are,
13      or ask it where she understands
14      it?
15  MR. FAULK:  We'll just object to
16      the extent it calls for a legal
17      conclusion.  But you answer the
18      best you can as you understand
19      the question.
20  MR. BRANTLEY:  If you can.
21  MR. WALDING:  I didn't ask her a
22      legal question.  I asked her
23      what they did to merit being
24      punished.
25  MR. BRANTLEY:  Well, that's legal.

161

1      MR. FAULK:  That's actually a legal
2          question.
3      THE WITNESS:  Okay.  I've got the
4          answer.
5      MR. FAULK:  But, anyway, she can
6          try her best to answer.
7      MR. WALDING:  If she's got an
8          answer, I would like to hear
9          it.
10     A    I hope this will answer your
11 question.  They are perpetuating and
12 promoting an inappropriate learning
13 environment for students as well as teachers.
14     Q    Okay.  And they should be punished
15 for that?
16     A    Yes, I believe so.
17     Q    Now, in your complaint, you also
18 ask for an award of attorney's fees.  Have
19 you paid any attorney's fees out of pocket?
20     A    Not at this time.
21     Q    Have you paid any money out of
22 pocket?
23     A    Not at this time.
24     MR. FAULK:  You're talking about
25          for --

162

1      MR. WALDING:  Related to the
2          lawsuit.
3      MR. FAULK:  Not just attorney fees.
4          And I don't know.  Maybe you
5          have and maybe you haven't.
6          But I just wanted to be sure
7          you were following him.
8      A    I don't believe I have at this
9 time.
10     Q    Okay.  What is your fee arrangement
11 with your attorneys?
12     MR. FAULK:  Hold on just a minute.
13          I don't see that that's
14          discoverable.  I mean, you can
15          get into that if we get to an
16          attorney fee petition at some
17          point.
18     MR. WALDING:  Y'all have asked for
19          it in your complaint.
20     MR. FAULK:  Yeah.
21     MR. WALDING:  I'm just asking for
22          the arrangement, Mr. Faulk.
23          I'm not asking for a number.
24     Q    Is it an hourly arrangement, and
25 how much per hour?

163

1      A    We really haven't discussed that.
2      Q    Okay.  So, you don't know the
3 answer to that?
4      A    No, I don't.
5      Q    All right.  When you were answering
6 Mr. Musso's questions, I understood you to
7 testify that you were not interested in
8 working for the Houston County School System.
9 Is that accurate?
10     A    To a certain degree.  If I was told
11 that I could be reinstated, I would consider
12 it.
13     Q    Do you understand that, as part of
14 your lawsuit, Mrs. Miller, you have asked the
15 Court to reinstate you to your position with
16 the Houston County Board of Education?
17     A    And I just said, if I was
18 reinstated, then I would accept that.
19     Q    I'm asking you --
20     A    I'm not actively seeking employment
21 right this minute at Houston County Schools.
22     Q    Okay.  Look at Defendant's 5 for
23 me, the last page of that, which I believe is
24 page seven.  Would you agree that paragraph
25 "A," under your demand for judgment, asks for

164

1 an order directing defendants to reinstate
2 plaintiff to her position with the Houston
3 County Board of Education?
4      A    I see that it states that.
5      Q    Are you telling me today that you
6 want a judge to reinstate you to your
7 position as a special ed teacher at Houston
8 County High School?
9      A    If the judge deems it appropriate,
10 yes.
11     Q    Ma'am, I'm not asking what the
12 judge deems.
13     MR. BRANTLEY:  Well, she's answered
14          it.
15     MR. FAULK:  I think so, too.
16     Q    I'm asking what you want.
17     MR. BRANTLEY:  Object.  Asked and
18          answered.
19     MR. WALDING:  I don't think it's
20          been answered at all.
21     Q    Do you want to be reinstated --
22     MR. FAULK:  I think we --
23     MR. WALDING:  If you have an
24          objection, go ahead.  I had the
25          question half out of my mouth.

