# EVIDENTIARY SUBMISSION
# (PART 4)

# TAB C

STATE OF ALABAMA }

HOUSTON COUNTY },

## DECLARATION OF SANDRA LEE JONES

I, Sandra Lee Jones, declare as follows:

1.     My name is Sandra Lee Jones. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this declaration.

2.     From 1983 to 2002, I was employed by Troy State University in Dothan. I retired in May 2005 as the Dean of the College of Education. I held the position as Dean of the College of Education since 2002.

3.     As Dean of the College of Education, I was responsible for the overall functioning of the College of Education. This included, but was not limited to, oversight of state and national accreditation of programs, faculty and staff employment, supervision and evaluation, budget, serving on various university and Troy system committees, facilities management, public service and public relations, and other duties as assigned.

4.     During the Fall 2004 semester and the Spring 2005 semester, my immediate supervisor was Dr. Barbara Alford, Troy University President.

5.     During the Fall 2004 semester and the Spring 2005 semester, I was the immediate supervisor of Dr. Greg Ruediger, an Associate Professor in the College of Education at Troy University in Dothan.

6.     During the Fall 2004 semester and the Spring 2005 semester, I was the immediate supervisor of Ms. Pam Parris, the Director of Professional Internship Programs in the College of Education at Troy University in Dothan.

7.    The mission of the College of Education is to prepare educators, counselors, administrators, and other professionals to be lifelong, innovative, informed, reflective decision makers effectively trained to achieve the goals, competencies, and skills identified by the accrediting and professional organizations for each program.

8.    The Teacher Education Unit at Troy University is comprised of all certification programs in the College of Education. All certification programs are approved by the Alabama State Board of Education.

9.    The ultimate goal of the College of Education Teacher Education Unit is the effective initial and continuing preparation of candidates, teachers, and other school personnel.

10.    Admission to Troy University does not qualify a student for admission to the Teacher Education Program. Candidates may only enroll in certain upper level courses prior to meeting all criteria for admission to the Teacher Education Program.

11.    Written application to the Teacher Education Program is required. Additional requirements include the following: (1) completion of 48 semester hours of required general studies courses including a grade of C or better in the two English composition courses and a grade of C or better in the required general studies mathematics course(s) for the teacher education major; (2) at least six of the twelve hours of required mathematics for elementary, early childhood, and collaborative teacher candidates; (3) a minimum grade-point-average of 2.75 on all coursework attempted; (4) any testing required Alabama Department of Education; (5) successful completion of a formal speech and interview; (6) completion of a minimum twelve clock hours of classroom observation/participation, and successful completion of an impromptu essay.

12.    Troy University's Professional Internship Program is the culminating clinical field-based experience for candidates seeking certification in a teaching field. Troy University's Professional Internship Program provides the student with the opportunity to conduct classes and assume the role of teacher while receiving supervision from a classroom teacher and a university supervisor.

13.    All candidates completing an initial certification program for teachers must complete a nine-semester-hour internship in the grade level(s) and academic subject(s) of the certification sought. This is a full-time assignment for a full semester with placement in a regionally accredited school. Interns must enroll in the appropriate three-semester hour internship seminar course during the internship semester.

14.    Prerequisites for internship include the following: (1) Admission to the Teacher Education Program (TEP); (2) a grade-point-average of 2.75 overall on all undergraduate coursework attempted; (3) a grade-point-average in all professional studies coursework attempted;  a grade-point-average of 2.75 in all teaching field coursework attempted; (4) three satisfactory recommendations from faculty; (5) completion of all student coursework except Internship Seminar, a class which is taken in conjunction with the internship; (6) completion of all professional studies and teaching field course with a grade of C or better; (7) completion and verification of a minimum of 150 contact hours of clinical experiences; (8) any testing required by the Alabama Department of Education; (9) successful completion of the preliminary components of the professional portfolio and the exit examinations in professional studies and the teaching field(s); (10) approval of the Director of the Teacher Education Program and the department chair;

(11) evidence of current professional liability coverage; and completion of any additional requirements mandated by the Alabama State Department of Education.

15.    Undergraduate internship experiences must occur in the appropriate grade level(s) and subject(s) and are supervised by an approved certified classroom teacher who is the teacher of record for the class.

16.    During the Fall 2004 semester, Nancy Miller was a student at Troy University in Dothan enrolled in the Teacher Education Program. At that time, she had had completed all prerequisites for her internship, and she was enrolled in SPE4454 Internship Seminar (the three-semester student internship seminar course), and SPE4465 Collaborative Teacher, the actual class title for the internship. Those are the two courses a student must be enrolled in during that student's internship. I was the teacher for the Internship Seminar, and Ms. Miller was my student.

17.    Ms. Miller was placed as a student intern at Houston County High School during the Fall 2004 semester. The Troy University teacher assigned to serve as her internship supervisor was Dr. Greg Ruediger.

18.    Because of the high demand and low availability of special education teachers, the Houston County High School principal requested permission for Ms. Miller to complete her Troy University student internship while employed as a special education teacher at Houston County High School. Troy University at Dothan granted permission with the conditions listed in the "Internship Agreement Between Houston County Schools and Troy University Dothan Campus," a copy of which is attached to this Declaration at Tab 1.

19.    I signed that Internship Agreement in my capacity as Dean. Ms. Parris also signed it in her capacity as the Director of the Professional Internship Program.

20.    Effective October 14, 2004, Ms. Miller's student internship was terminated.

21.    Pursuant to my instructions to Ms. Parris in a November 1, 2004, memo (attached at Tab 2), Ms. Miller received an I ("Incomplete") as her grade for the SPE4454 Internship Seminar course and the SPE4465 Internship course for the Fall 2004 semester.

22.    I was the individual who made the decision to terminate Ms. Miller's Fall 2004 student internship. It had become obvious to me that Ms. Miller was not achieving the pedagogical goals of her student internship, that is, to prepare her for her post-graduation teaching career. I had come to that conclusion based on a series of documented events, including information about her behavior and attitude in the school setting (see Tab 3), some weak evaluations she received, and what I consider a major event, her leaving the Houston County High School campus one day in September 2005 without permission from the Houston County High School principal.

23.    In the Spring 2005 semester, Ms. Miller successfully completed a Troy University student internship at Beverlye Middle School and completed the Troy University Internship Seminar course. She graduated at the end of the Spring 2005 semester.

24.    No one at Houston County High School or associated with the Houston County Board of Education ever asked me to terminate Ms. Miller's internship, and I am not aware of anyone at Houston County High School or associated with the Houston

County Board of Education ever making such a request to anyone employed at Troy University.

Done this __14th__ day of November, 2007

_Sandra Lee Jones_

Sandra Lee Jones

# TAB
# 1



**TROY STATE UNIVERSITY DOTHAN**

P. O. Box 8368
Dothan, Alabama 36304-0368
(334) 983-6556

## Internship Agreement Between Houston County Schools and Troy University Dothan Campus

July 28, 2004

Due to the high demand and low availability of special education teachers, Houston County Schools, specifically Superintendent Kenneth Lord, is experiencing a hardship situation. Mr. Tim Pitchford, principal of Houston County High School, has requested permission for Nancy Miller to complete her internship with Troy University Dothan while employed as a special education teacher at Houston County High School. This permission is granted under the following conditions:

1. Ms. Miller will continue to be employed throughout the internship period (August 16 – December 7, 2004).
2. Mr. Paul Strange will serve as cooperating teacher for Ms. Miller.
3. Ms. Miller will complete the same requirements as all other interns at Troy University Dothan with the following underlined exceptions:
   a. Internship will last a total of 70 school days. Absences will be made-up and extend beyond December 7, 2004.
   b. Mr. Strange will visit Ms. Miller's classroom one period each week. Ms. Miller will visit Mr. Strange's classroom one period each week. The intern is to use the log form provided to record the time spent in Mr. Strange's classroom. This log, signed by the intern and Mr. Strange, is to be turned in at the end of the semester to the Director of Internship by the intern.
   c. The school administration is responsible for IEP meetings. Ms. Miller's attendance is as that of a student intern. She cannot be held legally responsible for the meetings.
   d. Mr. Strange will conduct four official evaluations during the internship. The first observation will occur during the first two weeks of internship. The remaining three evaluations will occur approximately every three weeks. The white and the goldenrod copies of the evaluation form are to be mailed to the Director Professional Internship immediately as each one is completed.
   e. Mr. Strange is to review all lesson plans, handouts and notes to parents created by Ms. Miller. The first five lesson plans taught must be in the long format shown in the *Internship Handbook*. An additional five lessons during the term are to be written in the long format. Lesson plans written for the university supervisor visits written in the long format count as part of the required ten. All other lesson plans are to be written using the short form in the handbook.

THE TROY STATE UNIVERSITY SYSTEM
Troy  •  Dothan  •  Montgomery  •  Worldwide

Nancy Miller v. Troy University, et al 00119  Def. Docs Prod. Pursuant to Initial Disclosures

f. ~~Dr. Victoria Morin~~ *Dr. Greg Ruselys*, the University Supervisor, will conduct six official observations and evaluations during the period. Ms. Miller will complete the *Report of Internship* form provided in the handbook after each university supervisor visit.

g. A daily schedule must be provided by Ms. Miller to the Internship Office no later than August 30, 2004. This is to be used to schedule visits.

h. The intern will complete the internship records and requirements including documentation of the 485 hours of internship.

i. All summer coursework must be completed and internship pre-requisites met.

j. Ms. Miller must attend the Internship Seminar classes.

k. Ms. Miller is to e-mail Ms. Parris weekly about the internship.

l. The Director of Internship will contact Mr. Strange and Ms. Miller to schedule an appointment to discuss the progress of the internship. This visit will occur near the midterm of the semester.

I understand and agree to the above conditions of internship for Ms. Nancy Miller.

Tim Pitchford, Principal
Agent for Houston County Schools

Pam Parris, Director Professional
Internship, Agent for Troy
University, Dothan Campus

Paul Strange, Cooperating Teacher
Houston County High School

Dr. Sandra Lee Jones, Dean
Agent for Troy University Dothan
Campus

Nancy Miller, Intern
Troy University, Dothan Campus

cc: Morin

Nancy Miller v. Troy University, et al 00120  Def. Docs Prod. Pursuant to Initial Disclosures

# TAB
# 2

*Received from*
*Dr. J 11/04/04*
*[initials]*

*Copy mailed to*
*Mrs. Miller* *[initials]*
*11/04/04*

**TROY STATE UNIVERSITY DOTHAN**

P. O. Box 8368
Dothan, Alabama 36304-0368
(334) 983-6556

November 1, 2004

**To:**      Pam Parris, Director of the Professional Internship Program

**From:**   Dr. Sandra Lee Jones, Dean, College of Education *[signature] Jones*

**RE:**      Nancy Miller's Internship INC

This memo is to serve as clarification of the incomplete I instructed you to report for Mrs. Nancy Miller's internship at the end of the semester. As I stated in our conversations about this matter, Mrs. Miller will receive from you an incomplete in her internship; I will report an incomplete for SPE 4454: Internship Seminar.

To eliminate a problem in the event there is a delay in the internship until Fall 2005 as mentioned in Mrs. Miller's letter to us, please set the completion date for the internship at the end of Fall Semester, December 2005. This will give us more flexibility than the normal six-week time limitation for an incomplete to be cleared. I have already discussed this with the registrar. There will be no problem if Mrs. Miller elects to complete the internship in the spring and satisfies the requirements earlier than the established completion date of December 2005.

The incompletes are being granted so that Mrs. Miller will not have to register for those courses again in January 2005. This way she will not be responsible for paying tuition and fees a second time if the internship is completed prior to the December 2005 deadline to clear the incomplete.

 Nancy Miller v. Troy University, et al 00022 Def. Docs Prod. Pursuant to Initial Disclosures

# TAB
# 3

**Houston County High School**
**P.O. Box 519**
**Columbia, Alabama 36319**
**696-2221 or 696-4515**

To: Pam Parris / Troy University Dothan

From: Houston County High School

The following is a record of incidences that have occurred here at school involving Mrs. Nancy Miller.

(1)  Mrs. Miller left the school campus without informing administrative personnel. She did not return until the next school day.

(2)  Mrs. Miller accused Paul Strange of entering her locked filing cabinet and placing an IEP in a student folder. Mrs. Miller claims it was an IEP written without her knowledge. Mr. Strange and Mrs. Miller had written the IEP in her room approximately one week earlier. Mrs. Miller stated she had no recollection of that event.

(3)  Mrs. Miller has difficulty in communicating with faculty members.

(4)  Mrs. Miller questioned the lawfulness of the school systems inclusion policies.

(5)  Some students have requested that Mrs. Miller not be their inclusion teacher.

(6)  Classroom teachers reported that Mrs. Miller has been upset and crying during class time.

(7)  Office staff members reported that Mrs. Miller was upset and crying in the office lobby during school hours.

(8)  Not following suggestions provided by Mr. Strange as related to the resource room.

(9)  Mrs. Miller told a classroom teacher, "I don't like being here any more than you do, but I have to be in here a certain number of hours" This is in response to the classroom teacher telling her that she could leave the room because the lesson was over. Mrs. Miller said this in front of the students in the class.

*Stacy Ezell*

*Paul Strange*

# TAB D

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MILLER, | * | 2006 OCT 16  P 7: 24 |
| PLAINTIFF, | * | |
| | * | |
| v. | * | Case No. 1:06-cv-940-WKW |
| | * | |
| | * | |
| HOUSTON COUNTY BOARD OF | * | JURY DEMANDED |
| EDUCATION; | * | |
| KENNTH LORD; | * | |
| RILEY JOE ANDREWS; | * | |
| TIM PITCHFORD; | * | |
| PAUL STRANGE; | * | |
| STACY EZELL; | * | |
| TROY UNIVERSITY, DOTHAN; | * | |
| SANDRA JONES; | * | |
| PAM PARRIS; | * | |
| and | * | |
| GREG RUEDIGER, | * | |
| | * | |
| DEFENDANTS. | * | |

## COMPLAINT

## JURISDICTION AND VENUE

1. This Court has jurisdiction of the subject matter of this claim under the provisions of 28
   U.S.C. §1331, because this action arises under an Act of Congress relating to damages
   arising from a deprivation of Plaintiff's right to free speech under the United States
   Constitution; specifically, 42 U.S.C. §1983, and the First and Fourteenth Amendments to
   the U.S. Constitutions.

2. Venue is proper in this Court under 28 U.S.C. §1391, in that all parties reside in the
   Southern Division of the Middle District of Alabama, and the tort sued upon occurred in
   said Division.

## STATEMENT OF THE PARTIES

3.  Plaintiff Nancy Miller is an adult resident citizen of Houston County, Alabama.

4.  Defendant Houston County Board of Education is a governmental entity duly organized and existing under the laws of the State of Alabama.

5.  Defendant Kenneth Lord is an adult, resident citizen of Houston County, Alabama. At the time of the events complained herein, Mr. Lord was Superintendent of Education of the Houston County Board of Education. He is now retired.

6.  Defendant Riley Joe Andrews is an adult, resident citizen of Houston County, Alabama. At the time of the events complained herein, Mr. Andrews served as Federal Programs Coordinator for the Houston County Board of Education. He is now retired.

7.  Defendant Tim Pitchford is an adult, resident citizen of Houston County, Alabama. Mr. Pitchford is now Superintendent of Education for Houston County Board of Education, but at the time of the events complained of herein, he served as Principal at Houston County High School in Columbia, Alabama.

8.  Defendant Paul Strange is an adult, resident citizen of Houston County, Alabama. At the time of the events complained herein, he was employed as a teacher, assigned to mentor the Plaintiff at Houston County High School in Columbia, Alabama.

9.  Defendant Stacy Ezell is an adult, resident citizen of Houston County, Alabama. At the time of the events complained herein, she was employed as a teacher at Houston County High School in Columbia, Alabama

10. Defendant Troy University, Dothan is a legal entity, believed to be created by charter by the State of Alabama, having a principal place of business in Dale or Houston County, Alabama.

