# EVIDENTIARY SUBMISSION
# (PART 5)

# TAB G

1

```
  1            IN THE U. S. DISTRICT COURT
  2         FOR THE MIDDLE DISTRICT OF ALABAMA
  3                  SOUTHERN DIVISION
  4
  5   NANCY MILLER,
  6       PLAINTIFF,
  7   VS.              CASE NO.1:06-CV-940-WKW
  8   HOUSTON COUNTY BOARD
      OF EDUCATION, KENNETH
  9   LORD, RILEY JOE ANDREWS,
      TIM PITCHFORD, PAUL
 10   STRANGE, STACY EZELL,
      TROY UNIVERSITY, DOTHAN,
 11   SANDRA JONES, PAM PARRIS
      and GREG RUEDIGER,
 12
 13       DEFENDANTS.
 14       The deposition of VIRGINIA SINGLETARY,
 15   taken by the Plaintiff, pursuant to the
 16   Federal Rules of Civil Procedure, before
 17   Stacey Watkins, RPR, and Notary Public, State
 18   at Large, at the offices of Hardwick, Hause,
 19   Segrest & Walding, Dothan, Alabama, on the
 20   10th day of October 2007, at 3:20 p.m., CDT,
 21   pursuant to notice.
 22
 23
 24
 25
```

2

1
2
3    **APPEARANCES:**
4    **FOR THE PLAINTIFF:**
     **MR. WINN FAULK**
     Attorney at Law
5    Montgomery, Alabama

6    **MR. THOMAS K. BRANTLEY**
     Attorney at Law
7    Dothan, Alabama

8
9    **FOR HOUSTON COUNTY BOARD OF EDUCATION,**
     **KENNETH LORD, RILEY JOE ANDREWS AND**
     **TIM PITCHFORD:**
10
     **MR. KEVIN WALDING**
11   **MR. PATRICK B. MOODY**
     Attorneys at Law
12   Dothan, Alabama

13
14   **FOR PAUL STRANGE AND STACEY EZELL:**

15   **MS. KATHERINE HORTBERG**
     Attorney at Law
     Chelsea, Alabama
16

17   **FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,**
     **PAM PARRIS AND GREG RUEDIGER:**
18
     **MR. JOSEPH V. MUSSO**
19   Attorney at Law
     Birmingham, Alabama
20

21   **ALSO PRESENT:**

22   **NANCY MILLER**
     **KENNETH LORD**
23
24
25

3

**STIPULATION**

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

4

**VIRGINIA SINGLETARY**

having been first duly sworn, testified as follows, to-wit:

**EXAMINATION**

BY MR. FAULK:

Q    Is this Virginia Singletary?

A    Yes, sir.

Q    I'm Winn Faulk, Ms. Singletary.  I, along with Tom Brantley, represent Nancy Miller in this case.  I assume that you have been made aware, in a general way, at least, that this case involves a suit by Mrs. Miller against the Houston County Board of Education and others in connection with the loss of her internship and ultimately the loss of her employment.  Are you aware of that?

A    Yes, sir.

Q    Have you ever had your deposition taken before in any case?

A    No, sir.

Q    What I'm going to do, I'm going to ask you questions.  I want to make sure you understand my questions.  If I mumble or if I

5

1  ask a question that just doesn't make sense,
2  tell me that --
3      A    Okay.
4      Q    -- and I'll try to do it better.
5  Okay?
6      A    All right.
7      Q    If you need a break, let me know
8  that, and I'll be glad to take one.  During
9  the course of your testimony, if you remember
10 something you left out of a previous answer,
11 just interrupt me, and I'll be glad to let
12 you go back and change your answer.  Okay?
13     A    All right.
14     Q    To add to it, take away or
15 whatever.  Have you got everything you need
16 for right now?  I'm not going to be very
17 long, I hope.
18     A    I guess so.
19     Q    In the fall of 2004, Ms.
20 Singletary, what was your position with the
21 Houston County board?
22     A    Assistant special education
23 coordinator.
24     Q    And what is your position today?
25     A    Special education coordinator.

6

1      Q    Same position?
2      A    No, sir.  I was assistant.
3      Q    You were assistant.
4      A    And now I'm the coordinator.
5      Q    Do you have other duties besides
6  special education?
7      A    Federal programs, also.  Yes, sir.
8      Q    So, have you, effectively, replaced
9  or stepped into the position held by Mr.
10 Andrews prior to his retirement?
11     A    You did say "effectively," didn't
12 you?  I have stepped into the same position
13 as Mr. Andrews.  I can say that honestly.
14     Q    I appreciate your modesty.  But, in
15 any event, were you employed in your prior
16 capacity in the summer of 2004?
17     A    Yes, sir.
18     Q    Tell us about your educational
19 background, please, ma'am?
20     A    Okay.  Starting with college?
21     Q    Yes, please.
22     A    Troy State University, in Troy.
23 That's where I received my B.S.  I have a
24 double B.S. in special education and
25 elementary education.

7

1      Q    When was that?
2      A    I graduated in '75, I believe.
3  Then I attended Auburn University in
4  Montgomery.  Received my master's also in
5  special education, with an endorsement in
6  learning disabilities, and a master's degree
7  in elementary education.  That was in 1979, I
8  finished that.  Then, in 1990, I finished my
9  administrative certification at Troy State,
10 Dothan.
11     Q    And how long have you been employed
12 with the Houston County system?
13     A    This is 32 years.
14     Q    And the whole time, were you
15 involved in one way or another with special
16 education?
17     A    Yes, sir.  One time, at Rehobeth, I
18 was assistant principal out at the elementary
19 school, but we still dealt with special
20 education issues.
21     Q    Did you have any involvement in the
22 formation of the agreement for Mrs. Miller to
23 have an internship in the system?
24     A    No, sir.
25     Q    Or in her hiring as an

8

1  intern/teacher?
2      A    No, sir.
3      Q    To your best recollection, Ms.
4  Singletary, what would have been the first
5  time it came to your attention that there was
6  some type of problem, for lack of a better
7  word that I can think of, involving Mrs.
8  Miller's internship at the school?
9      A    I don't know that I could answer
10 when I first heard of some problems.  I was
11 not in on any of the meetings.  I was asked
12 to go check some folders because of some
13 concerns.  I couldn't -- I really don't know.
14 I knew very little up until that point, and
15 then, until I talked to Mrs. Miller, when she
16 came to the office.
17     Q    But you did go out to the high
18 school, Houston County High School, and
19 review some folders, prior to Mrs. Miller's
20 September 24 visit --
21     A    Yes, sir.
22     Q    -- to your office?
23     A    Yes, sir.
24     Q    And who asked you to go out to the
25 school and check things?

9

1    A    Mr. Andrews.

2    Q    Did he give you any written

3 instructions?

4    A    No, sir.

5    Q    When you finished your

6 investigation, if you will, did you make any

7 type of written report back to him?

8    A    No, sir.

9    Q    Did you have anything in writing as

10 to which students' folders were to be

11 checked?

12    A    I carried rolls with me that I

13 assume -- I can't even remember -- I guess

14 the secretary gave them to me.  And I checked

15 names off if there was a folder with an IEP

16 in it.

17    Q    Is it your belief that you checked

18 the IEP of every special ed student at that

19 school?

20    A    It's my belief that I checked a

21 folder for every person on the list that I

22 was given.  Yes, sir.

23    Q    Could it have exceeded 50 students?

24    A    It would have been close and

25 probably a little over, I think.  I believe

10

1 there were three teachers, and I think they

2 were all under 20, I believe.  But I can't --

3 I don't remember.

4    Q    When you say "under 20" --

5    MR. WALDING:  Under 20 students

6         each.

7    A    Each teacher, under 20 students

8 each.

9    Q    Oh, I got you.  Okay.

10    A    I don't remember how many.  But, if

11 there were over 20, that usually makes you

12 remember, because we try to keep it at that,

13 or did.  So, I can't say how many.

14    Q    So, somewhere between 50 and 60

15 students, in your best judgment?

16    A    I would think, yes, sir, in my best

17 judgment.

18    Q    When you would check a folder, what

19 would that check consist of?

20    A    I was simply checking to see if

21 there was an IEP in that folder.

22    Q    Were you checking to make any type

23 of determination whether the IEP in the

24 folder was up to date?

25    MR. WALDING:  Object to the form.

11

1    A    I was checking to see if there was

2 an IEP in the folder.  That was what I was

3 asked to do.

4    Q    But you weren't checking, for

5 example, to make some type of determination

6 as to whether that IEP was appropriate for

7 that student?

8    MR. WALDING:  Object to the form.

9    Q    Is that correct?

10    A    No, sir.  I was not checking for

11 appropriateness.  No, sir.

12    MR. WALDING:  And let me further

13         state my objection.  I don't

14         think anyone can, after the

15         fact, say an IEP is appropriate

16         or inappropriate.  It's up to

17         the IEP team to determine that.

18    Q    Where were these IEP's located that

19 you checked?

20    A    I don't know.  They were brought to

21 me in the conference room.  I did not go to

22 the classrooms.

23    Q    And who brought them to you, if you

24 recall?

25    A    And that, I can't remember.  I

12

1 don't know.  I could guess, but I don't

2 remember.  I just remember going through the

3 folders when they were brought in there.  I

4 don't know.

5    Q    Do you recall how much notice the

6 school administration had of your visit?

7    A    No, sir, I don't.

8    Q    And you've told us the full extent

9 of your review?

10    A    Sir?

11    Q    You've told us the full extent of

12 your review?

13    A    Yes, sir.

14    Q    And the full purpose of it?

15    A    Yes, sir.

16    Q    And did you have any further thing

17 to do with Mrs. Miller's internship and

18 employment between the time you did this

19 review and the time she came to your office

20 later in September?

21    A    Not that I remember, no, sir.

22    Q    Let's talk about the day in

23 September, which I think your attorney and I

24 have agreed is September 24th or

25 approximately that date.

13

```
 1     A    Yes, sir.
 2     Q    How did the situation of her coming
 3  first come to your attention? That is, did
 4  she call you, did she just show up, or what
 5  happened?
 6     A    I thought that Ms. Burgess, the
 7  secretary, let me know she was there, but
 8  I --
 9     Q    You're just not sure?
10     A    No sir. And I don't remember her
11  calling. I don't remember that. I don't.
12     Q    Do you recall -- and I'm not trying
13  to put words in your mouth. But, do you
14  recall that, when you first became aware that
15  Mrs. Miller was present in the office, that
16  Mr. Andrews was out?
17     A    Yes, sir.
18     Q    Okay. And then, pending his
19  return, did you have any dealings with Mrs.
20  Miller?
21     A    I stayed -- they met at my office,
22  actually.
23     Q    But, I mean, before he got back --
24     A    Yes, sir.
25     Q    -- did you and she have any private
```

14

```
 1  conversations?
 2     A    Yes, sir.
 3     Q    Okay. Tell us about that, please?
 4     A    She was expressing some concerns
 5  that she had about the program at Houston
 6  County. I asked her if it would be okay if I
 7  wrote down everything, because it's very
 8  difficult to recall and remember. And I did.
 9  I took notes as she talked. And those
10  concerns were listed in my notes.
11     Q    All right. And that's before Mr.
12  Andrews returned to the office?
13     A    Yes, sir.
14     Q    And was there a time when she left
15  and came back?
16     A    No, sir, I don't think so. I think
17  I called Mr. Andrews.
18     Q    Your best recollection is she
19  stayed there at the office until he arrived?
20     A    Yes, sir.
21     Q    So, by the time he got there, you
22  already had noted at least some concerns that
23  she was there to talk about?
24     A    Yes, sir.
25     Q    And then, after Mr. Andrews got
```

15

```
 1  there, did you join them for their
 2  conversation?
 3     A    I took notes.
 4     Q    Well, I meant were you present.
 5  I'm sorry.
 6     A    I was present. Yes, sir.
 7     Q    And, see, that's an example.
 8     A    Yes.
 9     Q    I mean, if I don't make sense, tell
10  me.
11     A    Yes, sir. I was. I was there. It
12  actually took place in my office. We didn't
13  move.
14     Q    Was anybody else present?
15     A    Not that I recall.
16     Q    Let me show you Defendant's Exhibit
17  16, and ask you if you're familiar with that,
18  and, if so, tell us what it is, please?
19     A    Yes, sir. That looks very much
20  like my handwritten notes that I took that
21  day.
22     Q    But these, of course, are --
23     A    They were typed.
24     Q    -- typed up?
25     A    And I signed them. Yes, sir.
```

16

```
 1     Q    Did anybody edit your notes in any
 2  way?
 3     A    It does not appear that they did.
 4  No, sir.
 5     Q    And then, what? Did you just give
 6  this to Mr. Andrews?
 7     A    I'm sure I did, after they were
 8  typed.
 9     Q    Do you know of anything else you --
10     A    I think I did.
11     Q    -- would have done with them?
12     A    No, sir.
13     Q    Did you have any role in following
14  up on the complaints listed on Defendant's
15  Exhibit 16?
16     A    No, sir.
17     Q    Did you have any involvement in Mr.
18  Andrews' gathering of information following
19  the September 24 meeting?
20     A    Not that I recall any. No, sir.
21     Q    Or any involvement in the
22  termination of Mrs. Miller's employment? And
23  by "involvement," I mean were you privy to
24  any discussions concerning the termination of
25  her employment, prior to or leading up to the
```

17

1  time of her termination?
2      A     No, sir, not that I recall.  No,
3  sir.
4      Q     Were you informed by Mr. Andrews or
5  any other responsible person in the office as
6  to the outcome of Mr. Andrews' inquiries into
7  these concerns that are listed in Defendant's
8  Exhibit 16?
9      A     At some time or another, I was.  I
10 do not know what date.  But, yes, sir.
11     Q     Tell me what you do recall about
12 that?
13     A     All I recall is that he and, I
14 think, Mr. Lord went out to the school to
15 deliver a letter to her.
16     Q     Nobody ever told you, by the way,
17 number 6 or 3 or any of these turned out to
18 be correct or incorrect?
19     A     No, sir, not that I recall.
20     Q     And the only follow-up to this that
21 you recall having been privy to, where you
22 actually heard somebody saying things and
23 doing things, was the delivery of the
24 termination notice by Mr. Lord and Mr.
25 Andrews?

18

1      A     Yes, sir.
2      Q     Thank you.  Did you have any other
3  involvement in Mrs. Miller's involvement with
4  the school system?
5      A     I believe I sat in on at least one
6  interview.  I don't know if she had more than
7  that.  But I sat in on --
8      Q     Prior to being hired?
9      A     Prior to being hired.  Yes, sir.
10     Q     That's all?
11     A     Yes, sir.
12           (Brief off-record.)
13           (Whereupon, Plaintiff's Exhibit 4
14            marked for identification.)
15     Q     I'm going to show you what we've
16 marked for identification as Plaintiff's
17 Exhibit 4, which purports to be a letter to
18 Mr. Pitchford, as superintendent, from Joseph
19 B. Morton, dated May 12, 2006, and its
20 enclosure, both which would comprise document
21 numbers 53 through 64 of the board of
22 education's production of documents in the
23 case.
24           I'll ask you to take a look at it,
25 please, and tell us whether you're familiar

19

1  with it.
2      A     (Witness reviewing documents.)  Do
3  you want me to answer am I familiar with
4  these?
5      Q     Yes, please.
6      A     Yes, sir, I am.
7      Q     Tell us what you know about how
8  that document came to be?
9      A     It's a result of the visitation
10 from the state department of education,
11 special education.  A review of our program.
12     Q     Have you been involved in reviews
13 of that nature?  Have you had any role in
14 connection with them?
15     A     Under two -- two, I have.  Yes,
16 sir.
17     Q     And would that be the one you're
18 looking at and this shown in Plaintiff's
19 Exhibit 3?
20     A     Yes, sir.
21     Q     Note the date on 3, please, is
22 March of 2004?  Correct?
23     A     Yes, sir.
24     Q     Was there any intervening focused
25 monitoring by the state department of

20

1  education in between these two reports, so
2  far as you know?
3      A     Not special education focused
4  monitoring.  And I cannot remember if the
5  county consolidated monitoring took place
6  between this or prior to this one.  There's a
7  county federal consolidated monitoring that
8  takes place, also.  And that could have been
9  before this or --
10     Q     By "consolidated" --
11     A     And I don't remember that.
12     Q     -- does that mean it's not limited
13 to special education?
14     A     Yes, sir.
15     Q     It would include other types --
16     A     Other areas.  Yes, sir.
17           MR. WALDING:  Y'all are both
18            talking at the same time.  Let
19            him ask a question and you
20            answer.
21           THE WITNESS:  I'm sorry.
22     Q     Now, looking at Plaintiff's Exhibit
23 3 for a second, can you tell or do you happen
24 to know what schools were actually monitored
25 there?

