# EVIDENTIARY SUBMISSION (PART 6)

# TAB I

**Page 1**

```
1          IN THE U. S. DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3                SOUTHERN DIVISION
4
5   NANCY MILLER,
6        PLAINTIFF,
7     VS.              CASE NO.1:06-CV-940-WKW
8   HOUSTON COUNTY BOARD
    OF EDUCATION, KENNETH
9   LORD, RILEY JOE ANDREWS,
    TIM PITCHFORD, PAUL
10  STRANGE, STACY EZELL,
    TROY UNIVERSITY, DOTHAN,
11  SANDRA JONES, PAM PARRIS
    and GREG RUEDIGER,
12
     DEFENDANTS.
13
14       The deposition of PAUL STRANGE, taken
15  by the Plaintiff, pursuant to the Federal
16  Rules of Civil Procedure, before Stacey
17  Watkins, RPR, and Notary Public, State at
18  Large, at the offices of Hardwick, Hause,
19  Segrest & Walding, Dothan, Alabama, on the
20  27th day of September 2007, at 9:00 a.m.,
21  CDT, pursuant to notice.
22
23
24
25
```

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:
MR. WINN FAULK
Attorney at Law
Montgomery, Alabama

MR. THOMAS K. BRANTLEY
Attorney at Law
Dothan, Alabama

FOR HOUSTON COUNTY BOARD OF EDUCATION,
KENNETH LORD, RILEY JOE ANDREWS AND
TIM PITCHFORD:

MR. KEVIN WALDING
MR. PATRICK B. MOODY
Attorneys at Law
Dothan, Alabama

FOR PAUL STRANGE AND STACEY EZELL:

MS. KATHERINE HORTBERG
Attorney at Law
Chelsea, Alabama

FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
PAM PARRIS AND GREG RUEDIGER:

MR. JOSEPH V. MUSSO
Attorney at Law
Birmingham, Alabama

ALSO PRESENT:

NANCY MILLER
KENNETH LORD
STACEY EZELL

**Page 3**

STIPULATION

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

**Page 4**

PAUL STRANGE
having been first duly sworn, testified as follows, to-wit:

EXAMINATION

BY MR. FAULK:
Q    State your full name for us, please, sir?
A    Paul Wayne Strange.
Q    Mr. Strange, we've been introduced in prior meetings, but I'm Winn Faulk. Along with Tom Brantley, I represent the plaintiff, Nancy Miller. You were present during both phases of Mrs. Miller's deposition, weren't you?
A    Yes, sir.
Q    Do you recall, in general, the instructions that your attorney and the other attorneys gave Mrs. Miller about the idea this is not an endurance test, and if you need a break or something like that, just let us know, and we'll be glad to give you one? I don't want to go through all that. But, do you understand that?

5

A   Yes, sir.

Q   All right.  Also, I tend to speak
pretty softly, by lawyer standards.  Some
people might say I mumble.  If I do, it
doesn't matter whether you hurt my feelings
or not, but feel free to tell me to speak up
if you don't understand something I say.
Okay?

A   Yes, sir.

Q   If I ask you a question that just
doesn't make sense, tell me --

A   Yes, sir.

Q   -- and I'll try to do it another
way.  I doubt seriously that I'll use a word
that's not part of your everyday vocabulary,
but if I do, don't be embarrassed to say
so --

A   Yes, sir.

Q   -- and I'll select another word for
you.  The main thing is, I just want to be
sure that you understand my questions, that
you have plenty of time to deliberate on them
and give me a truthful answer.  Okay?

A   Yes, sir.

Q   So, if there's anything you don't

6

understand, you will tell me, I hope.

A   Yes, sir.

Q   Okay.  And so, when we walk out of
here today, I should be able to do it with
the assumption that you've understood my
questions, had time to think about them, and
given me a truthful answer.  Would that be
fair?

A   Yes, sir.

Q   Okay.  Also, if there's anything
bothering you, headache, stomachache, just
tired and need to stand up and stretch, tell
me, and I'll be glad to do it.

A   Yes, sir.

Q   Did you see a copy of your
deposition notice that I sent to your
attorney?  (Handing document to the witness.)

A   Yes, sir.

Q   Okay.  If you would, please, turn
to the second page of it.  Do you see the
requests for production there?

A   Yes, sir.

Q   All right.  Have you brought any
additional documents with you that have not
previously been produced to us?

7

A   No, sir.

Q   Okay.  Should I infer from that,
that as we sit here, at least, you're not
aware of any additional relevant documents
that have not already been turned over?

A   I'm not aware of any, no.

Q   If you should become aware of some,
would you please notify your attorney, so she
can take a look at them and decide whether
we're entitled to them?

A   Yes, sir.

MR. FAULK:  I'll tell you, before
we get started, if Kevin comes
up with anything in his written
discovery responses that would
necessitate reconvening his
deposition, we would want to do
it.  I'm not so worried about
Joe, because his clients are
unconnected, basically, with
Mr. Strange.

So, anyway, you think
we're going to get them today?
Can you give me unsigned
copies?

8

MR. WALDING:  You're talking about
the interrogatory answers?

MR. FAULK:  Right.  Yeah.

MR. WALDING:  Okay.  I can give you
unsigned copies of the
interrogatory answers.  Patrick
tells me y'alls requests for
production are not due until
some time in October.

MR. FAULK:  You had told me you
would have them by today in
your e-mail the other day.

MR. WALDING:  I'll do my best, is
what I said.  I'm not trying to
take advantage of anybody.

MR. FAULK:  Well, you know, I can't
just let Mr. Strange absolutely
off the hook without seeing
what his boss has to say.

MR. WALDING:  Sure.  I can get you
unsigned of the
interrogatories.

MS. HORTBERG:  And I will state my
objection to reconvening this
deposition at any later time.

**9**

1  Y'all have had ample
2  opportunity to serve any kind
3  of written discovery on Mr.
4  Strange. He provided his
5  timely responses. And, you
6  know, if you all were wanting
7  to wait until you got all
8  discovery in 'til you took his
9  deposition, we could have
10  rescheduled today.
11  But he's here, ready to
12  give his deposition, and I
13  don't believe that we have any
14  responsibility to come back at
15  a later time because another
16  defendant hasn't provided their
17  discovery responses.
18  MR. FAULK: Granted, everything you
19  say. However, as you know, for
20  the record, you requested an
21  extra week from me, which I
22  agreed to, and then, you
23  complied --
24  MS. HORTBERG: Yes, sir.
25  MR. FAULK: -- within that week. I

**10**

1  also gave an extra week to the
2  other two defense counsel, who
3  have not yet complied. I'm not
4  concerned about Mr. Musso,
5  because of the relationships
6  involved between his client and
7  your clients. I am concerned
8  about getting Mr. Walding's
9  stuff. I've offered to take
10  unsigned copies. And I assume
11  I'll get them.
12  MR. WALDING: If we want to take a
13  break, I can get you those this
14  morning.
15  MR. FAULK: The argument is
16  unnecessary. But, I mean, I'm
17  not going to acquiesce any.
18  But, anyway, yeah, if you can
19  get them for us maybe during
20  the first break or something.
21  MR. WALDING: All right.
22  MS. HORTBERG: And I guess, on the
23  record, will that, then,
24  resolve any concern you have
25  about reconvening this

**11**

1  deposition for any purpose
2  regarding --
3  MR. FAULK: I'm assuming if another
4  lawyer gives me unsigned
5  copies, he's representing that
6  it's a good faith thing that he
7  doesn't have any particular
8  reason to anticipate a change
9  other than he hasn't gotten a
10  signature yet.
11  MR. WALDING: That's true.
12  MR. FAULK: And I'll take Kevin's
13  word for it.
14  MR. WALDING: I can give you two
15  signed sets and two that are
16  yet to be signed.
17  MR. FAULK: Let's just take it
18  during the first break.
19  MR. WALDING: Okay.
20  MR. FAULK: Do you need to talk to
21  your secretary or anything
22  before we get started?
23  MR. WALDING: I can do that right
24  now, and you can go ahead.
25  MR. FAULK: All right.

**12**

1  Q    Mr. Strange, I've handed you and
2  your attorney several exhibits that were
3  exhibits put in by the defense to Mrs.
4  Miller's depositions, and I've also handed
5  you one that was not previously submitted,
6  which I'm going to mark for identification as
7  Plaintiff's Exhibit 1, which is the second
8  document there.
9        (Whereupon, Plaintiff's Exhibit 1
10        marked for identification.)
11  Q    And that, I would represent to you,
12  is what I understand to be the answer filed
13  on behalf of you and certain other defendants
14  prior to the notice of appearance by Ms.
15  Hortberg and her law firm on your behalf.
16  And I've also, along with that, shown
17  you what was formerly Defendant's Exhibit 5.
18  And I'm going to just maintain that
19  designation. And that's a copy of the
20  summons and complaint in this case. Do you
21  have both those in front of you now?
22  A    Yes, sir.
23  Q    I see you're leafing through
24  Plaintiff's Exhibit 1, which is fine. I do
25  want you to take a look at that, please,

13

```
 1  because I'm going to ask you if you're
 2  familiar with it or if you've seen it before.
 3      A    (Witness reviewing document.)
 4      MR. FAULK:  While he's looking at
 5           it, Kate, you have not filed an
 6           amended answer, have you, on
 7           their behalf?
 8      MS. HORTBERG:  No, I don't believe
 9      so.
10      MR. FAULK:  I didn't see one.
11      A    I believe I've seen this.
12      Q    Okay, sir.  Well, I'll ask you to
13  presume that it, in fact, is a copy of the
14  answer we were served with on your behalf by
15  the Segrest-Hardwick firm, prior to Ms.
16  Hortberg's appearance in the case.
17      Let me call your attention, if you
18  would, on both Defendant's Exhibit 5 and
19  Plaintiff's Exhibit 1, to paragraph number 8.
20  In the complaint, Exhibit 5, we say, "The
21  defendant, Paul Strange, is an adult resident
22  citizen of Houston County, Alabama."  Is that
23  true?
24      A    Yes, sir.
25      Q    "And at the time of the events
```

14

```
 1  complained of herein" -- and I presume you
 2  understand by that we're talking about the
 3  things that led up to the termination of Mrs.
 4  Miller's internship and contract -- "he,"
 5  referring to you, "was employed as a teacher,
 6  assigned to mentor the plaintiff, at Houston
 7  County High School, in Columbia, Alabama."
 8  Is that statement true?
 9      A    Yes, sir.
10      Q    Okay.  Let me ask you to look at
11  paragraph 14 of each document, please.  In
12  the complaint, Defendant's Exhibit 5, it
13  states, "At the time of the events made the
14  basis for the action, plaintiff, Nancy
15  Miller, was a student intern at Troy State
16  University, working as a schoolteacher under
17  contract with defendant Houston County Board
18  of Education."
19      In the answer, Plaintiff's Exhibit 1,
20  the defendants admit that she was a student
21  intern at Troy State, but deny that she was
22  working as a schoolteacher under contract
23  with the Houston County Board of Education.
24  Do you see that?
25      A    Yes, sir.
```

15

```
 1      Q    All right.  Now, do you have any
 2  personal information, within your personal
 3  knowledge, on which to deny that Mrs. Miller
 4  was working as a schoolteacher under contract
 5  with the Houston County Board of Education?
 6      MS. HORTBERG:  I'm just going to
 7           object to that question, as we
 8           all know an answer is prepared
 9           by an attorney on behalf of
10           someone.  And this was prepared
11           by attorneys on behalf of Mr.
12           Strange, and he certainly did
13           not sign this document.
14      MR. FAULK:  That's fine.  But I'm
15           just asking Mr. Strange.
16      Q    Do you have any personal knowledge
17  on which to base the denial of the allegation
18  that she was working under contract as a
19  teacher?  And I'll add, that may be something
20  you just don't have an opinion about.  But,
21  if you do know something about that, I'd like
22  for you to tell me.
23      MS. HORTBERG:  Same objection.
24      A    So, what are you asking?  If I knew
25  what?
```

16

```
 1      Q    All right.  In the answer filed on
 2  your behalf, in paragraph 14, the second part
 3  of that compound sentence, it says, "... but
 4  they," talking about the defendants,
 5  including you, "deny that she," Nancy Miller,
 6  "was working as a schoolteacher under
 7  contract with the Houston County Board of
 8  Education."
 9      Do you have any personal knowledge on
10  which to base the denial of that?
11      MS. HORTBERG:  Object to the form.
12      MR. WALDING:  Let me also object to
13           the form.  And let me interpose
14           the objection that the answer
15           was filed on behalf of many
16           defendants, and not just Mr.
17           Strange.
18      A    I knew she was an intern at Troy
19  State.
20      Q    Did you ever see a contract for her
21  as a teacher?
22      A    Did I ever see one?
23      Q    Right.
24      A    No.
25      Q    Okay.  So, is it fair to say, Mr.
```

17

Strange, you can't really say for sure, one
way or the other, whether she was under
contract as a teacher?  That you just don't
know?

   A    Yes.  I do not know.

   Q    Okay.  Thank you.  Take a look at
paragraph 16, if you would, please, in both
documents.  16, in the complaint, Defendant's
Exhibit 5, reads, "Plaintiff noticed various
acts of malfeasance, misfeasance and
nonfeasance in violation of the laws and
regulations governing the special education
program.  When she noticed these violations,
she immediately reported such to Paul
Strange, who was her mentor and supervisor at
the school."

   In the answer, Plaintiff's Exhibit 1,
paragraph 16, it's alleged, "The defendants
are without sufficient information to form a
belief as to the truth of paragraph 16 of the
complaint."

   Now, I need to ask you, Mr. Strange, did
Mrs. Miller report to you certain
circumstances that she said that she felt
were somehow noncompliant with the law or

18

regulations governing special education?

        MS. HORTBERG:  Object to the form.

   A    I mean, what would she have
reported?

   Q    Well, are you saying she didn't
report to you any concerns about possible
noncompliance with the special education laws
and regulations?  And let me be sure you're
understanding me, Mr. Strange.

   A    I'm not.

   Q    I'm not asking you whether you
agreed with her assertions, and I'm not
asking you to agree with her assertions.  I'm
just asking you, right now, is it a fact
that, from time to time during her
internship, she reported things to you that
she said she felt were somehow noncompliant
with the special education laws and
regulations?

        MS. HORTBERG:  Object to the form.

   A    She reported that the inclusion
strategies were not being followed.  She
reported that the model, the inclusion model,
was not being followed.

   Q    And tell me, please, sir, what you

19

mean when you say "inclusion model"?

   A    The state had come up with the term
"inclusion."  And she said that we were not
following the inclusion model as it was
supposed to be followed.

   Q    Can you refer me to some particular
document or regulation of the state
department of education that would describe
that model, so I could look it up for myself?

   A    No, sir.  You could call the state
department, and they may could give it to
you.

   Q    Have you ever seen a written
version of that model?

   A    Of inclusion?

   Q    Right.  Whatever it is we're
talking about.

        MR. WALDING:  We object to the
           form.

   A    Yes, I have seen it.

