# EVIDENTIARY SUBMISSION
# (PART 7)

153

1   Exhibit 9.  And I'll ask you, as you're
2   looking at it, is that a copy of an
3   evaluation that you did concerning Mrs.
4   Miller, dated August 30, 2004?
5       A   It is.
6       Q   Do you see, down at the bottom,
7   where it indicates "Next observation,
8   September 13-17," right above her signature?
9   Do you see where I'm talking about?
10      A   I do.
11      Q   Did that mean what it said?  In
12  other words, it was anticipated that you
13  would do another evaluation during that
14  general time frame of September 13 to 17?
15      A   I don't know.  It says that her
16  next observation will be September the 13th
17  through 17th.
18      Q   Okay.  Is that your handwriting
19  that says "Sept."?
20      A   It is.
21      Q   And the dates are your handwriting?
22      A   Yes.
23      Q   The numerical date?
24      A   Yes.
25      Q   So, may we fairly infer from that,

154

1   that, at the time you did this, it was your
2   intention to do another evaluation during the
3   period September 13-17?
4       A   I mean, I don't know if that was
5   mine or her next -- I mean, that was the next
6   observation from somebody.  I mean, I don't
7   know if it was mine or not.
8       Q   But you wrote that down?
9       A   I did.  Yes, sir.
10      Q   And you don't recall what your
11  intention was, specifically, as to whether
12  that was your next observation or perhaps
13  Dr. Ruediger's next observation?  You're not
14  sure?
15      A   I'm not sure.
16      Q   Have you ever had to do these on
17  anybody else besides Mrs. Miller?
18      A   No.
19      Q   To the best of your recollection,
20  did you ever do a second evaluation on her?
21      A   I mean, I don't -- I don't remember
22  if I --
23      Q   Do you recall ever having been told
24  not to bother with a second evaluation?  Did
25  anyone ever tell you not to do it?

155

1       A   No.
2       Q   I see, at the top, you circle the
3   number of observations, one through five.
4   Should we infer from that, that, during the
5   normal internship, it was anticipated there
6   would be five?
7       MS. HORTBERG:  Object to the form.
8       A   I don't know.
9       Q   This is a form you would have
10  gotten from Troy State or out of their
11  handbook?  Is that correct?
12      A   Yes, sir.
13      Q   Okay.  Her lowest grade on here was
14  a 3?  Correct?  In fact, most of them are
15  3's.
16      A   There are some 4's and -- 3's and
17  4's.
18      Q   The lowest is a 3?
19      A   Lowest is a 3.
20      Q   And that's average performance,
21  based on your evaluation?
22      A   Yes, sir.  That's what a 3 is.
23      Q   4's are above average performance?
24  Correct?
25      A   Yes.

156

1       Q   When it says "no," am I correct in
2   understanding that to mean that that was
3   simply an activity that was not observed in
4   the course of this evaluation?
5       A   That's right.
6       Q   And are you trained to do PEPE
7   evaluations, P-E-P-E?
8       A   I am.
9       Q   And were you, at the time you did
10  this evaluation, trained in PEPE?
11      A   No.
12      Q   Okay.  I want to be sure we're
13  clear on the "not observed" entry.  This
14  isn't saying that she should have been doing
15  something and you didn't see it being done.
16  Doesn't it mean that it just wasn't involved
17  in the activity that you observed, and so,
18  therefore, you couldn't evaluate it?
19      A   That's my understanding.
20      Q   Okay.  At the time you did this
21  evaluation, did you have any expectation that
22  Mrs. Miller's internship would turn out to be
23  unsuccessful?
24      A   Are you asking me if I expected her
25  internship to turn out unsuccessful?

157

Q   Right.

A   No.

Q   So, at least at this point in time, August 30th, you felt like things were at least going all right?

A   Yes.

Q   Did you, as her cooperating teacher, ever actually observe her again in the same manner that you observed her in preparing this observation report, but just not do a report? I mean, did you ever have occasion to observe her to this same extent, in the same degree of detail again, after August the 30th --

A   Sir, I don't --

Q   -- whether you did a report or not?

A   I don't remember.

Q   In doing this report -- and the activity that leads up to preparing this report is a conscious observation by you, comparable to the type of observation you might do under PEPE? Is that fair?

A   Is it what, now?

Q   Where you actually visit a classroom and watch what they're doing on a

158

continuous basis during the class period, is that what happened here?

A   I observed her teaching a class here.

Q   Okay. So, you sat in on a whole class?

A   I don't know if it was a -- it says from 11:20 to 12:20.

Q   Would that be one block? How long are the instructional blocks?

A   96 minutes, roughly.

Q   So, you were there, though, a full hour, that resulted in this report?

A   I believe so.

Q   Did you ever observe her to that same extent again, whether you did a report or not?

A   I don't remember if I did or not. I've observed many teachers since this.

Q   But whether you were there to do a formal evaluation or not, you can't remember ever having observed her to this same extent during a single period after you did the August 30 report?

MS. HORTBERG:  Object to the form.

159

That's not what he just said.

A   I'm saying I don't remember if I did or not.

Q   Okay. Let's take a look at Defendant's Exhibit 8. Have you seen that document before, Mr. Strange?

A   I believe I have. Yes, sir.

Q   Do you recall the general occurrence on August 26, 2004, of Dr. Ruediger coming and doing an observation with Mrs. Miller -- or of Mrs. Miller, I guess? And I would represent to you that would have been his first observation of her, I believe.

A   Did you ask me if I knew --

Q   Right. Do you recall that occurrence?

A   Of him observing Mrs. Miller?

Q   Right.

A   Yes.

Q   Okay. Afterward -- let's just read the document.

A   Okay.

Q   "Observation occurred at 12:20 in a regular education math classroom. Ms. Towns

160

indicated that Mrs. Miller was interacting well with the students. After approximately 20 minutes, students were dismissed for lunch. During this time, Mrs. Miller had organized a meeting with Mr. Strange."

Now, were you present for any of that first phase of that, up until the point the students were dismissed for lunch?

A   Was I present when Dr. Ruediger observed her?

Q   Right. In Ms. Towns' math class, up to the point the children went to lunch?

A   I do not think I was there.

Q   Okay. "During this time, Mrs. Miller had organized a meeting with Mr. Strange. The meeting was held in the future classroom of Mrs. Miller (classroom floors were being cleaned or carpeted). Mr. Strange did not attend the 30-minute meeting." Do you recall there being some meeting scheduled you didn't attend?

A   No, sir.

Q   Are you saying that this statement is false, or that you simply do not recall the occurrence?

161

```
1   A    Am I saying Mrs. Miller had
2   organized a meeting with me --
3   Q    Right.
4   A    -- to be present with Dr. Ruediger?
5   Q    Right.
6   A    I'm saying that statement is false.
7   Q    Okay.  So, then, you didn't attend
8   a nonexistent meeting, then?
9   A    I did not know about a meeting I
10  was supposed to attend.
11  Q    "Mrs. Miller" -- and he's talking
12  about his dealings with Mrs. Miller --
13  "stressed her concerns regarding individual
14  education programs and the general structure
15  of the special education program.  It was
16  recommended that she initiate attempts to
17  comply with the current special education
18  law.  Specific suggestions included
19  discussing with Mr. Strange and Mr. Payne her
20  difficulties in establishing deadlines to
21  accomplish the task.  It was also suggested
22  to follow appropriate protocol if changes did
23  not result."
24      Now, you weren't present during any of
25  that discussion between the two of them?
```

162

```
1   A    No.
2   Q    Were you, to your recollection, in
3   a position to overhear any of that?  And I'm
4   not suggesting eavesdropping.  I just mean,
5   were you in a position to hear it, just like
6   Mrs. Ezell is in a position to hear us
7   talking right now?
8   A    No.
9   Q    It continues.  "Mrs. Miller
10  returned" --
11  A    Can I go back to that?
12  Q    Sure.  Yeah.
13  A    When you asked me if I was in a
14  position, I might have -- I don't know where
15  this meeting took place, but it's possible
16  that I was close by.  I'm not saying, because
17  I don't know where the meeting was at.  It's
18  possible I was close by.  But, did I hear
19  anything being said?  No.
20  Q    Okay, sir.  Let's look at the
21  second paragraph.  "Mrs. Miller returned to
22  complete her lesson in the regular education
23  math class.  Upon completion, debriefing
24  occurred in the library with Mrs. Miller and
25  Mr. Strange."  Okay.  So, this is a second
```

163

```
1   meeting, apparently, in which you were
2   present.  Continuing, "Mr. Strange indicated
3   that Mrs. Miller was doing well, despite not
4   having completed an observation.  We
5   discussed briefly inclusion and individual
6   education programs.
7       It was noted that Mr. Strange was
8   hesitant to communicate and make any eye
9   contact.  He indicated that he would complete
10  an observation some time soon.  Mr. Strange
11  left the meeting, as further discussion
12  addressed specific intern expectations,
13  curriculum, and strategies to promote
14  positive change."  And that's signed D. G.
15  Ruediger.
16      Now, do you recall attending a
17  postobservation meeting in the library with
18  Mrs. Miller and Dr. Ruediger?
19  A    Yes.
20  Q    Okay.  And is his summary of that
21  meeting accurate or inaccurate, so far as you
22  are concerned?
23  A    It's fairly accurate.  It's
24  accurate.
25  Q    Do you recall what, in particular,
```

164

```
1   you all discussed in your presence about
2   inclusion and individualized education
3   programs?
4   A    No.  I don't recall that.
5   Q    Do you recall it being in any way
6   or involving in any way concerns expressed by
7   Mrs. Miller about the suitability of the
8   inclusion and individual education programs
9   at your school?
10  A    No, sir.
11  Q    Can you tell us, please, your view
12  of his comment, "It was noted that Mr.
13  Strange was hesitant to communicate and make
14  any eye contact"?  Do you care to comment?  I
15  mean, was that the case?
16  A    It's very possible.
17  Q    Okay.  Could you explain why you
18  may have been hesitant to communicate and
19  make eye contact with him?
20  A    Because, I mean, at that particular
21  meeting, I was extremely nervous, just as I
22  am now.  So, I can see -- because I'm
23  uncomfortable now.  So, I can see where I
24  would have been uncomfortable meeting with a
25  Troy State professor for the very first time.
```

165

Q    Any other explanation?

A    No, sir.

Q    Okay. And you did, in fact, complete an observation some time soon, four days later? Right? If this was August 26th, and your observation was the 30th?

A    October 30th.

MS. HORTBERG: No. August.

Q    Did I say October?

A    No. I said that.

Q    And then, you left the meeting while they were still talking? "Mr. Strange left the meeting, as further discussion addressed specific intern expectations," and so forth.

