# EVIDENTIARY SUBMISSION (PART 8)

# TAB J



**1**

```
              IN THE U. S. DISTRICT COURT

         FOR THE MIDDLE DISTRICT OF ALABAMA

                   SOUTHERN DIVISION


    NANCY MILLER,

            PLAINTIFF,

    VS.              CASE NO.1:06-CV-940-WKW

    HOUSTON COUNTY BOARD
    OF EDUCATION, KENNETH
    LORD, RILEY JOE ANDREWS,
    TIM PITCHFORD, PAUL
    STRANGE, STACY EZELL,
    TROY UNIVERSITY, DOTHAN,
    SANDRA JONES, PAM PARRIS
    and GREG RUEDIGER,

            DEFENDANTS.


         The deposition of STACEY EZELL, taken

    by the Plaintiff, pursuant to the Federal

    Rules of Civil Procedure, before Stacey

    Watkins, RPR, and Notary Public, State at

    Large, at the offices of Hardwick, Hause,

    Segrest & Walding, Dothan, Alabama, on the

    27th day of September 2007, at 4:05 p.m.,

    CDT, pursuant to notice.
```

**3**

1    STIPULATION

2

3       It is stipulated by and between counsel

4    for the parties that this deposition be taken

5    at this time by Stacey Watkins, RPR, and

6    Notary Public, State at Large, who is to act

7    as commissioner without formal issuance of

8    commission to her; that said deposition shall

9    be taken down stenographically, transcribed,

10   and certified by the commissioner.  The

11   signature of the witness is waived.

12       Except for objections as to the form of

13   questions, no objections need be made at the

14   time of the taking of the deposition by

15   either party, but objections may be

16   interposed by either party at the time the

17   deposition is read into evidence, which

18   shall be ruled upon by the Court on the

19   trial of the cause upon the grounds of

20   objection then and there assigned.

21

22

23

24

25

**2**

APPEARANCES:

FOR THE PLAINTIFF:
MR. WINN FAULK
Attorney at Law
Montgomery, Alabama

MR. THOMAS K. BRANTLEY
Attorney at Law
Dothan, Alabama

FOR HOUSTON COUNTY BOARD OF EDUCATION,
KENNETH LORD, RILEY JOE ANDREWS AND
TIM PITCHFORD:

MR. KEVIN WALDING
MR. PATRICK B. MOODY
Attorneys at Law
Dothan, Alabama

FOR PAUL STRANGE AND STACEY EZELL:

MS. KATHERINE HORTBERG
Attorney at Law
Chelsea, Alabama

FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
PAM PARRIS AND GREG RUEDIGER:

MR. JOSEPH V. MUSSO
Attorney at Law
Birmingham, Alabama

ALSO PRESENT:

NANCY MILLER
KENNETH LORD

**4**

1        STACEY EZELL

2    having been first duly sworn, testified as

3    follows, to-wit:

4

5        EXAMINATION

6

7    BY MR. FAULK:

8       Q    State your name for us, please,

9    ma'am?

10      A    Full name?

11      Q    Yes, please.

12      A    Stacey Christine Ezell.

13      Q    And, Mrs. Ezell, you've been

14   present throughout the depositions up 'til

15   now, haven't you?

16      A    I have.

17      Q    And I know you have other matters

18   to attend to.  I want to be sure you

19   understand the situation.  But, on the other

20   hand, I don't want to just belabor the point.

21      From having attended other depositions,

22   you understand if you need a break or don't

23   understand something, you just need to let us

24   know.  If you want a glass of water or

25   whatever.  Okay?

5

1    A    Okay.

2    Q    It's not an endurance contest.  You
3    know, I'm not here to boss you around or
4    trick you or anything like that.  If you
5    don't understand what I say, or if it doesn't
6    make sense, tell me, and I'll try it again.
7    Okay?  Have you got any questions about that?

8    A    Not at this moment.

9         (Brief off-record.)

10    Q    This morning, we kind of went
11    through the complaint and answer with Mr.
12    Strange.  I need to do a little of that with
13    you, if we can find them.  And there's one of
14    them.

15         In number 9, I believe they alleged
16    insufficient knowledge as to who you were.
17    Do you admit that you're Stacey Ezell, an
18    adult resident citizen of Houston County,
19    Alabama?

20    A    I am.

21    Q    And do you admit that, at the time
22    Mrs. Miller was an intern at Houston County
23    High School, you were employed there as a
24    teacher?

25    A    I am.

6

1    Q    Do you have any personal knowledge
2    concerning the legal status of Mrs. Miller's
3    actual contract with the Houston County Board
4    of Education?  Is that something you know
5    anything about?

6    A    No, I do not.

7    Q    You've never even seen her
8    contract?

9    A    That wouldn't be in my field.

10    Q    Now, do you have any direct,
11    personal knowledge of any alleged
12    noncompliance issues that Mrs. Miller may or
13    may not have reported to Mr. Strange and
14    other people concerning the special ed
15    program?

16    A    Could you repeat that, please?
17    Restate it, please.

18    Q    I'm just trying to --

19    A    Sure.

20    Q    -- be as brief as possible.  In the
21    complaint, if you'll notice in paragraphs 17
22    -- namely 17, I guess, we allege sort of a
23    laundry list of things that, at the time I
24    drafted this, I understood were her
25    complaints.  They're not complaints so much

7

1    as expressions of concern about
2    irregularities or compliance issues at the
3    Houston County High School special education
4    program.

5         Now, do you have any personal knowledge
6    of Mrs. Miller having made complaints or
7    expressed concerns to other people, or to
8    you, for that matter, about asserted
9    deficiencies or noncompliance issues with the
10    Houston County High School special education
11    program?

12    A    I do not have any personal
13    knowledge of her complaints, nor did she ever
14    speak to me about any deficiencies in the
15    special ed program.

16    Q    Have other people told you that she
17    had complained to them or others about
18    specific issues that you recall having to do
19    with special ed?

20    A    No.

21    Q    So, any knowledge on that subject
22    that you have would be general, possibly
23    secondhand hearsay-type information?

24         MS. HORTBERG:  And as you've
25              already stated, she sat in on

8

1              your client's deposition and
2              other depositions.

3    Q    I'm talking about, you don't have
4    any personal knowledge about that?

5    A    I answered "no."

6    Q    All right.  Look at paragraph 19 of
7    the complaint, please, ma'am, and number 19
8    on the answer, as well, if you would, please.

9    A    Now, is this the form that was not
10    prepared -- this was prepared by the
11    attorneys?

12         MS. HORTBERG:  Uh-huh.

13    Q    Have you read both paragraphs 19 on
14    the complaint and answer now?

15    A    Yes.

16    Q    I'm going to show you or ask your
17    attorney to show you what was previously in
18    evidence as Defendant's Exhibit 18.

19         MR. FAULK:  Do you have that handy?

20         MS. HORTBERG:  I'm looking for it.

21         (Showing document to the
22              witness.)

23    Q    Do you recognize that document,
24    Mrs. Ezell?

25    A    I do.

9

Q    Is that your signature underneath the typed portion?

A    It is.

Q    Prior to signing it, did you read it?

A    I scanned over it.  I did.

Q    Did you type it?

A    No, I did not.

Q    Do you know who did type it?

A    I do not.

Q    Do you recall where you first saw it?

A    No, I don't.

Q    Do you recall the circumstances at all under which you saw it, as to anyone else being present, who brought it to you, anything like that?

A    I don't recall the circumstances of who brought it to me.  No.

Q    In signing your name, was it your intention to convey to third parties reading it that you, in fact, agreed with these nine assertions?

A    In signing my name, did I agree to those assertions?  That's your question?

10

Q    Was it your intention to convey to any reader, Pam Parris, Tim Pitchford, for example, that you, in fact, agreed with these nine assertions?

A    No.  That was not my intent.

Q    What was your intent, then, please?

A    To provide observations.

Q    Can you explain that to me?

A    To provide observations of Mrs. Miller's behavior.  And I can only really answer to three of those nine.

Q    Let's just run through them.

A    Sure.

Q    At the time you signed this, did you understand that it was going to Pam Parris at Troy University?

