# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **NANCY MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **1:06-CV-940-WKW** |
| **TROY UNIVERSITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## BRIEF IN SUPPORT OF SUMMARY JUDGMENT BY DEFENDANTS TROY UNIVERSITY, DR. SANDRA JONES, DR. GREG RUEDIGER, AND PAM PARRIS

---

Peyton Lacy, Jr.
James C. Pennington
Joseph V. Musso
Attorneys for Defendants
Troy University, et al

OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone:  (205) 328-1900
Facsimile:  (205) 328-6000

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................... 1-2

II.   STATEMENT OF FACTS ............................................. 2

    A.    GENERAL INFORMATION ............................. 2-3

    B.    TROY FACULTY AND ADMINISTRATION .................... 3

    C.    HOUSTON COUNTY DEFENDANTS ............................. 4-5

    D.    TROY-DOTHAN'S COLLEGE OF EDUCATION
          TEACHER EDUCATION UNIT ......................... 5-8

    E.    MILLER'S 2004 FALL SEMESTER
          STUDENT INTERNSHIP ......................................... 8

    F.    THE INTERNSHIP SEMINAR ......................... 8-10

    G.    MILLER'S STUDENT INTERNSHIP CLASS ............. 10-12

    H.    ONE TROY-DOTHAN PROFESSOR HAS
          RESERVATIONS RECOMMENDING MILLER
          FOR A STUDENT INTERNSHIP.................................. 12-14

    I.    MILLER'S EMPLOYMENT AT HOUSTON
          COUNTY HIGH..................................................... 14

    J.    MILLER'S COMPLAINTS ABOUT HOUSTON
          COUNTY HIGH SCHOOL'S SPECIAL
          EDUCATION PROGRAM .................................... 15

    K.    MILLER'S KNOWLEDGE REGARDING THE
          INDIVIDUALS WITH DISABILITIES
          EDUCATION ACT (IDEA) ........................... 15-16

L.   DR. RUEDIGER FIRST OBSERVES MILLER'S STUDENT INTERNSHIP PERFORMANCE .............. 16-17

M.   MILLER FOLLOWS DR. RUEDIGER'S INSTRUCTIONS ............... 18-19

N.   MILLER LEAVES THE HIGH SCHOOL CAMPUS WITHOUT PERMISSION ........................... 19-22

O.   ANDREWS WRITES TO PARRIS ................................. 22-23

P.   OTHER INFORMATION RELAYED TO TROY-DOTHAN ............... 23-24

Q.   DR. RUEDIGER'S SECOND ON-CAMPUS OBSERVATION ............... 24-25

R.   MILLER'S STUDENT INTERNSHIP IS TERMINATED ............... 25-27

S.   HER STUDENT INTERNSHIP AT BEVERLYE MIDDLE SCHOOL IS A HUGE SUCCESS ..................... 27-29

T.   MILLER IS INVITED BACK TO TROY-DOTHAN TO BE A SPEAKER IN A PROGRAM ............... 29

U.   MILLER KEPT HER CONCERNS INVOLVING HOUSTON COUNTY HIGHS SPECIAL EDUCATION PROGRAM IN-HOUSE AND AT THE LOWEST LEVEL ................... 29-30

V.   NO ONE AT TROY-DOTHAN STOPPED MILLER FROM COMPLAINING ..................... 30

W.   MILLER GRADUATES *MAGNA CUM LAUDE* ............... 31

III.   ANALYSIS ....................................... 31

A.    OFFICIAL CAPACITY CLAIMS SHOULD
      BE DISMISSED AS REDUNANT AND
      POTENTIALLLY CONFUSING TO A JURY ............. 31-32

B.    ALL CLAIMS AGAINST TROY-DOTHAN ARE DUE TO
      BE DISMISSED EITHER BASED ON IMMUNITY
      AND/OR MOOTNESS ........................................................ 32-33

      1.    Troy-Dothan Is an Instrumentality of the State of
            Alabama and Has Not Waived Its Sovereign
            Immunity ...................................................................... 33

            a.    Troy-Dothan is an Instrumentality of
                  Alabama.......................................................... 33-34

            b.    No Waiver of Eleventh Amendment
                  Immunity ............................................................... 34

      2.    Eleventh Amendment Immunity
            Bars Money Damages ............................................. 34-35

      3.    Miller's Federal Constitutional Claims
            for Equitable Relief Are Moot ............................... 35-37

            a.    No class certification........................................... 37

            b.    The "capable of repetition,
                  yet evading review" exception
                  does not apply ...................................................... 38

      4.    Miller Has No Constitutional Standing
            to Bring a Lawsuit Based on the
            Claim that Troy-Dothan
            Violated Her Rights ................................................ 38-39

      5.    Any 42 U.S.C. § 1983 Claim against
            Troy-Dothan Must be Dismissed................................ 39

        **a.**    **Troy-Dothan not a "person" acting under color of state law** ............................................. 39-40

        **b.**    **Eleventh Amendment to the U.S. Constitution bars § 1983 claims against Troy-Dothan** ..................................... 40-41

   **C.**    **DEFENDANTS ARE SEPARATELY DUE SUMMARY JUDGMENT ON THE MERITS** ................... 41

       **1.**    **Defendants Are Due Summary Judgment on the First Amendment Claim** ................................ 42

          **a.**    **Miller was in a classroom, not a public forum** ............................................. 42

             **(i)**    **The student internship is a classroom, not a public forum** ........... 42-44

             **(ii)**    **Troy-Dothan may impose reasonable restrictions** ........................... 44

             **(iii)**    **Dr. Jones Acted in Miller's Best Interests as a Student** ................. 44-46

          **b.**    **Miller's communications did not occur Against a background of ongoing Public debate** ................................... 46-47

       **2.**    **Troy-Dothan is Due Summary Judgment on the Due Process Claims** ................................ 47-49

       **3.**    **Troy-Dothan Is Due Summary Judgment on the Equal Protection Claim** ........................... 49-50

   **D.**    **THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE DUE TO BE DISMISSED BASED ON QUALIFIED IMMUNITY** .......................... 50-53

**IV.**    **CONCLUSION** .......................................................... 53-54

# I.
## <u>INTRODUCTION</u>

Plaintiff Nancy Miller (hereinafter "Miller") sued Troy University in Dothan (hereinafter "Troy-Dothan"), her college alma mater. She sued two of her alma mater's professors, Dr. Sandra Jones (hereinafter "Dr. Jones") and Dr. Greg Ruediger (hereinafter "Dr. Ruediger"). She sued the former Director of Troy-Dothan's College of Education's Professional Internship Program, Pam Parris (hereinafter "Parris").

Miller sued because in her opinion Troy-Dothan and the individual Troy-Dothan defendants violated her First Amendment right to free speech. However, neither Troy-Dothan nor the individual Troy-Dothan defendants violated any of Miller's constitutional rights. Rather, what Troy-Dothan and the individual Troy-Dothan defendants did was to prepare Miller to become the best special education teacher she can be.

In the Fall Semester of 2004, Miller was enrolled in a student internship class at Troy-Dothan, which provided her the opportunity to serve as a student intern at Houston County High School. After a short period of time, it was obvious that Miller was not achieving the pedagogical goals of the class, so Dr. Jones, the Dean of the College of Education, terminated the internship. However, Miller's student internship resumed the very next semester at Beverlye Middle School in Dothan, and it was a smashing

1

success, culminating with Miller graduating at the end of the 2005 Spring semester and being offered a full-time teaching position at Beverlye Middle School the following school year.

Motion for Summary Judgment filed on behalf of Troy-Dothan, Dr. Jones, Dr. Ruediger, and Parris is due to be granted and all of Miller's claims against all of those defendants are due to be dismissed with prejudice. There is no genuine issue as to any material fact. In short, Miller has no case.

## II.

## STATEMENT OF FACTS

Defendants Troy University, Dr. Sandra Jones, Dr. Greg Ruediger, and Pam Parris submit the following undisputed facts below for summary judgment purposes only:[1]

## A.     GENERAL INFORMATION

1.     Miller graduated from Troy-Dothan with a bachelor's degree at the end of the 2005 spring semester. Her major was special education. (Tab A at pp. 30-31). She graduated *magna cum laude*. (Tab B at p. 316).[2]

---

[1] Defendants deny many of Miller's allegations, but for purposes of a motion for summary judgment, the facts must be considered in a light most favorable to the non-movant.

[2] The Tabs refer to the Tab designations in Defendants' Evidentiary Submission.

2.      In August 2005, the State of Alabama certified her as a teacher. (Tab A at p. 31).

3.      Miller has considered applying to one of Troy's graduate programs, but has not determined that she will or whether she would even enroll at the Troy-Dothan campus. (Tab B at p. 7).