165

1    MR. FAULK:  You can try it again,
2         and then, we're going to call
3         the judge.  You go ahead.  Go
4         ahead.
5    MR. WALDING:  That's fine, Mr.
6         Faulk.  Thank you for
7         interrupting my thought to the
8         extent I can't remember my
9         question.
10   MR. FAULK:  You were asking her is
11        she seeking reinstatement, I
12        believe.
13   MR. WALDING:  Yes, sir.  That's
14        precisely what I'm asking.
15   Q    What do you want, Mrs. Miller?  Do
16 you want to be reinstated to a position as a
17 special education teacher at Houston County
18 High School?
19   A    I have not made that decision yet.
20 I want to be a special education teacher.
21 And so, I haven't really had a lot of time to
22 decide whether that would be appropriate, but
23 I would think that I would consider it.
24   MR. WALDING:  Okay.  That's all I
25        have.  Thank you, Mrs. Miller.

166

1              EXAMINATION
2
3    RESUMED BY MS. HORTBERG:
4    Q    I just needed to clarify one thing,
5 Mrs. Miller.  My name is Kate Hortberg, and I
6 represent Mr. Strange and Ms. Ezell.  And you
7 and I had a chance to talk last time.  But I
8 just had one quick question about some
9 questions that Mr. Walding asked you a few
10 minutes ago, when he was asking you about the
11 specific people that you had talked to about
12 the four concerns that you agreed were your
13 concerns, as we're calling them during this
14 deposition.
15        And he asked you whether you talked to
16 all of those people during school hours and
17 at the school, and, in the case of
18 Dr. Andrews, at the central office.  And when
19 you were asked about Mr. Strange, you said,
20 yes, it was both during and after school
21 hours, generally at the school facility.
22        You never spoke to Mr. Strange about
23 your concerns off of the school premises?
24 Correct?
25   A    Unless it would have been at a

167

1 special ed meeting or something like that at
2 the central office.  We might have been
3 having a discussion about some of the
4 findings we had or something.  I don't
5 recall.
6    Q    When were the special ed meetings
7 at the central office that you would have
8 attended while you were an intern at Houston
9 County High School?
10   A    I don't know that I have the dates
11 on them.  I'm sorry.
12   Q    Do you know whether they would be
13 written on your calendar right there?
14   A    I don't think that I had those
15 dates on there.
16   Q    How often were those meetings held
17 at the central office?
18   A    I know I attended at least one or
19 two, I believe.  I'm not positive.
20   Q    Who led those meetings?
21   A    I have no clue.  I have no
22 recollection of who they were.
23   Q    You don't remember who led the
24 meetings at the central office?
25   A    No.

168

1    Q    Would it be you and Mr. Payne and
2 Mr. Strange that would all attend those
3 meetings, as the special ed teachers from
4 Houston County High School?
5    A    Yes.  I would imagine we would all
6 be required to go.
7    Q    I'm asking about your personal
8 knowledge, though.  The meetings that you
9 attended, the one or two that you went to,
10 was it you, Mr. Strange and Mr. Payne who all
11 attended?
12   A    If I remember correctly.
13   Q    Do you have any handouts or other
14 sort of documentation from those meetings?
15   A    Those were probably left at the
16 high school when I left.
17   Q    You don't remember whether it was
18 Dr. Andrews or some other administrator that
19 was leading those meetings?
20   A    Mr. Andrews?  I'm sure he would
21 have probably been there.  No.  I'm not --
22   Q    I'm not asking you to guess.
23   A    Okay.  I don't know.
24   Q    Okay.  So, when you were qualifying
25 your answer about when you would have spoken

169

1  to Mr. Strange about your concerns, when you
2  said generally at school, to qualify that
3  answer even better would be, it would have
4  been either at the school facility or at the
5  central office?
6      A   Yes.
7      Q   There was no occasion where you and
8  Mr. Strange met off of school premises?
9      A   No.
10         MS. HORTBERG:  Okay.  That's all I
11         have.
12
13              EXAMINATION
14
15  RESUMED BY MR. MUSSO:
16      Q   You never were employed by Troy
17  University?  You never were an employee of --
18      A   No.  I just received compensation
19  for that collaborative presentation that I
20  did.
21      Q   Okay.  But that wasn't as an
22  employee?
23      A   Right.
24      Q   And you never were employed by
25  Dr. Jones?