2

11. Defendant Sandra Jones is an adult, resident citizen of the Southern Division of the Middle District of Alabama. At the time of the events complained herein, she served as Dean of the Troy State University, Dothan, College of Education.

12. Defendant Pam Parris is an adult, resident citizen of the Southern Division of the Middle District of Alabama. At the time of the events complained herein, she served as Director of Professional Internship Programs of Troy State University, Dothan.

13. Defendant Greg Ruediger is an adult, resident citizen of the Southern Division of the Middle District of Alabama. At the time of the events complained herein, he served as Troy State University, Dothan's advisor to the Plaintiff in connection with her internship.

## STATEMENT OF THE FACTS

14. At the time of the events made the basis for the action, Plaintiff, Nancy Miller, was a student intern at Troy State University, working as a school teacher under contract with Defendant Houston County Board of Education.

15. Plaintiff started work at Houston County High School in Columbia, Alabama, as a contract teacher under a nine month contract on July 28, 2004, for the 2004-2005 school year, in the field of special education.

16. Plaintiff noticed various acts of malfeasance, misfeasance and nonfeasance in violation of the laws and regulations governing the special education program. When she noticed these violations she immediately reported such to Paul Strange, who was her mentor and supervisor at the school.

17. Plaintiff reported, among other shortcomings, that Individualized Education Program (IEPs) were being either not prepared, wrongly prepared or even fabricated and backdated; that one or more students had not been switched from a resource room to a full inclusion room in

3

violation of board special education policy; that eight students had not been given Special Education History, although their IEPs called for such; that two science teachers had requested not to have a special education teacher in their classes, although they both had special education children in their classrooms; that at least one special education student with mental retardation had been failed because the teacher declared that the child was "just lazy and didn't do his work," despite such teacher's knowledge from the child's file that the child did not have the cognitive skills for the class; that there were at least two special education students (one of whom was homebound) for whom there were no IEPs prepared; that several students had only temporary services sheets with no current IEPs for the 2004-2005 school year; that one teacher prepared an IEP in front of Plaintiff with no IEP meeting with the student and his parents as required by law; that 57 special education students had no IEPs in their files as of August 2004; that school personnel had been ridiculing special education student's hair styles and appearance; that staff members had been making up IEPs without the customary meetings needed with the students and their parents; and that Plaintiff had been asked to write IEPs for those students who did not have IEPs and then to back date such IEPs so that the school would appear be in compliance with the laws governing special education students, which Plaintiff had refused to do. One of the teachers whose conduct was complained of by Plaintiff was Defendant Ezell.

18. Plaintiff reported the above referenced deficiencies to her mentor, Paul Strange, who told Plaintiff that the illegal IEPs had to be done and that she would have to sign off on them. Plaintiff made substantially similar reports, including a report as to Mr. Strange's reaction to her original report, to Tim Pitchford and Riley Joe Andrews, as well as to Dr. Ruediger, Ms. Parris, and Dr. Sandra Jones.

4

19. Shortly thereafter Mr. Andrews sent and undated letter to Ms. Parris expressing "concerns" about Plaintiff. Near in time to the Andrews report, Mr. Strange and Ms. Ezell co-authored a report to Parris regarding asserted deficiencies in Plaintiff's performance. Both the Andrews report and the Strange-Ezell report contained falsehoods or placed plaintiff in a derogatory false light, and such reports were calculated to have a pre-text for the withdrawal of Plaintiff's internship.

20. Dr. Greg Ruediger was Plaintiff's internship advisor at Troy State University. Following the advent of Plaintiff's reports, the principal at Columbia High School, Tim Pitchford, contacted Dr. Ruediger's supervisor at Troy State University, Pam Parris, who oversees all interns at the University. Pitchford made his displeasure known to Parris. Parris then removed Dr. Ruediger as supervisor of Plaintiff's internship, and Ruediger was replaced by Mary Brazelle. Dr Ruediger asked to be placed back over Miller's internship and Parris reinstated Dr. Ruediger over Plaintiff's internship. Ruediger then gave Plaintiff a poor rating on her evaluation, and he warned Plaintiff that he would need to "pull" Miller from the internship at Houston County High School, because of all of the things that Miller was reporting and writing about at the school.

21. When the Plaintiff refused to keep quiet about the special education program at Columbia High School, her internship was withdrawn and she was given an incomplete grade for the internship, and, subsequently, she was terminated from her position as a teacher.

22. Plaintiff's first notice of the withdrawal of her internship occurred on October 14, 2004, in a meeting between Plaintiff, her husband, and Parris, who confirmed the withdrawal of Plaintiff's internship by letter to Defendant Lord dated October 18, 2004. On October 20, 2004, Mr. Lord, who had knowledge of the Plaintiff's reports, as well as his staff's reaction

to such reports, had a letter dated October 19 hand delivered to Plaintiff at her school, informing her that, due to the withdrawal of her internship, her teaching contract was also terminated; whereupon, Plaintiff was escorted off campus.

## COUNT I

## VIOLATION OF 1ST AMENDMENT RIGHT TO FREE SPEECH

23. Plaintiff incorporates herein by this reference each and every allegation contained in each paragraph above.  Plaintiff avers that all acts and omissions attributed to the Defendants were done under color of state law, policy, practice or custom; and that, as a practical matter, each individual defendant was the highest repository of authority to take the action attributed to such actor or was so situated that his or her acts or edicts could fairly be construed as constituting official policy.  All individuals are sued in their individual capacities.

24. Plaintiff as a citizen of The United States of America had a right under the First and Fourteenth Amendments to the Constitution of the United States to speak out on such, as herebefore alleged.

25. Defendants violated Plaintiff's right to speak freely about such policies and violations of law that she witnessed by either causing her to lose her internship or causing her to lose her job, or both.

26. Defendants took such adverse actions and terminated in order to stifle Plaintiff's willingness and ability to speak honestly about violations of law, and to retaliate against her for having made such reports.

6

27. Defendants conduct was willful, malicious and oppressive, and as a proximate consequence of such conduct, Plaintiff lost income, had her college education delayed, was damaged in her reputation and suffered emotionally.

## DEMAND FOR JUDGEMENT

**WHEREFORE PLAINTIFF PRAYS** for judgment against Defendants as follows:

A.    An order directing Defendants to reinstate Plaintiff to her position with the Houston County Board of Education, and with all back pay and benefits under the contract the contract signed and dated on July 28, 2004;

B.    Awards of compensatory and punitive damages;

C.    An order directing Defendants to pay Plaintiff's reasonable attorney's fees and costs; and

D.    Such other and further relief as this Court may deem just and appropriate in the circumstances.

WINN FAULK
ASB-3091-L48W
Attorney for Plaintiff

**OF COUNSEL:**
FAULK & REED
524 S. Union Street
Montgomery, Alabama 36104-4626
Phone: 334.834.2000
Fax:    334.834.2088
winnfaulk@bellsouth.net

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY.

**WINN FAULK**
**Attorney for Plaintiff**

7

# TAB E

1

```
 1         IN THE U. S. DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3            SOUTHERN DIVISION
 4
 5   NANCY MILLER,
 6       PLAINTIFF,
 7       VS.          CASE NO.1:06-CV-940-WKW
 8   HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
 9   LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,
12
13       DEFENDANTS.
14       The deposition of KENNETH LORD, taken
15   by the Plaintiff, pursuant to the Federal
16   Rules of Civil Procedure, before Stacey
17   Watkins, RPR, and Notary Public, State at
18   Large, at the offices of Hardwick, Hause,
19   Segrest & Walding, Dothan, Alabama, on the
20   10th day of October 2007, at 4:10 p.m., CDT,
21   pursuant to notice.
22
23
24
25
```

2

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFF:
 4   MR. WINN FAULK
     Attorney at Law
 5   Montgomery, Alabama
 6   MR. THOMAS K. BRANTLEY
     Attorney at Law
 7   Dothan, Alabama
 8
 9   FOR HOUSTON COUNTY BOARD OF EDUCATION,
     KENNETH LORD, RILEY JOE ANDREWS AND
10   TIM PITCHFORD:
11   MR. KEVIN WALDING
     MR. PATRICK B. MOODY
12   Attorneys at Law
     Dothan, Alabama
13
14   FOR PAUL STRANGE AND STACEY EZELL:
15   MS. KATHERINE HORTBERG
     Attorney at Law
16   Chelsea, Alabama
17   FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
     PAM PARRIS AND GREG RUEDIGER:
18
     MR. JOSEPH V. MUSSO
19   Attorney at Law
     Birmingham, Alabama
20
21   ALSO PRESENT:
22   NANCY MILLER
23
24
25
```

3

```
 1              STIPULATION
 2
 3       It is stipulated by and between counsel
 4   for the parties that this deposition be taken
 5   at this time by Stacey Watkins, RPR, and
 6   Notary Public, State at Large, who is to act
 7   as commissioner without formal issuance of
 8   commission to her; that said deposition shall
 9   be taken down stenographically, transcribed,
10   and certified by the commissioner. The
11   signature of the witness is waived.
12       Except for objections as to the form of
13   questions, no objections need be made at the
14   time of the taking of the deposition by
15   either party, but objections may be
16   interposed by either party at the time the
17   deposition is read into evidence, which
18   shall be ruled upon by the Court on the
19   trial of the cause upon the grounds of
20   objection then and there assigned.
21
22
23
24
25
```

4