21

1    A    There were records from all schools
2  that were pulled. They visited, this year,
3  particularly, I think, Webb Elementary.
4    Q    And by "this year," you're talking
5  about the March 2004 --
6    A    Yes, sir.
7    Q    -- Exhibit 3?
8    A    Yes, sir. I remember Webb. And it
9  will tell me in here where else they visited.
10  I think Ashford High School should be on here
11  somewhere in this one. I don't remember the
12  other one. I don't see it right this minute.
13    Q    Can you tell me how the schools
14  that are visited and monitored are selected
15  from visit to visit?
16    A    Yes, sir. The state department
17  sends us a letter telling us the records to
18  pull a few weeks before the actual visit.
19  They tell us the records to have available
20  for them in the central office to review.
21    And then, they tell us usually three --
22  it can vary, but usually three -- students
23  that they're going to do a detailed report on
24  and actually visit the school, the teachers,
25  the parents, follow the schedule, and those

22

1  kind of things. They tell us that
2  information. It's called a student select
3  review or something like that.
4    Q    Do they review all records in each
5  school or only three records in each school?
6    A    They follow three children in the
7  county. Three different schools. Usually
8  one child at each of those three schools.
9    Q    I see.
10    A    They tell us the number of records
11  to pull to have available at the central
12  office, that they review at our central
13  office.
14    Q    So, you're saying they may have
15  this more comprehensive following on three
16  individual students, but you're saying they
17  may look at more students' records, but not
18  actually have this intensive follow-up?
19    A    They look at many more records than
20  three students. Yes, sir.
21    Q    And are those preliminary letters
22  kept on file somewhere, where they tell you,
23  here's what we want?
24    A    Where they tell you the records to
25  pull?

23

1    Q    Yes, ma'am.
2    A    Yes, sir.
3    Q    And what are those? Would those
4  letters have a name or something? If I was
5  asking Kevin for them, what should I call
6  them?
7    A    It would be a list of records to be
8  reviewed for consolidated monitoring, and you
9  would give the date.
10    Q    And this is focused monitoring?
11    A    Focused.
12    Q    Right?
13    A    Excuse me.
14    Q    That's okay. I'm learning as we
15  go. But, however many records they may look
16  at, there are only going to be typically
17  three schools at any one time?
18    A    That's been the procedure in the
19  past. Three schools.
20    Q    How many schools do y'all have?
21    A    Nine.
22    Q    Now, the IEP's that they have to
23  come look at, where are they kept?
24    A    Out at the schools, when this
25  review was done.

24

1    Q    What about on the other one, number
2  4?
3    A    Is this number 4 right here?
4    Q    Yes, ma'am.
5    A    This one was a little bit
6  different, because, at this point, all IEP's
7  are in the system of the computer, and they
8  actually monitored the IEP's before they
9  came. They still told us a number of records
10  to have ready and pulled, and they looked
11  through those at the central office.
12    But the director, the leader, Ms.
13  Lovelady, told me and our committee, before
14  she started, "We have reviewed your IEP's
15  through SETS web already." It's continuously
16  monitored now. There's a difference between
17  the years for that.
18    Q    What? Are they scanned into the
19  computer or something?
20    A    They're typed in and written into
21  the computer. There's a web site that
22  teachers have to -- it's generated on the
23  computer. They're not handwritten.
24    Q    What about the signatures on them?
25    A    The signature page is separate.

25

1  You type out who should be in attendance in
2  the SETS web. The signature page, you print
3  out, and they actually sign the signature
4  page at the meeting.
5      Q    But, how does the signed signature
6  page get into the system, so the state people
7  will know it's been signed?
8      A    It doesn't. It doesn't.
9      Q    Do either of those reports, so far
10  as you can tell, pertain to Houston County
11  High School?
12      A    I think this one does.
13      Q    That's Plaintiff's Exhibit 4?
14      A    As far as one of the three
15  students, I believe it was a Houston County
16  High School student. Exhibit 4.
17      Q    May I see it, please, ma'am?
18      A    Yes, sir. (Handing documents to
19  Mr. Faulk.)
20      Q    Take a moment, please, ma'am, and
21  look at it again, and just tell me, if you
22  can, identify the parts that actually pertain
23  to Houston County High School. And if you
24  can't, that's fine. This isn't a test or
25  something. But, if you could help us, I

26

1  would appreciate it.
2      A    I'll try. (Witness reviewing
3  documents.) It's very difficult for me to
4  say without doubt, because, obviously, the
5  names have been corrected -- I mean, blacked
6  out. Let me look again. I would think that
7  this is one, from the best I can remember.
8      Q    Let me see it.
9      A    (Handing document to Mr. Faulk.)
10      Q    And you're referring to an entry on
11  page 63 --
12      A    A component was not completed.
13      Q    -- that's entitled "Implementation
14  of Improvement Strategies. Review the IEP
15  for immediate correction." Why do you
16  believe that to have to do with Houston
17  County High School?
18      A    If I can remember?
19      Q    Yes, ma'am.
20      A    It says down here, "Address the
21  components that were not completed as
22  required." There was one student at that
23  school who had turned the appropriate age
24  during that school year, and a transition
25  goal, an appropriate transition goal, had not

27

1  been addressed, because he was not that age
2  at the beginning of the school year. But it
3  should have been addressed, because he turned
4  that age during the school year.
5      Q    And what age is that?
6      A    It's 16.
7      Q    16?
8      A    Yes, sir. Used to be 14, but they
9  had changed it to 16.
10      Q    And that has to do with, as I
11  gather, making some sort of plan to help that
12  student transition into postschool life?
13      A    Yes, sir.
14      Q    Should the preliminary letters that
15  you told us about show -- really answer my
16  question as to what school we're talking
17  about? In other words, the preliminary
18  letter, prior to the monitoring evidenced by
19  Plaintiff's Exhibit 4, should say, we want
20  such and such from Houston County High
21  School? Correct?
22      A    It wouldn't have the school listed.
23      Q    It would have the child?
24      A    They just list the child.
25      Q    I see. I want to show you

28

1  Defendant's Exhibit 17. Let me just ask
2  whether you had anything to do with the
3  preparation of that letter, which is from Mr.
4  Andrews to Ms. Parris?
5      A    Not that I recall.
6      Q    Okay. And as we understand your
7  testimony, you do not have any further
8  knowledge about any of the transactions that
9  occurred leading up to Mrs. Miller's losing
10  her internship and losing her employment,
11  that you haven't already told us about?
12      A    No, sir, not that I recall.
13      MR. FAULK: Okay. Thank you. And
14          sorry we kept you most of the
15          day for a little deposition.
16      THE WITNESS: That's fine.
17      MR. FAULK: I appreciate it.
18
19      END OF DEPOSITION
20
21
22
23
24
25

29

PLAINTIFF'S EXHIBIT NO. 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

30

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 29, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10    taken down by me in stenograph shorthand,

11    and transcribed by me personally or under my

12    personal supervision.

13        I further certify that I have no

14    interest in this matter, financial or

15    otherwise, or how it may develop or what

16    its outcome may be.  I further certify that

17    I am not of counsel for any of the parties,

18    nor am I related to counsel or litigants or

19    associated with anyone connected with this

20    cause to my knowledge.

21        Witness my hand this 24th day of

22    October, 2007.

23    _____

24        _____
        RPR, Notary Public,

25        State at Large
        ACCR# 155



PLAINTIFF'S EXHIBIT NO. 4



STATE OF ALABAMA

# DEPARTMENT OF EDUCATION

Joseph B. Morton
State Superintendent
of Education

**Alabama
State Board
of Education**

May 12, 2006

**Governor Bob Riley
President**

Mr. Tim Pitchford, Superintendent
Houston County Board of Education
Post Office Box 1688
Dothan, AL 36302-1688

**Randy McKinney
District I
President Pro Tem**

Dear Mr. Pitchford:

**Betty Peters
District II**

Enclosed is a copy of the *Focused Monitoring Report* for your Local Education Agency (LEA). Noncompliance issues found in the student file reviews that need immediate correction are listed by student name under the respective subheading in "Area(s) of Needed Improvement." Systemic improvements are listed under "Area(s) of Needed Improvement" on the *Focused Monitoring Report*. Systemic improvements must be addressed through training and/or by making amendments to the LEA Plan (Special Education Plan).

**Stephanie W. Bell
District III**

**Dr. Ethel H. Hall
District IV
Vice President
Emerita**

The special education coordinator for your LEA should call Ms. Dorothea Walker, the Data Analyst for your monitoring team, at (334) 242-8114 upon receipt of this letter to establish the due dates for documentation of compliance. Should you have questions regarding this report, you may contact your monitoring team leader, Ms. Wanda Lovelady.

**Ella B. Bell
District V**

Sincerely,

**David F. Byers, Jr.
District VI**

Joseph B. Morton
State Superintendent of Education

**Sandra Ray
District VII
Vice President**

**Dr. Mary Jane Caylor
District VIII**

JBM/MW/SH
Enclosures

**Joseph B. Morton
Secretary and
Executive Officer**

cc:  Ms. Virginia A. Singletary        Ms. Dorothea Walker
     Dr. Ruth C. Ash                    Ms. Wanda Lovelady
     Mr. Feagin Johnson, Jr.            Ms. Catherliene Williamson
     Dr. Mabrey Whetstone

FY06-2015



PLAINTIFF'S
EXHIBIT

GORDON PERSONS BUILDING • P.O. BOX 302101 • MONTGOMERY, ALABAMA  36130-2101 • TELEPHONE (334) 242-9700 • FAX (334) 242-9708 • WEB SITE:  www.alsde.edu

Defendants' Initial
Disclosures              53



# Focused Monitoring Report

Education Agency:                                    Houston County

Special Education Coordinator:                       Virginia Singletary

Focused Monitoring Date:                             April 03-05, 2006

Date Mailed to Coordinator:

Date of Verification Call From Coordinator:          May 15, 2006

Date Documentation Due:              30 Day

                                     6 Month

Special Education Services Team Leader:              Wanda L. Lovelady

Special Education Services Data Analyst:             Dorothea Walker

The Focused Monitoring Process is a blend of the previous compliance monitoring system and a shift toward addressing program development and improving outcomes for students. This report is based on findings from the System Profile Information, Special Education Coordinator's Questionnaire, Student File Review, Student Services Review, and Compliance Verification Form Summary.

During the Focused Monitoring Process, a designated number of student files were reviewed to verify compliance with state and federal requirements. Also, during this process, a small number of students have been reviewed to determine student status and related system performance results. Each SSR provides a combination of quantitative and qualitative results that reveal, in rich detail, what it is like to be a consumer of services and what is currently working for the student.

The purpose of this report is to provide feedback to the school system in identifying areas of strengths and assist in correcting current problems and establishing/implementing a continuous self-monitoring system. In addition, the department hopes that this information will help advance practice by developing a collegial effort between the State Department of Education, Special Education Services, and the education agency.

Houston County Focused Monitoring Report
Page 2 of 11

The Focused Monitoring Report includes the following:

- **Areas of Strengths** identified during monitoring.
- **Continuous Improvement Strategies** based on findings from the self-monitoring process conducted by the education agency to address practice issues focusing on program development and improving outcomes for students.
- **Areas of Concern** include problems that are not systemic at this time and requires no immediate action; however, if not addressed by the education agency, these concerns may become systemic problems.
- **Areas of Needed Improvement** include systemic problems and student files that require immediate correction.
- **Immediate Correction Strategies** (30-day items) address correcting specific student files.
- **Systemic Improvement Strategies** (6-month items) address correcting problems that could affect the quality of services and outcomes for all students with disabilities.
- **Documentation of Strategy Implementation** includes documentation of immediate corrections to student files that must be completed within 30 working days from the date of the verification call. All systemic areas of needed improvement must be addressed through professional development activities and either amending the *Special Education Plan for Children with Disabilities* to reflect appropriate current practice or documenting appropriate implementation of the current plan.

## GLOSSARY

AAC ......... Alabama Administrative Code
ADRS ........ Alabama Department of Rehabilitation Services
AYP ......... Adequate Yearly Progress
AOD ......... Alabama Occupational Diploma
BBSST ....... Building-Based Student Support Team
CRS ......... Children's Rehabilitation Services
CTIP ........ Career Technical Implementation Plan
DB .......... Deaf-Blindness
DD .......... Developmental Delay
ED .......... Emotional Disturbance
EI .......... Early Intervention
ESL ......... English as a Second Language
ESY ......... Extended School Year
FACE ........ Functional Assessment of the Classroom Environment
GEMS ........ Gaining Expertise through Mentoring and Support
HI .......... Hearing Impairment
IEP ......... Individualized Education Program
LEA ......... Local Education Agency
LEP ......... Limited English Proficiency
LRE ......... Least Restrictive Environment

MD .......... Multiple Disabilities
MR .......... Mental Retardation
OHI ......... Other Health Impairment
OI .......... Orthopedic Impairment
OT .......... Occupational Therapy
PLOP ........ Present Level of Performance
PT .......... Physical Therapy
SAT 10 ...... Stanford Achievement Test 10
SDE ......... State Department of Education
SES ......... Special Education Services
SIG ......... State Improvement Grant
SLD ......... Specific Learning Disabilities
SLI ......... Speech/Language Impairment
SSR ......... Student Services Review
STI ......... Software Technology Incorporated
TBI ......... Traumatic Brain Injury
VI .......... Visual Impairment
VRS ......... Vocational Rehabilitation Service

# Areas of Strength

Each school visited has a positive learning environment enhanced by the availability of extensive resources for students and staff.

The files reviewed were well organized.

Schools across the system provide before and after-school opportunities for students to receive extra help from teachers.

School nurses are available at every school to assist with special needs.

Technology is used extensively throughout the system for instruction, monitoring student progress, and communicating with parents.

There was collaboration between general and special education.

All schools have scientific, researched-based reading programs available.

In some files reviewed, student information was well documented and complete.

As of the date of the on-site monitoring visit, there are no overdue timelines for eligibility determination (initial and/or reevaluation for continued eligibility).

According to the 2004 Child Count data, Houston County's LRE data (time spent in general education is 80 percent or greater; or less than 6 hours per week is spent outside the general education environment) for students 6-21 years old is above the state average.

According to the results of the 2004-2005 Parent Survey, parental satisfaction regarding school experiences is high.

Recognition is given to the Special Education Coordinator for the knowledge, guidance, and support provided to teachers and administrators regarding the special education process.

The Houston County School System employs a licensed, professional counselor who assists with students with behavior problems.

In two of the three SSRs conducted, the parent and student were generally satisfied with the supports and services received through the IEP.

In two of the three SSRs conducted, a substantially successful pattern of decisions, actions, and results may be present in the IEP.

Houston County Focused Monitoring Report
Page 4 of 11

# Continuous Improvement Strategies

**NOTE: The following strategies are offered as suggestions for program improvement to facilitate continued growth and development in the implementation of the special education process.**

## Evaluation, Eligibility, and/or Reevaluation.

Provide to the appropriate teachers and administrators training on the evaluation, eligibility, and reevaluation process/criteria and requirements for the disability areas. Include training on interpretation of data to determine eligibility and the proper completion of the *Notice and Eligibility Decision Regarding Special Education Services* form.

## IEP Development/Implementation.

Continue to provide on-going training on the development of IEPs that are individualized for each student and emphasize content standards and access to the general education curriculum.

Ensure that all appropriate personnel understand how to complete the transition page of the IEP. This page should be the guide used to identify transition needs that should be addressed in the IEP.

## Collaborative Teaching.

Continue to strengthen unity of effort among IEP Team members, especially at the high school level. Continue to provide professional development to both general education and special education personnel on strategies for collaborative teaching and the development of unity of effort. Include evaluation procedures so that adjustments/changes are made as needed to ensure success across all grade levels and all environments

# Areas of Concern

**NOTE: These concerns are not systemic at this time; however, if not addressed by the education agency, they may become systemic problems.**

The Houston County School System has a strong working relationship with other agencies in the area to ensure collaborative services are available to special needs students.

**Prereferral Process.** (i.e., completed prereferral form attached to referral, documentation of FACE, documentation prereferral intervention strategies lasted six weeks or longer).

In one file reviewed, a functional assessment of the classroom environment was not completed as required. Any child referred for special education services by the school system December 1, 2000, and after must have a prereferral form and a functional assessment of the classroom environment completed for every referral.

**Evaluation, Eligibility, and/or Reevaluations.** (i.e., appropriate evaluations completed and documented on eligibility report, process for initial evaluation or reevaluation, notice of meeting, timelines met, appropriate membership including parents, decision regarding reevaluation, consent for reevaluation).

According to the 2004 Child Count data, Houston County's percentage of student population that is in special education is above the state average.

**IEP Development/Implementation.** (i.e., IEP notice, implementation/duration date, implementation date for preschoolers beginning on third birthday, student profile, goals, benchmarks, supplementary aids and services, related services/supports for school personnel, reporting of progress, transition, state testing information, appropriate membership, LRE, documentation copy of IEP given to parents and service providers informing them of their responsibilities and access to IEP, behavior intervention plan review, notice of intent, consent for placement).

In some files reviewed, students determined eligible by the LEA did not appear to have a disability that adversely affected educational performance to the extent that special education and related services would be needed.

In some files reviewed, the IEP Team membership was not documented as required by the AAC.