   Q    Do you recall the circumstances
under which you saw it?

   A    No, sir.

   Q    Do you recall where you saw it?

   A    No, sir.

20

   Q    Or who showed it to you?

   A    No, sir.

   Q    Was that the only concern of that
nature -- and by "that nature," I'm talking
about compliance with special education
program regulations -- that Mrs. Miller ever
expressed to you?

        MS. HORTBERG:  Object to the form.

   A    Yes, sir.

        MR. FAULK:  May I ask the ground of
           your objection, please?

        MS. HORTBERG:  I don't know that
           what you just categorized that
           is a good categorization of
           what he just testified to.

   Q    Did she ever report anything else
to you concerning the special education
program?

   A    I just -- I can't remember.

   Q    Take a look at paragraph 17 of both
documents, please, sir.  In the complaint, it
reads, "Plaintiff reported, among other
shortcomings, individualized education
programs, IEP's, were being either not
prepared, wrongly prepared, or even

21

1  fabricated and backdated."

2      I'm going to stop at the semicolon, and

3  ask you, do you recall any reports that could

4  fairly be describe by that first part of the

5  allegation, 17, that I just read to you?  I'm

6  talking about reports by Mrs. Miller.

7      A   No, sir.

8      Q   She never pointed out to you that

9  one or more IEP's had not been prepared?

10     A   No, sir.

11     Q   She never pointed out to you that

12 any IEP's had been wrongly prepared?

13     A   No, sir.

14     Q   And she never pointed out to you

15 that any had even been fabricated or

16 backdated?

17     A   No, sir.

18     Q   In the course of your work as a

19 special education teacher at Houston County

20 High School, did any IEP's that could be

21 fairly described as having simply not been

22 prepared, wrongly prepared, or fabricated or

23 backdated, ever come to your attention

24 through any means?

25     A   Say that again.

22

1      Q   Okay.  We're talking still about

2  the first part of paragraph 17 of the

3  complaint, and we're talking about -- well,

4  first, let me divert from this just a second.

5  Tell us, please, what your job is?

6      A   I'm assistant principal at

7  Cottonwood High School.

8      Q   And are you no longer involved

9  directly in special education?

10     A   I still attend meetings.

11     Q   At the time Mrs. Miller was serving

12 her internship at Houston County High School,

13 were you involved in special education?

14     A   I was.  Yes, sir.

15     Q   In what capacity?

16     A   Special ed teacher.

17     Q   Okay.  And how long had you been a

18 special ed teacher, not just at Houston

19 County High School, but anywhere,

20 approximately?

21     A   Seven years.

22     Q   Okay.  Was that all in Houston

23 County?

24     A   Yes.

25     Q   And what educational background did

23

1  you have to qualify you as a special ed

2  teacher, please?

3      A   College education.

4      Q   In what field?

5      A   Special ed.

6      Q   That was your major in college?

7      A   One of them.  Yes, sir.

8      Q   And where did you get that degree?

9      A   From Troy.

10     Q   And when did you get it?

11     A   Early 2000.

12     Q   Do you remember approximately what

13 your GPA was?

14     A   No, sir.

15     Q   Did you receive any academic honors

16 at that school in connection with special

17 education?

18     A   No, sir.

19     Q   You were, however, certified at

20 that time as a special education teacher?

21 Correct?

22     A   Yes, sir.

23     Q   And fully qualified, so far as you

24 know and so far as the State of Alabama was

25 concerned, to teach special education?

24

1      A   Yes.

2      Q   Tell us, please, sir -- and have I

3  correctly named this thing we've all been

4  calling IEP as individualized education

5  program?  Is that the correct name for it?

6      A   Individualized education plan.

7      Q   Plan.  Okay.  So, where we say

8  "program," it should say "plan."  Tell us,

9  please, for the Court, what an individualized

10 education plan is?

11     A   It's a plan that's developed for

12 special ed kids.

13     Q   Okay.  And to --

14     A   To help with their education.

15     Q   And you are familiar with those

16 plans and how they are to be prepared, aren't

17 you?

18     A   Yes, sir.

19     Q   And you were at the time Mrs.

20 Miller was an intern, weren't you?

21     A   Yes, sir.

22     Q   Okay.  And your testimony today is

23 that, at the time she was an intern, whether

24 she reported it to you or not, you never saw

25 any instances at Houston County High School

25

where IEP's had simply not been prepared on a given student?

A    Not that I remember.

Q    Obviously, of course, when a child comes in the door the first day, transferring from south Florida, there wouldn't be one, would there, unless they brought it with him?

A    That's true.

Q    And so, obviously, it would have to be prepared. But, what I'm asking you is, you never saw an instance in which one should have, by that point, been prepared, and it had not been?

MS. HORTBERG: I'm going to object to the first part of your statement there. But you can still answer.

A    Not that I remember.

Q    Okay, sir. And is your testimony that you never saw an IEP at Houston County High School that had been somehow wrongly prepared?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

MR. WALDING: Let me add to my

26

objection, I'm not sure that this gentleman can testify whether an IEP was wrongfully prepared.

MR. FAULK: I didn't say "wrongfully."

MR. WALDING: Can I finish?

MR. FAULK: Well, that wasn't the question, but go ahead.

MR. WALDING: It was wrongfully.

MR. FAULK: I said "wrongly," not "wrongfully."

MR. WALDING: All right. Wrongly, having the same import or meaning, Mr. Faulk.

MR. FAULK: Not to me. But, anyway, go ahead.

MR. WALDING: I don't think he can testify that an IEP was wrongly prepared unless he was part of the IEP team. And that is my objection.

Q    (By Mr. Faulk) You can go ahead and answer, please, sir.

A    I don't remember.

27

Q    I want to be sure we're not having any miscommunication. When I say "wrongly prepared," I understand that and I mean for you to understand that as being somehow inadequate. That it's just not done right and needs to be corrected. And you're saying you don't recall any such IEP's while you were at Houston County High School?

MR. WALDING: I object to the form.

Q    Is that correct? If you do, fine. If you don't, fine.

A    I don't remember.

Q    And your testimony is, at the time you were at Houston County High School, you don't have any knowledge of any IEP as having been fabricated? And by "fabricated," I'm using that in a sense that there should have been one on file for several months, and someone says, "Oops, we don't have one. Let's make one up and backdate it." You never saw anything like that?

A    No, sir.

Q    Did you ever see an instance, while Mrs. Miller was there, either through her report or otherwise, of one or more students

28

that had not been switched from a resource room to a full inclusion room, in violation of Houston County Board special education policy?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

A    I don't understand what you're asking.

Q    Okay. Let me divert again a little bit from the question. Is it correct, Mr. Strange, that some time around the summer of 2004, that the Houston County Board of Education made some change of policy to the effect that, in most cases, special education students would be fully included or subject to full inclusion in the academic program at Houston County High School?

MR. WALDING: Object to the form.

A    Ask that again, now.

Q    Okay. I'll try it another way. Does the term "full inclusion" have a special meaning to you in the context of special education?

A    Does it have a special meaning to me?

29

Q    Yes.  Or what does it mean to you, whether it's special or not?

A    Full inclusion would mean in the regular classroom as much as possible.

Q    That is, you would take a student who had been found eligible for special education resources, and he would be included in the normal classroom -- and I hate to say "normal" -- regular classroom, as much as possible?

A    If that was his least restrictive environment.

Q    And do you recall there having been a change of policy by the Houston County Board of Education relating to that subject some time after the end of the 2003-2004 school year?

MR. WALDING:  Object to the form.

MS. HORTBERG:  Object to the form.

MR. FAULK:  What's your objection?

MR. WALDING:  First, I'm not sure that this man would know that.

MR. FAULK:  Well, if he doesn't know, he can say he doesn't know.

30

MR. WALDING:  But, second --

MR. FAULK:  What's your objection?

MR. WALDING:  Second, there was no such thing.  You have a basic misunderstanding of the special education law.

Q    (By Mr. Faulk)  Are you aware of any kind of board policy change of that nature that I've described?

A    No, sir.

Q    Are you aware of any sort of policy change during that time frame that would have somehow increased the practice of full inclusion in Houston County?

A    No, sir.

Q    So, when the 2004-2005 school year began, is it your testimony there was nothing new at that school in special education having to do with full inclusion?

MS. HORTBERG:  Object to the form.

A    I don't know what you're asking me.  I don't know what you're asking.

Q    Okay.  You're saying the question doesn't make sense?

A    Yeah.  I mean, I don't --

31

Q    That's fine.  You're not going to hurt my feelings.  Doesn't matter if you do.

THE WITNESS:  Can we take a break?

MR. FAULK:  Sure.  Do you want to confer with your attorney?

MS. HORTBERG:  He just wants to take a break.

THE WITNESS:  He's trying to trip me up.  He's tricking me.  You're trying to do something.

(Recess in deposition.)

(Riley Joe Andrews present.)

Q    (By Mr. Faulk)  Mr. Strange, when we took a break, we were on paragraph 17 of the two documents we've been discussing.  And we were talking about this general subject.  And it may be, as Mr. Walding points out, maybe I just don't know anything about special education law.  And if I don't, you know, I'm sorry.

But, is it your testimony that you have no recollection about any change in the full inclusion of special ed students in the Houston County School System in the summer of 2004?

32

MR. WALDING:  Object to the form.

MS. HORTBERG:  Object to the form.

A    Yeah.  I have no recollection.

Q    Okay.  And is it also correct that you -- I may be mismembering this.  You testified as to your recollection as to what Mrs. Miller told you on that subject?  Correct?  You've already told us about that?

A    On what subject?

Q    On this thing about full inclusion versus keeping the kids in the resource room.  It seems to me I recall --

MS. HORTBERG:  I'm sure the transcript will indicate.

Q    Let me ask you --

MR. FAULK:  If you don't mind me asking him again, in case he hasn't testified to it.

Q    What do you recall, if anything, about Mrs. Miller telling you about some concern on this subject of full inclusion versus the resource room for students?

A    That the model was not being followed.  Yes, sir.

Q    And did you look into that concern

33

at all to see whether it was a valid concern?

A    I did.

Q    And what did you find?

A    That it was being followed properly.

Q    Okay.  In looking into it, what did you do to look into it?

A    I notified Mr. Pitchford.

Q    Then, was your basis for saying it was being properly followed based on information Mr. Pitchford gave you?

A    Yes.

Q    So, she came to you, and you went to Pitchford, and Pitchford got back to you and said, no, it's being followed, or words to that effect?

MS. HORTBERG:  Object to the form.

Q    And don't let me put words in your mouth.  I'm really not trying to trick you or something.  If you want to tell me, then, just in your own words, what happened, I'll be glad to sit here and listen.

MS. HORTBERG:  I object to the form.  I don't understand what question is on the table.

34

MR. FAULK:  All right.  Well, the question on the table was, what was his process of looking into her concerns she expressed, that he told us about.  And then, he said he got his information -- the basis for his opinion that the policy was being followed was information received from Mr. Pitchford.

MS. HORTBERG:  No.  He never used the word "policy."

Q    (By Mr. Faulk)  The model.  Is that what you're saying Mr. Pitchford said was being followed?

A    (No response.)

Q    Well, let me ask it another way.  What did Mr. Pitchford tell you?

MS. HORTBERG:  Object to the form.  If anything, I don't believe his testimony was that Mr. Pitchford told him anything.

A    No.  He did not come back and tell me that it was being followed.

Q    Okay, sir.  But your testimony is

35

that you, at some point, concluded that it was being followed.  Isn't that what you're telling us?

A    Yes, sir.  I assumed it was being followed.  It was my understanding it was being followed.  Yes, sir.

Q    And so, if I thought you were telling us that you based your opinion on something Mr. Pitchford told you, I would be mistaken?  Is that fair?

A    You're asking me if you're basing your decision on what Mr. Pitchford said?

Q    No, sir.  I want to be sure I'm not misunderstanding you.  A minute ago, I thought you told us that when Mrs. Miller spoke to you about this subject, that you looked into it by contacting Mr. Pitchford, and based on that contact, concluded that the model was being properly followed.

Now, it seems I may have misunderstood your testimony.  And I just want to be sure the record is clear on what your testimony is on this subject.

MS. HORTBERG:  Well, I'm going to object.  I think his testimony

36

is that he answered each question as you asked it to him, and now you're trying to link them all together in some fashion that was not a question to him.

MR. FAULK:  Fine.

Q    Do you understand my question?

A    No.

Q    Okay.  Do you acknowledge that Nancy Miller reported something to you about a concern that she had as to whether the full inclusion model was being followed?

A    Can I go back?

MS. HORTBERG:  Well --

A    Yes, she reported to me that the inclusion model --

Q    Was not being followed somehow?

A    Yes.

Q    Okay.  In what respect was it not being followed, according to Mrs. Miller, whether you agreed with her or not?

A    I don't remember.  It was just --

Q    And then, when she made that report to you, am I correct in thinking that you did

37

something about looking into it to see
whether she was right or not?

    A  No.  I did not --

    Q  So, if I thought that --

    A  I did not look into it to see if it
was right.  No.

    Q  Did you ever discuss her concern
with Mr. Pitchford?

    A  Yes.

    Q  Okay.  And so, when I say "look
into it," am I just using confusing language?

    MS. HORTBERG:  Object to the form.

    Q  Did you do anything to investigate
her concern other than talk to Mr. Pitchford?

    MS. HORTBERG:  Object to the form.

    A  I can't remember if I did anything
or not.  I mean, I --

    Q  When you talked to Mr. Pitchford
about this subject, was anyone else present?

    A  I can't remember if anyone was
there or not.

    Q  Okay.  Do you remember where you
talked to him?

    A  No.  It was at school.

    Q  And do you remember when you talked

38

to him?

    A  No.

    Q  Was this near the beginning of her
internship or toward the end, if you recall?

    A  I don't remember.

    Q  Okay.  And can you tell us, please,
then, what was said in this conversation, as
nearly as you can recall, between you and Mr.
Pitchford on this subject of inclusion?

    A  I mean, I don't remember the
conversation that we had.  I mean, I don't
know.

    Q  Do you remember enough of it that
you are satisfied, as you sit here today,
that Mr. Pitchford was of the opinion that
the inclusion model was being properly
followed?

    MR. WALDING:  Object to the form.

    MS. HORTBERG:  Object to the form.

    Q  If you can answer the question,
fine.  If you can't, just tell me.

    A  I don't remember.

    Q  You don't remember?

    A  (Witness shaking head in negative.)

    Q  Is it your opinion, as we sit here

39

today, that the inclusion model was being
properly followed?

    MR. WALDING:  Object to the form.

    A  Is it my opinion that it was being
followed?

    Q  Yes, sir.  As a special education
teacher at Houston County Board of Education?

    A  Yes.

    Q  Okay.  We're still looking at
paragraph 17 of the complaint, which is
Defendant's Exhibit 5.  The next item on here
-- and I'm at the top of page four now.
These are things that we allege Mrs. Miller
reported to you.  That eight students had not
been --

    MS. HORTBERG:  I --

    MR. FAULK:  I beg your pardon?