A    I mean, if that's what he's saying, that he continued after I left, yes, sir.

Q    You were present during both phases of Mrs. Miller's deposition? Correct?

A    Yes, sir.

Q    Do you recall any testimony by her -- and I'm not asking you to recite it -- but a general line of testimony by her to the effect that, after you stepped out of that meeting in the library, that you remained

166

close enough by to listen in?

A    I do recall her saying that.

Q    In your view of the matter, is that accurate testimony or not?

A    Is it accurate that I listened to what was being said?

Q    Well, let's just talk about staying in the library first. Did you remain in the library while they finished their meeting?

A    You're asking me to know what I did -- I mean, that's three years ago. Did someone --

Q    If you don't remember, that's fine.

A    Did someone stop and ask me a question, and me stop and respond to them? I might have. Did I walk straight out of the library? I might have done that. I can't tell you if I stopped off and talked to someone.

Q    All right. So far as you recall, could you overhear anything that they were saying after you left the meeting?

A    No. I could not hear anything that they were saying.

Q    And you did not consciously

167

eavesdrop, I presume, after you left the meeting?

A    No, sir.

Q    Did Mrs. Miller, to your recollection, ever talk to you about concerns that she had about Mrs. Ezell's comments to and concerning special ed students?

A    No.

Q    That's just a subject that never came up between y'all?

A    No.

Q    It did not? I want to be sure. "Yes" and "no" sometimes gets garbled in these things. Y'all never talked about that?

A    About what?

Q    About her contention that Mrs. Ezell said things in the nature of embarrassing, humiliating, or ridiculing things about special ed students.

A    No. We never did discuss that.

Q    Thank you.

A    Yes, sir.

Q    Was there a point that you recall that Mrs. Miller sought your assistance and possibly Mr. Pitchford's assistance in

168

connection with you in getting some sort of necessary information from Mrs. Ezell, in particular, lectures or lesson plans? Do you remember anything about that?

A    Was there a meeting? Is that what you -- what are you asking?

Q    Well, or where Mrs. Miller came to you and said, "I need these things from Mrs. Ezell," or words to the effect, "I can't get them. Will you help me," and you did. Do you recall anything like that?

A    Yes. Yes.

Q    Tell us what you remember about that incident, please?

A    It was -- again, I don't remember the date. Don't remember the day. But it was within the first few days -- might have been the first day. Within the first few days of her being an intern.

I was taking Mrs. Miller around to introduce her to the teachers. Introduced her to Mrs. Ezell. And I'm not -- I'm really not sure if it was during the first time I introduced her or if it was shortly after that. But Mrs. Miller asked -- she told Mrs.

169

Ezell what she needed.  And Mrs. Ezell
responded to her where the appropriate
information would be at when she needed it.

Q    Is that your best recollection?

MS. HORTBERG:  Objection to form.

Q    Do you remember anything else about
the incident?

A    What are you asking?

Q    I'm just asking, is that your
entire recollection of that incident, as we
sit here?  I just want to be sure I'm not
cutting you off, is all.

A    Yes.

MS. HORTBERG:  I'm terribly sorry.
I need to take a quick break.
I apologize.

MR. FAULK:  Sure.

(Recess in deposition from 1:30 to
1:33.)

Q    Let's look at Defendant's Exhibit
12.  Take a look at that document, please,
sir, and let me know if you've had occasion
to see it before.

(Brief off-record.)

Q    Have you had a chance to review

170

that?

A    I have.

Q    Let me ask you about it.  Had you
ever seen it before today?

A    I believe I have.

Q    And you understand it purports to
be an e-mail from Mrs. Miller to Pam Parris
and S. Jones at Troy State --

A    Yes.

Q    -- dated September 11?  I'm
particularly interested in the second
paragraph, where she begins talking about a
science teacher that embarrasses, belittles,
et cetera, special ed students.

And about halfway down, about the fourth
line from the bottom, "I have been ignoring
her behavior, but Paul Strange, my mentor,
wants feedback from you, too.  He is at a
loss as to how to handle the situation,
because it's one of those darned-if-you-do
and darned-if-you-don't.  Paul told me that
Mr. Pitchford indicated to you that there was
one teacher in particular who was not
pleasant to work with (it's her).  So, I
will be no help," presumably referring to Mr.

171

Pitchford.  Okay.  Did you follow along as I
read that?

A    I did.

Q    Is that statement, that portion of
the statement that I read aloud to you,
accurate?

A    No.

Q    Is it entirely untrue, or are there
parts of it that you feel are accurate?

A    Where did it start at?  "I have
been ignoring her"?  Is that where it's at?

Q    Right.  Yeah.

A    I just want to read it again to be
sure.  (Witness reviewing document.)  Okay.
I've read it now.

Q    Okay.  I'll just take it sentence
by sentence.  Is your testimony that you and
Mrs. Miller never discussed a science teacher
embarrassing and belittling and humiliating
her students?

A    Yes.

Q    That being the case, would it be
untrue that Paul Strange wanted feedback from
Ms. Parris and Dr. Jones?

A    About a science teacher belittling?

172

Yes, that's untrue.

Q    Was there anything around that
time, mid September 2004, that you recall
telling Mrs. Miller that you would like to
get feedback from the Troy people about,
other than this?

MR. WALDING:  Object to the form.
He wasn't trying to get
feedback as to this.

MR. FAULK:  Thank you.

Q    Was there something else that she
may be talking about, that you recall?

A    That I wanted some feedback on?

Q    Right.

A    Yes.

Q    Tell us what that was, please?

A    Again, it was in Mrs. --
particularly, it was in Mrs. Ezell's class.
And Mrs. Miller had stated that she was a
collaborative teacher, and she wanted to go
into the classroom and teach Mrs. Ezell's
class either two or three days a week.

Q    She said this to you?

A    Yes.  And I wasn't sure -- I mean,
I wasn't sure if she was supposed to do that

173

1 that early on. So, that was some things that
2 I had requested some feedback on.
3 Q About whether Mrs. Miller could go
4 in and actually teach Mrs. Ezell's class two
5 or three days a week?
6 A She wanted to teach Mrs. Ezell's
7 class -- say, like, this first week, she
8 wanted to teach Monday, Wednesday, Friday,
9 and Mrs. Ezell teach Tuesday, Thursday. Then
10 the next week would be the two days, vice
11 versa.
12 Q And your response to that was,
13 "Well, see what people at Troy have to say,"
14 or words to that effect?
15 A Yes.
16 Q But you're steadfast in your
17 testimony that it had nothing to do with Mrs.
18 Ezell ridiculing her students?
19 A No.
20 Q You are steadfast in your testimony
21 that it was not?
22 A Yes.
23 Q It had nothing to do with it?
24 A That's right.
25 Q Okay. Good. Did you ever tell

174

1 Mrs. Miller that Mr. Pitchford had indicated
2 to the Troy representatives that there was
3 one teacher in particular who was not
4 pleasant to work with, so that Mr. Pitchford
5 would be no help?
6 A No.
7 Q Let's look at Defendant's Exhibit
8 13. Take a moment and look that over,
9 please, Mr. Strange, and tell me when you've
10 finished.
11 A (Witness reviewing document.)
12 Okay.
13 Q If you notice, Mr. Strange, this
14 was dated September 13, e-mail from Mrs.
15 Miller to Ms. Parris, two days after
16 Plaintiff's Exhibit 12, which is dated
17 September 11. Do you agree with me on that?
18 A I do.
19 Q I'll read it. "Ms. Parris, Paul
20 went ahead and spoke to Mr. Pitchford, and
21 Mr. Pitchford brought the teacher in with Mr.
22 Strange to discuss the problems. She
23 immediately sent the items Mr. Pitchford told
24 her I would need, and asked her to be more
25 cooperative. She seemed to respond." Do you

175

1 recall an incident of that nature?
2 A No, sir.
3 Q You never recall a meeting between
4 Mr. Pitchford, you, and another teacher, in
5 which there was some kind of items that Mrs.
6 Miller was having trouble getting, and Mr.
7 Pitchford told her what to get, and the
8 teacher seemed to respond appropriately or
9 cooperatively? That doesn't ring any bells
10 with you?
11 A Yes. I had a meeting with Mr.
12 Pitchford and another teacher.
13 Q Tell us about that, please?
14 A Mr. Pitchford had -- he came to --
15 it was either me or Mrs. Ezell, and wanted to
16 know why wasn't Mrs. Ezell giving Mrs. Miller
17 her lesson plans.
18 And Mrs. Ezell had responded that she
19 had told Mrs. Miller where her lesson plans
20 would be, and that was in the office. All
21 teachers are required to have a copy of their
22 lesson plans. And I want to say that -- she
23 was not going up there and getting the lesson
24 plans, so --
25 Q Mrs. Miller was not --

176

1 A No.
2 Q -- going to the office and getting
3 them?
4 A So, she didn't have lesson plans.
5 And I believe that Mrs. Ezell might have went
6 and got a copy of the lesson plans and gave
7 it to Mrs. Miller or Mrs. Miller went and got
8 a copy. Somehow, she received a copy from
9 the office of the lesson plans.
10 Q Let me ask you this: Why did that
11 necessitate a meeting between you and Mr.
12 Pitchford and the teacher, instead of you
13 just telling Mrs. Miller, "Well, go to the
14 office and get them"?
15 A I mean, I don't know.
16 Q Would that have been something you
17 had the authority to do?
18 A What?
19 Q To just send Mrs. Miller to get the
20 things out of the office, rather than involve
21 all these people in a meeting.
22 A Could I have told her to go to the
23 office? Sure.
24 Q Let me ask this. And I don't know
25 the answer to that. Would one teacher at

177

```
 1   your school, at the time, have been free to
 2   just go to the office and look at any other
 3   teacher's lesson plans at any point?
 4       A    They were in a file.  All teachers'
 5   lesson plans were in a file.  So, I guess if
 6   they would have --
 7       Q    So far as you know, were they
 8   accessible to everybody?
 9       A    Were they?
10       Q    Yes.
11       A    Yes, they were.
12       Q    And that being the case, then, what
13   was the necessity for actually having a
14   meeting that you apparently instigated with
15   Mr. Pitchford and the teacher?
16           MS. HORTBERG:  Object to the form.
17              I don't believe that's what his
18              testimony is.
19       A    No.  That's not what I said.
20           MS. HORTBERG:  That's not what that
21              document says.
22       Q    I'm sorry if I misunderstood you.
23   Does the document state correctly that a
24   meeting occurred that you apparently
25   initiated with Mr. Pitchford and so forth?
```