A    No.

Q    Do you see where it says, at the top of the thing --

A    I see that.

Q    -- directed to her?  Do you recall that not being there when you signed it?

A    It was three years ago.  I really don't recall.

Q    You say there are only three of the

11

nine that you have personal knowledge of?

A    Correct.

Q    Which of those?

A    Number 3.  And I can only speak for my personal experience.

Q    And that one reads, "Mrs. Miller has difficulty in communicating with faculty members."

A    Uh-huh.  Number 6.

Q    Okay.  Which reads, "Classroom teachers reported that Mrs. Miller has been upset and crying during class time."

A    And number 9.

Q    And number 9.  "Mrs. Miller told a classroom teacher, 'I don't like being here any more than you do, but I have to be here a certain number of hours.'  This is in response to the classroom teacher telling her that she could leave the room because the lesson was over.  Mrs. Miller said this in front of students in the class."  Did I read it correctly?  Close enough?

A    Close enough.

Q    Now, let's just go through each of these.  What is your basis, your personal

12

knowledge, for the assertion that Mrs. Miller had difficulty in communicating with faculty members?  Just tell me in detail, please, the basis for that statement?

A    Well, I guess the lesson plan issue between us.  You know.  There obviously was some miscommunication there about the lesson plans.

Q    Is that all?

A    That's all I can recall.

Q    Okay.  Explain to me, please, in detail, what you're talking about about the lesson plan thing.  I know Mr. Strange alluded to it.

A    Right.

Q    But, tell me your version of it, please?

A    Well, the first day that I met with Mrs. Miller, we -- how did that go?  We had a meeting in Mr. Stephens' office.  And she was telling me, with Mr. Strange present, that she needed lesson plans.  And I told her that wouldn't be a problem.  That she could pick up a copy in the office.  That's where we had to provide them every Monday morning.  And I

13

1  think I repeated myself twice during that
2  meeting.
3       And she also needed copies of my lecture
4  notes, which wasn't a problem for me, because
5  I had done that in years past with several of
6  my special ed students that I've taught over
7  the 15 years. And copies of my tests, which,
8  again, I've always provided for the previous
9  special ed teachers, as well as the keys to
10  the tests.
11      Q    Okay. And then, what happened?
12  How did it become an issue, once you had told
13  her to go to the office and get them?
14      A    I don't know.
15      Q    Well, help me. At some point,
16  apparently, did Mr. Pitchford or Mr. Strange
17  somehow get involved in this issue?
18      A    Yes.
19      Q    Tell me what you know about how
20  that came about and what became of it?
21      A    I would say mid September, early
22  September, I was called in to Mr. Pitchford's
23  office. And Mr. Strange was there. And he
24  asked me was I providing Nancy Miller with
25  the lesson plans. And I repeated to him what

14

1  I just told you, that I told her she could
2  pick up a copy of my lesson plans in the
3  office. And I was providing lecture notes
4  and tests and keys. You know. That was a
5  good four weeks into the nine weeks.
6       Q    So, there were some materials,
7  aside from the lesson plans, that you were
8  personally providing?
9       A    Uh-huh.
10      Q    And you had told her, "If you need
11  the lesson plans, you can go to the office
12  and get them"?
13      A    That's correct.
14      Q    And when you talked with -- was it
15  just Pitchford or Pitchford and Strange?
16      A    I want to say Mr. Strange was
17  there, but I can't be 100 percent certain.
18      Q    When you talked to them, was it
19  your impression that she was telling them
20  that she couldn't get any of these things?
21      A    It was --
22      Q    And by "things," I mean the three
23  type things you just mentioned.
24      A    It was my impression that she was
25  not receiving anything.

15

1       Q    That she was saying she was not
2  receiving anything?
3       A    That was my impression.
4       Q    Because if you were giving her the
5  notes and the keys and all that, you knew she
6  was getting those? Right?
7       A    Correct.
8       Q    But it was your impression she had
9  not been getting the lesson plans?
10      A    I assume, from the meeting.
11      Q    At the meeting -- and what I'm
12  tying to get at is what Pitchford told you
13  that Mrs. Miller had claimed. Was it your
14  understanding that she claimed she wasn't
15  getting any of these type materials or only
16  the lesson plans?
17      A    It was my impression that she was
18  not getting the lesson plans, specifically.
19      Q    That's your whole answer? I just
20  want to make sure I'm not cutting you off.
21      A    It is.
22      Q    Okay. Any other basis for your
23  statement that she had difficulty in
24  communicating with faculty members?
25      A    That was only my personal

16

1  experience with Mrs. Miller in regards to
2  number 3.
3       Q    Had you heard of other experiences
4  that she was having with difficulty in
5  communicating with other faculty members?
6       A    No.
7       Q    No one else had come to you and
8  said, "God, you know, I really can't
9  communicate with this Miller woman"?
10      A    I don't recall.
11      Q    Let's see. What was the next one?
12  6?
13      A    Uh-huh.
14      Q    About crying in the classroom.
15  Tell me about that?
16      A    You know, I believe that was
17  towards the -- right before she was released
18  from her internship. She was obviously
19  stressed, and she was in front of my desk.
20  And I guess I asked her what was wrong. And
21  she told me there were problems with the
22  internship. And she got teary-eyed, said she
23  may not be able to ever teach. And that was
24  basically the gist of it.
25      Q    The third one was number 9?

17

1    A    Yes.

2    Q    Okay.  About, I don't want to be

3    here any more than you do, or words to that

4    effect.  What do you know about that?

5    A    That was during fourth block,

6    biology.  I gave the kids a break, which, in

7    my classroom, doesn't happen very often.  I

8    told them we were going to go off task the

9    remainder of the block, and they could have

10   essentially free time, which, you know,

11   basically is all that was.

12       And I stated to Mrs. Miller that if she

13   had some other things she needed to do, that

14   we were done.  And that's the response that I

15   received, that's written on the report.

16   Q    What was the reason for -- what

17   were your words?  Going off task?

18   A    Yes.  Going off task means, in the

19   classroom -- in my classroom, children should

20   always be on task, whether I'm giving lecture

21   notes or if they have an assignment or if

22   they're reading over their notes.  And we

23   were going off task, meaning we were done,

24   and I was going to give them some free time

25   to do what --

18

1    Q    Okay.  So, y'all had just

2    accomplished all that you intended to

3    accomplish during that class?

4    A    Right.

5    Q    And they were going to have a

6    little free time?

7    A    And I believe it was a Friday.

8    Yeah.

9    Q    Now, you say you don't know who

10   typed it or whose PC was used?  Right?

11   A    No, I don't.

12   Q    You don't remember who gave it to

13   you to sign?

14   A    No, I don't.

15   Q    Assuming nobody out there is

16   clairvoyant, do you know how the person who

17   did type it would have known to type in three

18   things that you knew about?

19   A    No.  I don't recall.

20   Q    Had you made earlier reports of

21   these three things to somebody that the

22   author could have gotten them from?

23   A    I really don't recall how this

24   letter evolved.

25   Q    Do you remember ever telling

19

1    anyone, prior to signing this letter, about

2    number 3, number 6 or number 9?

3    A    No.  I don't recall.

4    Q    And you can't tell us how in the

5    world the typist could have gotten that

6    information?

7    A    No.

8    Q    Were any of those events witnessed

9    by anyone else, other than perhaps the -- I

10   mean, by any other faculty member, other than

11   number 3, about the lesson plans?

12   A    Students.

13   Q    Okay.  So, you don't know.  Did you

14   understand that this document, Defendant's

15   Exhibit 18, would likely be used to undermine

16   her internship?

17       MR. WALDING:  Object to the form.

18       MS. HORTBERG:  Object to the form.

19   Q    Did you have any idea that this

20   could be used to hurt her?

21       MS. HORTBERG:  Object to the form.

22   A    No.

23   Q    What did you think it was for?

24   A    As I said earlier, I don't recall.

25   Q    Have you ever been involved in any

20

1    court proceedings at all?

2    A    No, I haven't.

3    Q    Did you witness the final departure

4    of Mrs. Miller from your school?