**B.    TROY-DOTHAN FACULTY AND ADMINISTRATION**

4.      Dr. Sandra Jones was employed by Troy-Dothan from 1983 to 2005. During the Fall 2004 and Spring 2005 semesters, Dr. Jones was the Dean of Troy-Dothan's College of Education. She is now retired. (Tab C at ¶3).

5.      Dr. Greg Ruediger was employed by Troy-Dothan as an Associate Professor in the College of Education during the Fall 2004 and Spring 2005 semesters. (Tab C at ¶5). Dr. Jones was his immediate supervisor at that time. (Tab C at ¶5). Dr. Ruediger still teaches full-time at Troy-Dothan. (Tab B at p. 118)

6.      During the Fall 2004 and Spring 2005 semesters, Pam Parris was employed as the Director of Professional Internship of Programs in the Troy-Dothan College of Education. (Tab C at ¶6). She no longer works at Troy-Dothan or any other campus of Troy University. (Tab B at p. 118).

C.     **HOUSTON COUNTY DEFENDANTS**

7.     The Houston County Board of Education is a defendant in this lawsuit. (Tab D, *passim*).

8.     Miller has also sued the following individuals who were associated with the Houston County school system during the Fall of 2004:

●     In the Fall of 2004, Kenneth Lord was the Houston County Superintendent of Education. He is now retired. (Tab E at p. 4).

●     Riley Joe Andrews was the Federal Programs Coordinator for the Houston County school system in the Fall of 2004. He is now retired.  (Tab F at pp. 5-6).

●     In the Fall of 2004, Virginia Singletary was the Assistant Special Education Coordinator. She is currently the Coordinator. (Tab G at p. 5).

●     Tim Pitchford is currently the Houston County Superintendent of Education. During the Fall 2004 semester, he was the Principal of Houston County High School. (Tab H at p. 6).

●     Paul Strange is currently the Assistant Principal at Cottonwood High School. In the Fall of 2004, he was a special education teacher at Houston County High School. (Tab I at p. 22).

4

● Stacey Ezell is a biology teacher at Houston County High School. (Tab J at p. 5, 35).

## D. TROY-DOTHAN'S COLLEGE OF EDUCATION TEACHER EDUCATION UNIT

9. The mission of Troy-Dothan's College of Education is to prepare educators, counselors, administrators, and other professionals to be lifelong, innovative, informed, reflective decision makers effectively trained to achieve the goals, competencies, and skills identified by the accrediting and professional organizations for each program. (Tab C at ¶7).

10. The Teacher Education Unit at Troy-Dothan University is comprised of all certification programs in the College of Education. All certification programs are approved by the Alabama State Board of Education. (Tab C at ¶8).

11. The ultimate goal of the College of Education Teacher Education Unit is the effective initial and continuing preparation of candidates, teachers, and other school personnel. (Tab C at ¶9).

12. Admission to Troy-Dothan does not qualify a student for admission to the Teacher Education Program ("TEP"). Candidates may only enroll in certain upper level courses prior to meeting all criteria for admission to the Teacher Education Program. (Tab C at ¶10).

13.    Written application to the Teacher Education Program is required. Additional requirements include the following: (1) completion of 48 semester hours of required general studies courses including a grade of C or better in the two English composition courses and a grade of C or better in the required general studies mathematics course(s) for the teacher education major; (2) at least six of the twelve hours of required mathematics for elementary, early childhood, and collaborative teacher candidates; (3) a minimum grade-point-average of 2.75 on all coursework attempted; (4) any testing required by Alabama Department of Education; (5) successful completion of a formal speech and interview; (6) completion of a minimum twelve clock hours of classroom observation/participation, and successful completion of an impromptu essay. (Tab C at ¶11).

14.    Troy-Dothan's Professional Internship Program is the culminating clinical field-based experience for candidates seeking certification in a teaching field. Troy-Dothan's Professional Internship Program provides the student with the opportunity to conduct classes and assume the role of teaching while receiving supervision from a classroom teacher and a university supervisor.  (Tab C at ¶12).

15.    All candidates completing an initial certification program for teachers must complete a nine-semester-hour internship in the grade level(s)

and academic subject(s) of the certification sought. This is a full-time assignment for a full semester with placement in a regionally accredited school. Interns must enroll in the appropriate three-semester hour internship seminar course during the internship semester. (Tab C at ¶13).

16.     Prerequisites for internship include the following: (1) Admission to the Teacher Education Program (TEP); (2) a grade-point-average of 2.75 overall on all undergraduate coursework attempted; (3) a grade-point-average of 2.75 in all professional studies coursework attempted; a grade-point-average of 2.75 in all teaching field coursework attempted; (4) three satisfactory recommendations from faculty; (5) completion of all student coursework except Internship Seminar, a class which is taken in conjunction with the internship; (6) completion of all professional studies and teaching field course with a grade of C or better; (7) completion and verification of a minimum of 150 contact hours of clinical experiences; (8) any testing required by the Alabama Department of Education; (9) successful completion of the preliminary components of the professional portfolio and the exit examinations in professional studies and the teaching field(s); (10) approval of the Director of the Teacher Education Program and the department chair; (11) evidence of current professional

7

liability coverage; and completion of any additional requirements mandated by the Alabama State Department of Education. (Tab C at ¶14).

17.    Undergraduate internship experiences must occur in the appropriate grade level(s) and subject(s) and are supervised by an approved certified classroom teacher who is the teacher of record for the class. (Tab C at ¶15).

**E.    MILLER'S 2004 FALL SEMESTER STUDENT INTERNSHIP**

18.    During the Fall 2004 semester, Miller was a student in Troy-Dothan's College of Education. At that time, she had completed all prerequisites for her internship, and she was enrolled in SPE4454 Internship Seminar (the three-semester hour student internship seminar course), and SPE4465 Collaborative Teacher, the actual class title for the internship. (Tab C at ¶16).

19.    Those are the two courses a student must be enrolled in during that student's internship. (Tab C at ¶ 16).

**F.    THE INTERNSHIP SEMINAR**

20.    Dr. Jones was the teacher for the Internship Seminar class during the Fall 2004 semester. (Tab C at ¶16). Miller said, "[I]t was once a week. We would also have assignments during the week, computer

assignments, where we would have to answer certain questions or whatever and respond." (Tab A at pp. 80-81).

21.    The computer assignments included an on-line discussion forum (known as "Blackboard") in which students in the internship seminar class were required to participate. (Tab B at p. 18). A student had to have a password to enter the discussion forum. (Tab B at pp. 18-19).

22.    The forum existed for students in the internship seminar class to communicate to their classmates their dealings in their internship. (Tab B at p. 25). Miller was required to read the posts on the board submitted by other students in the class and to participate in on-line discussions. (Tab B at p. 26).

23.    Miller said the purpose of the board was to "discuss issues that might be arising in the different school systems, gain advice from each other, bounce ideas off each other." (Tab B at p. 26).

24.    As the teacher of the class, Dr. Jones had access to the discussion forum. (Tab B at p. 19). Dr. Jones informed the students to be professional with their comments on the Blackboard discussions, and Miller had no problem with Dr. Jones' instructions on that count. (Tab B at p. 25).

25.    Miller found the Blackboard to be a useful teaching tool. (Tab B at p. 26).

26.    No teacher at Troy or fellow student ever criticized Miller for anything she communicated on the Blackboard. (Tab B at p. 24).

## G.    MILLER'S STUDENT INTERNSHIP CLASS

27.    Miller was placed as a student intern at Houston County High School during the Fall 2004 semester. The Troy-Dothan faculty member assigned to serve as her internship supervisor was Dr. Greg Ruediger. (Tab C at ¶17).

28.    Because of the high demand and low availability of special education teachers, the Houston County High School principal, Tim Pitchford, requested permission for Miller to complete her Troy-Dothan student internship while employed as a paid special education teacher at Houston County High School. (Tab C at ¶18).

29.    Troy-Dothan granted permission with the conditions listed in an "Internship Agreement Between Houston County Schools and Troy University Dothan Campus," which is dated July 28, 2004. (Tab C at ¶18, Tab 1). Those conditions were as follows:

> 1.    Ms. Miller will continue to be employed throughout the internship period (August 16 – December 7, 2004).
>
> 2.    Mr. Paul Strange will serve as cooperating teacher for Ms. Miller.