170

1      A   No.
2      Q   Or Dr. Ruediger?
3      A   No.
4      Q   Or Pam Parris?
5      A   No.
6          MR. MUSSO:  Just to make the record
7          clear.
8          MR. FAULK:  Is that it?
9          MR. WALDING:  I have asked all I
10         could possibly ask.
11         (Recess in deposition.)
12         MS. HORTBERG:  I promise that I
13         have just, like, two more
14         questions, Mrs. Miller.
15
16              EXAMINATION
17
18  RESUMED BY MS. HORTBERG:
19      Q   To go back to this earlier question
20  that I just asked you about with you and Mr.
21  Strange attending between one and two special
22  education meetings at the central office, and
23  you testified that you had talked to Mr.
24  Strange about your concerns either at the
25  school or at the central office.  You would

171

1  agree with me that the central office is a
2  part of the school system?  Correct?
3      A   Yes.
4      Q   And that those meetings were held
5  during school hours?
6      A   Yes.
7          MS. HORTBERG:  That's all I have.
8          (Recess in deposition.)
9          MR. FAULK:  We don't have anything.
10
11              END OF DEPOSITION
12
13
14
15
16
17
18
19
20
21
22
23
24
25

172

1          DEFENDANT'S EXHIBIT NO. 32
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

173

```
 1                    DEFENDANT'S EXHIBIT NO. 33
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

174

```
 1                    DEFENDANT'S EXHIBIT NO. 34
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

175

```
 1    STATE OF ALABAMA
 2    HOUSTON COUNTY
 3
 4         I, Stacey Watkins, RPR, and Notary
 5    Public, State at Large, do hereby certify
 6    that the foregoing transcript, pages 1
 7    through 174, is a true and correct transcript
 8    of the testimony and proceedings taken at
 9    said time and place; and that the same was
10    taken down by me in stenograph shorthand,
11    and transcribed by me personally or under my
12    personal supervision.
13         I further certify that I have no
14    interest in this matter, financial or
15    otherwise, or how it may develop or what
16    its outcome may be.  I further certify that
17    I am not of counsel for any of the parties,
18    nor am I related to counsel or litigants or
19    associated with anyone connected with this
20    cause to my knowledge.
21         Witness my hand this 10th day of
22    September, 2007.
23
24         _____
25         _____ RPR, Notary Public,
                    State at Large
```



DEFENDANT'S EXHIBIT NO. 32

## Pam Parris

| | |
|---|---|
| **From:** | <NMMiller@aol.com> |
| **To:** | <sjones@troyst.edu> |
| **Cc:** | <pparris@troyst.edu>; <gruediger@troyst.edu>; <nmmiller@aol.com>; <jrotc250924@aol.com> |
| **Sent:** | Sunday, September 26, 2004 1:08 PM |
| **Subject:** | Nancy Miller 9/24 |

Dr. Jones,

I left phone messages for you, Mrs. Parris, and Dr. Ruediger at TSUD on Friday morning and Saturday evening.

During my job interview, Mr. Andrews told me to come to him with any problems I had. I met him on Friday to discuss the legal and ethical issues I've been dealing with.

If you wish to contact me on Monday, you can reach me at HCHS.

Nancy Miller



DEFENDANT'S
EXHIBIT
32
PENGAD-Bayonne, N.J.



DEFENDANT'S EXHIBIT NO. 33

DEFENDANT'S
EXHIBIT

PENGAD-Bayonne, N.J.

*HP blk 27*
*Color 28*
*# 3845*

# 2004-2005 SCHOLASTIC MONTHLY
# DESK PLANNER

Name _Nancy Miller_

Address _100 Oak Manor Court,_

_Dothan_

School Name _TSUD_          _Houston Co. High_

School Address _____

Home Phone (_334_) _793-1684_   School Phone (_____) _983-_

Social Security/
Insurance Number _____   School ID # _____

## IN CASE OF EMERGENCY NOTIFY:

Name _Major Terry L. Miller_

Address _____

_____   _Dothan High School_

Phone (_____) _____   Business Phone (_334_) _677-1634_

## Class Schedule

| Class | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|-------|--------|---------|-----------|----------|--------|----------|--------|
|       |        |         |           |          |        |          |        |
|       |        |         |           |          |        |          |        |
|       |        |         |           |          |        |          |        |
|       |        |         |           |          |        |          |        |
|       |        |         |           |          |        |          |        |
|       |        |         |           |          |        |          |        |
|       |        |         |           |          |        |          |        |
|       |        |         |           |          |        |          |        |