```
 1              KENNETH LORD
 2   having been first duly sworn, testified as
 3   follows, to-wit:
 4
 5              EXAMINATION
 6
 7   BY MR. FAULK:
 8       Q    State your full name, please?
 9       A    Kenneth Jackie Lord.
10       Q    Until recently, you were
11   superintendent of education in Houston
12   County?
13       A    Yes, sir.
14       Q    When did you retire, if you
15   retired?
16       A    I believe it was -- yes, sir, I
17   did. I didn't run again. I retired -- I
18   believe it was December 31st of '04, I think.
19   I'm horrible with dates, but I think that was
20   it.
21       Q    And superintendents here are
22   elected?
23       A    Yes, sir.
24       Q    You have heard, I assume, several
25   times, the basic instructions about making
```

5

1  sure you understand the question, and if you
2  need a break, you can take one. Do I need to
3  run back over that?
4      A    No, sir.
5      Q    I want to just try to go through
6  this as nearly chronologically as we can.
7  What do you recall as being your first
8  knowledge about Nancy Miller coming here as
9  an intern?
10     A    The summer of '04, we were looking
11  to fill a number of positions, especially --
12  elementary was really not a problem. High
13  school was a problem, and especially in
14  special education. But we did even have a
15  problem or two with regular ed teachers, best
16  I recall.
17     Q    And then, you do recall Mrs. Miller
18  coming to interview as a possible intern and
19  teacher?
20     A    No, sir. I did not -- Mr. Andrews
21  handled all the interviews with the special
22  ed people. I handled a lot of the interviews
23  with the regular ed people. I didn't do any
24  of the special ed people.
25     Q    I think you've explained, in your

6

1  interrogatory answers, about how her contract
2  came to be drafted with your signature and so
3  forth.
4      A    That was one of the questions.
5  Yes, sir.
6      Q    Concerning her lack of a
7  certificate, in particular, was there, to
8  your knowledge, any type of certificate that
9  would have been appropriate for somebody in
10  her circumstances?
11     A    The certificate that she worked
12  under with us, as best I recall, was a
13  substitute teaching certificate. To my
14  knowledge, that was the only certificate that
15  she was eligible for.
16     Q    So, in your opinion, was her
17  employment appropriate or inappropriate,
18  based on that certificate?
19     A    I don't understand what you're
20  asking me.
21     Q    Well, the defendants, including you
22  -- and I know you didn't draft all this stuff
23  yourself. But one of the positions, as I
24  understand it, is that her contract was
25  actually an illegal contract due to her lack

7

1  of having certification.
2      A    Yes, sir.
3      Q    Is that a position you've had
4  occasion to discuss and give some thought to?
5      A    Yes, sir. I have since discovered
6  the contract that was issued to Mrs. Miller
7  -- I have since discovered, recently, of
8  course, that that contract should have never
9  been given to her. In other words, it didn't
10  really apply to someone who didn't have a
11  teaching certificate.
12     Q    Would there have been another type
13  contract that would have been appropriate for
14  her, or should she simply never have been
15  brought in as a paid employee?
16     A    Let me go around the world. I know
17  I probably shouldn't do this. In a small
18  system like ours, the only contract we gave
19  to anybody -- well, that contract was used
20  for anybody we hired, and probably was not a
21  good thing. Probably a review of that needs
22  to be done. In other words, a bus driver
23  would get that contract or whatever. It
24  would just say "bus driver," you know, for so
25  many days, and note the salary, and this,

8

1  that and the other. We should have
2  contracted with her as just a contract
3  substitute teacher, and not given that kind
4  of -- nothing signed. We should have not
5  gotten anything signed from her, it would be
6  my opinion.
7      As a matter of fact, really, we didn't
8  give contracts except -- I was superintendent
9  for almost -- well, for 12 school years. And
10  during that time, probably more than half of
11  those years, we didn't get anything signed
12  from anybody. And then, we started issuing
13  contracts. And, like I say, we didn't do a
14  very good job of it, or I didn't do a very
15  good job of it. I shouldn't say "we." I
16  didn't do a very good job of it.
17     Q    I appreciate your candor. Now, do
18  you remember a person named Amy Deese?
19     A    Yes, sir.
20     Q    Is it your recollection that she
21  came in under a similar arrangement to that
22  Mrs. Miller had, in that she was an intern
23  and a paid teacher at the same time?
24     A    Yes, sir.
25     Q    So far as you know, did Ms. Deese

9

1  have any sort of certification that Mrs.
2  Miller did not have?
3       A    No, sir.  She had a substitute
4  teaching certificate, the same as Mrs.
5  Miller.
6       Q    And then, what became of Ms. Deese?
7  Was she still working as a teacher when you
8  left?
9       A    Yes, sir.  Far as I know, she's a
10  tenured employee with the Houston County
11  Board of Education.
12       Q    So far as you know, has there ever
13  been any controversy that she owes you part
14  of her salary back or anything like that for
15  having taught under supposedly an illegal
16  contract?
17       A    Ms. Deese?
18       Q    Right.
19       A    No, sir.  The illegal contract --
20  and, yes, I don't think we had a good
21  contract.  It's not illegal to pay substitute
22  teachers.  And there's nowhere that I know in
23  the state law that says pay them $1.00 a day
24  or $1,000.00 a day.  So, we erred with a -- I
25  erred with a contract.  But, you know, you

10

1  can pay people to be substitutes.
2       Q    What was your first personal
3  involvement with the employment situation of
4  Nancy Miller other than technically issuing
5  the contract to her?
6       A    Now, personally, what --
7       Q    Personally involved.  I mean, at
8  what point did you get involved in any kind
9  of problems involving her internship or
10  employment?
11       A    Mr. Andrews reported to me on
12  several occasions that there was problems at
13  Houston County High School with an
14  intern/employee, Nancy Miller.  That's the
15  first -- the first recollection I have of her
16  is, he said, "Look, this is" -- and, which, I
17  knew we had no applications.  So, can we
18  recommend this person to the board?  Yes, we
19  can.  We did that, to have an
20  almost-certified teacher there.
21       And then, later on -- and I'm not sure
22  when, if it's September, October.  I really
23  can't recall that.  But, he made me aware
24  that there were some problems at Houston
25  County High School with Nancy Miller.

11

1       Q    Do you recall what the problems
2  were that he mentioned?
3       A    The only problems I recall Mr.
4  Andrews mentioning to me, really couldn't get
5  along with other teachers, other faculty
6  members, hard to take suggestions, follow
7  directions.  Those kind of things.
8       Q    Now, do you remember those things,
9  or -- you know, I'm not questioning your
10  truthfulness.
11       A    Yes, sir.  I understand.
12       Q    I'm just asking, are those things
13  you've heard in depositions, or do you
14  actually remember him saying those things to
15  you back at the time?
16       A    I remember him saying that there
17  was problems with Nancy Miller at Houston
18  County High School.  And the extent of those
19  problems was, like I say, just problems
20  getting along with the faculty members, and
21  the directions, as I mentioned, and hard to
22  -- really didn't take suggestions very well.
23  Those kinds of things.  That's the extent of
24  my knowledge of Nancy Miller.
25       Q    Well, did he ever tell you that she

12

1  was raising questions about the suitability
2  of certain aspects of the special ed program
3  at Houston County High School?
4       A    No, sir.
5       Q    Did that come to your attention at
6  some point prior to the termination of her
7  employment?
8       A    Problems with --
9       Q    That she was raising questions with
10  Mr. Andrews and other people, for that
11  matter, such as those listed in Defendant's
12  Exhibit 16 that I'll show you.
13       A    The only things I was aware of in
14  these listings here are basically the
15  comments that dealt, as I mentioned, about
16  having a hard time getting along with, those
17  kinds of things.  And I was made aware, at
18  some point, about her leaving school without
19  permission.  But, as far as a lot of these,
20  no, sir, not so much of those as it stated
21  there.
22       Q    Okay.  Did you have any
23  communication, oral or written or telephonic,
24  any means of communication, with Pam Parris
25  or anyone else connected with Troy

13

1　University, Dothan, having to do with these
2　problems?
3　　　A　　The problems with Nancy Miller?
4　　　Q　　Right.
5　　　A　　I really don't recall any
6　conversations with Pam Parris concerning
7　Nancy Miller. The only thing that I can
8　recall with Pam Parris was that I'm sure I
9　probably talked to her earlier in the summer,
10　possibly even about Amy Deese, about somebody
11　for that position. I wouldn't bet my life on
12　that. But that's really the only gist of
13　anything that I recall of any kind of
14　discussion with Ms. Parris during that
15　summer.
16　　　　Now, we have talked over previous years
17　concerning -- the talks I've had with Ms.
18　Parris was, "Look, do you have an intern, a
19　good intern, that we could spot in here to
20　help us finish out the school year," or do
21　something like that.
22　　　Q　　All right. Do you recall when --
23　and I don't mean a date. But, do you recall,
24　at some point, becoming aware that Troy
25　University had withdrawn Mrs. Miller's

14

1　internship? And if you do, tell me how it
2　came to your attention?
3　　　A　　And that's what I'm fuzzy on,
4　because I don't think -- as I stated a second
5　ago, I don't think that Ms. Parris called me
6　and talked to me about this. I think maybe
7　she sent me a fax, and then, followed it up
8　with a letter, I think, now.
9　　　　Again, it's been so long. I feel kind
10　of inadequate that I don't remember a lot of
11　this stuff, but I honestly don't. But I do
12　know that I got either a fax or a letter or
13　both. And I don't think she called me and
14　talked to me. But, again, I would hate to
15　say for certain, because I'm really not sure.
16　　　Q　　So, are you telling us that, to the
17　best of your recollection, your first
18　knowledge that Miller's internship would be
19　withdrawn was when you got an after-the-fact
20　memo of some type from Troy, informing you
21　that it had been withdrawn?
22　　　A　　Yes, sir.
23　　　Q　　Okay. Did you have any
24　conversations with Mr. Pitchford concerning
25　Nancy Miller, prior to the termination of her

15

1　employment?
2　　　A　　Yes, sir. I recall one, one
3　conversation. When I chose not to run again,
4　Mr. Pitchford -- and he ran and was elected,
5　I had made it okay with the board, and I
6　encouraged him to come up as much as he could
7　to the central office, so we could start
8　making him aware of different things.
9　　　　Somewhere in the midst of that -- and
10　this would be right around the very end of
11　this whole thing -- he was at the central
12　office one day. And I really don't know for
13　what. I can't remember for what reason.
14　　　　But I know he and I and Mr. Andrews
15　talked, right about the time that we got the
16　letter of her internship being withdrawn.
17　That's the only conversation I ever remember
18　us having. But I do remember that he, Mr.
19　Andrews, and myself, we did talk about it.
20　As a matter of fact, that was probably within
21　a day or two or three of me actually taking
22　the letter out to Houston County High School
23　to Mrs. Miller.
24　　　Q　　What do you recall about what was
25　discussed on that occasion?

16

1　　　A　　Well, again, I would be doing a lot
2　of guessing. Is that appropriate?
3　　　　　MR. WALDING: No, it's not.
4　　　Q　　Well, no. We don't want you to
5　guess. But if you can specifically recall
6　anything that was discussed, I'd like for you
7　to tell me.
8　　　A　　Specifically, I don't remember
9　anything. I'm thinking along the lines of,
10　we were talking about her internship was
11　withdrawn, and, you know, kind of put us in a
12　situation of what we're going to do.
13　Something along those lines. But that's
14　about the best I can do on that.
15　　　Q　　Is it your contention that you did
16　not consciously do anything that would have
17　adversely affected Mrs. Miller's internship
18　status?
19　　　A　　To the best of my recollection, no,
20　sir. I never had a conversation with anybody
21　that would have reflected badly on her
22　internship or her relationship with us.
23　　　Q　　Let me show you what's already in
24　as Defendant's Exhibit 28. It appears to be
25　a letter from you to Mrs. Miller, dated

17

1  October 19, 2004.  Do you recognize that?
2      A    Yes, sir.
3      Q    And did you hand deliver that to
4  her at the school?
5      A    Yes, sir.
6      Q    Take particular note, if you would,
7  sir, about something about her refusing to
8  leave the campus, and tell me what you had in
9  mind when you wrote that.  What were you
10  talking about, refusing to leave?
11      A    As best I can recall, this was two
12  or three, three or four days after her
13  internship had been terminated at Troy, after
14  we had received word that Troy was
15  terminating her internship.
16      And the fact that she had not come in
17  and made Mr. Pitchford, made anybody aware,
18  Mr. Andrews or anybody aware, me aware of
19  this, you know, and kept coming back, I think
20  that's what the refused part came about.  The
21  fact she hadn't come in and let anybody know
22  that, "My internship's over, and I've got to
23  -- I can't do this any more."  To the best of
24  my recollection, that's what we were talking
25  about there.

18

1      Q    Is that your best recollection of
2  that, as to why you used the word "refused"?
3      A    Yes, sir.  That's the only thing I
4  can think that -- again, three years ago,
5  whatever.  There was tons of things going on,
6  as a superintendent, and this was one of
7  1,000.  But, yes, sir, to the best of my
8  knowledge, this is why this is stated as is.
9      Q    Could you -- and I'm not faulting
10  your use of the language.  But, could you
11  just as easily, under those circumstances,
12  have said, "Because your internship has been
13  withdrawn, and you are continuing to report
14  to work, I must tell you not to any more"?
15      A    Yes, sir.
16      Q    "I'm terminating your employment."
17      A    Yes, sir.
18      Q    So, the refusal thing was not that
19  anybody had said, "Go away."  Correct?
20      A    Not to my knowledge.
21      Q    Okay.  But you felt like she should
22  have just known that, and by not going away,
23  she was refusing?
24      A    I can only put myself in her
25  position.  If my internship had been

19

1  terminated, I would have talked to somebody
2  and said, "How does this affect me
3  otherwise," is what I would have done.  I
4  would have appreciated that.
5      Q    When you delivered this to her,
6  what do you recall happening?
7      A    Mr. Andrews and I rode out to -- as
8  superintendent, any time we nonrenewed
9  someone, for whatever reason, someone from
10  the central office, and myself, when possible
11  -- and most of the time, I did -- would hand
12  deliver these.
13      We went out to Houston County High
14  School.  We met in Mr. Pitchford's office.  I
15  asked him to call her in.  She came in.  I
16  handed her the letter, asked her to read it.
17  The best I recall, she did.  Asked her if she
18  had any questions.  The best I remember, she
19  had no questions.
20      And at that point, Mr. Strange, Paul
21  Strange, was called in by somebody.  I don't
22  know if I said, "Mr. Pitchford, would you get
23  Mr. Strange," or if Mr. Pitchford said, "Let
24  me get" -- that, I can't recall.  But I know
25  we got Mr. Strange to go down and open up to

20

1  help her get anything, or if there was
2  anything locked up that was hers, you know,
3  that she would need to get, we asked him to
4  help her with that.  And that was pretty much
5  the extent of it.
6      Q    Do you recall any involvement on
7  the part of some sort of security man or
8  policeman or resource officer?
9      A    No, sir.
10      Q    Okay.  Were you actually present to
11  observe her leave the campus?
12      A    Sitting in the office at Houston
13  County High School, there's a big bay of
14  windows.  But I don't recall seeing her
15  leave.  I remember we stayed -- seems like we
16  stayed in Mr. Pitchford's office and talked
17  about some other things, best I recall.
18      Best I recall, the thing that let me
19  know that she was gone was when Mr. Strange
20  came back by and said, "She's gotten
21  everything and she's gone," best I recall.
22      Q    Let me show you the question and
23  answer, number 20, on your interrogatories,
24  and ask you to read the question and answer
25  and let me know when you're finished.

21

1    (The witness conferring with Mr.
2  Walding.)
3        MR. WALDING: He's just asked you
4            to read it, at this point.
5        THE WITNESS: Oh, okay. Just read
6            it. All right. I'm reading
7            it.
8    Q    (By Mr. Faulk) Tell me when you've
9  finished.
10   A    (Witness reviewing document.)
11  Okay.
12   Q    We know about her leaving campus
13  without notifying anyone. And that was your
14  understanding at the time? She had notified
15  no one?
16   A    Yes, sir. No one in authority that
17  she should have notified.
18   Q    Are you aware of any set policy on
19  that in Houston County at the time?
20   A    Yes, sir.
21   Q    All right. What was it?
22   A    Houston County Board of Education,
23  the policy manual, that's one of the things
24  that's spelled out under the teacher section.
25  Also, each school gives out a -- I was

22

1  assistant principal at Houston County High
2  School before I came to the central office.
3  And each year, we would give out a handbook
4  that had something to that effect in there.
5  And, also, that was something that was always
6  covered in the meetings before school, like,
7  the faculty meetings with the teachers. Just
8  one of those general kind of things that
9  would be covered.
10   Q    Do you know where I should be able
11  to find the handbook for the 2004-2005 school
12  year?
13   A    No, sir. I wouldn't know --
14   Q    And you're talking about the
15  faculty handbook for that school --
16   A    Yes, sir.
17   Q    -- or something that went out
18  systemwide?
19   A    For the school. They might have
20  some at Houston County High School, but I
21  wouldn't know.
22        (Off-record discussion held.)
23   Q    Let me ask you this, Mr. Lord: At