According to the 2004 Child Count data, Houston County's LRE data (time spent in the natural environment is 80 percent or greater) for students 3-5 years old is below the state average.

In one of the three SSRs conducted, the intensity of instructional services is poor in yielding desired results. Adjustments may be insufficient in keeping services responsive, dependable, or effective.

**General Concerns.**

According to the 2003-2004 student assessment data, students with disabilities did not meet participation or proficiency in reading and math for AYP.

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|
| | *Areas of Needed Improvement:* | Immediate Correction (30 day items) | Systemic Improvement (6 month items) | Immediate Correction (30 day items) | Systemic Improvement (6 month items) |
| **Evaluation, Eligibility, and/or Reevaluations** (i.e., appropriate evaluations completed and documented on eligibility report, process form did not document — initial evaluation or ...valuation, notice of all evaluation data (e.g., achievement tests, vision screening, hearing screening, meeting, timelines met, appropriate membership, including parents, decision regarding reevaluation, consent for reevaluation). | (1) The *Notice and Eligibility Decision Regarding Special Education Services* form did not document information on the appropriate pages of the *Notice and Eligibility Decision Regarding Special Education Services* form for the four students listed below: | (1) Use the information in the file to correct the eligibility report by documenting the missing information on the *Notice and Eligibility Decision Regarding Special Education Services* form for the four students listed below: | (1) Provide to the appropriate teachers and administrators training on the evaluation, eligibility, and reevaluation process/criteria and the requirements for the disability areas. | (1) Provide to the SDE a copy of the complete documentation on the evaluation, eligibility, [including corrected pages] eligibility report and the *Notice of Intent Regarding Special Education Services* form for the four students indicated. | (1) Provide to the SDE documentation on the evaluation, eligibility, and reevaluation process/training requirements including, but not limited to, written information provided, training agenda/outline, description of technical assistance provided, and participant sign-in forms. |
| *Environmental, Cultural and/or Economic Concerns* checklist, observations, etc.) as required by the AAC. | | [stamped text] | | Participant sign-in forms should contain columns for the following: name, position, and school/worksite. | |
| | | Indicate corrected copy and date of correction on the *Notice and Eligibility Decision Regarding Special Education Services* form. | | | |
| | | Complete the *Notice of Intent Regarding Special Education Services* form with explanation regarding omission of the | | An amendment to the *Special Education Plan for Children with Disabilities* is not required. Ensure that the *Special Education Plan for Children with Disabilities* written for IDEA 2004 reflects appropriate/current | |

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|
| | | Immediate Correction (30-day items) | Systemic Improvement (6-month items) | Immediate Correction (30-day items) | Systemic Improvement (6-month items) |
| | Areas of Needed Improvement | documentation on the eligibility report.<br><br>Send a copy of both forms to the parent and/or student.<br><br>Attach the corrected pages of the eligibility report and *Notice of Intent Regarding Special Education Services* form to the current eligibility report. | | | practice. |
| | (2) Evaluation data was not interpreted correctly to determine eligibility as required by the AAC. | (2) Convene the IEP Team and review the eligibility of the student listed below.<br><br>████████████<br><br>Reevaluate students as determined appropriate by a review of eligibility.<br><br>Convene the IEP Team/eligibility team and determine eligibility for the students who were evaluated as determined appropriate by the review. | | (2) Provide to the SDE a copy of the *Notice of Proposed Meeting, Notice of IEP Team's Decision Regarding Reevaluation, Consent for Reevaluation* (if appropriate), and *Notice and Eligibility Decision Regarding Special Education Services* form for the student indicated. | |

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|
| | Areas of Needed Improvement | Immediate Correction (30 day items) | Systemic Improvement (6 month items) | Immediate Correction (30 day items) | Systemic Improvement (6 month items) |
| | | | | If the LEA has determined to amend the IEP without holding an IEP Team meeting, documentation should include a written statement indicating who will meet with the parent to amend the current IEP and a copy of the revised IEP. | |
| | (3) Specific IEP components (e.g., LRE code and location of services on goal page) were not completed as required by the AAC. | (3) Review the IEP of the student listed below:

Action Point

Address the components that were not completed as required.

Revise IEPs as determined appropriate by the review. | | (3) Provide to the SDE documentation that the IEP review process has occurred for the student indicated.

If the LEA has determined that an IEP Team meeting will be held to make the required corrections, documentation should include a copy of the Notice of Proposed Meeting form and/or the written agreement of nonattendance (indicating the IEP Team members not in attendance) or the consent for excusal | |

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|
| | Areas of Needful Improvement | Immediate Correction (30 day items) | Systemic Improvement (6-month items) | Immediate Correction (30 day items) | Systemic Improvement (6-month items) |
| IEP Development/Implementation. (i.e., IEP notice, implementation/ duration date, (e.g., implementation date for preschoolers beginning on 3rd birthday, student file, goals, benchmarks, supplementary aids and services, related services/ supports for school personnel, reporting of progress, transition, state testing information, technology, program accommodations and modifications, and/or support for personnel) including frequency, duration, and/or location as required by the AAC. appropriate membership, LRE, documentation copy of IEP given to parents and service providers informing them of their responsibilities and access to IEP, behavior intervention plan review, notice of intent, consent for placement). | (1) The IEPs did not specify the specially designed instruction (e.g., special education, related services, supplementary aids and services, assistive technology, program accommodations and modifications, and/or support for personnel) including frequency, duration, and/or location as required by the AAC. | (1) Review the IEPs of the two students listed below: | Revise IEPs as determined appropriate by the review. | (1) Provide to the SDE documentation that the IEP review process has occurred for the two students indicated. | If the LEA has determined that an IEP Team meeting will be held to make the required corrections, documentation should include a copy of the *Notice of Proposed Meeting* form and/or the written agreement of nonattendance (indicating the IEP Team members not in attendance) or the consent for excusal (indicating the IEP Team members excused) and a copy of the revised IEP. If the LEA has determined to amend the IEP without holding an IEP Team meeting, documentation should include a written statement indicating |

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|
| | Areas of Needed Improvement | Immediate Correction (60-day items) | Systemic Improvement (6-month items) | Immediate Correction (30-day items) | Systemic Improvement (6-month items) |
| | (2) Specific IEP components (e.g., special factors, general factors, transition needs/services, evaluation of goals/benchmarks, LRE justification, transfer of student rights, nonacademic and extracurricular activities, implementation date, report of progress schedule, and/or copy to parents/students) were not completed as required by the AAC. | (2) Review the IEPs of the two students listed below: ~~[redacted] [redacted]~~ Address the components that were not completed as required. Revise IEPs as determined appropriate by the review. | | (2) Provide to the SDE documentation that the IEP review process has occurred for the two students indicated. If the LEA has determined that an IEP Team meeting will be held to make the required corrections, documentation should include a copy of the *Notice of Proposed Meeting* form and/or the written agreement of nonattendance (indicating the IEP Team members not in attendance) or the consent for excusal (indicating the IEP Team members excused) and a copy of the revised IEP. who will meet with the parent to amend the current IEP and a copy of the revised IEP. | |

| AREAS | FINDINGS | IMPLEMENTATION OF IMPROVEMENT STRATEGIES | | DOCUMENTATION OF IMPLEMENTATION OF IMPROVEMENT STRATEGIES | |
|---|---|---|---|---|---|
| | Areas of Needed Improvement | Immediate Correction (30-day items) | Systemic Improvement (6-month items) | Immediate Correction (30-day items) | Systemic Improvement (6-month items) |
| | | | | (indicating the IEP Team members excused) and a copy of the revised IEP.<br><br>If the LEA has determined to amend the IEP without holding an IEP Team meeting, documentation should include a written statement indicating who will meet with the parent to amend the current IEP and a copy of the revised IEP. | |

# TAB H

**1**

```
 1            IN THE U. S. DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3               SOUTHERN DIVISION
 4
 5   NANCY MILLER,
 6        PLAINTIFF,
 7     VS.            CASE NO.1:06-CV-940-WKW
 8   HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
 9   LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACEY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,
12
        DEFENDANTS.
13
14       The deposition of TIM PITCHFORD, taken
15   by the Plaintiff, pursuant to the Federal
16   Rules of Civil Procedure, before Stacey
17   Watkins, RPR, and Notary Public, State at
18   Large, at the offices of Hardwick, Hause,
19   Segrest & Walding, Dothan, Alabama, on the
20   10th day of October 2007, at 9:00 a.m., CDT,
21   pursuant to notice.
22
23
24
25
```

**2**

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFF:
 4   MR. WINN FAULK
     Attorney at Law
 5   Montgomery, Alabama
 6   MR. THOMAS K. BRANTLEY
     Attorney at Law
 7   Dothan, Alabama
 8
 9   FOR HOUSTON COUNTY BOARD OF EDUCATION,
     KENNETH LORD, RILEY JOE ANDREWS AND
     TIM PITCHFORD:
10
     MR. KEVIN WALDING
11   MR. PATRICK B. MOODY
     Attorneys at Law
12   Dothan, Alabama
13
     FOR PAUL STRANGE AND STACEY EZELL:
14
     MS. KATHERINE HORTBERG
15   Attorney at Law
     Chelsea, Alabama
16
17   FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
     PAM PARRIS AND GREG RUEDIGER:
18
     MR. JOSEPH V. MUSSO
19   Attorney at Law
     Birmingham, Alabama
20
21   ALSO PRESENT:
22   NANCY MILLER
     KENNETH LORD
23   RILEY JOE ANDREWS
     STACEY EZELL
24
25
```

**3**

```
 1            STIPULATION
 2
 3       It is stipulated by and between counsel
 4   for the parties that this deposition be taken
 5   at this time by Stacey Watkins, RPR, and
 6   Notary Public, State at Large, who is to act
 7   as commissioner without formal issuance of
 8   commission to her; that said deposition shall
 9   be taken down stenographically, transcribed,
10   and certified by the commissioner. The
11   signature of the witness is waived.
12       Except for objections as to the form of
13   questions, no objections need be made at the
14   time of the taking of the deposition by
15   either party, but objections may be
16   interposed by either party at the time the
17   deposition is read into evidence, which
18   shall be ruled upon by the Court on the
19   trial of the cause upon the grounds of
20   objection then and there assigned.
21
22
23
24
25
```

**4**