    MS. HORTBERG:  I'm going to object.
       I don't believe it says in here
       that she reported this to Mr.
       Strange.  It says she reported
       it.  But that is not the
       wording of paragraph 17, if
       we're going by your complaint.

    MR. FAULK:  Well, we disagree.  If

40

       you read it in context with
       paragraph 16 --

    MS. HORTBERG:  We're looking at
       paragraph 17, according to your
       questions.

    MR. FAULK:  Fine.  I'll ask it
       another way.

    Q  Mr. Strange, did Mrs. Miller ever
report to you that there were students who
had not been given special education history,
although their IEP's called for such a
course?

    A  Not that I remember.

    Q  Do you have any independent
knowledge of that situation, whether she
reported it to you or not?

    A  No.

    Q  Mr. Strange, have you looked at any
documents whatsoever to prepare yourself for
your deposition today?

    A  I have.

    Q  And what did you review in
preparation for it?

    A  What did I review?

    Q  Yes, sir.

41

MS. HORTBERG:  Do you want to know
   what these are called?
THE WITNESS:  Yes.
   (Ms. Hortberg handing documents to
   the witness.)
A    Defendant Paul Strange's responses
to plaintiff's --
Q    Interrogatories?
A    Yes.  Interrogatories.
Q    All right, sir.  Did you review any
other documents in preparation for your
deposition today?
A    No.
Q    And I think you've already
testified you're not aware of any documents
that you have access to that are pertinent to
this subject that you've not already turned
over to your attorney?
MS. HORTBERG:  Object to the form.
MR. FAULK:  Okay.  Well, we gave a
   request for production with the
   notice of deposition.  As I
   understood his testimony, there
   are no other documents that
   he's aware of that haven't been

42

turned over for evaluation by
   you in disclosure.  Is that not
   his testimony?
MR. WALDING:  I think she was
   objecting to the use of the
   term "subject."  If she wasn't,
   let me do that.
MR. FAULK:  On the subject of this
   case.
MR. WALDING:  Well, see, that's
   clear.
Q    (By Mr. Faulk)  In preparation for
your deposition, the only document you
reviewed was your answers to interrogatories?
Correct?
MS. HORTBERG:  He's referring to
   these.
A    Yes.
Q    And you're not aware of the
existence of any other documents that are
pertinent to this case, that you have, that
you haven't already turned over to your
attorney?
A    No.
Q    And we've exhausted your knowledge

43

about any students whose IEP's called for
special education history who were not
receiving that course?  You don't know any
more about that?
A    No.
Q    All right.  We allege that she
reported that two science teachers had
requested not to have a special education
teacher in their classes, although they both
had special education children in their
classrooms.  Do you see that allegation?
A    Yes, sir.
Q    All right.  Tell us what you know
about that, please?
A    I don't know anything about it.
Q    No one ever brought that
circumstance or anything of that nature to
your attention?
A    No.
Q    That at least one special education
student with mental retardation had been
failed because the teacher declared that the
child was, quote, Just lazy and didn't do his
work, close quote, despite such teacher's
knowledge from the child's file that the

44

child did not have the cognitive skills for
the class.  Do you have any personal
knowledge concerning that allegation?
A    No, sir.
Q    And no one ever reported that to
you?  Even though you may not have observed
it yourself, no one ever reported that
circumstance to you?
A    No, sir.
Q    Continuing on the complaint.  That
there were at least two special education
students, one of whom was homebound, for whom
there were no IEP's prepared.  Did Mrs.
Miller ever report that or anything to that
effect to you?
A    No, sir.
Q    And did you have any personal
knowledge of such a circumstance?
A    No, sir.
Q    That several students had only
temporary services sheets, with no current
IEP's for the 2004-2005 school year.  Were
you aware of that circumstance?
A    No, sir.
Q    And Mrs. Miller never reported that

45

circumstance to you?

    A   No, sir.

    Q   That one teacher prepared an IEP in front of the plaintiff, with no IEP meeting with the student and his parents as required by law. Are you aware of that having occurred?

    A   No, sir.

    Q   And Mrs. Miller never reported that to you? Is that correct?

    A   That's correct.

    Q   We had alleged in the complaint that 57 special education students had no IEP's in their files as of August 2004. Is that a correct statement?

        MR. WALDING:  Object to the form.

        MS. HORTBERG:  Object to the form.

        MR. WALDING:  That y'all alleged it?

    Q   We alleged it. But, I mean, is the statement in the complaint correct?

    A   Ask it again.

    Q   Do you know whether there were 57 special ed students that had no IEP's in their files as of August 2004?

46

    A   Are you asking me were there 57 special ed students with no IEP's?

    Q   Yes.

    A   No, there were not 57 students.

    Q   Okay. Fine. Were there some special education students, to your knowledge, at your school, in August of 2004, who did not have IEP's, who should have had them?

    A   I don't remember that.

    Q   Do you recall that there were some special education students at your school, that is, Houston County High School, who did not have current IEP's in their files as of August 2004?

    A   No, I do not recall that.

    Q   Do you recall Mrs. Miller ever reporting anything to that effect to you?

    A   No.

    Q   And specifically going back to any possible change in the full inclusion expectations, if you will, of the Houston County Board of Education -- well, let me ask you this: If a student at Houston County High School had, for a period of time, simply

47

attended classes in a resource room, if that child were to now be changed to full inclusion, would that necessitate a change in his IEP, in your opinion?

    A   I'm trying to make sure I understand you. Now, say that again. What did you say? Repeat it, please.

    Q   Okay. Again, I can't claim that my knowledge of special education law is perfect.

    A   No. I'm just trying to understand.

    Q   But it's my understanding -- well, tell us what your understanding is of the term "resource room" in this context?

        MS. HORTBERG:  In the context of special education?

        MR. FAULK:  Right. Yeah.

        MS. HORTBERG:  At Houston County High School --

        MR. FAULK:  Yeah.

        MS. HORTBERG:  -- in the fall of 2004?

        MR. FAULK:  Yeah.

    A   You want to know what a resource room is?

48

    Q   Yes, please.

    A   It's a classroom where special education students can come in and receive help from the special ed teacher.

    Q   Okay. Clear me up on something, please. Are there some students who spend all their school time in the resource room?

        MS. HORTBERG:  Object to the form. Are you talking about at Houston County High School, in the fall of 2004, that were on Mr. Strange's roll --

        MR. FAULK:  No.

        MS. HORTBERG:  -- or in general anywhere in the United States?

    Q   Just in general, in your experience. Limiting it to your experience.

    A   Are there students that receive -- what do you want to know?

    Q   Who spend their entire day, their entire school day, in a resource room, as distinguished from a general education classroom.

    A   In the United States?

    Q   No, sir. In schools where you have

49

1  taught special education.
2      A    I mean, there may have been. I
3  can't remember.
4      Q    You don't recall any. Okay. So,
5  is a resource room, then, something that's
6  used periodically during the day for
7  particular special ed students?
8          MS. HORTBERG: Object to the form.
9      A    It's used when needed.
10     Q    Give us, then, please, your best
11  definition, most comprehensive definition,
12  based on your education and experience, of
13  what a resource room is?
14         MS. HORTBERG: Object to the form.
15             Asked and answered. He has
16             already given you his
17             definition of a resource room.
18     Q    Well, let him say that. Have you
19  given us your best definition of a resource
20  room?
21         MS. HORTBERG: Object to the form.
22     A    Yes, sir.
23     Q    And if a child is being sent to a
24  resource room, is it fair to say they're not
25  being fully included in the general education

50

1  program?
2          MR. WALDING: Object to the form.
3          MS. HORTBERG: Object to the form.
4      A    Could you repeat it?
5      Q    No. What did, to your
6  recollection, this model full inclusion plan
7  or program or whatever it was that you're
8  talking about -- you've talked about a model
9  full inclusion. You've used that term,
10  haven't you?
11     A    I have used that term.
12     Q    All right. Did that model include
13  the use of resource rooms?
14         MS. HORTBERG: Object to the form.
15         MR. FAULK: On what grounds?
16         MS. HORTBERG: Well, to the extent
17             -- are you talking about -- his
18             testimony has been about Mrs.
19             Miller's complaint about that
20             particular topic. And you're
21             asking him about his
22             understanding or what he
23             understood Mrs. Miller's
24             understanding was?
25         MR. FAULK: I'm asking him about

51

1              his understanding, as an
2              educated special educator, and
3              an experienced special
4              educator, about this full
5              inclusion model that you've
6              testified about.
7          MS. HORTBERG: Well, I believe the
8              testimony was that it was a
9              concern from Mrs. Miller. It
10             may not be Mr. Strange's term.
11         MR. FAULK: That's fine.
12     Q    Are you now telling us that the
13  only place you ever heard about a full
14  inclusion model was from Mrs. Miller? You
15  didn't mean that, did you?
16         MS. HORTBERG: Object to the form.
17     A    Mrs. Miller used the term
18  "inclusion model."
19     Q    Okay. And is that a term you were
20  unfamiliar with when she used it?
21     A    I was familiar with the term
22  "inclusion."
23     Q    But not this business about a
24  model?
25     A    No, I was not. I mean, no, I was

52

1  not, about a model. I was not, I mean,
2  inclusion model.
3      Q    And I want to be sure I'm just not
4  using the wrong terminology and confusing
5  you. Am I to understand that it's your
6  testimony that, by the summer of 2004, there
7  was no special emphasis by the Houston County
8  Board of Education on full inclusion for
9  special education students?
10         MR. WALDING: Object to the form.
11     A    I just want to make sure I
12  understand you. What are you asking?
13     Q    Let me try to go about it another
14  way. Assume, if you will, sir, that a given
15  student has not been tested for special
16  education services, and so far as any of the
17  school faculty know, the child has full
18  learning capabilities. That child would not
19  be sent to a resource room, would he?
20     A    If he was not in special education,
21  no.
22     Q    Okay. And because of the apparent
23  confusion about my questions, I'm just going
24  to ask this one more time. Was there a point
25  in time that you recall where the approach,

53

if you will, of the Houston County Board of
Education with respect to full inclusion
changed?

    A    I can't recall that. I mean, I
don't know.

    Q    And, specifically, a change toward
emphasizing the usefulness of full inclusion?

    A    No. I can't recall that.

    Q    Okay. Prior to the fall of 2004,
in your experience, were there some students
in Houston County -- and by that, I mean the
Houston County system -- who were not subject
to full inclusion under their IEP's?

    A    Were there students that were not
subject to what?

    Q    Full inclusion.

    A    Yes, sir, I believe there was.

    Q    Okay. I want you to take one such
student, just hypothetically. If that
student was to be changed to full inclusion,
would you agree with me that there should be
a change in his IEP to indicate that?

    A    Well, that student would not be
changed, because they attend a different
school.

54

    Q    Explain that to me.

    A    If they were totally in the
resource room, and not attending any regular
classes, they would be at another school.

    Q    But, if such a student was to be
changed to full inclusion, would that not
necessitate a change in that student's IEP?
If that student was supposed to be
in the regular classroom the entire day? Is
that what you're asking?

    Q    If that's what full inclusion
means, yes.

    A    You would have to have a meeting to
change that IEP.

    Q    Okay. And who should attend such a
meeting?

    A    A special ed teacher, a regular ed
teacher, and an LEA.

    Q    What is an LEA?

    A    Local education agency. It would
be the person that would oversee it. And a
parent, if they chose to, and anyone else
that was invited.

    Q    Okay. And is that the norm, in
your education and experience, for any IEP

55

    meeting?

    A    Yes, sir.

    Q    Okay. Did Mrs. Miller ever make
you aware that one or more school personnel
had been ridiculing special education
students' hairstyles and appearance?

    A    No, sir.

    Q    Never discussed it?

    A    No, sir.

    Q    And, in particular, Mrs. Ezell.
Was that ever discussed between you and Mrs.
Miller?

    A    No, sir.

    Q    That staff members had been making
up IEP's without the customary meetings
needed with the students and their parents.
Was that concern ever expressed to you by
Mrs. Miller?

    A    No, sir.

    Q    Did that circumstance ever come to
your attention, independently of Mrs. Miller?

    A    No, sir.

    Q    That the plaintiff, that is, Mrs.
Miller, had been asked to write IEP's for
those students who did not have IEP's, and

56

then, to backdate such IEP's so the school
would appear to be in compliance with the
laws governing special education, which she
had refused to do. Did Mrs. Miller ever
report that circumstance to you?

    A    No, sir.

    Q    Did that circumstance ever come to
your attention independently of anything Mrs.
Miller told you?

    A    No, sir.

    Q    Let's look at paragraph 18 of
Defendant's Exhibit 5. Do you see where we
allege that the plaintiff reported the
above-referenced deficiencies to her mentor,
Paul Strange? And you deny that? Correct?

       MS. HORTBERG: Object to the form.

    Q    Well, do you admit it?

       MR. WALDING: I think he's already
          answered that question
          individually.

       MS. HORTBERG: Right. On each
          particular line. You've asked
          him line by line.

    Q    Is that your answer? Your lawyer
is going to tell me?

57

MS. HORTBERG:  Object.

Q    I just want to be sure.  In other words, Mrs. Miller, if she says she told you any of these things, she's not being truthful?  Is that your testimony?

A    Any of the things that you just asked me?

Q    Yes, sir.

A    Yes.

Q    Did you ever tell her that the illegal IEP's had to be done, and that she would have to sign off on them?

A    No, sir.

Q    And was there anything to that effect ever discussed between you?

A    Not that I recall.

Q    Let's look at paragraph 19 on both documents, please.  She alleges that Mr. Andrews sent an undated letter to Ms. Parris, expressing concerns about the plaintiff.  And in your answer, that sentence is admitted.  Would you agree with that?

MS. HORTBERG:  Object to the form.
Like has already been stated,
it's --

58

MR. FAULK:  Fine.  Fine.

Q    She further alleges that, near in time to the Andrews report, Mr. Strange and Mrs. Ezell co-authored a report to Parris regarding asserted deficiencies in plaintiff's performance.  Do you see that allegation?

A    I do.

Q    In your answer, "The defendants deny the other allegations contained in paragraph 19 of the complaint."  Is it your intention to deny that you and Mrs. Ezell co-authored a report to Ms. Parris regarding asserted deficiencies in plaintiff's performance?

MS. HORTBERG:  I'm going to object.
There's a lot of double
negatives in that question
there.

Q    Are you denying that you and Mrs. Ezell wrote a letter to Ms. Parris about my client?

A    Am I denying that I wrote a letter to Ms. Parris?

Q    Right.

59

A    Yes.

Q    Okay.  Look, if you will, please, -- and these should be in order -- at what's previously been admitted as Defendant's Exhibit 18 to Mrs. Miller's deposition.  Do you see that document?

A    This one?

Q    Yes, sir.

A    Yes, sir, I see it.

Q    Is that your signature at the bottom of it?

A    It is.

Q    And is it directed to Pam Parris, Troy University Dothan?

A    It is.

Q    Now, is that not something you wrote to Ms. Parris?