178

```
 1       A    Is it true that I initiated the
 2   meeting?
 3       Q    Yeah.
 4       A    No.
 5       Q    First of all, was there a meeting
 6   between you and Mr. Pitchford and some
 7   teacher, having to do with the need to be
 8   more cooperative and get these plans and so
 9   forth?
10       A    Yes.
11       Q    All right.  And I'm good with
12   whatever your answer is, okay, as long as
13   you're telling me it's truthful.  You had a
14   meeting with Mr. Pitchford on this general
15   subject about the lesson plans from Mrs.
16   Ezell?  Correct?
17       A    Yes.
18       Q    My question is, if these lesson
19   plans were on file in the office and readily
20   accessible to Mrs. Miller, what was the
21   necessity for having the meeting, instead of
22   just saying, "Go get them.  They're in the
23   office"?
24       A    I mean, I don't know how the
25   meeting came about.  We just had a meeting.
```

179

```
 1   I don't know.  Can't remember that.
 2       Q    That's your best recollection?
 3       A    Yes, sir.
 4       Q    Let's take a look at Defendant's
 5   Exhibit 14, please.  And take a minute and
 6   just read through it, please, sir.  Just tell
 7   me when you're finished.
 8       A    (Witness reviewing document.)  I'm
 9   finished.
10       Q    Do you recall the incident or
11   incidents described in this memo?
12       A    Such as?
13       Q    Let me try it another way.  It's a
14   memo to Mr. Pitchford from Nancy Miller,
15   dated September 24th, 2004.  I'm reading.
16   "This memo is to inform you that this
17   morning," which would be that date, "after I
18   attended an IEP meeting for" -- I'm just
19   going to call her a certain student --
20   "Starla, the psychometrist, in Paul Strange's
21   presence, asked me to sign three documents
22   claiming that I was at IEP meetings.  The
23   students were A. T. (two different
24   documents), and for J. C.  As you know,
25   signing the documents when I was not present
```

180

```
 1   at the meeting is unlawful.  You know that
 2   this is not the first time I have been
 3   approached about illegally signing IEP
 4   documents."  I'm going to stop there.  And
 5   let's talk about that incident.
 6       Do you recall an incident on September
 7   24, 2004, which I believe was the same day
 8   she left campus and went to the central
 9   office, where you were present when Starla,
10   the psychometrist, asked Mrs. Miller to sign
11   three documents stating that she was at IEP
12   meetings which she, in fact, had not
13   attended?
14       A    No.
15       Q    Do you remember any circumstance of
16   that nature on the day that Mrs. Miller left
17   school and went to central office?
18       A    Again, I don't know what day Mrs.
19   Miller left.  I mean, I don't know what day
20   she --
21       Q    I'll rephrase it.  Do you recall
22   any incident of that nature ever having taken
23   place in your presence?
24       A    Where she was asked to sign three
25   documents?
```

181

Q    Yeah. Or any number of documents. One document. It doesn't matter. But any documents that would have stated she was at an IEP meeting where she had not been?

A    I was in the presence of Starla Smith when we took some documents to Mrs. Miller's classroom. Yes.

Q    And tell us about that, please, sir?

A    It was -- and I don't know the students' names. It was an eligibility meeting that we had. And Mrs. Miller had -- she had stopped communicating with me. She wouldn't talk to me, wouldn't do anything. So, we held the meeting.

And after the meeting, I told Starla, "Let's walk down and show Mrs. Miller these documents, so that she will be" -- I believe she was supposed to come to the meeting and didn't come. Show her the documents, so she can become familiar with them. Because she was not familiar with any of the IEP process.

So, Starla walks in the classroom. I'm behind her. And she lays the -- says, "Here, Mrs. Miller. I want you to look at these,"

182

and lays the pages down on the table. Well, she immediately, you know, says, "I'm not signing these. I don't know why y'all are in here asking me to sign this stuff. I'm not going to do it." So, she picked the papers up, and we walked out of the class.

Q    Had you asked her to sign them?

A    No, I hadn't. No.

Q    Had Mrs. Smith, Starla, the psychometrist, asked her to?

A    Not that I'm aware of.

Q    Calling your attention to the first two lines of this memo. It says, "This morning, after I attended an IEP for the T. child," Starla did this and that. Do you recall that Mrs. Miller had attended an IEP meeting that day for a different child?

A    She might have. I mean, I don't know.

Q    But you say she had not attended an IEP eligibility meeting that day that she was supposed to attend?

A    No. I said -- I don't remember if she was invited or not. I mean, I said I believe she might have been invited to

183

attend. I mean, I don't know.

Q    Are you saying that the documents that you and Starla brought to Mrs. Miller that day had been generated on that day?

A    Yes.

Q    At a meeting that Mrs. Miller apparently did not attend?

A    Yes.

Q    And to your recollection, there was no specific request that she sign any of these three documents?

A    That's right.

Q    And you can't tell us whether or not that was the same day she left school and went to the central office?

A    No, sir. I can't tell you that.

Q    When she said, "I'm not going to sign any of these documents," did you say anything in response to that?

A    No.

Q    Did Starla say anything in response to that?

A    I'm not sure if she said anything or not. I mean --

Q    Well, did anybody say anything to

184

the effect that, "No one's asking you to sign these documents"?

A    I don't remember what was said.

Q    But your best recollection is that y'all took the documents and left at that point?

A    Yes.

Q    Left the room?

A    Yes.

Q    Let's continue where I had left off reading, about halfway down. "On August 11, 2004, at approximately 3:20 p.m., Cathy Keasler approached me as I was leaving the campus, and said we'd need to make up, sign, and date an IEP for R. S., without having a meeting. I told her that, first, as an intern, I'm not permitted to write or sign one if I have not attended a meeting, and that I wouldn't sign one because it is against the law. I have informed Dr. Jones and Ms. Parris of the situation, and I am leaving the premises."

Now, do you recall an earlier incident, in mid August, involving Cathy Keasler and an IEP for R. S., where there was some

185

disagreement between Ms. Keasler and Mrs. Miller about whether Mrs. Miller should participate in signing one?

A    No.

Q    I had asked you earlier about -- you said you did develop an IEP for R. S. for that school year? Correct? That was the only semester you were there? Right?

A    I was there one semester.

Q    Right. So, if an IEP was prepared for R. S. in mid August 2004, should that have been the IEP that you say you developed --

MS. HORTBERG: Object to the form.

Q    -- in your interrogatory answers? I'm looking at number 23.

A    Yes. Number 23 is -- I mean, that's a true statement.

Q    So, unless R. S. had more than one IEP developed for her during the semester you were at Houston County High School, these would be the same IEP, wouldn't they?

MS. HORTBERG: Object to the form. What IEP are you --

MR. FAULK: The one that Cathy

186

Keasler had in August of 2004, and the one you developed, that you mentioned here in your response to interrogatory number 23.

MS. HORTBERG: I'm going to object. I don't think that's what that document says.

MR. FAULK: I think he's got a good answer. He's smiling.

THE WITNESS: I'm just smiling.

Q    All right. Well, clear me up on that, if I'm just failing to understand. What is it about that that --

A    I think you're asking me, is the document for R. S. that I'm talking about in number 23 and the document that Cathy Keasler had, are they the same?

Q    Yes, sir.

A    And I'm saying no.

Q    Okay. Can you explain that for me, please?

A    I'm saying that I don't know if Cathy Keasler approached her or not. I have no knowledge of that.

187

Q    Okay. You were not present if that occurred?

A    That's exactly right.

Q    To your knowledge, were there more than one -- are you hearing me?

A    I'm listening. Yes, sir. I'm just trying to listen.

Q    To your knowledge, was there more than one IEP developed for R. S. in the fall of 2004, when you were at Houston County High School?

A    Not to my knowledge.

Q    Would there exist records from which that could be determined? Would the Houston County Board of Education or some affiliate of it, like the high school, have a record on this child that would show each IEP she had ever had here?

A    Oh, I don't know that.

Q    Should there be?

A    I don't know.

Q    Well, as a special educator, when a child gets a new IEP, do you know what becomes of the old one?

A    We turn them in to the central

188

office.

Q    Do you recall the approximate time during the semester that you developed R. S.'s IEP?

A    No, sir.

Q    Do you recall it being some sort of midterm revision of an IEP or any kind of special circumstance involved?

A    No, sir.

Q    Would it, in your judgment as a special education teacher, have been appropriate for Mrs. Miller to sign off on any of these IEP documents if she had not attended the meeting and somehow participated in the planning of them?

MS. HORTBERG: Object to the form.

A    Could she have signed off on them?

Q    Would it have been appropriate for her to?

A    She could have signed off on them, yes, if she would have attended the meeting.

Q    If she had attended the meeting. But, if she had not attended the meeting, would it be appropriate for her to sign the IEP?

189

MR. WALDING: Object to the form.

MS. HORTBERG: Same objection.

A    She should not have signed it if she didn't attend the meeting.

Q    Do you happen to know where Mr. Pitchford was at the time Mrs. Miller left the building to go to the central office on that day?

A    No.

Q    Let's look at Defendant's Exhibit 16. Do you need a break?

A    No.

Q    I could use one.

(Off-record discussion held.)

Q    Have you had a chance to look over what's previously been marked as Defendant's Exhibit 31?

A    Yes, sir.

Q    All right. And do you understand it, in general, to be an e-mail from Mrs. Miller to a discussion group, in which she has further remarks concerning a fellow teacher who makes unpleasant or embarrassing remarks to students, just as the general subject matter?

190

A    Yes.

Q    And let me call your attention -- you see the capital letters, "Very difficult," down there toward the bottom?

A    Yes, I do.

Q    I'm just trying to direct your attention where she says, "My mentor and I have spoken about the situation, and he is at a loss as to what to do. He would also like input from my internship seminar colleagues. The principal is aware of her personality and warned us that she could be difficult, so he will be of no help. If we approach her, she could make things even more difficult for special ed students. We do not want to alienate anyone. Any suggestions?"

Now, do you agree with me that the time and date stamp on there would be the same day, 22 minutes later, than Plaintiff's Exhibit 12, which is --

A    That's it?

Q    Yes, sir. -- which was the letter -- e-mail, rather, from Mrs. Miller to Ms. Parris and Dr. Jones, that we went over earlier on this same subject? Well, I will

191

represent to you that it indicates it is 22 minutes later. Maybe I'm wrong about that. Yeah. 22 minutes later, on the same date, saying substantially the same thing.

So, she said it to Jones and Parris in one e-mail, turns around and says substantially the same thing to her internship seminar, that you and she have discussed this problem, and that not only would she like feedback, but that you said you would like feedback.

And is your testimony still that that just didn't happen? That this is simply false?

MS. HORTBERG: Object to the form.

Q    Or does this help refresh your recollection at all?

MS. HORTBERG: Object to the form.