5    A    I was at Kirklin Clinic, in

6    Birmingham, the day she was -- the day she

7    was released.

8    Q    Bear in mind, of course, I'm a man,

9    and I don't understand a lot of things in

10   life.  And I don't mean to be insensitive or

11   anything like that.  I saw in your

12   interrogatories your reference to the Kirklin

13   Clinic.

14   A    Uh-huh.

15   Q    During this time frame here from

16   August through September and halfway into

17   October, were you taking any kind of

18   medications that, so far as you know, could

19   have influenced your behavior toward other

20   people?  And I'm talking about adversely

21   influenced.  And that may sound silly to you,

22   and I'm sorry if it does.  But I'm just

23   ignorant of these things.

24   A    No.  No.  No.  No.  You know, I was

25   taking hormone shots.  We were -- and this

21

1  was very common knowledge.  I talked about it
2  in biology, because it's a part of biology.
3  We were trying to get pregnant, and I was
4  giving myself fertility shots.  I can't tell
5  you the name of the hormones, but I can get
6  it from Kirklin Clinic, if you need it.
7      Q    Maybe you could get it to your
8  lawyer and let her decide whether I'm
9  entitled to it.  Okay?
10     A    Okay.  If that's what you need.
11     Q    And I'm not going to go on about
12  that.
13     A    That's fine.
14     Q    But I just felt like I had to ask.
15  You've heard, I'm sure, during Mrs. Miller's
16  depositions, as well as Mr. Strange's, that
17  there is a contention that Mrs. Miller
18  overheard you making statements in the
19  presence of students that she considered to
20  be potentially embarrassing to the students
21  or ridiculing the students, that type of
22  thing.
23         Now, whether you agree with it or not,
24  do you remember that general line of
25  testimony?

22

1      A    I --
2      Q    Just the fact that things about
3  that have been said?
4         MS. HORTBERG:  And to clarify your
5             question, that was testimony by
6             your client.  That was not
7             testimony by Paul Strange, that
8             he had --
9         MR. FAULK:  Okay.  Well, whether
10            Mr. Strange admits it or not, I
11            was asking him questions about
12            it.
13     Q    But you know the general line of
14  testimony I'm talking about?
15     A    You're asking me if I recall that
16  line of testimony?
17     Q    In the testimony.  I'm not asking
18  you to admit it, that it, in fact, happened.
19  I'm just trying to get us on the same page.
20  And I may do that from time to time during
21  your deposition.
22     A    All right.
23     Q    Do you remember this kind of
24  testimony, and, if you do, let's talk about
25  it.  Okay?

23

1      A    Okay.  And I was asking you if you
2  were asking me if I recall that line of
3  testimony.
4      Q    Yes.  That's what --
5      A    I recall that line of testimony.
6  Yes.
7      Q    All right.  Now, in that regard,
8  what is your testimony concerning those
9  allegations by her that you made
10 embarrassing, humiliating statements to your
11 students in class?
12     A    That's not true.
13     Q    Okay.  Now, realizing that, to some
14 extent, that could be a matter of opinion,
15 did you ever comment in a less than
16 flattering way about any student's hairdo?
17     A    No.
18     Q    Or any student's clothing?
19     A    No.
20     Q    Or any student's weight?
21     A    No.
22     Q    Or any student's apparent learning
23 ability?
24     A    No.
25     Q    Or difficulty, for that matter?

24

1      A    No.
2      Q    And so, if Mrs. Miller says you
3  did, she's either lying or grossly mistaken?
4  Is that fair to say?
5         MR. WALDING:  Object to the form.
6         MS. HORTBERG:  Same objection.
7      A    I think that's her opinion.
8         MR. WALDING:  She can just be
9             mistaken.
10        MR. FAULK:  Not just grossly
11            mistaken?
12        MR. WALDING:  I objected to your
13            form.
14     Q    Let me ask you this, Mrs. Ezell:
15 At the time you signed Defendant's Exhibit 18
16 that we talked about a minute ago, were you
17 aware that Mrs. Miller had said that sort of
18 thing to other people, about your making
19 embarrassing statements in front of your
20 children?
21     A    You know, let me be frank.  That
22 was three years ago.  And there was a lot
23 more going on in my world than what was going
24 on at school.  And I don't recall that.  All
25 I recall is a lot of trips to Kirklin Clinic.

25

1  Q    Do you have any particular training
2  in either the civil rights law or school law?
3  A    No.
4  Q    Do you have any specific knowledge
5  of what Mrs. Miller's official duties were in
6  connection with her job at your school?
7  A    Could you restate that, please?
8  Q    Do you have any specific knowledge
9  of what Mrs. Miller's official duties were
10 while working at your school?
11 A    No.
12 Q    Have you ever seen a written job
13 description for Mrs. Miller?
14 A    No. I'm not in administration.
15 Q    Have you ever had other special ed
16 interns come into your class over the years?
17 A    Interns --
18 Q    Right.
19 A    -- or teachers?
20 Q    No. Interns.
21 A    I've had -- not an intern, no.
22 Q    Have you been given any explanation
23 by any administrator, starting with Mr.
24 Pitchford, on up, with the Houston County
25 Board of Education, as to the true reason for

26

1  the termination of Mrs. Miller's employment?
2  A    No.
3  Q    Have you been given any explanation
4  by anyone in an administrative capacity
5  that's a basis for the withdrawal of her
6  internship?
7  A    No.
8  Q    Do you have any personal experience
9  or recollection of teachers in this school
10 system ever working on any type of
11 provisional or emergency certificates?
12     MS. HORTBERG: I'm sorry. Working
13         on or working under?
14     Ms. FAULK: Well, whatever.
15         However you work with a
16         certificate. I don't know if
17         you're under or on it.
18 A    Provisional?
19 Q    Well, you're a certified teacher?
20 A    I am.
21 Q    And it's a regular certificate, I
22 assume?
23 A    It is.
24 Q    And do you understand there may be
25 other types of emergency certificates or some

27

1  type of provisional certificate issued from
2  time to time? Is that anything you know
3  anything about?
4  A    I don't know anything about that.
5  Q    All right. Who is Amy Christine
6  Ezell?
7  A    That's my daughter.
8  Q    It says, "Resides with her
9  parents." Is that you and your husband?
10 A    It is.
11 Q    And who is William G. Ezell?
12 A    My husband's son from his first
13 marriage.
14 Q    What age is he, approximately?
15 A    He'll be 11 in a couple of weeks.
16 Q    Do you have any relatives in
17 Barbour County?
18 A    No.
19 Q    Just out of curiosity. They're
20 nice people, by the way. You don't have to
21 be nervous about answering. What was your
22 connection with Scott Stephens? Was he your
23 assistant principal? Was that the
24 relationship?
25     A    Scott was the assistant principal

28

1  at that time.
2  Q    Is he in your line of supervision
3  today?
4  A    He is our principal today.
5  Q    Okay. Do you know what your
6  approximate GPA in college was?
7  A    You know, that was a long time ago.
8  A lot of beers and pizza ago.
9  Q    Did you receive any particular
10 honors or distinction upon completion of any
11 of these degrees listed in your interrogatory
12 answers?
13 A    I think I was inducted into the
14 honor society at Troy, my master's program,
15 if I'm not mistaken.
16 Q    It's your chance to brag on
17 yourself.
18 A    I guess.
19 Q    Have you discussed this case at all
20 with Lisa Towns?
21 A    Is that your question?
22 Q    Yes.
23 A    No.
24 Q    In your interrogatory answers, you
25 say that she, among others, to the best of

29

1 your knowledge, have some knowledge regarding
2 the plaintiff. Can you tell us, in a general
3 way, what your basis is for saying that about
4 Ms. Towns? I'm referring to your response to
5 interrogatory number 9.
6    A    Just what I have read in all these
7 papers and hearsay.
8    Q    Has Ms. Towns ever informed you of
9 anything concerning Mrs. Miller's performance
10 at your school that, in your judgment,
11 reflects adversely on Mrs. Miller?
12    A    Could you restate that, please?
13    Q    Has Ms. Towns, Lisa Towns, ever
14 stated anything to you about Mrs. Miller
15 that, in your judgment, reflects adversely on
16 Mrs. Miller's performance at your school?
17    A    No.
18    Q    Has Ms. Towns intimated to you in
19 any way that she knows the true basis for the
20 withdrawal of Mrs. Miller's internship or the
21 termination of her employment?
22    A    No.
23    Q    Let me ask you the same question
24 about Melissa Sims. First, who is she?
25    A    She is the English teacher at work