3.    Ms. Miller will complete the same requirements as all other interns at Troy University Dothan with the following underlined exceptions:

a.    Internship will last a total of 70 school days. Absences will be made-up and extend beyond December 7, 2004.

b.    <u>Mr. Strange will visit Ms. Miller's classroom one period each week. Ms. Miller will visit Mr. Strange's classroom one period each week</u>. The intern is to use the log form provided to record the time spent in Mr. Strange's classroom. This log, signed by the intern and Mr. Strange, is to be turned in at the end of the semester.

c.    <u>The school administration is responsible for IEP meetings. Ms. Miller's attendance is that of a student intern. She cannot be held legally responsible for the meetings</u>.

d.    Mr. Strange will conduct four official evaluations during the internship. The first observation will occur during the first two weeks of internship. The remaining three evaluations will occur approximately every three weeks. The white and goldenrod copies of the evaluation form are to be mailed to the Director of Profession Internship immediate as each one is completed.

e.    Mr. Strange is to review all lesson plan, handouts and notes to parents created by Ms. Miller. The first five lesson plans taught must be in the long format shown in the *Internship Handbook*. An additional five lessons during the term are to be written in the long format. Lesson plans written for the university supervisor visits written in the format count as part of the required ten. All other lesson plans are to be written using the short form in the handbook.

f.    Dr. Greg Ruediger, the University Supervisor, will conduct the official observations and evaluations during the period. Ms. Miller will complete the *Report of Internship* form provided in the handbook after each university supervisor visit.

g.    A daily schedule must be provided by Ms. Miller to the Internship office no later than August 30, 2004. This is to be used to schedule visits.

h.    The intern will complete the internship records and requirements including documentation of the 485 hours of internship.

i.    All summer coursework must be completed and internships pre-requisites met.

j.    Ms. Miller must attend the Internship Seminar classes.

k.    Ms. Miller is to e-mail Ms. Parris one weekly about the internship.

l.    The Director of Internship will contact Mr. Strange and Ms. Miller to schedule an appointment to discuss the progress of the Internship. This visit will occur near the midterm of the semester.

(Tab A at Exh. 6; Tab C at ¶18, Exh. 1) (emphasis in original).

## H.    ONE TROY-DOTHAN PROFESSOR HAS RESERVATIONS RECOMMENDING MILLER FOR A STUDENT INTERNSHIP

30.    One of the Troy-Dothan's prerequisites for an internship is three satisfactory recommendations from faculty members. (Tab C at ¶14).

31.    One faculty member, Dr. Victoria Morin, submitted a written

12

recommendation dated April 27, 2004, which stated:

> "I have some reservations regarding this student's readiness for internship. I have no reservations about Nancy's academic readiness for internship. My concerns are about her willingness to receive and use corrective feedback. I believe that Nancy can have a successful student internship experience if she can reflect on what her supervisors tell her about a commitment to follow through on their recommendations."

(Tab A at pp. 62-63; <u>Id</u>. at Exh. 3).

32.     Because of Dr. Morin's reservations, Parris, the Director of Professional Internship Program, sent Miller a letter dated June 1, 2004, which stated:

> "The internship application process required completion of three Faculty Recommendation of Prospective Intern Forms. At least one of the forms submitted for you has an indication of some reservations about recommendation for internship. TSUD policy requires that you meet with the TEP Committee regarding these reservations. The committee will then determine your eligibility for internship."

(Tab A at p. 64; <u>Id</u>. at Exh. 4).

33.     On or about June 15, 2004, Miller met with Troy-Dothan College of Education faculty in her TEP committee meeting to discuss her internship. She said that they discussed with her the reservation one teacher had about her not being able to receive constructive feedback. She said she told them at that time she didn't understand why there was such a

reservation because she never had any problems with her classes or teachers. (Tab A at pp. 66-67).

34.    Dr. Ruediger approved of Miller's internship without any reservations. (Tab A at p. 69-70).

35.    The College of Education allowed her to proceed with her internship despite Dr. Morin's reservations. (Tab A at p. 70).

## I.    <u>MILLER'S EMPLOYMENT AT HOUSTON COUNTY HIGH</u>

36.    Miller started teaching at Houston County High School on or about July 28, 2004. (Tab A at p. 71). Her Troy-Dothan student internship did not officially start until August 16, 2004. (Tab A. at p. 71).

37.    Miller did not hold a valid teaching certificate through the State of Alabama Department of Education on or about July 28, 2004 (Tab A. at p. 85). It was her understanding that Riley Joe Andrews, the Federal Programs Coordinator for the Houston County school system, was requesting an emergency certificate from the State. (Tab A at pp. 85-86).

38.    Miller was paid a salary by the Houston County school system. The majority of student interns in Troy-Dothan's internship program were not paid. (Tab A at p. 87).

**J.     MILLER'S COMPLAINTS ABOUT HOUSTON COUNTY HIGH SCHOOL'S SPECIAL EDUCATION PROGRAM**

39.     Miller identified four different "concerns or problems" that she allegedly discovered at Houston County High School regarding its special education program: (1) some students did not have Individualized Education Program Plans (hereinafter "IEPs"); (2) some IEPs were inappropriate for the student; (3) a student counselor, Cathy Keasler, asked her to write an IEP even though Miller was not allowed to do so under her internship agreement; and (4) an individual named Starla asked her to sign an IEP even though she had not attended that student's IEP ["assessment"]. (Tab B at pp. 132-133).[3]

40.     Whenever Miller complained to anyone employed at the Houston County School System about the high school's special education program, she did so during school hours and/or at a school facility. (Tab B at p. 137-138).

**K.     MILLER'S KNOWLEDGE REGARDING THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA)**

41.     Miller has not read the entire text of IDEA, only certain sections of it while in college that she and other students were provided in a handout. (Tab A at pp. 31-32).

---

[3] The Houston County Defendants strongly dispute Miller's allegations regarding the Houston County school system's special education program, especially Miller's allegations of illegality.

15

42.    Miller has never read all of the regulations that interpret and expand on the IDEA. She has only read portions of the Alabama state regulations that interpret IDEA on the Alabama Department of Education website. (Tab A at pp. 32-33).

43.    Miller has never read a legal treatise regarding IDEA, nor attended any national conventions on special education law. (Tab A at pp. 33-34).

44.    Any training Miller would have had regarding special education laws would have come from coursework at Troy-Dothan. (Tab A at p. 34). She had taken a course that discussed a number of the federal laws, including IDEA, the Americans with Disabilities Act, and No Child Left Behind. (Tab A at p. 35).

## L.    DR. RUEDIGER FIRST OBSERVES MILLER'S STUDENT INTERNSHIP PERFORMANCE

45.    On August 26, 2004, as part of Miller's internship class, Troy-Dothan's Dr. Ruediger visited the Houston County High School campus to observe and evaluate Miller's performance as a student intern. (Tab A at p.89-90; Exh. 7).

46.    In his written evaluation memorializing his observations, he stated, "Mrs. Miller stressed her concerns regarding individualized education

programs and the general structure of the special education program." (Tab A at p. 94).

47.    Miller "told him that – I asked for his advice, number one. I told him that there were no IEPs for some students, that other students' IEP's only reflected resource room, rather than full inclusion into the general classroom . . . ." (Tab A at p. 95).

48.    Dr. Ruediger recommended to Miller that she initiate attempts to comply with the current special education law. He recommended that she go to Paul Strange, her cooperating teacher at Houston County High School, and encourage him to initiate IEP meetings. (Tab A at pp. 115-116). Miller had no problem with Dr. Ruediger's suggestion that she speak with Strange. (Tab B at pp. 13-14).

49.    Miller alleges Dr. Ruediger indicated to her at that time that he would like to pull her from her internship at Houston County High School because of the lack of support and inappropriateness by the Houston County school system's administrators and her cooperating teacher, Strange. She alleges that Dr. Ruediger told her: "The only thing is, you're employed, so I don't know how to handle the situation." (Tab A at pp. 202-203).

50.    Dr. Ruediger said nothing in that meeting that she disagreed with. (Tab B at p. 13).

**M.**     **MILLER FOLLOWS DR. RUEDIGER'S INSTRUCTIONS**

51.    On August 27, 2005, after Dr. Ruediger recommended that Miller speak with Strange, Miller went to see Strange, Pitchford (the principal) and Stephens (the assistant principal) to discuss the concerns she had raised with Dr. Ruediger (Tab A at pp. 117, 120).

52.    Miller alleges that after she told Pitchford about her complaints, Pitchford said he was angry because Dr. Ruediger should have come to him with his concerns rather than sending an intern to explain the situation. (Tab A at p. 119).

53.    Miller alleges that on that following Monday, August 30, Troy-Dothan's Parris told her in a phone conversation she was not at Houston County High School to shake things up. (Tab B at p. 46). Miller alleges that in that phone call "[s]he told me that I was not there to shake things up. I told her that there were, you know, illegal things going on. Some of the students – I may have – I don't now for sure that I told her there were no IEP's for some students, for instance. But, that I was concerned for the students, and their educational needs. And, again, she just said that it was not my place to come in and shake things up, and that if I didn't stop, I was in jeopardy of failing my internship." (Tab B at p. 50).