© 1995 - 2005 Amsterdam Printing & Litho
All rights reserved.
Reproduction of product formats or
descriptions in part or whole is prohibited by law.
166 Wallins Corners Road • Amsterdam, NY 12010
Tel 800-833-6231 • Fax 518-843-5204
Canada: Amsterdam Products, 2 Montreal Road
Cornwall, ON K6H 6L4 • Tel 800-267-9200 • Fax 613-933-4733

| SUNDAY | MONDAY | TUESDAY | WEDNESDA |
|---|---|---|---|
| **1** | **2** Civic Holiday (NT, BC, AB, SK, MB, ON, NB) | **3** | **4** Biology Exam Wallace |
| | 1st day for students Planning P. Strange Determine where needed most IEPs a mess! All reflect resource room instead of inc 1 Homebound NO IEP | Paul P. P. Payne + me 1 student IEP addresses 1 been here since Jan 04 | Hand-writing IEPs IEP addresses has temp serv |
| **8** | **9** Teachers (Ms.) learns, including let kids play with playing cards when he's tired with a tutor or tutor in the other lower students. Gets pretty rowdy when I'm trying to help students. | **10** | **11** Kathy Teasle told me I need to write an for Karen + back If I told her I wo it against the co the intern contra says I'm not all to be responsible writing IEPs - Raven needs to g eligibility BBS |
| **15** Return from Baton Rouge | **16** Internship Starts Told Ps falsify KK request on Aug 11 to write illegal IEP to cover project HCHS. He said I'd get touch with the chair | **17** Paul confers need to write IEP. Reminded him about internship contract - says I cant write one | **18** There is n reading program for Students who c read well & do know where to to get necessary courses. Strange is no help - |
| **22** | **23** | **24** | **25** |
| | | | |
| **29** Ms. Parris said that I am not at HCHS to shake things up to interfere w/ how things are I told her about illegal stuff going on + that I'm in jeopardy of failing my internship if I go + I better do anything I can to please | ►**30** Ms. Parris called Ms. Brazelli our advisor Paul Strange Observation Requested an appt w Mr Pitchfo If I tell him I'll get back to you | **31** All Ezell does is read notes + students have to write what she reads. 90 Min of this is torture for me. Poor kids w/ ME or no fine motor skills. As per Parris | 50 Aug. Discuss the Parris Haud Hurry Projects Ms. Parris call NO teacher Log NO NOTHING I am amongst the |

Ms. Teal let me use des phone in the library (private)

**Projects Due:**

| THURSDAY | FRIDAY | SATURDAY |
|---|---|---|
| **5** 218 | **6** 219 | **7** 220 |

_...eetings/completed last May but P.P. didn't do his_ ~~Strange said all IEPs were supposed to be~~

_...ical disability but not his LD no academic goals only ph...al_
_...sion" no accommodations for inclusion._
_...dient only no testing no eligibility NO IEP / shouldn't_

| **12** trip to Baton Rouge 225 | **13** Trip to Baton Rouge 226 | **14** Baton Rouge 227 |

_Off    talk_
_it    Dad M. + 95th Inf. Division Reunion_
_d_
_...ies_
_...u_

**2004**
ACADEMIC EDITION

| **19** 232 | **20** 233 | **21** 234 |

| **26** Dr Ruediger Observation Good 233 discussed violations of St. Sted saut wants to pull me but can't because employed. T40 will give more support into targets others admin to hold IEP meetings again to change to reflect inclusion + get specific accommodations. | **27** Conf w Princ. Asst Princ P.S.+ me. 8:30-9ish Pitcford AGRP will call Perm Parris + P.T. Andrews. He said Dr R should come direct to him instead of sending an intern to discuss problems with spec ed. 240 | **28** 241 |

_...Hunt   Supervisor Dismissed (internship) Him being? p 6_
_now Dr R. is advisor again (his request)_
_...s for me, no materials, no guidance, no help_
_No seating area for me I have to sit in a desk_
_...b. I really feel like I'm a professional teacher NOT_

AUGUST

AUGUST 2004 | SEPTEMBER 2004
OCTOBER 2004 | NOVEMBER 2004
DECEMBER 2004 | JANUARY 2005
FEBRUARY 2005 | MARCH 2005
APRIL 2005 | MAY 2005
JUNE 2005 | JULY 2005