24  the time you were superintendent, can you
25  tell us who was in charge of updating that

23

1  manual?
2    A    Each individual school would update
3  theirs over the summer. They had different
4  printing arrangements worked out to get
5  theirs printed, and this, that and the other.
6    Q    When you say, in your answer there,
7  that she had caused problems with and
8  dissension among the teachers, tell us what
9  you're talking about specifically, please?
10   A    As I had mentioned earlier, Mr.
11  Andrews would report to me that there was,
12  you know, dissension among the teachers there
13  at Houston County High School caused by Mrs.
14  Miller. Didn't get along real well. Again,
15  back to the following suggestions, taking
16  directions kind of thing.
17   Q    Well, as far as dissension among
18  the teachers are concerned, do you mean to
19  state there that she had caused two or more
20  teachers not to get along with each other?
21   A    The dissension I'm referring to is
22  the fact that -- dissension among the
23  teachers in the fact that the teachers didn't
24  get along very well with her.
25   Q    So, not that she was fermenting

24

1  any kind of unrest as between other teachers,
2  but, rather, that she was doing something
3  that was somehow irritating to other
4  teachers?
5    A    Correct.
6    Q    Okay. Do you know what it was?
7  Were you informed of what Mrs. Miller
8  supposedly did in order to create this
9  problem?
10   A    No, sir, no more than I've told you
11  already. That's the extent of what I knew.
12   Q    You go on to say that it had
13  nothing to do with her alleged speech, but
14  would reflect her inability to respect the
15  views, feelings and opinions of others. And
16  I'm paraphrasing a little bit.
17        When you say "views, feelings and
18  opinions," do you have any specific
19  information about that, or was that just
20  conveyed to you in sort of a summary fashion,
21  you know, where you, yourself, were being
22  told she doesn't respect the views and
23  feelings of others?
24   A    I have never been made aware of
25  anybody, until we received this lawsuit,

---

25

1  anything dealing with free speech.  In my 12
2  years as superintendent, nobody has ever said
3  we've tried to stifle their free speech in
4  any way that I'm aware of.
5      Q    Aside from that, though, I'm
6  talking about the particular views, feelings
7  and opinions of more senior and experienced
8  teachers.  Do you know what particular views,
9  feelings and opinions she seemed unable to
10  respect?
11      A    No, sir, other than the couldn't
12  follow directions well, wouldn't take
13  suggestions.  Those kind of things.
14      Q    So, that's reported to you in a
15  summary fashion, rather than, you know, "She
16  was mean to me when she said my child looked
17  funny" --
18      A    That's correct.
19      Q    -- or some specific instance?
20      A    That's correct.
21      Q    Okay.  Was it communicated to you
22  through people such as Mr. Andrews or Mr.
23  Pitchford, and not by the teachers
24  themselves, who were her presumed victims?
25      A    That's correct.

---

26

1      Q    Okay.  And would the same be true
2  of not working well with others?
3      A    That's correct.
4      Q    Do you have any particular training
5  or experience in special education matters?
6      A    Very little.  I've been to the
7  special education legal workshops, and I've
8  been to state meetings about special
9  education.  It seems like, 100 years ago, in
10  part of our education, it seems like we had
11  to take one special ed course.  But I might
12  have gotten lucky and didn't even take that
13  one.  I wouldn't bet my life I took that one.
14  But I've had just a small amount of special
15  education training.
16      Q    Am I understanding you correctly
17  that you were never informed of any precise
18  complaints or concerns that Mrs. Miller had
19  expressed having to do with the special
20  education program at the high school?
21      A    Correct.
22      Q    And so, as we sit here, you would
23  not have an opinion as to whether any such
24  complaints that she may have raised had any
25  merit?  Is that fair to say?

---

27

1      A    I'm not aware of any complaints she
2  made, so I couldn't make a judgment on merit.
3      Q    Okay.  After delivering Defendant's
4  Exhibit 28, the October 19 letter to Mrs.
5  Miller, did you recommend or seek any kind of
6  action by the Houston County Board of
7  Education with regard to the termination of
8  her employment?
9      A    Yes, sir.  I took it before the
10  board.
11      Q    And should that be reflected in the
12  minutes?
13      A    Yes, sir.  And I'm thinking that --
14  I thought we produced a copy of those minutes
15  to you, but maybe we --
16      Q    It's possible you did, and I
17  overlooked them.
18      MR. SMITH:  We don't have them.
19          You said you would make the
20          books available to us.
21      THE WITNESS:  I mean, that's not a
22          hard thing.
23      MR. WALDING:  I thought we had.
24      THE WITNESS:  I thought I made a
25          copy of it.  If I didn't, I'm

---

28

1          sorry.
2      Q    (By Mr. Faulk)  Did you seek board
3  approval prior to the delivery of the October
4  19 letter?
5      A    No, sir.  I don't think I'm legally
6  supposed to do that or can do that, I think.
7  I mean, I recommend, and they either vote it
8  up or down, is my understanding.
9      Q    Was it your belief, at the time you
10  delivered the October 19 letter, that you
11  were acting within the law, so far as you
12  knew?
13      A    Yes, sir.
14      Q    If you were terminating or seeking
15  the termination of a contract teacher during
16  the term of the contract, what would be your
17  understanding of the proper procedure to
18  follow?
19      MR. WALDING:  Object to the form.
20          You're asking this
21          hypothetically?
22      MR. FAULK:  Yeah.
23      Q    Just in the ordinary sense, if you
24  had a nontenured teacher under contract, the
25  term of the contract has not expired, and you

---

29

1  want to terminate that teacher's employment,
2  what was your understanding, at the time, of
3  the proper procedure to follow?
4        MR. WALDING: And I still object to
5              the form.
6        MR. FAULK: That's fine.
7        MR. WALDING: That's also assuming
8              the contract is valid.  Go
9              ahead and answer.
10       A    The same as we did with Mrs.
11 Miller.  I would have hand delivered her a
12 letter, waited over 15 days to give her a
13 chance to follow board policy to appeal this,
14 and then, bring it before the board of
15 education.
16       Q    Would you, in effect, suspend
17 someone, pending --
18       A    I would think that would depend on
19 the situation.  A teacher with a gun or a
20 teacher having sex in the hall is a whole lot
21 different than what we're talking about here,
22 or a teacher having sex with a gun in the
23 hall would be a whole lot different than what
24 we have right here.  It builds and builds and
25 builds.

30

1        (Off-record discussion held.)
2        Q    It's contended on your behalf, Mr.
3  Lord, as well as the other defendants, that
4  the reports that Mrs. Miller made to Mr.
5  Andrews and to the Troy people about what she
6  considered to be irregularities in the
7  special ed program at the high school were
8  somehow part of her official duties.  Can you
9  shed any light on that, as to what the source
10 of that duty might be?
11       A    If you will, clear me up about --
12 what reports are we talking about she made?
13       Q    Well, were you not aware, at the
14 time you terminated her employment, that she
15 had previously made some reports and
16 complaints to Mr. Andrews, among others,
17 Dr. Ruediger at Troy, about things that she
18 considered to be not in compliance with
19 special ed regulations and laws?
20       A    No, sir.  I have never been aware
21 that she made any kind of reports on any kind
22 of irregularities that were taking place in
23 our special education program, or that she
24 alluded to were taking place in our program.
25       Q    Assuming that she made such

31

1  reports, would she, in your judgment, have
2  had some official duty to make those reports?
3        A    As an employee of the Houston
4  County Board of Education, if she saw
5  something that was wrong that was going on in
6  our system, I would think she would certainly
7  be within her right to do that.
8        Q    But you can't point me to any job
9  description or set of duties or board policy
10 that said she must do that, can you?
11       A    I'm not sure if that's in the
12 Houston County board policy or not.  It's
13 been so long since I've looked at it, I
14 really don't know.
15       Q    So, it might or might not be?
16 We'll just have to go look?
17       A    Yes, sir.
18       MR. FAULK: All right.  Thank you
19              very much.  I don't know if
20              your lawyer has any follow-up
21              or not.
22       THE WITNESS: If he does, I'm going
23              to object to the form.
24       (Recess in deposition from 4:42 to
25              4:48.)

32

1              EXAMINATION
2
3  BY MR. WALDING:
4        Q    Mr. Lord, have you, yourself,
5  personally, done anything to stifle Mrs.
6  Miller's free speech rights?
7        A    No, sir.
8        Q    Have you personally done anything
9  to retaliate against her for supposedly
10 exercising her free speech rights?
11       A    No, sir.
12       Q    Did you, as superintendent of
13 education, do anything to stifle Mrs.
14 Miller's free speech rights?
15       A    No, sir.
16       Q    Did you, as superintendent of
17 education, do anything to try to punish her
18 or retaliate against her for supposedly
19 exercising her free speech rights?
20       MR. SMITH: Object to form.
21       A    No, sir.
22       Q    Now, did you make the decision to
23 withdraw or terminate Mrs. Miller's
24 internship?
25       A    No, sir.

---

**33**

1  Q    Did you ask anybody at Troy State
2  to withdraw or terminate her internship?
3  A    No, sir.
4  MR. WALDING:  That's all I wanted
5  to ask.
6
7  EXAMINATION
8
9  RESUMED BY MR. FAULK:
10  Q    During the break, we were given the
11  board minutes dated December 6, 2004, which
12  is page 1,452 of the board's disclosures.
13  And are those the board minutes you alluded
14  to earlier?
15  A    Yes, sir.
16  Q    In comparing that to Defendant's
17  Exhibit 28, do you agree with me 28 didn't
18  give an effective date?  It just told her to
19  get out, basically?  Right?  She was to leave
20  immediately?
21  A    The October 19th letter said -- yes
22  -- it's over.  Right.
23  Q    Do you know how we got the
24  effective date of November 16, 2004, that's
25  in the December 6 minutes?

---

**34**

1  A    No, sir.
2  Q    But this would have been a meeting
3  held by the county board on December 6, 2004?
4  A    Yes, sir.
5  Q    And should there have also been a
6  November meeting?
7  A    Could have been.
8  Q    Did the board normally meet once a
9  month when you were superintendent?
10  A    Normally, yes, sir.  Always, no.
11  But, normally, yes, sir.
12  Q    And they might have a called
13  meeting from time to time?  Correct?
14  A    Correct.
15  Q    Is there, like, a particular day,
16  like, the third Thursday or something like
17  that, that they meet?
18  A    Yes, sir.  Gosh, I thought I'd
19  never forget that.  I want to think it was
20  the third Monday of the month.  It was the
21  third Monday of the month or first Monday of
22  the month.  But it was a set date.  Yes, sir.
23  December 6th.  It must have been the first
24  Monday of the month, unless we had a special
25  meeting because we were getting out for

---

**35**

1  Christmas.
2  Q    But you're pretty sure it was a
3  Monday?
4  A    It was a Monday or a Thursday.
5  Q    Man, you are retired.
6  A    Listen, I'm retired.  I'm retired.
7  Trust me.  I don't have much left to offer.
8  I left it all there.
9  (Brief off-record.)
10  Q    Mr. Lord, if the effective date of
11  her termination was November 16th, do you
12  know why she would not have been paid through
13  that date?
14  MR. WALDING:  Object to the form.
15  Q    Assuming she was not, do you know
16  why she would not have been paid through the
17  effective date, according to the board?
18  MR. WALDING:  Object to the form.
19  A    I think she was paid.
20  Q    You think she was?
21  A    Yes, sir.
22  MR. WALDING:  Let me ask one more.
23
24
25

---

**36**

1  EXAMINATION
2
3  RESUMED BY MR. WALDING:
4  Q    Does Defendant's No. 28 state the
5  reason that you recommended to the board of
6  education that Mrs. Miller's employment be
7  terminated?
8  A    Is this 28?
9  Q    Yes, sir.
10  A    No, sir.
11  Q    Well, doesn't it say because her
12  internship --
13  A    Oh, yes, sir.
14  Q    -- was terminated?
15  A    Yes, sir.  I'm sorry.  I'm sorry.
16  Yes, sir.  I didn't read it.  I'm sorry.
17  Q    So, this letter does, in fact,
18  state the reason that her employment was
19  terminated?
20  A    That's correct.  I'm sorry.
21  Q    And, again, did you have any
22  control over terminating her internship?
23  A    No, sir.
24  MR. WALDING:  All right.  Thank
25  you.

---



37

1    MR. FAULK:  That's it.  Thank you

2    very much.

3

4    END OF DEPOSITION

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

38

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 37, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10    taken down by me in stenograph shorthand,

11    and transcribed by me personally or under

12    my personal supervision.

13        I further certify that I have no

14    interest in this matter, financial or

15    otherwise, or how it may develop or what

16    its outcome may be.  I further certify that I

17    am not of counsel for any of the parties,

18    nor am I related to counsel or litigants or

19    associated with anyone connected with this

20    cause to my knowledge.

21        Witness my hand this 24th day of

22    October, 2007.

23    _____

24    _____ RPR, Notary Public,

     State at Large

25    ACCR# 155

# TAB F



**Page 1**

IN THE U. S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

NANCY MILLER,

    PLAINTIFF,

    VS.        CASE NO.1:06-CV-940-WKW

HOUSTON COUNTY BOARD
OF EDUCATION, KENNETH
LORD, RILEY JOE ANDREWS,
TIM PITCHFORD, PAUL
STRANGE, STACY EZELL,
TROY UNIVERSITY, DOTHAN,
SANDRA JONES, PAM PARRIS
and GREG RUEDIGER,

    DEFENDANTS.

    The deposition of RILEY JOE ANDREWS,
taken by the Plaintiff, pursuant to the
Federal Rules of Civil Procedure, before
Stacey Watkins, RPR, and Notary Public, State
at Large, at the offices of Hardwick, Hause,
Segrest & Walding, Dothan, Alabama, on the
10th day of October 2007, at 1:35 p.m., CDT,
pursuant to notice.

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:
MR. WINN FAULK
Attorney at Law
Montgomery, Alabama

MR. THOMAS K. BRANTLEY
Attorney at Law
Dothan, Alabama

FOR HOUSTON COUNTY BOARD OF EDUCATION,
KENNETH LORD, RILEY JOE ANDREWS AND
TIM PITCHFORD:

MR. KEVIN WALDING
MR. PATRICK B. MOODY
Attorneys at Law
Dothan, Alabama

FOR PAUL STRANGE AND STACEY EZELL:

MS. KATHERINE HORTBERG
Attorney at Law
Chelsea, Alabama

FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
PAM PARRIS AND GREG RUEDIGER:

MR. JOSEPH V. MUSSO
Attorney at Law
Birmingham, Alabama

ALSO PRESENT:

NANCY MILLER
KENNETH LORD

**Page 3**

STIPULATION

It is stipulated by and between counsel
for the parties that this deposition be taken
at this time by Stacey Watkins, RPR, and
Notary Public, State at Large, who is to act
as commissioner without formal issuance of
commission to her; that said deposition shall
be taken down stenographically, transcribed,
and certified by the commissioner. The
signature of the witness is waived.

Except for objections as to the form of
questions, no objections need be made at the
time of the taking of the deposition by
either party, but objections may be
interposed by either party at the time the
deposition is read into evidence, which
shall be ruled upon by the Court on the
trial of the cause upon the grounds of
objection then and there assigned.

**Page 4**

RILEY JOE ANDREWS

having been first duly sworn, testified as
follows, to-wit:

EXAMINATION

BY MR. FAULK:

    Q    State your full name for us,
please, sir?

    A    Riley Joe Andrews.

    Q    And, Mr. Andrews, I guess you know
I'm Winn Faulk, and I represent Mrs. Miller
in this case.

    A    I do.

    Q    And I know you've attended some
depositions? Right?

    A    Yes, I have.

    Q    I'll just kind of touch on it
briefly. The main thing I want you to
understand is, if you need a break, if you're
uncomfortable with anything, you want to talk
to your lawyer or whatever, just tell us, and
we'll take a break.

    Secondly, if you don't understand a
question I ask you for some reason, for any

5

1  reason, let me know, and I'll rephrase it.
2  So, when we walk out of here, I want to walk
3  out with the conviction that you understood
4  my questions and gave me your best answers.
5  Okay?
6      A     I understand.
7      Q     I know these things can get a
8  little conversational.  But try to speak,
9  like, "yes" or "no," rather than nod your
10  head or shake your head, so it will be easier
11  for her to take down.  Of course, you want
12  her to get it down right, you know, what you
13  said.
14      Also, if you get along in here and you
15  remember something you left out from a prior
16  question, just interrupt me, and I'll go
17  back, or something you realize you misstated,
18  let me know, and we'll straighten it out.
19  Okay?
20      A     Okay.
21      Q     Okay.  What's your employment
22  status these days?
23      A     Retired.
24      Q     And when did you retire?
25      A     2005.

6

1      Q     And what was your position with the
2  Houston County school board prior to that?
3      A     Federal programs coordinator.
4      Q     How long did you hold that
5  position?
6      A     From 1991 to 2005.
7      Q     Okay.  And as federal programs
8  coordinator, what responsibility, if any, did
9  you have in connection with the special
10  education program in the county?
11      A     I was the coordinator for special
12  ed program.
13      Q     Tell me and the jury a little more
14  about what that entailed?
15      A     I oversaw the program.  I worked
16  with the principals and the teachers on
17  implementing programs in the schools for the
18  children with disabilities.
19      Q     And who was your immediate
20  supervisor?
21      A     Superintendent.
22      Q     Who did you actually supervise,
23  yourself?
24      A     I worked with the teachers.
25  Actually, as far as supervising any

7

1  particular teacher, I did not.  They had
2  their immediate supervisors at the schools.
3      Q     Okay.  What was Virginia -- what is
4  her name?  Singletary?
5      A     She was an assistant.
6      Q     An assistant to you?