```
 1            TIM PITCHFORD
 2   having been first duly sworn, testified as
 3   follows, to-wit:
 4
 5            EXAMINATION
 6
 7   BY MR. FAULK:
 8       Q    Mr. Pitchford, my name is Winn
 9   Faulk, and I, along with Tom Brantley,
10   represent Mrs. Miller. We haven't met 'til
11   today. Now, you've not been present at any
12   prior depositions in this case, have you?
13       A    No, sir.
14       Q    Okay. Have you ever had your
15   deposition taken before in other cases --
16       A    No, sir.
17       Q    -- for any reason? Okay. I'm sure
18   your lawyers talked to you, you know, about
19   what to expect in general, but I want to be
20   sure you and I kind of understand each other.
21       First of all, I want to know what you
22   know about this case. Okay? And I'm going
23   to ask you questions to try to find out.
24   It's important to you, as well as to me, that
25   you understand those questions. So, if I ask
```

5

1  you a question that doesn't make sense, just
2  tell me, and I'll be glad to try to rephrase
3  it. If I mumble, which I do sometimes, tell
4  me, and I'll speak up. Okay? If, for any
5  reason, you're not comfortable that you
6  understand the question, tell me before you
7  try to answer it. Okay?
8      Secondly, if you need a break for any
9  reason, business, personal, whatever, just
10  tell us. We'll be glad to accommodate you.
11     I guess that's about it. Mainly, it's
12  just, when we walk out of here, I want to be
13  satisfied that you've understood my questions
14  and given me complete answers that are
15  truthful. Okay?
16     A    (Witness nodding head in
17  affirmative.)
18     Q    Also, it helps her if you will say
19  "yes" and "no." I know people, in
20  conversation, often nod their heads or shake
21  their heads or whatever.
22     It will also help the court reporter and
23  be better for you if you don't anticipate my
24  questions and start answering them before I
25  finish them, because you might tell me

6

1  something I didn't have enough sense to ask.
2  Okay?
3      All right. State your name for us,
4  please, sir?
5      A    Tim Pitchford.
6      Q    Okay. And you're currently, I
7  gather, superintendent of education of
8  Houston County?
9      A    That's correct.
10     Q    And when did you take that
11  position?
12     A    January of 2005.
13     Q    And up 'til that time, were you
14  principal at Houston County High School?
15     A    Yes, sir.
16     Q    And when did you become principal
17  at Houston County High School?
18     A    Would be the school year of 2003,
19  beginning of 2000 -- no. That's not correct.
20  2002.
21         MR. FAULK: Kevin, did y'all bring
22         any documents with you pursuant
23         to the notice?
24         MR. WALDING: No. I think we've
25         produced -- no. You should

7

1      have his answers to
2      interrogatories and --
3         MR. FAULK: I've got them.
4         MR. WALDING: -- really all the
5         relevant documents, I think.
6      Q    (By Mr. Faulk) Let me show you
7  what's previously been put into evidence as
8  Defendant's Exhibit 5, which is the summons
9  and complaint in this case. And we should
10  have what's already been offered as
11  Plaintiff's Exhibit 1, which is the answer
12  filed on behalf of you and others in response
13  to that complaint. Are you generally
14  familiar with both those documents?
15     A    Generally.
16     Q    Okay, sir. I'm going to ask you
17  some questions about them. Take a look, if
18  you would, please, sir, at paragraph 14 of
19  Defendant's Exhibit 5, the complaint, and
20  tell me when you've finished reading
21  paragraph 14, please.
22     A    (Witness reviewing document.) I've
23  finished.
24     Q    And then, take a look on
25  Plaintiff's Exhibit 1 at your answer to

8

1  number 14, and tell me when you've read it.
2      A    (Witness reviewing document.) I've
3  read it.
4      Q    Okay. In it, you and some of your
5  fellow defendants deny that Mrs. Miller was
6  working as a schoolteacher under contract
7  with the Houston County Board of Education.
8  If you would, please, sir, tell me the basis
9  on which you would have denied that?
10     A    As principal at Houston County High
11  School, I had no authority to enter into
12  contract or recommend anyone for a teaching
13  position with the Houston County Board of
14  Education. The principal does not have that
15  authority.
16     Q    Yes, sir. On the other hand, what
17  you're denying here is our assertion that she
18  was -- at the time, in the fall of 2004,
19  we're alleging that she was working as a
20  schoolteacher under contract with the board
21  of education. And in your response, you say
22  that you deny that. Now, I realize you
23  didn't draft this answer yourself.
24     A    Right.
25     Q    But, do you personally, as we sit

9

1  here, have any knowledge that, as a matter of
2  fact, she was not working at your school as a
3  teacher?
4        MR. WALDING:  Object to the form.
5        You can answer if you
6        understand the question.
7        THE WITNESS:  Okay.
8    A    Again, I was not the
9  superintendent.  I did not attend a board
10 meeting where she was officially hired.  As a
11 principal, I could not recommend her.  I
12 don't have recommendation authority to the
13 board of education.  And I --
14   Q    Pardon me for interrupting you.
15   A    Yes, sir.
16   Q    But, are you really saying you
17 don't know what her status was?
18   A    I can tell you what I was told.
19   Q    Okay, sir.
20   A    I was told that she was a
21 teacher/student teacher at that time.
22   Q    And who informed you of that?
23   A    That would be Mr. Lord and Mr.
24 Andrews.
25   Q    Okay.  And is that the extent of

10

1  your actual knowledge about her status while
2  she was at your school, that is, her
3  employment status?
4    A    Yes.
5    Q    Okay.  Good enough.  Read paragraph
6  16 to yourself, please, and tell me when
7  you've read it, on both documents.
8    A    (Witness reviewing documents.)
9  Yes.
10   Q    All right.  Do you understand there
11 that she is alleging that she saw various
12 things that she considered to be not in
13 compliance with certain laws and regulations,
14 and that she reported these to Paul Strange,
15 in substance?
16   A    Yes, sir.
17   Q    All right.  Now, in your answer,
18 the Houston County defendants, which includes
19 you, say that they're without sufficient
20 information to form a belief as to whether
21 that's true or not.  Do you see that?
22   A    Yes, sir.
23   Q    All right.  Is that the case with
24 you?
25   A    Yes, sir.

11

1    Q    Did Paul Strange never come to you
2  or communicate with you in some way and tell
3  you, "Mrs. Miller is saying these things
4  about the IEP's and about our special ed
5  program that she thinks are wrong," or words
6  to that effect?
7    A    He mentioned to me Mrs. Miller's
8  concern about what was termed to me as the
9  model, the inclusion model.
10   Q    And what did you understand him to
11 mean by that?
12   A    According to Mr. Strange, that Mrs.
13 Miller felt as though she should be able to
14 teach.  Her role in the classroom would be
15 able to teach two, three days a week, and not
16 as a -- to help students, the special
17 education students, individually there,
18 either at their desk or to pull them out, if
19 they're having difficulty, to the school
20 resource -- to the special education resource
21 room to help them, again, either individually
22 or small groups.
23        That that was her concern, was the model
24 was not what she was taught, and she didn't
25 think that that was correct, what was being

12

1  done there at Houston County High School.
2    Q    And to your understanding, that was
3  limited to whether she would be permitted to
4  teach the entire classroom two or three days
5  a week?
6    A    That was the way I understood it.
7    Q    Did Mr. Strange ever report any
8  other concerns to you that he understood Mrs.
9  Miller had expressed?
10   A    Late in the process, there was
11 something mentioned about IEP's.  But this
12 was very late in the process.  And --
13   Q    Do you recall -- I'm sorry.
14   A    And I don't recall exactly what was
15 said about the IEP's, that maybe late in the
16 process he mentioned.  But what was mentioned
17 to me on more than one occasion was the
18 model.  And that term kept being used, the
19 model.  That Mrs. Miller did not agree with
20 the model and did not think that that was
21 according to state and federal law, the type
22 model that was being used.
23   Q    Okay.  Can you tell us any other
24 particulars, other than what you've already
25 told us, about what you were told her

13

1  complaints were?
2      A    That her complaints were?
3      Q    Right.  And maybe I should say
4  concerns.
5      A    From Mr. Strange or from anyone?
6      Q    Well, from Mr. Strange, first.
7      A    He mentioned that there was a
8  misunderstanding at one time about an
9  eligibility form.  That he and Starla Smith,
10  the psychometrist, they had had a meeting,
11  eligibility meeting.  And that, as a learning
12  tool, that they carried it over, because he
13  -- in Mr. Strange's words, now, that Mrs.
14  Miller was concerned that she was not
15  involved, not being involved in the process.
16      So, as a learning tool, he and Ms. Smith
17  carried that document to Mrs. Miller and put
18  it on her desk, and Ms. Smith -- again, this
19  is Ms. Smith, now, not Mr. Strange.  Do you
20  still want me to answer that?
21      Q    Yes, please.
22      A    That Ms. Smith asked her, hey, to
23  look at this, and Mrs. Miller reacted as
24  though that was an illegal act.
25      Q    Do you know in what respect she

14

1  thought it was an illegal act?
2          MR. WALDING:  Object to the form.
3      Q    And I don't want to get you to
4  guess.
5      A    Right.
6      Q    But, I mean, if you know, I would
7  like to know.
8          MR. WALDING:  I object to the form.
9          I don't know how he can get
10          inside Mrs. Miller's head.
11      Q    Well, what was expressed to you, if
12  anything, about what Mrs. Miller's particular
13  objection was?
14      A    That she assumed that she was going
15  to be signing that document, and that it was
16  an IEP and not -- it was an IEP and not an
17  eligibility form.
18      Q    Okay.  Now, you said there were --
19  or suggested, seemed to suggest, that there
20  might have been other particulars concerning
21  Mrs. Miller's concerns that were related to
22  you by other people, other than Mr. Strange.
23  And if that's the case, please tell us what
24  those were, please?
25      A    Right.  Mr. Strange -- and, again,

15

1  it's three years ago.  I'm trying to remember
2  all these meetings and these chance meetings
3  in the hall and standing in doorways.
4      Mr. Strange, and I think Mrs. Miller, at
5  one time, mentioned to me, in Ms. -- if I say
6  Ms. Breckenridge -- because I think she was
7  Ms. Breckenridge at that time, but she's
8  Ezell now.  There was a concern that she
9  wanted her -- a copy of her lesson plans.
10  Now, that was related to me.
11      I don't think there was any official
12  meeting that I can remember concerning that
13  lesson plan issue.  But that I talked to Mrs.
14  Ezell.  I talked to Mrs. Miller.  I talked to
15  Mr. Strange.  And there were copies in the
16  office.  And we got that resolved, got her
17  copies of the lesson plans that she was
18  requesting.
19      Q    Any other things --
20      A    Other complaints from --
21      Q    -- people told you about?  Yeah.
22      A    There were things that other
23  teachers and school personnel shared with me,
24  but not necessarily complaints that Mrs.
25  Miller had.

16

1      Q    Okay.  I'll get back to that.
2      A    Right.
3      Q    When you earlier alluded to
4  something having occurred -- I can't remember
5  your exact words, but something like late in
6  the process --
7      A    Right.
8      Q    -- let me try to set what I believe
9  are some benchmarks on the calendar that
10  might help us in trying to not pinpoint, but
11  at least focus on the timing of certain
12  events.
13      One of these would be August 26, 2004,
14  which I would represent to you was the first
15  observation of Mrs. Miller by Dr. Ruediger
16  from Troy.  Do you remember Dr. Ruediger?
17      A    I remember him, yes.
18      Q    Okay.  And then, prior testimony
19  from Mr. Strange, I believe, as well as Mrs.
20  Miller, indicates that there was some
21  follow-up meeting within a day or so to that
22  first observation that involved you.  I'm
23  going to ask you about that in a minute.
24      Another date that seems to sort of stand
25  out in everybody's mind is September 24th,

17

1  which is the day she left school and went to
2  the central office to see Mr. Andrews.
3      A    Right.
4      Q    And then, the general time frame
5  October 14 to 19, which is where everything
6  sort of -- the wheels fell off, and she's
7  gone. Okay? Now, when you say "late in the
8  process," when you were talking about Mr.
9  Strange relating things to you, if you
10  recall, would that be before or after the day
11  she took off and went to the central office?
12      A    That's going to be my biggest issue
13  here, are dates. I mean, it happened three
14  years ago, and there's a lot of water under
15  the bridge since that time. I'll do the best
16  I can.
17      I can't tell you for sure when that was
18  during that process that I was told about the
19  IEP's. I know it was -- when I say "late,"
20  that was not the initial concern that was
21  brought to my attention. Anything about
22  IEP's came well later.
23      Q    Okay. In late August 2004,
24  following an observation of Mrs. Miller by
25  Dr. Ruediger, do you recall Dr. Ruediger

18

1  coming to you to discuss things that had come
2  to his attention during that observation?
3      A    Yes.
4      Q    All right. Tell me, please, as
5  much as you can remember about who said what
6  between you and Dr. Ruediger in that
7  conversation. And, first, tell me whether
8  anybody else was present, and, if so, who?
9      A    I think, at that time, it was just
10  Dr. Ruediger and myself.
11      Q    Okay.
12      A    He asked to see me. He was there.
13  Again, I'm not sure whether he was there to
14  go over an observation, whether it was the
15  day of the observation. That, I don't
16  remember. But he and I did meet in the
17  conference room there in my office. And he
18  wanted to talk to me about some concerns he
19  had, some statements that Mrs. Miller had
20  made, or allegedly had made, and some things
21  that he had allegedly said.
22      Q    That Dr. Ruediger had allegedly
23  said?
24      A    Yes.
25      Q    To whom?

19

1      A    Statements that he had made to Mrs.
2  Miller.
3      Q    Okay. Dr. Ruediger is reporting to
4  you the substance of a conversation he had
5  had with Mrs. Miller?
6      A    He had met with Mr. Strange. I
7  believe they met in the library. And then,
8  he came directly -- I say "directly." I
9  don't know. He came that day to meet --
10  asked to meet with me. And we talked about
11  Mrs. Miller's situation.
12      And the things that stick out in my mind
13  about that conversation was that Mrs. Miller
14  had made accusations that Mr. Strange had
15  relayed to me that we were -- again, the
16  model that we were using was incorrect, was
17  not what she was taught at Troy State.
18      She felt that it was in violation of
19  state special education law and policy, and
20  that she -- again, this came from Mr. Strange
21  -- that she had talked to Dr. Ruediger about
22  it, he had agreed, and that he was going to
23  call the state department and check into it
24  and see -- you know, report that we were not
25  doing things correctly.

20

1      And I asked him about that. I'm not
2  sure whether he asked me, from the
3  conversation that he had with Paul Strange,
4  or I asked him. But we discussed that. I
5  asked him did he make those statements. Did
6  she say that to him, and did he agree with
7  her about our model and what we were doing
8  there.
9      Q    And what did he have to say about
10  that?
11      A    He said he did not make that
12  statement. That was incorrect.
13      Q    And the statement was that he
14  allegedly had said that he agreed with Mrs.
15  Miller's position that there was something
16  wrong with your model?
17      A    Right.
18      Q    Okay. Was anything else discussed
19  in this meeting?
20      A    Not that I -- I mean, there could
21  have been, but not that sticks out in my
22  mind. Not that I recall.
23      Q    Do you recall about how long the
24  meeting lasted?
25      A    Again, it's just an estimate. I'm

21

1  guessing.
2      Q    That's fine.
3      A    Five to ten minutes.
4      Q    Okay.  Do you recall what he --
5  wait a minute.  Are you saying he asked to
6  see you or you asked to see him?
7      A    I don't remember who asked to see
8  who, to be honest with you.  He met with Mr.
9  Strange, and then, after that -- I don't know
10 who asked to meet with who.  I'll be honest
11 with you.  I don't remember that.  I just
12 know that we met.
13     Q    All right.  But, in the meeting,
14 you had already been informed by Mr. Strange
15 not only that Mrs. Miller disagreed with the
16 format y'all were using, the model you were
17 using, but you had also been informed, prior
18 to the meeting, that she had quoted
19 Dr. Ruediger as being in agreement with her
20 criticism?
21     A    Yes.
22     Q    All right.  And in that meeting,
23 you asked him if that was so?
24     A    I don't know if I asked him or he
25 relayed what Mr. Strange had said to him.  It

22

1  was discussed.  I don't remember who asked
2  who.  But that subject was discussed.
3      Q    Do you recall any other subject
4  discussed in that meeting?
5      A    I don't remember.  I don't remember
6  if we discussed her observation.  I don't
7  remember discussing that.
8      Q    Is it your testimony still that,
9  at that juncture, there was still no
10 discussion concerning IEP's, as such?
11     A    Not that I recall.  No, sir.
12     Q    All right.  Between the time of
13 that meeting -- let me back up a minute.
14 After you had that meeting with Dr. Ruediger,
15 did you take any action following up on the
16 discussion?  For example, did you call anyone
17 at Troy and talk to them about it?
18     A    Now, I called Pam Parris and Mr.
19 Andrews at a certain point -- it might have
20 been before or after the meeting with
21 Dr. Ruediger -- about some concerns that the
22 faculty and staff -- various faculty and
23 staff had been coming and sharing with me.
24     Q    And those are the concerns that had
25 to do with Mrs. Miller, but not her concerns?

23

1      A    Right.
2      Q    Okay.  Let me show you your answers
3  to interrogatories at number 21, which is
4  sort of a lengthy interrogatory.  But it has
5  to do with what your role was, if anything,
6  leading up to the withdrawal of Mrs. Miller's
7  internship.
8      And let me ask you to -- well, just read
9  your response there.  And you're welcome, of
10 course, to flip back and read the question
11 itself on the preceding page.  Just tell me
12 when you're finished.
13         MR. WALDING:  Read the question,
14         please.
15         THE WITNESS:  Read it out loud?
16         MR. WALDING:  No.  Read the
17         question before you read your
18         answer.
19     A    (Witness reviewing documents.)
20 Okay.
21     Q    May I see it just a second, please,
22 sir?
23     A    Yes, sir.  (Witness handing
24 document to Mr. Faulk.)
25     Q    In regard to the answers you were

24

1  just giving just now in your deposition, do
2  you see here where, in your answer to
3  interrogatory, it says, "I also
4  communicated"?  Read that sentence aloud for
5  the record, please, sir.
6      A    "I also communicated Mrs. Miller's
7  concerns about certain students supposedly
8  not having an IEP to Andrews."
9      Q    Now, do you know about when that
10 report by you occurred?
11     A    Again, that's going to be late --
12 it was late in the process.  And I don't
13 remember the exact time and date of that --
14 reporting that to Mr. Andrews.
15     Q    Read the next sentence for us,
16 please, sir, beginning "I understand."
17     A    Right.  Yes, sir.
18     Q    Read that aloud for us.
19     A    "I understand that these concerns
20 were investigated, and it was found that the
21 students did have IEP's."
22     Q    Okay.  Do you remember who any of
23 the students were who are being referred to
24 there?
25     A    At that time, I was not informed of

25

1  any particular students.
2  Q    Okay.  Do you know who conducted
3  the investigation that you mention there in
4  your answer?
5  A    I believe Mr. Andrews sent Virginia
6  Singletary over to review IEP's.
7  Q    Okay.  And have you seen a written
8  report of that investigation?
9  A    I think she turned in one.  I
10  believe I have reviewed one, I think.  Yes.
11  Q    And it's your understanding that
12  she could find nothing wrong with things as
13  they stood at the time she made her
14  investigation?
15  A    Yes, sir.
16  Q    Do you know if that investigation
17  occurred before or after Mrs. Miller was no
18  longer an intern?
19  A    I think it was before.
20  Q    What was your mother's maiden name,
21  please?
22  A    Morris, M-o-r-r-i-s.
23  Q    And was her family a Houston County
24  family?
25  A    Yes, sir.

26

1  Q    And do they have descendents living
2  here today who are adults?
3  A    Yes, sir.
4  Q    What about your wife's family name?
5  A    McArdle, M-c-A-r-d-l-e.
6  Q    Was she from Houston County?
7  A    Yes, sir.
8  Q    And does she have other relatives
9  here in the county named McArdle?
10  A    Yes, sir.
11  Q    What are some other family names
12  that stand out, like, first cousins?  I'm not
13  interested in their first names so much as
14  just the surnames.  You gave us the name of
15  Pitchford, and you said you were kin to
16  everybody named Pitchford in the county.
17  A    There's not going to be any large
18  group of people with any other name other
19  than McArdle, Pitchford and Morris.  Any
20  large group of names that I can think of.
21  Q    And would that be true of the
22  surrounding counties, as well?
23  A    I have family members in -- a lot
24  of family members in Henry County, also.
25  Q    Named Pitchford?

27

1  A    Yes, sir.
2  Q    What about your wife?
3  A    She has some relatives in Henry
4  County, also.
5  Q    Are they all named McArdle?
6  A    Burdeshaw is a name that you might
7  want to make note of.
8  Q    Okay.  Any others?
9  A    Not that stand out.  No, sir.
10  Q    I'm just trying to prompt you to
11  say it out loud.
12  A    No, sir.
13  Q    After Mrs. Miller left the school
14  for good, was she replaced by another teacher
15  who would carry out these special ed
16  functions that she was supposed to have
17  carried out?
18        MR. WALDING:  Object to the form.
19  A    That's something I should know, but
20  I couldn't tell you who replaced her.  Again,
21  it was three years ago.  I'm fuzzy on some
22  things.  But, now, I can't tell you who
23  replaced her.
24  Q    Do you know that she was replaced,
25  and you just can't remember who it was?

28

1  A    I'll have to ask Mr. Lord or Mr.
2  Andrews.  They will know that.  I just don't
3  remember.  I know there was a shortage of
4  teachers at the time.  And so, I'm not sure
5  if she was replaced or not at that time.
6  Q    You alluded earlier to contacts you
7  had with people from Troy -- and, by that, I
8  mean Troy University -- about concerns that
9  other teachers had about Mrs. Miller.
10  A    Yes.
11  Q    Did you have concerns of your own
12  about Mrs. Miller?
13  A    Mrs. Miller and I had very few
14  meetings or conversations.  What I relayed to
15  Mr. Andrews and Pam Parris was information or
16  concerns of other faculty members and staff
17  members.
18  Q    Okay, sir.  And who were those
19  other faculty and staff members, please?
20  A    Lisa Towns is a mathematics
21  teacher.  Again, you have Paul Strange, her
22  mentor.  Stacey Ezell.  My office staff,
23  Barbara Hamm, Glenda Hammond.  Cathy Keasler,
24  the counselor.  And Starla Smith was not an
25  employee of our school, but she was an

29

1 employee of the county.
2    Q    Okay. Anyone else?
3    A    I don't think so.
4    Q    Let's just take them one at a time.
5 What was reported to you by Ms. Towns?
6    A    Ms. Towns came to my office with
7 concerns. One major concern was that Mrs.
8 Miller was coming into her room, on numerous
9 occasions, upset and crying, and that it was
10 disruptive to the class and the students,
11 especially the special education students who
12 had trouble focusing to start with, and this
13 was causing a disruption.
14    Q    Did she share with you her
15 understanding of what Mrs. Miller was upset
16 and crying about?
17    A    No.
18    Q    Did she come to you about this on
19 more than one occasion?
20    A    I'm not sure.
21    Q    Okay. Does that exhaust your
22 knowledge of Ms. Towns' involvement?
23    A    She also had a concern that she
24 would make suggestions on type lessons that
25 Mrs. Miller taught, as far as the ability of

30

1 the children to understand those lessons, the
2 level of the lessons, and that Mrs. Miller
3 would not always take her suggestions. That
4 the lessons were over their head.
5    Q    Did any of the people that you
6 named come to you in groups, or were these
7 all individual discussions?
8    A    They came in individually.
9    Q    Okay. Does that exhaust your
10 recollection of Ms. Towns' involvement in
11 these reports?
12    A    Late in the process, again, now,
13 later -- did not have anything to do with me
14 calling Mr. Andrews or Pam Parris -- Ms.
15 Towns was upset after Dr. Ruediger had
16 observed Mrs. Miller teaching in Ms. Towns'
17 class.
18    And Dr. Ruediger met with Ms. Towns to
19 discuss that observation and asked -- again,
20 this is according to Ms. Towns -- asked her
21 what she thought of the lesson. And that Ms.
22 Towns told Dr. Ruediger that she advised her
23 not to teach that lesson. That that lesson
24 was over the children's head.
25    And she was not aware -- did not know

31

1 that Dr. Ruediger would go back and share
2 that information with Mrs. Miller, but that
3 obviously he did. And Mrs. Miller came back
4 into her room, very upset, and told her,
5 "Thank you very much for what you told
6 Dr. Ruediger."
7    Q    Does that end the Towns
8 involvement?
9    A    As far as I can remember.
10    Q    Okay, sir. And I don't want to
11 discourage you from --
12    A    Right.
13    Q    -- telling me everything you know.
14 I do want to know what you know. What about
15 reports of the nature you're talking about
16 that you received from Mr. Strange?
17    A    Mr. Strange shared with me that
18 Mrs. Miller was constantly concerned about
19 the model. I mean, I know I've referred to
20 that several times. But that just really
21 sticks out in my mind, that she did not agree
22 with the model. She wanted to teach, and
23 thought that the model we were using with the
24 special education students and mainstreaming
25 was -- he could not convince her that we were

32

1 in compliance with state law.
2    He shared with me some conflicts that
3 she was sharing with him about in Mrs.
4 Ezell's class. That he had made suggestions
5 to her about taking the students that needed
6 some help, whether it be individually or
7 small groups, after Mrs. Ezell had initially
8 presented the lesson, and if the students did
9 not understand the lesson there, to take not
10 all of them, but those that needed help, back
11 to the resource room to work with them. That
12 she would not take his instructions on doing
13 so.
14    And Mr. Strange told me that she made a
15 statement to him, "No." That, "Mrs. Ezell is
16 making life miserable for me in that class,
17 and I'm going to stay in there and make life
18 miserable for her."
19    Again, later in the process -- and I
20 don't know when -- it was mentioned to me --
21 also mentioned to me about the eligibility