A    No.  I did not write that to Ms. Parris.

Q    To your knowledge, did Mrs. Ezell write that to Ms. Parris?

A    To my knowledge, she did not write that to Ms. Parris.

Q    Did you compose this document?

A    And by --

60

Q    Well, let me ask you this another way.  Did you participate in the drafting of this document, Defendant's Exhibit 18?

A    Yes.

Q    All right.  And what did your participation consist of?

A    Listing some of these items that's on this page.

Q    Okay, sir.  And when you say "listing" them, did you list them in writing?

A    I don't remember if I listed them in writing or not.

Q    Did you type this document?

A    No, I did not.

Q    Do you know who did?

A    No, I do not.

Q    Do you know whether Mrs. Ezell did?

A    No, I do not.

Q    Did you and Mrs. Ezell discuss the general contents of this document prior to its preparation?

A    No.

Q    How did your name come to be signed at the foot of the document, other than the fact you signed it?  I mean, did somebody

61

1 bring you this document and ask you to sign
2 it, or what happened?
3        A     I mean, I saw the document and
4 signed it.
5        Q     And how did you come to see it?
6        A     I don't remember.
7        Q     Nobody just slipped it under your
8 door or something like that?
9        A     I don't remember.
10       Q     After you signed it, did you give
11 it to somebody?
12       A     Somebody took it.
13       Q     You're under oath? Correct? You
14 understand that?
15       A     Yes, sir.
16       Q     To tell the truth?
17       A     Yes, sir.
18       Q     The whole truth, and nothing but
19 the truth?
20       A     Yes, sir.
21       Q     And you understand this is going to
22 be filed with the court, ultimately?
23       A     Yes, sir.
24       Q     Okay. And your testimony, under
25 oath, is, you don't know who typed this

62

1 document? You don't know who typed this
2 document?
3        A     No. I don't know who typed that
4 document.
5        Q     You don't know what computer it was
6 prepared on?
7        A     No.
8        Q     At the time Mrs. Miller was at
9 Houston County High School, did you have
10 access to a personal computer with a word
11 processing program?
12       A     I did.
13       Q     Okay. And where was that located?
14       A     Where was it --
15       Q     By that, I mean access to one for
16 your general use. Not just an internet bar
17 or something.
18       A     I had a computer in my room.
19       Q     Okay. And your testimony is you
20 did not type this?
21       A     No.
22       Q     And you don't know who did?
23       A     No.
24       Q     And you don't know who handed you
25 this for you to sign?

63

1        A     No. I don't remember who handed
2 that to me.
3        Q     Do you recall whether Mrs. Ezell's
4 signature was already on it when you signed
5 it?
6        A     No, sir. I don't recall that.
7        Q     Did you read it before you signed
8 it?
9        A     Probably.
10       Q     And if you had read it, would you
11 agree with me that you would have seen on it
12 that it was directed to Pam Parris, Troy
13 University Dothan?
14             MS. HORTBERG: Object to the form.
15       A     Would I have noticed that it was to
16 Pam Parris?
17       Q     Yes, sir.
18       A     I mean, not necessarily, no.
19       Q     But, if you read the entire
20 document, you would necessarily read that,
21 wouldn't you?
22             MS. HORTBERG: Object to the form.
23       A     If the entire document would have
24 been read, I would have seen it was directed
25 to Pam Parris. But I might not have read the

64

1 entire document.
2        Q     Did you have any authority to use
3 Houston County High School letterhead for
4 other than official school business?
5        A     Say that again.
6        Q     Did you have any other authority to
7 use Houston County High School letterhead for
8 any purpose other than official school
9 business?
10       A     I don't know. I don't know how to
11 answer that question. I'm not sure I know
12 what you're asking.
13       Q     What was your purpose or what did
14 you intend to accomplish by putting your
15 signature on this document?
16       A     What was I trying to accomplish?
17       Q     Yes, sir.
18       A     Nothing. I mean --
19       Q     Okay. Now, looking back, again, if
20 you would, please -- having reviewed
21 Defendant's Exhibit 18, looking back at
22 Defendant's Exhibit 5, paragraph 19, second
23 sentence, which reads, "Near in time to the
24 Andrews report, Mr. Strange and Mrs. Ezell
25 co-authored a report to Parris regarding

65

asserted deficiencies in plaintiff's
performance." And in your answer, you deny
that allegation among certain others
contained in paragraph 19 of the complaint.
Do you still deny that allegation?

    MS. HORTBERG: Object to the form.
        Asked and answered.

    MR. FAULK: That's before I showed
        him Defendant's 18.

    Q   Having seen Defendant's 18, do you
still deny that you and Mrs. Ezell
co-authored Defendant's Exhibit 18?

    MS. HORTBERG: Object to the form.

    A   What do you mean by "co-authored"?

    Q   Collaborated somehow in writing
this letter or seeing to it that it was
written.

    A   I participated in that.

    Q   Okay. Let's look at the nine
numbered allegations in Defendant's Exhibit
18. Is number 1 something that you had
knowledge of, to the effect that she left
school without informing administrative
personnel and didn't return until the next
school day?

66

    A   Did I know she left campus?

    Q   Right.

    A   Yes. I knew she left campus.

    Q   And you would have known that at
the time you signed this letter?

    MS. HORTBERG: Object to the form.

    Q   Would you?

    A   I assume.

    Q   Okay. And as we sit here today,
you do recall the incident, don't you, on
which she left school and went to the central
office one day?

    A   I remember her leaving. Yes.

    Q   And that's the incident you're
referring to here in paragraph number 1?

    MS. HORTBERG: Object to the form.

    Q   Isn't it?

    MS. HORTBERG: He hasn't testified
        that that was anything he was
        referring to. You've asked him
        if he was aware of it.

    Q   Well, what incident are you talking
about there in paragraph 1?

    A   I didn't put that on there.

    Q   Okay. To your understanding, was

67

    there more than one incident on which she
left school without, in your view, getting
proper permission or something?

    A   Oh, I don't know.

    Q   Are you aware of one incident of
that nature?

    A   I'm aware of an incident where she
left campus.

    Q   And you're not aware of any other
incident that could be described as Mrs.
Miller left the school campus without
informing administrative personnel, are you?
If you are, fine. I just need to know.

    A   I don't remember.

    Q   Now, you were her -- I believe the
term is cooperating teacher -- is that
correct? -- while she was an intern?

    A   I believe that's right. Yes, sir.

    Q   And you've sometimes been referred
to as her mentor.

    A   Yes, sir.

    Q   Would both those terms be basically
interchangeable?

    A   I assume, yes.

    Q   Now, on the day that you recall her

68

    leaving school, do you acknowledge that she
informed you that she was leaving school?

    A   She did not tell me she was leaving
school.

    Q   How did you know she left school on
that day?

    A   When students went to her room and
she was not in there, and we could not find
her.

    Q   Okay. That's the first you knew
about it?

    A   Yes.

    Q   Let's look at number 2. I'm going
to read it. "Mrs. Miller accused Paul
Strange of entering her locked filing cabinet
and placing an IEP in a student folder." Do
you recall that accusation having been made?

    A   Yes.

    Q   Was it true?

    A   No.

    Q   Did you write this paragraph? Do
you recall?

    A   The general knowledge of it, yes.

    Q   Did you report this to someone,
other than to put it in this letter?

69

A  Did I report that to someone?

Q  Yes, sir.

A  It might have been discussed.

Q  I'm going to continue reading.
"Mrs. Miller claims it was an IEP written
without her knowledge. Mr. Strange and Mrs.
Miller had written the IEP in her room
approximately one week earlier." Is that
last sentence a correct statement?

MS. HORTBERG: I'm going to object,
because there is an actual last
sentence in paragraph 2. Are
you asking about --

Q  The last sentence I just read.
"Mr. Strange and Mrs. Miller had written the
IEP in her room approximately one week
earlier." Is that a truthful statement, or
do you know?

A  We had written what could be placed
on that IEP prior to the meeting.

Q  Prior to an IEP meeting?

A  Yes.

Q  Do you recall which student's IEP
it was?

A  No, sir.

70

Q  It further states, in the same
paragraph, "Mrs. Miller stated she had no
recollection of that event." Is that a
statement by you, that she had no
recollection of the event?

A  Yes.

Q  Paragraph 2 that I've just read
over with you and asked you some questions
about, so far as you know, should Mrs. Ezell
have had any reason to have personal
knowledge of that matter?

A  Of paragraph 2?

Q  Right.

A  I don't know.

Q  But you recall an incident of that
nature? Correct?

MS. HORTBERG: An incident of the
accusation?

MR. FAULK: Right. Yes.

Q  In other words, what you're saying
there in your letter --

A  Yes.

Q  -- you recall an incident of that
nature --

A  Yes.

71

Q  -- having occurred?

A  Yes.

Q  And do you recall Mrs. Ezell having
been involved in any way in that incident?

A  No.

Q  Okay. Number 3. "Mrs. Miller has
difficulty in communicating with faculty
members." Was that your opinion at the time?

A  I did not put that on there.

Q  Was that your opinion, though? Did
you hold that opinion at that time?

A  I don't remember, at that time. I
don't know.

Q  Do you have an opinion on that
subject today?

A  No.

Q  Not one way or the other?

A  No.

Q  Did she have any difficulty
communicating with you? You're a faculty
member, or were.

A  Did we communicate?

Q  Did she have any difficulty in
communicating with you as a faculty member?

A  No.

72

Q  Number 4. "Mrs. Miller questioned
the lawfulness of the school system's
inclusion policies." Was that your belief at
the time this letter was signed?

A  I did not put that on there.

Q  Was that your opinion, though? Did
you hold that opinion?

A  She had stated that to me.

Q  Do you recall exactly what she told
you concerning that?

A  No, sir.

Q  I'm going to get my testimony.
Number 5. "Some students had requested that
Mrs. Miller not be their inclusion teacher."
Did you know that to be the case at the time
you signed this letter?

A  Yes, I did.

Q  Okay. And what was the basis of
your knowledge concerning that, please?

A  I had some students come to me
stating they did not want to go into her
room.

Q  And if she was being their
inclusion teacher, she would have actually
been in some other teacher's room, wouldn't

73

she?

MS. HORTBERG:  Object to the form.

A     Could you repeat it?

Q     Okay.  If you'd look, please, sir, at number 5, "Some students had requested that Mrs. Miller not be their inclusion teacher."  If she's acting as an inclusion teacher, would it be her room or some other teacher's room that she would be in?

A     I assume she could be in both rooms.

Q     And who were these students who came to you to say they didn't like Mrs. Miller being their teacher?

A     I can't remember their names.

Q     Can't remember one?

A     No.

Q     Do you know whether they were special education students?

A     They would have been.

Q     Let me stop you a second and ask you to do something for me.  There are a lot of things that you're testifying you don't remember, which implies to me you may have known it at some time and just don't remember

74

it today.  And if that turns out to be the case between now and trial, I'm going to ask you to let Ms. Hortberg know that you've remembered these things, so she can let me know.  Okay?

A     Sure.  Yes, sir.

Q     Number 6.  "Classroom teachers reported that Mrs. Miller has been upset and crying during class time."  Did I read that correctly?  "Classroom teachers reported that Mrs. Miller has been upset and crying during class time."  Did any classroom teachers report that to you?

A     I can't remember if they reported that to me or not.  I mean --

Q     Did you ever observe that behavior yourself?

A     Mrs. Miller crying?

Q     Upset and crying during class time.

A     She cried in my room.

Q     And were y'all alone at the time?

A     Yes.

Q     Tell us about that, please, the circumstances that were going on connected with her crying?

75

A     One morning she came into the room crying, upset.

Q     Did you ask her why?

A     I did.  But I don't remember what the response was.

Q     Do you remember whether you had an opinion at the time as to whether her mood had some reasonable basis?

MS. HORTBERG:  Object to the form.

Q     Or was she just being a silly woman or something?

MS. HORTBERG:  Object to the form.

A     Something was upsetting her.

Q     You don't recall what, and you don't recall whether you felt like her behavior was reasonable or unreasonable?

A     No.  I just know she was crying.

Q     "Office staff members reported that Mrs. Miller was upset and crying in the office lobby during school hours."  Did any office staff members report that occurrence to you?

A     No.

Q     Did you ever observe such an occurrence?

76

A     No.

Q     Number 8.  "Not following suggestions provided by Mr. Strange as related to the resource room."  Do you recall whether you added that statement to this letter?

A     I did.

Q     Okay.  And tell us what the basis for the statement is, please, the factual basis?

A     Mrs. Miller came to me stating that the students in biology class was having a difficult time taking in the material, was having a hard time in class.  She felt that they were not learning as well as could be. So, I told her that if she felt that way, then, when the teacher's lesson was over, that we had some AGS books that she could go to and pull references and take them to the resource room, so that they could get their help.  And she refused to do so.

Q     Yes, sir.  Tell us what AGS means, please?

A     It's a book company that produces books for -- that's used by special ed kids.

77

Q    Is that something that would be available there locally in the school?

A    Yes.

Q    Any other suggestions that you say she did not follow concerning the resource room?

A    No. That was what was meant by that.

Q    Let me ask you about suggestions in general by you, not limited to paragraph 8 of this letter. Were there other suggestions you made to her that you felt she did not adequately follow?

A    I just don't -- I don't recall that.

Q    In your letter here, you say didn't follow -- not following suggestions. In your testimony, you said she refused to follow it. Did she, in fact, tell you, "I'm not going to do that," or anything to that effect, or is your letter correct in that she didn't follow up on the suggestion, she didn't follow the suggestion?

MS. HORTBERG: Object to the form.

A    Could you restate that?

78

Q    Well, what I'm trying to get at, is, you characterized this, first of all, as a suggestion? Correct?

MS. HORTBERG: Object to the form. He's already testified he did not type this letter.

MR. FAULK: All right. Fine.

Q    You signed your name to it? Correct?

A    I signed my name to it.

Q    And by signing your name, is it fair for us to understand that it was your intention to adopt this letter as your own?

MS. HORTBERG: Object to the form.

A    To adopt it as my own?

Q    Right.

A    What do you mean?

Q    Well, I mean, are you vouching for the accuracy of this letter when you sign your name to it? Was that your intention?

A    Yes.

Q    Okay. Before you signed your name, were you given a draft of this that you made any revisions on or ask that anything be changed before you signed it?

79

A    Oh, I don't remember.

Q    Now, in this letter, in paragraph 8, you characterize what you told Mrs. Miller about the biology books as being a suggestion? Correct?

A    (No response.)

Q    Isn't that what it says?

A    That's what it says.

Q    Now, in your testimony, you said she refused to do what you told her about the biology books.

MS. HORTBERG: Object to the form.

Q    Do you remember that?

A    I remember that.

Q    Now, was this a suggestion, or was it a direct order?

A    I told -- I asked Mrs. Miller to take them out. She did not. And then, I told her to, and she did not, also.

Q    So, you told her to do it, and she didn't do it. Was there ever any verbal statement to you, by her, of, "I'm not going to do that," or words to that effect?

A    No. She did not say, "I'm not going to do that."