A    If what didn't take place?

Q    Well, as I understood your testimony as we talked about Defendant's Exhibit 12, as I understood in substance, we were talking about the second paragraph of Defendant's Exhibit 12 --

A    Yes.

192

Q    -- that Mrs. Miller never complained to you that Mrs. Ezell or any other science teacher continually embarrassed, belittled and humiliated the students, et cetera, as alleged in Plaintiff's Exhibit 12.

A    That's right.

Q    Then I'm just showing you where she did it again to other people on the same subject --

A    That's right.

Q    -- 22 minutes later.

A    Yes.

Q    And in both of them, she says y'all had discussed it, and that not only did she want input, you wanted input on this problem of the science teacher belittling her students.

Does that still not refresh your recollection at all about there being such a problem that Mrs. Miller had come to you about, and you, yourself, wanted input on it, as well?

A    No, it does not.

Q    Is any part of that true, other

193

than what you told me earlier about the
lesson plans?

A    That's true.

Q    That's her only complaint about
Mrs. Ezell or any other science teacher to
you?

A    As far as I can remember.

Q    (Handing documents to the witness.)
You may want to be looking over these.

(Recess in deposition from 2:14 to
2:16.)

Q    Have you had a chance to look it
over?

A    (Witness nodding head in
affirmative.)

Q    Let's look first at what was
Defendant's Exhibit 16, entitled "Concerns
expressed by Mrs. Miller." And I'll tell
you, Mr. Strange, from my understanding, this
is a document prepared by a person named
Virginia Singletary. Do you know Ms.
Singletary?

A    I do.

Q    And what's your understanding of
her position at the time of these events?

194

A    I mean, I don't know her title.
She worked at central office in the special
ed department.

Q    Do you know if she reported to Mr.
Andrews?

A    Do I know if she reported to him?

Q    Right. If you know. You may not
know.

A    I don't.

Q    Let's take a look at number 1.
It's my understanding that this is a document
Ms. Singletary prepared based upon Mrs.
Miller's visit to the central office on
September 24, 2004.

Number 1, "Paul Strange, Mrs. Miller's
quote, paid mentor, close quote, has
regular comments to Pam Parris, TSUD advisor.
Mrs. Miller stated that she's in jeopardy of
failing her internship because of Mr.
Strange's comments."

Now, at that point in time, Mr. Strange,
had you made any comments to Ms. Parris about
Ms. Miller's performance in her internship,
other than your August 30 written evaluation?

A    Again, I don't remember the dates

195

of any of the meetings. I mean, I don't
remember the dates. So, I mean, I don't know
when this -- I mean, I don't know when this
was -- you told me when it was written,
but --

Q    Let me try to help. Without regard
to specific dates, you remember the event of
your doing the written evaluation on Mrs.
Miller, in a general way?

A    Yes.

Q    And you remember, in a general way,
the day Mrs. Miller left campus and went to
the central office?

A    Yes.

Q    Now, what I'm trying to get at is,
in between those two events, do you have any
recollection of having made any comments, and
in particular, negative comments, concerning
Mrs. Miller to Ms. Parris?

A    No.

Q    Do you think that that may not have
occurred, or you just simply don't remember?

A    I don't remember. I'm going to
back -- that may not have occurred. It may
not have occurred. It's not that I don't

196

remember. I don't know.

Q    Do you have any reason, or do you
know any reason why, on September 22nd, 2004,
or at any time in that time frame, Ms. Parris
would have instructed Mrs. Miller to request
a meeting with Mr. Pitchford to make amends?

A    No.

Q    Do you know of any reason she
needed to make amends with Mr. Pitchford in
mid September 2004?

A    No.

Q    And we're talking about before the
visit to the central office.

A    No.

Q    Okay. Number 2. I think we've
already been over the substance of number 2,
haven't we, about Cathy Keasler asking her to
sign an IEP? And you say you really don't
know anything about that?

MS. HORTBERG: Object to the form.

Q    Well, you do know something about
it?

MS. HORTBERG: That's not what I
was saying.

MR. FAULK: Okay. I'm trying to

197

help.

Q    Number 2, do you understand that as having to do with the August 11 event that was reported in Ms. Miller's September 24 memo to Mr. Pitchford, having to do with Cathy Keasler, in Defendant's Exhibit 14? We talked about that earlier, didn't we?

A    Yes, sir. We talked about this.

Q    All right. Do you know of any other events that number 2 in Defendant's Exhibit 16 could be alluding to between Cathy Keasler and Mrs. Miller about an IEP in August 2004?

A    No.

Q    All right. Do you have any further information, as you sit here, concerning that alleged event?

A    No, sir.

Q    Who is Ms. Hamm, at the school, I guess? Is there a secretary out there named Ms. Hamm?

A    She works in the office. Yes.

Q    Do you have any familiarity with the events described in paragraph number 3 of Defendant's Exhibit 16?

198

A    No.

Q    Now, Ms. Keasler is not the psychometrist, is she?

A    No.

Q    Okay. Starla Smith is the psychometrist, to your understanding?

A    Yes.

Q    And have we fully discussed the events alleged in paragraph 4 of Defendant's Exhibit 16 to exhaust your knowledge on that subject?

A    Yes, sir.

Q    Do you have any knowledge of the event describe in number 5, about Scott Stephens walking out of a meeting because he was laughing too hard about her concerns over signing papers?

A    No, sir.

Q    Did Mrs. Miller ever tell you anything about that?

A    No, sir.

Q    Did you witness that event?

A    No, sir.

Q    Were you ever at a meeting with Scott Stephens and Mrs. Miller where the

199

general subject of her concerns about special ed were discussed?

A    No, sir.

Q    Number 6. Tell us about this notebook that's described in number 6. You're familiar with that, aren't you, about her keeping a notebook or log of her whereabouts during the day?

A    Am I familiar with having to keep a notebook?

Q    Well, it says doing a notebook to verify her activities. Do you have some recollection of that?

A    Yes, sir.

Q    Tell us how that came about, please?

A    I had to keep a notebook, while she was an intern at Columbia, of where I was at, what I was doing, because we can be so many different places. So, that notebook was, like, our schedule of where we were supposed to be, when we were supposed to be there.

Q    Did you have to have other teachers sign off to verify that you had, in fact, been to their classroom like you said you

200

had?

A    Oh, I don't remember if anyone had to sign them or not.

Q    Do you recall anything about Mrs. Miller being required to carry a notebook or logbook and have the other teachers sign off that she had, in fact, come to their room when she was supposed to?

A    I'm aware she had to do a notebook, just like myself.

Q    Okay. But you don't recall any verification aspect to the notebook for either yourself or Mrs. Miller?

A    I don't remember if anyone had to sign off on it or not. No. I don't remember that.

Q    Do you happen to still have yours?

A    Do I have them?

Q    Right.

A    No.

Q    Do you remember whose idea it was?

A    To do the notebook?

Q    (Nodding head.)

A    (No response.)

Q    Is that a "no," or are you still

201

thinking?

A    I'm still thinking.

Q    Oh, excuse me.

A    I'm trying to -- whose idea it was to do the notebook? No, sir. I can't remember whose idea it was.

Q    Did you keep one at your former school?

A    Yes, sir.

Q    Was it Wicksburg?

A    Yes, sir.

Q    You don't know anything about paragraph 7 that you haven't already told us, do you? And, in particular, the last line of paragraph 7. Are you aware that the psychometrist was holding eligibility meetings and so forth without sending out notices to parents?

A    No.

Q    Is it your contention that didn't occur, or are you just saying you didn't know about it?

A    Did I know about her having meetings without sending out notices?

Q    Right.

202

A    No.

Q    When a notice is sent out that a meeting is to occur, what was the normal procedure for doing that at Houston County High School?

A    I'm not sure what the procedure was at Houston County High School.

Q    What was the procedure at Wicksburg?

A    Some people mailed them. Some people gave them to the students.

Q    Was it the norm to mail them? How would you verify that the parent had actually received the notice?

A    When it came back signed.

Q    If the student brought it back signed by the parent?

A    Or if the parent brought it back.

Q    Okay. And when you mailed it, was it certified mail or regular mail?

A    I believe it was regular mail.

Q    Suppose the parent didn't bring it back? What would happen next? If they didn't send it back or mail it back or bring it back, what would you have to do?

203

A    You wouldn't hold a meeting.

Q    But you're required to hold a meeting at some point? Right?

A    Yes, sir.

Q    All right. And so, when you don't get the acknowledgment back from the parent, what would be the customary next step?

A    Send another one.

Q    Is there ever a point reached where it's just clear the parent is not going to cooperate? And, if so, what do you do then?

A    (No response.)

Q    That may not have ever happened. Did you ever have a situation where the parent just wouldn't come in to a meeting?

A    Sure.

Q    And what do you do under those circumstances?

A    If you have a signed form stating that they would not attend, then you have the meeting.

Q    Okay. But if they don't respond at all -- did you ever have that happen?

A    I can't remember if I've ever had it happen to me or not.

204

Q    Look at number 8, please. And I think we've already talked about most of that, haven't we?

A    Yes, sir.

Q    In number 9, the assertion that you had eavesdropped, if Mrs. Miller said that, it's your testimony that that's just not so? Correct?

A    That's not true.

Q    Let's look at Defendant's Exhibit 17, which is an undated letter from R. J. Andrews to Pam Parris, on Houston County School's letterhead, in which Mr. Andrews writes to express some concerns concerning Mrs. Miller. And he states, "After discussions with Mr. Tim Pitchford, principal, and Mr. Paul Strange, supervising teacher, the concerns are as follows."

Do you remember having such a meeting with Mr. Andrews and Mr. Pitchford?

A    I'm sure that we had a meeting, but I don't -- I mean, to tell you when and the specifics of it, I can't tell you that. I don't recall.

Q    I see. I would ask you to presume,

205

for purposes of my question, that this
occurred after the day she left campus and
before the date she was terminated.  Do you
remember that to be the case?

    A    What are you asking, now?

    Q    In other words, this meeting that's
being talked about here, wouldn't it have
occurred between the day she left campus and
the day she was terminated?

    A    I would say so.

    Q    It's an undated letter.

        MS. HORTBERG:  And I'm going to ask
           you not to assume or speculate
           about things.  If you don't
           have a specific recollection --
           and it may just be getting long
           in the day.  But I want you to
           make sure that you do remember
           that there was a meeting and
           that these things were
           discussed.  To me, all it says
           is "after discussions."  It
           doesn't say after a meeting.
           But I want you to make sure
           that you're understanding what

206

           his question is, and that
           you're not just speculating.

    Q    Do you have any reason to doubt
that this is a letter from Mr. Andrews?