30

1 -- at school, Houston County High School.
2    Q    Let me ask you the same questions I
3 asked you about Ms. Towns. Has Ms. Sims ever
4 intimated to you that she has some knowledge
5 of the basis for Mrs. Miller's loss of her
6 internship and the loss of employment?
7    A    No.
8    Q    Has Ms. Sims ever informed you of
9 any facts concerning Mrs. Miller's
10 performance at the school that you would
11 consider to be, you know, adverse, that would
12 adversely reflect on Mrs. Miller's
13 performance?
14    A    No.
15    Q    Have you discussed any of those
16 same subjects with Mr. Pitchford?
17    A    No.
18    Q    Mr. Strange?
19    A    No.
20    Q    Who are Louie and Carolyn Ezell?
21    A    My in-laws.
22    Q    Sherry Breckenridge?
23    A    Sherry Breckenridge? That's my
24 mother.
25    Q    Mike?

31

1    A    Breckenridge? My baby brother.
2    Q    Let me just run through these.
3 Where is William Ezell employed?
4    A    My husband?
5    Q    Right.
6    A    He works for CLM at Fort Rucker.
7    Q    Louie Ezell, is he currently in the
8 work force?
9    A    No. He's a retired educator.
10    Q    From what system?
11    A    Houston County.
12    Q    And Carolyn Ezell?
13    A    The same.
14    Q    Larry Breckenridge?
15    A    My father.
16    Q    And status?
17    A    He's self-employed.
18    Q    Doing what?
19    A    Industrial contractor.
20    Q    Does he have a d/b/a that he does
21 business as, other than his own name?
22    A    A who?
23    Q    I'm sorry. In other words, a lot
24 of time, people don't have a corporation or a
25 partnership, but it might be Winn Faulk doing

32

1 business as Hotshot Concrete Pourers or
2 something.
3    A    I have no clue.
4    Q    So, he doesn't have a trade name
5 that you're aware of --
6    A    No.
7    Q    -- that he does business? Okay.
8 And your mother, is she employed?
9    A    No.
10    Q    Has she been employed in the last
11 ten years?
12    A    No.
13    Q    And your brother, Mike?
14    A    Yes.
15    Q    Whereabouts?
16    A    He works for my father.
17    Q    Is he married?
18    A    No.
19    Q    Larry Breckenridge, Jr.?
20    A    Is my brother.
21    Q    And does he work?
22    A    For my father.
23    Q    And Hilda Smith?
24    A    My grandmother.
25    Q    Is she still in the work force?

33

1    A    She's retired.
2    Q    From where?
3    A    The University of -- Eastern
4    Washington University.
5    Q    Does she live around here?
6    A    She does now.
7    Q    Who are Beth and Brad Kirkland?
8    A    First cousin and husband.
9    Q    And where do they work?
10   A    You know, at the moment, I couldn't
11   tell you.
12   Q    What county do they live in?
13   A    Houston.
14   Q    And John and Jean Smith?
15   A    Aunt and uncle.
16   Q    Are they in the work force?
17   A    They are.
18   Q    Whereabouts?
19   A    Lowe's and Circle Pharmacy, I
20   believe it is.
21   Q    The ladies at the pharmacy?
22   A    Yes, she is.
23   Q    And James and Sarah Moorer?
24   A    That's Bill's aunt and uncle.
25   Q    And are they still in the work

34

1    force?
2    A    They're retired.
3    Q    And do you know from where?
4    A    Not right off, no.
5    Q    And Stanley and Linda Park?
6    A    That's Bill's aunt and uncle.
7    Q    And can you tell me about their
8    employment status or retirement status?
9    A    I really don't know.
10   Q    Other than the lecture notes and
11   lesson plans and tests and test keys that
12   we've already discussed, were there any other
13   materials and support that you provided Mrs.
14   Miller with that you're referring to in your
15   answer to interrogatory number 22?
16   A    I may have provided her with a
17   teacher's edition of the biology book. I
18   can't say that for a fact. I want to say
19   that she asked for one, and I want to say
20   that I gave her one. But I can't be 100
21   percent certain.
22   Q    Do you recall the general testimony
23   while ago by Mr. Strange about some biology
24   books that he referred to as AGS books, that
25   apparently are somehow considered useful for

35

1    special ed students?
2    A    No, not really.
3    Q    You're not even familiar with the
4    books?
5    A    I think I've seen them before.
6    Q    Do you recall any incident such as
7    that he discussed involving your students,
8    where Mrs. Miller was to take them out of
9    class and teach them biology with other
10   materials?
11   A    I really don't recall.
12   Q    Do you recall any move or effort by
13   Mrs. Miller to actually teach your class two
14   and three days a week, as described by Mr.
15   Strange?
16   A    That was never brought to my
17   attention. It was never requested.
18   Q    As a general education teacher, did
19   you receive any kind of specific training
20   with regard to implementing special education
21   IEP's in your classroom?
22   A    Well, I mean, we have periodic
23   workshops where they keep us abreast of
24   special education law, and they have people
25   come in and talk to us. So, yes. If you can

36

1    refer to that as training, yes.
2    Q    The Houston County School System
3    does that?
4    A    They do.
5    Q    Is there any other source of it
6    that you would regularly have attended? And
7    by "regularly," I mean when it was offered,
8    whether once a year or twice a year or
9    anything.
10   A    I believe I've attended a few
11   workshops.
12   Q    Would that be reflected in your
13   personnel file? Do you know?
14   A    I guess. I'm not really sure, to
15   be honest.
16   Q    Was there ever any time, while Mrs.
17   Miller was at your school as an intern, that
18   you ever requested of anyone in authority
19   that no special ed teacher be sent to your
20   classroom?
21   A    No.
22   Q    Was there ever any time that you
23   requested of anyone in authority that special
24   ed students not be sent to your classroom?
25   A    No.

37

Q    You've heard, I guess, my efforts
to understand what full inclusion means.  Can
you tell me what that term means to you,
please?
A    To me, would mean that the students
with learning disabilities are to be in the
classroom, in a regular classroom, in a
regular classroom setting, with the special
ed teacher there to aid in any problem they
may have, whether it might be lecture notes
or what have you.
Q    And were there students who were
subject to inclusion in your classroom who
were special ed students?
MS. HORTBERG:  Object to the form.
Are you talking about during
the time period that Mrs.
Miller --
MR. FAULK:  Right.  Yeah.
A    Could you restate that?
Q    You did have some special ed
students in your biology or science classroom
of some sort while Mrs. Miller was at the
school, didn't you?
A    I'm sure I did.  I do every year.

38

Q    Do you recall there being some type
of change with regard to inclusion in the
Houston County system between, like, 2003,
2004, in that period of time?
A    A change?
Q    Right.  Toward -- I guess you would
say fuller inclusion?
A    You mean a move from the resource
room to the classroom setting?
Q    Right.
A    I guess that would be about the
correct time frame.
Q    And how did you feel about that?
A    That was fine with me.
Q    You didn't have any objections to
that?
A    No.
Q    Did it make your job more difficult
in any way?
A    No.
Q    In your view, did that change or
interfere in any material way with the
education that your general education
students were receiving?
A    Could you restate that, please?

39

Q    The idea of additional special ed
students coming into your class, in your
view, did that in any way impede the
education of your other students or interfere
with it?
A    In my opinion, no.
Q    Did you ever discuss that sort of
thing with Mrs. Miller?
A    No.  That I recall, no.
Q    Have you been made aware of any
allegations concerning so-called dissension
among faculty members that was caused by Mrs.
Miller somehow?
A    No.
Q    I frankly think dissension may be a
bad word.  Have you ever heard of any
disruption in your school that was attributed
to Mrs. Miller?
A    Not that I recall.
Q    Have you ever participated in an
IEP meeting yourself?
A    As a general education teacher,
yes, on several occasions.
Q    Does that include assisting in
drafting the IEP's?