54.    Miller alleges that on September 1, 2004, in a face-to-face meeting, Parris told her there had been a complaint that she, Miller, was causing dissention among the faculty, that she didn't interact with the faculty that much. Miller alleges that Parris told her she "needed to get in line with what she had been telling [her] before, make Mr. Pitchford happy, or else I was in jeopardy of losing my internship." (Tab B at pp. 50-51).

55.    Miller alleges that once she and Parris were in an office with Pitchford and Andrews that day, Parris "was . . . trying to reassure Mr. Pitchford and Mr. Andrews that she valued their relationship, being able to put interns into the county system, and hoped that they would continue – be able to continue that for a long time." (Tab B at p. 52).

## N.    MILLER LEAVES THE HIGH SCHOOL CAMPUS WITHOUT PERMISSION

56.    On September 24 2004, at approximately 11:30 a.m., Miller walked off the Houston County High School campus. She informed Paul Strange and two other Houston County High School employees that she was leaving, but she did not inform either the principal or the assistant principal and receive permission to leave. (Tab A at p. 176, 229; Tab A at Exh. 15).

57.    Miller admits that part of her duties as a student intern at Houston County High School was that she was supposed to actually be on campus performing her work. (Tab A at p. 177).

58.    Upon leaving, she left the following memo with someone in Principal Pitchford's office:

> "This memo is to inform you that this morning after I attended an IEP meeting for [Houston County High School student], Starla, the Pscyhometrist, in Paul Strange's presence asked me to sign 3 documents claiming that I was at IEP meetings. . . . As you know, signing the documents when I was not present at a meeting is unlawful. You also know that this is not the first time I have been approached about illegally signing IEP documents. On August 11, 2004 at approximately 3:20 p.m., Cathy Keasler approached me as I was leaving campus and said we'd need to make up, sign, and date an IEP for [a Houston County High School student] – without having a meeting. I told her that first, as an Intern, I am not permitted to write or sign one if I have not attended a meeting and that I wouldn't sign one because it is against the law. I have informed Dr. Jones and Mrs. Parris of the situation and I am leaving the premises."

(Tab A at Exh. 14).

59.    After leaving the campus on September 24, 2004, her intention was to go to the central office of the Houston County school system to speak to Riley Joe Andrews, the Federal Programs Coordinator. (Tab A at p. 170). However, she did not actually walk into the central office until approximately 2:45 p.m. (Tab A at p. 181, 183). In between 11:30 a.m. and 2:45 p.m., she drove by the central office and did not see Andrews' truck, so she went to Dothan High School where her husband works. (Tab A at p. 188).

60.     Andrews was not at the central office when she walked in at 2:45 p.m., but Virginia Singletary, the Assistant Special Education Secretary, was. At that time, Miller had an envelope with her containing the memo she had left earlier that day for Principal Pitchford. (Tab A at p. 181, 183).

61.     Singletary memorialized Miller's arrival at the central office in writing, as follows:

> "At approximately 2:45 on Friday, September 24, 2004, Mrs. Nancy Miller came to the central office. Mrs. Miller had an envelope that she wanted to leave for Mr. Andrews. She also requested to talk to me in my office.
>
> Mrs. Miller and I talked at length about her concerns on various situations at HCHS. She expressed unhappiness over these incidents, culminating with the fact that she left the campus of HCHS today about 11:30.
>
> Mrs. Miller expressed her desire to talk with Mr. Andrews before returning to school. I contacted Mr. Andrews and he returned to the central office around 3:45. At this time, Mr. Andrews and I both met with Mrs. Miller about her concerns. . . . Mrs. Miller stated she would not feel comfortable returning to school until Mr. Andrews had spoken with Mrs. Pam Parris, Advisor for [Troy-Dothan]. Mr. Andrews instructed Mrs. Miller that if this was her wish, he would contact her Monday morning after speaking with Mrs. Paris."

(Tab A at Exh. 15).

62.     On the following Monday, September 27, Troy-Dothan's Parris visited Houston County High School. Parris told Miller she had started

getting phone calls. (Tab B at p. 31). Plaintiff does not know who had called Parris. (Tab B p. 31-32).

63.    According to Miller, Parris was "very, very angry," telling her "[y]ou've really done it now. I told you that you weren't supposed to shake things up here." (Tab B at p. 52). Miller further alleged that at that time Parris told her "I was in jeopardy of failing my internship." (Tab B at p. 53).

64.    The Troy-Dothan College of Education Professional Internship Program Handbook states: "Interns are expected to attend the school to which they have been assigned for the entire internship period. In the event of an emergency absence, the intern must notify the Director, the cooperating teacher, the cooperating teacher, the principal, and any other personnel as directed by the school. (Tab A at Exh.29, p. 11).

## O.    ANDREWS WRITES TO PARRIS

65.    Some time after September 24, 2004, Andrews wrote a letter to Troy-Dothan's Parris stating that he wanted to express some concerns about Miller, specifically Miller (a) following school procedures when leaving campus, (b) working with peer teachers, (c) developing positive teacher-student relationships, and (d) developing a better understanding of the special education process and required forms. (Tab A at p. 231; Tab A at Exh. 17).

66.    Miller admits that by the time Andrews wrote that letter, she had a strained relationship with special education teacher Strange, with Principal Pitchford, and with biology teacher Stacey Ezell. (Tab A at p. 231).

## P.    OTHER INFORMATION RELAYED TO TROY-DOTHAN

67.    Subsequent to her walking off Houston County High School's campus on September 24, 2004, Troy-Dothan received a memo signed by Stacey Ezell and Paul Strange outlining specific information. It read:

> "(1)    Mrs. Miller left the school campus without informing administrative personnel. She did not return until the next school day.
>
> (2)    Mrs. Miller accused Paul Strange of entering her locked filing cabinet and placing an IEP in a student folder. Mrs. Miller claims it was an IEP written without her knowledge. Mr. Strange and Mrs. Miller had written the IEP in her room approximately one week earlier. Mrs. Miller stated she had no recollection of that event.
>
> (3)    Mrs. Miller has difficulty in communicating with faculty members.
>
> (4)    Mrs. Miller questioned the lawfulness of the school systems inclusion policies.
>
> (5)    Some students have requested that Mrs. Miller not be their inclusion teacher.
>
> (6)    Classroom teachers reported that Mrs. Miller has been upset and crying during class time.

(7)    Office staff members reported that Mrs. Miller was upset and crying in the office lobby during school hours.

(8)    Not following suggestions provided by Mr. Strange as related to the resource room.

(9)    Mrs. Miller told a classroom teacher, "I don't like being here any more than you do, but I have to be in here a certain number of hours. This is in response to the classroom teacher telling her that she could leave the room because the lesson was over. Mrs. Miller said this in front of the students in the class. (Tab at Exh. 18)."

## Q.    DR. RUEDIGER'S SECOND ON-CAMPUS OBSERVATION

68.    On September 30, 2005, Dr. Ruediger performed a second on-campus observation of Miller's student internship. (Tab B at p. 39). While standing next to each other in a Houston County High School hallway that day, Miller alleges, "I wanted to explain [to Dr. Ruediger] why I had left Houston County [High School that following Friday]. And he said, 'You know, we're just not going to talk about that right now.' Something to that effect." (Tab B at p. 41).

69.    Although Dr. Ruediger observed Miller at Houston County High School, he actually met with her on the Troy-Dothan campus to discuss that second observation with her. On her written evaluation, Dr. Ruediger graded her a "1" for professional behavior for her leaving the school the way she did on September 24, 2005. That is the lowest possible score. Miller cannot recall Dr. Ruediger giving her any other reason for the "1" rating.

(Tab B at p. 43). She alleges that Dr. Ruediger admitted "that some of the scores were for my unprofessional behavior by leaving the school on Friday." (Tab A at p. 259). Another Troy-Dothan College of Education professor, Dr. Lumpkin, was at that meeting. (Tab B at p. 41).

70.    Miller received other scores on that day on her written evaluation that she considered too low. She said, "I felt it was a reflection of my trying to get help for my kids by going to Mr. Andrews," but admits that she can't recall if Dr. Ruediger ever said that was the case. (Tab B at p. 43-44). At the observation debriefing, she communicated to Dr. Ruediger that she was not pleased with the 1 and 2 scores. (Tab B at p. 44).

71.    However, other than the low scores Dr. Ruediger gave her in that evaluation at the end of September 2004, Miller "respected [Dr. Ruediger's] opinion, and asked for his advice, and appreciated, you know, what help he could give me." (Tab B at p. 99).

## R.    MILLER'S STUDENT INTERNSHIP IS TERMINATED

72.    Effective October 14, 2004, Ms. Miller's student internship was terminated.

73.    Dr. Jones, the Dean of the College of Education, was the individual who made the decision to terminate Miller's student internship.