CODR = 1/RC=1/RC=RC(R=RC) RC(R)=RC R=1/RC=RC FAX = 17 of 61

| SUNDAY | MONDAY | TUESDAY | WEDNESDA |
|---|---|---|---|
| **Projects Due:** Called Mrs Parris 9/20 According to Picciato & Picciato this ... my facility ... interning in residence is offensive to Mr P. I'd better start making him happy 9/20 UU Mrs Parris left a message at home to meet on Wed 9/22 @ 3km. Called to confirm. Threatened that I'm in jeopardy of failing my internship. | Same faculty & Mr Picciato & Picciato | **1** Paul Strange told me Mrs Parris is coming at 8:30 & so is Mr Andrews they want to meet w/ me & Paul & Picciato & Parris said TSUD and states relationship & wants to ... & me to continue Andrews telephoned that I have been put in a difficult student intern & employee. Mrs Miller. We want | |
| **5** 248 | **6** Labor Day Labour Day (Canada) 250 | **7** 251 | **8** Parris Called She said "Dr Ruediger put up fight & wants to continue as my supervisor." |
| **12** 256 | **13** Mrs Parris told me to get my Eyells lesson plans from the District & copy it in the copier room. 1st lesson plan from Mrs Eyell I asked Paul S to help me get special trng for Sp.Ed student from Eyell So I can help students. Paul wants me to ask for advice about getting Eyell to cooperate from all advisors. | **14** 258 | **15** 259 12:30 out weather Hurricane |
| **19** 262 | **20** We given a copy machine number previously instructed to use office copier for lecture not. They I don't have a ... faculty hostile, ignoring me, run away, wouldn't enter & special ed instructed by Mr Picciato to go to him for copy of ... lesson plans. P Strange said Mr Picciato told him to tell me to ask Picciato for lesson plan | **21** Paul said teachers went to admin (Picciato) to complain that they shouldn't have to teach the special ed (Morgan's Eyell) and that they don't want me as a teacher in class | **22** Autumn Begins 3 PM Meeting Dr R & Mrs Parris Feed info from mtg. in 7's who of ... neg. in area of negative feeding from advisors. |
| **26** She said your military background doesn't intimidate she a bit. I said it wasn't meant to. Then she said that Sharon Eyell doesn't intimidate her either because she has nothing to do with TSUD. She threatened me with failing my internship ... | **27** Parris said "you've done it now—really done it. I've gotten call after call since early this morning. You are NOT here to shake things up. I told you that before. I told her to a military wife for 32 yrs & take these ... of the card very seriously. | **28** | **29** met with Dr Ruediger & Dr K. Dr Ruediger said I should have told Dr K that I would like to discuss her request to write illegally with TSUD admin instead of saying no that is BS." |

| THURSDAY | FRIDAY | SATURDAY |
|---|---|---|
| **2** 246 | **3** 247 | **4** 248 |

sec.
HC Schools
I did
as an
He said
now here & need you here. I was dismissed while all of the...
continued to talk

| **9** Internship Seminar mtg. 253 at Harrison Hall | **10** 254 | **11** 255 |

| **16** Rosh Hashanah 260 Essay on Handbook due #4 send in electronically | **17** Paul won't be 261 here. | **18** 262 |

...ver
van →

Back in School

| **23** 267 | **24** | **25** Yom Kippur 269 |
|---|---|---|

Requested an appt. w/Mr. Pitchford 8:15 AM

Left HCHS @ 11:30-40. First called Mrs. Parris Dr. Jones asked them to call me asap left phone messages Called central office - but to check? Went to CO. Mr. A's tech not there went to DHS/called CO. AEA Rep after T. (to charge to McCotter) Left m...

Told P. strange I wa... wants CO. Told Sum... I was leaving. Wrote note... at C.O. after 3:0... time trying w/ phon... to reach me. Didn't return call so went over spoke w... secretary. She radioed Mr. A - met w/ Mr. A. Mrs. S took notes. Called Sharon Cole - AEA Rep Would it be possible to schedule a meeting w/ Mrs. Hamm said Pitchford? Yes not in right now but I'll let him know you want to meet with him + he can get back to you. (Glenda in office too) 9/23/04