7      A     Right.
8      Q     And so, you supervised Ms.
9  Singletary?
10      A     Her.  She was --
11      Q     Anybody else that you directly
12  supervised --
13      A     Not at that time.
14      Q     -- from day to day?
15      A     No.
16      Q     There are several --
17      A     Excuse me.
18      Q     Sure.
19      A     The psychometrist worked out of the
20  central office, also.
21      Q     What was that person's name?
22      A     Starla Smith.
23      Q     And was she generally under your
24  supervision?
25      A     She was in my department.  Yes.

8

1      Q     Tell me your background, please,
2  educationally, as it relates to special
3  education?
4      A     I was in education for 37 years.
5  12 of those years was in the classroom.  I
6  taught social sciences and histories in high
7  school.  And then, the other 25 years was in
8  administration.
9      I was principal at Ashford -- I was
10  three years assistant principal at Ashford
11  High School, and then, became the principal.
12  And, at that time, a great majority of the
13  special services were housed at Ashford.  So,
14  I worked closely with those teachers there as
15  a principal and assistant principal.     And
16  then, after I became coordinator, I attended
17  numerous workshops, seminars, and things of
18  that nature, to help me be able to do my job.
19      Q     Let me show you some documents that
20  you may have heard me speak of earlier.
21  These are document numbers 43 through 64,
22  produced by your attorneys as an amendment to
23  their production of documents.  I'll ask you
24  to take a look at those and tell me whether
25  you're familiar with that document, please?

9

1    A    Yes, I am.

2    Q    And there are two of them,

3  actually, under two cover letters. One may

4  be after you retired. Had you retired by May

5  of '06?

6    A    Yes.

7    Q    So, it's really the first document

8  you would have more particular knowledge of?

9  Right?

10    A    That is correct.

11      (Whereupon, Plaintiff's Exhibit 3

12      marked for identification.)

13    Q    Okay. Mr. Andrews, I'm going to

14  show you what we've marked for identification

15  as Plaintiff's Exhibit 3, which consists of

16  pages 43 through 52 of the documents for

17  production I just mentioned. I'll give it

18  back to you. Tell us what that is, please,

19  sir?

20    A    This is the results of the focused

21  monitoring that they conducted on Houston

22  County Schools.

23    Q    All right, sir. Tell me about

24  focused monitoring. What's that all about?

25    A    Focused monitoring is the

10

1  monitoring process that the state department

2  of education uses to come and send a team of

3  personnel down to the school to review

4  records, go out and visit the schools, talk

5  to parents, and review the records, and make

6  sure that you're in compliance, in essence.

7    Q    Do you recall the event that's

8  discussed in this report? I mean, do you

9  recall that spring in 2004 --

10    A    Yes.

11    Q    -- and the people came and --

12    A    I recall the monitoring. Yes.

13    Q    Do you know approximately how many

14  team members would have come during that

15  period?

16    A    I don't recall exactly, but I'd say

17  in the neighborhood of six to eight team

18  members.

19    Q    Do you know which schools in the

20  system they monitored that year?

21    A    Not off the top of my head, I

22  don't. No, sir.

23    Q    Am I correct in thinking that they

24  don't necessarily monitor every school every

25  year?

11

1    A    That is correct.

2    Q    Okay. Take a look, if you would,

3  please, sir, just at the report. If you

4  don't mind flipping through there and just

5  see if you think you can reasonably infer

6  from the face of the report what schools were

7  monitored?

8    A    (Witness reviewing document.) Webb

9  Elementary School was one. I don't know who

10  the other one would have been, off the top of

11  my head.

12    Q    How could we find out?

13    A    How could I find out?

14    Q    Right.

15    A    I can check with the students'

16  names and go back to class rolls and see who

17  they might be. There were some students'

18  names mentioned here that's been marked out.

19    Q    Should the state department of

20  education, to your knowledge, have any other

21  documentation concerning this focused

22  monitoring event other than what's set out in

23  the report?

24    A    Do they have any --

25    Q    Do you know if they keep any other

12

1  records other than the final report?

2    A    No, I do not.

3    Q    Okay, sir. Do you know whether

4  Houston County High School was monitored in

5  the spring of 2004?

6    A    Not for certain, no, sir.

7    Q    What do you think? Well, if you

8  have a thought. I mean, I'm not trying to

9  just get you to make something up.

10    A    I don't recall. Honestly, I don't

11  recall.

12    Q    All right. So, when we look at one

13  of these reports on focused monitoring, we're

14  looking at something that involved less than

15  all the schools? Correct?

16    A    Yes.

17    Q    And at those schools, do they

18  examine every student's situation, or do they

19  randomly select students?

20    A    Randomly select students. A few

21  days before the team arrives, they send us a

22  list or send the school system a list of 25

23  students, randomly selected by various

24  exceptionalities, and ask us to pull those

25  records. Like, if they're coming on Monday,

13

1   they would fax us that Friday afternoon.
2       Q    What else can you tell me about the
3   process in general?
4       A    Well, they come to the central
5   office. They pull those records. They
6   review them. They dissect them. They then
7   go out and visit the schools that the
8   students are attending.
9       Then they have the parents come in.
10  They talk with the parents of the students of
11  some of the -- they pick five, I believe, of
12  the 25, and talk with the parents. And they
13  come in and spend half a day with the
14  parents, discussing accessibility of
15  programs, how satisfied they are with the
16  programs, how accessible are the people that
17  are in charge of the programs and that
18  nature.
19      Q    I had asked somebody earlier -- I
20  can't remember -- and they weren't able to
21  quite tell me, but I don't think. When you have
22  a special ed child at, say, Houston County
23  High School, where would their current and
24  past IEP's be filed?
25      MR. WALDING: Object to the form.

14

1           I'm objecting because his
2           question asked you two things.
3       Q    Go ahead.
4       A    The current IEP is kept at the
5   school. The teacher that is in charge of
6   that student has a copy -- has the IEP. Past
7   IEP's or the previous IEP's normally are, at
8   the end of the school year, sent to the
9   central office to be stored, as a general
10  rule.
11      Q    To be stored?
12      A    Stored.
13      Q    Okay. If somebody has already
14  graduated or moved away from Houston County,
15  what should become of the stored IEP's?
16      A    They're destroyed after -- I forgot
17  the number of years. But "X" numbers of
18  years, they're destroyed, after the parents
19  are notified that they will be destroyed.
20      Q    Do you know if it's more or less
21  than five years?
22      A    It's more than five.
23      Q    So, any of the students who were
24  special ed at Houston County High School in
25  the fall of 2004 should have extant records

15

1   of their IEP's? Correct?
2       A    Should have a copy of the past
3   IEP's, if it was turned in to the central
4   office.
5       Q    Which it should have been?
6       A    Should have been.
7       Q    You know, of course, we're here to
8   talk about Mrs. Miller's situation. And I
9   know it's been a while. But there are three
10  events in particular that I think give us
11  sort of a set of landmarks.
12      One is her first observation -- well,
13  her hiring -- her first observation by
14  Dr. Ruediger, her meeting with you at your
15  office, and the end of her career, the days
16  shortly prior to her final departure. So, I
17  may be asking you to try to place some of
18  these other events around those times, if you
19  can.
20      A    Okay.
21      Q    Let's talk about her hiring for
22  just a minute. What was your involvement in
23  her hiring?
24      A    I interviewed the applicants. As
25  we needed special education teachers, I would

16

1   pursue the applicants. I would look through
2   the files at the office, and then, we would
3   go through the applications. And if we had
4   time, then I would involve the principal, you
5   know, if they could go out and interview with
6   the principal and so forth.
7       I think it's already been said, but,
8   during this time, there was no applicants to
9   be had when this person was employed.
10      Q    Okay. Did you have anything to do
11  with soliciting her internship from Troy?
12      A    Yes, I did.
13      MR. WALDING: Object to the form.
14          I object to the form of his
15          question.
16      Q    Tell us what your involvement was?
17      A    Well, there was no applicants to be
18  -- you know, on file for special ed teachers,
19  and school was fixing to start. We had no
20  special ed teacher at Houston County High
21  School. We had hired a teacher previously
22  from another system, but they talked her into
23  staying, just like I would have done if one
24  had tried to hire one from Houston County.
25  So, after there was no applicants, I

17

1　contacted several places around trying to
2　find applicants. Called several systems. No
3　one had any applicants. I called Troy
4　University of Dothan and asked them did they
5　have anybody. And they says, no, but they
6　had an intern that was -- a person that was
7　fixing to do their internship.
8　　　Q　　And did that turn out to be Nancy
9　Miller?
10　　　A　　It did.
11　　　Q　　Okay. What happened next, as far
12　as the process went that you were involved
13　in?
14　　　A　　Ms. Parris sent her for me to
15　interview her. I did interview Mrs. Miller.
16　We talked at length about the special
17　education process and talked about Houston
18　County Schools, what our expectations were.
19　And after our conversation with her, I
20　contacted Mr. Pitchford and asked him would
21　he like to interview her. And he said, no,
22　he would take my word for it. And I said,
23　well, I didn't -- I said, this is the only
24　applicant that I have, was Mrs. Miller.
25　　　Q　　Just so I don't forget to ask you,

18

1　after she was gone from the system, was she
2　replaced? Do you know?
3　　　A　　Yes.
4　　　Q　　Do you know who replaced her?
5　　　A　　I believe Ms. Joan Hicks
6　transferred from Ashford to Houston County
7　High School at the semester.
8　　　Q　　Was she certified in special ed?
9　　　A　　Yes. Veteran teacher.
10　　　Q　　Do you happen to know who oversaw
11　Mrs. Miller's students between the time she
12　left, in late October, and the time Ms. Hicks
13　arrived?
14　　　A　　I think a sub. I don't know. They
15　had to, you know, hire a sub. And I don't
16　know the name of the sub.
17　　　Q　　Where would there be a record of
18　that?
19　　　A　　I'm assuming at the school.
20　　　Q　　Okay. So, we've got her on board,
21　I guess. Well, she had to sign a contract?
22　Right?
23　　　　　MR. WALDING: Object to the form.
24　　　Q　　Did she sign a contract with the
25　school system?

19

1　　　A　　Yes, she did.
2　　　Q　　Did y'all also sign an internship
3　agreement?
4　　　A　　The system and --
5　　　Q　　Right.
6　　　A　　-- Troy, Dothan, yes. I didn't
7　sign it.
8　　　Q　　Are you familiar with it?
9　　　A　　I've seen it and I've looked over
10　it. Yes.
11　　　Q　　It's previously in evidence as
12　Defendant's Exhibit 6. In looking over it,
13　are you aware of any provisions in there that
14　Mrs. Miller failed to comply with, I mean,
15　other than not finishing the internship, of
16　course?
17　　　A　　These were activities that would be
18　carried out at the school. Which, I was not
19　at the school, so I have no knowledge of
20　whether she did or didn't do this.
21　　　Q　　Have you been told that she did not
22　in any particular way?
23　　　A　　I don't recall either way.
24　　　Q　　The question has been raised about
25　her certification. What can you tell us

20

1　about that, as far as, you know, going into
2　this arrangement with Mrs. Miller? What was
3　done or said by you about the certification?
4　　　A　　All I know is that, you know, she
5　was the closest person that we had to being a
6　certified special education teacher at that
7　time. And she was not a certified teacher.
8　But we didn't have much choice but, at that
9　point, to have someone to go into the
10　classroom. And we had, in the past, had some
11　interns that came in and did -- you know, you
12　worked with us in the school system.
13　　　Q　　As special ed people?
14　　　A　　Yes.
15　　　Q　　It's my understanding that you
16　never made any effort to apply for any type
17　of provisional certificate for her? Correct?
18　　　A　　That's correct.
19　　　Q　　Are you aware of anyone else making
20　such an effort?
21　　　A　　I don't know.
22　　　Q　　No one has told you that? No one
23　has told you they did?
24　　　A　　No.
25　　　Q　　The reason I ask that, generally

21

1 speaking, I want your personal knowledge.
2 But, you know, if you've heard about
3 something in the course of your duties --
4    A    Right.
5    Q    -- I would like to know that, too.
6    A    Okay.
7    Q    Okay. So, do you recall, during
8 the interview process and the hiring process,
9 stating to Mrs. Miller that if she had any
10 problems, she should come to see you?
11    A    I believe that's the last thing I
12 told her before we ended the interview. I do
13 that with all our teachers, all the teachers
14 in special programs.
15    Q    And, of course, we know about the
16 visit to your office on September the 24th.
17    A    Yes.
18    Q    But, prior to that, was anything
19 brought to your attention concerning
20 difficulties that Mrs. Miller was having or
21 that people were having with her at Houston
22 County High School?
23    A    I had received some calls, I think,
24 from Mr. Pitchford or Mr. Strange, one. I'm
25 not sure which. That's three years ago. But

22

1 I received some calls that there were some
2 concerns by some of the teachers, veteran
3 teachers there, that they and Mrs. Miller
4 were having a conflict.
5        And I believe that Mrs. Miller had made
6 some comments that there were some students
7 that didn't have IEP's, and she was being
8 asked to do things that she didn't want to do
9 or in that nature.
10    Q    Okay. You understand I'm talking
11 about before the day she came to your office,
12 you're saying you had already heard that sort
13 of thing?
14    A    About the -- earlier, I had
15 received some calls, prior to September 1st,
16 I believe, some calls, you know, that there
17 was some conflict there at the school. Yes.
18    Q    It could have been Mr. Pitchford or
19 Mr. Strange?
20    A    Someone. Yes. I don't remember
21 which one.
22    Q    Did you receive calls from other
23 people?
24    A    No.
25    Q    Okay. Now, to the best of my

23

1 information -- and your lawyer may correct me
2 -- is that it appears that the date of your
3 meeting with her, where she came to your
4 office, upset or something, was September the
5 24th.
6        MR. FAULK: Can we agree on that?
7        MR. WALDING: I think that's the
8            date.
9    Q    I notice, in your interrogatory
10 answer to number 25, you refer to a September
11 1st meeting, and you just mentioned September
12 the 1st just now. Was there a meeting around
13 September the 1st --
14    A    Yes.
15    Q    -- earlier than the 24th?
16    A    Yes. One on September the 1st.
17    Q    Okay. Tell us about that meeting,
18 please?
19    A    I'm trying to recall. I don't
20 remember -- Ms. Parris was conducting the
21 meeting at Houston County High School. I
22 attended it, and I think Mr. Pitchford was
23 there and Mrs. Miller, I believe, are the
24 four that were there. And the meeting, to
25 the best of my knowledge, was just about

24

1 general things about the internship. And I
2 don't recall what all else was said. But it
3 was primarily about her general duties as an
4 intern at the school, and carrying out her
5 duties there at the school.
6    Q    Do you know what prompted that
7 meeting?
8    A    I don't recall if there was a call
9 prior to that meeting or not to Ms. Parris --
10 I don't know -- about some of the concerns
11 that was being raised about her getting along
12 with her peer teachers and things of that
13 nature. I don't know. I don't recall that.
14    Q    Take a minute, if you would,
15 please, sir, and read to yourself the entire
16 question and your answer. Okay?
17    A    To which one?
18    Q    To 25. And then, let me know when
19 you've finished, because I want to talk to
20 you some more about it.
21    A    (Witness reviewing document.)
22 Okay.
23    Q    The question, on the face of it,
24 was directed to the late September meeting at
25 your office. And it appears -- and this is

25

1 fine. I mean, people make mistakes and
2 misspeak. I do it. It appears you talk
3 about an earlier meeting in your answer. So,
4 there was one meeting in your office in the
5 latter part of September? Correct?
6     A     Correct.
7     Q     But the meeting you're giving us
8 this answer about was the earlier September 1
9 meeting out at the high school?
10    A     That's the only meeting I attended
11 at the high school. Well, that's one of two
12 meetings I went to at the high school.
13    Q     All right. I guess what I'm trying
14 to be sure of, you say, "After the September
15 the 1st meeting, I sent Virginia Singletary
16 to Houston County High School to verify all
17 student IEP's." Now, was that done before
18 Mrs. Miller left the campus --
19    A     Yes.
20    Q     -- and came to see you at your
21 office?
22    A     Yes.
23    Q     And you're confident of that? I
24 don't mean to beat it to death, but I want to
25 be sure.

26

1     A     Uh-huh. She checked not only --
2 she checked all the IEP's. My instruction to
3 Ms. Singletary was to go and to get with the
4 teachers to see that all of them had an IEP.
5     Q     And then, you reported Ms.
6 Singletary's findings to Mr. Pitchford, and
7 also told him about Mrs. Miller's concerns?
8     A     That's at the 24th meeting, on
9 September 24th.
10    Q     And, again, I'm not arguing with
11 you. But I do think -- I mean, are you
12 possibly talking about both September
13 meetings in this answer?
14    A     Probably so, yes.
15    Q     I want to be sure I've got it
16 straight.
17          MR. FAULK: You can take a look at
18          it, Kevin. Because it may just
19          be a mistake.
20          MR. WALDING: Sure. Well,
21          September the 24th falls after
22          the September 1st meeting. The
23          sentence speaks for itself.
24          "After September the 1st,"