22 form. We've discussed it. That she
23 thought that she was being forced to sign an
24 IEP, and that she got very upset about being
25 forced to sign -- thought she was having to

33

1 sign an IEP, when it was an eligibility
2 meeting. He reported that to me.
3    Q    Let me butt in just a second.
4    A    Yes.
5    Q    Was she, to your understanding,
6 being asked to sign the eligibility form?
7        MR. WALDING: Object to the form.
8    A    I don't have any knowledge of that.
9 I was not told she was asked to sign it. I
10 was told that that was carried to her by Mr.
11 Strange and Starla Smith as a learning tool,
12 to make her feel more part of the process,
13 and as it was put on her desk, she
14 immediately reacted to where this was
15 illegal.
16    Q    Did Mr. Strange bring you any other
17 concerns that he had about Mrs. Miller?
18    A    There could be some. But, at this
19 time, that's the ones that stick out in my
20 mind.
21    Q    Okay. Let's talk about Mrs.
22 Ezell's reports to you.
23    A    Mrs. Ezell, again, there was not
24 any formal meetings. As all the faculty can
25 tell you, my door is open. People come in

34

1 and out, come to my door. I think I remember
2 a meeting -- not a meeting. But Mrs. Ezell
3 just came to the door in between classes with
4 a concern that Mrs. Miller did not like the
5 way she was teaching her class, again wanting
6 to -- Mrs. Miller wanted to teach. She
7 wanted -- did not like the role that she had
8 in her class. She wanted to teach half the
9 week, half the class time.
10        And there was a comment that was made --
11 Mrs. Ezell relayed to me a comment that Mrs.
12 Miller said that, "I don't like being in here
13 any more than you do, but I've got to be in
14 here, and I've got to make my time." She
15 relayed that to me.
16    Q    Do you recall any other reports by
17 Mrs. Ezell?
18    A    The issue about the lesson plans
19 that we've already discussed. That was
20 resolved. Again, there could be others, but,
21 at this time, that's what sticks out in my
22 mind.
23    Q    Well, did Mrs. Ezell come to you
24 about the lesson plans, or did Mrs. Miller
25 come to you about that?

35

1    A    Again, I don't know who came to me.
2 I don't know whether it was Mr. Strange or
3 Mrs. Miller or Mrs. Ezell. I don't remember
4 who. But the issue was brought to my
5 attention. More than one of them could have
6 brought it to my attention.
7        There was no -- I don't remember any
8 official meeting, but, again, a lot of
9 meeting in the doorways, meeting in the hall,
10 standing. I don't remember whether -- I
11 don't remember a meeting and exactly who it
12 was that brought it to my attention.
13    Q    Okay, sir. And who, other than Ms.
14 Hamm and Ms. Hammond, were part of your
15 office staff during the period we're talking
16 about?
17    A    That's the only two.
18    Q    And what was Ms. Hamm's job?
19    A    Ms. Hamm was the secretary.
20    Q    That's H-a-m-m?
21    A    That's correct.
22    Q    What did Ms. Hamm tell you about
23 Mrs. Miller that you alluded to earlier?
24    A    That, again, there were occasions
25 where she would come into the office upset,

36

1 crying, visibly upset.
2    Q    Did Ms. Hamm tell you whether she
3 had any knowledge of why Mrs. Miller was
4 upset?
5    A    She did not know why she was upset.
6    Q    Other than her being apparently or
7 visibly upset, did Ms. Hamm tell you anything
8 else?
9    A    Again, on the 24th, the day --
10 September the 24th --
11    Q    The day she left?
12    A    Right. She came to me, actually
13 after Mr. Strange did, to tell me that she
14 had seen her leave the building, crying, with
15 a basket full of -- was not sure what she had
16 -- with a basket full. Walked out the front
17 door, crying, upset, and left the building.
18    Q    Okay. But Ms. Hamm apparently had
19 not had any communication with Mrs. Miller
20 about her leaving?
21    A    No. Or that's what she told me.
22 No.
23    Q    Do you recall anything else Ms.
24 Hamm reported to you concerning Mrs. Miller?
25    A    No, sir.

37

1    Q    All right. Let's talk about Ms.
2 Hammond. What was her job?
3    A    Ms. Hammond was the receptionist.
4    Q    Okay. What did Ms. Hammond report
5 to you?
6    A    Again, the situation about -- on
7 the 24th, about her leaving. I asked Ms.
8 Hammond -- after this incident, I asked Ms.
9 Hammond, and Ms. Hammond said that she saw
10 her -- also saw her leaving, and that also
11 there were times when Mrs. Miller would be in
12 the office, upset, crying.
13    Q    Anything else by Ms. Hammond?
14    A    No, sir.
15    Q    Did Ms. Hammond tell you whether or
16 not she had been told where Mrs. Miller was
17 going or planned to go?
18    A    Told by whom?
19    Q    By Mrs. Miller or anybody else.
20    A    She was not.
21    Q    While we're on that subject, let me
22 show you what's already in evidence as
23 Defendant's Exhibit 14, and ask you to read
24 that to yourself and just tell me when you've
25 finished, please.

38

1    A    (Witness reviewing document.) I've
2 finished.
3    Q    Do you recall seeing this document
4 before?
5    A    I saw that document two days ago.
6 My attorney provided me a copy of that
7 document.
8    Q    You had never seen it prior to
9 that?
10    A    No, sir.
11    Q    And you're confident of that?
12    A    Yes, sir. To the best of my
13 knowledge, I had not seen that until this
14 past Monday.
15    Q    Do you know who these students are
16 that are mentioned, A. T. and J. C.?
17    A    I vaguely remember the students,
18 vaguely.
19    Q    And do you know whether they were
20 in the special ed program?
21    A    I believe A. T. was. I think he —
22 again, three years ago, a student. I think
23 he tested out. But I do remember A. T. And
24 what was the other one?
25    Q    J. C.

39

1    A    I don't remember J. C. being a
2 special education student, but that's not
3 saying that he might not be or might not have
4 been.
5        MR. WALDING: Winn, I don't mean to
6        interrupt, but when you get to
7        a place, I'd like some more
8        coffee, if we could take a
9        short break.
10        MR. FAULK: Give me just a second,
11        because I think I'm near a
12        stopping point, a break point.
13    Q    In the people you named off, you
14 mentioned Cathy Keasler, K-e-a-s-l-e-r.
15    A    K-e-a-s-l-e-r. Yes, sir.
16    Q    Tell me what Ms. Keasler reported
17 to you about Mrs. Miller?
18    A    She was the counselor there at our
19 school. Students -- and this has just
20 refreshed my memory, now, on something else
21 that some of these other teachers had
22 reported.
23    Q    That's fine. And any time -- let
24 me just tell you, if you realize you've
25 omitted something or misstated something,

40

1 just tell me, and I'll be glad to let you go
2 back and add it.
3    A    I'll need to go back. Because,
4 what Ms. Keasler reported to me was reported
5 to me by other teachers. Ms. Keasler had
6 students -- and she did not tell me their
7 names. But she had special education
8 students come to her office and tell her that
9 they did not want to go to Mrs. Miller's
10 class. They did not feel comfortable going
11 to her class. Please not make them go to her
12 class.
13    Q    What did you do about that?
14    A    I did nothing.
15    Q    Why not?
16    A    Other than have Ms. Keasler and Mr.
17 Strange discuss that with the students, I did
18 nothing. I did not have any communication
19 with the students.
20    Q    Did you get any kind of follow-up
21 report from either Mr. Strange or Ms. Keasler
22 about that?
23    A    Other than that they talked to the
24 students and tried to reassure them that
25 everything would be okay.

41

1    Q    Okay. You say other teachers had
2  mentioned similar things to you?
3    A    Right. Ms. Towns. The students
4  relayed to her that they did not feel
5  comfortable -- they did not -- you know,
6  don't make them go to the resource room with
7  Mrs. Miller.
8    Q    Do you know whether these were the
9  same students that had approached Ms.
10  Keasler?
11    A    I do not know.
12    Q    Okay. Do you --
13    A    Mr. Strange also reported to me
14  that -- I didn't mean to interrupt you. I'm
15  sorry.
16    Q    That's all right.
17    A    Mr. Strange also reported to me
18  that students were coming to him and
19  requesting, "Don't make us go to the resource
20  room with Mrs. Miller."
21    Q    Was that sort of thing
22  unprecedented, in your experience, that is,
23  that the children would ask not to be with a
24  particular teacher?
25    A    There would be -- there is an

42

1  occasion that a student requests a schedule
2  change, but not a lot of students about one
3  particular employee.
4    Q    So, in that sense, it was unusual?
5    A    Yes.
6    Q    That's your testimony?
7    A    Yes.
8    Q    Anything else by Ms. Keasler?
9    A    She reported to me about -- I think
10  Ms. Smith and Mr. Strange came in and talked
11  to her about the eligibility form and the
12  misunderstanding about it being an IEP. I
13  don't think she was there when that happened,
14  but she did mention that incident to me. I
15  don't think she was there. Again, I'm not
16  sure.
17    Q    Let me show you Defendant's Exhibit
18  14 again, and ask you to look. See the
19  mention here, about in the middle of it,
20  about Cathy Keasler?
21    A    Right.
22    Q    And whether you had seen this
23  before or not, do you recall any prior thing,
24  back in August, of any kind of problem
25  between Mrs. Miller and Cathy Keasler about

43

1  an IEP for R. S.? Do you remember anything
2  about that incident?
3        MR. WALDING: Object to the form.
4    Q    Assuming it occurred, I mean, do
5  you remember anything about it?
6        MR. WALDING: That's my objection.
7    A    I don't remember that being
8  reported to me.
9    Q    Is the same true about the
10  assertion in the letter that Miller had
11  attended an IEP meeting for someone named
12  Thornton during second block, and that
13  Starla, in Paul Strange's presence, had asked
14  her to sign three documents claiming that she
15  was at the meeting? Do you recall anything
16  of that nature coming to your attention?
17    A    I don't recall the -- I don't
18  recall this student at all. But, now, to my
19  understanding, this was the incident that
20  happened about the eligibility form. Again,
21  I think this was the same incident about the
22  eligibility form. But, again, I'm not 100
23  percent sure. If not, I was not aware of
24  that. The only incident that I was made
25  aware of with Starla Smith and Paul Strange

44

1  was the eligibility document.
2    Q    Now, Starla Smith. Concerns
3  expressed to you by Starla Smith about Nancy
4  Miller. Tell me about those.
5    A    Other than, again, what we've
6  repeated several times about the -- and she
7  did not come to my office. The conversation
8  I had with her, to my best recollection, was
9  there in Cathy Keasler's office. I know
10  Cathy Keasler was present. I'm not sure if
11  Paul Strange was present at that time or not.
12  But, again, it was relayed to me about this
13  incident about the eligibility form and Mrs.
14  Miller reacting so, thinking it was an IEP.
15    Q    Have we now exhausted your present
16  memory about other teachers and employees
17  expressing concerns to you about Mrs. Miller?
18    A    Yes, sir.
19        MR. FAULK: Okay. Are you ready
20        for your coffee?
21        MR. WALDING: I would love some.
22        (Recess from 9:56 to 10:12.)
23    Q    Let me back up to something that I
24  think you said you didn't have any
25  recollection of, but I just want to be sure.

45

1    Do you recall ever having met with Nancy
2    Miller, Paul Strange and Cathy Keasler
3    concerning some special education matter, a
4    meeting between y'all, and particularly
5    having to do with an IEP?
6        A    No, sir.  I don't recall any
7    meeting.
8        Q    Now, the situation you've described
9    of various teachers and staff members and
10   professionals from central office coming to
11   you and complaining or expressing concerns
12   about Mrs. Miller, given that situation, did
13   you try to do anything about the situation,
14   and, if so, what?
15       A    I wanted to treat Mrs. Miller as an
16   intern and try to allow her to have as much
17   of that intern experience as possible.  This
18   was a very unusual situation with
19   employee/intern.  I had never dealt with that
20   before.  Now I had two on the staff.  Amy
21   Deese and Nancy Miller were both there at the
22   same time, with the same situation, due to no
23   applicants in those particular disciplines.
24   There was no model -- I hate to keep using
25   that term.  But there was no model for me to

46

1    use to how to deal with this situation,
2    because it was unusual.  I had never dealt
3    with it before.  I chose to try to give her
4    as much of the intern experience as possible.
5        She was having to meet with Mr. Strange.
6    He was having to observe her one day a week
7    in her class.  She was supposed to observe
8    one day a week in his class.  He was supposed
9    to observe her four times during this
10   process.  Dr. Ruediger was supposed to
11   observe her four times during this process.
12   Not to mention the various meetings that she
13   was having with Pam Parris.
14       This support system had been set up for
15   not only her, but for any other intern.  And
16   I was afraid that I would -- I didn't want to
17   intimidate her any more than it was possibly
18   -- with all that pressure on her, which is
19   standard for any intern, I just felt like
20   that I would not add any more pressure to
21   that, and that I would deal with the mentor
22   on trying to work, and he would be the
23   go-between, as I did with Amy Deese.
24       I had no meetings with Amy Deese, the
25   other intern there with the same situation.

47

1    She came in, occasionally walked in, Amy
2    Deese did, with concerns.  She would come in
3    and talk to me about a discipline issue.  But
4    she would just walk in.  There were no
5    meetings -- you know, set up any meetings.
6        Now, I don't know if I've answered your
7    question or not.  But I did call -- my
8    recollection, I called one meeting with Mrs.
9    Miller.
10       Q    Alone?
11       A    Mr. Stephens, the assistant
12   principal, was there.
13       Q    Okay.  Tell us about that meeting,
14   how it came about and what happened?
15       A    Again, the time frame, I'm going to
16   struggle with.  But I think it was after I
17   had called Mr. Andrews about all these
18   issues.  Now, I'm going to be honest with
19   you.  I took -- again, Mrs. Miller never
20   shared those concerns with me personally.
21   She never told me she had any issues with the
22   model or IEP's, that I can recall.  The
23   information I was getting, I was getting
24   through Paul Strange, the mentor.
25       But I took her -- the concerns he was

48

1    sharing with me about the model -- I mean,
2    I'm the principal of the school.  I took that
3    very serious.  And I called Mr. Andrews, and
4    I said, "Look, I've got a lady over here
5    that's saying that we're in violation of
6    state and federal special education law by
7    the model that we're using as far as
8    mainstreaming and inclusion."  And he assured
9    me, "We're in full compliance."  He said, "I
10   assure you, we're ahead of the game.  We're
11   in full compliance."
12       But he still, as we've talked about,
13   sent Virginia Singletary to check IEP's, and
14   then, he came over and had a meeting with us.
15   Pam Parris called a meeting that Mr. Andrews
16   was present.
17       But some times after -- I think it's
18   after the -- I know it was after the meeting
19   that Ms. Parris called, that Mr. Andrews and
20   I both attended.  Some time after that, when
21   I was, myself, 100 percent sure that we were
22   in compliance, I called a meeting with Mrs.
23   Miller.  And I had Mr. Stephens, the
24   assistant principal, sit in on that meeting.
25   And I sat down with her, and I basically -- I

49

1  don't remember everything that was said in
2  the meeting. But the purpose of that meeting
3  was to tell her, okay, you're an intern. You
4  don't have -- you have not even received --
5  you haven't graduated yet. You haven't
6  received your teaching certificate yet, and
7  you've been here a short period of time.
8     We've got the state department of
9  education who has come down and monitored us
10  this past spring, previous spring of 2004,
11  and assured us that we're in full compliance.
12  They checked, and we got a passing grade.
13     We've got the superintendent, we've got
14  Mr. Andrews, that has assured myself and you
15  and everybody involved that we're in full
16  compliance. And there is the principal, me,
17  with over 20 years experience. You've got
18  Mr. Strange, your mentor, who is experienced,
19  has his degree, been teaching probably less
20  than ten years. I'm estimating eight years.
21     You've got all these people that are
22  telling me and telling you that we're in full
23  compliance. I believe we are. And there is
24  a chain of command, and that's what we expect
25  you to follow.

50

1     And then, we've got all these issues
2  that teachers have been coming to me and
3  sharing with me. I am satisfied that we're
4  doing what we're supposed to do.
5     Q    And you said all that to her, or
6  words to that effect?
7     A    To that effect.
8     Q    Okay. And in regard to what
9  teachers were coming to you about, did you
10  elaborate on that to Mrs. Miller in that
11  meeting?
12     A    I did not.
13     Q    On that occasion or on any other
14  occasion, do you recall Mr. Stephens leaving
15  the room, laughing?
16     A    I think Mr. Stephens left the room.
17  Now, my attention was on Mrs. Miller, just as
18  my attention right now is on you. I don't
19  know what this gentleman is doing. If he
20  gets up and leaves the room, I don't know why
21  he left the room. But my attention is on
22  her, as it's on you now.
23     Q    So, if that happened, you don't
24  know that it happened?
25     A    He left the room.

51

1     Q    But you don't remember anything
2  about him laughing?
3     A    I don't know why he left the room.
4     Q    Was that the only meeting you had
5  with Mrs. Miller being present that had
6  anything to do with what we've been
7  discussing?
8        MR. WALDING: Object to the form.
9        You mean that he called?
10     Q    Well, that you were present in and
11  she was present in --
12     A    No.
13     Q    -- either alone or with other
14  people.
15     A    There was one informal meeting
16  that she and I had alone -- and we didn't
17  even sit down -- standing in my office, very
18  near the end of this whole process. And
19  there was another meeting that Pam Parris
20  called, that we -- actually two meetings that
21  Pam Parris called, one that didn't take
22  place, and then, one that did take place,
23  that Mr. Andrews was present.
24     Q    These are in addition to the
25  meeting you just told us about with Mr.

52

1  Stephens?
2     A    Yes.
3     Q    Do you remember whether the meeting
4  with Mr. Stephens happened before or after
5  she left campus to go to the central office
6  in September?
7     A    I'm not 100 percent sure about the
8  24th, whether it was before or after. But it
9  was after Mr. Andrews -- I had talked to Mr.
10  Andrews, and he, through his direction, had
11  investigated everything and assured me we
12  were in full compliance with what we were
13  doing there as far as special education.
14     Q    Okay. Do you recall which came
15  first between the Andrews meeting and the
16  Parris meeting that you've mentioned just a
17  minute ago?
18     A    I believe my meeting came after
19  that, after the Parris -- after the meeting
20  that -- again, I'm not 100 percent sure. But
21  I think my meeting came after the meeting
22  that Pam Parris called, that Mrs. Miller, Mr.
23  Andrews and myself attended.
24     Q    Oh, okay. Did Andrews and Parris
25  each call a separate meeting?

53

1     A     I'm not aware of any meeting Mr.
2   Andrews called.
3     Q     Oh, okay.  I misunderstood you.
4     A     He attended --
5     Q     So, Pam Parris asked for a meeting
6   that Mr. Andrews attended?
7     A     Yes.
8     Q     Okay.  Tell us about when that
9   happened, please, and who was present, and
10  your best recollection as to who said what,
11  please?
12    A     Again, dates, I'm going to struggle
13  with, and the timeline, I'll struggle with.
14  But I think it was after I had called Mr.
15  Andrews and Ms. Parris about the concerns
16  that I had -- was receiving from the faculty
17  and staff.  Ms. Parris, I think, called two
18  meetings.
19          I believe, the first one, Mr. Andrews
20  was not invited to.  And I don't remember who
21  all was at that meeting.  But that meeting, I
22  don't think, ever took place, because Mrs.
23  Miller refused to meet because her AEA rep
24  was not there, Sharon Cole was not there.
25  And that was a meeting that Pam Parris

54

1   called.
2     Q     Did the meeting take place between
3   y'all, just without Mrs. Miller, or did the
4   meeting just simply not progress?
5     A     To my best recollection, we sat
6   around, and it just dissolved.  There was no
7   official meeting.  There was no meeting,
8   because Mrs. Miller would not meet with us.
9     Q     What was your understanding of the
10  purpose of that meeting?
11    A     To address some of the issues that
12  had come up, that I had called about and that
13  Mr. Andrews, I think, had -- Mr. Andrews was
14  not there.  I'm not sure if Mr. Andrews had
15  already had a conversation with Pam Parris at
16  that time.  I knew he was aware of the issues
17  that we were having.  But that initial
18  meeting that did not materialize, Mr. Andrews
19  was not there.
20    Q     Tell us, then, about the meeting
21  that did take place with Pam Parris?
22    A     Again, to my knowledge, Pam Parris
23  was there.  Mrs. Miller, myself, and Mr.
24  Andrews.  And I'm not sure if there was
25  anybody else present or not there in the

55

1   conference room at Houston County High
2   School.
3          And Ms. Parris -- again, I'll just have
4   to talk to you in general terms, because I
5   don't know specifically what was said.  But,
6   just addressed some of the issues that we
7   had.
8     Q     What issues?
9     A     All those that I have shared with
10  you previously.
11    Q     Now, you're talking about teacher
12  complaints as well as Mrs. Miller's
13  complaints?
14    A     I don't know exactly.  Again, I
15  don't know the specifics of that meeting.
16  But it was kind of a resolution meeting of
17  trying to put things back together and get
18  started back on a positive direction.  But,
19  again, I don't remember the specifics of that
20  meeting, other than to address the concerns
21  that had been shared with Ms. Parris.
22    Q     For you to discuss those with Ms.
23  Parris?
24    A     I'm sorry?
25    Q     I may have misunderstood you.  The

56

1   purpose of the meeting was to discuss what
2   you had heard with Ms. Parris?
3     A     No.
4          MR. WALDING:  No.
5     Q     Help me out.
6     A     I called -- and it was not -- I did
7   not get all these concerns, now, from -- all
8   these that we discussed, that list of people
9   that you've got there, I did not get these
10  all in one day.
11    Q     I understand that.
12    A     They came in various days.  But, at
13  a certain point, I called Mr. Andrews, and I
14  called Ms. Parris -- and I am assuming that
15  it's the same -- I think at the same day --
16  and shared with Ms. Parris that we've got
17  some concerns here.  And I'm sure that I
18  probably shared with her some specifics on
19  the phone.  And I shared those with Mr.
20  Andrews.  And not long after that, Ms. Parris
21  called a meeting.
22    Q     And have you told us what you can
23  recall about what was said at that meeting?
24    A     The specifics, I can't recall.  But
25  it was just to address the relationship that

57

1 Mrs. Miller, the intern, was having with her
2 mentor, with the teachers, students, and
3 trying to get back started in a positive
4 direction. But, now, the specifics, I don't
5 -- now, Mr. Andrews might recall those
6 specifics, but I just don't.
7        Q    And this meeting that actually
8 occurred with Ms. Parris, was it a follow-up
9 to the meeting that fizzled out?
10       A    I think so. I know there was an
11 original meeting that did not take place.
12 And I think this second meeting was a
13 follow-up to that, and Mr. Andrews coming,
14 also. Again, I'm fuzzy on the timeline. But
15 I know there was two meetings.
16       Q    Was the AEA woman present at the
17 second meeting?
18       A    No.
19       Q    Do you recall talking to her about
20 this situation?
21       A    I vaguely remember a call. She
22 called about -- and just kind of asked me,
23 one day in my office, "What's going on?" It
24 was not a two-minute conversation on the
25 phone. I just said, "You know, we've got

58

1 some issues here with an intern, Mrs. Miller,
2 you know, that we're dealing with." I did
3 not go into specifics with Ms. Cole.
4        Q    And she didn't inquire as to
5 specifics?
6        A    Not to my recollection. I think
7 maybe she had said she had gotten a call from
8 Mrs. Miller, and she was just calling me.
9        Q    Do you recall other contacts, by
10 either telephone or in person -- talking
11 about oral contacts -- between you and Ms.
12 Parris concerning these issues that you had
13 about Mrs. Miller?
14       A    I can only remember a couple of --
15 two conversations I had with her on the
16 phone. Three. Three conversations I had.
17       Q    Tell us about each of those.
18       A    The first call that I had was,
19 again, after -- at a certain point, when I
20 had received all these concerns from the
21 teachers and staff, I called Ms. Parris and
22 just told her we had -- there were some
23 concerns with -- and we talked in general
24 terms.
25       I'm not sure if it was that conversation

59

1 -- on the 24th, that Mrs. Miller left school,
2 I know I called the central office. I think
3 I called and left a message -- and, again, I
4 think. I'm not sure. I think I called Pam
5 Parris. But, again, this is on Friday, and I
6 don't believe they were in school over there.
7 I don't think Troy State of Dothan -- they're
8 closed on Friday or they don't have classes
9 on Friday.
10       But I called and talked to Ms. Parris
11 about -- maybe I reported -- I might have had
12 to leave it on her machine that Mrs. Miller
13 had left school, I did not know where she
14 was, and her students were down there
15 unsupervised.
16       I want to think that it might have been
17 the first conversation that I had with Ms.
18 Parris, when I called her about some issues,
19 her response to me was, "Mr. Pitchford, I'm
20 so sorry. I was afraid this was going to
21 happen."
22       And she continued to say that they had
23 had issues with Mrs. Miller in her classes at
24 Troy State of Dothan with some of her
25 instructors. Similar type behavior that I

60

1 was describing to her. Not cooperating with
2 her instructors. I don't know the specifics
3 that she said. But it was issues with some
4 of her professors. And that they had to have
5 a special meeting at Troy State with the
6 dean. Again, I don't know who. I want to
7 think she mentioned the dean, but I don't
8 know who else they had a meeting with, and
9 Mrs. Miller.    And sat down with her, and
10 had her to reassure them that they had had
11 these issues in classes out at Troy State of
12 Dothan with her. Would she guarantee them,
13 if they allowed her to go out and allow her
14 to do her internship at a school, a school
15 system, out at Houston -- again, at that
16 time, I'm not sure if it was Houston County
17 High School -- was she going to cooperate,
18 when she got out to the schools, and to
19 listen and cooperate. Again, I'm
20 paraphrasing. And that the decision was made
21 to allow her to do so.
22       And no one had told me or Mr. Andrews or
23 no one else before about that meeting or that