80

Q    So, you suggested that it be done, and it wasn't done, and that's the extent of your knowledge on it?

MS. HORTBERG: Object to the form.

Q    Question mark.

A    Yes.

Q    Number 9. "Mrs. Miller told a classroom teacher, quote, I don't like being here any more than you do, but I have to be in here a certain number of hours, close quote. This is in response to the classroom teacher telling her that she could leave the room because the lesson was over. Mrs. Miller said this in front of the students in the class."

Did you, at the time you signed this, have any personal knowledge of that occurrence?

A    I did not put that on there.

Q    Had anyone told you about such an occurrence prior to your signing it?

A    Yes.

Q    And who told you about it?

A    Mrs. Ezell.

Q    Was it your understanding that Mrs.

81

Ezell was the classroom teacher mentioned in
paragraph 9?

    A   Yes.

    MS. HORTBERG: I think that's a
       good stopping point. We've
       been going about an hour.
    (Recess from 11:05 to 11:20.)
    (Riley Joe Andrews no longer
      present.)

    Q   Mr. Strange, let's look at
paragraph 22 of the complaint and your
answer. Do you have it there? Before we do
that, let me go back to Defendant's Exhibit
18 just a minute, the letter there from you
and Mrs. Ezell. Concerning number 8, which
you testified had to do with some biology
students and a situation, whose biology class
was involved in that?

    A   Mrs. Ezell.

    Q   Looking at paragraphs 22 in the two
documents, the complaint and the answer, an
incident that's alleged to have occurred on
October 20th, that concerns a letter dated
October the 19th being hand delivered to the
plaintiff at the school, do you see where I'm

82

looking at? And the plaintiff being escorted
off campus. Do you see the paragraph I'm
referring to?

    A   What number are you talking about?

    Q   In the complaint, Defendant's
Exhibit 5, we're talking about page five,
paragraph 22, going over to the next page.
And on the answer, Plaintiff's Exhibit 1,
we're looking at page four, paragraph 22.
Have you had a chance to read those?

    A   Yes, sir.

    MS. HORTBERG: Wait. You haven't
      had a chance to read the
      answer.

    A   Okay. I read -- (Witness reviewing
document.)

    Q   Okay. In particular regard to
paragraph 22 of the answer, were you present
during any part of the occurrence described
there, where Mr. Lord hand delivered a letter
to her on October the 20th, and she was
escorted off campus? Did you witness that
personally?

    A   I don't remember if Mr. Lord -- if
I watched Mr. Lord hand deliver it, but I do

83

remember her being -- I do remember her
leaving campus.

    Q   Do you have any recollection of an
escort accompanying her, in the sense of
being taken off campus by someone?

    A   No. She wasn't taken off campus by
anyone.

    Q   So, in the answer, then, where your
then attorneys alleged that she was escorted
off campus when she refused to leave, you
don't know anything about that?

    A   I do.

    Q   You do? Tell us what you do know?

    A   I went with Mrs. Miller and helped
her, assisted her, in gathering her stuff,
and provided -- I helped her take her stuff
out to her car.

    Q   Did anyone else accompany you and
Mrs. Miller on that occasion?

    A   No.

    Q   Okay. So, if there was any escort,
it would have been you?

    A   I didn't escort her.

    Q   You didn't view it as being
escorting her? You were just helping her

84

take things to her car?

    A   I was helping her get her things to
her car.

    Q   Do you recall her actually refusing
to leave after being given the letter by Mr.
Lord?

    A   No. I don't recall that.

    Q   Okay. Good. That went smoothly.
Let's look at paragraph 23. Mr. Strange,
certain of the terms in paragraph 23 are what
I regard primarily as legal terms. And it
may be that your response here is necessarily
a lawyer response.

    Do you have any personal knowledge about
what we mean by people acting under color of
state law, policy, practice or custom --

    MS. HORTBERG: Object to the form.

    Q   -- in the context of this
situation?

    MS. HORTBERG: Same objection.

    Q   I mean, does that have any meaning
for you?

    MS. HORTBERG: Object to the form.

    Q   If it doesn't, that's fine. This
isn't a bar exam for you or something. Do

85

you know what I'm talking about?

    MS. HORTBERG:  Object to the form.

    A     No.  I don't know what you're talking about.

    Q     Do you have any special knowledge, Mr. Strange, as to whether any particular speech is protected by the First Amendment or not?

    MS. HORTBERG:  Object to the form.

    Q     Do you have any special legal knowledge about freedom of speech and the First Amendment?

    MS. HORTBERG:  Object to the form.

    Q     Again, I'm not trying to give you a bar exam.  I just don't want to waste time talking about something that's outside the scope of your knowledge.

    A     I'm not sure what you're asking.  But, no, I don't have any special knowledge.

    Q     You haven't had any special courses or anything on constitutional law or free speech or anything like that?

    A     I have not taken a course on free speech.

    Q     Okay.  Fine.  And you've told us

86

everything at this point that you can remember Mrs. Miller complaining to you about concerning the special education program at your school?

    A     Yes.

    Q     Let me ask you to look at page seven of your answer, Plaintiff's Exhibit 1.

    MS. HORTBERG:  Are you done with the complaint?

    MR. FAULK:  Right.

    Q     Let me back up.  Concerning Plaintiff's Exhibit 18, first, did you not believe, at the time you signed this, that this letter could adversely affect Mrs. Miller's standing as an intern with Troy?

    MS. HORTBERG:  Object to the form.

    A     One more time.  Say it again.

    Q     Did you not understand, at the time that you signed this letter, that it could adversely affect Mrs. Miller's standing as an intern with Troy University?

    MS. HORTBERG:  Object to the form, again, just because there's a double negative there at the beginning, did you not

87

    understand that it could adversely affect her.  I don't know how you could properly answer that question.

    MR. FAULK:  It's not a double negative.

    Q     Go ahead.

    A     Would you --

    Q     All right.  Fine.  Did you understand, when you signed this letter, that it could adversely affect her standing as an intern?

    A     If you're asking me if I thought that was going to affect her internship --

    Q     Right.

    A     -- the answer is no.

    Q     Was your intention, in signing this letter, to get rid of Mrs. Miller as an intern?

    A     No.

    Q     Was it your impression that this letter would help her somehow?

    A     Possibly.

    Q     In what way?

    A     By listing my concerns, someone

88

would talk with her, and the concerns would be concerns no more.

    Q     And was that a thought in your head at the time?  Was that your intention in signing this?

    A     My intention was to list my concerns at the time.

    Q     Period?

    A     Yes.

    Q     And that was your purpose in signing this?

    A     Yes.

    Q     Did you send Mrs. Miller a copy of this?

    A     No.

    Q     I'm sorry.  I said page seven.  I meant page six in the answer, which is Plaintiff's Exhibit 1, in particular, the third affirmative defense, subparagraph (b).  The last sentence of that subparagraph.  And I'll read it.  Do you see where it says, "Any statements made by the plaintiff"?

    A     Yes.

    Q     "Any statements made by the plaintiff regarding the special education

89

programs at Houston County High School to
administrators and other teachers were
pursuant to her official duties as a teaching
intern." Do you see all that?

   A   I do.

   Q   Is that your opinion? Is that your
personal opinion?

          MS. HORTBERG: Object to the form.
          As we've already stated and
          gone over, this is an answer
          that was prepared by attorneys.
          It was not signed by Mr.
          Strange.

          MR. FAULK: That's fine.

   Q   But, do you share that opinion, Mr.
Strange?

          MS. HORTBERG: That legal opinion?

   Q   That it had to do with her official
duties. Did you regard her actions in
speaking to you and other administrators and
teachers in the school that whatever she said
was done pursuant to her official duties as a
teaching intern? Is that your opinion or
not?

   A   I mean, I'm not sure what you're

90

asking me.

   Q   I'm asking, do you view that
statement as being a factually correct
statement?

          MS. HORTBERG: Same objection.

   A   I don't know.

   Q   You don't have an opinion on that
subject, or you don't know whether it's
accurate, or --

          MS. HORTBERG: Object to the form.

   A   I don't have an opinion.

   Q   Okay. Turn over to page seven,
please, if you haven't already. Subparagraph
(d) of the third defense. It is alleged
there -- and before we get into any
objections, I understand you did not draft
this document. That's correct? Right? The
lawyers did it for you?

   A   Yes.

   Q   Nevertheless, I need to ask you, in
regard to part (d), do you have any
understanding, as we sit here today, of the
actual basis upon which Mrs. Miller's
employment was terminated in the Houston
County Board of Education?

91

   1   A   No.

   2   Q   You do not know the official basis
   3  for the termination of her employment?

   4   A   No.

   5   Q   The subject has come up, Mr.
   6  Strange, as you may have heard in the prior
   7  depositions, about the status of Mrs.
   8  Miller's teaching certificate at the time she
   9  was interning. Do you have any personal
 10  knowledge about that?

 11   A   No.

 12   Q   Are you aware of any instances
 13  during your tenure in the Houston County
 14  School System of any teacher or teachers
 15  having been allowed to teach based on some
 16  type of provisional or emergency teaching
 17  certificate, who were not regularly
 18  certified?

 19   A   I don't know that.

 20   Q   Did you, at any time in your own
 21  experience, ever teach on anything other than
 22  a regularly issued certificate?

 23          MS. HORTBERG: Object to the form.

 24   Q   Have you ever taught under an
 25  emergency certificate --

92

   1   A   No.

   2   Q   -- or any type of provisional
   3  certificate?

   4   A   No.

   5          MS. HORTBERG: Are we done with the
   6          answer?

   7          MR. FAULK: As far as I know. And
   8          the complaint, for that matter.

   9   Q   How old are you, Mr. Strange?

 10   A   Thirty-seven.

 11   Q   Who is Judy Fowler?

 12   A   She's my principal at Cottonwood
 13  High School.

 14   Q   That's where you are now?

 15   A   Yes, sir.

 16   Q   Had you ever been supervised by Ms.
 17  Fowler before this year?

 18   A   Yes, sir.

 19   Q   Whereabouts?

 20   A   Cottonwood High School.

 21   Q   When did you work at Cottonwood
 22  High School before?

 23   A   That's where I'm working now.

 24   Q   But I mean before now. Had you
 25  ever been supervised by Ms. Fowler anywhere

93

before this year, before this school year?

A    Yes, sir.

Q    And that's at Cottonwood High School?

A    Yes, sir.

Q    And prior to this year, when did you teach at Cottonwood High School?

A    Last year. I mean, I don't --

Q    Is this your second year at Cottonwood?

A    This is my -- this will be my third full year at Cottonwood.

Q    And how many full academic years were you employed at Houston County High School?

A    I was not employed a full academic year at Houston County High School.

Q    So, what was your tenure there, please?

A    At Houston County High School?

Q    Right.

A    August or July of 2004 to January 2005.

Q    Okay. And what was the occasion for your being transferred? What led to your

94

transfer?

A    Assistant principal at Cottonwood.

Q    And that was a promotion?

A    Yes, sir.

Q    Do you teach any courses now?

A    No, sir.

Q    Who is James Johnson, please?

A    He was my principal at Wicksburg.

Q    That's before you came to Houston County High School?

A    It is.

Q    And who is James Murray?

A    He was also my principal at Wicksburg.

Q    Tell us, please, what your general duties are as assistant principal, other than to assist the principal. I mean, do you have, like, a specific job description that's applicable to you in particular?

A    No, sir.

Q    What about when you were a special education teacher? Did you have a written job discrimination?

A    I had a contract. Is that what you're asking?

95

Q    Would it have been any different than the form contract that any teacher signs, other than it had your name on it and the position on it?

A    No.

Q    You're not aware, then, of the existence of any written job description for special education teachers in the Houston County system? Is that fair to say?

A    Not that I recall.

Q    Okay. With respect to your education, in your answers to interrogatories, number 5, you refer to Troy University Alternative A Program, master's degree in special education. What does Alternative A mean, please?

A    I entered the master's program, and when I graduated, I had a master's degree. That's the Alternative A.

Q    But your bachelor's was in business administration from Auburn?

A    That's right.

Q    When you talked earlier about having had a college degree in special education, you're referring to your master's

96

degree?

A    Yes, sir.

Q    And there's a Troy State Dothan, an education leadership degree in administration. Is that an additional master's degree, or how is that --

A    It's just an educational leadership degree.

Q    Is that on a graduate level or what?

A    Yes.

Q    Does it lead to any particular certification in education?

A    To become an administrator.

Q    So far as you know, are you a party to any sort of joint defense agreement in this case? Does that term mean anything to you?

A    No, sir. Could you explain it?

Q    Any sort of agreement between your attorneys to cooperate with each other in connection with this case.

A    No.

Q    You're not aware of it, if it exists?

97

A   No.

Q   Have there been occasions on which you have been personally present in meetings between yourself and other co-defendants having to do with this case?

MS. HORTBERG: I'm going to object to the form. I'm going to object to anything that is attorney/client privileged.

MR. FAULK: I didn't ask him what was said.

Q   I'm just asking, have you been present in meetings with other defendants in this case, concerning this case?

MS. HORTBERG: Certainly, he -- well, I object to anything that is attorney/client privileged. If there was a meeting between you and me or Mark Boardman and you, that is attorney/client privileged.

MR. FAULK: That's not my question.

MR. WALDING: And so he understands, if there was a meeting where I was present or

98

Jere Segrest or Patrick Moody were present, that would also be attorney/client privilege.

MR. FAULK: Do you continue to represent him?

MR. WALDING: My understanding is that we represent all defendants in this case. Yes, sir.

MR. FAULK: And you represent Mrs. Ezell and Mr. Strange?

MS. HORTBERG: Mark Boardman and I do. Yes.

MR. FAULK: In conjunction with the Hardwick firm?

MS. HORTBERG: Yes.

Q   (By Mr. Faulk) All right, sir. I'm not asking you what was said. I'm asking you, have you ever been present at any meetings, with or without attorneys, with other co-defendants in this case, in which the general subject matter of this case was discussed?

A   No.

Q   That's easy enough. Prior to this

99

case having been filed -- Mr. Strange, if I could get your attention. Prior to the case being filed, in fact, prior to Mrs. Miller leaving Houston County High School's employment, were you a party to any meetings with school administrators concerning what should be done about Mrs. Miller?

MR. WALDING: Object to the form.

MS. HORTBERG: Object. Same objection.

A   I don't understand what you're asking.

Q   Okay. Were you ever party to any meetings with Mr. Pitchford concerning Mrs. Miller?

A   Yes.

Q   Do you know how many?

A   No, sir.

Q   Can you tell us what they concerned?

A   Some of the concerns that were listed on that piece of paper that we went over a little while ago.

Q   The concerns in Defendant's Exhibit 18, the letter signed by you and Mrs. Ezell?

100

A   Yes.

Q   When did that meeting or meetings occur, if you recall?

A   I do not recall that.

Q   Was it prior to Mrs. Miller leaving the school's employment? Before she was let go?

A   The meeting between me and Mr. Pitchford?

Q   Right.

A   Yes.