    A    I don't know if it is or not.

    Q    Well, I'm going to ask you to
assume it is.  Do you understand, on the face
of it, that it's saying that he is expressing
some concerns about Nancy Miller, in the
first line?  Correct?

    A    Yes.

    Q    And it relates discussions, plural,
with Tim Pitchford and you, concerning these
four areas.  Do you recall discussions of any
type with Mr. Andrews concerning these four
areas that occurred some time after the day
she left campus and before the day she was
terminated?

    A    I don't recall.

    Q    Not necessarily face-to-face.  It
could be telephone discussions.  But, do you
recall any discussions with Mr. Andrews on
any of those four subjects, A through D?

    A    I don't recall.  I don't know.

    Q    Did you, in the fall of 2004,

207

believe that there was reason to be concerned
about Mrs. Miller developing a better
understanding of the special education
process and the required forms, specifically
eligibility meetings and referral meetings?
Did you have any concerns at that time about
her developing a better understanding of that
process and the required forms?

    A    As her mentor teacher, I was trying
to show her the forms and how to fill them
out.

    Q    Well, did you, at that time,
consider her understanding of that to be
deficient in some way?

        MS. HORTBERG:  Object to the form
           as to whatever time period it
           is you're talking about.  I
           think you've asked him to
           assume a time period, but --

    Q    Between September 24 and October
the 19th of 2004, without regard to when this
letter may have been written, during that
time frame, did you have any particular
concern about Mrs. Miller's need or ability
to develop a better understanding of the

208

special education process and the required
forms?

    A    Again, I don't remember any dates,
so I don't know.

    Q    Well, did you have that concern at
any time, that she might have some deficiency
in being able or willing to develop an
adequate understanding of the special
education process and required forms?

    A    Yes.  I felt she needed some help.

    Q    Okay.  You felt that she needed a
better understanding.

    A    Of the IEP forms.

    Q    When it says "the special education
process itself," what about that?

    A    I'm just saying I felt she needed
some help -- some better understanding with
the forms of special education.

    Q    Okay.  And be more specific than
that, if you would, please.  What particular
deficiency or lack of understanding did you
feel she had about the required forms?

    A    I felt that she did not know all of
the information that had to be included on an
IEP.

209

Q    Can you give us an example?

A    The necessary information to put on a student profile page.

Q    Does the page itself call for specific information?

A    No. Yes, it does. Yes. It does call for specific information.

Q    So, if it calls for the specific information, and you know how to read, explain to us how it is that you wouldn't understand what it was calling for?

MS. HORTBERG: Object to the form.

Q    You're not saying she didn't have enough sense to fill these forms out, are you?

MS. HORTBERG: Object to the form.

A    Could you explain yourself?

Q    Okay. You're saying that you had a concern that she needed a better understanding of how to fill out the required forms to put the necessary information on it, and you gave the example, I believe, of a student profile. But you say the form itself says on it what information it's calling for. And in what respect did she seem to lack

210

understanding?

A    I was trying to show her what I would put on an IEP student profile page.

Q    Any other examples you can think of?

A    No, sir.

Q    Did you have any concern, in late September or early October 2004, about Mrs. Miller's being able to develop positive student/teaching relationships? And, if so, what were they?

A    I don't remember.

Q    Any concerns at that time about working with peer teachers?

A    I don't know.

Q    You do recall the event of her leaving campus? Correct?

MS. HORTBERG: Object to the form. Asked and answered.

Q    Well, I'm going to assume that you remember that event. Let me ask you this: In your opinion, and based on your experience in the Houston County School System and at Houston County High School in particular, tell us, please, specifically, how did Mrs.

211

Miller fail to follow procedure, in your opinion, on the day that she left campus and went to the central office?

A    I don't know that.

Q    So, that's not necessarily your opinion, that she failed to follow procedure in leaving campus?

A    No. That's not my opinion.

(Recess for lunch from 2:43 to 3:05.)

Q    Were you paid anything extra for your mentoring of Mrs. Miller?

A    No, sir.

Q    Have you ever heard Mrs. Miller say that it was her intention to take down Houston County High School, or words to that effect?

A    No, sir.

Q    Has anyone ever told you that Mrs. Miller had said such a thing?

A    Not that I remember.

Q    Now, let me take us back to the August 26, 2004 meeting between Dr. Ruediger and Mrs. Miller that you had certain involvement in. His first observation of

212

her. Okay?

A    Okay.

Q    Just trying to focus. There has been testimony that after Dr. Ruediger had his private critique with Mrs. Miller, that he met with Mr. Pitchford to discuss her concerns about the special ed program. Do you recall testimony to that effect? Not yours, but hers.

A    I mean, I don't remember.

Q    Let me try another route. Did Mr. Pitchford, or anyone else, ever inform you that, following Ruediger's critique of Miller on that occasion, that Ruediger met with Pitchford to discuss, among other things, her concerns about the special ed program?

A    No.

Q    Do you recall a meeting the day after her first observation and critique by Ruediger, in which there was a meeting between you, Pitchford, Stephens and Miller concerning these --

A    No, sir. I don't recall that.

Q    -- concerns?

A    No, sir.

213

Q   Do you deny such a meeting occurred, or are you just saying, if there was one, I don't remember?

A   There was a meeting between who?

Q   Pitchford, Stephens and Miller, that included you, at which the concerns she had expressed to Ruediger were discussed.

A   I'm saying I don't remember a meeting.

Q   Okay.  Do you recall a meeting in the conference room at Houston County High School, following the time Mrs. Miller had left the campus to go to the central office that day?  Do you recall a meeting at the high school between Pam Parris, Tim Pitchford, Riley Andrews and Mrs. Miller?  Do you have any knowledge of that meeting?

A   Between --

Q   Parris, Pitchford, Andrews and Miller.  Were you ever in a meeting with those several people at the same time?

A   I was in a meeting in a conference room with some other people.  If those exact people were there, I can't recall that.

Q   Do you recall anybody who was

214

there?

A   I do.

Q   Okay.  Who do you remember being there?

A   Ms. Parris and Mr. Pitchford.

Q   And do you recall the general subject matter of the meeting?  The purpose of it?

A   It would have had to have been to discuss Mrs. Miller.  I mean, it was something to do with Mrs. Miller.

Q   Do you remember any more about the meeting than that?

A   No, sir.

Q   And you say you don't remember meeting after the first observation with Pitchford, Stephens and Miller?

A   No, sir.  I'm saying I don't remember that.

Q   On any of these meetings, do you recall any preparatory meetings with Mr. Pitchford or anyone else, getting ready to meet with Mrs. Miller?

A   No.

Q   Is it your testimony that, in

215

general, such preparatory meetings would not occur?

A   Would not occur?

Q   Right.

A   Yes, sir.  That's right.

Q   I may have asked you this.  If I have, I apologize.  After that first observation, did you somehow become aware that Dr. Ruediger had reported her concerns to Mr. Pitchford?

A   No.  I wasn't aware of it.

Q   After Mrs. Miller went to the central office that day, did you, to your recollection, make any special effort to try to improve your relationship with her?

A   Not that I recall.

Q   At that time, did you consider that there was a problem with your relationship?

A   Not that I recall.

Q   Did you ever, to your recollection, state to Mrs. Miller, in substance, that you regretted the events that had led to her central office visit?

A   Not that I recall.

Q   Is it your testimony that you have

216

no recollection of any follow-up on your part with Mrs. Miller, Dr. Ruediger, Pitchford and others, concerning concerns that she had expressed during her first observation?

MR. WALDING:  Object to the form.

MS. HORTBERG:  Object to the form.

A   I don't understand what you're asking.

Q   All right.  I'll try it again.  Do you have any recollection of any kind of follow-up on your part with Mrs. Miller, Dr. Ruediger, Mr. Pitchford or others, regarding the concerns that she had expressed to Ruediger in that first critique?  Any kind of follow-up on your part with any of those people?

A   What -- I mean -- I don't --

Q   Well, you testified a minute ago, I think, that you don't recall Mr. Pitchford or anyone coming to you and saying, Ruediger said Miller said this, this, this and this.

A   That's right.

Q   And I guess, would it be correct to assume you don't have any recollection of any follow-up on your part acting upon those --

217

A    That's right.

Q    -- expressed concerns?

A    Yes, sir.

Q    You said you are now PEPE certified or -- what's the correct term for somebody that's permitted to do PEPE evaluations?

A    That's what it is.

Q    Okay.  Do you agree that the evaluation or observation process for interns was modeled on the PEPE -- or would appear to be modeled on the PEPE model for observations?

A    Appears to be.

(Brief off-record.)

Q    Would Mrs. Miller's involvement at IEP meetings have been only as that of an observer rather than a true participant?

A    Yes, sir.

Q    Are there limitations, to your knowledge, on what an observer could do besides observe in that situation?

MS. HORTBERG:  Object to the form.

A    What are you asking?

Q    Well, I mean, she's not supposed to interject anything in the meeting if she's

218

there as an observer?  Not just Mrs. Miller, but any observer.  Do they actively participate in some way in the meeting, or do they just sit there and watch?

A    I guess they could participate.

Q    Do you know of that being the case, or are you just saying it could happen?

A    No.  I don't know that to be the case.

MS. HORTBERG:  Just for clarification sake, are you saying, does he know that it was the case that Mrs. Miller ever observed, but did participate?

MR. FAULK:  That wasn't what I asked, but --

MS. HORTBERG:  Then I just guess you just --

Q    What I'm try to ask is, I gather you're saying a guest or observer could, in fact, somehow participate, but you're not aware personally of any instances where that's the case?  Is that correct?

A    (No response.)

219

Q    And it's not a case killer.  I'll even withdraw it, if you want me to.

A    Okay.

Q    I mean, I'll just stand on your testimony.  But, anyway --

A    Can you ask the question again?

Q    There was some testimony earlier, not from you, but in earlier depositions that I recall, about the idea that she was only involved in IEP meetings as a, quote, observer.  Is that your understanding and recollection?

And if it is, I was just asking, does an observer do anything in that context other than sit there and watch and presumably learn something?

A    I don't know.

Q    Are you familiar with what's called a focused monitoring report that the state department of education conducts concerning local education agencies' compliance, noncompliance, with special education regulations?

A    I'm not.

Q    You're not.  Have you ever been

220

privy in any way to any type of monitoring or investigation of the special ed program by representatives from the state department of education?

A    No.

Q    Let me show you -- I'm not going to mark it here yet -- but, a document entitled "Focused monitoring report."  It's several pages.  It was produced by the Houston County Board of Education as an amendment to their initial disclosures.  Take a second and just peruse it.  And if you've never seen one before, that's fine.  If it turns out you're familiar with it, I'll mark it, and we can talk about it.