40

A    No.
Q    Do you happen to know whether it's
appropriate for a person to sign an IEP who
did not attend a meeting, if you know?
A    I can't speak to that, because
that's not my field of knowledge.
Q    Have you ever been asked to sign an
IEP at Houston County High School where you
did not attend the meeting that preceded the
preparation of the IEP document?
A    No, I haven't.
Q    Do you recall hearing that Mrs.
Miller had, one day in late September, left
school and gone to the central office for
some reason?
A    Yes.  I recall briefly.  I think it
was a Friday.
Q    Do you recall the event, or do you
recall somebody telling you about it later?
A    I just had heard about it.
Q    Can you tell us how, if at all, her
behavior in connection with that event, the
fact that she left school -- can you tell us
specifically any way in which her behavior
adversely affected your ability to teach?

41

1    A    Not off the top of -- restate that,
2  please.
3    Q    Well, did her leaving school and
4  going to the central office adversely affect
5  your classroom environment in any material
6  way?
7    A    Other than the special ed teachers
8  -- the special ed students didn't have
9  someone to help them with lecture notes that
10  day or tests or quizzes that I may have been
11  giving that day. That's the only way I can
12  think of. It didn't adversely affect me, but
13  it probably adversely affected students that
14  needed her assistance.
15    Q    All right. If her absence was
16  during one of your classes where she had
17  special ed students?
18    A    Yeah. If it was during that time.
19  Yes.
20    Q    Did she, herself, have special ed
21  students in every one of your classes?
22         MS. HORTBERG: Object to the form.
23    A    I really don't recall.
24    Q    But you recall there was more than
25  one special ed teacher at the school? Right?

42

1    A    Uh-huh.
2    Q    Paul Strange and Paul Payne?
3    A    Uh-huh.
4    Q    And Mrs. Miller. Was there anybody
5  else?
6    A    I believe it was only three.
7    Q    Did you ever give Mrs. Miller any
8  advice, as such, concerning her job
9  performance?
10    A    No.
11         (Brief off-record.)
12    Q    Do you recall, while Mrs. Miller
13  was at your school, having to make any
14  particular accommodations for special ed
15  students included in your class? And, if so,
16  what sorts of things would you have to do in
17  order to include a special ed child in your
18  class?
19    A    Could you restate that question,
20  please?
21    Q    Probably not, but I'll try.
22    A    It's late in the day.
23    Q    In other words, if you were having
24  -- and I realize there are different degrees
25  of special education eligibility.

43

1    A    Yes.
2    Q    Some students, apparently, is it
3  correct, with a learning disability, may be
4  fully capable of learning with a little extra
5  help, and if they're severely retarded, maybe
6  not. Is that your experience in general?
7    A    You have students with different
8  learning ability -- different learning
9  disabilities, I should say. And it would all
10  depend on their IEP.
11    Q    Would you agree with me that, since
12  that's not your field of expertise, if that
13  child did not have a current IEP, you might
14  or might not be making the right
15  accommodations for that child in your
16  classroom?
17         MS. HORTBERG: Object to the form.
18    A    Restate that question.
19    Q    How would you know what
20  accommodations to make for a particular child
21  if he did not have a current IEP?
22    A    I would be reliant on the special
23  ed teacher.
24    Q    There's been testimony about a
25  conversation you allegedly had with Mrs.

44

1  Miller in which you had commented that Sandra
2  Jones and you were old friends. Do you
3  recall such a conversation having taken place
4  or such a comment being made by you?
5    A    I never made that comment. Sandra
6  Jones was my advisor during my master's
7  degree program, and I think I had a class --
8  I can't be 100 percent sure about that. That
9  was a long time ago. But, as far as friends,
10  no. She was my academic advisor.
11         And the only reason that even came up
12  was because Mrs. Miller told me that Sandy
13  Jones was her academic advisor, if I recall
14  correctly. And I stated that she was my
15  advisor during my master's degree program.
16    Q    And that would be at Troy-Dothan,
17  from '93 to '95?
18    A    That's correct.
19    Q    And had you stayed in touch with
20  Dr. Jones over the years?
21    A    No.
22    Q    Has she ever been to your house for
23  dinner?
24    A    No.
25    Q    Or you to her house?

45

1   A    No.

2   Q    Did Mr. Pitchford ever ask you, in

3   substance, to be more cooperative with Mrs.

4   Miller?

5   A    What do you mean, in substance?

6   Q    Well, maybe not in so many words,

7   but in words to that effect?

8   A    Yes.  He called me in for the

9   meeting that I had -- we talked about

10  earlier, to provide her with lesson plans.

11  And I explained to him that I had told her at

12  the first meeting we had that she could get a

13  copy of my lesson plans in the office.  And

14  that's how she -- after that meeting, I

15  believe she started going to the office to

16  get a copy of my lesson plans.

17  Q    Was there any time in which you

18  said to Mrs. Miller, in substance, "I hear

19  that you could fail your internship"?

20  A    No.

21  Q    Did you ever hear rumors to that

22  effect prior to the withdrawal of her

23  internship?

24  A    No.

25  Q    So, you never said that to her, and

46

1   nobody ever said that to you?

2   A    No.

3   Q    Do you recall asking her something

4   about, why was Pitchford keeping track of

5   her?

6   A    No.

7   Q    Do you recall having to sign off on

8   a log for her when she would come to your

9   class?

10  A    Not that I recall.

11  Q    The question was asked during one

12  of Mrs. Miller's depositions, I think by your

13  attorney, had she ever made the statement to

14  anyone to the effect that she planned to take

15  down Houston County High School.  Has she

16  ever said that in your presence?

17  A    Not in my presence, no.

18  Q    Has anyone ever told you that she

19  had said that?

20  A    Yes.

21  Q    And who told you that, please?

22  A    Amy McNeal.

23  Q    Who is Mrs. McNeal?

24  A    An English teacher at Houston

25  County High School.

47

1   Q    Spell McNeal for me?

2   A    Oh, gosh.

3   Q    Is it N-i-e-l or N-e-a-l?

4   A    I couldn't spell my own name at

5   this point.  I really don't know.

6   Q    Approximately when did Mrs. McNeal

7   tell you that?

8   A    It's probably been a good year,

9   maybe a year and a half ago.  I really don't

10  -- I know it's been -- it's probably been

11  about a year, year and a half ago.

12  Q    Do you know whether it was before

13  or after you were served with papers in this

14  lawsuit?

15  A    It was before.

16  Q    In the notice of your deposition,

17  we had a request for production of any and

18  all documents or tangible things that you

19  consider relevant to a fair understanding of

20  your testimony.

21      Are you aware of any documents, the

22  existence of any documents, that you have

23  access to, that you have not already produced

24  to your attorney, that have something to do

25  with this case?

48

1   A    No.  I'm not aware of any

2   documents.

3   Q    And you didn't bring any with you?

4   A    No, I did not.

5       (Brief off-record.)

6   Q    Take a look, please, at what's been

7   marked as Defendant's Exhibit 31.  I'm also

8   giving you Defendant's Exhibit 12.  And I'll

9   ask you, please, to just look over both those

10  and tell me when you've had a chance to

11  review them.

12  A    Okay.  (Witness reviewing

13  documents.)  Yes, I'm familiar with these.

14  Q    You see they're both dated

15  September the 11th?

16  A    Yes.

17  Q    Now, admittedly, that's some pretty

18  strong talk.

19  A    Yeah.  Pretty well besmirches my

20  name, doesn't it?

21  Q    Now, when is the first time you can

22  remember it coming to your attention that

23  Mrs. Miller was saying this type thing about

24  you?

25  A    When I first read this.

Q    And when would that be?

A    Last fall, after the lawsuit was filed.

Q    Your testimony is you really did not know that she had said this sort of thing about you to other people?

A    No, I was not aware. As I said earlier -- I don't know how to put this, other than, you know, my focus during that time was not so much work as it was the infertility issues that my husband and I were having. And that's where my mind was at. But this is pretty damning to my name. I can tell you that.