74.     According to Dr. Jones, "[i]t had become obvious to me that Ms. Miller was not achieving the pedagogical goals of her student internship, that is, to prepare her for her post-graduation teaching career. I had come to that conclusion based on a series of documented events, including information about her behavior and attitude in the school setting, some weak evaluations she received, and what I consider a major event, her leaving the Houston County High School campus one day in September 2004 without permission from the Houston County High School principal." (Tab C at ¶22).

75.     According the Dr. Jones, no one at Houston County High School or associated with the Houston County Board of Education ever asked her to terminate Miller's internship, and she is not aware of anyone at Houston County High School or associated with the Houston County Board of Education ever making such a request to anyone employed at Troy University. (Tab C at ¶24).

76.     Pursuant to Dr. Jones' instructions to Ms. Parris in a November 1, 2004, memo, Miller received an I ("Incomplete") as her grade for the SPE4454 Internship Seminar course and the SPE4465 Internship course for the Fall 2004 semester. (Tab C at ¶21). Miller took the student intern class

and the intern seminar class again in the Spring of 2005 and was not charged tuition. (Tab B at p. 77).

77.    On October 20, 2004, Miller was handed a letter from Houston County school officials stating that her employment at Houston County High School had ended. (Tab B at p. 92).

## S.    MILLER'S STUDENT INTERNSHIP AT BEVERLYE MIDDLE SCHOOL IS A HUGE SUCCESS

78.    In the Spring 2005 semester, Miller successfully completed a Troy-Dothan student internship at Beverlye Middle School and completed the internship seminar course. (Tab C at ¶23). Beverlye Middle School is a part of the Dothan City School System. (Tab B at p. 79).

79.    Miller never considered not completing her Beverlye Middle School internship. She wanted to be a special education teacher. (Tab B at p. 126)

80.    The Troy-Dothan faculty member who observed Miller during her Beverlye Middle School internship was Dr. Morin. In her first review, Dr. Morin gave her 1's and 2's in her evaluation, but Miller did not have any problems with the 1's and 2's Dr. Morin gave her because "that was her call" and Miller thought Dr. Morin was fair. Miller improved her scores in later on-site observations Dr. Morin made. (Tab B at p. 117). Dr. Morin had the reputation of being a hard teacher. (Tab B at p. 117).

81.    In a November 30, 2005, TEP meeting before her Beverlye Middle School internship began, (Tab B at p. 104), Dr. Morin stressed that she wanted to do everything she could to try to make Miller's Beverlye Middle School internship successful, and Dr. Morin did just that. (Tab B at p. 115).

82.    Gary Manfready, a new instructor, was Miller's teacher for the internship seminar she took during her Spring 2005 internship at Beverlye Middle School. (Tab B at p. 105).

83.    Miller learned a lot from her internship at Beverlye Middle School. (Tab B at p. 75). When asked what was the purpose of a student internship at Troy-Dothan, she replied:

> "My understanding, it's the culmination of all your learning. It's an exciting and fun, yet stressful period in which you are able to experiment with, you know, things that you've learned, get help and advice and just try to learn as much as you can about your profession."

(Tab B at p. 75-76).

84.    When asked if she got all of that at her Beverlye Middle School internship, she said "[a]bsolutely." (Tab B at p. 76).

85.    According to Miller, her internship at Houston County High School was neither exciting nor fun; "[i]t was torture." (Tab B at p. 76).

86.    She said at Houston County High School she "learned what not to do," while at Beverlye Middle School she learned what to do. (Tab B at p. 76).

## T.    MILLER IS INVITED BACK TO TROY-DOTHAN TO BE A SPEAKER IN A PROGRAM

87.    After she had graduated and started working full-time as a special education teacher at Beverlye Middle School, Miller was invited with another teacher from Beverlye Middle School to give a speech (power-point presentation) at Troy-Dothan. (Tab B at p. 67).

88.    Miller enjoyed being a part of that panel very much and was honored by the words Dr. Morin used to introduce her. (Tab B at pp. 67-68). Dr. Morin had invited her to participate. (Tab B at p. 69).

## U.    MILLER KEPT HER CONCERNS INVOLVING HOUSTON COUNTY HIGH SCHOOL'S SPECIAL EDUCATION PROGRAM IN-HOUSE AND AT THE LOWEST LEVEL

89.    Miller tried to keep all of her complaints "at the very lowest level." (Tab B at p. 66).

90.    She told some of her classmates in her student internship class via Blackboard about her situation.  (Tab B at p. 87).

91.    When asked if she communicated any of the alleged "non-compliance" issues she alleges she witnessed at Houston County High School with anyone other than a member of the Houston County Board,

Houston County High, Troy University faculty or administrative member, or a Troy University student, she answered, "[n]ot to my recollection." (Tab B at p. 90).

92.    Miller never communicated any alleged non-compliance issue to any newspaper, parent/teacher group, parent of any student, or to the Alabama Department of Education. (Tab B at p. 90).

93.    Moreover, she did not contact any member of the press and did not publish anything on the internet about her allegations. She also did not go to any open Houston County Board of Education meeting to report anything. (Tab B at pp. 90-91).

94.    Again, she stated, "I tried to keep it on the lowest level possible." (Tab B at p. 91). At Troy-Dothan, she says she never complained to anyone above Dr. Jones about the alleged non-compliance issues. (Tab B at p. 91). Moreover, Miller never went to Dr. Jones to complain about anything that Parris or Ruediger did. (Tab B at p. 73).

## V.    NO ONE AT TROY-DOTHAN STOPPED MILLER FROM COMPLAINING

95.    Dr. Jones never told her not to communicate anything to the Houston County Board of Education. (Tab B at p. 72-73).

96.    Miller said that nothing Parris allegedly told her kept her from making any complaints to anyone. (Tab B at p. 87).

**W.    MILLER GRADUATES *MAGNA CUM LAUDE***

97.    Miller graduated from Troy-Dothan *magna cum laude*. (Tab A at p. 316).

98.    Miller admits that no one at Troy-Dothan has any authority to get her job back at Houston County High School. (Tab B at p. 123).

## III.

## ANALYSIS

Defendants Troy University, Dr. Sandra Jones, Dr. Greg Ruediger, and Pam Parris are entitled to dismissal with prejudice of all claims against them for the following separate reasons:

**A.    ANY OFFICIAL CAPACITY CLAIMS SHOULD BE DISMISSED AS REDUNDANT AND POTENTIALLY CONFUSING TO A JURY**

The Complaint states that "all individuals are sued in their individual capacities." (Tab D at ¶23). Out of an abundance of caution, Defendants Jones, Ruediger, and Parris state that to any extent, if at all, they are sued in their official capacities, such claims are due to be dismissed because they would be redundant to any claims against Troy-Dothan. See Stavropoulos v. Firestone, 361 F.3d 610, 614 n.4 (11th Cir. 2004) ("The court also allowed Stavropoulos's official-capacity Title VII, Title IX, and ADA claims against Firestone, Squires, and Nix to proceed, though it recognized them as

redundant to claims against the Board. In its summary judgment order, the district court dismissed these official-capacity statutory actions as redundant."); <u>Portera v. State of Alabama Dept. of Finance</u>, 322 F. Supp. 2d 1285, 1287 (M.D. Ala. 2004) (Thompson, J.) ("[A]ny claim against McClenney in his official capacity is redundant since the [Alabama State] Finance Department is already a defendant."); <u>Garrison v. Montgomery County Bd. of Education</u>, 2006 WL 625876 at * 9 (M.D. 2006) (Albritton, Senior J.) ("To retain this suit as one against Purcell, et al., in their official capacities and as one against the MCBOE would be redundant and possibly confusing to the jury.") (quotes omitted)

**B.** **ALL CLAIMS AGAINST TROY-DOTHAN ARE DUE TO BE DISMISSED EITHER BASED ON IMMUNITY, MOOTNESS OR MILLER'S FAILURE TO ESTABLISH STANDING**

Troy-Dothan, an instrumentality of the State of Alabama, is due summary judgment on all claims either because of the doctrine of immunity, the doctrine of mootness, or Miller's failure to establish standing. Specifically, summary judgment is due based on the following:

- Eleventh Amendment immunity bars Miller from recovering any money damages based on alleged violations of the United States Constitution;

- Because Miller has graduated from Troy-Dothan, she is barred from receiving injunctive or declaratory relief with regard to her federal claims; and

● Miller is barred from any relief, injunctive or otherwise, with regard to her 42 U.S.C. § 1983 claims because Troy-Dothan is not a "person" acting under color of state law and because of Eleventh Amendment immunity.

### 1. Troy-Dothan Is an Instrumentality of the State of Alabama and Has Not Waived Its Sovereign Immunity

The Eleventh Amendment of the United States Constitution "prohibits federal courts from entertaining suits by private parties against States and their agencies" in the absence of a state's consent. Alabama v. Pugh, 438 U.S. 781 (1978). See also Lassiter v. Alabama A&M University, 3 F.3d 1482, 1485 (11th Cir. 1993) ("The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity.")