JR. Varsity DHS game

Varsity Game Oct 1

| **30** 274 Dr. Ruediger 11 PM - 2nd Observation | | |

Internship Sem. Dr. Rod Davis asked Dr. Davis

Gave Tiara for Homecoming Queen TR. & me sell tickets @ HCHS F.B. game

**SEPTEMBER**

**2004**
**ACADEMIC EDITION**

Case 1:15-cv-03000-XXX-XXX Document 19-2 Filed 11/02/2001 Page 56 of 61

| SUNDAY | MONDAY | TUESDAY | WEDNESDA |
|---|---|---|---|

**Projects Due:** *Bring diploma info form*
*Buy Cap & Gown 10/20 or 10/21*
~~Awards~~ *tiara for Miss Houstonian Pageant*

| | | | |
|---|---|---|---|
| **3** 277 | **4** *School Day make up Day - Paul said I was complained to admin she wants the four kids out of her class* | **5** *Parent Teacher Conf* | **6** *Off* 280 |
| **10** 284 | **11** Columbus Day Thanksgiving Day (Canada) 285 | **12** | **13** 287 |
| **17** *Gamma Beta Phi* 291 *2:30* *Amy Case asked me if I was going to go work for Galesville City Schools she'd heard at ACHS* | **18** *Mr. Pitchford came to me - told me to pull student selected by Mrs. Fouts to my resource room after the lesson* | **19** 293 | **20** *Michelin Room - Buy Cap & gown* 294 *3:30 - 6 PM* *Bring Diploma* ~~Parent~~ *7:30AM Terminated from HCHS* |
| **24** 298 | **25** 299 | **26** 300 | **27** 301 |
| **31** Daylight Saving Time Ends Halloween 305 | | | |

| THURSDAY | FRIDAY | SATURDAY |
|---|---|---|
| | **1** School Day make up day | **2** *to as my coop. teacher. He said he didn't know how to clean up the mess. He said I tried to get to do, even the coach to get me to have a successful internship?* |
| | 275 *Conference w/ Paul ... I never wanted things to go too far but I cannot do these things and will not even if it does mean I will fail my internship. He said everything will be ok. He said he was sorry I didn't understand what he was supposed* | 276 |
| **7** *Off* | **8** *Off* | **9** Miss Houstown Pageant |
| 281 | 282 | 283 |
| **14** *Letter of Application resume DUE - Intern Sem.* | **15** NCHS **HomeComing** I asked Administratively Cathy Keasler for Katherine ... to return call about interview | **16** National Boss' Day |
| 288 *Internship Withdrew from TSUD Total turnaround from Failing Arents.* | 289 | 290 |
| *Parris/D&K Conf w/ TL & me* | | |
| **21** *Michelin Room Buy Cap & Gown on 3:30 - 6 PM* | **22** NVHS/DHS game 4 PM. | **23** Eastgate/Med Center Picnic 8:30 - 7 PM (take down) |
| 295 *$8.52 + tax* | 296 | |
| **28** Prof. Dev. Essay Due | **29** | **30** |
| 302 | 303 | 304 |

**2004**
ACADEMIC EDITION

| AUGUST 2004 | SEPTEMBER 2004 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 3 4 5 6 7 | 1 2 3 4 |
| 8 9 10 11 12 13 14 | 5 6 7 8 9 10 11 |
| 15 16 17 18 19 20 21 | 12 13 14 15 16 17 18 |
| 22 23 24 25 26 27 28 | 19 20 21 22 23 24 25 |
| 29 30 31 | 26 27 28 29 30 |

| OCTOBER 2004 | NOVEMBER 2004 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 | 1 2 3 4 5 6 |
| 3 4 5 6 7 8 9 | 7 8 9 10 11 12 13 |
| 10 11 12 13 14 15 16 | 14 15 16 17 18 19 20 |
| 17 18 19 20 21 22 23 | 21 22 23 24 25 26 27 |
| 24 25 26 27 28 29 30 | 28 29 30 |
| 31 | |

| DECEMBER 2004 | JANUARY 2005 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 3 4 | 1 |
| 5 6 7 8 9 10 11 | 2 3 4 5 6 7 8 |
| 12 13 14 15 16 17 18 | 9 10 11 12 13 14 15 |
| 19 20 21 22 23 24 25 | 16 17 18 19 20 21 22 |
| 26 27 28 29 30 31 | 23 24 25 26 27 28 29 |
| | 30 31 |

| FEBRUARY 2005 | MARCH 2005 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 3 4 5 | 1 2 3 4 5 |
| 6 7 8 9 10 11 12 | 6 7 8 9 10 11 12 |
| 13 14 15 16 17 18 19 | 13 14 15 16 17 18 19 |
| 20 21 22 23 24 25 26 | 20 21 22 23 24 25 26 |
| 27 28 | 27 28 29 30 31 |