25          which could include September

27

1 the 24th.
2          MR. FAULK: Well, it was after the
3          crucifixion, too, but the
4          question wasn't about the
5          crucifixion.
6     Q     And I'm not trying to just mess
7 with you --
8     A     No.
9     Q     -- Mr. Andrews. I mean, I am suing
10 you, of course, but I'm not just jerking you
11 around.
12    A     Are you sure about that?
13          MR. WALDING: Well, it's good we
14          can laugh about it.
15    Q     Take another look at it. If you
16 did misspeak, I mean, here's a good chance to
17 correct it with no harm done to anybody.
18          MR. WALDING: My point is that he's
19          not misspeaking. The 24th does
20          occur after September the 1st.
21          MR. FAULK: I got that. Thank you.
22          MR. WALDING: And that's what the
23          sentence says, Mr. Faulk.
24    A     Some time after September the 1st,
25 Ms. Singletary did go out to Houston County

28

1 High School to check the IEP's. That's what
2 I was referring to.
3     Q     Do you know whether it was before
4 Mrs. Miller coming to see you or not?
5     A     Yes.
6     Q     You're satisfied that you sent Ms.
7 Singletary out there based on the earlier
8 meeting?
9     A     To the best of my recollection,
10 yes.
11    Q     All right. Then, after she made
12 her report to you, you then called and
13 expressed Miller's stated concerns and
14 problems to Pitchford and Strange?
15    A     When she came to my office that
16 Friday afternoon -- I was not in the office
17 that morning. She came. I was working with
18 the Association of Retarded Children. We
19 were selling Tootsie Rolls, by the way.
20 That's their annual fundraiser. And I was
21 participating in that. I received a call on
22 my radio that Mrs. Miller was wanting to
23 speak with me.
24          Now, prior to that, I had received a
25 call from Ms. Singletary, stating that Mr.

---

**29**

1   Pitchford had called her and said that Mrs.
2   Miller had left the campus. And then, she
3   wanted to speak with me. That Mrs. Miller
4   wanted to speak with me. I left the Tootsie
5   Roll drive and came to the office and met
6   with Mrs. Miller and Ms. Singletary.
7        Q    Tell me what you recall about that
8   meeting, please?
9        A    We got there, I guess,
10  approximately 3:30, 3:45. Somewhere in that
11  neighborhood. I'm not exactly sure. We met.
12  I asked Mrs. Miller -- you know, she had some
13  concerns. I just asked her to share her
14  concerns with me. Like I had told her at the
15  very beginning, when I hired her -- I didn't
16  hire her. I can't hire anybody. But, when I
17  recommended her for employment --
18       Q    I understand.
19       A    -- if she had any concerns or
20  problems, to come to me.
21       Q    And she did?
22       A    And this was the first time that
23  she had come to me. Yeah. She expressed
24  those concerns, and Ms. Singletary made notes
25  while she was talking. And then, from the

---

**30**

1   notes, a list was compiled of her concerns.
2        Q    I'll show you what's in evidence as
3   Defendant's Exhibit 16, and ask you if that's
4   the compilation you just referred to?
5        A    That is correct.
6        Q    All right, sir. And you've had a
7   chance to review it recently?
8        A    I've looked at it, yes.
9        Q    Look over it. I want to ask you a
10  few questions about it. Let me know when
11  you've read it.
12       A    (Witness reviewing document.)
13  Okay.
14       Q    Do you feel like that fully and
15  fairly records the substance of Mrs. Miller's
16  complaints to you on that occasion?
17       A    That's as I recall them, yes.
18       Q    Do you recall any that Ms.
19  Singletary failed to record here?
20       A    I do not at this time, no.
21       Q    Now, at any time during that
22  meeting, did you speak to Mrs. Miller about
23  any impropriety on her part?
24       A    No. Not to my knowledge, I didn't.
25       Q    And you had had this prior meeting

---

**31**

1   on September the 1st? I'd like to go back to
2   that for a minute.
3        A    At the school. Yes.
4        Q    And that included Ms. Parris and
5   Mr. Pitchford, Mr. Strange?
6        A    I don't know if Mr. -- he might
7   have been -- yeah. Mr. Strange was there.
8   Yeah.
9        Q    And Mrs. Miller?
10       A    Right.
11       Q    Did y'all have any premeeting, that
12  didn't include Mrs. Miller?
13       A    Not to my knowledge. I did not,
14  no.
15       Q    Did you participate in any prior
16  telephone meetings or anything about it?
17       A    I don't recall if there was any
18  phone calls. I feel like there had been some
19  phone calls. I can't recollect the date or
20  anything of that nature. There were some
21  concerns with her and the other teachers
22  there at Houston County High School. Yes.
23       Q    Can you give me any more detail on
24  that?
25       A    Well, it's just that -- things that

---

**32**

1   -- she wanted to do things in the classroom.
2   She wanted to be a teacher. She wanted to
3   teach in the regular classroom, you know,
4   with the special ed students that were being
5   included in those classrooms. She wanted to
6   participate in that. And, you know, I
7   understand that, her being a professional
8   person, wanting to teach in those classrooms.
9   But, at the same time, we were
10  confronted with No Child Left Behind. This
11  was the high school students. And the only
12  person that can give grades to a high school
13  student, regular ed or special ed, in the
14  core classes, is a highly qualified teacher.
15  And that's a mandate under the No Child Left
16  Behind Act.
17  And so, that is the reason that we had
18  talked about collaborative teaching, so that
19  the special ed teacher and the regular ed
20  teacher could get together, and they could
21  teach the children, meet the needs of the
22  students that held an IEP, and they could
23  then collaborate, get together, come up with
24  grades, and assess the progress of the
25  students' IEP's, according to the goals on

33

1    their IEP's.
2        Q    Was there any discussion during the
3    September 1st meeting about any inappropriate
4    behavior on Mrs. Miller's part?
5        A    Again, I don't recall any
6    specifics.  I just know that the meeting was
7    about generally going over her duties as an
8    intern, primarily.  To sit here and tell you,
9    yes, there was, or there wasn't, I don't
10   recall that.
11       Q    Do you recall any discussion at the
12   September 1st meeting about concerns that
13   Mrs. Miller had expressed about the state of
14   the IEP's out at that school?
15       A    No.  Nothing was mentioned to me at
16   that time.
17       Q    Assuming that to be correct, let me
18   ask you, why would you have sent Virginia
19   Singletary out there before the September 24
20   visit to your office?
21       A    From September -- after September
22   1st meeting is when I started receiving the
23   phone calls from the personnel there at
24   Houston County High School about concerns
25   that -- there were some comments made about

34

1    her working with other teachers and dealing
2    with students, and that some comments had
3    been made either by her, to Mr. Strange, I'm
4    assuming, being he was her mentor, about some
5    of the students not having IEP's.
6        Q    Okay.  And that prompted your
7    sending Ms. Singletary out there?
8        A    Yes.
9        Q    Okay.  Did you have any further
10   communications concerning Mrs. Miller, that
11   you specifically recall, prior to the
12   September 24 meeting?
13       A    No.  I don't recall any specific
14   meeting or any specific call.  I know I
15   didn't have any meetings.  I don't recall if
16   Mr. Pitchford had called me or Mr. Strange,
17   either one, during that time or not.  They
18   may have.  I don't recall.
19       Q    What about communications between
20   you and people affiliated with Troy
21   University, Dothan?
22       A    The only person I talked to at Troy
23   University was Pam Parris.
24       Q    Did you talk to her between the 1st
25   and the 24th, that is, between those two

35

1    meetings?
2        A    If I received calls from the
3    principal or the mentor at the school about
4    some concerns, I'm sure I relayed them to Ms.
5    Parris.
6        Q    And you would have done that
7    promptly?
8        A    I would think so, yes.
9        Q    Or within a reasonable time?
10       A    I assume, yes.
11       Q    There are several people mentioned
12   by name in Ms. Singletary's notes in
13   Defendant's Exhibit 16, aside from Mr.
14   Strange and so forth.  Did you ever discuss
15   any of this privately with any of these
16   individuals that are mentioned here?
17       A    After -- the concerns?
18       Q    Yes, sir.
19       A    After our meeting with Mrs. Miller,
20   when she left, I tried to call Troy
21   University that Friday afternoon.  They were
22   not there.  I left word, you know, that I had
23   met with Mrs. Miller, and that -- you know,
24   that she needed to go out and meet with Mrs.
25   Miller out at Houston County High School.

36

1        Because I had asked Mrs. Miller, after
2    we had talked, if she felt comfortable going
3    back to the school.  And she said, no, not
4    until she had met or she had had a chance to
5    talk with Ms. Pam Parris.  And I called Ms.
6    Parris and left a message.  And I want to say
7    that I called her again on Monday morning to
8    ask her to go and meet with them about these
9    concerns.
10       Also, there were questions about Starla
11   Smith and Paul Strange asking her to --
12   asking Mrs. Miller to sign some documents
13   for, that she wasn't there.  I called and
14   talked to Mr. Strange.  And he told me, at
15   that point, that that was not an IEP.  It was
16   an eligibility meeting.  And that the only
17   reason that they asked Mrs. Miller to even
18   review the document was so that she would
19   feel like she was part of the learning
20   process as an intern.  Also asked Ms. Starla
21   Smith.  She gave me the same answer.
22       Q    Can I see that back, please?
23       A    (Handing document to Mr. Faulk.)
24       Q    What about Cathy Keasler?  Did you
25   talk to her about any of this?

37

1 A No, I did not.

2 Q What about Scott Stephens?

3 A No, I did not.

4 Q Did you talk to Dr. Ruediger about

5 it?

6 A No. I did not talk to Dr. Ruediger

7 at all.

8 Q Do you know about what time your

9 meeting with Mrs. Miller concluded on the

10 24th? What time of day?

11 A Not exactly. I'd say somewhere

12 roughly an hour, probably, that we met. I'm

13 not sure.

14 Q Did the meeting conclude prior to

15 the close of the school day? Do you remember

16 that?

17 A No. It was after the school day.

18 Q Did you tell her what to do? When

19 she said she didn't want to go back 'til she

20 had had time to talk to Pam Parris, what did

21 you have to say about that?

22 A I asked her did she want to go

23 back. And she told me that she would rather

24 talk to Pam Parris, her advisor, intern

25 advisor, before she went back. And I told

38

1 her that that would be fine. That I would

2 contact Ms. Parris and tell her that she

3 needed to talk with her. And that's what I

4 did.

5 Q Was it your opinion, at the time,

6 that it was wrong for Mrs. Miller to come to

7 you with these concerns?

8 A No. Had I not meant for her to

9 come, I wouldn't have told her that.

10 Q Did you, yourself, ever make any

11 kind of survey of these IEP's to satisfy

12 yourself that they were appropriate?

13 A No, I did not.

14 Q You relied solely on Ms.

15 Singletary's --

16 A Singletary.

17 Q -- report for that?

18 A That is correct.

19 Q Anybody else?

20 A No.

21 Q And then, after the meeting on the

22 24th, then, is when you called to talk to Mr.

23 Pitchford, and got further assurances that

24 the IEP's were proper? Correct?

25 MR. WALDING: Object to the form.

39

1 A I called to tell him that I had met

2 with Mrs. Miller that Friday afternoon, and

3 she had expressed some concerns to me, and

4 that I had those concerns. And I believe, at

5 that same time, I asked him to express his

6 concerns or their concerns to me, so that I

7 could make Ms. Parris aware of those

8 concerns, so that we could provide some help

9 to Mrs. Miller in those areas.

10 Q And then, did that list of concerns

11 come to you in the form of Defendant's

12 Exhibit 18 that I'm showing you?

13 A That is correct.

14 Q And was it based on Defendant's

15 Exhibit 18 that you prepared Defendant's

16 Exhibit 17?

17 A That is correct.

18 Q And then, I gather you sent

19 Defendant's Exhibit 17 and 18 to Ms. Parris?

20 A That is correct.

21 Q What? Did you fax it to her?

22 A I mailed it to her.

23 Q Do you know how soon that was after

24 Mrs. Miller coming to your office?

25 A No, sir. I don't recall. But I

40

1 would assume that it would have been within a

2 few days. As soon as I could have got the

3 responses from Houston County.

4 Q Had Ms. Parris already come and met

5 with you by the time you sent her this

6 letter?

7 A No.

8 Q Was it your opinion, after having

9 talked to Mr. Pitchford and Mr. Strange, that

10 the concerns that are listed on Defendant's

11 Exhibit 16 by Ms. Singletary, attributed to

12 Mrs. Miller -- did you conclude that all of

13 those concerns were unfounded?

14 MR. WALDING: Object to the form.

15 A All I did was ask her the ones that

16 pertained to the programatic things dealing

17 with special ed, for Ms. Singletary to check

18 on the IEP's. And I followed up with the

19 psychometrist and the other person here about

20 what they had said or not said. And the

21 other things, I had no knowledge if they

22 happened or not, if they did or not.

23 Q Did Ms. Singletary do two

24 investigations?

25 A No. This is all the one.

41

1    Q    So, you sent her out there after
2  the 24th meeting?
3    A    No.
4    Q    You sent her out there before that?
5    A    Right.
6    Q    Had Mrs. Miller previously
7  expressed some of these concerns, to your
8  understanding --
9    A    No.
10    Q    -- prior to the 24th?
11    A    No. I had not talked to Mrs.
12  Miller.
13    Q    Okay. Well, I don't mean expressed
14  them to you. But I just said, to your
15  understanding, where someone, Mr. Pitchford,
16  possibly, said she said these things?
17    A    These were the things they sent.
18  These are the things Mrs. Miller expressed to
19  me in the 24th meeting.
20    Q    Did any of these overlap with
21  things that had already come to your
22  attention that led you to send Ms. Singletary
23  out there in the first place?
24    A    The only things that I see a tie
25  that we had already investigated was the

42

1  IEP's.
2    Q    What number are you referring to?
3    A    Number 2.
4    MR. WALDING: It's the one about
5      Ms. Keasler asking her to do
6      one.
7    A    I don't know if these IEP's were
8  not done or they were done on the 24th. I'm
9  assuming, you know, they would not have been
10  there when Ms. Singletary went to check. I
11  don't know if these were new students or
12  what.
13    Q    So, once you heard these
14  complaints --
15    A    From Mrs. Miller.
16    Q    -- the nine areas that are listed
17  there in Defendant's Exhibit 16 -- am I right
18  about that? 16? -- any investigation you
19  did into these additional concerns was in the
20  forum of discussing them on the telephone
21  with Mr. Pitchford and Mr. Strange? Is that
22  correct?
23    MR. WALDING: Object to the form.
24    A    And the psychometrist and anybody
25  that -- I asked the psychometrist and I asked

43

1  Mr. Strange, you know, about the alleged
2  signing of IEP's, and that she wasn't at the
3  meeting. Because they knew that she was not
4  a certified teacher, and under the terms of
5  the agreement, she couldn't do IEP's. They
6  knew that.
7    Q    Based on their answers to you --
8    A    I was satisfied.
9    Q    -- you were satisfied?
10    A    Yes.
11    Q    Did you have any other source of
12  knowledge that led to your satisfaction?
13    A    These were veteran personnel that
14  we had in our system. And after I had
15  contacted them and they gave me their
16  answers, I was satisfied with their answers.
17    Q    Okay. And based on that, you were
18  satisfied that her complaints were unfounded?
19  Correct?
20    MR. WALDING: Object to the form.
21    A    The ones that I confirmed were
22  unfounded. Others, I couldn't -- I did not
23  know.
24    Q    But your conclusion that they were
25  unfounded were based upon the say-so --

44

1    A    Of others.
2    Q    -- of these other people?
3    A    Right. I did not go personally,
4  myself. No.
5    Q    Let me show you Defendant's Exhibit
6  14, which is a letter dated September 24th,
7  purporting to be from Nancy Miller to Mr.
8  Pitchford. Had you seen that before today?
9    A    Yes.
10    Q    And what was the occasion for you
11  seeing it?
12    A    This was in an envelope that was
13  given to me by Mrs. Miller that Friday
14  afternoon on the 24th. This was in the
15  envelope.
16    Q    All right, sir. Did you look into
17  the allegations, if you will, that are made
18  in that letter?
19    A    Well, the one about Cathy Keasler
20  is the same one that we've already talked
21  about. The others, again, Ms. Singletary had
22  gone to the school and said that they all had
23  valid IEP's.
24    MR. WALDING: Let me interject. I
25    don't mean to testify for him.

45

1    But the first thing is about
2    Starla Smith. And he did
3    testify that he talked with Ms.
4    Smith. Correct?
5    THE WITNESS: Yes. I talked with
6    Ms. Smith.
7    MR. FAULK: That's fine.
8    Q    Let me ask you this: When you sent
9    Defendant's 17 and 18 to Ms. Parris --
10   A    Right.
11   Q    -- what did you wish to accomplish
12   by doing that?
13   A    I think I stated this earlier.
14   After I had talked to Mrs. Miller on the
15   24th, that afternoon, and then, she listed
16   her concerns, I contacted the school about
17   their concerns, to get them in writing, so
18   that if there was a problem, which,
19   obviously, there seemed to be one, that we
20   could come to some consensus to assist or
21   help Mrs. Miller.
22   Q    And did you do anything else to
23   further that end of helping Mrs. Miller?
24   A    No. I did not go out there.
25   Q    Well, did you do anything else to

46

1    further the end of helping Mrs. Miller other
2    than to convey these assertions set out in
3    those letters to Ms. Parris?
4    A    She was an intern, and Ms. Parris
5    was her supervisor, advisor. I expected Ms.
6    Parris to handle the concerns, because she
7    was under her direct supervision as her
8    advisor, is what my expectations were, after
9    I made Ms. Parris aware of some concerns that
10   the school system had.
11   Q    Was it your expectation that the
12   Troy University people that ran the intern