24 issue, that there were problems at Troy State
25 before she ever got to Houston County High

61

1   School.  And Ms. Parris apologized to me for
2   that.
3       Q     So, you said there were three phone
4   calls.  Have we covered them all?
5       A     No.  There's one more.
6       Q     Go ahead.
7       A     I mentioned to you about a meeting
8   that Mrs. Miller and I had in my office, that
9   was not a called meeting.  I'm not even sure
10  why she walked into my office.  But it was
11  right at the end of her tenure there at
12  Houston County High School.  At that time, I
13  did not know that her internship had been
14  terminated.  But she was in my office.  I
15  don't know what the issue was, what she was
16  there to ask me for.
17      And I -- and we were standing.  We
18  didn't sit down.  And I said, "Mrs. Miller,
19  let's start over."  I said, "Let's start
20  over.  I want you to have a successful
21  internship here.  I want you to be a good
22  employee at Houston County High School for
23  years to come.  Let's start over.  Let me
24  call Troy State.  Let me call them and just
25  see can we start over."  And she did not --

62

1   there was no response.  She looked at me and
2   did not respond.
3       And when she walked out of the room, I
4   still called Pam Parris, and I said, "Pam" --
5   I told her about the conversation that I had
6   had with Mrs. Miller.  And she said, "It's
7   too late."  She said, "The decision has been
8   made to cancel her internship."  She said,
9   "It's too late."
10      Q     Do you happen to know whether Mrs.
11  Miller already knew that at the time you had
12  that brief conversation?
13      A     I did not know that.  She did not
14  respond to me.  When I asked her to let's
15  somehow start over, she just did not respond
16  at all.
17      Q     Was anyone else present during that
18  exchange?
19      A     No, sir.
20      Q     And the exchange I'm talking about
21  is between you and Mrs. Miller.
22      A     No, sir.
23      Q     What about the occasion on which
24  Mrs. Miller departed from the school for good
25  that day?  Were you present when she actually

63

1   left the school for good?
2       A     Her last day?
3       Q     Yes, sir.
4       A     Yes, sir.
5       Q     Okay.  Tell us what you recall
6   about that.
7       A     I'm not sure if Mr. Lord called me
8   and said he and Mr. Andrews -- they were
9   coming, and had a letter for Mrs. Miller.  I
10  don't know if I ever saw the letter itself.
11      I mean, but I have been part of -- not a
12  situation similar to this.  But, I mean,
13  we've had to give notification of teachers
14  being nonrenewed before.  And this is just a
15  standard procedure, that you come personally
16  and hand out those letters.  I do that now,
17  as a superintendent.  I go hand those letters
18  personally to employees.
19      They came.  I'm not sure if Mr. Strange
20  was present in the office at that time
21  whenever we called her -- Mr. Lord called her
22  in and gave her her letter.  I don't think he
23  was, but I'm not sure.
24      But, when Mrs. Miller left, Mr. Strange
25  was asked to go with her and see if he could

64

1   help her get up any of her things, to help
2   her to her car.  I'm not sure whether he was
3   asked that whenever she locks her door, ask
4   for her keys.  I don't remember the exact
5   conversation.  But that's my recollection of
6   that day.
7       Q     There have been statements here and
8   there -- I can't even point you to them --
9   just coming up in this case, where people
10  have said in so many words that Mrs. Miller
11  refused to leave the school.  Do you know
12  anything about that?
13      A     I don't know of -- I would not term
14  it that way.  No, sir.  I don't -- I know her
15  internship was terminated, and she kept
16  coming to work.  Now, I don't think I ever
17  instructed her not to come back to work, not
18  to report back to school, until she was given
19  that letter.
20      Q     Prior to Mr. Lord delivering the
21  letter that you mentioned, are you aware or
22  have you heard of anyone else telling Mrs.
23  Miller, "You must leave the campus and not
24  come back," or words to that effect?
25      A     I don't remember that.  I don't

65

1 recall that.
2     Q     That's fine. Have you now told us
3 everything that you did and attempted to do
4 about the complaints that you were getting
5 from teachers and staff about Mrs. Miller?
6     A     To the best of my recollection.
7     Q     And have you told me everything you
8 can recall about your contacts, both in
9 person and by telephone -- I'll get to the
10 written things here in a minute -- with Ms.
11 Parris?
12     A     The best of my recollection, those
13 are the three conversations, phone
14 conversations and the meeting, that I
15 remember. Now, am I sitting here to tell you
16 there were no other conversations? I can't
17 tell you that. The best of my knowledge,
18 those are the conversations that I had.
19     Q     Okay. That's fine. What about
20 other people connected with Troy?
21     A     Other than Dr. Ruediger -- I think
22 I had that one conversation with him -- I
23 don't recall having any conversation with
24 anybody at Troy.
25     Q     Sandra Jones, for example? Do you

66

1 recall ever --
2     A     I don't recall having a
3 conversation with Ms. Jones.
4     Q     So, we've covered your contacts
5 with Troy concerning Mrs. Miller, so far as
6 you can recall today?
7     A     Yes.
8     Q     Okay. Let me ask you this: In
9 your answer, Plaintiff's Exhibit 1, I want to
10 direct your attention to page six of nine.
11 If you would, please, I'm going to ask you
12 about parts (b), as in boy, and (d), as in
13 dog, of that answer.
14     And if you need to look at the
15 corresponding -- well, there wouldn't be a
16 corresponding part of the complaint, because
17 this is your third affirmative defense. If
18 you would, read to yourself part (b) and part
19 (d), and tell me when you've finished,
20 please.
21     A     (Witness reviewing document.)
22 Okay.
23     Q     Okay. In regard to part (b), when
24 it says that -- as I understand that, you're
25 contending, through your attorney, that any

67

1 reports that she made concerning doubts she
2 had, if you will, about the special education
3 program at your school, would have been part
4 of her official duties. Do you understand
5 that?
6     A     I understand what you're asking.
7     Q     Okay. Did you consider that the
8 reports she was making to Mr. Strange and to
9 Mr. Andrews and Ms. Singletary and to
10 Dr. Ruediger or to Ms. Parris, did you
11 consider those reports to be part of her
12 official duties at the school?
13         MR. WALDING: Let me object to the
14             form of the question. (b) of
15             the third defense of the answer
16             says part of her official
17             duties as a teaching intern.
18             And that's different from the
19             question you're asking this
20             gentleman.
21     Q     Adopt his language and take the
22 question. In other words, did you consider
23 that to be part of her official duties as a
24 teaching intern?
25     A     I would think any employee would

68

1 have the right to any concern they have about
2 any policy, whether it be special education
3 or any other policy that we have, to ask
4 those questions. Yes.
5     Q     And can you point us, as past
6 principal, now superintendent in the county,
7 to any written set of duties from which that
8 -- well, that actually states that teachers
9 in your system have such a duty?
10     A     Not at this time. Not to my
11 knowledge. That's not saying that there is
12 not one. But, sitting here at this table, I
13 can't put my hands on one now. No, sir.
14     Q     In one of the meetings you had with
15 her, with Mr. Stephens, I believe, didn't
16 you, in effect, tell her to just knock it off
17 and stop doing this?
18     A     No, sir.
19         MR. WALDING: Object to the form.
20     A     No, sir. That was not the intent
21 of what I told her. I was trying to reassure
22 her that everybody from the state department
23 of education who had come down and evaluated
24 our program in the spring before, and you've
25 got a superintendent with 30 years

69

1  experience, and Mr. Andrews with over 30
2  years, all these people ahead of her, with
3  all this experience, are reassuring her and
4  me that we're in full compliance. And you've
5  got to trust somebody. You know.
6       Here you are, an intern. You haven't
7  graduated yet. You know. The purpose of an
8  internship is to learn, and to take all this
9  vast knowledge and information and learn from
10 it.
11      Q    I just remembered something. When
12 you were talking about your reports that you
13 got from other teachers, do you ever recall
14 Mr. Strange telling you that he was
15 uncomfortable or felt guarded around Mrs.
16 Miller?
17      A    I don't recall that. He might
18 have. But I don't recall him telling me
19 that.
20      Q    Okay. I believe it had something
21 to do about a comment she had made to him
22 about she and her husband would be taking up
23 tickets at some game. Does that ring a bell
24 with you?
25      A    A comment from Mr. Strange?

70

1       Q    A comment by Mrs. Miller to Mr.
2  Strange.
3       A    Mr. Strange? No, sir. I mean,
4  that's duties -- everybody has ticket duties
5  at ball games that they accept. Sometimes
6  their spouses come with them. That's not
7  unusual.
8       Q    Okay. But you don't recall having
9  a conversation like that with Mr. Strange?
10      A    I don't recall that.
11      Q    Take a look at part (d) of the
12 third defense, please, sir. You've already
13 read that, I think. Do you understand that
14 as saying, in substance, that she would have
15 been let go, no matter what she might have
16 reported, for other reasons?
17      A    Again, now, I'm answering this as a
18 -- do you want me to -- I was the principal
19 at the time, now. Board policy, I didn't
20 deal with, you know, as far as making
21 recommendations to the board. I was the
22 principal. Superintendent only has the
23 authority to do that. Are you asking me to
24 answer that in the role as the principal that
25 I was in, or now that I'm a superintendent?

71

1       Q    Well, from what you understand of
2  the facts of this case, you know, to the
3  extent you know them, is it your opinion that
4  she would have been let go in any event, even
5  if she had engaged in some type of free
6  speech?
7            MR. WALDING: Object to the form.
8       Q    Or even if she had not engaged in
9  any type of free speech?
10      A    It's my understanding that once her
11 internship was terminated, that that
12 terminated her employment with Houston County
13 schools. But, again, as the principal, I had
14 no authority to make that decision. Only the
15 superintendent and the board can make that
16 decision.
17      Q    What is your understanding, Mr.
18 Pitchford, assuming you have one, as to why
19 her internship was withdrawn?
20      A    Troy did not -- once it was
21 withdrawn, they did not call and give a
22 specific reason. Is it safe to assume
23 because of some concerns there at the school?
24 I would assume that. But, again, as the
25 principal, I had no authority to terminate

72

1  her internship.
2       Q    And you didn't ever observe her
3  performing her job, did you?
4       A    I did not observe her classes. No,
5  sir. Now, as part of our evaluation policy,
6  if she had remained there at Houston County
7  High School as an employee, I would have been
8  required to have observed her. She would
9  have been required to receive four
10 observations. And one or two of those would
11 have been by me.
12      Q    Let me show you what's already in
13 evidence as Defendant's Exhibit 6, the
14 internship agreement between Houston County
15 Schools and Troy University, Dothan campus,
16 which appears to be signed by you, among
17 others. Is that your signature?
18      A    Yes, sir.
19      Q    Are you familiar with the document?
20      A    Yes, sir.
21      Q    Okay. Can you tell us whether Mrs.
22 Miller abided by the terms of that document,
23 so far as you know?
24      A    I would have no knowledge of
25 whether she turned in all of her forms that

73

1  they're saying here that she has to do. I
2  would have no knowledge if she fulfilled
3  these or not.
4      Q    Okay. I'm going to show you a
5  couple of documents. There are three,
6  actually. One is already in as Defendant's
7  Exhibit 18, which is a letter purporting to
8  be from Stacey Ezell and Paul Strange to Pam
9  Parris.
10      Another is Defendant's Exhibit 30, dated
11  September 30, 2004, just entitled "Nancy
12  Miller professional comments." I'm showing
13  you that.
14      And also a letter from Mr. Andrews to
15  Ms. Parris, which is undated. It appears to
16  be in evidence as Defendant's Exhibit 17.
17      Are you familiar with those documents?
18      A    I'm familiar with these two. I
19  have seen this one, but I'm not -- I don't
20  know where it came from.
21      Q    So, the two you're familiar with
22  are 18 and what apparently is 17, the Andrews
23  letter?
24      A    Right.
25      Q    Okay. Have you ever seen 30

74

1  before?
2      A    I've seen it. I don't know where
3  it came from, but I have seen it.
4      Q    Do you think you saw it in context
5  of the litigation, or do you think you saw it
6  prior to the litigation?
7      A    I've seen it within the last two
8  weeks.
9      Q    Okay. And you don't recall seeing
10  it prior to that?
11      A    No, sir.
12      Q    With respect to Defendant's Exhibit
13  18, the letter from Ezell and Strange, what
14  can you tell us, please, sir, about the
15  origin or genesis of this letter?
16      A    In the conversation with Mr.
17  Andrews -- again, Mr. Andrews is special
18  education coordinator. You've heard me refer
19  to, "I called Mr. Andrews. I called Mr.
20  Andrews." He's the expert. I'm the
21  principal of the school, and I have general
22  knowledge about many things. I have general
23  knowledge about chemistry. I supervise
24  chemistry teachers. But I know nothing about
25  chemistry. I have general knowledge about

75

1  special education. But, when there are
2  questions or concerns about special
3  education, I call the expert.
4      And in Houston County, at that time, in
5  the Houston County School System, Mr. Andrews
6  was the expert. And I called him. And
7  noting that the original conversation with
8  Troy and Mrs. Miller came through Mr.
9  Andrews, is how she ended up at Houston
10  County High School. I requested a teacher.
11  I didn't request any particular teacher. So,
12  when issues came up, and it being in the
13  special education department, I called Mr.
14  Andrews.
15      And somewhere during this process, he
16  said, "Get up a list of concerns. You know,
17  y'all get up a list of concerns." And when
18  he says "y'all," he's including me and
19  anybody else that has any concerns there.
20  "Get me a list of concerns." That was how
21  this document -- the origination of this
22  document started. That was instruction from
23  Mr. Andrews, to get him up a list of
24  concerns.
25      This is a combination of Mr. Strange --

76

1  I think Mrs. Ezell has a comment or two on
2  here. Many of these are things that I've
3  already shared with you that I received from
4  other employees, other teachers that I've
5  shared with you. That's what's included on
6  this document.
7      Q    Okay. Did you draft the document?
8      A    Parts of it. But, now, also, Mr.
9  Strange and, again, Mrs. Ezell, their
10  signatures are here. Parts of this, they --
11  again, I don't remember how it was handed to
12  me, you know, their parts. I would assume it
13  was handed to me handwritten. And, now,
14  under normal circumstances, I would have had
15  my secretary type this. But, do I recall
16  having her type it? No. But that would be
17  standard. If I had something that I was
18  going to forward on to the central office, I
19  would have my secretary type it.
20      Q    Okay. Do you know if any of the
21  underlying notes still exist?
22      A    No, sir, not that I'm aware of.
23      Q    Do you recall how they came to sign
24  the letter?
25      A    I'm sure I -- again, I don't

---

77

1 remember. But I probably asked them to sign
2 it. Since parts of this was coming from
3 them, I asked them to sign it.
4    Q    Did you ask anyone else to sign it
5 who declined to sign it?
6    A    No, sir.
7    Q    But some of these complaints didn't
8 just come from Mrs. Ezell and Mr. Strange?
9 Right?
10    A    Right. There were things that were
11 shared with me. Right.
12    Q    Why didn't you ask anybody else to
13 sign it?
14    A    I don't know.
15    Q    Then, once they had signed it,
16 what, if anything, did you do with it?
17    A    Gave that to Mr. Andrews. Gave him
18 this copy.
19    Q    You didn't send it to Pam Parris?
20 You gave it to Mr. Andrews?
21    A    Mr. Andrews is who requested this.
22 Now, yeah, it's to Pam Parris. I don't think
23 I sent her -- again, I don't think I sent her
24 this. This document came as a request from
25 Mr. Andrews. And I guess, us assuming that

---

78

1 it was originally going to go to Pam Parris,
2 we put Pam Parris on it. But this was given
3 to Mr. Andrews.
4    Q    You say you have some familiarity
5 with Mr. Andrews' letter that I believe is
6 Defendant's Exhibit 17?
7    A    I've seen this after the fact.
8 Yes.
9    Q    After the litigation began?
10    A    Yes.
11    Q    You didn't see it before?
12    A    Not that I recall. I could have.
13 I don't recall seeing this -- I didn't see
14 this transformed to this.
15    Q    Okay. No matter who you gave
16 Defendant's Exhibit 18 to, is it fair to say
17 it was your understanding that it would
18 ultimately go to Pam Parris?
19        MR. WALDING: Object to the form.
20    A    I'm assuming that was -- well, no.
21 I'm not assuming. Mr. Andrews needed some
22 concerns, wanted us to give him a list of
23 concerns. I knew he was in communication
24 with Pam Parris. What did I know for sure
25 was going to happen to this? I didn't know.

---

79

1    Q    I was asking what was your
2 understanding. I mean, you had your
3 secretary direct it to Pam Parris, didn't
4 you?
5    A    Right. Right.
6    Q    Wouldn't that suggest to you that
7 you understood that it was to go to her?
8    A    Possibly.
9    Q    Okay. Now, assuming that it did go
10 to her, and that that was the intention of
11 it, what did you expect to accomplish through
12 this?
13    A    Hopefully to address those issues.
14 It was my intention, my hope, was -- I don't
15 see a date on this.
16    Q    Let me call your attention to
17 something that's not actually a date. But,
18 number 1, "Mrs. Miller left the school campus
19 without" --
20    A    Right.
21    Q    So, you could infer from that --
22    A    After the 24th. Right.
23    Q    -- it would be after the 24th of
24 September? Right?
25    A    Right.

---

80

1        MR. WALDING: Y'all are both
2            talking at one time. You ask
3            him a question, and he'll do
4            his best to answer it.
5        MR. FAULK: I'm trying.
6    A    I had no -- what was your question
7 again?
8    Q    I think my question -- I think we
9 were trying to establish about -- you had
10 mentioned that it didn't have a date, and
11 then, I called your attention to the number 1
12 thing. So, we know it was after the 24th of
13 September? Right?
14    A    Right.
15    Q    Okay. And I had asked you, what
16 did you expect to happen as a consequence of
17 your passing this letter to Mr. Andrews?
18    A    I had no expectation. I was doing
19 as I was asked to do, to get a list of
20 concerns. I had no expectation.
21    Q    Now, you said your hope was that it
22 would address these concerns, I believe?
23    A    My hope, all the way to the bitter
24 end, was to -- even standing there in my
25 office with Mrs. Miller, the last

81

1   conversation I had with her was, "Let's start
2   over. Let's start over." My hope, all
3   along, was to try to have a successful
4   internship and a good special education
5   teacher, which there was a shortage of.
6       Q     So, as of the time you participated
7   in the production of Defendant's Exhibit 18,
8   it was your belief or hope that this letter
9   would somehow straighten the matter out?
10          MR. WALDING:  Object to the form.
11      Q     Or salvage the internship?  Is that
12  your testimony?
13          MR. WALDING:  Again, object to the
14              form.
15      A     Originally, I didn't have any
16  expectations of what this is.  Now, if you're
17  asking me in general, not necessarily
18  specific to this document, was to always have
19  a successful internship and a successful
20  teaching career at Houston County High
21  School.  I had no expectations of what this
22  document -- this was a document that I was
23  asked to send on to Mr. Andrews.
24      Q     Did Mr. Andrews tell you why he
25  wanted it?

82

1       A     He just said, "Send me a list of
2   concerns."  Now, I don't know if Pam Parris
3   asked him for that, for that list.  I do not
4   know the answer to that.
5       Q     Do you recall whether you contacted
6   him, and he said, "Send me a list of
7   concerns," or whether he contacted you and
8   said, "Send me a list of concerns"?
9       A     I know that I called Mr. Andrews --
10  now, this was after the 24th.  I don't know
11  if he called me or I called him.  I don't
12  know the answer to that.  I know Mrs. Miller
13  had met with him on the 24th.  And that was
14  after the 24th.  So, I'm not sure if Mr.
15  Andrews did not call me and ask me for that.
16      Q     Take a look at Defendant's Exhibit
17  30.  There are some remarks here that would
18  appear to be attributed to you.  I'm not
19  saying you really made them.  Look at those,
20  please, and then, I'm going to talk to you
21  about them.
22      A     (Witness reviewing document.)
23  Okay.
24      Q     Do you ever recall stating to
25  anyone connected with Troy University that

83

1   Miller engaged in unprofessional behavior,
2   and given as an example, leaving campus and
3   negative comments made to cooperating
4   teacher?
5       A     What's your question?
6       Q     Do you recall telling anyone
7   connected with Troy that?
8       A     I told -- I think I told Ms. -- in
9   a conversation somewhere with Ms. Parris --
10  might have been after Mr. Andrews talked to
11  her.  But, yes, I -- I don't recall, but I'm
12  sure I probably did tell her about leaving
13  campus.
14      Q     Okay.  Next statement is, "Causing
15  anxiety among teachers.  Three teachers had
16  with met with him," I guess you, "expressing
17  concerns."
18      A     That did happen.
19      Q     And are those the three you've
20  mentioned, Towns, Ezell and Strange?
21      A     That's three of them, yes.  There
22  are more, but that's three.
23      Q     Who are the others?
24      A     You have your list.  We've
25  already --

84

1       Q     We're talking about teachers.
2   Hamm, Hammond, Keasler and Smith weren't
3   really teachers, were they?
4       A     Keasler is a teacher.  She's a
5   counselor, but she's a teacher.  That's
6   considered a teacher.  And Starla Smith is a
7   psychometrist.  But she would, in the broad
8   sense --
9       Q     I'm not trying to trick you.  My
10  view of the matter was just that Towns,
11  Strange and Ezell were the three teachers,
12  and these other people weren't -- they were
13  something other than teachers.
14      A     In the broad sense, I would still
15  consider them teachers.
16      Q     Okay.  Fine.  And then, next is
17  "Not following directions of cooperating
18  teacher."  Have you already told us about
19  that?
20      A     Yes, sir.
21      Q     And you did report that to Pam
22  Parris, you think?
23      A     That was one of the concerns, so I
24  probably did.
25      Q     Okay.  "Crying in the classroom."

85

1  Do you recall telling Pam Parris about that?
2      A    I don't recall.
3      Q    Or anybody connected with Troy?
4      A    Well, the only people that I talked
5  to was Dr. Ruediger and Pam Parris. I don't
6  think I talked to Dr. Ruediger about any of
7  these issues other than the model, the
8  statement supposedly that was made about us
9  not following. So, if I made any comments --
10  any of these comments, it would have had to
11  have been to Pam Parris, because I didn't
12  talk to anybody else at Troy State.
13     Q    In any of your conversations with
14  either Dr. Ruediger or Ms. Parris, did you
15  ever intimate to either of them that you
16  would like to have Miller out of your school?
17     A    I don't remember making any such
18  comment.
19     Q    In any of those discussions with
20  either Ms. Parris or Dr. Ruediger, did you
21  ever express reservations about having
22  interns in the future in your school?
23     A    No, sir.
24     Q    Or anything from which they, in
25  your judgment, could reasonably infer that

86

1  the Miller situation could somehow jeopardize
2  their access to your school for internships?
3      A    I don't recall making that
4  statement. And that would be a board policy.
5  And that would be something I couldn't
6  determine as a principal, anyway.
7      Q    Have you ever expressed to Mr.
8  Andrews you would just as soon not have any
9  more interns?
10     A    No, sir, not that I recall.
11     Q    It's not entirely clear on the face
12  of Defendant's Exhibit 17 as to exactly to
13  whom Mr. Andrews is attributing these
14  statements, A through D. But he says, "After
15  discussion with Mr. Tim Pitchford and Paul
16  Strange, the concerns are as follows." And
17  then, he lists four concerns. Do you recall
18  discussing any of those four concerns with
19  Mr. Andrews?
20     A    I gave Mr. Andrews that list, the
21  previous exhibit.
22     Q    The number 18?
23     A    I gave him. And, again, I -- until
24  -- my best knowledge, until this lawsuit
25  started, I had never seen this.

87

1      Q    Okay. When he says "after
2  discussions with," do you recall telling him
3  -- in substance, telling him any of these
4  items A through D in Defendant's Exhibit 17?
5      A    We discussed leaving -- Mrs. Miller
6  leaving campus. We did discuss that. We did
7  discuss, in general terms, about working with
8  peer teachers. Yes. Positive student
9  relationships, I mean, I shared -- yes.
10  Because I shared with Mr. Andrews what I've
11  shared with you today also, about the
12  students and their not wanting to go to Mrs.
13  Miller's class. Now, that -- again, that's
14  dealing with special education process.
15     Q    Part D?
16     A    D. Yes. I'm sorry. That's
17  dealing with special education process. And
18  that's what I have limited knowledge of.
19     Q    You would not have had an opinion
20  at that time as to whether she understood the
21  required forms and the special ed process?
22     A    No, sir.
23     Q    All right, sir. Do you recall
24  anything, Mr. Pitchford, about requiring Mrs.
25  Miller to keep a notebook to verify her

88

1  whereabouts and activities around the school?
2      A    I don't recall specifically asking
3  her. But this would be something that I
4  would ask all the special education teachers
5  to do. Because, with the inclusion process,
6  their schedules -- they're not like a regular
7  classroom teacher. They might be in this
8  class this day for 20 minutes, or that class
9  -- another class, another teacher's class,
10  for 30 minutes the next day. Because those
11  inclusion students, mainstreamed special
12  education students, were all over the
13  building.
14     But it would not be something that I
15  would specifically require her to do. I
16  would require -- I required all my special
17  education teachers to do.
18     Q    Is the intention of that so that
19  you will know in advance where they should be
20  at a particular time, or so that you can
21  verify later that they were where they
22  claimed they were?
23     A    Probably both. And the big thing
24  is to make sure the students are being
25  served.

89