Q   Do you remember which of these items 1 through 9 you and Mr. Pitchford specifically discussed?

A   No, sir, not specifically.

Q   Did you ever meet with Mr. Andrews concerning any of these concerns about Mrs. Miller?

A   I don't remember if I met with Mr. Andrews or not.

Q   What about Mr. Lord?

A   I don't remember if I met with Mr. Lord or not.

Q   Do you recall Mr. Stephens being employed at the school?

101

A    Scott Stephens?  Yes, sir.

Q    What was his capacity at the school?

A    He was assistant principal.

Q    Do you recall any meetings involving Mr. Stephens that concerned Mrs. Miller and these concerns, the concerns you've listed in the letter?

A    No, sir.

Q    Or other concerns about Mrs. Miller, for that matter?

A    No, sir.

Q    So far as you know, have any written statements been taken from witnesses who are not defendants in connection with this case?

A    I don't know that.

Q    Or tape recorded or video recorded statements, to your knowledge?

A    I don't know that.

Q    What was Cathy Keasler's position at Houston County High School?

A    She was counselor.

Q    Starla Smith?

A    She was a psychometrist.

102

Q    And Lisa Towns?

A    She wasn't at Houston County, though.  She was psychometrist for the county.

Q    Starla Smith?

A    Uh-huh.

Q    What was Lisa Towns' capacity?

A    Math teacher.

Q    At Houston County High School.  All right.  Was there a Ms. Monday?

A    Yes.

Q    What was her first name?

A    I don't remember her first name.

Q    During your time in Houston County, have you ever had any other occasion on which to mentor or serve as a cooperating teacher for an intern?

A    No, sir.

Q    During your tenure with Houston County School System, not just the high school, are you aware of anyone else's internship having been withdrawn?

A    I don't know.

Q    Beg your pardon?

A    I don't know that.  I mean, I don't

103

know.

Q    You haven't heard of that?

A    I don't know.

Q    You don't know.  But, have you ever heard of that?  Has anyone ever told you that?  I understand you're saying you don't have any personal knowledge of it.  But, has anyone else ever told you about any other intern's internship being withdrawn or terminated?

A    I don't know if I've heard that or not.  I mean, I don't know.

Q    Okay.  Fine.  In your interrogatory answer number 14 about organizations that you belong to, you list, in addition to a couple of churches, the Alabama Education Association, the National Education Association, and something called CLAS, all caps.  What is that last thing an acronym for?

A    It's for school administrators.

Q    And when did you become a member of that?

A    A couple of years ago.

Q    Have you made any inquiry of that

104

organization as to whether there is insurance coverage available to you through that organization in connection with this case?

MS. HORTBERG:  Object to the form.

Q    Have you asked?  That's all I'm asking.

MS. HORTBERG:  Object to the form.

Q    Have you checked into whether they would afford you any insurance coverage?

MS. HORTBERG:  Same objection.

A    Have I asked them what?

Q    Have you checked with that organization to find out whether they will afford you any type of insurance coverage that would be applicable to this case?

MS. HORTBERG:  Object to the form.

MR. FAULK:  What's your objection?
      State a legal objection, so I
      can rephrase my question, if
      necessary.

MS. HORTBERG:  As to whether he has
      insurance coverage underneath
      CLAS.

MR. FAULK:  It's a federal case, of
      course, where it's supposed to

105

be voluntarily disclosed. I
mean, that, in itself, is not
objectionable. I'm just asking
him has he inquired about the
availability of it, and you're
objecting to the form. And I'm
asking you what the legal
objection is, so if I've
committed an error, I can
revise it here on the record.

MS. HORTBERG: He can still answer
your question.

MR. FAULK: Well, I'm asking you
what the basis for your
objection to form is.

MS. HORTBERG: And I've stated it.
If you would like to restate
your question --

MR. FAULK: Is it has to do with
insurance. Okay.

Q    Have you asked about the
availability of insurance through the CLAS
organization that would be applicable to this
case?

A    No, sir, I don't believe I have.

106

Q    Would you please contact a
representative of that organization and make
an inquiry and let your lawyer know whether
there is additional insurance available to
you through that organization, please? Will
you do that?

A    I don't know.

Q    I will voluntarily tell you that
every defendant in this case, including you,
has a duty, under the federal rules of
disclosure, to disclose any applicable
insurance coverage.

I'll also tell you that, in other cases,
I have seen where CLAS had group liability
insurance available. It might or might not
still have it. It might or might not help
you in this case. I'm just asking you to
inquire into it and let your lawyer know. Do
you have any problem with that?

A    I'll talk to her.

MR. FAULK: Do you have any problem
with him doing it?

MS. HORTBERG: I know the answer.
But, that's fine. If you would
like him to make that inquiry

107

and tell us, that would be
fine.

MR. FAULK: Thank you.

Q    Have you ever had any occasion to
appear before the Houston County Board of
Education on any matter having to do with
your duties as a special education teacher in
Houston County?

A    No, sir.

Q    You have listed in your
interrogatory answers, number 18,
specifically, some surnames or last names of
people, I guess, who are kin to you in
Houston County. Is that what that's intended
to convey?

A    Yes, sir.

Q    Your name, obviously, is Strange.
Did you grow up in Houston County?

A    I did.

Q    And where does the Crawford name
come from? How is that connected to you?

A    My mother.

Q    Your mother was a Crawford?

A    She was a Tyson, but her mother was
a Crawford.

108

Q    And Brannon. What's the connection
there?

A    That's my wife's maiden name.

Q    What's her first name?

A    My wife?

Q    Huh?

A    My wife?

Q    Yes.

A    Kelly.

Q    Kelly. And what are her parents'
names? Are they living?

A    Uh-huh. James and June.

Q    And they live in Houston County?

A    Yes, sir.

Q    And what's the Mixon connection?

A    That's my wife's mother's maiden
name. My mother-in-law's maiden name.

Q    Are her parents living?

A    Yes.

Q    What are their names?

A    Bennie Joe and Lula.

Q    Did I ask you your wife's parents'
names, first names?

A    James and June.

Q    What's the Etheredge connection?

109

```
 1    A    That's my mother's name now.
 2    Q    Is she currently married?
 3    A    She is.
 4    Q    What is her husband's name?
 5    A    David.
 6    Q    Where does he work?
 7    A    He doesn't.
 8    Q    Are any of these other people you
 9  just mentioned currently employed?  That
10  would be --
11    A    Any of the people you just asked
12  me?
13    Q    Yeah.  Your mother, is she living?
14    A    She is.
15    Q    And is she employed?
16    A    No, sir.
17    Q    Is she retired?
18    A    She is.
19    Q    Where did she retire from?
20    A    State Farm Insurance.
21    Q    How long ago?
22    A    Three or four years.
23    Q    And the Tyson connection, where are
24  they employed?
25    A    You didn't ask me about Tysons.
```

110

```
 1    Q    What is the Tyson connection?
 2    A    That's my granddaddy on my mother's
 3  side.
 4    Q    Is he still employed?
 5    A    He's dead.
 6    Q    I'm sorry.  And the Brannons, where
 7  are they employed?
 8    A    Which one?
 9    Q    Well --
10    A    James?
11    Q    Refresh my memory.  That's your
12  wife's parents?
13    A    That's my wife's parents.  Yes.
14    Q    Okay.  Are they currently employed?
15    A    Yes.
16    Q    All right.  Tell us where they are,
17  please?
18    A    James is at Polyengineering.  June
19  is at Rehobeth.
20    Q    School?
21    A    Yes.
22    Q    The Mixon connection -- I'm sorry.
23  I can't keep track of it all in my head.
24    A    That's my wife's grandparents.
25    Q    Are they living?
```

111

```
 1    A    Yes.
 2    Q    Are they employed?
 3    A    No.
 4    Q    How recently did they retire?  The
 5  past ten years?
 6    A    She's never worked.
 7    Q    Where did he work?
 8    A    He was a farmer.
 9    Q    Did we talk about the Etheredge
10  employment?  Where is he employed?
11    A    He's not.  I mean, I can't
12  remember, either, if you can't.
13    Q    Is he retired?
14    A    He is.
15    Q    From where?
16    A    He was a meat cutter at a grocery
17  store.
18    Q    Do you know which one?  Here in
19  town?
20    A    No.
21    Q    Whereabouts?
22    A    I think it was in Dale County.  He
23  was retired before they married.
24    Q    Look at the next to the last page
25  in that stack I handed you.  It's Defendant's
```

112

```
 1  Exhibit 30, which is a memorandum of some
 2  sort dated September 30, 2004.  Says "Nancy
 3  Miller professional comments."  Do you know
 4  anything, Mr. Strange, about the genesis or
 5  origin of this document?
 6    A    No.
 7    Q    Do you know who prepared it?
 8    A    No, sir.
 9    Q    Do you know why it was prepared?
10    A    No, sir.
11    Q    Or when?
12    A    No, sir.
13    Q    Do you see the section entitled
14  "Mr. Tim Pitchford"?
15    A    Yes, sir.
16    Q    Are you familiar with this
17  document?  Have you seen it before?
18    A    Yes, sir.
19    Q    Take a moment just to look over it
20  and refresh your memory about it, and tell me
21  when you've had a chance to read over it,
22  please?
23    A    (Witness reviewing document.)
24  Okay.
25    Q    Okay.  The first entry under "Tim
```

113

Pitchford" reads "Unprofessional behavior -
leaving campus." We've already talked about
that, I think, haven't we?

A    Yes, sir.

Q    As far as you know?

A    Yes, sir.

Q    And "Negative comments made to
cooperating teacher." Do you know what
negative -- you're the cooperating teacher?
Right?

A    Yes.

Q    Is there anybody else who would be
considered her cooperating teacher, to your
knowledge?

A    Not while she was at Houston
County.

Q    Okay. "Negative comments made to
cooperating teacher." Do you know what Mr.
Pitchford is talking about there, assuming he
made that statement?

A    No, sir.

Q    Do you recall ever having informed
Mr. Pitchford of any negative comments made
to you by Mrs. Miller?

A    I can't remember if I did or not.

114

Q    Do you recall her making any
negative comments to you?

A    I can't recall at this time. I
mean --

Q    That's your best answer right now?
        MS. HORTBERG: Object to the form.
        MR. FAULK: He didn't sound like he
            was finished. If he's
            finished, that's fine.

A    I'm finished.

Q    The second statement, quote,
Causing anxiety among teachers, close quote.
"Three teachers had met with him," presumably
Pitchford, "expressing concerns." Do you
have any knowledge of that?

A    No.

Q    The basis for that statement?

A    No.

Q    Quote, Not following directions
from the cooperating teacher. What knowledge
do you have of that, that you haven't already
told us about?

A    None that I haven't already told
you about.

Q    Okay. "Crying in the classroom."

115

Do you have any knowledge of that you haven't
already told us about?

A    Not that I haven't told you about.

Q    In the subcaption, "Mr. Paul
Strange, cooperating teacher." Whoever
drafted this uses some quote marks here and
there. "Professional behavior not very good
of late." Do you ever recall making that
statement to anybody in connection with Mrs.
Miller?

A    I don't recall it.

Q    Do you recall having made any
statement substantially to that effect
concerning Mrs. Miller --

A    No.

Q    -- to anybody? Not to anybody?

A    No.

Q    This is not in quotes. "Telling
other teachers that he is out to get her."
Did anything like that ever come to your
attention?

A    No.

Q    Did you ever tell anyone that she
had been telling other teachers that you were
out to get her?

116

        MS. HORTBERG: Object to the form,
            just because I lost you there.
            I'm sorry.

A    I don't know. What --

Q    The statement is apparently
attributed to you, not in quotations, but
under your name, that Mrs. Miller had been
telling other teachers that you were out to
get her. Did anything of that nature ever
come to your attention while Mrs. Miller was
an intern?

A    Did I ever say --

Q    No, sir. I'm just asking you, did
any information to that effect ever come to
your attention, where somebody said, "You
know, she's out here telling people you're
out to get her"?

A    Oh, I can't remember. I don't
remember that.

Q    Do you ever remember telling anyone
that she had been doing that?

A    I don't remember.

Q    Did you ever tell anyone that she,
Mrs. Miller, had lied about writing an IEP,
and claimed that someone else went into her

117

files?

A    I do.

Q    Okay.  Tell us what you know about that, please?

A    It was at a meeting when she said that an IEP was not present, and I said, "It is."

Q    Do you recall the student involved?

A    No.

Q    Even by initials?

A    No, sir.

Q    Do you recall who else was present at the meeting?

A    I do not.

Q    Was there anybody there besides you and Mrs. Miller?

A    There was people there.  Yes, sir.

Q    Do you remember where it was?

A    It was at Houston County School.

Q    Do you know about when it was, in relation to either her coming there or leaving there?

A    No, sir.

Q    And you're talking about the issue was whether or not a particular IEP was in

118

her filing cabinet or something?  Can you give us a little more context, please?

A    Yes.  It was about an IEP that she claimed was not in her files.

Q    That she expected to be there, or an IEP that was there, that she expected not to be there?

MS. HORTBERG:  I'm just going to object to the form.  He doesn't know what her expectations were.  He certainly can't testify to that.

Q    Her expressed expectation is what I'm talking about.  Just your understanding.

A    My understanding was one that she said was not there, but was.

Q    Okay.  And is that your best recollection of that whole event?  Are there any more details that you recall?

A    About that IEP?

Q    Right.

A    Yes.

Q    Tell us about it, please?

A    She said that if it was there, someone would have had to go in -- to break

119

into her files and put it in there.

Q    So, are we correctly understanding that an IEP was in her files, that she claimed should not have been in her files?

A    That she claimed should not have been in there.  Yes.

Q    And was it your view that it should have been there?

MS. HORTBERG:  Object to the form.

A    It was there.

Q    Was it supposed to be there?  Was it proper for it to be there?

A    Yes.

Q    And it says that you had said she lied about writing the IEP.  Did you, in fact, accuse her of lying about that incident?

MS. HORTBERG:  Object to the form.

A    She wasn't telling the truth about the IEP.

Q    And in what respect was what she was saying not -- are you saying that you disagreed with it, that it was inaccurate, or are you accusing her of consciously lying about this incident?

120

MS. HORTBERG:  Object to the form.

In this document or today?

MR. FAULK:  Period.

Q    Just tell me what you feel.  I mean, how do you feel about it today?  Are you saying that she lied to someone about this IEP?

A    I'm saying she wasn't truthful.

Q    Well, I make a distinction between something simply being incorrect or inaccurate and being consciously misleading, which would be lying or untruthful.  Okay?  So, when I ask you -- are you saying, as best you can say, that her statement was inaccurate, or are you saying it was consciously untruthful?

MS. HORTBERG:  Object to the form.

I think his statement is on the record, and it speaks for itself.

Q    Do you understand the distinction I'm trying to draw between something that's just not correct and something that's consciously made incorrect through a lie?

A    Yes, I understand that.