A    (Witness reviewing document.)

Q    Go ahead and just feel free to flip through it.

A    (Witness reviewing document.)  No, I'm not familiar with this report.

Q    Okay.  At any time when you served as a special educator, have you ever been contacted by the state department of education representatives to review IEP's and that type of thing?

221

A   No.

Q   Let me show you something that is an exhibit, but I don't have the exhibit number. Do you recall when one of the lawyers, maybe your lawyer, introduced some copies of Mrs. Miller's calendar from this period in her deposition?

A   Yes.

Q   Okay. Let me show you what I understand to be a copy from September. Yeah. Because, see, it's got Labor Day here on the 6th. And I don't know if you can read her writing.

"Paul said teachers went to administration (Pitchford), to complain that they shouldn't have to teach the special ed kids (Monday and Ezell), and that they don't want special ed teachers in class." And that's on the September 21, 2004 calendar entry.

Do you recall having had a conversation with Mrs. Miller to that effect around that time?

A   No.

Q   Do you happen to know, whether you

222

talked to her about it or not, whether that was a true statement, that Mrs. Ezell and Ms. Monday had gone to Pitchford and said, "We don't want to have to teach these kids, and we don't want special ed teachers in our classes"?

A   No. I do not know if that's a true statement.

Q   Mr. Pitchford never told you that?

A   No.

Q   And Mrs. Ezell and Monday never told you that?

A   No.

Q   After Mrs. Miller went to the central office on the day we've talked about, did you have any discussions with Mrs. Miller about what she had discussed with Mr. Andrews?

A   No.

Q   We've been here a good little while today. And earlier you had told me, unequivocally, I believe, that Mrs. Miller did not tell you that she was leaving campus on that day. Has anything we've covered refreshed your memory beyond that --

223

A   No, sir.

Q   -- at this point?

A   No, sir.

Q   That's still your testimony?

A   Yes, sir.

Q   Have you had any contacts -- and I'm not talking about in the context of litigation preparation or anything -- but, any contacts, face-to-face, telephone, e-mail, memo or other writings, with any of these people concerning what to do about Mrs. Miller, as to whether she should fail her internship or be terminated? Mr. Pitchford? Did y'all ever discuss the subject of either terminating Mrs. Miller or having Troy State withdraw her internship?

A   No.

Q   Did you ever discuss such subject with Mr. Andrews?

A   No.

Q   Ms. Singletary?

A   No.

Q   Mr. Lord?

A   No.

Q   Ms. Parris?

224

A   No.

Q   Dr. Ruediger?

A   No.

Q   Did you, prior to the termination of her employment and withdrawal of her internship, ever discuss the prospect of that outcome with anyone in a position of authority with the Houston County Board of Education?

A   No.

Q   Or anyone at Troy University Dothan?

A   No.

Q   And you understand I'm talking about where you expressed the view that her internship should be considered a failure, or words to that effect?

A   No.

Q   Did any of those people ever express that view to you, prior to the withdrawal of her internship and the termination of her employment?

A   No.

Q   When you were studying at Troy, did you have any of these people, Parris or

225

Ruediger or Jones, involved in your education
at Troy?

    A    Not that I recall, no.

    Q    Did you intern as a special
education teacher?

    A    I did.

    Q    Whereabouts?

    A    An elementary school in Enterprise,
and a high school, Carroll High School.

    Q    In Ozark?

    A    In Ozark.

    Q    Do you remember who your mentors
were?

    A    No.

    Q    Was it some sort of split
internship, or did you have two internships?

    A    It was split. I know the name of
the elementary school. It's College Street.

    Q    Okay. When you were an intern, did
you ever express any concerns comparable to
those expressed by Mrs. Miller during her
internship?

        MR. WALDING: Object to the form.

        MS. HORTBERG: Same objection.

    Q    Well, did you ever express any

226

concerns to your mentor or other officials in
those schools about perceived irregularities
in the special ed program at those schools?

    A    Not that I recall.

    Q    Did you ever have any such
concerns, whether you expressed them or not?

    A    Not that I recall.

    Q    Do you feel there's anything wrong
with somebody in Mrs. Miller's capacity as an
intern expressing concerns of that nature?

        MS. HORTBERG: Object to the form.

    A    About the special ed process at
Columbia?

    Q    Right. In other words, the things
she spoke up about, that you know of, is it
your view that it was somehow wrong for her
to speak up about it?

        MR. WALDING: Object to the form.

    A    Yeah. I don't understand what
you're wanting me to --

        MR. WALDING: The one thing he
            testified to was that this
            inclusion model was not being
            followed. And that's the only
            concern that this gentleman, at

227

    1        least in my recollection, has
    2        testified to. And you've asked
    3        him about concerns.
    4            MR. FAULK: Okay.
    5        Q    There's been some discussion about
    6    so-called dissension among the faculty
    7    members on account of Mrs. Miller's behavior.
    8    Can you tell us anything about that? Do you
    9    have any knowledge of that?
    10        A    No, sir.
    11        Q    Did you miss any appreciable amount
    12    of time from work during Mrs. Miller's
    13    internship, more than maybe go to the dentist
    14    or have one day sick or something?
    15        A    No, sir.
    16        Q    Do you have any concerns about Mrs.
    17    Miller's teaching or professionalism that
    18    have not been discussed here today?
    19        A    No, sir.
    20        Q    I want to be sure we've covered the
    21    specific effects that you're aware of that
    22    resulted from Mrs. Miller leaving campus on
    23    the day we've discussed.
    24            In addition to anything you may have
    25    already told us, can you tell us any specific

228

    1    adverse effects that her leaving campus had
    2    on the educational process at your school on
    3    that day?
    4            MS. HORTBERG: Object to the form
    5                to the extent that he's already
    6                testified to that.
    7        Q    In addition to that. In addition
    8    to everything you've told us.
    9        A    No.
    10        Q    You can't. Okay.
    11            MR. FAULK: If you'll give me just
    12                a few minutes with them
    13                privately.
    14            (Recess in deposition.)
    15        Q    Mr. Strange, I want to call your
    16    attention to the period immediately in the
    17    next several days following the first
    18    observation by Dr. Ruediger in late August.
    19    Okay? I want to get us on the same page.
    20            Do you have any knowledge of Mr. Andrews
    21    having, shortly thereafter, contacted Houston
    22    County High School special ed and given them
    23    a set number of days to come into compliance
    24    on various deficiencies?
    25        A    No, sir.

229

Q    Are you saying that didn't happen, or are you saying you have no recollection of it happening?

A    I'm saying I have no recollection of that happening.

Q    Do you have any understanding, Mr. Strange, as to some special classification of Mrs. Miller as an instructor rather than as a teacher?

A    Do what, now?

Q    The words "instructor" and "teacher," do you have any understanding of how either of those words should have been applied to Mrs. Miller in the position she was in while she was working at Houston County High School?

A    No, sir.

Q    What about just in the general terms within the Houston County School System? Are you aware of any distinction between the term "instructor" and the term "teacher"?

A    I'm not aware of it.

MR. FAULK:  Unless somebody else has some questions, I'm

230

finished for now.

MR. MUSSO:  Nothing for me.

MR. WALDING:  No questions.

MR. FAULK:  I'll say that I've reviewed your written discovery, and I don't have any questions based on that for this gentleman.

MS. HORTBERG:  And with that, we're on the record that this deposition is completed?  Is that a true statement?

MR. FAULK:  Yeah.  We're done.

MS. HORTBERG:  We're done with Mr. Strange.

MR. FAULK:  Thank you, Mr. Strange. I appreciate it.

**END OF DEPOSITION**

231

PLAINTIFF'S EXHIBIT NO. 1

232

PLAINTIFF'S EXHIBIT NO. 2

233

**STATE OF ALABAMA**

**HOUSTON COUNTY**

    I, Stacey Watkins, RPR, and Notary
Public, State at Large, do hereby certify
that the foregoing transcript, pages 1
through 232, is a true and correct transcript
of the testimony and proceedings taken at
said time and place; and that the same was
taken down by me in stenograph shorthand,
and transcribed by me personally or under
my personal supervision.

    I further certify that I have no
interest in this matter, financial or
otherwise, or how it may develop or what
its outcome may be.  I further certify that
I am not of counsel for any of the parties,
nor am I related to counsel or litigants or
associated with anyone connected with this
cause to my knowledge.

    Witness my hand this 8th day of
October, 2007.

        _____

_____ **RPR, Notary Public,**
          **State at Large**
          **ACCR# 155**



PLAINTIFF'S EXHIBIT NO. 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

NANCY MILLER,                    *
                                 *
        PLAINTIFF                *
                                 *
vs.                              *
                                 *        CASE NO.1:06-CV-940-WKW
HOUSTON COUNTY BOARD OF          *
EDUCATION, KENNETH LORD,         *
RILEY JOE ANDREWS, TIM           *
PITCHFORD, PAUL STRANGE,         *
STACY EZELL, TROY                *
UNIVERSITY, DOTHAN, SANDRA       *
JONES, PAM PARRIS and            *
GREG RUEDIGER,                   *
                                 *
        DEFENDANTS.              *

HOUSTON COUNTY BOARD OF EDUCATION, FORMER
SUPERINTENDENT LORD, SUPERINTENDENT PITCHFORD, RILEY JOE
ANDREWS, PAUL STRANGE,* AND STACY EZELL *
ANSWER TO PLAINTIFF'S COMPLAINT

The Defendants, Houston County Board of Education

"HCBOE," former Superintendent Lord, Superintendent

Pitchford, Riley Joe Andrews, Paul Strange, and Stacy Ezell

answer the Plaintiff's Complaint and asserts various

affirmative defenses as follows:

1.    The Defendants admit the jurisdictional claims in

Paragraph 1 of the Complaint.

2.    The Defendants are without sufficient information

to form a belief as to the truth of Paragraph 2 of the

Complaint.

PLAINTIFF'S
EXHIBIT

* See later Notice of Appearance for Strange
& Ezell filed by Board's own firm

3.    The Defendants are without sufficient information to form a belief as to the truth of Paragraph 3 of the Complaint.

4.    Admit.

5.    Admit.

6.    Admit.

7.    Admit.

8.    The Defendants are without sufficient information to form a belief as to the truth of Paragraph 8 of the Complaint.

9.    The Defendants are without sufficient information to form a belief as to the truth of Paragraph 9 of the Complaint.

10.    The Defendants are without sufficient information to form a belief as to the truth of Paragraph 10 of the Complaint.

11.    The Defendants are without sufficient information to form a belief as to the truth of Paragraph 11 of the Complaint.

12.    The Defendants are without sufficient information to form a belief as to the truth of Paragraph 12 of the Complaint.