Q    At the time Mrs. Miller left the school, was it your impression that you and she had a good relationship, a good professional relationship?

A    You mean that Friday she left? What are you talking about?

Q    No. When she left for good. By the time she left for good, what was your opinion of the state of your relationship with Mrs. Miller?

A    I didn't have one.

Q    Didn't have an opinion or didn't have a relationship?

A    Didn't have an opinion.

Q    Would you agree with me that the three items on Defendant's Exhibit 18 that you contributed are not flattering accusations, if you will? It's getting late for me, too.

MS. HORTBERG: Object to the form.

Q    Do you want to take a look at it?

A    Oh, I know --

Q    I mean, these are adverse comments, aren't they?

MS. HORTBERG: Object to the form.

Q    It's okay. You can answer.

A    It's simply my observations.

Q    But they're not intended to promote her career, are they?

MS. HORTBERG: Object to the form.

A    Simply my opinions.

Q    You don't have an opinion as to whether these comments are good for her career or bad for her career?

A    I don't think I'm in a place to judge that. I'm not in administration.

Q    At the time you contributed to Defendant's 18, you didn't have any personal reason to feel badly toward Mrs. Miller? You were just making professional observations --

A    That is correct.

Q    -- that you considered to be truthful and objective?

A    That is correct.

Q    If you would, please, look at Defendant's Exhibit 13.

(Ms. Hortberg reviewing documents.)

Q    While she's looking for Defendant's Exhibit 13, let me ask you this: Did anyone else, other than whoever asked for your information on Defendant's Exhibit 18, contact you or solicit information from you concerning Mrs. Miller's performance?

A    Did anyone else contact me about what, now?

Q    And solicit information from you concerning Mrs. Miller's performance.

A    No.

Q    You've got Defendant's 13 there. If you would, please, ma'am, read the first paragraph there, and let me know when you've

finished.

A    (Witness reviewing document.) Yes. I've read the first paragraph.

Q    Does that appear to be referring to the meeting that Mr. Pitchford had with you about the lesson plans and so forth that you talked about earlier?

A    Yes.

Q    Take a look, please, ma'am, at Defendant's Exhibit 30. Take a moment, please, and just read down through that document. Have you seen it before today?

A    Yes.

Q    Did you see it prior to the litigation?

A    No.

Q    Look over it for just a minute, and tell me when you're satisfied you can talk about it.

A    (Witness reviewing document.) Okay.

Q    There's certain information that appears, on the face of it, to be attributed to Tim Pitchford. Let's just take them one at a time. Unprofessional behavior. Do you

53

have any knowledge of that sort of thing on Mrs. Miller's part that you've not already testified to today?

A No, I don't.

Q Causing anxiety among teachers. Would you be one of the three teachers who had met with him expressing concerns?

A No, I was not.

Q Do you know who they were?

A No, I do not.

Q Do you know anything about that subject?

A No, I do not.

Q Not following directions of the cooperating teacher. Would you have any reason to know about that?

A No, I do not.

Q And you say you do know about the crying in the classroom?

A Only because it happened in my classroom.

Q Did she ever tell you that Mr. Strange was out to get her or anything to that effect?

A No.

54

Q Did she ever make any statements to you about Mr. Strange that you considered to reflect adversely on Mr. Strange?

A No.

Q Did she ever display extreme disrespect for anyone else in your presence?

A No, that I can -- no.

Q Other than as might be reflected by your comments on Defendant's Exhibit 18, was she cooperative with you in your classroom?

A In the classroom and cooperative? Yeah. I thought we cooperated pretty well together in the classroom. It seemed to be the difficulty was the lesson plans.

Q Tell me a little more about that.

A The lesson plans?

Q Her saying she didn't have them or what?

A That I wasn't providing them. But there were copies in the office, as I stated earlier.

Q Okay. So, there wasn't any other problem having to do with the lesson plans, other than what you've already told me?

A As far as I know, there was no

55

other problem.

Q There's a statement here, "Difficulties collaborating with regular education." So, other than the thing about the lesson plans, so far as you were concerned, y'all didn't have any difficulty collaborating with each other?

A In the classroom, it seemed to be fine.

Q Well, I just have to ask. I mean, was there some interaction between y'all outside the classroom?

A Not that I recall.

Q Or outside the school environment?

A No.

Q Did you ever ask anyone what was wrong with Mrs. Miller?

A No.

Q Did you ever feel like y'all were having -- that she came across as overbearing or had a clash of personalities with you?

A I would agree with that.

Q Okay. Tell us about that, please. What's your basis for that?

A Just the lesson plans in general.

56

I didn't know there was a problem until a month later. You know. She never once approached me and said, "Hey, I need your lesson plans." I had told her previously in the meeting, twice, in the beginning, this is where they would be at. And then, next thing I know, I'm having a meeting with my principal because, supposedly, I'm not providing her with materials a month into the grading period.

Q Did she appear nervous to you at times, other than the one incident you told us about?

A Not that I recall.

Q You had nothing to do with the observations of her by Dr. Ruediger or Mr. Strange, did you?

A No.

Q Did either of those take place in your classroom?

A No.

Q Take a look, if you would, please, at -- I can't read the document number. Do you have that one?

A (Witness reviewing document.)

57

Q    And in particular -- I realize this
is a long document, and a lot of it doesn't
have anything to do with the school room.
Let me call your attention to the second
paragraph, about halfway down, where it says,
"However, I'm going to vent."  Do you see
that?

A    Uh-huh.

Q    Start reading there, please, ma'am,
and tell me when you get to the end of the
paragraph.

A    (Witness reviewing document.)
Okay.

Q    Again, is it your testimony that
you deny having engaged in the type conduct
alleged in those couple of sentences?

A    That is correct.

Q    Okay.  Assuming her statement to be
true, that she and Paul Strange had discussed
it, is there any basis, to your knowledge,
that Mr. Strange would have had for thinking
that you were engaging in that type of
behavior?

MS. HORTBERG:  Object to the form.

MR. WALDING:  Object to the form.

58

MR. FAULK:  Fine.

Q    The answer is "no," I take it?

A    No.

Q    Other than the thing here in
Defendant's Exhibit 18, was there any sort of
routine document that you would have filed
regularly or periodically concerning an
intern's dealings with you in the classroom,
as to how she was doing and that type thing?

A    No.

Q    Do you remember, Mrs. Ezell,
whether Plaintiff's Exhibit 18 was signed
before or after Mrs. Miller had made her trip
to the central office?

A    I don't recall.

Q    You see there in number 1 -- do you
see it says she left the campus without
informing administrative personnel?

A    Uh-huh.

Q    Are you aware of more than one such
absence from the campus by Mrs. Miller?

A    I really can't speak to that.

(Recess in deposition.)

Q    Let me back up.  And your lawyer
will probably start screaming.  But I just

59

want to make sure I've got your correct
testimony on these things.  When I showed you
Defendant's Exhibit 31, that attributes
certain behaviors to you, and Defendant's
Exhibit 12, second paragraph, which
attributes some behaviors to you -- and I
want to say there was another one somewhere.

MS. HORTBERG:  This one that's
sitting right here on top?

MR. FAULK:  What exhibit is that?

MS. HORTBERG:  I have no idea.

Q    Let's see.  This document that I
can't read the exhibit number on is a
two-page document from the Blackboard
learning system, dated September 11, 2004, at
1:53 p.m.  It's the second half of the second
paragraph.

Am I correct in understanding that, your
having reviewed those documents, you're
unequivocally denying ever having engaged in
any of those behaviors attributed to you in
these documents?  Is that correct?

A    That's correct.

Q    Now, to your knowledge, has Amy
McNeal ever been known by another last name?

60

A    I think her maiden name is Deese.

Q    Let me show you Defendant's Exhibit
31.  Do you have a copy of that in front of
you?

MS. HORTBERG:  Yes.

A    Okay.

Q    Do you know, please, ma'am, where
the defendants obtained this document before
it was first admitted into evidence?  Did you
provide that to counsel?

A    I wouldn't have access to that.

Q    So, you never saw this document,
Defendant's Exhibit 31, before it was
introduced as an exhibit in Mrs. Miller's
deposition?  Is that fair to say?