### a. Troy-Dothan is an instrumentality of Alabama

As the Eleventh Circuit noted in Harden v. Adams, 760 F.2d 1158, 1163-1164 (11th Cir. 1985), Troy-Dothan is an instrumentality of the State of Alabama entitled to Eleventh Amendment immunity:

"The Alabama Supreme Court has held on at least two occasions that state universities, including Troy State University, are agencies or instrumentalities of the state. *See Massler v. Troy State University,* 343 So.2d 1 (Ala.1977); *Ellison v. Abbot,* 337 So.2d 756 (Ala.1976). Moreover, Troy State University is subject to substantial state control: its Board

of Trustees, which reports to the state legislature yearly on the condition of the University, is composed in part of state officials and in part of gubernatorial appointees. Sections 16-56-1 and 16-56-3, *Code of Alabama* (1975). Troy State must also submit its budget to, and receive appropriations from, the state legislature. Section 16-56-10, *Code of Alabama* (1975). The Alabama Supreme Court has also determined that the Board of Trustees of a state university is entitled to sovereign immunity as an instrumentality of the state. *See Hutchinson v. Board of Trustees of University of Alabama,* 47 Ala.App. 460, 256 So.2d 279 (1971)."

### b.    No waiver of Eleventh Amendment immunity

Alabama has not waived Eleventh Amendment immunity. Alabama v. Pugh, 438 U.S. 781, 782 (1978) (noting that "no consent could be given under Art. I, § 14, of the Alabama Constitution, which provides that 'the State of Alabama shall never be made a defendant in any court of law or equity'"); Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1429 (11th Cir. 1997) (holding Alabama has not waived its Eleventh Amendment immunity).

### 2.    Eleventh Amendment Immunity Bars Money Damages

The Eleventh Amendment to the United States Constitution bars Miller from recovering money damages from Troy-Dothan for alleged First and Fourteenth Amendment violations. Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) ("Federal courts may not award retrospective relief, for instance money damages or its equivalent, if the State invokes its

immunity."); <u>Zabriske v. Court Administration</u>, 2006 WL 231528 (11th Cir. 2006) ("The district court properly dismissed Plaintiff's claims for money damages as barred by Eleventh Amendment immunity"); <u>Raspberry v. Johnson</u>, 88 F. Supp. 2d 1319, 1324 (M.D. Ala. 2000) (DeMent, J.) ("Plaintiff wisely does not contest this argument because the Eleventh Amendment unequivocally bars suits for money damages against a state by the citizens of that state, unless the state consents to suit or specifically waives its Eleventh Amendment immunity.")

### 3.    **Miller's Federal Constitutional Claims for Equitable Relief Are Moot**

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969). Any decision on the merits of a moot case would be an impermissible advisory opinion. <u>Church of Scientology Flag Serv. Org. v. City of Clearwater</u>, 777 F.2d 598, 604 (11th Cir. 1985), cert. denied 476 U.S. 1116 (1986).

Miller brings claims for injunctive relief based on the First and Fourteenth Amendments of the United States Constitution.[4] Her graduation from Troy-Dothan at the end of the 2005 spring semester has rendered those claims moot. She can no longer claim her First or Fourteenth Amendment

---

[4] Tab D, Complaint at ¶1.

rights are threatened from Troy-Dothan or from any Troy-Dothan professor or administrator. Beasley v. Alabama State University, 3 F. Supp. 2d 1325, 1344 (M.D. Ala. 1998) (Thompson, J.):

> While Beasley had standing to pursue injunctive relief when she first filed suit, as well as when she first moved to certify a plaintiff class in June 1996, because she still had several months of eligibility to participate in NCAA athletics at that time, her eligibility has now long expired. Consequently, she can no longer benefit from an order requiring ASU to comply with the mandates of Title IX, and her claim for injunctive relief is now moot.

See also Adler v. Duval County School Bd., 112 F.3d 1475, 1477 (11th Cir. 1997) ("All appellants have graduated, and none are threatened with harm from possible prayers in future Duval County graduation ceremonies."); Pederson v. Louisiana State University, 213 F.3d 858, 874 (5th Cir. 2000) ("As is so often the case in suits for injunctive relief brought by students, graduation or impending graduation renders their claims for injunctive relief moot."); Cook v. Colgate University, 992 F.2d 17 (2d Cir.1993) (holding that Title IX claims brought by women club ice hockey team at University were moot because the players had graduated), cited with approval in Beasley, 3 F. Supp. 2d at 1343.

Miller has not applied for graduate school at Troy-Dothan, only considered it. Moreover, she has not determined whether she would even enroll at the Troy-Dothan campus. (Tab B at p. 7). Therefore, her claims for

injunctive and declaratory relief based on federal constitutional claims are barred by the doctrine of mootness, and there is no exception to save them.

### a. No class certification

The Complaint makes no request for class certification. (Tab D, passim).[5] Moreover, the deadline to file a motion for class certification has long since passed and no such motion was filed. Therefore, the lawsuit contains no party still enrolled in Troy-Dothan who can stave off the mootness of the federal constitutional claims for injunctive relief. According to Beasley v. Alabama State University—

> "Beasley has not availed herself of this opportunity to preserve her claims for injunctive relief, though, because she never renewed her motion to certify a plaintiff class after the court first denied it with leave to renew in March 1997, and no class has since been certified in this action.
>
> "Consequently, Beasley has not staved off the mootness of her claim for injunctive relief, and she cannot now assert this claim on behalf of herself or other female student-athletes at ASU. The defendants' motion for summary judgment is therefore due to be granted as to Beasley's sole remaining claim for prospective injunctive relief."

3 F.Supp.2d at 1343.

---

[5] According to the Middle District of Alabama's Local Rule 23.1, "[i]n any case sought to be maintained as a class action, the complaint or other pleading asserting a class action, shall include in its caption under the case number, the legend 'Class Action.'" The Complaint in this case has no such assertion in its caption. (Tab D, caption).

**b.    The "capable of repetition, yet evading review" exception does not apply**

Graduated students often maintain that their claims fall under an exception to the mootness doctrine where the harm is "capable of repetition, yet evading review." Mellen v. Bunting, 327 F.2d 355, 363 (4th Cir. 2003). Graduated students do not ordinarily qualify for this exception to the mootness doctrine because, once they have graduated, they will never again be subject to the school's policies. Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 71 (2d Cir.), cert. denied, 534 U.S. 827 (2001) ("[T]he 'capable of repetition, yet evading review' exception is not available when the issue is students' rights and the complaining students have graduated from the defendant institution.").

**4.    Miller's Has No Constitutional Standing to Bring a Lawsuit Based on Her Claim that Troy-Dothan Violated Her Rights**

As stated by the Eleventh Circuit in Alabama-Tombigbee Rivers Coalition v. Norton, 338 F.3d 1244, 1252 (11th Cir. 2003), the three required elements for constitutional standing are "(1) 'an 'injury in fact' — a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent', not 'conjectural' or 'hypothetical'; (2) 'causation — a fairly traceable connection between the plaintiff's injury and the complained-of conduct of

the defendant;' and (3) 'redressability' — a likelihood that the requested relief will redress the alleged injury."

Because Miller graduated from Troy-Dothan at the end of the 2005 spring semester and is no longer on campus, no injunction can redress any alleged injury she suffered.  Troy-Dothan has no power to reinstate her to her teaching position at Houston County High School.

**5.    Any 42 U.S.C. § 1983 Claim against Troy-Dothan Must Be Dismissed**

To the extent, if any, Miller brings a 42 U.S.C. § 1983 claim against Troy-Dothan, it is due to be dismissed because Troy-Dothan is not a "person" acting under color of state law and because of Eleventh Amendment Immunity.

**a.    Troy-Dothan is not a "person" acting under color of state law**

"In order to succeed on a § 1983 claim, 'a plaintiff must show that he or she was deprived of a federal right <u>by a person</u> acting under color of state law.'" <u>Taylor v. Department of Public Safety</u>, 142 Fed.Appx. 373, 374 (11th Cir. 2005) (emphasis in original), quoting <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1303 (11th Cir. 2001). According to <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 67 (1989), the State is not a "person" within the meaning of § 1983.