| APRIL 2005 | MAY 2005 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 | 1 2 3 4 5 6 7 |
| 3 4 5 6 7 8 9 | 8 9 10 11 12 13 14 |
| 10 11 12 13 14 15 16 | 15 16 17 18 19 20 21 |
| 17 18 19 20 21 22 23 | 22 23 24 25 26 27 28 |
| 24 25 26 27 28 29 30 | 29 30 31 |

| JUNE 2005 | JULY 2005 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 3 4 | 1 2 |
| 5 6 7 8 9 10 11 | 3 4 5 6 7 8 9 |
| 12 13 14 15 16 17 18 | 10 11 12 13 14 15 16 |
| 19 20 21 22 23 24 25 | 17 18 19 20 21 22 23 |
| 26 27 28 29 30 | 24 25 26 27 28 29 30 |
| | 31 |



DEFENDANT'S EXHIBIT NO. 34



T.E.P. Minutes
November 30, 2004 Meeting

Attending: Pam Parris, Jim Windle, Greg Rueidger, Victoria Morin, Elizabeth Fell, Cynthia Lumpkin, Cynthia Hicks, Gary Manfready, Rita Farver, JoAnn McFarland

<u>Nancy Miller:</u>

Addressing Ms. Miller, Mrs. Parris said with a new beginning in this internship, could she tell us what kind of support she felt she needed and would like to have. Ms. Miller responded that she would like 1) the normal support, 2) answers to her emails, and 3) if she has a question, she would like it answered directly.

Dr. Morin said that Ms. Miller had indicated that she didn't get support. Ms. Miller responded that this school (meaning TUD) told her one thing, and her other school told her another.

Mrs. Parris asked that she please be sure to make all contacts during our University's school hours. Ms. Miller stated that all of the contacts she made were. Ms. Miller then stated that she was unaware of Fridays. She said that she got no response under these circumstances.

Dr. Rueidger explained that he could go back to his deleted e-mails, and there weren't any. He emphasized that our faculty wants her to be successful and part of that is our wanting to support her. And he reiterated that if he goes back in his database, there are no emails from her. Dr. Rueidger further stated that there were phone calls from her later in the evening (6 something at night) and explained that the only time he would be here at the University, would be for class or an emergency. He pointed out that there was a conflict there and as he looked back, he could not see a lack of support. He continued to emphasize how the faculty wants to support her. Dr. Rueidger gave her feedback that she has demonstrated knowledge and that now we needed to see skills demonstrated. He affirmed again that this group and all of TUD truly want to support her and want to know how to support her. Ms. Miller said that Dr. Jones was another one that she had class with and that she received no response. Mrs. Parris communicated that as she began her new internship, everyone here wanted to be sure that she realized we would be available and would work together during normal hours. Dr. Lumpkin emphasized that if she called or emailed after University hours or days when we were not here, she needed to allow a couple of days for a response. Dr. Lumpkin told Ms. Miller not to expect a response on Fridays. Ms. Miller said that on that Friday, it was a kind of desperation. Ms. Parris reminded her that if she left her school and if no one was available at TUD, she needed to leave a voice mail at the University. Mrs. Parris explained that she must not leave her school without notifying the administration. She concluded with the fact that she knew that they had covered this, but just wanted to reiterate it.

Dr. Lumpkin asked Ms. Miller if there was anything new that she had learned in this internship that she would carry into the next one. After a long pause, Ms. Miller said that

she will never, when asked, do illegal or unethical things. Dr. Morin stated that she does not know the particulars but that Ms. Miller needed to figure out a way to work with people. She, too, stressed that we want this to be a successful internship for her. Dr. Lumpkin affirmed that we be positive and go from there. Dr. Rueidger asked if Ms. Miller felt comfortable with what is expected of her. Ms. Miller responded that yes, she did.

Mrs. Parris then invited her to come to orientation if she would like. Mrs. Parris informed her that she did not yet have her placement but that when she did, she could go speak with her teacher. Mrs. Parris told Ms. Miller thank you, and Ms. Miller left.

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 174, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under my

12   personal supervision.

13       I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21       Witness my hand this 10th day of

22   September, 2007.

23

24   _____

25       RPR, Notary Public,
         State at Large