13   program would follow up on your letter and
14   take some kind of corrective action?
15   A    That was my hopes. Because we had
16   no teachers, and she was the teacher that we
17   had in place at the time.
18   Q    Okay. Once you sent this letter
19   off, or these letters, did you get any
20   further feedback from anyone connected with
21   Troy about what they were doing to help Mrs.
22   Miller?
23   A    I don't recall if there was
24   anything. I think there was a -- I don't
25   know. I can't answer that. I don't know.

47

1    Q    What's the next thing you remember
2    happening in connection with all this, I
3    mean, with Mrs. Miller and the school and so
4    forth? The next event that stands out in
5    your mind?
6    A    After the 24th?
7    Q    Yes, sir. Well, after the 24th,
8    and then, you got this information, and you
9    sent it to Ms. Parris.
10   A    It was my understanding there was a
11   meeting at school with Ms. Parris, Mrs.
12   Miller, and I think the school officials. I
13   didn't attend that meeting. I wasn't
14   invited. And I don't know exactly what
15   happened at that meeting. You know, I was
16   not there.
17   Q    Did you instruct them to have that
18   meeting, or did they directly deal with Troy
19   on it?
20   A    After the 21st?
21   Q    Right.
22   A    The 24th, I mean.
23   Q    24th. Yes.
24   A    That was primarily at Mrs. Miller's
25   request. Because I had talked to -- she

48

1    wanted to talk to Ms. Parris. And I called
2    her and told her that she had these concerns.
3    That she wanted to talk with her.
4    Q    Did you attend any more meetings,
5    prior to the final discharge of Mrs. Miller,
6    that had to do with her employment?
7    A    No.
8    Q    Did you have any further telephone
9    contacts with Mr. Pitchford that had to do
10   with her employment, after you sent these
11   letters to Ms. Parris?
12   A    I don't recall any.
13   Q    When did it first come to your
14   attention that Ms. Miller's internship had
15   been withdrawn?
16   A    I don't recall if I got a phone
17   call. I got something from Troy that they
18   were going to terminate her internship. I
19   don't know if it was a phone call or what. I
20   don't remember. It was some -- and then, we
21   got a letter later.
22   Q    And then, what happened next, as
23   far as getting rid of Mrs. Miller is
24   concerned?
25   MR. WALDING: Object to the form.

49

1    A    We did not get rid of Mrs. Miller.
2  I've said this time after time, that she was
3  a teacher of record at that time there, or
4  employee there at that school, carrying out
5  the special ed duties. And I had no one
6  else.
7    Q    It's my understanding that she
8  stayed there several days after she was
9  notified that her internship was withdrawn.
10  Is that your understanding?
11    A    That's my understanding. Yes.
12    Q    There have been references in the
13  litigation to her refusing to leave the
14  campus. Do you know anything about that?
15    A    No, I do not.
16    Q    And by "know anything about it," I
17  mean, has anything concerning that came to
18  your attention in connection with your
19  performance of your official duties?
20    A    (No response.)
21    Q    You have to tell her.
22    A    Okay.
23    Q    I take it no one told you, at the
24  time, "She's out here and refusing to
25  leave" --

50

1    A    Nobody called me and told me. No.
2    Q    -- or words to that effect?
3    A    No.
4    Q    Is it your understanding Mr. Lord
5  wrote Mrs. Miller a letter and delivered it
6  to her, telling her that her employment was
7  terminated?
8    A    I accompanied him to deliver that
9  letter.
10    Q    Okay. Tell me about that occasion,
11  please?
12    A    Mr. Lord and I rode out to Houston
13  County High School. And I don't know where
14  we met. I don't know if it was in the board
15  room there or the meeting room, conference
16  room, or what. But he gave Mrs. Miller the
17  letter.
18        And at that point, Mr. Pitchford or Mr.
19  Lord -- I think Mr. Pitchford -- instructed
20  Mr. Stephens (sic), who had come in about
21  that time, I think, there at the outside door
22  there, to go with her and assist her in
23  getting her stuff.
24    Q    Did you witness her being escorted
25  off campus?

51

1    A    No. I don't remember -- I don't
2  recall that.
3    Q    Were you still there when she left?
4    A    I was in the room there. I do not
5  recall her being escorted. I think Mr.
6  Strange went with her. Yes.
7    Q    Nothing you would describe as
8  being --
9    A    No.
10    Q    -- forcibly escorted?
11    A    No.
12    Q    Now, when she was hired in, was any
13  kind of board action taken to confirm that
14  hiring, if you know?
15    A    When she was hired?
16    Q    Right.
17    A    I recommended to Mr. Lord that she
18  be employed. And it's my understanding that
19  she was hired by the board, at a regular
20  board meeting.
21    Q    And that would be the norm with any
22  employee? Correct?
23    A    Sure.
24    Q    When she was terminated, to your
25  knowledge, was there any board action to

52

1  confirm the termination?
2    A    I'm sure there was, but I don't --
3  I can't be specific.
4    Q    Well, when you say you're sure
5  there was, are you saying that you would
6  expect there to be, or that you, in fact,
7  know that there was board action?
8    A    I can't answer that concretely.
9  No, I don't know.
10    Q    Am I correct in saying that,
11  generally speaking, when an employee is
12  terminated, for whatever reason, there's
13  supposed to be some board action on it?
14    A    At some point, yes.
15    Q    Did you ever talk to Mrs. Stacey
16  Ezell about Mrs. Miller?
17    A    I don't know if she was there in
18  meeting her on the day I was out at the
19  school or not. I can't recall for sure. I
20  can't answer that. I don't recall. I don't
21  know.
22    Q    Let me show you Defendant's Exhibit
23  28, which is a letter from Mr. Lord to Mrs.
24  Miller, dated October 19, 2004, and ask you
25  is that the letter you recall being delivered

53

1 to her?

2     A    I assume that's the letter that I

3 accompanied him to deliver. Yes.

4     Q    Do you see in here where he talks

5 about her refusing to leave?

6     A    Yes, I see that.

7     Q    Do you have any knowledge, as we

8 sit here, of her having previously been asked

9 or told to leave the campus?

10     A    I don't know what transpired when

11 she was, you know, terminated. I don't know

12 what transpired at that point. No.

13     Q    So, you don't have any knowledge of

14 it, at any rate?

15     A    No.

16     Q    There's been talk, in connection

17 with this case, about whether or not Mrs.

18 Miller had some official duty to make these

19 complaints to you. In your judgment, was

20 that part of her official duties?

21     A    I don't know if it's her official

22 duties or not. But, as I stated earlier, had

23 I not meant what I said to Mrs. Miller about,

24 if she had problems, to come to me or contact

25 me, I wouldn't have said that. And I meant

54

1 that. Because I expect people to have

2 pleasant working relationships at schools and

3 to meet the needs of our children. That's

4 why I relayed that to her.

5     Q    Was that a direct order, or was

6 that an invitation?

7     A    It wasn't an order, no. I would

8 assume that anybody would have taken that as,

9 you know, "I have an open door. If you've

10 got a problem, I've got a problem."

11     Q    What about this business of her

12 leaving the campus without telling Mr.

13 Pitchford that she was leaving? At the time

14 that occurred, to your knowledge, was there a

15 written policy anywhere in the school system

16 about what a teacher was to do under those

17 circumstances?

18     A    I don't know what the policy was at

19 the school. But I know that it's an unspoken

20 policy that any time you leave your post or

21 your job, you're supposed -- I would assume

22 that you're supposed to report to someone.

23 You just don't leave.

24     Q    Well, if she reported it to her

25 mentor, in the absence of Mr. Pitchford, in

55

1 your judgment, would that have been

2 inappropriate?

3     MR. WALDING: Object to the form.

4     A    Unless there was a written policy

5 contrary to that.

6     MR. FAULK: Excuse us just a

7         second.

8     (Recess in deposition from 2:35 to

9         2:53.)

10     Q    During the break, Mr. Andrews, I

11 had asked you to review pages 1013 through

12 1041 and 1066 through 1070 of defendant board

13 of education's production of documents. And

14 have you now had a chance to do that?

15     A    Yes.

16     (Brief off-record.)

17     Q    You understand these to be IEP

18 reports concerning R. S.?

19     A    Yes.

20     Q    Do you have any knowledge as to

21 whether, at the time the one shown at 1013

22 through 1041 was prepared, whether R. S. had

23 any other IEP besides the one shown at 1066

24 through 1070?

25     A    I do not know. No.

56

1     Q    Do you have an opinion, based on

2 your education and experience, as to whether

3 it would have been appropriate for the

4 Houston County School System not to have --

5 assuming for a moment that the 1066 through

6 1070 was the most recent IEP at the time 1013

7 through 1041 was prepared -- I'll just ask

8 you to assume that for purposes of this

9 question. We can find out later.

10     Assuming that, would it have been

11 appropriate for the Houston County Schools

12 not to have prepared a new IEP for Miss S.

13 prior to October of 2004?

14     MR. WALDING: Object to the form.

15     A    They possibly should have prepared

16 a new one. However, until a new one is

17 prepared, they could have used the old IEP

18 and carried through with it until a new one

19 was prepared.

20     Q    When you say they should have

21 prepared one --

22     A    They could have.

23     Q    -- what are you basing that on?

24     A    Let me rephrase that. They could

25 have. Or they could accept the one that they

57

1  had until they did prepare a new one.
2      Q    Well, can you just go on
3  indefinitely, in your opinion, without
4  preparing a new one?
5      A    No.
6      Q    Is there some kind of time frame
7  within which a new IEP should be prepared, or
8  at least the old one reviewed and approved?
9      A    Efforts should be made, you know,
10  to draft a new IEP to cover the time frame
11  that you're in.  Yes.  Temporary IEP's are
12  normally signed, or they were at that time --
13  they no longer do that now, because the law
14  has changed again.  But temporary IEP's are
15  done that would last for 30 days, and then,
16  you could get an extension on that.  But
17  they've discontinued that practice now.
18      Q    Well, is it your opinion that, as
19  of October 2004, the IEP shown at 1066
20  through 1070 would have been appropriate
21  without being updated prior to October?
22          MR. WALDING:  Object to the form.
23      A    I don't know what day that Miss S.
24  enrolled at Houston County High School.  I
25  don't know if there was a time lapse in that.

58

1  I don't know.  I don't have that information
2  before me.  This was the last IEP that was
3  done for her.
4      Q    You're talking about 1066 to 1070?
5      A    Until this one was done in October.
6  And if she was at school there, they either
7  had to follow the old one, just like they
8  would on any transfer student -- you can use
9  the one that transfers in to you.  You can
10  use that, as long as you provide services.
11  And there's a consent form and all that with
12  this.  You continue the services until a new
13  IEP can be developed, whatever the
14  circumstances might be.
15      Q    But there's no set time frame
16  for --
17      A    Like I said --
18      Q    -- reviewing the IEP's?
19      A    -- normally, it's 30 days.  You
20  have a temporary for 30 days.
21          (Brief off-record.)
22      Q    Now, a child's current IEP, a copy
23  of it is kept at the local school?  Correct?
24      A    The teacher -- a working copy is at
25  the school.  The teachers have that, and they

59

1  share that with all the teachers that teach
2  that child.
3      Q    Is there also a copy at the central
4  office?
5      A    Not of the new one.  Just the one
6  that they have -- that they have that they're
7  working from now, that is kept at the school
8  with the teacher.  The teacher keeps that
9  IEP.
10      Q    Now, your lawyer keeps telling me
11  in depositions that I just don't understand
12  special education law, and he's probably
13  right, but --
14          MR. WALDING:  For the record, I've
15              only said that once.
16          MR. FAULK:  You've said it twice,
17              which is fine.  As I say,
18              you're probably right.
19          MR. WALDING:  But I'll say it again
20              today, if you'd like.
21      Q    We've talked around this subject of
22  full inclusion.  And I went into this case
23  under the impression that there had been some
24  sort of policy change in the Houston County
25  School System between the spring of '04 and

60

1  the fall of '04 that concerned this question
2  of full inclusion.  Now, can you shed any
3  light on that?
4      A    I'll do my best to.
5      Q    All right, please.
6      A    Full inclusion is exactly what it
7  says.  They're fully included in the general
8  curriculum.  IEP's are based on standards set
9  out in the Alabama courses of study.
10      Students that are on a regular diploma
11  track are to receive their instructions from
12  a highly qualified teacher, and that being
13  the subject matter teacher.  Like, in high
14  school, they're highly qualified in English,
15  math or whatever.  They receive instruction
16  from that teacher, and with support -- no
17  special ed child should be placed in an
18  included environment without support.
19      That is where the special ed teachers
20  come in.  Special ed teachers are to monitor
21  that student, are to make sure that the
22  components that are being taught that child
23  in the regular class are understood by that
24  child.  And if, for some reason, that child
25  cannot comprehend what is being taught that

61

1    day in the general curriculum, it's that
2    special ed teacher's obligation to pull that
3    child into her classroom or his classroom,
4    reteach that information, so that that child
5    can understand what was taught or the
6    concepts of that lesson.
7         Now, most children that are in the
8    inclusion -- inclusion is exactly, like I
9    said, what it says. They're included in the
10   general curriculum. And the regular ed and
11   the special ed teachers should collaborate on
12   what's going to be taught in those classes.
13   And they should be able to come to a
14   consensus on who was going -- or how they
15   were going to grade that child, what
16   accommodations that meant for that child in
17   the IEP, if they were going to modify -- not
18   modify. I'm sorry -- if they were going to
19   limit the number of choices on tests that the
20   child would be -- instead of ten choices,
21   there may be four choices for a special needs
22   child.
23        These are things that the special ed
24   teacher and the general ed teacher get
25   together and collaborate on how to meet the

62

1    needs of that child.
2         As long as the concepts or the standards
3    of the Alabama course of study are taught,
4    then the class is not watered down, so to
5    speak, and it's not modified. Because, if
6    the class is modified, and that child is
7    seeking a regular diploma, then they will not
8    get credit for that class.
9         However, if accommodations are made, and
10   those teachers collaboratively get together,
11   teach the concepts of that class, and then,
12   the tests are given, and they collaboratively
13   give a grade on that child -- now, Houston
14   County Schools, Riley Andrews, the president
15   of the United States, does not have the
16   authority to say this is carte blanche what
17   you're going to do to that child.
18        We did emphasize that the children be
19   placed in the least restrictive environment,
20   with general ed being the least restrictive.
21   We recommended that. But if the child could
22   not function in that environment, then they
23   had to go to the resource room for
24   reteaching or clarification.
25        Q    That's it? That's your answer?

63

1    A    Yeah.
2    Q    Okay. Was there some sort of
3    change in emphasis on this subject that you
4    were just talking about that occurred over
5    the summer of 2004 in Houston County, to your
6    knowledge?
7    A    Not to my knowledge, no. The IEP's
8    are done in the fall -- I'm sorry -- in the
9    spring of the preceding year, for the next
10   year. They're usually done -- I say they
11   -- in April or May, before school is out.
12        And we had attended meetings on
13   collaborative teaching or inclusion, teachers
14   working together, and we were trying to
15   implement this program or implement what the
16   state was asking us to do. And we had a
17   meeting, even, and I think Mrs. Miller
18   attended the meeting, in the summer of 2004,
19   July, a day or so before school started, and
20   we talked about those issues.
21        We talked about how to do the
22   collaborative teaching. We talked about how
23   they were to meet and try to make sure that
24   the standards -- because IEP's at that time
25   were going standards based. In other words,

64

1    everything that -- that special ed child was
2    going to be held for the same standards that
3    any other child was held for, because they
4    were seeking the same diploma, if they were
5    seeking a regular diploma.
6         If they were seeking a certificate, then
7    the rules were different for those children,
8    and that was identified on that child's IEP.
9    But if they were seeking a regular diploma,
10   they were accountable for the same standards.
11        Q    But if a child was to be included
12   in the general education program --
13        A    Yes.
14        Q    -- should that be reflected in his
15   or her IEP?
16        A    It should be, yes. And if it's
17   not, if something has changed, then someone
18   should have brought it to someone's attention
19   and a meeting held. And then, if that was
20   not done, whoever was making the assumptions
21   or the complaints should have contacted me.
22            (Brief off-record.)
23        MR. FAULK: I don't have any more.
24        MR. WALDING: Let me just ask one
25            question.

65

EXAMINATION

BY MR. WALDING:

Q   According to these documents that are numbered 1066 through 1070, what sort of diploma track was R. S. on?

A   States in her student profile that she was seeking an occupational diploma.

Q   And just for our record and for the judge and jury in this case, is that the regular diploma?