```
1              (Brief off-record.)
2     Q    These are documents 43 through 64,
3  produced on behalf of the Houston County
4  Board of Education and certain individual
5  defendants, including yourself, as part of --
6  there's an amendment to your initial
7  disclosures, which are required in the case.
8  Take a look at these, please, sir, and tell
9  me whether you are familiar with them?
10    A    (Witness reviewing documents.) I
11 would not be familiar with this, not as a
12 principal. I would not be familiar with it.
13    Q    Are those findings -- and look
14 through it enough to where you -- have you
15 looked at every page?
16    A    (Witness reviewing documents.)
17    Q    I just want to be sure you're
18 satisfied before you say that unequivocally.
19    A    (Witness reviewing documents.)
20 This goes back to me having general knowledge
21 of special education. That's what we -- in
22 my role as a superintendent, that's why I
23 have specialists that are in charge. That's
24 what they handle, is special education. And
25 I would even have less knowledge of this as a
```

90

```
1  principal.
2          MR. WALDING: Let me direct his
3             attention to one page, though.
4      THE WITNESS: Right. Yeah. Let me
5             find out what this is. First,
6             I've got to see what this is.
7             (Witness reviewing document.)
8             Can I talk out loud here, while
9             I'm looking?
10     MR. FAULK: Sure.
11     THE WITNESS: You were talking out
12             loud. Can I talk out loud?
13     MR. FAULK: Go right ahead. Yes,
14             sir.
15     THE WITNESS: May 12. I'm assuming
16             this would be a copy of the
17             state monitoring report from
18             the spring of -- of course,
19             this was the spring of 2006.
20             This has been this past spring.
21     MR. WALDING: And, Winn, I don't
22             mean to tell you how to conduct
23             your deposition. But you'll
24             probably get more information
25             out of Virginia Singletary or
```

91