121

1    Q    Okay. So, it's your position that
2 whatever she said happened about that IEP was
3 not simply inaccurate, but it was, in fact, a
4 lie?
5    A    What she said was not correct, is
6 what I'm saying.
7    Q    Okay. Now, here we have one in
8 quotes, under your name, "Extreme
9 disrespect." Do you ever recall reporting
10 that condition or attribute of Mrs. Miller to
11 anyone?
12    A    No.
13    Q    In your judgment, sitting here
14 today, had she been extremely disrespectful
15 to anyone, to your knowledge?
16    A    She had been.
17    Q    Can you tell us about that, please?
18    A    Well, she had been disrespectful in
19 the -- what we just went over, about claiming
20 that someone went into her files. That's one
21 thing.
22    Q    Well, who do you consider that to
23 be disrespectful of?
24    A    Whoever she was lying on, or being
25 inaccurate.

122

1    Q    So, we're back to lying?
2    A    Well, that's because I read that on
3 this sheet of paper. That's why I said that.
4    Q    Okay. Do you recall any other
5 instances of conduct involving Mrs. Miller in
6 which you would characterize her as
7 displaying extreme disrespect for someone?
8    A    I can't remember now, right now.
9    Q    All right. And the next quotation,
10 At times not following my directions, close
11 quote. Were there any times, other than the
12 biology incident, where, in your view, she
13 did not follow your directions?
14    A    I can't remember.
15    Q    Quote, I am guarded around her,
16 close quote. Do you recall making that
17 statement or any statement substantially to
18 that effect concerning Mrs. Miller?
19    A    I did.
20    Q    Okay, sir. And do you recall who
21 you made it to?
22    A    No, sir.
23    Q    Do you recall the basis for the
24 statement as to why you felt guarded around
25 her?

123

1    A    I do.
2    Q    Tell us, please?
3    A    One day at school, we were walking
4 down the hall together, and I was trying to
5 make -- talk with Mrs. Miller. And I had
6 asked her if she was coming to the football
7 game. It was on a Friday. I asked her if
8 she was coming to a football game. And she
9 responded that, no, her and her husband would
10 be taking up tickets at Dothan High's
11 football game.
12    And it kind of shocked her that I would
13 ask her what she was going to do on a Friday
14 night. And I was just simply wanting to
15 know. And I made some comment, "Well, I
16 didn't know y'all took up tickets."
17    And later someone -- I don't remember
18 who it was -- came to me and claimed that she
19 was stating that I was trying to -- and they
20 may not have used the term -- it's my term --
21 stalk her, wanted to know what she was doing
22 after school. And that simply was not true.
23    So, if I made that statement, that's
24 what it was -- one of the things that I can
25 remember, sitting here. That's what it

124

1 referred to.
2    Q    Other than the things of a personal
3 nature, was there anything else that you felt
4 guarded around her about?
5    A    No.
6    Q    Without quotations, the statement
7 says, "Does not feel he can accurately
8 assess, she is vindictive." Did you ever say
9 anything substantially to that effect to
10 anyone concerning Mrs. Miller?
11    A    Don't remember that.
12    Q    Quote, Interacts okay with kids,
13 close quote. Do you recall saying anything
14 to that effect about Mrs. Miller?
15    A    Don't remember that.
16    Q    Do you have an opinion as to
17 whether that was the case with Mrs. Miller?
18    A    No, sir.
19    Q    You don't have any basis for an
20 opinion as to whether she interacted okay
21 with children?
22    A    I don't have an opinion, no.
23    Q    Quote, Outside the classroom is
24 where she is having problems, close quote.
25 Did you state that or anything substantially

125

to that effect to anyone concerning Mrs.
Miller?

    A    I don't remember that.

    Q    Do you hold that opinion today?

    A    I don't have that opinion.

    Q    Quote, Difficulties collaborating
with regular education, close quote. Did you
ever tell anyone that or anything
substantially to that effect about Mrs.
Miller?

    A    I did.

    Q    Okay. Tell us what you said,
please, and to whom you said it?

    A    If it was said, it was said to Mr.
Pitchford.

    Q    Okay. And do you recall the
context of it or the factual basis for
expressing that opinion?

    A    In the meeting, Mr. Pitchford told
me that some teachers had been to him, and
they were having difficulties in the
classroom.

    Q    Concerning Mrs. Miller?

    A    Mrs. Miller. That's right.

    Q    And what did you say to that?

126

    A    Something along the effect -- well,
actually, I don't know how I responded.

    Q    As we sit here today, would you
have had any factual basis for having
concurred, in Pitchford's opinion, that she
was having difficulty collaborating with
regular education?

    MS. HORTBERG: Object to the form.

    Q    Do you know of any factual basis
for that assertion that she had difficulties
collaborating with regular education, other
than what we've already talked about, about
Mrs. Ezell? Okay? Do you know of any other
instances where that might be said?

    A    She had made a teacher cry. I
mean, that may be one thing.

    Q    Mrs. Miller had made a teacher cry.
And who was the teacher, please?

    A    Ms. Towns.

    Q    And were you present when it
occurred?

    A    No.

    Q    What was the source of your
knowledge about that? How did you know about
it?

127

1    A    I mean, I don't remember how I come
2 to find out about it.
3    Q    What did you understand were the
4 underlying circumstances of how Ms. Miller
5 made Ms. Towns cry? Did anybody tell you
6 what happened?
7    A    Yes, sir. I don't remember who
8 told me that.
9    Q    What did they tell you?
10    A    That she had been observed, and
11 received some marks that she was not happy
12 with, and had went back in there and said
13 something to Ms. Towns.
14    Q    Mrs. Miller had been the subject of
15 some kind of observation. Do you mean, like,
16 in the course of an evaluation-type thing?
17    A    Yes.
18    Q    And she was dissatisfied, and had
19 something to say to Ms. Towns, which made Ms.
20 Towns cry?
21    A    Yes.
22    Q    And you don't know any more than
23 that?
24    A    No.
25    Q    You don't recall who told you that?

128

1    A    No.
2    Q    Quote, Three or four teachers have
3 asked, "What is wrong with Mrs. Miller,"
4 closed quote. Did you tell Mr. Pitchford or
5 anyone else that or anything substantially to
6 that effect?
7    A    That was during the meeting that I
8 told you about.
9    Q    And what was the basis for that
10 statement, the factual basis? Who are these
11 three or four teachers?
12    A    I don't remember.
13    Q    Are you saying they had asked you
14 what was wrong with her?
15    MS. HORTBERG: Object to the form.
16    A    No, sir. I'm not saying that.
17    Q    Who are you saying they asked?
18    MS. HORTBERG: Objection to form.
19    I think we've already
20    established that this was not
21    typed by him.
22    MR. FAULK: Well, that's fine. I'm
23    just asking, had he said
24    anything substantially to that
25    effect.

129

```
 1    A    No, I had not.
 2    Q    And you said "yes."
 3    A    That I said that?
 4    Q    Right.  Did you say anything --
 5  when I say "substantially to that effect," I
 6  mean, in case that's not a precise quotation
 7  of your words, have you said anything that
 8  would mean basically the same thing,
 9  substantially to that effect, concerning Mrs.
10  Miller?
11    A    I don't remember that.
12    Q    You don't remember any teachers
13  coming up to you and saying, "What's wrong
14  with Mrs. Miller," or anything like that?
15    A    No.  I don't remember that.
16    Q    That's fine.  And so, the time that
17  she made Ms. Towns cry would have been prior
18  to your conversation with Mr. Pitchford?
19  Correct?
20    A    Oh, I don't know.
21    Q    Well, if you were telling him about
22  it, and that's your example of the
23  difficulties of her collaborating with
24  regular education, in addition to the Mrs.
25  Ezell situation, if you told Mr. Pitchford
```

130

```
 1  about that, it would have already happened,
 2  or you couldn't be telling him?  Right?
 3    A    Told Mr. Pitchford about what?
 4    Q    About Ms. Towns crying.
 5        THE WITNESS:  Did I say that?
 6        MS. HORTBERG:  I'm going to object.
 7            If his testimony says that --
 8    A    I didn't tell you that I told Mr.
 9  Pitchford that.
10    Q    Okay.  Fine.  That's just an
11  occurrence you knew about that would be an
12  example of the difficulty collaborating with
13  regular education?
14    A    That I knew about.  Yes.
15    Q    All right.  Did you know about that
16  incident prior to the meeting with Mr.
17  Pitchford in which you told him these things?
18        MS. HORTBERG:  Object to the form.
19            I don't think that's his
20            testimony.
21    A    I didn't tell you that.
22    Q    You didn't tell us while ago that
23  you told Mr. Pitchford that it was your
24  understanding she had some difficulties
25  collaborating with regular education?
```

131

```
 1    A    No, I don't believe I did.
 2    Q    Do you recall telling anyone that?
 3    A    No.
 4    Q    So, if somebody has quoted that and
 5  attributed it to you, you don't understand
 6  the basis for that quotation, in terms of
 7  attributing it to you?
 8    A    That's right.
 9    Q    Let's run down, just real quickly,
10  down these quoted statements, Mr. Strange.
11    A    I'm listening.
12    Q    If you would, please, take a look
13  where it says, quote, Professional behavior
14  not very good of late.  If somebody quoted
15  that and attributed it to you, would that be
16  an accurate quotation or not?
17    A    No, not that I am aware of.
18    Q    The quotation of "Extreme
19  disrespect," do you consider that to be an
20  accurate quotation of you?
21    A    No.
22    Q    Quote, At times, not following my
23  directions, close quote.  Do you consider
24  that to be an accurate quotation of you?
25        MS. HORTBERG:  I'm going to object
```

132

```
 1            to all of these.  He's already
 2            answered all of these, this
 3            exact same line of questioning.
 4        MR. FAULK:  In light of his later
 5            answer about the difficulty
 6            with one of the quotations, I
 7            just want to make sure.
 8    Q    I mean, are you being accurately
 9  quoted there or not?
10        MS. HORTBERG:  I believe his -- his
11            testimony will speak for
12            itself.  But I think all of
13            this has already been asked and
14            answered.
15        MR. FAULK:  My questions were, had
16            he said that or anything
17            substantially to that effect.
18            I'm asking him now --
19    Q    Is that an accurate quotation of
20  something you said, or is it not?
21    A    I don't know if that is or not.
22    Q    Same about "I'm guarded around
23  her."
24    A    Did I actually tell somebody, "I'm
25  guarded around her"?
```

133

1    Q    (Nodding head.)
2    A    I do not know. I don't remember.
3    Q    And "Interacts okay with kids," you
4    say that's -- you don't recall saying that to
5    anybody?
6    A    No.
7    Q    Do you recall saying, quote,
8    Outside the classroom is where she's having
9    problems?
10   A    No.
11   Q    Quote, Difficulties collaborating
12   with regular education, in quotes?
13   A    I do not remember saying that.
14   Q    And "Three or four teachers have
15   asked what's wrong with Mrs. Miller," in
16   quotes. You don't recall specifically saying
17   that?
18   A    No.
19   Q    The people you list in your
20   response to interrogatory number 18, you say
21   are all Houston County residents. Do you
22   have any relatives in those same categories
23   in either Henry, Dale, Coffee or Geneva
24   counties?
25   A    It's very possible.

134

1    Q    Would they be any closer than
2    second cousins, by blood or marriage?
3    A    It's very possible.
4    Q    Do you know of any first cousins
5    that you have in any of those counties?
6    A    First cousins, no.
7    Q    Do you know of any first cousins
8    your wife has in any of those counties?
9    A    No.
10   Q    Look at your answer to
11   interrogatory number 20, please, sir, which
12   begins, "I provided support to the plaintiff
13   prior to the withdrawal of her internship."
14   Do you see that?
15   A    I do.
16   Q    "Including meeting with the
17   plaintiff, evaluating her teaching abilities
18   and providing feedback, teaching her to
19   prepare lesson plans and certain special
20   education documents." What special education
21   documents are you talking about?
22   A    We would go over pages of the IEP
23   to help her with a better understanding of
24   it.
25   Q    Okay. Any other special education

135

1    documents other than the IEP?
2    A    Any paperwork associated with an
3    IEP.
4    Q    You only did one written evaluation
5    for her -- right? -- or observation?
6    A    That's all I remember doing.
7    Q    Okay. Did you keep any notes or
8    logs or just personal notes of any kind about
9    your meetings with Mrs. Miller?
10   A    About my observation or my
11   meetings?
12   Q    Well, meetings and -- well, do you
13   have any personal notes or logs or calendars
14   that have not been produced having to do with
15   Mrs. Miller --
16   A    No.
17   Q    -- and your dealings with her?
18   A    No.
19   Q    Other than your written evaluation,
20   did you keep any official notes, logs, or
21   anything of that nature concerning her
22   progress with you?
23   A    No.
24   Q    Look at your answer to number 22,
25   please. Tell me when you've read it.

136

1    A    My answer?
2    Q    Well, and the question itself,
3    since they're not in the same document.
4    A    (Witness reviewing documents.)
5    Okay. I read it.
6    Q    Both the question and the answer?
7    You've read both the question and the answer?
8    A    Yes, sir. Yes, sir.
9    Q    Okay. Let me show you what I've
10   got here that are excerpts that I've taken
11   out of Defendant's Exhibit 29, the
12   professional internship program handbook.
13   I'll show you the cover. Is that the
14   handbook you're referring to in your answer?
15   A    It is, unless it's changed since
16   this has happened.
17   Q    Well, that's the one that some
18   defense lawyer in the case has already
19   offered in evidence through Mrs. Miller in
20   her deposition. And I've taken pages out of
21   that that I could find that alluded to the
22   cooperating teacher's duties.
23   I'm going to ask you to look at those
24   excerpts, and just ask you if you recall any
25   other duties that you had as cooperating

137

1  teacher under the Troy handbook that I've
2  failed to include. I've also included a
3  table of contents, so you might look at that.
4  I'll be quiet while you look at it. Just
5  tell me when you've finished, please, sir.
6      A    (Witness reviewing document.)
7          MS. HORTBERG: I think his question
8              was, do you remember anything
9              else from the handbook that
10             discussed cooperating teachers.
11     A    No.
12     Q    When you refer to, in your answer
13 there, "What I did as a cooperating teacher
14 is set out in the Troy University College of
15 Education Professional Internship Program
16 Handbook," we're talking about those excerpts
17 that I've shown you? That's what you're
18 talking about?
19         MS. HORTBERG: Object to the form.
20             You asked him if he remembered
21             if there were any others. You
22             know, we don't have the entire
23             handbook in front of us.
24         MR. FAULK: Well, y'all put it in
25             evidence, or somebody did.

138

1          MS. HORTBERG: I didn't put it into
2              evidence.
3          MR. FAULK: I was trying to
4              simplify things.
5      Q    I'm going to show you my copy from
6  the court reporter of what I understand to be
7  this handbook, from a prior deposition. And
8  I've already given you the table of contents.
9  If you'll look through that, that might help
10 you.
11         MS. HORTBERG: I'm sorry. What is
12             the question?
13         MR. FAULK: The question is, does
14             he -- when he answers this
15             here, number 22, as being he
16             did what's set out in that
17             handbook, I just want to be
18             sure I've got it all.
19     Q    If you're looking at that, and
20 you're telling us you can't remember any
21 other duties that were expected of you as a
22 cooperating teacher, that's fine. If you do
23 remember some other ones, I'm asking you to
24 please let us know?
25         MS. HORTBERG: I mean, I'll object.