13.  The Defendants are without sufficient information to form a belief as to the truth of Paragraph 13 of the Complaint.

14.  The Defendants admit that Ms. Miller was a student intern at Troy State University, but they deny she was working as a school teacher under contract with the HCBOE.

15. The Defendants admit that the Plaintiff began working as an intern at the Houston County High School in Columbia, Alabama on July 28, 2004, in the field of special education.  The Defendants deny that the Plaintiff was a teacher because she did not fulfill the requirements for becoming certified as a teacher under the laws of the State of Alabama, because she did not complete the student internship at Troy State University.

16.  The Defendants are without sufficient information to form a belief as to the truth of Paragraph 16 of the Complaint.

17.  The Defendants are without sufficient knowledge to form a belief as to the truth of the Plaintiff's claimed reportings in Paragraph 17.  The Defendants deny all other factual allegations contained in Paragraph 17.

18. The Defendants are without sufficient knowledge to form a belief as to the first sentence of Paragraph 18 in the Complaint. The Defendants admit that the Plaintiff reported information to Tim Pitchford and Riley Joe Andrews, but are without sufficient knowledge to form a belief on the reporting to the other named individuals.

19. The Defendants admit that Mr. Andrews sent a letter to Ms. Parris expressing concerns about the Plaintiff. The Defendants deny the other allegations contained in Paragraph 19 of the Complaint.

20. The Defendants are without sufficient information to form a belief as to the truth of Paragraph 20 of the Complaint.

21. The Defendants deny the allegations in Paragraph 21 of the Complaint.

22. The Defendants admit that Mr. Lord presented the Plaintiff with a hand-delivered letter dated October 19th informing the Plaintiff that her contract was terminated because of the withdrawal of her internship and that she was escorted off campus when she refused to leave. The Defendants deny any other claims or allegations in Paragraph 22 of the Complaint.

23. The Defendants deny all allegations in Paragraph 23 of the Complaint.

24. Defendants admit that the Plaintiff is a citizen of the United States but deny that any of the events concerning this matter violated the First or Fourteenth Amendments to the Constitution of the United States.

25. The Defendants deny the allegations contained in Paragraph 25 of the Complaint.

26. The Defendants deny all allegations in Paragraph 26 of the Complaint.

27. The Defendants deny all allegations contained within Paragraph 27 of the Complaint.

## 1st Defense

Defendants plead the general issue, deny that they are guilty of the things and matters alleged, and demands strict proof of all allegations and inferences contained in the Complaint.

## 2nd Defense

Defendants deny that they are indebted in any way to the Plaintiff and demand strict proof.

### 3<u>rd</u> Defense

Defendant moves to dismiss the Complaint because the Plaintiff has failed to state a claim for which relief can be granted.

a.    The Plaintiff cannot recover under the Fourteenth Amendment because she was not deprived of liberty or property without procedural due process.  "State law determines whether a public employee has a property interest in his or her job." *Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir. 1991).  "Under Alabama law...[,] a nontenured teacher has no right statutory or otherwise, to be re-employed." *Foster v. Blount County Bd. of Educ.,* 340 So.2d 751, 752 (Ala. 1976).

b.    The Plaintiff cannot recover under the First Amendment.  "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the constitution does not insulate their communications from employer discipline." *Gilder-Lucas v. Elmore County Bd. of Educ.,* No. 05-16561, 2006 WL 1736833 (11th Cir., June 26, 2006)(Slip copy). Any statements made by the Plaintiff regarding the special education programs at Houston County

High School to administrators and other teachers were pursuant to her official duties as a teaching intern.

c. The Plaintiff did not complete the requirements to become a legally certified teacher in the State of Alabama, therefore the contract between the HCBOE and the Plaintiff could not have been fulfilled.

d. The HCBOE can demonstrate by a preponderance of the evidence that it would have reached the same employment decisions regarding the Plaintiff in the absence of any speech the Plaintiff claims is protected.

### 4th Defense

The Defendants plead the applicable Statutes of Limitations.

### 5th Defense

Plaintiff could not complete her contract with the HCBOE because her internship was withdrawn by Troy State. As a result, her contract became impossible for either party to perform.

### 6th Defense

The contract between the Plaintiff and the HCBOE is illegal and unenforceable because Miller is not a certified teacher approved by the State Department of Education.

<u>7th Defense</u>

The Plaintiff is not entitled to a jury trial on the issues of reinstatement, back pay, and other benefits of the contract because these are equitable remedies sought by a § 1983 action. *Sullivan v. School Bd. of Pinellas County,* 773 F.2d 1182, 1187 (11th Cir. 1985). Defendants move the Court to strike the Plaintiff's jury demand in whole or part.

<u>8th Defense</u>

The Defendants reserve the right to amend this pleading, and to add other defenses, should the appropriateness become apparent during discovery.

HARDWICK, HAUSE, SEGREST & WALDING

BY:    /s/ Jere C. Segrest
     Jere C. Segrest (SEG005)
     ASB-1759-S-80J
     Attorney for Defendants
     Post Office Box 1469
     Dothan, Alabama 36302
     Phone:  (334)794-4144
     Fax:    (334)671-9330


BY:    /s/ Kevin Walding
     Kevin Walding (WAL036)
     ASB-8121-I-69J
     Attorney for Defendants
     Post Office Box 1469
     Dothan, Alabama 36302
     Phone:  (334) 794-4144
     Fax:    (334) 671-9330

Page 8 of 9

## CERTIFICATE OF SERVICE

I hereby certify that, this date, I have served a copy of this document on the following individual(s)or attorney(s) of record by placing a copy in the United States Mail in a properly addressed envelope with adequate postage.

Winn Faulk, Esquire
FAULK & REED
524 S. Union Street
Montgomery, Alabama 36104-4626

Thomas K. Brantley, Esquire
BRANTLEY & AMASON
401 N. Foster Street
Dothan, Alabama 36303

This the 7th day of November, 2006.

_____
Of Counsel



PLAINTIFF'S EXHIBIT NO. 2



# COLLEGE OF EDUCATION

# PROFESSIONAL INTERNSHIP PROGRAM HANDBOOK

Professional Internship Office
P. O. Box 8368,
Dothan, Alabama  36304
(334) 983-6556, ext. 361
pparris@tsud.edu

*troyst.edu*



DEFENDANT'S
EXHIBIT
PERIGO-Bynum N.

PLAINTIFF'S
EXHIBIT

*Amy Rm 7*
*Sus 52.*

*Excerpts*
*WF*

Internship Handbook Fall 2004

# TABLE OF CONTENTS

College of Education Philosophy & Ethics Statement ............................ 1

Prerequisites ............................ 2

Placement Procedures ............................ 3-4

Orientation, Pre-registration and Certification ............................ 5-6

Purpose and General Description of Internship ............................ 6-9

Successful Internship ............................ 9

Role Description of Teacher ............................ 10

Attendance and Evaluation ............................ 11

Responsibilities of Cooperating Teachers ............................ 12-13

Competencies Desirable for Working with Interns ............................ 14-16

Explanation of Forms for the Cooperating Teacher ............................ 17

Explanation of Evaluation Coding ............................ 18

Observation (evaluation) ............................ 19

Explanation of Competencies ............................ 20-22

Equal Employment Opportunity Policy (EEO)/Americans with Disabilities Act (ADA) ............................ 23

*Appendix: Forms* ............................ 24

Internship Checklist ............................ 25-26

Report of Pre-Internship Visitation ............................ 27

Internship Teaching Schedule ............................ 28-29

Lesson Plan Format ............................ 30

Secondary Lesson Plan Short Form ............................ 31

ECE/ELE/SPE Short Form Lesson Plan ............................ 32

# TABLE OF CONTENTS

Report of Internship

33

Attendance for Intern

34

Summary Report for Internship

35

Summary Evaluation of Internship

36

Intern Evaluation of University Supervisor

37

Agreement to Serve as University Supervisor

38

Agreement to Serve as Cooperating Teacher

39

Cooperating Teacher Evaluation of University Supervisor

40

University Supervisor Evaluation of Cooperating Teacher

41

Evaluation of Cooperating Teacher to be Completed by the Intern

42

Agreement to Serve as Professional Intern

43

Indemnification and Release

44

Intern Demographics

45

*Cooperating Teacher.* The cooperating teacher is the classroom teacher with whom the intern is placed for the internship period. The cooperating teacher's role in the internship is a critical factor in the success of the intern.

The cooperating teacher is to:

a.     provide good teaching experiences for his/her students thus providing a good environment for the intern;

b.     provide direct assistance to the intern in becoming accomplished in the teaching role;

c.     demonstrate effective teaching techniques;

d.     observe the intern and offer appropriate feedback;

e.     assist the intern in the many facets of teaching.

4.   *The Principal.* The building principal is the principal of the school in which the intern has been placed. Principals are encouraged to participate in the internship program by placing interns, observing interns as they perform the many internship duties, and providing feedback to the intern from the perspective of building level administrator.

# SUCCESSFUL INTERNSHIP

The attitude and initiative of the intern are expected to reflect a sincere desire to participate in the internship and to be successful in the internship endeavor. The relationship developed with the students in the classroom by the intern is essential to the effectiveness of the internship. Interns must establish appropriate rapport and must utilize appropriate interpersonal skills with the students. The intern is responsible for his/her behavior throughout the internship.

The following information is offered to the intern to remind him/her of ways to display a positive attitude and initiative. The intern is expected to:

1. show a genuine interest in the concerns and interests of the students, the cooperating teacher, and other school faculty and staff;
2. be a good listener;
3. quickly learn the names of the students and school personnel;
4. determine the extent of responsibility and authority at the beginning of the internship;
5. respect the school, the school personnel, the students, and the parents of the students;
6. accentuate the positive aspects of the school;
7. keep confidential information *confidential*;
8. fulfill responsibilities and commitments *on time*;
9. have excellent attendance (In the event of an emergency, contact the Director, the cooperating teacher(s), and any other personnel as directed by school policy):
10. show appreciation for the school placement and the assistance extended during the internship period.

The above list is only representative of the behavior expected of all interns at all times during the internship.

The intern is expected to fulfill all responsibilities in a timely, effective, ethical, and professional manner. The teacher's performance responsibilities are outlined in the Professional Education Personnel Evaluation Program of Alabama (1997).

# RESPONSIBILITIES OF COOPERATING TEACHERS

Cooperating teachers are classroom teachers who not only have responsibility for guiding the development of the pupils in the classroom, but they are also teachers who are willing to assume the additional responsibility for guiding the development of an intern in his/her continuous teaching experience.