A    I never saw this document until
after the lawsuit was filed.

Q    Did you see it prior to Mrs.
Miller's deposition being taken?

A    I guess it was in discovery.  I'm
not really sure.  But I saw it after the
lawsuit was filed.  I don't recall.  I mean,
there's so many --

Q    Let me ask you this:  Did you
obtain this document from any outside source,

61

that is, from a source outside the people in
this room?

    A   No.

    Q   Have you obtained any documents
pertinent to this case from Amy McNeal?

    A   No.

    Q   And has she directed you to any?

    A   No.

    Q   Are you aware, ma'am, about any
distinction in the terms "instructor" and
"teacher" as used in the Houston County
School System?

    A   No.

       MR. FAULK:  It is finished.


       END OF DEPOSITION

62

STATE OF ALABAMA

HOUSTON COUNTY


    I, Stacey Watkins, RPR, and Notary
Public, State at Large, do hereby certify
that the foregoing transcript, pages 1
through 61, is a true and correct transcript
of the testimony and proceedings taken at
said time and place; and that the same was
taken down by me in stenograph shorthand,
and transcribed by me personally or under
my personal supervision.

    I further certify that I have no
interest in this matter, financial or
otherwise, or how it may develop or what
its outcome may be.  I further certify that
I am not of counsel for any of the parties,
nor am I related to counsel or litigants or
associated with anyone connected with this
cause to my knowledge.

    Witness my hand this 8th day of
October, 2007.


       _____
       RPR, Notary Public,
       State at Large
       ACCR# 155

# TAB K

<div align="center">

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

</div>

| | | |
|---|---|---|
| **NANCY MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NUMBER:** |
| | ) | |
| **TROY UNIVERSITY, DOTHAN, et al.,** | ) | **1:06-cv-940-WHN** |
| | ) | |
| **Defendants.** | ) | |

<div align="center">

**ANSWER BY DEFENDANT TROY UNIVERSITY, DOTHAN CAMPUS**

</div>

Defendant Troy University, Dothan Campus (hereinafter "Defendant" or "Troy") answers the Complaint as follows:

<div align="center">

**ALLEGED JURISDICTION AND VENUE**

</div>

1.    Paragraph 1 of the Complaint is answered as follows:

(a)    Admitted that Plaintiff attempts to bring claims based on alleged constitutional and statutory rights.

(b)    Defendant denies that it violated any constitutional or statutory law.

(c)    Defendant denies that Plaintiff is due any relief sought.

(d)    Except to the extent answered above, the allegations of Paragraph 1 are denied.

2.    Paragraph 2 of the Complaint is answered as follows:

(a)    Defendant does not contest venue with regard to claims brought pursuant to the United States Constitution and federal statutory law.

(b)    Defendant denies that Plaintiff states any claim for a "tort sued upon."

(c)     Except to the extent answered above, the allegations of Paragraph 2 are denied.

## STATEMENT OF THE PARTIES

3.     Paragraph 3 of the Complaint is answered as follows:

(a)     Admitted that Plaintiff is an adult.

(b)     Defendant is without sufficient knowledge or information to form a belief as to whether Plaintiff is a resident citizen of Houston County, Alabama.

(c)     Except to the extent answered above, the allegations of Paragraph 3 are denied.

4.     Because Paragraph 4 is not addressed to Troy, no response from Troy is required.

5.     Because Paragraph 5 is not addressed to Troy, no response from Troy is required.

6.     Because Paragraph 6 is not addressed to Troy, no response from Troy is required.

7.     Because Paragraph 7 is not addressed to Troy, no response from Troy is required.

8.     Because Paragraph 8 is not addressed to Troy, no response from Troy is required.

9.     Because Paragraph 9 is not addressed to Troy, no response from Troy is required.

10.     Paragraph 10 of the Complaint is answered as follows:

(a)     Troy University, Dothan Campus is an Alabama public state university.

(b)     Troy University, Dothan Campus is located in Houston County, Alabama.

(c)     Troy University, Dothan Campus was established under the laws of the State of Alabama.

(d)     Alabama Constitution Article I, § 14 provides for the sovereign immunity of the state and this immunity extends to Troy University, Dothan Campus.

(e)     Troy University, Dothan Campus is an arm of the State of Alabama and is thus entitled to immunity pursuant to the Eleventh Amendment of the United States Constitution.

(f)     Except to the extent answered above, the allegations of Paragraph 10 are denied.

11.     Paragraph 11 of the Complaint is answered as follows:

(a)     Sandra Jones resides in Dothan, Alabama.

(b)     Sandra Jones is the former Dean of the Troy University, Dothan Campus College of Education.

(c)     Except to the extent answered above, the allegations of Paragraph 11 are denied.

12.     Paragraph 12 of the Complaint is answered as follows:

(a)     Pam Parris is the former Director of Professional Internship Programs at Troy University, Dothan Campus.

(b)     Except to the extent answered above, the allegations of Paragraph 12 are denied.

13.     Paragraph 13 of the Complaint is answered as follows:

(a)     Greg Ruedigar resides in Dothan, Alabama.

(b)     Greg Ruedigar served as an internship supervisor to the Plaintiff in Fall 2004.

(c)     Except to the extent answered above, the allegations of Paragraph 13 are denied.

## ALLEGED STATEMENT OF FACTS

14.     Paragraph 14 of the Complaint is answered as follows:

3

       (a)      Plaintiff enrolled in the following courses at Troy University, Dothan Campus: SPE 4454 Internship Seminar and SPE 4465 Collaborative Teacher (6-12) Internship.

       (b)      Defendant is without sufficient knowledge or information to form a belief as to whether Plaintiff was working as a school teacher under contract with Defendant Houston County Board of Education at the time of the events Plaintiff alleges constitute this action.

       (c)      Except to the extent answered above, the allegations of Paragraph 14 are denied.

15.     Paragraph 15 of the Complaint is answered as follows:

       (a)      Because Paragraph 15 is not addressed to Troy, no response from Troy is required.

       (b)      Except to the extent answered above, the allegations of Paragraph 15 are denied.

16.     Paragraph 16 of the Complaint is answered as follows:

       (a)      Because Paragraph 16 is not addressed to Troy, no response from Troy is required.

       (b)      Except to the extent answered above, the allegations of Paragraph 16 are denied.

17.     Paragraph 17 of the Complaint is answered as follows:

       (a)      Because Paragraph 17 is not addressed to Troy, no response from Troy is required.

       (b)      Except to the extent answered above, the allegations of Paragraph 17 are denied.

18.     Paragraph 18 of the Complaint is answered as follows:

(a)    That part of Paragraph 18 referring to alleged Houston County Board of Education employees Paul Strange, Tim Pitchford, and Riley Joe Andrews is not addressed to Troy; therefore, no response to those allegations are required from Troy.

(b)    Plaintiff's reference to "substantially similar reports" is vague.

(c)    Except to the extent answered above, the allegations of Paragraph 18 are denied.

19.    Paragraph 19 of the Complaint is answered as follows:

(a)    Defendant is without sufficient knowledge or information to form a belief as to what document(s) plaintiff is actually referencing when she speaks of an undated letter ("the Andrews report") and the "Strange-Ezell report."

(b)    Except to the extent answered above, the allegations of Paragraph 19 are denied.

20.    Paragraph 20 of the Complaint is answered as follows:

(a)    Dr. Greg Ruedigar served as an internship supervisor to the Plaintiff in Fall 2004.

(b)    Except to the extent answered above, the allegations of Paragraph 20 are denied.

21.    The allegations of Paragraph 21 are denied.

22.    Paragraph 22 of the Complaint is answered as follows:

(a)    Defendant is without sufficient knowledge or information to form a belief as to when Plaintiff first had notice that her internship in the Fall of 2004 would be terminated.

(b)    Pam Parris sent a letter to Mr. Kenneth Lord dated October 18, 2004, which stated that Plaintiff's "internship was terminated effective October 14, 2004."

(c)     Defendant is without sufficient knowledge or information to form a belief as to what Mr. Lord's knowledge was on October 20, 2004, or as to what his "staff's reaction" was "to such reports."