The Eleventh Circuit has held that because neither a State nor its officials acting in their official capacities are "persons" under § 1983, claims brought under § 1983 against a State or its officials are due to be dismissed. Ferguson v. Georgia Dept. of Corrections, 2006 WL 997416 at *7 (11th Cir. 2006) (dismissing § 1983 claims for damages against State officials brought in their official capacity because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983, which provides a cause of action only against 'persons' who, under color of state law, deprive an individual of his constitutional rights"). See also McReynolds ex rel. D.M. v. Alabama Dept. of Youth Services, 2006 WL 821203 at * 4 (M.D. Ala. 2006 (Fuller, J.) ("[T]he ADYS is an arm of the state. Consequently, the Plaintiff cannot maintain an action under §1983 against the ADYS or any ADYS employee in his or her official capacity. Therefore, all such claims are dismissed.")

### b. The Eleventh Amendment to the United States Constitution bars § 1983 claims against Troy-Dothan

The Eleventh Amendment to the United States Constitution bars a § 1983 action against Alabama and its instrumentalities unless the State either consents to suit or waives its sovereign immunity with regard to § 1983 claims. Alabama v. Pugh, 438 U.S. 781, 781 (1978) (ruling the Eleventh Amendment barred an action against the State). As established in Part

III.B.1.b of this brief, Troy-Dothan has not waived its Eleventh Amendment immunity.[6] "Moreover, Congress has not abrogated eleventh amendment immunity in § 1983 cases." <u>Carr v. City of Florence, Ala.</u>, 916, F.2d 1521, 1524 (11th Cir. 1990). Therefore, the Eleventh Amendment bars a § 1983 claim against Troy.

## C.     <u>DEFENDANTS ARE SEPARATELY DUE SUMMARY JUDGMENT ON THE MERITS</u>

For the reasons stated in Part III.B of this brief, Defendant Troy-Dothan is due summary judgment on all claims and no further analysis is necessary. For the reasons stated in Part III.A, if Miller is bringing official capacity claims against the individual defendants, summary judgment is due on those claims as well without further analysis.

However, even if one or all of the Defendants were not entitled to summary judgment based on immunity, mootness, or standing, they all would still be due summary judgment on the First Amendment claim based on the merits, and the individual defendants — Dr. Jones, Dr. Ruediger, and Pam Parris — would further be entitled to summary judgment based on qualified immunity.

---

[6] Troy-Dothan also expressly stated in its Answer to the Complaint that it was an arm of the State of Alabama and that it did not waive any immunity from suit. (Tab K at p. 96, ¶¶31-37).

1.    **Defendants Are Due Summary Judgment on the First Amendment Claim**

Miller's First Amendment claim against Troy-Dothan and the Troy-Dothan individual defendant is based on the following allegations in her Complaint:

> —    "Defendants violated Plaintiff's right to speak freely about such policies and violations of law that she witnessed by either causing her to lose her internship or causing her to lose her job, or both." (Tab D at ¶24).

> —    "Defendant took such adverse actions and terminated (sic) in order to stifle Plaintiff's willingness and ability to speak honestly about violations of law, and to retaliate against her for having made such reports." (Tab D at ¶25).

a.    **Miller was in a classroom, not a public forum**

*(i)*    ***The student internship is a class, not a public forum.*** The purpose of the College of Education's student internship is pedagogical. It exists as an extended classroom for Troy-Dothan students. It is not open for the general public. Moreover, whenever Miller complained to anyone employed at the Houston County School System about the high school's special education program, she did so during school hours and/or at a school facility. (Tab B at p. 137-138).

In <u>Bishop v. Aronov</u>, 926 F.2d 1066, 1071 (11th Cir. 1991), the Eleventh Circuit held that a University classroom is not an open forum during instruction time.

"[S]chool facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' <u>Perry Education Assn. v. Perry Local Educators' Assn.</u>, 460 U.S. 37, 47 [103 S. Ct. 948, 956, 74 L. Ed. 2d 794 (1983), or by some segment of the public, such as student organizations. <u>Id</u>. at 46, n.7 [103 S. Ct. at 955 n.7 (citing <u>Widmar v. Vincent</u>). If the facilities have instead been reserved for other intended purposes . . . then no public forum has been created, and school officials may impose *reasonable restrictions* on the speech of students, teachers, and other members of the school community. <u>Hazelwood School Dist. v. Kuhlmeier</u>, 484 U.S. 260, 267, 108 S. Ct. 562, 568, 98 L. Ed. 2d 592 (1988) (emphasis added). While the University may make its classrooms available for other purposes, we have no doubt that during instructional periods the University's classrooms are 'reserved for other intended purposes,' *viz.,* the teaching of a particular university course for credit. Thus, we first hold that Dr. Bishop's classroom is not an open forum."

In <u>Virgil v. School Board of Columbia County, Florida</u>, 862 F.2d 1517, 1522 (11th Cir. 1989), the Eleventh Circuit noted that "[o]ne factor identified in <u>Hazelwood</u> as relevant to the determination of whether an activity could fairly be characterized as part of the curriculum is whether 'the public might reasonably perceive [the activity] to bear the imprimatur of the school.'" (brackets in original).

It is undisputed that the College of Education's Professional Internship Program bears the impratur of Troy-Dothan. Both in policy and practice, the teacher - and administrator-staffed program exists so that students in the College of Education, like Miller, could gain practical

teaching experience, earn college credits toward graduation, and further qualify for State teacher certification.

(ii) ***Troy-Dothan may impose reasonable restrictions.*** As the Eleventh Circuit stated in <u>Aronov</u>, pursuant to the United States Supreme Court's decision in <u>Hazelwood School Dist. v. Kuhlmeier</u>, 484 U.S. 260 (1988), where no public forum has been created, a University "may impose <u>reasonable restrictions</u> on the speech of students, teachers, and other members of the school community." 926 F.2d at 1021. (emphasis in original). In <u>Bannon v. School District of Palm Beach</u>, 387 F.3d 1208, 1213-1214 (11th Cir. 2004), the Eleventh Circuit stated that "[b]etween the spectrum of pure student expression and government expression is the intermediate category of school-sponsored expression: when 'students, parents, and members of the public might reasonably perceive [students' expressive activities] to bear the imprimatur of the school,' schools may censor student expression so long as their action are reasonably related to legitimate pedagogical concerns." (brackets in original).

(iii) ***Dr. Jones Acted in Miller's Best Interests as a Student.*** The record is undisputed that Dr. Sandra Jones, the Dean of the College of Education, made the decision to terminate Miller's Fall 2004 student

internship. Dr. Jones' reasons for doing so are soundly grounded in Miller's

best interests as a student:

> "It had become obvious to me that Ms. Miller was not achieving the pedagogical goals of her student internship, that is, to prepare her for her post-graduation teaching career. I had come to that conclusion based on a series of documented events, including information about her behavior and attitude in the school setting (see Tab 3), some weak evaluations she received, and what I consider a major event, her leaving the Houston County High School campus one day in September 2005 without permission from the Houston County High School principal."

(Tab C at ¶22). When Miller was asked what was the purpose of a student

internship at Troy-Dothan, she replied:

> "My understanding, it's the culmination of all your learning. It's an exciting and fun, yet stressful period in which you are able to experiment with, you know, things that you've learned, get help and advice and just try to learn as much as you can about your profession."

(Tab B at p. 75-76). Nothing in Miller's own description of the purpose of

the student internship says anything about it being anything other than

pedagogical, certainly not a public forum. When asked if she got all of that

at her Beverlye Middle School internship, Miller said "[a]bsolutely." (Tab B

at p. 76). In juxtaposition, she unequivocally stated that her internship at

Houston County High School was neither exciting nor fun; "[i]t was

torture." (Tab B at p. 76). Finally, and most revealing, Miller said at

Houston County High School she "learned what not to do," while at Beverlye Middle School she learned what to do. (Tab B at p. 76).

If Dr. Jones had not made the decision to terminate Miller's internship, Miller never would have received the educational benefits she received at Beverlye Middle School. It is undisputed that Dr. Jones acted reasonably.

### b.    Miller's communications did not occur against a background of ongoing public debate

Miller conveyed her opinions that policies and laws were being violated with regard to the Houston County High School special education program to Houston County school system officials and Troy-Dothan officials only. The context of her speech is further evidence that she did not address a matter of public concern. See Dodds v. Childers, 933 F.2d 271, 274 (5th Cir. 1991):

> "Nor does the form or context of Dodds's complaints support the contention that she addressed a matter of public concern. The private form and context of speech, while not dispositive, are relevant factors in assessing whether that speech addresses a matter of public concern. Dodds did not address her complaints to anyone outside the College, nor did those complaints occur against a background of ongoing public debate about the administration of the College, its use of funds, or the operation of the Cosmetology Program."

Miller tried to keep all of her complaints "at the very lowest level." (Tab B at p. 66). When asked if she communicated any of the alleged "non-

compliance" issues she witnessed at Houston County High School with anyone other than a member of the Houston County Board, Houston County High, Troy University faculty or administrative member, or a Troy University student, she answered, "[n]ot to my recollection." (Tab B at p. 90).