A   No, it's not.

MR. WALDING:  All right.  Nothing further.

MR. FAULK:  That's it.  Thank you, sir.

END OF DEPOSITION

66

PLAINTIFF'S EXHIBIT NO. 3

67

STATE OF ALABAMA

HOUSTON COUNTY

I, Stacey Watkins, RPR, and Notary Public, State at Large, do hereby certify that the foregoing transcript, pages 1 through 66, is a true and correct transcript of the testimony and proceedings taken at said time and place; and that the same was taken down by me in stenograph shorthand, and transcribed by me personally or under my personal supervision.

I further certify that I have no interest in this matter, financial or otherwise, or how it may develop or what its outcome may be.  I further certify that I am not of counsel for any of the parties, nor am I related to counsel or litigants or associated with anyone connected with this cause to my knowledge.

Witness my hand this 23rd day of October, 2007.

_____

_____ RPR, Notary Public,
State at Large
ACCR# 155



1    PLAINTIFF'S EXHIBIT NO. 3
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



STATE OF ALABAMA
# DEPARTMENT OF EDUCATION



Joseph B. Morton
Interim State Superintendent
of Education

Alabama
State Board
of Education

March 12, 2004

Governor Bob Riley
President

Mr. Kenneth Jackie Lord, Superintendent
Houston County Board of Education
Post Office Drawer 1688
Dothan, AL 36302-1688

Randy McKinney
District I

Betty Peters
District II

Dear Mr. Lord:

Enclosed is a copy of the *Focused Monitoring Report* for your Local Education Agency
(LEA). Noncompliance issues found in the student file reviews that need immediate
correction are listed by student name under the respective subheading in "Area(s) of
Needed Improvement." Systemic improvements are listed under "Area(s) of Needed
Improvement" on the *Focused Monitoring Report*. Systemic improvements must be
addressed through training and/or by making amendments to the LEA Plan (Special
Education Plan).

Stephanie W. Bell
District III

Dr.      H. Hall
District IV
Vice President

The special education coordinator for your LEA should call Ms. Marla Holbrook, the
Data Analyst for your monitoring team, at (334) 242-8114 upon receipt of this letter to
establish the due dates for documentation of compliance. Should you have questions
regarding this report, you may contact your monitoring team leader, Ms. Abbie Felder.

Ella B. Bell
District V

Sincerely,

David F. Byers, Jr.
District VI

Joseph B. Morton
Interim State Superintendent of Education

Sandra Ray
District VII

Mary Jane Caylor
District VIII

JBM/MW/SH
Enclosures
cc:  Mr. Riley Andrews              Ms. Marla Holbrook
     Dr. Joseph B. Morton           Ms. Abbie Felder
     Mr. Feagin Johnson, Jr.        Ms. Inez Lewis
     Dr. Mabrey Whetstone

Joseph B. Morton
Secretary and
Executive Officer

FY04-2057



Defendants' Initial
Disclosures              43

# Focused Monitoring Report



Education Agency:                                Houston County

Special Education Coordinator:                   Riley Andrews

Focused Monitoring Date:                         February 18, 2004

Date Mailed to Coordinator:

Date of Verification Call From Coordinator:      March 16, 2004

Date Documentation Due:           30 Day

                                  6 Month

Special Education Services Team Leader:          Abbie Felder

Special Education Services Data Analyst:         Marla Holbrook

The Focused Monitoring Process is a blend of the previous compliance monitoring system and a shift toward addressing program development and improving outcomes for students. This report is based on findings from the System Profile Information, Student File Review, and Student Services Review.

During the Focused Monitoring Process, a designated number of student files were reviewed to verify compliance with state and federal requirements. Also, during this process, a small number of students may have been reviewed to determine student status and related system performance results. Each SSR provides a combination of quantitative and qualitative results that reveal, in rich detail, what it is like to be a consumer of services and what is currently working for the student.

The purpose of this report is to provide feedback to the school system in identifying areas of strengths and assist in correcting current problems and establishing/implementing a continuous self-monitoring system. In addition, the department hopes that this information will help advance practice by developing a collegial effort between the State Department of Education, Special Education Services, and the education agency.

Defendants' Initial
Disclosures

44

The Focused Monitoring Report includes the following:

- **Area(s) of Strengths** identified during monitoring.
- **Continuous Improvement Strategies** are based on findings from the self-monitoring process conducted by the education agency to address practice issues focusing on program development and improving outcomes for students.
- **Area(s) of Concern** are not systemic at this time and require no immediate action; however, if not addressed by the education agency, these concerns may become systemic problems.
- **Area(s) of Needed Improvement** include systemic problems and student files that require immediate correction.

**Immediate Correction Strategies** (30-day items) address correcting specific student files.

**Systemic Improvement Strategies** (6-month items) address correcting problems that could affect the quality of services and outcomes for all students with disabilities.

**Documentation of Strategy Implementation** includes documentation of immediate corrections to student files that must be completed within 30 working days from the date of the verification call. All systemic problems must be addressed through amendments to the *Special Education Plan for Children with Disabilities* and professional development activities. This documentation is due within six months from the date of the verification call. The team leader will call the special education coordinator to determine the correction process.

## GLOSSARY

AAC. .........Alabama Administrative Code
ADRS .........Alabama Department of Rehabilitation Services
AOD. .........Alabama Occupational Diploma
BBSST. .........Building-Based Student Support Team
CRS .........Children's Rehabilitation Services
CTIP .........Career Technical Implementation Plan
DB .........Deaf-Blindness
DD. .........Developmental Delay
ED. .........Emotional Disturbance
EI. .........Early Intervention
ESL. .........English as a Second Language
ESY. .........Extended School Year
ACE .........Functional Assessment of the Classroom Environment
HI. .........Hearing Impairment
IEP. .........Individualized Education Program
LEA .........Local Education Agency
LEP .........Limited English Proficiency
LRE .........Least Restrictive Environment

MD. .........Multiple Disabilities
MR. .........Mental Retardation
OHI. .........Other Health Impairment
OI. .........Orthopedic Impairment
OT. .........Occupational Therapy
PLOP. .........Present Level of Performance
PT. .........Physical Therapy
SAT 10. .........Stanford Achievement Test 10
SDE .........State Department of Education
SES. .........Special Education Services
SIG. .........State Improvement Grant
SLD. .........Specific Learning Disabilities
SLI. .........Speech/Language Impairment
SSR. .........Student Services Review
TBI. .........Traumatic Brain Injury
VI. .........Visual Impairment
VRS. .........Vocational Rehabilitation Service

# Area(s) of Strength

• It appears from the SSRs that the students have access to school programs and extracurricular activities.

○ The students interviewed participate in most school activities and appear to be served in the most appropriate LRE.

○ Files reviewed were extremely well organized and complete.

○ The student status from the SSRs reviewed was in the maintenance zone.

○ Communication between home and school was evident.

• Houston County Schools have purchased supplemental reading materials that coincide with general education reading programs. This is commendable.

• The following observations were noted at Webb Elementary:

  ○ Teacher collaboration and team teaching.
  ○ The teacher of the year at Webb, Carol Lasseter, is a teacher of special needs students.
  ○ The staff had high regards for the principal, Mr. Fairloth, who works very hard to ensure success for all students.

• The LEA has extensive resources available to provide services for students with disabilities:

  ○ A nurse is assigned to each school to assist students with special needs.
  ○ Occupational and physical therapy.
  ○ Two full time and two part time psychometrists.
  ○ One licensed professional counselor to address behavior issues.

• Low student/teacher ratios were observed for students in the SSR process.

• The system continues to have excellent communication and unity of effort with community agencies.

• The LEA has purchased two fully equipped houses on the Houston County School Campuses to teach functional living skills. This is commendable.

Staff knowledge of individual students was evident.

Parents and students interviewed expressed satisfaction.

General and special educators interviewed understand student needs and use available resources.

Recognition is given to the special education coordinator for the knowledge, guidance, and support provided to teachers and administrators regarding the special education process.

## Continuous Improvement Strategies

**NOTE:** The following strategies are offered as suggestions for program improvement to facilitate continued growth and development in the implementation of the special education process.

**IEP** – Continue to provide on-going training on development of IEPs that are specifically individualized for each student and emphasize content standards and access to the general education curriculum. Continue to emphasize that IEPs should clearly address how each student will access the general curriculum.

**AOD** – Continue to provide to principals, counselors, career technical education teachers, job coaches, and special education teachers (Grades 8-12) training on the AOD requirements and implementation, including various approaches to receive AOD credit. Ensure that exit option decisions are individual decisions made by the IEP Team. Ensure that students are not "tracked" through an exit option based on area of disability. Expand the array of options for students pursuing the AOD with regard to community experiences and career technical education courses.

**Reading** – Continue to encourage all teachers to share reading strategies/evaluations to improve reading and to develop IEPs that address appropriate reading instruction to meet the individual needs of students with disabilities. Focus on research-based supplemental and/or intervention reading programs to be used by special education personnel that complement the core reading programs used in general education.

**Collaborative Teaching** – Continue to provide professional development to both general education and special education personnel on strategies for collaborative teaching and unity of effort. Include how to evaluate the results and how to make changes as needed to ensure success across all grade levels and all environments. Refine the use of the inclusion of assistants and teachers (i.e., follow-through) to increase the success of all students with disabilities.

# Area(s) of Concern

**NOTE:** These concerns are not systemic at this time; however, if not addressed by the education agency, they may become systemic problems.

**Evaluation, Eligibility, and/or Reevaluations.** (i.e., appropriate evaluations completed and documented on eligibility report, process for initial evaluation or reevaluation, notice of meeting, timelines met, appropriate membership including parents, decision regarding reevaluation, consent for reevaluation).

In some files reviewed, the eligibility reports did not include strengths and needs.

**IEP Development/Implementation.** (i.e., IEP notice, implementation/duration date, implementation date for preschoolers beginning on third birthday, student profile, goals, benchmarks, supplementary aids and services, related services/supports for school personnel, reporting of progress, transition, state and access to IEP, behavior intervention plan review, notice of intent, consent for placement).

In some files reviewed, progress reports reflecting progress toward IEP goals were not developed and provided required by the AAC.

The LRB for students 3-5 years old is below the state average.

| AREAS | FINDINGS (Areas Needing Improvement) | IMPLEMENTATION OF IMPROVEMENT STRATEGIES (Immediate Correction) | (Systemic Improvement) | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES (Immediate Correction) | (Systemic Improvement) |
|---|---|---|---|---|---|
| Evaluation, Eligibility, and/or Reevaluations. eligibility (reevaluation for continued eligibility) were not completed and documented on eligibility report, process for initial evaluation or reevaluation, notice of meeting, timelines met, appropriate membership including parents, decision regarding reevaluation, consent for reevaluation). | (1) Timelines for eligibility (reevaluation for continued eligibility) were not met as required by the AAC. | (1) Compile a list of all students that are currently overdue for reevaluation. | (1) Provide to all school IEP Team and/or eligibility team members information, trainings, and/or technical assistance on timeline compliance and documentation. | (1) Provide to the SDE the list of all students overdue for reevaluation as of March 15, 2004. | (1) All eligibility determinations (initial and/or reevaluation) must be in compliance with the required by the six-month due date. |
| | | Include the last eligibility determination date for each student overdue for reevaluation. | | | |

Houston County Focused Monitoring Report
Page 6 of 9

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|
| | Areas of Need (Noncompliance Issues) | Immediate Correction (Correction of Specific Issues) | Systemic Correction (Correction of System to Prevent Recurrence of Issues) | Immediate Correction (Evidence of Correction of Specific Issues) | Systemic Correction (Evidence of Correction of System to Prevent Recurrence of Issues) |
| | | | Complete all overdue reevaluations by the six-month due date. | | |
| | | | Ensure that all eligibility determinations (initial and/or reevaluation) are in compliance with the required timelines by the six-month due date. | | |
| | (2) The *Notice and Eligibility Decision Regarding Special Education Services* did not document all evaluation data (e.g., vision screening and/or follow-up, hearing screening and/or follow-up, rating scales intelligence tests, achievement tests, documentation of accommodations, examination of oral structures and functioning, observations, interviews, work | (2) Use the information in the file to correct the eligibility report(s) by documenting the missing information on the appropriate page(s) of the *Notice and Eligibility Decision Regarding Special Education Services* form for the student listed below: ▬▬▬▬▬ Indicate corrected copy and date of correction on the *Notice and Eligibility Decision Regarding* | | (2) Provide to the SDE a copy of the complete [including corrected page(s)] eligibility report and the *Notice of Intent Regarding Special Education Services* form for the student indicated. | |

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|
| | | Immediate Correction | Systemic Improvement | Immediate Correction | Systemic Improvement |
| | samples, Environmental Cultural Economic Concerns form developmental scales, etc.) as required by the AAC. | Special Education Services form. Complete the *Notice of Intent Regarding Special Education Services* form with explanation regarding the omission of documentation on the eligibility report. Send a copy of both forms to the parent and/or student. Attach the corrected pages of the eligibility report and *Notice of Intent Regarding Special Education Services* to the current eligibility report. | | | |
| IEP Development/Implementation. (i.e., IEP Notice, implementation date, implementation for preschoolers beginning on third birthday, student profile, goals, benchmarks, supplementary aids and services, related services/supports for school personnel, reporting of progress, transition, | (1) The IEPs did not specify the specially designed instruction listed below: (e.g., special education, related services, supplementary aids and services, assistive technology, program accommodations and modifications, and or | (1) Convene the IEP Team and review the IEPs of the student listed below: ▬▬▬▬ Revise IEPs as determined appropriate by the review. | | (1) Provide to the SDE documentation that the IEP review process has occurred for the student indicated by including a copy of the *Notice of Proposed Meeting* form and a copy of the revised IEP. | |

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES |
|---|---|---|---|
| | Areas Needing Improvement | Immediate (Corrections Due...) | Systemic (Improvement...) | Immediate (Corrections Due...) | Systemic (Improvement...) |

| AREAS | FINDINGS — Areas Needing Improvement | IMPLEMENTATION — Systemic (Improvement) | DOCUMENTATION — Systemic (Improvement) |
|---|---|---|---|
| ...ate testing information, appropriate membership, LRE, documentation, copy of IEP, given to parents and service providers informing them of... ...ect responsibilities and access to IEP, behavior intervention plan review, notice of intent, ...nt for placement). | support for personnel) including frequency, duration, and location, as required by the AAC. | | |
| | (2) The IEPs did not specify the specially designed instruction (e.g., special education, related services, supplementary aids and services, assistive technology, program accommodations and modifications, and/or support for personnel) including frequency, duration, and location, as required by the AAC. | (2) Provide to the appropriate teachers and administrators training, information, and/or technical assistance on appropriate completion of the IEP form. | (2) Provide to the SDE documentation of training, information, and/or technical assistance on appropriate completion of the IEP form including but not limited to, written information provided, description of technical assistance provided, training agenda/outline, and participant sign-in forms. The participant sign-in forms should contain columns for the following: name, position, and school/worksite. |

| AREAS | FINDINGS | | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|---|
| | Areas of Need | | Immediate/Continuing | Systemic Improvement | Immediate/Continuing | Systemic Improvement |
| Lee v. Macon Special Education Consent Decree. | Houston County Schools has made significant progress in Overrepresentation of minority students by at least one student in the area of MR as defined by the guidelines in Lee v. Macon. | | | Continue to monitor the identification of: African-American students in Grades K-6 who are determined eligible for special education services. | | |