```
1             Riley Joe Andrews on these
2             documents.
3          MR. FAULK: Okay.
4     Q    And that's really kind of what I'm
5  getting to --
6     A    Right.
7     Q    -- Mr. Pitchford. If these are
8  documents that you're simply unfamiliar with,
9  that's fine. You know. If you're not
10 familiar with them --
11    A    These are documents that I should
12 be. And I should be more familiar with them
13 as a superintendent. But that's a situation
14 where I just trust those that we hire to
15 handle that.
16    Q    To your knowledge, Mr. Pitchford,
17 while you were principal, did you ever have
18 any teachers who were teaching under any type
19 of emergency or provisional certificate? And
20 I may not be using the technically correct
21 term. But something other than the regular
22 certificate?
23    A    As principal, I did not have any
24 dealings with certification issues. That was
25 all handled in the central office and through
```

92

```
1  the superintendent and the supervisors. You
2  know. I would not have any knowledge of
3  that.
4     Q    What about now, as superintendent?
5  Are you aware of any teachers in the system
6  who are under some type of temporary or
7  provisional certificate?
8     A    Yes. I do have knowledge of that
9  now. Yes.
10    Q    What are the circumstances under
11 which such a certificate can be obtained?
12    A    An emergency certificate, the best
13 of my understanding, now -- there are those,
14 again, that I delegate to handle these
15 responsibilities. But the best of my
16 knowledge is that if you have a four-year
17 degree, that there is -- you have one
18 opportunity to have one year on an emergency
19 certificate. One year only in your whole
20 career.
21    I've got 26, seven years in. I've still
22 got an emergency year that I can use if I
23 want to go teach band. If there is an
24 emergency situation, and a school needs a
25 band instructor, legally, they can put me on
```

93

1  an emergency certificate for one year, and I
2  can do so. That is a year that every -- but
3  you have to have a four-year degree. You
4  have to have a B.S. degree.
5      Q    Do you have an opinion, based on
6  your experience and education, as to whether
7  Mrs. Miller would have been eligible for any
8  type of provisional certificate to teach at
9  your school when she was there?
10     A    Other than a -- possibly as a
11 substitute. She did not have a four-year
12 degree. She did not gradu -- again, I never
13 saw her credentials. Okay. I never saw what
14 she had. But if she did not have a four-year
15 degree, had not graduated and have a
16 four-year degree, we would not be able to put
17 her on an emergency certificate. She could
18 be a substitute.
19     Q    And would the same have been true
20 of Amy Deese, as far as you know?
21     A    That's correct.
22          MR. FAULK: If you give me just a
23          minute, I think I'm through.
24          (Recess from 11:25 to 11:36.)
25          MR. FAULK: Just a few questions.

94

1      Q    Was there a handbook, faculty
2  handbook, in effect at Houston County High
3  School when Mrs. Miller was there?
4      A    Yes. We handed out one at the
5  beginning of every school year at a faculty
6  meeting before students arrive.
7      Q    Do you know whether or not it had a
8  specific statement in it that governed the
9  circumstances under which an employee could
10 leave school during the school day?
11     A    I don't have that specific
12 handbook. Under normal circumstances, and
13 under the ones that are handed out now at
14 that school, that would be addressed. But,
15 again, I don't have a copy of that three
16 years ago.
17     Q    And is the answer, at least based
18 on the information available to you today,
19 you don't know whether it had a provision on
20 leaving campus in it?
21     A    I can't say for sure.
22     Q    Fine. That's what --
23     A    Under normal circumstances, it
24 would.
25     Q    All right. Without regard to any

95

1  kind of written policy or procedure for
2  leaving campus, when Mrs. Miller was there,
3  what would have been your expectation as
4  principal when a teacher or person such as
5  Mrs. Miller needed to leave campus during the
6  school day?
7      A    To notify me, so I could make
8  arrangements for her class.
9      Q    And I know you weren't in
10 Washington, D. C. that day, but suppose you
11 had been. I mean, is there some -- who do
12 you go to?
13     A    Notify the assistant principal.
14 Someone -- the reason for that is that
15 someone has -- I mean, those children are
16 going to be there. And a schedule has to be
17 made or someone called to have somebody in
18 that employee's place.
19     Q    In your absence on that occasion,
20 since I gather you were doing something that
21 made you unavailable to her --
22          MR. WALDING: Object to the form.
23     Q    -- would it have been appropriate
24 for her to notify her mentor, Mr. Strange,
25 that she intended to leave campus?

96

1          MR. WALDING: And I object to the
2          form of the question. But he
3          can answer it, if he
4          understands it.
5      A    The mentor would not have the
6  authority to call a sub or to rework
7  someone's schedule in order to cover her
8  classes. It would have to be an
9  administrator that would have the authority
10 to do that.
11     Q    And so, you're telling us, then, in
12 your judgment, it would have been
13 inappropriate for her to have simply notified
14 her mentor prior to leaving campus on that
15 occasion?
16     A    It would have been more appropriate
17 to notify the principal or the assistant
18 principal.
19     Q    Was it inappropriate if she
20 notified Mr. Strange?
21          MR. WALDING: Object to the form of
22          the question.
23     A    Not along with others. Not if she
24 notified Mr. Strange, and then, also notified
25 the principal or assistant principal. That

97

1  would not have been inappropriate.
2      Q      You had testified that she had some
3  students who were left unsupervised when she
4  left the campus on that occasion.
5      A      Right.
6      Q      Tell us about that, please.  What
7  do you know about that?
8      A      Mr. Strange came to me.  That was
9  how I was first notified that Mrs. Miller was
10  not there.  Mr. Strange came to me and said,
11  "I think Mrs. Miller's gone."  And I said,
12  "Why do you say that?"  He said, "She's not
13  here."  He said, "There are students that
14  came to me and said that Mrs. Miller is not
15  -- 'Where is Mrs. Miller?'"
16      And then, Ms. Hamm, the secretary, came
17  and said that she saw Mrs. Miller go out the
18  door, upset, crying, with her arms -- with a
19  basket of materials.
20      Q      But you never actually saw any
21  unsupervised students yourself?  You're
22  relying on Mr. Strange's report?
23      A      Yes.
24      Q      And was his report worded
25  substantially as you have related it?

98

1      A      Yes.
2      Q      Now, did you, from time to time,
3  sit in on IEP meetings?
4      A      Yes.
5      Q      Okay, sir.  Let me show you what
6  has been produced by your attorneys as page
7  numbers 1013 through 1041 of documents being
8  produced by them in this litigation.  Okay?
9  And ask you just to take a look at it enough
10  to tell me whether you're familiar with the
11  document.
12      A      (Witness reviewing documents.)  I'm
13  familiar with it enough to tell you that it's
14  an IEP.  But, am I -- again, I think I've
15  said before, I'm not the expert, and I just
16  have a general knowledge of special
17  education.
18      Q      Let me call your attention in
19  particular to page number 1020, and ask you
20  if I'm pointing to your signature there?
21      A      Yes, sir.
22      Q      And that's dated what?
23      A      10-27-04.
24      Q      Which would be a week plus a day or
25  two after Mrs. Miller left your school for

99

1  good?  Right?
2      A      I'm not sure the date she did
3  leave.
4      Q      I would ask you to assume she left
5  on the 19th or 20th.  But, would that be the
6  day you signed it?  Is the date also in your
7  handwriting?
8      A      Yes, sir.
9      Q      All right.  And it says, above
10  that, "The following people attended and
11  participated in the meeting to develop this
12  IEP."  Correct?
13      A      Right.
14      Q      Do you recall attending this
15  meeting for the student R. S. on 10-27-04?
16      A      If I signed it and dated it, I
17  attended it.
18      Q      Do you recall it, though?
19      A      Do I recall this particular IEP?
20      Q      Yes, sir.
21      A      No, sir, I don't.
22      Q      Do you recall attending other
23  meetings, other IEP meetings?
24      A      Not individual students.  I've
25  attended a lot of IEP meetings.  But I don't

100

1  recall any particular IEP meeting.
2      Q      Had you attended IEP meetings
3  before Mrs. Miller came to the school?
4      A      Yes, sir.
5      Q      What would your role normally be if
6  you attended an IEP meeting?
7      A      I am the administrator.  It's
8  required that an administrator or my designee
9  attend the meeting.  And that's my role
10  there.  I think it's listed what my -- how I
11  would be classified.
12      Q      Do you remember the student R. S.?
13      A      Vaguely, I do remember her.  She
14  was -- I don't think she was there long, but
15  I do remember her.
16      Q      Do you recall whether she was a
17  student who had come around the beginning of
18  the second semester of the prior year, that
19  is, around January 2004?
20      A      I would not have remembered when
21  she came.  No, sir.
22      Q      At the time -- and I'll give this
23  back to you, so you can look at it.  Looking
24  at the document, do you recall whether there
25  had been a prior IEP on this student?  Is

101

1  there some way to tell, by looking at it,
2  whether it replaces another one?
3      A    In my general knowledge, I would
4  not be able to tell you that.
5      Q    Okay.  Do you know whether any
6  prior IEP's would be preserved in this
7  child's records?
8      A    Depending on where she came from.
9  If she had an IEP where she came from, there
10  should be one.
11      Q    In your records, that is, the
12  Houston County records?
13      A    We would have to find it.
14      Q    Do you recall there being some
15  change from 2003 to 2004 having to do with
16  inclusion in special ed in Houston County?
17          MR. WALDING:  Object to the form.
18      A    Not specifically in Houston County.
19  That was along the time that "highly
20  qualified" term was being used, and that
21  being required, that all students have a
22  highly qualified teacher.  But, as far as any
23  specific change in policy or inclusion or
24  anything like that, I mean, we're still -- no
25  matter what the form or what the model is, a

102

1  student is still bound by IEP, which is
2  determined by an IEP team.  And the student
3  just needs to be in the least restrictive
4  environment.  Nothing has changed that.
5      Q    Let me show you pages 1066 to 1070
6  out of the same set of documents that have
7  been produced, and tell me whether you are
8  familiar with that form or that document?
9      A    This is currently enrolled at
10  Cottonwood?  No, sir.  I would not be
11  familiar with that.
12      Q    Well, if a student transferred from
13  Cottonwood to your school, would that have
14  come with their records, if that was a record
15  of Cottonwood School?
16      A    Should have been requested.  If
17  there was an IEP in place at another school,
18  it should have followed until a new IEP was
19  written.
20          MR. FAULK:  Okay.  Thank you.
21              That's all.
22          (Brief recess.)
23
24
25

103

1          EXAMINATION
2
3  BY MR. WALDING:
4      Q    Mr. Pitchford, I don't normally ask
5  my own client questions, but I'm going to ask
6  you just a few.  Did you ever specifically
7  ask someone from Troy State, Dothan, to
8  withdraw or terminate Mrs. Miller's
9  internship?
10      A    I don't recall that.  I don't have
11  the authority to ask that, to do that.
12      Q    Okay.  Did you ever implicitly, or
13  by implication, request that her internship
14  be withdrawn or terminated?
15      A    Say that again.
16          MR. WALDING:  Read that back.
17          THE WITNESS:  Yeah.  Repeat that.
18              What did he ask?  You're using
19              too big of words for me.
20      Q    Did you ever imply to someone,
21  imply --
22      A    Right.
23      Q    -- not state directly, but by
24  implication, request that her internship be
25  terminated or withdrawn?

104

1      A    Not that I'm aware of.
2          MR. WALDING:  All right.  That's
3          all I wanted to ask.  Now, they
4          may want to ask some more
5          questions because I asked
6          those.
7          MR. FAULK:  Thank you.  Appreciate
8          it.
9
10          END OF DEPOSITION
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

105

1     STATE OF ALABAMA

2     HOUSTON COUNTY

3

4         I, Stacey Watkins, RPR, and Notary

5     Public, State at Large, do hereby certify

6     that the foregoing transcript, pages 1

7     through 104, is a true and correct transcript

8     of the testimony and proceedings taken at

9     said time and place; and that the same was

10    taken down by me in stenograph shorthand,

11    and transcribed by me personally or under

12    my personal supervision.

13        I further certify that I have no

14    interest in this matter, financial or

15    otherwise, or how it may develop or what

16    its outcome may be.  I further certify that

17    I am not of counsel for any of the parties,

18    nor am I related to counsel or litigants or

19    associated with anyone connected with this

20    cause to my knowledge.

21        Witness my hand this 23rd day of

22    October, 2007.

23        _____

24        _____ RPR, Notary Public,

              State at Large

25              ACCR# 155