139

1          This has already been put into
2              evidence. So, what's the point
3              of just taking excerpts from
4              it? He's provided the
5              information in his. He didn't
6              provide this. You did.
7          MR. FAULK: The defense put it into
8              evidence. And I don't want to
9              get off into a little contest.
10     Q    Is there anything you specifically
11 remember as being something expected of you
12 as a cooperating teacher that's not set out
13 in the excerpts I've handed you from
14 Defendant's Exhibit 29, which I'll go ahead
15 and mark as Plaintiff's Exhibit 2?
16         (Whereupon, Plaintiff's Exhibit 2
17             marked for identification.)
18     Q    And your answer may be, "I can't
19 remember." And if it is, that's fine. But,
20 if you do remember something else, I would
21 appreciate you telling me.
22     A    This handbook is what I went by.
23         MS. HORTBERG: This?
24     A    This handbook is what I went by.
25     Q    As far as you are concerned, you

140

1  followed it to the letter? Is that fair to
2  say?
3          MS. HORTBERG: Object to the form.
4      A    It's fair to say that I went by
5  this handbook.
6      Q    To the best of your ability?
7      A    Sure.
8      Q    And you're referring to the entire
9  handbook, Defendant's Exhibit 29?
10     A    Yes, sir.
11     Q    You did take a moment to look over
12 Plaintiff's Exhibit 2, didn't you?
13     A    I did.
14     Q    And, again, I will grant you that
15 if there are other duties of a cooperating
16 teacher in the full exhibit, Defendant's 29,
17 that I've overlooked, I'll take your word for
18 it that you did your best to follow them.
19     But, just as we sit here, does anything
20 come to your mind that I've excluded here?
21 Does it appear to you that I've left anything
22 out that you think was one of your duties as
23 cooperating teacher?
24     A    I do not know.
25         (Recess in deposition from 12:40

141

to 12:50.)

MS. HORTBERG: Now that we're back on the record, I think Mr. Strange wanted to clarify an answer that he had provided earlier, that, in looking over his interrogatory responses --

Q    Okay, sir. What was that?

A    One, when you asked if I did not -- do I remember anyone who said they did not want to go to Mrs. Miller's classroom, it was -- one of them was G. G.

Q    Is that a boy or girl?

A    That's a girl.

Q    Do you recall whether she gave any reason for not going to the plaintiff's classroom?

A    She just -- she told me that Mrs. Miller was asking her a bunch of questions, and she was making her feel uncomfortable, and she did not want to go into her classroom.

Q    Do you recall anything about the subject matter of the questions?

A    No, sir.

142

Q    Did you ever discuss this with anyone else other than the child?

A    I don't remember.

Q    Do you recall whether you ever informed Mrs. Miller of it?

A    No, sir. I don't remember.

Q    Do you recall whether you ever talked to the child's parents about the problem?

A    I did.

Q    Okay. And tell us about that conversation, please. Where did it take place?

A    At the school.

Q    Did you ask the parents to come to the school, or did they just come in on their own, or what?

A    She just came in on her own.

Q    "She" being --

A    The mother.

Q    Okay. Do you recall her name?

A    Mrs. G. is all I remember. I mean --

Q    Do these people live in or near Columbia?

143

A    I would assume, being she came to school.

Q    Tell us, as near as you can recall, your conversation with G. G.'s mother?

A    She came in and said something to the effect of -- like I said, this has been three years ago. Come in and said that we was mistreating G. And I told her, "No, we're not."

She asked -- I don't know if she asked or not. I showed the IEP to her. I believe she told me that her IEP was not being followed. I showed her the IEP. She responded that some lady had called her to tell her that the IEP was not being followed. We was mistreating her.

And after I showed her, she told me that she thought that G.'s grades were better than they had ever been. And I said, "Yeah. She's got good grades." And she said, "Okay," and left.

Q    Was your source of information about G.'s preferences her mother, or did it come straight from the child to you?

A    It came straight from the child.

144

Q    Okay. And the child's complaint was that Mrs. Miller was asking her too many questions or making her uncomfortable somehow?

A    Yeah. She was making her uncomfortable.

Q    Let me ask you this: In your own mind, did you draw a connection between the mother's visit and the child's complaints to you? Did they appear to be related or independent of each other?

A    I would have to say they were independent of one another.

Q    Did they occur near in time?

A    They occurred during her internship.

Q    Okay. Within a couple of months? Some time in that same period?

A    Uh-huh.

MS. HORTBERG: You need to give an out loud answer, so that she can take it down.

THE WITNESS: Okay.

Q    And did you, in fact, truly believe that the IEP was being followed? Was that

145

1  your true opinion, what you told Ms. G.?
2      A    Yes.
3      Q    And as we sit here today, can you
4  remember the names of any other students who
5  said they didn't want to be in Mrs. Miller's
6  class?
7      A    No, sir.
8      Q    Do you recall any other parents
9  coming in and talking to you about anything
10 having to do with Mrs. Miller?
11     A    No, sir.
12     Q    Let's go back up to 23, please.
13 Was there anything extraordinary, to your
14 recollection, unusual, about the process in
15 which you assisted in developing R. S.'s IEP?
16     A    No, sir.
17     Q    Nothing out of the ordinary, to
18 your recollection?
19     A    No, sir.
20     Q    And as we sit here, you didn't have
21 any involvement in the C. A. or the L.
22 brothers' IEP's?
23     A    Not that I remember.
24     Q    And it's your testimony, according
25 to answer number 24, that you never requested

146

1  Mrs. Miller to sign any IEP documents, IEP
2  process documents?
3      A    No.  I never asked her to sign any.
4      Q    And by "process documents," I mean,
5  does that have any special meaning to you?  I
6  mean, is that the IEP?  Is that what you
7  understand?
8      A    I never asked her to sign an IEP.
9           MS. HORTBERG:  Can we go back to my
10              original, before we started,
11              when I said that he had two
12              points of clarification?
13          MR. FAULK:  I beg your pardon.  I
14              didn't understand that.
15          MS. HORTBERG:  The first was as to
16              the identification of that one
17              student, and then, the second
18              was as to the meeting.
19          MR. FAULK:  What meeting?
20     A    You asked if I had ever met with
21 any outside --
22          MS. HORTBERG:  Co-defendants.
23          THE WITNESS:  Yeah.
24     A    -- co-defendants.  And I have.  I
25 have.

147

1      Q    And who is that?
2      A    It was a meeting at the central
3  office with Mr. Lord and Mr. Andrews and Mrs.
4  Ezell and myself.  Might have been some other
5  people there.
6      Q    Was anybody representing Troy State
7  there or Troy University there?
8      A    Not that I remember.
9      Q    Is this after suit was filed?
10     A    Yes.
11     Q    Were your attorneys present?
12     A    No.
13     Q    Did the meeting have to do with the
14 lawsuit?
15     A    We was trying to find out what was
16 going on after we had been --
17     Q    After you got served --
18     A    Yes.
19     Q    -- with the papers?
20     A    Yes, sir.
21     Q    If you would, please, tell us what
22 was discussed on that occasion, as near as
23 you can recall?
24     A    We were trying to -- I mean, it
25 slipped my mind, so it was a brief -- we were

148

1  just trying to find out what was going on.
2      Q    My recollection is, I think y'all
3  were -- or most of you were served in care of
4  the board of education.  Was that why you
5  happened to be there, was to pick up the
6  papers?
7      A    Could have been.
8      Q    There were several of you there at
9  the same time?
10     A    Yes, sir.
11     Q    And you don't recall anything in
12 particular about the discussion other than,
13 "Hey, what's this," or something?
14     A    Trying to find out what was going
15 on.
16     Q    And who were you inquiring of?  The
17 superintendent?  You say you were trying to
18 find out something.  Who were you asking what
19 was going on?
20     A    We were all trying to find out.
21     Q    Just talking to each other?
22     A    Yes.
23     Q    Anything else that you need to
24 revise about your testimony that's come to
25 mind --

149

1  A    No, sir.
2  Q    -- in the interim?  Okay.  When you
3  prepared R. S.'s IEP, who else was
4  participating in that process?
5  A    Whose?
6  Q    R. S.  Do you recall who else was
7  on the IEP committee?
8  A    Who was on the IEP team?  No, sir.
9  I don't recall who was on it.
10  Q    Do you recall whether Mrs. Miller
11  was present?
12  A    No, sir.  I don't recall that.
13  Q    Were any of the student who
14  complained about being in Mrs. Miller's care,
15  I guess you could say, removed from her?
16  A    No, sir.
17  Q    Would it be fair to say that if you
18  felt that it was in their educational best
19  interest to remove them, you would have
20  recommended that?
21  A    The other students would -- if I
22  was in the resource room, they were allowed
23  to come to my room instead of going to her
24  room.
25  Q    So, there was some kind of change

150

1  made?
2  A    If they chose to be.  But I did not
3  remove them, no, if you're asking that.
4  Q    And you understand, I'm sure,
5  better than I do, the original scheme.  But
6  there was a point at which these children
7  would go to Mrs. Miller's room.  They said
8  something to you about preferring not to be
9  in her room.  And you gave them the option of
10  coming to your room if they chose?
11  A    No.
12  Q    Okay.  Well, explain it.
13  A    They had the option.  I didn't -- I
14  mean, she was in the resource room or she may
15  not have been in the resource room.  If I was
16  in the resource room, they had the option of
17  coming to my classroom for help.
18  Q    And who established that option?
19  A    Well, I mean, if I wasn't in my
20  room, they had the option of going to another
21  resource room.  It was established.
22  Q    Okay.  That's not something you set
23  up?
24  A    No.
25  Q    And that was not set up in response

151

1  to the children's complaints about Mrs.
2  Miller, was it?
3  A    No.
4  Q    So, my question that I tried -- and
5  I'm sorry if I'm not articulate enough.  But,
6  after these children came to you about Mrs.
7  Miller, did you recommend any type of change
8  in their relations with Mrs. Miller?
9  A    No.
10  Q    And would it be fair to say that
11  if, in your opinion as a special educator, it
12  would have been in their educational best
13  interest for some change to be made, that you
14  would have recommended such a change?
15  A    I don't know.
16  Q    Let me show you what's already in
17  evidence as Defendant's Exhibit 6.  I think
18  we may have cut you off in looking at it when
19  we came back after the break.  Are you
20  familiar with that document?
21  A    Yes.
22  Q    And that's the internship agreement
23  between Houston County Schools and Troy
24  University, dated July 28, 2004?  Correct?
25  A    That's right.

152

1  Q    All right.  And in it, you
2  understand it is creating certain duties on
3  Mrs. Miller's part and on your part and on
4  the part of other people having to do with
5  the internship?
6  A    Yes.
7  Q    In your opinion, did you faithfully
8  carry out your duties under this agreement?
9  A    Yes.
10  Q    Do you have an opinion as to
11  whether Mrs. Miller faithfully carried out
12  her duties under this agreement?
13  A    No.  I don't have an opinion.
14  Q    Not one way or the other?
15  A    No.
16  Q    Are you aware of any specific way
17  in which Mrs. Miller violated the terms of
18  this agreement?
19  A    No.
20  Q    Let's take a look, please, at --
21  are you finished?
22  A    Am I finished?
23  Q    Yes.
24  A    Yes, sir.
25  Q    Let's take a look at Defendant's

153

1  Exhibit 9.  And I'll ask you, as you're
2  looking at it, is that a copy of an
3  evaluation that you did concerning Mrs.
4  Miller, dated August 30, 2004?
5     A    It is.
6     Q    Do you see, down at the bottom,
7  where it indicates "Next observation,
8  September 13-17," right above her signature?
9  Do you see where I'm talking about?
10    A    I do.
11    Q    Did that mean what it said?  In
12 other words, it was anticipated that you
13 would do another evaluation during that
14 general time frame of September 13 to 17?
15    A    I don't know.  It says that her
16 next observation will be September the 13th
17 through 17th.
18    Q    Okay.  Is that your handwriting
19 that says "Sept."?
20    A    It is.
21    Q    And the dates are your handwriting?
22    A    Yes.
23    Q    The numerical date?
24    A    Yes.
25    Q    So, may we fairly infer from that,

154

1  that, at the time you did this, it was your
2  intention to do another evaluation during the
3  period September 13-17?
4     A    I mean, I don't know if that was
5  mine or her next -- I mean, that was the next
6  observation from somebody.  I mean, I don't
7  know if it was mine or not.
8     Q    But you wrote that down?
9     A    I did.  Yes, sir.
10    Q    And you don't recall what your
11 intention was, specifically, as to whether
12 that was your next observation or perhaps
13 Dr. Ruediger's next observation?  You're not
14 sure?
15    A    I'm not sure.
16    Q    Have you ever had to do these on
17 anybody else besides Mrs. Miller?
18    A    No.
19    Q    To the best of your recollection,
20 did you ever do a second evaluation on her?
21    A    I mean, I don't -- I don't remember
22 if I --
23    Q    Do you recall ever having been told
24 not to bother with a second evaluation?  Did
25 anyone ever tell you not to do it?

155

1     A    No.
2     Q    I see, at the top, you circle the
3  number of observations, one through five.
4  Should we infer from that, that, during the
5  normal internship, it was anticipated there
6  would be five?
7        MS. HORTBERG:  Object to the form.
8     A    I don't know.
9     Q    This is a form you would have
10 gotten from Troy State or out of their
11 handbook?  Is that correct?
12    A    Yes, sir.
13    Q    Okay.  Her lowest grade on here was
14 a 3?  Correct?  In fact, most of them are
15 3's.
16    A    There are some 4's and -- 3's and
17 4's.
18    Q    The lowest is a 3?
19    A    Lowest is a 3.
20    Q    And that's average performance,
21 based on your evaluation?
22    A    Yes, sir.  That's what a 3 is.
23    Q    4's are above average performance?
24 Correct?
25    A    Yes.

156

1     Q    When it says "no," am I correct in
2  understanding that to mean that that was
3  simply an activity that was not observed in
4  the course of this evaluation?
5     A    That's right.
6     Q    And are you trained to do PEPE
7  evaluations, P-E-P-E?
8     A    I am.
9     Q    And were you, at the time you did
10 this evaluation, trained in PEPE?
11    A    No.
12    Q    Okay.  I want to be sure we're
13 clear on the "not observed" entry.  This
14 isn't saying that she should have been doing
15 something and you didn't see it being done.
16 Doesn't it mean that it just wasn't involved
17 in the activity that you observed, and so,
18 therefore, you couldn't evaluate it?
19    A    That's my understanding.
20    Q    Okay.  At the time you did this
21 evaluation, did you have any expectation that
22 Mrs. Miller's internship would turn out to be
23 unsuccessful?
24    A    Are you asking me if I expected her
25 internship to turn out unsuccessful?