Area superintendents recommend cooperating teachers because of their demonstrated teaching ability, their interest in contributing to the improvement of the profession, and their special skills in working with and supervising another person. Cooperating teachers show competence in their teaching area(s), hold a master's degree in that area(s) for which the intern is seeking certification, and have at least three years of successful teaching experience.

The cooperating teacher is a critical component of the team of professionals working with the intern in that the cooperating teacher is responsible for providing day-to-day guidance and supervision of the intern. The major functions of the cooperating teacher are listed below:

1. Orient the intern to the school, the school personnel, the students, and the school procedures:

   During the pre-internship visit, the intern is to become acquainted with the cooperating teacher, the principal, and assignment. Before reporting for the day of the internship period, the intern is to have provided the cooperating teacher and the principal with information about himself/herself. The cooperating teacher may use this material to prepare the students for internship.

   Upon reporting to the school at the beginning of the internship period or at the time of the pre-internship visit, the intern is to be shown through the building, introduced to members of the staff, and be given an opportunity to become thoroughly familiar with the room(s) where he/she is to teach. The intern is to be made familiar with the policies of the school and system. The intern needs copies of the textbooks and any other instructional materials and supplies required to effectively deliver content material. The intern needs to be given an opportunity to review copies of any student or faulty handbooks and other policy manuals reflecting policies of the school and system.

   The intern needs a desk and a bookshelf which he/she can use during the internship period. The intern needs to become acquainted with the students he/she is to teach and is given information which will help him/her become an understanding teacher.

2. Induct the intern into the teaching process:

   The intern is usually eager to begin teaching. It has been found that gradual induction to teaching during the internship period, with the intern assuming some responsibility from the first day, builds confidence in the beginning teacher and is conducive to later success.

3.  Supervise the teaching of the intern:

Each intern is required to teach all day for twenty days. Ten days must be consecutive. Each intern is required to earn a minimum of 245 hours of teaching time. The cooperating teacher and intern are to determine the teaching schedule. This schedule is to be submitted to the Director by the end of the first week of internship.

4.  Providing feedback to the intern:

The cooperating teacher is to formally evaluate the intern on at least four times during the semester. The first observation should take place early in the term as the student begins teaching. At least one observation must take place during the ten consecutive days of teaching. The observations should occur approximately every three weeks. The cooperating teacher and intern will have a conference to review each evaluation as it is completed.

Explanation of the internship evaluation form and coding is provided beginning on page 17.

The cooperating teacher is to give continuous feedback to the intern regarding the intern's effectiveness. The cooperating teacher is responsible for guiding the growth of the intern and leading the intern through self-evaluation as well.

5.  Other responsibilities:

The intern is to engage in all required activities of the teacher.

# CONCLUSION

In conclusion, some of the major responsibilities of the cooperating teacher(s) include:
1.  plan for the initial orientation of the intern;
2.  acquaint himself/herself with the Troy University, Dothan Campus internship program;
3.  familiarize himself/herself with the intern;
4.  create an effective learning environment;
5.  introduce the intern to class routines, and school policy and procedure;
6.  acquaint the intern with record keeping requirements;
7.  acquaint the intern with instructional materials, supplies, and equipment;
8.  establish a climate in which the intern may gradually develop skill in planning and delivering lessons;
9.  offer the intern continuous feedback;
10. treat the intern as a professional;
11. provide opportunities for the intern to test ideas and theories;
12. arrange the schedule for the intern's teaching experiences;
13. provide continuous evaluation of the intern's teaching experiences through planned conferences and evaluation reports and feedback.

# COMPETENCIES DESIRABLE FOR WORKING WITH INTERNS

## Personal Relations

The cooperating teacher should:

1. respect the personal integrity of the intern;
2. accept the intern as a student and a fellow teacher;
3. establish and maintain informal, friendly working relations with the intern;
4. encourage the intern to express and discuss problems;
5. encourage the intern to make decisions based on careful study and defensible standards;
6. develop and suggest new ideas;
7. observe the intern at work and record observations for later conference;
8. suggest a positive approach toward solving problems;
9. maintain confidence in the intern and be optimistic;
10. take an empathetic interest in the intern; and;
11. be tactful and helpful in assisting the intern in adjusting to responsibilities and limitations;
12. be flexible in allowing the interns to test their new ideas and methods.

## Opportunities for Growth

The cooperating teacher should:

1. allow the intern to observe well-planned lessons which are designed to illustrate important principles and procedures;
2. properly use the intern's background experiences for the enrichment of the teaching-learning activities;
3. lead the intern into responsible teaching;
4. demonstrate sound teacher-pupil relations based on a thorough understanding of the psychology of child growth and development;
5. assist the intern in planning appropriate lessons;
6. provide a generous period of independent teaching to allow the intern a chance to develop self-confidence and skills (NOTE: The cooperating teacher is to leave the intern alone in the classroom ONLY with the permission of the administration of the local school system);
7. encourage independent study, responsibility for planning, organizing, and directing instruction;
8. maintain an open mind toward the intern's suggestion;
9. practice self-evaluation and model this process for the intern;
10. encourage the intern to analyze procedures and results;
11. continuously adjust to the changing needs and progressive development of the intern; and
12. encourage reflective decision-making.

## Growth in Professional Competence

The cooperating teacher should:
1. adjust the length and activities of the induction process to meet the needs of the intern;
2. evaluate the intern's early teaching to encourage the intern and provide the intern with proper and appropriate suggestions;
3. encourage the intern to use a wide variety of learning activities;
4. encourage the intern to develop new ideas and activities;
5. assist the intern in observing the growth of the students;
6. assist the intern in setting reasonable standards of performance for the class(es) and encouraging frequent evaluation for the class(es) and evaluation of appropriateness of the standards;
7. assist actively and continuously in the evaluation process; and
8. develop a system of observations including anecdotal records of observations and share these records with the intern at appropriate times.

## Professional Relations

The cooperating teacher should:
1. clarify the responsibilities and privileges of the intern; explain what is expected of the intern on the first day, during the week and periodically throughout the internship;
2. clarify the relationship of the intern to the administration, other teachers, pupils and parents;
3. explain to the intern the proper channels of communication;
4. make a place for the intern in the professional and social life of the school staff;
5. make definitive arrangements for the time, place and frequency of conferences;
6. assist the intern in arranging for observations and opportunities for further experience throughout the school and community;
7. assist the intern in securing opportunities to discuss professional matter with the administrative personnel and other staff members;
8. administrative personnel and other staff members;
9. refer the intern to sources of information, materials, and agencies that offer personal and professional services;
10. counsel the intern concerning professional plans and ambitions; and
11. invite the intern to appropriate seminars, meetings, etc.

## High Personal Standards

The cooperating teacher should:
1. influence the intern by example;
2. practice self-evaluation on an objective basis;
3. follow acceptable standards of language, dress, social amenities, and interpersonal skills;
4. maintain a sense of humor;
5. live a well-rounded life and retain a mature perspective toward personal and professional matters; and
6. exemplify maturity and emotional stability in the manner of reactions to situations and the method of proceeding professionally in the face of emotional tension, outside personal cares, and responsibilities.

## Good Professional Ethics

The cooperating teacher should:

1. maintain perspective and good working relations with the intern, students, colleagues, university faculty, parents, administration, and public;
2. refrain from placing personal "busy work" on the intern;
3. secure and analyze personal data about the intern and use it in a professional and confidential manner;
4. maintain objectivity if it becomes necessary to discuss with the intern inappropriate behavior on his/her part;
5. accept gracefully the standards of social and moral behavior which are expected of teachers by the community; and
6. objectively evaluate the advantages and disadvantages of teaching, but exhibit support of the profession;

# EXPLANATION OF FORMS FOR THE COOPERATING TEACHER

1. <u>Evaluation Instruments</u>

   This four-part form is to be completed by the intern's cooperating teacher. The cooperating teacher should send the white (original) and the goldenrod copies **immediately** upon completion of the evaluation to:

   > Director, Professional Internship Program
   > College of Education
   > Troy University Dothan
   > Post Office Box 8368
   > Dothan, AL  36304-0368

   The yellow copy is given to the intern and the cooperating teacher keeps the pink copy.

2. <u>Report of Attendance for the Intern (page 34)</u>

   The intern will complete the Attendance form daily. The completed form signed by the intern and cooperating teacher, will be turned in at the Close of Internship Meeting by the intern. The intern is required to be present in the assigned classroom a minimum of 14 consecutive weeks (70 school days and 485 clock hours) *UNLESS* the intern has an Alabama State Department of Education letter authorizing otherwise.

3. <u>Evaluation of University Supervisor</u> (page 40)

   This form is to be completed by the cooperating teacher and returned to the office of the Director of the Professional Internship Program by the end of the semester. The university supervisor has the privilege to review the evaluation by the cooperating teacher. The Director of the Professional Internship Program reviews this evaluation and addresses noted problems or concerns with the university supervisor.

*NOTE:  The university supervisors and the interns evaluate the cooperating teachers each semester. These evaluations are available to the cooperating teachers upon request.*

# Evaluation of Interns by Cooperating Teachers and University Supervisors

## Explanation of Coding

Intern evaluation forms will use the following coding scale.

(5)   **Excellent, consistent performance**  -
<u>Explanation</u>:  The intern's performance on the competency indicators is excellent. The intern is consistently effective in the completion of the item.  The observer has gathered evidence through observation, interview, and a review of paperwork connected with the lesson.

(4)   **Above average performance**
<u>Explanation</u>:  The intern's performance often exceeds expectations for a pre-service teacher's performance on the competency being evaluated.  The skills present are appropriate for the classroom situation as observed.

(3)   **Average Performance**
<u>Explanation</u>:  The intern's performance exceeds minimal performance standards but does not meet the overall expectations for above average.

(2)   **Minimally acceptable performance**
<u>Explanation</u>:  The intern's performance meets the lowest level of expectations. The intern does not demonstrate adequate consistency in the skills being evaluated.  An intern receiving this rating will be required to meet the evaluator's requirements for the next evaluation or the item will receive a (1) rating.

(1)   **Unsatisfactory performance**
<u>Explanation</u>:  The intern does not demonstrate the desired competency during the evaluation period.  The intern MUST improve performance on any indicator with a (1) rating or he/she will not satisfactorily complete the internship.

(NO)  **Not Observed**
<u>Explanation</u>:  The observer/evaluator did not see evidence of this competency due to the nature of the classroom situation or the learners.  This is not a negative rating; the omission of the competency is not seen by the evaluator as a deficiency.  Any deficiencies should be noted with the other codes on the scale.

Recommendations or requirements made by the university supervisor and/or the cooperating teacher must be employed in the classroom as soon as possible.  Failure to cooperate with school personnel or university personnel will result in the termination of the internship with a grade of F (Failure).