(d)     Defendant is without sufficient knowledge or information to form a belief as to the reason(s) for termination of Plaintiff's teaching contract or whether she was "escorted off campus."

(e)     Except to the extent answered above, the allegations of Paragraph 22 are denied.

## COUNT I -- ALLEGED VIOLATION
## OF FIRST AMENDMENT RIGHT TO FREE SPEECH

23.     Paragraph 23 of the Complaint is answered as follows:

(a)     For answer to Paragraph 23 of the Complaint, Defendant repeats and incorporates its responses to Paragraphs 1-22.

(b)     Troy denies that it engaged in any unlawful acts or omissions.

(c)     Except to the extent answered above, the allegations of Paragraph 23 are denied.

24.     The allegations of Paragraph 24 are denied.

25.     The allegations of Paragraph 25 are denied.

26.     The allegations of Paragraph 26 are denied.

27.     The allegations of Paragraph 27 are denied.

## DEMAND FOR JUDGMENT

28.    Plaintiff's unnumbered paragraph following Paragraph 27 and entitled "Demand for Judgment" is answered as follows:

(a)    Because subpart A. of Plaintiff's Demand for Judgment is directed to the Houston County Board of Education, no response from Troy is required.

(b)    Plaintiff is not due any of the relief sought in her Demand for Judgment or to any other legal or equitable relief.

(c)    Except to the extent answered above, the allegations contained in the Demand for Judgment are denied.


**B.    DEFENSES AND ADDITIONAL ANSWER TO THE COMPLAINT:**

29.    Except to the extent answered above, the allegations of the Complaint are denied.

30.    Plaintiff fails to state a claim upon which relief may be granted.

31.    Plaintiff's claims are barred, in whole or in part, by the Eleventh Amendment to the United States Constitution.

32.    Defendant is entitled to absolute immunity from suit.

33.    Defendant is not a person within the meaning of 42 U.S.C. § 1983.

34.    Defendant is an arm of the State of Alabama.

35.    Defendant has not waived and does not waive its immunity from suit under the Eleventh Amendment to the United States Constitution.

36.    The Eleventh Amendment to the United States deprives this court of jurisdiction over this Defendant and this action.

37.     As an arm of the State of Alabama and entitled to the protections of the Eleventh Amendment to the United States Constitution, this Defendant does not have the capacity to be sued.

38.     The conditions precedent to suit have not been satisfied in that Plaintiff has not exhausted her contractual and administrative remedies.

39.     To the extent any claim falls outside of any applicable statute of limitation, it is precluded.

40.     Plaintiff is precluded from recovering any damages or other relief not provided for by statutory or case law.

41.     Plaintiff's failure to mitigate damages precludes and/or limits any alleged damages.

42.     Some or all of the claims in the Complaint may be barred by the doctrine of waiver and/or estoppel.

43.     Some or all of the claims in the Complaint are due to be dismissed because they are moot.

44.     Some or all of the claims in the Complaint are due to be dismissed based on the doctrine of ripeness.

45.     Plaintiff does not have standing to bring some or all of the claims alleged in the Complaint because she has not suffered any constitutionally recognized injury in fact that is fairly traceable to Defendant's conduct and is likely to be redressed by a judicial action.

46.     Plaintiff does not have standing to bring some or all of the claims alleged in the Complaint because she has not alleged nor can she prove a real or immediate threat that she will be wronged again.

47.     Plaintiff's claims are barred, in whole or in part, by her failure to exhaust her administrative remedies.

48.     Defendant provided Plaintiff all the process she is due under the Fourteenth Amendment to the United States Constitution.

49.     Some or all of the claims in the Complaint are due to be dismissed based on the doctrine of unclean hands.

50.     Some or all of the claims in the Complaint are due to be dismissed based on the doctrine of laches and the applicable statute of limitations.

51.     Defendant did not open its classrooms or buildings for indiscriminate use.

52.     Defendant did not open its classrooms or buildings for any activity not in furtherance of the school's educational mission.

53.     The alleged speech did not take place in a public forum.

54.     Imposition of federal standards on the content of the work assigned and review thereof by Defendant in exercising its educational mission would violate the rights of Defendant and its instructors guaranteed by the First and Fourteenth Amendments to the United States Constitution.

55.     The rights in the United States Constitution do not extend to a university student choosing her own curriculum or classroom management in contravention of school policy or dictates.

56.     The United States Constitution does not prohibit Defendant or one of its faculty members from placing reasonable restrictions on the learning experience so as to comply with the University's educational mission.

57.   Defendant is entitled to reasonably regulate speech and campus activities in furtherance of the school's educational mission.

58.   Defendant's actions were narrowly tailored to serve a compelling state interest.

59.   Defendant's educational mission justified any reasonable restrictions placed on the Plaintiff.

60.   Defendant's actions were neither unreasonable nor arbitrary and capricious.

61.   Any limitations on Plaintiff's speech were appropriate and reasonable time, place, and manner restrictions.

62.   Even if Plaintiff proved that Defendant was motivated by any unconstitutional reason with respect to any legally actionable decision, Defendant will prove that it would have reached the same decision in the absence of any impermissible motivation.

63.   Plaintiff has not pled a property interest protected by the Due Process Clause.

64.   No action of Defendant is the proximate cause of any injury or damages alleged by Plaintiff.

65.   Defendant reserves the right to assert any and all defenses that may be applicable.

Respectfully submitted,

s/ Joseph V. Musso
Bar No:  ASB-4825-O40J
James C. Pennington
Peyton Lacy, Jr.
Joseph V. Musso
Attorneys for Defendant
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
Telephone:  (205) 328-1900
Facsimile :  (205) 328-6000
Email:  joseph.musso@odnss.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/EDF system which will send notification of such filing to the following:

Thomas Kirven Brantley
Brantley & Amason
E-mail: brantleymcle@graceba.net

Winn Faulk
Faulk & Reed
E-mail: winnfaulk@bellsouth.net

James K. Walding
Hardwick, Hause & Segrest
E-mail: kwalding@graceba.net

Jere C. Segrest
Hardwick Hause & Segrest
E-mail: jerecs@aol.com

s/ Joseph V. Musso
OF COUNSEL

1903514.2

11

## Answers to Complaints

1:06-cv-00940-MEF-DRB Miller v. Houston County Board of Education et al

### U.S. District Court

### Alabama Middle District

Notice of Electronic Filing

The following transaction was received from Musso, Joseph Vincent entered on 11/13/2006 at 4:25 PM
CST and filed on 11/13/2006

**Case Name:**     Miller v. Houston County Board of Education et al
**Case Number:**    1:06-cv-940
**Filer:**          Sandra Jones
                    Troy University Dothan
                    Pam Parris
                    Greg Ruediger

**Document Number:** 14

**Docket Text:**
*Troy University - Dothan Campus* ANSWER to Complaint by Troy University Dothan, Sandra Jones,
Pam Parris, Greg Ruediger.(Musso, Joseph)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=11/13/2006] [FileNumber=633266-0
] [5c6d4cbecca3a72cab49cae898a6e52e328cef7b12aba388b8612863eccfd62c4e5
2dceb5cce60460de1a214365f15e37e2a2ad81c305baaad991a828941853d]]

**1:06-cv-940 Notice will be electronically mailed to:**

Mark S. Boardman     mboardman@boardmancarr.com, mail@boardmancarr.com

Thomas Kirven Brantley     brantleymcle@graceba.net

Winn Faulk    winnfaulk@bellsouth.net

Joseph Vincent Musso     joseph.musso@odnss.com, nikita.lockett@odnss.com

Jere C. Segrest     jerecs@aol.com

James K. Walding     kwalding@graceba.net

**1:06-cv-940 Notice will be delivered by other means to:**

Sandra Jones
c/o Troy University, Dothan
500 University Drive
Dothan, AL 36303

Pam Parris
c/o Troy University, Dothan
500 University Drive
Dothan, AL 36303

Greg Ruediger
c/o Troy University, Dothan
500 University Drive
Dothan, AL 36303

Troy University Dothan
500 University Drive
Dothan, AL 36303