Moreover, Miller never communicated any alleged non-compliance issue to any newspaper, parent/teacher group, parent of any student, and/or to the Alabama Department of Education. (Tab B at p. 90). She did not contact any member of the press, and she did not publish anything on the internet. She also did not go to any open Houston County Board of Education meeting to report her allegations. (Tab B at pp. 90-91). At Troy-Dothan, she never complained to anyone above Dr. Jones about the alleged non-compliance issues. (Tab B at p. 91). She never even went to Dr. Jones to complain about anything that Parris or Dr. Ruediger did. (Tab B at p. 73).

## 2. __Troy-Dothan Is Due Summary Judgment on the Due Process Claims__

Miller says that her rights under the Fourteenth Amendment were violated. (Tab D at ¶24). The Due Process Clause of the Fourteenth Amendment provides constitutional protection for both procedural due process and substantive due process. McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994). Miller does not plead a procedural due process claim in her

Complaint. (Tab D, passim). Her substantive due process claim is subsumed into her First Amendment claim and therefore is due to be dismissed.

Applying the principles announced by the U.S. Supreme Court in Graham v. Conner, 490 U.S. 386 (1989), because the First Amendment provides an explicit textual source of constitutional protection against denial of free expression, the First Amendment, not the more generalized notion of substantive due process, must be the guide in reviewing Miller's denial of free expression claim. In Graham, the U.S. Supreme Court reviewed an excessive use of force claim against police officers and held that "because the Fourth Amendment provides an explicit textual source of constitutional protection . . . [the Fourth] Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." 490 U.S. at 395. See also  Quantz v. Edwards, 2005 WL 3500838 at *14 (W.D. Wash. 2005) (internal citations omitted)

> To the extent that Mr. Quantz is basing his substantive due process claim on the same facts as his freedom of speech claim, the claim must be brought under the First Amendment. When a plaintiff's claim falls within the purview of both substantive due process and of a constitutional amendment, the claim is analyzed under the applicable amendment. This principle has been applied to overlapping substantive due process and First Amendment claims.

As shown in Part III.B above, Troy-Dothan did not deprive Miller of her First Amendment rights. Therefore, summary judgment with regard to her substantive due process rights is also due to be granted.

### 3.    Troy Is Due Summary Judgment on Any Equal Protection Claim

Miller's Complaint does not appear to allege an equal protection claim. (Tab E, *passim*).  If she, is however, alleging that the facts that give rise to her First Amendment claim also gives rise to an Equal Protection Claim, then she is doing nothing more than restating her First Amendment claim. Therefore, pursuant to Eleventh Circuit precedent, her Equal Protection Claim would be due to be dismissed. Watkins v. Bowden, 105 F.3d 1344, 1354-1355 (11th Cir. 1997) ("To the extent Watkins contends that she was dismissed because of her expressive activity, that claim arises under the First Amendment." Thompson v. City of Starkville, 901 F.2d 456, 468 (5th Cir. 1990) (dismissing plaintiff's equal protection claim in retaliation case because it "amounts to no more than a restatement of his first amendment claim"); Vukadinovich v. Bartels, 853 F.2d 1387, 1391-1392 (7th Cir. 1988), cited with approval in Watkins v. Bowden, 105 F.3d 1344, 1354-1355 (11th Cir. 1997), (finding that plaintiff's equal protection retaliation claim, based on allegation that "he was treated differently because

he exercised his right to free speech," "is best characterized as a mere rewording of [his] First Amendment-retaliation claim" ).

### D.   THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE DUE TO BE DISMISSED BASED ON QUALIFIED IMMUNITY

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

"For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Gonzalez v. Lee County Housing Authority, 161 F.3d 1290, 1295 (11th Cir. 1988) (emphasis added) (quotes omitted). Moreover, the

Eleventh Circuit "has established stringent standards for a plaintiff seeking to overcome the affirmative defense of qualified immunity asserted by a government official in an individual capacity." Id.

The Eleventh Circuit has recognized that the concept of qualified immunity is particularly applicable to First Amendment cases where there is no bright-line standard to put the public actor on notice of a constitutional violation. Dartland V. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir. 1989). Therefore, the individual "is entitled to immunity except in the extraordinary case where . . . balancing [the rights of individuals versus the rights of the government] would lead to the inevitable conclusion" that the plaintiff's rights had been violated. Id.

Certainly the facts in this case do not lead to the inevitable conclusion that either Dr. Jones, Dr. Ruediger, or Parris violated Miller's First Amendment rights. Under Hazelwood, the key to such an analysis is whether an individual's conduct was reasonable under the circumstances. The facts here do not establish that any individual defendant's conduct was so unreasonable to make it obvious to that individual that his or her actions violated Miller's constitutional rights.

Of particular importance is the analysis in the case Hosty v. Carter, 412 F.3d 731, 738-739 (7th Cir. 2005), which points out that some Circuits,

like the Sixth Circuit, do not apply Hazelwood to high schools and colleges,

but other Circuits, like the Eleventh, do. In Hosty, the Seventh Circuit held

that "Dean Carter" at Governor's State University in Illinois was entitled to

qualified immunity because it cannot be said that Dean Carter could have

reasonably known that his conduct in censoring a student newspaper was

unlawful:

> "Qualified immunity nonetheless protects Dean Carter from personal liability unless it should have been "clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." . . . .

> The district court held that any reasonable college administrator should have known that (a) the approach of *Hazelwood* does not apply to colleges; and (b) only speech that is part of the curriculum is subject to supervision. We have held that neither of these propositions is correct—that *Hazelwood's* framework is generally applicable and depends in large measure on the operation of public-forum analysis rather than the distinction between curricular and extracurricular activities.

> But even if student newspapers at high schools and colleges operate under different constitutional frameworks, as both the district judge and our panel thought, it greatly overstates the certainty of the law to say that any reasonable college administrator had to know that rule. The question had been reserved in *Hazelwood*, and the Supreme Court does not identify for future decision questions that already have "clearly established" answers. . . . Post-*Hazelwood* decisions likewise had not "clearly established" that college administrators must keep hands off all student newspapers. As we mentioned in Part II.A, **the tenth and eleventh circuits have used *Hazelwood* as the framework for evaluating the acts of colleges as well as high schools.** One circuit has said otherwise. See Student

Government Ass'n v. University of Massachusetts, 868 F2d
473, 480 n.6 (1st Cir. 1989) (asserting, in sole reliance on
*Hazelwood's* footnote 7, that the Supreme Court itself "holds"
that *Hazelwood's* approach does not apply to post-secondary
education). The approach of others is hard to classify. See
Kincaid v. Gibson, 236 F.3d 342, 346 n. 5 (6th Cir. 2001) (en
banc) (stating, in reliance on the parties' agreement, that
*Hazelwood* has "little application" to collegiate publications but
not explaining what this means, or how a constitutional
framework can apply "just a little"). This circuit had not spoken
on the subject until our panel's opinion, which post-dated Dean
Carter's actions." 412 F. 3d at 738-739 (emphasis added).

As the Seventh Circuit points out in Hosty, a 2005 opinion, the legal

landscape in the college student speech arena is far from established. Still,

Hosty points out that the Eleventh Circuit approaches the issue in a light

favorable to the defendants in this case.

Therefore, it cannot be said that Dr. Jones, Dr. Ruediger, or Parris

could reasonably have concluded that their dealings with Miller were in any

way unlawful. Their goal was to insure she receive the pedagogical training

her student internship class was supposed to provide her, and they ultimately

achieved that goal.

## III.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed by

Defendant Troy University in Dothan, Dr. Sandra Jones, Dr. Greg Ruediger,

and Pam Parris is due to be granted and all of Plaintiff Nancy Miller's claims dismissed with prejudice, costs taxed to plaintiff.

Respectfully submitted,

s/ Joseph V. Musso
Bar No: ASB-4825-O40J

Peyton Lacy, Jr.
James C. Pennington
**_Attorneys for Defendants Troy University, et al_**
Ogletree, Deakins, Nash,
    Smoak & Stewart, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
Telephone: (205) 328-1900
Facsimile: (205) 328-6000
Email:joseph.musso@ogletreedeakins.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/EDF system which will send notification of such filing to the following:

Thomas Kirven Brantley
Brantley & Amason
E-mail: brantleymcle@graceba.net

Winn Faulk
Faulk & Reed
E-mail: winnfaulk@bellsouth.net

James K. Walding
Hardwick, Hause & Segrest
E-mail:  kwalding@graceba.net

Jere C. Segrest
Hardwick Hause & Segrest
E-mail:  jerecs@aol.com

Katherine C. Hortberg
Boardman, Carr & Hutcheson
E-mails:  khortberg@boardmancarr.com
          mail@bcwhlaw.com


                            s/ Joseph V. Musso
                            OF COUNSEL