IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED
SOUTHERN DIVISION

2007 NOV 16  A 11: 42

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| NANCY MILLER, | ★ | |
| | ★ | |
| **PLAINTIFF** | ★ | |
| | ★ | |
| **vs.** | ★ | |
| | ★ | **CASE NO.1:06-CV-940-WKW** |
| HOUSTON COUNTY BOARD OF | ★ | |
| EDUCATION, KENNETH LORD, | ★ | |
| RILEY JOE ANDREWS, TIM | ★ | |
| PITCHFORD, PAUL STRANGE, | ★ | |
| STACY EZELL, TROY | ★ | |
| UNIVERSITY, DOTHAN, SANDRA | ★ | |
| JONES, PAM PARRIS and | ★ | |
| GREG RUEDIGER, | ★ | |
| | ★ | |
| DEFENDANTS. | ★ | |

## MOTION FOR SUMMARY JUDGMENT

THE DEFENDANTS, Houston County Board of Education,
former Superintendent Kenneth Lord, Superintendent Tim
Pitchford and Riley Joe Andrews, (hereinafter "Board
Defendants"), move this Court to enter a full, final and
appealable summary judgment in their favor and against the
Plaintiff as to all counts of the Complaint, pursuant to
Rule 56 Fed. R. Civ. P.  In support of these requests, the
Board Defendants state:

1.    No genuine issues of material fact exists.

2.    The Board Defendants are entitled to a judgment
and to affirmative rulings and orders from this Court as a

matter of law.

3.    There is no just reason for delay.

4.    The Board Defendants submit their Brief in Support
of their Motion for Summary Judgment in support of this
motion.

5.    The Board Defendants submit the following
evidentiary materials, in addition to the pleadings of
record in this case, in support of this motion:

(a)  The Deposition of Nancy Miller taken on July 17,

2007, together with Defendant's Exhibits 2, 3, 4, 6,

10, 11, 17, 18 and 28 thereto.

(b) The Continuation of the Deposition of Nancy Miller

taken on August 23, 2007.

(c)  The Deposition of Kenneth Lord.

(d)  The Deposition of Tim Pitchford.

(e)  The Deposition of Riley Joe Andrews.

(f)  The Deposition of Paul Strange.

(g)  The Deposition of Stacey Ezell.

(h)  The Deposition of Virginia Singletary.

(i) The Affidavit of Kenneth Lord.

(j) Defendant's Initial Disclosures 5 and 6 , the
Public School Contract signed by Miller.

(k) Defendant's Initial Disclosures 829 - 899 the

2007-2008 Houston County High School Teacher's
Handbook.

(1) The Affidavit of Riley Joe Andrews.

WHEREFORE, the Board Defendants move the Court to enter
a full, final and appealable summary judgment in their favor
and against the Plaintiff as to all counts of the Complaint
or, alternatively, as to such counts of the Complaint and to
each Defendant as the evidence entitles it.

HARDWICK, HAUSE, SEGREST & WALDING

BY: _____
Jere C. Segrest (SEG005)
ASB-1759-S-80J

BY: _____
Kevin Walding (WAL036)
ASB-8121-I-69J

BY: _____
Patrick B. Moody (MOO110)
ASB 0902-T-73M
Post Office Box 1469
Dothan, Alabama 36302
Phone:  (334)794-4144
Fax:    (334)671-9330
ATTORNEYS FOR DEFENDANTS

Page 3 of 4

CERTIFICATE OF SERVICE

I hereby certify that, this date, I have served a copy of this document on the following individual(s)or attorney(s) of record by placing a copy in the United States Mail in a properly addressed envelope with adequate postage.

Winn Faulk, Esquire
FAULK & REED
524 S. Union Street
Montgomery, Alabama 36104-4626

Thomas K. Brantley, Esquire
BRANTLEY & HAYWOOD
401 N. Foster Street
Dothan, Alabama 36303

Mark S. Boardman, Esq.
Katherine Hortberg, Esq.
BOARDMAN, CARR, WEED & HUTCHESON, P.C.
400 Boardman Drive
Chelsea, Alabama 35043-2811

Mr. James C. Pennington
Mr. Joseph Vincent Musso
Mr. Peyton Lacy, Jr.
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, Alabama 35203

This the 16th day of November, 2007.

_____
Of Counsel

1

IN THE U. S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

NANCY MILLER,

   PLAINTIFF,

VS.    CASE NO.1:06-CV-940-WKW

HOUSTON COUNTY BOARD OF EDUCATION, KENNETH LORD, RILEY JOE ANDREWS, TIM PITCHFORD, PAUL STRANGE, STACEY EZELL, TROY UNIVERSITY, DOTHAN, SANDRA JONES, PAM PARRIS and GREG RUEDIGER,

   DEFENDANTS.

The deposition of NANCY MILLER, taken by the Defendants, pursuant to the Federal Rules of Civil Procedure, before Stacey Watkins, RPR, and Notary Public, State at Large, at the offices of Hardwick, Hause, Segrest & Walding, Dothan, Alabama, on the 17th day of July, 2007, at 10:10 a.m., CDT, pursuant to notice.

2

APPEARANCES:

FOR THE PLAINTIFF:
MR. WINN FAULK
Attorney at Law
Montgomery, Alabama

MR. THOMAS K. BRANTLEY
Attorney at Law
Dothan, Alabama

FOR HOUSTON COUNTY BOARD OF EDUCATION, KENNETH LORD, RILEY JOE ANDREWS AND TIM PITCHFORD:

MR. KEVIN WALDING
MR. PATRICK B. MOODY
Attorneys at Law
Dothan, Alabama

FOR PAUL STRANGE AND STACEY EZELL:

MS. KATHERINE HORTBERG
Attorney at Law
Chelsea, Alabama

FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES, PAM PARRIS AND GREG RUEDIGER:

MR. JOSEPH V. MUSSO
Attorney at Law
Birmingham, Alabama

ALSO PRESENT:
KENNETH LORD
PAUL STRANGE
STACEY EZELL

3

STIPULATION

It is stipulated by and between for the parties that this deposition at this time by Stacey Watkins, RP[R] Notary Public, State at Large, [...] as commissioner without form[...] commission to her; that said[...] be taken down stenograph[...] and certified by the comm[...] signature of the witness is [...]

Except for objections as to [...] questions, no objections need be m[...] the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

4

(Defendant's Exhibits 1 through 28 previously marked for identification.)

NANCY MILLER

having been first duly sworn, testified as follows, to-wit:

EXAMINATION

BY MR. WALDING:

Q   Mrs. Miller, I'm Kevin Walding, and my law firm represents the Houston County Board of Education and various of the individual defendants you have sued in this case. Do you understand that?

A   Yes.

Q   I'm here to take your deposition today as part of your lawsuit. Do you understand that?

A   Yes.

Q   Have you ever given a deposition before, ma'am?

A   No, ma'am -- no.

Q   Okay. Well, just so that you and

5

1  are on the same page of the hymnbook, as I
2  like to say, because I'm just a country boy
3  myself, let me just kind of go over the
4  process with you, so that I can make sure you
5  and I are communicating well and you
6  understand how the process works.  Okay?
7      A    Yes.
8      Q    Basically, the process works -- and
9  let me stop myself.
10          MR. WALDING:  Do we have usual
11              stipulations?
12          MR. BRANTLEY:  Yes.
13          MR. MUSSO:  Yeah.
14          MS. HORTBERG: (Nodding head.)
15          MR. BRANTLEY:  Do you want to
16              explain to her what those
17              usual --
18          MR. WALDING:  No.  I'll let you do
19              that.
20          MR. BRANTLEY:  Okay.
21      Q    (By Mr. Walding)  The basic
22  process, ma'am, is for me, as the attorney,
23  to ask you questions, one at the time, and
24  then, you to respond to those questions, one
25  at the time.

6

1          This lady here is a court reporter.  And
2  she's here to transcribe my questions and the
3  other lawyers' questions, because they will
4  all get a chance to ask you questions, and
5  your responses.  And the process is, of
6  course, that you are under oath, sworn to
7  tell the truth.
8          It's important, though, as part of the
9  process, that if you don't understand the
10  question that I'm asking, or you and I are
11  just not communicating very well, that you
12  let me know that in some way.  Okay?
13      A    Yes.
14      Q    Do you understand that?
15      A    Yes.
16      Q    And will you agree that, if you
17  don't understand one of my questions -- and,
18  you know, sometimes lawyers just ask bad
19  questions -- that you'll let me know that in
20  some way?
21      A    Yes.
22      Q    Okay.  And can I assume that if you
23  answer the question, though, and you don't
24  tell me, "Listen, I didn't understand that,
25  Mr. Walding," that you did, in fact,

1      understand the question?
2      A    Yes.
3      Q    Okay.  Because you've agreed to
4  tell me if you didn't understand something.
5      A    Right.  Got you.
6      Q    All right.  It's also important, as
7  part of our process, that you answer the
8  question verbally, out loud.
9      A    (Witness nodding head in
10  affirmative.)
11      Q    Shaking your head up and down, just
12  like you're doing now --
13      A    Just like I'm doing.
14      Q    -- is good, and most people do it.
15  But it's more difficult for us to understand
16  at a later time exactly what you meant if you
17  don't answer the questions out loud.
18          So, if you can -- and I'll remind you, as
19  we go through it, you know, if you're not
20  doing this for me -- can you answer the
21  questions out loud and with words, "yes,"
22  "no," or sentences?
23      A    (Witness nodding head in
24  affirmative.)
25      Q    Can you do that for me?

1      A    Yes.
2      Q    And do you understand why I'm
3  asking you to do that?
4      A    Yes.
5      Q    Okay.  Are you taking any sorts of
6  medications or drugs or substances of any
7  kind that might interfere with your ability
8  to listen to my questions, to understand
9  those, and then, to respond to them?
10      A    No.  I'm not on any medication
11  except an occasional Tylenol.
12      Q    Okay.  Well, now, the last time I
13  checked, Tylenol didn't interfere with your
14  ability to --
15      A    Correct.
16      Q    -- listen and understand and
17  answer.
18      A    That is correct.
19      Q    Okay.  Did you take some Tylenol
20  this morning?
21      A    No.
22      Q    Well, you may need some before
23  we're over.
24      A    That's what I've been told.
25      Q    Really, the process is not that

9

1  bad, but other people disagree with my
2  statement there. Are you suffering from any
3  sorts of medical conditions that might
4  interfere with your ability to listen to my
5  questions, understand those, and then,
6  respond to them?
7     A    No.
8     Q    Okay. Do you have a hearing
9  problem of any kind?
10    A    No, I don't.
11    Q    Do you have a problem reading?
12    A    No.
13    Q    Okay. I notice that you have
14  glasses with you today.
15    A    Right.
16    Q    Are those just reading glasses?
17    A    Yes.
18    Q    Okay. So, then, if we look at
19  documents, you may have to actually use your
20  reading glasses?
21    A    That's correct.
22    Q    Okay. Are you suffering from any
23  sorts of emotional or psychological problems
24  today that might keep you from listening to
25  my questions, understanding those, and

10

1  responding?
2     A    I've had a sister-in-law have
3  surgery, so my mind is a little bit, you
4  know, concerned about her. But I don't think
5  it will interfere.
6     Q    So, you might be slightly
7  distracted because of your sister-in-law?
8     A    Possibly.
9     Q    Okay. Well, will you do your best
10 to focus on what we're here for today?
11    A    Absolutely.
12    Q    And if you get distracted at some
13 point, would you tell me that, and maybe we
14 could take a break, and you could get some
15 caffeine or something?
16    A    Yes, I will.
17    Q    Will that be okay?
18    A    That will be fine.
19    Q    Because we have lots of caffeine in
20 this office.
21    A    Okay.
22    Q    Okay?
23    A    All right.
24    Q    And, ma'am, I do hate to ask you
25 this question. But, would you tell me how

11

1  old you are, please?
2     A    Oh, I don't mind a bit. I'm 53.
3     Q    Well, I have discovered in life
4  that that's not a pleasant question to ask,
5  especially females, and I've been slapped a
6  few times for asking it. So, I'd like to
7  apologize ahead of time. Okay? Where do you
8  live, ma'am?
9     A    100 Oak Manor Court, Midland of t.
10 Alabama. That's my mailing address. We're
11 actually in the city limits of Dothan.
12    Q    Now, whereabouts is that?
13    A    Off Brannon Stand Road and
14 Bethlehem Road.
15    Q    Sure. How long have you lived
16 there?
17    A    We built our house in 1985. And
18 with the exception of being assigned to
19 several military assignments in a five-year
20 period, we've lived there the entire time.
21 We moved back here into our same home. So,
22 we've owned the home since 1985.
23    Q    But y'all actually physically moved
24 away for some time?
25    A    In 1989. Uh-huh.

12

1     Q    Where did you move to?
2     A    That was Fort Leavenworth, Kansas.
3  And then, we moved to Fort Lee, Virginia.
4  And then, my husband retired, and we moved
5  back here to our home.
6     Q    I take it that your husband is in
7  the military?
8     A    He's retired now. Uh-huh.
9     Q    Okay. Well, what branch of the
10 military was he in?
11    A    Army.
12    Q    And what rank did he obtain?
13    A    He retired as a major.
14    Q    All right. How long were y'all at
15 Fort Leavenworth, Kansas?
16    A    Let me see. From 1989 to May of
17 1992.
18       (Brief off-record.)
19    Q    You said that y'all also went to
20 Fort Lee, Virginia?
21    A    Uh-huh.
22    Q    When was that?
23    A    That was 1992. And then, when my
24 husband retired, we moved back here.
25    Q    And when did he retire?

1    A   1994.

2    Q   So, then, you have lived at 100 Oak

3 Manor Court continuously, then, since 1994?

4    A   That is correct.

5    Q   And you live there as we sit here

6 today?

7    A   That is correct.

8        (Brief off-record.)

9    Q   I take it that you are married?

10   A   Yes.

11   Q   And you spoke about your husband

12 earlier.

13   A   Uh-huh.

14   Q   To whom are you married?

15   A   Major Terry L. Miller.

16   Q   Have you been married to anyone

17 else?

18   A   No.

19   Q   When did you and he marry?

20   A   1972, December 2nd.

21   Q   And do you have any children?

22   A   We have three.

23   Q   And what are their names?

24   A   Jennifer is my oldest.  And then,

25 Quentin, Q-u-e-n-t-i-n.

14

1    Q   Yes, ma'am.

2    A   And Justin.

3    Q   How old is Jennifer?

4    A   Jennifer was born in '74, so she is

5 33.

6    Q   And does she live in Houston

7 County?

8    A   No.

9    Q   Does she live in southeast Alabama?

10   A   She lives in Montgomery, right now.

11   Q   What about Quentin?  How old is he?

12   A   Quentin is -- let's see.  Gosh.

13 That's terrible.  He is 27.

14   Q   Yes, ma'am.  And where does he

15 live?

16   A   He's in Tuscaloosa.  May I correct

17 that?  I believe he's 28.  Let me

18 double-check.

19   Q   That's all right, ma'am.  I won't

20 tell, if you don't.

21   A   That's terrible.  I tried to

22 forget that part of it there.  Makes me feel

23 old.

24   Q   Sure.  What about Justin?  How old

25 is he?

1    A   He is 26.

2    Q   And where does he live, ma'am?

3    A   He's actually living at home, right

4 now.

5    Q   Here in Houston County?

6    A   Actually, it's Dale County.

7    Q   Dale County?

8    A   Uh-huh.

9    Q   Now, is Justin married?

10   A   No.

11   Q   All right.  Ma'am, do you have any

12 relatives by blood or marriage, that are over

13 19 years of age, and that live in Houston,

14 Henry, Dale, Geneva or Coffee Counties,

15 Alabama?

16   A   No.  Only Justin.  Just Justin is

17 the only one.

18   Q   And that's one reason I asked you

19 if he was married.  So you understand that

20 question, I'm really asking that for purposes

21 of striking a jury in this case.

22   A   Okay.

23   Q   And those are the counties in this

24 district, or this part of the Middle District

25 of Alabama.  So, you don't have any relatives

1 by blood or marriage?

2    A   No.

3    Q   And your husband doesn't have any

4 relatives --

5    A   No.

6    Q   -- in those counties?

7    A   (Witness shaking head in negative.)

8    Q   Do I need to repeat the counties

9 for you?

10   A   No.

11   Q   Do you have any close friends that

12 are over 19 years of age that live in those

13 counties?  That's Houston, Henry, Dale,

14 Geneva and Coffee Counties.

15   A   No.

16   Q   You don't have any close friends

17 that live in this area?

18   A   Not particularly, no.

19   Q   Well, when you say "not

20 particularly," that means that you're

21 qualifying your answer.

22   A   I'm sorry.

23   Q   Do you have any close friends?

24   A   No.  I don't have any real close

25 friends here in this area.

17

1    Q    Okay.  So, you don't have anyone
2    that you interact with on a fairly regular
3    basis?
4    A    No.  My family.  And that's about
5    it, unless we go over to Georgia.  You know.
6    We have friends in Georgia, military friends.
7    Q    Yes, ma'am.  Okay.  So, do you
8    engage in any hobbies with other individuals
9    in this area?
10    A    No.
11    Q    Okay.  Like, play tennis or golf?
12    A    No.
13    Q    Bridge or cards of any kind?
14    A    No.
15    Q    All right.  Are you a member of any
16    church?
17    A    I'm not a member at this time.  I
18    occasionally have gone to Covenant United
19    Methodist Church, but haven't been there for
20    several years.
21    Q    Okay.  When you went to Covenant
22    Methodist Church, did you go to a Sunday
23    school class?
24    A    No.
25    Q    Well, did you interact with any

18

1    persons from Covenant on a regular basis?
2    A    No.
3    Q    So, you just went to church for
4    your service and went home?
5    A    Uh-huh.  Didn't attend any kind of
6    extra things, social things or anything like
7    that.  No.
8    Q    All right.  Are you a member of any
9    social or civic club?
10    A    At this point in time, no.
11    Q    I take it that you have been --
12    A    Yes, uh-huh, years ago.
13    Q    -- because of your qualifier?
14    A    Yes, years ago.
15    Q    Was that here in southeast Alabama?
16    A    Yes.
17    Q    And what civic or social clubs were
18    you a member of?
19    A    For instance, Wiregrass Arabian
20    Horse Association, which is no longer a
21    viable organization.
22    Q    Right.  Any others?
23    A    Let me see.  While I was in school,
24    going to Troy University, I was in the Gamma
25    Beta Phi, which is an honors organization.

19

1    Kappa Delta Pi, which was an education honors
2    association.  AEA, student AEA.  I'm trying
3    to think.  At this time, I just can't
4    remember.  If I think of some, I'll let you
5    know, though.
6    Q    Okay.  Did these organizations, the
7    Gamma Beta Phi --
8    A    Phi.  Uh-huh.
9    Q    -- and the Kappa Delta Pi --
10    A    Uh-huh.
11    Q    Am I saying those right?
12    A    Yes.
13    Q    Did they have meetings of some
14    kind?
15    A    Yes.
16    Q    Okay.  And were there persons in
17    those organizations with whom you regularly
18    engaged or interacted?
19    A    Just at the meetings.  We were all
20    involved in school, and so, it just left very
21    little time for much of anything.
22    Q    Well, were there any individuals
23    that you can name for me today that you
24    interacted with as part of those
25    organizations?

20

1    A    Brenda Patterson.  She happened to
2    be a fellow student in the teacher program.
3    Q    Yes, ma'am.
4    A    I'm trying to think of other
5    people.  I didn't really know that many of
6    them --
7    Q    Right.
8    A    -- 'cause some -- it wasn't
9    necessarily, as far as Gamma Beta Phi -- it
10    was a conglomerate of, you know, all
11    different of the -- like, business,
12    education.
13    Q    All of the colleges and
14    departments?
15    A    All of the different colleges.
16    Yes.
17    Q    It was an honor society, you said?
18    A    Uh-huh.
19    Q    But the Kappa Delta Pi --
20    A    Kappa Delta Pi -- Kappa Delta Pi
21    was an education organization.
22    Q    Yes, ma'am.  And did you interact
23    with people regularly in that organization?
24    A    I would see a couple of students
25    that I knew.  I didn't know everybody.

21

1  fact, I knew very few, because I was a
2  special education major, and there weren't
3  that many special education students at the
4  time.
5      Q   I understand. Can you name any of
6  those persons that you would interact with?
7      A   I'm trying to think of the girl's
8  last name. Jenny. I can't remember her last
9  name. I'm sorry.
10     Q   All right. What about the student
11 AEA? Did it have meetings?
12     A   Yes.
13     Q   And were there persons with whom
14 you regularly engaged or interacted?
15     A   Yes, when we would have meetings.
16     Q   Okay. Can you name me any of those
17 persons?
18     A   Gosh. I'm sorry. I just can't
19 recollect who all was in the organization.
20     Q   Sure. I understand.
21     A   It's been a while.
22     Q   Okay. So, you don't have any
23 relatives by blood or marriage in this area,
24 and you don't have any close friends. You
25 have attended a church, Covenant Methodist,

22

1  but you can't name any persons from that
2  organization that might be your friends or
3  close associates. Is that an accurate
4  statement?
5      A   That's pretty accurate. We didn't
6  attend that often.
7      Q   Okay. Well, I understand Dr. McKay
8  can be fairly boring sometimes. I
9  understand. That's a joke. That's a joke,
10 Mrs. Miller. Please don't go tell him I said
11 that.
12     A   When I actually went there, I
13 believe it was Dr. Harbour who was the
14 minister.
15     Q   That has been some time.
16     A   He married my daughter back then.
17     Q   He performed the ceremony?
18     A   Yes. I'm sorry. I said he married
19 my daughter. I'm sorry. He performed the
20 ceremony.
21     Q   Yes, ma'am. And I do hate to ask
22 you this next series of questions, ma'am, but
23 I need to ask them, regardless. Okay?
24     A   Uh-huh.
25     Q   Have you ever been arrested?

23

1      A   No.
2      Q   Have you ever been accused of a
3  crime?
4      A   A speeding ticket, and I believe I
5  ran a stop sign. I ran a stop sign.
6      Q   Other than traffic-related --
7      A   No.
8      Q   -- problems?
9      A   No.
10     Q   Have you ever lied under oath?
11     A   Not to my knowledge, no. No.
12     Q   Have you ever been involved in any
13 other lawsuits other than the one that we're
14 here about today?
15     A   No.
16     Q   This is the first lawsuit that you
17 have filed?
18     A   That is correct.
19     Q   Have you ever filed for bankruptcy?
20     A   No.
21     Q   Okay. If you would, ma'am, tell me
22 a little bit about your education. Where did
23 you go to high school?
24     A   New Philadelphia High School, in
25 New Philadelphia, Ohio.

1      Q   And did you grow up in New
2  Philadelphia, Ohio?
3      A   Yes. I was born in Springfield,
4  but I grew up in New Philadelphia.
5      Q   Okay. And you took a high school
6  diploma there?
7      A   Yes.
8      Q   All right. And when was that?
9      A   I graduated in 1972.
10     Q   What did you do after graduating
11 from high school?
12     A   I worked --
13     Q   Yes, ma'am.
14     A   -- at a Kroeger store, and then I
15 met my husband and got married.
16     Q   And did you continue to work after
17 you married Mr. Miller?
18     A   No.
19     Q   All right. So, you became a
20 homemaker then?
21     A   That's correct.
22     Q   And what was the next step, if any,
23 on your educational background?
24     A   When we moved to Fort Leavenworth,
25 Kansas, I attended the Johnson County

25

1  Community College. They had an equine
2  studies program there, and I jumped at the
3  chance.
4      Q    Pun intended, I'm sure.
5      A    Actually, I'm not a hunter jumper,
6  so, actually, not.
7      Q    And did they offer some sort of
8  certificate or degree at this --
9      A    Degree. An associate's.
10     Q    It's an associate's degree?
11     A    Uh-huh.
12     Q    Okay. And did you use that degree
13 in some way to work or earn a living?
14     A    I have given lessons before.
15 Uh-huh.
16     Q    Well, tell me the next step in your
17 education?
18     A    Okay. When we moved back down here
19 to Alabama, I went to real estate school.
20     Q    All right. And you moved back down
21 to Alabama -- would that have been in 1985?
22     A    I moved back down here in 1994.
23 1985 is when we first built our house.
24     Q    Yes, ma'am.
25     A    And then, my husband retired in

26

1  1994, and we moved back down here from Fort
2  Lee.
3      Q    Well, then, I just misunderstood
4  you. I assumed you had to be in this area
5  when you built the house, but I don't suppose
6  that's true.
7      A    No. That is true. In 1985, we
8  built our home. We were stationed from Fort
9  Meade, Maryland, down here to Dothan.
10     Q    Yes, ma'am.
11     A    We built our home. 1989, we kept
12 the house and rented it out and moved to Fort
13 Leavenworth, Kansas.
14     Q    I see. Okay. But when you said
15 earlier that you moved back to Alabama and
16 went to real estate school --
17     A    Right.
18     Q    -- that was roughly --
19     A    That was in 1994, after my husband
20 retired.
21     Q    Yes, ma'am. And did you use that
22 training or education to earn a living in
23 some way?
24     A    Yes. I was a realtor for several
25 years.

27

1      Q    With whom were you a realtor?
2      A    ERA Jack Hughes Realty.
3      Q    And how long were you with that
4  group?
5      A    Offhand -- I can't remember
6  exactly. Probably a yearish. Somewhere
7  around there.
8      Q    And, also, Mr. Strange standing up
9  reminds me that if you need to take a break
10 at any time, you just let me know that, and
11 we can do that at any time.
12     A    Thank you.
13          (Brief off-record.)
14     Q    Now, tell me the next step in your
15 education?
16     A    Okay. I went to Troy University.
17     Q    Yes, ma'am. So, you were a realtor
18 for about a year. That would put us around
19 1995?
20     A    Well, actually, I was a realtor at
21 that particular company for one year,
22 approximately a year. I was at a couple of
23 other real estate companies.
24     Q    What other companies?
25     A    Okay. Lummus Company, Better Homes

28

1  & Gardens.
2      Q    Lummus?
3      A    It's actually pronounced Lummus --
4      Q    Well, I told you that I was a
5  country boy.
6      A    -- according to Dave Lummus.
7  'Cause I always thought so, too.
8          MR. BRANTLEY: I've always said
9          Lummus.
10         THE WITNESS: Uh-huh. He said
11         there's no double "o." It's
12         only "u."
13     Q    Country folks call it Lummus.
14 Okay. How long were you with Dave Lummus?
15     A    Probably another -- maybe year and
16 a half or so. I don't remember exactly the
17 dates. I mean, I would have to look them up.
18     Q    Sure. I understand. All right.
19 And then, you indicated you were a realtor
20 with at least one other company?
21     A    That's correct. The Buyer's Agent.
22 It's no longer in business, unfortunately.
23     Q    Who was the principal in that?
24     A    Barbara Lewis purchased the
25 franchise from a lady in Enterprise.

29

1   Q   Okay. And who was that lady?

2   A   Becky -- I'm sorry.

3   Q   You don't know?

4   A   I can't remember her last name.

5   Q   Okay. And how long were you with

6  The Buyer's Agent?

7   A   I believe it was less than a year,

8  because she ended up selling the franchise

9  back to Becky. Becky Hancock.

10   Q   And you said Ms. Hancock was from

11  Enterprise?

12   A   Yes.

13   Q   Okay. Any other real estate

14  agencies you worked for?

15   A   No.

16   Q   Then you indicated that you started

17  at Troy University?

18   A   Uh-huh.

19   Q   And was that here in Dothan?

20   A   Yes.

21   Q   And approximately when would that

22  have been?

23   A   2001. Fall semester of 2001.

24   Q   And what sort of courses were you

25  taking then?

30

1   A   Special education. I was going to

2  be a special education major. So, I started

3  off with the normal core classes that you

4  have to take prior to.

5   Q   You started out with classes that

6  every college student would have to take?

7   A   Yes.

8   Q   But you had already made up your

9  mind at that time that you wanted to be a special

10  education teacher?

11   A   Absolutely.

12   Q   And at the time that the incidents

13  that are the basis of this lawsuit, I don't

14  believe you had actually attained a

15  bachelor's degree? Is that right?

16   A   That is correct.

17   Q   So, when you were doing your intern

18  teaching, your internship out at Houston

19  County High School, you had not attained your

20  bachelor's?

21   A   That's correct.

22   Q   Did you eventually attain your

23  bachelor's degree?

24   A   Yes.

25   Q   And did you eventually become a

31

1  certified teacher?

2   A   Yes.

3   Q   When did you become certified?

4   A   I believe it was August of 2005, is

5  actually when my certificate came back from

6  the state.

7   Q   Okay. And when did you attain your

8  bachelor's degree?

9   A   On my birthday of 2005. May 6th.

10   Q   And, Mrs. Miller, do you hold a law

11  degree?

12   A   No, I do not.

13   Q   Have you ever been to law school?

14   A   No.

15   Q   Do you hold a degree of any kind in

16  a law-related or legal field?

17   A   No.

18   Q   Like, a paralegal-type certificate?

19   A   No.

20   Q   Do you have any other degrees or

21  certificates past the bachelor's degree?

22   A   No.

23   Q   Have you, yourself, ever read the

24  IDEA?

25   A   I've read certain sections of it in

32

1  college, when our instructor would give us a,

2  you know, handout.

3   Q   Okay. Have you ever sat down and

4  read the entire federal law called the IDEA?

5   A   No.

6   Q   Have you ever read the federal

7  regulations that interpret and expand on the

8  IDEA?

9   A   No.

10   Q   Have you ever read the state

11  regulations that interpret and expand on the

12  IDEA?

13   A   I would imagine that would be the

14  -- I'm not sure exactly what you're talking

15  about, I mean, specifically those terms. But

16  I have seen the information on the state

17  education web site concerning the state

18  rules.

19   Q   When you said the state web site,

20  you're talking about the Alabama Department

21  of Education web site?

22   A   That is correct.

23   Q   So, have you ever sat down and read

24  the state regulations that interpret and

25  expand on the IDEA?

**33**

1    A    I have read portions of, but I've
2    not sat down the read the entire thing.
3    Q    Okay.  And the portions that you
4    read would have been on the web site for the
5    state education department?
6    A    No.  That would probably -- let me
7    think.  I'm not sure where I would have read
8    that from.  I'm sorry.
9    Q    Okay.  Have you ever read one of
10   the approximately three or four standard
11   legal treatises on special education law?
12   A    I'm not familiar with those -- with
13   that term.
14   Q    Which term are you not familiar
15   with?
16   A    The treatises.
17   Q    Okay.  Treatise is a fancy word for
18   book.  It's a law book.
19   A    Okay.  I have not read -- to my
20   knowledge, I've not read a law book
21   pertaining to special education.  A law book.
22   My understanding of what a law book would be.
23   Q    All right.  And I'm not trying to
24   mislead you, or you and I not communicate
25   well.  But there are approximately three or

**34**

1    four standard works in the special education
2    legal field.  And I'm asking you if you have
3    read any of those?
4    A    To my knowledge, I don't think I
5    have.
6    Q    Okay.  Have you ever attended one
7    of the national conventions on special
8    education law?
9    A    No.
10   Q    Have you ever taken any special
11   classes or courses that specifically taught
12   or were directed towards teaching the special
13   education laws?
14   A    Yes, at Troy University.
15   Q    Have you been specifically trained
16   in the special education laws?
17   A    I'm under the understanding that I
18   have been trained in terms of what the
19   special education program offers at Troy
20   University.
21   Q    Okay.  Any training that you have
22   would have come from your education at --
23   A    That is correct.
24   Q    -- Troy University?
25   A    That is correct.

**35**

1    Q    And you mentioned a specific course
2    that you took at Troy University?
3    A    I believe it was called policies
4    and procedures.  And, of course, in other
5    classes, we discussed, naturally, the federal
6    laws.  We discussed IDEA, the Americans
7    Disabilities Act.  And let me think what
8    else.  No Child Left Behind.
9    Q    Yes, ma'am.  So, those would have
10   come up during different sections in the
11   course work?
12   A    Yes.
13   Q    If I'm understanding you right --
14   and I want to make sure that I'm
15   understanding you right -- the only course
16   that specifically dealt with the law of
17   special education would be this policies and
18   procedures course you mentioned?
19   A    To my understanding, yes.
20   Q    And who taught that course?
21   A    That was Dr. Ruediger.
22   Q    Is that Dr. Greg Ruediger?
23   A    Yes.
24   Q    To your knowledge, is Dr. Greg
25   Ruediger an attorney?

**36**

1    A    No, not to my knowledge.
2    Q    And as part of the course on
3    policies and procedures -- I'm just going to
4    call that course that.  Okay?
5    A    Uh-huh.
6    Q    And you'll understand the course
7    I'm talking about when I say that?
8    A    Yes.
9    Q    Okay.  As part of that course, were
10   you required to read the federal law?  You
11   called it IDEA.  I call it I-D-E-A.  It
12   stands for Individuals with Disabilities and
13   Education Act.
14   A    Uh-huh.  Yes.  We were not required
15   to sit there and read the entire thing.
16   Specific areas, he would print off excerpts
17   and that sort of thing.
18   Q    And how many weeks was this course
19   on policies and procedures?
20   A    It was a semester.
21   Q    Yes, ma'am.  The question is the
22   same.
23   A    A semester.  I'm not sure how many
24   weeks that involved, right off the top of my
25   head.  I don't recall.

37

1    Q    So, you don't think it was nine or
2  twelve weeks?  You don't have any idea?
3    A    I don't recall.
4    Q    How many times per week did you
5  attend the course?
6    A    I'm trying to think if that was an
7  independent study or if it wasn't.
8  Generally, we had either two days a week or
9  three days a week.  I think it was two days a
10  week, but I'm not 100 percent sure.
11    Q    Okay.  And then, the course was
12  taught for an hour each time?
13    A    I believe it was more than that,
14  but I'm not 100 percent sure.  I'm sorry.
15    Q    And again, just so that you and I
16  are communicating well, this policies and
17  procedures class, that would have been the
18  only formal education you would have on the
19  special education laws?
20       MR. FAULK:  The only course
21          specifically devoted to that?
22       MR. WALDING:  Yes, sir.  Formal
23          education.
24    A    I believe that's the only course
25  that was specifically addressing that.

38

1    Q    And did you undertake, yourself,
2  informally, let's say, outside of a classroom
3  setting, to become familiar with the special
4  education laws?
5    A    Yes.
6    Q    Okay.  Tell me how you did that?
7    A    I did research on the computer.  We
8  had been told that we could go to the
9  library, of course, and, you know, get books
10  on special education.  Oftentimes, if I had
11  time in between classes, I would go to the
12  library and get books out.  I wouldn't
13  actually, necessarily, take them home, you
14  know, check them out or whatever, but I would
15  read.
16    Q    All right.  Anything else?
17    A    The computer.  I did a lot of
18  computer work at home and at school.
19    Q    All right.  And what sort of
20  research did you do on the computer to become
21  familiar with the special education laws?
22    A    There were articles.  Oftentimes,
23  we would have to write articles about certain
24  topics, and sometimes it had to do with
25  different scenarios.

39

1       And so, let's say there was an article
2  that Dr. Ruediger or one of the other
3  instructors, Dr. Morin, would give us, and
4  then, we might have to do a little research,
5  and then, critique the article, and
6  interject, you know, things that we've
7  learned from outside sources and that sort of
8  thing into the information.
9    Q    Okay.  So, if I'm understanding
10  you, the computer research that you did would
11  have been related to classes that you were
12  taking at the time, and not specifically
13  directed towards learning and having a good
14  and general understanding of the special
15  education laws and regulations?
16    A    I also did other types of research,
17  areas that I was not familiar with.  Let's
18  say students with autism, you know, or
19  students with mental retardation.  And, you
20  know, there are so many disabilities under --
21  that come under special education, that I
22  wanted to familiarize myself in case I
23  experienced any of those types of
24  disabilities.
25    Q    Okay.  Can you tell me, according

40

1  to the IDEA, how many types of disabilities
2  are recognized?
3    A    There is SLD, which is specific
4  learning disabilities.  Mental retardation.
5  OHI, which stands for other health
6  impairments.  VI, which is visual impairment.
7  There's emotionally conflicted, or they used
8  to call it emotionally disturbed.  I think
9  emotionally conflicted is the correct term
10  nowadays, the politically correct term.
11    Q    Yes, ma'am.  Can you tell me the
12  number of disabilities that are accepted and
13  stated under the special education law known
14  as the IDEA?  It's a very simple question,
15  ma'am.
16    A    Well, I'm not sure that -- there
17  are other -- I'm not sure how to phrase it
18  I can't be specific with a certain number.
19  I'm just --
20    Q    Okay.  You can't tell me that
21  number, because you've never read the IDEA?
22    A    I don't believe that's the reason
23  why.  It's more like a memory sort of thing.
24    Q    Okay.  But you would agree you
25  can't tell me that number?

41

1    A    I can't tell you a specific number,
2 but I've given you some of -- an idea of some
3 of the disabilities.
4    Q    Yes, ma'am.  I wrote down five
5 disabilities that you named off.
6    A    Okay.
7    Q    I want to make sure you've answered
8 my question.  Can you tell me the number of
9 disabilities that are listed and accepted
10 under the IDEA?
11    A    I'm not 100 percent sure of all of
12 them.
13    Q    And I am clear to the fact that
14 you've never actually read the federal law of
15 the IDEA?
16    A    Not totally.
17    Q    Okay.  Do you have an
18 understanding, ma'am, of how the special
19 education process itself works?
20    A    I believe I do.
21    Q    All right.  Good.  I want you to
22 assume for me that you have a student who is
23 not labeled special education, and that
24 student is having problems either
25 academically or behaviorally, or both, in the

42

1 classroom, and that either a teacher or a
2 parent thinks that child may have some form
3 of disability and needs some special help.
4 What is the process that teacher or parent
5 would go through in order to get that child
6 help?
7    A    The first thing, my understanding,
8 is that they would go through the Building
9 Base Support Team and talk -- Building Base
10 Support Team, BBSST, would discuss the issues
11 and try to determine interventions that could
12 be done in the classroom.  They would go back
13 to the classroom, try those interventions,
14 and if it didn't -- if they didn't work, or
15 if some did, they would report back to the
16 BBSST.
17    And if it was found that those
18 interventions did not help that student, they
19 would -- it's my understanding -- now, I've
20 never actually been involved in the BBSST.
21 But my understanding is that they would --
22 the BBSST would recommend that the student be
23 tested, and when the testing was finished,
24 they would determine eligibility.
25    Q    Who would do the testing?

43

1    A    My understanding is a psychometrist
2 is in charge of that.
3    Q    Do you understand the type testing
4 that's done?
5    A    They usually -- my understanding is
6 that they usually do intelligence tests and
7 achievement tests.
8    Q    But what if it's a behavior
9 problem?
10    A    Behavior alone is not -- my
11 understanding is that behavior alone is not
12 specifically under the criterion for a
13 student to be able to receive special
14 education services.  It's my understanding
15 that that could be part of the problem.  But
16 if they have a behavior problem, they would
17 take those things into consideration, and
18 that would be part of --
19    Q    Sure.  My real question is, do you
20 understand that there's testing involved in
21 behavior problems, behavior issues?
22    A    I have not been -- I have not
23 actually seen any testing for behavior
24 problems other than someone on the outside, a
25 doctor of some sort, you know, having --

44

1 like, for instance, ADHD --
2    Q    Sure.
3    A    -- they would -- the doctor would
4 determine whether or not he had ADHD.
5    Q    You've never done testing,
6 yourself, have you?
7    A    No.
8    Q    All right.  Tell me the remainder
9 of the process, as you understand it?
10    A    Once the eligibility team has
11 determined that the student does get -- is
12 eligible for special education services, then
13 it goes to the IEP team.  Now, that's been my
14 experience.
15    Q    So, if the eligibility team
16 determines that the child does not fit into
17 one of the established categories of
18 disabilities, and is not entitled to special
19 education services, what happens?
20    A    To my knowledge, what I've seen, in
21 my experience --
22    Q    Yes, ma'am.  That's what I'm
23 asking.
24    A    -- that student is -- if they're
25 not eligible for services, then the student

45

1  just goes back into the classroom, like
2  normal, and they can put that child up again
3  for BBSST at some other point in time.
4      Q    Okay. So, you recognize, then,
5  that there's a difference between this group
6  that determines eligibility for special
7  education services and the group that plans
8  programming once a child is determined to be
9  eligible for special education services?
10     A    That has been my experience.
11     Q    Yes, ma'am. And that's the process
12  you just told me about?
13     A    Uh-huh.
14     Q    I'm trying to make sure that you
15  and I are on the same page. You understand
16  there's something called the eligibility team
17  that determines whether a child is eligible
18  to get services, and then, there's something
19  called the IEP team that deals with
20  programming?
21     A    Technically speaking, my
22  understanding is that they could be one and
23  the same. But, in my experience, the
24  eligibility team has been separate until
25  they've been determined -- the student has

46

1  been determined eligible, and then, a special
2  education teacher will come into the
3  eligibility meeting with the parent, and sit
4  in, so that they can discuss some ideas for
5  eventually doing the IEP. Or if the notice
6  of proposal that is sent to the parent about
7  eligibility states on there -- is checked off
8  where the IEP team will also develop the IEP
9  at the same time, then that's okay, too.
10     But it has been rarely my experience --
11  I think I had one student that I can recall
12  where we actually did the IEP at the same
13  time that we did -- at the same meeting that
14  the parent was told the child was eligible.
15  And that was -- if I'm not mistaken, it was
16  -- he was up for re-eval.
17     Q    Re-evaluation?
18     A    Uh-huh.
19     Q    So, then, he had already been
20  identified --
21     A    Uh-huh.
22     Q    -- as a child in need of special
23  education services?
24     A    In that particular case.
25     Q    Okay. But, in general, where we

47

1  have the hypothetical I gave you earlier, a
2  child who has not been labeled special
3  education, would you agree with me that, in
4  general, we're talking about two steps in
5  this process? Eligibility, or
6  identification, and then, actual programming,
7  planning for the educational services?
8      A    As I understand you, yes.
9      Q    Okay. Good. Thank you, ma'am. To
10  the extent we've not already done so, I want
11  you to tell me about your work history. You
12  told me that you were a realtor, and you
13  talked about the three or four different
14  companies here locally that you worked.
15     We know about the internship, or we're
16  going to talk about it pretty extensively
17  today, which was part of your education and
18  training at Troy.
19     What has been your work history since
20  that time?
21     A    After I graduated, there were no
22  special education jobs in this area that I
23  applied for. I waited until a job opening
24  came at Beverlye Middle School. I had done
25  my internship at Beverlye, and had a

48

1  successful one, very much enjoyed working
2  with those people. And I applied for that
3  position and was hired. It was in January, I
4  believe, of 2006.
5      Q    Okay. And you're employed there
6  today?
7      A    I am looking for a job right now.
8      Q    When did you cease to be employed
9  at Beverlye Middle School?
10     A    The end of this school semester,
11  this past -- in May, the end of May.
12     Q    May of '07?
13     A    Uh-huh. Yes.
14     Q    So, if I'm understanding what you
15  just told me correctly, you worked as a
16  special education teacher at Beverlye Middle
17  School for the second semester of the '06-07
18  school year?
19     A    No. I'm sorry. I worked at
20  Beverlye Middle School from January '06 --
21     Q    Yes, ma'am.
22     A    -- through May of '07. I was there
23  a year and a half, basically.
24     Q    A year and a half.
25     A    At least.

49

1    Q    I'm sorry.

2    A    That would be two years, two school

3  years.

4    Q    I understand you now. The last

5  semester of one school year?

6    A    That's correct.

7    Q    And both semesters of the next

8  school year?

9    A    That's correct.

10    Q    Okay. You said, after graduating,

11  there weren't any special education positions

12  that you applied for.

13    A    Uh-huh.

14    Q    Are you saying there weren't any

15  special education positions in this area?

16    A    I wanted to stay in the Dothan City

17  School System, and preferably Beverlye, so I

18  did not apply.

19    Q    Is it your testimony this morning,

20  ma'am, that there were no special education

21  positions with the Dothan City Board of

22  Education that were not associated with

23  Beverlye Middle School?

24    A    Not to my knowledge.

25    Q    Okay. They didn't have a need for

50

1  a special education teacher in the Dothan

2  City system?

3    A    Not to my knowledge.

4    Q    Okay. And how long was it that you

5  were unemployed after doing this internship

6  at Beverlye Middle School?

7    A    I just stopped working at Beverlye.

8  So, it's been from May --

9    Q    No. No. No. No.

10    A    I'm sorry.

11    Q    Between your internship at Beverlye

12  Middle School --

13    A    Oh, okay.

14    Q    You did an internship at Beverlye

15  Middle School?

16    A    Okay. Internship. I'm sorry.

17  Yes.

18    Q    And I'm asking you how long you

19  were unemployed before you became a teacher

20  at Beverlye Middle School?

21    A    I see. I apologize. From -- let's

22  see. My internship and when I graduated was

23  May. So, from May until January.

24         MR. FAULK: May '05 to January '06?

25         THE WITNESS: Yes.

51

1         MR. FAULK: Excuse me.

2         MR. WALDING: That's fine. Thank

3    you.

4    Q    And you said that you are presently

5  looking for a job?

6    A    Yes.

7    Q    Does that just about cover your

8  work history? Have we covered everything?

9    A    To my recollection, yes.

10    Q    All right. And I thought we had,

11  honestly. But if there's something else

12  that's of importance in your work history, I

13  want to give you a chance to tell me about

14  it. You told me about selling real estate

15  and working at Kroeger and being a homemaker.

16    A    Okay. So, you would like for me to

17  -- let me understand you correctly. You

18  would like me to go back through my entire

19  time, not just --

20    Q    No.

21    A    Oh, okay.

22    Q    I'm really asking you, haven't we

23  just done that?

24    A    I did -- let me think what year it

25  was. 19 maybe 88, 89, I did work at Wallace

52

1  College. I did cake decorating. I was a

2  community -- oh, what's the term they call?

3  Community -- not community services. It was

4  just one of the extracurricular-type, you

5  know, classes that they offer.

6    Q    You taught a course --

7    A    Yes.

8    Q    -- on cake decorating?

9    A    Cake decorating. And prior to

10  that, I owned Nancy's Classic Cakes &

11  Decorating Supplies, which was a little cake

12  shop, and I had cake decorating supplies.

13  That was, like, 19 -- that was about during

14  the same time. 19 maybe 88 to 89.

15         And I'm an owner of Felicity Tiaras,

16  currently. I have a business license, but

17  I'm not really -- my daughter and I aren't

18  really involved in actually trying to get the

19  business going yet, because of a lot of

20  personal things that we've got going on at

21  this time. So, we own a company called

22  Felicity Tiaras. It's based out of our home.

23    Q    You and your daughter?

24    A    Yes.

25    Q    That's Jennifer?

53

1    A    Jennifer. Uh-huh.

2    Q    And what does Felicity Tiaras do?

3    A    We make Swarovski crystal wedding

4  tiaras, bridal tiaras, that sort of thing.

5    Q    And I am sorry, ma'am. You're

6  talking about those little crown things?

7    A    Yes. And bridal vails.

8    Q    Vails?

9    A    Uh-huh.

10    Q    Okay. How long have you and your

11  daughter been engaged in that business?

12    A    I think we started it up around

13  2001. We had a company that had some of our

14  tiaras in their shop locally, but we really

15  aren't pushing that right now.

16    Q    This company actually makes these

17  tiaras?

18    A    Yes. We actually hand make them.

19    Q    And then, allow other businesses to

20  sell them retail?

21    A    Yes. And we only had one

22  particular company that we approached, and

23  then, we decided, at a certain point, that we

24  were going to stop right then. But we still

25  continued to get our business license, in

54

1  case we -- we anticipate continuing at some

2  point in time.

3    MR. WALDING: All right. Good

4        enough. Why don't we take a

5        break now?

6    (Recess in deposition.)

7    MR. WALDING: We're back from a

8        break. And during the break,

9        the lawyers had a discussion

10        concerning circulating and

11        agreeing upon a protective

12        order, because, as the course

13        of this deposition proceeds, we

14        will probably need to discuss

15        some children's names, and

16        there, of course, is a concern

17        for their privacy.

18    And I believe what we have

19        agreed on is to circulate a

20        protective order and agree on

21        that, and ask the Court to

22        enter that protective order.

23        That would require all the

24        parties and counsel to keep the

25        transcript and the names of

55

1        these children confidential,

2        and only be used in the lawsuit

3        itself.

4    And I believe we have

5        agreed that the court reporter

6        will substitute initials for

7        the children's names, and that

8        if there are two children that

9        have the same initials, we'll

10        deal with that if it comes up.

11    I think we also agreed to

12        file under seal, if necessary.

13        And we can address that, I

14        suppose, in our protective

15        order that we're going to

16        circulate.

17    Just for our record, will

18        y'all all sort of indicate

19        that's what we talked about and

20        agreed on?

21    MR. MUSSO: That's what we talked

22        about and agreed on.

23    MR. FAULK: Yes. That's fine.

24    MR. BRANTLEY: Yes.

25    MR. WALDING: Good enough.

56

1    Q    Mrs. Miller, I want to show you --

2  one of my problems this morning was these

3  exhibits, and I apologize to you. Let me

4  show you what I have had marked Defendant's

5  Exhibit No. 5, and ask you if you recognize

6  that document?

7    A    (Witness reviewing document.) I am

8  familiar. I have seen this document before.

9    Q    Okay. You do recognize the

10  document?

11    A    Yes.

12    Q    And, Mrs. Miller, that is a copy of

13  your complaint --

14    A    Uh-huh.

15    Q    -- the lawsuit that you filed in

16  this case. Do you understand that?

17    A    Yes.

18    Q    Have you had a chance to review the

19  document today?

20    A    Not today. I mean, right now?

21    Q    Yes, ma'am.

22    A    I'm briefly looking over it.

23    Q    Okay. Well, what I'd like to ask

24  you, is, does that document accurately state

25  the problems and complaints you have against

57

1   the defendants, the people you have sued in
2   this case?
3       A    Yes.
4       Q    Now, as I read your complaint,
5   ma'am, you're saying that the defendants, the
6   people you've sued, have somehow violated
7   your constitutional right to freedom of
8   speech?
9       A    Yes.
10      Q    And is that what you contend in
11  this case?
12      A    Yes.
13      Q    Now, I actually read your complaint
14  to say that the defendants have somehow
15  violated your constitutional right to free
16  speech by stifling or squelching --
17  "squelching" is a word I use -- your right to
18  free speech. Do you make that contention?
19          MR. FAULK: Excuse me. I'm going
20              to object to the form just to
21              the extent that it might call
22              for a legal conclusion.
23          MR. WALDING: Sure.
24          MR. FAULK: On any of these
25              contention-seeking things, to

58

1              the extent they call for a
2              legal conclusion, we just want
3              to have a continuing objection,
4              and I won't be interrupting
5              you.
6          MR. WALDING: That's fine.
7          MR. FAULK: Unless you want me to.
8          MR. WALDING: I'd rather you not
9              interrupt me, Winn, but if you
10             need to, you go ahead.
11         MR. FAULK: If we could agree to
12             have a continuing objection to
13             any questions calling for a
14             legal conclusion, then she can
15             answer the best she can.
16         MR. WALDING: Sure.
17      Q    You agreed with me earlier, did you
18  not, Mrs. Miller, that this document
19  accurately reflects the problems and
20  complaints you have against the defendants?
21      A    Yes.
22      Q    Okay. I read your complaint to say
23  that one thing the defendants did was somehow
24  stifle, squelch, suppress your right to
25  freedom of speech. Is that one of the

59

1   contentions you're making? Is that one of
2   the allegations you're making?
3       A    Yes.
4       Q    Okay. And do you read that in this
5   document, Defendant's Exhibit 5? If you
6   would, look at paragraph 26. That's on page
7   six of Defendant's Exhibit 5. Would you
8   agree with me that the first part of that
9   sentence uses the verb "to stifle"?
10      A    Yes.
11      Q    Okay. Now, I read your complaint
12  to say, also, that, somehow, the various
13  defendants violated your constitutional right
14  to free speech by retaliating against you in
15  some way. Is that a contention or allegation
16  you're making?
17      A    Yes.
18      Q    And would you agree with me, also,
19  that paragraph 26 of Defendant's Exhibit 5
20  uses the verb "to retaliate"?
21      A    Yes.
22      Q    Okay. So, I want to make sure I'm
23  understanding. How I read your complaint is,
24  you're basically saying the various
25  defendants somehow tried to stifle or

60

1   suppress or squelch your right to speak
2   freely?
3       A    Yes.
4       Q    And then, that the various
5   defendants somehow retaliated against you for
6   speaking freely?
7       A    Yes.
8       Q    Okay. I'd like to show you what I
9   have marked as Defendant's Exhibit No. 2. If
10  you would, just put Defendant's 5 away for
11  right now. Defendant's Exhibit No. 2, do you
12  recognize that document?
13      A    I have seen this document.
14      Q    Okay. Have you seen it as part of
15  this lawsuit or this litigation?
16      A    Yes.
17      Q    Okay. This document appears to me
18  to be an e-mail of some kind from Victoria
19  Morin to Pam Parris. Would you agree with
20  that?
21      A    Yes.
22      Q    And would you agree that it appears
23  to be dated April 27, 2004?
24      A    Yes.
25      Q    And according to the document

61

1  least, that was a Tuesday?
2      A    Yes.
3      Q    Okay.  Now, do you know Victoria
4  Morin?
5      A    Yes, I do.
6      Q    And do you know Pam Parris?
7      A    Yes, I do.
8      Q    And as a matter of fact, Ms. Parris
9  is one of the defendants in this case?
10     A    Yes.
11     Q    Now, is Dr. Morin a defendant?
12     A    No.
13     Q    All right.  According to this
14  document, Dr. Morin had some reservations
15  about recommending you for an internship.  Do
16  you read the document that way?
17     A    Yes.
18     Q    Okay.  In fact, her reservations
19  seem to be that you do not take corrective
20  feedback well, and when things don't go well
21  for you, that you are quick to make excuses
22  and blame others.  Would you agree the
23  document says that?
24     A    Yes, the document says that.
25     Q    Have you ever discussed with

62

1  Dr. Morin this opinion she has of you?
2      A    No.  I was never made aware of it
3  until this lawsuit occurred.
4      Q    All right.  Let me ask you this,
5  then.  Let me show you Defendant's Exhibit 3,
6  and ask if you recognize that document?
7      A    Yes.
8      Q    And have you seen that document
9  before today?
10     A    No -- yes.
11     Q    As part of this litigation?
12     A    As part of this litigation.  Yes.
13     Q    What is the document, Defendant's
14  Exhibit 3?
15     A    It's called "Faculty Recommendation
16  of Prospective Internship, College of
17  Education."
18     Q    And would you agree it relates to
19  you, Nancy Miller?
20     A    Yes, it does.
21     Q    And it appears to be dated 4-27-04.
22     A    Yes.  The same date that she sent
23  the e-mail.
24     Q    So, Defendant's Exhibit 3 is dated
25  the same day as Defendant's Exhibit 2?

63

1      A    That's correct.
2      Q    April 27 of '04?
3      A    Yes.
4      Q    Okay.  In fact, the last sentence
5  of Defendant's Exhibit 2 says, "I will send
6  on the recommendation to you today."
7  Correct?
8      A    Yes.
9      Q    And so, Defendant's Exhibit 3 is,
10  in fact, a copy of that recommendation?
11     A    Correct.
12     Q    All right.  And does Dr. Morin
13  express her concerns about you as part of
14  this document, Defendant's 3?
15     A    Yes.
16     Q    Okay.  And, in fact, she checks a
17  little box that says, "I have some
18  reservations regarding this student's
19  readiness for internship."  Correct?
20     A    Yes.
21     Q    Okay.  Let me show you Defendant's
22  Exhibit No. 4, and ask if you recognize that
23  document?
24     A    Yes.
25     Q    Okay.  And did you receive the

64

1  original of that document?
2      A    Yes.
3      Q    You would agree with me it's
4  addressed to you?
5      A    Yes.
6      Q    Okay.  Just for purposes of our
7  record, tell us what that appears to be,
8  Defendant's 4?
9      A    It is stating that there's going to
10  be a meeting of the TEP committee, and that
11  they are requesting me to attend.
12     Q    Okay.  Would it be a letter from --
13  is it Dr. Parris?
14     A    No.  It's Ms. Parris.
15     Q    Ms. Parris?
16     A    Uh-huh.
17     Q    -- dated June 1, 2004, addressed to
18  you, Nancy Miller?
19     A    Yes.
20     Q    And that letter informs you that at
21  least one of the faculty recommendation forms
22  indicated some reservations about you?
23     A    Yes.
24     Q    So, at least as of June 1, 2004,
25  you knew at least one of your faculty pe

65

1  had some reservations about recommending you
2  for an internship, did you not?
3      A    Yes.
4      Q    Okay.  And so, in our sequence,
5  Defendant's Exhibit 2 follows into
6  Defendant's Exhibit 3, which then leads to
7  Defendant's Exhibit 4?  Right?
8      A    Okay.  Yes.
9      Q    These are all logical?  Right?
10     A    Yes.
11     Q    Dr. Morin had some reservations.
12 She expressed those in her e-mail to Ms.
13 Parris.
14     A    Uh-huh.
15     Q    She then filled -- that's
16 Defendant's 2.  She fills out this
17 recommendation form and expresses her
18 reservations about you.  That's Defendant's
19 3?  Correct?
20     A    Yes.
21     Q    And then, as a result, Ms. Parris
22 writes a letter to you, saying, we've got to
23 have a meeting.  That's Defendant's 4?
24     A    That's correct.
25     Q    Okay.  Did you, in fact, attend

66

1  some sort of meeting of this TEP committee on
2  or about June 15, 2004?
3      A    Yes, I did, along with many other
4  students.
5      Q    So, the meeting was held with lots
6  of students?
7      A    Yes.  Each individual student would
8  have their little time frame.
9      Q    It was held privately for each
10 student, though?
11     A    Right.
12     Q    Okay.  What is a TEP committee, if
13 you know?
14     A    The teacher education program at
15 Troy University.
16     Q    Oh.  And do you recall this
17 meeting?
18     A    Yes.
19     Q    As it related to you, I mean?
20     A    Yes.
21     Q    Okay.  Tell me what happened?
22     A    They asked some questions in terms
23 of, Mrs. Miller, you know, something similar
24 to, there is a reservation about you not
25 being able to receive constructive feedback.

67

1  And if I remember correctly, there was --
2  they asked me if I understood that.  And I
3  said, no, not really.  Because I've never
4  really had any problems with any of my
5  classes or my teachers, to my -- you know, to
6  my understanding.  It's never been brought
7  across that way.
8      Dr. Morin is a very intense instructor.
9  I learned a whole lot from her.  I mean, she
10 was just incredible.  And she had actually
11 recommended me for a stipend, because, you
12 know, I was really --
13     Q    Yes, ma'am.  If we could
14 concentrate on the TEP meeting, please.
15     A    Okay.  I'm sorry.  Okay.  I
16 explained that I wasn't really sure what this
17 was about.  And they just said concern to
18 receive corrective feedback.
19     And the only time that I can recall
20 getting corrective feedback from Dr. Morin
21 was when a project was due, and I turned it
22 in, and I got a "B" on the project, and other
23 students got "B's," maybe even, you know, a
24 different grade, and she suggested that we
25 redo the project.

68

1  And I was happy with my "B," and so, I
2  explained to her, "Well, I think I'll just go
3  ahead and keep this grade."  That's the only
4  time that I could think of that was
5  constructive, you know, feedback that she
6  might have been upset with.
7      Q    Yes, ma'am.  Let me ask some
8  questions about this meeting.
9      A    Okay.
10     Q    Who was present for the TEP meeting
11 as it related to you?
12     A    Several of the faculty at Troy
13 University.  Ms. Parris was there.  Of
14 course, Dr. Morin was there.  I believe
15 Dr. Ruediger was there.  And Dr. Ruediger did
16 give me a no hesitation recommendation.
17 There were probably several other teachers
18 from the education department there, but I
19 don't recollect offhand.
20     Q    And during this meeting, did
21 Dr. Morin, herself, express what her
22 reservations were?
23     A    I do not recall.
24     Q    Well, did they identify which of
25 the faculty members had the reservation

69

1    about you?

2       A    I do not recall. I do not remember

3    Dr. Morin having said this at that meeting.

4    Because this was really a surprise to me when

5    I saw this document.

6       Q    How long did the meeting take?

7       A    Maybe ten minutes. Not even ten

8    minutes.

9       Q    So, if I'm understanding you

10   correctly, we have a ten-minute meeting.

11   Someone identifies, you know, one of the

12   faculty thinks you have a problem taking

13   corrective feedback. You say, well, I really

14   don't know what y'all are talking about. Is

15   that the essence of it?

16      A    In the essence. And then, other

17   teachers, like, Dr. Ruediger, he -- I do

18   recall him saying that he had no

19   reservations, but that he would hope that if

20   there were any concerns that I had or

21   anything like that, that we would come back

22   to the supervisors and discuss those.

23      Q    Would you agree with me that it

24   would be good for a student or an intern to

25   be able to take and accept corrective

70

1    feedback?

2       A    Absolutely.

3       Q    Okay. That's part of the learning

4    process, is it not?

5       A    Absolutely. Absolutely.

6       Q    Okay. So, this was a short

7    meeting. In your mind, was the meeting

8    productive?

9       A    In my mind, the outcome was

10   acceptable.

11      Q    And what was the outcome?

12      A    I was approved for internship,

13   after the discussion amongst the faculty.

14      Q    All right. And I believe you said

15   Dr. Morin was present?

16      A    Yes. I believe she was. I don't

17   -- yes. I'm 99 percent sure.

18      Q    All right. According to your

19   complaint, you started your internship

20   through Troy, at Houston County High School,

21   on or about July 28 of '04. And I am

22   referring to --

23      MR. BRANTLEY: Paragraph 15?

24      MR. WALDING: Yes. Thank you, Tom.

25      Q    -- paragraph 15. Is that accurate?

71

1       A    Technically, I didn't start my

2    internship until -- I believe it was the 16th

3    of August. That's when the actual internship

4    started. I started my teaching contract

5    around July 28th.

6       Q    The internship did not start until

7    when?

8       A    I believe it was August 16th.

9       Q    And why is that date memorable?

10      A    Because that's when my internship

11   started.

12      Q    In other words, you actually

13   started going out to Columbia, to Houston

14   County High School, on August 16th?

15      A    No. That's when I had the dual

16   role starting. Okay. I was actually hired

17   by Mr. Andrews around the 28th of July. Ms.

18   Parris had recommended me to interview. Mr.

19   Andrews -- it's my understanding that Mr.

20   Andrews contacted Ms. Parris because he was

21   having a hard time getting a special ed

22   position filled, as well as an English

23   position.

24      And so, he called Ms. Parris, and she

25   arranged to have a couple of us students

72

1    interview for the position of -- me for

2    special education, and Amy Deese for English.

3       Q    Okay. Who did you interview with?

4       A    Mr. Andrews. I had not met Mr.

5    Pitchford at that point in time.

6       Q    Yes, ma'am. Mr. Andrews, at the

7    time, worked at the central office for

8    Houston County?

9       A    Correct.

10      Q    And you went to the central office

11   when you interviewed with him?

12      A    That's correct.

13      Q    Tell me about that interview?

14      A    He asked me some questions. He

15   told me about some of the things that he

16   expected, and said that he was going to

17   recommend me for the position.

18      Q    And you're thinking this occurred

19   before July 28?

20      A    The actual interview, I believe,

21   was before July 28th. I'm sorry. I don't

22   have a date in my mind exactly. I want to

23   say that Ms. Parris told me about the

24   position, like, the middle of the month or

25   something like that.

73

1   Q   Mid July?

2   A   I think so.

3   Q   Yes, ma'am.

4   A   Somewhere like that. But, anyway,

5   then I went and interviewed.

6   Q   Okay. Let me show you what I've

7   marked as Defendant's Exhibit No. 6, and ask

8   you if you recognize that document?

9   A   Yes.

10   Q   Would you agree with me that that

11   document is dated July 28, 2004?

12   A   Yes.

13   Q   And that is the very same date

14   identified in your complaint?

15   A   Yes.

16   Q   Okay. Would you agree with me that

17   Defendant's Exhibit 6 is -- the header states

18   "Internship agreement between Houston County

19   Schools and Troy University Dothan Campus"?

20   A   Yes.

21   Q   And that's a two-page document?

22   A   Yes, it is.

23   Q   And on the second page of the

24   document, bottom left-hand, is that your

25   signature?

74

1   A   Yes.

2   Q   And underneath your signature, what

3   does it say?

4   A   "Intern, Troy University, Dothan

5   campus."

6   Q   It also states your name, does it

7   not?

8   A   Yes.

9   Q   But it identifies you as an intern?

10   Correct?

11   A   Yes.

12   Q   Does the document that you hold

13   appear to be a true and correct copy of this

14   internship agreement?

15   A   It appears to be.

16   Q   Okay. Did you fulfill all the

17   obligations imposed on you by that agreement?

18   A   I was terminated from my

19   internship. So, some of -- let me see here.

20   So, I was not able to complete some of the

21   items.

22   Q   Okay. Before you were terminated

23   from the internship, did you complete all the

24   obligations imposed on you by that agreement?

25   The ones that could be completed without

75

1   completing the internship. The ones that

2   could be done. Does that question make sense

3   to you?

4   A   Just a moment. (Witness reviewing

5   document.) I was in the process of

6   completing things. Do you want me to explain

7   that?

8   Q   Sure.

9   A   Okay. For instance, the log that

10   was provided to record the time spent in Mr.

11   Strange's room, yes, I was doing that.

12   Q   Did you visit Mr. Strange's

13   classroom one period each week? Do you see

14   that in 3(b)?

15   A   I visited his class as often as he

16   gave me permission to. Because, some days,

17   he would be in a classroom when I -- let's

18   say, for instance, I had my planning period.

19   Okay. So, rather than go into his classroom

20   where he might have been -- you know, as an

21   inclusion teacher, I couldn't do that. So,

22   he would make arrangements with me when we

23   could meet.

24   Q   Okay. Would you agree with me that

25   Defendant's Exhibit 6, paragraph 3(b),

76

1   required you to visit Mr. Strange's classroom

2   one period each week?

3   A   Yes.

4   Q   That says that in plain, clear

5   English, doesn't it?

6   A   Yes. And what would happen there

7   is, Mr. Strange and I would make arrangements

8   for me to come when -- at a convenient time

9   for both of us.

10   Q   So, you did your best to comply

11   with that responsibility you had?

12   A   Yes, I did.

13   Q   Okay. And then, if I understood

14   you correctly earlier, you did your best to

15   use these log forms to record that time?

16   A   That is correct.

17   Q   Where are these log forms?

18   A   The log forms were no longer needed

19   when my internship was terminated, and so, I

20   wasn't required to turn those in.

21   Q   They were in your possession?

22   A   They were actually in Mr. -- no.

23   Excuse me. They were probably in my

24   possession, and then, when I would go to his

25   class, he would sign off.

77

1    Q    Was it your responsibility to turn
2 the log forms in to someone at Troy?
3    A    If I completed my internship, yes.
4    Q    Okay.  What did you do with the log
5 forms?
6    A    Whatever I had, I turned in to Troy
7 University, if they requested it.  So, if
8 they did not request, I didn't turn anything
9 in.  I wasn't required -- in other words, I
10 was not required to, by Ms. Parris -- since
11 it was going to be terminated, I wasn't
12 required to turn in all my hours and that
13 sort of thing.  As a paid intern, I got
14 credit for teaching every single day, is what
15 Ms. Parris had told me.
16    Q    All right.  I'm just trying to
17 understand what happened to these documents.
18    A    Okay.
19    Q    They were in your possession.  Your
20 internship was terminated.  Did someone ask
21 you, point blank, "Turn those log forms in"?
22    A    No.
23    Q    Okay.  What did you do with the log
24 forms?
25    A    I either left them at the school --

78

1 I did not bring them home, because I do not
2 have any kind of log forms.
3    Q    Okay.  You either left them at the
4 school or you brought them home?
5    A    I had a notebook at school with the
6 log-in documents -- the log-in documents, the
7 paperwork that showed Ms. Parris my schedule,
8 and that sort of thing.  She had to have
9 copies of those sent in.  And so, I had a
10 copy of it, showing my schedule, so that when
11 Dr. Ruediger would come for an observation,
12 he would know when I -- you know, what
13 classes I had and that sort of thing.
14    Q    He would know where you were
15 supposed to be?
16    A    Right.  Right.  So, I had a copy of
17 that, too.  But I had it in a notebook at the
18 high school.
19    Q    Okay.  What happened to this
20 notebook?
21    A    Well, when I was terminated, I was
22 told I could, you know, get my personal
23 belongings, and that was left.  I just did
24 not get that.
25    Q    Okay.  That was part of your

79

1 personal belongings, was it not?
2    A    Yes.  But I probably left a couple
3 of other things that were my personal
4 belongings.  I didn't have that much time to
5 gather my things.  I didn't have a list --
6    Q    Sure.
7    A    -- of things that were mine.
8    Q    Okay.  This notebook, though, was
9 something you maintained for your internship
10 through Troy?
11    A    Uh-huh.
12    Q    All right.  And I'm not trying to
13 beat a horse.
14    A    Okay.
15    Q    Whether it's dead or not, I'm not
16 sure.  Did you prepare lesson plans, as is
17 required of you under Defendant's Exhibit 6?
18    A    Yes.  When I had an observation by
19 Mr. Strange or by Dr. Ruediger, I was
20 required to make lesson plans, and they got a
21 copy of those.
22    Q    Okay.  Did you complete this report
23 of internship form after each visit from
24 Dr. Ruediger?
25    A    Yes.

80

1    Q    Did you provide a daily schedule to
2 -- was it Ms. Parris you were supposed to
3 provide that to?
4    A    Yes.
5    Q    Did you provide it to her?
6    A    Yes.
7    Q    You did that through this notebook
8 you're talking about?
9    A    Not through the notebook.  That was
10 my copy in my notebook.
11    Q    Okay.  You gave her a copy of your
12 schedule?
13    A    I gave her -- yes.
14    Q    All right.  Did you attend the
15 internship seminar classes?
16    A    Yes.
17    Q    How many classes were involved
18 there?
19    A    It was the whole semester.  I
20 attended all of them through October 20th.
21    Q    This was a class, basically, for
22 everyone who was going through an internship
23 at that time?
24    A    Correct.  And it was once a week
25 We would also have assignments during

81

1  week, computer assignments, where we would
2  have to answer certain questions or whatever
3  and respond. And those are in copies you
4  have as part of the exhibits.
5      Q    Yes, ma'am. We'll get to those
6  soon enough.
7      A    Yeah.
8      Q    Okay. Did you e-mail Dr. Parris
9  weekly?
10     A    Yes. And Dr. Jones.
11     Q    All right. So, then, if we go back
12  through all the records, we ought to see
13  e-mails from you to Dr. Parris and Dr. Jones
14  every week of this internship you had at
15  Houston County High School?
16     A    I had no control over whether or
17  not they printed them off or not. I printed
18  off ones that I felt were interesting. And
19  the program that we utilized -- it was called
20  Blackboard -- it wouldn't let you print
21  everything that you wanted to print. Some
22  nights, I would be able to print things off.
23  Some, I wouldn't.
24     Q    But it's your testimony under oath
25  today that you e-mailed Dr. -- Ms. Parris --

82

1  I'm sorry -- and Dr. --
2      A    Dr. Jones.
3      Q    -- Jones each week of your
4  internship?
5      A    Yes.
6      Q    Okay. Would you agree with me,
7  Mrs. Miller, that Defendant's Exhibit 6 kind
8  of governed the relationship between you,
9  Houston County Schools, and Troy University
10  Dothan, as it related to your internship?
11     A    Yes. That's my understanding.
12     Q    Okay. In fact, that's what the
13  header of the document states, doesn't it?
14     A    Uh-huh. Yes.
15     Q    In pretty clear English.
16  "Internship Agreement Between Houston County
17  Schools and Troy University Dothan Campus."
18     A    Yes.
19     Q    That's clear enough?
20     A    That's right. Yeah.
21     Q    Would you agree with me that's
22  clear?
23     A    I would agree.
24     Q    Okay. So, this document,
25  Defendant's Exhibit 6, governed the

83

1  relationships between you? Would you agree
2  with that?
3          MR. FAULK: Excuse me.
4          MR. BRANTLEY: Object.
5          MR. FAULK: Yeah. Legal
6      conclusion. I just want that
7      to be readily apparent.
8          MR. WALDING: I don't think that's
9      a legal conclusion at all. I'm
10     asking for her understanding.
11         MR. FAULK: Well, you go ahead and
12     give him your best answer. I'm
13     just making an objection.
14     A    I understand that this agreement is
15  between Houston County Schools and Troy
16  University.
17     Q    Did you understand that this
18  document governed the relationships between
19  you?
20     A    Yes.
21     Q    Okay. And would you agree with me
22  that the second page of Defendant's Exhibit 6
23  is signed by basically all of the players in
24  this relationship?
25     A    Yes.

84

1      Q    Okay. It's signed by Tim
2  Pitchford, as the principal? Correct?
3      A    Yes.
4      Q    It's signed by Pam Parris, as the
5  director of professional internship for Troy
6  University?
7      A    Yes.
8      Q    Signed by Dr. Jones, dean for Troy
9  University?
10     A    Yes.
11     Q    Signed by Mr. Paul Strange, a
12  cooperating teacher?
13     A    Yes.
14     Q    And signed by you, also, an intern?
15     A    Yes.
16     Q    Okay. Does the document refer to
17  you as a certified teacher?
18     A    No.
19     Q    It refers to you as an intern, does
20  it not?
21     A    Yes, it does.
22     Q    In fact, it refers to Mr. Strange
23  as a teacher, does it not?
24     A    Yes.
25     Q    And at the time you signed this

85

1  agreement, on or about July 28, 2004, you
2  were not a certified teacher?  Correct?
3    A    That is correct.
4          MR. BRANTLEY:  Object on that.
5          MR. WALDING:  That's a matter of
6              fact.  She either was or she
7              wasn't.
8          MR. BRANTLEY:  Disagree it's a
9              matter of fact.
10   Q    Did you hold a valid teaching
11  certificate through the Alabama State
12  Department of Education on or about July 28,
13  2004, ma'am?
14   A    No, I did not.
15          MR. BRANTLEY:  Well, again, object.
16              Object to the term "valid."
17          MR. WALDING:  All right.  You
18              object to the form of my
19              question by the use of the term
20              "valid"?
21          MR. BRANTLEY:  Yes.
22   Q    Did you hold an invalid certificate
23  on that date?
24   A    It's my understanding that there
25  was going to be an emergency certificate

86

1  requested by Mr. Andrews.
2    Q    Did you hold an emergency
3  certificate on that date?
4    A    I don't know.  It would not have
5  come to me.  It would have gone to central
6  office.
7    Q    Okay.  Would you agree with me that
8  Defendant's Exhibit 6 states that the reason
9  for this agreement and this relationship was
10  because of the high demand and low
11  availability of special education teachers?
12   A    That is what it says.
13   Q    Yes, ma'am.  Was it your
14  understanding, back in July 2004, that there
15  was a high demand for and low availability of
16  special education teachers?
17   A    That's what Ms. Parris had
18  indicated to me.
19   Q    That was your understanding?
20   A    That was my understanding.
21   Q    Okay.  Because, would you agree
22  with me that this arrangement, this
23  relationship, was unusual?
24   A    I don't think I'd say unusual.
25  There have been a number of interns placed in

87

1  these positions.
2    Q    Okay.  Wouldn't it be more normal
3  more regular, a majority of teaching students
4  would do their internships without being
5  compensated?
6    A    That is true.  Yes.
7    Q    And, yet, you were compensated for
8  this internship?
9    A    Yes.  I, as well as others.
10   Q    Good.  But I want to ask as to you
11  specifically.
12   A    Uh-huh.
13   Q    You were compensated?
14   A    Yes, I was.
15   Q    All right.  Look at paragraph 3(c)
16  for me of Defendant's Exhibit 6.
17   A    Uh-huh.
18   Q    Would you agree with me that that
19  paragraph says that, "The school
20  administration is responsible for IEP
21  meetings"?
22   A    Yes.
23   Q    Would you agree that that paragraph
24  of Defendant's Exhibit 6 says that your
25  attendance at IEP meetings is simply as a

88

1  student intern?
2    A    Yes.
3          MR. BRANTLEY:  Well --
4    A    At the meetings.
5          MR. BRANTLEY:  Object.  It doesn't
6              say "simply."
7    Q    The sentence says, "Mrs. Miller's
8  attendance is as that of a student intern."
9  Correct?
10   A    Yes.
11   Q    Does the sentence or any other part
12  of the paragraph indicate that your
13  attendance at an IEP meeting would be in any
14  other role other than as an intern?
15   A    No.
16   Q    Does the paragraph of Defendant's
17  Exhibit 6 also indicate that you cannot be
18  held legally responsible for the meetings?
19   A    Yes.
20   Q    And were you given an opportunity
21  to review this document before you signed it?
22   A    The document came the day that we
23  had the meeting with Mr. Pitchford.  I don't
24  believe it was July 28th.  I believe it was
25  after that date.  And could you repeat t

89

1  question again?

2     Q    I want to know if you had an

3  opportunity to review the document?

4     A    I had an opportunity to review the

5  document at the same time everybody else did,

6  at the meeting.

7     Q    No one prevented you from reading

8  this document?

9     A    No.

10    Q    And you're able to read the English

11 language?

12    A    Yes.

13    Q    Let me show you what I have marked

14 as Defendant's Exhibit No. 7. Have you seen

15 that document before?

16    A    Yes, I have.

17    Q    I'm sorry. Your lawyer has it.

18 I'm sorry.

19        (Mr. Brantley handing document to

20        the witness.)

21    Q    What is that document?

22    A    This is an observation document

23 from Dr. Ruediger.

24    Q    Okay. So, this is one of the

25 requirements under Defendant's Exhibit 6, was

90

1  for him to do some observations on you in the

2  classroom setting?

3     A    Correct.

4     Q    Okay. And this is a document that

5  evidences that or documents it?

6     A    Correct.

7     Q    Let's see. And this one is dated

8  August 26, 2004?

9     A    Yes.

10    Q    And is that your signature under

11 "Intern's signature" on the document?

12    A    Yes.

13    Q    As a part of this observation and

14 rating -- is it true that he gives you

15 ratings as part of this observation?

16    A    Yes.

17    Q    And according to the coding scale,

18 5 is an excellent? Correct?

19    A    Uh-huh.

20    Q    4 is above average? Correct?

21    A    Uh-huh.

22    Q    If you could say "yes" or "no,"

23 ma'am.

24    A    I'm sorry. Yes.

25    Q    3 is average performance?

1     A    Yes.

2     Q    2 is minimally acceptable

3  performance?

4     A    Yes.

5     Q    And 1 is unsatisfactory?

6     A    Yes.

7     Q    And "no" means not observed?

8     A    Yes.

9     Q    All right. Would you agree that

10 Dr. Ruediger does not give you a rating above

11 average?

12    A    Yes.

13    Q    He does not?

14    A    That's correct.

15    Q    So, 3 is the highest rating you

16 get?

17    A    That's correct.

18    Q    And then, he apparently did not

19 observe you present the lesson introduction,

20 development, closure, evaluation, because he

21 has "no" next to those?

22    A    That's correct. He was late for

23 the observation.

24    Q    Well, he obviously didn't observe

25 other things, also, like managing class

1  behavior, number 11?

2     A    Well, my opinion is that he did

3  observe it, because he was in for some of the

4  lesson. So, I don't know why he didn't say

5  manages -- I don't know why he didn't rate

6  that.

7     Q    Okay. You would agree with me that

8  it says "no"?

9     A    Yes. I do agree with you. It does

10 say "no."

11    Q    And next to number 12, maintains

12 student involvement, it also says "no"?

13    A    Yes. It says "not observed."

14    Q    And under 13, manages class time,

15 it states "no"?

16    A    He says -- yes. That's correct.

17    Q    Not observed?

18    A    Not observed.

19    Q    Yes, ma'am. And would you agree

20 with me -- I think you just did earlier --

21 that that's your signature at the bottom of

22 the page?

23    A    Yes.

24    Q    So, you had an opportunity to

25 review this document --

93

1      A    Yes.
2      Q    -- before you signed it?
3      A    Yes.
4      Q    Okay. So, if you had issues with
5  his ratings or what he indicated here as his
6  score, you could have discussed that with him
7  at the time, could you not?
8      A    And I did. We did. Uh-huh.
9      Q    All right. Let me show you
10  Defendant's Exhibit 8. Do you recognize that
11  document?
12     A    Yes.
13     Q    You've seen that document before
14  today?
15     A    As part of this lawsuit. I did not
16  see it prior to then.
17     Q    You did not see it prior to the
18  lawsuit?
19     A    No. No.
20     Q    Okay. And just so I'm clear, I
21  assume -- and, of course, you know about
22  assumptions. But, I assume that Dr. Ruediger
23  typed this document some time after the
24  observation he made on August 26th. Did you
25  see him typing Defendant's Exhibit 8 while he

94

1  was observing you?
2      A    No.
3      Q    He didn't bring a laptop computer
4  or anything like that?
5      A    Not to my recollection.
6      Q    Okay. And you have not seen the
7  document until this lawsuit was filed --
8      A    That's correct.
9      Q    -- as part of the discovery
10  process?
11     A    That's correct.
12     Q    Okay. In the first paragraph of
13  Defendant's Exhibit 8, there is a sentence,
14  "Mrs. Miller stressed her concerns regarding
15  individualized education programs and the
16  general structure of the special education
17  program."
18     A    Uh-huh.
19     Q    Do you see that sentence?
20     A    Yes, I do.
21     Q    Do you know to what Dr. Ruediger is
22  referring by that sentence?
23     A    I do.
24     Q    Tell me what you believe he is
25  referring to?

95

1      A    I told him that -- I asked for his
2  advice, number one. I told him that there
3  were no IEPs for some students, that other
4  students' IEP's only reflected resource room
5  rather than full inclusion into the general
6  classroom.
7          And there are different -- in order to
8  serve the students appropriately, there must
9  be certain things listed in the IEP when
10  they're in the general education classroom
11  versus the resource room. And so, I talked a
12  little in general about those types of
13  examples.
14     Q    Okay. Those were your concerns?
15     A    I expressed concern about the fact
16  that I was asked to write an IEP for a
17  student who did not have anything in her file
18  except a temporary services sheet that, if I
19  remember correctly, was dated January 14th of
20  '05. That was a very big concern.
21     Q    Would you agree with me that
22  Dr. Ruediger does not specifically mention
23  that concern in Defendant's Exhibit 8?
24     A    That is correct. He does not
25  specifically mention that.

96

1      Q    Yes, ma'am. Okay.
2      A    He doesn't specifically mention
3  anything.
4      Q    Well, he mentions that you stressed
5  concerns regarding individualized education
6  programs and the general structure of the
7  special education program.
8      A    That's very general. That's not
9  specific.
10     Q    Yes, ma'am. Well, tell me --
11  again, let's go back. What is your
12  understanding of what he means by that?
13     A    I believe that he means that there
14  are -- the IEP's were not written correctly,
15  that they were -- they needed to be at least
16  amended, if not rewritten totally, in order
17  for the students to be able to get their
18  needed services and get the education that
19  they deserve.
20         So, the general structure of how the
21  school was going about doing things, when I
22  told him that they had already had the
23  meetings in May, and that Mr. Strange told me
24  that the administrators were not going to,
25  you know, like the idea of having new

97

1    meetings for these students, because they had
2    already had them, that we were going to have
3    to write some of these IEP's all over again,
4    or write new ones for the ones who did not
5    have any. And I told him about these things,
6    so he knew about these things.
7        Q    Yes, ma'am. Let's go back. As of
8    August 26, 2004, how long had you been out at
9    Houston County High School?
10       A    I'm sorry. Say that again.
11       Q    How long had you been at Houston
12   County High School, as an intern, on August
13   26, 2004?
14       A    Approximately 24 days or so.
15       Q    24 school days?
16       A    I believe we started August 1st or
17   2nd, something like that, on.
18       Q    Are you telling me you were there
19   24 school days?
20       A    No. I don't believe it was 24
21   school days. If I could have a calendar, I'd
22   be glad to count the days, specifically, that
23   I was there. I do remember not being there
24   for two days because I was in Louisiana.
25       Q    Well, give me your best estimate of

98

1    how many school days, actual teaching days,
2    you were there when this document -- or
3    before August 26, 2004?
4        A    Anywhere from probably 15 to 20
5    days.
6        Q    And in those 15 to 20 days, how
7    many IEP's for students did you review?
8        A    As a team, Paul Strange, Paul Payne
9    and I, all together, were in a room, and we
10   got all the IEP's together. We looked at the
11   IEP's. We were determining who was going to
12   get which IEP's and that sort of thing. So,
13   we were able to look at just about every one
14   of them. We determined that there were
15   certain files that were missing. So, you
16   know, we made a list.
17       Q    Apparently, there was some sort of
18   meeting between you and Mr. Strange and Mr.
19   Payne -- it is Mr. Payne?
20       A    Correct.
21       Q    -- in which y'all had various
22   special education students' files in front of
23   you?
24       A    Correct.
25       Q    How many special education student

99

1    files did you have in front of you?
2        A    Approximately -- there were 57
3    students. There were some that did not have
4    files.
5        Q    How do you know that there were 57
6    students?
7        A    We had a list of students. I
8    believe central office provided that list of
9    the names of the students, and then --
10       Q    Provided it to whom?
11       A    I believe Mr. Payne, Mr. Strange
12   Mr. Payne was already there at that school.
13   Mr. Strange, it was his first year. If I
14   remember correctly, it was his first year at
15   Houston County High School. He had come from
16   another county school.
17       Q    So, if I'm understanding you
18   correctly, central office provides a list of
19   what you think is approximately 57 student
20   names?
21       A    Uh-huh.
22       Q    Correct?
23       A    Correct.
24       Q    And it's your understanding that
25   these 57 students were special education

100

1    students?
2        A    That's my understanding, yes.
3        Q    Was it your understanding that they
4    had already been identified as students in
5    need of special education services?
6        A    Yes.
7        Q    So, they would already be past step
8    two of that process you and I talked about
9    earlier?
10       A    Correct.
11       Q    Okay. And then, you're saying
12   that, during this meeting you had with Mr.
13   Strange and Mr. Payne, that y'all had files
14   of some kind for each of these 57 students?
15       A    We were supposed to have files for
16   each one of the 57 students. As I said, some
17   files were missing. There were no files for
18   some students.
19       Q    You say they're missing. But what
20   you knew objectively, I think, is that you
21   had a list of 57 names, and you may or may
22   not have had 57 folders?
23       A    Correct.
24       Q    Okay. And you're assuming that
25   there was no file? Correct?

101

1    A    (No response.)
2    Q    Do you know for a fact that there
3  was no file for any of those 57 people?
4    A    There were no files for some
5  students.  For instance, on my list --
6  eventually, I got a list of students that I
7  was supposed to -- that were on my caseload.
8  Okay.  And as we checked through those files,
9  there were at least two students that did not
10 have a file at all, and so, there was no IEP.
11 Okay.  Now, there could have been, like, a
12 folder.  For instance, the one girl had a
13 folder with her temporary services page in
14 there, but no IEP.
15   Q    Okay.  So, for purposes of me
16 understanding you, what girl are you
17 referring to?
18        THE WITNESS:  Is it okay to say it?
19        MR. BRANTLEY:  Well, I think we
20              have an agreement --
21        MR. WALDING:  We've got an
22              agreement.
23        MR. BRANTLEY:  -- don't we, to
24              disclose names here under seal?
25              Is that correct?

102

1        MR. WALDING:  We do.
2    A    That would be R. S.
3        MR. BRANTLEY:  Let the record
4              reflect everybody has agreed we
5              have an agreement on record
6              under seal.  Did you give the
7              name?
8        THE WITNESS:  Yes.
9    A    And then, there was another one,
10 C. A.  She was a homebound student, but she
11 still -- according to my understanding of
12 law, she must have an IEP.  And she did not
13 have an IEP.
14   Q    What you know objectively, though,
15 is that she was on some sort of list you had?
16   A    Yes.
17   Q    And that you couldn't find a
18 physical file?
19   A    That's correct.  For two months.
20   Q    Yes, ma'am.  How many names were on
21 this list of your caseload?
22   A    I believe there were approximately
23 19 students on my -- 19 to 22 students on my
24 caseload.
25   Q    Okay.  And did you actually

103

1  interact with C. A.?
2    A    Yes, I did.
3    Q    Okay.  I thought you said she was
4  on homebound?
5    A    That's correct.  I wanted to meet
6  her.  And Beverly Teat, who was the librarian
7  who was taking some information out to her,
8  some school work and that sort of thing,
9  invited me to come, and I jumped at the
10 chance to meet her.
11   Q    All right.  So, this young lady,
12 who was on homebound services, Ms. Teat
13 obviously was part of her programming in some
14 way, because she was taking educational
15 materials to her?
16   A    That's correct.
17   Q    Okay.  And so, you had the
18 opportunity to go with Ms. Teat and actually
19 visit C. A.?
20   A    Yes.
21   Q    Okay.  Well, was it your
22 understanding it was part of your job to
23 provide educational services for C. A.?
24   A    According to the law, my
25 understanding of the law, is that she must

104

1  have an IEP and that we must provide her with
2  an education at home.
3    Q    Yes, ma'am.  If you'll answer my
4  question.
5    A    I'm sorry.  Perhaps I'm not
6  understanding.
7    Q    Was it part of your duties, as a
8  student intern, to provide educational
9  services for C. A.?
10   A    It was my duty, as a teacher, to --
11       MR. FAULK:  I think he's asking you
12             was she part of your caseload.
13             Is that what you --
14       MR. WALDING:  No, sir.
15       MR. BRANTLEY:  Well, I don't
16             understand it.
17       THE WITNESS:  I'm not
18             understanding.
19       MR. BRANTLEY:  Would you rephrase
20             it?
21       MR. WALDING:  I rephrased it twice.
22   Q    You told me that C. A., according
23 to your understanding, was on homebound
24 status.
25   A    That's correct.

105

1  Q  Was it part of your internship
2  duties to provide homebound status
3  educational services for C. A.?  That's a
4  "yes" or "no," ma'am.
5  A  I don't know how to answer that.
6  MR. FAULK:  Did you have any
7  specific duties with respect to
8  this student?
9  A  She was on my caseload and -- I
10  don't know what else to say.
11  Q  If you'll answer my question,
12  ma'am.
13  MR. BRANTLEY:  She's trying to.
14  A  I am.
15  Q  Do you understand what homebound
16  means?
17  A  Yes.
18  Q  What does it mean?
19  A  It means that she has been, for
20  whatever reason, told -- kept from the high
21  school for -- it could be a behavior problem.
22  I don't know what the reason was.  Okay.  But
23  she's homebound.  She can't come to the
24  school.  But she's entitled to receive an
25  education.  And as an intern --

106

1  Q  Do you understand the term
2  "homebound" means that she's to receive her
3  educational services at home?
4  A  At home.  Correct.
5  Q  My question to you was very simple.
6  Were you the individual who was responsible
7  for providing those educational services to
8  C. A.?
9  A  On her schedule, it said I was her
10  English teacher, if I'm not mistaken, but I
11  was not teaching English.  They were -- the
12  administration had made other arrangements to
13  provide her her educational needs.  I went
14  out to visit her, to meet her.
15  Q  Yes, ma'am.  I understood that.
16  I'm asking if it was part of your duties, as
17  a student internship, to provide the
18  educational services for this homebound
19  student, C. A.?  And that is a "yes" or "no"
20  answer.
21  A  And since my name was on the
22  schedule for her, I would have to say yes.
23  Q  Okay.  If it was part of your
24  duties, did you undertake to fulfill those
25  duties by teaching this young lady English?

107

1  A  I was told that someone else would
2  be taking the information to -- Ms. Teat, in
3  fact, I believe, was one of the people who
4  would take the information and work with her.
5  Q  Okay.  Did you provide English
6  information to Ms. Teat for C. A.?
7  A  Ms. Teat came to my room, and we
8  went through some of the books that were
9  there at school, in the resource room, and
10  she and I chose some things to take to her.
11  Q  Okay.  You undertook it also,
12  though, to go and visit C. A. yourself?
13  A  Yes.
14  Q  Tell me about that visit?
15  A  After being invited.
16  Q  By Ms. Teat?
17  A  Yes.
18  Q  Were you invited by C. A. or her
19  parents to their home?
20  A  It's my understanding that Ms. Teat
21  got permission.
22  Q  Yes, ma'am.  If you would listen to
23  my question, and then, respond to it.
24  MR. FAULK:  I think she is trying
25  to answer your question.

108

1  MR. BRANTLEY:  I do, too.
2  MR. FAULK:  We're going to be in it
3  here in a minute.
4  MR. WALDING:  That's fine.  If you
5  want to interpose an objection
6  to the form of my question --
7  MR. FAULK:  I'm telling you she's
8  trying to answer --
9  MR. WALDING:  -- that's fine.
10  MR. FAULK:  -- your question.
11  MR. WALDING:  Well, she's not doing
12  a very good job of listening to
13  it and answering it.
14  MR. BRANTLEY:  Well, I disagree.
15  Q  (By Mr. Walding)  My question was
16  simple.  Were you invited by Ms. A.'s parents
17  to visit her home?
18  A  She didn't extend the invitation to
19  me personally.
20  Q  Good.  What inquiry did you make,
21  if any, to find out whether there was an IEP
22  or other educational service document in
23  existence for C. A.?
24  A  I went directly to Paul Strange,
25  because he was my supervisor there at t

109

1  school.
2      Q    He was your mentor, was he not?
3      A    He was my mentor, my cooperating
4  teacher. All of those terms would be
5  applied.
6      Q    Okay. You went to Mr. Strange?
7      A    Yes.
8      Q    And what?
9      A    And gave him a list of the ones
10  that I did not have. In fact, we all got
11  together and made a list. He made a list of
12  the ones that we didn't have.
13      And, on occasion, there were maybe a
14  couple that were in Mr. Payne's drawer. Ms.
15  Keasler got one of them for me. She found
16  one of the files in his drawer, when he was
17  not there, and brought it to me. So, you
18  know, we were trying to find them. But there
19  ended up to be a list of certain ones that
20  did not have a file.
21      Q    Okay. And if I understood you
22  correctly, your list of students for whom you
23  could find no file contained two names?
24      A    I actually had several more. And I
25  can't remember exactly who they were, because

110

1  I wasn't prepared for names today. But there
2  were more than that.
3      Q    This list that you presented to Mr.
4  Strange, how many names were on it?
5      A    Probably approximately four, to my
6  recollection, on my own list. And then,
7  while we were meeting, we listed the other
8  ones -- for instance, Mr. Payne -- I believe
9  it was Mr. Payne that had two other homebound
10  boys, and there were no files for them, as
11  well.
12      Q    Okay. Do you know for a fact that
13  there were no files for these two homebound
14  boys?
15      A    From the time that I went to the
16  school and the time that I left the school,
17  no one informed me that those files, any of
18  those files, had been found.
19      Q    Okay. Do you know for a fact that
20  there were no files?
21      A    I know for a fact there were some
22  students that had no files, no IEP's.
23      Q    Which students do you know for a
24  fact had no IEP's?
25      A    C. A., R. S., the L. brothers.

111

1  One, I want to say, is N., but I'm not 100
2  percent sure of his name. And to my
3  recollection, at this time, that's all I can
4  actually, for sure, say.
5      Q    You said the L. brothers.
6      A    Uh-huh.
7      Q    Meaning two young men?
8      A    That's correct.
9      Q    One of whom was named N., you
10  think?
11      A    I believe it was N.
12      Q    But, then, there would have been
13  another one?
14      A    Yes. It was stated to me by Mr.
15  Payne that he had no files on those boys.
16      Q    All right. Then, for the L.
17  brothers, what you are relying on for that
18  fact is something that Mr. Payne told you?
19      A    Yes, for them.
20      Q    As to C. A. and R. S., you,
21  yourself, never saw a file containing an IEP?
22      A    That's correct.
23      Q    Okay. And C. A. was on homebound
24  status?
25      A    That's correct.

112

1      Q    Was R. S. to be educated on site?
2      A    Yes, at Houston County High School.
3      Q    So, to go back to Defendant's
4  Exhibit 8, if I can, what you're telling me
5  is that, during this meeting, what
6  Dr. Ruediger calls a debriefing --
7      A    Uh-huh.
8      Q    Would you agree that he uses that
9  term?
10      A    Yes.
11      Q    -- you expressed concerns to
12  Dr. Ruediger about certain students not
13  having IEP's, at least that you could find
14  copies of?
15      A    Yes, that's correct.
16      Q    Okay. Did you express other
17  concerns that he might be referring to with
18  this sentence, "Mrs. Miller stressed her
19  concerns regarding individualized education
20  programs and the general structure of the
21  special education program"?
22      A    I explained to him that the
23  meetings that had taken place in May, where
24  the IEP's were written for the resource room,
25  were totally inappropriate for the student

113

1  because they were placed in full inclusion
2  rooms, general education classes. And so,
3  the process by which we were supposed to do
4  that is send notice of proposed meeting to
5  the parents, and if they -- if you don't hear
6  back by them, you know, in a reasonable
7  amount of time, you send a second notice.
8       I was instructed in school that you
9  might even want to send a certified copy to
10  make sure that the parent got it and document
11  the fact that you sent it.
12      None of that was being done. We were
13  not holding IEP meetings at all. And that --
14  you know, the whole process was just not
15  being followed.
16      Q   All right. Let me make sure I'm
17  understanding this. One of your concerns was
18  that they weren't holding IEP meetings at
19  all?
20      A   That they had no intention of
21  holding new IEP meetings to amend -- at least
22  amend the current IEP's that were there at
23  the school.
24      Q   I'm somewhat confused, Mrs. Miller.
25  You had been at Houston County High School as

114

1  a student intern for -- I believe you told me
2  15 to 20 class days?
3      A   Uh-huh. Yes.
4      Q   And you were telling experienced
5  teachers that IEP's were inappropriate for
6  particular students?
7      A   Yes, I did.
8      Q   Okay. And you were giving advice
9  to experienced educators as to the special
10  education process and how they should follow
11  it?
12      A   Yes.
13      Q   Okay. Interesting. And all of
14  this advice that you were giving to these
15  experienced educators, it came from your one
16  class you took at Troy State University --
17      A   No.
18      Q   -- this policy and procedures
19  class?
20      A   No.
21      Q   Okay. You admitted to me earlier
22  that you had never read the IDEA? Correct?
23      A   I admitted that I had not read the
24  entire law.
25      Q   Okay. You admitted to me earlier

115

1  that you had never read any of the standard
2  legal treatises on special education law?
3  Correct?
4      A   And if I understand the books that
5  you're talking about, no, I have not.
6      Q   Okay. You have to understand what
7  I'm struggling with over here. You're a
8  student intern, who doesn't even have a
9  bachelor's degree --
10      A   Uh-huh.
11      Q   -- and, yet, you're telling
12  seasoned educators these IEP's are
13  inappropriate as to students?
14      A   Yes. Because when I took classes
15  at Troy University, it was very clear, very
16  clear, about the IEP's and how they should be
17  written and that there should be some for
18  special ed students. Yes.
19      Q   Okay. What, if any, advice did
20  Dr. Ruediger give you during this debriefing
21  about your concerns or your advice to these
22  seasoned educators at Houston County High
23  School?
24      A   Right after that sentence that says
25  Mr. Strange -- I'm sorry -- that Mrs. Miller

116

1  expressed -- or stressed her concerns, right
2  after that, it says that it was recommended
3  by him that she initiate attempts to comply
4  with the current special education law.
5      -- He recommended that I go back to Mr.
6  Strange and encourage him to initiate IEP
7  meetings, so that these students would be
8  able to receive the education that they
9  actually need and the accommodations that
10  they actually need in the general education
11  classroom.
12      Q   Okay. Which students are you
13  referring to that were not receiving the
14  services they needed, in your opinion?
15      A   The students whose IEP's reflected
16  the resource room versus the general
17  education room, which was nearly all of them.
18  There were very few students at that school
19  who were not in a resource room originally.
20  Okay? There were a couple -- I can think of
21  one on my list, B. G. She was a regular ed
22  student. But even her IEP should have had --
23  should have been better written. I'll just
24  put it that way.
25      Q   In your opinion?

117

1   A    In my opinion.
2   Q    And were you part of the IEP team
3   that developed these IEP's?
4   A    No.
5   Q    And had you interacted with these
6   children in any way other than this 15 or 20
7   school days you had been there?
8   A    No.
9   Q    All right.  Let me go back.  Did
10  you actually go to Mr. Strange and discuss
11  these concerns as was suggested by
12  Dr. Ruediger?
13  A    Oh, yes.  In fact, we went to Mr.
14  Pitchford, as well.  And --
15  Q    There's no question, ma'am.
16  A    I'm sorry.
17  Q    Was there a meeting, then, between
18  you and Mr. Strange and Mr. Pitchford?
19  A    Yes.
20  Q    And when did this meeting occur?
21  A    The day after this observation, on
22  the 27th.
23  Q    Where did it occur?
24  A    In the conference room.  If I
25  remember correctly, in the conference room of

1   you know, else Mr. Pitchford would designate
2   to write until after I graduated.
3   Q    Okay.  And you are referring to
4   Defendant's 6, this internship agreement?
5   A    That's correct.
6   Q    Okay.  What, if anything, did Mr.
7   Pitchford say to you?
8   A    He was very angry.  It came across
9   that way.  He said that he was angry because
10  Dr. Ruediger should have come to him with his
11  concerns rather than sending an intern to
12  explain the situation.
13  And Mr. Stephens was actually in the
14  room, as well.  And when Mr. Pitchford said
15  that he should have come himself, instead of
16  sending an intern, Mr. Stephens started
17  laughing so hard, he got up and left the
18  room.
19  Q    Okay.  Did Mr. Pitchford express
20  anything else to you?
21  A    He said he was going to call Ms.
22  Parris and central office, Mr. Andrews
23  Q    Okay.  Anything else?
24  A    Not that I can recall at this point
25  in time.

118

1   the high school.
2   Q    How long did the meeting take?
3   A    Maybe -- I imagine, the best of my
4   knowledge, probably 10 or 15 minutes.
5   Q    What, if anything, did you say to
6   Mr. Pitchford?
7   A    I told Mr. Pitchford that I was
8   concerned that there were no IEP's for some
9   students.  That the IEP's that were written
10  in May did not reflect the central office's
11  decision over the summer to have all of the
12  students, the special ed students, be
13  included in the regular classroom.  And
14  because of the decision to put all of them in
15  the special education classroom, it required
16  that the IEP's for those students to be at
17  least amended, if not totally rewritten.
18  And I also explained to him that I had
19  been approached by Cathy Keasler to write an
20  IEP for R. S., when she knew very well that
21  we would have to go through an IEP process.
22  And also the fact that, in my contract,
23  it says that I'm not permitted to write the
24  IEP.  That was supposed to be the
25  responsibility of Paul Strange or whoever,

1   Q    Okay.  So, apparently, in this
2   meeting on the 27th of August, there was you,
3   Mr. Strange, Mr. Stephens and Mr. Pitchford?
4   A    That's correct.
5   Q    And Mr. Stephens was the vice
6   principal?
7   A    At the time.
8   (Brief off-record.)
9   Q    During this 10 to 15-minute
10  conference with Mr. Pitchford, did you
11  identify the students who, in your opinion,
12  had no IEP's?
13  A    I don't recall whether I did or
14  not.
15  Q    Okay.  During this 10 to 15-minute
16  conference with Mr. Pitchford, Mr. Strange
17  and Mr. Stephens, did you indicate which of
18  the IEP's you felt were inappropriate, based
19  on this central office decision that all
20  special ed students would go in the regular
21  ed class?
22  A    I didn't elaborate.
23  Q    And it's your understanding that
24  the central office in some way decided that
25  all special education students were going

121

1    be serviced in the general education
2    classrooms, regardless?
3        A    The law --
4        Q    Ma'am, the question was very
5    simple.  Would you address the question,
6    please?
7        A    Could you repeat the question,
8    please?  I'm sorry.
9            (Whereupon, requested portion of
10           record read back by the court
11           reporter.)
12       A    That's my understanding.
13       Q    Okay.  Where did you come about
14   that understanding?
15       A    From Mr. Strange.
16       Q    Okay.  He told you that?
17       A    He indicated to me that, over the
18   summer, the decision was made -- in previous
19   years, some students were in the regular
20   education classroom.  Mr. Strange said that,
21   over the summer, the decision was made to
22   include all of the students into the general
23   education classroom.
24       Q    What is your understanding of what
25   the term "IEP" means?

122

1        A    It's an individualized program,
2    education program, for each student.  And
3    each student has certain requirements.
4        Q    Yes, ma'am.  What does the term "I"
5    stand for?
6        A    Individualized.
7        Q    So, does it not follow, then, that
8    if you form an individualized program for a
9    student, you cannot automatically say that
10   student is going to be taught in the regular
11   classroom?
12       A    The IEP's specifically said that --
13   in the accommodations, for instance, that the
14   students would spend the day in the resource
15   room.  The resource room is totally different
16   than the general education class.  The
17   resource room --
18       Q    Yes, ma'am.
19       A    -- would have a special education
20   teacher --
21       Q    Yes, ma'am.
22       A    -- in there providing the services
23   that individual child needed.
24       Q    Yes, ma'am.  I am very familiar
25   with the special education laws.

123

1        A    Okay.
2        Q    Okay?
3        A    Uh-huh.
4        Q    What I asked you was, does it not
5    follow logically that, if the program has to
6    be individualized to that one child, that you
7    cannot automatically say that child is going
8    to receive services in the regular education
9    classroom?  Yes or no?
10           MR. FAULK:  Object.
11       A    I understand.  I understand what
12   you're saying.  That is correct.
13       Q    Good.  Thank you.  You expressed to
14   Mr. Pitchford, during this 10 to 15-minute
15   meeting on August 27, 2004, that a lady named
16   Cathy Keasler had asked you to write an IEP
17   for R. S.?
18       A    Yes.
19       Q    Who is Cathy Keasler?
20       A    She was a counselor at Houston
21   County High School.
22       Q    Tell me the circumstances under
23   which this request took place?
24       A    I was leaving the campus.  It was
25   after school hours.  And it was some time

124

1    between, say, 3:30 and 4:00.  She approached
2    me in the hallway.  And I had previously
3    asked her about the IEP, and told her, you
4    know, that there was none.  That there was
5    only a temporary services sheet in the file.
6    And that, you know, we needed to, you know,
7    probably go through the whole process again,
8    in terms of eligibility, because there had
9    been such a long period of time between
10   January of '04, her not having an IEP, and
11   August, not having an IEP that whole time
12   frame.
13       So, when she stopped me in the hallway,
14   she said, "I know it's totally illegal, but
15   we're going to need to write the IEP for R.
16   And it shocked me, because she has a special
17   ed background, is what I recall from her.
18       And I proceeded to tell her that, I'm
19   sorry.  Number one, my internship agreement
20   says that, you know, I'm not to be involved
21   with the IEP -- you know, writing IEP's, in
22   terms of being responsible for them.  I can
23   go ahead and, you know, as a learning
24   situation, learn about, you know, how to
25   write an IEP and that sort of thing, and

125

1　central office at Houston County may have
2　certain, you know, things that they want us
3　to do, incorporate, or whatever, but that I
4　couldn't do it because of the internship
5　seminar -- I'm sorry -- internship --
6　　　Q　Agreement.
7　　　A　-- agreement, and then, also
8　because it would be against the law not to
9　hold the meetings and have the parent there.
10　　　Q　Okay.  When did this -- I'm going
11　to call it a meeting -- take place?
12　　　A　It was, I want to say, around -- on
13　or around August 11.  It was right before --
14　it was on a Wednesday, if I'm not mistaken,
15　because, on Thursday and Friday, I was going
16　to be leaving for --
17　　　Q　This conference?
18　　　A　-- Louisiana.  Uh-huh.
19　　　Q　Okay.  So, this occurred on the
20　11th.  You were gone the 12th and 13th?
21　　　A　Uh-huh.
22　　　Q　Did you inform someone the next
23　week?
24　　　A　Yes, on Monday.
25　　　Q　Who did you inform?

126

1　　　A　Paul Strange.
2　　　Q　Maybe I misunderstood.  This
3　conference we're talking about occurred on
4　the 27th of August?
5　　　A　Right.  And what I'm saying is,
6　that's where I was telling Mr. Pitchford
7　about that situation.
8　　　Q　I understand.  Did you, yourself,
9　inform Mr. Pitchford about this meeting or
10　conversation with Ms. Keasler before the 27th
11　day of August?
12　　　A　No.  I talked with Mr. Strange
13　about it.
14　　　Q　And you said that there was some
15　sort of service plan in place for Ms. S.?
16　　　A　It's called a temporary services.
17　It just -- the parent gives permission for
18　the school to provide special education
19　services, you know, accommodations and that
20　sort of thing, until they get the IEP --
21　either get it from another school, or, if
22　that doesn't happen, then it's my
23　understanding that Houston County would have
24　to get information from the prior school,
25　and, you know, if it was acceptable to

127

1　Houston County, they would accept the IEP
2　If it wasn't, then it would have to be
3　rewritten.
4　　　Q　So, was it your understanding that
5　R. S. had transferred from another school?
6　　　A　Yes.  That was my understanding.
7　　　Q　And then, the temporary service
8　plan you're talking about was basically using
9　the IEP from the other school on a temporary
10　basis?
11　　　A　I've not had experience with
12　temporaries, so -- too much experience.  It
13　was my understanding that, yes, we would be
14　looking at her IEP from the other school, and
15　teachers -- general education teachers could
16　go ahead and use other accommodations if they
17　felt they were appropriate for R., even if
18　they weren't listed on that other IEP.
19　Anything to help that young woman be
20　successful in a general education classroom
21　　　Q　Okay.  Just so I'm understanding,
22　because, obviously, R. S. is fairly important
23　to this case, she transferred from another
24　system?
25　　　A　Uh-huh.

128

1　　　Q　And this was her first time as a
2　student at Houston County High School, as far
3　as you knew?
4　　　A　As far as I knew.
5　　　Q　And there was a temporary service
6　plan in place that you, yourself, saw?
7　　　A　A temporary service sheet.  It
8　wasn't really a plan.  It was just a sheet
9　that was signed by her parent, saying, yes,
10　she could receive services.
11　　　Q　And it's your testimony that Ms.
12　Keasler approached you on August the 11th and
13　said, "We need you to write an IEP"?
14　　　A　Yes.  She was on my caseload.
15　　　Q　Okay.  And is it your testimony
16　that she used the words, quote, I know it's
17　totally illegal?
18　　　A　Yes.
19　　　Q　But you did not, in fact, do that?
20　　　A　No, I did not.
21　　　Q　Okay.  And you told her that you
22　would not, in fact, do that?
23　　　A　I told her I would not do that.  I
24　told her I would not be able to do that.
25　　　Q　Yes, ma'am.  And one of the re

129

1    you told her you would not be able to do that
2    was because it was illegal?
3        A    Yes.
4        Q    And another was because of your
5    internship agreement?
6        A    Correct.
7        Q    That's Defendant's Exhibit 6?
8        A    Correct.
9        Q    Which specifically says that the
10   school administration is responsible for IEP
11   meetings, and your attendance is as that of a
12   student intern, and you cannot be held
13   legally responsible for meetings?
14       A    Correct.  During my internship.
15       Q    Yes.  And, in fact, one of the
16   things you discussed with Mr. Pitchford on
17   August 27 was that, according to your
18   internship contract or agreement, you were
19   not permitted to write IEP's?
20       A    Correct.  That's an understanding
21   that he had.  He signed the agreement.
22       Q    He's able to read the English
23   language, as far as you know?
24       A    Yes.
25       Q    All right.  Were there any other

130

1    discussions during this 10 to 15-minute
2    meeting on August 27?
3        A    There may have been, but I don't
4    recall at this point in time.
5        Q    Mr. Pitchford, you said, was angry?
6        A    Yes.
7        Q    And Mr. Stephens apparently found
8    something you said to be funny?
9        A    Very, yes.
10       Q    Okay.  Because he had to leave the
11   room, he laughed so hard?
12       A    Yes.
13       Q    After this meeting on August 27,
14   did you and Mr. Strange leave the room
15   together?
16       A    I don't recall.
17       Q    Okay.  Do you recall y'all having
18   any conversations about the meeting?
19       A    Afterwards, yes.  I mean, we just
20   discussed the fact that things needed to
21   change.
22       Q    Okay.  Let's look at Defendant's --
23   did I hand you 9 already?
24            MR. BRANTLEY:  Yeah.  We've got 9.
25       Q    Defendant Exhibit 9, have you seen

131

1    that document before?
2        A    Yes.
3        Q    What is that document?
4        A    It is another observation by Mr.
5    Strange.
6        Q    And I'm sorry.  Have we marked as
7    an exhibit another observation by Mr.
8    Strange?
9        A    No.
10       Q    Okay.  Was there another one before
11   this date on August 30?
12       A    No.  This was by Dr. Ruediger.
13       Q    Yes.  And that's why I'm asking
14   those questions.  You said this is another
15   one --
16       A    I'm sorry.
17       Q    -- by Mr. Strange.
18       A    This is another observation, but
19   this is by Mr. Strange rather than
20   Dr. Ruediger.
21       Q    Yes, ma'am.  And, in fact, the
22   document itself indicates that it is the
23   first observation.
24       A    From Mr. Strange.  That is correct.
25       Q    He has circled number 1 under

132

1    "number of observation"?  Correct?
2        A    Yes.
3        Q    And this observation occurred on
4    what date?
5        A    That would be, according to the
6    document, August 30th.
7        Q    Okay.  And would you agree that
8    most -- not all, but most of your scores by
9    Mr. Strange are average, 3's?
10       A    Yes.  Very good.
11       Q    Okay.  And, in fact, four of them
12   are 4's, or above average?
13       A    That's correct.
14       Q    He gave you above average on
15   provides practice and review?
16       A    Uh-huh.
17       Q    Correct?
18       A    Correct.
19       Q    He gave you an above average on
20   speaks standard, clear English?
21       A    Correct.
22       Q    He gave you an above average on
23   writes standard, clear English?
24       A    Correct.
25       Q    And an above average on exhibits a

133

1    professional demeanor?
2        A    Correct.
3        Q    And would you agree with me, also,
4    that as to the scores he gave you a 3, he has
5    provided you with some input or with some
6    suggestions?
7        A    Absolutely.
8        Q    And he's written those on this
9    form, hasn't he?
10       A    Yes.
11       Q    Okay.  And would you agree with me,
12   also, that this document, Defendant's Exhibit
13   9, is dated after this meeting that happened
14   on August 27?
15       A    Yes.  That's correct.
16       Q    Let me show you Defendant's Exhibit
17   No. 10, and ask you if you recognize that?
18       A    (Witness reviewing document.)
19            (Recess for lunch.)
20       Q    We are back from our lunch break.
21   And before the break, Mrs. Miller, we were
22   talking about this meeting that you had on
23   August 27th, 2004.  And I had just handed
24   you, I believe, Defendant's Exhibit No. 10?
25   Is that right?  Is that in front of you now?

135

1    up at the top, it says "discussion boards"?
2        A    Uh-huh.
3        Q    What is a discussion board?
4        A    Okay.  I mentioned the Blackboard
5    Learning System --
6        Q    Yes, ma'am.
7        A    -- that Troy University
8    incorporates into their internship seminar
9    class.  And this is a forum to discuss issues
10   that come up at the different schools that
11   each intern is at.
12       Q    All right.  So, what is your
13   understanding of who has access to this --
14   I'm sorry -- you called it Blackboard?
15       A    Uh-huh.
16       Q    Is that some sort of software
17   program?
18       A    That's my understanding.  I'm not
19   that computer savvy.
20       Q    Does each of the classes or the
21   seminars have its own little Blackboard or
22   discussion board?
23       A    I'm not sure how the system works.
24       Q    Before September 11, 2004, had you
25   used this Blackboard thing before?

134

1        A    This is the class introductions at
2    Troy University.
3        Q    This is a printout of some sort
4    that was produced during the discovery in
5    this case.  Is this a printout of some sort
6    of communication you had with your classmates
7    in the internship seminar?
8        A    Correct.
9        Q    Okay.  And you penned the words on
10   this document?
11       A    Yes.
12       Q    All right.  And would you tell us,
13   for our record, the date of the information?
14       A    It was September 11th of 2004.
15       Q    Okay.  According to the document
16   itself, Defendant's 10, that was a Saturday?
17       A    Apparently, yes.
18       Q    It says, right up there --
19       A    Uh-huh.
20       Q    -- "Saturday, September 11, 2004"?
21       A    Yes, it does.
22       Q    And it also says it was at 1:53
23   p.m.?
24       A    Uh-huh.
25       Q    Now, just so that I understand it,

136

1        A    Yes.  As far as I know, yes.  There
2    was a certain point in time when it wasn't up
3    and running for our particular class.  If I'm
4    not mistaken, it takes time to get
5    everybody's names in and everything, it's my
6    understanding.  And so -- but, yes.  Each
7    week, you know, we had things that we were
8    supposed to do on this.
9        Q    I want to make sure I'm grasping
10   this.  You had to take this internship class?
11       A    Uh-huh.
12       Q    Is that right?
13       A    Internship seminar class.  Yes.
14       Q    And as part of that seminar class,
15   you had to log onto the internet?  Is that
16   right?
17       A    Correct.
18       Q    And go to this message board?
19       A    Correct.
20       Q    And then, you had to interact with
21   the other students in the class in some way?
22       A    It wasn't what they call, I think,
23   realtime.  But Dr. Jones would have a
24   discussion question.  For instance, like, the
25   current forum was the class introduction

137

1  So, each one of the students in that
2  particular internship class would go in and
3  tell a little bit about themselves.
4      Q   I see.  And that's what you're
5  doing here on Defendant's 10?
6      A   Correct.
7      Q   You're just introducing yourself to
8  the other members of the internship seminar
9  class?
10     A   Right.
11     Q   Okay.  And had y'all had class
12 meetings before this September 11?
13     A   I want -- to the best of my
14 knowledge, yes.  I don't exactly recall when
15 we started actually meeting.  But, yes.
16     Q   All right.  I see a lot of personal
17 information in here about you --
18     A   Right.
19     Q   -- which would fit in with
20 introducing yourself to the class.
21     A   Uh-huh.
22     Q   Would you agree with me that you
23 tell your other classmates that you've been
24 married to your best friend, Terry, for 32
25 years?

138

1      A   At that time, yes, 32 years.
2      Q   That's there in the third
3  paragraph.
4      A   Yes.
5      Q   Do you see that?
6      A   Uh-huh.
7      Q   Do you tell them that you have
8  three children?  That's in the fourth
9  paragraph.
10     A   Yes.
11     Q   You even name your children?
12     A   Yes.
13     Q   Tell a little bit about them?
14     A   Yes.
15     Q   You also talk about making wedding
16 cakes and stained glass windows, and you talk
17 about this business you've told me about this
18 morning.
19     A   Correct.
20     Q   Okay.  I like your comment at the
21 end, that they deserve lots of points for
22 reading this.
23     A   Right.
24     Q   I like that.  It appears to me --
25 and I want you to correct me if I'm wrong --

139

1  that really the only paragraphs that are
2  relevant to your internship or to this
3  lawsuit are the first two paragraphs of this
4  document.  Would you agree with that?
5      A   I would agree with that.
6      Q   Okay.  And in the first paragraph,
7  you seem to tell them, you know, this is who
8  I am, and here's what I'm doing.
9      A   Uh-huh.
10     Q   Is that right?
11     A   That's correct.
12     Q   In the second paragraph, you talk
13 about the number of students that you're
14 interacting with?  Correct?
15     A   That's correct.
16     Q   And then, you tell about this one
17 particular student who recognized you and
18 called you by name?
19     A   Uh-huh.
20     Q   Is that right?
21     A   That's correct.
22     Q   All right.  Now, it also seems that
23 you liked the third block math teacher?
24     A   Yes.
25     Q   Okay.  You, in fact, said that she

140

1  was terrific?
2      A   Yes.
3      Q   Okay.  Who is she?
4      A   Ms. Towns, Lisa Towns.
5      Q   Ms. Towns.  And then, you say you
6  want to vent a little?  Correct?
7      A   Let me find that.
8      Q   If you'll look for, "However, I'm
9  going to vent."
10     A   Okay.  Got it.
11     Q   Do you see that?
12     A   Right.  Uh-huh.
13     Q   Okay.  Which person are you
14 referring to there, when you talk about one
15 teacher in particular?
16     A   In this particular case, I was
17 talking about Stacey Ezell.
18     Q   But you don't name her by name?
19     A   That's correct.
20     Q   And you complain, in essence, to
21 your other classmates that she uses
22 worksheets, quizzes and tests?  Correct?
23     A   Uh-huh.
24     Q   And you complain that she doesn't
25 want special education students in her

141

1    A    Uh-huh.

2    Q    Correct?

3    A    Uh-huh.

4    Q    And then, you also complain that

5  she embarrasses and humiliates the special

6  education kids and you?

7    A    Uh-huh.

8    Q    Okay.  Do you say anything else in

9  this communication that, you know, might be

10  relevant to this lawsuit or this dispute?

11    A    The fact that Mr. Strange and I had

12  discussed some of the problems and issues

13  that I was having, trying to make sure that

14  the special education students in her classes

15  were getting needed services.

16    Q    Okay.  Where do you say that?

17    A    My mentor and I have discussed at

18  great length, and even though he has been

19  teaching for about eight years, blah, blah,

20  blah, any suggestions to help out with those

21  problem areas.  You know.

22    Q    All right.  The sentence actually

23  says, "My mentor and I have discussed this at

24  great length, and he, even though he's been

25  teaching for about eight years, he's at a

142

1  loss for any suggestions that are

2  diplomatic."

3        Now, Mrs. Miller, I read that sentence

4  to understand, and understood from it, that

5  you were referring to the problems you had

6  identified with Ms. Ezell above that.  Is

7  that incorrect?

8    A    In addition to other things that I

9  did not specifically mention.

10    Q    Okay.  Well, now, would you agree

11  that the people in your class, you know,

12  wouldn't know about anything you didn't

13  specifically mention to them?

14    A    Right.

15    Q    So, if you read that sentence, and

16  you were part of this class, you would think,

17  well, she's talking about this one teacher

18  who uses worksheets and intentionally

19  embarrasses and humiliates?

20    A    Uh-huh.

21    Q    Correct?

22    A    Yes.  I can see your point.

23    Q    Okay.  And according to what you

24  tell them, Mr. Strange -- you don't name him

25  by name.  Would you agree with that?

143

1    A    That's correct.

2    Q    But, according to the sentence,

3  your mentor doesn't really have any

4  suggestions as to how you can do that

5  diplomatically?

6    A    Right.

7    Q    But he knows and understands your

8  dilemma?  Correct?

9    A    Yes.

10    Q    All right.  So, that's as specific

11  as you get?

12    A    That's as specific as I got with

13  that group of people.  Yes.

14    Q    Yes.  All right.  To your knowledge

15  and recollection, did you ever get more

16  specific with this group, your classmates in

17  the internship seminar, about the problems

18  you saw at Houston County High School?

19    A    There's a possibility.  But,

20  unfortunately, when I attempted to make

21  copies of my communications, sometimes the

22  Blackboard system would not let us print, for

23  whatever reason.  I don't know why.

24    Q    Okay.  There's a possibility, but

25  if it is, you weren't able to print it?

144

1    A    Right.

2    Q    Okay.  Would you agree with me,

3  though, that Defendant's Exhibit 10, at

4  least, doesn't say the first thing about

5  students not having IEP's?

6    A    That is correct.

7    Q    Would you agree with me that

8  Defendant's Exhibit 10 doesn't say the first

9  thing about IEP's being inappropriate for

10  students?

11    A    That's correct.

12    Q    Would you agree with me that

13  Defendant's Exhibit 10 doesn't say the first

14  thing that the system needs to rewrite or

15  amend all of these IEP's?

16    A    That's correct.

17    Q    And would you agree with me again

18  that Defendant's Exhibit 10 doesn't say the

19  first thing about anybody asking you to,

20  allegedly, illegally write IEP's?

21    A    That's correct.

22    Q    Okay.  Let's look at Defendant's

23  Exhibit 11.  This document is similar to

24  Defendant's Exhibit 10.  Would you agree with

25  that?

145

1    A    Yes.
2    Q    All right. It's another message
3    board or discussion board entry?
4    A    Correct.
5    Q    And it's an entry by you?
6    A    Correct.
7    Q    You penned the information that's
8    here, or typed it?
9    A    Correct.
10   Q    The date of Defendant's Exhibit 11,
11   or the information contained in it, is
12   Saturday, September 11, 2004?
13   A    That's correct.
14   Q    Would you agree?
15   A    Yes.
16   Q    And it's at 2:52 p.m.? Correct?
17   A    Correct.
18   Q    So, this is on the same day as
19   Defendant's Exhibit 10, just a little later
20   in time?
21   A    Correct. It's a different forum,
22   different discussion.
23   Q    And the subject matter is
24   surprises?
25   A    Uh-huh.

146

1    Q    So, one of the items put up for
2    discussion, apparently, by Dr. Jones --
3    A    Uh-huh.
4    Q    -- was surprises?
5    A    Uh-huh.
6    Q    Is that "yes"?
7    A    Yes. I'm sorry.
8    Q    Okay. What is ISC?
9    A    That is the computer room over at
10   Troy University.
11   Q    Okay. So, you were actually doing
12   this in a room at Troy University?
13   A    Correct.
14   Q    On that Saturday afternoon?
15   A    Correct.
16   Q    Okay. So, in that first sentence,
17   you're saying you spent so much time doing
18   Defendant's Exhibit 10, the building you're
19   in is about to close?
20   A    That's correct.
21   Q    All right. You mention, in
22   Defendant's 11, that your biggest surprise
23   was the teacher you talked about in
24   Defendant's Exhibit 10? Correct?
25   A    Correct.

147

1    Q    And that would be Ms. Ezell again?
2    Correct?
3    A    Correct.
4    Q    But you don't name her by name?
5    A    Correct.
6    Q    And you state, if I'm correct, your
7    opinion that her disrespect for students and
8    colleagues alike simply floored you?
9    A    Uh-huh.
10   Q    Is that right?
11   A    That is correct.
12   Q    But you acknowledge that she's been
13   teaching for 15 years?
14   A    Yes.
15   Q    All right. There's a sentence in
16   the second paragraph of Defendant's 11 "I'm
17   having no ease -- I'm having to ease" --
18   excuse me -- "my way around the teachers,
19   because they are not happy with full
20   inclusion."
21   A    Correct.
22   Q    Okay. And that was a surprise to
23   you?
24   A    That was a surprise to me.
25   Q    Okay. Why?

148

1    A    I would have imagined that they
2    would see -- teachers would see having more
3    special education students in their classroom
4    as a welcome challenge, understanding that
5    special education students with mental
6    retardation and other types of disabilities
7    benefit from being in a general ed classroom
8    with other peers.
9    Q    But you're basically telling your
10   classmates that this is your opinion, first,
11   that they're not happy with full inclusion?
12   A    Yes.
13   Q    Had any teacher specifically told
14   you that?
15   A    Mr. Strange had said that a lot of
16   them were not happy about full inclusion
17   because they just found out about it days
18   before school started.
19   Q    And this goes back to the alleged
20   policy you're talking about from the central
21   office?
22   A    Of full inclusion, you mean?
23   Q    Yes, ma'am.
24   A    The change from partial inclusion
25   to full inclusion. Yes.

149

1    Q    Okay.  I'm just trying to make a
2  reference back to what you told me earlier.
3  You told me earlier, before the lunch break,
4  that Mr. Strange had indicated to you the
5  central office policy had changed, so that
6  all special ed students had to be educated in
7  the general education classroom, without
8  exception?
9    A    I did not say "without exception."
10  I said that he said to me that this was the
11  policy.  He didn't specify "without
12  exception."  He just told me that the central
13  office had made the decision to place all
14  students in the regular classroom.  And I
15  personally do not know of any students that
16  were in the building -- not homebound, but in
17  the building -- who were not in full
18  inclusion regular education classes.
19    Q    Okay.  So, at Houston County High
20  School, while you were there for your
21  internship, you don't know of any students
22  who were strictly in the resource room all
23  day long?
24    A    No, I don't.
25    Q    All right.  Basically, here, you're

150

1  just telling your classmates, first, your
2  opinion that the teachers are not happy --
3  teachers out there in the field, not happy
4  with this full inclusion idea?
5    A    Uh-huh.
6    Q    And that surprised you?
7    A    It surprised me.
8    Q    All right.  At the time you typed
9  or penned these words, how long had you been
10  interning at Houston County High School?
11    A    Since approximately the 1st of
12  August.
13    Q    All right.  So, five weeks?
14    A    Approximately.
15    Q    Okay.  Would you agree with me
16  that, in Defendant's Exhibit 11, you don't
17  say anything about all of these children not
18  having IEP's?
19    A    That's correct.
20    Q    You don't say anything about
21  allegedly being asked to write illegal IEP's?
22    A    That's correct.
23    Q    You don't say anything about all of
24  the IEP's are inappropriate and need to be
25  rewritten or amended?

151

1    A    That's correct.
2    Q    In fact, you don't even say
3  anything in Defendant's 11 or Defendant's 10
4  about being asked to write IEP's, when your
5  internship agreement doesn't permit you to do
6  that?
7    A    That's correct.
8    Q    Let's look at Defendant's Exhibit
9  12.  Do you recognize this document?
10    A    Yes, I do.
11    Q    What is this document?
12    A    This is correspondence -- one that
13  I was able to print off -- correspondence
14  between myself and Ms. Parris and Dr. Jones.
15    Q    Okay.  I assume that it was an
16  e-mail.  Is it an e-mail?
17    A    Uh-huh.
18    Q    A printout of an e-mail?
19    A    Yes, it is.
20    Q    So, you electronically sent this
21  message to Ms. Parris and Dr. Jones?
22    A    Yes.
23    Q    And according to the document
24  itself, Defendant's 12, you did this on
25  Saturday, September 11, 2004, at 5:48 p.m.?

152

1    A    That's correct.
2    Q    So, I'm going to assume, based on
3  what you told me earlier, that you had to
4  send this message from another site other
5  than the computer center at Troy?
6    A    Yes, I believe so.  I'm not sure if
7  it was from my computer or the school, Troy
8  University, computer.
9    Q    You had a computer at your home,
10  though?
11    A    I had one at one point in time, and
12  it stopped working, but I'm not sure exactly
13  when that was.
14    Q    You agree you told me earlier, when
15  we were looking at Defendant's 11, that the
16  computer building or center, the ISC, was
17  about to close?
18    A    Yes.
19    Q    You do remember that now?
20    A    Yes.
21    Q    All right.  So, I'm making an
22  assumption that, from 2:52 p.m., Defendant's
23  11, to 5:48 p.m., Defendant's 12, you changed
24  your physical location to another internet
25  connection?

153

1    A    That is correct.  That is correct.
2    Q    All right.  And would it be your
3  recollection that you did this from your
4  home, or would you perhaps have done it from
5  somewhere else?
6    A    It must have been from my home.
7    Q    What sort of computer system did
8  you have at your home?
9    A    Just a regular tower computer.
10    Q    A desktop system?
11    A    Yes.
12    Q    But you had internet connection of
13  some kind?
14    A    Yes.
15    Q    Was that through your cable
16  company?
17    A    No.  Phone.
18    Q    Through your phone company?
19    A    Uh-huh.
20    Q    So, it was dial-up?
21    A    Yes.  I mean, it was -- I mean, it
22  attached to the phone.  I'm not real computer
23  savvy.  So, it attached to my phone line, so,
24  apparently, it was dial-up.  I guess that's
25  what that's called.

154

1    Q    I'm not trying to trick you.
2    A    I know.
3    Q    I'm just trying to understand.
4    A    I'm not even sure what to call it.
5    Q    Well, according to Defendant's 12,
6  this is from NMMiller@aol.com?
7    A    Uh-huh.  That's my aol address.
8  Yes.
9    Q    Would you agree with me that it
10  says it's from NMMiller@aol.com?
11    A    Correct.
12    Q    And that's your e-mail address?
13    A    Yes.
14    Q    And is that a personal e-mail
15  address?
16    A    Yes.
17    Q    Do you still have that e-mail
18  address?
19    A    Yes.
20    Q    All right.  And do you have access
21  to it?
22    A    I'm not sure what you mean.
23    Q    Do you still have the address?
24    A    Yes, uh-huh.
25    Q    And do you have access or can you

155

1  send e-mails from that address, as we s t
2  here today?
3    A    Yes.
4    Q    Okay.  And have you, yourself,
5  deleted e-mails from that e-mail address?
6    A    I have, on occasion, yeah.
7  Absolutely.
8    Q    Okay.  Have you gone back to that
9  e-mail address and checked to see if there
10  were other e-mails that applied to this
11  lawsuit?
12    A    My e-mail service, after maybe a
13  month -- I don't know -- I don't think I can
14  get to any more.  When I go to my screen, it
15  shows up blank.  So, I wouldn't know how to
16  go about doing that.
17    Q    Okay.  Well, my next question s,
18  have you tried?
19    A    No.
20    Q    All right.  Well, if I can ask, did
21  you find this document?
22    A    Did I find it?
23    Q    Yes, ma'am.
24    A    No.  This was -- usually, there's a
25  date.  And, unfortunately, the date's missing

156

1  on here.
2    Q    All right.  You don't recall
3  finding this document off of your home
4  computer system and turning it over to your
5  lawyers?
6    A    Oh, no.  No.  This was already
7  printed out when I did it, when I sent the
8  e-mail.
9    Q    This was already printed out when
10  you sent it?
11    A    When I sent the e-mail, I printed a
12  copy of it before I sent it or after I sent
13  it or whatever.
14    Q    Okay.  At the same time that you
15  electronically sent it, you made yourself a
16  hard copy?
17    A    Yes.  I was trying to collect a o
18  of this stuff just as a -- in my internship
19  notebook.  I mean, it wasn't specifically --
20  I wasn't specifically requested to do that or
21  anything like that.  I just, you know, pulled
22  some --
23    Q    You took it on yourself to do it?
24    A    Yes.
25    Q    All right.  Now, it appears to r

157

1 that you tell Ms. Parris and Dr. Jones about
2 going to this workshop.
3      A    Yes.
4      Q    Is that the one in Louisiana you
5 referred to earlier?
6      A    No.  PEPE is -- I can't remember
7 exactly what the acronym stands for.  But
8 it's the evaluation method that the school
9 systems go by when they -- when your
10 principal comes in and does your, you know,
11 observations and that sort of thing.
12      Q    But, then, you're also telling them
13 that you only spent two days in your
14 internship that particular week?
15      A    Right.
16      Q    Okay.  And you said it was the
17 worst week emotionally?  Correct?
18      A    Uh-huh.  That's correct.
19      Q    All right.  You talk about this one
20 student who you asked her to put away her
21 food, and she did that, and said, "Oh, Mrs.
22 Miller, I love you."  Correct?
23      A    That's correct.
24      Q    And then, you talk about the
25 problems that upset you?

158

1      A    Uh-huh.
2      Q    That's the second paragraph?
3 Correct?
4      A    That's correct.
5      Q    Then we go back to the science
6 teacher who embarrasses, belittles and
7 humiliates you?  Correct?
8      A    Yes.
9      Q    And that's Ms. Ezell?
10      A    That's correct.
11      Q    Now, you say, in this e-mail
12 communication to Ms. Parris and Dr. Jones,
13 that you gave Ms. Ezell a list of
14 accommodations for special ed students, and
15 that she became aggravated by that and didn't
16 appreciate it?
17      A    Correct.  And the list of
18 accommodations can technically be used for
19 any student that might be having a problem.
20 But I gave them especially to her for some of
21 the students that might be experiencing
22 problems in her room.
23      Q    Okay.  And this list that we're
24 talking about, was it basically a list of
25 suggested techniques to deal with special ed

159

1 students with mental retardation and learning
2 disabilities?
3      A    If I remember correctly, it was
4 from one of the books that I had purchased.
5 Not necessarily a school book, but a book
6 that I had purchased that had ideas for
7 students with learning disabilities and that
8 sort of thing.
9      Q    And you say, in Defendant's 12
10 that Ms. Ezell became aggravated because she
11 said she's been teaching a lot longer than
12 you?
13      A    Right.
14      Q    Okay.  And according to what you
15 said over in Defendant's 11, you were aware
16 that Ms. Ezell had been teaching for over 15
17 years back at that time?
18      A    That's correct.
19      Q    So, would you agree that she had
20 been teaching a lot longer than you?
21      A    Yes.
22      Q    Because you had only been teaching
23 a few weeks?
24      A    That's correct.
25      Q    You had only been interning for a

160

1 few weeks?
2      A    That's correct.  But she didn't
3 have that many special education students in
4 her room prior to when I started to intern --
5      Q    Yes, ma'am.
6      A    -- from my understanding.
7      Q    But can you understand how a
8 seasoned educator like Ms. Ezell might become
9 aggravated when an intern with only a few
10 weeks of experience hands her a list of
11 suggested methods for dealing with her
12 students?
13      A    No.  I disagree.  Because I was
14 still considered a professional teacher,
15 according to my contract.  And even if I was
16 just, in her eyes, an intern, I believe that
17 she had the obligation to treat me as a
18 professional, or at least with common
19 courtesy, rather than being disgusted or,
20 like, who-do-you-think-you-are sort of thing.
21 I think that she should have been much more
22 respectful and helpful to an intern or a
23 teacher.
24      Q    So, you can't even understand how
25 she would become aggravated?

161

1   A   No.  No, I can't.

2   Q   Well, all right.  Good enough.  In

3   this communication, Defendant's 12, you don't

4   specifically mention that there are students

5   with no IEP's, do you?

6   A   No.

7   Q   You don't specifically mention, in

8   Defendant's 12, that, in your opinion, the

9   IEP's for students at Houston County High

10  School are inappropriate and need to be

11  amended or rewritten?

12  A   No.

13  Q   And in Defendant's 12, you don't

14  specifically mention this alleged incident

15  about Ms. Keagler allegedly asking you to

16  illegally do things, do you?

17  A   Ms. Keasler.  No, I don't mention

18  that.

19  Q   All right.  You don't mention it?

20  A   No.

21  Q   And I apologize for mispronouncing

22  her name.  Keasler?

23  A   Keasler.

24  Q   Okay.  And you also don't mention

25  anything about the fact that you're not

162

1   allowed to do these sorts of things under

2   your internship agreement, do you?

3   A   What sorts of things?

4   Q   Writing IEP's.

5   A   Okay.  No.  I don't mention that at

6   all.

7   Q   Okay.  And would you agree with me

8   that this communication to Ms. Parris and

9   Dr. Jones is after this meeting of August 27

10  with Mr. Strange, Mr. Pitchford and Mr.

11  Stephens?

12  A   That's correct.

13  Q   Let me show you Defendant's 13,

14  Mrs. Miller.

15  A   (Witness reviewing document.)

16  Q   Are you ready?

17  A   Yes.

18  Q   Defendant's 13.  That is another

19  e-mail communication from you, from your

20  personal e-mail account?

21  A   Correct.

22  Q   And it is addressed to Pam Parris

23  at Troy?

24  A   Correct.

25  Q   It is dated Monday, September 13,

163

1   2004, at 4:33 p.m.?  Correct?

2   A   Correct.

3   Q   And the subject line is "Nancy

4   Miller week three"?

5   A   Correct.

6   Q   Does that mean we're talking about

7   the third week of your internship?

8   A   Correct.

9   Q   Go back to Defendant's 12 for me

10  please.

11  A   May I say something first?

12  Actually, it says "week three."  So, I don't

13  -- I can't really say for sure it was my

14  third week of internship, but it was our

15  third week of communication through the

16  internship, back and forth to Ms. Jones --

17  Dr. Jones and Ms. Parris.

18  Q   Would you agree with me that

19  Defendant's Exhibit 6 -- that's your

20  internship agreement -- required you to

21  communicate with Ms. Parris on a weekly

22  basis?

23  A   Uh-huh.  Yes.  And that was either

24  -- my understanding was either verbal or by

25  telephone.  We did a lot of telephone

164

1   talking.

2   Q   Yes, ma'am.  If you'll look at

3   Defendant's Exhibit 6 for me, please.

4   A   Okay.

5   Q   And if you'll look on the second

6   page thereof, that paragraph (k).  Does it

7   not say, "Mrs. Miller is to e-mail Ms. Parris

8   weekly" --

9   A   Okay.

10  Q   -- "about the internship"?  Yes or

11  no?

12  A   Yes.  Yes, it does.

13  Q   All right.  Again, Defendant's

14  Exhibit 13, the "wk3" in the subject line

15  refers to your third week of internship?

16  A   Okay.

17  Q   Correct?

18  A   I believe so.

19  Q   And Defendant's 12, the subject

20  line says "Nancy Miller week three," also?

21  Correct?

22  A   Yes.

23  Q   So, that would refer to the third

24  week of your internship?

25  A   Correct.  That could have been

165

1 mistake, in terms of -- it could have been
2 the fourth, and I just put third. That's a
3 possibility.
4    Q    You would admit the document says
5 what I just said?
6    A    Yes. I will admit that.
7    Q    Good. In this e-mail
8 communication, Defendant's 13, you state
9 that, "Paul went ahead and spoke to Mr.
10 Pitchford." Do you see that?
11    A    Yes, I do.
12    Q    Who is Paul?
13    A    Mr. Strange.
14    Q    Okay. You called him by his first
15 name?
16    A    Yes. We called each other by our
17 first names a lot.
18    Q    All right. And you say, in your
19 communication to Ms. Parris, that, "Mr.
20 Pitchford brought the teacher in with Mr.
21 Strange to discuss the problems. She
22 immediately sent the items Mr. Pitchford told
23 her I would need, and asked her to be more
24 cooperative."
25    A    Uh-huh.

167

1 on paper.
2    So, I had requested copies of her
3 lectures in advance, so that I could give
4 them to the students, and they could either
5 read, which was still hard for a student with
6 mental retardation -- but I could try and
7 make it more to where the students could
8 understand.
9    Q    You could translate it?
10    A    Yeah. On occasion -- not very
11 often, but on occasion, they were written in
12 script. And most of the students that I
13 worked with could not read handwriting. They
14 can only read printed material. So, I might
15 have to, you know, print them over and give
16 them to the students.
17    Q    But that was the problem that you
18 and Mr. Strange addressed to Mr. Pitchford?
19    A    Those sorts of things are what Mr.
20 Strange went to Mr. Pitchford about. Yes.
21    Q    Getting lesson plans and copies of
22 the lectures?
23    A    And things like that. Yes.
24    Q    What other things like that?
25    A    Clarification on when she's done

166

1    Q    "She seemed to respond."
2    A    Yes.
3    Q    Okay. Who is the teacher?
4    A    Ms. Ezell.
5    Q    Okay. And what items did she
6 immediately send?
7    A    I had mentioned that I would need
8 lesson plans, so that I would know where she
9 was going to be during the course of the
10 week, so that I could possibly plan things
11 for, for instance, one of the students with
12 mental retardation. That sort of thing.
13 Lesson plans, any kind of notes.
14    Oftentimes, in addition to the
15 worksheets and the book work and that sort of
16 thing, she would lecture a lot. And some of
17 my students, especially those with mental
18 retardation, have fine motor skill problems.
19 So, they weren't able to sit there even the
20 length of time that she would, you know,
21 maybe repeat part of a sentence, like, three
22 different times, and then, move on. They
23 still didn't have the -- number one, the
24 cognitive ability, nor the fine motor skills
25 in order to write, you know, her lecture down

168

1 with a class, you know, with the lecture
2 part. She always wanted me to take the
3 students out of the room, the special ed kids
4 out of the room, if they were done. And that
5 would give me an opportunity to help them
6 one-on-one. So, you know, trying to work out
7 that sort of thing, when I could and when I
8 couldn't.
9    At one point in time -- I believe it was
10 on either the week of September 13th or maybe
11 even the week before -- I was required to
12 make a log of every time I went in her
13 classroom or any other teacher's classroom
14 and that sort of thing. So, I would have to
15 document what I was going to be doing with
16 those special ed students and that sort of
17 thing.
18    So, you know, I was hoping to get sort
19 of an idea of when I would be able to work
20 with the students and what to work on when I
21 took them out of the classroom.
22    Q    Okay. And then, you indicate to
23 Ms. Parris in this communication, Defendant's
24 13, that, after this meeting or discussion,
25 that Ms. Ezell was more cooperative, an

169

1  seemed to respond?
2      A    Uh-huh.
3      Q    Is that "yes"?
4      A    Yes.
5      Q    Okay.  So, in this communication,
6  Defendant's Exhibit 13, again, you don't say
7  the first thing about there are students with
8  no IEP's?
9      A    No.
10     Q    You don't say the first thing
11 about, in your opinion, all of the IEP's are
12 inappropriate and need to be amended or
13 rewritten?
14     A    No.
15     Q    You don't say the first thing about
16 Cathy Keasler asking you to allegedly do an
17 illegal IEP?
18     A    No.
19     Q    And you don't say anything about
20 someone asking you to write an IEP or writing
21 an IEP not being permissible under your
22 internship agreement?
23     A    No.
24     Q    All right.  Look at Defendant's 14
25 for me, please.

170

1      A    (Witness reviewing document.)
2      Q    All right.  What is Defendant's 14?
3      A    This is a memo that I wrote to Mr.
4  Pitchford the morning that I left the high
5  school to go to central office to talk to Mr.
6  Andrews.
7      Q    Okay.  Would you agree with me that
8  the date of Defendant's 14 is September 24,
9  2004?
10     A    Yes.
11     Q    And you, yourself, typed this
12 document?
13     A    Yes.
14     Q    And in the document, you tell Mr.
15 Pitchford, "This memo is to inform you that
16 this morning, after I attended an IEP meeting
17 for T. T." --
18     A    T. T. Uh-huh.
19     Q    -- "during second block, Starla,
20 the psychometrist, in Paul Strange's
21 presence, asked me to sign three documents
22 claiming that I was at IEP meetings."
23 Correct?
24     A    Yes.  That is correct.
25     Q    That's what it says?

171

1      A    Yes.  That is correct.
2      Q    And I realize I slaughtered the --
3      A    That's okay.
4      Q    -- student's name.  But that's what
5  it says?  Right?
6      A    That is correct.
7      Q    Who is Starla, the psychometrist?
8      A    She was the psychometrist from
9  Houston County Board of Education.  That's my
10 understanding.
11     Q    Yes, ma'am.  Do you know her full
12 name?
13     A    No.  I don't recall.
14     Q    Are you talking about Starla Smith?
15     A    I'm not sure what her name was.
16     Q    You don't know what her last name
17 is?
18     A    I don't now.  I did then, but I did
19 not -- I neglected to put it in the document.
20 I can see that.  I don't recall her last
21 name.
22     Q    Where did you produce this
23 document?
24     A    At Houston County High School.
25     Q    Yes.  Where?

172

1      A    At Houston County High School, in
2  my resource room.
3      Q    On a computer system?
4      A    That's correct.
5      Q    Okay.  And then, you printed it off
6  when you were done?
7      A    That's correct.
8      Q    Okay.  And then, in Defendant's 14,
9  you name the two students you're referring
10 to.  Three documents, two students?  Correct?
11     A    That's correct.
12     Q    And then, you tell Mr. Pitchford or
13 state to Mr. Pitchford, "As you know, signing
14 the documents when I was not present at a
15 meeting is unlawful."  Correct?
16     A    May I backtrack for a second?
17     Q    Is that what it says or not?
18     A    Two different documents, but --
19 there were three different documents, but t
20 wasn't for three different students.  It was
21 two students, but three documents.
22     Q    Yes, ma'am.  I understood that.
23     A    Oh, I'm sorry.  I thought --
24     Q    I think that's what I said.
25     A    I'm sorry.

173

1    Q    There were three documents, two
2  that applied to one student, and another
3  document that applied to another student?
4    A    That's correct.
5    Q    Three documents, two students?
6    A    That's correct.
7    Q    And you would agree with me that
8  your next sentence says, "Signing the
9  documents when I was not present at a meeting
10  is unlawful."
11    A    That was my understanding.  Yes.
12    Q    And where did you come about that
13  understanding?
14    A    From my education at Troy
15  University.
16    Q    All right.  And then, you state,
17  "You also know that this is not the first
18  time I have been approached about illegally
19  signing IEP documents."
20    A    Correct.
21    Q    And you're referring back to Cathy
22  Keasler?
23    A    Correct.
24    Q    Then you tell him again about
25  August 11, at 3:20, Keasler approached you,

174

1  all those things?
2    A    Yes.
3    Q    Correct?
4    A    That's correct.
5    Q    Okay.  And then, your last
6  sentence, "I have informed Dr. Jones and Ms.
7  Parris of the situation, and I am leaving the
8  premises."
9    A    Correct.
10    Q    How did you inform Dr. Jones and
11  Ms. Parris of the situation?
12    A    I called and left a message at Troy
13  University, and asked them to give me a call
14  back.  They never did.  But I left a message
15  for them to inform them.
16    Q    So, then, you didn't actually
17  inform Dr. Jones and Ms. Parris of the
18  situation.  You left messages for them to
19  call you?
20    MR. BRANTLEY:  Object as to form.
21    Q    If you'll answer the question,
22  ma'am.
23    MR. BRANTLEY:  Well, it's a
24       compound question.  I mean, it
25       calls for two separate answers.

1    MR. WALDING:  I don't think it
2       does.
3    MR. BRANTLEY:  Well, there's two
4       different questions there.
5    Q    (By Mr. Walding)  What did you say
6  in the message to Dr. Jones and Ms. Parris?
7    A    I told them that I was going to
8  my recollection, that I was going to central
9  office to talk with Mr. Andrews about the
10  noncompliance issues or the illegal, you
11  know, things that were going on, and that if
12  they could call me back before I left, I
13  would appreciate it.  That I was -- I planned
14  to go, but I wanted to -- I really wanted to
15  talk with them first.
16    Q    Okay.  And then, you state, as your
17  last thought in this exhibit, "I am leaving
18  the premises."
19    A    Uh-huh.  That's correct.
20    Q    Okay.  Did you actually talk with
21  Mr. Pitchford on September 24, 2004?
22    A    No.  Ms. Hamm was in the office,
23  and she said he was in a -- she didn't -- I
24  believe she said she didn't know where he
25  was, but that she would make sure that she

176

1  got the letter from me.
2    Q    You left the letter with the
3  secretary, Ms. Hamm?
4    A    That's correct.
5    Q    You did not get to talk to Mr.
6  Pitchford?
7    A    No, I did not.
8    Q    And before you left the premises at
9  Houston County High School on September 24,
10  2004, as far as you know, did Mr. Pitchford
11  get to read Defendant's Exhibit 14?
12    A    I don't know.
13    Q    Okay.  As far as you know?
14    A    As far as I know, he did not read
15  it.
16    Q    You didn't see him read it?
17    A    I did not see him read it.
18    Q    Okay.  Did you have Mr. Pitchford's
19  permission to leave the school campus on
20  September 24, 2004?
21    A    No, not specifically.
22    Q    Did you have the assistant
23  principal's permission to leave the premises?
24    A    No.  I informed Mr. Strange and Ms.
25  Towns and Ms. Sims.

Q    And would you agree with me that,
as part of your duties as an intern at
Houston County High School, you were supposed
to be out there, in Columbia, at the high
school, performing work?

A    Yes.

Q    Okay. Let's look at Defendant's
15. Well, before we do that, I want to go
back to 14 just a moment. The documents that
you refer to in 14, that Starla, the
psychometrist, asked you to sign, what sort
of documents were they?

A    I believe -- I didn't really look
really closely. But I believe they had to do
with eligibility, which is part of the IEP
process.

Q    All right. Did you look at the
documents or study the documents?

A    No. No. Mr. Strange was there.
He knew that I was not supposed to really be
legally involved in any of the IEP things,
and yet, he was standing there while Starla
was asking me to sign these documents. And
my training taught me -- Dr. Morin and
Dr. Ruediger taught us that we don't sign if

178

we've not attended the meeting.

Q    Okay. And in your experience, have
you never heard of a person signing an
IEP-related document when they were not
actually present at a meeting?

A    At this point in time, no, not that
I can recall.

Q    Can you tell me whether the federal
law, the IDEA, prints that?

A    I believe that a person who -- a
special ed teacher, a regular teacher, the
LEA, they are required to be at the meeting
and sign off.

Q    Are you telling me that you know
for a fact the federal law, IDEA, requires
the person to actually be at the meeting
before they can sign a document?

A    Yes. From my school training, yes.

Q    Okay. But did I understand you
correctly, you understood the documents were
as to eligibility --

A    Uh-huh.

Q    -- and not services?

A    The IEP process is the IEP process.

Q    Yes, ma'am. And we discussed it

earlier.

A    And it was my understanding from my
supervisors that I was not to sign anything
unless I was at the meetings, and then, it
was as an intern.

Q    Okay. And that's going back to
Defendant's Exhibit 6, isn't it?

A    Yes.

Q    Because Defendant's Exhibit 6
specifically says, "The school administration
is responsible for IEP meetings," does it
not?

A    Yes.

Q    And it specifically says that,
"Mrs. Miller's attendance is as that of a
student intern," doesn't it?

A    Uh-huh.

Q    Is that "yes"?

A    Yes.

Q    And Defendant's Exhibit 6
specifically says, "She," Mrs. Miller,
"cannot be held legally responsible for the
meetings." Correct?

A    That's correct.

Q    And you had read Defendant's

180

Exhibit 6 before September 24, 2004?

A    Yes.

Q    Okay. Defendant's 15, have you
seen this document before?

A    After, yes, the lawsuit.

Q    After the lawsuit?

A    Yes.

Q    Okay. And this is a document
prepared by Virginia Singletary?

A    Uh-huh.

Q    Would you agree with that?

A    Yes.

Q    She has signed at the bottom of the
document?

A    Yes.

Q    Okay. Do you know Virginia
Singletary?

A    I met her that day.

Q    Do you know who she is, what she
is?

A    I believe she was a secretary, to
my knowledge.

Q    She would be very unhappy for you
to say that.

A    I'm sorry.

181

1    Q    That's all right.  She was someone
2  with whom you interacted at the central
3  office?
4    A    That's correct.
5    Q    She states that, "At approximately
6  2:45 on Friday, September 24, 2004, Mrs.
7  Nancy Miller came to the central office."  Do
8  you see that?
9    A    Yes.
10    Q    And do you agree with that?
11    A    Yes.
12    Q    She states that you had an envelope
13  that you wanted to leave for Mr. Andrews.
14    A    That's correct.
15    Q    You did --
16    A    Since he was not there at the time,
17  yes, I was going to leave an envelope with
18  her.
19    Q    Okay.  And what was in the
20  envelope?
21    A    It was this memo to Mr. Pitchford.
22    Q    Defendant's 14?
23    A    Correct.
24        MR. FAULK:  Excuse me.  Are we
25          talking about Andrews or--

182

1          Pitchford?  I can't see the
2          document.
3        MR. WALDING:  Andrews.
4        MR. BRANTLEY:  We're talking about
5          -- Virginia Singletary authored
6          this document, but it was given
7          to Andrews' secretary, I guess.
8          Is that what she is?  No.
9          She's central office, isn't
10          she?  She's central office.
11        MR. WALDING:  She is now the
12          special education director and
13          federal programs coordinator.
14        THE WITNESS:  Well, she wasn't at
15          the time.
16        MR. WALDING:  Yes, ma'am.  She
17          certainly wasn't a secretary.
18        THE WITNESS:  I don't know what she
19          was.  I'm sorry.
20        MR. WALDING:  That's all right.
21        MR. BRANTLEY:  Well, anyway, you
22          gave the envelope to her?
23        THE WITNESS:  Yes.
24        MR. WALDING:  That wasn't even the
25          question.  Let me go back to my

183

1          question.
2    Q    I'm asking you if -- really what I
3  want to ask you, if the statements that she
4  says in this document are true.  And you just
5  agreed with me that you showed up at the
6  central office at 2:45, Friday, September 24?
7    A    That is correct.
8    Q    Okay.  And that you had an envelope
9  or you made an envelope, and you wanted to
10  leave it for Mr. Andrews?
11    A    Since he was not there, yes, I
12  wanted to leave it for him.
13    Q    And then, what was in the envelope
14  was a copy of Defendant's 14?
15    A    That's correct.
16    Q    Because you had left the original
17  with Mr. Pitchford?
18    A    That's correct.
19    Q    Okay.  So, I take it that when you
20  produced Defendant's 14 at your computer at
21  Houston County High School, you kept a copy
22  for yourself and you made several other
23  copies?
24    A    Yes.
25    Q    Okay.  Because you're -- at this

184

1  juncture, at 2:45 in the afternoon, you're
2  giving a copy of this document or putting it
3  in an envelope for Mr. Andrews?
4    A    I actually put it in the envelope
5  at 11:30, when I left the high school.
6    Q    So, you made copies originally?
7    A    Yes.
8    Q    One for yourself, one for Mr.
9  Andrews?
10    A    Correct.
11    Q    Okay.  And one for Mr. Pitchford?
12    A    Yes.
13    Q    Okay.  She states, as her third
14  sentence of the first paragraph, "She also
15  requested to talk to me in my office."  Is
16  that true?
17    A    I don't remember asking to talk to
18  her.  I asked to talk to Mr. Andrews, and
19  whether or not he was going to be coming back
20  any time soon, 'cause I needed to talk.  She
21  said, "Well, come on in.  Let's talk," is my
22  recollection.
23    Q    And I can't tell you Ms.
24  Singletary's exact title on this date.  But,
25  in essence, she was the assistant special

185

1  director at the time.
2      A    Okay.  I didn't know that.
3      Q    The second paragraph states,
4  "Miller and I talked at length about her
5  concerns on various situations at Houston
6  County High School."
7      A    Uh-huh.
8      Q    Would you agree with that?
9      A    Yes.
10     Q    And you and she, in fact, had some
11 sort of conversation?
12     A    Yes.
13     Q    And would you agree that it was at
14 length?
15     A    Yes.
16     Q    Approximately how long?
17     A    I'm not sure about how long with
18 just her.  But by the time that Mr. Andrews
19 came, I believe it was close to 5:00 o'clock
20 before I left, if I'm not mistaken.
21 Somewhere around there.
22     Q    All right.  And in the third
23 paragraph of Defendant's 15, the third
24 sentence, it says, "At this time, Mr. Andrews
25 and I both met with Mrs. Miller about her

186

1  concerns."  Is that accurate?
2      A    I've not found it yet.
3      Q    Third paragraph, third sentence.
4      A    Yes.
5      Q    The sentence preceding that says,
6  "I contacted Mr. Andrews, and he returned to
7  the central office around 3:45."
8      A    Right.  That is correct.
9      Q    And then, the next sentence, the
10 one I was talking about, said, "At this time,
11 Mr. Andrews and I both met with Mrs. Miller
12 about her concerns."
13     A    Correct.
14     Q    So, do you agree with Ms.
15 Singletary, that, around 3:45 in the
16 afternoon, that Friday afternoon, you met
17 with both Ms. Singletary and Mr. Andrews?
18     A    That's correct.
19     Q    And talked about your concerns at
20 Houston County High School?
21     A    That is correct.
22     Q    Okay.  And then, Ms. Singletary
23 indicates, in the third paragraph, that you
24 requested Mr. Andrews to speak with or
25 communicate with Ms. Parris at Troy?

187

1      A    Right.  Right.
2      Q    Is that accurate?
3      A    Yes, that is accurate.
4      Q    Okay.  And according to Defendant's
5  15, Mr. Andrews indicated that he would
6  contact Ms. Parris on Monday morning?
7      A    Correct.
8      Q    Okay.  Because this was late Friday
9  afternoon?
10     A    Correct.
11     Q    All right.  Now, according to
12 Defendant's 15, you left the Houston County
13 High School campus around 11:30?
14     A    Correct.  I had called the Houston
15 County Board of Education and asked for Mr.
16 Pitchford.  He was at some sort of a
17 function, and he would be back.  And so, I
18 assumed that he would be back in a short
19 time.  So, that's when I left, at 11:30, to
20 go meet with him.
21     Q    Mr. Pitchford?
22     A    I'm sorry.  I'm sorry.  Excuse me.
23 Mr. Andrews.
24     Q    Okay.  My question is, did you
25 leave the campus of Houston County High

188

1  School around 11:30 a.m. on Friday, September
2  24, 2004?
3      A    Yes, I did.
4      Q    And you've already agreed with me
5  you did that without permission?
6      A    Without the teacher's -- or the
7  principal's permission.  Yes.
8      Q    Yes, ma'am.  All right.  According
9  to Defendant's Exhibit 15, you show up at the
10 central office of the Houston County Board of
11 Education around 2:45 p.m.?
12     A    That's correct.
13     Q    Okay.  What happened to the hours
14 in between?
15     A    I went by central office, and Mr.
16 Andrews' truck was not there.  They told me
17 that he was still at some function.  And so,
18 I went over to Dothan High School, because my
19 husband works there and it was close by.  So,
20 I waited there, thinking that I could use his
21 telephone to call and find out when he was --
22 Mr. Andrews was going to come back.
23     Q    Okay.  What was supposed to happen
24 to the students that you were interacting
25 with as part of your internship while yo

189

1  were gone that afternoon?
2      A    Well, I was not their teacher of
3  record. So, the teacher of record had the
4  students in their classes. I notified each
5  one of them that I was going to be going to
6  central office, and that I would be leaving,
7  and they said they had no problem with that.
8  I also let Mr. Strange know, as well. And
9  the teachers that I informed at that point in
10  time were Ms. Towns and Ms. Sims.
11      Q    Okay. You didn't inform Ms. Ezell?
12      A    No. I'm not sure -- on my
13  schedule, I had several teachers that I would
14  go back and forth with, that I would cover
15  their classrooms. So, sometimes --
16      Q    Did you inform Ms. Ezell?
17      A    No, I did not inform Ms. Ezell.
18      Q    All right. Thank you. Defendant's
19  16, have you seen that document before today?
20      A    Yes. I have seen this as of the
21  lawsuit.
22      Q    Okay. And would you agree with me
23  that, at the foot of the document, Virginia
24  Singletary has signed her name?
25      A    Yes.

190

1      Q    And so, this document most likely
2  was generated by Virginia Singletary?
3      A    That would be my assumption.
4      Q    Okay. But the occurrences or the
5  events that are talked about in the document
6  are the things that happened on Friday,
7  September 24, 2004? Would you agree?
8      A    Some of the things, yes.
9      Q    Okay. The header of the document
10  is "Concerns expressed by Mrs. Nancy Miller."
11      A    Uh-huh.
12      Q    Would you agree?
13      A    Yes.
14      Q    Number 1 states, "Mr. Paul Strange,
15  Mrs. Miller's paid mentor, has made regular
16  comments to Ms. Pam Parris, TSUD advisor."
17  Do you see that?
18      A    Yes.
19      Q    "Mrs. Miller stated that she is in
20  jeopardy of failing her internship because of
21  Mr. Strange's comments." Do you see that?
22      A    Yes.
23      Q    "She referred several times to Mr.
24  Strange as her paid mentor." Do you see
25  that?

191

1      A    Yes.
2      Q    "Mrs. Miller stated that she had a
3  meeting with Ms. Parris on Wednesday,
4  September 22, 2004, at which time Ms. Parris
5  instructed her to request a meeting with Mr.
6  Tim Pitchford, principal at Houston County
7  High School, to 'make amends.'"
8      A    Yes.
9      Q    Okay. Did you refer to Mr. Strange
10  as your paid mentor?
11      A    Yes. He was under a -- I believe a
12  fairly new program, where Houston County was
13  going through an organization that paid their
14  mentors -- I want to say it was, if I
15  remember correctly, like, $500.00, for the
16  term that he was going to be my mentor, in
17  addition to a small payment from Troy
18  University. That's just --
19      Q    Okay. But, going back to my
20  question, did you refer to Mr. Strange as
21  your paid mentor?
22      A    Yes.
23      Q    Okay. And did you express to Ms.
24  Singletary and/or Ms. Singletary and Mr.
25  Andrews that Mr. Strange made regular

192

1  comments to Pam Parris?
2      A    I do not recall that.
3      Q    Do you have any evidence or
4  information that would indicate that Mr.
5  Strange made regular comments to Pam Parris?
6      A    No, I don't.
7      Q    Did you state to Ms. Singletary
8  and/or Ms. Singletary and Mr. Andrews that
9  you felt in jeopardy of failing your
10  internship because of comments Mr. Strange
11  had made?
12      A    I told her that I was -- that I
13  felt I was in jeopardy because Ms. Parris
14  actually told me that I was in jeopardy of
15  failing my internship.
16      Q    Okay. When did that occur?
17      A    When did she --
18      Q    ma'am.
19      A    Okay. Between the time that I
20  reported to Mr. Strange and Dr. Ruediger
21  about the illegal -- or shall we say
22  noncompliance issues at the school.
23      Q    And when?
24      A    Between August --
25      Q    No. You said between that time

193

1  So, I was waiting to here the "and when," the
2  other time. And the date of this document?
3      A   When Dr. Ruediger had come to my
4  observation in August, and then, the next
5  day, Mr. Pitchford -- we had the meeting with
6  Mr. Pitchford on the 27th. Between those
7  days.
8      Q   So, between August 27 and September
9  24, both of '04 --
10     A   Uh-huh.
11     Q   -- you had some sort of
12  conversation with Pam Parris?
13     A   That's correct. If I remember
14  correctly, she came to the school the
15  following week, like, on a Wednesday, maybe.
16     Q   Okay. And doesn't Ms. Singletary's
17  paragraph one of Defendant's 16 indicate that
18  that was a Wednesday, September 22nd, 2004?
19     A   Yes.
20     Q   She says, "Mrs. Miller stated she
21  had a meeting with Ms. Parris on Wednesday,
22  September 22, 2004."
23     A   Uh-huh.
24     Q   Did you say that to Ms. Singletary?
25     A   Yes, I believe I did.

194

1      Q   Okay. Is that the meeting you're
2  referring to?
3      A   No. No. Ms. Parris would come
4  periodically to the school, but this was
5  before September 22nd.
6      Q   Okay. But we know it was after
7  August 27?
8      A   Yes.
9      Q   Between August 27 and before the
10  date that -- September 24, 2004?
11     A   September 22nd? Are you saying
12  between --
13     Q   September 24, 2004, is the Friday
14  you left school.
15     A   Okay.
16     Q   I'm not trying to trick you, Mrs.
17  Miller.
18     A   Okay.
19     Q   It's also the date that this
20  conversation happened in the central office.
21  Are you telling me that you had a
22  conversation with Ms. Parris between August
23  27, when you had the conversation with Mr.
24  Pitchford, Mr. Strange, Mr. Stephens, and the
25  date you had this conversation with Mr.

195

1  Andrews --
2      A   Yes.
3      Q   -- and Ms. Singletary?
4      A   Yes. Several times. There we go.
5  I understand.
6      Q   Okay. You told Ms. Parris this
7  information several times?
8      A   I had conversations with Ms. Parris
9  several times --
10     Q   Several times.
11     A   -- where she was threatening to
12  fail my internship.
13     Q   Okay. But we've been through
14  several e-mail communications --
15     A   Uh-huh.
16     Q   -- that you had with Ms. Parris --
17     A   Uh-huh.
18     Q   -- and/or Dr. Jones?
19     A   That's correct.
20     Q   You mention nothing about these
21  problems.
22     A   That's correct.
23     Q   We've covered all that?
24     A   That's correct.
25     Q   Okay. Tell me about this

196

1  conversation or this meeting where Ms. Parris
2  threatens to fail you in your internship?
3      A   It's my understanding that, from
4  what Dr. Ruediger told me, he was going to go
5  back on the 26th and discuss the problems
6  that I was having at Houston County High
7  School, express concern, and ask for support
8  for me from Dr. Jones and Ms. Parris. That
9  was my understanding. So, Ms. Parris and
10  Dr. Jones, was my understanding, already knew
11  about this situation from Dr. Ruediger.
12     Q   You don't know that they knew it?
13     A   I don't know. That was my
14  assumption, because he told me he was going
15  to go back and discuss these issues.
16     Q   Yes. Dr. Ruediger indicated to
17  you, on August 26th --
18     A   That's correct.
19     Q   -- when he made his observation,
20  and you and he had his discussion, where he
21  did his little debriefing --
22     A   He didn't do the debriefing with
23  me.
24     Q   I understand that.
25     A   Okay.

197

1    Q    But the events took place on the
2    26th?
3    A    That's correct.
4    Q    Okay. You understood he was going
5    to go back to Troy and discuss with Dr. Jones
6    and Ms. Parris these issues you had raised?
7    A    That's correct.
8    Q    But you don't know for a fact
9    whether he ever did that?
10    A    No. However, when we had phone
11    conversations -- she would call and get me
12    out of class and have phone conversations,
13    asking me to come in for a particular meeting
14    or something like that, or inform me of when
15    she was going to be coming or whatever -- you
16    know, whatever little things that she wanted
17    to talk about.
18    Q    Yes. This is Ms. Parris you're
19    talking about?
20    A    This is Ms. Parris.
21    Q    Yes.
22    A    She was quite aware of the
23    noncompliance issues, because I would mention
24    the noncompliance issues. She would ask how
25    things are going. And I said, "The

196

1    noncompliance issues are still not being
2    taken care of."
3    Q    And just so that we're clear on our
4    record, the noncompliance issues we're
5    talking about, we're going back to some
6    students not having IEP's?
7    A    Yes.
8    Q    We're talking about, in your
9    opinion, all of the IEP's being inappropriate
10    and needing to be amended or rewritten?
11    A    Yes.
12    Q    We're talking about you allegedly
13    being asked to write an IEP by Cathy Keasler?
14    A    Yes.
15    Q    And we're talking about the fact
16    that somebody is asking you to write an IEP
17    violates your internship agreement?
18    A    Yes.
19    Q    Okay. You told me that Ms. Parris
20    threatened to fail you in your internship.
21    A    That's correct.
22    Q    When did that happen?
23    A    After the meeting with Mr.
24    Pitchford and Mr. Strange and Mr. Stephens,
25    on the 27th.

1    Q    After August 27?
2    A    That's correct.
3    Q    And in what context did it happen?
4    A    There was a meeting where she came
5    out to the school and spoke with Mr.
6    Pitchford -- and I believe Mr. Andrews was
7    also there -- telling them that --
8    Q    Were you present for the meeting?
9    A    Yes, I was.
10    Q    You were with Ms. Parris, Mr.
11    Pitchford and Mr. Andrews?
12    A    And Mr. Strange.
13    Q    I want to understand who was
14    present at this meeting.
15    A    I believe that was all --
16    Q    Pitchford, Andrews --
17    A    -- to my recollection.
18    Q    -- Strange, Parris and you?
19    A    I believe that was all.
20    Q    Where did this meeting take place?
21    I know it happened at the school.
22    A    In the conference room.
23    Q    Can you pinpoint a date for me that
24    this conference happened?
25    A    I want to say it was the following

1    Wednesday, if I'm not mistaken.
2    Q    The Wednesday following what?
3    A    I would have to look at my little
4    calendar. Following the meeting on Friday,
5    the 27th.
6    Q    The meeting with Mr. Pitchford,
7    Strange and Stephens in the conference room?
8    A    Correct.
9    Q    Okay. Tell me what Ms. Parris said
10    when she threatened to fail you in your
11    internship?
12    A    She did not tell me that in that
13    meeting. When she went to leave, she asked
14    me to come out into the little stoop area of
15    the school. And she said, "Nancy, you are
16    not here to shake things up, and that you
17    better do everything possible to make your
18    principal happy, because you're in jeopardy
19    of failing your internship." Words to that
20    effect.
21    Q    Okay. But, now, you told me
22    earlier that she threatened to fail you in
23    your internship.
24    A    Yes.
25    Q    But, then, you just told me th

201

1 that she said you were in jeopardy of failing
2 your internship.
3 　　A　　That was the first time she said
4 anything about failing my internship. And
5 there was at least another meeting -- and I
6 don't know what the dates were. I would have
7 to refer back to my calendar -- that she came
8 out again. On the phone, she threatened,
9 you're in -- you're going to fail your
10 internship if you don't stop doing what I'm
11 doing.
12 　　Q　　So, you're telling me that there
13 was a phone conversation following this
14 meeting the Wednesday after August 27th --
15 　　A　　Yes.
16 　　Q　　-- where Ms. Parris says, "You are
17 going to fail your internship if you don't
18 stop doing what you're doing"?
19 　　A　　Yes.
20 　　Q　　Can you pinpoint for me when this
21 telephone conversation allegedly took place?
22 　　A　　I'm sorry. I can't. My calendar
23 may have a date in there when one of the
24 conversations -- when the conversations that
25 I had with her.

202

1 　　　　There was one specific time when I was
2 called away from class, and Ms. Teat, who was
3 the librarian, she offered to -- she offered
4 to have me come into her library office and
5 use her phone in there because it was
6 private. And so, we had a conversation
7 there.
8 　　　　And I believe that that had to do -- I
9 believe, at that point in time, it had to do
10 with the fact that she was going to try and
11 change -- in fact, she had already changed my
12 internship advisor to Mary Brazzelle rather
13 than Dr. Ruediger, 'cause I believe -- my
14 opinion was that she was angry with
15 Dr. Ruediger.
16 　　Q　　About what?
17 　　A　　When Dr. Ruediger did my
18 observation, my first observation, on the
19 26th, when we discussed the noncompliance
20 issues, he had indicated to me that he would
21 like to pull me from my internship at Houston
22 County Schools because of the lack of support
23 and inappropriateness by the administrators
24 and my special education mentor, my
25 cooperating teacher. And he said, "The only

203

1 thing is, you're employed, so I don't know
2 how to handle the situation. I'll go back
3 -- that's when he said he'd go back to Ms.
4 Parris and --
5 　　Q　　Dr. Jones?
6 　　A　　-- Dr. Jones, was my assumption,
7 both of them, and discuss the issues and
8 provide me with more support.
9 　　Q　　Was it your understanding that he
10 was going to go back to them to discuss the
11 issues, these four concern areas that you
12 had, or was he going to go back to them and
13 discuss pulling you from the internship at
14 Houston County High School and placing you
15 somewhere else?
16 　　A　　He said that he didn't think that
17 would be a possibility, since I was employed.
18 He didn't know. So, I was under the
19 assumption that he was going to go back and
20 talk about all of the above.
21 　　Q　　Okay. But the immediate context of
22 his statement would be, my inclination is to
23 pull you from this internship, however,
24 you're being paid. I don't know exactly how
25 to handle this. Correct?

204

1 　　A　　You have a teacher contract. So,
2 if you want to say "paid," that's fine. But
3 because --
4 　　Q　　You were being paid?
5 　　A　　-- I had a teacher contract, it was
6 not as simple as being able to take another
7 intern from another school, who wasn't in my
8 position, and making arrangements for that
9 intern to go to a different school.
10 　　Q　　All right. Were there any other
11 incidents where Ms. Parris allegedly
12 threatened your internship?
13 　　A　　There were several total. One
14 particular time, she also said that -- when I
15 told her that I take -- and, again, we were
16 out in the stoop. When I take --
17 　　Q　　Is this the same incident?
18 　　A　　I believe this was a different one
19 　　Q　　But in the same place?
20 　　A　　I believe so.
21 　　Q　　Okay.
22 　　A　　I believe she was there twice, if
23 I'm not mistaken. I had explained to her
24 that, you know, being a military wife, 32
25 years at that point in time, that I take

205

1  laws of the United States pretty seriously,
2  especially when it comes to special
3  education, and that I wasn't going to do
4  things that I wasn't supposed to do.
5      And she said that she was -- that my
6  military background did not intimidate her.
7  And I told her it wasn't meant to intimidate,
8  for heaven's sake. It was meant to explain
9  the fact that my husband and I, serving our
10  country, believe in doing the right thing,
11  especially when it comes to the law.
12      Q   Okay. Do you believe someone has
13  to be in the military to do the right thing
14  and follow the law?
15      A   No. I don't think that's
16  necessarily true. But I'm just saying that,
17  in my -- it just adds extra value to me, even
18  more value to me. My whole family had been
19  in the military. My father had been in the
20  military. And, you know, I just grew up --
21      Q   Yes, ma'am. Have you ever been in
22  the military?
23      A   No. I just grew up with respect
24  and love for the country.
25      Q   All right. And do you believe that

206

1  being married to a person in the military
2  somehow makes you more respectful for our
3  country than others?
4      A   No, not necessarily.
5      Q   Okay. Well, I'm just trying to
6  understand your statements.
7      A   I just wanted to emphasize to
8  her --
9      Q   That because you were married to a
10  man in the military, you were going to follow
11  the law?
12      A   No.
13      Q   And that made you special somehow?
14      A   No.
15      Q   Okay. Tell me about the incident
16  on the stoop, other than the fact that you
17  told her you were a military wife and you
18  were going to follow the law. Is that all
19  that was said? Did she threaten your
20  internship?
21      A   Yes.
22      Q   Tell me how she did that?
23      A   She said, if I don't go in and make
24  an appointment with Mr. Pitchford and try and
25  make him a happy camper, so to speak -- she

1  may not have used those particular words.
2  But if I did not make Mr. Pitchford happy,
3  then I was in jeopardy of -- I could fail my
4  internship.
5      And she implied that Mr. Pitchford had
6  control over that, when it's technically -- I
7  found out later that it was Troy University.
8  But it was an intimidation factor. I felt
9  that she was trying to intimidate me into
10  doing something that I really ought not to be
11  doing. That was the way I felt.
12      Q   What did you feel she was
13  intimidating you into doing?
14      A   She couldn't understand that a
15  50-year-old woman was not going to do what
16  some people wanted her to do.
17      Q   What was it that you thought people
18  wanted you to do, Mrs. Miller?
19      A   Write IEP's that were
20  inappropriate. That sort of thing.
21      Q   Okay. You didn't do that, did you?
22      A   Not advocate for those students.
23      Q   Did you write IEP's that were
24  inappropriate?
25      A   Not being concerned about the

208

1  education that these students were getting.
2  It was all about -- it seemed to me that it
3  was more about her ability to place interns
4  in the future than to actually have an intern
5  do the right thing.
6      When we were in the meeting with Mr.
7  Andrews and Mr. Pitchford and Ms. Parris, Mr.
8  Andrews said, "Mrs. Miller, we want you and
9  we need you here." And he said, "I've heard
10  good things about your teaching ability."
11  Mr. Pitchford said the same thing.
12      And Ms. Parris was telling Mr. Andrews
13  that she hoped that they would be able to
14  continue with the relationship that they've
15  had in the past, on into the future.
16      Q   Uh-huh.
17      A   And my impression was that she was
18  more concerned about getting new -- other
19  interns into the positions in Houston County
20  'cause her job depends on that.
21      Q   Well, if that's part of your job
22  duties, shouldn't that be one of your
23  concerns?
24      A   To a certain degree.
25      Q   Yes, ma'am.

209

1          (Brief off-record.)
2     Q    Have any of the defendants that
3  you've sued in this matter ever specifically
4  said to you, "I have the authority to fail
5  you in your internship"?
6     A    No.
7     Q    Have any of the defendants that you
8  have sued in this matter, other than Ms.
9  Parris -- and I believe she's a defendant.
10         MR. BRANTLEY:  She is.
11         MR. WALDING:  Sir?
12         MR. BRANTLEY:  She's a defendant.
13         MR. WALDING:  Okay.
14    Q    Have any other defendants
15  threatened to fail you in your internship?
16    A    No.
17    Q    Okay.  So, as far as someone
18  threatening to fail you in your internship,
19  that was strictly Pam Parris?
20    A    That's correct.
21    Q    And none of the other -- well, none
22  of the defendants, if I heard you correctly,
23  specifically said to you, "I have authority
24  to fail you in your internship"?
25    A    That's correct.

210

1     Q    And more specifically, did anyone
2  on the Houston County Board of Education ever
3  say to you, "I have authority to fail you in
4  your internship"?
5     A    No.
6     Q    Okay.  Or did any of the individual
7  defendants associated with the Houston County
8  Board of Education, Mr. Lord, Mr. Andrews,
9  say to you, "I have authority to fail you in
10  your internship"?
11    A    No.
12    Q    Okay.  Let's go back to Defendant's
13  16.  Paragraph 2, or the one that's numbered
14  paragraph 2, talks about this incident with
15  Cathy Keasler.  Would you agree with that?
16    A    Yes.
17    Q    And did you express this
18  information about Cathy Keasler allegedly
19  asking you to write an allegedly illegal IEP
20  with Mr. Andrews and Ms. Singletary?
21    A    Yes.
22    Q    Okay.  Number 3, the third
23  paragraph of Defendant's 16, seems to talk
24  about you indicating to Ms. Singletary and
25  Mr. Andrews that, at least at one juncture,

1  Mr. Pitchford was not very cordial to you.
2     A    That's correct.
3     Q    And did you communicate that
4  information to Ms. Singletary and Mr.
5  Andrews?
6     A    Yes, I did.
7     Q    Paragraph 4 of Defendant's 16 talks
8  about the incident earlier that day.  Would
9  you agree?
10    A    Yes.
11    Q    And we're talking about the
12  incident where the psychometrist, Starla,
13  asked you to sign these three documents?
14    A .  That's correct.  Those were two
15  separate meetings, though.  I had attended an
16  IEP.  I want to clarify that.  I had attended
17  an IEP meeting.  And then, later on, Ms
18    Q    Starla?
19    A    -- Starla came in.  Uh-huh.
20    Q    And basically what I am asking you,
21  Mrs. Miller -- the document says these
22  things.  I'm asking you, did you communicate
23  this information to Ms. Singletary and Mr.
24  Andrews?
25    A    Yes, I did.

212

1     Q    So, Ms. Singletary has correctly
2  recorded the information you gave to them
3  that day?
4          MR. BRANTLEY:  With regard to
5             number 2.
6          MR. WALDING:  4.
7          MR. BRANTLEY:  I'm sorry.  4.  Yes.
8          MR. WALDING:  I'm on number 4.  And
9             I'm not trying to trick
10            anybody.
11    A    Yes.
12    Q    All right.  Paragraph 5 says
13  something about Mr. Stephens doing a belly
14  laugh and leaving the room.
15    A    I had already talked about that
16  before.  Yes.
17    Q    That goes back to the meeting on
18  August 27?
19    A    Correct.
20    Q    And did you communicate this
21  information to Ms. Singletary and Mr.
22  Andrews?
23    A    Yes, I did.
24    Q    And you felt he was acting
25  unprofessional?

213

1    A   Yes.
2    Q   Okay. So, she's correctly recorded
3 the information you gave her and Mr. Andrews?
4    A   Yes.
5    Q   All right. Paragraph 6 of
6 Defendant's 16 says that, "Mr. Pitchford has
7 had Mrs. Miller, according to her, quote,
8 doing a notebook, end quote, to verify her
9 activities."
10   A   That's correct.
11   Q   And you communicated this
12 information to Ms. Singletary and Mr.
13 Andrews?
14   A   That's correct.
15   Q   This notebook is the one you
16 referred to earlier about --
17   A   A log.
18   Q   -- a log of all your activities?
19   A   Correct.
20   Q   Okay. And were you complaining
21 about having to do a notebook?
22   A   What I was mentioning to her is
23 that, according to Mr. Strange, he and Mr.
24 Payne were instructed to do the same, but
25 they weren't going to. They didn't feel the

214

1 need to do that.
2    And so, I got the impression that it
3 was, like, we're going to make sure that
4 she's where she needs to be when she needs to
5 be there. We're going to document
6 everything. It was kind of -- to me, it felt
7 like an intimidation tactic.
8   Q   Okay. Well, did anybody
9 specifically tell you what the purpose of
10 this notebook was?
11   A   No.
12   Q   Okay. But Mr. Pitchford asked you
13 to keep a notebook of your activities?
14   A   Right. But he never asked to see
15 it.
16   Q   Yes, ma'am.
17   A   Thought that was unusual.
18   Q   He asked you to keep one? Correct?
19   A   Yes. And so, I did.
20   Q   And he was the principal at Houston
21 County High School?
22   A   That's true.
23   Q   And you're stating to me, or
24 testifying today, under oath, that Mr.
25 Strange and Mr. Payne were also directed to

215

1 do something by their direct and immediate
2 supervisor, and they refused to do it?
3   A   I'm saying that Mr. Strange
4 indicated to me that they were all going to
5 be keeping a notebook, not necessarily that
6 Mr. Pitchford had told them that they had to.
7 But I got the impression that he was being
8 polite and saying, we're supposed to keep a
9 log, but it was really not -- they weren't
10 really required to do it.
11   I never saw -- in other words, I never
12 saw them keep a log. Okay. And, you know I
13 was -- I kept mine with me wherever I went,
14 to all my classes and that sort of thing, and
15 I never saw them carry any kind of a log to
16 get any kind of signatures. And we
17 interacted, you know, throughout the day,
18 passing each other and that sort of thing
19 frequently.
20   Q   Okay. Whose signatures were you
21 supposed to obtain on this?
22   A   The teachers with whom I was
23 included.
24   Q   Okay. The teachers in whose class
25 you went?

216

1    A   Uh-huh.
2   Q   Okay. Would you agree with me,
3 Mrs. Miller, that at the time this log
4 requirement was asked of you or imposed on
5 you, you were an intern?
6   A   Yes.
7   Q   And that would be different from
8 Mr. Strange and Mr. Payne, who were both
9 certified special education teachers?
10   A   The implication was that they were
11 supposed to, but they weren't going to, and
12 that I was -- they wanted me to do it. And
13 this was all after the --
14   Q   Yes. The question was --
15   A   -- meeting.
16   Q   -- do you acknowledge that there's
17 a difference? You were an intern, and they
18 were certified special education teachers?
19   A   Yes.
20   Q   All right. Thank you. Defendant's
21 Exhibit 16, paragraph 7. According to Ms.
22 Singletary's note, you stated that you had to
23 leave at 11:30 because you felt so
24 uncomfortable with the situation.
25   A   That is correct.

217

1    Q    And you expressed that to Ms.
2  Singletary --
3    A    Yes.
4    Q    -- and Mr. Andrews?
5    A    That is correct.
6    Q    Okay.  She indicates here that you
7  stated you believe that the psychometrist --
8  that would be Starla?  Correct?
9    A    Yes.
10    Q    -- was part of a sabotage plan to
11  set you up for failure, and that the
12  psychometrist holds meetings on students
13  without sending out notices?
14    A    That was her interpretation.
15    Q    Okay.  Did you communicate that
16  information to Ms. Singletary --
17    A    What I --
18    Q    -- and Mr. Andrews?  Let me finish
19  my question, please.
20    A    Pardon me.
21    Q    Did you communicate that
22  information?
23    A    I communicated that I felt that Mr.
24  Strange, being in the room with Starla, that
25  it seemed like it was a sabotage plan on his

218

1  part to have me sign things that I shouldn't
2  sign, that didn't need to sign, that I wasn't
3  permitted to sign, and he knew it.  So, you
4  know, it was, like, well, why would Paul
5  Strange be standing there, when he knows I'm
6  not supposed to sign things, according to the
7  internship --
8    Q    Agreement?
9    A    -- agreement.
10    Q    Help me understand.  Did you use
11  the words "sabotage plan"?
12    A    I may have.  I may have used that
13  term.
14    Q    So, you were thinking, in your
15  mind, that at least Mr. Strange and -- I
16  believe her name is Ms. Smith, but whatever
17  Starla, the psychometrist's name is -- were
18  part of a scheme or plan to make you fail
19  your internship?
20    A    I can't say that Starla was a part
21  of it, cognitively, but I believe Mr. Strange
22  definitely.  Yes.
23    Q    You believe Mr. Strange wanted you
24  to fail your internship?
25    A    Yes.

219

1    Q    He was your paid mentor?
2    A    Yes.
3    Q    And he wanted you to fail your
4  internship?
5    A    Yes.
6    Q    And why do you believe that?
7    A    Because throughout this -- up to
8  this point in time, I had gotten very little
9  support from him.  I learned -- you know, he
10  was supposed to be teaching me all these
11  different things and showing me how to do
12  certain things and all this sort of thing.
13  And I was getting nothing -- very little.
14  I'm sorry.  I should say very little in the
15  way of appropriate knowledge.
16    Q    Okay.  Well, did you receive
17  inappropriate knowledge?
18    A    Yes.
19    Q    And what are you referring to?  The
20  same problems you've identified already?
21    A    Yes.  When Mr. Strange comes back
22  and tells me, yes, we are going to have to --
23  you are going to have to make up these IEP's,
24  without meetings and that sort of thing.
25  Yes.  You don't teach an intern to do things

220

1  that they're not supposed to do.  It's
2  supposed to be a positive, fun experience for
3  a new teacher, and a learning experience, a
4  positive learning experience.  And it was a
5  nightmare instead.
6    Q    Okay.  Would you agree with me that
7  the experience is a two-way street that
8  requires involvement on your part?
9    A    Absolutely.  And I was there
10  wanting to learn as much as I possibly could.
11    Q    Did Mr. Strange ever specifically
12  threaten to fail you in your internship?
13    A    No.
14    Q    Did Mr. Strange ever specifically
15  state to you, "I have the authority to fail
16  you in your internship"?
17    A    No.
18    Q    Okay.  Defendant's 16, paragraph 8,
19  Ms. Singletary records that you reported that
20  regular program teachers ridicule students
21  and make rude comments about students, such
22  as, quote, student failed because he did not
23  try, end quote, or, quote, failed because he
24  is lazy, end quote.  Did you convey that
25  information to Ms. Singletary?

221

1    A    Yes, I did.
2    Q    And Mr. Andrews?
3    A    Yes.
4    Q    Am I correct that all this
5  information that's recorded on Defendant's 16
6  was conveyed to both Virginia Singletary and
7  Riley Joe Andrews?
8    A    Yes.
9    Q    Okay. And that would apply to all
10  these paragraphs?
11    A    Yes.
12    Q    All right. Did you state to Ms.
13  Singletary and Mr. Andrews that, as a child,
14  you had been ridiculed because of your large
15  chest?
16    A    I don't know that I put it that
17  way, but I said my physical appearance. Yes.
18    Q    Okay. You did communicate some
19  information about being ridiculed as a child?
20    A    Yes. So, I knew how it felt at
21  that age. Uh-huh.
22    Q    Do you see the sentence I'm
23  referring to in paragraph 8?
24    A    Yes.
25    Q    I mean, has she correctly recorded

222

1  the information you conveyed?
2    A    To my recollection, I just kind of
3  motioned to the upper part of my body. And
4  so -- but that's exactly what I meant. But I
5  don't think I actually said it, but that's
6  what I meant. Yes.
7    Q    Okay. She's correctly recorded the
8  information you meant to communicate --
9    A    Correct.
10    Q    -- whether you stated it in words
11  or not?
12    A    Correct. Yes.
13    Q    Paragraph 9. She has recorded that
14  you told her and Mr. Andrews that Mr. Strange
15  eavesdropped on your conversations with
16  Dr. Ruediger at Troy, and reported back to
17  Mr. Pitchford.
18    A    That's correct.
19    Q    Okay. How do you know Mr. Strange
20  eavesdropped on your conversations?
21    A    It was the day of Dr. Ruediger's
22  first observation.
23    Q    August 26th?
24    A    That's correct. And we were in the
25  library, doing our little debrief, we'll call

223

1  it. And Mr. Strange was there for part of
2  the meeting. Then Dr. Ruediger basically
3  told him that that was all he needed him for.
4  And so, Mr. Strange -- the questions that
5  Dr. Ruediger had asked in the debriefing, it
6  goes into a little bit of Dr. Ruediger's
7  perception of how Mr. Strange came across at
8  that meeting.
9    Anyway, he went to -- we were sitting at
10  a desk, and Dr. Ruediger and I were in
11  chairs. And the cases where the bookcases
12  were, were right beside the table. And Mr.
13  Strange, rather than leaving and giving us,
14  you know, some privacy to talk about the
15  actual observation, hung around right there
16  at the bookcase, so that he could -- it was
17  our opinion that he could hear some of the
18  information that we were talking about
19    Q    Okay. Well, did you ask him to
20  leave?
21    A    No.
22    Q    Did Dr. Ruediger ask him to leave?
23    A    Well, it was nothing, really,
24  that --
25    Q    Yes, ma'am. Did Dr. Ruediger ask

224

1  him --
2    A    No.
3    Q    -- to leave?
4    A    No.
5    Q    How do you know that he reported
6  back to Mr. Pitchford?
7    A    After the observation, Mr. Strange
8  met with me in the library and said, "I
9  understand that he's, you know, got some
10  concerns." And we went over those.
11    Q    "He" who?
12    A    Dr. Ruediger. Dr. Ruediger had
13  asked him some questions about IEP's and that
14  sort of thing. And so, he knew that
15  Dr. Ruediger, you know, knew about some of
16  the noncompliance issues.
17    Q    Right.
18    A    And so, he said that, "We need to
19  probably talk to Mr. Pitchford about this."
20  And he said, "I'll go into the office and,
21  you know, talk to him about it." So, he went
22  into the office and talked. And that's when
23  he came back out and told me that Mr.
24  Pitchford wanted to see us in the morning.
25    Q    Okay. The sentence states that

225

1  Strange eavesdropped on your conversations
2  with Dr. Ruediger and reported back to Mr.
3  Pitchford, which, to me, sounds very cloak
4  and dagger.  What you've just described to me
5  doesn't really sound that way.
6     You're saying you believe he
7  eavesdropped on your conversation because he
8  was nearby when you were having a
9  conversation with Dr. Ruediger?  Correct?
10    A   Yes.
11    Q   You don't know for a fact that he
12 heard a word of your conversation with Dr.
13 Ruediger, do you?
14    A   It would be very hard not to.
15    Q   You don't know for a fact --
16    A   But I don't know for a fact.
17    Q   Okay.  And the reporting back to
18 Mr. Pitchford was after he, Mr. Strange, had
19 a direct conversation with you?
20    A   Yes.
21       MR. WALDING:  All right.  Let's
22       take that break now, please.
23       (Recess in deposition.)
24    Q   All right, Mrs. Miller.  Let me
25 show you what I've marked as Defendant's

226

1  Exhibit No. 17, and ask you if you've seen
2  that document?
3     A   Yes, I have.
4     Q   Did you see it before this lawsuit?
5     A   Yes, actually.
6     Q   Would you agree that this is a
7  letter from Riley Joe Andrews to Pam Parris?
8     A   Yes.
9     Q   All right.  And I'm looking for a
10 date, but I certainly don't see one right
11 now.
12    A   There is no date.  There was a fax
13 date that Troy University had, which was
14 after my appointment with Mr. Andrews,
15 discussing the issues.
16    Q   Okay.  Just so I've got that clear
17 in my mind and it's clear on our record, we
18 just got done looking at Defendant's Exhibit
19 16 and Defendant's Exhibit 15, which are two
20 documents drafted by Virginia Singletary --
21    A   Correct.
22    Q   -- that talk about a meeting on
23 Friday, September 24, between you, Ms.
24 Singletary and Mr. Andrews?
25    A   That's correct.

227

1     Q   So, it's your understanding that
2  what I've marked as Defendant's 17 comes
3  after that meeting?
4     A   That's correct.
5        MR. BRANTLEY:  Comes after what
6        meeting?  I missed that.
7        THE WITNESS:  The one on the 24th
8        with the central office.
9        MR. WALDING:  The one on the 24th.
10    A   But I don't recall the date -- I'm
11 sorry -- on the fax.
12    Q   Yes, ma'am.  And that's fine.
13 That's fine.  It was not actually addressed
14 to you.
15    A   Correct.  True.
16    Q   This document is not actually
17 addressed to you?
18    A   Correct.
19    Q   But you have seen it before --
20    A   Yes.
21    Q   -- before you filed this lawsuit?
22    A   That's correct.
23    Q   How did you see it?
24    A   Dr. Ruediger and Ms. Parris --
25 while we were having a meeting with my

228

1  husband about the fact that they were going
2  to terminate my internship at Houston County
3  High School, Dr. Ruediger pulled this
4  document out and showed me.
5     Q   All right.  Let me skip ahead to
6  what I have marked as Defendant's 27, which
7  is a letter from you to Dr. Jones.  Would you
8  agree?
9     A   Yes.
10    Q   And it's dated October 18 of '04?
11    A   That's correct.
12    Q   And in the letter, in the body of
13 the letter, it says, "Last week, Ms. Parris
14 and Dr. Ruediger indicated to my husband and
15 me that I have been administratively
16 withdrawn from my internship at Houston
17 County High School."
18    A   That's correct.
19    Q   So, is that the meeting that you're
20 referring to, where you saw this letter from
21 Mr. Andrews?
22    A   Yes.
23    Q   So, then, approximately -- well,
24 the week before October 18, 2004, there was a
25 meeting where you saw Mr. Andrews' letter --

229

1 which is undated?

2     A    Uh-huh. That's correct.

3     Q    Okay. Let's go back to 17. And

4 I'll come back to 27. It occurred to me that

5 the meeting you were talking about had to be

6 the same one referred to in 27. Correct?

7     A    Yes.

8     Q    All right. In Defendant's Exhibit

9 17, Mr. Andrews is conveying information to

10 Ms. Parris, and he talks about or conveys

11 information about four concerns. Would you

12 agree with that?

13     A    Yes.

14     Q    And those concerns are following

15 school procedures when leaving campus.

16 That's the first one.

17     A    That's correct.

18     Q    Okay. And you did, in fact, leave

19 the school campus without permission on the

20 24th?

21     A    Yes, I did.

22     Q    Okay. He says that there's a

23 concern about working with peer teachers.

24     A    Yes. It states that.

25     Q    Yes, ma'am. He states that there's

230

1 a concern about developing positive

2 teacher-student relationships.

3     A    That's correct. It states that.

4     Q    And he says that there's a concern

5 about developing a better understanding of

6 the special education process and required

7 forms (eligibility meeting and referral

8 meeting).

9     A    Yes.

10     Q    It states that. Okay. Does this

11 letter state, in any way, that Mr. Andrews or

12 Houston County Schools wants your internship

13 canceled?

14     A    No, it does not.

15     Q    Does this letter state, in any way,

16 that Mr. Andrews or Houston County Schools or

17 anybody associated with the Houston County

18 Schools wants you somehow punished because of

19 these concerns Mr. Andrews had?

20     A    No, it does not state that.

21     Q    Do you think there was no concern

22 about working with other teachers, with peer

23 teachers?

24     A    I think there was a concern with

25 Ms. Ezell and Mr. Strange.

1     Q    Okay. You had a strained

2 relationship with Ms. Ezell. Would you agree

3 with that?

4     A    Yes, I would.

5     Q    And at least as to the juncture

6 when this letter was written, which is after

7 September 24 of '04, you had something of a

8 strained relationship with Mr. Strange?

9     A    That's correct.

10     Q    And that's a tongue twister. All

11 right. And you've indicate to me at least

12 once, if not twice in your testimony thus

13 far, that Mr. Pitchford became aggravated or

14 upset at you during meetings? Correct?

15     A    Yes.

16     Q    Okay. So, that would indicate, at

17 least to me -- and if you disagree, please do

18 -- that there's some strain in that

19 relationship?

20     A    Yes.

21     Q    Okay. So, then, do you think that

22 working with peer teachers is an invalid

23 concern on the part of Mr. Andrews or persons

24 at the Houston County School System?

25        MR. FAULK: Form.

232

1        MR. BRANTLEY: Object to form.

2     Q    I mean, there were these problems?

3 Yes?

4     A    There were problems. Yes.

5     Q    It says that he has a concern or

6 they have a concern about developing positive

7 teacher-student relationships. Did you have

8 any specific run-ins or problems with

9 students?

10     A    No, not to my knowledge.

11     Q    Were you aware of any students who

12 specifically asked not to have to deal with

13 you as an intern teacher?

14     A    No, not one.

15     Q    Okay. Are you saying that there

16 were none or you're not aware of any?

17     A    I'm not aware of any student.

18     Q    And then, he says there are

19 concerns about developing a better

20 understanding of the special education

21 process and required forms. Do you see that

22 there should be any concerns in that area as

23 to you?

24     A    No.

25     Q    Because you know all about the

233

1  special education process?
2      A    No.  Because I was in a learning --
3  it was supposed to be a learning experience.
4  And although I didn't have much experience,
5  per se, I learned a lot at school, and my
6  grades show that.
7      Q    And we're going back to the class
8  on policy and procedure that you took with
9  Dr. Ruediger?
10     A    I'm going back to all of the
11  special education classes that I took at Troy
12  University Dothan.
13     Q    What did you make in the class on
14  policy and procedure?  What was your grade?
15     A    I'm not quite sure.  I don't recall
16  specifically.  It was either an "A" or "B."
17     Q    All right.  Defendant's 18, have
18  you seen that document?
19         MR. FAULK:  That's undated, too.
20         MR. WALDING:  These were all
21              produced in discovery.
22     A    This was another document that I
23  saw at my meeting, that terminated my
24  internship.  And Dr. Ruediger also pointed
25  out the fact that it was after I had met with

234

1  Mr. Andrews and Ms. Singletary, the fax.
2      Q    Well, we've already established
3  that it was after your meeting with Ms.
4  Singletary and --
5      A    We established that this one was.
6      Q    Ma'am, I'm speaking.  And you and I
7  both can't talk at the same time.  Okay?
8      A    Pardon me.
9      Q    All right.  I thought we had
10  already established that this meeting was
11  identified in Defendant's 27 as the week
12  before October 18, 2004?
13     A    Yes.  That's correct.
14     Q    So, what you're telling me now is
15  that Defendant's 18, you also saw this
16  document at the meeting the week before
17  October 18, 2004?
18     A    That is correct.
19     Q    All right.  According to
20  Defendant's 18, paragraph 1, or the paragraph
21  numbered 1, we've talked about you leaving
22  the school campus already, have we not?
23     A    Yes.
24     Q    All right.  The paragraph numbered
25  2, did you accuse Mr. Strange of entering

235

1  your locked file cabinet and placing an IEP
2  in a student folder?
3      A    What I said was that the IEP for
4  R. S. was in my IEP file, cabinet file, in my
5  locked room.
6      Q    Okay.  You said that to Mr.
7  Strange?
8      A    I believe it might have not been
9  directly to him.  It might have been to Mr.
10  Pitchford or someone like that.
11     Q    Okay.  Well, according to the
12  paragraph, it says, "Mrs. Miller accused Paul
13  Strange of entering her locked filing cabinet
14  and placing an IEP in a student folder.  Mrs.
15  Miller claims it was an IEP written without
16  her knowledge.  Mr. Strange and Mrs. Miller
17  had written the IEP in her room approximately
18  one week earlier.  Mrs. Miller stated she had
19  no recollection of that event."
20         I mean, do you know at all what we're
21  talking about here?
22     A    I know what folder we're talking
23  about.  It was -- again, it was R. S.'s.  And
24  Paul Strange had -- he and I together
25  actually sat down to talk about how to write

236

1  IEP's.  And so, this was one time when I was
2  anticipating learning how he wanted -- or the
3  school wanted their IEP's written.  So, Mr.
4  Strange took out a blank form and wrote down
5  goals and a little bit about R. on the
6  profile sheet.
7      Q    Yes.
8      A    And a few accommodations and that
9  sort of thing.  And the next thing I know, a
10  couple of days later, it's in my filing
11  cabinet, like it's supposed to be her IEP.
12  Well, we had no meeting.  It was a practice
13  session.  But it was inappropriate to have it
14  in my file, like that was the IEP that I was
15  supposed to follow.
16     Q    Okay.  And how did it get there, if
17  you know?
18     A    I don't know for sure.  I do know
19  that Paul Payne had a master key to the
20  doors.  He used it several times and told me,
21  "Shhh.  Don't tell anybody, because I'm not
22  supposed to have this."  But he had indicated
23  to me that he had this master key, and opened
24  my door one day when I didn't have my key,
25  when I had forgotten my key at home.

237

1  Q  So, then, somehow, Mr. Payne had to
2  be involved?
3  A  I don't know for sure. It could
4  have been another teacher. A gentleman by
5  the name of -- he's, I believe, Lewis, Mr.
6  Lewis.
7  Q  Steve Lewis?
8  A  Steve Lewis. I'm not sure exactly
9  what he taught at Houston County High School.
10  But I know he had a master key, because there
11  were two occasions when he actually opened my
12  room, went into my special education room,
13  with his master key.
14  One time, I was actually sitting at my
15  computer. I didn't have my light on, 'cause
16  I was in a hurry, and I was just typing out
17  something for one of the students, maybe a
18  quiz or something like that. I don't even
19  remember what it was. But I was at my
20  computer, and my computer -- my door was
21  here. My computer was here. He unlocked the
22  door and came in and started walking around
23  my room.
24  Q  And is your point that he had a key
25  to your room?

238

1  A  Yes.
2  Q  All right. Well, let's try to
3  focus on --
4  A  So, I mean, I don't know who else
5  had a key.
6  Q  Yes, ma'am. And I'm not trying to
7  be rude to you. Really, I'm not.
8  A  I understand.
9  Q  But it's getting late in the day,
10  and I'd like us to focus. Okay?
11  A  Okay.
12  Q  Did you accuse Mr. Strange of
13  somehow entering your locked filing cabinet?
14  A  No. I did not accuse him, per se.
15  Q  Did you imply that he broke into
16  your room or entered your locked filing
17  cabinet and put this document there?
18  A  He may have taken that. I just
19  said the IEP was in my filing cabinet, and I
20  didn't put it there.
21  Q  And did you see this draft or this
22  practice IEP as a valid, legal document?
23  A  No.
24  Q  Okay. It says here that you claim
25  it was written without your knowledge.

239

1  A  No. That is not true.
2  Q  Because it was a practice session?
3  A  I was sitting there right beside
4  him. Yes. I was sitting there right beside
5  him.
6  Q  All right. Paragraph 3 of
7  Defendant's 18. "Mrs. Miller has difficulty
8  in communicating with faculty members." Do
9  you see that?
10  A  I see that.
11  Q  Okay. And do you deny that you had
12  difficulty communicating with faculty
13  members?
14  A  I don't think I had a problem
15  communicating with faculty members.
16  Q  Paragraph 4. "Mrs. Miller
17  questioned the lawfulness of the school
18  system's inclusion policies."
19  A  I have no idea what he means by
20  that.
21  Q  Okay. Paragraph 5. "Some students
22  have requested that Mrs. Miller not be their
23  inclusion teacher."
24  A  I have no knowledge of that at all.
25  Q  Okay. Do you know for a fact that

240

1  students didn't request for you to be
2  their teacher?
3  A  No.
4  Q  Okay. So, that could have
5  happened?
6  A  It possibly could have happened.
7  Q  You just don't know?
8  A  No. It would be interesting to
9  find out who it was.
10  Q  Okay. Paragraph 6. "Classroom
11  teachers reported that Mrs. Miller has been
12  upset and crying during class time."
13  A  Absolutely.
14  Q  Okay. So, there were times during
15  your internship that you were upset and
16  cried?
17  A  Yes, a couple of times.
18  Q  During school hours?
19  A  Yes, definitely.
20  Q  So, that's a true statement?
21  A  Absolutely.
22  Q  Paragraph 7. "Office staff members
23  reported that Mrs. Miller was upset and
24  crying in the office lobby during school
25  hours." Is that true?

241

1    A    At one point in time, I could have
2  been in the office.  I don't recall
3  specifically the incident.  But it's a
4  possibility.
5    Q    Paragraph 8.  "Not following
6  suggestions provided by Mr. Strange as
7  related to the resource room."
8    A    I'm not sure I understand that, as
9  far as the resource room is concerned.  As
10  far as the IEP's are concerned, no, I did not
11  follow suggestions by Mr. Strange.
12    Q    And he was your paid mentor?
13    A    That's correct.
14    Q    Okay.  Paragraph 9.  Mrs. Miller
15  told a classroom teacher, quote, I don't like
16  being here any more than you do, but I have
17  to be in here a certain number of hours, end
18  quote.  Did you tell a teacher that?
19    A    No.
20    Q    Did you tell a teacher something to
21  that import?
22    A    No.  Even when I had a problem in
23  the classroom, I loved being there with those
24  kids.  You know, with Ms. Ezell, okay, even
25  though the relationship was strained, I loved

242

1  being in there.  I wanted to be in there with
2  those students.
3    Q    Would you agree with me that
4  Defendant's 18 is signed at the bottom by
5  Stacey Ezell and Paul Strange?
6    A    Yes.
7    Q    Defendant's 19, do you recognize
8  that document?
9    A    Yes, I do.
10    Q    Again, that's an e-mail from your
11  personal e-mail account?
12    A    That's correct.
13    Q    And it's dated Sunday, September
14  26, 2004, at 1:08 p.m.?
15    A    That's correct.
16    Q    And the subject line says it
17  concerns Nancy Miller 9/24.
18    A    That's correct.
19    Q    And does that mean September 24?
20    A    Yes.
21    Q    Okay.  So, then, the subject of the
22  e-mail is the meeting -- or what happened on
23  September 24?
24    A    Correct.
25    Q    Which is when you left campus at

243

1  Houston County High School?
2    A    Correct.
3    Q    And when you had your meeting with
4  Mr. Andrews and Ms. Singletary?
5    A    Correct.
6    Q    And you say to Dr. Jones -- well,
7  let me ask you this:  This document,
8  Defendant's 19, is actually to
9  sjones@troyst.edu?  Correct?
10    A    Correct.
11    Q    That's Dr. Jones?
12    A    Correct.
13    Q    And it's also cc'd to pparris?
14    A    Correct.
15    Q    That's Ms. Parris?
16    A    Correct.
17    Q    And to ruediger -- or
18  gruediger@troyst.edu?
19    A    Correct.
20    Q    Is that Dr. Ruediger?
21    A    Correct.
22    Q    And then, you also sent it to
23  yourself?
24    A    Yes.
25    Q    Okay.  And you sent it to

244

1  jrotc250924@aol.com?
2    A    That's correct.
3    Q    And who is that?
4    A    That's my husband.
5    Q    All right.  This document, then,
6  just refers to those phone messages you told
7  me about earlier, before you left the campus
8  at Columbia?
9    A    Correct.
10    Q    Okay.  But you didn't specify all
11  the problems and concerns you had in this
12  e-mail?
13    A    No.  They already knew.
14    Q    Okay.  Well, you're making
15  assumptions about what's in someone's head,
16  aren't you?
17    A    No, I don't think so.
18    Q    Well, they knew them if they
19  listened to your phone messages?
20    A    They knew about the noncompliance
21  issues from practically, you know, the
22  beginning of my internship, when I spoke with
23  Dr. Ruediger.
24    Q    Dr. Ruediger knew about them?
25    A    Dr. Ruediger.  And when I spo

245

1  with Ms. Parris on the phone several times, I
2  addressed -- when she asked me about how
3  things were going, I said, "The noncompliance
4  issues are still a problem."
5      Q    And that's how you put it?
6      A    Possibly.  I mean, to my
7  recollection, that would be the terminology I
8  would have used.  Something on the order of
9  that.
10     Q    Defendant's 20.
11     A    Yes.
12     Q    Have you seen this document before?
13     A    Yes.
14     Q    And is this the second internship
15 observation form by Dr. Ruediger?
16     A    Yes.
17     Q    Okay.  And the date of it is what?
18     A    September 30th.
19     Q    Did Dr. Ruediger actually come out
20 to the campus at Houston County High School?
21     A    Yes, he did.
22     Q    And he made his observation?
23     A    Yes.
24     Q    Did you and he have some sort of
25 debriefing session after the observation?

246

1      A    Yes, at Troy University.
2      Q    Oh, okay.
3      A    Instead of at the high school, like
4  the previous one.
5      Q    Okay.  And is that your signature
6  there at the foot of the page, Defendant's
7  20?
8      A    Yes.
9      Q    Let's look at 21, then.  So, if I
10 understood you correctly, what you told me
11 just a few minutes ago is that this
12 debriefing session that, the previous time,
13 y'all had right there at Columbia, at the
14 high school --
15     A    Correct.
16     Q    -- this time, on September 30, it
17 occurred at Troy?
18     A    Correct.
19     Q    All right.  And it looks as though
20 this Dr. Lumpkin also attended this
21 debriefing?
22     A    That's correct.
23     Q    Who is Dr. Lumpkin?
24     A    I never had Dr. Lumpkin for any
25 classes, but she was one of the education

247

1  professors there.  I believe, at some point
2  in time, if I remember correctly, reading one
3  of the past Troy books that, you know, have
4  the listings of classes and all that sort of
5  thing in it, I believe she used to be the
6  education department head or something like
7  that.  That's what I recall for some reason.
8      Q    Okay.  The first sentence says,
9  "Dr. Lumpkin was asked to attend the
10 meeting."  Do you see that?
11     A    Yes.
12     Q    Did you ask Dr. Lumpkin to attend
13 the meeting?
14     A    No.  Dr. Ruediger did.
15     Q    Okay.  Second paragraph indicates
16 that -- well, did Dr. Ruediger lead this
17 meeting?
18     A    Yes.
19     Q    Second paragraph says, "I began the
20 meeting by asking Mrs. Miller to discuss her
21 relationship with her supervisor and
22 principal."  Is that accurate?
23     A    That is accurate.
24     Q    All right.  "She indicated that she
25 was interacting well with her students and

248

1  other teachers.  She stated, quote, I am
2  getting along well with Mr. Strange, end
3  quote."
4      A    Uh-huh.  That's correct.
5      Q    Did you state that?
6      A    Yes, I did.  I felt, at that time,
7  I was getting along with him, because he had
8  indicated to Ms. Parris that he regretted,
9  you know, what had happened and all, and that
10 he was going to try to make sure that I had a
11 successful internship.
12       So, after I had gone to central office,
13 Ms. Parris called me and indicated to me that
14 Mr. Strange had said that he wanted to make
15 sure I had a successful internship.
16     Q    All right.  So, the basis of you
17 saying, "I am getting along well with Mr.
18 Strange" is something Ms. Parris said to you?
19     A    Because his attitude and his
20 demeanor changed toward me at that point in
21 time, the last few days since the day I went
22 to talk with Mr. Andrews.
23     Q    Okay.  Would you agree with me that
24 Defendant's 18 is a document signed by Mr.
25 Strange, and it expresses various conce

249

1  about you?
2     A    Yes, uh-huh. Odd.
3     Q    The next sentence says, "She was
4  asked why she left the school campus the
5  previous week during school hours. Miller
6  stated that she felt that she was required to
7  do something which she did not feel was
8  appropriate."
9     Did they ask you about leaving the
10  campus the previous week?
11     A    Yes, they did. And I went into
12  detail why, again. But he does not address
13  exactly what I said. He just kind of glosses
14  over it, in my opinion.
15     Q    Okay. And did you, in fact, state
16  that you felt you were required to do
17  something you didn't feel was appropriate?
18     A    Yes.
19     Q    And that's sign those three
20  documents?
21     A    That's correct.
22     Q    Who required you to sign those
23  three documents?
24     A    They were asking me to sign those
25  documents, and I said "No." So, I didn't

250

1  feel like I was -- anybody was -- nobody
2  actually said, "I'm requiring you to do
3  this." But just by Mr. Strange's appearance
4  in the room at that time, requesting for me
5  to sign these documents, that was
6  inappropriate, in my opinion.
7     Q    So inappropriate that you should
8  leave the campus?
9     A    It was a continuation of all of the
10  stuff that had been going on prior to, and
11  this was -- it had just come to the head, and
12  I just needed to talk to somebody about it.
13  This was supposed to be a positive --
14     Q    It was so inappropriate --
15     A    Yes.
16     Q    -- that you had to leave the
17  campus?
18     A    Yes.
19     Q    You couldn't have just said, "No,
20  Starla, the psychometrist, I'm not going to
21  sign those"?
22     A    I told her that, too.
23     Q    And you couldn't have gone about
24  your merry way in your internship that day?
25     A    No. I decided not to.

251

1     Q    Okay. I understand that. The next
2  sentence states that, "Dr. Lumpkin and I
3  stressed" -- and this is Dr. Ruediger -- "the
4  importance of demonstrating professional
5  behavior and the correct protocol to follow
6  when difficulties arise. She apologized for
7  leaving the school campus."
8     A    Yes.
9     Q    Did you?
10     A    Yes, I did.
11     Q    Okay. So, at least on September
12  30, 2004, you realized that leaving the
13  school campus because Starla, the
14  psychometrist, asked you to sign three
15  documents was perhaps a little extreme?
16     A    No. I decided that because Mr.
17  Pitchford -- I couldn't get ahold of Ms.
18  Parris and Dr. Ruediger or Dr. Jones to
19  discuss the situation. Because I had called
20  them earlier than 11:30. ...
21     I decided that, even though I left the
22  campus, I would have liked to have had the
23  opportunity to speak with one of my
24  supervisors. But since I didn't have that
25  opportunity, I felt -- personally, I felt

252

1  backed into a corner. So, I decided -- I
2  apologized for leaving, but I do not regret
3  leaving.
4     Q    Why were you backed into a corner,
5  ma'am?
6     A    For two months -- for two months, I
7  was asked to do all these different things.
8  My students that I had on my roll were not
9  getting the education that they deserved or
10  they required. They were not getting any
11  kind of accommodations that were appropriate
12  for them. They were not getting any kind of
13  lessons that were appropriate for them.
14     When you have a student with mental
15  retardation, and he's told to answer critical
16  thinking questions, and that it doesn't take
17  a genius to answer those questions, that's
18  totally inappropriate.
19     I had had it. You can only take so
20  much, seeing that these kids are suffering
21  for the, in my opinion, abuse that some of
22  these teachers are putting on them.
23     Q    Okay. And Starla asking you to
24  sign these three documents was just the straw
25  that broke the camel's back?

253

1    A    No. The straw that broke the
2 camel's back was Mr. Strange standing in that
3 room, knowing that, on my contract, it says
4 that I don't -- I'm not legally responsible
5 for these things. I was not in one of the
6 meetings. And just, you know, instead of saying, "Oh, Starla, she
7 there, instead of saying, "Oh, Starla, she
8 doesn't need to sign them. I'll go ahead and
9 sign them."
10    Because he was, technically, in my
11 opinion, in my understanding of my
12 internship, that he was the one who should
13 have been signing the documents, not Nancy
14 Miller.
15    Q    I understand you. You were just
16 backed into a corner?
17    A    I felt like backed into a corner.
18 Two months of this sort of thing.
19    Q    Sure. I understand. The document
20 then indicates -- well, why did you
21 apologize?
22    A    Because that was the appropriate
23 thing to do.
24    Q    Okay. Well, did Dr. Ruediger and
25 Dr. Lumpkin indicate to you that the

254

1 appropriate thing to do would have been to
2 stay at school?
3    A    To my recollection, they never said
4 anything like that. They just questioned why
5 I left, to my recollection.
6    Q    Okay. The next sentence says, "I
7 further asked Mrs. Miller if, at any other
8 times during her internship, if she had
9 demonstrated inappropriate professional
10 behavior." Do you see that?
11    A    Yes.
12    Q    And do you recall Dr. Ruediger
13 inquiring of you as to whether you exhibited
14 what, in his opinion, apparently, other types
15 of inappropriate professional behavior?
16    A    I don't recall him asking that.
17    Q    Well, did you glean, from
18 Dr. Ruediger and Dr. Lumpkin, during this
19 debriefing session, that leaving the school
20 campus that day was inappropriate
21 professional behavior?
22    A    Yes. That was the impression that
23 I got from them. Yes.
24    Q    Good. Another sentence, it says,
25 "After some hesitation, she indicated she had

1 not." And then, the next sentence states,
2 "She later indicated that she could
3 understand how her behavior may have been
4 interpreted as unprofessional."
5    A    Yes.
6    Q    Did you state that?
7    A    I probably did. I don't recall
8 that specifically. But, in so many words, I
9 may have stated that. Yes.
10    Q    Okay. And then, the second
11 paragraph talks about you all discussing
12 lesson plannings and things of that nature?
13 Correct?
14    A    Yes.
15    Q    All right. And this meeting lasted
16 approximately an hour?
17    A    I have no recollection, but
18 apparently. That's what they've got
19 indicated on there, so --
20    Q    It says 3:10 to 4:10.
21    A    I would have to say yes.
22    Q    Okay. Look at Defendant's 22. Do
23 you recognize that document?
24    A    Yes, I do.
25    Q    And this is a document that you

256

1 typed or penned?
2    A    That's correct.
3    Q    And what, if anything, did you do
4 with this document?
5    A    This was part of the observation
6 report for --
7    Q    The 30th?
8    A    Yes, uh-huh. And I was required to
9 write after-action, so to speak, reports, and
10 this was it.
11    Q    What are after-action reports?
12    A    After the observation, it's, like,
13 a reflection. Interns are required to, you
14 know, naturally, sit back and look at things
15 that happened during your -- during the
16 observation, and note things that you did
17 that were strong and note things that you
18 might have been able to do better and that
19 sort of thing.
20    Q    Okay. Reflect on the feedback
21 you've been given and comment on it?
22    A    Correct.
23    Q    And hopefully take the feedback and
24 use it in a positive manner to better
25 yourself?

257

1   A   Correct.

2   Q   Okay. You begin Defendant's 22 by

3  saying that you disagree with what

4  Dr. Ruediger concludes?

5   A   Yes, I say that.

6   Q   And then, you go on to say a great

7  many things about the problems you perceive,

8  don't you?

9   A   According to each one of the areas

10  that he observed.

11   Q   Okay. Show me, in this document,

12  any reflection on what Dr. Ruediger saw as

13  either unprofessional behavior or areas that

14  you needed to improve, that you then took as

15  positive and tried to better yourself with?

16   A   It would take me a while to review

17  and remind myself of what I actually said,

18  because I haven't really looked at this in

19  depth. This was after going to Mr. Andrews.

20  And Mr. Strange and Ms. Towns --

21   Q   Yes, ma'am. If you could address

22  my question.

23   A   I'm trying to.

24   Q   Actually, you're just talking right

25  now.

258

1   A   They helped me pre --

2   Q   Mrs. Miller, the process works by

3  me asking you a question, and then, you

4  responding to the question.

5    My question is, can you identify any

6  parts of this document where you take the

7  feedback that Dr. Ruediger gave you, and

8  reflect on it and try to better yourself?

9  Can you do that?

10    MR. FAULK: Take your time and

11      review the document. Take

12      whatever time you need.

13    THE WITNESS: Okay.

14   A   (Witness reviewing document.)

15  Okay. I would say that, no, it addressed

16  more of the positive things that I had done

17  as far as the -- and the reflection is

18  supposed to include strengths and weaknesses.

19  I did not address the weaknesses, in terms of

20  comments that he made.

21    I've always been told, through our

22  special education classes at school, that

23  these items are supposed to be scored on the

24  basis of what he actually sees. Okay. Now,

25  when he gives me the 2's in the "Presents the

259

1  lesson," Mr. Strange and Ms. Towns are the

2  ones who provided information for me, and I

3  used the IEP's to create the lesson.

4   Q   It wasn't your fault? It was

5  theirs?

6   A   No. I'm not saying it's a fault

7  It's actually a positive.

8   Q   You're saying he gave you 2's in

9  areas that you didn't have control over?

10   A   No. I'm saying he gave me 2's as a

11  direct reflection from my reporting to Mr.

12  Andrews the situation that was going on, and

13  this was his reprimand to me.

14   Q   This observation form?

15   A   Yes. The scores that he gave me

16  And he admitted, in his debriefing, that some

17  of the scores were for my unprofessional

18  behavior by leaving the school on Friday.

19   Q   Okay. For your behavior, ma'am?

20   A   For my behavior. When I've been

21  told by Dr. Morin and Dr. Ruediger that these

22  are for when you're at the observation, what

23  you specifically observe. He did not observe

24  any of this at that observation.

25   Q   Okay. So, you can't find one

260

1  instance on Defendant's 22 where you take his

2  critical feedback and apply it positively to

3  yourself in a way that might better yourself

4  as a professional?

5   A   Not in my observation critique.

6   Q   Good. 23. This is an observation

7  form by Mr. Strange, dated August 30, 04?

8  Correct?

9   A   That's correct.

10    MR. FAULK: Haven't we already

11      looked at that?

12    MR. BRANTLEY: One earlier. This

13      is August 30th.

14    MR. FAULK: I was thinking we

15      already saw that.

16    MR. WALDING: No, sir.

17    THE WITNESS: No. That's from --

18    MR. WALDING: We saw the one from

19      Ruediger.

20    THE WITNESS: -- Mr. Strange.

21    MR. BRANTLEY: You've got Exhibit 2

22      at the top, now.

23    MR. WALDING: I don't. Y'all did.

24      This was one of y'alls initial

25      disclosure documents.

261

1    Q    All right.  Would you agree that

2    that document is dated August 30, 2004?

3    A    Yes.

4    Q    And that it was an observation form

5    completed by Paul Strange?

6    A    Yes.

7    Q    And is that your signature at the

8    foot of the document?

9    A    Yes.

10    Q    Okay.  And would you agree with me

11    that Mr. Strange gives you mostly average

12    ratings?

13    A    Yes.  And I was thrilled.

14        MR. FAULK:  Could I interrupt?  I'm

15            sorry.

16        MR. WALDING:  Sure.

17        MR. FAULK:  Just looking at my

18            notes, at one point, you showed

19            a document marked as

20            Defendant's Exhibit 9, which

21            was dated August 30th, and it

22            was an observation by Strange.

23        MR. WALDING:  Oh.  Is it the same?

24        MR. FAULK:  And I wondered if it

25            may be two different documents.

262

1        MR. WALDING:  I don't know.  Maybe

2            I'm confused.  No.  You're

3            right, Winn.  They are the

4            same.

5        MR. BRANTLEY:  23 and what?  9?

6        MR. WALDING:  Yeah.  Let's just

7            pull 23 out.  That just means

8            my document debacle continues.

9            I thought it was after -- I

10            thought there was one after.

11            And I apologize.  Again, it is

12            late in the day.

13        THE WITNESS:  We all make mistakes.

14        MR. WALDING:  Sure, we do.  Sure.

15    Q    All right.  Let's look at 24.

16    That's another e-mail from you to Dr. Jones,

17    that's cc'd to Ms. Parris?

18    A    Right.  That's one of those weekly

19    things.

20    Q    All right.  And you indicated it

21    had been a rough week, and it was good that

22    it was behind you?

23    A    Yes.

24    Q    All right.  There's a sentence that

25    reads, "We both regret the events of the week

263

1    and look forward to meeting again."

2    A    Uh-huh.

3    Q    What are the events of the week

4    you're referring to?

5    A    Mr. Strange and I had a

6    conversation that we both regret that -- you

7    know, I regretted that I felt compelled to go

8    to central office, but that I was concerned

9    for the students.  And he said he regretted

10    the events of the week.  Of course, at that

11    time, I did not know he had sent -- he and

12    Ms. Ezell had sent the --

13    Q    What are the events of the week?

14    A    -- exhibit.

15    Q    You leaving the campus?

16    A    Leaving the campus and -- yes.  I

17    would say leaving the campus.

18    Q    All right.  Thank you.  Defendant's

19    25, have you seen this document before?

20    A    Yes, after the --

21    Q    Lawsuit?

22    A    -- lawsuit was filed.

23    Q    And this purports to be an e-mail

24    from Cynthia Lumpkin -- is that Dr. Lumpkin?

25    A    Yes.

264

1    Q    -- to Pam Parris?

2    A    Yes.

3    Q    And it purports to be dated

4    Wednesday, October 6, 2004, at 12:15 p.m.?

5    A    Correct.

6    Q    But the subject matter of the

7    e-mail, if you'll look at the first

8    paragraph, indicates that, "As requested, I

9    met with Dr. Greg Ruediger and Mrs. Nancy

10    Miller on Thursday, September 30, at 3:10

11    p.m."  Correct?

12    A    Correct.

13    Q    All right.  That's the debriefing

14    session we talked about already?

15    A    Correct.

16    Q    Skip down, if you will, to the

17    third paragraph.  It indicates that you

18    thought Mr. Pitchford had some authority to

19    pass or fail you in your internship.

20    A    Correct.

21    Q    You told me earlier, though, that

22    he never directly stated to you he had

23    authority to pass or fail you in your

24    internship?

25    A    Correct.  Ms. Parris implied that

265

1  he had the ability to say "yea" or "nay."
2  You know.
3      Q    And then, it says, "We explained to
4  her the TSUD decides that, but that Mr.
5  Pitchford decides if she is allowed in his
6  school."
7      A    That's correct.  Yes.
8      Q    Was that information conveyed to
9  you by Dr. Ruediger and Dr. Lumpkin on
10  September 30?
11      A    No, not to my recollection.
12      Q    So, you're saying she didn't
13  explain to you that Troy State decided
14  whether you passed or failed your internship?
15      A    I'm not sure if that was addressed.
16      Q    You do see that she says that in
17  the third paragraph?
18      A    Yes.
19      Q    You're saying she didn't or they
20  didn't address that?
21      A    No.  I'm saying that I don't recall
22  exactly her specifically saying that Mr.
23  Pitchford would decide whether or not I'm
24  allowed to stay at his school.  I do not
25  recall her saying that.  I'm not saying that

266

1  she didn't.  I'm just saying I do not recall
2  that.
3      Q    Okay.  Well, do you recall them
4  saying that persons at Troy State decided if
5  you passed or failed your internship?
6      A    Yes.  And technically, from the
7  internship handbook, yes, I mean, that was
8  what I was -- the understanding.
9          But when I was being threatened with
10  failing my internship, it was implied that
11  Mr. Pitchford -- I had better go back and
12  make Mr. Pitchford a happy camper, so that I
13  would pass my internship.  So, you know, he
14  was going to influence it one way or another,
15  naturally.
16      Q    You're saying that your internship
17  handbook indicates that that's a decision by
18  Troy State, whether you pass or fail?
19      A    That's correct.
20      Q    And you had access to this
21  handbook?
22      A    Yes.
23      Q    All right.  26.  26 is a letter
24  dated October 18, 2004, from Pamela Parris to
25  Kenneth Lord?

267

1      .  A    Uh-huh.  Yes.
2      Q    Have you seen that letter before
3  today?
4      A    Yes.
5      Q    Did you also see this letter during
6  this meeting that we talked about earlier,
7  along with Defendant's, I think, 27?
8      A    No.  Actually, I was hand given
9  oh, I'm sorry.  No.  I'm sorry.  I'm
10  mistaken.  This is from Ms. Parris.  Right?
11  I saw this -- I might have received a copy of
12  it in the mail, is what happened, I believe
13  is what happened.  I don't think I actually
14  saw it at the meeting we were at.  I think I
15  received a copy of it in the mail.
16      Q    Okay.  The meeting that y'all were
17  at was on October 18 of '04?
18      A    The meeting that I had with Troy
19  University was actually prior to the 18th.
20      Q    You're right.  And I apologize.  It
21  was the week before, according to Defendant's
22  27.  All right.  You did receive a copy of
23  this?
24      A    Yes, in the mail.
25      Q    Some time after the 18th?

268

1      A    That's correct.  They informed me,
2  and then, I got a copy.
3      Q    And the second sentence of the
4  letter states, "The purpose of this letter is
5  to inform you that her internship" -- that's
6  your internship --
7      A    Correct.
8      Q    -- "was terminated effective
9  October 14, 2004."
10      A    Correct.
11      Q    "Mrs. Miller was notified of this
12  decision during a meeting at the university
13  on October 14, 2004."
14      A    That's correct.
15      Q    All right.  So, that gives us a
16  specific date for this meeting?  Correct?
17      A    That is correct.
18      Q    All right.  And that's the meeting
19  where you and your husband were present, and
20  you were informed that your internship had
21  been terminated?
22      A    Correct.
23      Q    And, again, that meeting involved
24  you, your husband, Ms. Parris, and who else?
25      A    Dr. Ruediger.

269

1    Q    Okay.  No one from Houston County
2  Schools was present at that meeting?
3    A    No.
4    Q    No member of the Houston County
5  school board present for that meeting?
6    A    No.
7    Q    Okay.  We've looked at 27 already,
8  I believe.  Do you still have your --
9    A    (Witness reviewing document.)
10   Q    That's a copy of a letter from you
11 to Dr. Jones, dated October 18, '04?
12   A    That's correct.
13   Q    Okay.  And that first sentence
14 indicates y'all had this meeting on -- we now
15 know the 14th?  Right?
16   A    That's correct.
17   Q    Where you were told that your
18 internship had been terminated?
19   A    That's correct.
20   Q    Now, you state, in Defendant's 27,
21 that your internship was administratively
22 withdrawn.
23   A    That's correct.
24   Q    What does that mean?
25   A    Well, according to Dr. Jones, that

270

1  was the terminology that she used.  And
2  Dr. Jones -- it's my understanding that
3  Dr. Jones, rather than Ms. Parris, actually
4  made the decision to administratively
5  withdraw me from my internship, instead of
6  failing, that I had been threatened with.
7    Q    Well, what's your understanding of
8  who got to make the decision whether you
9  passed or failed?
10   A    Ordinarily, it's my understanding
11 that Ms. Parris made the decision, normally.
12   Q    Because she was the director of the
13 internship program?
14   A    Correct.  That's my understanding.
15   Q    All right.  Apparently, this
16 information there about you being
17 administratively withdrawn was communicated
18 to you on the 14th?
19   A    Yes.
20   Q    Okay.  You go on, in Defendant's
21 27, to request basically that you get another
22 internship?
23   A    Right.  I had choices that were
24 given to me.  It's rare that they offer a
25 student another opportunity for an

271

1  internship.  Normally, they fail or you can
2  -- and you get to choose -- like, you can
3  still get your degree, but you can't be a
4  teacher.  You can get your collaborative
5  degree, but you'll never be a teacher.  And I
6  think there was a couple of other options
7  that they offer.
8         But they also indicate, in the
9  paperwork, that there could be other options.
10 And Dr. Jones made the decision to give me
11 the opportunity to have another internship.
12   Q    Okay.  Were these other options or
13 other choices discussed with you at the
14 meeting on October 14?
15   A    Yes.
16   Q    What were the other options or
17 choices?
18   A    Well, the first thing -- I don't
19 recall specifically what's in the handbook.
20 But, in the handbook, it specifically says I
21 can get my degree, my special education
22 degree, but not a teaching degree, not be
23 able to get a teacher's certificate.  It says
24 I can pursue some other -- I believe it says
25 I can pursue something else.

272

1    Q    (Handing document to the witness.)
2    A    Thank you.
3    Q    Just for our record, I've handed
4  you a copy of the Professional Internship
5  Program Handbook?
6    A    That is correct.  Okay.  It comes
7  under the evaluation of the internship.
8         MR. FAULK:  What page are you on?
9         THE WITNESS:  I'm on page 11.
10   Q    And does it list these other
11 options somehow?
12   A    Yes.
13   Q    Could I see it, please?
14   A    Yes.  (Handing document to Mr.
15 Walding.)
16   Q    Thank you, ma'am.
17        (Whereupon, Defendant's Exhibit 29
18        marked for identification.)
19   Q    I'm going to mark this Defendant's
20 29.  Page 11 of Defendant's 29 is where you
21 were referring to?
22   A    Yes.
23   Q    And it states that, "If the student
24 is removed from the internship experience,
25 options include but are not limited to the

273

1  following: 1. The internship will be
2  terminated with a grade of 'F.'"
3      A    Correct.
4      Q    "2. The student will participate
5  in a remediation program."
6      A    Correct.
7      Q    "3. The student may select a
8  noncertifiable degree option."
9      A    Correct. And not limited to just
10  those three. There were other options.
11     Q    Right. Did they discuss the other
12  options, other than these three?
13     A    Yes. They told me that I would be
14  able to do another internship to become a
15  teacher.
16     Q    All right. So, then, this being
17  administratively withdrawn and given the
18  opportunity to do another internship would be
19  one of these other options?
20     A    Correct. That's my understanding.
21     Q    All right. And that's what
22  happened for you?
23     A    Exactly.
24     Q    Okay. And then, you actually did,
25  if I understood you correctly, an internship

274

1  at Beverlye Middle School?
2      A    Yes, I did.
3      Q    And successfully completed that?
4      A    Fabulously successful.
5      Q    28. This is a letter from Kenneth
6  Lord to you, dated October 19, 2004?
7      A    That's correct.
8      Q    Did you actually receive that
9  letter?
10     A    Yes, in my hand.
11     Q    It says, right at the top, "hand
12  delivery."
13     A    Yes, absolutely.
14     Q    It does say that.
15     A    Yes.
16     Q    And you received that?
17     A    Yes, I did.
18     Q    And it informs you that because
19  your internship has been terminated or
20  whatever, administratively withdrawn -- it
21  uses the phrase "terminated" --
22     A    Right.
23     Q    -- that that terminates your
24  employment internship agreement with Houston
25  County Schools.

275

1      A    That's what they have written.
2  Yes.
3      Q    That's what the document says?
4      A    That is correct.
5      Q    Okay. I take it, from your
6  sentence, that you disagree with that?
7      A    Yes. And so did AEA.
8      Q    Yes, ma'am. But I can't take AEA's
9  deposition. When your internship was
10  terminated, or you were administratively
11  withdrawn, how many days of the internship
12  had you completed?
13     A    I don't know the exact number of
14  days. It was from August 1st, when the
15  actual first day of school started, I
16  believe, through October 20th -- or to
17  October 20th. I received this on the 20th,
18  the morning of the 20th, if I'm not mistaken.
19     Q    Did you complete all of the days of
20  the internship?
21     A    No.
22     Q    Okay. Did you complete all 485
23  hours of the internship?
24     A    I'm not sure how many hours it
25  actually --

276

1      Q    Assume for me that the entire
2  internship was 485 hours.
3      A    But I was a different scenario,
4  according to Ms. Parris. I was getting
5  credit for every day, every hour that I was
6  there of school hours, because I was a paid
7  intern. Whereas, for interns, they have
8  certain times when they can claim hours.
9  Whereas, because I was hired as a teacher, I
10  got credit for all the hours that I was
11  there.
12     So, I don't know how many hours from
13  August 1st through August 19th that there
14  were, class hours, offhand. I would have to
15  have a calculator.
16     Q    All right. But you indicated to me
17  just a few moments ago that you disagreed
18  with the statement that the effect of this
19  termination or administrative withdrawal of
20  your internship was to terminate this
21  agreement?
22     A    That's my understanding.
23     Q    No. I'm asking you -- well, I
24  thought you told me earlier that you
25  disagreed with that statement, that the

277

1   effect of the termination or withdrawal of
2   your internship was to terminate this
3   internship agreement.
4       A   That is correct.
5       Q   Okay. Tell me why you disagree
6   with that statement?
7       A   Because nowhere in that contract
8   does it say that my teaching contract for a
9   whole year that I signed was contingent upon
10  my being an intern at, you know -- although
11  it said that the -- in the contract, it says
12  that Mrs. Miller should -- will be employed
13  for the entire time from the internship. I
14  believe it is right up there.
15      Q   (Handing document to the witness.)
16      A   Let me read it. Sorry.
17      Q   That's all right.
18      A   In other words, "Mrs. Miller will
19  continue to be employed throughout the
20  internship period, August 16 through December
21  7." But it doesn't say that, upon
22  termination of an internship, that she
23  terminates her job. My other contract, my
24  school contract, doesn't say that at all.
25      Q   All right. Defendant's Exhibit 5

278

1   is your complaint. And I think I clarified
2   with you, to begin with, that your complaints
3   and problems with the various defendants you
4   have sued are constitutional issues regarding
5   your free speech? Correct?
6       A   Yes.
7           MR. BRANTLEY: Object to the form.
8           MR. WALDING: Good. Object.
9       Q   Okay. Do you understand that you
10  have somehow made a claim under your
11  so-called contract with the Houston County
12  Board of Education?
13      A   I'm not understanding.
14          MR. BRANTLEY: Just ask him to
15              repeat it.
16      Q   Well, if you don't understand it --
17  you don't understand my question?
18      A   No, I don't understand it.
19      Q   As part of this lawsuit, are you
20  contending that, on the basis of that alleged
21  contract of employment, you know, you've got
22  some sort of breach of contract claim against
23  the Houston County Board of Education?
24          MR. FAULK: Same objection. Go
25              ahead and answer it, if you're

279

1           able to answer it, or tell him
2           what you think, if you think
3           you know the answer. But, you
4           know, I'm not telling you not
5           to answer.
6       A   I think there's a valid claim. I
7   believe there is.
8       Q   A valid claim for what?
9       A   That the contract should have still
10  been in effect.
11      Q   Okay. Even though your internship
12  program was terminated?
13      A   That's correct.
14      Q   And even though you were not a
15  certified teacher?
16      A   Correct. Because it was my
17  understanding that Mr. Andrews was ordering
18  an emergency teacher certificate in my name,
19  which would allow me to continue to be the
20  teacher for that one year. That's my
21  understanding.
22      Q   Yes, ma'am. I understand exactly
23  what you're saying. Can you show me, in
24  Defendant's 5, where you're making some sort
25  of claim in this lawsuit for breach of

280

1   contract?
2           MR. FAULK: Same objection. He
3               wants you to look --
4           MR. WALDING: To my form, I think.
5           MR. FAULK: He wants you to look at
6               Defendant's Exhibit 5. And if
7               you see a breach of contract
8               claim in it, tell him. If you
9               don't, tell him that.
10          MR. WALDING: Well, I mean, I don't
11              think I'm being unfair. It's
12              not there. Are y'all saying
13              it's there, and I've just
14              missed it?
15          MR. FAULK: I'm not saying it's --
16      Q   (By Mr. Walding) I mean, you
17  agreed with me earlier, this was a
18  constitutional claim. Yes?
19      A   It's a constitutional claim.
20  That's my understanding.
21      Q   Can you show me, in Defendant's 5
22  -- that's your complaint -- a claim for
23  breach of contract?
24      A   I don't see one in there.
25      Q   Very well. Thank you, ma'am. I

281

1    not trying to beat a dead horse, again.
2    A    You're doing a good job.
3    Q    Doing a good job of beating a dead
4    horse?
5         MR. FAULK:  Trying to beat him to
6         death.
7    Q    Do you need a break, ma'am?
8    A    No.  I'm fine.  Do you need a
9    break?
10   Q    No.  I can go all day.
11        (Brief off-record.)
12   Q    Mrs. Miller?
13   A    Sir?
14   Q    Tell me, in your own words, if you
15   would, what the Houston County Board of
16   Education has done to deprive you of your
17   First Amendment right to freedom of speech?
18        MR. FAULK:  Form.  I'm just talking
19        to her.  Don't pay any
20        attention.
21        THE WITNESS:  Okay.
22   A    I hope I'm answering the question
23   correctly.
24   Q    I don't know, ma'am.  It's your
25   lawsuit.

283

1    disability.  They have a math and reading
2    disability.  Reading goes over into every
3    single area that they have a class in.
4    English, math, science, social studies,
5    agriculture.  Even, you know, when they play
6    sports, they're going to have to learn to
7    read the plays and that sort of thing.
8    Q    Yes, ma'am.  And I don't mean to
9    interrupt your speech.  But if you could
10   focus on the question I've asked you, which
11   is, tell me how the Houston County Board of
12   Education -- do you understand that the
13   Houston County Board of Education is a body
14   of elected officials?  Yes or no?  Do you
15   understand that?
16   A    Yes.
17   Q    Okay.  It's made up of members who
18   are elected by the voters and taxpayers.  Do
19   you understand that?
20   A    Yes.
21   Q    Okay.  Tell me what those people
22   did -- and I can give you their names, if you
23   would like to hear them -- what those people
24   did, either individually or as a group, that
25   somehow deprived you of your First Amendment

282

1    A    Students, the students at Houston
2    County High School, the special ed students,
3    particularly, are entitled to a wonderful
4    education.  They are entitled to specific
5    accommodations to make them successful,
6    successful in the general education
7    classroom.
8         And when I voiced my concerns to Paul
9    Strange and to Mr. Pitchford and to Mr.
10   Andrews and to Ms. Parris and to
11   Dr. Ruediger, I felt that all of them
12   combined were trying to shut me up.
13        I am a parent.  I would be appalled if I
14   had a special education student who was the
15   last meeting that I knew, in May, stated that
16   that student was going to be in a resource
17   room, and then, by the time school starts, in
18   August, those students are put into an
19   inclusion class, with no specific
20   accommodations, no appropriate goals, no
21   information for teachers to know what grade
22   level that student reads at --
23   Q    Yes, ma'am.
24   A    -- what math level that child is
25   at.  Students don't have a science

284

1    right to free speech?
2         MR. FAULK:  Object.
3         MR. WALDING:  Object to the form?
4         MR. FAULK:  Same objection.
5    Q    Yes, ma'am.  I'm waiting on an
6    answer, not a speech.  I want to know what
7    the board members -- the board, acting as a
8    public entity, did to violate your rights to
9    freedom of speech?
10        MR. FAULK:  Same objection.
11   A    I don't know what to say.
12   Q    Can you tell me that Ken Lane,
13   Jimmy Kilgore, Dorothy Butts, Scott Thomas,
14   Bobby Harrell, Donnie Smith and Doyle Bond,
15   either individually or acting together, did
16   one thing to violate your First Amendment
17   right to free speech?
18        MR. FAULK:  Same objection.
19   A    (No response.)
20   Q    Can you, ma'am?
21   A    I don't know how to answer that
22   question.
23   Q    Can you tell me that either of
24   those individuals, either acting individually
25   or acting together, as a body, did something

285

1  that violated your rights to free speech?

2      MR. FAULK:  Same objection.

3   A  (Witness shaking head in negative.)

4   Q  Is the answer "no"?

5   A  I don't know how to answer that

6  question.

7   Q  Why not?

8   A  I don't understand the question.

9   Q  You understand that the Houston

10  County Board of Education is one of the

11  people or entities that you have sued in this

12  lawsuit?  Do you understand that, ma'am?

13   A  Yes.

14   Q  And one of the first things I told

15  you this morning -- and I realize it's been a

16  long day.  But one of the first things I told

17  you this morning is that my law firms

18  represents the Houston County Board of

19  Education.  Do you remember that?

20   A  Yes.

21   Q  So, one of my clients is the

22  Houston County Board of Education.

23   A  Okay.  And my understanding of the

24  Houston County Board of Education includes

25  teachers and administrators and central

287

1  to those, Mr. Faulk.  The day

2  is young.  I'd like her to

3  answer the question as to the

4  Houston County Board of

5  Education.

6     MR. FAULK:  She's not contending

7  that any individual member of

8  the board of education

9  individually took any action to

10  violate her First Amendment

11  rights.

12     MR. WALDING:  Okay.  Well, then,

13  why can't she answer that

14  question?

15     MR. BRANTLEY:  She doesn't

16  understand it.  She's not a

17  lawyer.

18     THE WITNESS:  I don't understand.

19  I'm not.

20     MR. FAULK:  I'm her lawyer.  I'm

21  telling you what she's

22  contending in her lawsuit.

23     MR. WALDING:  I understand what

24  she's contending, because I can

25  read your complaint.

286

1  office hierarchy in that whole group.

2   Q  All right.  But focus on my

3  question.  I asked you did you understand

4  that the Houston County Board of Education

5  was a public body, elected by the people, and

6  you said "yes."

7   A  Yes.

8   Q  I just named you the names of those

9  people elected by the taxpayers and voters of

10  Houston County, back at the time frame we're

11  talking about.  What did they do, if

12  anything, that violated your rights to free

13  speech?

14     MR. FAULK:  Just a moment, please.

15  For the record, we're not suing

16  any of these board members

17  individually.

18     MR. WALDING:  I understand that.

19     MR. FAULK:  We're suing the board

20  as an entity --

21     MR. WALDING:  Yes, sir.

22     MR. FAULK:  -- among certain

23  individuals who are not members

24  of the board, so far as I know.

25     MR. WALDING:  And I'm going to get

288

1   Q  I want to know, can you tell me

2  whether the Houston County Board of

3  Education, acting together as a public body,

4  did some act that you think violated your

5  constitutional right to free speech?

6     MR. FAULK:  Object to the form

7  again.

8   A  I have no idea.

9   Q  Okay.  So, you can't tell me

10  anything that they did as a body?

11   A  I have no knowledge that I can

12  express "yes" or "no," either way.  I have no

13  understanding of the question.

14   Q  You have no evidence or information

15  in your possession or in your head that

16  indicates they did something to violate your

17  freedom of speech?

18     MR. BRANTLEY:  Object to the form.

19   Q  And I'm talking about the board,

20  acting as a public body.

21     MR. BRANTLEY:  Object to the form.

22   Q  If you have such evidence or

23  information, I'd like to know what it is,

24  ma'am.

25     MR. BRANTLEY:  I'm going to

289

1   instruct my client not to
2   answer that. She's not a
3   lawyer. And, you know, I know
4   what you're going to do.
5   You're going to come back in
6   front of the jury and say, "She
7   said she didn't have any
8   evidence." It's the oldest
9   trick in the book.
10   MR. WALDING: I'm not trying to
11   trick anybody, Tom.
12   MR. BRANTLEY: Well, she's not a
13   lawyer. She doesn't know how
14   to answer that.
15   Q   (By Mr. Walding) Do you have any
16   information, any facts, that the Houston
17   County Board of Education, acting as a public
18   body, did anything to violate your rights to
19   free speech?
20   MR. BRANTLEY: Again, object to the
21   form. And it's redundant.
22   She's just given you --
23   MR. WALDING: It's not at all
24   redundant.
25   MR. BRANTLEY: We've been here all

290

1   day.
2   MR. WALDING: She's yet to answer
3   my question.
4   MR. BRANTLEY: Well, here's what
5   I'm saying. She's given seven
6   hours of information already.
7   MR. WALDING: No, sir, she hasn't.
8   MR. BRANTLEY: Six. So, that's
9   redundant.
10   MR. WALDING: Are you instructing
11   her not to answer my question?
12   MR. BRANTLEY: Yes.
13   MR. WALDING: And what's your
14   grounds for doing that?
15   MR. BRANTLEY: It's redundant.
16   She's already given you six
17   hours of information.
18   MR. FAULK: I think her answer is
19   that she does not -- she's not
20   aware of any individual acts by
21   any board members or the board
22   acting as a body, as such.
23   MR. WALDING: Okay. And that's
24   what I want to hear.
25   Q   Do you have any evidence or

291

1   information? I'm not talking about these
2   other individuals you've sued, because you've
3   sued virtually everybody. Okay? I'm talking
4   about the Houston County Board of Education.
5   A   (No response.)
6   Q   Are you going to answer my
7   question?
8   MR. WALDING: Are you going to
9   instruct her not to answer the
10   question?
11   MR. BRANTLEY: I think it's a legal
12   question to be brought out by
13   pleadings.
14   MR. WALDING: No, sir. The
15   attorneys for Mrs. Miller have
16   sued the Houston County Board
17   of Education. And your
18   complaint says, defendants
19   violated her constitutional
20   rights to free speech. We've
21   covered that already. I'd like
22   to know what evidence or
23   information she's got to
24   support that defendant, the
25   Houston County Board of

292

1   Education, did something to
2   violate her rights to free
3   speech. And if she's got it, I
4   want to hear it today. And if
5   she doesn't, she can say that,
6   and I'll move on to the next
7   defendant.
8   MR. BRANTLEY: Well, I think the
9   explanation there is going to
10   be more in line of a legal
11   argument and theory or
12   doctrine, as it is.
13   MR. WALDING: The two of you can
14   make whatever legal arguments
15   and espouse whatever theories
16   you like. But I'd like to know
17   what Mrs. Miller, as a witness,
18   knows. She's the plaintiff.
19   MR. BRANTLEY: I don't know that
20   she understands how to answer
21   that question. Isn't that what
22   you've said?
23   THE WITNESS: That is correct.
24   Q   (By Mr. Walding) Do you know or
25   are you aware of the Houston County Board of

293

1  Education, acting a body, having done
2  anything that you say violated your right to
3  free speech? Did they take any act that you
4  say violated your right to free speech?
5       MR. FAULK: Acting as a body?
6       MR. WALDING: That's what the
7            question said, Mr. Faulk.
8       MR. FAULK: Just say "no," and
9            let's move on.
10 A   Not that I know of.
11 Q   Very well. You told me earlier
12 that the students of Houston County Schools
13 were entitled to an education, and when you
14 voiced your concerns, Mr. Strange, Mr.
15 Pitchford, Mr. Andrews, Ms. Parris and
16 Dr. Ruediger all combined to shut you up.
17 A   That's my opinion.
18 Q   Okay. Tell me what all of these
19 individuals or any of these individuals did
20 to shut you up?
21 A   By, for instance, Ms. Parris
22 threatening my internship, failing it,
23 telling me that I was going to -- I could
24 fail my internship because I was basically
25 speaking out for these kids. I'm advocating

295

1  mean Sandy Jones, Dr. Sandy Jones? Sandy and
2  I are good ole buddies," you know, or
3  something to that effect, implying that, oh,
4  all she had to do is give ole Sandy a call,
5  her buddy, and, you know, boot me out. You
6  know. That was the implication.
7       And, you know, to me, that was -- you
8  know, it's one thing to have a personality
9  conflict, but it's another to be vicious and
10 try to intimidate and try to come across as,
11 you know, oh, I've got connections, honey.
12 And, you know, that sort of thing is what
13 continually happened.
14      Mr. Strange, when he would tell me, yes,
15 I need to write an IEP. I'm not going to --
16 because I said "no" to him, he does not need
17 to go back and say that was unprofessional,
18 that was inappropriate, or anything like
19 that. It would be inappropriate of me to do
20 these things that they were asking me to do.
21      There are many instances that happened
22 to where I felt like they were trying to shut
23 me up. Because, two months after I was
24 there, from August 1st through August -- or
25 October 19th, the majority of IEP's, there

294

1  for these students. There were -- I received
2  no reprimand in terms of any kind of written
3  statements or anything like that while I was
4  there at Houston County High School, from Mr.
5  Pitchford or Mr. Strange, saying that I had
6  done anything wrong in terms of my teaching
7  ability and that sort of thing.
8       Ms. Ezell even came up and said one day,
9  "I hear you could be -- you might fail your
10 internship." And I replied back to her that
11 Sandy Jones -- I'm sorry. The way I said it
12 was, "Dr. Jones, from what I understand, is
13 going to make a determination," because Ms.
14 Parris had just told me that.
15      And that was one of the days that I was
16 kind of teary.  When she mentioned, you
17 know, "I hear you could fail," that upset me.
18 You know. It was ridiculous to me, because I
19 had not had any bad type of experiences in
20 terms of written things saying, this is what
21 you did wrong, this is what you did wrong, or
22 anything like that.
23      It was just -- anyway, I told Ms. Ezell
24 that it was Dr. Jones who was going to make
25 the determination. And she said, "Oh, you

296

1  were only a couple that they actually held
2  meetings for, and the rest of them were still
3  in the condition that they were on the first
4  day of school. And there were still IEP's
5  that were not there.
6       And I kept getting threatened that I was
7  going to fail my internship because I'm
8  advocating for these students.
9  Q   Okay. And the person, as I
10 understood your testimony earlier, that
11 allegedly threatened you was Pam Parris?
12 A   That's correct.
13 Q   And you specifically told me --
14 because I asked you. I beat the horse deader
15 than all get-out -- that none of the other
16 defendants specifically threatened you.
17 A   No. But they did intimidation
18 tactics.
19 Q   Intimidation tactics?
20 A   Yes. Collusion. When you get Ms.
21 Ezell and Mr. Strange together, after I go to
22 central office, and they write these little
23 complaints that had to do with me going to
24 central office and the reports that I
25 actually said to central office, I believe

297

1  that's collusion. That is specifically
2  saying, I'm mad. I want this girl out of
3  here. She's trouble, and let's get rid of
4  her.
5      And then, Mr. Andrews did the same
6  thing. He was very cordial and said, you
7  know, he had heard good things about my
8  teaching. He said that, we're glad to have
9  you here at this high school, and that we
10  need you here, Mrs. Miller, in front of Ms.
11  Parris and Mr. Pitchford and -- Mr. Pitchford
12  said that he had no problems with my teaching
13  ability. Okay? He claimed to Ms. Parris
14  that I was causing dissension among the
15  faculty.
16      Well, when I specifically went to Mr.
17  Strange and told him that Ms. Monday had --
18  asked why Ms. Monday had failed E. S., who
19  has mental retardation, failed him in science
20  the year before, and he was in Ms. Ezell's
21  class this next year, with me in there trying
22  to help him, with no appropriate IEP -- you
23  know, what do you do?
24      Q    Tell me what intimidation tactics
25  you're referring to, Mrs. Miller?

298

1      A    For instance, Ms. Ezell saying,
2  "Oh, Sandy Jones. She and I are good
3  buddies." Okay. That's intimidation.
4      Q    What other intimidation tactics?
5      A    When I would walk through the hall,
6  Mr. Pitchford would stand there and glare.
7  Mr. Strange comes in my room and has Starla
8  trying to get me to sign paperwork.
9      You know, it's, like, if you don't do
10  this, or if you do do this, either way,
11  you're going to be messed up. Because, if
12  you do it, then you're part of the problem.
13  If you don't do it, then we're going to get
14  rid of you. You know. That is the
15  impression that I got.
16      Q    Yes, ma'am. Any other intimidation
17  tactics?
18      A    Ms. Parris. Ms. Parris saying
19  frequently that I was going to fail my
20  internship.
21      Q    No, ma'am. No, ma'am. You
22  indicated that there were three times where
23  there was an implication of a threat, and you
24  and I have talked about those.
25      MR. BRANTLEY: Object, now. You're

299

1          arguing with her. And that's
2          not what I heard her say
3          initially.
4      MR. WALDING: Well, I'm going to
5          ask her.
6      Q    Are there other times, other than
7  those three occasions that you and I have
8  talked about already?
9      A    Those are the occasions I'm talking
10  about.
11      Q    Are there any others?
12      MR. BRANTLEY: That's what she's
13          given you.
14      MR. WALDING: I want to know if
15          there are more than the ones
16          we've talked about, Tom, so I
17          can cover them also.
18      MR. BRANTLEY: Well, this
19          transcript is --
20      A    Those are the three that --
21      MR. BRANTLEY: Excuse me. Excuse
22          me. Let me object.
23      THE WITNESS: I'm sorry.
24      MR. BRANTLEY: This transcript is
25          going to come out of your

300

1          question with you saying, "Tell
2          me all the times you've been
3          intimidated." Now, if she
4          doesn't go back and list all of
5          them under your question,
6          you're going to say she didn't
7          say that at the deposition.
8      MR. WALDING: I'm taking issue with
9          her statement that there were
10          frequent threats. She told me
11          about three incidents. And I'd
12          like to know if there are more
13          than the three. If there's
14          more than those three, let's
15          talk about them.
16      A    As far as I recollect, there were
17  three specific times. Okay?
18      Q    Okay. And you're listing --
19      MR. FAULK: Are you through with
20          your answer? I couldn't tell
21          whether you were hiccuping or
22          fixing to say "however."
23      A    I'm trying to come up with some
24  other ones for the other -- you know, I can't
25  come up with all of them, because of the

301

1 it was a two-month period.  And, you know, my
2 memory is pretty darn good, but it's not
3 perfect.  Okay?
4     And, you know, when Mr. -- I can give
5 you another example.  When Mr. -- I go to Mr.
6 Andrews because, when I interviewed with him
7 -- my husband happened to see him one day,
8 and, oh, you're so-and-so's dad.  Because my
9 son, one of my sons, played ball with his
10 son.  Okay?  So, we were acquainted barely.
11 Okay?
12     So, when I have a conversation with him,
13 and he says, "You come to me.  If you have
14 any problems whatsoever, you come to me."
15 And I said, "Fine," not anticipating anything
16 at all.  You know.  But when he told me to do
17 that, I did that.
18     But the next thing you know, he's
19 sending all these -- or sending this one
20 particular message to -- fax to Ms. Parris,
21 with, you know, items that he perceived to be
22 a problem, after he called in Ms. Ezell and
23 Mr. Strange.  You know.  If that isn't
24 collusion, I'm not sure what is.  You know.
25    Q    That's what you're referring to?

302

1    A    Those types of things are what I'm
2 referring to.
3    Q    All right.  My question was, tell
4 me what were these intimidation tactics.
5 Okay?  And I'm trying to be fair.
6    A    And I explained some of these.
7    Q    Yes, ma'am.  If I could finish my
8 question.
9    A    Certainly.
10    Q    You have identified for me Ms.
11 Ezell mentioning Sandy Jones, and them being
12 friends of some kind.  Right?
13    A    Uh-huh.  That's correct.
14    Q    You've mentioned that you walked
15 down the hall, and Mr. Pitchford glared at
16 you.
17    A    Correct.
18    Q    You've mentioned the incident about
19 Starla, the psychometrist, asking you to sign
20 papers, and Mr. Strange being there.
21    A    Correct.
22    Q    You've mentioned the perceived
23 threats by Pam Parris that you would fail
24 your internship.
25    A    Correct.

303

1    Q    And now you've mentioned Mr.
2 Andrews' letter that he sent to Pam Parris.
3    A    Correct.
4    Q    Are there any other incidents or
5 occurrences that you're referring to when you
6 say "intimidation tactics"?
7    A    When I started having to use the
8 notebook, the log, Ms. Ezell, in front of the
9 class, says, "Hey, you know, what's this
10 about Pitchford keeping track of you?"  And I
11 had to explain to her, you know, what was
12 going on.
13     I mean, it was an intimidation thing
14 where, oh, I know this is going on, because
15 -- the only person that I can think of who
16 would have told her would be either Strange
17 or -- Mr. Strange or Mr. Pitchford.
18     And that's fine and dandy to tell,
19 inform, because they only saw me as an
20 intern, not as a professional teacher with
21 the same respect that they ought to -- I
22 mean, I had gone through all my course work
23 except for the internship itself.  So, a
24 first-year teacher should have gotten more
25 respect, and not had to put up with the

304

1 intimidation items, you know, little comments
2 and that sort of thing, that they would make.
3    Q    Okay.  Are there any other?
4    A    At this time, I can't think of
5 anything.
6    Q    What would you do to refresh your
7 memory?
8    A    Maybe take a break.  I don't know
9 how long it will take, though.
10    Q    Is there a specific document you
11 might look at to refresh your memory?
12    A    There are lots of documents to go
13 through for specifics.  I don't know what to
14 tell you.
15    Q    Yes, ma'am.  I asked if there was
16 something specific you could look at that it
17 might refresh your memory.
18    A    I don't know specifically.  I can't
19 think of anything specifically, right this
20 minute.
21    Q    All right.  Can you tell me what,
22 if anything, Kenneth Lord did that you think
23 violated your rights to free speech?
24    A    I'm not sure how to answer that
25 question.

305

1    Q    You've yet to mention his name all
2  day long.
3         MR. FAULK:  Well, I think she
4              testified about a letter he had
5              signed.
6         MR. WALDING:  I agree with you.
7              It's an exhibit.
8    Q    Ma'am?
9    A    He sent a letter --
10   Q    Sent a letter?
11   A    -- terminating my employment.
12   Q    Okay.  So, other than that letter,
13 did Kenneth Lord do anything that you think
14 violated your rights to free speech?
15        (Brief off-record.)
16        MR. FAULK:  Were you asking what
17             Kenneth Lord did to violate her
18             free speech rights?
19        MR. WALDING:  Kenneth Lord.
20        MR. FAULK:  We object to the form.
21        MR. WALDING:  Very well.
22   Q    Ma'am?
23        MR. FAULK:  To the extent that it
24             calls for a legal conclusion.
25             Now, if she can tell you

306

1              something, fine.
2    Q    Do you have any information about
3  Kenneth Lord doing anything that you think
4  violated your right to free speech?
5    A    At this time, I have no knowledge.
6    Q    I want to know what's in your head.
7  Anything --
8    A    I haven't --
9    Q    -- about Kenneth Lord?  You
10 understand you've sued Kenneth Lord?
11   A    Yes.
12   Q    Okay.  What did he do to violate
13 your rights to free speech?
14        MR. FAULK:  Object to form.
15   Q    He's just objecting for the record,
16 Mrs. Miller.  You can answer that question.
17   A    I personally do not know.  I don't
18 know the law of the First Amendment.
19   Q    All right.  You don't know.
20        MR. BRANTLEY:  She said she didn't
21             know the law.
22        MR. WALDING:  Well, I would agree
23             with that.  She's not a lawyer.
24             But she is the plaintiff in
25             this lawsuit.

307

1    Q    What has Riley Joe Andrews done
2  that you believe violated your right to free
3  speech?  Is that the letter that he sent to
4  Ms. Parris?
5    A    I think that is.
6         MR. FAULK:  Same objection.
7    Q    Anything else that Riley Joe
8  Andrews has done?
9         MR. FAULK:  Same objection.
10   A    Not to my knowledge at this time.
11   Q    Is there some document or
12 information you could look at to refresh your
13 memory, that might change what you've just
14 told me?
15   A    Not that I know of.
16   Q    All right.  Tim Pitchford.  What
17 has he done to violate your rights to free
18 speech?
19        MR. FAULK:  Same objection.
20   A    The items that I reported to him, I
21 did report, but as a result, I believe that
22 he was responsible for having my internship
23 terminated.
24   Q    Now, you told me earlier that your
25 internship was academically withdrawn.

308

1    A    That's correct.
2         MR. BRANTLEY:  Administratively.
3         MR. WALDING:  I'm sorry.
4    A    Administratively.
5    Q    Administratively withdrawn.
6    A    Administratively withdrawn.  But
7  Pam Parris -- I'm using Pam Parris'
8  terminology.
9    Q    Yes, ma'am.  And you told me
10 earlier that Dr. Sandra Jones made that
11 decision.
12   A    That's correct.
13   Q    What evidence or information do you
14 have that would connect Tim Pitchford with
15 this decision made by Sandra Jones to
16 terminate or administratively withdraw your
17 internship?
18   A    Because Ms. Parris said that Mr.
19 Pitchford would be the person to decide
20 whether he wanted me in that school or not.
21   Q    Okay.  How does that connect you to
22 the internship?
23        MR. BRANTLEY:  Object.  We haven't
24             taken his deposition yet.
25        MR. WALDING:  I'm asking what this

309

1  lady knows. That's what I'm
2  entitled to do, Mr. Brantley.
3  A    Would you repeat the question,
4  please?
5  Q    I don't know that I can, Mrs.
6  Miller. I'll try, or this lady can.
7       (Whereupon, requested portion of
8       record read back by the court
9       reporter.)
10  A    How did Mr. Pitchford connect me to
11  the internship?
12      MR. WALDING: Let's go back to the
13      question before that.
14      (Whereupon, requested portion of
15      record read back by the court
16      reporter.)
17  A    It would be my logical way of
18  thinking that if my internship was
19  terminated, that Mr. Pitchford had made some
20  sort of a request or had some influence in
21  that decision.
22  Q    Okay. And do you know for a fact
23  that he made that request or had some
24  influence in that decision?
25  A    I don't know for a fact.

1  please?
2  Q    Tell me how he violated your rights
3  to free speech, Paul Strange?
4       MR. FAULK: Same objection.
5  A    As I understand the question, I
6  would have to say that it was the same way
7  that Mr. Pitchford was able to influence -
8  Q    The decision Dr. Jones made?
9  A    Yes.
10  Q    Okay. And do you have any direct
11  knowledge or information that Mr. Paul
12  Strange actually influenced the decision that
13  Dr. Sandra Jones made?
14  A    I would pretty much believe that
15  one of the exhibits that you showed here -
16  in fact, there are two exhibits that we have
17  that indicate that he could very well have
18  been partially responsible. Yes.
19  Q    Okay. You're talking about
20  Defendant's Exhibit 18?
21  A    Yes. That's one of them. Uh-huh.
22  Q    What is the other?
23  A    I don't -- I've not seen it here
24  today. But there's another communication
25  Q    A communication between Paul

310

1  Q    How did Paul Strange violate your
2  rights to free speech?
3  A    The same sort of thing. As my
4  mentor and cooperating teacher, he had the
5  ability to go to Ms. Parris and say whatever
6  he wanted to say.
7  Q    In other words, he had the right to
8  free speech that you filed your very lawsuit
9  about?
10      MR. FAULK: Object to the form.
11  Q    Would you agree? Does he enjoy the
12  same rights under the United States
13  Constitution that you do, Mrs. Miller?
14      MR. FAULK: We'll stipulate that
15      Mr. Strange has a right to free
16      speech. That doesn't include
17      defamation and that sort of
18      thing.
19      THE WITNESS: Thank you.
20      MR. WALDING: Certainly. Thank
21      you, Mr. Faulk, for your
22      speech. There is a tort of
23      defamation.
24  Q    Yes, ma'am?
25  A    Could you repeat the question,

311

1  Strange and Dr. Sandra Jones?
2  A    I don't know that it's Sandra
3  Jones, per se. I don't know who it was to,
4  because it did not indicate -- on the
5  paperwork I saw, it didn't indicate to whom
6  it was sent, to my recollection. It was just
7  a list from Mr. Pitchford, Mr. Strange and, I
8  believe, Ms. -- I believe Ms. Towns. Yes.
9  It was Ms. Towns.
10  Q    A list of what?
11  A    Professional comments.
12  Q    Okay. And do you possess a copy of
13  this list?
14  A    I don't right this minute. But it
15  was part of --
16      MR. BRANTLEY: Initial disclosures?
17  A    -- the initial disclosures from
18  either Houston County or from Troy
19  University.
20      (Whereupon, Defendant's Exhibit 30
21      marked for identification.)
22  Q    If we could go back. I'll show you
23  what I've marked as Defendant's Exhibit No.
24  30. Is that the document that you're
25  referring to?

313

1    A    That is correct. I don't know who
2    this was sent to. I don't know.
3    Q    As you sit here today, do you know
4    for a fact that Defendant's Exhibit 30, or a
5    copy of it, was sent to Dr. Sandra Jones?
6    A    This was in my file at school. So,
7    I don't know if it was specifically given to
8    her. I don't know that for a fact.
9    Q    Okay. Do you know for a fact that
10   Dr. Sandra Jones reviewed Defendant's Exhibit
11   30 before making her decision to terminate or
12   administratively withdraw your internship?
13   A    I don't know for a fact.
14   Q    Tell me what Stacey Ezell did to
15   violate your right to free speech?
16        MR. FAULK: Same objection.
17   A    She also was part of the exhibit
18   right there.
19   Q    That's Defendant's 18?
20   A    That's correct.
21   Q    Anything else?
22   A    At this point, not that I can think
23   of.
24   Q    Is there some document or piece of
25   information you would look at to refresh your

314

1    memory?
2    A    I don't know.
3    Q    I'm sorry?
4    A    I don't know. I can't recall if
5    there was another document or not. I have a
6    lot more documents than this, you know, from
7    the initial disclosures. So, there could be
8    something, but it would take a while to find.
9    Q    All right. Tell me, in your own
10   words, how you've been hurt or damaged by
11   what you say the defendants have done wrong?
12   A    Well, number one, I did not get to
13   complete my internship with my other fellow
14   classmates. It was embarrassing to -- if I
15   did happen to see them out in public, and
16   they said, "Well, you know, what happened?
17   You know. Did you graduate? Are you working
18   somewhere," that sort of thing. And I had to
19   tell them, "No. I have to have another
20   internship."
21        I ended up having to spend quite a bit
22   more money. I didn't have to actually pay
23   for tuition or books or anything. But, of
24   course, extending another internship ends up
25   to be more expensive. I didn't have the

315

1    income that one expects when they're hired as
2    a teacher. Of course, that was the way it
3    goes.
4         When I was able to go trough the next
5    internship, Dr. Morin had called Beverlye
6    Middle School and said that I had had a
7    problem with my previous internship, and that
8    -- could I go there.
9         Actually, Ms. Parris had set up a
10   different internship with me over at
11   Northview High School, but for some reason or
12   other, that didn't work out, so she arranged
13   -- either she or Dr. Morin -- I'm not sure
14   who it was. But it's my understanding that
15   Dr. Morin talked to the principal and the
16   vice principal and asked if I could be an
17   intern there, and they said "yes." But as
18   soon as I had my first conference with them,
19   they asked me, you know, "What kind of
20   problems did you have?"
21        So, you know, I mean, it's, like,
22   totally embarrassing, humiliating, not to
23   have gone -- gotten to graduate and all. It
24   was embarrassing to my family. I was
25   embarrassed to my family because, you know, I

316

1    had gotten all these "A's," all these "B's."
2    You know. I graduated magna cum laude.
3         And I had substituted in Dothan City
4    Schools and been well received, well liked.
5    My husband is at ROTC in Dothan High School.
6    I'm known as Major Mom and Momma Miller and
7    that sort of thing. I get along with the
8    teachers there. You know. I get along with
9    the students there. I get along with,
10   generally, most people.
11   Q    Yes, ma'am.
12   A    But to --
13   Q    If you could focus on my question,
14   please.
15        MR. BRANTLEY: That's what she's
16        doing.
17   A    Embarrassment is part of the
18   question, is my opinion, I believe.
19   Q    Let me take issue with what your
20   lawyer just said. You're sort of focusing,
21   but not really. What you're saying is that,
22   one way that you've been hurt or damaged by
23   what you say the defendants did wrong to you
24   is that you were embarrassed?
25   A    And humiliated. Yes.

317

1  Q   Okay. Good.

2  A   I was intimidated. I'm 53 years

3  old now. At the time, I was around 50. And,

4  you know, for a 50-year-old woman who has,

5  you know, helped do all kinds of community

6  service projects for the police department

7  and the fire department and all these

8  different places, and for the association of

9  realtors and that sort of thing, I mean, it's

10  humiliating to have all this sort of thing

11  happen, all because somebody is trying to

12  shut you up because you're talking -- you're

13  advocating for students.

14  Intimidation. I felt -- I honestly felt

15  intimidated by some of the things that were

16  going on. The glaring. My husband and I

17  went to a football game. And even my husband

18  was shocked at the way Mr. Pitchford behaved.

19  I mean, he said "Hello" and shook hands.

20  But, I mean, you know, he kept looking over.

21  And, you know, my husband just couldn't

22  understand that.

23  Even when I applied at Beverlye Middle

24  School for the job that came open, they asked

25  me again, you know, "How's things going, you

318

1  know, with this lawsuit?" You know, at the

2  time, the lawsuit hadn't been filed. But,

3  you know, I don't know if Dr. Morin mentioned

4  something about it or, you know, the

5  possibility or something like that. But it's

6  haunting me. Let's put it like that. I

7  mean, it's haunting me everywhere I go.

8  I am no longer at Beverlye Middle

9  School. I'm looking for a job. And I went

10  to Girard Middle School and interviewed with

11  Greg Yance. And the first thing out of his

12  mouth was, "Well, Mrs. Miller, I understand

13  you've got a lawsuit." You know. I mean,

14  that is ridiculous.

15  Q   Your lawsuit is haunting you?

16  A   The lawsuit -- the fact that I had

17  to resort to something like this to draw

18  attention to inappropriateness, illegal

19  things that are going on at that high school.

20  And if it's happening at that high school,

21  I'm afraid it possibly could be happening at

22  other schools in that Houston County area.

23  So, if I don't do something, I'm part of the

24  problem. And I accept that. But it makes me

25  sick, I mean, literally sick to my stomach.

319

1  Q   What does?

2  A   The way they treated me. I went in

3  there as an intern, so excited about having

4  the opportunity to teach these special ed

5  kids. And it's like they didn't care about

6  the kids' education. If they cared about

7  their education, they would do the right

8  thing and have the correct type of IEP that

9  they need for those students. They need to

10  have services for those students.

11  And so, it just makes me literally sick.

12  Tears, okay, for the past two years. I get

13  very emotional because I think to myself,

14  what if this had been my child? What if my

15  children had special education needs, and

16  they were not getting the treatment that they

17  needed? What if they were being ridiculed?

18  Okay?

19  Americans with Disabilities Act says

20  you're not supposed to ridicule students.

21  You know. They're entitled to have an

22  appropriate education. Teachers are

23  appropriately to be looked as advocates

24  for these students, because there's nobody

25  else that's going to do anything for them. A

320

1  teacher needs to stand up for these kids, and

2  that's what I did.

3  And I'm just glad that I was not a young

4  intern who was easily malleable and so

5  frightened that they were going to fail their

6  internship that they didn't speak up. I'm

7  glad it was me. I'm glad it was me.

8  Q   So, then, all of this is a good

9  thing.

10  A   I want to make sure that these kids

11  get an education. And I worry today -- I

12  still worry about the students that were on

13  my rolls and the students that I was in

14  classes with and knew to say "Hi." I'm

15  worried about how they've been able to cope,

16  what did they learn.

17  Q   All right. My question was, how

18  have you been -- you, personally, how have

19  you been hurt or damaged by what you say the

20  defendants in this case did wrong, which is

21  to violate -- allegedly violate your rights

22  to free speech.

23  You've told me that you didn't complete

24  your internship with your class, and that

25  that was embarrassing to you.

321

1     A     That's correct.

2     Q     You did complete your internship,
3    however?

4     A     Eventually, yes.

5     Q     And you did eventually graduate
6    from college?

7     A     Eventually, yes.

8     Q     And you did eventually receive your
9    teaching certificate?

10     A     That's correct.

11     Q     Okay. You told me that you were
12   embarrassed when people ask about your
13   lawsuit.

14     A     Yes. And Mr. Yance, Greg Yance,
15   told me that he was glad that the person who
16   called him recommending me had called, but
17   that, you know, he would have to take into
18   consideration what's best for his school.

19     So, the lawsuit -- you know, in my
20   opinion, that statement or something similar
21   to what, you know, he actually said there,
22   was an indication to me that I'm going to
23   have a problem -- I might have a problem
24   getting a job.

25     Q     Might?

322

1     A     Might.

2     Q     All right. Are you aware, Mrs.
3    Miller, that your lawsuit is a public record
4    and public document?

5     A     Yes.

6     Q     Okay. You told me another way that
7    you've been hurt or damaged was that you had
8    to spend more money, but then you also said
9    you didn't have to pay any tuition or books
10   for your internship.

11     A     That's correct.

12     Q     Okay. Tell me about this money
13   that you're talking about. What money are
14   you talking about?

15     A     Well, out of my husband's pay,
16   rather than a paycheck that I would be
17   getting -- I have the habit of purchasing
18   things for my students. And so, rather than,
19   you know, purchasing them with my money that
20   I've made from a job, I've asked him if he
21   minds that I go ahead and spend some of the
22   money on resources and that sort of thing for
23   the students.

24     Q     Okay. So, you essentially either
25   got money from your husband or borrowed money

323

1    from your husband to spend on your children
2    that were involved in this second internship?

3     A     Yes.

4     Q     How much money are we talking
5    about?

6     A     I didn't keep track.

7     Q     Give me your best estimate?

8     A     Probably at least a couple of
9    hundred dollars.

10     Q     What else do you mean when you're
11   talking about money? Anything else?

12     A     Basically, lack of money. You
13   know. I had three kids in college, and I
14   have things to pay for. So, you know, I
15   anticipated having a little bit of income to
16   help pay for those -- for my college, as well
17   as my children. I still have a student loan
18   that, you know, I have to pay.

19     Q     Let me make sure I understand this.
20   Let's assume that your internship had gone
21   just perfectly. Were you guaranteed a job
22   after your internship?

23     A     No, not necessarily.

24     Q     Okay. So, what money are you
25   talking about?

324

1     A     Well, I've already told you.

2     Q     You said a couple of hundred
3    dollars, but --

4     A     And then, I would have to go to the
5    school and back and that sort of thing. Just
6    normal expenses for another internship.

7     Q     Okay. Can you give me your best
8    estimate of how much you're talking about?

9     A     Probably a total of -- I don't know
10   for sure, but I'll just say $500.00.

11     Q     All right. Are there any other
12   ways that you've been hurt or damaged by what
13   you say the defendants have done wrong other
14   than these things we've already talked about?

15     A     At this time, I just can't think of
16   anything.

17     MR. WALDING: Okay. And I pass the
18       witness.

19     (Recess in deposition.)

20

21       EXAMINATION

22

23   BY MS. HORTBERG:

24     Q     Mrs. Miller, I didn't get a chance
25   to introduce myself earlier. My name is Kate

325

1   Hortberg, and I'm the attorney for Paul
2   Strange and Stacey Ezell.  And I have the
3   same ground rules that Mr. Walding went over
4   with you earlier.  And you understand that
5   you're still under oath?
6       A    Yes.
7       Q    Okay.  I just have some follow-up
8   questions for you about some information that
9   you've already provided earlier today.
10      During your day at Houston County High
11  School, when you were an intern there, was
12  your day split up into the same blocks that
13  the students' day was split up into?
14      A    Yes.
15      Q    So, their first block was also your
16  first block?
17      A    That's correct.
18      Q    And whose class were you in during
19  first block?
20      A    I had planning at that point in
21  time.
22      Q    And how long is a block?
23      A    90 minutes, approximately.
24      Q    And is your 90 minutes of your
25  planning period spent in your resource room?

326

1       A    Not necessarily.  Some days, yes.
2   Not others.  I had a list of teachers that I
3   needed to cover their special ed students in
4   there.  If they had a test, they could come
5   into the -- special ed students could come
6   into my resource room and take the test, or
7   sometimes I'd go visit the teachers to see if
8   they were having a problem or, you know, take
9   something that they might need.
10      Q    Would those be your typical
11  teachers that you would also be going to
12  their rooms later in the day, or these would
13  be different teachers?
14      A    Different teachers.
15      Q    Okay.  During the time that you
16  were an intern at Houston County High School,
17  were you covering the 11th and 12th grade
18  special education students?
19      A    If I remember correctly, I had 10th
20  -- 9th, 10th, 11th and 12th grade students on
21  my roll.  I actually covered some of the
22  other students that were on the rolls of, if
23  I remember correctly, Mr. Payne and Mr.
24  Strange.
25      Q    But I believe you testified earlier

327

1   you only had between 19 and 22 students on
2   your roll?
3       A    On my roll.
4       Q    Going back to that planning period
5   you had first block.  Would that also be one
6   of the times that you would have your
7   meetings with Mr. Strange that you discussed
8   with us earlier?
9       A    Yes.  If he was available, yes.
10      Q    Okay.  And so, you had that first
11  block available every day on your schedule
12  as your planning period?
13      A    Correct.
14      Q    So, you and Mr. Strange would just
15  coordinate which of those -- you know, which
16  day during the week you all could meet, and
17  it might be during your first block planning
18  period?
19      A    Correct.
20      Q    And just in coordination with his
21  schedule?
22      A    Correct.
23      Q    Second block, whose class were you
24  in?
25      A    That would have been -- let me

328

1   think -- Ms. Sims' class.
2       Q    English?
3       A    Yes.  Or Ms. Ezell's class.
4       Q    Science?
5       A    Correct.
6       Q    Were there particular grade levels
7   in the English class?  Was it, like, 9th
8   grade English or composition or --
9       A    Gosh.  I don't recall.  I'm sorry.
10      Q    What about the science class, Ms.
11  Ezell's second block?  Was it a particular
12  grade level?
13      A    Again, I don't recall.
14      Q    Okay.  Was there a reason why you
15  weren't specifically designated to be in Ms.
16  Sims' class every day during second block?
17      A    Because there were a number of
18  special ed students in her class as well as
19  Ms. Ezell's class.  So, we needed to serve as
20  many as possible.  So, that was the way they
21  asked me to take care of my teaching for that
22  second block.
23      Q    Okay.  And then, third block, whose
24  classroom were you in?
25      A    Ms. Towns.

329

1   Q   She's math?
2   A   Math.  Uh-huh.
3   Q   And she's the class where you had
4 at least one of your evaluations by
5 Dr. Ruediger?
6   A   Dr. Ruediger.  Yes, that's correct.
7   Q   And then, fourth block, whose class
8 were you in?
9   A   Ms. Ezell's.
10   Q   Science?
11   A   Yes.
12   Q   Do you remember the grades that
13 were in that class?
14   A   I know one of the students was
15 classified as a senior.  I believe the other
16 one might not have been a senior.  I'm not
17 really sure.
18   Q   Okay.  The math class, was it a
19 particular grade level?
20   A   I don't recall that, either.  But
21 the majority, if not all of -- the majority
22 of students, I believe, in that class, were
23 on my roll.  And, again, I had 7th, 8th, 9th
24 and 10th.  So, I know that's -- the classroom
25 of Ms. Towns was basically all special

330

1 education students.
2   Q   Okay.  I believe you testified just
3 a few minutes ago that you had 9th through
4 12th graders on your roll?
5   A   That's correct.
6   Q   And then, now, you just said you
7 had 7th, 8th, 9th and 10th.
8   A   I apologize.  That was a mistake.
9 It's 9th, 10th, 11th and 12th.
10   Q   Okay.  Were there only four blocks
11 in a day?
12   A   Yes.
13   Q   Would the third block be the block
14 that you had your lunch period, also?
15   A   That is correct.
16   Q   So, that was sort of a split class?
17   A   Correct.
18   Q   So, the three teachers to whom you
19 were designated as sort of being assigned to
20 their classrooms during the day were Sims,
21 Towns and Ezell?
22   A   Yes.
23   Q   Then, your first period, you might
24 float between other teachers?
25   A   Correct.

331

1   Q   Or you might stay in your resource
2 room, and teachers would send students to
3 you?
4   A   Correct.
5   Q   And in all four of those blocks,
6 you were -- I think your term has been
7 essentially servicing or, I mean, teaching
8 special education students?  Correct?
9   A   Uh-huh.  I was in the role of a
10 collaborative special education teacher.  And
11 the general education teacher gives the
12 actual lesson, and then, I help the students.
13 On the days that I was designated to have an
14 observation, I would actually teach the
15 class.
16   Q   Okay.  And then, also, not only
17 being in the classroom as part of your
18 collaborative effort with the classroom
19 teachers, you also assisted the classroom
20 teachers by allowing the students who, I
21 assume, needed the accommodation, to be sent
22 to the resource room to take a particular
23 test?
24   A   That's correct.
25   Q   Would they come into the resource

332

1 room to do other things besides taking the
2 test?
3   A   Sometimes I would bring students in
4 to -- like, if Ms. Ezell had an assignment --
5 let me back up.  Did you actually mean just
6 first block?
7   Q   No, ma'am.  Any time during the
8 day.
9   A   Okay.  Good.  No.  There were times
10 when I would take students out of Ms. Ezell's
11 class to work on assignments, to read some of
12 the material, because some of them could not
13 read well, and that sort of thing.  What
14 else?  Generally just help the students.
15 Now, Ms. Towns' class, I didn't do that
16 initially.  It wasn't until -- let me think.
17 I want to say it wasn't until after
18 September, when I went to Mr. Andrews, that I
19 was requested to start taking students out of
20 Ms. Towns' class.
21   Q   And you took them to your resource
22 room to help them there?
23   A   Right.
24   Q   All of these activities you've just
25 discussed with us about how you assisted the

**333**

1 special education students, they were
2 accommodations that were being made as part
3 of those students' educations?  Correct?
4      A    That's correct.  The interesting
5 thing about that, though, is that the
6 accommodations that I was told to help
7 provide were not listed in the IEP's.
8      And for instance, like, R. S., it's my
9 understanding that since there was no IEP in
10 her file from January through October, that
11 was a legitimate, legal document, that,
12 technically, she shouldn't have been
13 serviced, because there was no legal
14 documentation.
15      Q    I believe you said earlier, though,
16 there was something that was signed by her
17 mother, asking for some accommodations to be
18 made on her behalf?
19      A    Correct.  But that expires.
20      Q    Ma'am, but there was -- the
21 question was, there was such a document in
22 existence in your file on behalf of R.?
23      A    Yes.  Dated January of '05, I
24 believe it was.
25      Q    In talking about documentation, you

**334**

1 testified earlier that Starla Smith asked you
2 to sign three documents on behalf of two
3 students, and you did not get a chance to
4 look at those.  You essentially just told
5 her, "No, I will not sign those"?
6      A    She told me that --
7      Q    Ma'am --
8      A    I'm sorry.
9      Q    -- I've only got 45 minutes, so I'm
10 just trying to kind of consolidate it all
11 down.
12      A    Could you repeat that again?
13      MS. HORTBERG:  Can you read it
14          back?
15      (Whereupon, requested portion of
16          record read back by the court
17          reporter.)
18      Q    Is that correct?
19      A    That's correct.
20      Q    Okay.  So, you don't have any
21 specific knowledge of who actually signed
22 those documents?
23      A    No, I don't.
24      Q    Okay.  You don't know whether they
25 had already been signed by someone else on

**335**

1 behalf of the special education teacher?
2      A    I don't know.
3      Q    I believe you testified earlier
4 that Paul Strange was your mentor, and you've
5 also described him, at some point, as a paid
6 mentor.  But you don't have any specific
7 personal knowledge that Mr. Strange ever
8 accepted payment to be your mentor, do you?
9      A    I know that there was a contract
10 with -- if I remember correctly, offered to
11 Mr. Strange on, I believe, the day that Ms
12 Parris came.  It was a small amount.
13      But, then, I was at a special education
14 meeting, if I remember correctly, at central
15 office, and I believe it was there that a
16 mentor program was talked about for the
17 teachers who were cooperating teachers.  And
18 it was through some sort of an organization
19 for mentors.  And if I remember correctly,
20 they indicated that the person -- the persons
21 were going to receive $500.00.
22      Q    My question was, you don't have any
23 personal knowledge that Paul Strange ever
24 accepted any monitory compensation for being
25 your mentor, do you?

**336**

1      MR. BRANTLEY:  Well --
2      MS. HORTBERG:  My question is --
3      MR. BRANTLEY:  I object.
4      MS. HORTBERG:  I understand all of
5          her background that she just
6          gave me, but she didn't answer
7          my particular question.
8      MR. BRANTLEY:  I disagree.  I think
9          she did answer it.  I think the
10          -- you're just calling for a
11          "yes" or "no" on everything,
12          without explanation?
13      MS. HORTBERG:  No.  I'm just asking
14          her to answer that question.
15      MR. BRANTLEY:  Personal knowledge?
16      MS. HORTBERG:  Yes.  Does she have
17          any personal knowledge that
18          Paul Strange ever received any
19          sort of monetary compensation
20          for being her mentor.
21      MR. BRANTLEY:  She just answered
22          that.
23      MS. HORTBERG:  Okay.
24      Q    So, "no" is your answer?  You don't
25 have any personal knowledge that he ever

337

1  received --
2      MR. BRANTLEY:  Well, I would say
3          she does have personal
4          knowledge.
5      MS. HORTBERG:  She has personal
6          knowledge that there was money
7          being offered to some mentors.
8          But whether or not Paul Strange
9          accepted that money, no, sir,
10         she did not answer that she had
11         personal knowledge of that.
12     MR. FAULK:  Why don't we just cut
13         through.  I mean, do you have
14         any knowledge other than what
15         you've already told Ms.
16         Hortberg?
17     THE WITNESS:  No.
18     Q   (By Ms. Hortberg)  And I believe
19  you testified earlier that Paul Strange and
20  you coordinated to meet on a regular basis,
21  and you all just got together on your
22  schedules to do that, and that he also sat
23  down with you one day to discuss how to
24  prepare an IEP?
25     A   Yes.

338

1      Q   Okay.  What other sorts of things
2  did you and Mr. Strange discuss as far as his
3  mentoring you as a special education teacher?
4      A   One day, he had me come into his
5  room, and he was doing a math lesson.  I
6  believe it was for Ms. Pitchford's class,
7  some of the students in Ms. Pitchford's
8  class.  And I would observe that sort of
9  scenario.
10         (Brief off-record.)
11     A   We discussed, not in great detail
12  or anything, how to write lesson plans and
13  that sort of thing.  When I was in school, we
14  wrote lesson plans, but they were specific
15  things.
16         And in this scenario, I wasn't given any
17  kind of lesson plans or anything on a regular
18  basis until we were able to work that out
19  with the teachers, requesting that sort of
20  thing.  So, he would try to show me what
21  needed to be included in a lesson plan and,
22  you know, things like that.
23     Q   Okay.  And he also did that
24  evaluation of you?
25     A   Yes.

339

1      Q   And did you all have the same sort
2  of debriefing after that evaluation that you
3  had with Dr. Ruediger?
4      A   Mr. Strange and I, yes, we would --
5  to my recollection, we would talk about the
6  observation.
7      Q   Okay.  And I believe, of the two
8  or of the three evaluations that you had
9  during the course of your internship, Mr.
10  Strange was the one that gave you the highest
11  ratings?  Correct?
12     A   Yes, I believe so.
13     Q   And none of those observations,
14  either by Dr. Ruediger or by Mr. Strange,
15  ever occurred in Stacey Ezell's class?
16  Correct?
17     A   That's correct.
18     Q   Do you know whether Dr. Ruediger
19  ever spoke with any of the other teachers
20  beyond the teacher in whose class you were
21  doing the teaching, as part of his
22  evaluation?
23     A   No.  But I do know that he
24  conferenced -- the day that he came after I
25  had visited central office, he conferenced

340

1  with Mr. Pitchford during our lunch break.
2  That's what he told me he was going to do.
3      Q   Okay.  But, I guess, going back to
4  that original question, the day that
5  Dr. Ruediger came to evaluate you in Ms.
6  Towns' math class, as part of that evaluation
7  or as part of his rating, was he going to
8  talk to Ms. Sims or Ms. Ezell about your
9  teaching in their classes?
10     A   No.  It was my understanding that
11  it's only the observation done on that
12  particular day, at that particular time.
13     Q   And not in conjunction with any
14  input from any of the other teachers?
15     A   Correct.
16     Q   Okay.  And I know we've gone on ad
17  nauseam about your discussions with various
18  people about your concerns about alleged
19  deficiencies with the special education
20  program at Houston County High School.  Did
21  you ever take those concerns to any Houston
22  County Board of Education meeting?
23     A   No.
24     Q   Did you ever take those concerns to
25  any public meeting?

1   A   No.

2   Q   Did you ever prepare a petition to
3   take out to the community to get them to sign
4   to join with you in your concerns about the
5   special education program?

6   A   No.  I was only there such a short
7   time, I felt that I could --

8   MR. FAULK:  The answer is "no."

9   THE WITNESS:  Okay.  No.  Thank
10   you.

11   MR. FAULK:  Sorry.

12   THE WITNESS:  It's okay.  Thank
13   you.

14   Q   Have you told us today all of the
15   people with whom you've spoken about your
16   concerns about the special education program
17   at Houston County High School?

18   A   To my recollection?

19   Q   Yes.

20   A   Yes, to my recollection.

21   Q   And you do not have any knowledge
22   about how the special education programs were
23   being administered at any other school within
24   the Houston County system.  Just the Houston
25   County High School where you were?  Correct?

342

1   A   I believe, if I remember correctly,
2   in our class work at Troy, some of the
3   students were already teachers, maybe getting
4   their master's degree or something like that.
5   So, they would indicate certain things about
6   how things were done at their particular
7   school.

8   Q   And what teachers were those?

9   A   Oh, my gosh.  I can't recall the
10   names from these classes.

11   Q   Do you know what schools they
12   taught at?

13   A   Actually, one was at Ashford, part
14   of Houston County.

15   Q   In what county?

16   A   Houston County.  Ashford School.

17   Q   And that's a special education
18   teacher there?

19   A   Yes.  I believe she was a dual
20   teacher.  I think she had her -- I believe
21   she had an elementary teaching degree and was
22   going, I believe, for her master's in special
23   education or something like that.

24   Q   Okay.  Any other teachers within
25   the Houston County system that you remember

1   from your Troy classes?

2   A   I just can't remember who else
3   might have been there.  I'm sorry.

4   Q   Do you have any plans currently --
5   I know that you testified earlier that you
6   are no longer employed by the Dothan City
7   School System.

8   A   At this point, uh-huh.

9   Q   Do you have any plans on suing
10   them?

11   A   Oh, heaven's, no.  Not at this
12   point in time.  No, I don't.

13   Q   Are you currently pursuing
14   employment elsewhere?

15   A   Yes.

16   Q   Okay.  In what systems are you
17   currently pursuing employment?

18   A   Dothan City.

19   Q   Have you applied for a particular
20   position with Dothan City Schools?

21   A   Yes.

22   Q   Which position is that?

23   A   Special education teacher at Girard
24   Elementary -- I'm sorry -- Girard Middle
25   School, and I've requested Dothan High

344

1   School.

2   Q   Previously, for the year and a half
3   that you were employed by Dothan City, you
4   were employed at Beverlye Middle School --

5   A   Right.

6   Q   -- as a special education teacher?

7   A   Yes.

8   Q   Has someone been employed at
9   Beverlye Middle School to take the position
10   that you held at that time?

11   A   I believe they're -- yes.

12   Q   And I'm assuming, when you were
13   nonrenewed by the Dothan City School System,
14   you were not given a reason for that
15   nonrenewal?

16   A   No.

17   Q   Have you ever told another teacher
18   that you were going to take down the Houston
19   County High School?

20   A   Heavens, no.

21   Q   You never said that?

22   A   Absolutely, no.

23   Q   During the time that you were at
24   Houston County High School as an intern, Paul
25   Strange never asked you to write an IEP?

345

1  Correct?
2      A    He came back to me and said, "Yes,
3  you'll need to write an IEP." And I reminded
4  him that my internship agreement says I can't
5  do that, legally speaking, in terms of, you
6  know, actually being responsible for the IEP.
7      Q    So, you did not ever prepare an IEP
8  while you were at Houston County High School?
9      A    Oh, no.
10     Q    Do you remember what day Mr.
11 Strange allegedly asked you this?
12     A    I told -- the original -- I was
13 approached originally on Wednesday. I think
14 I already gave the information. I can't
15 remember the date, right off, again. But,
16 then, the following Monday is when Mr.
17 Strange came back to me -- I'm sorry. I went
18 to him and told him what had happened. He
19 said he would get back with me.
20     It was either that same day or possibly
21 the next day, somewhere during that week, he
22 confirmed that we would have to write the
23 IEP. And she was on my roll, so --
24     Q    Going back to -- you're talking
25 about the Wednesday incident. Was that with

346

1  Cathy Keasler?
2      A    Yes.
3      Q    And you said that "we" had to go
4  back and do that. Did Mr. Strange actually
5  prepare some documentation for whatever
6  student it is you're referring to?
7      A    Eventually, yes. He had indicated
8  -- it was my understanding that he was
9  indicating to me that I would need to do
10 that. And then, when I reminded him of my
11 internship agreement --
12     Q    Then he took care of whatever
13 needed to happen?
14     A    Yes.
15     Q    How many special education students
16 off of your roll were in Ms. Sims' second
17 block class?
18     A    I'm not 100 percent sure. I would
19 probably say anywhere from probably five to
20 maybe even eight. It could be more.
21     Q    What about Ms. Ezell's second block
22 class? How many special education students
23 from your roll were in that class?
24     A    Oh, I'm sorry. That was what I
25 was --

347

1      Q    I asked you about Ms. Sims.
2      A    I'm sorry.
3          MR. FAULK:  That's what you asked
4          her.
5          MS. HORTBERG:  No. I asked about
6          Ms. Sims' class.
7      A    I apologize. That's my mistake.
8  Right offhand, I would probably say -- I'll
9  just stick with five to eight, I think. I
10 think that's safe to say.
11     Q    In both Sims' and Ezell's second
12 block classes?
13     A    Yes.
14     Q    Okay. All total, you only had 19
15 to 22 students on your roll? Correct?
16     A    That's correct. Let me think here.
17 Some of the students might possibly have been
18 on Mr. Strange's roll or possibly even Mr.
19 Payne's roll. I need to try to remember that
20 a little bit more clearly.
21     Q    Did you keep a copy of your roll?
22     A    I have no clue. I mean, I've not
23 located anything at this point in time.
24     Q    Have you looked?
25     A    I have looked for a lot of things.

348

1  Yes.
2      Q    And how many special education
3  students from your roll were in Ms. Towns'
4  math class?
5      A    Just about, I would say, all of my
6  students, if I remember correctly.
7      Q    So, Ms. Towns had between 19 and 22
8  students in that class, all of whom were
9  special education?
10     A    In the neighborhood of that. I
11 can't say specifically 19 to 22.
12     Q    What about Ms. Ezell's fourth block
13 science class? You said you remembered, in
14 particular, one student who was a senior in
15 that class. How many students from your roll
16 were in that class?
17     A    Two, that I recall.
18     Q    And what were those students'
19 names?
20     A    That was E. S. and A. M.
21     Q    Do you have a specific recollection
22 of any other students who were in any other
23 particular class?
24     A    Right offhand, not right this
25 second.

349

1  Q  Do you have a particular
2  recollection of the names of the 19 to 22
3  students that were in your class -- I mean,
4  that were on your roll?
5  A  Now, as part of one of the requests
6  for something, because it had the names of
7  the students, we declined to include that, I
8  believe.  But I do have a list.
9  Q  You do have a list?
10  A  Yes.
11  Q  So, assuming, once we get this
12  protective order entered, it should not be a
13  problem for you to come back and fill in the
14  names of those students in response to
15  whatever request that was?
16  A  That's correct.
17  Q  But you don't have any particular
18  documentation from the time you were at the
19  school about that?  That's just from your
20  recall now that you're going to provide that
21  list of students?
22  A  I was instructed not to turn a list
23  of students in because it was part of the
24  confidentiality thing.
25  Q  But I'm saying, is that a list that

350

1  you had at the time you were at Houston
2  County High School --
3  A  Yes.
4  Q  -- or is that something you've come
5  up with after the fact?
6  A  No.  That is a list of students
7  that I had from Houston County.
8  Q  Okay.  What else did you keep from
9  the days that you were an intern at Houston
10  County High School?
11  A  Just my schedule and the list of
12  students on all of our rolls, because we had
13  been trying to determine who needed to cover
14  what and that sort of thing.  I may have some
15  other things, but I just can't recollect what
16  they might be.
17  Q  Have you turned over everything
18  that you've found besides that list?
19  A  Yes.
20  Q  Are there other documents that you
21  have that contain names of students that you
22  have not turned over?
23  A  Not that -- I don't think, that,
24  you know, relate to this.
25  Q  Well, I would think that anything

351

1  related to the time that you spent at Houston
2  County High School is related to this
3  lawsuit.  So, if you have documents that you
4  think -- or that pertain to your time at
5  Houston County High School, could you turn
6  those over to your attorney?
7  A  Yes, I will.
8  (Whereupon, Defendant's Exhibit 31
9  marked for identification.)
10  MS. HORTBERG:  Let me introduce
11  this as Defendant's Exhibit 31.
12  Q  Have you ever seen that document
13  before?
14  A  Actually, yes.  I don't have a copy
15  of it.  That was one of them that I probably
16  wasn't able to print off.  But, yes.
17  Q  Are you the author of that e-mail
18  message or Blackboard message there?
19  A  Yes.
20  Q  And was that sent to all of the
21  students in your intern seminar?
22  A  Yes.  They had access to it.  It
23  wasn't actually sent to them, but they had --
24  I believe they could click on her name or my
25  response or whatever and -- yes.

352

1  Q  Did your professor and any other
2  administrator have access to that posting?
3  A  I'm sorry?
4  Q  Would your professor and/or any
5  other administrator from Troy have had access
6  to that posting, as well?
7  A  It's my understanding that only
8  Dr. Jones would have access to this.
9  Q  Okay.  And have you had a chance to
10  review your posting?
11  A  I haven't read the whole thing.
12  Q  Okay.  Why don't you take some time
13  and do that for me?
14  A  (Witness reviewing document.)
15  Uh-huh.  Okay.
16  Q  That posting seems to discuss one
17  teacher.
18  A  Uh-huh.
19  Q  And is that teacher Stacey Ezell?
20  A  Yes, it is.
21  Q  Was this a posting that you made
22  after that other posting that you made about
23  Ms. Ezell?
24  A  I would have to check the dates to
25  be sure.

353

MR. BRANTLEY: We haven't gotten
this. Can you make a copy of
this before we leave?

(Brief off-record.)

Q   What I was referring to a minute
ago were Defendant's Exhibit 10 and 11, where
you referenced a teacher in those. And you
testified earlier the teacher about whom you
were referencing was Stacey Ezell.

A   That's correct.

Q   What are the dates on 10 and 11
versus the one I just gave you, that he just
walked away with?

A   It was September 11th. So, this
was -- when we do our own, then we're
supposed to go in and have conversations and
respond to comments that those persons have
made.

Q   Okay. And the Amy that you
referred to -- well, I guess we have to wait
on him to bring that back.

A   It's Amy Deese.

Q   Okay. And she is currently
employed by the Houston County Board, at
Houston County High School?

354

A   Correct.

Q   Or she was --

A   She was.

Q   -- as of the time that you were
there?

A   That's correct. She was an
intern/contract teacher.

Q   Okay. Did you ever receive any
input from Dr. Jones about any of these
postings?

A   No, not personally, that I can
recall.

Q   I mean, "personally" being her
coming to you personally or --

A   That, or her sending me an e-mail,
that I can recall, that was directly from
her, saying anything. Not to my knowledge.
Not to my recollection.

(Off-record discussion held.)

Q   I just have one or two other quick
follow-ups. Do you have any -- and I'm not
talking about that any more, so we're done.

A   Okay.

Q   Do you have any personal notes or
that notebook or anything like that that

355

would show who was in attendance at all of
those meetings, beyond the documents that
we've gone through today?

A   Which meetings?

Q   Any of the meetings that we've
discussed today.

A   Oh, okay. Do I have any documents?

Q   Uh-huh.

A   Not that I know of.

Q   Okay. You've discussed a lot of
meetings today. And if there was not a
document associated with that meeting, are
you going by your own recollection of that
meeting to tell us who was in attendance at
that meeting?

A   Yes. For instance, like, when Ms.
Parris came and Mr. Andrews came. Yes.

Q   You don't have any notes or
anything in writing that actually evidences
who was present at those meetings? This is
just your recollection?

A   No, I don't. Yes, that's correct.

Q   Do you know how many special
education students were in the regular
classroom setting in Ms. Ezell's classroom

356

prior to the time that you became an intern
there?

A   No. I mean, the beginning of that
school year that I was there? Is that what
you're saying?

Q   No, ma'am.

A   Or the previous?

Q   Correct.

A   Okay. No, I don't.

Q   You don't have any knowledge about
the 15 years prior to the time that you came
to Houston County High School, how many
special education students were in her class
or how the special education program was
being administered in her class during those
15 years?

A   No, I don't.

(Brief recess.)


EXAMINATION


RESUMED BY MR. WALDING:

Q   Mrs. Miller, Defendant's 31, the
document that was just handed to you
earlier --

357

1   A   Yes.

2   Q   -- does that document say anything

3   about this concern that you had that some of

4   the students had no IEP's?

5   A   No.   That wasn't what the

6   discussion was about.

7   Q   Yes, ma'am.   Does that document say

8   anything about this concern that you had that

9   the IEP's were, in your opinion,

10   inappropriate and needed to be amended and

11   rewritten?

12   A   No.   It wouldn't be appropriate of

13   me to comment on that in this forum.

14   Q   That document doesn't say that,

15   though, does it?

16   A   No.

17   Q   Does that document say anything

18   about this alleged incident where Cathy

19   Keasler asked you to write an IEP?

20   A   No.

21   Q   And does that document say anything

22   about the fact that you were not permitted to

23   write IEP's because of your internship

24   agreement?

25   A   No.

359

1   MR. FAULK:   If we can agree on

2   that, I can tell the Court

3   tomorrow that we're withdrawing

4   our objection.

5   MR. MUSSO:   I don't have a problem

6   with you doing your cross after

7   mine.

8   MR. FAULK:   And if we could just

9   use the same reporter?

10   MR. MUSSO:   I would like to use the

11   same court reporter.

12   MR. FAULK:   Are you available on

13   the 24th?

14   COURT REPORTER:   Sure.

15   MR. MUSSO:   Are y'all available to

16   come on the 24th?   I had

17   originally set that date, but I

18   didn't --

19   MR. WALDING:   I assume so.

20   MS. HORTBERG:   I mean, we still

21   have the right to come back and

22   ask any follow-up questions

23   after y'alls cross, since y'all

24   are reserving the right to

25   cross her until after --

358

1   MR. WALDING:   All right.   Thank

2   you, ma'am.

3   MR. BRANTLEY:   Is that it?

4   MR. MUSSO:   I just want to state

5   real quickly on the record, I

6   have a pending motion to resume

7   the deposition for the Troy

8   University and Troy individual

9   defendants.   And, you know, the

10   judge is going to rule on that

11   when the judge rules on that.

12   MR. FAULK:   We had originally

13   objected to taking a second

14   deposition, and we still object

15   to a second deposition, as

16   such.

17   What we'll do, is -- we

18   concede, of course, your right

19   to ask questions.   But what I

20   prefer to do is recess this

21   deposition, pending your turn,

22   and then, reserve our

23   cross-examination until you

24   have completed yours.

25   MR. MUSSO:   That's fine with me.

360

1   MR. BRANTLEY:   Right.   That's fine.

2   Yes.

3

4   DEPOSITION ADJOURNED

5

389

DEFENDANT'S EXHIBIT NO. 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

390

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 389, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under

12   my personal supervision.

13       I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21       Witness my hand this 19th day of july,

22   2007.

23

24   _____

25   _____ RPR, Notary Public,
                     State at Large

## Pam Parris

**From:**      "Victoria Morin" <vmorin@troyst.edu>
**To:**        "Pam Parris" <pparris@troyst.edu>
**Sent:**      Tuesday, April 27, 2004 1:52 PM
**Subject:**   Nancy Miller

Pam,  Just curious=== When was the deadline for turning in letters of recommendation for internship? Nancy Miller dropped hers off yesterday while I was advising students.

In class, Nancy did not take corrective feedback well and, when things did not go well for her, or she did not perform adequately, she was quick to make excuses or blame others.  She also has used inappropriate language in the classroom. (The only student who ever did == in my 10+ years at TSUD!) I did speak to her about that, and she did apologize.

I have concerns about her willingness to receive and use corrective feedback.

I will send on the recommendation to you today.
Victoria


DEFENDANT'S EXHIBIT



# Faculty Recommendation of Prospective Internship
## College of Education

Student's Name: _Nancy Miller_

Proposed Internship Semester: _Fall 2004_

**Check one:**

☐ I recommend this student for his/her internship without reservation.

☒ I have some reservations regarding this student's readiness for internship.
   (Please explain in the comment section below.)

☐ I do not recommend this student for his/her internship.
   (Please explain in the comment section.)

*Please comment on such items as academic background, personal appearance, tact, self-control, dependability, cooperation, and promptness. If you have indicated any reservations or if you did not recommend this student for internship, please explain your concerns.*

I have no reservations about Nancy's
academic readiness for internship.
My concerns are about her willingness
to receive and use corrective feedback.
I believe that Nancy can have a successful
student internship experience if she can
reflect on what her supervisors tell her about

Your comments will be shared with the student. her performance and make

a commitment to follow through on their recommendation.

Signature _Christa Morris phd_

Title _(Associate Professor)_

Date _4/27/04_

Please complete and return to:
Director, Professional Internship Program
Troy State University Dothan
Post Office Box 8368
Dothan, AL 36304-0368


DEFENDANT'S
EXHIBIT



**TROY STATE UNIVERSITY DOTHAN**

P. O. Box 8368
Dothan, Alabama 36304-0368
(334) 983-6556

June 1, 2004

Nancy Miller
100 Oak Manor Court
Midland City, AL 36350

Dear Ms. Miller:

The internship application process required completion of three Faculty Recommendation of Prospective Intern forms. At least one of the forms submitted for you has an indication of some reservations about recommendation for internship. TSUD policy requires that you meet with the TEP Committee regarding these reservations. The committee will then determine your eligibility for internship. You may request to review the recommendation forms prior to the meeting by contacting me at extension 1361.

Your meeting with the TEP Committee has been scheduled for <u>Tuesday</u> <u>June 15, 2004,</u> at <u>12:30</u>. The meeting will take place in <u>Adams Hall Room 304</u>. If you have any questions prior to this meeting please contact me at (334) 983-6556 extension 1361.

Sincerely,

*Pamela G. Parris*

Pamela G. Parris
Director, Professional Internship Office

PGP/njt


DEFENDANT'S EXHIBIT



**TROY STATE UNIVERSITY DOTHAN**

P. O. Box 8368
Dothan, Alabama 36304-0368
(534) 983-8536

## Internship Agreement Between Houston County Schools and Troy University Dothan Campus

July 28, 2004

Due to the high demand and low availability of special education teachers, Houston County Schools, specifically Superintendent Kenneth Lord, is experiencing a hardship situation. Mr. Tim Pitchford, principal of Houston County High School, has requested permission for Nancy Miller to complete her internship with Troy University Dothan while employed as a special education teacher at Houston County High School. This permission is granted under the following conditions:

1. Ms. Miller will continue to be employed throughout the internship period (August 16 – December 7, 2004).
2. Mr. Paul Strange will serve as cooperating teacher for Ms. Miller.
3. Ms. Miller will complete the same requirements as all other interns at Troy University Dothan with the following underlined exceptions:
    a. Internship will last a total of 70 school days. Absences will be made-up and extend beyond December 7, 2004.
    b. Mr. Strange will visit Ms.Miller's classroom one period each week. Ms. Miller will visit Mr. Strange's classroom one period each week. The intern is to use the log form provided to record the time spent in Mr. Strange's classroom. This log, signed by the intern and Mr. Strange, is to be turned in at the end of the semester to the Director of Internship by the intern.
    c. The school administration is responsible for IEP meetings. Ms. Miller's attendance is as that of a student intern. She cannot be held legally responsible for the meetings.
    d. Mr. Strange will conduct four official evaluations during the internship. The first observation will occur during the first two weeks of internship. The remaining three evaluations will occur approximately every three weeks. The white and the goldenrod copies of the evaluation form are to be mailed to the Director Professional Internship immediately as each one is completed.
    e. Mr. Strange is to review all lesson plans, handouts and notes to parents created by Ms. Miller. The first five lesson plans taught must be in the long format shown in the *Internship Handbook*. An additional five lessons during the term are to be written in the long format. Lesson plans written for the university supervisor visits written in the long format count as part of the required ten. All other lesson plans are to be written using the short form in the handbook.

THE TROY STATE UNIVERSITY SYSTEM
Troy  •  Dothan  •  Montgomery  •  Worldwide



f.  ~~Dr. Victoria~~ *Dr. Greg Ruecker*, the University Supervisor, will conduct six official
    observations and evaluations during the period. Ms. Miller will complete
    the *Report of Internship* form provided in the handbook after each
    university supervisor visit.

g.  A daily schedule must be provided by Ms. Miller to the Internship Office
    no later than August 30, 2004.  This is to be used to schedule visits.

h.  The intern will complete the internship records and requirements including
    documentation of the 485 hours of internship.

i.  All summer coursework must be completed and internship pre-requisites
    met.

j.  Ms. Miller must attend the Internship Seminar classes.

k.  Ms. Miller is to e-mail Ms. Parris weekly about the internship.

l.  The Director of Internship will contact Mr. Strange and Ms. Miller to
    schedule an appointment to discuss the progress of the internship. This
    visit will occur near the midterm of the semester.

I understand and agree to the above conditions of internship for Ms. Nancy Miller.


Tim Pitchford, Principal
Agent for Houston County Schools

Pam Parris, Director Professional
Internship, Agent for Troy
University, Dothan Campus


Paul Strange. Cooperating Teacher
Houston County High School

Dr. Sandra Lee Jones, Dean
Agent for Troy University Dothan
Campus


Nancy Miller, Intern
Troy University, Dothan Campus


Cc: Morin



COURSES > INTERNSHIP SEMINAR (JONES) 04FA > COMMUNICATIONS > DISCUSSION BOARDS > MESSAGE VIEW

---

**Current Forum:** Class Introductions
**Date:** Sat Sep 11, 2004 1:53 pm
**Author:** Miller, Nancy M. <nmmiller@aol.com>
**Subject:** Class Introduction

( Modify )

---

Hi all,

Nancy Miller here. I am a Collaborative Special Ed. major "in my own classroom" as well as an intern. I work at Houston County High School in Columbia. The school has a total of around 400 students. According to my mentor, there are approximately 24 teachers and interestingly we have determined that 1/4 are newly hired and another 1/4 are not tenured. Prior to becoming a teacher, I was a Realtor here in Dothan. High turn-over rates in Real Estate offices meant one thing. Can you guess what that is? If anyone wants to discuss this, feel free to email me.

Although I have a resource room, I spend very little time in it. I support 40+ student in grades 7th - 12th. A fabulous thing about a small school is that you get to know the students very quickly & the students all know who you are, too. At the beginning of the year when I went to check on the needs of the Special ed students, I would go into a classroom and everyone would say, "Hi, Mrs. Miller!" At that time, I only knew the Special Ed students by name but now I know most of regular students by name (because I asked them). I track about 6 different teachers' classes and regularly stay in 4 teacher's rooms during a typical day. Third block Math is the only class I stay in for the entire block because all of the students are Special Ed students. This is also the only class I have an opportunity in which to "teach". She is terrific. However, I'm going to vent a little - one teacher in particular has worksheets, quizzes &/or tests nearly everyday (and wants the Spec. Ed students out of "her room") She intentionally embarrasses, humiliates not only the Spec. Ed kids but the Reg. Ed students ...as even embarrassed me in front of her class. Sometimes it's subtle and sometimes blatant. I know I will have to get some input from YOU, my colleagues, about this situation at a later date. My mentor & I have discussed this at great length and he even though he's been teaching for about 8 years he's at a loss for any suggestions that are diplomatic. He knows what he'd do but understands my dilemma.

Ok, let's move on. I have been married to my best friend, Terry, for 32 years (come December 2nd). It was love at first sight and we only knew each other less than 5 months before we were married. He is a retired Army Major with 23 + years of active duty service. We have lived all over the U.S but mostly in the South. He retired in 1994. Having been an enlisted Staff Sgt., Airborne, Drill Sgt. and an OCS graduate, made him highly qualified to teach JROTC. He was hired at Dothan High School before his official retirement date and has been there ever since. He was and is my inspiration for becoming a teacher. He has 100+ students during the course of a year, many of which are Special Ed. students. JROTC teaches students responsibility, self-esteem, self-reliance, integrity, pride, team work, and leadership (just to name a few). Most students excell in his classes because there is a lot of hands-on activities, critical thinking opportunities, enthusiasm, motivation, mentoring, genuine caring for the students, as well as discipline - and I don't necessarily mean "punishment type" discipline. JROTC is far from the "easy A" elective. Terry suggests that if they can succeed in his classes, they should succeed in other classes. Excellent point. Why don't they? It's clear to him. Is anyone interested in discussing this?

On a personal note we have 3 children, Jennifer, Quentin, & Justin. All 3 went or are going to UA. Jen is 30 and graduated from UA in Journalism. She was employed at the Enterprise Ledger for 3 1/2 years. She just quit so she could enroll at TUO obtain her Master's in Community Counseling (what she made is what the stats indicate a student without a high school diploma would make& basically at the poverty level). My "boys" (25 & 24) are still plugging away, the younger in Chemical Engineering & the elder in Exercise Science. Both are working full time. Four in college at the same time - Ouch !

In my spare time I make wedding cakes, stained glass windows, and my daughter & I own Felicity Tiaras (a wholesale business). I have a degree in Equine Studies and love to train horses. It may sound really strange to most people but I think horses has given me a patience, sensitivity and an appreciation for teaching Special Ed students (but certainly applies to Ed kids as well). I have to be able to communicate with a 1000+ pound horse through the use of my body weight, legs, hands, and voice without being able to get any verbal feedback. 99% of the time it is the rider's inability to communicate to horse what the rider wants the horse to do. Failure to appropriately communicate expectations can result in "bad behavior", injury or even death. Me getting angry accomplishes absolutly nothing but more problems. Does this ring any bells? Anyway, I'd really love to teach riding lessons again but at this point in time I have VERY LITTLE time. Over the y

...I was a stay at home Mom, I owned a cake decorating supply/bake shop, developed & taught cake decorating classes for Continuing Ed. at Wallace College, and was a "Mayor" at Fort Leavenworth, KS.

Well good heavens !!!   Dr. Jones should give everyone who reads this LOTS OF BONUS POINTS!!!!  I just turned 50 recently - can I use that as an excuse?

( Reply )

---

**Current Thread Detail:**
Class Introduction                    Miller, Nancy M.                              Sat Sep 11, 2004 1:53 pm

( OK )

Blackboard Learning System TM (Release 6)

DEFENDANT'S
EXHIBIT

COURSES > INTERNSHIP SEMINAR (JONES) 04FA > COMMUNICATIONS > DISCUSSION BOARDS > MESSAGE VIEW

◄◄ Previous Message     Next Message ►►

---

**Current Forum:** Discussion #2: Surprises -- Due Sept. 5th-11th
**Date:** Sat Sep 11, 2004 2:52 pm
**Author:** Miller, Nancy M. <nmmiller@aol.com>
**Subject:** Surprises

( Modify )

Well I spent so much time writing & responding to the Introduction, that ISC is about to close.  My biggest surprise was the teacher I mentioned in my Introduction.  The disrespect for students and collegues alike floored me.  She has been teaching for over 15 years I believe.  Perhaps she is part of the turnover problem in the school.

I have a Resource Room but hardly spend time in it.  I am having to ease my way around the teachers because they are NOT happy with full inclusion.  Reality is that it will take time for them to want me to do any "co-teaching" etc.  Many don't even want the Special Ed teachers in their class because they think we see too much.  Teachers let the kids play cards "after they get their work done" etc. So we see that sort of thing and they are uncomfortable.

( Reply )

---

◄◄ Previous Message     Next Message ►►

---

**Current Thread Detail:**

| Surprises | Miller, Nancy M. | Sat Sep 11, 2004 2:52 pm |

( OK )



# Houston County Schools

404 West Washington St.
P.O. Drawer 1688
Dothan, AL 36302
(334) 792-8331

Kenneth Lord, Superintendent

Mrs. Pam Parris
Director of Student Interns
Troy University – Dothan
500 University Drive
Dothan, Alabama 36303

Dear Mrs. Parris:

I am writing to express some concerns regarding a non-traditional intern, Nancy Miller, at Houston County High School.

After discussions with Mr. Tim Pitchford, Principal, and Mr. Paul Strange, supervising teacher, the concerns are as following:

    A.    Following school procedures when leaving campus
    B.    Working with peer teachers
    C.    Developing positive teacher-student relationships
    D.    Developing a better understanding of the special education process and required forms (eligibility meeting and referral meeting)

As always, we appreciate you and Troy University and look forward to continue working with you to develop excellent teachers.

Thanks,

R J Andrews,
Federal Programs Coordinator



**Houston County High School**
**P.O. Box 519**
**Columbia, Alabama 36319**
**696-2221 or 696-4515**

To: Pam Parris / Troy University Dothan

From: Houston County High School

The following is a record of incidences that have occurred here at school involving Mrs. Nancy Miller.

(1)   Mrs. Miller left the school campus without informing administrative personnel. She did not return until the next school day.

(2)   Mrs. Miller accused Paul Strange of entering her locked filing cabinet and placing an IEP in a student folder. Mrs. Miller claims it was an IEP written without her knowledge. Mr. Strange and Mrs. Miller had written the IEP in her room approximately one week earlier. Mrs. Miller stated she had no recollection of that event.

(3)   Mrs. Miller has difficulty in communicating with faculty members.

(4)   Mrs. Miller questioned the lawfulness of the school systems inclusion policies.

(5)   Some students have requested that Mrs. Miller not be their inclusion teacher.

(6)   Classroom teachers reported that Mrs. Miller has been upset and crying during class time.

(7)   Office staff members reported that Mrs. Miller was upset and crying in the office lobby during school hours.

(8)   Not following suggestions provided by Mr. Strange as related to the resource room.

(9)   Mrs. Miller told a classroom teacher, "I don't like being here any more than you do, but I have to be in here a certain number of hours". This is in response to the classroom teacher telling her that she could leave the room because the lesson was over. Mrs. Miller said this in front of the students in the class.

Stacy Ezell

Paul Strange


DEFENDANT'S EXHIBIT



# Houston County Schools

404 West Washington St.
P.O. Drawer 1688
Dothan, AL 36302
(334) 792-8331

Kenneth Lord, Superintendent

HAND-DELIVERY

October 19, 2004

Ms. Nancy Miller

Dear Ms. Miller:

We are informed by letter from Pamela G. Parris, Director of Professional Internship Programs at Troy University of Dothan, that your internship was terminated effective October 14, 2004. The legal effect of this termination by Troy University is to terminate your Employment Internship Agreement with the Houston County Schools.

I am sorry is has become necessary to write you this letter. However, because you refuse to leave the campus of Houston County High School, this letter is necessary to terminate you as an intern teacher at Houston County High School and direct you to leave and not return to the campus.

Sincerely,

HOUSTON COUNTY BOARD OF EDUCATION

BY: _Kenneth Lord_
        Kenneth Lord, Superintendent

KL/nw


DEFENDANT'S EXHIBIT

```
              IN THE U. S. DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF ALABAMA
                  SOUTHERN DIVISION


NANCY MILLER,

     PLAINTIFF,

     VS.                CASE NO.1:06-CV-940-WKW

HOUSTON COUNTY BOARD
OF EDUCATION, KENNETH
LORD, RILEY JOE ANDREWS,
TIM PITCHFORD, PAUL
STRANGE, STACY EZELL,
TROY UNIVERSITY, DOTHAN,
SANDRA JONES, PAM PARRIS
and GREG RUEDIGER,

     DEFENDANTS.


        The continuation of the deposition of
    NANCY MILLER, taken by the Defendants,
    pursuant to the Federal Rules of Civil
    Procedure, before Stacey Watkins, RPR, and
    Notary Public, State at Large, at the offices
    of Hardwick, Hause, Segrest & Walding,
    Dothan, Alabama, on the 23rd day of August
    2007, at 10:15 a.m., CDT, pursuant to notice.
```

---

**APPEARANCES:**

FOR THE PLAINTIFF:
MR. WINN FAULK
Attorney at Law
Montgomery, Alabama

MR. THOMAS K. BRANTLEY
Attorney at Law
Dothan, Alabama

FOR HOUSTON COUNTY BOARD OF EDUCATION, KENNETH LORD, RILEY JOE ANDREWS AND TIM PITCHFORD:

MR. KEVIN WALDING
MR. PATRICK B. MOODY
Attorneys at Law
Dothan, Alabama

FOR PAUL STRANGE AND STACEY EZELL:

MS. KATHERINE HORTBERG
Attorney at Law
Chelsea, Alabama

FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES, PAM PARRIS AND GREG RUEDIGER:

MR. JOSEPH V. MUSSO
Attorney at Law
Birmingham, Alabama

ALSO PRESENT:

KENNETH LORD
PAUL STRANGE
STACEY EZELL

---

3

**STIPULATION**

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

---

4

NANCY MILLER

having been first duly sworn, testified as follows, to-wit:

**EXAMINATION**

BY MR. MUSSO:

Q   Mrs. Miller, my name is Joe Musso, and I was here at your last deposition. I represent Troy University, Dr. Ruediger, Pam Parris and Dr. Jones.

Now, the same rules apply for this deposition as the last one. If you don't understand one of my questions, please let me know. Otherwise, I would assume that you would. Is that fair?

A   That's fair.

Q   Is there any reason today why you can't give complete, truthful, honest answers?

A   No.

Q   Now, I'm going to do my best to try not to repeat very much of the last deposition. I went through it yesterday very carefully. So, maybe we can get out of here

*β*

5

1    a little quicker today.  But, you know, there
2    still are going to be some things I need to
3    cover.  The same rules apply.  If you need to
4    take a break, let us know.  We'll accommodate
5    that.
6          It's always important that we don't talk
7    on top of each other.  Otherwise, it makes
8    life for her difficult, and she'll throw
9    something at us.  It's also important that
10   you always give some type of verbal response,
11   because if you shake your head or say
12   "huh-uh," then, again, that's hard for her to
13   put that down.  Is that okay?
14     A    Yes.
15     Q    Now, I think the last time we were
16   here, you were currently unemployed as a
17   teacher?  Is that correct?
18     A    That is correct.
19     Q    Is that still the case?
20     A    That is still the case.
21     Q    Have you had any job interviews
22   between the last deposition and this
23   deposition for a teaching job?
24     A    No.
25     Q    Have you had any job interviews for

6

1    any other type of job?
2      A    No.
3      Q    Have you made any applications
4    between the last deposition and this one for
5    a teaching job?
6      A    Yes.
7      Q    Okay.  And where have you made
8    those applications?
9      A    Dothan City Schools.
10     Q    Do you know of any job openings
11   that have come open, from the time of your
12   last deposition up until now, that you would
13   be interested in being a teacher in that
14   position?
15     A    Yes.
16     Q    And which jobs are those?
17     A    There were two special education
18   positions at Dothan High School.
19     Q    Do you know if those have been
20   filled yet?
21     A    Yes, they have.
22     Q    Do you know who filled them?
23     A    No.
24     Q    And did you ever actually interview
25   for either of those?

7

1      A    No, unfortunately.
2      Q    Now, I know last time we were here,
3    you had mentioned that you were interested in
4    working at the Dothan City School System.
5      A    Correct.
6      Q    Okay.  Do you have any interest in
7    returning to the Houston County system?
8      A    No.
9      Q    In your last deposition, you had
10   mentioned you graduated from Troy University
11   in May of 2005.  Am I correct?
12     A    That is correct.
13     Q    Okay.  Have you considered applying
14   to any of Troy's graduate programs?
15     A    I have considered it.
16     Q    Okay.  Have you made any
17   determination whether you're going to do that
18   or not?
19     A    At this point in time, no, I have
20   not.
21     Q    Okay.  And have you made any
22   decision as to what type of graduate program
23   at Troy you'd like to --
24     A    If I did, it would have to be with
25   special education.

8

1      Q    Okay.  And would it be at the
2    Dothan campus?
3      A    I haven't really determined that.
4      Q    Okay.  Has it got to the point
5    where you've actually filled out any type of
6    application?
7      A    No.
8      Q    Made any phone calls to any
9    professors to ask about classes?
10     A    No.
11     Q    Have you read any bulletins or
12   anything like that?
13     A    Yes.
14     Q    Okay.  Now, under the master's
15   program, would you need to take any further
16   types of internships?
17     A    I believe it's -- I don't know
18   exactly what they call it.  I don't know for
19   sure.  That would be a ways on.
20     Q    Do you ever have any desire to try
21   to get a Ph.D. in education?
22     A    I would -- I've always thought I
23   would.  But I'd have to get my master's
24   first, of course.
25     Q    Do you know whether Troy offers a

1  Ph.D. in an education field that you would be
2  interested in?
3      A    No.  I haven't really looked into
4  that.
5      Q    Now, you began working at the
6  Beverlye Middle School in January of 2006?
7  Am I correct?
8      A    That's correct.
9      Q    Was there an opening for a special
10  education position in the fall of 2005 at
11  Beverlye?
12      A    Not that I'm aware of.
13      Q    Now, I know that you were an intern
14  there in the spring of 2005.  Am I correct?
15      A    That is correct.
16      Q    Okay.  Is it while you were an
17  intern at Beverlye that you learned that
18  there was going to be a position opening for
19  a full-time job, or did you learn that
20  somewhere else?
21      A    No.  I didn't learn that until it
22  actually happened.
23      Q    And when did it happen?
24      A    As far as I can recall, in January
25  of '06.

10

1      Q    Okay.  And let me go ahead and say
2  I always talk loud in depositions, so she can
3  hear me.  Don't think I'm yelling at you.
4  Okay?  And, plus, there's a room full of
5  lawyers.
6      A    Sure.
7      Q    Who told you that that position was
8  going to be open?  Was it someone at Beverlye
9  Middle School?
10      A    No.  I found it on the internet,
11  going to the Dothan site.
12      Q    Did you approach someone at
13  Beverlye and tell them that you were
14  interested?
15      A    I don't recall actually speaking
16  with anybody.  I think I just applied for the
17  position when I found out it was open.
18      Q    Did anyone at Troy University write
19  you any letters of recommendation for that
20  Beverlye job?
21      A    Not that I'm aware of.
22      Q    Did you ever ask anyone at Troy to
23  write you any letters of recommendation?
24      A    I don't recall.
25      Q    And that would include anyone at

1  Troy writing you letters of recommendation
2  for any job, at any time, not just the
3  Beverlye job.
4      A    No, not that I can recall.
5      Q    Now, since your last deposition,
6  have you worked in any job anywhere?
7      A    No.
8      Q    I know you had mentioned that you
9  and your daughter had that tiara company.
10      A    Right.
11      Q    Have you been pursuing that any
12  more?
13      A    No, not right at this time.
14      Q    Now, when you were an intern at the
15  Houston County High School -- and it was at
16  Houston County High School?  Correct?
17      A    Yes.
18      Q    -- you were compensated for that?
19      A    Yes.
20      Q    And you actually signed that
21  internship agreement?
22      A    Yes.
23      Q    That was something we talked about
24  at the last deposition.  Do you know of any
25  other interns at Troy University in Dothan

12

1  who also were compensated when they were an
2  intern?
3      A    Amy Deese, who was at Troy -- or
4  Houston County.
5          MR. FAULK:  Who is that?  Did you
6              say a name?
7          THE WITNESS:  Yes.
8          MR. MUSSO:  Yes, a name.  Amy
9              Deese.
10          MR. FAULK:  Excuse me.
11      A    There were several others, but I
12  don't recall their names.
13      Q    Okay.  Do you know whether any of
14  them signed agreements the way you did?
15      A    I don't know for sure.
16      Q    Did any of these -- Ms. Deese or
17  any of the other students whose names you
18  don't recall, do you know whether any of
19  those individuals' internships were
20  terminated before they were finished?
21      A    I do not know.
22      Q    And do you know of any other
23  students whose internships were terminated
24  before they were finished, whether these
25  students were compensated or not?

13

1    A    I do not know of any.

2    Q    Now, I know you had a meeting with
3    Dr. Ruediger on August 26th with regard to
4    his observation of you.

5    A    Yes.

6    Q    Okay. And that was something that
7    was covered in your last deposition. I guess
8    I just have a few more questions. Do you
9    recall how long that meeting lasted?

10    A    It was probably 45 minutes to an
11    hour, if I remember correctly.

12    Q    Did Dr. Ruediger, in that meeting,
13    say anything to you that you disagreed with?

14    A    Not that I can recall.

15    Q    Now, I know you communicated a lot
16    of things to Dr. Ruediger in that meeting,
17    and that was something that was discussed in
18    your last deposition. In your last
19    deposition, you stated some things that
20    Dr. Ruediger communicated to you. And
21    correct me if I'm wrong. But, if I remember
22    correctly, he had asked you to approach some
23    of the members at the Houston County High
24    School regarding some of your concerns? Is
25    that correct?

14

1    A    Yes. He suggested I go to Mr.
2    Strange.

3    Q    Okay. And did you have any problem
4    with him making that suggestion?

5    A    No.

6    Q    Now, as an employee at Houston
7    County High School, as well as an intern at
8    Troy University -- in your last deposition,
9    you had mentioned a lot of communications you
10    made to members of Houston County, be it the
11    principal, the assistant principal, central
12    office, Mr. Strange, regarding concerns you
13    had at Houston County High School.

14    Do you consider that that was part of
15    your job that you raised these concerns with
16    them, because you saw problems that you
17    considered that were happening?

18    A    No.

19    Q    It wasn't part of your job as an
20    employee at Houston County High School?

21    A    I didn't think so.

22    Q    And why did you not think so?

23    A    Well, I think that, as just a
24    person -- well, as an intern, I was given
25    information. Okay. As an employee, I was

15

1    given information. And as a person, I was
2    given information. The information I had,
3    and I asked questions and that sort of thing
4    about, they had already given me answers.
5    And so, as a person, I'm questioning some of
6    these things.

7    Through my schooling, I know it's wrong.
8    But I pretty much feel that I just --
9    because, like, for instance, Mr. Strange and
10    Mr. Pitchford are my supervisors, they are
11    the ones who know -- or were supposed to know
12    what was supposed to be done. And since it
13    was okay with them, that's just the way
14    things were.

15    Q    Okay. But I guess my question
16    really is, do you not feel that an employee,
17    regardless of their position, any teacher at
18    that school, if they determine that something
19    is not being done properly -- and I think
20    what you said in your deposition, it wasn't
21    legal -- do you not think that they have a
22    duty, as part of their job, to go report that
23    to their supervisors or someone else?

24    A    No.

25    Q    You don't think they have a duty?

16

1    A    I don't think so.

2    Q    So, if there's a situation where a
3    student is being mistreated, even if the
4    supervisor knows that, you don't think that
5    the teacher would still have a duty to try to
6    report that to somebody?

7    MR. BRANTLEY:  Object to the form.

8    MR. FAULK:  Excuse me.

9    MR. BRANTLEY:  Define "mistreated."

10    MR. FAULK:  Are you talking about,

11    like, sex abuse reporting laws

12    or something?

13    Q    Let's just say a student is being
14    physically abused in the classroom. Okay?
15    Say, slapped by another teacher. Even if you
16    know that the supervisor, the principal,
17    knows that, do you not feel that the teacher
18    has a duty to go off and try to report that
19    to the central office or somewhere else?

20    A    It's not my understanding that she
21    has a duty to do that.

22    Q    And is that some understanding you
23    have by something you read in any handbook or
24    official policy?

25    A    No.

17

1    Q    Do you know where you came to that
2    understanding?
3    A    That's just my opinion.
4         MR. FAULK:  Are we still talking
5              about physical -- excuse me
6              just a minute.
7         MR. MUSSO:  No.  We're talking
8              about --
9         MR. FAULK:  We're not talking about
10             physical abuse any more?
11        MR. MUSSO:  Let's just go back to
12             -- she says that she didn't
13             have a duty, as an employee, to
14             report any of the things that
15             she reported.
16   Q    My question is, is there anything
17   in any type of handbook that says that you
18   didn't have that duty as an employee?
19   A    I've never seen anything.
20   Q    Now, did you have a duty, as an
21   intern, to report any of the things that you
22   reported?
23   A    Not that I'm aware of.
24   Q    Okay.  Then, when Dr. Ruediger
25   suggested that you report it, why did you

18

1    then report it, if you didn't have a duty?
2    A    I didn't report it.  I had already
3    talked about it with Mr. Strange.
4    Q    Now, last time in your deposition,
5    you had mentioned something called the
6    Blackboard discussion forums.
7    A    Uh-huh.
8    Q    Do you recall those?
9    A    Yes.
10   Q    The individuals who participated in
11   that discussion forum, were those members in
12   your internship class?
13   A    Internship seminar class.  Yes.
14   Q    And was everyone in that internship
15   seminar class a special education specialist?
16   A    No.
17   Q    Was anyone participating in those
18   discussion forums with regard to the
19   Blackboard who were not members of your
20   internship seminar class?
21   A    Not that I'm aware of.
22   Q    Did you have to have a special
23   password or something to get in?
24   A    Yes.  You had to have a -- you had
25   to go under your name and have a password, I

19

1    believe, as well.
2    Q    And do you have knowledge whether
3    any teacher had any access to read that?
4    A    The only person that I was aware of
5    was Dr. Jones.
6    Q    But you did have knowledge that she
7    had access to it?
8    A    Yes.  She was the head of the
9    class.
10   Q    Was she the actual teacher of the
11   class?
12   A    Yes.
13   Q    Was that the class that you
14   ultimately would receive a grade in for being
15   an intern?
16   A    No.  This was a separate --
17   Q    Separate class?
18   A    Separate class.  Uh-huh.
19   Q    Now, the internship, was that a
20   pass/fail type of course, or was it actually
21   a graded course, be it A, B, C or D?
22   A    I believe it was a pass/fail, but
23   I'm not 100 percent sure.
24   Q    And what about the separate class
25   that you had with Dr. Jones?

20

1    A    As far as I know, it was an A, B, C
2    type of thing, if I'm not mistaken.
3    Q    And did you actually receive a -- I
4    know, for the internship, there was an
5    administrative withdrawal?  Correct?
6    A    Correct.
7    Q    Did you actually receive a grade
8    for that class with Dr. Jones?
9    A    No.  I was withdrawn with that, as
10   well, from that class.
11   Q    And were you allowed to take that
12   class again in the spring?
13   A    Yes.
14   Q    And did you receive a grade in that
15   class?
16   A    Yes.
17   Q    Do you recall what it is?
18   A    I don't remember.
19   Q    But, do you recall it being a --
20   A    Oh, it was definitely a pass of
21   some sort.
22   Q    Okay.  It wasn't an F?
23   A    No.
24   Q    Do you recall being disappointed in
25   that grade?

21

1    A    No.

2    Q    And did Dr. Jones teach that class

3  again?

4    A    No.  I don't believe it was

5  Dr. Jones.

6    Q    Now, for your internship, when you

7  enrolled for it, was there actually a

8  professor assigned to be your professor?

9    A    To be the one that comes out to the

10  school to observe me, you mean?

11    Q    Yes.

12    A    Yes.  Actually, the first one was

13  Dr. Morin.

14    Q    I'm sorry.  Dr. Morin?

15    A    Dr. Morin.

16    Q    Okay.  And then, it became

17  Dr. Ruediger?  Correct?

18    A    That's correct.

19    Q    Do you know why --

20    A    No.

21    Q    -- it went from Dr. Morin to

22  Dr. Ruediger?

23    A    No clue.  I don't know if it was a

24  scheduling problem or what.

25    Q    I think, in your last deposition,

22

1  you mentioned -- how do you pronounce her

2  last name?  Brazzelle?

3    A    Brazzelle.

4    Q    Brazzelle?

5    A    Yes.

6    Q    I never would have got that.

7    A    Mary Brazzelle.

8    Q    Did she actually ever officially

9  become your internship professor?

10    A    I never met her.  I never saw her.

11  No.  Ms. Parris called me back and said she

12  wasn't going to be after all.

13    Q    When she called you back and said

14  she wasn't going to be after all, at that

15  point, did you have knowledge that your

16  internship was going to be terminated?

17    A    No.  No, not at all.

18    Q    At that point, you just thought it

19  was going to continue to be Dr. Ruediger?

20    A    Ms. Parris had called me at -- I

21  believe at school, and told me Mary Brazzelle

22  was going to be my advisor, new advisor.

23  Then, a day or several days or whatever

24  later, she called me back and said that

25  Dr. Ruediger had requested that he continue

23

1  to be my advisor.

2    Q    Did you ever tell anyone at Troy

3  that you didn't want Dr. Ruediger to be your

4  advisor?

5    A    No.

6    Q    Did you ever tell anyone at Troy

7  that you didn't want Dr. Morin to be your

8  advisor?

9    A    No.

10    Q    You liked Dr. Morin?  Correct?  Or

11  you thought she was a good teacher?

12    A    Yes.

13    Q    And did you ever tell anyone that

14  you didn't want Mary Brazzelle to be your --

15    A    No.

16    Q    And when you were at Beverlye, who

17  was your internship advisor?

18    A    Dr. Morin.

19    Q    Dr. Morin.  Now, is there anything

20  Dr. Morin did as your internship advisor at

21  Beverlye that has anything to do with this

22  lawsuit?  I mean, did she violate your rights

23  in any way while you were at Beverlye?

24    A    No.

25    Q    Now, I know that you've sued

24

1  Dr. Ruediger, Dr. Jones and Ms. Parris

2  individually.  Is there anyone else at Troy,

3  other than those three individuals, who

4  specifically did anything wrong to you for

5  which you're complaining in this lawsuit?

6    A    No.

7    Q    Let's go back to the discussion

8  forum on the Blackboard.  Did anyone at Troy

9  ever tell you -- or criticize anything that

10  you wrote on that Blackboard discussion

11  forum?

12    MR. FAULK:  Including students,

13    when you say "anyone at Troy"?

14    Q    Well, let's just say any faculty

15  member.

16    A    Mine personally?

17    Q    Yeah.

18    A    Not that I can really -- not that I

19  can recall.

20    Q    Did any student criticize anything

21  you wrote on any of the Blackboards?

22    A    Not that I recall.

23    Q    Did any faculty member or any

24  administrative member at Troy try to censor

25  anything you wrote on the Blackboard?

25

1    A    I do remember a general message
2  from Dr. Jones that warned everyone to be
3  careful what they said.  It might be -- I
4  believe the idea was that it might be
5  construed as unprofessional.  But I did not
6  get anything specific that I can recall.
7    Q    I mean, did you have any problem
8  with her giving that message?
9    A    No.
10    Q    And was the discussion forum
11  basically for individuals to communicate
12  their dealings with their internship?
13    A    That's my -- yes -- understanding.
14    Q    It wasn't something personal for
15  them to express their political views or
16  anything like that?
17    A    Unless something like that would
18  come up.  I don't think it was, specifically.
19  No.
20    Q    I've never been on one of those
21  discussion forums, but I understand some of
22  them you get kicked off if you ever veer from
23  -- I know there's a rose forum my wife
24  belongs to, and if you talk about anything
25  but roses, they send you to Disneyland.  You

26

1  can't even say, you know, you had a good day
2  with your family.
3       Before I leave the board, describe to me
4  what you believe the purpose of the board was
5  for?
6    A    Okay.  To discuss issues that might
7  be arising in the different school systems,
8  gain advice from each other, bounce ideas off
9  each other.  That sort of thing.
10    Q    Were you required to participate in
11  the board?
12    A    Yes.
13    Q    Does that mean you were required to
14  read the notes?
15    A    Yes.
16    Q    And were you required to post
17  anything?
18    A    Yes.
19    Q    And was that requirement because of
20  the class?
21    A    Yes.  To my recollection, yes.
22    Q    Did you find it a useful teaching
23  tool?
24    A    Yes, very much.
25    Q    Now, I understand that there was a

27

1  day at the Houston County High School that
2  you left early?
3    A    Yes.
4    Q    I believe you left at 11:30.  And
5  from reading your last deposition, there was
6  an attempt by you to contact Dr. Jones that
7  day -- I think -- was it Ms. Parris and
8  Dr. Ruediger?  Did you try to contact all
9  three?
10    A    I believe it was all three.
11    Q    And that you were unsuccessful?
12    A    I left messages.
13    Q    Left messages.  So, you were not
14  able to talk to them before the end of the
15  day?
16    A    That's correct.  And it was Friday.
17  And they had indicated to us that someone
18  would be there 'til noon; but, after noon --
19    Q    When did you try to reach them?
20    A    I want to say maybe 9:30.
21  Something like that.
22    Q    And when you say they indicated
23  someone would be there before noon, who
24  indicated that?
25    A    Well, we were just told, when we

28

1  had our internship classes, that there would
2  be people at the university until noon.
3    Q    Did they specifically say it would
4  be Dr. Ruediger or --
5    A    No.
6    Q    -- Dr. Jones --
7    A    No.
8    Q    -- or Ms. Parris?
9    A    Nobody specifically.
10    Q    I, at one time, was a professor,
11  and Fridays, period, were not known to be
12  high attendance days for professors.  Would
13  that kind of be a fair assessment?
14    A    That might be a fair assessment.
15       (Whereupon, Defendant's Exhibit 32
16       marked for identification.)
17    Q    I'm handing your attorney a
18  document.  I'm going to hand you what's
19  marked as Defendant's Exhibit 32.
20    A    (Witness reviewing document.)
21    Q    Tell me when you've had a chance to
22  finish reading that.
23    A    Yes, I have.
24    Q    And could you identify Defendant's
25  Exhibit 32?

29

1    A   Yes.  It is an e-mail that I sent
2  to Dr. Jones, Ms. Parris and Dr. Ruediger, as
3  well as myself and my husband, to document
4  the fact that I had left phone messages at
5  the university on Friday morning.  And I
6  believe it was Saturday evening that I left a
7  message at Dr. Ruediger's home phone number.
8    And I mentioned that, as Mr. Andrews
9  indicated to me at our interview that if I
10  had any problems at all, to come to him, and
11  so, that's what I did.
12    Q   And it says, "If you wish to
13  contact me on Monday, you can reach me at
14  "HCHS."
15    A   Correct.
16    Q   Did they ever contact you about
17  your discussion with Mr. Andrews?
18    A   No one contacted me at all until I
19  had talked with AEA rep, and there was a
20  meeting scheduled for Monday, if I'm not
21  mistaken.
22    Q   Okay.  Now, was that AEA rep an
23  attorney?
24    A   No.  It was Sharon Cole.
25    Q   And do you recall what her job

30

1  title was?
2       MR. BRANTLEY:  UniServe director.
3       THE WITNESS:  Thank you.
4    A   And I talked to her on Friday, and
5  then, I believe it was Monday, as well.
6       MR. FAULK:  Excuse me.  I just want
7       to be clear.  Are we talking
8       about the same Friday that you
9       went to see Mr. Andrews, or a
10       day that happened to be Friday?
11       THE WITNESS:  It happened to be
12       Friday, the day that I went to
13       Mr. Andrews' office.
14       MR. FAULK:  Okay.  I just wanted to
15       be sure.
16    Q   (By Mr. Musso)  And that's the day
17  you talked with someone from AEA?
18    A   Yes.
19    Q   And when did you first talk to
20  either Dr. Ruediger, Dr. Jones or Ms. Parris
21  with regard to your meeting with Mr. Andrews?
22    A   The only person that ended up
23  coming out to the school, to Houston County
24  High School, was Ms. Parris.
25    Q   And when did she come out?

31

1    A   Do you mind if I look at my
2  calendar?
3    Q   No.  That's fine.
4    A   Because I don't recall the exact
5  date.
6       (Off-record discussion held.)
7    A   Ms. Parris came out on the 27th, in
8  the morning, of the Monday after the Friday
9  that I went to Mr. --
10    Q   Okay.  And do you know how it was
11  that it was communicated to her to be out
12  there?  I mean, was she out there for a
13  normal visit, or do you know whether --
14    A   Oh, no.
15    Q   -- somebody called her and asked
16  her to come?
17    A   Apparently, somebody -- she -- to
18  my knowledge, she started getting phone
19  calls, is what she told me, early Monday
20  morning.
21    Q   Did she tell you who she got the
22  phone calls from?
23    A   Not specifically.
24    Q   Did she say whether it was someone
25  from the AEA, or someone from Houston County

32

1  High School, someone from Troy?
2    A   I got the impression that somebody
3  from Houston County School.  I don't know if
4  Sharon Cole actually called her or not.
5       MR. MUSSO:  Let me go ahead and
6       mark Defendant's Exhibit 33,
7       which is the copy of, I
8       believe, some calendar notes.
9       I'll let you actually tell me
10       what they are.
11       (Whereupon, Defendant's Exhibit 33
12       marked for identification.)
13    Q   Just take a moment to look at
14  Defendant's Exhibit 33, and after you finish
15  looking at it, let me know.  And my first
16  question is simply going to be for you to
17  identify what it is.
18       MR. BRANTLEY:  Do you want to take
19       this off?
20       MR. MUSSO:  It was --
21       MR. BRANTLEY:  That's what we gave
22       you?
23       MR. MUSSO:  That's what you gave
24       me.  I don't know -- I know it
25       certainly doesn't have any

33

1    information on it.
2    A    It actually says "Troy State
3    calendar" or something -- university calendar
4    or something like that.
5        MR. BRANTLEY:  Tell him what 33 is.
6        Is it 33?
7        THE WITNESS:  Yeah.
8        MR. BRANTLEY:  Tell him what that
9        is.
10    A    This was a monthly calendar that I
11    took with me to Troy University to mark dates
12    and that sort of thing.
13    Q    Okay.  Now, this calendar has
14    writing on it.
15    A    Uh-huh.
16    Q    Take a moment and look and tell me
17    if there is any handwriting on here that is
18    anyone else's other than yours?
19    A    (Witness reviewing document.)  No.
20    Q    Okay.  So, all the handwriting on
21    here is your handwriting?
22    A    Yes.
23    Q    And is there anything written on
24    here that someone else told you to write?
25    A    No.

34

1    Q    So, you wrote everything on here of
2    your own volition?
3    A    Yes.
4    Q    Now, the notes that appear on the
5    certain dates, were those written
6    contemporaneously on the dates that the
7    events occurred?
8    A    Yes.  If I ran out of room, I might
9    go over to, let's say, on Sunday, and kind of
10    put arrows to myself, so I would remember.
11    Q    Just looking, for instance, on
12    August the 9th --
13    A    Okay.
14    Q    -- did you actually write that note
15    on August the 9th?
16    A    Yes.
17    Q    And that would be true of every
18    date except the situations where you may have
19    ran out of space and had to write over a
20    date?  Correct?
21    A    Would you repeat the question?
22    Q    Okay.  Is that true of every date
23    that has writing in it?
24    A    Is what true?
25    Q    That you actually wrote that note

35

1    on the date that the writing appears.
2    A    Yes.
3    Q    Okay.  Now, I know you said
4    earlier, sometimes -- for instance, if you
5    look at the 29th, you have an arrow into the
6    30th, into the 29th.  And that appears that
7    it occurred on the 29th, but you ran out of
8    space on the 29th.
9    A    That occurred, actually, on the
10    30th, and I put the arrow over to the 29th.
11    So, it actually happened on the 30th, but
12    because I ran out of room, I would go over
13    and put an arrow to myself.
14    Q    Oh, okay.  So, that occurred on the
15    20th -- I mean, on the 30th --
16    A    30th.
17    Q    -- and you drew an arrow because
18    you ran out you space on the 30th?
19    A    Right.
20    Q    Let me see if there's any other
21    type of arrows like that.  Okay.  Look on
22    September the 23rd.  There's an arrow.
23    A    Right.
24    Q    What's going on there with the
25    asterisk and the arrow?

36

1    A    Right.  Okay.  On the 23rd, I
2    requested an appointment with Mr. Pitchford,
3    for example, at 8:15.  And then, right down
4    that arrow, it says -- okay.  Ms. Hamm said
5    Mr. Pitchford is not in right now, and that
6    he'll let him -- or she'll let him know that
7    I need to meet with him, and he'll get back
8    to me.  That sort of thing.
9    Q    So, you just ran out of space on
10    the 23rd, and that's why you --
11    A    Right.  It wasn't a very big
12    calendar.
13    Q    Now, is this a calendar that you
14    personally purchased?
15    A    Yes.
16    Q    And you said, if it wasn't black on
17    the front, it may say something like "Troy
18    University"?
19    A    Yes.
20    Q    So, you bought it at the bookstore?
21    A    I bought it at the bookstore.
22    Q    Were you required, as part of your
23    class, to keep these notes?
24    A    No.
25    Q    Did you keep such a calendar when

37

1  you went to Beverlye?
2     A    Yes.
3     Q    I have a question about -- I think
4  it's Defendant's Exhibit No. 12.  If you can
5  go to that, please?
6     A    Okay.
7     Q    When I refer to No. 12, that's 12
8  that was entered in your prior deposition.
9     A    All righty.
10    Q    Okay.  And this has been discussed
11 already.  But I did notice at the -- and
12 correct me if I'm wrong.  This is just an
13 e-mail from you to Pam Parris, cc'd to
14 Dr. Jones?  Correct?
15    A    Correct.
16    Q    Okay.  Now, at the end -- and, you
17 know, please take the time to read this
18 through carefully.  But, at the end, you have
19 the words "please advise."  And my question
20 here is going to be whether either Dr. Jones,
21 Ms. Parris, or anyone else at Troy
22 University, a faculty member, administrative
23 member, advised you pursuant to your "please
24 advise"?
25    A    No.

38

1     Q    Now, in your prior deposition, you
2  had mentioned Ms. Parris threatening to fail
3  your internship.
4     A    Yes.
5     Q    Did you complain to anyone at Troy
6  University, not a student, but any faculty
7  member, administrative member, that Ms.
8  Parris was doing that?
9     A    Just Dr. Ruediger.
10    Q    And when did you tell Dr. Ruediger
11 that?
12    A    Probably after -- the first meeting
13 after --
14    Q    Do you want to look at your --
15    A    Here we go.
16    Q    And you're looking at your
17 Defendant's Exhibit 33?
18    A    33.  Okay.  It was some time after
19 the 27th.
20    Q    And what month would that be?
21    A    August 27th.
22    Q    When you say it was after August
23 27th, do you have any recollection as to when
24 after the 27th?  Whether it was still in
25 August or September or October?

39

1     A    It was probably -- 'cause the only
2  time I ever really saw him was when he came
3  to observe.  So, it had to have been, I would
4  say, the day he gave me his second
5  observation.  And that was September --
6     Q    I believe that was September 30th.
7     A    Yes.
8     Q    Was anyone else present at that
9  meeting with Dr. Ruediger on September 30th?
10    A    No.
11    Q    Okay.  And what did you tell him
12 with regard to Ms. Parris?
13    A    That, you know, I was being
14 threatened that I was going to fail my
15 internship.
16    Q    And did he say anything to you
17 about that?
18    A    No, not that I can recall.  He was
19 upset that I had gone to central office and
20 all that sort of thing.  So, he was not in a
21 pleasant mood.
22    Q    How long did that September 30th
23 meeting with Dr. Ruediger take place?
24    A    Well, he was there for the
25 observation, which was in Ms. Towns' class,

40

1  and it was a split class.  So, I spoke to him
2  before he went to Mr. Pitchford's office to
3  speak with Mr. Pitchford.  And so, I
4  mentioned it to him in that time frame.
5  Because the observation debriefing actually
6  took place -- instead of at the school this
7  time, it took place at Troy University.
8     Q    So, when you mentioned it to him
9  while he was still at Houston County High
10 School, how long did that meeting with him
11 take place?
12    A    We were just standing out in the
13 hallway until the students all came out.  And
14 he left to go to Mr. Pitchford's office while
15 we went to the lunchroom with the students,
16 while Ms. Towns and I went to the lunchroom.
17 So, it was just a couple of minutes.
18    Q    And did he or you address that
19 again during the observation debriefing at
20 Troy?
21    A    I don't recall.  There are some
22 notes that he and Dr. Lumpkin took, but
23 I don't recall that that was mentioned.
24    Q    And Dr. Lumpkin was at that
25 debriefing at Troy?  Correct?

41

1    A    Yes.  And if I remember correctly,
2  it probably didn't get mentioned, because
3  they were pretty adamant about discussing the
4  observation, and that was about it.
5    Q    Now, when you were in the hallway
6  with Dr. Ruediger, was anyone else present
7  that could have heard you speaking with him?
8  Ms. Towns or anyone else?
9    A    It was so loud with all the kids
10  around.  It was lunch period.  So, I doubt
11  it.
12    Q    Now, in that hallway -- I'll just
13  call it hallway meeting, for lack of a better
14  term.
15    A    Okay.
16    Q    Did Dr. Ruediger say anything to
17  you at that point about anything?
18    A    I wanted to try to explain why I
19  had left Houston County.  And he said, "You
20  know, we're just not going to talk about that
21  right now."  Something to that effect.
22    Q    Now, did y'all talk about your
23  leaving the Houston County High School at the
24  debriefing?
25    A    With Dr. Lumpkin present?

42

1    Q    Yes.
2    A    Yes.
3    Q    Okay.  Now, did Dr. Lumpkin do
4  anything to you that you're complaining about
5  in this lawsuit?
6    A    No.
7    Q    And Dr. Lumpkin's first name?
8    A    Cynthia, if I remember correctly.
9    Q    I just don't know if that's in the
10  record or not.  If I remember, you said that
11  she may have been a prior dean or a prior
12  head, department head?
13    A    I want to say I read that
14  somewhere.
15    Q    And I don't know.  I'm just
16  saying --
17    A    But I don't know for sure.
18    Q    I thought I read that in your
19  deposition.  Have you ever had any classes
20  with Dr. Lumpkin?
21    A    No.
22    Q    Did she play any role in your
23  Beverlye --
24    A    No.
25    Q    And, again, how long did that

43

1  observation debriefing at Troy take place?
2    A    I believe the paperwork said an
3  hour.  I just didn't recall.
4    Q    And did Dr. Ruediger say anything
5  at that debriefing about your leaving school?
6    A    Yes.  That was one of the critiques
7  that he mentioned.  He gave me a 1 on
8  professional behavior.
9    Q    And did he say he was giving you
10  that 1 because of your leaving?
11    A    Yes.  If I remember correctly, yes,
12  that was what he indicated.
13    Q    Did he say he was giving you the 1
14  for any other reason?
15    A    Not that I recall.
16    Q    Did you get any other scores on
17  your observation that day that you would
18  consider too low?
19    A    Yes.
20    Q    Okay.  What scores were those?
21    A    There were some -- mostly 2's.
22    Q    Now, did you consider all of the
23  2's that you received too low?
24    A    I felt that it was a reflection of
25  my trying to get help for the kids by going

44

1  to Mr. Andrews.
2    Q    Did Dr. Ruediger ever say that that
3  was the case?
4    A    I don't recall if he said yes or
5  no.
6    Q    Now, did you disagree with
7  Dr. Ruediger giving you that 1 for
8  professional behavior?
9    A    Yes.  Because it was my
10  understanding that whenever an observation
11  was being done, it is on that given moment in
12  time in the classroom, not outside the
13  classroom.
14    Q    And where did you get that
15  understanding from?
16    A    From all of my teachers at Troy
17  University who had anything to do with any
18  kind of education program.  It's based on the
19  PEPE, that Dothan City Schools, for instance,
20  uses as their way of measuring, you know, how
21  a teacher is doing in the classroom.
22    Q    Now, did you ever communicate to
23  Dr. Ruediger that you were not pleased with
24  both the 1 and the 2's?
25    A    Yes.

1    Q    And when did you communicate that
2    to him?
3    A    At that meeting, as well as in the
4    written response, the reflection.
5    Q    And when you communicated it to him
6    at that meeting, Dr. Lumpkin would have heard
7    that? Correct?
8    A    Yes.
9    Q    And do you know whether Dr. Lumpkin
10   or anyone else read your written statement,
11   other than Dr. Ruediger?
12   A    I have no idea.
13   Q    Did you complain to anyone else,
14   other than Dr. Ruediger or Dr. Lumpkin, who
15   was sitting there that day?
16   A    No.
17   Q    Now, I know that you had said that
18   you told Dr. Ruediger in that hallway meeting
19   that Ms. Parris was threatening to fail your
20   internship. Did you tell Dr. Ruediger that
21   at any other time?
22   A    No, I don't believe so. Mainly
23   because he was only there twice, and the
24   first time, I was not being threatened. It
25   wasn't until after I went and talked to Mr.

1    stated that she made that threat in phone
2    conversations.
3    A    At least one phone conversation,
4    but in person, as well.
5    Q    So, at least one phone
6    conversation. And how many times in person?
7    A    I believe it was at least two, that
8    I can recall.
9    Q    And once would have been on the
10   30th of August? Am I correct?
11   A    Yes.
12   Q    And when would the other in-person
13   threat be?
14   A    Okay. That would have been -- let
15   me make sure I've got that. The 30th would
16   have been a phone call, I believe. I'm
17   sorry.
18   Q    I'm sorry. Would that be August
19   the 30th?
20   A    I believe August the 30th was a
21   phone call.
22   Q    Okay. Do you know who initiated
23   that call?
24   A    Originally, Ms. Teat, who is the
25   librarian, had come to my room, wherever I

46

1    Pitchford about the concerns.
2    Q    So, Ms. Parris didn't threaten you
3    until you went and talked to Mr. Pitchford
4    about the concerns?
5    A    After I had talked to him and he
6    had called her. Yes.
7    Q    What date would that be? Would you
8    be able to look at your calendar and tell me?
9    A    Yes. Okay. The conference was on
10   Friday, August 27th. And so, Monday, the
11   30th, was when she claimed that I was not
12   there to shake things up at the school and
13   all that sort of thing.
14   Q    And did there ever come a time that
15   Ms. Parris stopped threatening to fail your
16   internship?
17   A    Well, I guess that would be around
18   the 14th of October, when she actually told
19   me that it had been administratively
20   withdrawn.
21   Q    Did she ever threaten to fail your
22   internship when anyone else was present that
23   could hear that?
24   A    No, not to my recollection.
25   Q    Now, reading your deposition, you

48

1    was, and told me that she was on the phone,
2    and that I could use -- or that she had
3    called. And she let me use her phone in the
4    library.
5    Q    So, was it Ms. Parris who called
6    you first?
7    A    Yes.
8    Q    Okay. And you returned her call?
9    A    I returned her call. September 1st
10   was the first time she actually told me in
11   person. And that was in a meeting at about
12   8:30 that morning.
13   Q    Was anyone else present at that
14   meeting?
15   A    Yes. Mr. Andrews came, Paul
16   Strange, Mr. Pitchford, Pam Parris, and my
17   AEA rep, I believe. No. That was a
18   different meeting. So, September 1st was the
19   first time she told me in person.
20        The second time she told me in person, I
21   believe, would have been after -- the Monday
22   after the 24th of September. So, that would
23   have been --
24   Q    The 27th of September?
25   A    Yes.

49

1    Q    Was anyone else present at that
2  meeting?
3    A    I believe that -- I'm sorry.  I'm
4  not sure.  Let me think here.
5        MR. FAULK:  You're not sure about
6          the date or not sure who was
7          present?
8        THE WITNESS:  I'm not sure about
9          the date.  I'm sorry.
10    Q    Take your time with your calendar.
11        MR. BRANTLEY:  Just take your time.
12    A    (Witness reviewing document.)
13  Okay.  It was September 27th.
14    Q    Okay.  That Monday after the 24th?
15    A    Right.  And that's when Sharon Cole
16  had told me that she would come to that
17  meeting, as well, but she didn't.
18        (Recess in deposition.)
19    Q    Now, you had referred to that
20  August 30 phone call with Ms. Parris as a
21  situation where she had threatened to fail
22  your internship.
23    A    Yes.
24    Q    How long did that phone call take
25  place?

50

1    A    Probably 15 minutes or so, I would
2  imagine.
3    Q    And what did Ms. Parris tell you in
4  this phone call?
5    A    She told me that I was not there to
6  shake things up.  I told her that there were,
7  you know, illegal things going on.  Some of
8  the students -- I may have -- I don't know
9  for sure that I specifically told her that
10  there were no IEP's for some students, for
11  instance.  But, that I was concerned for the
12  students and their educational needs.
13        And, again, she just said that it was
14  not my place to come in and shake things up,
15  and that if I didn't stop, I was in jeopardy
16  of failing my internship.
17    Q    Did she say anything else?
18    A    I don't recall what else.  That was
19  just the main part of the conversation.
20    Q    Now, on the September 1st
21  person-to-person meeting, what did Ms. Parris
22  say to you that was a threat to fail your
23  internship?
24    A    She said that there had been a
25  complaint that I was causing dissension among

51

1  the faculty.  And I didn't interact with the
2  faculty that much.  The only people that I
3  interacted with were mainly the teachers that
4  I was in their room with.  And that would
5  have been Ms. Sims, Ms. Ezell and Ms. Towns.
6        But I understood that Ms. Monday had
7  made a complaint about a statement that I had
8  -- or she had made to me.  And she didn't
9  particularly want me in -- any special ed
10  teacher in her class.
11        But, that I needed to get in line with
12  what she had been telling me before, make Mr.
13  Pitchford happy, or else I was in jeopardy of
14  losing my -- or failing my internship.
15    Q    And what she said to you, would
16  that have been heard by the other individuals
17  at that meeting on September 1st?
18    A    No.  She took me -- she had me walk
19  out with her into the little vestibule to
20  have a little private chat.
21    Q    Did she say anything else in that
22  September 1st meeting?
23    A    Specifically about my failing my
24  internship --
25    Q    Yes.

52

1    A    -- or other things?  No, not that I
2  can recall.
3    Q    What else did she say in that
4  September 1st meeting?
5    A    She was in the meeting trying to
6  reassure Mr. Pitchford and Mr. Andrews that
7  she valued their relationship, being able to
8  put interns into the county system, and hoped
9  that they would continue -- be able to
10  continue that for a long time.
11    Q    Did she say anything else?
12    A    Not that I can recall.  I'm sure
13  she probably did.
14    Q    Now, in the September 27th --
15    A    Yes.
16    Q    -- meeting, what did Ms. Parris say
17  with regard to a threat toward your failing
18  the internship?
19    A    Well, she was very, very angry.
20  Because I was waiting out in the -- I was
21  waiting for Ms. Cole to come, to show up.
22  And she got to the point where she said that,
23  "You've really done it now."  When she first
24  came in, she told me, in the conference room
25  -- and, unfortunately, we were just by

53

1  ourselves. But she said, "You've really done
2  it now. I told you that you weren't supposed
3  to shake things up here. And I've had phone
4  calls starting early in the morning, phone
5  call after phone call," typing then.
6       And then, she also -- after the meeting
7  was over, again, she had me walk out in the
8  vestibule, and that's where she again
9  threatened that I would -- I could -- I was
10  in jeopardy of failing my internship.
11       Q    What did she say to you in the
12  vestibule?
13       A    She told me that I was in jeopardy
14  of failing my internship. And I told her --
15  that's where I -- when I told her that, as a
16  military wife, you know, I take the laws of
17  the land pretty seriously, and that I wasn't
18  going to do anything illegal. And she told
19  me that she wasn't intimidated by the fact
20  that I was a military wife.
21       And I told her it wasn't intended to be
22  any kind of intimidation. Just I wanted to
23  stress to her that it's very important to me,
24  as a citizen, as a military wife, that I do
25  the right thing.

54

1       She also indicated to me that she knew
2  Sharon Cole -- that I had been waiting for
3  Sharon Cole, who never showed up. But she
4  said, "Sharon Cole doesn't intimidate me,
5  either, because she has nothing to do with
6  Troy University."
7       Q    And would anyone have heard the
8  vestibule conference?
9       A    Unfortunately, no.
10       Q    Do you know whether Ms. Cole ever
11  communicated with anyone at Troy?
12       A    I know she called -- I know she
13  talked to Mr. Pitchford. I do not know if
14  she talked to anybody else.
15       Q    And when did you first contact the
16  AEA?
17       A    On that Friday.
18       Q    That Friday, the 24th of September?
19       A    Yes.
20       Q    So, prior to September 24th, you
21  hadn't contacted them?
22       A    No.
23       Q    And when did you first become a
24  member of the AEA?
25       MR. FAULK: Objection. You're

55

1  getting into her rights of
2  association. And what
3  relevance of discovery, I don't
4  understand. What's the idea of
5  the question?
6       MR. MUSSO: I just want to know
7  when she became a member of the
8  AEA. If she said certain
9  things to the AEA that are
10  relevant to this lawsuit,
11  they're certainly discoverable.
12       MR. FAULK: Well, that's not
13  necessarily true. But,
14  anyway --
15       MR. MUSSO: I mean, unless they
16  were said to a lawyer, they're
17  completely discoverable.
18       MR. FAULK: That's not necessarily
19  true.
20       MR. MUSSO: And whether they can
21  lead to discovery is also
22  what's important. I mean, if
23  she has a right to association,
24  she also filed a lawsuit, and
25  she has to provide

56

1  communication in this lawsuit,
2  called discovery.
3       MR. FAULK: Well, she has to
4  respond to appropriate
5  discovery. Now, I don't
6  particularly care if she tells
7  you when she joined the AEA.
8  But, I mean, we're just heading
9  in a direction that's going to
10  lead to a dispute, if what
11  you're trying to do is get at
12  her private communications when
13  she's seeking legal assistance
14  through her professional
15  organization.
16       MR. MUSSO: And I'm not going to
17  ask her what she talked to with
18  regard to a lawyer at the AEA.
19       Q    But I'm asking you, when did you
20  first become a member of the AEA?
21       MR. BRANTLEY: Object.
22       MR. FAULK: No. You can answer
23  that.
24       A    Well, I was a student AEA when I
25  became an intern. Then, when I became

57

1    employed by Houston County, student AEA said
2    I was not eligible to them. I would have to
3    join the regular AEA.
4        Q    And did you do that?
5        A    Yes. So, that would have been some
6    time in August, whenever they came around and
7    gave me the information.
8        Q    Was your membership dual? Were you
9    still student and regular, or were you just
10   regular?
11       A    According to my information, it was
12   just regular.
13       Q    And at any time you met with any
14   Troy representative, be it Dr. Ruediger,
15   Dr. Lumpkin, Ms. Parris, Dr. Jones,
16   Dr. Morin, was there ever an AEA
17   representative present?
18       A    No.
19       Q    Now, you made reference to this
20   August 30th phone call. Do you have any
21   specific recollection of any other phone
22   calls with Ms. Parris where she threatened to
23   fail your internship?
24       A    She would call me at school every
25   now and again, but I don't recall

58

1    specifically any dates.
2        Q    So, was there any time after
3    September the 27th that Ms. Parris threatened
4    to fail your internship?
5        A    I believe, but I did not document
6    it, that there might have been another time.
7    Because she talked to me about Dr. Jones will
8    probably make the decision. And if I
9    remember correctly, it was about a week
10   before. And I said, "So, what does that
11   mean? Am I going to fail the internship?"
12   And she said that Dr. Jones will make the
13   final decision.
14       Q    And where were you at? Was this a
15   phone conversation or face-to-face?
16       A    I'm sorry. I don't -- I don't
17   know. I did not document that.
18       Q    Did you say it was a week before a
19   certain date or certain event?
20       A    I want to say it was about a week
21   before I was actually administratively
22   withdrawn. Somewhere a week or two, max.
23       Q    In your prior deposition -- let me
24   ask you this: Do you recall when you learned
25   that Ms. Parris was not going to be making

59

1    the decision whether you failed or not?
2        A    The final decision? I don't know a
3    specific date. She just indicated that
4    Dr. Jones would be making the final decision.
5        Q    Do you know what Ms. Parris'
6    official title was?
7        A    I've got it written down somewhere.
8        Q    If you know today?
9        A    Internship advisor or something.
10   No. It's something different, I think.
11       Q    Do you know whether she was
12   actually a faculty member or not?
13       A    She taught a class.
14       Q    Which class did she teach?
15       A    I don't recall the name of it. I
16   would have to look on my records. But it was
17   an introductory class to the education
18   program.
19       Q    Do you know whether that class was
20   a pass or fail or actual graded class?
21       A    I believe it was an actual graded
22   class.
23       Q    And did she also administer
24   internships for individuals who were not part
25   of the special ed program?

60

1        A    Yes. She was over all the interns.
2    But she would specifically make visits to the
3    interns that had -- that were being paid by a
4    school system.
5        Q    Do you know if she ever made visits
6    to any other interns who weren't being paid?
7        A    Not that I'm aware of.
8        Q    Do you know whether she had any
9    types of degrees, and what they were?
10       A    I don't know for sure.
11       Q    She wasn't called doctor, though,
12   was she?
13       A    No.
14       Q    Do you know whether she did or
15   didn't have a Ph.D.?
16       A    I don't believe she had a Ph.D.
17       Q    Do you know whether she had ever
18   had any type of training in special
19   education?
20       A    Not to my knowledge.
21       Q    Do you know whether she ever had
22   any type of training in special education
23   law?
24       A    Not to my knowledge.
25       Q    Do you know whether she ever had

1   any special training in the IDEA?
2     A   Not to my knowledge.
3     Q   Any special training in the ADA?
4     A   Not to my knowledge.
5     Q   Any special training on how to do
6   an IEP?
7     A   Not to my knowledge.
8     Q   Now, in the September 30th
9   observation debriefing when Dr. Lumpkin was
10  present, did Dr. Lumpkin or Dr. Ruediger say
11  anything about your going to the central
12  office that Friday before?
13     A   About leaving the school to go.
14     Q   Did they say anything about your
15  actual discussion, anything you said with Mr.
16  Andrews?
17     A   I don't recall.
18     Q   They did refer to your leaving the
19  school?
20     A   Yes. Yes.
21     Q   Did Dr. Ruediger note disapproval
22  that you left the school?
23     A   Yes.
24     Q   And did Dr. Lumpkin note
25  disapproval that you were leaving the school?

---

62

1     A   Yes.
2     Q   Did they state why that they
3  disapproved that?
4     A   I don't recall specifically.
5     Q   Do you know of any other intern,
6  whether they were paid or not, who ever left
7  the school during school hours?
8     A   I'm not sure of interns, but other
9  teachers did.
10     Q   When you say "other teachers," were
11  these other teachers at Houston County?
12     A   Yes.
13     Q   Did you communicate to anyone at
14  Troy about these other teachers at Houston
15  County School System who had left early?
16     A   The only person that I think knew
17  about it was Amy Deese, because she was the
18  first person to actually tell me that she had
19  seen Paul Payne, who was a special education
20  teacher assigned to her room -- she saw him
21  leave the campus in his vehicle. She had a
22  huge window grouping, and watched him leave
23  and come back with some food.
24     And one day when I was in her room, she
25  said, "There he goes again." And so, I saw

1   him leave in his car from campus.
2     Q   And Amy Deese was a fellow intern?
3     A   She was another situation like
4  mine, where she was a paid intern. Yes.
5     Q   And what did she teach?
6     A   English.
7     Q   English. Did anyone else at Troy
8  have any knowledge about anyone at the
9  Houston County School System leaving early?
10     A   I don't know.
11     Q   And Mr. Payne, do you know whether
12  he was on his lunch hour?
13     A   It was not lunchtime.
14     Q   It wasn't lunchtime?
15     A   No.
16     Q   Do you know one way or the other
17  whether he had asked for any permission to do
18  that?
19     A   Not to my knowledge.
20     Q   Now, as we sit here today, do you
21  know who actually made the decision to
22  administratively withdraw your internship?
23     A   I don't know for sure.
24     Q   Did anyone tell you that someone
25  made that decision?

---

64

1     A   I don't know that they actually
2  told me. I got a letter from Dr. Jones that
3  said my internship had been administratively
4  withdrawn.
5     Q   What was Dr. Jones' position at
6  that time, when your internship was
7  administratively withdrawn?
8     A   Dean of education.
9     Q   Was there a chairperson there at
10  Dothan --
11     A   I'm sorry?
12     Q   -- at the education department?
13  Actual chairperson of the education
14  department?
15     A   In Dothan?
16     Q   Yes.
17     A   I'm not sure what you mean.
18     Q   Just, you know, when I was a
19  teacher, you had the chairperson of the
20  English department, and then, you had a dean
21  over the chairperson.
22     A   I don't know how -- I mean, I know
23  -- well, at Dothan High School, I believe
24  they have theirs departmentalized. But other
25  schools, like Beverlye, they didn't have --

65

1  Q    I'm sorry. I meant Troy. Troy
2  University.
3  A    Oh, Troy.
4  Q    I'm sorry. Do you know if there
5  was a chairperson over the education
6  department?
7  A    I don't know that. I believe
8  Dr. Morin was called the chair of special
9  education.
10  Q    Was there someone at Troy
11  University who, at that time, you considered
12  the head of the special education group?
13  A    I guess that would be Dr. Morin.
14  Q    When you say you guess, do you
15  know? I'm not trying to --
16  A    Right.
17  Q    -- ask you to guess.
18  A    I believe that was her title.
19  Q    So, would Dr. Jones have been over
20  Dr. Morin?
21  A    Yes. That's my understanding.
22  Q    And Dr. Ruediger would have been
23  under Dr. Morin?
24  A    One would assume that.
25  Q    And that's just an assumption.

66

1  And, again, I'm not asking you to guess.
2  But, did you ever go to Dr. Morin and
3  complain about anything that Dr. Jones did,
4  Dr. Ruediger did, or Pam Parris did?
5  A    No.
6  Q    Is there any specific reason you
7  didn't?
8  A    I tried to keep everything at the
9  very lowest level. And I figured she would
10  know about it, anyway. Because, as a
11  military wife, the chain of command, I'm
12  familiar with.
13  Q    Do you know, one way or the other,
14  whether she did know about it?
15  A    From the times I've seen her since
16  my internship, I don't think she knows.
17  MR. FAULK: You're talking about
18     Dr. Morin, now?
19  MR. MUSSO: Yes.
20  THE WITNESS: Yeah. Dr. Morin.
21  A    I didn't get the impression that
22  she knew everything that had gone on. I got
23  the impression that she knew what they wanted
24  her to know. That was just my impression.
25  Q    And when you got that impression,

67

1  what caused you to have that impression?
2  A    She invited me to be a consultant,
3  along with another teacher from Beverlye
4  Middle School, a consultant to the
5  university, a year ago or so, in September,
6  last year.
7  And I got the impression that she was
8  under the impression that I had turned around
9  in terms of not causing dissension. You
10  know, like this -- you know, the dissension
11  that had been previously mentioned, that I
12  was causing dissension among the faculty at
13  Troy -- excuse me -- Houston County High
14  School. I got the impression that that was
15  what she was speaking about.
16  Q    Did she actually say something to
17  you that caused you to have that impression?
18  A    She was introducing me to the group
19  of educators, principals. I believe it was
20  principals and some other people from the
21  education field around the Wiregrass area.
22  And she just kept telling everybody how proud
23  she was of me, and that I had just come such
24  a long way, or something to that effect.
25  Q    And did you have any complaints

68

1  about what she was saying about you that day?
2  A    No.
3  Q    I mean, were you honored by what
4  she was saying about you, then?
5  A    Yes. I was delighted.
6  Q    And do you know whether her opinion
7  has changed at all from that speech she gave
8  about you that day?
9  A    I don't know.
10  Q    And were you pleased to be a part
11  of that panel that day?
12  A    I enjoyed it very much.
13  Q    Was that the first time you had
14  been back on the Dothan campus since your
15  graduation?
16  A    I believe it was.
17  Q    And have you been back since then?
18  A    No, except to get my -- excuse me.
19  Except to get a copy of my transcript.
20  That's it.
21  Q    And that day when you were on that
22  panel, what exactly did you do? Did you give
23  a speech?
24  A    This other general education
25  teacher, she was a history teacher. And I

1   love history. And we did -- we presented a
2   -- oh, gosh. I'm trying to remember what the
3   word is. We presented on the topic of
4   collaboration. We did a --
5      Q    Powerpoint?
6      A    Thank you. -- Powerpoint
7   presentation. And one of our fellow teachers
8   had taped us collaborating and that sort of
9   thing. So, we had that presented.
10     Q    So, you were talking about the
11  special education element?
12     A    Yes. Collaboration.
13     Q    Okay. And she was a teacher who
14  you worked with to incorporate the special
15  education students into her general
16  classroom?
17     A    Right. Yes.
18     Q    How long did your presentation
19  last?
20     A    Oh, probably 20 minutes or so.
21  Maybe a little longer.
22     Q    And it was Dr. Morin who invited
23  you to do that?
24     A    Yes.
25     Q    Did you have any hesitation on

70

1   doing it?
2      A    No.
3      Q    When you were there, did you see
4   Dr. Ruediger?
5      A    Yes. He was present.
6      Q    Did you speak to him or he speak to
7   you?
8      A    We nodded. That's about all. When
9   I got there -- she had told me to be there at
10  a certain time. And so, things were already
11  kind of starting. And so, it wasn't like we
12  had a big opportunity to go around and speak
13  to each other.
14     Q    Did you see Dr. Jones there?
15     A    No. I don't believe she was there.
16     Q    Did you see Ms. Parris there?
17     A    No.
18     Q    And this is while you were a
19  full-time teacher at Beverlye? Correct?
20     A    Correct.
21     Q    You had already graduated?
22     A    Correct.
23     Q    Is that something you put on your
24  resume?
25     A    I would probably put it on. I

1   haven't done it yet, but I would.
2      Q    I just reminded you.
3      A    Thank you.
4      Q    Now, I know in this lawsuit you've
5   said that Pam Parris threatened to fail your
6   internship, and that Dr. Ruediger gave you
7   low scores on that observation.
8      A    Uh-huh.
9      Q    What I'm a little confused at,
10  reading your complaint and hearing your
11  testimony so far, is, what did Dr. Jones do
12  to you?
13     A    Dr. Jones is part of the chain of
14  command. And it's my understanding that
15  she's responsible for the actions of her
16  professors.
17     Q    Any other reason that you sued her?
18         MR. FAULK: She's, of course,
19             acting on legal advice. But,
20             other than that, whatever you
21             know, go ahead and tell him
22             your personal knowledge.
23     A    Not that I can think of at the
24  time.
25     Q    Did Dr. Jones ever tell you not to

72

1   communicate anything to the Houston County
2   Board of Education?
3      A    No.
4      Q    Did you ever go to her and complain
5   to her about anything that Ms. Parris or
6   Dr. Ruediger did to you?
7      A    No.
8      Q    Did she ever tell you that she was
9   going to take any action against you that you
10  didn't like because of anything you did at
11  the Houston County Board of Education?
12     A    No. The only time I talked to
13  Dr. Jones specifically about a situation was,
14  I believe, after -- I think it was after I
15  completed my internship, my second
16  internship. Dr. Morin had suggested that I
17  go and talk to her.
18     Q    And when you talked to her, was
19  anyone else present?
20     A    No.
21     Q    Was this in her office?
22     A    In her office.
23     Q    And what did you tell her at that
24  point?
25     A    That I was disappointed with the

73

1  way things were handled the first time, with
2  my first internship, and that -- I can't
3  recall specifically.
4      Q    Do you recall anything that she
5  told you at that time?
6      A    Not particularly. She pretty much
7  listened.
8      Q    Was anyone else present?
9      A    No.
10          MR. FAULK: I'm sorry. You may
11          have done it, but I'm not quite
12          clear when that conversation
13          was.
14          MR. MUSSO: It happened at the end
15          of her Beverlye internship.
16          THE WITNESS: I believe it was at
17          the end of my Beverlye
18          internship, when I was assured
19          that I was going to graduate.
20      Q    (By Mr. Musso) How did it come
21  about that you actually were assigned to
22  Beverlye?
23      A    I'm not exactly sure, but I -- all
24  I know is that, ordinarily, Pam Parris
25  arranges that sort of thing. I was

74

1  originally assigned, for my second
2  internship, to go to Northview. And then, I
3  got a call -- I think it was from Ms. Parris,
4  but I'm not 100 percent sure -- that I was
5  going to be going to Beverlye. That Mr.
6  Norris had been delighted to have me there.
7  He knew me from Dothan High School.
8      Q    And Mr. Norris, was he the
9  principal at Beverlye?
10      A    Yes.
11      Q    And what grades are actually at
12  Beverlye?
13      A    It's middle school. It's 6th, 7th
14  and 8th.
15      Q    And which school system is
16  Northview with?
17      A    Dothan City.
18      Q    Dothan City. Were you disappointed
19  that you were going to have to go to Beverlye
20  instead of Northview?
21      A    No.
22      Q    Were you given a choice?
23      A    No. They assigned me.
24      Q    But you were pleased to be at
25  Beverlye?

75

1      A    I was excited. Yes. Only because
2  I knew people over there. I would have been
3  fine over at Northview. I just didn't know
4  anybody over there any more.
5      Q    What was closer to your home?
6      A    Actually, Northview would have been
7  closer.
8      Q    How much further away was Beverlye?
9      A    Oh, just -- it's on the south side,
10  whereas -- on the south side of the Circle a
11  little bit, and Northview is on the north
12  side.
13      Q    And did Beverlye have a good
14  special education program?
15      A    I learned a lot from them. Yes.
16      Q    I don't even think this has been
17  asked yet. But, what is the purpose of a
18  student internship at Troy University at
19  Dothan?
20      A    My understanding, it's the
21  culmination of all your learning. It's an
22  exciting and fun, yet stressful period in
23  which you are able to experiment with, you
24  know, things that you've learned, get help
25  and advice and just try to learn as much as

76

1  you can about your profession.
2      Q    And did you get all of that at your
3  Beverlye internship?
4      A    Absolutely.
5      Q    And was your internship at Houston
6  County High School exciting or fun?
7      A    Absolutely not. It was torture.
8      Q    Torture. Okay.
9      A    The only pleasurable thing were the
10  children.
11      Q    Was your internship at Houston
12  County High School, during the period you
13  were there, was it a valuable learning tool?
14      A    Oh, I learned what not to do.
15      Q    But, at Beverlye, did you learn
16  what to do?
17      A    Yes.
18      Q    And again -- and I asked you this.
19  I'm sorry to repeat it. Was the internship
20  pass or fail?
21      A    And, again, I'm thinking it was
22  pass or fail, but I'm not 100 percent sure.
23      Q    But you know that, regardless of
24  what it was, you passed or made a grade that
25  was passing, because you did graduate?

1    A    Right.

2    Q    And from reading your last
3    deposition, I believe that, pursuant to your
4    being administratively withdrawn from the
5    internship in the fall of 2005, you were not
6    charged tuition again in the spring of 2006?
7    Is that correct?

8    A    That is correct.

9    Q    Okay. Were you charged any student
10   fees?

11   A    No.

12   Q    Did you have to buy any additional
13   books that you didn't already have?

14   A    I don't believe so.

15   Q    Okay. And you took that student
16   intern class again in the spring of 2006?

17   A    Yes.

18   Q    Did you take any other classes
19   other than that student intern class and your
20   internship?

21   A    Those were the only two that I had
22   left in order to get my degree.

23   Q    And those were the two classes you
24   had taken the fall of 2005?

25   A    That is correct.

---

1    your internship, had you made any decisions
2    as to whether you wanted to work in the
3    Houston County School System on a full-time
4    basis after your graduation?

5    A    That would have been fine with me.

6    Q    Okay. But I guess my question is,
7    had you started looking for employment in any
8    other place, other than Houston County High
9    School, in the fall of 2005 --

10   A    No.

11   Q    -- before your internship was --

12   A    No. I was approached by Ms. Parris
13   about this particular paid internship. I had
14   no anticipation of getting paid at all. This
15   was just kind of out of the blue.

16   Q    Beverlye Middle School is a part of
17   which system?

18   A    Dothan City.

19   Q    Dothan City Schools?

20   A    Uh-huh.

21   Q    Okay. Did you apply for any other
22   schools in the Dothan City system other than
23   Beverlye?

24   A    To my recollection, there were no
25   special education middle school or high

---

78

1    Q    Now, in the fall of 2005, you were
2    employed at the Houston County High School?
3    Correct?

4    A    Yes.

5    Q    Okay. Was it your anticipation, if
6    you had been reappointed -- well, I guess I
7    should ask you this. Did you have any job
8    offerings from any other school for the fall
9    of 2006?

10   A    For the fall of 2006?

11   Q    Of 2006. Yeah. So, in other
12   words, here you were working at Houston
13   County High in the fall of 2005. Had you
14   made any decisions then as to whether you
15   wanted to work in another school or try to
16   work again at Houston County High?

17   A    I pretty much figured that working
18   at Houston County Schools at all were
19   probably not ever going to happen. You know.
20   Me teaching there would probably never
21   happen.

22   Q    But, let me ask you before there
23   were any problems with your internship.

24   A    Oh, okay.

25   Q    Before there were any problems with

---

80

1    school job openings.

2    Q    And is it my understanding that you
3    would only want to teach middle school or
4    high school, and not elementary?

5    A    That's all I'm qualified to teach.

6    Q    Are you qualified to teach anything
7    other than special education?

8    A    No.

9    Q    I had asked you about graduate
10   programs. Have you ever decided whether you
11   wanted to go back to Troy University for any
12   other type of bachelor program?

13   A    No. That would not be an option.

14   Q    Is that something you just wouldn't
15   want to do?

16   A    No. I've got my degree in special
17   education. And that was my chosen field, my
18   chosen profession that I wanted to be in, and
19   I still want to be in it.

20   Q    There are some people who just love
21   to get degrees. I've got four of them.

22   A    Well, I'd love to stay --

23   Q    Some I've never used.

24   A    -- a college student. I love it.

25   Q    And I did until I went broke. Then

81

1   I went to law school, and I'm still broke.
2   You would like to work for the Dothan City
3   School System now?  Correct?
4       A    Yes.
5       Q    And I think I've asked you before.
6   You do not want to go work for the Houston
7   County System?  Correct?
8       A    No.
9       Q    Okay.  And is there any other
10  school system within your residential area
11  that you would consider working for?
12      A    Yes.
13      Q    Which ones?
14      A    Probably Dale County, Henry County.
15  I'm just not much of a driver.  I don't like
16  to drive.
17      Q    Have you applied at any of those?
18      A    I have gotten online and started to
19  fill out an application, but I have not
20  finished it.
21      Q    And would that be for both Dale and
22  Henry?
23      A    Yes, it will be.
24      Q    Any other county?
25      A    Let me think.  No.  Not right this

82

1   minute, that I can think of.
2       Q    Now, do you know of any special
3   education jobs that may be coming open in the
4   next year or two at the Dothan City system?
5       A    No one would really know that, that
6   far in advance.
7       Q    Sometimes you know people who may
8   be close to retirement or --
9       A    No.
10      Q    -- you've heard them say, one more
11  year, and I'm out of here.
12      A    And they never go.
13      Q    I guess one of the things, how many
14  types of those jobs are available at the
15  Dothan City System?
16      A    Gosh.
17      Q    Would it be a dozen?
18           MR. FAULK:  You mean how many
19                positions?
20      Q    I'm sorry.  Special education.  It
21  doesn't have to be a specific number.  But
22  you're just kind of aware of how many of
23  those special education jobs that you would
24  be qualified for and be interested in are
25  there out there in the Dothan City system?

83

1       A    There were only the ones that I
2   knew of prior to the beginning of this school
3   year.  I believe there were, like, maybe four
4   or five.
5       Q    I'm sorry.  The four open --
6           MR. FAULK:  Excuse me.  I don't
7                think it's clear whether you're
8                talking about vacancies or
9                existing positions.
10      Q    Let's just say existing positions.
11  I'm just trying to get an idea of how many
12  are out there.
13      A    To my knowledge, there's none open
14  now.  They've all been filled.
15      Q    Yeah.  None open.  But, what about,
16  just how many positions are there, period?
17      A    Oh, I don't even know.
18      Q    But, I mean, would it be dozens or,
19  like, less than ten?
20      A    Oh, no.  There's -- I think
21  there's, like, maybe nine or so at Dothan
22  High School alone.
23      Q    Okay.  I just wanted to kind of get
24  an idea of --
25      A    Right.  But I'm collaborative.  So,

84

1   you know, if there's a special ed position
2   open, let's say, at Northview, and it was
3   working with the severe disabilities or
4   whatever, I'm not really trained to do that.
5   You know.  I'm trained to go into the
6   classroom with the general education teacher.
7       Q    In order to be trained to, say,
8   work with the severely disabled, and not do
9   the collaborative stuff, would that require
10  more course work?
11      A    Oh, absolutely.
12      Q    Do you have any desire to do that?
13      A    Well, there's nowhere around here
14  that -- to my knowledge, that I'd be able to
15  do that.
16      Q    So, Dothan Troy does not offer
17  that?
18      A    No.  They offer the collaborative.
19      Q    Now, I know, in your other
20  deposition, you had mentioned about Ms.
21  Ezell, there, saying something to the effect
22  that she knew Dr. Jones?
23      A    Yes.
24      Q    Do you know whether Ms. Ezell had
25  any conversations with Dr. Jones about

1  anything that happened to you at Houston
2  County High?
3     A   I do not know.
4     Q   Now, in any of these conversations
5  you had with anyone at Troy University or at
6  the Houston County Board of Education, did
7  you ever tape any of those?
8     A   No.
9     Q   Do you know of anyone who taped any
10  of those?
11     A   No.
12     Q   And I've always got to ask these
13  questions or get burned at trial.  Do you
14  have any video recordings of any of these
15  conversations?
16     A   No.
17     Q   Do you know of any video
18  recordings?
19     A   No, I do not.
20     Q   Do you know of any audio
21  recordings?
22     A   I don't know of any audio.
23     Q   Now, I know that you've given me
24  Defendant's Exhibit 33, which is some notes
25  that you took contemporaneously on the dates

86

1  they occurred.  Do you have any other type of
2  notes -- I'm not asking you things that your
3  attorney told you to do.  But, any other
4  types of notes or journals or diaries that
5  you took with regard to any facts in this
6  case?
7     A   Not that I've been able to locate
8  at this time.
9     Q   But, do you know of any?
10     A   There was a log that I was required
11  to keep.
12     Q   And I think we talked about that in
13  your last deposition?  Right?
14     A   Right.
15     Q   Anything other than that log?
16     A   Not -- no.
17     Q   Now, do you BLOG on the internet?
18     A   No.
19     Q   So, you never put anything on a web
20  page or My Space or anything like that --
21     A   No.
22     Q   -- regarding this lawsuit?
23     A   No.
24     Q   Now, I know that you stated that
25  Pam Parris threatened to fail your

87

1  internship.  You told me a couple of
2  instances where that happened.  Did her doing
3  that ever stop you from going to anyone at
4  Houston County High School or the board of
5  education and making any of your complaints?
6     A   No.  Because, as a citizen, I'm
7  outraged at what was happening there, and I
8  was -- I would have done it even if I wasn't
9  a teacher or an intern, if somebody had come
10  to me, a neighbor or something like that, and
11  said something was going on or whatever.
12     Q   Did you ever communicate that to
13  anyone other than a -- let me see.  I know
14  you talked to your husband about what was
15  going on at Houston County High?  Correct?
16     A   Yes.
17     Q   And I know, from the Blackboard,
18  you talked about some of the instances with
19  regard to what happened to some of your
20  classmates.
21     A   Yes.
22     Q   Okay.  And I know that you said you
23  communicated some of the things that you
24  considered were improper to members of the
25  Houston County Board -- I mean, individuals

88

1  who worked at the Houston County High School?
2  Correct?
3     A   Yes.
4     Q   And you communicated that to some
5  of the people who worked at Troy University?
6     A   Yes.
7     Q   Did you communicate any of the
8  disagreement you had with what was going on
9  at the school to anyone else?
10     MR. BRANTLEY:  Object to the form.
11     Q   A neighbor or friend or anyone?
12     MR. BRANTLEY:  Object to the form.
13     Disagreement.
14     Q   Well, okay.  For instance, did you
15  tell anyone else that the IEP's were not
16  being done properly?
17     A   I don't recall telling anybody that
18  specifically.
19     MR. FAULK:  Excuse me.  Do you
20     realize that, as phrased, your
21     question would exclude Andrews?
22     First you said anybody with the
23     Houston County Board, and then,
24     you said anybody at Houston
25     County High School.

89

```
 1    Q    What I'm looking for are people who
 2  don't work for the Houston County Board,
 3  people who don't work for Houston County High
 4  School, people who don't work for Troy
 5  University, people who weren't your
 6  classmates in that class. And I know you've
 7  spoken to your husband about it.
 8    A    Right.
 9    Q    My question, is there anyone else
10  in the history of the world that you talked
11  to about the IEP's not being done properly?
12    A    Not to my recollection.
13    Q    Did you talk to anyone with regard
14  to students not receiving the instruction
15  that they should be receiving?
16    A    I had a neighbor who was in the
17  teacher program, as well, in the master's.
18  And I may have mentioned to her something
19  about I was in jeopardy of losing -- or
20  failing my internship because of some
21  noncompliance issues or something to that
22  effect.
23    Q    Did you communicate to anyone other
24  than any member of the Houston County Board,
25  Houston County High, Troy University faculty
```

90

```
 1  or administrative member, or a Troy
 2  University student, anything with regard to
 3  any noncompliance issues that occurred at
 4  Houston County High?
 5    A    Not to my recollection.
 6         MR. BRANTLEY: And you can take
 7             your time and think, if you
 8             want to.
 9    A    Not to my recollection.
10    Q    So, you didn't go to any newspaper?
11    A    No.
12    Q    You didn't go to any parent/teacher
13  group?
14    A    No.
15    Q    You didn't call any parent of any
16  student?
17    A    No. I did not call the department
18  of education. No.
19    Q    You didn't go to any member of the
20  press, be it in print --
21    A    No.
22    Q    It's not something you put on the
23  internet for the world to see?
24    A    No.
25    Q    Did you actually go to any open
```

91

```
 1  board meeting?
 2    A    No. I tried to keep it on the
 3  lowest level possible.
 4    Q    And I think you said you've never
 5  met Mary -- is it Brazzelle?
 6    A    Brazzelle. No, I've never met her.
 7    Q    And I know you said you kept it on
 8  the lowest possible. So, that means you
 9  never complained to anyone above Dr. Jones,
10  say, to the provost or anyone else?
11    A    No.
12    Q    The vice president over at Dothan
13  or anyone like that?
14    A    No.
15         (Recess for lunch.)
16    Q    After you learned that your
17  internship had been administratively
18  withdrawn, did you ever return to the Houston
19  County High School?
20    A    Yes.
21    Q    Okay. And what did you do? Did
22  you actually do any teaching, or did you just
23  pick up your materials and leave? Explain
24  what happened.
25    A    No. I was back teaching again.
```

92

```
 1    Q    And how long did you continue
 2  teaching?
 3    A    Until October 20th.
 4    Q    Until you received a letter saying
 5  that your employment was ending?
 6    A    Until, yes, I was handed that
 7  letter.
 8    Q    We've talked about that in your
 9  last deposition. Now, from the time you
10  learned that you were administratively
11  withdrawn, up until today, have you ever
12  complained to anyone at the Houston County
13  Board of Education or Houston County High
14  School, Houston County education system,
15  about anything that happened to you while you
16  were at Houston County High?
17    A    No.
18         MR. FAULK: Pardon me. Just to
19             make sure we don't appear to be
20             hiding the ball, there were
21             some communications between AEA
22             representatives and the Houston
23             County Board and I guess their
24             attorney. I think I saw
25             something from Jere Segrest.
```

93

1     But, anyway, I mean, she did,
2     through representatives, in any
3     event.
4         MR. WALDING:  But not directly.
5     Q    Other than something that would
6  have been through any complaint you made with
7  the AEA, did you discuss with anybody at the
8  Houston County Board of Education, Houston
9  County education system, Houston County High
10  School, anything that happened to you at
11  Houston County High?
12     A    No, I don't believe so.
13     Q    Now, did you ever complain about
14  anything that you felt was not being done
15  properly at the Houston County High School
16  before your internship started?
17     A    Just to Mr. Strange, when we were
18  discussing the fact that we didn't have IEP's
19  for some of the students, didn't have files
20  for some of them, some of the IEP's were
21  written for the resource room instead of the
22  general education room.  That sort of thing.
23     Q    And that would have been before
24  your internship started?
25     A    Yes.

94

1     Q    At that time, you were employed
2  by --
3     A    Yes.
4     Q    -- Houston County?
5     A    Yes.
6     Q    Now, was Dr. Ruediger the first
7  individual from Troy University who you said
8  anything with regard to anything being wrong
9  at Houston County High School?
10     A    Yes.
11     Q    And, at that time, you were an
12  intern?
13     A    Yes.
14     Q    Now, did anyone at Troy University
15  ever tell you -- and by "anyone at Troy
16  University," I'm not talking about a student,
17  not a fellow classmate.  But, anyone at Troy
18  University tell you that you were wrong in
19  how you were interpreting the special
20  education law?
21     A    No.
22     Q    Did anybody tell you you were
23  right?
24     A    Yes.
25     Q    Who told you that?

95

1     A    Mr. Strange.
2     Q    No.  I'm talking about --
3     A    Oh, at Troy.
4     Q    -- at Troy.
5     A    Oh, I'm sorry.
6     Q    Yeah.
7     A    Dr. Ruediger.
8     Q    Anybody other than Dr. Ruediger?
9     A    No.
10     Q    Now, I guess I should back up with
11  that other question, because you answered
12  Strange.  Did anyone at Troy University
13  ever say that you were wrong in how you
14  interpreted the special education law?
15     A    No.
16     Q    And you said Dr. Ruediger said you
17  were right?
18     A    That's correct.
19     Q    Specifically, did he do that one
20  time, in one meeting, or when did that occur?
21     A    At the observation, when we
22  discussed the issues.
23     Q    Was that the August 24th
24  observation?
25     A    Yes.  That was the first.

96

1     Q    Any other time?
2     A    Not that I can recall right now.
3     Q    And what did Dr. Ruediger
4  specifically say about that?
5     A    That I was correct, in that there
6  should have been IEP's for the homebound
7  students, there should be IEP's for all
8  students.  That one of the students who had
9  not had an IEP since what I was told was her
10  first day at Houston County, which was in
11  January of '05, that she --
12         MR. BRANTLEY:  '05 or '04, Tom.
13         MR. WALDING:  She said '05, Tom.
14         THE WITNESS:  January -- let me
15         see.  '04.  Excuse me.  Thank
16         you.  Yes.  January of '04.
17     A    That there should have been an
18  eligibility -- the IEP process should have
19  been started over.  That the IEP's should
20  reflect being in the general education
21  classroom instead of the resource room.  That
22  accommodations should be listed specific to
23  the general education room, and goals should
24  be listed specific to the general education
25  room, and that testing materials should be

97

1  available in order to help make those
2  decisions.
3    Q    And did he say anything else other
4  than what you've told me?
5    A    Not that I can recall.
6    Q    And was there any other time that
7  he talked to you about whether you were right
8  in your assessment as to the special
9  education law other than this August 24?
10    A    Not that I can recall.
11    Q    And did he actually look at any of
12  the student files?
13    A    No.
14    Q    So, the information he would have
15  received with regard to what was happening at
16  Houston County High, would that have been
17  through you?
18    A    Yes.  And he also questioned Mr.
19  Strange, as well.
20    Q    Were you present when he questioned
21  Mr. Strange?
22    A    Yes.
23    Q    And what did he ask Mr. Strange?
24    A    About the noncompliance issues.
25    Q    But, what did he say to Mr.

98

1  Strange?
2    A    He asked about the noncompliance
3  issues, and if they were being addressed, and
4  asked him if he was under the impression they
5  should be addressed, and would anything be
6  remedied.
7    Q    And did he do this on the 24th?
8    A    Yes.
9    Q    And what did Mr. Strange say, if
10  anything?
11    A    I don't recall specifically.  I
12  know he was uncomfortable.  Dr. Ruediger had
13  made a comment to me afterward that, you
14  know, he did not maintain any kind of eye
15  contact, so he felt that Mr. Strange was
16  uncomfortable with the situation, you know,
17  being asked questions about those issues.
18    Q    Now, I know you didn't like the
19  scores that Dr. Ruediger gave you in that
20  September observation.  Correct?
21    A    Uh-huh.
22    Q    I'm sorry.  That was a "yes"?
23    A    Yes.  That was a "yes."
24    Q    Is there anything else that
25  Dr. Ruediger did that you did not like with

99

1  regard to him being your advisor?
2    A    Not that I can think of at this
3  time.  I respected his opinion, and asked for
4  his advice, and appreciated, you know, what
5  help he could give me.
6    Q    Did you ever take any classes with
7  Dr. Ruediger --
8    A    Yes.
9    Q    -- at any other time?
10    A    Uh-huh.
11    Q    And in any of those other classes,
12  do you recall your grades?
13    A    I got A's and B's.
14    Q    Did you ever question any of the
15  grades he gave you?
16    A    No.
17    Q    Did you ever disagree with any of
18  the grades he gave you in those classes?
19    A    Probably, on occasion.  Maybe on a
20  paper that I wrote or something like that.
21  But I certainly accepted, you know, and
22  appreciated his critique.
23    Q    Did you have any classes with
24  Dr. Jones?
25    A    Only the internship seminar class,

100

1  that I can recall.
2    Q    And did you take any classes with
3  Dr. Parris?
4    A    Ms. Parris.
5    Q    Ms. Parris.  I'm sorry.
6    A    Yes.  Just that first class, when
7  we were getting into the teacher education
8  program.
9    Q    Was that the first education class
10  you took at Troy?
11    A    I don't recall.  It was probably
12  one of them.
13    Q    And you took classes with
14  Dr. Morin?
15    A    Yes.
16    Q    And did you ever take classes with
17  Dr. Lumpkin?
18    A    No.
19    Q    Who were some of your other
20  professors at Troy-Dothan in the education
21  department?
22    A    Right.  Dr. Fell.  I don't remember
23  her first name, right offhand.
24    Q    How do you spell her last name?
25    A    F-e-l-l.  Dr. Davis.  I believe it

101

1   was Kirk Davis.  Kirk.  I think it's Kirk.
2   And let me see who else.  A Mr. Miller for
3   math.  I can't remember all of them.
4       Q    Okay.  That's fine.  Now, earlier,
5   I think you had mentioned a neighbor that you
6   had spoken to.
7       A    Yes.
8       Q    What was that neighbor's name?
9       A    Oh, let me think.  Vandergeest.
10  Carol Vandergeest.  She's moved away, and I
11  have no clue where she is.
12      Q    And what were the circumstances
13  that you were talking to her?
14      A    If I remember correctly, it was
15  when I had been administratively withdrawn.
16  And she thought that was highly unusual.  And
17  I just said there were some noncompliance
18  issues at the school I was at.
19      Q    Did you tell her what those
20  noncompliance issues were?
21      A    No.
22      Q    Give her any details about what
23  actually happened other than you had been
24  administratively withdrawn?
25      A    No.

102

1       Q    Where were you at when you told her
2   this?
3       A    I believe I was at her house.
4       Q    Anyone else present?
5       A    Her children might have been.
6       Q    Were they minor children?
7       A    Yes.
8       Q    And how long were you speaking to
9   her about your situation at Troy and Houston
10  County High School?
11      A    Not long at all.
12      Q    And you said she was also an
13  educator?
14      A    Yes.  She was getting her master's.
15      Q    At Troy?
16      A    Yes.
17      Q    And was she also teaching at a
18  school?
19      A    No, not to my knowledge.
20      Q    Do you know whether she worked
21  anywhere?
22      A    I think, eventually, she might
23  have, but I don't know where it was.
24      Q    But, at that time, was she a
25  homemaker?

103

1       A    Yes, I believe so.
2       Q    Now, for your second internship,
3   did you have another TEP meeting?
4       A    Yes.
5           MR. FAULK:  What kind of meeting?
6           THE WITNESS:  TEP, T-E-P.
7           MR. MUSSO:  T-E-P.  Teacher
8              education --
9           THE WITNESS:  Program.
10          MR. MUSSO:  -- program meeting.
11          (Whereupon, Defendant's Exhibit 34
12             marked for identification.)
13      Q    (By Mr. Musso) Take as much time
14  as you need to read this.  Let me know when
15  you've finished looking at it.  I'm going to
16  give a copy to your lawyer.
17      A    (Witness reviewing document.)
18      Q    And I'll kind of go ahead and let
19  you know where I'm heading with this.  I'm
20  basically just wanting to know if there's
21  going to be anything in here you disagree
22  with.
23      A    (Witness reviewing document.)
24  Okay.
25      Q    First of all, let me ask you, did

104

1   you actually have a TEP meeting on November
2   30th?
3       A    Yes.
4       Q    Do you recall having any other TEP
5   meeting before your Beverlye internship?
6       A    Yes.  We had one before my
7   internship, that we discussed last time.
8       Q    I'm sorry.  That was before your
9   Houston County High?
10      A    Yes.
11      Q    Okay.  And this one was before your
12  Beverlye?
13      A    That's correct.
14      Q    Did you have any other TEP meetings
15  other than those two?
16      A    No.
17      Q    Now, who is Jim Windle?  Do you
18  know?
19      A    I have no clue.
20      Q    Okay.  Victoria Morin, that would
21  be Dr. Morin?  Correct?
22      A    Correct.
23      Q    And Elizabeth Fell, you had
24  mentioned, was a professor?
25      A    Yes.

105

1   Q   Cynthia Lumpkin, that would be
2   Dr. Lumpkin?
3   A   Yes.
4   Q   What about Cynthia Hicks?
5   A   I don't recall who that is.
6   Q   Gary Manfready?
7   A   Manfready. He was a newer
8   professor, and I -- he was the one who was
9   the professor for the new internship seminar
10  class that I would be attending when I was at
11  Beverlye.
12  Q   Oh, okay. So, he was your
13  instructor for that?
14  A   Right. He was one of them. And
15  then, JoAnn McFarland, if I remember
16  correctly, was the second one. There were
17  two.
18  Q   And what about Rita Farver?
19  A   Rita Farver. I never had her for a
20  class, but she was -- I believe she taught
21  classes there.
22  Q   And I may have already asked you
23  this, and I apologize if I have. But, who
24  basically held the role that Dr. Ruediger
25  held when you were at Beverlye, and was your

106

1   advisor?
2   A   Who was my advisor at Beverlye?
3   Q   Yes.
4   A   Dr. Morin.
5   Q   Dr. Morin. Now, I guess probably
6   the most efficient way is, in this first
7   paragraph, do you disagree with anything
8   that's written in this first paragraph?
9        MR. FAULK: Excuse me. Are you
10           asking her if it accurately
11           reports what was said --
12       MR. MUSSO: I'm going to get to
13           that.
14       MR. FAULK: -- or are you asking
15           her whether she agrees with the
16           assertions that were made by
17           them at the meeting?
18  Q   Okay. Let me put it this way.
19  First of all, do you know who actually
20  prepared this document?
21  A   No.
22  Q   Okay. Now, in this meeting, did
23  Ms. Parris say that it would be a new
24  beginning in this internship?
25  A   Yes.

107

1   Q   And did she ask you to tell her
2   what kind of support she felt you needed and
3   would like to have?
4   A   Yes.
5   Q   Okay. And did you respond that you
6   would like the normal support, answers to
7   e-mails, and if you have a question, you
8   would like it answered directly?
9   A   Yes.
10  Q   And was there anything else that
11  you said with regard to her question that's
12  not listed here?
13  A   I don't really recall.
14  Q   Okay. Now, Dr. Morin said that
15  Mrs. Miller had indicated that she didn't get
16  support. Is that something that you had
17  indicated to Dr. Morin?
18  A   I had actually indicated that to
19  Dr. Ruediger and Ms. Parris.
20  Q   Do you ever recall indicating that
21  to Dr. Morin?
22  A   I had not seen Dr. Morin until that
23  TEP minutes since the last class I had with
24  her, if I remember.
25  Q   During this TEP, did you indicate

108

1   to her or anyone else that you didn't get
2   support in your first internship?
3   A   At that meeting? If I remember
4   correctly, I elaborated a little bit on that.
5   Yes.
6   Q   So, there would be a reason for
7   Dr. Morin to have knowledge that you had
8   indicated you didn't get support?
9   A   Somebody must have told her. Yes.
10  Q   Now, did you ever respond that this
11  school, meaning Troy University Dothan, told
12  you one thing, and the other school told you
13  another?
14  A   They didn't ask me to elaborate on
15  that.
16  Q   But, did you tell them something to
17  that effect?
18  A   Yes.
19  Q   But that's not something you
20  elaborated on during that meeting?
21  A   Correct.
22  Q   As we sit here today, what did Troy
23  tell you on one hand, and the other school
24  tell you on the other?
25  A   Okay. Troy University tells me

109

1  that there are certain things that need to be
2  done with the students' IEP's and the whole
3  IEP process sort of thing. And the other
4  school is basically saying, hey, look, you
5  know, they've already been done last May.
6  The administration is not going to want to
7  hold the meetings all over again. So, this
8  is the way it is for now.
9      Q    And the other school being Houston
10 County High?
11     A    Houston County High School.
12     Q    Was there some discussion at this
13 TEP meeting with regard to the inability of
14 anyone -- let me just put it this way.
15 September 24th, you tried to contact some
16 folks at Troy?
17     A    That's correct.
18     Q    And they did not get back with you
19 on the 24th? Right?
20     A    That's correct.
21     Q    And I think you said they didn't
22 get back with you that Saturday?
23     A    That's correct.
24     Q    And that the first person you spoke
25 to was Ms. Parris that following Monday?

110

1      A    That's correct.
2      Q    Okay. So, at this TEP meeting on
3  November 30th, was it discussed with regard
4  to your being able to communicate with people
5  in your next internship?
6      A    Yes.
7      Q    And were there any types of
8  understanding or agreements reached?
9      A    Yes.
10     Q    Okay. And what were those?
11     A    That I would need to know that,
12 probably on Fridays, it would not be a good
13 day to contact anybody, although, previous to
14 that, they had indicated the fact that they
15 try to check their e-mails and their phone
16 calls and that sort of thing, but sometimes
17 they don't.
18     Q    Now, in a couple of places here, it
19 says Dr. Ruediger explained that -- "He
20 emphasized that our faculty wants her to be
21 successful, and part of that is our wanting
22 to support her." Did he say that at this
23 meeting, or something to that effect?
24     A    He must have.
25     Q    But, do you recall one way or the

111

1  other?
2      A    I don't really recall.
3      Q    But you don't have any reason to
4  doubt that he said it?
5      A    No, I don't.
6      Q    Do you recall how long this meeting
7  lasted?
8      A    No. Probably 10, 15 minutes.
9      Q    Do you see the bottom paragraph on
10 the first page that says, "Dr. Lumpkin asked
11 Mrs. Miller if there was anything new that
12 she had learned in this internship that she
13 would carry into the next one. After a long
14 pause, Mrs. Miller said that she will never,
15 when asked, do illegal or unethical things."
16 Do you recall that conversation taking place?
17     A    Yes.
18     Q    And that accurately reflects what
19 happened?
20     A    Yes. At that point in time, I
21 didn't feel that I could say a whole lot,
22 because, to be honest, I didn't trust anybody
23 too much. You know. I mean, I just didn't
24 have a whole lot of trust.
25     Q    When you say you didn't have a

112

1  whole lot of trust, was there anyone in
2  specific you didn't have a whole lot of
3  trust?
4      A    Well, Dr. Ruediger, like, here,
5  he's explaining that he went back to his
6  deleted e-mails, and there weren't any. But
7  as part of the exhibits, there is an e-mail
8  addressed to him stating that I was leaving
9  the campus. And he says that he received
10 none. Just little things like that.
11     Q    Anyone other than Dr. Ruediger you
12 had a lack of trust?
13     A    Pam Parris.
14     Q    Anyone other than Dr. Ruediger and
15 Pam Parris?
16     A    No. Because I did not feel that
17 they were privy to the information that Pam
18 Parris and Dr. Ruediger were privy to.
19     Q    When you say "they," that would be
20 the other individuals at the meeting?
21     A    Correct.
22          MR. BRANTLEY: When you asked her
23          is there anybody else she
24          trusts or does not trust --
25          MR. MUSSO: And I was talking about

113

1    at the meeting.
2        MR. BRANTLEY:  You were just
3            talking about at the meeting.
4            Okay.  I just wanted to clear
5            that up.
6    Q    I guess that just leads me to say,
7    is there anyone you don't trust at Troy who
8    wasn't at the meeting?
9        MR. BRANTLEY:  At Troy?
10       MR. MUSSO:  At Troy.  Yeah.  I'm
11           not talking about Houston
12           County.
13   A    Well, Dr. Jones.
14   Q    Anyone other than Dr. Jones,
15   Dr. Ruediger and Ms. Parris?
16   A    No.
17   Q    And then, it says, "Dr. Morin
18   stated that she does not know the
19   particulars, but that Mrs. Miller needed to
20   figure out a way to work with people."
21   A    Right.  I found that interesting,
22   that she didn't know the particulars, her
23   being the special education department head.
24   But, again, you know, that goes back to what
25   Ms. Parris was indicating, my inability -- or

114

1    my causing dissension among the faculty.
2        And I'd like to clarify that.  It wasn't
3    dissension -- that was what Mr. Pitchford had
4    told her, is what she told me.  And it wasn't
5    dissension among the faculty.  It was
6    dissension between perhaps me and Ms. Ezell,
7    maybe a personality conflict there, or Mr.
8    Strange, and the fact that, you know, he's
9    asking me to do things that I'm not supposed
10   to be doing.  So, you know, it wasn't amongst
11   the whole entire faculty or anything like
12   that.  It was just that I was pissing people
13   off.  Excuse me.
14   Q    Now, Dr. Morin.  Do you have any
15   knowledge, one way or the other, whether
16   Dr. Morin knew any of the particulars?
17   A    I don't know that she did or
18   didn't.  All I can say is, in this particular
19   TEP minutes, she says that she doesn't know
20   the particulars.
21   Q    Did she say that at the meeting,
22   that you recall?
23   A    Yes.
24   Q    Did you, at any time, try to take
25   her aside to tell her any of the particulars?

115

1    A    Not at that particular point in
2    time.  No.
3    Q    At any particular point in time,
4    did you?
5    A    I actually had wanted to do that,
6    but it didn't really -- it was past news.
7    You know.
8    Q    I know you said you wanted to do
9    that, but did you?
10   A    No.
11   Q    And she, Dr. Morin, stressed that
12   she wanted this to be a successful internship
13   for her.  Did she say that at the meeting?
14   A    Yes.
15   Q    Did you believe her?
16   A    Yes, I did believe her.
17   Q    Did she do everything she could to
18   try to make it successful?
19   A    Yes.
20   Q    Did Dr. Lumpkin say that she wanted
21   to be positive and go from there?
22   A    I don't recall Dr. Lumpkin saying
23   that, but I have no reason to doubt it.
24   Q    And did Dr. Ruediger ask if you
25   felt comfortable with what is expected of

116

1    you?
2    A    I do recall.  Yes.
3    Q    And do you recall responding "yes"?
4    A    Yes.
5    Q    Did Ms. Parris invite you to come
6    to orientation?
7    A    I believe she did.
8    Q    In reading this document, No. 34,
9    was this an accurate reflection, to the best
10   of your memory, as to what happened at this
11   November 30th, 2004, TEP meeting?
12   A    Yes.
13   Q    Is there anything you recall
14   happening at this meeting that, if you were
15   writing the minutes, you would have put in?
16   A    No, I don't believe so.
17   Q    Now, did Dr. --
18       MR. FAULK:  I'm sorry.  Did she
19           answer?
20       MR. MUSSO:  Yeah.  She said, "No, I
21           don't believe so."
22   Q    Am I correct?
23   A    Yes.
24   Q    Now, did Dr. Morin actually come
25   and do observations when you were at

117

1    Beverlye?

2      A    Yes.

3      Q    And what were your scores?

4      A    The first one, she comes in, and
5    she's extremely hard.  That's the mentality
6    of the process.  You know.  You come in
7    there.  This person, no matter how good they
8    are, is not a perfect teacher, so we're going
9    to start a little lower.  So, she gave me, I
10   believe it was, one or two 2's, which means
11   needs work and needs improvement, and 3's and
12   4's.  And, eventually, I believe by probably
13   the third time she was there, maybe even
14   second, I was getting 4's -- 3's, 4's and
15   5's.

16     Q    Did you have any problems with the
17   1's and 2's that she may have given you?

18     A    No.

19     Q    So, you thought that they were
20   fair, whether you agreed with them or not?

21     A    Right.  That was her call.

22     Q    Did she have a reputation as being
23   a hard teacher?

24     A    Absolutely.

25     Q    I can't remember if I asked you

118

1    this.  Did you request her to be your --

2      A    No.

3      Q    She was just assigned to you?

4      A    Yes.

5      Q    And did you have any trepidation
6    going in, the fact that she was going to be
7    it?

8      A    A little nervous.  Yes.

9      Q    She had done it for other students,
10   too?  Right?

11     A    Oh, yes.

12     Q    Now, do you know whether Dr. Jones
13   still teaches out there or whether she's
14   retired?

15     A    I believe someone told me that they
16   thought she had retired.

17     Q    And do you know if Ms. Parris is
18   still employed at Troy?

19     A    I believe she had moved on, as
20   well.

21     Q    Do you know why she moved on?

22     A    No.

23     Q    And Dr. Ruediger, do you know
24   whether he's still teaching there?

25     A    I believe he's still there.

119

1      Q    Now, if you had to go out there and
2    take any graduate courses, would you take any
3    of these courses with Dr. Ruediger?

4      A    No, not any more.

5      Q    If Dr. Jones, say, were teaching a
6    course out there, if she wasn't retired, or
7    came back to teach a one-time special course,
8    would you take a course from Dr. Jones?

9      A    I've never really thought about it.
10   Don't know that I would really have an
11   opinion on that.

12     Q    Is there any professor, if you go
13   back to take any graduate courses, that you
14   would not have them as a teacher because of
15   anything that happened to you at Houston
16   County High?

17     A    Not that I can think of.

18     Q    Or anything that happened to you
19   because of your internship?

20     A    Not that I can think of.

21     Q    I mean, there may be some teachers
22   you just don't want to take, period, for
23   whatever reason, that doesn't have to do with
24   your internship or Houston County High.

25     A    I enjoyed all of my teachers that I

120

1    had.  And may I also say that I very much
2    enjoyed Dr. Ruediger's classes, too.  I had a
3    lot of respect for him then.

4      Q    Do you need to take a break?

5      A    (Witness shaking head in negative.)

6      Q    Are you sure?  We can take a break
7    if you want to.

8      A    (Witness shaking head in negative.)

9      Q    Now, you understand that I
10   represent Dr. Ruediger, Ms. Parris and
11   Dr. Jones?  Correct?

12     A    Yes.

13     Q    I need to ask you a damages
14   question.  Do you want money from any of
15   those three people?

16        MR. FAULK:  I think we're suing
17            them for money.

18     Q    Well, you know, the question now
19   I'm asking today, do you want money from any
20   of those people?  If you win the lawsuit, do
21   you want them to write you a check?

22        MR. BRANTLEY:  I'm going to object
23            to form.

24        MR. MUSSO:  You can object, but she
25            can answer.  It's her lawsuit.

121

1        MR. WALDING:  He didn't ask y'all.
2        MR. BRANTLEY:  And I'm objecting.
3            I'm not testifying.
4    A    I don't know of any other way that
5    these people can be held responsible for
6    their behavior towards people who want to
7    become a teacher.
8    Q    So, you do want money if you win?
9    A    I want them --
10        MR. BRANTLEY:  She's not through.
11            She's trying to answer your
12            question.
13    A    I want them to compensate somehow
14    for their behavior.  And that may be the only
15    recourse I have.
16    Q    Can you think of any other recourse
17    that you would have with those three
18    individuals?
19    A    At this point in time, I've never
20    really given it any thought.  So, I just
21    don't know what to say at this time.
22    Q    But I guess the question still is,
23    do you want money from them?
24        MR. BRANTLEY:  Object.  Asked and
25            answered.

122

1        MR. MUSSO:  No.  She still hasn't
2            said whether she wanted money
3            or not.
4        MR. BRANTLEY:  I think she has.
5        MR. MUSSO:  No.
6    A    I want them to compensate me in
7    some manner.
8    Q    And would you want part of that
9    compensation to be monetary?
10    A    If that's what's deemed
11    appropriate, then, yes.
12    Q    So, if that's what a jury says,
13    you'll take the money?
14    A    I hope that wouldn't be all that
15    the jury would say.
16    Q    Can you think of any other way they
17    could compensate you, other than monetarily?
18    A    I'm not a lawyer, so I don't know
19    what other kinds of compensation I would be
20    entitled to.
21        MR. FAULK:  That would call for a
22            legal conclusion.
23    Q    Well, you've graduated?  Right?
24    A    Yes.
25    Q    So, they can't do anything with

123

1    regards to helping you graduate.  You've
2    already graduated.
3    A    Correct.
4    Q    You would agree that they can't get
5    you your job back at Houston County High?
6    A    I wouldn't think so.
7    Q    I mean, as far as you know, they
8    don't work there?  Right?
9    A    Correct.
10    Q    They don't get to make the
11    decisions as to who works at Houston County
12    High?  Right?
13    A    Correct.
14    Q    Did Dr. Ruediger or Dr. Jones or
15    Pam Parris ever tell you that they wanted you
16    to take the internship again?
17        MR. FAULK:  You're talking about at
18            Houston County?
19        MR. MUSSO:  No.  At Beverlye.
20    Q    Let me put it this way.  I think,
21    in your other deposition, you said, at the
22    point where your internship at Houston County
23    High was going to end, you had to make some
24    decisions?  Correct?
25    A    Correct.

124

1    Q    Okay.  One of those decisions would
2    be that, you know, I've had enough.  I'm not
3    going to do this internship again, if you had
4    chosen to do that?  Correct?
5    A    Right.  The offering of another
6    internship was not offered to me initially.
7    It wasn't until my husband made some comments
8    to Ms. Parris and Dr. Ruediger.  And then, he
9    questioned, would another internship -- what
10    about another internship.  And I believe
11    that's when she said that I would have to
12    request that through Dr. Jones.
13    Q    And did you request that through
14    Dr. Jones?
15    A    Yes, I did.
16    Q    And was that a formal request in
17    writing?
18    A    Yes.
19    Q    And did Dr. Jones grant that
20    request?
21    A    Yes.
22    Q    Did Dr. Jones ever tell you that
23    she wasn't going to grant that request?
24    A    No.
25    Q    Did anyone ever tell you they

125

1  weren't going to grant that request?

2     A    No.

3     Q    But that was a choice you had to

4  make? Right?

5     A    Yes.

6     Q    That you wanted to take the --

7     A    They had several options that they

8  read in the handbook. And I don't believe

9  another internship was one of the options.

10  But they eventually --

11     Q    But I think one of the options was

12  basically a catch-all, what we deem

13  appropriate? Am I correct?

14     A    They had actually listed things,

15  and it said that it was not limited to.

16     Q    So, being not limited to means that

17  they have kind of options to --

18     A    Other possibilities. But, from

19  what I understand, it was highly irregular.

20     Q    And did you ever consider not doing

21  that other internship at Beverlye?

22     A    Absolutely not.

23     Q    So, it's something you wanted to

24  do?

25     A    Absolutely. I want to be a special

126

1  education teacher.

2     Q    Now, did Dr. Jones, Dr. Ruediger or

3  Ms. Parris ever tell you not to do the

4  Beverlye internship?

5     A    No.

6     Q    Did either of them ever encourage

7  you to go ahead and do that internship, and

8  not take any of those other options?

9     A    No.

10     Q    Did any of them recommend the other

11  options instead of this internship?

12     A    Ms. Parris listed them, here are

13  your options. And then, when my husband --

14  and that was all she said. And then, my

15  husband, if I remember correctly, after he

16  said a few things, asked about another

17  internship.

18     Q    After you had decided that you

19  wanted this other internship, did Dr. Jones

20  ever tell you that she wanted you to be

21  successful with that?

22     A    I never had any communication with

23  her after that.

24     Q    Did Dr. Ruediger ever tell you he

25  wanted you to be successful?

127

1     A    Not until this TEP meeting.

2     Q    And did he ever tell you anything

3  to that effect after the TEP meeting?

4     A    I never -- I don't believe I saw

5  him after that TEP meeting.

6     Q    Did you ever talk to him at all,

7  other than maybe that one time you nodded at

8  him when you gave the presentation?

9     A    No.

10     Q    And the same for Pam Parris. After

11  this TEP meet, did you ever have any

12  communication with Pam Parris?

13     A    Yes.

14     Q    Was that with regard to your

15  Beverlye internship?

16     A    It was at the end of my internship.

17  It was the day when we all were to bring our

18  paperwork.

19     Q    And did you have any problems with

20  Ms. Parris during your Beverlye internship?

21     A    No. I didn't have any

22  communication with her at all.

23     Q    Now, I think earlier you used the

24  term "past news" with regard to your

25  situation at Houston County High, by the time

128

1  you were having this TEP meeting on November

2  the 30th?

3     A    Right. They told me that it was a

4  forgotten thing. It would be in a file. No

5  one would ever see any of that information.

6     Q    Do you know whether anyone did see

7  that information from that file?

8     A    I don't know. I would have no way

9  of knowing that.

10     Q    And did you have any problem with

11  them saying it's going to be a forgotten

12  thing?

13     A    No.

14          MR. FAULK: I'm sorry. Who are

15          "they"?

16          MR. MUSSO: "They" being the Troy

17          people at the TEP meeting.

18          MR. FAULK: Okay.

19          MR. BRANTLEY: And, also, if you

20          would, please, define the

21          phrase "Did you have any

22          problem with."

23          MR. MUSSO: Well, okay.

24     Q    They said it's a forgotten thing?

25     A    The first internship, yes.

1  Q   Okay. So, you didn't disagree with
2  them saying, "Hey, this is a forgotten thing.
3  We're going to put it in a file. It's not
4  going to affect your further internship"?
5  A   Right.
6  Q   You didn't want it to affect your
7  further internship? Right?
8  A   No.
9  Q   And as far as you know, it's not
10 something that was ever communicated to
11 anyone else --
12 A   I don't know.
13 Q   -- outside of the Troy department?
14 A   I have no clue.
15 Q   Okay. When you apply for jobs, do
16 you list references? Any of your teachers at
17 Troy as references?
18 A   I haven't applied for a job since I
19 had my initial application in. I've started
20 them on the internet, but I haven't gotten
21 that far to where they need references.
22 Q   Do you know whether any of them do
23 need references?
24 A   I don't know, offhand.
25 Q   When you applied at Beverlye, did

1  you have to list any references of teachers?
2  A   No.
3  Q   Did you have to list any
4  references, period?
5  A   I had already turned in my resume.
6  They had that at the central office. So,
7  they just used that.
8  Q   And they had already known about
9  your work, because you were an intern?
10 Correct?
11 A   Yes, as far as I know.
12 Q   And you weren't reappointed at
13 Beverlye?
14 A   I was there for a semester, kept on
15 for the next year, and then, was not renewed.
16 Q   Do you know why you weren't
17 renewed?
18 A   I know what I was told. I mean,
19 not by Mr. Norris or anybody.
20 Q   What were you told?
21 A   That there was -- things were going
22 to change, and that there was just going to
23 be some new people coming in.
24 Q   And who told you that?
25 A   Gosh. I'm not real sure. I'm not

1  real sure who it was.
2  Q   But, when they say "new people
3  coming in," do you know who those new people
4  were?
5  A   They had an idea.
6  Q   And do you know why there were
7  going to be changes?
8  A   No.
9  Q   Do you have any idea what those
10 changes were going to be?
11 A   No.
12 Q   Is there someone there now at
13 Beverlye doing that same job you were doing?
14 A   There's been a couple of new hires
15 over there.
16 Q   Anyone doing the collaborative
17 special ed?
18 A   I don't know about collaborative.
19 I don't know.
20 MR. MUSSO: That's it, gentlemen.
21 MR. FAULK: Thank you.
22 (Recess in deposition.)
23
24
25

1                    EXAMINATION
2
3  RESUMED BY MR. WALDING:
4  Q   Mrs. Miller, I apologize, but I've
5  got some more questions for you.
6  A   That's all right.
7  Q   I'm going to try not to beat a dead
8  horse, though.
9  A   I hate to see dead horses.
10 Q   Now, during your first deposition,
11 or the first part of your deposition,
12 whichever it is, you identified about four
13 different concerns or problems that you saw
14 in the Houston County system, special ed
15 related, one of which was that students did
16 not have IEP's.
17     Another was that, in your opinion, IEP's
18 that you looked at were inappropriate for the
19 students.
20     Another was that a lady named Cathy
21 Keasler asked you to actually write an IEP,
22 and that you were not permitted to do that
23 under your internship agreement.
24     And I believe another was, you became
25 somewhat upset when a lady named Starla asked

133

1　you to sign on a document when you had not
2　actually been present for the meeting.
3　　　Are those the concerns that you talked
4　to me about during your first deposition?
5　　　A　Yes.
6　　　Q　All right.  Now, for the rest of my
7　questions, I'm going to use the phrase
8　"concerns" or "problems."  And those are the
9　things I'm referring to.  Okay?
10　　　A　Okay.
11　　　Q　Is that all right with you?
12　　　A　Yes.
13　　　Q　And you'll know what I'm talking
14　about when I say that?
15　　　A　Yes.
16　　　Q　Okay.  Now, in listening to your
17　testimony today, it appears that you
18　expressed those concerns, problems, to
19　various people associated with the Houston
20　County School System.  Is that true?
21　　　A　Yes.
22　　　Q　All right.  I'd like you to
23　identify for me who with the Houston County
24　School System you identified those problems
25　to?

134

1　　　A　That would be my supervisor, my
2　cooperating teacher, Paul Strange.
3　　　Q　Okay.
4　　　A　Principal Tim Pitchford.
5　　　Q　All right.
6　　　A　Riley Joe Andrews.
7　　　Q　All right.
8　　　A　And to my recollection, I believe
9　-- actually, I spoke to Ms. Monday about one
10　of the boy's IEP's.  Well, not the IEP
11　exactly.  The fact that she had failed him,
12　and he was having to take a science class
13　again.  And this was a student with mental
14　retardation.  So, I did ask her some
15　questions about those concerns.
16　　　Q　Are those all the persons
17　associated with the Houston County School
18　System that you addressed your concerns or
19　problems to?
20　　　A　In a roundabout way, I guess you
21　could say I discussed them with Ms. Towns,
22　because she being the teacher of record for,
23　for instance, the math classes, I discussed
24　IEP's with her and the lack of, you know,
25　accommodations, as well as with Ms. Ezell.

135

1　　　In fact, all of the students that I had
2　on my roll, I went to each one of the
3　teachers to discuss their IEP's, what was
4　there, if there was one there.  If there
5　wasn't one there, I indicated that, and told
6　them that we would have to make sure that
7　when we did get some sort of IEP for that
8　student, we would come around to them and
9　explain any kind of accommodations that might
10　be needed, the goals and that sort of thing,
11　for those students.
12　　　Q　Okay.  I want to make sure I'm
13　understanding every person within the Houston
14　County School System you identified your
15　problems or concerns with.  You told me Paul
16　Strange?
17　　　A　Yes.
18　　　Q　Tim Pitchford?
19　　　A　Yes.
20　　　Q　Riley Joe Andrews?
21　　　A　Yes.
22　　　Q　Ms. Monday?
23　　　A　Ms. Monday.
24　　　Q　Ms. Towns?
25　　　A　Ms. Towns.

136

1　　　Q　Ms. Ezell?
2　　　A　Yes.
3　　　Q　And then, you mentioned teachers
4　for students who were on your roll?
5　　　A　Right.  And Ms. Sims was another
6　one.
7　　　Q　Was she one of the teachers?
8　　　A　Yes.
9　　　MR. BRANTLEY:  That you had a
10　　　problem with or a concern?
11　　　THE WITNESS:  These were --
12　　　MR. WALDING:  My question was very
13　　　clear.
14　　　Q　Did you misunderstand my question?
15　　　A　I don't believe so.  You asked me
16　who I discussed the IEP's --
17　　　Q　Your problems and concerns.
18　　　A　Right.
19　　　Q　You agreed you would understand
20　what I meant when I said that.
21　　　A　And you said the IEP's, not having
22　them and inappropriate ones.  So, those are
23　what I spoke to them about.
24　　　Q　Right.
25　　　A　Yes.

137

1   Q    All right.  Are those all the
2   persons that you expressed your problems or
3   concerns to?
4   A    If they were on -- if the students
5   were on --
6        MR. FAULK:  Connected with the
7        Houston County Board?
8        MR. WALDING:  Yes.  I'm sorry.
9        Connected with the Houston
10       County School System.
11  A    If the students were on my roll, I
12  went to each one of those teachers with their
13  IEP's and showed them the information that I
14  had at that time with those IEP's, to let
15  them know.
16  Q    So, there may be some name that you
17  just don't remember that was a teacher with
18  the system?
19  A    Correct.
20  Q    All right.  Now, I want to ask you
21  this:  When you went to those teachers whose
22  names you may not remember, would you have
23  done that during school hours?
24  A    Generally, yes.
25  Q    And would you have done that as

138

1   part of your duties as an intern and a
2   teacher?
3   A    Some aspects, yes.
4   Q    Okay.  Let's go to Paul Strange.
5   When you talked with Paul Strange, did you do
6   that during school hours?
7   A    Yes.  Sometimes after school.
8   Q    Okay.  Well, was it at the school
9   facility?
10  A    Generally, yes.
11  Q    What about Tim Pitchford?  Did you
12  speak with him during school hours?
13  A    Yes.
14  Q    And was that also at the school
15  facility?
16  A    Yes.
17  Q    Riley Joe Andrews.  When you spoke
18  with him, you spoke with him at the central
19  office location?
20  A    Yes.
21  Q    And that was also during school
22  hours, was it not?
23  A    Yes.
24  Q    Ms. Monday.  You talked with her
25  during school hours?

139

1   A    Yes.
2   Q    And was that also at a school
3   facility?
4   A    Yes.
5   Q    Ms. Towns.  Did you talk with her
6   during school hours?
7   A    Yes.
8   Q    And at a school facility?
9   A    Yes.
10  Q    Ms. Ezell?
11  A    Yes.
12  Q    During school hours?
13  A    Yes.
14  Q    And at a school facility?
15  A    Yes.
16  Q    You mentioned, during the
17  questioning by Mr. Musso, that you had a very
18  short conversation with your neighbor, Carol
19  Vandergeest.
20  A    Uh-huh.
21  Q    Am I saying that last name right?
22  A    Yes.
23  Q    But you did not give her any
24  specifics about your problems or concerns?
25  A    No.

140

1   Q    All right.  You basically just told
2   her that your internship was in jeopardy
3   because of some noncompliance issues?
4   A    Yes.  And the illegal things that
5   they were doing at the school, which are
6   basically noncompliance issues.  Yes.
7   Q    Okay.  But, have I accurately
8   stated what you told Ms. Vandergeest?
9   A    Yes.  I would say that, to my
10  recollection, yes.
11  Q    You didn't specify these four or
12  five problems and concerns?
13  A    Not that I recall.
14  Q    All right.  Good.  And did you say,
15  during your answers to Mr. Musso, that this
16  conversation you had with Ms. Vandergeest
17  happened after you had been administratively
18  withdrawn?
19  A    I believe that was one of the
20  times, yes, that I spoke with her.
21  Q    All right.  Now, you also indicated
22  that you called Sharon Cole at one point.
23  A    Yes.
24  Q    When did you call Sharon Cole?
25  A    When I went to central office on --

141

1  let me look at my calendar to make sure of
2  the date.
3         MR. MUSSO:  I think the 24th.
4         THE WITNESS:  I think so.
5    A    On the 24th, I called her.
6    Q    And I'm sorry.  That's of
7  September?
8    A    Let me double-check.  I believe it
9  is.  Yes.
10   Q    Just for our record, you're
11 referring to Defendant's what over there?
12        MR. MUSSO:  It's 33.
13   A    33.  And, yes, the 24th of
14 September.
15   Q    And, again, for our record, what
16 year are we talking about?
17   A    2004.
18   Q    Thank you, ma'am.  Okay.  I'm
19 sorry.  You called her before you went to the
20 central office or after you went to the
21 central office?
22   A    I called her -- let me think.  I
23 believe it was before I was at the central
24 office.  I believe I called from Dothan High
25 School.

142

1    Q    And if I recall correctly, what you
2  testified to in your first deposition is that
3  you left the school at Columbia, Houston
4  County High School --
5    A    Yes.
6    Q    -- and you went to Dothan High,
7  where your husband has a position?
8    A    I went to central office, and
9  Mr. --
10   Q    Andrews?
11   A    -- Andrews' truck was not there.
12 And I believe -- I'm not 100 percent sure,
13 but I believe I called Mr. Andrews' office --
14 well, central office, and got the message
15 that he was not there, and so -- he was
16 expected back.
17        And so, I figured by the time I got to
18 the central office, he would be there.  So,
19 that's why I swung by central office.  And
20 his truck was not there.  So, I went to
21 Dothan High School to call from there,
22 because it was the closest place that I could
23 get to a phone.
24   Q    And your husband has a position
25 there?

143

1    A    Yes.
2    Q    At Dothan High School, I mean.
3    A    That's correct.
4    Q    All right.  Tell me what it is you
5  communicated to Sharon Cole?
6    A    I --
7         MR. FAULK:  Whoa.  Excuse me just a
8         minute.  We're going to object
9         to any inquiry about her
10        efforts to obtain -- you know,
11        any actual communications
12        between her and her
13        professional representative, in
14        particular, anything involving
15        a request for legal assistance.
16             We may have to do this in
17        some kind of motion for a
18        protective order or something.
19        But I'm not going to let you
20        inquire into, and I'm going to
21        instruct her not to answer,
22        concerning any communications
23        she had with AEA
24        representatives in the nature
25        of seeking legal assistance.

144

1         MR. WALDING:  And your basis for
2         that is what, Mr. Faulk?
3         MR. FAULK:  Attorney/client
4         privilege, as well as her right
5         to association and to have
6         support through a professional
7         organization.
8         MR. WALDING:  Are you saying that
9         Ms. Cole is a lawyer?
10        MR. FAULK:  No, I'm not.
11        MR. WALDING:  Because my
12        understanding is that she is
13        not.
14        MR. FAULK:  She is, in fact, a
15        conduit to the legal staff at
16        the AEA.  And it wound up with
17        the legal staff, and was
18        referred out to Mr. Brantley
19        after those negotiations
20        failed.
21        MR. WALDING:  I'm not trying to get
22        into negotiations, but I do
23        want to know about this
24        conversation she had with Ms.
25        Cole.

145

1    MR. FAULK:  We need to take a
2        break.
3    MR. WALDING:  That's fine.
4    (Recess in deposition.)
5    MR. FAULK:  I called and checked.
6        She first sought legal
7        assistance October 20th, 2004.
8    MR. WALDING:  Okay.
9    MR. FAULK:  So, anything from that
10       point forward, we would contend
11       is privileged and not subject
12       to discovery, and would move
13       for a protective order
14       concerning it, whether it went
15       through a paralegal or UniServe
16       director or who, as long as
17       she's in process of seeking
18       legal representation.
19          In any event, up to that
20       point, if you want to talk to
21       her about what she told AEA,
22       that's fine.  And then, when we
23       get to that point, if there's
24       any dispute about it, we might
25       have to make some kind of

146

1        motion.
2    MR. WALDING:  Give me that date
3        again.
4    MR. FAULK:  October 20th, which I
5        think was the day she was
6        actually told to leave the
7        campus, I think.
8    MR. WALDING:  That may be.  I don't
9        know.  Let's go back to my
10       original question, then, which
11       was -- Stacey?
12   (Whereupon, requested portion of
13       record read back by the court
14       reporter.)
15   A    Okay.  On -- let me check the date
16   -- September 24th, I left a message with
17   Sharon Cole.  She did not return my call, I
18   don't believe, until later that evening or
19   maybe the next day.
20       I just told her I was experiencing some
21   problems at Houston County High School
22   concerning IEP's, lack of, inappropriate,
23   being asked to write IEP's.  Concerns that we
24   previously discussed.
25   Q    Those four or five concerns or

147

1    problems?
2    A    Correct.
3    Q    Did you specifically address those
4    four or five concerns or problems with Sharon
5    Cole?
6    A    Yes.
7        MR. FAULK:  You're talking about in
8            the phone message, now?
9        THE WITNESS:  I'm talking about
10           when she finally got back with
11           me.
12       MR. FAULK:  Let's keep it straight.
13           Keep it straight, now.
14       THE WITNESS:  Okay.
15       MR. WALDING:  I was straight.
16       MR. FAULK:  I'm not.
17   A    When she returned my call --
18   Q    Hold on.  I was understanding what
19   you said.  You left Ms. Cole a message the
20   day you went to see Riley Joe Andrews?
21   A    Correct.
22   Q    And she did not call you back until
23   later that evening or the next day?
24   A    Correct.
25   Q    And now you're telling me about a

148

1    telephone conversation you actually had with
2    Sharon Cole, which was later that same -- the
3    evening of that day or the next day?
4    A    Or on that weekend, at some point,
5    when she was able to get back with me.  Yes.
6    And so, I told her that Mr. Andrews had given
7    me permission to not go back to the school
8    until Monday.
9        She said, "That's fine.  Just make sure
10   you go back to the school."
11       I said, "Of course.  I planned on doing
12   that."
13       And that was pretty much the extent of
14   the conversation then.  I did tell her that
15   we were going to have the meeting.  Come to
16   think of it, she did say that she would come
17   to that meeting on the following Monday.
18   Q    And which meeting are you referring
19   to?
20   A    This is the meeting where Mr.
21   Andrews was going to set it up with Ms.
22   Parris, Mr. Pitchford, Mr. Strange, myself.
23   And then, Sharon was going to come, as well.
24   Q    And did this meeting actually take
25   place?

149

1    A    Yes.

2    Q    And where did the meeting take

3 place?

4    A    In the conference room at Houston

5 County High School.

6    Q    Okay.  You and I talked about that

7 during your first deposition?

8    A    Yes.

9    Q    What was your purpose in calling

10 Ms. Cole?

11    A    I was an employee, and I felt that

12 I needed some advice from her.

13    Q    And what's your understanding of

14 Ms. Cole's position?

15    A    She is a liaison-type person

16 between the school district and AEA.

17    Q    And is it your understanding that

18 AEA is, in essence, a labor union?

19         MR. FAULK:  Oh, bull.  Objection.

20         Move to strike.

21         MR. WALDING:  I think she can

22         answer that question.

23         MR. FAULK:  And it calls for a

24         legal conclusion, among other

25         things, and is utterly

150

1         irrelevant.

2         MR. WALDING:  I don't think it's

3         irrelevant at all.

4         MR. FAULK:  You know it's not a

5         labor union.

6         MR. WALDING:  I don't know anything

7         of the sort, Mr. Faulk.

8         MR. FAULK:  You're trying to muddy

9         up the record.  We're going to

10        move to strike any such thing.

11        I'm going to go ahead and start

12        my motion in limine now.

13        MR. WALDING:  That's great.

14    Q    Would you answer my question?

15    A    I don't know what, in that respect.

16    Q    You were a member of AEA at the

17 time you made the call?

18    A    Yes.

19    Q    What's your understanding of what

20 the organization is?

21    A    It helps teachers with all kinds of

22 benefits and help and advice.

23    Q    Employment-related benefits?

24 Correct?

25    A    I guess that is my understanding.

151

1    Q    Okay.  And that's what I'm asking

2 you for, Mrs. Miller, is your understanding.

3 You're a member of this organization?

4    A    Yes.

5    Q    So, I wanted to know what your

6 understanding of what the organization is.

7 Your attorney is objecting to me calling it a

8 labor union, and I understand that.  What

9 would you characterize it as?

10    A    An organization that promotes

11 education, rights for their teachers,

12 providing benefits for the teachers, that

13 sort of thing.

14    Q    And you agree with me that it helps

15 to promote employment-related benefits for

16 teachers?

17    A    I believe so.

18    Q    Okay.  Did Ms. Cole attend a

19 meeting of any kind between the time you

20 called her on September 24th and when you

21 first sought legal representation on August

22 20?

23    A    She did not attend any meetings.

24         MR. FAULK:  Excuse me.  Did I say

25         August 20?

152

1         THE WITNESS:  No.  October.

2         MR. WALDING:  You said October 20.

3         I'm sorry.  Did I say August?

4         MR. FAULK:  Yes.

5         MR. WALDING:  Let me restate the

6         question, so we're a little

7         clearer.

8    Q    Between the time you called Ms.

9 Cole, on September 24 of '04, okay, and

10 October 20 of '04, when your attorney is

11 telling me you sought legal representation,

12 did Ms. Cole attend with you a meeting of any

13 kind related to these problems or concerns

14 you had?

15    A    No.

16    Q    To your knowledge, did Ms. Cole

17 ever have any meeting with Tim Pitchford or

18 Kenneth Lord or Riley Joe Andrews between

19 September 24 and October 20?

20    A    It's my understanding she had a

21 phone conversation, at least one phone

22 conversation, but I don't know.  I don't

23 know.  You would have to ask her.

24    Q    Sure.  How did you come about your

25 understanding that she had one phone

153

1  conversation?

2  A  Monday of -- the meeting on Monday,

3  in which she was going to attend, she called

4  me later and apologized that she couldn't

5  make it, but that she had talked to Mr.

6  Pitchford.

7  Q  And what, if anything, did she tell

8  you about that conversation?

9  A  She did not tell me anything, that

10  I can recall.

11  Q  She just said, "I called and talked

12  to Tim Pitchford"?

13  A  That's what I recall.

14  Q  All right.  You and I talked about

15  several communications that you made on this

16  Blackboard system at Troy during your first

17  deposition.  And do you have the exhibits

18  there in front of you?

19  A  (Witness reviewing documents.)

20  Q  I would ask you to look at

21  Defendant's Exhibit No. 10.

22  A  Yes.

23  Q  That's one of the communications

24  you had on the Blackboard system?

25  A  Yes.

154

1  Q  Look over at Defendant's Exhibit

2  No. 11.

3  A  Yes.

4  Q  That's another of the

5  communications you had on this Blackboard

6  system?

7  A  Yes.

8  Q  And I have a notation, Defendant's

9  Exhibit No. 31.  It should be the last

10  exhibit, Mrs. Miller, in that stack.

11  A  Yes.

12  Q  And that is also one of those

13  Blackboard communications?

14  A  Yes.

15  Q  To your knowledge, were there any

16  other communications you made over this

17  Blackboard system that might be related to

18  this lawsuit?

19  A  There could be.

20  Q  And have you seen such?

21  A  I don't have copies of them, but

22  they could -- I don't know if they could

23  still be in the program that they have at the

24  school or what.

25  Q  Have you seen hard copies of them

155

1  produced during the course of this lawsuit?

2  A  No.

3  Q  Would these be the only three that

4  we have hard copies of?

5  A  Yes, to my knowledge.

6  Q  All right.  Let me go back and ask

7  you to look at Defendant's Exhibit No. 17.

8  And I'm going to ask you to look at 18, also,

9  if you want to put a sticky on that, Tom.

10  Let's go with 17 first, though.  Does 17

11  specifically ask Ms. Parris to terminate your

12  internship?

13  A  No, it does not.

14  Q  Okay.  In fact, does it

15  specifically ask Troy to take any action

16  against you?

17  A  No.

18  Q  Look at Defendant's No. 18 for me.

19  Does that letter or document specifically ask

20  Ms. Parris or Troy to terminate your

21  internship?

22  A  No.

23  Q  Does it specifically ask Ms. Parris

24  or Troy to take any action against you?

25  A  No.

156

1  Q  Now, Mr. Musso asked you, as to

2  each of his clients, whether you wanted to be

3  compensated from them and whether you wanted

4  to be paid money.  I want to ask you the same

5  question as to each of my clients.

6  Are you asking a judge or a jury to

7  award you money by Kenneth Lord?

8  A  If that's the only compensation or

9  if that's part of a compensation or if that's

10  the appropriate compensation, yes.

11  Q  Same question as to Riley Joe

12  Andrews?

13  A  Yes.

14  Q  It's part of an appropriate award?

15  A  Yes.  They need to be -- they need

16  to be made an example of.  They need to be

17  discouraged from doing this kind of behavior

18  to anybody else that comes into their school

19  as a teacher or even an aide or anything like

20  that.  They need to be discouraged from

21  behaving the way they behaved.  So, that

22  could be.

23  Q  Same question as to Tim Pitchford?

24  A  Yes.

25  Q  The same questions as to Mr.

157

159

1 Strange?

2   A   Same answer as before.  Yes.

3   Q   And how about Ms. Ezell?

4   A   Yes.

5   Q   How about the Houston County Board,

6 as a body?

7   A   Yes.

8   Q   And when you say they need to be

9 made an example of and discouraged from this

10 type of behavior, you're referring back to

11 the behavior you told me about in your first

12 deposition?

13   A   I'm talking about the

14 inappropriateness of not having appropriate

15 IEP's for students, treating employees or

16 even interns, for that matter, the way they

17 treated me.  Yes.

18   Q   What, in your mind, have Mr. Lord,

19 Mr. Andrews, Mr. Pitchford, Mr. Strange and

20 Ms. Ezell and the Houston County Board, as a

21 body, done that would merit them being

22 punished in some way?

23   MR. FAULK:  Excuse me.  You've

24       already been over that in your

25       last seven-hour deposition, and

1   Q   Would you answer my question,

2 please, ma'am?

3   A   Okay.

4   MR. BRANTLEY:  Do you understand

5       the question?

6   A   Perhaps it would be best if you

7 asked it again.

8   MR. WALDING:  And I was trying --

9       y'all are not objecting to me

10       lumping them all together?

11       Because I can make eight

12       questions, if that was what you

13       want.

14   MR. FAULK:  As I understand --

15   MR. WALDING:  I understand it's

16       compound.

17   MR. FAULK:  As I now understand

18       your question, you're asking

19       her what, in her view, did each

20       of these people that you

21       represent --

22   MR. WALDING:  Right.

23   MR. FAULK:  -- and I presume, also,

24       Ms. Ezell and Mr. Strange --

25   MR. WALDING:  Yes.

158

160

1       we object.

2   MR. WALDING:  I don't think so.

3   MR. FAULK:  I don't see that it

4       raises any new issues on

5       redirect.  You've gone over

6       this.  You asked it as to every

7       one of them, and so did this

8       lady, Ms. Hortberg.

9   MR. WALDING:  I asked what they did

10       to merit being punished,

11       speaking to punitive damages,

12       which I believe your complaint

13       asks for.  And I've got a right

14       to cross-examine this lady.

15   MR. FAULK:  All right.  You didn't

16       ask her about punitive damages

17       before, I suppose.

18   MR. WALDING:  I used the term

19       "punished."

20   MR. FAULK:  She may not understand

21       the connection.

22   MR. WALDING:  I understand that.  I

23       understand she's not a lawyer.

24       Y'all have made that abundantly

25       clear.

1   MR. FAULK:  -- what did they do for

2       which they --

3   MR. WALDING:  Merit punishment.

4   MR. FAULK:  -- merit some type of

5       punishment.  And by that, he's

6       talking about monetary

7       damage-type punishment --

8   MR. WALDING:  Yes, sir.

9   MR. FAULK:  -- if that's your

10       question.

11   MR. BRANTLEY:  Would you explain to

12       her what punitive damages are,

13       or ask it where she understands

14       it?

15   MR. FAULK:  We'll just object to

16       the extent it calls for a legal

17       conclusion.  But you answer the

18       best you can as you understand

19       the question.

20   MR. BRANTLEY:  If you can.

21   MR. WALDING:  I didn't ask her a

22       legal question.  I asked her

23       what they did to merit being

24       punished.

25   MR. BRANTLEY:  Well, that's legal.

161

```
 1         MR. FAULK:  That's actually a legal
 2      question.
 3         THE WITNESS:  Okay.  I've got the
 4      answer.
 5         MR. FAULK:  But, anyway, she can
 6      try her best to answer.
 7         MR. WALDING:  If she's got an
 8      answer, I would like to hear
 9      it.
10      A    I hope this will answer your
11   question.  They are perpetuating and
12   promoting an inappropriate learning
13   environment for students as well as teachers.
14      Q    Okay.  And they should be punished
15   for that?
16      A    Yes, I believe so.
17      Q    Now, in your complaint, you also
18   ask for an award of attorney's fees.  Have
19   you paid any attorney's fees out of pocket?
20      A    Not at this time.
21      Q    Have you paid any money out of
22   pocket?
23      A    Not at this time.
24         MR. FAULK:  You're talking about
25         for --
```

162

```
 1         MR. WALDING:  Related to the
 2      lawsuit.
 3         MR. FAULK:  Not just attorney fees.
 4      And I don't know.  Maybe you
 5      have and maybe you haven't.
 6      But I just wanted to be sure
 7      you were following him.
 8      A    I don't believe I have at this
 9   time.
10      Q    Okay.  What is your fee arrangement
11   with your attorneys?
12         MR. FAULK:  Hold on just a minute.
13      I don't see that that's
14      discoverable.  I mean, you can
15      get into that if we get to an
16      attorney fee petition at some
17      point.
18         MR. WALDING:  Y'all have asked for
19      it in your complaint.
20         MR. FAULK:  Yeah.
21         MR. WALDING:  I'm just asking for
22      the arrangement, Mr. Faulk.
23      I'm not asking for a number.
24      Q    Is it an hourly arrangement, and
25   how much per hour?
```

163

```
 1      A    We really haven't discussed that.
 2      Q    Okay.  So, you don't know the
 3   answer to that?
 4      A    No, I don't.
 5      Q    All right.  When you were answering
 6   Mr. Musso's questions, I understood you to
 7   testify that you were not interested in
 8   working for the Houston County School System.
 9   Is that accurate?
10      A    To a certain degree.  If I was told
11   that I could be reinstated, I would consider
12   it.
13      Q    Do you understand that, as part of
14   your lawsuit, Mrs. Miller, you have asked the
15   Court to reinstate you to your position with
16   the Houston County Board of Education?
17      A    And I just said, if I was
18   reinstated, then I would accept that.
19      Q    I'm asking you --
20      A    I'm not actively seeking employment
21   right this minute at Houston County Schools.
22      Q    Okay.  Look at Defendant's 5 for
23   me, the last page of that, which I believe is
24   page seven.  Would you agree that paragraph
25   "A," under your demand for judgment, asks for
```

164

```
 1   an order directing defendants to reinstate
 2   plaintiff to her position with the Houston
 3   County Board of Education?
 4      A    I see that it states that.
 5      Q    Are you telling me today that you
 6   want a judge to reinstate you to your
 7   position as a special ed teacher at Houston
 8   County High School?
 9      A    If the judge deems it appropriate,
10   yes.
11      Q    Ma'am, I'm not asking what the
12   judge deems.
13         MR. BRANTLEY:  Well, she's answered
14      it.
15         MR. FAULK:  I think so, too.
16      Q    I'm asking what you want.
17         MR. BRANTLEY:  Object.  Asked and
18      answered.
19         MR. WALDING:  I don't think it's
20      been answered at all.
21      Q    Do you want to be reinstated --
22         MR. FAULK:  I think we --
23         MR. WALDING:  If you have an
24      objection, go ahead.  I had the
25      question half out of my mouth.
```

165

```
 1        MR. FAULK:  You can try it again,
 2           and then, we're going to call
 3           the judge.  You go ahead.  Go
 4           ahead.
 5        MR. WALDING:  That's fine, Mr.
 6           Faulk.  Thank you for
 7           interrupting my thought to the
 8           extent I can't remember my
 9           question.
10        MR. FAULK:  You were asking her is
11           she seeking reinstatement, I
12           believe.
13        MR. WALDING:  Yes, sir.  That's
14           precisely what I'm asking.
15     Q    What do you want, Mrs. Miller?  Do
16  you want to be reinstated to a position as a
17  special education teacher at Houston County
18  High School?
19     A    I have not made that decision yet.
20  I want to be a special education teacher.
21  And so, I haven't really had a lot of time to
22  decide whether that would be appropriate, but
23  I would think that I would consider it.
24        MR. WALDING:  Okay.  That's all I
25           have.  Thank you, Mrs. Miller.
```

166

```
 1                EXAMINATION
 2
 3  RESUMED BY MS. HORTBERG:
 4     Q    I just needed to clarify one thing,
 5  Mrs. Miller.  My name is Kate Hortberg, and I
 6  represent Mr. Strange and Ms. Ezell.  And you
 7  and I had a chance to talk last time.  But I
 8  just had one quick question about some
 9  questions that Mr. Walding asked you a few
10  minutes ago, when he was asking you about the
11  specific people that you had talked to about
12  the four concerns that you agreed were your
13  concerns, as we're calling them during this
14  deposition.
15        And he asked you whether you talked to
16  all of those people during school hours and
17  at the school, and, in the case of
18  Dr. Andrews, at the central office.  And when
19  you were asked about Mr. Strange, you said,
20  yes, it was both during and after school
21  hours, generally at the school facility.
22        You never spoke to Mr. Strange about
23  your concerns off of the school premises?
24  Correct?
25     A    Unless it would have been at a
```

167

```
 1  special ed meeting or something like that at
 2  the central office.  We might have been
 3  having a discussion about some of the
 4  findings we had or something.  I don't
 5  recall.
 6     Q    When were the special ed meetings
 7  at the central office that you would have
 8  attended while you were an intern at Houston
 9  County High School?
10     A    I don't know that I have the dates
11  on them.  I'm sorry.
12     Q    Do you know whether they would be
13  written on your calendar right there?
14     A    I don't think that I had those
15  dates on there.
16     Q    How often were those meetings held
17  at the central office?
18     A    I know I attended at least one or
19  two, I believe.  I'm not positive.
20     Q    Who led those meetings?
21     A    I have no clue.  I have no
22  recollection of who they were.
23     Q    You don't remember who led the
24  meetings at the central office?
25     A    No.
```

168

```
 1     Q    Would it be you and Mr. Payne and
 2  Mr. Strange that would all attend those
 3  meetings, as the special ed teachers from
 4  Houston County High School?
 5     A    Yes.  I would imagine we would all
 6  be required to go.
 7     Q    I'm asking about your personal
 8  knowledge, though.  The meetings that you
 9  attended, the one or two that you went to,
10  was it you, Mr. Strange and Mr. Payne who all
11  attended?
12     A    If I remember correctly.
13     Q    Do you have any handouts or other
14  sort of documentation from those meetings?
15     A    Those were probably left at the
16  high school when I left.
17     Q    You don't remember whether it was
18  Dr. Andrews or some other administrator that
19  was leading those meetings?
20     A    Mr. Andrews?  I'm sure he would
21  have probably been there.  No.  I'm not --
22     Q    I'm not asking you to guess.
23     A    Okay.  I don't know.
24     Q    Okay.  So, when you were qualifying
25  your answer about when you would have spoken
```

169

1  to Mr. Strange about your concerns, when you
2  said generally at school, to qualify that
3  answer even better would be, it would have
4  been either at the school facility or at the
5  central office?
6      A    Yes.
7      Q    There was no occasion where you and
8  Mr. Strange met off of school premises?
9      A    No.
10     MS. HORTBERG:  Okay.  That's all I
11         have.
12
13             EXAMINATION
14
15  RESUMED BY MR. MUSSO:
16     Q    You never were employed by Troy
17  University?  You never were an employee of --
18     A    No.  I just received compensation
19  for that collaborative presentation that I
20  did.
21     Q    Okay.  But that wasn't as an
22  employee?
23     A    Right.
24     Q    And you never were employed by
25  Dr. Jones?

:70

1      A    No.
2      Q    Or Dr. Ruediger?
3      A    No.
4      Q    Or Pam Parris?
5      A    No.
6      MR. MUSSO:  Just to make the record
7         clear.
8      MR. FAULK:  Is that it?
9      MR. WALDING:  I have asked all I
10         could possibly ask.
11  (Recess in deposition.)
12     MS. HORTBERG:  I promise that I
13         have just, like, two more
14         questions, Mrs. Miller.
15
16             EXAMINATION
17
18  RESUMED BY MS. HORTBERG:
19     Q    To go back to this earlier question
20  that I just asked you about with you and Mr.
21  Strange attending between one and two special
22  education meetings at the central office, and
23  you testified that you had talked to Mr.
24  Strange about your concerns either at the
25  school or at the central office.  You would

171

1  agree with me that the central office is a
2  part of the school system?  Correct?
3      A    Yes.
4      Q    And that those meetings were held
5  during school hours?
6      A    Yes.
7      MS. HORTBERG:  That's all I have.
8  (Recess in deposition.)
9      MR. FAULK:  We don't have anything.
10
11          END OF DEPOSITION
12
13
14
15
16
17
18
19
20
21
22
23
24
25

172

1          DEFENDANT'S EXHIBIT NO. 32
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DEFENDANT'S EXHIBIT NO. 33

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 174, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under my

12   personal supervision.

13       I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21       Witness my hand this 10th day of

22   September, 2007.

23

24       _____

25   _____ RPR, Notary Public,

                 State at Large

174

DEFENDANT'S EXHIBIT NO. 34

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1

```
1              IN THE U. S. DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                   SOUTHERN DIVISION
4
5    NANCY MILLER,
6         PLAINTIFF,
7    VS.              CASE NO.1:06-CV-940-WKW
8    HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
9    LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,
12
         DEFENDANTS.
13
14       The deposition of KENNETH LORD, taken
15   by the Plaintiff, pursuant to the Federal
16   Rules of Civil Procedure, before Stacey
17   Watkins, RPR, and Notary Public, State at
18   Large, at the offices of Hardwick, Hause,
19   Segrest & Walding, Dothan, Alabama, on the
20   10th day of October 2007, at 4:10 p.m., CDT,
21   pursuant to notice.
22
23
24
25
```

---

2

1  **APPEARANCES:**
2
3  **FOR THE PLAINTIFF:**
4  **MR. WINN FAULK**
   Attorney at Law
5  Montgomery, Alabama

6  **MR. THOMAS K. BRANTLEY**
   Attorney at Law
7  Dothan, Alabama

8
   **FOR HOUSTON COUNTY BOARD OF EDUCATION,**
9  **KENNETH LORD, RILEY JOE ANDREWS AND**
   **TIM PITCHFORD:**
10
   **MR. KEVIN WALDING**
11 **MR. PATRICK B. MOODY**
   Attorneys at Law
12 Dothan, Alabama

13
   **FOR PAUL STRANGE AND STACEY EZELL:**
14
   **MS. KATHERINE HORTBERG**
15 Attorney at Law
   Chelsea, Alabama
16
17 **FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,**
   **PAM PARRIS AND GREG RUEDIGER:**
18
   **MR. JOSEPH V. MUSSO**
19 Attorney at Law
   Birmingham, Alabama
20
21 **ALSO PRESENT:**
22 **NANCY MILLER**
23
24
25

---

3

1           **STIPULATION**
2
3      It is stipulated by and between counsel
4  for the parties that this deposition be taken
5  at this time by Stacey Watkins, RPR, and
6  Notary Public, State at Large, who is to act
7  as commissioner without formal issuance of
8  commission to her; that said deposition shall
9  be taken down stenographically, transcribed,
10 and certified by the commissioner. The
11 signature of the witness is waived.
12     Except for objections as to the form of
13 questions, no objections need be made at the
14 time of the taking of the deposition by
15 either party, but objections may be
16 interposed by either party at the time the
17 deposition is read into evidence, which
18 shall be ruled upon by the Court on the
19 trial of the cause upon the grounds of
20 objection then and there assigned.
21
22
23
24
25

---

4

1              **KENNETH LORD**
2  having been first duly sworn, testified as
3  follows, to-wit:
4
5              **EXAMINATION**
6
7  BY MR. FAULK:
8      Q    State your full name, please?
9      A    Kenneth Jackie Lord.
10     Q    Until recently, you were
11 superintendent of education in Houston
12 County?
13     A    Yes, sir.
14     Q    When did you retire, if you
15 retired?
16     A    I believe it was -- yes, sir, I
17 did. I didn't run again. I retired -- I
18 believe it was December 31st of '04, I think.
19 I'm horrible with dates, but I think that was
20 it.
21     Q    And superintendents here are
22 elected?
23     A    Yes, sir.
24     Q    You have heard, I assume, several
25 times, the basic instructions about making

1  sure you understand the question, and if you
2  need a break, you can take one. Do I need to
3  run back over that?
4      A    No, sir.
5      Q    I want to just try to go through
6  this as nearly chronologically as we can.
7  What do you recall as being your first
8  knowledge about Nancy Miller coming here as
9  an intern?
10     A    The summer of '04, we were looking
11 to fill a number of positions, especially --
12 elementary was really not a problem. High
13 school was a problem, and especially in
14 special education. But we did even have a
15 problem or two with regular ed teachers, best
16 I recall.
17     Q    And then, you do recall Mrs. Miller
18 coming to interview as a possible intern and
19 teacher?
20     A    No, sir. I did not -- Mr. Andrews
21 handled all the interviews with the special
22 ed people. I handled a lot of the interviews
23 with the regular ed people. I didn't do any
24 of the special ed people.
25     Q    I think you've explained, in your

---

6

1  interrogatory answers, about how her contract
2  came to be drafted with your signature and so
3  forth.
4      A    That was one of the questions.
5  Yes, sir.
6      Q    Concerning her lack of a
7  certificate, in particular, was there, to
8  your knowledge, any type of certificate that
9  would have been appropriate for somebody in
10 her circumstances?
11     A    The certificate that she worked
12 under with us, as best I recall, was a
13 substitute teaching certificate. To my
14 knowledge, that was the only certificate that
15 she was eligible for.
16     Q    So, in your opinion, was her
17 employment appropriate or inappropriate,
18 based on that certificate?
19     A    I don't understand what you're
20 asking me.
21     Q    Well, the defendants, including you
22 -- and I know you didn't draft all this stuff
23 yourself. But one of the positions, as I
24 understand it, is that her contract was
25 actually an illegal contract due to her lack

---

7

1  of having certification.
2      A    Yes, sir.
3      Q    Is that a position you've had
4  occasion to discuss and give some thought to?
5      A    Yes, sir. I have since discovered
6  the contract that was issued to Mrs. Miller
7  -- I have since discovered, recently, of
8  course, that that contract should have never
9  been given to her. In other words, it didn't
10 really apply to someone who didn't have a
11 teaching certificate.
12     Q    Would there have been another type
13 contract that would have been appropriate for
14 her, or should she simply never have been
15 brought in as a paid employee?
16     A    Let me go around the world. I know
17 I probably shouldn't do this. In a small
18 system like ours, the only contract we gave
19 to anybody -- well, that contract was used
20 for anybody we hired, and probably was not a
21 good thing. Probably a review of that needs
22 to be done. In other words, a bus driver
23 would get that contract or whatever. It
24 would just say "bus driver," you know, for so
25 many days, and note the salary, and this,

---

8

1  that and the other. We should have
2  contracted with her as just a contract
3  substitute teacher, and not given that kind
4  of -- nothing signed. We should have not
5  gotten anything signed from her, it would be
6  my opinion.
7      As a matter of fact, really, we didn't
8  give contracts except -- I was superintendent
9  for almost -- well, for 12 school years. And
10 during that time, probably more than half of
11 those years, we didn't get anything signed
12 from anybody. And then, we started issuing
13 contracts. And, like I say, we didn't do a
14 very good job of it, or I didn't do a very
15 good job of it. I shouldn't say "we." I
16 didn't do a very good job of it.
17     Q    I appreciate your candor. Now, do
18 you remember a person named Amy Deese?
19     A    Yes, sir.
20     Q    Is it your recollection that she
21 came in under a similar arrangement to that
22 Mrs. Miller had, in that she was an intern
23 and a paid teacher at the same time?
24     A    Yes, sir.
25     Q    So far as you know, did Ms. Deese

1   have any sort of certification that Mrs.
2   Miller did not have?
3       A    No, sir.  She had a substitute
4   teaching certificate, the same as Mrs.
5   Miller.
6       Q    And then, what became of Ms. Deese?
7   Was she still working as a teacher when you
8   left?
9       A    Yes, sir.  Far as I know, she's a
10  tenured employee with the Houston County
11  Board of Education.
12      Q    So far as you know, has there ever
13  been any controversy that she owes you part
14  of her salary back or anything like that for
15  having taught under supposedly an illegal
16  contract?
17      A    Ms. Deese?
18      Q    Right.
19      A    No, sir.  The illegal contract --
20  and, yes, I don't think we had a good
21  contract.  It's not illegal to pay substitute
22  teachers.  And there's nowhere that I know in
23  the state law that says pay them $1.00 a day
24  or $1,000.00 a day.  So, we erred with a -- I
25  erred with a contract.  But, you know, you

10

1   can pay people to be substitutes.
2       Q    What was your first personal
3   involvement with the employment situation of
4   Nancy Miller other than technically issuing
5   the contract to her?
6       A    Now, personally, what --
7       Q    Personally involved.  I mean, at
8   what point did you get involved in any kind
9   of problems involving her internship or
10  employment?
11      A    Mr. Andrews reported to me on
12  several occasions that there was problems at
13  Houston County High School with an
14  intern/employee, Nancy Miller.  That's the
15  first -- the first recollection I have of her
16  is, he said, "Look, this is" -- and, which, I
17  knew we had no applications.  So, can we
18  recommend this person to the board?  Yes, we
19  can.  We did that, to have an
20  almost-certified teacher there.
21      And then, later on -- and I'm not sure
22  when, if it's September, October.  I really
23  can't recall that.  But, he made me aware
24  that there were some problems at Houston
25  County High School with Nancy Miller.

2   were that he mentioned?
3       A    The only problems I recall Mr.
4   Andrews mentioning to me, really couldn't get
5   along with other teachers, other faculty
6   members, hard to take suggestions, follow
7   directions.  Those kind of things.
8       Q    Now, do you remember those things,
9   or -- you know, I'm not questioning your
10  truthfulness.
11      A    Yes, sir.  I understand.
12      Q    I'm just asking, are those things
13  you've heard in depositions, or do you
14  actually remember him saying those things to
15  you back at the time?
16      A    I remember him saying that there
17  was problems with Nancy Miller at Houston
18  County High School.  And the extent of those
19  problems was, like I say, just problems
20  getting along with the faculty members, and
21  the directions, as I mentioned, and hard to
22  -- really didn't take suggestions very well.
23  Those kinds of things.  That's the extent of
24  my knowledge of Nancy Miller.
25      Q    Well, did he ever tell you that she

12

1   was raising questions about the suitability
2   of certain aspects of the special ed program
3   at Houston County High School?
4       A    No, sir.
5       Q    Did that come to your attention at
6   some point prior to the termination of her
7   employment?
8       A    Problems with --
9       Q    That she was raising questions with
10  Mr. Andrews and other people, for that
11  matter, such as those listed in Defendant's
12  Exhibit 16 that I'll show you.
13      A    The only things I was aware of in
14  these listings here are basically the
15  comments that dealt, as I mentioned, about
16  having a hard time getting along with, those
17  kinds of things.  And I was made aware, at
18  some point, about my leaving school without
19  permission.  But, as far as a lot of these,
20  no, sir, not so much of those as it stated
21  there.
22      Q    Okay.  Did you have any
23  communication, oral or written or telephonic,
24  any means of communication, with Pam Parris
25  or anyone else connected with Troy

13

1  University, Dothan, having to do with these
2  problems?
3      A    The problems with Nancy Miller?
4      Q    Right.
5      A    I really don't recall any
6  conversations with Pam Parris concerning
7  Nancy Miller. The only thing that I can
8  recall with Pam Parris was that I'm sure I
9  probably talked to her earlier in the summer,
10 possibly even about Amy Deese, about somebody
11 for that position. I wouldn't bet my life on
12 that. But that's really the only gist of
13 anything that I recall of any kind of
14 discussion with Ms. Parris during that
15 summer.
16     Now, we have talked over previous years
17 concerning -- the talks I've had with Ms.
18 Parris was, "Look, do you have an intern, a
19 good intern, that we could spot in here to
20 help us finish out the school year," or do
21 something like that.
22     Q    All right. Do you recall when --
23 and I don't mean a date. But, do you recall,
24 at some point, becoming aware that Troy
25 University had withdrawn Mrs. Miller's

14

1  internship? And if you do, tell me how it
2  came to your attention?
3      A    And that's what I'm fuzzy on,
4  because I don't think -- as I stated a second
5  ago, I don't think that Ms. Parris called me
6  and talked to me about this. I think maybe
7  she sent me a fax, and then, followed it up
8  with a letter, I think, now.
9      Again, it's been so long. I feel kind
10 of inadequate that I don't remember a lot of
11 this stuff, but I honestly don't. But I do
12 know that I got either a fax or a letter or
13 both. And I don't think she called me and
14 talked to me. But, again, I would hate to
15 say for certain, because I'm really not sure.
16     Q    So, are you telling us that, to the
17 best of your recollection, your first
18 knowledge that Miller's internship would be
19 withdrawn was when you got an after-the-fact
20 memo of some type from Troy, informing you
21 that it had been withdrawn?
22     A    Yes, sir.
23     Q    Okay. Did you have any
24 conversations with Mr. Pitchford concerning
25 Nancy Miller, prior to the termination of her

15

1  employment?
2      A    Yes, sir. I recall one, one
3  conversation. When I chose not to run again,
4  Mr. Pitchford -- and he ran and was elected,
5  I had made it okay with the board, and I had
6  encouraged him to come up as much as I could
7  to the central office, so we could start
8  making him aware of different things.
9      Somewhere in the midst of that -- and
10 this would be right around the very end of
11 this whole thing -- he was at the central
12 office one day. And I really don't know for
13 what. I can't remember for what reason.
14     But I know he and I and Mr. Andrews
15 talked, right about the time that we got the
16 letter of her internship being withdrawn.
17 That's the only conversation I ever remember
18 us having. But I do remember that he, Mr.
19 Andrews, and myself, we did talk about it.
20 As a matter of fact, that was probably within
21 a day or two or three of me actually taking
22 the letter out to Houston County High School
23 to Mrs. Miller.
24     Q    What do you recall about what was
25 discussed on that occasion?

16

1      A    Well, again, I would be doing a lot
2  of guessing. Is that appropriate?
3      MR. WALDING: No, it's not.
4      Q    Well, no. We don't want you to
5  guess. But if you can specifically recall
6  anything that was discussed, I'd like for you
7  to tell me.
8      A    Specifically, I don't remember
9  anything. I'm thinking along the lines of,
10 we were talking about her internship was
11 withdrawn, and, you know, kind of put us in a
12 situation of what we're going to do.
13 Something along those lines. But that's
14 about the best I can do on that.
15     Q    Is it your contention that you did
16 not consciously do anything that would have
17 adversely affected Mrs. Miller's internship
18 status?
19     A    To the best of my recollection, no,
20 sir. I never had a conversation with anybody
21 that would have reflected badly on her
22 internship or her relationship with us.
23     Q    Let me show you what's already in
24 as Defendant's Exhibit 28. It appears to be
25 a letter from you to Mrs. Miller, dated

1  October 19, 2004. Do you recognize that?
2     A    Yes, sir.
3     Q    And did you hand deliver that to
4  her at the school?
5     A    Yes, sir.
6     Q    Take particular note, if you would,
7  sir, about something about her refusing to
8  leave the campus, and tell me what you had in
9  mind when you wrote that. What were you
10  talking about, refusing to leave?
11     A    As best I can recall, this was two
12  or three, three or four days after her
13  internship had been terminated at Troy, after
14  we had received word that Troy was
15  terminating her internship.
16        And the fact that she had not come in
17  and made Mr. Pitchford, made anybody aware,
18  Mr. Andrews or anybody aware, me aware of
19  this, you know, and kept coming back, I think
20  that's what the refused part came about. The
21  fact she hadn't come in and let anybody know
22  that, "My internship's over, and I've got to
23  -- I can't do this any more." To the best of
24  my recollection, that's what we were talking
25  about there.

1  terminated, I would have talked to somebody
2  and said, "How does this affect me
3  otherwise," is what I would have done. I
4  would have appreciated that.
5     Q    When you delivered this to her,
6  what do you recall happening?
7     A    Mr. Andrews and I rode out to -- as
8  superintendent, any time we nonrenewed
9  someone, for whatever reason, someone from
10  the central office, and myself, when possible
11  -- and most of the time, I did -- would hand
12  deliver these.
13        We went out to Houston County High
14  School. We met in Mr. Pitchford's office. I
15  asked him to call her in. She came in. I
16  handed her the letter, asked her to read it.
17  The best I recall, she did. Asked her if she
18  had any questions. The best I remember, she
19  had no questions.
20        And at that point, Mr. Strange, Paul
21  Strange, was called in by somebody. I don't
22  know if I said, "Mr. Pitchford, would you get
23  Mr. Strange," or if Mr. Pitchford said, "Let
24  me get" -- that, I can't recall. But I know
25  we got Mr. Strange to go down and open up to

18

1     Q    Is that your best recollection of
2  that, as to why you used the word "refused"?
3     A    Yes, sir. That's the only thing I
4  can think that -- again, three years ago,
5  whatever. There was tons of things going on,
6  as a superintendent, and this was one of
7  1,000. But, yes, sir, to the best of my
8  knowledge, this is why this is stated as is.
9     Q    Could you -- and I'm not faulting
10  your use of the language. But, could you
11  just as easily, under those circumstances,
12  have said, "Because your internship has been
13  withdrawn, and you are continuing to report
14  to work, I must tell you not to any more"?
15     A    Yes, sir.
16     Q    "I'm terminating your employment."
17     A    Yes, sir.
18     Q    So, the refusal thing was not that
19  anybody had said, "Go away." Correct?
20     A    Not to my knowledge.
21     Q    Okay. But you felt like she should
22  have just known that, and by not going away,
23  she was refusing?
24     A    I can only put myself in her
25  position. If my internship had been

20

1  help her get anything, or if there was
2  anything locked up that was hers, you know,
3  that she would need to get, we asked him to
4  help her with that. And that was pretty much
5  the extent of it.
6     Q    Do you recall any involvement on
7  the part of some sort of security man or
8  policeman or resource officer?
9     A    No, sir.
10     Q    Okay. Were you actually present to
11  observe her leave the campus?
12     A    Sitting in the office at Houston
13  County High School, there's a big bay of
14  windows. But I don't recall seeing her
15  leave. I remember we stayed -- seems like we
16  stayed in Mr. Pitchford's office and talked
17  about some other things, best I recall.
18        Best I recall, the thing that let me
19  know that she was gone was when Mr. Strange
20  came back by and said, "She's gotten
21  everything and she's gone," best I recall.
22     Q    Let me show you the question and
23  answer, number 20, on your interrogatories,
24  and ask you to read the question and answer
25  and let me know when you're finished.

1    (The witness conferring with Mr.
2    Walding.)
3        MR. WALDING:  He's just asked you
4            to read it, at this point.
5        THE WITNESS:  Oh, okay.  Just read
6            it.  All right.  I'm reading
7            it.
8    Q    (By Mr. Faulk)  Tell me when you've
9    finished.
10    A    (Witness reviewing document.)
11    Okay.
12    Q    We know about her leaving campus
13    without notifying anyone.  And that was your
14    understanding at the time?  She had notified
15    no one?
16    A    Yes, sir.  No one in authority that
17    she should have notified.
18    Q    Are you aware of any set policy on
19    that in Houston County at the time?
20    A    Yes, sir.
21    Q    All right.  What was it?
22    A    Houston County Board of Education,
23    the policy manual, that's one of the things
24    that's spelled out under the teacher section.
25    Also, each school gives out a -- I was

---

22

1    assistant principal at Houston County High
2    School before I came to the central office.
3    And each year, we would give out a handbook
4    that had something to that effect in there.
5    And, also, that was something that was always
6    covered in the meetings before school, like,
7    the faculty meetings with the teachers.  Just
8    one of those general kind of things that
9    would be covered.
10    Q    Do you know where I should be able
11    to find the handbook for the 2004-2005 school
12    year?
13    A    No, sir.  I wouldn't know --
14    Q    And you're talking about the
15    faculty handbook for that school --
16    A    Yes, sir.
17    Q    -- or something that went out
18    systemwide?
19    A    For the school.  They might have
20    some at Houston County High School, but I
21    wouldn't know.
22        (Off-record discussion held.)
23    Q    Let me ask you this, Mr. Lord:  At
24    the time you were superintendent, can you
25    tell us who was in charge of updating that

---

manual?
2    A    Each individual school would update
3    theirs over the summer.  They had different
4    printing arrangements worked out to get
5    theirs printed, and this, that and the other.
6    Q    When you say, in your answer there,
7    that she had caused problems with and
8    dissension among the teachers, tell us what
9    you're talking about specifically, please?
10    A    As I had mentioned earlier, Mr.
11    Andrews would report to me that there was,
12    you know, dissension among the teachers there
13    at Houston County High School caused by Mrs.
14    Miller.  Didn't get along real well.  Again,
15    back to the following suggestions, taking
16    directions kind of thing.
17    Q    Well, as far as dissension among
18    the teachers are concerned, do you mean to
19    state there that she had caused two or more
20    teachers not to get along with each other?
21    A    The dissension I'm referring to is
22    the fact that -- dissension among the
23    teachers in the fact that the teachers didn't
24    get along very well with her.
25    Q    So, not that she was fermenting

---

24

1    any kind of unrest as between other teachers,
2    but, rather, that she was doing something
3    that was somehow irritating to other
4    teachers?
5    A    Correct.
6    Q    Okay.  Do you know what it was?
7    Were you informed of what Mrs. Miller
8    supposedly did in order to create this
9    problem?
10    A    No, sir, no more than I've told you
11    already.  That's the extent of what I knew.
12    Q    You go on to say that it had
13    nothing to do with her alleged speech, but
14    would reflect her inability to respect the
15    views, feelings and opinions of others.  And
16    I'm paraphrasing a little bit.
17        When you say "views, feelings and
18    opinions," do you have any specific
19    information about that, or was that just
20    conveyed to you in sort of a summary fashion,
21    you know, where you, yourself, were being
22    told she doesn't respect the views and
23    feelings of others?
24    A    I have never been made aware of
25    anybody, until we received this lawsuit,

1  anything dealing with free speech. In my 12
2  years as superintendent, nobody has ever said
3  we've tried to stifle their free speech in
4  any way that I'm aware of.
5      Q    Aside from that, though, I'm
6  talking about the particular views, feelings
7  and opinions of more senior and experienced
8  teachers. Do you know what particular views,
9  feelings and opinions she seemed unable to
10  respect?
11      A    No, sir, other than the couldn't
12  follow directions well, wouldn't take
13  suggestions. Those kind of things.
14      Q    So, that's reported to you in a
15  summary fashion, rather than, you know, "She
16  was mean to me when she said my child looked
17  funny" --
18      A    That's correct.
19      Q    -- or some specific instance?
20      A    That's correct.
21      Q    Okay. Was it communicated to you
22  through people such as Mr. Andrews or Mr.
23  Pitchford, and not by the teachers
24  themselves, who were her presumed victims?
25      A    That's correct.

26

1      Q    Okay. And would the same be true
2  of not working well with others?
3      A    That's correct.
4      Q    Do you have any particular training
5  or experience in special education matters?
6      A    Very little. I've been to the
7  special education legal workshops, and I've
8  been to state meetings about special
9  education. It seems like, 100 years ago, in
10  part of our education, it seems like we had
11  to take one special ed course. But I might
12  have gotten lucky and didn't even take that
13  one. I wouldn't bet my life I took that one.
14  But I've had just a small amount of special
15  education training.
16      Q    Am I understanding you correctly
17  that you were never informed of any precise
18  complaints or concerns that Mrs. Miller had
19  expressed having to do with the special
20  education program at the high school?
21      A    Correct.
22      Q    And so, as we sit here, you would
23  not have an opinion as to whether any such
24  complaints that she may have raised had any
25  merit? Is that fair to say?

1      A    I'm not aware of any complaints she
2  made, so I couldn't make a judgment on merit.
3      Q    Okay. After delivering Defendant's
4  Exhibit 28, the October 19 letter to Mrs.
5  Miller, did you recommend or seek any kind of
6  action by the Houston County Board of
7  Education with regard to the termination of
8  her employment?
9      A    Yes, sir. I took it before the
10  board.
11      Q    And should that be reflected in the
12  minutes?
13      A    Yes, sir. And I'm thinking that --
14  I thought we produced a copy of those minutes
15  to you, but maybe we --
16      Q    It's possible you did, and I
17  overlooked them.
18          MR. SMITH: We don't have them.
19          You said you would make the
20          books available to us.
21          THE WITNESS: I mean, that's not a
22          hard thing.
23          MR. WALDING: I thought we had.
24          THE WITNESS: I thought I made a
25          copy of it. If I didn't, I'm

28

1          sorry.
2      Q    (By Mr. Faulk) Did you seek board
3  approval prior to the delivery of the October
4  19 letter?
5      A    No, sir. I don't think I'm legally
6  supposed to do that or can do that, I think.
7  I mean, I recommend, and they either vote it
8  up or down, is my understanding.
9      Q    Was it your belief, at the time you
10  delivered the October 19 letter, that you
11  were acting within the law, so far as you
12  knew?
13      A    Yes, sir.
14      Q    If you were terminating or seeking
15  the termination of a contract teacher during
16  the term of the contract, what would be your
17  understanding of the proper procedure to
18  follow?
19          MR. WALDING: Object to the form.
20          You're asking this
21          hypothetically?
22          MR. FAULK: Yeah.
23      Q    Just in the ordinary sense, if you
24  had a nontenured teacher under contract, the
25  term of the contract has not expired, and you

29

1   want to terminate that teacher's employment,
2   what was your understanding, at the time, of
3   the proper procedure to follow?
4           MR. WALDING:  And I still object to
5               the form.
6           MR. FAULK:  That's fine.
7           MR. WALDING:  That's also assuming
8               the contract is valid.  Go
9               ahead and answer.
10      A     The same as we did with Mrs.
11  Miller.  I would have hand delivered her a
12  letter, waited over 15 days to give her a
13  chance to follow board policy to appeal this,
14  and then, bring it before the board of
15  education.
16      Q     Would you, in effect, suspend
17  someone, pending --
18      A     I would think that would depend on
19  the situation.  A teacher with a gun or a
20  teacher having sex in the hall is a whole lot
21  different than what we're talking about here,
22  or a teacher having sex with a gun in the
23  hall would be a whole lot different than what
24  we have right here.  It builds and builds and
25  builds.

30

1           (Off-record discussion held.)
2       Q     It's contended on your behalf, Mr.
3   Lord, as well as the other defendants, that
4   the reports that Mrs. Miller made to Mr.
5   Andrews and to the Troy people about what she
6   considered to be irregularities in the
7   special ed program at the high school were
8   somehow part of her official duties.  Can you
9   shed any light on that, as to what the source
10  of that duty might be?
11      A     If you will, clear me up about --
12  what reports are we talking about she made?
13      Q     Well, were you not aware, at the
14  time you terminated her employment, that she
15  had previously made some reports and
16  complaints to Mr. Andrews, among others,
17  Dr. Ruediger at Troy, about things that she
18  considered to be not in compliance with
19  special ed regulations and laws?
20      A     No, sir.  I have never been aware
21  that she made any kind of reports on any kind
22  of irregularities that were taking place in
23  our special education program, or that she
24  alluded to were taking place in our program.
25      Q     Assuming that she made such

31

1   reports, would she, in your judgment, have
2   had some official duty to make those reports?
3       A     As an employee of the Houston
4   County Board of Education, if she saw
5   something that was wrong that was going on in
6   our system, I would think she would certainly
7   be within her right to do that.
8       Q     But you can't point me to any job
9   description or set of duties or board policy
10  that said she must do that, can you?
11      A     I'm not sure if that's in the
12  Houston County board policy or not.  It's
13  been so long since I've looked at it, I
14  really don't know.
15      Q     So, it might or might not be?
16  We'll just have to go look?
17      A     Yes, sir.
18          MR. FAULK:  All right.  Thank you
19              very much.  I don't know if
20              your lawyer has any follow-up
21              or not.
22          THE WITNESS:  If he does, I'm going
23              to object to the form.
24          (Recess in deposition from 4:42 to
25              4:48.)

32

1               EXAMINATION
2
3   BY MR. WALDING:
4       Q     Mr. Lord, have you, yourself,
5   personally, done anything to stifle Mrs.
6   Miller's free speech rights?
7       A     No, sir.
8       Q     Have you personally done anything
9   to retaliate against her for supposedly
10  exercising her free speech rights?
11      A     No, sir.
12      Q     Did you, as superintendent of
13  education, do anything to stifle Mrs.
14  Miller's free speech rights?
15      A     No, sir.
16      Q     Did you, as superintendent of
17  education, do anything to try to punish her
18  or retaliate against her for supposedly
19  exercising her free speech rights?
20          MR. SMITH:  Object to form.
21      A     No, sir.
22      Q     Now, did you make the decision to
23  withdraw or terminate Mrs. Miller's
24  internship?
25      A     No, sir.

1    Q    Did you ask anybody at Troy State
2    to withdraw or terminate her internship?
3    A    No, sir.
4        MR. WALDING:  That's all I wanted
5            to ask.
6
7            EXAMINATION
8
9    RESUMED BY MR. FAULK:
10    Q    During the break, we were given the
11    board minutes dated December 6, 2004, which
12    is page 1,452 of the board's disclosures.
13    And are those the board minutes you alluded
14    to earlier?
15    A    Yes, sir.
16    Q    In comparing that to Defendant's
17    Exhibit 28, do you agree with me 28 didn't
18    give an effective date?  It just told her to
19    get out, basically?  Right?  She was to leave
20    immediately?
21    A    The October 19th letter said -- yes
22    -- it's over.  Right.
23    Q    Do you know how we got the
24    effective date of November 16, 2004, that's
25    in the December 6 minutes?

---

1    Christmas.
2    Q    But you're pretty sure it was a
3    Monday?
4    A    It was a Monday or a Thursday.
5    Q    Man, you are retired.
6    A    Listen, I'm retired.  I'm retired.
7    Trust me.  I don't have much left to offer.
8    I left it all there.
9        (Brief off-record.)
10    Q    Mr. Lord, if the effective date of
11    her termination was November 16th, do you
12    know why she would not have been paid through
13    that date?
14        MR. WALDING:  Object to the form.
15    Q    Assuming she was not, do you know
16    why she would not have been paid through the
17    effective date, according to the board?
18        MR. WALDING:  Object to the form.
19    A    I think she was paid.
20    Q    You think she was?
21    A    Yes, sir.
22        MR. WALDING:  Let me ask one more.
23
24
25

---

34

1    A    No, sir.
2    Q    But this would have been a meeting
3    held by the county board on December 6, 2004?
4    A    Yes, sir.
5    Q    And should there have also been a
6    November meeting?
7    A    Could have been.
8    Q    Did the board normally meet once a
9    month when you were superintendent?
10    A    Normally, yes, sir.  Always, no.
11    But, normally, yes, sir.
12    Q    And they might have a called
13    meeting from time to time?  Correct?
14    A    Correct.
15    Q    Is there, like, a particular day,
16    like, the third Thursday or something like
17    that, that they meet?
18    A    Yes, sir.  Gosh, I thought I'd
19    never forget that.  I want to think it was
20    the third Monday of the month.  It was the
21    third Monday of the month or first Monday of
22    the month.  But it was a set date.  Yes, sir.
23    December 6th.  It must have been the first
24    Monday of the month, unless we had a special
25    meeting because we were getting out for

---

36

1            EXAMINATION
2
3    RESUMED BY MR. WALDING:
4    Q    Does Defendant's No. 28 state the
5    reason that you recommended to the board of
6    education that Mrs. Miller's employment be
7    terminated?
8    A    Is this 28?
9    Q    Yes, sir.
10    A    No, sir.
11    Q    Well, doesn't it say because her
12    internship --
13    A    Oh, yes, sir.
14    Q    -- was terminated?
15    A    Yes, sir.  I'm sorry.  I'm sorry.
16    Yes, sir.  I didn't read it.  I'm sorry.
17    Q    So, this letter does, in fact,
18    state the reason that her employment was
19    terminated?
20    A    That's correct.  I'm sorry.
21    Q    And, again, did you have any
22    control over terminating her internship?
23    A    No, sir.
24        MR. WALDING:  All right.  Thank
25            you.

1          MR. FAULK:  That's it.  Thank you

2              very much.

3

4              END OF DEPOSITION

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        38

1          STATE OF ALABAMA

2          HOUSTON COUNTY

3

4              I, Stacey Watkins, RPR, and Notary

5          Public, State at Large, do hereby certify

6          that the foregoing transcript, pages 1

7          through 37, is a true and correct transcript

8          of the testimony and proceedings taken at

9          said time and place; and that the same was

10         taken down by me in stenograph shorthand,

11         and transcribed by me personally or under

12         my personal supervision.

13             I further certify that I have no

14         interest in this matter, financial or

15         otherwise, or how it may develop or what

16         its outcome may be.  I further certify that I

17         am not of counsel for any of the parties,

18         nor am I related to counsel or litigants or

19         associated with anyone connected with this

20         cause to my knowledge.

21             Witness my hand this 24th day of

22         October, 2007.

23         _____

24         _____ RPR, Notary Public,

                              State at Large

25                            ACCR# 155

**1**

```
 1              IN THE U. S. DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  SOUTHERN DIVISION
 4
 5   NANCY MILLER,
 6        PLAINTIFF,
 7   VS.              CASE NO.1:06-CV-940-WKW
 8   HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
 9   LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,
12
         DEFENDANTS.
13
14       The deposition of TIM PITCHFORD, taken
15   by the Plaintiff, pursuant to the Federal
16   Rules of Civil Procedure, before Stacey
17   Watkins, RPR, and Notary Public, State at
18   Large, at the offices of Hardwick, Hause,
19   Segrest & Walding, Dothan, Alabama, on the
20   10th day of October 2007, at 9:00 a.m., CDT,
21   pursuant to notice.
22
23
24
25
```

**2**

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFF:
 4   MR. WINN FAULK
     Attorney at Law
 5   Montgomery, Alabama
 6   MR. THOMAS K. BRANTLEY
     Attorney at Law
 7   Dothan, Alabama
 8
 9   FOR HOUSTON COUNTY BOARD OF EDUCATION,
     KENNETH LORD, RILEY JOE ANDREWS AND
     TIM PITCHFORD:
10
11   MR. KEVIN WALDING
     MR. PATRICK B. MOODY
12   Attorneys at Law
     Dothan, Alabama
13
     FOR PAUL STRANGE AND STACEY EZELL:
14
15   MS. KATHERINE HORTBERG
     Attorney at Law
     Chelsea, Alabama
16
17   FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
     PAM PARRIS AND GREG RUEDIGER:
18
19   MR. JOSEPH V. MUSSO
     Attorney at Law
     Birmingham, Alabama
20
21   ALSO PRESENT:
22   NANCY MILLER
     KENNETH LORD
23   RILEY JOE ANDREWS
     STACEY EZELL
24
25
```

**3**

```
 1              STIPULATION
 2
 3      It is stipulated by and between counsel
 4   for the parties that this deposition be taken
 5   at this time by Stacey Watkins, RPR, and
 6   Notary Public, State at Large, who is to act
 7   as commissioner without formal issuance of
 8   commission to her; that said deposition shall
 9   be taken down stenographically, transcribed,
10   and certified by the commissioner. The
11   signature of the witness is waived.
12      Except for objections as to the form of
13   questions, no objections need be made at the
14   time of the taking of the deposition by
15   either party, but objections may be
16   interposed by either party at the time the
17   deposition is read into evidence, which
18   shall be ruled upon by the Court on the
19   trial of the cause upon the grounds of
20   objection then and there assigned.
21
22
23
24
25
```

**4**

```
 1              TIM PITCHFORD
 2   having been first duly sworn, testified as
 3   follows, to-wit:
 4
 5              EXAMINATION
 6
 7   BY MR. FAULK:
 8      Q    Mr. Pitchford, my name is Winn
 9   Faulk, and I, along with Tom Brantley,
10   represent Mrs. Miller. We haven't met 'til
11   today. Now, you've not been present at any
12   prior depositions in this case, have you?
13      A    No, sir.
14      Q    Okay. Have you ever had your
15   deposition taken before in other cases --
16      A    No, sir.
17      Q    -- for any reason? Okay. I'm sure
18   your lawyers talked to you, you know, about
19   what to expect in general, but I want to be
20   sure you and I kind of understand each other.
21   First of all, I want to know what you
22   know about this case. Okay? And I'm going
23   to ask you questions to try to find out.
24   It's important to you, as well as to me, that
25   you understand those questions. So, if I ask
```

1  you a question that doesn't make sense, just
2  tell me, and I'll be glad to try to rephrase
3  it.  If I mumble, which I do sometimes, tell
4  me, and I'll speak up.  Okay?  If, for any
5  reason, you're not comfortable that you
6  understand the question, tell me before you
7  try to answer it.  Okay?
8       Secondly, if you need a break for any
9  reason, business, personal, whatever, just
10 tell us.  We'll be glad to accommodate you.
11      I guess that's about it.  Mainly, it's
12 just, when we walk out of here, I want to be
13 satisfied that you've understood my questions
14 and given me complete answers that are
15 truthful.  Okay?
16      A     (Witness nodding head in
17 affirmative.)
18      Q     Also, it helps her if you will say
19 "yes" and "no."  I know people, in
20 conversation, often nod their heads or shake
21 their heads or whatever.
22      It will also help the court reporter and
23 be better for you if you don't anticipate my
24 questions and start answering them before I
25 finish them, because you might tell me

1       have his answers to
2       interrogatories and --
3       MR. FAULK:  I've got them.
4       MR. WALDING:  -- really all the
5       relevant documents, I think.
6       Q     (By Mr. Faulk)  Let me show you
7  what's previously been put into evidence as
8  Defendant's Exhibit 5, which is the summons
9  and complaint in this case.  And we should
10 have what's already been offered as
11 Plaintiff's Exhibit 1, which is the answer
12 filed on behalf of you and others in response
13 to that complaint.  Are you generally
14 familiar with both those documents?
15      A     Generally.
16      Q     Okay, sir.  I'm going to ask you
17 some questions about them.  Take a look, if
18 you would, please, sir, at paragraph 14 of
19 Defendant's Exhibit 5, the complaint, and
20 tell me when you've finished reading
21 paragraph 14, please.
22      A     (Witness reviewing document.)  I've
23 finished.
24      Q     And then, take a look on
25 Plaintiff's Exhibit 1 at your answer to

---

6

1  something I didn't have enough sense to ask.
2  Okay?
3       All right.  State your name for us,
4  please, sir?
5       A     Tim Pitchford.
6       Q     Okay.  And you're currently, I
7  gather, superintendent of education of
8  Houston County?
9       A     That's correct.
10      Q     And when did you take that
11 position?
12      A     January of 2005.
13      Q     And up 'til that time, were you
14 principal at Houston County High School?
15      A     Yes, sir.
16      Q     And when did you become principal
17 at Houston County High School?
18      A     Would be the school year of 2003,
19 beginning of 2000 -- no.  That's not correct.
20 2002.
21      MR. FAULK:  Kevin, did y'all bring
22      any documents with you pursuant
23      to the notice?
24      MR. WALDING:  No.  I think we've
25      produced -- no.  You should

8

1  number 14, and tell me when you've read it.
2       A     (Witness reviewing document.)  I've
3  read it.
4       Q     Okay.  In it, you and some of your
5  fellow defendants deny that Mrs. Miller was
6  working as a schoolteacher under contract
7  with the Houston County Board of Education.
8  If you would, please, sir, tell me the basis
9  on which you would have denied that?
10      A     As principal at Houston County High
11 School, I had no authority to enter into
12 contract or recommend anyone for a teaching
13 position with the Houston County Board of
14 Education.  The principal does not have that
15 authority.
16      Q     Yes, sir.  On the other hand, what
17 you're denying here is our assertion that she
18 was -- at the time, in the fall of 2004,
19 we're alleging that she was working as a
20 schoolteacher under contract with the board
21 of education.  And in your response, you say
22 that you deny that.  Now, I realize you
23 didn't draft this answer yourself.
24      A     Right.
25      Q     But, do you personally, as we sit

9

1    here, have any knowledge that, as a matter of
2    fact, she was not working at your school as a
3    teacher?
4            MR. WALDING:  Object to the form.
5            You can answer if you
6            understand the question.
7            THE WITNESS:  Okay.
8    A    Again, I was not the
9    superintendent.  I did not attend a board
10   meeting where she was officially hired.  As a
11   principal, I could not recommend her.  I
12   don't have recommendation authority to the
13   board of education.  And I --
14   Q    Pardon me for interrupting you.
15   A    Yes, sir.
16   Q    But, are you really saying you
17   don't know what her status was?
18   A    I can tell you what I was told.
19   Q    Okay, sir.
20   A    I was told that she was a
21   teacher/student teacher at that time.
22   Q    And who informed you of that?
23   A    That would be Mr. Lord and Mr.
24   Andrews.
25   Q    Okay.  And is that the extent of

10

1    your actual knowledge about her status while
2    she was at your school, that is, her
3    employment status?
4    A    Yes.
5    Q    Okay.  Good enough.  Read paragraph
6    16 to yourself, please, and tell me when
7    you've read it, on both documents.
8    A    (Witness reviewing documents.)
9    Yes.
10   Q    All right.  Do you understand there
11   that she is alleging that she saw various
12   things that she considered to be not in
13   compliance with certain laws and regulations,
14   and that she reported these to Paul Strange,
15   in substance?
16   A    Yes, sir.
17   Q    All right.  Now, in your answer,
18   the Houston County defendants, which includes
19   you, say that they're without sufficient
20   information to form a belief as to whether
21   that's true or not.  Do you see that?
22   A    Yes, sir.
23   Q    All right.  Is that the case with
24   you?
25   A    Yes, sir.

1    Q    Did Paul Strange never come to you
2    or communicate with you in some way and tell
3    you, "Mrs. Miller is saying these things
4    about the IEP's and about our special ed
5    program that she thinks are wrong," or words
6    to that effect?
7    A    He mentioned to me Mrs. Miller's
8    concern about what was termed to me as the
9    model, the inclusion model.
10   Q    And what did you understand him to
11   mean by that?
12   A    According to Mr. Strange, that Mrs.
13   Miller felt as though she should be able to
14   teach.  Her role in the classroom would be
15   able to teach two, three days a week, and not
16   as a -- help students, the special
17   education students, individually there,
18   either at their desk or to pull them out, if
19   they're having difficulty, to the school
20   resource -- to the special education resource
21   room to help them, again, either individually
22   or small groups.
23         That that was her concern, was the model
24   was not what she was taught, and she didn't
25   think that that was correct, what was being

12

1    done there at Houston County High School.
2    Q    And to your understanding, that was
3    limited to whether she would be permitted to
4    teach the entire classroom two or three days
5    a week?
6    A    That was the way I understood it.
7    Q    Did Mr. Strange ever report any
8    other concerns to you that he understood Mrs.
9    Miller had expressed?
10   A    Late in the process, there was
11   something mentioned about IEP's.  But this
12   was very late in the process.  And --
13   Q    Do you recall -- I'm sorry.
14   A    And I don't recall exactly what was
15   said about the IEP's, that maybe late in the
16   process he mentioned.  But what was mentioned
17   to me on more than one occasion was the
18   model.  And that term kept being used, the
19   model.  That Mrs. Miller did not agree with
20   the model and did not think that that was
21   according to state and federal law, the type
22   model that was being used.
23   Q    Okay.  Can you tell us any other
24   particulars, other than what you've already
25   told us, about what you were told her

13

1  complaints were?
2      A    That her complaints were?
3      Q    Right.  And maybe I should say
4  concerns.
5      A    From Mr. Strange or from anyone?
6      Q    Well, from Mr. Strange, first.
7      A    He mentioned that there was a
8  misunderstanding at one time about an
9  eligibility form.  That he and Starla Smith,
10  the psychometrist, they had had a meeting,
11  eligibility meeting.  And that, as a learning
12  tool, that they carried it over, because he
13  -- in Mr. Strange's words, now, that Mrs.
14  Miller was concerned that she was not
15  involved, not being in the process.
16      So, as a learning tool, he and Ms. Smith
17  carried that document to Mrs. Miller and put
18  it on her desk, and Ms. Smith -- again, this
19  is Ms. Smith, now, not Mr. Strange.  Do you
20  still want me to answer that?
21      Q    Yes, please.
22      A    That Ms. Smith asked her, hey, to
23  look at this, and Mrs. Miller reacted as
24  though that was an illegal act.
25      Q    Do you know in what respect she

14

1  thought it was an illegal act?
2          MR. WALDING:  Object to the form.
3      Q    And I don't want to get you to
4  guess.
5      A    Right.
6      Q    But, I mean, if you know, I would
7  like to know.
8          MR. WALDING:  I object to the form.
9          I don't know how he can get
10          inside Mrs. Miller's head.
11      Q    Well, what was expressed to you, if
12  anything, about what Mrs. Miller's particular
13  objection was?
14      A    That she assumed that she was going
15  to be signing that document, and that it was
16  an IEP and not -- it was an IEP and not an
17  eligibility form.
18      Q    Okay.  Now, you said there were --
19  or suggested, seemed to suggest, that there
20  might have been other particulars concerning
21  Mrs. Miller's concerns that were related to
22  you by other people, other than Mr. Strange.
23  And if that's the case, please tell us what
24  those were, please?
25      A    Right.  Mr. Strange -- and, again,

15

1  it's three years ago.  I'm trying to remember
2  all these meetings and these chance meetings
3  in the hall and standing in doorways.
4      Mr. Strange, and I think Mrs. Miller, at
5  one time, mentioned to me, in Ms. -- if I say
6  Ms. Breckenridge -- because I think she was
7  Ms. Breckenridge at that time, but she's
8  Ezell now.  There was a concern that she
9  wanted her -- a copy of her lesson plans.
10  Now, that was related to me.
11      I don't think there was any official
12  meeting that I can remember concerning that
13  lesson plan issue.  But that I talked to Mrs.
14  Ezell.  I talked to Mrs. Miller.  I talked to
15  Mr. Strange.  And there were copies in the
16  office.  And we got that resolved, got her
17  copies of the lesson plans that she was
18  requesting.
19      Q    Any other things --
20      A    Other complaints from --
21      Q    -- people told you about?  Yeah.
22      A    There were things that other
23  teachers and school personnel shared with me,
24  but not necessarily complaints that Mrs.
25  Miller had.

16

1      Q    Okay.  I'll get back to that.
2      A    Right.
3      Q    When you earlier alluded to
4  something having occurred -- I can't remember
5  your exact words, but something like late in
6  the process --
7      A    Right.
8      Q    -- let me try to set what I believe
9  are some benchmarks on the calendar that
10  might help us in trying to not pinpoint, but
11  at least focus on the timing of certain
12  events.
13      One of these would be August 26, 2004,
14  which I would represent to you was the first
15  observation of Mrs. Miller by Dr. Ruediger
16  from Troy.  Do you remember Dr. Ruediger?
17      A    I remember him, yes.
18      Q    Okay.  And then, prior testimony
19  from Mr. Strange, I believe, as well as Mrs.
20  Miller, indicates that there was some
21  follow-up meeting within a day or so to that
22  first observation that involved you.  I'm
23  going to ask you about that in a minute.
24      Another date that seems to sort of stand
25  out in everybody's mind is September 24th,

17

1  which is the day she left school and went to
2  the central office to see Mr. Andrews.
3      A    Right.
4      Q    And then, the general time frame
5  October 14 to 19, which is where everything
6  sort of -- the wheels fell off, and she's
7  gone. Okay? Now, when you say "late in the
8  process," when you were talking about Mr.
9  Strange relating things to you, if you
10  recall, would that be before or after the day
11  she took off and went to the central office?
12      A    That's going to be my biggest issue
13  here, are dates. I mean, it happened three
14  years ago, and there's a lot of water under
15  the bridge since that time. I'll do the best
16  I can.
17      I can't tell you for sure when that was
18  during that process that I was told about the
19  IEP's. I know it was -- when I say "late,"
20  that was not the initial concern that was
21  brought to my attention. Anything about
22  IEP's came well later.
23      Q    Okay. In late August 2004,
24  following an observation of Mrs. Miller by
25  Dr. Ruediger, do you recall Dr. Ruediger

18

1  coming to you to discuss things that had come
2  to his attention during that observation?
3      A    Yes.
4      Q    All right. Tell me, please, as
5  much as you can remember about who said what
6  between you and Dr. Ruediger in that
7  conversation. And, first, tell me whether
8  anybody else was present, and, if so, who?
9      A    I think, at that time, it was just
10  Dr. Ruediger and myself.
11      Q    Okay.
12      A    He asked to see me. He was there.
13  Again, I'm not sure whether he was there to
14  go over an observation, whether it was the
15  day of the observation. That, I don't
16  remember. But he and I did meet in the
17  conference room there in my office. And he
18  wanted to talk to me about some concerns he
19  had, some statements that Mrs. Miller had
20  made, or allegedly had made, and some things
21  that he had allegedly said.
22      Q    That Dr. Ruediger had allegedly
23  said?
24      A    Yes.
25      Q    To whom?

19

1      A    Statements that he had made to Mrs.
2  Miller.
3      Q    Okay. Dr. Ruediger is reporting to
4  you the substance of a conversation he had
5  had with Mrs. Miller?
6      A    He had met with Mr. Strange. I
7  believe they met in the library. And then,
8  he came directly -- I say "directly." I
9  don't know. He came that day to meet --
10  asked to meet with me. And we talked about
11  Mrs. Miller's situation.
12      And the things that stick out in my mind
13  about that conversation was that Mrs. Miller
14  had made accusations that Mr. Strange had
15  relayed to me that we were -- again, the
16  model that we were using was incorrect, was
17  not what she was taught at Troy State.
18      She felt that it was in violation of
19  state special education law and policy, and
20  that she -- again, this came from Mr. Strange
21  -- that she had talked to Dr. Ruediger about
22  it, he had agreed, and that he was going to
23  call the state department and check into it
24  and see -- you know, report that we were not
25  doing things correctly.

20

1      And I asked him about that. I'm not
2  sure whether he asked me, from the
3  conversation that he had with Paul Strange,
4  or I asked him. But we discussed that. I
5  asked him did he make those statements. Did
6  she say that to him, and did he agree with
7  her about our model and what we were doing
8  there.
9      Q    And what did he have to say about
10  that?
11      A    He said he did not make that
12  statement. That was incorrect.
13      Q    And the statement was that he
14  allegedly had said that he agreed with Mrs.
15  Miller's position that there was something
16  wrong with your model?
17      A    Right.
18      Q    Okay. Was anything else discussed
19  in this meeting?
20      A    Not that I -- I mean, there could
21  have been, but not that sticks out in my
22  mind. Not that I recall.
23      Q    Do you recall about how long the
24  meeting lasted?
25      A    Again, it's just an estimate. I'm

21

1    guessing.
2    Q    That's fine.
3    A    Five to ten minutes.
4    Q    Okay. Do you recall what he --
5    wait a minute. Are you saying he asked to
6    see you or you asked to see him?
7    A    I don't remember who asked to see
8    who, to be honest with you. He met with Mr.
9    Strange, and then, after that -- I don't know
10   who asked to meet with who. I'll be honest
11   with you. I don't remember that. I just
12   know that we met.
13   Q    All right. But, in the meeting,
14   you had already been informed by Mr. Strange
15   not only that Mrs. Miller disagreed with the
16   format y'all were using, the model you were
17   using, but you had also been informed, prior
18   to the meeting, that she had quoted
19   Dr. Ruediger as being in agreement with her
20   criticism?
21   A    Yes.
22   Q    All right. And in that meeting,
23   you asked him if that was so?
24   A    I don't know if I asked him or he
25   relayed what Mr. Strange had said to him. It

22

1    was discussed. I don't remember who asked
2    who. But that subject was discussed.
3    Q    Do you recall any other subject
4    discussed in that meeting?
5    A    I don't remember. I don't remember
6    if we discussed her observation. I don't
7    remember discussing that.
8    Q    Is it your testimony still that,
9    at that juncture, there was still no
10   discussion concerning IEP's, as such?
11   A    Not that I recall. No, sir.
12   Q    All right. Between the time of
13   that meeting -- let me back up a minute.
14   After you had that meeting with Dr. Ruediger,
15   did you take any action following up on the
16   discussion? For example, did you call anyone
17   at Troy and talk to them about it?
18   A    Now, I called Pam Parris and Mr.
19   Andrews at a certain point -- it might have
20   been before or after the meeting with
21   Dr. Ruediger -- about some concerns that the
22   faculty and staff -- various faculty and
23   staff had been coming and sharing with me.
24   Q    And those are the concerns that had
25   to do with Mrs. Miller, but not her concerns?

23

1    A    Right.
2    Q    Okay. Let me show you your answers
3    to interrogatories at number 21, which is
4    sort of a lengthy interrogatory. But it has
5    to do with what your role was, if anything,
6    leading up to the withdrawal of Mrs. Miller's
7    internship.
8        And let me ask you to -- well, just read
9    your response there. And you're welcome, of
10   course, to flip back and read the question
11   itself on the preceding page. Just tell me
12   when you're finished.
13       MR. WALDING: Read the question,
14           please.
15       THE WITNESS: Read it out loud?
16       MR. WALDING: No. Read the
17           question before you read your
18           answer. ....
19   A    (Witness reviewing documents.)
20   Okay.
21   Q    May I see it just a second, please,
22   sir?
23   A    Yes, sir. (Witness handing
24   document to Mr. Faulk.)
25   Q    In regard to the answers you were

24

1    just giving just now in your deposition, do
2    you see here where, in your answer to
3    interrogatory, it says, "I also
4    communicated"? Read that sentence aloud for
5    the record, please, sir.
6    A    "I also communicated Mrs. Miller's
7    concerns about certain students supposedly
8    not having an IEP to Andrews."
9    Q    Now, do you know about when that
10   report by you occurred?
11   A    Again, that's going to be late --
12   it was late in the process. And I don't
13   remember the exact time and date of that --
14   reporting that to Mr. Andrews.
15   Q    Read the next sentence for us,
16   please, sir, beginning "I understand."
17   A    Right. Yes, sir.
18   Q    Read that aloud for us.
19   A    "I understand that these concerns
20   were investigated, and it was found that the
21   students did have IEP's."
22   Q    Okay. Do you remember who any of
23   the students were who are being referred to
24   there?
25   A    At that time, I was not informed of

1    any particular students.

2    Q    Okay.  Do you know who conducted

3    the investigation that you mention there in

4    your answer?

5    A    I believe Mr. Andrews sent Virginia

6    Singletary over to review IEP's.

7    Q    Okay.  And have you seen a written

8    report of that investigation?

9    A    I think she turned in one.  I

10    believe I have reviewed one, I think.  Yes.

11    Q    And it's your understanding that

12    she could find nothing wrong with things as

13    they stood at the time she made her

14    investigation?

15    A    Yes, sir.

16    Q    Do you know if that investigation

17    occurred before or after Mrs. Miller was no

18    longer an intern?

19    A    I think it was before.

20    Q    What was your mother's maiden name,

21    please?

22    A    Morris, M-o-r-r-i-s.

23    Q    And was her family a Houston County

24    family?

25    A    Yes, sir.

---

26

1    Q    And do they have descendents living

2    here today who are adults?

3    A    Yes, sir.

4    Q    What about your wife's family name?

5    A    McArdle, M-c-A-r-d-l-e.

6    Q    Was she from Houston County?

7    A    Yes, sir.

8    Q    And does she have other relatives

9    here in the county named McArdle?

10    A    Yes, sir.

11    Q    What are some other family names

12    that stand out, like, first cousins?  I'm not

13    interested in their first names so much as

14    just the surnames.  You gave us the name of

15    Pitchford, and you said you were kin to

16    everybody named Pitchford in the county.

17    A    There's not going to be any large

18    group of people with any other name other

19    than McArdle, Pitchford and Morris.  Any

20    large group of names that I can think of.

21    Q    And would that be true of the

22    surrounding counties, as well?

23    A    I have family members in -- a lot

24    of family members in Henry County, also.

25    Q    Named Pitchford?

---

1    A    Yes, sir.

2    Q    What about your wife?

3    A    She has some relatives in Henry

4    County, also.

5    Q    Are they all named McArdle?

6    A    Burdeshaw is a name that you might

7    want to make note of.

8    Q    Okay.  Any others?

9    A    Not that stand out.  No, sir.

10    Q    I'm just trying to prompt you to

11    say it out loud.

12    A    No, sir.

13    Q    After Mrs. Miller left the school

14    for good, was she replaced by another teacher

15    who would carry out these special ed

16    functions that she was supposed to have

17    carried out?

18    MR. WALDING:  Object to the form.

19    A    That's something I should know, but

20    I couldn't tell you who replaced her.  Again,

21    it was three years ago.  I'm fuzzy on some

22    things.  But, now, I can't tell you who

23    replaced her.

24    Q    Do you know that she was replaced,

25    and you just can't remember who it was?

---

28

1    A    I'll have to ask Mr. Lord or Mr.

2    Andrews.  They will know that.  I just don't

3    remember.  I know there was a shortage of

4    teachers at the time.  And so, I'm not sure

5    if she was replaced or not at that time.

6    Q    You alluded earlier to contacts you

7    had with people from Troy -- and, by that, I

8    mean Troy University -- about concerns that

9    other teachers had about Mrs. Miller.

10    A    Yes.

11    Q    Did you have concerns of your own

12    about Mrs. Miller?

13    A    Mrs. Miller and I had very few

14    meetings or conversations.  What I relayed to

15    Mr. Andrews and Pam Parris was information or

16    concerns of other faculty members and staff

17    members.

18    Q    Okay, sir.  And who were those

19    other faculty and staff members, please?

20    A    Lisa Towns is a mathematics

21    teacher.  Again, you have Paul Strange, her

22    mentor.  Stacey Ezell.  My office staff,

23    Barbara Hamm, Glenda Hammond.  Cathy Keasler,

24    the counselor.  And Starla Smith was not an

25    employee of our school, but she was an

1 employee of the county.

2 Q    Okay.  Anyone else?

3 A    I don't think so.

4 Q    Let's just take them one at a time.

5 What was reported to you by Ms. Towns?

6 A    Ms. Towns came to my office with

7 concerns.  One major concern was that Mrs.

8 Miller was coming into her room, on numerous

9 occasions, upset and crying, and that it was

10 disruptive to the class and the students,

11 especially the special education students who

12 had trouble focusing to start with, and this

13 was causing a disruption.

14 Q    Did she share with you her

15 understanding of what Mrs. Miller was upset

16 and crying about?

17 A    No.

18 Q    Did she come to you about this on

19 more than one occasion?

20 A    I'm not sure.

21 Q    Okay.  Does that exhaust your

22 knowledge of Ms. Towns' involvement?

23 A    She also had a concern that she

24 would make suggestions on type lessons that

25 Mrs. Miller taught, as far as the ability of

---

30

1 the children to understand those lessons, the

2 level of the lessons, and that Mrs. Miller

3 would not always take her suggestions.  That

4 the lessons were over their head.

5 Q    Did any of the people that you

6 named come to you in groups, or were these

7 all individual discussions?

8 A    They came in individually.

9 Q    Okay.  Does that exhaust your ·

10 recollection of Ms. Towns' involvement in

11 these reports?

12 A    Late in the process, again, now,

13 later -- did not have anything to do with me

14 calling Mr. Andrews or Pam Parris -- Ms.

15 Towns was upset after Dr. Ruediger had

16 observed Mrs. Miller teaching in Ms. Towns'

17 class.

18 And Dr. Ruediger met with Ms. Towns to

19 discuss that observation and asked -- again,

20 this is according to Ms. Towns -- asked her

21 what she thought of the lesson.  And that Ms.

22 Towns told Dr. Ruediger that she advised her

23 not to teach that lesson.  That that lesson

24 was over the children's head.

25 And she was not aware -- did not know

---

1 that Dr. Ruediger would go back and share

2 that information with Mrs. Miller, but that

3 obviously he did.  And Mrs. Miller came back

4 into her room, very upset, and told her,

5 "Thank you very much for what you told

6 Dr. Ruediger."

7 Q    Does that end the Towns

8 involvement?

9 A    As far as I can remember.

10 Q    Okay, sir.  And I don't want to

11 discourage you from --

12 A    Right.

13 Q    -- telling me everything you know.

14 I do want to know what you know.  What about

15 reports of the nature you're talking about

16 that you received from Mr. Strange?

17 A    Mr. Strange shared with me that

18 Mrs. Miller was constantly concerned about

19 the model.  I mean, I know I've referred to

20 that several times.  But that just really

21 sticks out in my mind, that she did not agree

22 with the model.  She wanted to teach, and

23 thought that the model we were using with the

24 special education students and mainstreaming

25 was -- he could not convince her that we were

---

32

1 in compliance with state law.

2 He shared with me some conflicts that

3 she was sharing with him about in Mrs.

4 Ezell's class.  That he had made suggestions

5 to her about taking the students that needed

6 some help, whether it be individually or

7 small groups, after Mrs. Ezell had initially

8 presented the lesson, and if the students did

9 not understand the lesson there, to take not

10 all of them, but those that needed help, back

11 to the resource room to work with them.  That

12 she would not take his instructions on doing

13 so.

14 And Mr. Strange told me that she made a

15 statement to him, "No."  That, "Mrs. Ezell is

16 making life miserable for me in that class,

17 and I'm going to stay in there and make life

18 miserable for her."

19 Again, later in the process -- and I

20 don't know when -- it was mentioned to me --

21 also mentioned to me about the eligibility

22 form.  We've discussed that.  That she

23 thought that she was being forced to sign an

24 IEP, and that she got very upset about being

25 forced to sign -- thought she was having to

---

1 sign an IEP, when it was an eligibility

2 meeting. He reported that to me.

3     Q    Let me butt in just a second.

4     A    Yes.

5     Q    Was she, to your understanding,

6 being asked to sign the eligibility form?

7          MR. WALDING: Object to the form.

8     A    I don't have any knowledge of that.

9 I was not told she was asked to sign it. I

10 was told that that was carried to her by Mr.

11 Strange and Starla Smith as a learning tool,

12 to make her feel more part of the process,

13 and as it was put on her desk, she

14 immediately reacted to where this was

15 illegal.

16     Q    Did Mr. Strange bring you any other

17 concerns that he had about Mrs. Miller?

18     A    There could be some. But, at this

19 time, that's the ones that stick out in my

20 mind.

21     Q    Okay. Let's talk about Mrs.

22 Ezell's reports to you.

23     A    Mrs. Ezell, again, there was not

24 any formal meetings. As all the faculty can

25 tell you, my door is open. People come in

---

34

1 and out, come to my door. I think I remember

2 a meeting -- not a meeting. But Mrs. Ezell

3 just came to the door in between classes with

4 a concern that Mrs. Miller did not like the

5 way she was teaching her class, again wanting

6 to -- Mrs. Miller wanted to teach. She

7 wanted -- did not like the role that she had

8 in her class. She wanted to teach half the

9 week, half the class time.

10      And there was a comment that was made --

11 Mrs. Ezell relayed to me a comment that Mrs.

12 Miller said that, "I don't like being in here

13 any more than you do, but I've got to be in

14 here, and I've got to make my time." She

15 relayed that to me.

16     Q    Do you recall any other reports by

17 Mrs. Ezell?

18     A    The issue about the lesson plans

19 that we've already discussed. That was

20 resolved. Again, there could be others, but,

21 at this time, that's what sticks out in my

22 mind.

23     Q    Well, did Mrs. Ezell come to you

24 about the lesson plans, or did Mrs. Miller

25 come to you about that?

---

35

1     A    Again, I don't know who came to me.

2 I don't know whether it was Mr. Strange or

3 Mrs. Miller or Mrs. Ezell. I don't remember

4 who. But the issue was brought to my

5 attention. More than one of them could have

6 brought it to my attention.

7      There was no -- I don't remember any

8 official meeting, but, again, a lot of

9 meeting in the doorways, meeting in the hall,

10 standing. I don't remember whether -- I

11 don't remember a meeting and exactly who it

12 was that brought it to my attention.

13     Q    Okay, sir. And who, other than Ms.

14 Hamm and Ms. Hammond, were part of your

15 office staff during the period we're talking

16 about?

17     A    That's the only two.

18     Q    And what was Ms. Hamm's job?

19     A    Ms. Hamm was the secretary.

20     Q    That's H-a-m-m?

21     A    That's correct.

22     Q    What did Ms. Hamm tell you about

23 Mrs. Miller that you alluded to earlier?

24     A    That, again, there were occasions

25 where she would come into the office upset,

---

36

1 crying, visibly upset.

2     Q    Did Ms. Hamm tell you whether she

3 had any knowledge of why Mrs. Miller was

4 upset?

5     A    She did not know why she was upset.

6     Q    Other than her being apparently or

7 visibly upset, did Ms. Hamm tell you anything

8 else?

9     A    Again, on the 24th, the day --

10 September the 24th --

11     Q    The day she left?

12     A    Right. She came to me, actually

13 after Mr. Strange did, to tell me that she

14 had seen her leave the building, crying, with

15 a basket full of -- was not sure what she had

16 -- with a basket full. Walked out the front

17 door, crying, upset, and left the building.

18     Q    Okay. But Ms. Hamm apparently had

19 not had any communication with Mrs. Miller

20 about her leaving?

21     A    No. Or that's what she told me.

22 No.

23     Q    Do you recall anything else Ms.

24 Hamm reported to you concerning Mrs. Miller?

25     A    No, sir.

37

1    Q    All right. Let's talk about Ms.
2    Hammond. What was her job?
3    A    Ms. Hammond was the receptionist.
4    Q    Okay. What did Ms. Hammond report
5    to you?
6    A    Again, the situation about -- on
7    the 24th, about her leaving. I asked Ms.
8    Hammond -- after this incident, I asked Ms.
9    Hammond, and Ms. Hammond said that she saw
10    her -- also saw her leaving, and that also
11    there were times when Mrs. Miller would be in
12    the office, upset, crying.
13    Q    Anything else by Ms. Hammond?
14    A    No, sir.
15    Q    Did Ms. Hammond tell you whether or
16    not she had been told where Mrs. Miller was
17    going or planned to go?
18    A    Told by whom?
19    Q    By Mrs. Miller or anybody else.
20    A    She was not.
21    Q    While we're on that subject, let me
22    show you what's already in evidence as
23    Defendant's Exhibit 14, and ask you to read
24    that to yourself and just tell me when you've
25    finished, please.

38

1    A    (Witness reviewing document.) I've
2    finished.
3    Q    Do you recall seeing this document
4    before?
5    A    I saw that document two days ago.
6    My attorney provided me a copy of that
7    document.
8    Q    You had never seen it prior to
9    that?
10    A    No, sir.
11    Q    And you're confident of that?
12    A    Yes, sir. To the best of my
13    knowledge, I had not seen that until this
14    past Monday.
15    Q    Do you know who these students are
16    that are mentioned, A. T. and J. C.?
17    A    I vaguely remember the students,
18    vaguely.
19    Q    And do you know whether they were
20    in the special ed program?
21    A    I believe A. T. was. I think he —
22    again, three years ago, a student. I think
23    he tested out. But I do remember A. T. And
24    what was the other one?
25    Q    J. C.

39

1    A    I don't remember J. C. being a
2    special education student, but that's not
3    saying that he might not be or might not have
4    been.
5        MR. WALDING: Winn, I don't mean to
6            interrupt, but when you get to
7            a place, I'd like some more
8            coffee, if we could take a
9            short break.
10        MR. FAULK: Give me just a second,
11            because I think I'm near a
12            stopping point, a break point.
13    Q    In the people you named off, you
14    mentioned Cathy Keasler, K-e-a-s-l-e-r.
15    A    K-e-a-s-l-e-r. Yes, sir.
16    Q    Tell me what Ms. Keasler reported
17    to you about Mrs. Miller?
18    A    She was the counselor there at our
19    school. Students -- and this has just
20    refreshed my memory, now, on something else
21    that some of these other teachers had
22    reported.
23    Q    That's fine. And any time -- let
24    me just tell you, if you realize you've
25    omitted something or misstated something,

40

1    just tell me, and I'll be glad to let you go
2    back and add it.
3    A    I'll need to go back. Because,
4    what Ms. Keasler reported to me was reported
5    to me by other teachers. Ms. Keasler had
6    students -- and she did not tell me their
7    names. But she had special education
8    students come to her office and tell her that
9    they did not want to go to Mrs. Miller's
10    class. They did not feel comfortable going
11    to her class. Please not make them go to her
12    class.
13    Q    What did you do about that?
14    A    I did nothing.
15    Q    Why not?
16    A    Other than have Ms. Keasler and Mr.
17    Strange discuss that with the students, I did
18    nothing. I did not have any communication
19    with the students.
20    Q    Did you get any kind of follow-up
21    report from either Mr. Strange or Ms. Keasler
22    about that?
23    A    Other than that they talked to the
24    students and tried to reassure them that
25    everything would be okay.

1    Q    Okay.  You say other teachers had
2  mentioned similar things to you?
3    A    Right.  Ms. Towns.  The students
4  relayed to her that they did not feel
5  comfortable -- they did not -- you know,
6  don't make them go to the resource room with
7  Mrs. Miller.
8    Q    Do you know whether these were the
9  same students that had approached Ms.
10  Keasler?
11    A    I do not know.
12    Q    Okay.  Do you --
13    A    Mr. Strange also reported to me
14  that -- I didn't mean to interrupt you.  I'm
15  sorry.
16    Q    That's all right.
17    A    Mr. Strange also reported to me
18  that students were coming to him and
19  requesting, "Don't make us go to the resource
20  room with Mrs. Miller."
21    Q    Was that sort of thing
22  unprecedented, in your experience, that is,
23  that the children would ask not to be with a
24  particular teacher?
25    A    There would be -- there is an

42

1  occasion that a student requests a schedule
2  change, but not a lot of students about one
3  particular employee.
4    Q    So, in that sense, it was unusual?
5    A    Yes.
6    Q    That's your testimony?
7    A    Yes.
8    Q    Anything else by Ms. Keasler?
9    A    She reported to me about -- I think
10  Ms. Smith and Mr. Strange came in and talked
11  to her about the eligibility form and the
12  misunderstanding about it being an IEP.  I
13  don't think she was there when that happened,
14  but she did mention that incident to me.  I
15  don't think she was there.  Again, I'm not
16  sure.
17    Q    Let me show you Defendant's Exhibit
18  14 again, and ask you to look.  See the
19  mention here, about in the middle of it,
20  about Cathy Keasler?
21    A    Right.
22    Q    And whether you had seen this
23  before or not, do you recall any prior thing,
24  back in August, of any kind of problem
25  between Mrs. Miller and Cathy Keasler about

1  an IEP for R. S.?  Do you remember anything
2  about that incident?
3        MR. WALDING:  Object to the form.
4    Q    Assuming it occurred, I mean, do
5  you remember anything about it?
6        MR. WALDING:  That's my objection.
7    A    I don't remember that being
8  reported to me.
9    Q    Is the same true about the
10  assertion in the letter that Miller had
11  attended an IEP meeting for someone named
12  Thornton during second block, and that
13  Starla, in Paul Strange's presence, had asked
14  her to sign three documents claiming that she
15  was at the meeting?  Do you recall anything
16  of that nature coming to your attention?
17    A    I don't recall the -- I don't
18  recall this student at all.  But, now, to my
19  understanding, this was the incident that
20  happened about the eligibility form.  Again,
21  I think this was the same incident about the
22  eligibility form.  But, again, I'm not 100
23  percent sure.  If not, I was not aware of
24  that.  The only incident that I was made
25  aware of with Starla Smith and Paul Strange

44

1  was the eligibility document.
2    Q    Now, Starla Smith.  Concerns
3  expressed to you by Starla Smith about Nancy
4  Miller.  Tell me about those.
5    A    Other than, again, what we've
6  repeated several times about the -- and she
7  did not come to my office.  The conversation
8  I had with her, to my best recollection, was
9  there in Cathy Keasler's office.  I know
10  Cathy Keasler was present.  I'm not sure if
11  Paul Strange was present at that time or not.
12  But, again, it was relayed to me about this
13  incident about the eligibility form and Mrs.
14  Miller reacting so, thinking it was an IEP.
15    Q    Have we now exhausted your present
16  memory about other teachers and employees
17  expressing concerns to you about Mrs. Miller?
18    A    Yes, sir.
19        MR. FAULK:  Okay.  Are you ready
20          for your coffee?
21        MR. WALDING:  I would love some.
22        (Recess from 9:56 to 10:12.)
23    Q    Let me back up to something that I
24  think you said you didn't have any
25  recollection of, but I just want to be sure.

45

1  Do you recall ever having met with Nancy
2  Miller, Paul Strange and Cathy Keasler
3  concerning some special education matter, a
4  meeting between y'all, and particularly
5  having to do with an IEP?
6      A    No, sir. I don't recall any
7  meeting.
8      Q    Now, the situation you've described
9  of various teachers and staff members and
10  professionals from central office coming to
11  you and complaining or expressing concerns
12  about Mrs. Miller, given that situation, did
13  you try to do anything about the situation,
14  and, if so, what?
15      A    I wanted to treat Mrs. Miller as an
16  intern and try to allow her to have as much
17  of that intern experience as possible. This
18  was a very unusual situation with
19  employee/intern. I had never dealt with that
20  before. Now I had two on the staff. Amy
21  Deese and Nancy Miller were both there at the
22  same time, with the same situation, due to no
23  applicants in those particular disciplines.
24  There was no model -- I hate to keep using
25  that term. But there was no model for me to

46

1  use to how to deal with this situation,
2  because it was unusual. I had never dealt
3  with it before. I chose to try to give her
4  as much of the intern experience as possible.
5  She was having to meet with Mr. Strange.
6  He was having to observe her one day a week
7  in her class. She was supposed to observe
8  one day a week in his class. He was supposed
9  to observe her four times during this
10  process. Dr. Ruediger was supposed to
11  observe her four times during this process.
12  Not to mention the various meetings that she
13  was having with Pam Parris.
14      This support system had been set up for
15  not only her, but for any other intern. And
16  I was afraid that I would -- I didn't want to
17  intimidate her any more than it was possibly
18  -- with all that pressure on her, which is
19  standard for any intern, I just felt like
20  that I would not add any more pressure to
21  that, and that I would deal with the mentor
22  on trying to work, and he would be the
23  go-between, as I did with Amy Deese.
24      I had no meetings with Amy Deese, the
25  other intern there with the same situation.

47

1  She came in, occasionally walked in, Amy
2  Deese did, with concerns. She would come in
3  and talk to me about a discipline issue. But
4  she would just walk in. There were no
5  meetings -- you know, set up any meetings.
6      Now, I don't know if I've answered your
7  question or not. But I did call -- my
8  recollection, I called one meeting with Mrs.
9  Miller.
10      Q    Alone?
11      A    Mr. Stephens, the assistant
12  principal, was there.
13      Q    Okay. Tell us about that meeting,
14  how it came about and what happened?
15      A    Again, the time frame, I'm going to
16  struggle with. But I think it was after I
17  had called Mr. Andrews about all these
18  issues. Now, I'm going to be honest with
19  you. I took -- again, Mrs. Miller never
20  shared those concerns with me personally.
21  She never told me she had any issues with the
22  model or IEP's, that I can recall. The
23  information I was getting, I was getting
24  through Paul Strange, the mentor.
25      But I took her -- the concerns he was

48

1  sharing with me about the model -- I mean,
2  I'm the principal of the school. I took that
3  very serious. And I called Mr. Andrews, and
4  I said, "Look, I've got a lady over here
5  that's saying that we're in violation of
6  state and federal special education law by
7  the model that we're using as far as
8  mainstreaming and inclusion." And he assured
9  me, "We're in full compliance." He said, "I
10  assure you, we're ahead of the game. We're
11  in full compliance."
12      But he still, as we've talked about,
13  sent Virginia Singletary to check IEP's, and
14  then, he came over and had a meeting with us.
15  Pam Parris called a meeting that Mr. Andrews
16  was present.
17      But some times after -- I think it's
18  after the -- I know it was after the meeting
19  that Ms. Parris called, that Mr. Andrews and
20  I both attended. Some time after that, when
21  I was, myself, 100 percent sure that we were
22  in compliance, I called a meeting with Mrs.
23  Miller. And I had Mr. Stephens, the
24  assistant principal, sit in on that meeting.
25  And I sat down with her, and I basically -- I

1    don't remember everything that was said in
2    the meeting.  But the purpose of that meeting
3    was to tell her, okay, you're an intern.  You
4    don't have -- you have not even received --
5    you haven't graduated yet.  You haven't
6    received your teaching certificate yet, and
7    you've been here a short period of time.
8       We've got the state department of
9    education who has come down and monitored us
10   this past spring, previous spring of 2004,
11   and assured us that we're in full compliance.
12   They checked, and we got a passing grade.
13      We've got the superintendent, we've got
14   Mr. Andrews, that has assured myself and you
15   and everybody involved that we're in full
16   compliance.  And there is the principal, me,
17   with over 20 years experience.  You've got
18   Mr. Strange, your mentor, who is experienced,
19   has his degree, been teaching probably less
20   than ten years.  I'm estimating eight years.
21      You've got all these people that are
22   telling me and telling you that we're in full
23   compliance.  I believe we are.  And there is
24   a chain of command, and that's what we expect
25   you to follow.

50

1       And then, we've got all these issues
2    that teachers have been coming to me and
3    sharing with me.  I am satisfied that we're
4    doing what we're supposed to do.
5       Q    And you said all that to her, or
6    words to that effect?
7       A    To that effect.
8       Q    Okay.  And in regard to what
9    teachers were coming to you about, did you
10   elaborate on that to Mrs. Miller in that
11   meeting?
12      A    I did not.
13      Q    On that occasion or on any other
14   occasion, do you recall Mr. Stephens leaving
15   the room, laughing?
16      A    I think Mr. Stephens left the room.
17   Now, my attention was on Mrs. Miller, just as
18   my attention right now is on you.  I don't
19   know what this gentleman is doing.  If he
20   gets up and leaves the room, I don't know why
21   he left the room.  But my attention is on
22   her, as it's on you now.
23      Q    So, if that happened, you don't
24   know that it happened?
25      A    He left the room.

1       Q    But you don't remember anything
2    about him laughing?
3       A    I don't know why he left the room.
4       Q    Was that the only meeting you had
5    with Mrs. Miller being present that had
6    anything to do with what we've been
7    discussing?
8            MR. WALDING:  Object to the form.
9            You mean that he called?
10      Q    Well, that you were present in and
11   she was present in --
12      A    No.
13      Q    -- either alone or with other
14   people.
15      A    There was one informal meeting
16   that she and I had alone -- and we didn't
17   even sit down -- standing in my office, very
18   near the end of this whole process.  And
19   there was another meeting that Pam Parris
20   called, that we -- actually two meetings that
21   Pam Parris called, one that didn't take
22   place, and then, one that did take place,
23   that Mr. Andrews was present.
24      Q    These are in addition to the
25   meeting you just told us about with Mr.

52

1    Stephens?
2       A    Yes.
3       Q    Do you remember whether the meeting
4    with Mr. Stephens happened before or after
5    she left campus to go to the central office
6    in September?
7       A    I'm not 100 percent sure about the
8    24th, whether it was before or after.  But it
9    was after Mr. Andrews -- I had talked to Mr.
10   Andrews, and he, through his direction, had
11   investigated everything and assured me we
12   were in full compliance with what we were
13   doing there as far as special education.
14      Q    Okay.  Do you recall which came
15   first between the Andrews meeting and the
16   Parris meeting that you've mentioned just a
17   minute ago?
18      A    I believe my meeting came after
19   that, after the Parris -- after the meeting
20   that -- again, I'm not 100 percent sure.  But
21   I think my meeting came after the meeting
22   that Pam Parris called, that Mrs. Miller, Mr.
23   Andrews and myself attended.
24      Q    Oh, okay.  Did Andrews and Parris
25   each call a separate meeting?

53

1   A   I'm not aware of any meeting Mr.
2   Andrews called.
3   Q   Oh, okay. I misunderstood you.
4   A   He attended --
5   Q   So, Pam Parris asked for a meeting
6   that Mr. Andrews attended?
7   A   Yes.
8   Q   Okay. Tell us about when that
9   happened, please, and who was present, and
10  your best recollection as to who said what,
11  please?
12  A   Again, dates, I'm going to struggle
13  with, and the timeline, I'll struggle with.
14  But I think it was after I had called Mr.
15  Andrews and Ms. Parris about the concerns
16  that I had -- was receiving from the faculty
17  and staff. Ms. Parris, I think, called two
18  meetings.
19  I believe, the first one, Mr. Andrews
20  was not invited to. And I don't remember who
21  all was at that meeting. But that meeting, I
22  don't think, ever took place, because Mrs.
23  Miller refused to meet because her AEA rep
24  was not there, Sharon Cole was not there.
25  And that was a meeting that Pam Parris

54

1   called.
2   Q   Did the meeting take place between
3   y'all, just without Mrs. Miller, or did the
4   meeting just simply not progress?
5   A   To my best recollection, we sat
6   around, and it just dissolved. There was no
7   official meeting. There was no meeting,
8   because Mrs. Miller would not meet with us.
9   Q   What was your understanding of the
10  purpose of that meeting?
11  A   To address some of the issues that
12  had come up, that I had called about and that
13  Mr. Andrews, I think, had -- Mr. Andrews was
14  not there. I'm not sure if Mr. Andrews had
15  already had a conversation with Pam Parris at
16  that time. I knew he was aware of the issues
17  that we were having. But that initial
18  meeting that did not materialize, Mr. Andrews
19  was not there.
20  Q   Tell us, then, about the meeting
21  that did take place with Pam Parris?
22  A   Again, to my knowledge, Pam Parris
23  was there. Mrs. Miller, myself, and Mr.
24  Andrews. And I'm not sure if there was
25  anybody else present or not there in the

55

1   conference room at Houston County High
2   School.
3   And Ms. Parris -- again, I'll just have
4   to talk to you in general terms, because I
5   don't know specifically what was said. But,
6   just addressed some of the issues that we
7   had.
8   Q   What issues?
9   A   All those that I have shared with
10  you previously.
11  Q   Now, you're talking about teacher
12  complaints as well as Mrs. Miller's
13  complaints?
14  A   I don't know exactly. Again, I
15  don't know the specifics of that meeting.
16  But it was kind of a resolution meeting of
17  trying to put things back together and get
18  started back on a positive direction. But,
19  again, I don't remember the specifics of that
20  meeting, other than to address the concerns
21  that had been shared with Ms. Parris.
22  Q   For you to discuss those with Ms.
23  Parris?
24  A   I'm sorry?
25  Q   I may have misunderstood you. The

56

1   purpose of the meeting was to discuss what
2   you had heard with Ms. Parris?
3   A   No.
4   MR. WALDING: No.
5   Q   Help me out.
6   A   I called -- and it was not -- I did
7   not get all these concerns, now, from -- all
8   these that we discussed, that list of people
9   that you've got there, I did not get these
10  all in one day.
11  Q   I understand that.
12  A   They came in various days. But, at
13  a certain point, I called Mr. Andrews, and I
14  called Ms. Parris -- and I am assuming that
15  it's the same -- I think at the same day --
16  and shared with Ms. Parris that we've got
17  some concerns here. And I'm sure that I
18  probably shared with her some specifics on
19  the phone. And I shared those with Mr.
20  Andrews. And not long after that, Ms. Parris
21  called a meeting.
22  Q   And have you told us what you can
23  recall about what was said at that meeting?
24  A   The specifics, I can't recall. But
25  it was just to address the relationship that

57

1  Mrs. Miller, the intern, was having with her
2  mentor, with the teachers, students, and
3  trying to get back started in a positive
4  direction. But, now, the specifics, I don't
5  -- now, Mr. Andrews might recall those
6  specifics, but I just don't.
7      Q    And this meeting that actually
8  occurred with Ms. Parris, was it a follow-up
9  to the meeting that fizzled out?
10     A    I think so. I know there was an
11  original meeting that did not take place.
12  And I think this second meeting was a
13  follow-up to that, and Mr. Andrews coming,
14  also. Again, I'm fuzzy on the timeline. But
15  I know there was two meetings.
16     Q    Was the AEA woman present at the
17  second meeting?
18     A    No.
19     Q    Do you recall talking to her about
20  this situation?
21     A    I vaguely remember a call. She
22  called about -- and just kind of asked me,
23  one day in my office, "What's going on?" It
24  was not a two-minute conversation on the
25  phone. I just said, "You know, we've got

58

1  some issues here with an intern, Mrs. Miller,
2  you know, that we're dealing with." I did
3  not go into specifics with Ms. Cole.
4      Q    And she didn't inquire as to
5  specifics?
6      A    Not to my recollection. I think
7  maybe she had said she had gotten a call from
8  Mrs. Miller, and she was just calling me.
9      Q    Do you recall other contacts, by
10  either telephone or in person -- talking
11  about oral contacts -- between you and Ms.
12  Parris concerning these issues that you had
13  about Mrs. Miller?
14     A    I can only remember a couple of --
15  two conversations I had with her on the
16  phone. Three. Three conversations I had.
17     Q    Tell us about each of those.
18     A    The first call that I had was,
19  again, after -- at a certain point, when I
20  had received all these concerns from the
21  teachers and staff, I called Ms. Parris and
22  just told her we had -- there were some
23  concerns with -- and we talked in general
24  terms.
25     I'm not sure if it was that conversation

59

1  -- on the 24th, that Mrs. Miller left school,
2  I know I called the central office. I think
3  I called and left a message -- and, again, I
4  think. I'm not sure. I think I called Pam
5  Parris. But, again, this is on Friday, and I
6  don't believe they were in school over there.
7  I don't think Troy State of Dothan -- they're
8  closed on Friday or they don't have classes
9  on Friday.
10     But I called and talked to Ms. Parris
11  about -- maybe I reported -- I might have had
12  to leave it on her machine that Mrs. Miller
13  had left school, I did not know where she
14  was, and her students were down there
15  unsupervised.
16     I want to think that it might have been
17  the first conversation that I had with Ms.
18  Parris, when I called her about some issues,
19  her response to me was, "Mr. Pitchford, I'm
20  so sorry. I was afraid this was going to
21  happen."
22     And she continued to say that they had
23  had issues with Mrs. Miller in her classes at
24  Troy State of Dothan with some of her
25  instructors. Similar type behavior that I

60

1  was describing to her. Not cooperating with
2  her instructors. I don't know the specifics
3  that she said. But it was issues with some
4  of her professors. And that they had to have
5  a special meeting at Troy State with the
6  dean. Again, I don't know who. I want to
7  think she mentioned the dean, but I don't
8  know who else they had a meeting with, and
9  Mrs. Miller.    And sat down with her, and
10  had her to reassure them that they had had
11  these issues in classes out at Troy State of
12  Dothan with her. Would she guarantee them,
13  if they allowed her to go out and allow her
14  to do her internship at a school, a school
15  system, out at Houston -- again, at that
16  time, I'm not sure if it was Houston County
17  High School -- was she going to cooperate,
18  when she got out to the schools, and to
19  listen and cooperate. Again, I'm
20  paraphrasing. And that the decision was made
21  to allow her to do so.
22     And no one had told me or Mr. Andrews or
23  no one else before about that meeting or that
24  issue, that there were problems at Troy State
25  before she ever got to Houston County High

61

1 School. And Ms. Parris apologized to me for
2 that.
3    Q    So, you said there were three phone
4 calls. Have we covered them all?
5    A    No. There's one more.
6    Q    Go ahead.
7    A    I mentioned to you about a meeting
8 that Mrs. Miller and I had in my office, that
9 was not a called meeting. I'm not even sure
10 why she walked into my office. But it was
11 right at the end of her tenure there at
12 Houston County High School. At that time, I
13 did not know that her internship had been
14 terminated. But she was in my office. I
15 don't know what the issue was, what she was
16 there to ask me for.
17    And I -- and we were standing. We
18 didn't sit down. And I said; "Mrs. Miller,
19 let's start over." I said, "Let's start
20 over. I want you to have a successful
21 internship here. I want you to be a good
22 employee at Houston County High School for
23 years to come. Let's start over. Let me
24 call Troy State. Let me call them and just
25 see can we start over." And she did not --

62

1 there was no response. She looked at me and
2 did not respond.
3    And when she walked out of the room, I
4 still called Pam Parris, and I said, "Pam" --
5 I told her about the conversation that I had
6 had with Mrs. Miller. And she said, "It's
7 too late." She said, "The decision has been
8 made to cancel her internship." She said,
9 "It's too late."
10    Q    Do you happen to know whether Mrs.
11 Miller already knew that at the time you had
12 that brief conversation?
13    A    I did not know that. She did not
14 respond to me. When I asked her to let's
15 somehow start over, she just did not respond
16 at all.
17    Q    Was anyone else present during that
18 exchange?
19    A    No, sir.
20    Q    And the exchange I'm talking about
21 is between you and Mrs. Miller.
22    A    No, sir.
23    Q    What about the occasion on which
24 Mrs. Miller departed from the school for good
25 that day? Were you present when she actually

63

1 left the school for good?
2    A    Her last day?
3    Q    Yes, sir.
4    A    Yes, sir.
5    Q    Okay. Tell us what you recall
6 about that.
7    A    I'm not sure if Mr. Lord called me
8 and said he and Mr. Andrews -- they were
9 coming, and had a letter for Mrs. Miller. I
10 don't know if I ever saw the letter itself.
11    I mean, but I have been part of -- not a
12 situation similar to this. But, I mean,
13 we've had to give notification of teachers
14 being nonrenewed before. And this is just a
15 standard procedure, that you come personally
16 and hand out those letters. I do that now,
17 as a superintendent. I go hand those letters
18 personally to employees. ··      ...
19    They came. I'm not sure if Mr. Strange
20 was present in the office at that time
21 whenever we called her -- Mr. Lord called her
22 in and gave her her letter. I don't think he
23 was, but I'm not sure.
24    But, when Mrs. Miller left, Mr. Strange
25 was asked to go with her and see if he could

64

1 help her get up any of her things, to help
2 her to her car. I'm not sure whether he was
3 asked that whenever she locks her door, ask
4 for her keys. I don't remember the exact
5 conversation. But that's my recollection of
6 that day.
7    Q    There have been statements here and
8 there -- I can't even point you to them --
9 just coming up in this case, where people
10 have said in so many words that Mrs. Miller
11 refused to leave the school. Do you know
12 anything about that?
13    A    I don't know of -- I would not term
14 it that way. No, sir. I don't -- I know her
15 internship was terminated, and she kept
16 coming to work. Now, I don't think I ever
17 instructed her not to come back to work, not
18 to report back to school, until she was given
19 that letter.
20    Q    Prior to Mr. Lord delivering the
21 letter that you mentioned, are you aware or
22 have you heard of anyone else telling Mrs.
23 Miller, "You must leave the campus and not
24 come back," or words to that effect?
25    A    I don't remember that. I don't

65

1  recall that.
2      Q    That's fine. Have you now told us
3  everything that you did and attempted to do
4  about the complaints that you were getting
5  from teachers and staff about Mrs. Miller?
6      A    To the best of my recollection.
7      Q    And have you told me everything you
8  can recall about your contacts, both in
9  person and by telephone -- I'll get to the
10 written things here in a minute -- with Ms.
11 Parris?
12     A    The best of my recollection, those
13 are the three conversations, phone
14 conversations and the meeting, that I
15 remember. Now, am I sitting here to tell you
16 there were no other conversations? I can't
17 tell you that. The best of my knowledge,
18 those are the conversations that I had.
19     Q    Okay. That's fine. What about
20 other people connected with Troy?
21     A    Other than Dr. Ruediger -- I think
22 I had that one conversation with him -- I
23 don't recall having any conversation with
24 anybody at Troy.
25     Q    Sandra Jones, for example? Do you

66

1  recall ever --
2      A    I don't recall having a
3  conversation with Ms. Jones.
4      Q    So, we've covered your contacts
5  with Troy concerning Mrs. Miller, so far as
6  you can recall today?
7      A    Yes.
8      Q    Okay. Let me ask you this: In
9  your answer, Plaintiff's Exhibit 1, I want to
10 direct your attention to page six of nine.
11 If you would, please, I'm going to ask you
12 about parts (b), as in boy, and (d), as in
13 dog, of that answer.
14     And if you need to look at the
15 corresponding -- well, there wouldn't be a
16 corresponding part of the complaint, because
17 this is your third affirmative defense. If
18 you would, read to yourself part (b) and part
19 (d), and tell me when you've finished,
20 please.
21     A    (Witness reviewing document.)
22 Okay.
23     Q    Okay. In regard to part (b), when
24 it says that -- as I understand that, you're
25 contending, through your attorney, that any

67

1  reports that she made concerning doubts she
2  had, if you will, about the special education
3  program at your school, would have been part
4  of her official duties. Do you understand
5  that?
6      A    I understand what you're asking.
7      Q    Okay. Did you consider that the
8  reports she was making to Mr. Strange and to
9  Mr. Andrews and Ms. Singletary and to
10 Dr. Ruediger or to Ms. Parris, did you
11 consider those reports to be part of her
12 official duties at the school?
13          MR. WALDING: Let me object to the
14              form of the question. (b) of
15              the third defense of the answer
16              says part of her official
17              duties as a teaching intern.
18              And that's different from the
19              question you're asking this
20              gentleman.
21     Q    Adopt his language and take the
22 question. In other words, did you consider
23 that to be part of her official duties as a
24 teaching intern?
25     A    I would think any employee would

68

1  have the right to any concern they have about
2  any policy, whether it be special education
3  or any other policy that we have, to ask
4  those questions. Yes.
5      Q    And can you point us, as past
6  principal, now superintendent in the county,
7  to any written set of duties from which that
8  -- well, that actually states that teachers
9  in your system have such a duty?
10     A    Not at this time. Not to my
11 knowledge. That's not saying that there is
12 not one. But, sitting here at this table, I
13 can't put my hands on one now. No, sir.
14     Q    In one of the meetings you had with
15 her, with Mr. Stephens, I believe, didn't
16 you, in effect, tell her to just knock it off
17 and stop doing this?
18     A    No, sir.
19          MR. WALDING: Object to the form.
20     A    No, sir. That was not the intent
21 of what I told her. I was trying to reassure
22 her that everybody from the state department
23 of education who had come down and evaluated
24 our program in the spring before, and you've
25 got a superintendent with 30 years

69

1 experience, and Mr. Andrews with over 30
2 years, all these people ahead of her, with
3 all this experience, are reassuring her and
4 me that we're in full compliance. And you've
5 got to trust somebody. You know.
6     Here you are, an intern. You haven't
7 graduated yet. You know. The purpose of an
8 internship is to learn, and to take all this
9 vast knowledge and information and learn from
10 it.
11     Q     I just remembered something. When
12 you were talking about your reports that you
13 got from other teachers, do you ever recall
14 Mr. Strange telling you that he was
15 uncomfortable or felt guarded around Mrs.
16 Miller?
17     A     I don't recall that. He might
18 have. But I don't recall him telling me
19 that.
20     Q     Okay. I believe it had something
21 to do about a comment she had made to him
22 about she and her husband would be taking up
23 tickets at some game. Does that ring a bell
24 with you?
25     A     A comment from Mr. Strange?

70

1     Q     A comment by Mrs. Miller to Mr.
2 Strange.
3     A     Mr. Strange? No, sir. I mean,
4 that's duties -- everybody has ticket duties
5 at ball games that they accept. Sometimes
6 their spouses come with them. That's not
7 unusual.
8     Q     Okay. But you don't recall having
9 a conversation like that with Mr. Strange?
10     A     I don't recall that.
11     Q     Take a look at part (d) of the
12 third defense, please, sir. You've already
13 read that, I think. Do you understand that
14 as saying, in substance, that she would have
15 been let go, no matter what she might have
16 reported, for other reasons?
17     A     Again, now, I'm answering this as a
18 -- do you want me to -- I was the principal
19 at the time, now. Board policy, I didn't
20 deal with, you know, as far as making
21 recommendations to the board. I was the
22 principal. Superintendent only has the
23 authority to do that. Are you asking me to
24 answer that in the role as the principal that
25 I was in, or now that I'm a superintendent?

71

1     Q     Well, from what you understand of
2 the facts of this case, you know, to the
3 extent you know them, is it your opinion that
4 she would have been let go in any event, even
5 if she had engaged in some type of free
6 speech?
7         MR. WALDING: Object to the form.
8     Q     Or even if she had not engaged in
9 any type of free speech?
10     A     It's my understanding that once her
11 internship was terminated, that that
12 terminated her employment with Houston County
13 schools. But, again, as the principal, I had
14 no authority to make that decision. Only the
15 superintendent and the board can make that
16 decision.
17     Q     What is your understanding, Mr.
18 Pitchford, assuming you have one, as to why
19 her internship was withdrawn?
20     A     Troy did not -- once it was
21 withdrawn, they did not call and give a
22 specific reason. Is it safe to assume
23 because of some concerns there at the school?
24 I would assume that. But, again, as the
25 principal, I had no authority to terminate

72

1 her internship.
2     Q     And you didn't ever observe her
3 performing her job, did you?
4     A     I did not observe her classes. No,
5 sir. Now, as part of our evaluation policy,
6 if she had remained there at Houston County
7 High School as an employee, I would have been
8 required to have observed her. She would
9 have been required to receive four
10 observations. And one or two of those would
11 have been by me.
12     Q     Let me show you what's already in
13 evidence as Defendant's Exhibit 6, the
14 internship agreement between Houston County
15 Schools and Troy University, Dothan campus,
16 which appears to be signed by you, among
17 others. Is that your signature?
18     A     Yes, sir.
19     Q     Are you familiar with the document?
20     A     Yes, sir.
21     Q     Okay. Can you tell us whether Mrs.
22 Miller abided by the terms of that document,
23 so far as you know?
24     A     I would have no knowledge of
25 whether she turned in all of her forms that

73

1  they're saying here that she has to do. I
2  would have no knowledge if she fulfilled
3  these or not.
4      Q    Okay. I'm going to show you a
5  couple of documents. There are three,
6  actually. One is already in as Defendant's
7  Exhibit 18, which is a letter purporting to
8  be from Stacey Ezell and Paul Strange to Pam
9  Parris.
10     Another is Defendant's Exhibit 30, dated
11 September 30, 2004, just entitled "Nancy
12 Miller professional comments." I'm showing
13 you that.
14     And also a letter from Mr. Andrews to
15 Ms. Parris, which is undated. It appears to
16 be in evidence as Defendant's Exhibit 17.
17     Are you familiar with those documents?
18     A    I'm familiar with these two. I
19 have seen this one, but I'm not -- I don't
20 know where it came from.
21     Q    So, the two you're familiar with
22 are 18 and what apparently is 17, the Andrews
23 letter?
24     A    Right.
25     Q    Okay. Have you ever seen 30

74

1  before?
2      A    I've seen it. I don't know where
3  it came from, but I have seen it.
4      Q    Do you think you saw it in context
5  of the litigation, or do you think you saw it
6  prior to the litigation?
7      A    I've seen it within the last two
8  weeks.
9      Q    Okay. And you don't recall seeing
10 it prior to that?
11     A    No, sir.
12     Q    With respect to Defendant's Exhibit
13 18, the letter from Ezell and Strange, what
14 can you tell us, please, sir, about the
15 origin or genesis of this letter?
16     A    In the conversation with Mr.
17 Andrews -- again, Mr. Andrews is special
18 education coordinator. You've heard me refer
19 to, "I called Mr. Andrews. I called Mr.
20 Andrews." He's the expert. I'm the
21 principal of the school, and I have general
22 knowledge about many things. I have general
23 knowledge about chemistry. I supervise
24 chemistry teachers. But I know nothing about
25 chemistry. I have general knowledge about

75

1  special education. But, when there are
2  questions or concerns about special
3  education, I call the expert.
4      And in Houston County, at that time, in
5  the Houston County School System, Mr. Andrews
6  was the expert. And I called him. And
7  noting that the original conversation with
8  Troy and Mrs. Miller came through Mr.
9  Andrews, is how she ended up at Houston
10 County High School. I requested a teacher.
11 I didn't request any particular teacher. So,
12 when issues came up, and it being in the
13 special education department, I called Mr.
14 Andrews.
15     And somewhere during this process, he
16 said, "Get up a list of concerns. You know,
17 y'all get up a list of concerns." And when
18 he says "y'all," he's including me and
19 anybody else that has any concerns there.
20 "Get me a list of concerns." That was how
21 this document -- the origination of this
22 document started. That was instruction from
23 Mr. Andrews, to get him up a list of
24 concerns.
25     This is a combination of Mr. Strange --

76

1  I think Mrs. Ezell has a comment or two on
2  here. Many of these are things that I've
3  already shared with you that I received from
4  other employees, other teachers that I've
5  shared with you. That's what's included on
6  this document.
7      Q    Okay. Did you draft the document?
8      A    Parts of it. But, now, also, Mr.
9  Strange and, again, Mrs. Ezell, their
10 signatures are here. Parts of this, they --
11 again, I don't remember how it was handed to
12 me, you know, their parts. I would assume it
13 was handed to me handwritten. And, now,
14 under normal circumstances, I would have had
15 my secretary type this. But, do I recall
16 having her type it? No. But that would be
17 standard. If I had something that I was
18 going to forward on to the central office, I
19 would have my secretary type it.
20     Q    Okay. Do you know if any of the
21 underlying notes still exist?
22     A    No, sir, not that I'm aware of.
23     Q    Do you recall how they came to sign
24 the letter?
25     A    I'm sure I -- again, I don't

77

1  remember. But I probably asked them to sign
2  it. Since parts of this was coming from
3  them, I asked them to sign it.
4      Q    Did you ask anyone else to sign it
5  who declined to sign it?
6      A    No, sir.
7      Q    But some of these complaints didn't
8  just come from Mrs. Ezell and Mr. Strange?
9  Right?
10     A    Right. There were things that were
11  shared with me. Right.
12     Q    Why didn't you ask anybody else to
13  sign it?
14     A    I don't know.
15     Q    Then, once they had signed it,
16  what, if anything, did you do with it?
17     A    Gave that to Mr. Andrews. Gave him
18  this copy.
19     Q    You didn't send it to Pam Parris?
20  You gave it to Mr. Andrews?
21     A    Mr. Andrews is who requested this.
22  Now, yeah, it's to Pam Parris. I don't think
23  I sent her -- again, I don't think I sent her
24  this. This document came as a request from
25  Mr. Andrews. And I guess, us assuming that

79

1      Q    I was asking what was your
2  understanding. I mean, you had your
3  secretary direct it to Pam Parris, didn't
4  you?
5      A    Right. Right.
6      Q    Wouldn't that suggest to you that
7  you understood that it was to go to her?
8      A    Possibly.
9      Q    Okay. Now, assuming that it did go
10  to her, and that that was the intention of
11  it, what did you expect to accomplish through
12  this?
13     A    Hopefully to address those issues.
14  It was my intention, my hope, was -- I don't
15  see a date on this.
16     Q    Let me call your attention to
17  something that's not actually a date. But,
18  number 1, "Mrs. Miller left the school campus
19  without" --
20     A    Right.
21     Q    So, you could infer from that --
22     A    After the 24th. Right.
23     Q    -- it would be after the 24th of
24  September? Right?
25     A    Right.

78

1  it was originally going to go to Pam Parris,
2  we put Pam Parris on it. But this was given
3  to Mr. Andrews.
4      Q    You say you have some familiarity
5  with Mr. Andrews' letter that I believe is
6  Defendant's Exhibit 17?
7      A    I've seen this after the fact.
8  Yes.
9      Q    After the litigation began?
10     A    Yes.
11     Q    You didn't see it before?
12     A    Not that I recall. I could have.
13  I don't recall seeing this -- I didn't see
14  this transformed to this.
15     Q    Okay. No matter who you gave
16  Defendant's Exhibit 18 to, is it fair to say
17  it was your understanding that it would
18  ultimately go to Pam Parris?
19         MR. WALDING: Object to the form.
20     A    I'm assuming that was -- well, no.
21  I'm not assuming. Mr. Andrews needed some
22  concerns, wanted us to give him a list of
23  concerns. I knew he was in communication
24  with Pam Parris. What did I know for sure
25  was going to happen to this? I didn't know.

80

1         MR. WALDING: Y'all are both
2              talking at one time. You ask
3              him a question, and he'll do
4              his best to answer it.
5         MR. FAULK: I'm trying.
6      A    I had no -- what was your question
7  again?
8      Q    I think my question -- I think we
9  were trying to establish about -- you had
10  mentioned that it didn't have a date, and
11  then, I called your attention to the number 1
12  thing. So, we know it was after the 24th of
13  September? Right?
14     A    Right.
15     Q    Okay. And I had asked you, what
16  did you expect to happen as a consequence of
17  your passing this letter to Mr. Andrews?
18     A    I had no expectation. I was doing
19  as I was asked to do, to get a list of
20  concerns. I had no expectation.
21     Q    Now, you said your hope was that it
22  would address these concerns, I believe?
23     A    My hope, all the way to the bitter
24  end, was to -- even standing there in my
25  office with Mrs. Miller, the last

**81**

1  conversation I had with her was, "Let's start
2  over. Let's start over." My hope, all
3  along, was to try to have a successful
4  internship and a good special education
5  teacher, which there was a shortage of.
6      Q    So, as of the time you participated
7  in the production of Defendant's Exhibit 18,
8  it was your belief or hope that this letter
9  would somehow straighten the matter out?
10          MR. WALDING: Object to the form.
11     Q    Or salvage the internship? Is that
12 your testimony?
13          MR. WALDING: Again, object to the
14          form.
15     A    Originally, I didn't have any
16 expectations of what this is. Now, if you're
17 asking me in general, not necessarily
18 specific to this document, was to always have
19 a successful internship and a successful
20 teaching career at Houston County High
21 School. I had no expectations of what this
22 document -- this was a document that I was
23 asked to send on to Mr. Andrews.
24     Q    Did Mr. Andrews tell you why he
25 wanted it?

**82**

1      A    He just said, "Send me a list of
2  concerns." Now, I don't know if Pam Parris
3  asked him for that, for that list. I do not
4  know the answer to that.
5      Q    Do you recall whether you contacted
6  him, and he said, "Send me a list of
7  concerns," or whether he contacted you and
8  said, "Send me a list of concerns"?
9      A    I know that I called Mr. Andrews --
10 now, this was after the 24th. I don't know
11 if he called me or I called him. I don't
12 know the answer to that. I know Mrs. Miller
13 had met with him on the 24th. And that was
14 after the 24th. So, I'm not sure if Mr.
15 Andrews did not call me and ask me for that.
16     Q    Take a look at Defendant's Exhibit
17 30. There are some remarks here that would
18 appear to be attributed to you. I'm not
19 saying you really made them. Look at those,
20 please, and then, I'm going to talk to you
21 about them.
22     A    (Witness reviewing document.)
23 Okay.
24     Q    Do you ever recall stating to
25 anyone connected with Troy University that

**83**

1  Miller engaged in unprofessional behavior,
2  and given as an example, leaving campus and
3  negative comments made to cooperating
4  teacher?
5      A    What's your question?
6      Q    Do you recall telling anyone
7  connected with Troy that?
8      A    I told -- I think I told Ms. -- in
9  a conversation somewhere with Ms. Parris --
10 might have been after Mr. Andrews talked to
11 her. But, yes, I -- I don't recall, but I'm
12 sure I probably did tell her about leaving
13 campus.
14     Q    Okay. Next statement is, "Causing
15 anxiety among teachers. Three teachers had
16 with met with him," I guess you, "expressing
17 concerns."
18     A    That did happen.
19     Q    And are those the three you've
20 mentioned, Towns, Ezell and Strange?
21     A    That's three of them, yes. There
22 are more, but that's three.
23     Q    Who are the others?
24     A    You have your list. We've
25 already --

**84**

1      Q    We're talking about teachers.
2  Hamm, Hammond, Keasler and Smith weren't
3  really teachers, were they?
4      A    Keasler is a teacher. She's a
5  counselor, but she's a teacher. That's
6  considered a teacher. And Starla Smith is a
7  psychometrist. But she would, in the broad
8  sense --
9      Q    I'm not trying to trick you. My
10 view of the matter was just that Towns,
11 Strange and Ezell were the three teachers,
12 and these other people weren't -- they were
13 something other than teachers.
14     A    In the broad sense, I would still
15 consider them teachers.
16     Q    Okay. Fine. And then, next is
17 "Not following directions of cooperating
18 teacher." Have you already told us about
19 that?
20     A    Yes, sir.
21     Q    And you did report that to Pam
22 Parris, you think?
23     A    That was one of the concerns, so I
24 probably did.
25     Q    Okay. "Crying in the classroom."

85

1    Q    Do you recall telling Pam Parris about that?
2    A    I don't recall.
3    Q    Or anybody connected with Troy?
4    A    Well, the only people that I talked
5    to was Dr. Ruediger and Pam Parris. I don't
6    think I talked to Dr. Ruediger about any of
7    these issues other than the model, the
8    statement supposedly that was made about us
9    not following. So, if I made any comments --
10   any of these comments, it would have had to
11   have been to Pam Parris, because I didn't
12   talk to anybody else at Troy State.
13   Q    In any of your conversations with
14   either Dr. Ruediger or Ms. Parris, did you
15   ever intimate to either of them that you
16   would like to have Miller out of your school?
17   A    I don't remember making any such
18   comment.
19   Q    In any of those discussions with
20   either Ms. Parris or Dr. Ruediger, did you
21   ever express reservations about having
22   interns in the future in your school?
23   A    No, sir.
24   Q    Or anything from which they, in
25   your judgment, could reasonably infer that

86

1    the Miller situation could somehow jeopardize
2    their access to your school for internships?
3    A    I don't recall making that
4    statement. And that would be a board policy.
5    And that would be something I couldn't
6    determine as a principal, anyway.
7    Q    Have you ever expressed to Mr.
8    Andrews you would just as soon not have any
9    more interns?
10   A    No, sir, not that I recall.
11   Q    It's not entirely clear on the face
12   of Defendant's Exhibit 17 as to exactly to
13   whom Mr. Andrews is attributing these
14   statements, A through D. But he says, "After
15   discussion with Mr. Tim Pitchford and Paul
16   Strange, the concerns are as follows." And
17   then, he lists four concerns. Do you recall
18   discussing any of those four concerns with
19   Mr. Andrews?
20   A    I gave Mr. Andrews that list, the
21   previous exhibit.
22   Q    The number 18?
23   A    I gave him. And, again, I -- until
24   -- my best knowledge, until this lawsuit
25   started, I had never seen this.

87

1    Q    Okay. When he says "after
2    discussions with," do you recall telling him
3    -- in substance, telling him any of these
4    items A through D in Defendant's Exhibit 17?
5    A    We discussed leaving -- Mrs. Miller
6    leaving campus. We did discuss that. We did
7    discuss, in general terms, about working with
8    peer teachers. Yes. Positive student
9    relationships, I mean, I shared -- yes.
10   Because I shared with Mr. Andrews what I've
11   shared with you today also, about the
12   students and their not wanting to go to Mrs.
13   Miller's class. Now, that -- again, that's
14   dealing with special education process.
15   Q    Part D?
16   A    D. Yes. I'm sorry. That's
17   dealing with special education process. And
18   that's what I have limited knowledge of.
19   Q    You would not have had an opinion
20   at that time as to whether she understood the
21   required forms and the special ed process?
22   A    No, sir.
23   Q    All right, sir. Do you recall
24   anything, Mr. Pitchford, about requiring Mrs.
25   Miller to keep a notebook to verify her

88

1    whereabouts and activities around the school?
2    A    I don't recall specifically asking
3    her. But this would be something that I
4    would ask all the special education teachers
5    to do. Because, with the inclusion process,
6    their schedules -- they're not like a regular
7    classroom teacher. They might be in this
8    class this day for 20 minutes, or that class
9    -- another class, another teacher's class,
10   for 30 minutes the next day. Because those
11   inclusion students, mainstreamed special
12   education students, were all over the
13   building.
14   But it would not be something that I
15   would specifically require her to do. I
16   would require -- I required all my special
17   education teachers to do.
18   Q    Is the intention of that so that
19   you will know in advance where they should be
20   at a particular time, or so that you can
21   verify later that they were where they
22   claimed they were?
23   A    Probably both. And the big thing
24   is to make sure the students are being
25   served.

89

1    (Brief off-record.)

2    Q    These are documents 43 through 64,

3 produced on behalf of the Houston County

4 Board of Education and certain individual

5 defendants, including yourself, as part of --

6 there's an amendment to your initial

7 disclosures, which are required in the case.

8 Take a look at these, please, sir, and tell

9 me whether you are familiar with them?

10    A    (Witness reviewing documents.) I

11 would not be familiar with this, not as a

12 principal. I would not be familiar with it.

13    Q    Are those findings -- and look

14 through it enough to where you -- have you

15 looked at every page?

16    A    (Witness reviewing documents.)

17    Q    I just want to be sure you're

18 satisfied before you say that unequivocally.

19    A    (Witness reviewing documents.)

20 This goes back to me having general knowledge

21 of special education. That's what we -- in

22 my role as a superintendent, that's why I

23 have specialists that are in charge. That's

24 what they handle, is special education. And

25 I would even have less knowledge of this as a

90

1 principal.

2         MR. WALDING: Let me direct his

3         attention to one page, though.

4    THE WITNESS: Right. Yeah. Let me

5         find out what this is. First,

6         I've got to see what this is.

7         (Witness reviewing document.)

8         Can I talk out loud here, while

9         I'm looking?

10    MR. FAULK: Sure.

11    THE WITNESS: You were talking out

12         loud. Can I talk out loud?

13    MR. FAULK: Go right ahead. Yes,

14         sir.

15    THE WITNESS: May 12. I'm assuming

16         this would be a copy of the

17         state monitoring report from

18         the spring of -- of course,

19         this was the spring of 2006.

20         This has been this past spring.

21    MR. WALDING: And, Winn, I don't

22         mean to tell you how to conduct

23         your deposition. But you'll

24         probably get more information

25         out of Virginia Singletary or

91

1         Riley Joe Andrews on these

2         documents.

3         MR. FAULK: Okay.

4    Q    And that's really kind of what I'm

5 getting to --

6    A    Right.

7    Q    -- Mr. Pitchford. If these are

8 documents that you're simply unfamiliar with,

9 that's fine. You know. If you're not

10 familiar with them --

11    A    These are documents that I should

12 be. And I should be more familiar with them

13 as a superintendent. But that's a situation

14 where I just trust those that we hire to

15 handle that.

16    Q    To your knowledge, Mr. Pitchford,

17 while you were principal, did you ever have

18 any teachers who were teaching under any type

19 of emergency or provisional certificate? And

20 I may not be using the technically correct

21 term. But something other than the regular

22 certificate?

23    A    As principal, I did not have any

24 dealings with certification issues. That was

25 all handled in the central office and through

92

1 the superintendent and the supervisors. You

2 know. I would not have any knowledge of

3 that.

4    Q    What about now, as superintendent?

5 Are you aware of any teachers in the system

6 who are under some type of temporary or

7 provisional certificate?

8    A    Yes. I do have knowledge of that

9 now. Yes.

10    Q    What are the circumstances under

11 which such a certificate can be obtained?

12    A    An emergency certificate, the best

13 of my understanding, now -- there are those,

14 again, that I delegate to handle these

15 responsibilities. But the best of my

16 knowledge is that if you have a four-year

17 degree, that there is -- you have one

18 opportunity to have one year on an emergency

19 certificate. One year only in your whole

20 career.

21    I've got 26, seven years in. I've still

22 got an emergency year that I can use if I

23 want to go teach band. If there is an

24 emergency situation, and a school needs a

25 band instructor, legally, they can put me on

93

1    an emergency certificate for one year, and I
2    can do so.  That is a year that every -- but
3    you have to have a four-year degree.  You
4    have to have a B.S. degree.
5        Q    Do you have an opinion, based on
6    your experience and education, as to whether
7    Mrs. Miller would have been eligible for any
8    type of provisional certificate to teach at
9    your school when she was there?
10       A    Other than a -- possibly as a
11   substitute.  She did not have a four-year
12   degree.  She did not gradu -- again, I never
13   saw her credentials.  Okay.  I never saw what
14   she had.  But if she did not have a four-year
15   degree, had not graduated and have a
16   four-year degree, we would not be able to put
17   her on an emergency certificate.  She could
18   be a substitute.
19       Q    And would the same have been true
20   of Amy Deese, as far as you know?
21       A    That's correct.
22            MR. FAULK:  If you give me just a
23        minute, I think I'm through.
24        (Recess from 11:25 to 11:36.)
25            MR. FAULK:  Just a few questions.

94

1        Q    Was there a handbook, faculty
2    handbook, in effect at Houston County High
3    School when Mrs. Miller was there?
4        A    Yes.  We handed out one at the
5    beginning of every school year at a faculty
6    meeting before students arrive.
7        Q    Do you know whether or not it had a
8    specific statement in it that governed the
9    circumstances under which an employee could
10   leave school during the school day?
11       A    I don't have that specific
12   handbook.  Under normal circumstances, and
13   under the ones that are handed out now at
14   that school, that would be addressed.  But,
15   again, I don't have a copy of that three
16   years ago.
17       Q    And is the answer, at least based
18   on the information available to you today,
19   you don't know whether it had a provision on
20   leaving campus in it?
21       A    I can't say for sure.
22       Q    Fine.  That's what --
23       A    Under normal circumstances, it
24   would.
25       Q    All right.  Without regard to any

95

1    kind of written policy or procedure for
2    leaving campus, when Mrs. Miller was there,
3    what would have been your expectation as
4    principal when a teacher or person such as
5    Mrs. Miller needed to leave campus during the
6    school day?
7        A    To notify me, so I could make
8    arrangements for her class.
9        Q    And I know you weren't in
10   Washington, D. C. that day, but suppose you
11   had been.  I mean, is there some -- who do
12   you go to?
13       A    Notify the assistant principal.
14   Someone -- the reason for that is that
15   someone has -- I mean, those children are
16   going to be there.  And a schedule has to be
17   made or someone called to have somebody in
18   that employee's place.
19       Q    In your absence on that occasion,
20   since I gather you were doing something that
21   made you unavailable to her --
22            MR. WALDING:  Object to the form.
23       Q    -- would it have been appropriate
24   for her to notify her mentor, Mr. Strange,
25   that she intended to leave campus?

96

1            MR. WALDING:  And I object to the
2        form of the question.  But he
3        can answer it, if he
4        understands it.
5      A    The mentor would not have the
6    authority to call a sub or to rework
7    someone's schedule in order to cover her
8    classes.  It would have to be an
9    administrator that would have the authority
10   to do that.
11       Q    And so, you're telling us, then, in
12   your judgment, it would have been
13   inappropriate for her to have simply notified
14   her mentor prior to leaving campus on that
15   occasion?
16       A    It would have been more appropriate
17   to notify the principal or the assistant
18   principal.
19       Q    Was it inappropriate if she
20   notified Mr. Strange?
21            MR. WALDING:  Object to the form of
22        the question.
23       A    Not along with others.  Not if she
24   notified Mr. Strange, and then, also notified
25   the principal or assistant principal.  That

97

1  would not have been inappropriate.
2      Q    You had testified that she had some
3  students who were left unsupervised when she
4  left the campus on that occasion.
5      A    Right.
6      Q    Tell us about that, please.  What
7  do you know about that?
8      A    Mr. Strange came to me.  That was
9  how I was first notified that Mrs. Miller was
10  not there.  Mr. Strange came to me and said,
11  "I think Mrs. Miller's gone."  And I said,
12  "Why do you say that?"  He said, "She's not
13  here."  He said, "There are students that
14  came to me and said that Mrs. Miller is not
15  -- 'Where is Mrs. Miller?'"
16          And then, Ms. Hamm, the secretary, came
17  and said that she saw Mrs. Miller go out the
18  door, upset, crying, with her arms -- with a
19  basket of materials.
20      Q    But you never actually saw any
21  unsupervised students yourself?  You're
22  relying on Mr. Strange's report?
23      A    Yes.
24      Q    And was his report worded
25  substantially as you have related it?

98

1      A    Yes.
2      Q    Now, did you, from time to time,
3  sit in on IEP meetings?
4      A    Yes.
5      Q    Okay, sir.  Let me show you what
6  has been produced by your attorneys as page
7  numbers 1013 through 1041 of documents being
8  produced by them in this litigation.  Okay?
9  And ask you just to take a look at it enough
10  to tell me whether you're familiar with the
11  document.
12      A    (Witness reviewing documents.)  I'm
13  familiar with it enough to tell you that it's
14  an IEP.  But, am I -- again, I think I've
15  said before, I'm not the expert, and I just
16  have a general knowledge of special
17  education.
18      Q    Let me call your attention in
19  particular to page number 1020, and ask you
20  if I'm pointing to your signature there?
21      A    Yes, sir.
22      Q    And that's dated what?
23      A    10-27-04.
24      Q    Which would be a week plus a day or
25  two after Mrs. Miller left your school for

99

1  good?  Right?
2      A    I'm not sure the date she did
3  leave.
4      Q    I would ask you to assume she left
5  on the 19th or 20th.  But, would that be the
6  day you signed it?  Is the date also in your
7  handwriting?
8      A    Yes, sir.
9      Q    All right.  And it says, above
10  that, "The following people attended and
11  participated in the meeting to develop this
12  IEP."  Correct?
13      A    Right.
14      Q    Do you recall attending this
15  meeting for the student R. S. on 10-27-04?
16      A    If I signed it and dated it, I
17  attended it.
18      Q    Do you recall it, though?
19      A    Do I recall this particular IEP?
20      Q    Yes, sir.
21      A    No, sir, I don't.
22      Q    Do you recall attending other
23  meetings, other IEP meetings?
24      A    Not individual students.  I've
25  attended a lot of IEP meetings.  But I don't

100

1  recall any particular IEP meeting.
2      Q    Had you attended IEP meetings
3  before Mrs. Miller came to the school?
4      A    Yes, sir.
5      Q    What would your role normally be if
6  you attended an IEP meeting?
7      A    I am the administrator.  It's
8  required that an administrator or my designee
9  attend the meeting.  And that's my role
10  there.  I think it's listed what my -- how I
11  would be classified.
12      Q    Do you remember the student R. S.?
13      A    Vaguely, I do remember her.  She
14  was -- I don't think she was there long, but
15  I do remember her.
16      Q    Do you recall whether she was a
17  student who had come around the beginning of
18  the second semester of the prior year, that
19  is, around January 2004?
20      A    I would not have remembered when
21  she came.  No, sir.
22      Q    At the time -- and I'll give this
23  back to you, so you can look at it.  Looking
24  at the document, do you recall whether there
25  had been a prior IEP on this student?  Is

1 there some way to tell, by looking at it,
2 whether it replaces another one?
3     A    In my general knowledge, I would
4 not be able to tell you that.
5     Q    Okay.  Do you know whether any
6 prior IEP's would be preserved in this
7 child's records?
8     A    Depending on where she came from.
9 If she had an IEP where she came from, there
10 should be one.
11    Q    In your records, that is, the
12 Houston County records?
13    A    We would have to find it.
14    Q    Do you recall there being some
15 change from 2003 to 2004 having to do with
16 inclusion in special ed in Houston County?
17        MR. WALDING:  Object to the form.
18    A    Not specifically in Houston County.
19 That was along the time that "highly
20 qualified" term was being used, and that
21 being required, that all students have a
22 highly qualified teacher.  But, as far as any
23 specific change in policy or inclusion or
24 anything like that, I mean, we're still -- no
25 matter what the form or what the model is, a

102

1 student is still bound by IEP, which is
2 determined by an IEP team.  And the student
3 just needs to be in the least restrictive
4 environment.  Nothing has changed that.
5     Q    Let me show you pages 1066 to 1070
6 out of the same set of documents that have
7 been produced, and tell me whether you are
8 familiar with that form or that document?
9     A    This is currently enrolled at
10 Cottonwood?  No, sir.  I would not be
11 familiar with that.
12    Q    Well, if a student transferred from
13 Cottonwood to your school, would that have
14 come with their records, if that was a record
15 of Cottonwood School?
16    A    Should have been requested.  If
17 there was an IEP in place at another school,
18 it should have followed until a new IEP was
19 written.
20        MR. FAULK:  Okay.  Thank you.
21        That's all.
22        (Brief recess.)
23
24
25

1         EXAMINATION
2
3 BY MR. WALDING:
4     Q    Mr. Pitchford, I don't normally ask
5 my own client questions, but I'm going to ask
6 you just a few.  Did you ever specifically
7 ask someone from Troy State, Dothan, to
8 withdraw or terminate Mrs. Miller's
9 internship?
10    A    I don't recall that.  I don't have
11 the authority to ask that, to do that.
12    Q    Okay.  Did you ever implicitly, or
13 by implication, request that her internship
14 be withdrawn or terminated?
15    A    Say that again.
16        MR. WALDING:  Read that back.
17        THE WITNESS:  Yeah.  Repeat that.
18        What did he ask?  You're using
19        too big of words for me.
20    Q    Did you ever imply to someone,
21 imply --
22    A    Right.
23    Q    -- not state directly, but by
24 implication, request that her internship be
25 terminated or withdrawn?

104

1     A    Not that I'm aware of.
2        MR. WALDING:  All right.  That's
3        all I wanted to ask.  Now, they
4        may want to ask some more
5        questions because I asked
6        those.
7        MR. FAULK:  Thank you.  Appreciate
8        it.
9
10        END OF DEPOSITION
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1        STATE OF ALABAMA
 2        HOUSTON COUNTY
 3
 4            I, Stacey Watkins, RPR, and Notary
 5        Public, State at Large, do hereby certify
 6        that the foregoing transcript, pages 1
 7        through 104, is a true and correct transcript
 8        of the testimony and proceedings taken at
 9        said time and place; and that the same was
10        taken down by me in stenograph shorthand,
11        and transcribed by me personally or under
12        my personal supervision.
13            I further certify that I have no
14        interest in this matter, financial or
15        otherwise, or how it may develop or what
16        its outcome may be.  I further certify that
17        I am not of counsel for any of the parties,
18        nor am I related to counsel or litigants or
19        associated with anyone connected with this
20        cause to my knowledge.
21            Witness my hand this 23rd day of
22        October, 2007.
23            _____
24        _____ RPR, Notary Public,
                      State at Large
25                    ACCR# 155
```

1

```
 1          IN THE U. S. DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3              SOUTHERN DIVISION
 4
 5   NANCY MILLER,
 6       PLAINTIFF,
 7   VS.             CASE NO.1:06-CV-940-WKW
 8   HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
 9   LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,
12
         DEFENDANTS.
13
14       The deposition of RILEY JOE ANDREWS,
15   taken by the Plaintiff, pursuant to the
16   Federal Rules of Civil Procedure, before
17   Stacey Watkins, RPR, and Notary Public, State
18   at Large, at the offices of Hardwick, Hause,
19   Segrest & Walding, Dothan, Alabama, on the
20   10th day of October 2007, at 1:35 p.m., CDT,
21   pursuant to notice.
22
23
24
25
```

2

**APPEARANCES:**

**FOR THE PLAINTIFF:**
**MR. WINN FAULK**
Attorney at Law
Montgomery, Alabama

**MR. THOMAS K. BRANTLEY**
Attorney at Law
Dothan, Alabama

**FOR HOUSTON COUNTY BOARD OF EDUCATION, KENNETH LORD, RILEY JOE ANDREWS AND TIM PITCHFORD:**

**MR. KEVIN WALDING**
**MR. PATRICK B. MOODY**
Attorneys at Law
Dothan, Alabama

**FOR PAUL STRANGE AND STACEY EZELL:**

**MS. KATHERINE HORTBERG**
Attorney at Law
Chelsea, Alabama

**FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES, PAM PARRIS AND GREG RUEDIGER:**

**MR. JOSEPH V. MUSSO**
Attorney at Law
Birmingham, Alabama

**ALSO PRESENT:**

**NANCY MILLER**
**KENNETH LORD**

3

**STIPULATION**

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

4

**RILEY JOE ANDREWS**

having been first duly sworn, testified as follows, to-wit:

**EXAMINATION**

BY MR. FAULK:

Q    State your full name for us, please, sir?

A    Riley Joe Andrews.

Q    And, Mr. Andrews, I guess you know I'm Winn Faulk, and I represent Mrs. Miller in this case.

A    I do.

Q    And I know you've attended some depositions? Right?

A    Yes, I have.

Q    I'll just kind of touch on it briefly. The main thing I want you to understand is, if you need a break, if you're uncomfortable with anything, you want to talk to your lawyer or whatever, just tell us, and we'll take a break.

Secondly, if you don't understand a question I ask you for some reason, for any

5

1  reason, let me know, and I'll rephrase it.
2  So, when we walk out of here, I want to walk
3  out with the conviction that you understood
4  my questions and gave me your best answers.
5  Okay?
6     A     I understand.
7     Q     I know these things can get a
8  little conversational. But try to speak,
9  like, "yes" or "no," rather than nod your
10 head or shake your head, so it will be easier
11 for her to take down. Of course, you want
12 her to get it down right, you know, what you
13 said.
14    Also, if you get along in here and you
15 remember something you left out from a prior
16 question, just interrupt me, and I'll go
17 back, or something you realize you misstated,
18 let me know, and we'll straighten it out.
19 Okay?
20    A     Okay.
21    Q     Okay. What's your employment
22 status these days?
23    A     Retired.
24    Q     And when did you retire?
25    A     2005.

7

1  particular teacher, I did not. They had
2  their immediate supervisors at the schools.
3     Q     Okay. What was Virginia -- what is
4  her name? Singletary?
5     A     She was an assistant.
6     Q     An assistant to you?
7     A     Right.
8     Q     And so, you supervised Ms.
9  Singletary?
10    A     Her. She was --
11    Q     Anybody else that you directly
12 supervised --
13    A     Not at that time.
14    Q     -- from day to day?
15    A     No.
16    Q     There are several --
17    A     Excuse me.
18    Q     Sure.
19    A     The psychometrist worked out of the
20 central office, also.
21    Q     What was that person's name?
22    A     Starla Smith.
23    Q     And was she generally under your
24 supervision?
25    A     She was in my department. Yes.

6

1     Q     And what was your position with the
2  Houston County school board prior to that?
3     A     Federal programs coordinator.
4     Q     How long did you hold that
5  position?
6     A     From 1991 to 2005.
7     Q     Okay. And as federal programs
8  coordinator, what responsibility, if any, did
9  you have in connection with the special
10 education program in the county?
11    A     I was the coordinator for special
12 ed program.
13    Q     Tell me and the jury a little more
14 about what that entailed?
15    A     I oversaw the program. I worked
16 with the principals and the teachers on
17 implementing programs in the schools for the
18 children with disabilities.
19    Q     And who was your immediate
20 supervisor?
21    A     Superintendent.
22    Q     Who did you actually supervise,
23 yourself?
24    A     I worked with the teachers.
25 Actually, as far as supervising any

8

1     Q     Tell me your background, please,
2  educationally, as it relates to special
3  education?
4     A     I was in education for 37 years.
5  12 of those years was in the classroom. I
6  taught social sciences and histories in high
7  school. And then, the other 25 years was in
8  administration.
9     I was principal at Ashford -- I was
10 three years assistant principal at Ashford
11 High School, and then, became the principal.
12 And, at that time, a great majority of the
13 special services were housed at Ashford. So,
14 I worked closely with those teachers there as
15 a principal and assistant principal.     And
16 then, after I became coordinator, I attended
17 numerous workshops, seminars, and things of
18 that nature, to help me be able to do my job.
19    Q     Let me show you some documents that
20 you may have heard me speak of earlier.
21 These are document numbers 43 through 64,
22 produced by your attorneys as an amendment to
23 their production of documents. I'll ask you
24 to take a look at those and tell me whether
25 you're familiar with that document, please?

11

1    A    Yes, I am.

2    Q    And there are two of them,

3 actually, under two cover letters.  One may

4 be after you retired.  Had you retired by May

5 of '06?

6    A    Yes.

7    Q    So, it's really the first document

8 you would have more particular knowledge of?

9 Right?

10    A    That is correct.

11         (Whereupon, Plaintiff's Exhibit 3

12         marked for identification.)

13    Q    Okay.  Mr. Andrews, I'm going to

14 show you what we've marked for identification

15 as Plaintiff's Exhibit 3, which consists of

16 pages 43 through 52 of the documents for

17 production I just mentioned.  I'll give it

18 back to you.  Tell us what that is, please,

19 sir?

20    A    This is the results of the focused

21 monitoring that they conducted on Houston

22 County Schools.

23    Q    All right, sir.  Tell me about

24 focused monitoring.  What's that all about?

25    A    Focused monitoring is the

10

1 monitoring process that the state department

2 of education uses to come and send a team of

3 personnel down to the school to review

4 records, go out and visit the schools, talk

5 to parents, and review the records, and make

6 sure that you're in compliance, in essence.

7    Q    Do you recall the event that's

8 discussed in this report?  I mean, do you

9 recall that spring in 2004 --

10    A    Yes.

11    Q    -- and the people came and --

12    A    I recall the monitoring.  Yes.

13    Q    Do you know approximately how many

14 team members would have come during that

15 period?

16    A    I don't recall exactly, but I'd say

17 in the neighborhood of six to eight team

18 members.

19    Q    Do you know which schools in the

20 system they monitored that year?

21    A    Not off the top of my head, I

22 don't.  No, sir.

23    Q    Am I correct in thinking that they

24 don't necessarily monitor every school every

25 year?

1    A    That is correct.

2    Q    Okay.  Take a look, if you would,

3 please, sir, just at the report.  If you

4 don't mind flipping through there and just

5 see if you think you can reasonably infer

6 from the face of the report what schools were

7 monitored?

8    A    (Witness reviewing document.)  Webb

9 Elementary School was one.  I don't know who

10 the other one would have been, off the top of

11 my head.

12    Q    How could we find out?

13    A    How could I find out?

14    Q    Right.

15    A    I can check with the students'

16 names and go back to class rolls and see who

17 they might be.  There were some students'

18 names mentioned here that's been marked out.

19    Q    Should the state department of

20 education, to your knowledge, have any other

21 documentation concerning this focused

22 monitoring event other than what's set out in

23 the report?

24    A    Do they have any --

25    Q    Do you know if they keep any other

12

1 records other than the final report?

2    A    No, I do not.

3    Q    Okay, sir.  Do you know whether

4 Houston County High School was monitored in

5 the spring of 2004?

6    A    Not for certain, no, sir.

7    Q    What do you think?  Well, if you

8 have a thought.  I mean, I'm not trying to

9 just get you to make something up.

10    A    I don't recall.  Honestly, I don't

11 recall.

12    Q    All right.  So, when we look at one

13 of these reports on focused monitoring, we're

14 looking at something that involved less than

15 all the schools?  Correct?

16    A    Yes.

17    Q    And at those schools, do they

18 examine every student's situation, or do they

19 randomly select students?

20    A    Randomly select students.  A few

21 days before the team arrives, they send us a

22 list or send the school system a list of 25

23 students, randomly selected by various

24 exceptionalities, and ask us to pull those

25 records.  Like, if they're coming on Monday,

1  they would fax us that Friday afternoon.
2      Q      What else can you tell me about the
3  process in general?
4      A      Well, they come to the central
5  office. They pull those records. They
6  review them. They dissect them. They then
7  go out and visit the schools that the
8  students are attending.
9          Then they have the parents come in.
10  They talk with the parents of the students of
11  some of the -- they pick five, I believe, of
12  the 25, and talk with the parents. And they
13  come in and spend half a day with the
14  parents, discussing accessibility of
15  programs, how satisfied they are with the
16  programs, how accessible are the people that
17  are in charge of the programs and that
18  nature.
19      Q      I had asked somebody earlier -- I
20  can't remember -- and they weren't able to
21  quite tell me, I don't think. When you have
22  a special ed child at, say, Houston County
23  High School, where would their current and
24  past IEP's be filed?
25          MR. WALDING: Object to the form.

14
1          I'm objecting because his
2          question asked you two things.
3      Q      Go ahead.
4      A      The current IEP is kept at the
5  school. The teacher that is in charge of
6  that student has a copy -- has the IEP. Past
7  IEP's or the previous IEP's normally are, at
8  the end of the school year, sent to the
9  central office to be stored, as a general
10  rule.
11      Q      To be stored?
12      A      Stored.
13      Q      Okay. If somebody has already
14  graduated or moved away from Houston County,
15  what should become of the stored IEP's?
16      A      They're destroyed after -- I forgot
17  the number of years. But "X" numbers of
18  years, they're destroyed, after the parents
19  are notified that they will be destroyed.
20      Q      Do you know if it's more or less
21  than five years?
22      A      It's more than five.
23      Q      So, any of the students who were
24  special ed at Houston County High School in
25  the fall of 2004 should have extant records

1  of their IEP's? Correct?
2      A      Should have a copy of the past
3  IEP's, if it was turned in to the central
4  office.
5      Q      Which it should have been?
6      A      Should have been.
7      Q      You know, of course, we're here to
8  talk about Mrs. Miller's situation. And I
9  know it's been a while. But there are three
10  events in particular that I think give us
11  sort of a set of landmarks.
12          One is her first observation -- well,
13  her hiring -- her first observation by
14  Dr. Ruediger, her meeting with you at your
15  office, and the end of her career, the days
16  shortly prior to her final departure. So, I
17  may be asking you to try to place some of
18  these other events around those times, if you
19  can.
20      A      Okay.
21      Q      Let's talk about her hiring for
22  just a minute. What was your involvement in
23  her hiring?
24      A      I interviewed the applicants. As
25  we needed special education teachers, I would

16
1  pursue the applicants. I would look through
2  the files at the office, and then, we would
3  go through the applications. And if we had
4  time, then I would involve the principal, you
5  know, if they could go out and interview with
6  the principal and so forth.
7          I think it's already been said, but,
8  during this time, there was no applicants to
9  be had when this person was employed.
10      Q      Okay. Did you have anything to do
11  with soliciting her internship from Troy?
12      A      Yes, I did.
13          MR. WALDING: Object to the form.
14          I object to the form of his
15          question.
16      Q      Tell us what your involvement was?
17      A      Well, there was no applicants to be
18  -- you know, on file for special ed teachers,
19  and school was fixing to start. We had no
20  special ed teacher at Houston County High
21  School. We had hired a teacher previously
22  from another system, but they talked her into
23  staying, just like I would have done if one
24  had tried to hire one from Houston County.
25          So, after there was no applicants, I

1  contacted several places around trying to
2  find applicants. Called several systems. No
3  one had any applicants. I called Troy
4  University of Dothan and asked them did they
5  have anybody. And they says, no, but they
6  had an intern that was -- a person that was
7  fixing to do their internship.
8      Q    And did that turn out to be Nancy
9  Miller?
10     A    It did.
11     Q    Okay. What happened next, as far
12 as the process went that you were involved
13 in?
14     A    Ms. Parris sent her for me to
15 interview her. I did interview Mrs. Miller.
16 We talked at length about the special
17 education process and talked about Houston
18 County Schools, what our expectations were.
19     And after our conversation with her, I
20 contacted Mr. Pitchford and asked him would
21 he like to interview her. And he said, no,
22 he would take my word for it. And I said,
23 well, I didn't -- I said, this is the only
24 applicant that I have, was Mrs. Miller.
25     Q    Just so I don't forget to ask you,

1      A    Yes, she did.
2      Q    Did y'all also sign an internship
3  agreement?
4      A    The system and --
5      Q    Right.
6      A    -- Troy, Dothan, yes. I didn't
7  sign it.
8      Q    Are you familiar with it?
9      A    I've seen it and I've looked over
10 it. Yes.
11     Q    It's previously in evidence as
12 Defendant's Exhibit 6. In looking over it,
13 are you aware of any provisions in there that
14 Mrs. Miller failed to comply with, I mean,
15 other than not finishing the internship, of
16 course?
17     A    These were activities that would be
18 carried out at the school. Which, I was not
19 at the school, so I have no knowledge of
20 whether she did or didn't do this.
21     Q    Have you been told that she did not
22 in any particular way?
23     A    I don't recall either way.
24     Q    The question has been raised about
25 her certification. What can you tell us

18

1  after she was gone from the system, was she
2  replaced? Do you know?
3      A    Yes.
4      Q    Do you know who replaced her?
5      A    I believe Ms. Joan Hicks
6  transferred from Ashford to Houston County
7  High School at the semester.
8      Q    Was she certified in special ed?
9      A    Yes. Veteran teacher.
10     Q    Do you happen to know who oversaw
11 Mrs. Miller's students between the time she
12 left, in late October, and the time Ms. Hicks
13 arrived?
14     A    I think a sub. I don't know. They
15 had to, you know, hire a sub. And I don't
16 know the name of the sub.
17     Q    Where would there be a record of
18 that?
19     A    I'm assuming at the school.
20     Q    Okay. So, we've got her on board,
21 I guess. Well, she had to sign a contract?
22 Right?
23         MR. WALDING: Object to the form.
24     Q    Did she sign a contract with the
25 school system?

20

1  about that, as far as, you know, going into
2  this arrangement with Mrs. Miller? What was
3  done or said by you about the certification?
4      A    All I know is that, you know, she
5  was the closest person that we had to being a
6  certified special education teacher at that
7  time. And she was not a certified teacher.
8  But we didn't have much choice but, at that
9  point, to have someone to go into the
10 classroom. And we had, in the past, had some
11 interns that came in and did -- you know,
12 worked with us in the school system.
13     Q    As special ed people?
14     A    Yes.
15     Q    It's my understanding that you
16 never made any effort to apply for any type
17 of provisional certificate for her? Correct?
18     A    That's correct.
19     Q    Are you aware of anyone else making
20 such an effort?
21     A    I don't know.
22     Q    No one has told you that? No one
23 has told you they did?
24     A    No.
25     Q    The reason I ask that, generally

21

1  speaking, I want your personal knowledge.
2  But, you know, if you've heard about
3  something in the course of your duties --
4      A    Right.
5      Q    -- I would like to know that, too.
6      A    Okay.
7      Q    Okay.  So, do you recall, during
8  the interview process and the hiring process,
9  stating to Mrs. Miller that if she had any
10  problems, she should come to see you?
11      A    I believe that's the last thing I
12  told her before we ended the interview.  I do
13  that with all our teachers, all the teachers
14  in special programs.
15      Q    And, of course, we know about the
16  visit to your office on September the 24th.
17      A    Yes.
18      Q    But, prior to that, was anything
19  brought to your attention concerning
20  difficulties that Mrs. Miller was having or
21  that people were having with her at Houston
22  County High School?
23      A    I had received some calls, I think,
24  from Mr. Pitchford or Mr. Strange, one.  I'm
25  not sure which.  That's three years ago.  But

22

1  I received some calls that there were some
2  concerns by some of the teachers, veteran
3  teachers there, that they and Mrs. Miller
4  were having a conflict.
5      And I believe that Mrs. Miller had made
6  some comments that there were some students
7  that didn't have IEP's, and she was being
8  asked to do things that she didn't want to do
9  or in that nature.
10      Q    Okay.  You understand I'm talking
11  about before the day she came to your office,
12  you're saying you had already heard that sort
13  of thing?
14      A    About the -- earlier, I had
15  received some calls, prior to September 1st,
16  I believe, some calls, you know, that there
17  was some conflict there at the school.  Yes.
18      Q    It could have been Mr. Pitchford or
19  Mr. Strange?
20      A    Someone.  Yes.  I don't remember
21  which one.
22      Q    Did you receive calls from other
23  people?
24      A    No.
25      Q    Okay.  Now, to the best of my

23

1  information -- and your lawyer may correct me
2  -- is that it appears that the date of your
3  meeting with her, where she came to your
4  office, upset or something, was September the
5  24th.
6          MR. FAULK:  Can we agree on that?
7          MR. WALDING:  I think that's the
8          date.
9      Q    I notice, in your interrogatory
10  answer to number 25, you refer to a September
11  1st meeting, and you just mentioned September
12  the 1st just now.  Was there a meeting around
13  September the 1st --
14      A    Yes.
15      Q    -- earlier than the 24th?
16      A    Yes.  One on September the 1st.
17      Q    Okay.  Tell us about that meeting,
18  please?
19      A    I'm trying to recall.  I don't
20  remember -- Ms. Parris was conducting the
21  meeting at Houston County High School.  I
22  attended it, and I think Mr. Pitchford was
23  there and Mrs. Miller, I believe, are the
24  four that were there.  And the meeting, to
25  the best of my knowledge, was just about

24

1  general things about the internship.  And I
2  don't recall what all else was said.  But it
3  was primarily about general duties as an
4  intern at the school, and carrying out her
5  duties there at the school.
6      Q    Do you know what prompted that
7  meeting?
8      A    I don't recall if there was a call
9  prior to that meeting or not to Ms. Parris --
10  I don't know -- about some of the concerns
11  that was being raised about her getting along
12  with her peer teachers and things of that
13  nature.  I don't know.  I don't recall that.
14      Q    Take a minute, if you would,
15  please, sir, and read to yourself the entire
16  question and your answer.  Okay?
17      A    To which one?
18      Q    To 25.  And then, let me know when
19  you've finished, because I want to talk to
20  you some more about it.
21      A    (Witness reviewing document.)
22  Okay.
23      Q    The question, on the face of it,
24  was directed to the late September meeting at
25  your office.  And it appears -- and this is

25

1 fine. I mean, people make mistakes and
2 misspeak. I do it. It appears you talk
3 about an earlier meeting in your answer. So,
4 there was one meeting in your office in the
5 latter part of September? Correct?
6    A    Correct.
7    Q    But the meeting you're giving us
8 this answer about was the earlier September 1
9 meeting out at the high school?
10    A    That's the only meeting I attended
11 at the high school. Well, that's one of two
12 meetings I went to at the high school.
13    Q    All right. I guess what I'm trying
14 to be sure of, you say, "After the September
15 the 1st meeting, I sent Virginia Singletary
16 to Houston County High School to verify all
17 student IEP's." Now, was that done before
18 Mrs. Miller left the campus --
19    A    Yes.
20    Q    -- and came to see you at your
21 office?
22    A    Yes.
23    Q    And you're confident of that? I
24 don't mean to beat it to death, but I want to
25 be sure.

26

1    A    Uh-huh. She checked not only --
2 she checked all the IEP's. My instruction to
3 Ms. Singletary was to go and to get with the
4 teachers to see that all of them had an IEP.
5    Q    And then, you reported Ms.
6 Singletary's findings to Mr. Pitchford, and
7 also told him about Mrs. Miller's concerns?
8    A    That's at the 24th meeting, on
9 September 24th.
10    Q    And, again, I'm not arguing with
11 you. But I do think -- I mean, are you
12 possibly talking about both September
13 meetings in this answer?
14    A    Probably so, yes.
15    Q    I want to be sure I've got it
16 straight.
17        MR. FAULK: You can take a look at
18        it, Kevin. Because it may just
19        be a mistake.
20        MR. WALDING: Sure. Well,
21        September the 24th falls after
22        the September 1st meeting. The
23        sentence speaks for itself.
24        "After September the 1st,"
25        which could include September

27

1 the 24th.
2        MR. FAULK: Well, it was after the
3        crucifixion, too, but the
4        question wasn't about the
5        crucifixion.
6    Q    And I'm not trying to just mess
7 with you --
8    A    No.
9    Q    -- Mr. Andrews. I mean, I am suing
10 you, of course, but I'm not just jerking you
11 around.
12    A    Are you sure about that?
13        MR. WALDING: Well, it's good we
14        can laugh about it.
15    Q    Take another look at it. If you
16 did misspeak, I mean, here's a good chance to
17 correct it with no harm done to anybody.
18        MR. WALDING: My point is that he's
19        not misspeaking. The 24th does
20        occur after September the 1st.
21        MR. FAULK: I got that. Thank you.
22        MR. WALDING: And that's what the
23        sentence says, Mr. Faulk.
24    A    Some time after September the 1st,
25 Ms. Singletary did go out to Houston County

28

1 High School to check the IEP's. That's what
2 I was referring to.
3    Q    Do you know whether it was before
4 Mrs. Miller coming to see you or not?
5    A    Yes.
6    Q    You're satisfied that you sent Ms.
7 Singletary out there based on the earlier
8 meeting?
9    A    To the best of my recollection,
10 yes.
11    Q    All right. Then, after she made
12 her report to you, you then called and
13 expressed Miller's stated concerns and
14 problems to Pitchford and Strange?
15    A    When she came to my office that
16 Friday afternoon -- I was not in the office
17 that morning. She came. I was working with
18 the Association of Retarded Children. We
19 were selling Tootsie Rolls, by the way.
20 That's their annual fundraiser. And I was
21 participating in that. I received a call on
22 my radio that Mrs. Miller was wanting to
23 speak with me.
24    Now, prior to that, I had received a
25 call from Ms. Singletary, stating that Mr.

1 Pitchford had called her and said that Mrs.
2 Miller had left the campus. And then, she
3 wanted to speak with me. That Mrs. Miller
4 wanted to speak with me. I left the Tootsie
5 Roll drive and came to the office and met
6 with Mrs. Miller and Ms. Singletary.
7    Q    Tell me what you recall about that
8 meeting, please?
9    A    We got there, I guess,
10 approximately 3:30, 3:45. Somewhere in that
11 neighborhood. I'm not exactly sure. We met.
12 I asked Mrs. Miller -- you know, she had some
13 concerns. I just asked her to share her
14 concerns with me. Like I had told her at the
15 very beginning, when I hired her -- I didn't
16 hire her. I can't hire anybody. But, when I
17 recommended her for employment --
18    Q    I understand.
19    A    -- if she had any concerns or
20 problems, to come to me.
21    Q    And she did?
22    A    And this was the first time that
23 she had come to me. Yeah. She expressed
24 those concerns, and Ms. Singletary made notes
25 while she was talking. And then, from the

1 on September the 1st? I'd like to go back to
2 that for a minute.
3    A    At the school. Yes.
4    Q    And that included Ms. Parris and
5 Mr. Pitchford, Mr. Strange?
6    A    I don't know if Mr. -- he might
7 have been -- yeah. Mr. Strange was there.
8 Yeah.
9    Q    And Mrs. Miller?
10    A    Right.
11    Q    Did y'all have any premeeting, that
12 didn't include Mrs. Miller?
13    A    Not to my knowledge. I did not,
14 no.
15    Q    Did you participate in any prior
16 telephone meetings or anything about it?
17    A    I don't recall if there was any
18 phone calls. I feel like there had been some
19 phone calls. I can't recollect the date or
20 anything of that nature. There were some
21 concerns with her and the other teachers
22 there at Houston County High School. Yes.
23    Q    Can you give me any more detail on
24 that?
25    A    Well, it's just that -- things that

30

1 notes, a list was compiled of her concerns.
2    Q    I'll show you what's in evidence as
3 Defendant's Exhibit 16, and ask you if that's
4 the compilation you just referred to?
5    A    That is correct.
6    Q    All right, sir. And you've had a
7 chance to review that recently?
8    A    I've looked at it, yes.
9    Q    Look over it. I want to ask you a
10 few questions about it. Let me know when
11 you've read it.
12    A    (Witness reviewing document.)
13 Okay.
14    Q    Do you feel like that fully and
15 fairly records the substance of Mrs. Miller's
16 complaints to you on that occasion?
17    A    That's as I recall them, yes.
18    Q    Do you recall any that Ms.
19 Singletary failed to record here?
20    A    I do not at this time, no.
21    Q    Now, at any time during that
22 meeting, did you speak to Mrs. Miller about
23 any impropriety on her part?
24    A    No. Not to my knowledge, I didn't.
25    Q    And you had had this prior meeting

32

1 -- she wanted to do things in the classroom.
2 She wanted to be a teacher. She wanted to
3 teach in the regular classroom, you know,
4 with the special ed students that were being
5 included in those classrooms. She wanted to
6 participate in that. And, you know, I
7 understand that, her being a professional
8 person, wanting to teach in those classrooms.
9    But, at the same time, we were
10 confronted with No Child Left Behind. This
11 was the high school students. And the only
12 person that can give grades to a high school
13 student, regular ed or special ed, in the
14 core classes, is a highly qualified teacher.
15 And that's a mandate under the No Child Left
16 Behind Act.
17    And so, that is the reason that we had
18 talked about collaborative teaching, so that
19 the special ed teacher and the regular ed
20 teacher could get together, and they could
21 teach the children, meet the needs of the
22 students that held an IEP, and they could
23 then collaborate, get together, come up with
24 grades, and assess the progress of the
25 students' IEP's, according to the goals on

33

1  their IEP's.

2      Q     Was there any discussion during the

3  September 1st meeting about any inappropriate

4  behavior on Mrs. Miller's part?

5      A     Again, I don't recall any

6  specifics.  I just know that the meeting was

7  about generally going over her duties as an

8  intern, primarily.  To sit here and tell you,

9  yes, there was, or there wasn't, I don't

10  recall that.

11      Q     Do you recall any discussion at the

12  September 1st meeting about concerns that

13  Mrs. Miller had expressed about the state of

14  the IEP's out at that school?

15      A     No.  Nothing was mentioned to me at

16  that time.

17      Q     Assuming that to be correct, let me

18  ask you, why would you have sent Virginia

19  Singletary out there before the September 24

20  visit to your office?

21      A     From September -- after September

22  1st meeting is when I started receiving the

23  phone calls from the personnel there at

24  Houston County High School about concerns

25  that -- there were some comments made about

34

1  her working with other teachers and dealing

2  with students, and that some comments had

3  been made either by her, to Mr. Strange, I'm

4  assuming, being he was her mentor, about some

5  of the students not having IEP's.

6      Q     Okay.  And that prompted your

7  sending Ms. Singletary out there?

8      A     Yes.

9      Q     Okay.  Did you have any further

10  communications concerning Mrs. Miller, that

11  you specifically recall, prior to the

12  September 24 meeting?

13      A     No.  I don't recall any specific

14  meeting or any specific call.  I know I

15  didn't have any meetings.  I don't recall if

16  Mr. Pitchford had called me or Mr. Strange,

17  either one, during that time or not.  They

18  may have.  I don't recall.

19      Q     What about communications between

20  you and people affiliated with Troy

21  University, Dothan?

22      A     The only person I talked to at Troy

23  University was Pam Parris.

24      Q     Did you talk to her between the 1st

25  and the 24th, that is, between those two

35

1  meetings?

2      A     If I received calls from the

3  principal or the mentor at the school about

4  some concerns, I'm sure I relayed them to Ms.

5  Parris.

6      Q     And you would have done that

7  promptly?

8      A     I would think so, yes.

9      Q     Or within a reasonable time?

10      A     I assume, yes.

11      Q     There are several people mentioned

12  by name in Ms. Singletary's notes in

13  Defendant's Exhibit 16, aside from Mr.

14  Strange and so forth.  Did you ever discuss

15  any of these privately with any of these

16  individuals that are mentioned here?

17      A     After -- the concerns?

18      Q     Yes, sir.

19      A     After our meeting with Mrs. Miller,

20  when she left, I tried to call Troy

21  University that Friday afternoon.  They were

22  not there.  I left word, you know, that I had

23  met with Mrs. Miller, and that -- you know,

24  that she needed to go out and meet with Mrs.

25  Miller out at Houston County High School.

36

1  Because I had asked Mrs. Miller, after

2  we had talked, if she felt comfortable going

3  back to the school.  And she said, no, not

4  until she had met or she had had a chance to

5  talk with Ms. Pam Parris.  And I called Ms.

6  Parris and left a message.  And I want to say

7  that I called her again on Monday morning to

8  ask her to go and meet with them about these

9  concerns.

10      Also, there were questions about Starla

11  Smith and Paul Strange asking her to --

12  asking Mrs. Miller to sign some documents

13  for, that she wasn't there.  I called and

14  talked to Mr. Strange.  And he told me, at

15  that point, that that was not an IEP.  It was

16  an eligibility meeting.  And that the only

17  reason that they asked Mrs. Miller to even

18  review the document was so that she would

19  feel like she was part of the learning

20  process as an intern.  Also asked Ms. Starla

21  Smith.  She gave me the same answer.

22      Q     Can I see that back, please?

23      A     (Handing document to Mr. Faulk.)

24      Q     What about Cathy Keasler?  Did you

25  talk to her about any of this?

**37**

1  A   No, I did not.

2  Q   What about Scott Stephens?

3  A   No, I did not.

4  Q   Did you talk to Dr. Ruediger about

5  it?

6  A   No. I did not talk to Dr. Ruediger

7  at all.

8  Q   Do you know about what time your

9  meeting with Mrs. Miller concluded on the

10  24th? What time of day?

11  A   Not exactly. I'd say somewhere

12  roughly an hour, probably, that we met. I'm

13  not sure.

14  Q   Did the meeting conclude prior to

15  the close of the school day? Do you remember

16  that?

17  A   No. It was after the school day.

18  Q   Did you tell her what to do? When

19  she said she didn't want to go back 'til she

20  had had time to talk to Pam Parris, what did

21  you have to say about that?

22  A   I asked her did she want to go

23  back. And she told me that she would rather

24  talk to Pam Parris, her advisor, intern

25  advisor, before she went back. And I told

**39**

1  A   I called to tell him that I had met

2  with Mrs. Miller that Friday afternoon, and

3  she had expressed some concerns to me, and

4  that I had those concerns. And I believe, at

5  that same time, I asked him to express his

6  concerns or their concerns to me, so that I

7  could make Ms. Parris aware of those

8  concerns, so that we could provide some help

9  to Mrs. Miller in those areas.

10  Q   And then, did that list of concerns

11  come to you in the form of Defendant's

12  Exhibit 18 that I'm showing you?

13  A   That is correct.

14  Q   And was it based on Defendant's

15  Exhibit 18 that you prepared Defendant's

16  Exhibit 17?

17  A   That is correct.

18  Q   And then, I gather you sent

19  Defendant's Exhibit 17 and 18 to Ms. Parris?

20  A   That is correct.

21  Q   What? Did you fax it to her?

22  A   I mailed it to her.

23  Q   Do you know how soon that was after

24  Mrs. Miller coming to your office?

25  A   No, sir. I don't recall. But I

**38**

1  her that that would be fine. That I would

2  contact Ms. Parris and tell her that she

3  needed to talk with her. And that's what I

4  did.

5  Q   Was it your opinion, at the time,

6  that it was wrong for Mrs. Miller to come to

7  you with these concerns?

8  A   No. Had I not meant for her to

9  come, I wouldn't have told her that.

10  Q   Did you, yourself, ever make any

11  kind of survey of these IEP's to satisfy

12  yourself that they were appropriate?

13  A   No, I did not.

14  Q   You relied solely on Ms.

15  Singletary's --

16  A   Singletary.

17  Q   -- report for that?

18  A   That is correct.

19  Q   Anybody else?

20  A   No.

21  Q   And then, after the meeting on the

22  24th, then, is when you called to talk to Mr.

23  Pitchford, and got further assurances that

24  the IEP's were proper? Correct?

25  MR. WALDING: Object to the form.

**40**

1  would assume that it would have been within a

2  few days. As soon as I could have got the

3  responses from Houston County.

4  Q   Had Ms. Parris already come and met

5  with you by the time you sent her this

6  letter?

7  A   No.

8  Q   Was it your opinion, after having

9  talked to Mr. Pitchford and Mr. Strange, that

10  the concerns that are listed on Defendant's

11  Exhibit 16 by Ms. Singletary, attributed to

12  Mrs. Miller -- did you conclude that all of

13  those concerns were unfounded?

14  MR. WALDING: Object to the form.

15  A   All I did was ask her the ones that

16  pertained to the programatic things dealing

17  with special ed, for Ms. Singletary to check

18  on the IEP's. And I followed up with the

19  psychometrist and the other person here about

20  what they had said or not said. And the

21  other things, I had no knowledge if they

22  happened or not, if they did or not.

23  Q   Did Ms. Singletary do two

24  investigations?

25  A   No. This is all the one.

41

1   Q    So, you sent her out there after
2   the 24th meeting?
3   A    No.
4   Q    You sent her out there before that?
5   A    Right.
6   Q    Had Mrs. Miller previously
7   expressed some of these concerns, to your
8   understanding --
9   A    No.
10  Q    -- prior to the 24th?
11  A    No. I had not talked to Mrs.
12  Miller.
13  Q    Okay. Well, I don't mean expressed
14  them to you. But I just said, to your
15  understanding, where someone, Mr. Pitchford,
16  possibly, said she said these things?
17  A    These were the things they sent.
18  These are the things Mrs. Miller expressed to
19  me in the 24th meeting.
20  Q    Did any of these overlap with
21  things that had already come to your
22  attention that led you to send Ms. Singletary
23  out there in the first place?
24  A    The only things that I see a tie
25  that we had already investigated was the

42

1   IEP's.
2   Q    What number are you referring to?
3   A    Number 2.
4        MR. WALDING: It's the one about
5            Ms. Keasler asking her to do
6            one.
7   A    I don't know if these IEP's were
8   not done or they were done on the 24th. I'm
9   assuming, you know, they would not have been
10  there when Ms. Singletary went to check. I
11  don't know if these were new students or
12  what.
13  Q    So, once you heard these
14  complaints --
15  A    From Mrs. Miller.
16  Q    -- the nine areas that are listed
17  there in Defendant's Exhibit 16 -- am I right
18  about that? 16? -- any investigation you
19  did into those additional concerns was in the
20  forum of discussing them on the telephone
21  with Mr. Pitchford and Mr. Strange? Is that
22  correct?
23       MR. WALDING: Object to the form.
24  A    And the psychometrist and anybody
25  that -- I asked the psychometrist and I asked

43

1   Mr. Strange, you know, about the alleged
2   signing of IEP's, and that she wasn't at the
3   meeting. Because they knew that she was not
4   a certified teacher, and under the terms of
5   the agreement, she couldn't do IEP's. They
6   knew that.
7   Q    Based on their answers to you --
8   A    I was satisfied.
9   Q    -- you were satisfied?
10  A    Yes.
11  Q    Did you have any other source of
12  knowledge that led to your satisfaction?
13  A    These were veteran personnel that
14  we had in our system. And after I had
15  contacted them and they gave me their
16  answers, I was satisfied with their answers.
17  Q    Okay. And based on that, you were
18  satisfied that her complaints were unfounded?
19  Correct?
20       MR. WALDING: Object to the form.
21  A    The ones that I confirmed were
22  unfounded. Others, I couldn't -- I did not
23  know.
24  Q    But your conclusion that they were
25  unfounded were based upon the say-so --

44

1   A    Of others.
2   Q    -- of these other people?
3   A    Right. I did not go personally,
4   myself. No.
5   Q    Let me show you Defendant's Exhibit
6   14, which is a letter dated September 24th,
7   purporting to be from Nancy Miller to Mr.
8   Pitchford. Had you seen that before today?
9   A    Yes.
10  Q    And what was the occasion for you
11  seeing it?
12  A    This was in an envelope that was
13  given to me by Mrs. Miller that Friday
14  afternoon on the 24th. This was in the
15  envelope.
16  Q    All right, sir. Did you look into
17  the allegations, if you will, that are made
18  in that letter?
19  A    Well, the one about Cathy Keasler
20  is the same one that we've already talked
21  about. The others, again, Ms. Singletary had
22  gone to the school and said that they all had
23  valid IEP's.
24       MR. WALDING: Let me interject. I
25           don't mean to testify for him.

45

1      But the first thing is about
2      Starla Smith.  And he did
3      testify that he talked with Ms.
4      Smith.  Correct?
5      THE WITNESS:  Yes.  I talked with
6      Ms. Smith.
7      MR. FAULK:  That's fine.
8    Q    Let me ask you this:  When you sent
9   Defendant's 17 and 18 to Ms. Parris --
10    A    Right.
11    Q    -- what did you wish to accomplish
12   by doing that?
13    A    I think I stated this earlier.
14   After I had talked to Mrs. Miller on the
15   24th, that afternoon, and then, she listed
16   her concerns, I contacted the school about
17   their concerns, to get them in writing, so
18   that if there was a problem, which,
19   obviously, there seemed to be one, that we
20   could come to some consensus to assist or
21   help Mrs. Miller.
22    Q    And did you do anything else to
23   further that end of helping Mrs. Miller?
24    A    No.  I did not go out there.
25    Q    Well, did you do anything else to

46

1   further the end of helping Mrs. Miller other
2   than to convey these assertions set out in
3   those letters to Ms. Parris?
4    A    She was an intern, and Ms. Parris
5   was her supervisor, advisor.  I expected Ms.
6   Parris to handle the concerns, because she
7   was under her direct supervision as her
8   advisor, is what my expectations were, after
9   I made Ms. Parris aware of some concerns that
10   the school system had.
11    Q    Was it your expectation that the
12   Troy University people that ran the intern
13   program would follow up on your letter and
14   take some kind of corrective action?
15    A    That was my hopes.  Because we had
16   no teachers, and she was the teacher that we
17   had in place at the time.
18    Q    Okay.  Once you sent this letter
19   off, or these letters, did you get any
20   further feedback from anyone connected with
21   Troy about what they were doing to help Mrs.
22   Miller?
23    A    I don't recall if there was
24   anything.  I think there was a -- I don't
25   know.  I can't answer that.  I don't know.

47

1    Q    What's the next thing you remember
2   happening in connection with all this, I
3   mean, with Mrs. Miller and the school and so
4   forth?  The next event that stands out in
5   your mind?
6    A    After the 24th?
7    Q    Yes, sir.  Well, after the 24th,
8   and then, you got this information, and you
9   sent it to Ms. Parris.
10    A    It was my understanding there was a
11   meeting at school with Ms. Parris, Mrs.
12   Miller, and I think the school officials.  I
13   didn't attend that meeting.  I wasn't
14   invited.  And I don't know exactly what
15   happened at that meeting.  You know.  I was
16   not there.
17    Q    Did you instruct them to have that
18   meeting, or did they directly deal with Troy
19   on it?
20    A    After the 21st?
21    Q    Right.
22    A    The 24th, I mean.
23    Q    24th.  Yes.
24    A    That was primarily at Mrs. Miller's
25   request.  Because I had talked to -- she

48

1   wanted to talk to Ms. Parris.  And I called
2   her and told her that she had these concerns.
3   That she wanted to talk with her.
4    Q    Did you attend any more meetings,
5   prior to the final discharge of Mrs. Miller,
6   that had to do with her employment?
7    A    No.
8    Q    Did you have any further telephone
9   contacts with Mr. Pitchford that had to do
10   with her employment, after you sent these
11   letters to Ms. Parris?
12    A    I don't recall any.
13    Q    When did it first come to your
14   attention that Ms. Miller's internship had
15   been withdrawn?
16    A    I don't recall if I got a phone
17   call.  I got something from Troy that they
18   were going to terminate her internship.  I
19   don't know if it was a phone call or what.  I
20   don't remember.  It was some -- and then, we
21   got a letter later.
22    Q    And then, what happened next, as
23   far as getting rid of Mrs. Miller is
24   concerned?
25      MR. WALDING:  Object to the form.

49

1    A    We did not get rid of Mrs. Miller.
2  I've said this time after time, that she was
3  a teacher of record at that time there, or
4  employee there at that school, carrying out
5  the special ed duties. And I had no one
6  else.
7    Q    It's my understanding that she
8  stayed there several days after she was
9  notified that her internship was withdrawn.
10  Is that your understanding?
11    A    That's my understanding. Yes.
12    Q    There have been references in the
13  litigation to her refusing to leave the
14  campus. Do you know anything about that?
15    A    No, I do not.
16    Q    And by "know anything about it," I
17  mean, has anything concerning that came to
18  your attention in connection with your
19  performance of your official duties?
20    A    (No response.)
21    Q    You have to tell her.
22    A    Okay.
23    Q    I take it no one told you, at the
24  time, "She's out here and refusing to
25  leave" --

50

1    A    Nobody called me and told me. No.
2    Q    -- or words to that effect?
3    A    No.
4    Q    Is it your understanding Mr. Lord
5  wrote Mrs. Miller a letter and delivered it
6  to her, telling her that her employment was
7  terminated?
8    A    I accompanied him to deliver that
9  letter.
10    Q    Okay. Tell me about that occasion,
11  please?
12    A    Mr. Lord and I rode out to Houston
13  County High School. And I don't know where
14  we met. I don't know if it was in the board
15  room there or the meeting room, conference
16  room, or what. But he gave Mrs. Miller the
17  letter.
18    And at that point, Mr. Pitchford or Mr.
19  Lord -- I think Mr. Pitchford -- instructed
20  Mr. Stephens (sic), who had come in about
21  that time, I think, there at the outside door
22  there, to go with her and assist her in
23  getting her stuff.
24    Q    Did you witness her being escorted
25  off campus?

51

1    A    No. I don't remember -- I don't
2  recall that.
3    Q    Were you still there when she left?
4    A    I was in the room there. I do not
5  recall her being escorted. I think Mr.
6  Strange went with her. Yes.
7    Q    Nothing you would describe as
8  being --
9    A    No.
10    Q    -- forcibly escorted?
11    A    No.
12    Q    Now, when she was hired in, was any
13  kind of board action taken to confirm that
14  hiring, if you know?
15    A    When she was hired?
16    Q    Right.
17    A    I recommended to Mr. Lord that she
18  be employed. And it's my understanding that
19  she was hired by the board, at a regular
20  board meeting.
21    Q    And that would be the norm with any
22  employee? Correct?
23    A    Sure.
24    Q    When she was terminated, to your
25  knowledge, was there any board action to

52

1  confirm the termination?
2    A    I'm sure there was, but I don't --
3  I can't be specific.
4    Q    Well, when you say you're sure
5  there was, are you saying that you would
6  expect there to be, or that you, in fact,
7  know that there was board action?
8    A    I can't answer that concretely.
9  No, I don't know.
10    Q    Am I correct in saying that,
11  generally speaking, when an employee is
12  terminated, for whatever reason, there's
13  supposed to be some board action on it?
14    A    At some point, yes.
15    Q    Did you ever talk to Mrs. Stacey
16  Ezell about Mrs. Miller?
17    A    I don't know if she was there in
18  meeting her on the day I was out at the
19  school or not. I can't recall for sure. I
20  can't answer that. I don't recall. I don't
21  know.
22    Q    Let me show you Defendant's Exhibit
23  28, which is a letter from Mr. Lord to Mrs.
24  Miller, dated October 19, 2004, and ask you
25  is that the letter you recall being delivered

53

1   to her?

2       A    I assume that's the letter that I

3   accompanied him to deliver.  Yes.

4       Q    Do you see in here where he talks

5   about her refusing to leave?

6       A    Yes, I see that.

7       Q    Do you have any knowledge, as we

8   sit here, of her having previously been asked

9   or told to leave the campus?

10      A    I don't know what transpired when

11  she was, you know, terminated.  I don't know

12  what transpired at that point.  No.

13      Q    So, you don't have any knowledge of

14  it, at any rate?

15      A    No.

16      Q    There's been talk, in connection

17  with this case, about whether or not Mrs.

18  Miller had some official duty to make these

19  complaints to you.  In your judgment, was

20  that part of her official duties?

21      A    I don't know if it's her official

22  duties or not.  But, as I stated earlier, had

23  I not meant what I said to Mrs. Miller about,

24  if she had problems, to come to me or contact

25  me, I wouldn't have said that.  And I meant

54

1   that.  Because I expect people to have

2   pleasant working relationships at schools and

3   to meet the needs of our children.  That's

4   why I relayed that to her.

5       Q    Was that a direct order, or was

6   that an invitation?

7       A    It wasn't an order, no.  I would

8   assume that anybody would have taken that as,

9   you know, "I have an open door.  If you've

10  got a problem, I've got a problem."

11      Q    What about this business of her

12  leaving the campus without telling Mr.

13  Pitchford that she was leaving?  At the time

14  that occurred, to your knowledge, was there a

15  written policy anywhere in the school system

16  about what a teacher was to do under those

17  circumstances?

18      A    I don't know what the policy was at

19  the school.  But I know that it's an unspoken

20  policy that any time you leave your post or

21  your job, you're supposed -- I would assume

22  that you're supposed to report to someone.

23  You just don't leave.

24      Q    Well, if she reported it to her

25  mentor, in the absence of Mr. Pitchford, in

55

1   your judgment, would that have been

2   inappropriate?

3            MR. WALDING:  Object to the form.

4       A    Unless there was a written policy

5   contrary to that.

6            MR. FAULK:  Excuse us just a

7            second.

8            (Recess in deposition from 2:35 to

9            2:53.)

10      Q    During the break, Mr. Andrews, I

11  had asked you to review pages 1013 through

12  1041 and 1066 through 1070 of defendant board

13  of education's production of documents.  And

14  have you now had a chance to do that?

15      A    Yes.

16           (Brief off-record.)

17      Q    You understand these to be IEP

18  reports concerning R. S.?

19      A    Yes.

20      Q    Do you have any knowledge as to

21  whether, at the time the one shown at 1013

22  through 1041 was prepared, whether R. S. had

23  any other IEP besides the one shown at 1066

24  through 1070?

25      A    I do not know.  No.

56

1       Q    Do you have an opinion, based on

2   your education and experience, as to whether

3   it would have been appropriate for the

4   Houston County School System not to have --

5   assuming for a moment that the 1066 through

6   1070 was the most recent IEP at the time 1013

7   through 1041 was prepared -- I'll just ask

8   you to assume that for purposes of this

9   question.  We can find out later.

10           Assuming that, would it have been

11  appropriate for the Houston County Schools

12  not to have prepared a new IEP for Miss S.

13  prior to October of 2004?

14           MR. WALDING:  Object to the form.

15      A    They possibly should have prepared

16  a new one.  However, until a new one is

17  prepared, they could have used the old IEP

18  and carried through with it until a new one

19  was prepared.

20      Q    When you say they should have

21  prepared one --

22      A    They could have.

23      Q    -- what are you basing that on?

24      A    Let me rephrase that.  They could

25  have.  Or they could accept the one that they

57

1  had until they did prepare a new one.
2      Q    Well, can you just go on
3  indefinitely, in your opinion, without
4  preparing a new one?
5      A    No.
6      Q    Is there some kind of time frame
7  within which a new IEP should be prepared, or
8  at least the old one reviewed and approved?
9      A    Efforts should be made, you know,
10 to draft a new IEP to cover the time frame
11 that you're in.  Yes.  Temporary IEP's are
12 normally signed, or they were at that time --
13 they no longer do that now, because the law
14 has changed again.  But temporary IEP's are
15 done that would last for 30 days, and then,
16 you could get an extension on that.  But
17 they've discontinued that practice now.
18     Q    Well, is it your opinion that, as
19 of October 2004, the IEP shown at 1066
20 through 1070 would have been appropriate
21 without being updated prior to October?
22         MR. WALDING:  Object to the form.
23     A    I don't know what day that Miss S.
24 enrolled at Houston County High School.  I
25 don't know if there was a time lapse in that.

58

1  I don't know.  I don't have that information
2  before me.  This was the last IEP that was
3  done for her.
4      Q    You're talking about 1066 to 1070?
5      A    Until this one was done in October.
6  And if she was at school there, they either
7  had to follow the old one, just like they
8  would on any transfer student -- you can use
9  the one that transfers in to you.  You can
10 use that, as long as you provide services.
11 And there's a consent form and all that with
12 this.  You continue the services until a new
13 IEP can be developed, whatever the
14 circumstances might be.
15     Q    But there's no set time frame
16 for --
17     A    Like I said --
18     Q    -- reviewing the IEP's?
19     A    -- normally, it's 30 days.  You
20 have a temporary for 30 days.
21         (Brief off-record.)
22     Q    Now, a child's current IEP, a copy
23 of it is kept at the local school?  Correct?
24     A    The teacher -- a working copy is at
25 the school.  The teachers have that, and they

59

1  share that with all the teachers that teach
2  that child.
3      Q    Is there also a copy at the central
4  office?
5      A    Not of the new one.  Just the one
6  that they have -- that they have that they're
7  working from now, that is kept at the school
8  with the teacher.  The teacher keeps that
9  IEP.
10     Q    Now, your lawyer keeps telling me
11 in depositions that I just don't understand
12 special education law, and he's probably
13 right, but --
14         MR. WALDING:  For the record, I've
15             only said that once.
16         MR. FAULK:  You've said it twice,
17             which is fine.  As I say,
18             you're probably right.
19         MR. WALDING:  But I'll say it again
20             today, if you'd like.
21     Q    We've talked around this subject of
22 full inclusion.  And I went into this case
23 under the impression that there had been some
24 sort of policy change in the Houston County
25 School System between the spring of '04 and

60

1  the fall of '04 that concerned this question
2  of full inclusion.  Now, can you shed any
3  light on that?
4      A    I'll do my best to.
5      Q    All right, please.
6      A    Full inclusion is exactly what it
7  says.  They're fully included in the general
8  curriculum.  IEP's are based on standards set
9  out in the Alabama courses of study.
10     Students that are on a regular diploma
11 track are to receive their instructions from
12 a highly qualified teacher, and that being
13 the subject matter teacher.  Like, in high
14 school, they're highly qualified in English,
15 math or whatever.  They receive instruction
16 from that teacher, and with support -- no
17 special ed child should be placed in an
18 included environment without support.
19     That is where the special ed teachers
20 come in.  Special ed teachers are to monitor
21 that student, are to make sure that the
22 components that are being taught that child
23 in the regular class are understood by that
24 child.  And if, for some reason, that child
25 cannot comprehend what is being taught that

1  day in the general curriculum, it's that
2  special ed teacher's obligation to pull that
3  child into her classroom or his classroom,
4  reteach that information, so that that child
5  can understand what was taught or the
6  concepts of that lesson.
7      Now, most children that are in the
8  inclusion -- inclusion is exactly, like I
9  said, what it says. They're included in the
10  general curriculum. And the regular ed and
11  the special ed teachers should collaborate on
12  what's going to be taught in those classes.
13  And they should be able to come to a
14  consensus on who was going -- or how they
15  were going to grade that child, what
16  accommodations that meant for that child in
17  the IEP, if they were going to modify -- not
18  modify. I'm sorry -- if they were going to
19  limit the number of choices on tests that the
20  child would be -- instead of ten choices,
21  there may be four choices for a special needs
22  child.
23      These are things that the special ed
24  teacher and the general ed teacher get
25  together and collaborate on how to meet the

62

1  needs of that child.
2      As long as the concepts or the standards
3  of the Alabama course of study are taught,
4  then the class is not watered down, so to
5  speak, and it's not modified. Because, if
6  the class is modified, and that child is
7  seeking a regular diploma, then they will not
8  get credit for that class.
9      However, if accommodations are made, and
10  those teachers collaboratively get together,
11  teach the concepts of that class, and then,
12  the tests are given, and they collaboratively
13  give a grade on that child -- now, Houston
14  County Schools, Riley Andrews, the president
15  of the United States, does not have the
16  authority to say this is carte blanche what
17  you're going to do to that child.
18      We did emphasize that the children be
19  placed in the least restrictive environment,
20  with general ed being the least restrictive.
21  We recommended that. But if the child could
22  not function in that environment, then they
23  had to be pulled to the resource room for
24  reteaching or clarification.
25      Q    That's it? That's your answer?

1      A    Yeah.
2      Q    Okay. Was there some sort of
3  change in emphasis on this subject that you
4  were just talking about that occurred over
5  the summer of 2004 in Houston County, to your
6  knowledge?
7      A    Not to my knowledge, no. The IEP's
8  are done in the fall -- I'm sorry -- in the
9  spring of the preceding year, for the next
10  year. They're usually done -- I say spring
11  -- in April or May, before school is out.
12      And we had attended meetings on
13  collaborative teaching or inclusion, teachers
14  working together, and we were trying to
15  implement this program or implement what the
16  state was asking us to do. And we had a
17  meeting, even, and I think Mrs. Miller
18  attended the meeting, in the summer of 2004,
19  July, a day or so before school started, and
20  we talked about those issues.
21      We talked about how to do the
22  collaborative teaching. We talked about how
23  they were to meet and try to make sure that
24  the standards -- because IEP's at that time
25  were going standards based. In other words,

64

1  everything that -- that special ed child was
2  going to be held for the same standards that
3  any other child was held for, because they
4  were seeking the same diploma, if they were
5  seeking a regular diploma.
6      If they were seeking a certificate, then
7  the rules were different for those children,
8  and that was identified on that child's IEP.
9  But if they were seeking a regular diploma,
10  they were accountable for the same standards.
11      Q    But if a child was to be included
12  in the general education program --
13      A    Yes.
14      Q    -- should that be reflected in his
15  or her IEP?
16      A    It should be, yes. And if it's
17  not, if something has changed, then someone
18  should have brought it to someone's attention
19  and a meeting held. And then, if that was
20  not done, whoever was making the assumptions
21  or the complaints should have contacted me.
22          (Brief off-record.)
23      MR. FAULK: I don't have any more.
24      MR. WALDING: Let me just ask one
25          question.

65

EXAMINATION

BY MR. WALDING:

Q    According to these documents that are numbered 1066 through 1070, what sort of diploma track was R. S. on?

A    States in her student profile that she was seeking an occupational diploma.

Q    And just for our record and for the judge and jury in this case, is that the regular diploma?

A    No, it's not.

MR. WALDING: All right. Nothing further.

MR. FAULK: That's it. Thank you, sir.

END OF DEPOSITION

---

67

STATE OF ALABAMA

HOUSTON COUNTY

I, Stacey Watkins, RPR, and Notary Public, State at Large, do hereby certify that the foregoing transcript, pages 1 through 66, is a true and correct transcript of the testimony and proceedings taken at said time and place; and that the same was taken down by me in stenograph shorthand, and transcribed by me personally or under my personal supervision.

I further certify that I have no interest in this matter, financial or otherwise, or how it may develop or what its outcome may be. I further certify that I am not of counsel for any of the parties, nor am I related to counsel or litigants or associated with anyone connected with this cause to my knowledge.

Witness my hand this 23rd day of October, 2007.

_____

_____ RPR, Notary Public,

State at Large

ACCR# 155

---

66

PLAINTIFF'S EXHIBIT NO. 3

1

IN THE U. S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

NANCY MILLER,

PLAINTIFF,

VS.                    CASE NO.1:06-CV-940-WKW

HOUSTON COUNTY BOARD
OF EDUCATION, KENNETH
LORD, RILEY JOE ANDREWS,
TIM PITCHFORD, PAUL
STRANGE, STACY EZELL,
TROY UNIVERSITY, DOTHAN,
SANDRA JONES, PAM PARRIS
and GREG RUEDIGER,

DEFENDANTS.

The deposition of PAUL STRANGE, taken
by the Plaintiff, pursuant to the Federal
Rules of Civil Procedure, before Stacey
Watkins, RPR, and Notary Public, State at
Large, at the offices of Hardwick, Hause,
Segrest & Walding, Dothan, Alabama, on the
27th day of September 2007, at 9:00 a.m.,
CDT, pursuant to notice.

---

3

1     **STIPULATION**

2

3     It is stipulated by and between counsel

4     for the parties that this deposition be taken

5     at this time by Stacey Watkins, RPR, and

6     Notary Public, State at Large, who is to act

7     as commissioner without formal issuance of

8     commission to her; that said deposition shall

9     be taken down stenographically, transcribed,

10    and certified by the commissioner. The

11    signature of the witness is waived.

12    Except for objections as to the form of

13    questions, no objections need be made at the

14    time of the taking of the deposition by

15    either party, but objections may be

16    interposed by either party at the time the

17    deposition is read into evidence, which

18    shall be ruled upon by the Court on the

19    trial of the cause upon the grounds of

20    objection then and there assigned.

21

22

23

24

25

---

2

**APPEARANCES:**

**FOR THE PLAINTIFF:**
**MR. WINN FAULK**
**Attorney at Law**
Montgomery, Alabama

**MR. THOMAS K. BRANTLEY**
**Attorney at Law**
Dothan, Alabama

**FOR HOUSTON COUNTY BOARD OF EDUCATION,
KENNETH LORD, RILEY JOE ANDREWS AND
TIM PITCHFORD:**

**MR. KEVIN WALDING**
**MR. PATRICK B. MOODY**
**Attorneys at Law**
Dothan, Alabama

**FOR PAUL STRANGE AND STACEY EZELL:**

**MS. KATHERINE HORTBERG**
**Attorney at Law**
Chelsea, Alabama

**FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
PAM PARRIS AND GREG RUEDIGER:**

**MR. JOSEPH V. MUSSO**
**Attorney at Law**
Birmingham, Alabama

**ALSO PRESENT:**

**NANCY MILLER**
**KENNETH LORD**
**STACEY EZELL**

---

4

1                **PAUL STRANGE**

2     having been first duly sworn, testified as

3     follows, to-wit:

4

5                **EXAMINATION**

6

7     BY MR. FAULK:

8         Q     State your full name for us,

9     please, sir?

10        A     Paul Wayne Strange.

11        Q     Mr. Strange, we've been introduced

12    in prior meetings, but I'm Winn Faulk. Along

13    with Tom Brantley, I represent the plaintiff,

14    Nancy Miller. You were present during both

15    phases of Mrs. Miller's deposition, weren't

16    you?

17        A     Yes, sir.

18        Q     Do you recall, in general, the

19    instructions that your attorney and the other

20    attorneys gave Mrs. Miller about the idea

21    this is not an endurance test, and if you

22    need a break or something like that, just let

23    us know, and we'll be glad to give you one?

24    I don't want to go through all that. But, do

25    you understand that?

1    A   Yes, sir.

2    Q   All right. Also, I tend to speak

3 pretty softly, by lawyer standards. Some

4 people might say I mumble. If I do, it

5 doesn't matter whether you hurt my feelings

6 or not, but feel free to tell me to speak up

7 if you don't understand something I say.

8 Okay?

9    A   Yes, sir.

10   Q   If I ask you a question that just

11 doesn't make sense, tell me --

12   A   Yes, sir.

13   Q   -- and I'll try to do it another

14 way. I doubt seriously that I'll use a word

15 that's not part of your everyday vocabulary,

16 but if I do, don't be embarrassed to say

17 so --

18   A   Yes, sir.

19   Q   -- and I'll select another word for

20 you. The main thing is, I just want to be

21 sure that you understand my questions, that

22 you have plenty of time to deliberate on them

23 and give me a truthful answer. Okay?

24   A   Yes, sir.

25   Q   So, if there's anything you don't

6

1 understand, you will tell me, I hope.

2    A   Yes, sir.

3    Q   Okay. And so, when we walk out of

4 here today, I should be able to do it with

5 the assumption that you've understood my

6 questions, had time to think about them, and

7 given me a truthful answer. Would that be

8 fair?

9    A   Yes, sir.

10   Q   Okay. Also, if there's anything

11 bothering you, headache, stomachache, just

12 tired and need to stand up and stretch, tell

13 me, and I'll be glad to do it.

14   A   Yes, sir.

15   Q   Did you see a copy of your

16 deposition notice that I sent to your

17 attorney? (Handing document to the witness.)

18   A   Yes, sir.

19   Q   Okay. If you would, please, turn

20 to the second page of it. Do you see the

21 requests for production there?

22   A   Yes, sir.

23   Q   All right. Have you brought any

24 additional documents with you that have not

25 previously been produced to us?

---

1    A   No, sir.

2    Q   Okay. Should I infer from that,

3 that as we sit here, at least, you're not

4 aware of any additional relevant documents

5 that have not already been turned over?

6    A   I'm not aware of any, no.

7    Q   If you should become aware of some,

8 would you please notify your attorney, so she

9 can take a look at them and decide whether

10 we're entitled to them?

11   A   Yes, sir.

12       MR. FAULK: I'll tell you, before

13          we get started, if Kevin comes

14          up with anything in his written

15          discovery responses that would

16          necessitate reconvening his

17          deposition, we would want to do

18          it. I'm not so worried about

19          Joe, because his clients are

20          unconnected, basically, with

21          Mr. Strange.

22         So, anyway, you think

23          we're going to get them today?

24          Can you give me unsigned

25          copies?

8

1       MR. WALDING: You're talking about

2          the interrogatory answers?

3       MR. FAULK: Right. Yeah.

4       MR. WALDING: Okay. I can give you

5          unsigned copies of the

6          interrogatory answers. Patrick

7          tells me y'alls requests for

8          production are not due until

9          some time in October.

10      MR. FAULK: You had told me you

11          would have them by today in

12          your e-mail the other day.

13       MR. WALDING: I'll do my best, is

14          what I said. I'm not trying to

15          take advantage of anybody.

16       MR. FAULK: Well, you know, I can't

17          just let Mr. Strange absolutely

18          off the hook without seeing

19          what his boss has to say.

20       MR. WALDING: Sure. I can get you

21          unsigned of the

22          interrogatories.

23       MS. HORTBERG: And I will state my

24          objection to reconvening this

25          deposition at any later time.

1 Y'all have had ample
2 opportunity to serve any kind
3 of written discovery on Mr.
4 Strange. He provided his
5 timely responses. And, you
6 know, if you all were wanting
7 to wait until you got all
8 discovery in 'til you took his
9 deposition, we could have
10 rescheduled today.
11 But he's here, ready to
12 give his deposition, and I
13 don't believe that we have any
14 responsibility to come back at
15 a later time because another
16 defendant hasn't provided their
17 discovery responses.
18 MR. FAULK: Granted, everything you
19 say. However, as you know, for
20 the record, you requested an
21 extra week from me, which I
22 agreed to, and then, you
23 complied --
24 MS. HORTBERG: Yes, sir.
25 MR. FAULK: -- within that week. I

10

1 also gave an extra week to the
2 other two defense counsel, who
3 have not yet complied. I'm not
4 concerned about Mr. Musso,
5 because of the relationships
6 involved between his client and
7 your clients. I am concerned
8 about getting Mr. Walding's
9 stuff. I've offered to take
10 unsigned copies. And I assume
11 I'll get them.
12 MR. WALDING: If we want to take a
13 break, I can get you those this
14 morning.
15 MR. FAULK: The argument is
16 unnecessary. But, I mean, I'm
17 not going to acquiesce any.
18 But, anyway, yeah, if you can
19 get them for us maybe during
20 the first break or something.
21 MR. WALDING: All right.
22 MS. HORTBERG: And I guess, on the
23 record, will that, then,
24 resolve any concern you have
25 about reconvening this

1 deposition for any purpose
2 regarding --
3 MR. FAULK: I'm assuming if another
4 lawyer gives me unsigned
5 copies, he's representing that
6 it's a good faith thing that he
7 doesn't have any particular
8 reason to anticipate a change
9 other than he hasn't gotten a
10 signature yet.
11 MR. WALDING: That's true.
12 MR. FAULK: And I'll take Kevin's
13 word for it.
14 MR. WALDING: I can give you two
15 signed sets and two that are
16 yet to be signed.
17 MR. FAULK: Let's just take it
18 during the first break.
19 MR. WALDING: Okay.
20 MR. FAULK: Do you need to talk to
21 your secretary or anything
22 before we get started?
23 MR. WALDING: I can do that right
24 now, and you can go ahead.
25 MR. FAULK: All right.

12

1 Q    Mr. Strange, I've handed you and
2 your attorney several exhibits that were
3 exhibits put in by the defense to Mrs.
4 Miller's depositions, and I've also handed
5 you one that was not previously submitted,
6 which I'm going to mark for identification as
7 Plaintiff's Exhibit 1, which is the second
8 document there.
9 (Whereupon, Plaintiff's Exhibit 1
10 marked for identification.)
11 Q    And that, I would represent to you,
12 is what I understand to be the answer filed
13 on behalf of you and certain other defendants
14 prior to the notice of appearance by Ms.
15 Hortberg and her law firm on your behalf.
16 And I've also, along with that, shown
17 you what was formerly Defendant's Exhibit 5.
18 And I'm going to just maintain that
19 designation. And that's a copy of the
20 summons and complaint in this case. Do you
21 have both those in front of you now?
22 A    Yes, sir.
23 Q    I see you're leafing through
24 Plaintiff's Exhibit 1, which is fine. I do
25 want you to take a look at that, please,

because I'm going to ask you if you're
familiar with it or if you've seen it before.

A    (Witness reviewing document.)

    MR. FAULK:  While he's looking at
        it, Kate, you have not filed an
        amended answer, have you, on
        their behalf?

    MS. HORTBERG:  No, I don't believe
        so.

    MR. FAULK:  I didn't see one.

A    I believe I've seen this.

Q    Okay, sir.  Well, I'll ask you to
presume that it, in fact, is a copy of the
answer we were served with on your behalf by
the Segrest-Hardwick firm, prior to Ms.
Hortberg's appearance in the case.

    Let me call your attention, if you
would, on both Defendant's Exhibit 5 and
Plaintiff's Exhibit 1, to paragraph number 8.
In the complaint, Exhibit 5, we say, "The
defendant, Paul Strange, is an adult resident
citizen of Houston County, Alabama."  Is that
true?

A    Yes, sir.

Q    "And at the time of the events

---

14

complained of herein" -- and I presume you
understand by that we're talking about the
things that led up to the termination of Mrs.
Miller's internship and contract -- "he,"
referring to you, "was employed as a teacher,
assigned to mentor the plaintiff, at Houston
County High School, in Columbia, Alabama."
Is that statement true?

A    Yes, sir.

Q    Okay.  Let me ask you to look at
paragraph 14 of each document, please.  In
the complaint, Defendant's Exhibit 5, it
states, "At the time of the events made the
basis for the action, plaintiff, Nancy
Miller, was a student intern at Troy State
University, working as a schoolteacher under
contract with defendant Houston County Board
of Education."

    In the answer, Plaintiff's Exhibit 1,
the defendants admit that she was a student
intern at Troy State, but deny that she was
working as a schoolteacher under contract
with the Houston County Board of Education.
Do you see that?

A    Yes, sir.

---

Q    All right.  Now, do you have any
personal information, within your personal
knowledge, on which to deny that Mrs. Miller
was working as a schoolteacher under contract
with the Houston County Board of Education?

    MS. HORTBERG:  I'm just going to
        object to that question, as we
        all know an answer is prepared
        by an attorney on behalf of
        someone.  And this was prepared
        by attorneys on behalf of Mr.
        Strange, and he certainly did
        not sign this document.

    MR. FAULK:  That's fine.  But I'm
        just asking Mr. Strange.

Q    Do you have any personal knowledge
on which to base the denial of the allegation
that she was working under contract as a
teacher?  And I'll add, that may be something
you just don't have an opinion about.  But,
if you do know something about that, I'd like
for you to tell me.

    MS. HORTBERG:  Same objection.

A    So, what are you asking?  If I knew
what?

---

16

Q    All right.  In the answer filed on
your behalf, in paragraph 14, the second part
of that compound sentence, it says, "... but
they," talking about the defendants,
including you, "deny that she," Nancy Miller,
"was working as a schoolteacher under
contract with the Houston County Board of
Education."

    Do you have any personal knowledge on
which to base the denial of that?

    MS. HORTBERG:  Object to the form.

    MR. WALDING:  Let me also object to
        the form.  And let me interpose
        the objection that the answer
        was filed on behalf of many
        defendants, and not just Mr.
        Strange.

A    I knew she was an intern at Troy
State.

Q    Did you ever see a contract for her
as a teacher?

A    Did I ever see one?

Q    Right.

A    No.

Q    Okay.  So, is it fair to say, Mr.

17    19

1    Strange, you can't really say for sure, one
2    way or the other, whether she was under
3    contract as a teacher? That you just don't
4    know?
5        A    Yes. I do not know.
6        Q    Okay. Thank you. Take a look at
7    paragraph 16, if you would, please, in both
8    documents. 16, in the complaint, Defendant's
9    Exhibit 5, reads, "Plaintiff noticed various
10   acts of malfeasance, misfeasance and
11   nonfeasance in violation of the laws and
12   regulations governing the special education
13   program. When she noticed these violations,
14   she immediately reported such to Paul
15   Strange, who was her mentor and supervisor at
16   the school."
17       In the answer, Plaintiff's Exhibit 1,
18   paragraph 16, it's alleged, "The defendants
19   are without sufficient information to form a
20   belief as to the truth of paragraph 16 of the
21   complaint."
22       Now, I need to ask you, Mr. Strange, did
23   Mrs. Miller report to you certain
24   circumstances that she said that she felt
25   were somehow noncompliant with the law or

1    mean when you say "inclusion model"?
2        A    The state had come up with the term
3    "inclusion." And she said that we were not
4    following the inclusion model as it was
5    supposed to be followed.
6        Q    Can you refer me to some particular
7    document or regulation of the state
8    department of education that would describe
9    that model, so I could look it up for myself?
10       A    No, sir. You could call the state
11   department, and they may could give it to
12   you.
13       Q    Have you ever seen a written
14   version of that model?
15       A    Of inclusion?
16       Q    Right. Whatever it is we're
17   talking about.
18            MR. WALDING: We object to the
19            form.
20       A    Yes, I have seen it.
21       Q    Do you recall the circumstances
22   under which you saw it?
23       A    No, sir.
24       Q    Do you recall where you saw it?
25       A    No, sir.

18

1    regulations governing special education?
2            MS. HORTBERG: Object to the form.
3        A    I mean, what would she have
4    reported?
5        Q    Well, are you saying she didn't
6    report to you any concerns about possible
7    noncompliance with the special education laws
8    and regulations? And let me be sure you're
9    understanding me, Mr. Strange.
10       A    I'm not.
11       Q    I'm not asking you whether you
12   agreed with her assertions, and I'm not
13   asking you to agree with her assertions. I'm
14   just asking you, right now, is it a fact
15   that, from time to time during her
16   internship, she reported things to you that
17   she said she felt were somehow noncompliant
18   with the special education laws and
19   regulations?
20           MS. HORTBERG: Object to the form.
21       A    She reported that the inclusion
22   strategies were not being followed. She
23   reported that the model, the inclusion model,
24   was not being followed.
25       Q    And tell me, please, sir, what you

20

1        Q    Or who showed it to you?
2        A    No, sir.
3        Q    Was that the only concern of that
4    nature -- and by "that nature," I'm talking
5    about compliance with special education
6    program regulations -- that Mrs. Miller ever
7    expressed to you?
8            MS. HORTBERG: Object to the form.
9        A    Yes, sir.
10           MR. FAULK: May I ask the ground of
11           your objection, please?
12           MS. HORTBERG: I don't know that
13           what you just categorized that
14           is a good categorization of
15           what he just testified to.
16       Q    Did she ever report anything else
17   to you concerning the special education
18   program?
19       A    I just -- I can't remember.
20       Q    Take a look at paragraph 17 of both
21   documents, please, sir. In the complaint, it
22   reads, "Plaintiff reported, among other
23   shortcomings, individualized education
24   programs, IEP's, were being either not
25   prepared, wrongly prepared, or even

fabricated and backdated."

I'm going to stop at the semicolon, and ask you, do you recall any reports that could fairly be describe by that first part of the allegation, 17, that I just read to you?  I'm talking about reports by Mrs. Miller.

A   No, sir.

Q   She never pointed out to you that one or more IEP's had not been prepared?

A   No, sir.

Q   She never pointed out to you that any IEP's had been wrongly prepared?

A   No, sir.

Q   And she never pointed out to you that any had even been fabricated or backdated?

A   No, sir.

Q   In the course of your work as a special education teacher at Houston County High School, did any IEP's that could be fairly described as having simply not been prepared, wrongly prepared, or fabricated or backdated, ever come to your attention through any means?

A   Say that again.

---

22

Q   Okay.  We're talking still about the first part of paragraph 17 of the complaint, and we're talking about -- well, first, let me divert from this just a second. Tell us, please, what your job is?

A   I'm assistant principal at Cottonwood High School.

Q   And are you no longer involved directly in special education?

A   I still attend meetings.

Q   At the time Mrs. Miller was serving her internship at Houston County High School, were you involved in special education?

A   I was.  Yes, sir.

Q   In what capacity?

A   Special ed teacher.

Q   Okay.  And how long had you been a special ed teacher, not just at Houston County High School, but anywhere, approximately?

A   Seven years.

Q   Okay.  Was that all in Houston County?

A   Yes.

Q   And what educational background did

---

1   you have to qualify you as a special ed
2   teacher, please?
3       A   College education.
4       Q   In what field?
5       A   Special ed.
6       Q   That was your major in college?
7       A   One of them.  Yes, sir.
8       Q   And where did you get that degree?
9       A   From Troy.
10      Q   And when did you get it?
11      A   Early 2000.
12      Q   Do you remember approximately what
13  your GPA was?
14      A   No, sir.
15      Q   Did you receive any academic honors
16  at that school in connection with special
17  education?
18      A   No, sir.
19      Q   You were, however, certified at
20  that time as a special education teacher?
21  Correct?
22      A   Yes, sir.
23      Q   And fully qualified, so far as you
24  know and so far as the State of Alabama was
25  concerned, to teach special education?

---

24

1       A   Yes.
2       Q   Tell us, please, sir -- and have I
3   correctly named this thing we've been
4   calling IEP as individualized education
5   program?  Is that the correct name for it?
6       A   Individualized education plan.
7       Q   Plan.  Okay.  So, where we say
8   "program," it should say "plan." Tell us,
9   please, for the Court, what an individualized
10  education plan is?
11      A   It's a plan that's developed for
12  special ed kids.
13      Q   Okay.  And to --
14      A   To help with their education.
15      Q   And you are familiar with those
16  plans and how they are to be prepared, aren't
17  you?
18      A   Yes, sir.
19      Q   And you were at the time Mrs.
20  Miller was an intern, weren't you?
21      A   Yes, sir.
22      Q   Okay.  And your testimony today is
23  that, at the time she was an intern, whether
24  she reported it to you or not, you never saw
25  any instances at Houston County High School

---

where IEP's had simply not been prepared on a given student?

A   Not that I remember.

Q   Obviously, of course, when a child comes in the door the first day, transferring from south Florida, there wouldn't be one, would there, unless they brought it with him?

A   That's true.

Q   And so, obviously, it would have to be prepared. But, what I'm asking you is, you never saw an instance in which one should have, by that point, been prepared, and it had not been?

MS. HORTBERG: I'm going to object to the first part of your statement there. But you can still answer.

A   Not that I remember.

Q   Okay, sir. And is your testimony that you never saw an IEP at Houston County High School that had been somehow wrongly prepared?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

MR. WALDING: Let me add to my

---

objection, I'm not sure that this gentleman can testify whether an IEP was wrongfully prepared.

MR. FAULK: I didn't say "wrongfully."

MR. WALDING: Can I finish?

MR. FAULK: Well, that wasn't the question, but go ahead.

MR. WALDING: It was wrongfully.

MR. FAULK: I said "wrongly," not "wrongfully."

MR. WALDING: All right. Wrongly, having the same import or meaning, Mr. Faulk.

MR. FAULK: Not to me. But, anyway, go ahead.

MR. WALDING: I don't think he can testify that an IEP was wrongly prepared unless he was part of the IEP team. And that is my objection.

Q   (By Mr. Faulk) You can go ahead and answer, please, sir.

A   I don't remember.

---

Q   I want to be sure we're not having any miscommunication. When I say "wrongly prepared," I understand that and I mean for you to understand that as being somehow inadequate. That it's just not done right and needs to be corrected. And you're saying you don't recall any such IEP's while you were at Houston County High School?

MR. WALDING: I object to the form.

Q   Is that correct? If you do, fine. If you don't, fine.

A   I don't remember.

Q   And your testimony is, at the time you were at Houston County High School, you don't have any knowledge of any IEP as having been fabricated? And by "fabricated," I'm using that in a sense that there should have been one on file for several months, and someone says, "Oops, we don't have one. Let's make one up and backdate it." You never saw anything like that?

A   No, sir.

Q   Did you ever see an instance, while Mrs. Miller was there, either through her report or otherwise, of one or more students

---

that had not been switched from a resource room to a full inclusion room, in violation of Houston County Board special education policy?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

A   I don't understand what you're asking.

Q   Okay. Let me divert again a little bit from the question. Is it correct, Mr. Strange, that some time around the summer of 2004, that the Houston County Board of Education made some change of policy to the effect that, in most cases, special education students would be fully included or subject to full inclusion in the academic program at Houston County High School?

MR. WALDING: Object to the form.

A   Ask that again, now.

Q   Okay. I'll try it another way. Does the term "full inclusion" have a special meaning to you in the context of special education?

A   Does it have a special meaning to me?

Q   Yes. Or what does it mean to you, whether it's special or not?

A   Full inclusion would mean in the regular classroom as much as possible.

Q   That is, you would take a student who had been found eligible for special education resources, and he would be included in the normal classroom -- and I hate to say "normal" -- regular classroom, as much as possible?

A   If that was his least restrictive environment.

Q   And do you recall there having been a change of policy by the Houston County Board of Education relating to that subject some time after the end of the 2003-2004 school year?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

MR. FAULK: What's your objection?

MR. WALDING: First, I'm not sure that this man would know that.

MR. FAULK: Well, if he doesn't know, he can say he doesn't know.

MR. WALDING: But, second --

MR. FAULK: What's your objection?

MR. WALDING: Second, there was no such thing. You have a basic misunderstanding of the special education law.

Q   (By Mr. Faulk) Are you aware of any kind of board policy change of that nature that I've described?

A   No, sir.

Q   Are you aware of any sort of policy change during that time frame that would have somehow increased the practice of full inclusion in Houston County?

A   No, sir.

Q   So, when the 2004-2005 school year began, is it your testimony there was nothing new at that school in special education having to do with full inclusion?

MS. HORTBERG: Object to the form.

A   I don't know what you're asking me. I don't know what you're asking.

Q   Okay. You're saying the question doesn't make sense?

A   Yeah. I mean, I don't --

Q   That's fine. You're not going to hurt my feelings. Doesn't matter if you do.

THE WITNESS: Can we take a break?

MR. FAULK: Sure. Do you want to confer with your attorney?

MS. HORTBERG: He just wants to take a break.

THE WITNESS: He's trying to trip me up. He's tricking me. You're trying to do something.

(Recess in deposition.)

(Riley Joe Andrews present.)

Q   (By Mr. Faulk) Mr. Strange, when we took a break, we were on paragraph 17 of the two documents we've been discussing. And we were talking about this general subject. And it may be, as Mr. Walding points out, maybe I just don't know anything about special education law. And if I don't, you know, I'm sorry.

But, is it your testimony that you have no recollection about any change in the full inclusion of special ed students in the Houston County School System in the summer of 2004?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

A   Yeah. I have no recollection.

Q   Okay. And is it also correct that you -- I may be misremembering this. You testified as to your recollection as to what Mrs. Miller told you on that subject? Correct? You've already told us about that?

A   On what subject?

Q   On this thing about full inclusion versus keeping the kids in the resource room. It seems to me I recall --

MS. HORTBERG: I'm sure the transcript will indicate.

Q   Let me ask you --

MR. FAULK: If you don't mind me asking him again, in case he hasn't testified to it.

Q   What do you recall, if anything, about Mrs. Miller telling you about some concern on this subject of full inclusion versus the resource room for students?

A   That the model was not being followed. Yes, sir.

Q   And did you look into that concern

33

at all to see whether it was a valid concern?

A    I did.

Q    And what did you find?

A    That it was being followed properly.

Q    Okay.  In looking into it, what did you do to look into it?

A    I notified Mr. Pitchford.

Q    Then, was your basis for saying it was being properly followed based on information Mr. Pitchford gave you?

A    Yes.

Q    So, she came to you, and you went to Pitchford, and Pitchford got back to you and said, no, it's being followed, or words to that effect?

MS. HORTBERG:  Object to the form.

Q    And don't let me put words in your mouth.  I'm really not trying to trick you or something.  If you want to tell me, then, just in your own words, what happened, I'll be glad to sit here and listen.

MS. HORTBERG:  I object to the form.  I don't understand what question is on the table.

34

MR. FAULK:  All right.  Well, the question on the table was, what was his process of looking into her concerns she expressed, that he told us about.  And then, he said he got his information -- the basis for his opinion that the policy was being followed was information received from Mr. Pitchford.

MS. HORTBERG:  No.  He never used the word "policy."

Q    (By Mr. Faulk)  The model.  Is that what you're saying Mr. Pitchford said was being followed?

A    (No response.)

Q    Well, let me ask it another way.  What did Mr. Pitchford tell you?

MS. HORTBERG:  Object to the form.  If anything.  I don't believe his testimony was that Mr. Pitchford told him anything.

A    No.  He did not come back and tell me that it was being followed.

Q    Okay, sir.  But your testimony is

35

that you, at some point, concluded that it was being followed.  Isn't that what you're telling us?

A    Yes, sir.  I assumed it was being followed.  It was my understanding it was being followed.  Yes, sir.

Q    And so, if I thought you were telling us that you based your opinion on something Mr. Pitchford told you, I would be mistaken?  Is that fair?

A    You're asking me if you're basing your decision on what Mr. Pitchford said?

Q    No, sir.  I want to be sure I'm not misunderstanding you.  A minute ago, I thought you told us that when Mrs. Miller spoke to you about this subject, that you looked into it by contacting Mr. Pitchford, and based on that contact, concluded that the model was being properly followed.

Now, it seems I may have misunderstood your testimony.  And I just want to be sure the record is clear on what your testimony is on this subject.

MS. HORTBERG:  Well, I'm going to object.  I think his testimony

36

is that he answered each question as you asked it to him, and now you're trying to link them all together in some fashion that was not a question to him.

MR. FAULK:  Fine.

Q    Do you understand my question?

A    No.

Q    Okay.  Do you acknowledge that Nancy Miller reported something to you about a concern that she had as to whether the full inclusion model was being followed?

A    Can I go back?

MS. HORTBERG:  Well --

A    Yes, she reported to me that the inclusion model --

Q    Was not being followed somehow?

A    Yes.

Q    Okay.  In what respect was it not being followed, according to Mrs. Miller, whether you agreed with her or not?

A    I don't remember.  It was just --

Q    And then, when she made that report to you, am I correct in thinking that you did

something about looking into it to see
whether she was right or not?

A   No. I did not --

Q   So, if I thought that --

A   I did not look into it to see if it
was right. No.

Q   Did you ever discuss her concern
with Mr. Pitchford?

A   Yes.

Q   Okay. And so, when I say "look
into it," am I just using confusing language?

MS. HORTBERG: Object to the form.

Q   Did you do anything to investigate
her concern other than talk to Mr. Pitchford?

MS. HORTBERG: Object to the form.

A   I can't remember if I did anything
or not. I mean, I --

Q   When you talked to Mr. Pitchford
about this subject, was anyone else present?

A   I can't remember if anyone was
there or not.

Q   Okay. Do you remember where you
talked to him?

A   No. It was at school.

Q   And do you remember when you talked

38

to him?

A   No.

Q   Was this near the beginning of her
internship or toward the end, if you recall?

A   I don't remember.

Q   Okay. And can you tell us, please,
then, what was said in this conversation, as
nearly as you can recall, between you and Mr.
Pitchford on this subject of inclusion?

A   I mean, I don't remember the
conversation that we had. I mean, I don't
know.

Q   Do you remember enough of it that
you are satisfied, as you sit here today,
that Mr. Pitchford was of the opinion that
the inclusion model was being properly
followed?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

Q   If you can answer the question,
fine. If you can't, just tell me.

A   I don't remember.

Q   You don't remember?

A   (Witness shaking head in negative.)

Q   Is it your opinion, as we sit here

---

1   today, that the inclusion model was being
2   properly followed?
3        MR. WALDING: Object to the form.
4   A   Is it my opinion that it was being
5   followed?
6   Q   Yes, sir. As a special education
7   teacher at Houston County Board of Education?
8   A   Yes.
9   Q   Okay. We're still looking at
10  paragraph 17 of the complaint, which is
11  Defendant's Exhibit 5. The next item on here
12  -- and I'm at the top of page four now.
13  These are things that we allege Mrs. Miller
14  reported to you. That eight students had not
15  been --
16        MS. HORTBERG: I --
17        MR. FAULK: I beg your pardon?
18        MS. HORTBERG: I'm going to object.
19            I don't believe it says in here
20            that she reported this to Mr.
21            Strange. It says she reported
22            it. But that is not the
23            wording of paragraph 17, if
24            we're going by your complaint.
25        MR. FAULK: Well, we disagree. If

40

1            you read it in context with
2            paragraph 16 --
3        MS. HORTBERG: We're looking at
4            paragraph 17, according to your
5            questions.
6        MR. FAULK: Fine. I'll ask it
7            another way.
8   Q   Mr. Strange, did Mrs. Miller ever
9   report to you that there were students who
10  had not been given special education history,
11  although their IEP's called for such a
12  course?
13  A   Not that I remember.
14  Q   Do you have any independent
15  knowledge of that situation, whether she
16  reported it to you or not?
17  A   No.
18  Q   Mr. Strange, have you looked at any
19  documents whatsoever to prepare yourself for
20  your deposition today?
21  A   I have.
22  Q   And what did you review in
23  preparation for it?
24  A   What did I review?
25  Q   Yes, sir.

MS. HORTBERG: Do you want to know what these are called?

THE WITNESS: Yes.

(Ms. Hortberg handing documents to the witness.)

A    Defendant Paul Strange's responses to plaintiff's --

Q    Interrogatories?

A    Yes. Interrogatories.

Q    All right, sir. Did you review any other documents in preparation for your deposition today?

A    No.

Q    And I think you've already testified you're not aware of any documents that you have access to that are pertinent to this subject that you've not already turned over to your attorney?

MS. HORTBERG: Object to the form.

MR. FAULK: Okay. Well, we gave a request for production with the notice of deposition. As I understood his testimony, there are no other documents that he's aware of that haven't been

42

turned over for evaluation by you in disclosure. Is that not his testimony?

MR. WALDING: I think she was objecting to the use of the term "subject." If she wasn't, let me do that.

MR. FAULK: On the subject of this case.

MR. WALDING: Well, see, that's clear.

Q    (By Mr. Faulk) In preparation for your deposition, the only document you reviewed was your answers to interrogatories? Correct?

MS. HORTBERG: He's referring to these.

A    Yes.

Q    And you're not aware of the existence of any other documents that are pertinent to this case, that you have, that you haven't already turned over to your attorney?

A    No.

Q    And we've exhausted your knowledge

about any students whose IEP's called for special education history who were not receiving that course? You don't know any more about that?

A    No.

Q    All right. We allege that she reported that two science teachers had requested not to have a special education teacher in their classes, although they both had special education children in their classrooms. Do you see that allegation?

A    Yes, sir.

Q    All right. Tell us what you know about that, please?

A    I don't know anything about it.

Q    No one ever brought that circumstance or anything of that nature to your attention?

A    No.

Q    That at least one special education student with mental retardation had been failed because the teacher declared that the child was, quote, Just lazy and didn't do his work, close quote, despite such teacher's knowledge from the child's file that the

44

child did not have the cognitive skills for the class. Do you have any personal knowledge concerning that allegation?

A    No, sir.

Q    And no one ever reported that to you? Even though you may not have observed it yourself, no one ever reported that circumstance to you?

A    No, sir.

Q    Continuing on the complaint. That there were at least two special education students, one of whom was homebound, for whom there were no IEP's prepared. Did Mrs. Miller ever report that or anything to that effect to you?

A    No, sir.

Q    And did you have any personal knowledge of such a circumstance?

A    No, sir.

Q    That several students had only temporary services sheets, with no current IEP's for the 2004-2005 school year. Were you aware of that circumstance?

A    No, sir.

Q    And Mrs. Miller never reported that

45

circumstance to you?

A    No, sir.

Q    That one teacher prepared an IEP in front of the plaintiff, with no IEP meeting with the student and his parents as required by law. Are you aware of that having occurred?

A    No, sir.

Q    And Mrs. Miller never reported that to you? Is that correct?

A    That's correct.

Q    We had alleged in the complaint that 57 special education students had no IEP's in their files as of August 2004. Is that a correct statement?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

MR. WALDING: That y'all alleged it?

Q    We alleged it. But, I mean, is the statement in the complaint correct?

A    Ask it again.

Q    Do you know whether there were 57 special ed students that had no IEP's in their files as of August 2004?

46

A    Are you asking me were there 57 special ed students with no IEP's?

Q    Yes.

A    No, there were not 57 students.

Q    Okay. Fine. Were there some special education students, to your knowledge, at your school, in August of 2004, who did not have IEP's, who should have had them?

A    I don't remember that.

Q    Do you recall that there were some special education students at your school, that is, Houston County High School, who did not have current IEP's in their files as of August 2004?

A    No, I do not recall that.

Q    Do you recall Mrs. Miller ever reporting anything to that effect to you?

A    No.

Q    And specifically going back to any possible change in the full inclusion expectations, if you will, of the Houston County Board of Education -- well, let me ask you this: If a student at Houston County High School had, for a period of time, simply

47

attended classes in a resource room, if that child were to now be changed to full inclusion, would that necessitate a change in his IEP, in your opinion?

A    I'm trying to make sure I understand you. Now, say that again. What did you say? Repeat it, please.

Q    Okay. Again, I can't claim that my knowledge of special education law is perfect.

A    No. I'm just trying to understand.

Q    But it's my understanding -- well, tell us what your understanding is of the term "resource room" in this context?

MS. HORTBERG: In the context of special education?

MR. FAULK: Right. Yeah.

MS. HORTBERG: At Houston County High School --

MR. FAULK: Yeah.

MS. HORTBERG: -- in the fall of 2004?

MR. FAULK: Yeah.

A    You want to know what a resource room is?

48

Q    Yes, please.

A    It's a classroom where special education students can come in and receive help from the special ed teacher.

Q    Okay. Clear me up on something, please. Are there some students who spend all their school time in the resource room?

MS. HORTBERG: Object to the form. Are you talking about at Houston County High School, in the fall of 2004, that were on Mr. Strange's roll --

MR. FAULK: No.

MS. HORTBERG: -- or in general anywhere in the United States?

Q    Just in general, in your experience. Limiting it to your experience.

A    Are there students that receive -- what do you want to know?

Q    Who spend their entire day, their entire school day, in a resource room, as distinguished from a general education classroom.

A    In the United States?

Q    No, sir. In schools where you have

taught special education.

A   I mean, there may have been. I can't remember.

Q   You don't recall any. Okay. So, is a resource room, then, something that's used periodically during the day for particular special ed students?

MS. HORTBERG: Object to the form.

A   It's used when needed.

Q   Give us, then, please, your best definition, most comprehensive definition, based on your education and experience, of what a resource room is?

MS. HORTBERG: Object to the form.
Asked and answered. He has
already given you his
definition of a resource room.

Q   Well, let him say that. Have you given us your best definition of a resource room?

MS. HORTBERG: Object to the form.

A   Yes, sir.

Q   And if a child is being sent to a resource room, is it fair to say they're not being fully included in the general education

50

program?

MR. WALDING: Object to the form.

MS. HORTBERG: Object to the form.

A   Could you repeat it?

Q   No. What did, to your recollection, this model full inclusion plan or program or whatever it was that you're talking about -- you've talked about a model full inclusion. You've used that term, haven't you?

A   I have used that term.

Q   All right. Did that model include the use of resource rooms?

MS. HORTBERG: Object to the form.

MR. FAULK: On what grounds?

MS. HORTBERG: Well, to the extent
-- are you talking about -- his
testimony has been about Mrs.
Miller's complaint about that
particular topic. And you're
asking about his
understanding or what he
understood Mrs. Miller's
understanding was?

MR. FAULK: I'm asking him about

his understanding, as an
educated special educator, and
an experienced special
educator, about this full
inclusion model that you've
testified about.

MS. HORTBERG: Well, I believe the
testimony was that it was a
concern from Mrs. Miller. It
may not be Mr. Strange's term.

MR. FAULK: That's fine.

Q   Are you now telling us that the only place you ever heard about a full inclusion model was from Mrs. Miller? You didn't mean that, did you?

MS. HORTBERG: Object to the form.

A   Mrs. Miller used the term "inclusion model."

Q   Okay. And is that a term you were unfamiliar with when she used it?

A   I was familiar with the term "inclusion."

Q   But not this business about a model?

A   No, I was not. I mean, no, I was

52

not, about a model. I was not, I mean, inclusion model.

Q   And I want to be sure I'm just not using the wrong terminology and confusing you. Am I to understand that it's your testimony that, by the summer of 2004, there was no special emphasis by the Houston County Board of Education on full inclusion for special education students?

MR. WALDING: Object to the form.

A   I just want to make sure I understand you. What are you asking?

Q   Let me try to go about it another way. Assume, if you will, sir, that a given student has not been tested for special education services, and so far as any of the school faculty know, the child has full learning capabilities. That child would not be sent to a resource room, would he?

A   If he was not in special education, no.

Q   Okay. And because of the apparent confusion about my questions, I'm just going to ask this one more time. Was there a point in time that you recall where the approach,

if you will, of the Houston County Board of
Education with respect to full inclusion
changed?

A    I can't recall that. I mean, I
don't know.

Q    And, specifically, a change toward
emphasizing the usefulness of full inclusion?

A    No. I can't recall that.

Q    Okay. Prior to the fall of 2004,
in your experience, were there some students
in Houston County -- and by that, I mean the
Houston County system -- who were not subject
to full inclusion under their IEP's?

A    Were there students that were not
subject to what?

Q    Full inclusion.

A    Yes, sir, I believe there was.

Q    Okay. I want you to take one such
student, just hypothetically. If that
student was to be changed to full inclusion,
would you agree with me that there should be
a change in his IEP to indicate that?

A    Well, that student would not be
changed, because they attend a different
school.

54

Q    Explain that to me.

A    If they were totally in the
resource room, and not attending any regular
classes, they would be at another school.

Q    But, if such a student was to be
changed to full inclusion, would that not
necessitate a change in that student's IEP?

A    If that student was supposed to be
in the regular classroom the entire day? Is
that what you're asking?

Q    If that's what full inclusion
means, yes.

A    You would have to have a meeting to
change that IEP.

Q    Okay. And who should attend such a
meeting?

A    A special ed teacher, a regular ed
teacher, and an LEA.

Q    What is an LEA?

A    Local education agency. It would
be the person that would oversee it. And a
parent, if they chose to, and anyone else
that was invited.

Q    Okay. And is that the norm, in
your education and experience, for any IEP

1    meeting?
2    A    Yes, sir.
3    Q    Okay. Did Mrs. Miller ever make
4    you aware that one or more school personnel
5    had been ridiculing special education
6    students' hairstyles and appearance?
7    A    No, sir.
8    Q    Never discussed it?
9    A    No, sir.
10    Q    And, in particular, Mrs. Ezell.
11    Was that ever discussed between you and Mrs.
12    Miller?
13    A    No, sir.
14    Q    That staff members had been making
15    up IEP's without the customary meetings
16    needed with the students and their parents.
17    Was that concern ever expressed to you by
18    Mrs. Miller?
19    A    No, sir.
20    Q    Did that circumstance ever come to
21    your attention, independently of Mrs. Miller?
22    A    No, sir.
23    Q    That the plaintiff, that is, Mrs.
24    Miller, had been asked to write IEP's for
25    those students who did not have IEP's and

56

1    then, to backdate such IEP's so the school
2    would appear to be in compliance with the
3    laws governing special education, which she
4    had refused to do. Did Mrs. Miller ever
5    report that circumstance to you?
6    A    No, sir.
7    Q    Did that circumstance ever come to
8    your attention independently of anything Mrs.
9    Miller told you?
10    A    No, sir.
11    Q    Let's look at paragraph 18 of
12    Defendant's Exhibit 5. Do you see where we
13    allege that the plaintiff reported the
14    above-referenced deficiencies to her mentor,
15    Paul Strange? And you deny that? Correct?
16        MS. HORTBERG: Object to the form.
17    Q    Well, do you admit it?
18        MR. WALDING: I think he's already
19            answered that question
20            individually.
21        MS. HORTBERG: Right. On each
22            particular line. You've asked
23            him line by line.
24    Q    Is that your answer? Your lawyer
25    is going to tell me?

MS. HORTBERG: Object.

Q    I just want to be sure.  In other words, Mrs. Miller, if she says she told you any of these things, she's not being truthful?  Is that your testimony?

A    Any of the things that you just asked me?

Q    Yes, sir.

A    Yes.

Q    Did you ever tell her that the illegal IEP's had to be done, and that she would have to sign off on them?

A    No, sir.

Q    And was there anything to that effect ever discussed between you?

A    Not that I recall.

Q    Let's look at paragraph 19 on both documents, please.  She alleges that Mr. Andrews sent an undated letter to Ms. Parris, expressing concerns about the plaintiff.  And in your answer, that sentence is admitted.  Would you agree with that?

MS. HORTBERG:  Object to the form.  Like has already been stated, it's --

58

MR. FAULK:  Fine.  Fine.

Q    She further alleges that, near in time to the Andrews report, Mr. Strange and Mrs. Ezell co-authored a report to Parris regarding asserted deficiencies in plaintiff's performance.  Do you see that allegation?

A    I do.

Q    In your answer, "The defendants deny the other allegations contained in paragraph 19 of the complaint."  Is that your intention to deny that you and Mrs. Ezell co-authored a report to Ms. Parris regarding asserted deficiencies in plaintiff's performance?

MS. HORTBERG:  I'm going to object.  There's a lot of double negatives in that question there.

Q    Are you denying that you and Mrs. Ezell wrote a letter to Ms. Parris about my client?

A    Am I denying that I wrote a letter to Ms. Parris?

Q    Right.

1    A    Yes.

2    Q    Okay.  Look, if you will, please,

3    -- and these should be in order -- at what's

4    previously been admitted as Defendant's

5    Exhibit 18 to Mrs. Miller's deposition.  Do

6    you see that document?

7    A    This one?

8    Q    Yes, sir.

9    A    Yes, sir, I see it.

10    Q    Is that your signature at the

11    bottom of it?

12    A    It is.

13    Q    And is it directed to Pam Parris,

14    Troy University Dothan?

15    A    It is.

16    Q    Now, is that not something you

17    wrote to Ms. Parris?

18    A    No.  I did not write that to Ms.

19    Parris.

20    Q    To your knowledge, did Mrs. Ezell

21    write that to Ms. Parris?

22    A    To my knowledge, she did not write

23    that to Ms. Parris.

24    Q    Did you compose this document?

25    A    And by --

60

1    Q    Well, let me ask you this another

2    way.  Did you participate in the drafting of

3    this document, Defendant's Exhibit 18?

4    A    Yes.

5    Q    All right.  And what did your

6    participation consist of?

7    A    Listing some of these items that's

8    on this page.

9    Q    Okay, sir.  And when you say

10    "listing" them, did you list them in writing?

11    A    I don't remember if I listed them

12    in writing or not.

13    Q    Did you type this document?

14    A    No, I did not.

15    Q    Do you know who did?

16    A    No, I do not.

17    Q    Do you know whether Mrs. Ezell did?

18    A    No, I do not.

19    Q    Did you and Mrs. Ezell discuss the

20    general contents of this document prior to

21    its preparation?

22    A    No.

23    Q    How did your name come to be signed

24    at the foot of the document, other than the

25    fact you signed it?  I mean, did somebody

bring you this document and ask you to sign it, or what happened?

A I mean, I saw the document and signed it.

Q And how did you come to see it?

A I don't remember.

Q Nobody just slipped it under your door or something like that?

A I don't remember.

Q After you signed it, did you give it to somebody?

A Somebody took it.

Q You're under oath? Correct? You understand that?

A Yes, sir.

Q To tell the truth?

A Yes, sir.

Q The whole truth, and nothing but the truth?

A Yes, sir.

Q And you understand this is going to be filed with the court, ultimately?

A Yes, sir.

Q Okay. And your testimony, under oath, is, you don't know who typed this

62

document? You don't know who typed this document?

A No. I don't know who typed that document.

Q You don't know what computer it was prepared on?

A No.

Q At the time Mrs. Miller was at Houston County High School, did you have access to a personal computer with a word processing program?

A I did.

Q Okay. And where was that located?

A Where was it --

Q By that, I mean access to one for your general use. Not just an internet bar or something.

A I had a computer in my room.

Q Okay. And your testimony is you did not type this?

A No.

Q And you don't know who did?

A No.

Q And you don't know who handed you this for you to sign?

1 A No. I don't remember who handed
2 that to me.
3 Q Do you recall whether Mrs. Ezell's
4 signature was already on it when you signed
5 it?
6 A No, sir. I don't recall that.
7 Q Did you read it before you signed
8 it?
9 A Probably.
10 Q And if you had read it, would you
11 agree with me that you would have seen on it
12 that it was directed to Pam Parris, Troy
13 University Dothan?
14 MS. HORTBERG: Object to the form.
15 A Would I have noticed that it was to
16 Pam Parris?
17 Q Yes, sir.
18 A I mean, not necessarily, no.
19 Q But, if you read the entire
20 document, you would necessarily read that,
21 wouldn't you?
22 MS. HORTBERG: Object to the form.
23 A If the entire document would have
24 been read, I would have seen it was directed
25 to Pam Parris. But I might not have read the

64

1 entire document.
2 Q Did you have any authority to use
3 Houston County High School letterhead for
4 other than official school business?
5 A Say that again.
6 Q Did you have any other authority to
7 use Houston County High School letterhead for
8 any purpose other than official school
9 business?
10 A I don't know. I don't know how to
11 answer that question. I'm not sure I know
12 what you're asking.
13 Q What was your purpose or what did
14 you intend to accomplish by putting your
15 signature on this document?
16 A What was I trying to accomplish?
17 Q Yes, sir.
18 A Nothing. I mean --
19 Q Okay. Now, looking back, again, if
20 you would, please -- having reviewed
21 Defendant's Exhibit 18, looking back at
22 Defendant's Exhibit 5, paragraph 19, second
23 sentence, which reads, "Near in time to the
24 Andrews report, Mr. Strange and Mrs. Ezell
25 co-authored a report to Parris regarding

asserted deficiencies in plaintiff's
performance." And in your answer, you deny
that allegation among certain others
contained in paragraph 19 of the complaint.
Do you still deny that allegation?

    MS. HORTBERG: Object to the form.
        Asked and answered.

    MR. FAULK: That's before I showed
        him Defendant's 18.

Q    Having seen Defendant's 18, do you
still deny that you and Mrs. Ezell
co-authored Defendant's Exhibit 18?

    MS. HORTBERG: Object to the form.

A    What do you mean by "co-authored"?

Q    Collaborated somehow in writing
this letter or seeing to it that it was
written.

A    I participated in that.

Q    Okay. Let's look at the nine
numbered allegations in Defendant's Exhibit
18. Is number 1 something that you had
knowledge of, to the effect that she left
school without informing administrative
personnel and didn't return until the next
school day?

---

there more than one incident on which she
left school without, in your view, getting
proper permission or something?

A    Oh, I don't know.

Q    Are you aware of one incident of
that nature?

A    I'm aware of an incident where she
left campus.

Q    And you're not aware of any other
incident that could be described as Mrs.
Miller left the school campus without
informing administrative personnel, are you?
If you are, fine. I just need to know.

A    I don't remember.

Q    Now, you were her -- I believe the
term is cooperating teacher -- is that
correct? -- while she was an intern?

A    I believe that's right. Yes, sir.

Q    And you've sometimes been referred
to as her mentor.

A    Yes, sir.

Q    Would both those terms be basically
interchangeable?

A    I assume, yes.

Q    Now, on the day that you recall her

---

66

A    Did I know she left campus?

Q    Right.

A    Yes. I knew she left campus.

Q    And you would have known that at
the time you signed this letter?

    MS. HORTBERG: Object to the form.

Q    Would you?

A    I assume.

Q    Okay. And as we sit here today,
you do recall the incident, don't you, on
which she left school and went to the central
office one day?

A    I remember her leaving. Yes.

Q    And that's the incident you're
referring to here in paragraph number 1?

    MS. HORTBERG: Object to the form.

Q    Isn't it?

    MS. HORTBERG: He hasn't testified
        that that was anything he was
        referring to. You've asked him
        if he was aware of it.

Q    Well, what incident are you talking
about there in paragraph 1?

A    I didn't put that on there.

Q    Okay. To your understanding, was

---

68

leaving school, do you acknowledge that she
informed you that she was leaving school?

A    She did not tell me she was leaving
school.

Q    How did you know she left school on
that day?

A    When students went to her room and
she was not in there, and we could not find
her.

Q    Okay. That's the first you knew
about it?

A    Yes.

Q    Let's look at number 2. I'm going
to read it. "Mrs. Miller accused Paul
Strange of entering her locked filing cabinet
and placing an IEP in a student folder." Do
you recall that accusation having been made?

A    Yes.

Q    Was it true?

A    No.

Q    Did you write this paragraph? Do
you recall?

A    The general knowledge of it, yes.

Q    Did you report this to someone,
other than to put it in this letter?

69

A    Did I report that to someone?

Q    Yes, sir.

A    It might have been discussed.

Q    I'm going to continue reading. "Mrs. Miller claims it was an IEP written without her knowledge. Mr. Strange and Mrs. Miller had written the IEP in her room approximately one week earlier." Is that last sentence a correct statement?

        MS. HORTBERG: I'm going to object, because there is an actual last sentence in paragraph 2. Are you asking about --

Q    The last sentence I just read. "Mr. Strange and Mrs. Miller had written the IEP in her room approximately one week earlier." Is that a truthful statement, or do you know?

A    We had written what could be placed on that IEP prior to the meeting.

Q    Prior to an IEP meeting?

A    Yes.

Q    Do you recall which student's IEP it was?

A    No, sir.

71

1    Q    -- having occurred?

2    A    Yes.

3    Q    And do you recall Mrs. Ezell having

4    been involved in any way in that incident?

5    A    No.

6    Q    Okay.  Number 3.  "Mrs. Miller has

7    difficulty in communicating with faculty

8    members."  Was that your opinion at the time?

9    A    I did not put that on there.

10   Q    Was that your opinion, though?  Did

11   you hold that opinion at that time?

12   A    I don't remember, at that time.  I

13   don't know.

14   Q    Do you have an opinion on that

15   subject today?

16   A    No.

17   Q    Not one way or the other?

18   A    No.

19   Q    Did she have any difficulty

20   communicating with you?  You're a faculty

21   member, or were.

22   A    Did we communicate?

23   Q    Did she have any difficulty in

24   communicating with you as a faculty member?

25   A    No.

70

Q    It further states, in the same paragraph, "Mrs. Miller stated she had no recollection of that event."  Is that a statement by you, that she had no recollection of the event?

A    Yes.

Q    Paragraph 2 that I've just read over with you and asked you some questions about, so far as you know, should Mrs. Ezell have had any reason to have personal knowledge of that matter?

A    Of paragraph 2?

Q    Right.

A    I don't know.

Q    But you recall an incident of that nature?  Correct?

        MS. HORTBERG:  An incident of the accusation?

        MR. FAULK:  Right.  Yes.

Q    In other words, what you're saying there in your letter --

A    Yes.

Q    -- you recall an incident of that nature --

A    Yes.

72

1    Q    Number 4.  "Mrs. Miller questioned

2    the lawfulness of the school system's

3    inclusion policies."  Was that your belief at

4    the time this letter was signed?

5    A    I did not put that on there.

6    Q    Was that your opinion, though?  Did

7    you hold that opinion?

8    A    She had stated that to me.

9    Q    Do you recall exactly what she told

10   you concerning that?

11   A    No, sir.

12   Q    I'm going to get my testimony.

13   Number 5.  "Some students had requested that

14   Mrs. Miller not be their inclusion teacher."

15   Did you know that to be the case at the time

16   you signed this letter?

17   A    Yes, I did.

18   Q    Okay.  And what was the basis of

19   your knowledge concerning that, please?

20   A    I had some students come to me

21   stating they did not want to go into her

22   room.

23   Q    And if she was being their

24   inclusion teacher, she would have actually

25   been in some other teacher's room, wouldn't

73

she?

    MS. HORTBERG: Object to the form.

A    Could you repeat it?

Q    Okay. If you'd look, please, sir, at number 5, "Some students had requested that Mrs. Miller not be their inclusion teacher." If she's acting as an inclusion teacher, would it be her room or some other teacher's room that she would be in?

A    I assume she could be in both rooms.

Q    And who were these students who came to you to say they didn't like Mrs. Miller being their teacher?

A    I can't remember their names.

Q    Can't remember one?

A    No.

Q    Do you know whether they were special education students?

A    They would have been.

Q    Let me stop you a second and ask you to do something for me. There are a lot of things that you're testifying you don't remember, which implies to me you may have known it at some time and just don't remember

74

it today. And if that turns out to be the case between now and trial, I'm going to ask you to let Ms. Hortberg know that you've remembered these things, so she can let me know. Okay?

A    Sure. Yes, sir.

Q    Number 6. "Classroom teachers reported that Mrs. Miller has been upset and crying during class time." Did I read that correctly? "Classroom teachers reported that Mrs. Miller has been upset and crying during class time." Did any classroom teachers report that to you?

A    I can't remember if they reported that to me or not. I mean --

Q    Did you ever observe that behavior yourself?

A    Mrs. Miller crying?

Q    Upset and crying during class time.

A    She cried in my room.

Q    And were y'all alone at the time?

A    Yes.

Q    Tell us about that, please, the circumstances that were going on connected with her crying?

75

1    A    One morning she came into the room

2  crying, upset.

3    Q    Did you ask her why?

4    A    I did. But I don't remember what

5  the response was.

6    Q    Do you remember whether you had an

7  opinion at the time as to whether her mood

8  had some reasonable basis?

9    MS. HORTBERG: Object to the form.

10    Or was she just being a silly woman

11  or something?

12    MS. HORTBERG: Object to the form.

13    A    Something was upsetting her.

14    Q    You don't recall what, and you

15  don't recall whether you felt like her

16  behavior was reasonable or unreasonable?

17    A    No. I just know she was crying.

18    Q    "Office staff members reported that

19  Mrs. Miller was upset and crying in the

20  office lobby during school hours." Did any

21  office staff members report that occurrence

22  to you?

23    A    No.

24    Q    Did you ever observe such an

25  occurrence?

76

1    A    No.

2    Q    Number 8. "Not following

3  suggestions provided by Mr. Strange as

4  related to the resource room." Do you recall

5  whether you added that statement to this

6  letter?

7    A    I did.

8    Q    Okay. And tell us what the basis

9  for the statement is, please, the factual

10  basis?

11    A    Mrs. Miller came to me stating that

12  the students in biology class was having a

13  difficult time taking in the material, was

14  having a hard time in class. She felt that

15  they were not learning as well as could be.

16  So, I told her that if she felt the teacher's

17  way, then, when the teacher's lesson was

18  over, that we had some AGS books that she

19  could go to and pull references and take them

20  to the resource room, so that they could get

21  their help. And she refused to do so.

22    Q    Yes, sir. Tell us what AGS means,

23  please?

24    A    It's a book company that produces

25  books for -- that's used by special ed kids.

Q   Is that something that would be available there locally in the school?

A   Yes.

Q   Any other suggestions that you say she did not follow concerning the resource room?

A   No. That was what was meant by that.

Q   Let me ask you about suggestions in general by you, not limited to paragraph 8 of this letter. Were there other suggestions you made to her that you felt she did not adequately follow?

A   I just don't -- I don't recall that.

Q   In your letter here, you say didn't follow -- not following suggestions. In your testimony, you said she refused to follow it. Did you, in fact, tell you, "I'm not going to do that," or anything to that effect, or is your letter correct in that she didn't follow up on the suggestion, she didn't follow the suggestion?

MS. HORTBERG: Object to the form.

A   Could you restate that?

---

78

Q   Well, what I'm trying to get at, is, you characterized this, first of all, as a suggestion? Correct?

MS. HORTBERG: Object to the form. He's already testified he did not type this letter.

MR. FAULK: All right. Fine.

Q   You signed your name to it? Correct?

A   I signed my name to it.

Q   And by signing your name, is it fair for us to understand that it was your intention to adopt this letter as your own?

MS. HORTBERG: Object to the form.

A   To adopt it as my own?

Q   Right.

A   What do you mean?

Q   Well, I mean, are you vouching for the accuracy of this letter when you sign your name to it? Was that your intention?

A   Yes.

Q   Okay. Before you signed your name, were you given a draft of this that you made any revisions on or ask that anything be changed before you signed it?

---

1   A   Oh, I don't remember.

2   Q   Now, in this letter, in paragraph

3   8, you characterize what you told Mrs. Miller

4   about the biology books as being a

5   suggestion? Correct?

6   A   (No response.)

7   Q   Isn't that what it says?

8   A   That's what it says.

9   Q   Now, in your testimony, you said

10  she refused to do what you told her about the

11  biology books.

12      MS. HORTBERG: Object to the form.

13  Q   Do you remember that?

14  A   I remember that.

15  Q   Now, was this a suggestion, or was

16  it a direct order?

17  A   I told -- I asked Mrs. Miller to

18  take them out. She did not. And then, I

19  told her to, and she did not, also.

20  Q   So, you told her to do it, and she

21  didn't do it. Was there ever any verbal

22  statement to you, by her, of, "I'm not going

23  to do that," or words to that effect?

24  A   No. She did not say, "I'm not

25  going to do that."

---

80

1   Q   So, you suggested that it be done,

2   and it wasn't done, and that's the extent of

3   your knowledge on it?

4       MS. HORTBERG: Object to the form.

5   Q   Question mark.

6   A   Yes.

7   Q   Number 9. "Mrs. Miller told a

8   classroom teacher, quote, I don't like being

9   here any more than you do, but I have to be

10  in here a certain number of hours, close

11  quote. This is in response to the classroom

12  teacher telling her that she could leave the

13  room because the lesson was over. Mrs.

14  Miller said this in front of the students in

15  the class."

16      Did you, at the time you signed this,

17  have any personal knowledge of that

18  occurrence?

19  A   I did not put that on there.

20  Q   Had anyone told you about such an

21  occurrence prior to your signing it?

22  A   Yes.

23  Q   And who told you about it?

24  A   Mrs. Ezell.

25  Q   Was it your understanding that Mrs.

81

1  Ezell was the classroom teacher mentioned in
2  paragraph 9?
3      A    Yes.
           MS. HORTBERG:  I think that's a
       good stopping point.  We've
       been going about an hour.
       (Recess from 11:05 to 11:20.)
       (Riley Joe Andrews no longer
       present.)
10     Q    Mr. Strange, let's look at
11  paragraph 22 of the complaint and your
12  answer.  Do you have it there?  Before we do
13  that, let me go back to Defendant's Exhibit
14  18 just a minute, the letter there from you
15  and Mrs. Ezell.  Concerning number 8, which
16  you testified had to do with some biology
17  students and a situation, whose biology class
18  was involved in that?
19     A    Mrs. Ezell.
20     Q    Looking at paragraphs 22 in the two
21  documents, the complaint and the answer, an
22  incident that's alleged to have occurred on
23  October 20th, that concerns a letter dated
24  October the 19th being hand delivered to the
25  plaintiff at the school, do you see where I'm

82

1  looking at?  And the plaintiff being escorted
2  off campus.  Do you see the paragraph I'm
3  referring to?
4      A    What number are you talking about?
5      Q    In the complaint, Defendant's
6  Exhibit 5, we're talking about page five,
7  paragraph 22, going over to the next page.
8  And on the answer, Plaintiff's Exhibit 1,
9  we're looking at page four, paragraph 22.
10  Have you had a chance to read those?
11     A    Yes, sir.
           MS. HORTBERG:  Wait.  You haven't
       had a chance to read the
       answer.
15     A    Okay.  I read -- (Witness reviewing
16  document.)
17     Q    Okay.  In particular regard to
18  paragraph 22 of the answer, were you present
19  during any part of the occurrence described
20  there, where Mr. Lord hand delivered a letter
21  to her on October the 20th, and she was
22  escorted off campus?  Did you witness that
23  personally?
24     A    I don't remember if Mr. Lord -- if
25  I watched Mr. Lord hand deliver it, but I do

83

1  remember her being -- I do remember her
2  leaving campus.
3      Q    Do you have any recollection of an
4  escort accompanying her, in the sense of
5  being taken off campus by someone?
6      A    No.  She wasn't taken off campus by
7  anyone.
8      Q    So, in the answer, then, where your
9  then attorneys alleged that she was escorted
10  off campus when she refused to leave, you
11  don't know anything about that?
12     A    I do.
13     Q    You do?  Tell us what you do know?
14     A    I went with Mrs. Miller and helped
15  her, assisted her, in gathering her stuff,
16  and provided -- I helped her take her stuff
17  out to her car.
18     Q    Did anyone else accompany you and
19  Mrs. Miller on that occasion?
20     A    No.
21     Q    Okay.  So, if there was any escort,
22  it would have been you?
23     A    I didn't escort her.
24     Q    You didn't view it as being
25  escorting her?  You were just helping her

84

1  take things to her car?
2      A    I was helping her get her things to
3  her car.
4      Q    Do you recall her actually refusing
5  to leave after being given the letter by Mr.
6  Lord?
7      A    No.  I don't recall that.
8      Q    Okay.  Good.  That went smoothly.
9  Let's look at paragraph 23.  Mr. Strange,
10  certain of the terms in paragraph 23 are what
11  I regard primarily as legal terms.  And it
12  may be that your response here is necessarily
13  a lawyer response.
14     Do you have any personal knowledge about
15  what we mean by people acting under color of
16  state law, policy, practice or custom --
17           MS. HORTBERG:  Object to the form.
18     Q    -- in the context of this
19  situation?
20           MS. HORTBERG:  Same objection.
21     Q    I mean, does that have any meaning
22  for you?
23           MS. HORTBERG:  Object to the form.
24     Q    If it doesn't, that's fine.  This
25  isn't a bar exam for you or something.  Do

85

```
    you know what I'm talking about?
         MS. HORTBERG:  Object to the form.
    A    No.  I don't know what you're
talking about.
    Q    Do you have any special knowledge,
Mr. Strange, as to whether any particular
speech is protected by the First Amendment or
not?
         MS. HORTBERG:  Object to the form.
    Q    Do you have any special legal
knowledge about freedom of speech and the
First Amendment?
         MS. HORTBERG:  Object to the form.
    Q    Again, I'm not trying to give you a
bar exam.  I just don't want to waste time
talking about something that's outside the
scope of your knowledge.
    A    I'm not sure what you're asking.
But, no, I don't have any special knowledge.
    Q    You haven't had any special courses
or anything on constitutional law or free
speech or anything like that?
    A    I have not taken a course on free
speech.
    Q    Okay.  Fine.  And you've told us
```

86

```
    everything at this point that you can
remember Mrs. Miller complaining to you about
concerning the special education program at
your school?
    A    Yes.
    Q    Let me ask you to look at page
seven of your answer, Plaintiff's Exhibit 1.
         MS. HORTBERG:  Are you done with
              the complaint?
         MR. FAULK:  Right.
    Q    Let me back up.  Concerning
Plaintiff's Exhibit 18, first, did you not
believe, at the time you signed this, that
this letter could adversely affect Mrs.
Miller's standing as an intern with Troy?
         MS. HORTBERG:  Object to the form.
    A    One more time.  Say it again.
    Q    Did you not understand, at the time
that you signed this letter, that it could
adversely affect Mrs. Miller's standing as an
intern with Troy University?
         MS. HORTBERG:  Object to the form,
              again, just because there's a
              double negative there at the
              beginning, did you not
```

87

```
1    understand that it could
2    adversely affect her.  I don't
3    know how you could properly
4    answer that question.
5         MR. FAULK:  It's not a double
6         negative.
7    Q    Go ahead.
8    A    Would you --
9    A    All right.  Fine.  Did you
10   understand, when you signed this letter, that
11   it could adversely affect her standing as an
12   intern?
13   A    If you're asking me if I thought
14   that was going to affect her internship --
15   Q    Right.
16   A    -- the answer is no.
17   Q    Was your intention, in signing this
18   letter, to get rid of Mrs. Miller as an
19   intern?
20   A    No.
21   Q    Was it your impression that this
22   letter would help her somehow?
23   A    Possibly.
24   Q    In what way?
25   A    By listing my concerns, someone
```

88

```
1    would talk with her, and the concerns would
2    be concerns no more.
3    Q    And was that a thought in your head
4    at the time?  Was that your intention in
5    signing this?
6    A    My intention was to list my
7    concerns at the time.
8    Q    Period?
9    A    Yes.
10   Q    And that was your purpose in
11   signing this?
12   A    Yes.
13   Q    Did you send Mrs. Miller a copy of
14   this?
15   A    No.
16   Q    I'm sorry.  I said page seven.  I
17   meant page six in the answer, which is
18   Plaintiff's Exhibit 1, in particular, the
19   third affirmative defense, subparagraph (b).
20   The last sentence of that subparagraph.  And
21   I'll read it.  Do you see where it says, "Any
22   statements made by the plaintiff"?
23   A    Yes.
24   Q    "Any statements made by the
25   plaintiff regarding the special education
```

programs at Houston County High School to
administrators and other teachers were
pursuant to her official duties as a teaching
intern." Do you see all that?

A    I do.

Q    Is that your opinion? Is that your
personal opinion?

        MS. HORTBERG:  Object to the form.
            As we've already stated and
            gone over, this is an answer
            that was prepared by attorneys.
            It was not signed by Mr.
            Strange.

    MR. FAULK:  That's fine.

Q    But, do you share that opinion, Mr.
Strange?

        MS. HORTBERG:  That legal opinion?

Q    That it had to do with her official
duties. Did you regard her actions in
speaking to you and other administrators and
teachers in the school that whatever she said
was done pursuant to her official duties as a
teaching intern? Is that your opinion or
not?

A    I mean, I'm not sure what you're

---

90

asking me.

Q    I'm asking, do you view that
statement as being a factually correct
statement?

        MS. HORTBERG:  Same objection.

A    I don't know.

Q    You don't have an opinion on that
subject, or you don't know whether it's
accurate, or --

        MS. HORTBERG:  Object to the form.

A    I don't have an opinion.

Q    Okay. Turn over to page seven,
please, if you haven't already. Subparagraph
(d) of the third defense. It is alleged
there -- and before we get into any
objections, I understand you did not draft
this document. That's correct? Right? The
lawyers did it for you?

A    Yes.

Q    Nevertheless, I need to ask you, in
regard to part (d), do you have any
understanding, as we sit here today, of the
actual basis upon which Mrs. Miller's
employment was terminated in the Houston
County Board of Education?

---

1    A    No.

2    Q    You do not know the official basis
3    for the termination of her employment?

4    A    No.

5    Q    The subject has come up, Mr.
6    Strange, as you may have heard in the prior
7    depositions, about the status of Mrs.
8    Miller's teaching certificate at the time she
9    was interning. Do you have any personal
10   knowledge about that?

11   A    No.

12   Q    Are you aware of any instances
13   during your tenure in the Houston County
14   School System of any teacher or teachers
15   having been allowed to teach based on some
16   type of provisional or emergency teaching
17   certificate, who were not regularly
18   certified?

19   A    I don't know that.

20   Q    Did you, at any time in your own
21   experience, ever teach on anything other than
22   a regularly issued certificate?

23       MS. HORTBERG:  Object to the form.

24   Q    Have you ever taught under an
25   emergency certificate --

---

92

1    A    No.

2    Q    -- or any type of provisional
3    certificate?

4    A    No.

5        MS. HORTBERG:  Are we done with the
6            answer?

7        MR. FAULK:  As far as I know. And
8            the complaint, for that matter.

9    Q    How old are you, Mr. Strange?

10   A    Thirty-seven.

11   Q    Who is Judy Fowler?

12   A    She's my principal at Cottonwood
13   High School.

14   Q    That's where you are now?

15   A    Yes, sir.

16   Q    Had you ever been supervised by Ms.
17   Fowler before this year?

18   A    Yes, sir.

19   Q    Whereabouts?

20   A    Cottonwood High School.

21   Q    When did you work at Cottonwood
22   High School before?

23   A    That's where I'm working now.

24   Q    But I mean before now. Had you
25   ever been supervised by Ms. Fowler anywhere

---

before this year, before this school year?

    A    Yes, sir.

    Q    And that's at Cottonwood High School?

    A    Yes, sir.

    Q    And prior to this year, when did you teach at Cottonwood High School?

    A    Last year. I mean, I don't --

    Q    Is this your second year at Cottonwood?

    A    This is my -- this will be my third full year at Cottonwood.

    Q    And how many full academic years were you employed at Houston County High School?

    A    I was not employed a full academic year at Houston County High School.

    Q    So, what was your tenure there, please?

    A    At Houston County High School?

    Q    Right.

    A    August or July of 2004 to January 2005.

    Q    Okay. And what was the occasion for your being transferred? What led to your

---

transfer?

    A    Assistant principal at Cottonwood.

    Q    And that was a promotion?

    A    Yes, sir.

    Q    Do you teach any courses now?

    A    No, sir.

    Q    Who is James Johnson, please?

    A    He was my principal at Wicksburg.

    Q    That's before you came to Houston County High School?

    A    It is.

    Q    And who is James Murray?

    A    He was also my principal at Wicksburg.

    Q    Tell us, please, what your general duties are as assistant principal, other than to assist the principal. I mean, do you have, like, a specific job description that's applicable to you in particular?

    A    No, sir.

    Q    What about when you were a special education teacher? Did you have a written job discrimination?

    A    I had a contract. Is that what you're asking?

---

    Q    Would it have been any different than the form contract that any teacher signs, other than it had your name on it and the position on it?

    A    No.

    Q    You're not aware, then, of the existence of any written job description for special education teachers in the Houston County system? Is that fair to say?

    A    Not that I recall.

    Q    Okay. With respect to your education, in your answers to interrogatories, number 5, you refer to Troy University Alternative A Program, master's degree in special education. What does Alternative A mean, please?

    A    I entered the master's program, and when I graduated, I had a master's degree. That's the Alternative A.

    Q    But your bachelor's was in business administration from Auburn?

    A    That's right.

    Q    When you talked earlier about having had a college degree in special education, you're referring to your master's

---

degree?

    A    Yes, sir.

    Q    And there's a Troy State Dothan, an education leadership degree in administration. Is that an additional master's degree, or how is that --

    A    It's just an educational leadership degree.

    Q    Is that on a graduate level or what?

    A    Yes.

    Q    Does it lead to any particular certification in education?

    A    To become an administrator.

    Q    So far as you know, are you a party to any sort of joint defense agreement in this case? Does that term mean anything to you?

    A    No, sir. Could you explain it?

    Q    Any sort of agreement between your attorneys to cooperate with each other in connection with this case.

    A    No.

    Q    You're not aware of it, if it exists?

97

```
A    No.
Q    Have there been occasions on which
you have been personally present in meetings
between yourself and other co-defendants
having to do with this case?
        MS. HORTBERG: I'm going to object
        to the form. I'm going to
        object to anything that is
        attorney/client privileged.
    MR. FAULK: I didn't ask him what
    was said.
Q    I'm just asking, have you been
present in meetings with other defendants in
this case, concerning this case?
        MS. HORTBERG: Certainly, he --
        well, I object to anything that
        is attorney/client privileged.
        If there was a meeting between
        you and me or Mark Boardman and
        you, that is attorney/client
        privileged.
    MR. FAULK: That's not my question.
    MR. WALDING: And so he
    understands, if there was a
    meeting where I was present or
```

98

```
    Jere Segrest or Patrick Moody
    were present, that would also
    be attorney/client privilege.
MR. FAULK: Do you continue to
    represent him?
MR. WALDING: My understanding is
    that we represent all
    defendants in this case. Yes,
    sir.
MR. FAULK: And you represent Mrs.
    Ezell and Mr. Strange?
MS. HORTBERG: Mark Boardman and I
    do. Yes.
MR. FAULK: In conjunction with the
    Hardwick firm?
MS. HORTBERG: Yes.
Q    (By Mr. Faulk) All right, sir.
I'm not asking you what was said. I'm asking
you, have you ever been present at any
meetings, with or without attorneys, with
other co-defendants in this case, in which
the general subject matter of this case was
discussed?
A    No.
Q    That's easy enough. Prior to this
```

99

```
1    case having been filed -- Mr. Strange, if I
2    could get your attention. Prior to the case
3    being filed, in fact, prior to Mrs. Miller
4    leaving Houston County High School's
5    employment, were you a party to any meetings
6    with school administrators concerning what
7    should be done about Mrs. Miller?
8            MR. WALDING: Object to the form.
9            MS. HORTBERG: Object. Same
10                objection.
11    A    I don't understand what you're
12    asking.
13    Q    Okay. Were you ever party to any
14    meetings with Mr. Pitchford concerning Mrs.
15    Miller?
16    A    Yes.
17    Q    Do you know how many?
18    A    No, sir.
19    Q    Can you tell us what they
20    concerned?
21    A    Some of the concerns that were
22    listed on that piece of paper that we went
23    over a little while ago.
24    Q    The concerns in Defendant's Exhibit
25    18, the letter signed by you and Mrs. Ezell?
```

100

```
1    A    Yes.
2    Q    When did that meeting or meetings
3    occur, if you recall?
4    A    I do not recall that.
5    Q    Was it prior to Mrs. Miller leaving
6    the school's employment? Before she was let
7    go?
8    A    The meeting between me and Mr.
9    Pitchford?
10    Q    Right.
11    A    Yes.
12    Q    Do you remember which of these
13    items 1 through 9 you and Mr. Pitchford
14    specifically discussed?
15    A    No, sir, not specifically.
16    Q    Did you ever meet with Mr. Andrews
17    concerning any of these concerns about Mrs.
18    Miller?
19    A    I don't remember if I met with Mr.
20    Andrews or not.
21    Q    What about Mr. Lord?
22    A    I don't remember if I met with Mr.
23    Lord or not.
24    Q    Do you recall Mr. Stephens being
25    employed at the school?
```

101

A    Scott Stephens?    Yes, sir.

Q    What was his capacity at the school?

A    He was assistant principal.

Q    Do you recall any meetings involving Mr. Stephens that concerned Mrs. Miller and these concerns, the concerns you've listed in the letter?

A    No, sir.

Q    Or other concerns about Mrs. Miller, for that matter?

A    No, sir.

Q    So far as you know, have any written statements been taken from witnesses who are not defendants in connection with this case?

A    I don't know that.

Q    Or tape recorded or video recorded statements, to your knowledge?

A    I don't know that.

Q    What was Cathy Keasler's position at Houston County High School?

A    She was counselor.

Q    Starla Smith?

A    She was a psychometrist.

102

Q    And Lisa Towns?

A    She wasn't at Houston County, though.    She was psychometrist for the county.

Q    Starla Smith?

A    Uh-huh.

Q    What was Lisa Towns' capacity?

A    Math teacher.

Q    At Houston County High School.    All right.    Was there a Ms. Monday?

A    Yes.

Q    What was her first name?

A    I don't remember her first name.

Q    During your time in Houston County, have you ever had any other occasion on which to mentor or serve as a cooperating teacher for an intern?

A    No, sir.

Q    During your tenure with Houston County School System, not just the high school, are you aware of anyone else's internship having been withdrawn?

A    I don't know.

Q    Beg your pardon?

A    I don't know that.    I mean, I don't

103

know.

Q    You haven't heard of that?

A    I don't know.

Q    You don't know.    But, have you ever heard of that?    Has anyone ever told you that?    I understand you're saying you don't have any personal knowledge of it.    But, has anyone else ever told you about any other intern's internship being withdrawn or terminated?

A    I don't know if I've heard that or not.    I mean, I don't know.

Q    Okay.    Fine.    In your interrogatory answer number 14 about organizations that you belong to, you list, in addition to a couple of churches, the Alabama Education Association, the National Education Association, and something called CLAS, all caps.    What is that last thing an acronym for?

A    It's for school administrators.

Q    And when did you become a member of that?

A    A couple of years ago.

Q    Have you made any inquiry of that

104

organization as to whether there is insurance coverage available to you through that organization in connection with this case?

MS. HORTBERG:    Object to the form.

Q    Have you asked?    That's all I'm asking.

MS. HORTBERG:    Object to the form.

Q    Have you checked into whether they would afford you any insurance coverage?

MS. HORTBERG:    Same objection.

A    Have I asked them what?

Q    Have you checked with that organization to find out whether they will afford you any type of insurance coverage that would be applicable to this case?

MS. HORTBERG:    Object to the form.

MR. FAULK:    What's your objection?
      State a legal objection, so I
      can rephrase my question, if
      necessary.

MS. HORTBERG:    As to whether he has
      insurance coverage underneath
      CLAS.

MR. FAULK:    It's a federal case, of
      course, where it's supposed to

105

1    be voluntarily disclosed.  I
2    mean, that, in itself, is not
3    objectionable.  I'm just asking
4    him has he inquired about the
5    availability of it, and you're
6    objecting to the form.  And I'm
7    asking you what the legal
8    objection is, so if I've
9    committed an error, I can
10   revise it here on the record.
11       MS. HORTBERG:  He can still answer
12   your question.
13       MR. FAULK:  Well, I'm asking you
14   what the basis for your
15   objection to form is.
16       MS. HORTBERG:  And I've stated it.
17   If you would like to restate
18   your question --
19       MR. FAULK:  Is it has to do with
20   insurance.  Okay.
21    Q    Have you asked about the
22   availability of insurance through the CLAS
23   organization that would be applicable to this
24   case?
25    A    No, sir, I don't believe I have.

106

1    Q    Would you please contact a
2    representative of that organization and make
3    an inquiry and let your lawyer know whether
4    there is additional insurance available to
5    you through that organization, please?  Will
6    you do that?
7    A    I don't know.
8    Q    I will voluntarily tell you that
9    every defendant in this case, including you,
10   has a duty, under the federal rules of
11   disclosure, to disclose any applicable
12   insurance coverage.
13       I'll also tell you that, in other cases,
14   I have seen where CLAS had group liability
15   insurance available.  It might or might not
16   still have it.  It might or might not help
17   you in this case.  I'm just asking you to
18   inquire into it and let your lawyer know.  Do
19   you have any problem with that?
20   A    I'll talk to her.
21       MR. FAULK:  Do you have any problem
22   with him doing it?
23       MS. HORTBERG:  I know the answer.
24   But, that's fine.  If you would
25   like him to make that inquiry

107

1    and tell us, that would be
2    fine.
3        MR. FAULK:  Thank you.
4    Q    Have you ever had any occasion to
5    appear before the Houston County Board of
6    Education on any matter having to do with
7    your duties as a special education teacher in
8    Houston County?
9    A    No, sir.
10   Q    You have listed in your
11   interrogatory answers, number 18,
12   specifically, some surnames or last names of
13   people, I guess, who are kin to you in
14   Houston County.  Is that what that's intended
15   to convey?
16   A    Yes, sir.
17   Q    Your name, obviously, is Strange.
18   Did you grow up in Houston County?
19   A    I did.
20   Q    And where does the Crawford name
21   come from?  How is that connected to you?
22   A    My mother.
23   Q    Your mother was a Crawford?
24   A    She was a Tyson, but her mother was
25   a Crawford.

108

1    Q    And Brannon.  What's the connection
2    there?
3    A    That's my wife's maiden name.
4    Q    What's her first name?
5    A    My wife?
6    Q    Huh?
7    A    My wife?
8    Q    Yes.
9    A    Kelly.
10   Q    Kelly.  And what are her parents'
11   names?  Are they living?
12   A    Uh-huh.  James and June.
13   Q    And they live in Houston County?
14   A    Yes, sir.
15   Q    And what's the Mixon connection?
16   A    That's my wife's mother's maiden
17   name.  My mother-in-law's maiden name.
18   Q    Are her parents living?
19   A    Yes.
20   Q    What are their names?
21   A    Bennie Joe and Lula.
22   Q    Did I ask you your wife's parents'
23   names, first names?
24   A    James and June.
25   Q    What's the Etheredge connection?

109

| | | |
|---|---|---|
| 1 | A | That's my mother's name now. |
| 2 | Q | Is she currently married? |
| 3 | A | She is. |
| 4 | Q | What is her husband's name? |
| 5 | A | David. |
| 6 | Q | Where does he work? |
| 7 | A | He doesn't. |
| 8 | Q | Are any of these other people you |

just mentioned currently employed?  That

would be --

11    A    Any of the people you just asked

me?

13    Q    Yeah.  Your mother, is she living?

14    A    She is.

15    Q    And is she employed?

16    A    No, sir.

17    Q    Is she retired?

18    A    She is.

19    Q    Where did she retire from?

20    A    State Farm Insurance.

21    Q    How long ago?

22    A    Three or four years.

23    Q    And the Tyson connection, where are

they employed?

25    A    You didn't ask me about Tysons.

110

1    Q    What is the Tyson connection?

2    A    That's my granddaddy on my mother's

side.

4    Q    Is he still employed?

5    A    He's dead.

6    Q    I'm sorry.  And the Brannons, where

are they employed?

8    A    Which one?

9    Q    Well --

10    A    James?

11    Q    Refresh my memory.  That's your

wife's parents?

13    A    That's my wife's parents.  Yes.

14    Q    Okay.  Are they currently employed?

15    A    Yes.

16    Q    All right.  Tell us where they are,

please?

18    A    James is at Polyengineering.  June

is at Rehobeth.

20    Q    School?

21    A    Yes.

22    Q    The Mixon connection -- I'm sorry.

I can't keep track of it all in my head.

24    A    That's my wife's grandparents.

25    Q    Are they living?

111

1    A    Yes.

2    Q    Are they employed?

3    A    No.

4    Q    How recently did they retire?  The

past ten years?

6    A    She's never worked.

7    Q    Where did he work?

8    A    He was a farmer.

9    Q    Did we talk about the Etheredge

employment?  Where is he employed?

11    A    He's not.  I mean, I can't

remember, either, if you can't.

13    Q    Is he retired?

14    A    He is.

15    Q    From where?

16    A    He was a meat cutter at a grocery

store.

18    Q    Do you know which one?  Here in

town?

20    A    No.

21    Q    Whereabouts?

22    A    I think it was in Dale County.  He

was retired before they married.

24    Q    Look at the next to the last page

in that stack I handed you.  It's Defendant's

112

1    Exhibit 30, which is a memorandum of some

2    sort dated September 30, 2004.  Says "Nancy

3    Miller professional comments."  Do you know

4    anything, Mr. Strange, about the genesis or

5    origin of this document?

6    A    No.

7    Q    Do you know who prepared it?

8    A    No, sir.

9    Q    Do you know why it was prepared?

10    A    No, sir.

11    Q    Or when?

12    A    No, sir.

13    Q    Do you see the section entitled

14    "Mr. Tim Pitchford"?

15    A    Yes, sir.

16    Q    Are you familiar with this

17    document?  Have you seen it before?

18    A    Yes, sir.

19    Q    Take a moment just to look over it

20    and refresh your memory about it, and tell me

21    when you've had a chance to read over it,

22    please?

23    A    (Witness reviewing document.)

24    Okay.

25    Q    Okay.  The first entry under "Tim

113

1  Pitchford" reads "Unprofessional behavior -
2  leaving campus."  We've already talked about
3  that, I think, haven't we?
4      A    Yes, sir.
5      Q    As far as you know?
6      A    Yes, sir.
7      Q    And "Negative comments made to
8  cooperating teacher."  Do you know what
9  negative -- you're the cooperating teacher?
10  Right?
11     A    Yes.
12     Q    Is there anybody else who would be
13  considered her cooperating teacher, to your
14  knowledge?
15     A    Not while she was at Houston
16  County.
17     Q    Okay.  "Negative comments made to
18  cooperating teacher."  Do you know what Mr.
19  Pitchford is talking about there, assuming he
20  made that statement?
21     A    No, sir.
22     Q    Do you recall ever having informed
23  Mr. Pitchford of any negative comments made
24  to you by Mrs. Miller?
25     A    I can't remember if I did or not.

114

1      Q    Do you recall her making any
2  negative comments to you?
3      A    I can't recall at this time.  I
4  mean --
5      Q    That's your best answer right now?
6           MS. HORTBERG:  Object to the form.
7           MR. FAULK:  He didn't sound like he
8                was finished.  If he's
9                finished, that's fine.
10     A    I'm finished.
11     Q    The second statement, quote,
12  Causing anxiety among teachers, close quote.
13  "Three teachers had met with him," presumably
14  Pitchford, "expressing concerns."  Do you
15  have any knowledge of that?
16     A    No.
17     Q    The basis for that statement?
18     A    No.
19     Q    Quote, Not following directions
20  from the cooperating teacher.  What knowledge
21  do you have of that, that you haven't already
22  told us about?
23     A    None that I haven't already told
24  you about.
25     Q    Okay.  "Crying in the classroom."

115

1  Do you have any knowledge of that you haven't
2  already told us about?
3      A    Not that I haven't told you about.
4      Q    In the subcaption, "Mr. Paul
5  Strange, cooperating teacher."  Whoever
6  drafted this uses some quote marks here and
7  there.  "Professional behavior not very good
8  of late."  Do you ever recall making that
9  statement to anybody in connection with Mrs.
10  Miller?
11     A    I don't recall it.
12     Q    Do you recall having made any
13  statement substantially to that effect
14  concerning Mrs. Miller --
15     A    No.
16     Q    -- to anybody?  Not to anybody?
17     A    No.
18     Q    This is not in quotes.  "Telling
19  other teachers that he is out to get her."
20  Did anything like that ever come to your
21  attention?
22     A    No.
23     Q    Did you ever tell anyone that she
24  had been telling other teachers that you were
25  out to get her?

116

1           MS. HORTBERG:  Object to the form,
2                just because I lost you there.
3                I'm sorry.
4      A    I don't know.  What --
5      Q    The statement is apparently
6  attributed to you, not in quotations, but
7  under your name, that Mrs. Miller has been
8  telling other teachers that you were out to
9  get her.  Did anything of that nature ever
10  come to your attention while Mrs. Miller was
11  an intern?
12     A    Did I ever say --
13     Q    No, sir.  I'm just asking you, did
14  any information to that effect ever come to
15  your attention, where somebody said, "You
16  know, she's out here telling people you're
17  out to get her"?
18     A    Oh, I can't remember.  I don't
19  remember that.
20     Q    Do you ever remember telling anyone
21  that she had been doing that?
22     A    I don't remember.
23     Q    Did you ever tell anyone that she,
24  Mrs. Miller, had lied about writing an IEP,
25  and claimed that someone else went into her

1 files?

2    A    I do.

3    Q    Okay. Tell us what you know about

4 that, please?

5    A    It was at a meeting when she said

6 that an IEP was not present, and I said, "It

7 is."

8    Q    Do you recall the student involved?

9    A    No.

10    Q    Even by initials?

11    A    No, sir.

12    Q    Do you recall who else was present

13 at the meeting?

14    A    I do not.

15    Q    Was there anybody there besides you

16 and Mrs. Miller?

17    A    There was people there. Yes, sir.

18    Q    Do you remember where it was?

19    A    It was at Houston County School.

20    Q    Do you know about when it was, in

21 relation to either her coming there or

22 leaving there?

23    A    No, sir.

24    Q    And you're talking about the issue

25 was whether or not a particular IEP was in

1 into her files and put it in there.

2    Q    So, are we correctly understanding

3 that an IEP was in her files, that she

4 claimed should not have been in her files?

5    A    That she claimed should not have

6 been in there. Yes.

7    Q    And was it your view that it should

8 have been there?

9         MS. HORTBERG: Object to the form.

10    A    It was there.

11    Q    Was it supposed to be there? Was

12 it proper for it to be there?

13    A    Yes.

14    Q    And it says that you had said she

15 lied about writing the IEP. Did you, in

16 fact, accuse her of lying about that

17 incident?

18         MS. HORTBERG: Object to the form.

19    A    She wasn't telling the truth about

20 the IEP.

21    Q    And in what respect was what she

22 was saying not -- are you saying that you

23 disagreed with it, that it was inaccurate, or

24 are you accusing her of consciously lying

25 about this incident?

118

1 her filing cabinet or something? Can you

2 give us a little more context, please?

3    A    Yes. It was about an IEP that she

4 claimed was not in her files.

5    Q    That she expected to be there, or

6 an IEP that was there, that she expected not

7 to be there?

8         MS. HORTBERG: I'm just going to

9              object to the form. He doesn't

10              know what her expectations

11              were. He certainly can't

12              testify to that.

13    Q    Her expressed expectation is what

14 I'm talking about. Just your understanding.

15    A    My understanding was one that she

16 said was not there, but was.

17    Q    Okay. And is that your best

18 recollection of that whole event? Are there

19 any more details that you recall?

20    A    About that IEP?

21    Q    Right.

22    A    Yes.

23    Q    Tell us about it, please?

24    A    She said that if it was there,

25 someone would have had to go in -- to break

120

1         MS. HORTBERG: Object to the form.

2              In this document or today?

3         MR. FAULK: Period.

4    Q    Just tell me what you feel. I

5 mean, how do you feel about it today? Are

6 you saying that she lied to someone about

7 this IEP?

8    A    I'm saying she wasn't truthful.

9    Q    Well, I make a distinction between

10 something simply being incorrect or

11 inaccurate and being consciously misleading,

12 which would be lying or untruthful. Okay?

13 So, when I ask you -- are you saying, as best

14 you can say, that her statement was

15 inaccurate, or are you saying it was

16 consciously untruthful?

17         MS. HORTBERG: Object to the form.

18              I think his statement is on the

19              record, and it speaks for

20              itself.

21    Q    Do you understand the distinction

22 I'm trying to draw between something that's

23 just not correct and something that's

24 consciously made incorrect through a lie?

25    A    Yes, I understand that.

121

1    Q    Okay. So, it's your position that
2  whatever she said happened about that IEP was
3  not simply inaccurate, but it was, in fact, a
4  lie?
5    A    What she said was not correct, is
6  what I'm saying.
7    Q    Okay. Now, here we have one in
8  quotes, under your name, "Extreme
9  disrespect." Do you ever recall reporting
10  that condition or attribute of Mrs. Miller to
11  anyone?
12    A    No.
13    Q    In your judgment, sitting here
14  today, had she been extremely disrespectful
15  to anyone, to your knowledge?
16    A    She had been.
17    Q    Can you tell us about that, please?
18    A    Well, she had been disrespectful in
19  the -- what we just went over, about claiming
20  that someone went into her files. That's one
21  thing.
22    Q    Well, who do you consider that to
23  be disrespectful of?
24    A    Whoever she was lying on, or being
25  inaccurate.

122

1    Q    So, we're back to lying?
2    A    Well, that's because I read that on
3  this sheet of paper. That's why I said that.
4    Q    Okay. Do you recall any other
5  instances of conduct involving Mrs. Miller in
6  which you would characterize her as
7  displaying extreme disrespect for someone?
8    A    I can't remember now, right now.
9    Q    All right. And the next quotation,
10  At times not following my directions, close
11  quote. Were there any times, other than the
12  biology incident, where, in your view, she
13  did not follow your directions?
14    A    I can't remember.
15    Q    Quote, I am guarded around her,
16  close quote. Do you recall making that
17  statement or any statement substantially to
18  that effect concerning Mrs. Miller?
19    A    I did.
20    Q    Okay, sir. And do you recall who
21  you made it to?
22    A    No, sir.
23    Q    Do you recall the basis for the
24  statement as to why you felt guarded around
25  her?

123

1    A    I do.
2    Q    Tell us, please?
3    A    One day at school, we were walking
4  down the hall together, and I was trying to
5  make -- talk with Mrs. Miller. And I had
6  asked her if she was coming to the football
7  game. It was on a Friday. I asked her if
8  she was coming to a football game. And she
9  responded that, no, her and her husband would
10  be taking up tickets at Dothan High's
11  football game.
12    And it kind of shocked her that I would
13  ask her what she was going to do on a Friday
14  night. And I was just simply wanting to
15  know. And I made some comment, "Well, I
16  didn't know y'all took up tickets."
17    And later someone -- I don't remember
18  who it was -- came to me and claimed that she
19  was stating that I was trying to -- and they
20  may not have used the term -- it's my term --
21  stalk her, wanted to know what she was doing
22  after school. And that simply was not true.
23    So, if I made that statement, that's
24  what it was -- one of the things that I can
25  remember, sitting here. That's what it

124

1  referred to.
2    Q    Other than the things of a personal
3  nature, was there anything else that you felt
4  guarded around her about?
5    A    No.
6    Q    Without quotations, the statement
7  says, "Does not feel he can accurately
8  assess, she is vindictive." Did you ever say
9  anything substantially to that effect to
10  anyone concerning Mrs. Miller?
11    A    Don't remember that.
12    Q    Quote, Interacts okay with kids,
13  close quote. Do you recall saying anything
14  to that effect about Mrs. Miller?
15    A    Don't remember that.
16    Q    Do you have an opinion as to
17  whether that was the case with Mrs. Miller?
18    A    No, sir.
19    Q    You don't have any basis for an
20  opinion as to whether she interacted okay
21  with children?
22    A    I don't have an opinion, no.
23    Q    Quote, Outside the classroom is
24  where she is having problems, close quote.
25  Did you state that or anything substantially

125

1    to that effect to anyone concerning Mrs.

2    Miller?

3        A    I don't remember that.

4        Q    Do you hold that opinion today?

5        A    I don't have that opinion.

6        Q    Quote, Difficulties collaborating

7    with regular education, close quote.  Did you

8    ever tell anyone that or anything

9    substantially to that effect about Mrs.

10   Miller?

11       A    I did.

12       Q    Okay.  Tell us what you said,

13   please, and to whom you said it?

14       A    If it was said, it was said to Mr.

15   Pitchford.

16       Q    Okay.  And do you recall the

17   context of it or the factual basis for

18   expressing that opinion?

19       A    In the meeting, Mr. Pitchford told

20   me that some teachers had been to him, and

21   they were having difficulties in the

22   classroom.

23       Q    Concerning Mrs. Miller?

24       A    Mrs. Miller.  That's right.

25       Q    And what did you say to that?

126

1       A    Something along the effect -- well,

2    actually, I don't know how I responded.

3       Q    As we sit here today, would you

4    have had any factual basis for having

5    concurred, in Pitchford's opinion, that she

6    was having difficulty collaborating with

7    regular education?

8           MS. HORTBERG:  Object to the form.

9       Q    Do you know of any factual basis

10   for that assertion that she had difficulties

11   collaborating with regular education, other

12   than what we've already talked about, about

13   Mrs. Ezell?  Okay?  Do you know of any other

14   instances where that might be said?

15       A    She had made a teacher cry.  I

16   mean, that may be one thing.

17       Q    Mrs. Miller had made a teacher cry.

18   And who was the teacher, please?

19       A    Ms. Towns.

20       Q    And were you present when it

21   occurred?

22       A    No.

23       Q    What was the source of your

24   knowledge about that?  How did you know about

25   it?

127

1       A    I mean, I don't remember how I come

2    to find out about it.

3       Q    What did you understand were the

4    underlying circumstances of how Ms. Miller

5    made Ms. Towns cry?  Did anybody tell you

6    what happened?

7       A    Yes, sir.  I don't remember who

8    told me that.

9       Q    What did they tell you?

10       A    That she had been observed, and

11   received some marks that she was not happy

12   with, and had went back in there and said

13   something to Ms. Towns.

14       Q    Mrs. Miller had been the subject of

15   some kind of observation.  Do you mean, like,

16   in the course of an evaluation-type thing?

17       A    Yes.

18       Q    And she was dissatisfied, and had

19   something to say to Ms. Towns, which made Ms.

20   Towns cry?

21       A    Yes.

22       Q    And you don't know any more than

23   that?

24       A    No.

25       Q    You don't recall who told you that?

128

1       A    No.

2       Q    Quote, Three or four teachers have

3    asked, "What is wrong with Mrs. Miller,"

4    closed quote.  Did you tell Mr. Pitchford or

5    anyone else that or anything substantially to

6    that effect?

7       A    That was during the meeting that I

8    told you about.

9       Q    And what was the basis for that

10   statement, the factual basis?  Who are these

11   three or four teachers?

12       A    I don't remember.

13       Q    Are you saying they had asked you

14   what was wrong with her?

15           MS. HORTBERG:  Object to the form.

16       A    No, sir.  I'm not saying that.

17       Q    Who are you saying they asked?

18           MS. HORTBERG:  Objection to form.

19             I think we've already

20          established that this was not

21          typed by him.

22          MR. FAULK:  Well, that's fine.  I'm

23          just asking, had he said

24          anything substantially to that

25          effect.

1    A    No, I had not.

2    Q    And you said "yes."

3    A    That I said that?

4    Q    Right.  Did you say anything --
5    when I say "substantially to that effect," I
6    mean, in case that's not a precise quotation
7    of your words, have you said anything that
8    would mean basically the same thing,
9    substantially to that effect, concerning Mrs.
10    Miller?

11    A    I don't remember that.

12    Q    You don't remember any teachers
13    coming up to you and saying, "What's wrong
14    with Mrs. Miller," or anything like that?

15    A    No.  I don't remember that.

16    Q    That's fine.  And so, the time that
17    she made Ms. Towns cry would have been prior
18    to your conversation with Mr. Pitchford?
19    Correct?

20    A    Oh, I don't know.

21    Q    Well, if you were telling him about
22    it, and that's your example of the
23    difficulties of her collaborating with
24    regular education, in addition to the Mrs.
25    Ezell situation, if you told Mr. Pitchford

---

1    A    No, I don't believe I did.

2    Q    Do you recall telling anyone that?

3    A    No.

4    Q    So, if somebody has quoted that and
5    attributed it to you, you don't understand
6    the basis for that quotation, in terms of
7    attributing it to you?

8    A    That's right.

9    Q    Let's run down, just real quickly,
10    down these quoted statements, Mr. Strange.

11    A    I'm listening.

12    Q    If you would, please, take a look
13    where it says, quote, Professional behavior
14    not very good of late.  If somebody quoted
15    that and attributed it to you, would that be
16    an accurate quotation or not?

17    A    No, not that I am aware of.

18    Q    The quotation of "Extreme
19    disrespect," do you consider that to be an
20    accurate quotation of you?

21    A    No.

22    Q    Quote, At times, not following my
23    directions, close quote.  Do you consider
24    that to be an accurate quotation of you?

25            MS. HORTBERG:  I'm going to object

---

130

1    about that, it would have already happened,
2    or you couldn't be telling him?  Right?

3    A    Told Mr. Pitchford about what?

4    Q    About Ms. Towns crying.

5            THE WITNESS:  Did I say that?

6            MS. HORTBERG:  I'm going to object.
7            If his testimony says that --

8    A    I didn't tell you that I told Mr.
9    Pitchford that.

10    Q    Okay.  Fine.  That's just an
11    occurrence you knew about that would be an
12    example of the difficulty collaborating with
13    regular education?

14    A    That I knew about.  Yes.

15    Q    All right.  Did you know about that
16    incident prior to the meeting with Mr.
17    Pitchford in which you told him these things?

18            MS. HORTBERG:  Object to the form.
19            I don't think that's his
20            testimony.

21    A    I didn't tell you that.

22    Q    You didn't tell us while ago that
23    you told Mr. Pitchford that it was your
24    understanding she had some difficulties
25    collaborating with regular education?

---

132

1            to all of these.  He's already
2            answered all of these, this
3            exact same line of questioning.

4    MR. FAULK:  In light of his later
5            answer about the difficulty
6            with one of the quotations, I
7            just want to make sure.

8    Q    I mean, are you being accurately
9    quoted there or not?

10            MS. HORTBERG:  I believe his -- his
11            testimony will speak for
12            itself.  But I think all of
13            this has already been asked and
14            answered.

15            MR. FAULK:  My questions were, had
16            he said that or anything
17            substantially to that effect.
18            I'm asking him now --

19    Q    Is that an accurate quotation of
20    something you said, or is it not?

21    A    I don't know if that is or not.

22    Q    Same about "I'm guarded around
23    her."

24    A    Did I actually tell somebody, "I'm
25    guarded around her"?

1    Q    (Nodding head.)
2    A    I do not know. I don't remember.
3    Q    And "Interacts okay with kids," you
4    say that's -- you don't recall saying that to
5    anybody?
6    A    No.
7    Q    Do you recall saying, quote,
8    Outside the classroom is where she's having
9    problems?
10   A    No.
11   Q    Quote, Difficulties collaborating
12   with regular education, in quotes?
13   A    I do not remember saying that.
14   Q    And "Three or four teachers have
15   asked what's wrong with Mrs. Miller," in
16   quotes. You don't recall specifically saying
17   that?
18   A    No.
19   Q    The people you list in your
20   response to interrogatory number 18, you say
21   are all Houston County residents. Do you
22   have any relatives in those same categories
23   in either Henry, Dale, Coffee or Geneva
24   counties?
25   A    It's very possible.

1    documents other than the IEP?
2    A    Any paperwork associated with an
3    IEP.
4    Q    You only did one written evaluation
5    for her -- right? -- or observation?
6    A    That's all I remember doing.
7    Q    Okay. Did you keep any notes or
8    logs or just personal notes of any kind about
9    your meetings with Mrs. Miller?
10   A    About my observation or my
11   meetings?
12   Q    Well, meetings and -- well, do you
13   have any personal notes or logs or calendars
14   that have not been produced having to do with
15   Mrs. Miller --
16   A    No.
17   Q    -- and your dealings with her?
18   A    No.
19   Q    Other than your written evaluation,
20   did you keep any official notes, logs, or
21   anything of that nature concerning her
22   progress with you?
23   A    No.
24   Q    Look at your answer to number 22,
25   please. Tell me when you've read it.

---

134

1    Q    Would they be any closer than
2    second cousins, by blood or marriage?
3    A    It's very possible.
4    Q    Do you know of any first cousins
5    that you have in any of those counties?
6    A    First cousins, no.
7    Q    Do you know of any first cousins
8    your wife has in any of those counties?
9    A    No.
10   Q    Look at your answer to
11   interrogatory number 20, please, sir, which
12   begins, "I provided support to the plaintiff
13   prior to the withdrawal of her internship."
14   Do you see that?
15   A    I do.
16   Q    "Including meeting with the
17   plaintiff, evaluating her teaching abilities
18   and providing feedback, teaching her to
19   prepare lesson plans and certain special
20   education documents." What special education
21   documents are you talking about?
22   A    We would go over pages of the IEP
23   to help her with a better understanding of
24   it.
25   Q    Okay. Any other special education

136

1    A    My answer?
2    Q    Well, and the question itself,
3    since they're not in the same document.
4    A    (Witness reviewing documents.)
5    Okay. I read it.
6    Q    Both the question and the answer?
7    You've read both the question and the answer?
8    A    Yes, sir. Yes, sir.
9    Q    Okay. Let me show you what I've
10   got here that are excerpts that I've taken
11   out of Defendant's Exhibit 29, the
12   professional internship program handbook.
13   I'll show you the cover. Is that the
14   handbook you're referring to in your answer?
15   A    It is, unless it's changed since
16   this has happened.
17   Q    Well, that's the one that some
18   defense lawyer in the case has already
19   offered in evidence through Mrs. Miller in
20   her deposition. And I've taken pages out of
21   that that I could find that alluded to the
22   cooperating teacher's duties.
23   I'm going to ask you to look at those
24   excerpts, and just ask you if you recall any
25   other duties that you had as cooperating

1  teacher under the Troy handbook that I've
2  failed to include. I've also included a
3  table of contents, so you might look at that.
4  I'll be quiet while you look at it. Just
5  tell me when you've finished, please, sir.
6     A     (Witness reviewing document.)
7           MS. HORTBERG: I think his question
8           was, do you remember anything
9           else from the handbook that
10          discussed cooperating teachers.
11    A     No.
12    Q     When you refer to, in your answer
13  there, "What I did as a cooperating teacher
14  is set out in the Troy University College of
15  Education Professional Internship Program
16  Handbook," we're talking about those excerpts
17  that I've shown you? That's what you're
18  talking about?
19          MS. HORTBERG: Object to the form.
20          You asked him if he remembered
21          if there were any others. You
22          know, we don't have the entire
23          handbook in front of us.
24          MR. FAULK: Well, y'all put it in
25          evidence, or somebody did.

138

1           MS. HORTBERG: I didn't put it into
2           evidence.
3           MR. FAULK: I was trying to
4           simplify things.
5     Q     I'm going to show you my copy from
6  the court reporter of what I understand to be
7  this handbook, from a prior deposition. And
8  I've already given you the table of contents.
9  If you'll look through that, that might help
10  you.
11          MS. HORTBERG: I'm sorry. What is
12          the question?
13          MR. FAULK: The question is, does
14          he -- when he answers this
15          here, number 22, as being he
16          did what's set out in that
17          handbook, I just want to be
18          sure I've got it all.
19    Q     If you're looking at that, and
20  you're telling us you can't remember any
21  other duties that were expected of you as a
22  cooperating teacher, that's fine. If you do
23  remember some other ones, I'm asking you to
24  please let us know?
25          MS. HORTBERG: I mean, I'll object.

1           This has already been put into
2           evidence. So, what's the point
3           of just taking excerpts from
4           it? He's provided the
5           information in his. He didn't
6           provide this. You did.
7           MR. FAULK: The defense put it into
8           evidence. And I don't want to
9           get off into a little contest.
10    Q     Is there anything you specifically
11  remember as being something expected of you
12  as a cooperating teacher that's not set out
13  in the excerpts I've handed you from
14  Defendant's Exhibit 29, which I'll go ahead
15  and mark as Plaintiff's Exhibit 2?
16          (Whereupon, Plaintiff's Exhibit 2
17          marked for identification.)
18    Q     And your answer may be, "I can't
19  remember." And if it is, that's fine. But,
20  if you do remember something else, I would
21  appreciate you telling me.
22    A     This handbook is what I went by.
23          MS. HORTBERG: This?
24    A     This handbook is what I went by.
25    Q     As far as you are concerned, you

140

1  followed it to the letter? Is that fair to
2  say?
3           MS. HORTBERG: Object to the form.
4     A     It's fair to say that I went by
5  this handbook.
6     Q     To the best of your ability?
7     A     Sure.
8     Q     And you're referring to the entire
9  handbook, Defendant's Exhibit 29?
10    A     Yes, sir.
11    Q     You did take a moment to look over
12  Plaintiff's Exhibit 2, didn't you?
13    A     I did.
14    Q     And, again, I will grant you that
15  if there are other duties of a cooperating
16  teacher in the full exhibit, Defendant's 29,
17  that I've overlooked, I'll take your word for
18  it that you did your best to follow them.
19    But, just as we sit here, does anything
20  come to your mind that I've excluded here?
21  Does it appear to you that I've left anything
22  out that you think was one of your duties as
23  cooperating teacher?
24    A     I do not know.
25          (Recess in deposition from 12:40

to 12:50.)

MS. HORTBERG: Now that we're back
on the record, I think Mr.
Strange wanted to clarify an
answer that he had provided
earlier, that, in looking over
his interrogatory responses --

Q   Okay, sir. What was that?

A   One, when you asked if I did not -- do I remember anyone who said they did not want to go to Mrs. Miller's classroom, it was -- one of them was G. G.

Q   Is that a boy or girl?

A   That's a girl.

Q   Do you recall whether she gave any reason for not going to the plaintiff's classroom?

A   She just -- she told me that Mrs. Miller was asking her a bunch of questions, and she was making her feel uncomfortable, and she did not want to go into her classroom.

Q   Do you recall anything about the subject matter of the questions?

A   No, sir.

---

A   I would assume, being she came to school.

Q   Tell us, as near as you can recall, your conversation with G. G.'s mother?

A   She came in and said something to the effect of -- like I said, this has been three years ago. Come in and said that we was mistreating G. And I told her, "No, we're not."

She asked -- I don't know if she asked or not. I showed the IEP to her. I believe she told me that her IEP was not being followed. I showed her the IEP. She responded that some lady had called her to tell her that the IEP was not being followed. We was mistreating her.

And after I showed her, she told me that she thought that G.'s grades were better than they had ever been. And I said, "Yeah. She's got good grades." And she said, "Okay," and left.

Q   Was your source of information about G.'s preferences her mother, or did it come straight from the child to you?

A   It came straight from the child.

---

142

Q   Did you ever discuss this with anyone other than the child?

A   I don't remember.

Q   Do you recall whether you ever informed Mrs. Miller of it?

A   No, sir. I don't remember.

Q   Do you recall whether you ever talked to the child's parents about the problem?

A   I did.

Q   Okay. And tell us about that conversation, please. Where did it take place?

A   At the school.

Q   Did you ask the parents to come to the school, or did they just come in on their own, or what?

A   She just came in on her own.

Q   "She" being --

A   The mother.

Q   Okay. Do you recall her name?

A   Mrs. G. is all I remember. I mean --

Q   Do these people live in or near Columbia?

---

144

Q   Okay. And the child's complaint was that Mrs. Miller was asking her too many questions or making her uncomfortable somehow?

A   Yeah. She was making her uncomfortable.

Q   Let me ask you this: In your own mind, did you draw a connection between the mother's visit and the child's complaints to you? Did they appear to be related or independent of each other?

A   I would have to say they were independent of one another.

Q   Did they occur near in time?

A   They occurred during her internship.

Q   Okay. Within a couple of months? Some time in that same period?

A   Uh-huh.

MS. HORTBERG: You need to give an
out loud answer, so that she
can take it down.

THE WITNESS: Okay.

Q   And did you, in fact, truly believe that the IEP was being followed? Was that

145

1 your true opinion, what you told Ms. G.?
2    A    Yes.
3    Q    And as we sit here today, can you
4 remember the names of any other students who
5 said they didn't want to be in Mrs. Miller's
6 class?
7    A    No, sir.
8    Q    Do you recall any other parents
9 coming in and talking to you about anything
10 having to do with Mrs. Miller?
11    A    No, sir.
12    Q    Let's go back up to 23, please.
13 Was there anything extraordinary, to your
14 recollection, unusual, about the process in
15 which you assisted in developing R. S.'s IEP?
16    A    No, sir.
17    Q    Nothing out of the ordinary, to
18 your recollection?
19    A    No, sir.
20    Q    And as we sit here, you didn't have
21 any involvement in the C. A. or the L.
22 brothers' IEP's?
23    A    Not that I remember.
24    Q    And it's your testimony, according
25 to answer number 24, that you never requested

147

1    Q    And who is that?
2    A    It was a meeting at the central
3 office with Mr. Lord and Mr. Andrews and Mrs.
4 Ezell and myself.  Might have been some other
5 people there.
6    Q    Was anybody representing Troy State
7 there or Troy University there?
8    A    Not that I remember.
9    Q    Is this after suit was filed?
10    A    Yes.
11    Q    Were your attorneys present?
12    A    No.
13    Q    Did the meeting have to do with the
14 lawsuit?
15    A    We was trying to find out what was
16 going on after we had been --
17    Q    After you got served --
18    A    Yes.
19    Q    -- with the papers?
20    A    Yes, sir.
21    Q    If you would, please, tell us what
22 was discussed on that occasion, as near as
23 you can recall?
24    A    We were trying to -- I mean, it
25 slipped my mind, so it was a brief -- we were

146

1 Mrs. Miller to sign any IEP documents, IEP
2 process documents?
3    A    No.  I never asked her to sign any.
4    Q    And by "process documents," I mean,
5 does that have any special meaning to you?  I
6 mean, is that the IEP?  Is that what you
7 understand?
8    A    I never asked her to sign an IEP.
9        MS. HORTBERG:  Can we go back to my
10            original, before we started,
11            when I said that he had two
12            points of clarification?
13        MR. FAULK:  I beg your pardon.  I
14            didn't understand that.
15        MS. HORTBERG:  The first was as to
16            the identification of that one
17            student, and then, the second
18            was as to the meeting.
19        MR. FAULK:  What meeting?
20    A    You asked if I had ever met with
21 any outside --
22        MS. HORTBERG:  Co-defendants.
23        THE WITNESS:  Yeah.
24    A    -- co-defendants.  And I have.  I
25 have.

148

1 just trying to find out what was going on.
2    Q    My recollection is, I think y'all
3 were -- or most of you were served in care of
4 the board of education.  Was that why you
5 happened to be there, was to pick up the
6 papers?
7    A    Could have been.
8    Q    There were several of you there at
9 the same time?
10    A    Yes, sir.
11    Q    And you don't recall anything in
12 particular about the discussion other than,
13 "Hey, what's this," or something?
14    A    Trying to find out what was going
15 on.
16    Q    And who were you inquiring of?  The
17 superintendent?  You say you were trying to
18 find out something.  Who were you asking what
19 was going on?
20    A    We were all trying to find out.
21    Q    Just talking to each other?
22    A    Yes.
23    Q    Anything else that you need to
24 revise about your testimony that's come to
25 mind --

1    A    No, sir.

2    Q    -- in the interim? Okay. When you

3  prepared R. S.'s IEP, who else was

4  participating in that process?

5    A    Whose?

6    Q    R. S. Do you recall who else was

7  on the IEP committee?

8    A    Who was on the IEP team? No, sir.

9  I don't recall who was on it.

10    Q    Do you recall whether Mrs. Miller

11  was present?

12    A    No, sir. I don't recall that.

13    Q    Were any of the student who

14  complained about being in Mrs. Miller's care,

15  I guess you could say, removed from her?

16    A    No, sir.

17    Q    Would it be fair to say that if you

18  felt that it was in their educational best

19  interest to remove them, you would have

20  recommended that?

21    A    The other students would -- if I

22  was in the resource room, they were allowed

23  to come to my room instead of going to her

24  room.

25    Q    So, there was some kind of change

---

150

1  made?

2    A    If they chose to be. But I did not

3  remove them, no, if you're asking that.

4    Q    And you understand, I'm sure,

5  better than I do, the original scheme. But

6  there was a point at which these children

7  would go to Mrs. Miller's room. They said

8  something to you about preferring not to be

9  in her room. And you gave them the option of

10  coming to your room if they chose?

11    A    No.

12    Q    Okay. Well, explain it.

13    A    They had the option. I didn't -- I

14  mean, she was in the resource room or she may

15  not have been in the resource room. If I was

16  in the resource room, they had the option of

17  coming to my classroom for help.

18    Q    And who established that option?

19    A    Well, I mean, if I wasn't in my

20  room, they had the option of going to another

21  resource room. It was established.

22    Q    Okay. That's not something you set

23  up?

24    A    No.

25    Q    And that was not set up in response

---

1  to the children's complaints about Mrs.

2  Miller, was it?

3    A    No.

4    Q    So, my question that I tried -- and

5  I'm sorry if I'm not articulate enough. But,

6  after these children came to you about Mrs.

7  Miller, did you recommend any type of change

8  in their relations with Mrs. Miller?

9    A    No.

10    Q    And would it be fair to say that

11  if, in your opinion as a special educator, it

12  would have been in their educational best

13  interest for some change to be made, that you

14  would have recommended such a change?

15    A    I don't know.

16    Q    Let me show you what's already in

17  evidence as Defendant's Exhibit 6. I think

18  we may have cut you off in looking at it when

19  we came back after the break. Are you

20  familiar with that document?

21    A    Yes.

22    Q    And that's the internship agreement

23  between Houston County Schools and Troy

24  University, dated July 28, 2004? Correct?

25    A    That's right.

---

152

1    Q    All right. And in it, you

2  understand it is creating certain duties on

3  Mrs. Miller's part and on your part and on

4  the part of other people having to do with

5  the internship?

6    A    Yes.

7    Q    In your opinion, did you faithfully

8  carry out your duties under this agreement?

9    A    Yes.

10    Q    Do you have an opinion as to

11  whether Mrs. Miller faithfully carried out

12  her duties under this agreement?

13    A    No. I don't have an opinion.

14    Q    Not one way or the other?

15    A    No.

16    Q    Are you aware of any specific way

17  in which Mrs. Miller violated the terms of

18  this agreement?

19    A    No.

20    Q    Let's take a look, please, at --

21  are you finished?

22    A    Am I finished?

23    Q    Yes.

24    A    Yes, sir.

25    Q    Let's take a look at Defendant's

---

153

1   Exhibit 9. And I'll ask you, as you're
2   looking at it, is that a copy of an
3   evaluation that you did concerning Mrs.
4   Miller, dated August 30, 2004?
5       A    It is.
6       Q    Do you see, down at the bottom,
7   where it indicates "Next observation,
8   September 13-17," right above her signature?
9   Do you see where I'm talking about?
10      A    I do.
11      Q    Did that mean what it said? In
12  other words, it was anticipated that you
13  would do another evaluation during that
14  general time frame of September 13 to 17?
15      A    I don't know. It says that her
16  next observation will be September the 13th
17  through 17th.
18      Q    Okay. Is that your handwriting
19  that says "Sept."?
20      A    It is.
21      Q    And the dates are your handwriting?
22      A    Yes.
23      Q    The numerical date?
24      A    Yes.
25      Q    So, may we fairly infer from that,

154

1   that, at the time you did this, it was your
2   intention to do another evaluation during the
3   period September 13-17?
4       A    I mean, I don't know if that was
5   mine or her next -- I mean, that was the next
6   observation from somebody. I mean, I don't
7   know if it was mine or not.
8       Q    But you wrote that down?
9       A    I did. Yes, sir.
10      Q    And you don't recall what your
11  intention was, specifically, as to whether
12  that was your next observation or perhaps
13  Dr. Ruediger's next observation? You're not
14  sure?
15      A    I'm not sure.
16      Q    Have you ever had to do these on
17  anybody else besides Mrs. Miller?
18      A    No.
19      Q    To the best of your recollection,
20  did you ever do a second evaluation on her?
21      A    I mean, I don't -- I don't remember
22  if I --
23      Q    Do you recall ever having been told
24  not to bother with a second evaluation? Did
25  anyone ever tell you not to do it?

155

1       A    No.
2       Q    I see, at the top, you circle the
3   number of observations, one through five.
4   Should we infer from that, that, during the
5   normal internship, it was anticipated there
6   would be five?
7            MS. HORTBERG: Object to the form.
8       A    I don't know.
9       Q    This is a form you would have
10  gotten from Troy State or out of their
11  handbook? Is that correct?
12      A    Yes, sir.
13      Q    Okay. Her lowest grade on here was
14  a 3? Correct? In fact, most of them are
15  3's.
16      A    There are some 4's and -- 3's and
17  4's.
18      Q    The lowest is a 3?
19      A    Lowest is a 3.
20      Q    And that's average performance,
21  based on your evaluation?
22      A    Yes, sir. That's what a 3 is.
23      Q    4's are above average performance?
24  Correct?
25      A    Yes.

156

1       Q    When it says "no," am I correct in
2   understanding that to mean that that was
3   simply an activity that was not observed in
4   the course of this evaluation?
5       A    That's right.
6       Q    And are you trained to do PEPE
7   evaluations, P-E-P-E?
8       A    I am.
9       Q    And were you, at the time you did
10  this evaluation, trained in PEPE?
11      A    No.
12      Q    Okay. I want to be sure we're
13  clear on the "not observed" entry. This
14  isn't saying that she should have been doing
15  something and you didn't see it being done.
16  Doesn't it mean that it just wasn't involved
17  in the activity that you observed, and so,
18  therefore, you couldn't evaluate it?
19      A    That's my understanding.
20      Q    Okay. At the time you did this
21  evaluation, did you have any expectation that
22  Mrs. Miller's internship would turn out to be
23  unsuccessful?
24      A    Are you asking me if I expected her
25  internship to turn out unsuccessful?

1    Q    Right.

2    A    No.

3    Q    So, at least at this point in time,

4    August 30th, you felt like things were at

5    least going all right?

6    A    Yes.

7    Q    Did you, as her cooperating

8    teacher, ever actually observe her again in

9    the same manner that you observed her in

10    preparing this observation report, but just

11    not do a report? I mean, did you ever have

12    occasion to observe her to this same extent,

13    in the same degree of detail again, after

14    August the 30th --

15    A    Sir, I don't --

16    Q    -- whether you did a report or not?

17    A    I don't remember.

18    Q    In doing this report -- and the

19    activity that leads up to preparing this

20    report is a conscious observation by you,

21    comparable to the type of observation you

22    might do under PEPE? Is that fair?

23    A    Is it what, now?

24    Q    Where you actually visit a

25    classroom and watch what they're doing on a

158

1    continuous basis during the class period, is

2    that what happened here?

3    A    I observed her teaching a class

4    here.

5    Q    Okay. So, you sat in on a whole

6    class?

7    A    I don't know if it was a -- it says

8    from 11:20 to 12:20.

9    Q    Would that be one block? How long

10    are the instructional blocks?

11    A    96 minutes, roughly.

12    Q    So, you were there, though, a full

13    hour, that resulted in this report?

14    A    I believe so.

15    Q    Did you ever observe her to that

16    same extent again, whether you did a report

17    or not?

18    A    I don't remember if I did or not.

19    I've observed many teachers since this.

20    Q    But whether you were there to do a

21    formal evaluation or not, you can't remember

22    ever having observed her to this same extent

23    during a single period after you did the

24    August 30 report?

25    MS. HORTBERG: Object to the form.

1    That's not what he just said.

2    A    I'm saying I don't remember if I

3    did or not.

4    Q    Okay. Let's take a look at

5    Defendant's Exhibit 8. Have you seen that

6    document before, Mr. Strange?

7    A    I believe I have. Yes, sir.

8    Q    Do you recall the general

9    occurrence on August 26, 2004, of

10    Dr. Ruediger coming and doing an observation

11    with Mrs. Miller -- or of Mrs. Miller, I

12    guess? And I would represent to you that

13    would have been his first observation of her,

14    I believe.

15    A    Did you ask me if I knew --

16    Q    Right. Do you recall that

17    occurrence?

18    A    Of him observing Mrs. Miller?

19    Q    Right.

20    A    Yes.

21    Q    Okay. Afterward -- let's just read

22    the document.

23    A    Okay.

24    Q    "Observation occurred at 12:20 in a

25    regular education math classroom. Ms. Towns

160

1    indicated that Mrs. Miller was interacting

2    well with the students. After approximately

3    20 minutes, students were dismissed for

4    lunch. During this time, Mrs. Miller had

5    organized a meeting with Mr. Strange."

6    Now, were you present for any of that

7    first phase of that, up until the point the

8    students were dismissed for lunch?

9    A    Was I present when Dr. Ruediger

10    observed her?

11    Q    Right. In Ms. Towns' math class,

12    up to the point the children went to lunch?

13    A    I do not think I was there.

14    Q    Okay. "During this time, Mrs.

15    Miller had organized a meeting with Mr.

16    Strange. The meeting was held in the future

17    classroom of Mrs. Miller (classroom floors

18    were being cleaned or carpeted). Mr. Strange

19    did not attend the 30-minute meeting." Do

20    you recall there being some meeting scheduled

21    you didn't attend?

22    A    No, sir.

23    Q    Are you saying that this statement

24    is false, or that you simply do not recall

25    the occurrence?

1    A    Am I saying Mrs. Miller had

2  organized a meeting with me --

3    Q    Right.

4    A    -- to be present with Dr. Ruediger?

5    Q    Right.

6    A    I'm saying that statement is false.

7    Q    Okay. So, then, you didn't attend

8  a nonexistent meeting, then?

9    A    I did not know about a meeting I

10  was supposed to attend.

11    Q    "Mrs. Miller" -- and he's talking

12  about his dealings with Mrs. Miller --

13  "stressed her concerns regarding individual

14  education programs and the general structure

15  of the special education program. It was

16  recommended that she initiate attempts to

17  comply with the current special education

18  law. Specific suggestions included

19  discussing with Mr. Strange and Mr. Payne her

20  difficulties in establishing deadlines to

21  accomplish the task. It was also suggested

22  to follow appropriate protocol if changes did

23  not result."

24    Now, you weren't present during any of

25  that discussion between the two of them?

162

1    A    No.

2    Q    Were you, to your recollection, in

3  a position to overhear any of that? And I'm

4  not suggesting eavesdropping. I just mean,

5  were you in a position to hear it, just like

6  Mrs. Ezell is in a position to hear us

7  talking right now?

8    A    No.

9    Q    It continues. "Mrs. Miller

10  returned" --

11    A    Can I go back to that?

12    Q    Sure. Yeah.

13    A    When you asked me if I was in a

14  position, I might have -- I don't know where

15  this meeting took place, but it's possible

16  that I was close by. I'm not saying, because

17  I don't know where the meeting was at. It's

18  possible I was close by. But, did I hear

19  anything being said? No.

20    Q    Okay, sir. Let's look at the

21  second paragraph. "Mrs. Miller returned to

22  complete her lesson in the regular education

23  math class. Upon completion, debriefing

24  occurred in the library with Mrs. Miller and

25  Mr. Strange." Okay. So, this is a second

1  meeting, apparently, in which you were

2  present. Continuing, "Mr. Strange indicated

3  that Mrs. Miller was doing well, despite not

4  having completed an observation. We

5  discussed briefly inclusion and individual

6  education programs.

7    It was noted that Mr. Strange was

8  hesitant to communicate and make any eye

9  contact. He indicated that he would complete

10  an observation some time soon. Mr. Strange

11  left the meeting, as further discussion

12  addressed specific intern expectations,

13  curriculum, and strategies to promote

14  positive change." And that's signed D. G.

15  Ruediger.

16    Now, do you recall attending a

17  postobservation meeting in the library with

18  Mrs. Miller and Dr. Ruediger?

19    A    Yes.

20    Q    Okay. And is his summary of that

21  meeting accurate or inaccurate, so far as you

22  are concerned?

23    A    It's fairly accurate. It's

24  accurate.

25    Q    Do you recall what, in particular,

164

1  you all discussed in your presence about

2  inclusion and individualized education

3  programs?

4    A    No. I don't recall that.

5    Q    Do you recall it being in any way

6  or involving in any way concerns expressed by

7  Mrs. Miller about the suitability of the

8  inclusion and individual education programs

9  at your school?

10    A    No, sir.

11    Q    Can you tell us, please, your view

12  of his comment, "It was noted that Mr.

13  Strange was hesitant to communicate and make

14  any eye contact"? Do you care to comment? I

15  mean, was that the case?

16    A    It's very possible.

17    Q    Okay. Could you explain why you

18  may have been hesitant to communicate and

19  make eye contact with him?

20    A    Because, I mean, at that particular

21  meeting, I was extremely nervous, just as I

22  am now. So, I can see -- because I'm

23  uncomfortable now. So, I can see where I

24  would have been uncomfortable meeting with a

25  Troy State professor for the very first time.

165

1    Q    Any other explanation?

2    A    No, sir.

3    Q    Okay. And you did, in fact,

4    complete an observation some time soon, four

5    days later? Right? If this was August 26th,

6    and your observation was the 30th?

7    A    October 30th.

8         MS. HORTBERG: No. August.

9    Q    Did I say October?

10   A    No. I said that.

11   Q    And then, you left the meeting

12   while they were still talking? "Mr. Strange

13   left the meeting, as further discussion

14   addressed specific intern expectations," and

15   so forth.

16   A    I mean, if that's what he's saying,

17   that he continued after I left, yes, sir.

18   Q    You were present during both phases

19   of Mrs. Miller's deposition? Correct?

20   A    Yes, sir.

21   Q    Do you recall any testimony by her

22   -- and I'm not asking you to recite it -- but

23   a general line of testimony by her to the

24   effect that, after you stepped out of that

25   meeting in the library, that you remained

166

1    close enough by to listen in?

2    A    I do recall her saying that.

3    Q    In your view of the matter, is that

4    accurate testimony or not?

5    A    Is it accurate that I listened to

6    what was being said?

7    Q    Well, let's just talk about staying

8    in the library first. Did you remain in the

9    library while they finished their meeting?

10   A    You're asking me to know what I did

11   -- I mean, that's three years ago. Did

12   someone --

13   Q    If you don't remember, that's fine.

14   A    Did someone stop and ask me a

15   question, and me stop and respond to them? I

16   might have. Did I walk straight out of the

17   library? I might have done that. I can't

18   tell you if I stopped off and talked to

19   someone.

20   Q    All right. So far as you recall,

21   could you overhear anything that they were

22   saying after you left the meeting?

23   A    No. I could not hear anything that

24   they were saying.

25   Q    And you did not consciously

167

1    eavesdrop, I presume, after you left the

2    meeting?

3    A    No, sir.

4    Q    Did Mrs. Miller, to your

5    recollection, ever talk to you about concerns

6    that she had about Mrs. Ezell's comments to

7    and concerning special ed students?

8    A    No.

9    Q    That's just a subject that never

10   came up between y'all?

11   A    No.

12   Q    It did not? I want to be sure.

13   "Yes" and "no" sometimes gets garbled in

14   these things. Y'all never talked about that?

15   A    About what?

16   Q    About her contention that Mrs.

17   Ezell said things in the nature of

18   embarrassing, humiliating, or ridiculing

19   things about special ed students.

20   A    No. We never did discuss that.

21   Q    Thank you.

22   A    Yes, sir.

23   Q    Was there a point that you recall

24   that Mrs. Miller sought your assistance and

25   possibly Mr. Pitchford's assistance in

168

1    connection with you in getting some sort of

2    necessary information from Mrs. Ezell, in

3    particular, lectures or lesson plans? Do you

4    remember anything about that?

5    A    Was there a meeting? Is that what

6    you -- what are you asking?

7    Q    Well, or where Mrs. Miller came to

8    you and said, "I need these things from Mrs.

9    Ezell," or words to the effect, "I can't get

10   them. Will you help me," and you did. Do

11   you recall anything like that?

12   A    Yes. Yes.

13   Q    Tell us what you remember about

14   that incident, please?

15   A    It was -- again, I don't remember

16   the date. Don't remember the day. But it

17   was within the first few days -- might have

18   been the first day. Within the first few

19   days of her being an intern.

20        I was taking Mrs. Miller around to

21   introduce her to the teachers. Introduced

22   her to Mrs. Ezell. And I'm not -- I'm really

23   not sure if it was during the first time I

24   introduced her or if it was shortly after

25   that. But Mrs. Miller asked -- she told Mrs.

1  Ezell what she needed. And Mrs. Ezell
2  responded to her where the appropriate
3  information would be at when she needed it.
4      Q    Is that your best recollection?
5          MS. HORTBERG: Objection to form.
6      Q    Do you remember anything else about
7  the incident?
8      A    What are you asking?
9      Q    I'm just asking, is that your
10  entire recollection of that incident, as we
11  sit here? I just want to be sure I'm not
12  cutting you off, is all.
13      A    Yes.
14          MS. HORTBERG: I'm terribly sorry.
15              I need to take a quick break.
16              I apologize.
17          MR. FAULK: Sure.
18          (Recess in deposition from 1:30 to
19              1:33.)
20      Q    Let's look at Defendant's Exhibit
21  12. Take a look at that document, please,
22  sir, and let me know if you've had occasion
23  to see it before.
24          (Brief off-record.)
25      Q    Have you had a chance to review

169

1  that?
2      A    I have.
3      Q    Let me ask you about it. Had you
4  ever seen it before today?
5      A    I believe I have.
6      Q    And you understand it purports to
7  be an e-mail from Mrs. Miller to Pam Parris
8  and S. Jones at Troy State --
9      A    Yes.
10      Q    -- dated September 11? I'm
11  particularly interested in the second
12  paragraph, where she begins talking about a
13  science teacher that embarrasses, belittles,
14  et cetera, special ed students.
15          And about halfway down, about the fourth
16  line from the bottom, "I have been ignoring
17  her behavior, but Paul Strange, my mentor,
18  wants feedback from you, too. He is at a
19  loss as to how to handle the situation,
20  because it's one of those darned-if-you-do
21  and darned-if-you-don't. Paul told me that
22  Mr. Pitchford indicated to you that there was
23  one teacher in particular who was not
24  pleasant to work with (it's her). So, he
25  will be no help," presumably referring to Mr.

170

1  Pitchford. Okay. Did you follow along as I
2  read that?
3      A    I did.
4      Q    Is that statement, that portion of
5  the statement that I read aloud to you,
6  accurate?
7      A    No.
8      Q    Is it entirely untrue, or are there
9  parts of it that you feel are accurate?
10      A    Where did it start at? "I have
11  been ignoring her"? Is that where it's at?
12      Q    Right. Yeah.
13      A    I just want to read it again to be
14  sure. (Witness reviewing document.) Okay.
15  I've read it now.
16      Q    Okay. I'll just take it sentence
17  by sentence. Is your testimony that you and
18  Mrs. Miller never discussed a science teacher
19  embarrassing and belittling and humiliating
20  her students?
21      A    Yes.
22      Q    That being the case, would it be
23  untrue that Paul Strange wanted feedback from
24  Ms. Parris and Dr. Jones?
25      A    About a science teacher belittling?

171

1  Yes, that's untrue.
2      Q    Was there anything around that
3  time, mid September 2004, that you recall
4  telling Mrs. Miller that you would like to
5  get feedback from the Troy people about,
6  other than this?
7          MR. WALDING: Object to the form.
8              He wasn't trying to get
9              feedback as to this.
10          MR. FAULK: Thank you.
11      Q    Was there something else that she
12  may be talking about, that you recall?
13      A    That I wanted some feedback on?
14      Q    Right.
15      A    Yes.
16      Q    Tell us what that was, please?
17      A    Again, it was in Mrs. --
18  particularly, it was in Mrs. Ezell's class.
19  And Mrs. Miller had stated that she was a
20  collaborative teacher, and she wanted to go
21  into the classroom and teach Mrs. Ezell's
22  class either two or three days a week.
23      Q    She said this to you?
24      A    Yes. And I wasn't sure -- I mean,
25  I wasn't sure if she was supposed to do that

172

1  that early on. So, that was some things that
2  I had requested some feedback on.
3      Q    About whether Mrs. Miller could go
4  in and actually teach Mrs. Ezell's class two
5  or three days a week?
6      A    She wanted to teach Mrs. Ezell's
7  class -- say, like, this first week, she
8  wanted to teach Monday, Wednesday, Friday,
9  and Mrs. Ezell teach Tuesday, Thursday. Then
10  the next week would be the two days, vice
11  versa.
12      Q    And your response to that was,
13  "Well, see what people at Troy have to say,"
14  or words to that effect?
15      A    Yes.
16      Q    But you're steadfast in your
17  testimony that it had nothing to do with Mrs.
18  Ezell ridiculing her students?
19      A    No.
20      Q    You are steadfast in your testimony
21  that it was not?
22      A    Yes.
23      Q    It had nothing to do with it?
24      A    That's right.
25      Q    Okay. Good. Did you ever tell

174

1  Mrs. Miller that Mr. Pitchford had indicated
2  to the Troy representatives that there was
3  one teacher in particular who was not
4  pleasant to work with, so that Mr. Pitchford
5  would be no help?
6      A    No.
7      Q    Let's look at Defendant's Exhibit
8  13. Take a moment and look that over,
9  please, Mr. Strange, and tell me when you've
10  finished.
11      A    (Witness reviewing document.)
12  Okay.
13      Q    If you notice, Mr. Strange, this
14  was dated September 13, e-mail from Mrs.
15  Miller to Ms. Parris, two days after
16  Plaintiff's Exhibit 12, which is dated
17  September 11. Do you agree with me on that?
18      A    I do.
19      Q    I'll read it. "Ms. Parris, Paul
20  went ahead and spoke to Mr. Pitchford, and
21  Mr. Pitchford brought the teacher in with Mr.
22  Strange to discuss the problems. She
23  immediately sent the items Mr. Pitchford told
24  her I would need, and asked her to be more
25  cooperative. She seemed to respond." Do you

1  recall an incident of that nature?
2      A    No, sir.
3      Q    You never recall a meeting between
4  Mr. Pitchford, you, and another teacher, in
5  which there was some kind of items that Mrs.
6  Miller was having trouble getting, and Mr.
7  Pitchford told her what to get, and the
8  teacher seemed to respond appropriately or
9  cooperatively? That doesn't ring any bells
10  with you?
11      A    Yes. I had a meeting with Mr.
12  Pitchford and another teacher.
13      Q    Tell us about that, please?
14      A    Mr. Pitchford had -- he came to --
15  it was either me or Mrs. Ezell, and wanted to
16  know why wasn't Mrs. Ezell giving Mrs. Miller
17  her lesson plans.
18      And Mrs. Ezell had responded that she
19  had told Mrs. Miller where her lesson plans
20  would be, and that was in the office. All
21  teachers are required to have a copy of their
22  lesson plans. And I want to say that -- she
23  was not going up there and getting the lesson
24  plans, so --
25      Q    Mrs. Miller was not --

176

1      A    No.
2      Q    -- going to the office and getting
3  them?
4      A    So, she didn't have lesson plans.
5  And I believe that Mrs. Ezell might have went
6  and got a copy of the lesson plans and gave
7  it to Mrs. Miller or Mrs. Miller went and got
8  a copy. Somehow, she received a copy from
9  the office of the lesson plans.
10      Q    Let me ask you this: Why did that
11  necessitate a meeting between you and Mr.
12  Pitchford and the teacher, instead of you
13  just telling Mrs. Miller, "Well, go to the
14  office and get them"?
15      A    I mean, I don't know.
16      Q    Would that have been something you
17  had the authority to do?
18      A    What?
19      Q    To just send Mrs. Miller to get the
20  things out of the office, rather than involve
21  all these people in a meeting.
22      A    Could I have told her to go to the
23  office? Sure.
24      Q    Let me ask this. And I don't know
25  the answer to that. Would one teacher at

1  your school, at the time, have been free to
2  just go to the office and look at any other
3  teacher's lesson plans at any point?
4      A    They were in a file. All teachers'
5  lesson plans were in a file. So, I guess if
6  they would have --
7      Q    So far as you know, were they
8  accessible to everybody?
9      A    Were they?
10     Q    Yes.
11     A    Yes, they were.
12     Q    And that being the case, then, what
13 was the necessity for actually having a
14 meeting that you apparently instigated with
15 Mr. Pitchford and the teacher?
16         MS. HORTBERG: Object to the form.
17             I don't believe that's what his
18             testimony is.
19     A    No. That's not what I said.
20         MS. HORTBERG: That's not what that
21             document says.
22     Q    I'm sorry if I misunderstood you.
23 Does the document state correctly that a
24 meeting occurred that you apparently
25 initiated with Mr. Pitchford and so forth?

178

1      A    Is it true that I initiated the
2  meeting?
3      Q    Yeah.
4      A    No.
5      Q    First of all, was there a meeting
6  between you and Mr. Pitchford and some
7  teacher, having to do with the need to be
8  more cooperative and get these plans and so
9  forth?
10     A    Yes.
11     Q    All right. And I'm good with
12 whatever your answer is, okay, as long as
13 you're telling me it's truthful. You had a
14 meeting with Mr. Pitchford on this general
15 subject about the lesson plans from Mrs.
16 Ezell? Correct?
17     A    Yes.
18     Q    My question is, if these lesson
19 plans were on file in the office and readily
20 accessible to Mrs. Miller, what was the
21 necessity for having the meeting, instead of
22 just saying, "Go get them. They're in the
23 office"?
24     A    I mean, I don't know how the
25 meeting came about. We just had a meeting.

1  I don't know. Can't remember that.
2      Q    That's your best recollection?
3      A    Yes, sir.
4      Q    Let's take a look at Defendant's
5  Exhibit 14, please. And take a minute and
6  just read through it, please, sir. Just tell
7  me when you're finished.
8      A    (Witness reviewing document.) I'm
9  finished.
10     Q    Do you recall the incident or
11 incidents described in this memo?
12     A    Such as?
13     Q    Let me try it another way. It's a
14 memo to Mr. Pitchford from Nancy Miller,
15 dated September 24th, 2004. I'm reading.
16 "This memo is to inform you that this
17 morning," which would be that date, "after I
18 attended an IEP meeting for" -- I'm just
19 going to call her a certain student --
20 "Starla, the psychometrist, in Paul Strange's
21 presence, asked me to sign three documents
22 claiming that I was at IEP meetings. The
23 students were A. T. (two different
24 documents), and for J. C. As you know,
25 signing the documents when I was not present

180

1  at the meeting is unlawful. You know that
2  this is not the first time I have been
3  approached about illegally signing IEP
4  documents." I'm going to stop there. And
5  let's talk about that incident.
6      Do you recall an incident on September
7  24, 2004, which I believe was the same day
8  she left campus and went to the central
9  office, where you were present when Starla,
10 the psychometrist, asked Mrs. Miller to sign
11 three documents stating that she was at IEP
12 meetings which she, in fact, had not
13 attended?
14     A    No.
15     Q    Do you remember any circumstance of
16 that nature on the day that Mrs. Miller left
17 school and went to central office?
18     A    Again, I don't know what day Mrs.
19 Miller left. I mean, I don't know what day
20 she --
21     Q    I'll rephrase it. Do you recall
22 any incident of that nature ever having taken
23 place in your presence?
24     A    Where she was asked to sign three
25 documents?

181

1    Q    Yeah. Or any number of documents.
2    One document. It doesn't matter. But any
3    documents that would have stated she was at
4    an IEP meeting where she had not been?
5        A    I was in the presence of Starla
6    Smith when we took some documents to Mrs.
7    Miller's classroom. Yes.
8        Q    And tell us about that, please,
9    sir?
10       A    It was -- and I don't know the
11   students' names. It was an eligibility
12   meeting that we had. And Mrs. Miller had --
13   she had stopped communicating with me. She
14   wouldn't talk to me, wouldn't do anything.
15   So, we held the meeting.
16       And after the meeting, I told Starla,
17   "Let's walk down and show Mrs. Miller these
18   documents, so that she will be" -- I believe
19   she was supposed to come to the meeting and
20   didn't come. Show her the documents, so she
21   can become familiar with them. Because she
22   was not familiar with any of the IEP process.
23       So, Starla walks in the classroom. I'm
24   behind her. And she lays the -- says, "Here,
25   Mrs. Miller. I want you to look at these,"

182

1    and lays the pages down on the table. Well,
2    she immediately, you know, says, "I'm not
3    signing these. I don't know why y'all are in
4    here asking me to sign this stuff. I'm not
5    going to do it." So, she picked the papers
6    up, and we walked out of the class.
7        Q    Had you asked her to sign them?
8        A    No, I hadn't. No.
9        Q    Had Mrs. Smith, Starla, the
10   psychometrist, asked her to?
11       A    Not that I'm aware of.
12       Q    Calling your attention to the first
13   two lines of this memo. It says, "This
14   morning, after I attended an IEP for the T.
15   child," Starla did this and that. Do you
16   recall that Mrs. Miller had attended an IEP
17   meeting that day for a different child?
18       A    She might have. I mean, I don't
19   know.
20       Q    But you say she had not attended an
21   IEP eligibility meeting that day that she was
22   supposed to attend?
23       A    No. I said -- I don't remember if
24   she was invited or not. I mean, I said I
25   believe she might have been invited to

183

1    attend. I mean, I don't know.
2        Q    Are you saying that the documents
3    that you and Starla brought to Mrs. Miller
4    that day had been generated on that day?
5        A    Yes.
6        Q    At a meeting that Mrs. Miller
7    apparently did not attend?
8        A    Yes.
9        Q    And to your recollection, there was
10   no specific request that she sign any of
11   these three documents?
12       A    That's right.
13       Q    And you can't tell us whether or
14   not that was the same day she left school and
15   went to the central office?
16       A    No, sir. I can't tell you that.
17       Q    When she said, "I'm not going to
18   sign any of these documents," did you say
19   anything in response to that?
20       A    No.
21       Q    Did Starla say anything in response
22   to that?
23       A    I'm not sure if she said anything
24   or not. I mean --
25       Q    Well, did anybody say anything to

184

1    the effect that, "No one's asking you to sign
2    these documents"?
3        A    I don't remember what was said.
4        Q    But your best recollection is that
5    y'all took the documents and left at that
6    point?
7        A    Yes.
8        Q    Left the room?
9        A    Yes.
10       Q    Let's continue where I had left off
11   reading, about halfway down. "On August 11,
12   2004, at approximately 3:20 p.m., Cathy
13   Keasler approached me as I was leaving the
14   campus, and said we'd need to make up, sign,
15   and date an IEP for R. S., without having a
16   meeting. I told her that, first, as an
17   intern, I'm not permitted to write or sign
18   one if I have not attended a meeting, and
19   that I wouldn't sign one because it is
20   against the law. I have informed Dr. Jones
21   and Ms. Parris of the situation, and I am
22   leaving the premises."
23       Now, do you recall an earlier incident,
24   in mid August, involving Cathy Keasler and an
25   IEP for R. S., where there was some

1  disagreement between Ms. Keasler and Mrs.
2  Miller about whether Mrs. Miller should
3  participate in signing one?
4  　　A    No.
5  　　Q    I had asked you earlier about --
6  you said you did develop an IEP for R. S. for
7  that school year?  Correct?  That was the
8  only semester you were there?  Right?
9  　　A    I was there one semester.
10 　　Q    Right.  So, if an IEP was prepared
11 for R. S. in mid August 2004, should that
12 have been the IEP that you say you
13 developed --
14 　　　　MS. HORTBERG:  Object to the form.
15 　　Q    -- in your interrogatory answers?
16 I'm looking at number 23.
17 　　A    Yes.  Number 23 is -- I mean,
18 that's a true statement.
19 　　Q    So, unless R. S. had more than one
20 IEP developed for her during the semester you
21 were at Houston County High School, these
22 would be the same IEP, wouldn't they?
23 　　　　MS. HORTBERG:  Object to the form.
24 　　　　What IEP are you --
25 　　　　MR. FAULK:  The one that Cathy

185

1  　　　　Keasler had in August of 2004,
2  　　　　and the one you developed, that
3  　　　　you mentioned here in your
4  　　　　response to interrogatory
5  　　　　number 23.
6  　　　　MS. HORTBERG:  I'm going to object.
7  　　　　I don't think that's what that
8  　　　　document says.
9  　　　　MR. FAULK:  I think he's got a good
10 　　　　answer.  He's smiling.
11 　　　　THE WITNESS:  I'm just smiling.
12 　　Q    All right.  Well, clear me up on
13 that, if I'm just failing to understand.
14 What is it about that that --
15 　　A    I think you're asking me, is the
16 document for R. S. that I'm talking about in
17 number 23 and the document that Cathy Keasler
18 had, are they the same?
19 　　Q    Yes, sir.
20 　　A    And I'm saying no.
21 　　Q    Okay.  Can you explain that for me,
22 please?
23 　　A    I'm saying that I don't know if
24 Cathy Keasler approached her or not.  I have
25 no knowledge of that.

1  　　Q    Okay.  You were not present if that
2  occurred?
3  　　A    That's exactly right.
4  　　Q    To your knowledge, were there more
5  than one -- are you hearing me?
6  　　A    I'm listening.  Yes, sir.  I'm just
7  trying to listen.
8  　　Q    To your knowledge, was there more
9  than one IEP developed for R. S. in the fall
10 of 2004, when you were at Houston County High
11 School?
12 　　A    Not to my knowledge.
13 　　Q    Would there exist records from
14 which that could be determined?  Would the
15 Houston County Board of Education or some
16 affiliate of it, like the high school, have a
17 record on this child that would show each IEP
18 she had ever had here?
19 　　A    Oh, I don't know that.
20 　　Q    Should there be?
21 　　A    I don't know.
22 　　Q    Well, as a special educator, when a
23 child gets a new IEP, do you know what
24 becomes of the old one?
25 　　A    We turn them in to the central

186

1  office.
2  　　Q    Do you recall the approximate time
3  during the semester that you developed
4  R. S.'s IEP?
5  　　A    No, sir.
6  　　Q    Do you recall it being some sort of
7  midterm revision of an IEP or any kind of
8  special circumstance involved?
9  　　A    No, sir.
10 　　Q    Would it, in your judgment as a
11 special education teacher, have been
12 appropriate for Mrs. Miller to sign off on
13 any of these IEP documents if she had not
14 attended the meeting and somehow participated
15 in the planning of them?
16 　　　　MS. HORTBERG:  Object to the form.
17 　　A    Could she have signed off on them?
18 　　Q    Would it have been appropriate for
19 her to?
20 　　A    She could have signed off on them,
21 yes, if she would have attended the meeting.
22 　　Q    If she had attended the meeting.
23 But, if she had not attended the meeting,
24 would it be appropriate for her to sign the
25 IEP?

189

1    MR. WALDING: Object to the form.

2    MS. HORTBERG: Same objection.

3    A    She should not have signed it if

4    she didn't attend the meeting.

5    Q    Do you happen to know where Mr.

6    Pitchford was at the time Mrs. Miller left

7    the building to go to the central office on

8    that day?

9    A    No.

10    Q    Let's look at Defendant's Exhibit

11    16. Do you need a break?

12    A    No.

13    Q    I could use one.

14    (Off-record discussion held.)

15    Q    Have you had a chance to look over

16    what's previously been marked as Defendant's

17    Exhibit 31?

18    A    Yes, sir.

19    Q    All right. And do you understand

20    it, in general, to be an e-mail from Mrs.

21    Miller to a discussion group, in which she

22    has further remarks concerning a fellow

23    teacher who makes unpleasant or embarrassing

24    remarks to students, just as the general

25    subject matter?

190

1    A    Yes.

2    Q    And let me call your attention --

3    you see the capital letters, "Very

4    difficult," down there toward the bottom?

5    A    Yes, I do.

6    Q    I'm just trying to direct your

7    attention where she says, "My mentor and I

8    have spoken about the situation, and he is at

9    a loss as to what to do. He would also like

10    input from my internship seminar colleagues.

11    The principal is aware of her personality and

12    warned us that she could be difficult, so he

13    will be of no help. If we approach her, she

14    could make things even more difficult for

15    special ed students. We do not want to

16    alienate anyone. Any suggestions?"

17    Now, do you agree with me that the time

18    and date stamp on there would be the same

19    day, 22 minutes later, than Plaintiff's

20    Exhibit 12, which is --

21    A    That's it?

22    Q    Yes, sir. -- which was the letter

23    -- e-mail, rather, from Mrs. Miller to Ms.

24    Parris and Dr. Jones, that we went over

25    earlier on this same subject? Well, I will

191

1    represent to you that it indicates it is 22

2    minutes later. Maybe I'm wrong about that.

3    Yeah. 22 minutes later, on the same date,

4    saying substantially the same thing.

5    So, she said it to Jones and Parris in

6    one e-mail, turns around and says

7    substantially the same thing to her

8    internship seminar, that you and she have

9    discussed this problem, and that not only

10    would she like feedback, but that you said

11    you would like feedback.

12    And is your testimony still that that

13    just didn't happen? That this is simply

14    false?

15    MS. HORTBERG: Object to the form.

16    Q    Or does this help refresh your

17    recollection at all?

18    MS. HORTBERG: Object to the form.

19    A    If what didn't take place?

20    Q    Well, as I understood your

21    testimony as we talked about Defendant's

22    Exhibit 12, as I understood in substance, we

23    were talking about the second paragraph of

24    Defendant's Exhibit 12 --

25    A    Yes.

192

1    Q    -- that Mrs. Miller never

2    complained to you that Mrs. Ezell or any

3    other science teacher continually

4    embarrassed, belittled and humiliated the

5    students, et cetera, as alleged in

6    Plaintiff's Exhibit 12.

7    A    That's right.

8    Q    Then I'm just showing you where she

9    did it again to other people on the same

10    subject --

11    A    That's right.

12    Q    -- 22 minutes later.

13    A    Yes.

14    Q    And in both of them, she says y'all

15    had discussed it, and that not only did she

16    want input, you wanted input on this problem

17    of the science teacher belittling her

18    students.

19    Does that still not refresh your

20    recollection at all about there being such a

21    problem that Mrs. Miller had come to you

22    about, and you, yourself, wanted input on it,

23    as well?

24    A    No, it does not.

25    Q    Is any part of that true, other

193

1  than what you told me earlier about the
2  lesson plans?
3      A    That's true.
4      Q    That's her only complaint about
5  Mrs. Ezell or any other science teacher to
6  you?
7      A    As far as I can remember.
8      Q    (Handing documents to the witness.)
9  You may want to be looking over these.
10         (Recess in deposition from 2:14 to
11     2:16.)
12     Q    Have you had a chance to look it
13  over?
14     A    (Witness nodding head in
15  affirmative.)
16     Q    Let's look first at what was
17  Defendant's Exhibit 16, entitled "Concerns
18  expressed by Mrs. Miller." And I'll tell
19  you, Mr. Strange, from my understanding, this
20  is a document prepared by a person named
21  Virginia Singletary. Do you know Ms.
22  Singletary?
23     A    I do.
24     Q    And what's your understanding of
25  her position at the time of these events?

194

1      A    I mean, I don't know her title.
2  She worked at central office in the special
3  ed department.
4      Q    Do you know if she reported to Mr.
5  Andrews?
6      A    Do I know if she reported to him?
7      Q    Right. If you know. You may not
8  know.
9      A    I don't.
10     Q    Let's take a look at number 1.
11  It's my understanding that this is a document
12  Ms. Singletary prepared based upon Mrs.
13  Miller's visit to the central office on
14  September 24, 2004.
15         Number 1, "Paul Strange, Mrs. Miller's
16  quote, paid mentor, close quote, has made
17  regular comments to Pam Parris, TSUD advisor.
18  Mrs. Miller stated that she's in jeopardy of
19  failing her internship because of Mr.
20  Strange's comments."
21         Now, at that point in time, Mr. Strange,
22  had you made any comments to Ms. Parris about
23  Ms. Miller's performance in her internship,
24  other than your August 30 written evaluation?
25     A    Again, I don't remember the dates

195

1  of any of the meetings. I mean, I don't
2  remember the dates. So, I mean, I don't know
3  when this -- I mean, I don't know when this
4  was -- you told me when it was written,
5  but --
6      Q    Let me try to help. Without regard
7  to specific dates, you remember the event of
8  your doing the written evaluation on Mrs.
9  Miller, in a general way?
10     A    Yes.
11     Q    And you remember, in a general way,
12  the day Mrs. Miller left campus and went to
13  the central office?
14     A    Yes.
15     Q    Now, what I'm trying to get at is,
16  in between those two events, do you have any
17  recollection of having made any comments, and
18  in particular, negative comments, concerning
19  Mrs. Miller to Ms. Parris?
20     A    No.
21     Q    Do you think that that may not have
22  occurred, or you just simply don't remember?
23     A    I don't remember. I'm going to
24  back -- that may not have occurred. It may
25  not have occurred. It's not that I don't

196

1  remember. I don't know.
2      Q    Do you have any reason, or do you
3  know any reason why, on September 22nd, 2004,
4  or at any time in that time frame, Ms. Parris
5  would have instructed Mrs. Miller to request
6  a meeting with Mr. Pitchford to make amends?
7      A    No.
8      Q    Do you know of any reason she
9  needed to make amends with Mr. Pitchford in
10  mid September 2004?
11     A    No.
12     Q    And we're talking about before the
13  visit to the central office.
14     A    No.
15     Q    Okay. Number 2. I think we've
16  already been over the substance of number 2,
17  haven't we, about Cathy Keasler asking her to
18  sign an IEP? And you say you really don't
19  know anything about that?
20         MS. HORTBERG: Object to the form.
21     Q    Well, you do know something about
22  it?
23         MS. HORTBERG: That's not what I
24     was saying.
25         MR. FAULK: Okay. I'm trying to

1    help.
2        Q    Number 2, do you understand that as
3    having to do with the August 11 event that
4    was reported in Ms. Miller's September 24
5    memo to Mr. Pitchford, having to do with
6    Cathy Keasler, in Defendant's Exhibit 14? We
7    talked about that earlier, didn't we?
8        A    Yes, sir.  We talked about this.
9        Q    All right.  Do you know of any
10   other events that number 2 in Defendant's
11   Exhibit 16 could be alluding to between Cathy
12   Keasler and Mrs. Miller about an IEP in
13   August 2004?
14       A    No.
15       Q    All right.  Do you have any further
16   information, as you sit here, concerning that
17   alleged event?
18       A    No, sir.
19       Q    Who is Ms. Hamm, at the school, I
20   guess?  Is there a secretary out there named
21   Ms. Hamm?
22       A    She works in the office.  Yes.
23       Q    Do you have any familiarity with
24   the events described in paragraph number 3 of
25   Defendant's Exhibit 16?

198

1        A    No.
2        Q    Now, Ms. Keasler is not the
3    psychometrist, is she?
4        A    No.
5        Q    Okay.  Starla Smith is the
6    psychometrist, to your understanding?
7        A    Yes.
8        Q    And have we fully discussed the
9    events alleged in paragraph 4 of Defendant's
10   Exhibit 16 to exhaust your knowledge on that
11   subject?
12       A    Yes, sir.
13       Q    Do you have any knowledge of the
14   event describe in number 5, about Scott
15   Stephens walking out of a meeting because he
16   was laughing too hard about her concerns over
17   signing papers?
18       A    No, sir.
19       Q    Did Mrs. Miller ever tell you
20   anything about that?
21       A    No, sir.
22       Q    Did you witness that event?
23       A    No, sir.
24       Q    Were you ever at a meeting with
25   Scott Stephens and Mrs. Miller where the

1    general subject of her concerns about special
2    ed were discussed?
3        A    No, sir.
4        Q    Number 6.  Tell us about this
5    notebook that's described in number 6.
6    You're familiar with that, aren't you, about
7    her keeping a notebook or log of her
8    whereabouts during the day?
9        A    Am I familiar with having to keep a
10   notebook?
11       Q    Well, it says doing a notebook to
12   verify her activities.  Do you have some
13   recollection of that?
14       A    Yes, sir.
15       Q    Tell us how that came about,
16   please?
17       A    I had to keep a notebook, while she
18   was an intern at Columbia, of where I was at,
19   what I was doing, because we can be so many
20   different places.  So, that notebook was,
21   like, our schedule of where we were supposed
22   to be, when we were supposed to be there.
23       Q    Did you have to have other teachers
24   sign off to verify that you had, in fact,
25   been to their classroom like you said you

200

1    had?
2        A    Oh, I don't remember if anyone had
3    to sign him or not.
4        Q    Do you recall anything about Mrs.
5    Miller being required to carry a notebook or
6    logbook and have the other teachers sign off
7    that she had, in fact, come to their room
8    when she was supposed to?
9        A    I'm aware she had to do a notebook,
10   just like myself.
11       Q    Okay.  But you don't recall any
12   verification aspect to the notebook for
13   either yourself or Mrs. Miller?
14       A    I don't remember if anyone had to
15   sign off on it or not.  No.  I don't remember
16   that.
17       Q    Do you happen to still have yours?
18       A    Do I have them?
19       Q    Right.
20       A    No.
21       Q    Do you remember whose idea it was?
22       A    To do the notebook?
23       Q    (Nodding head.)
24       A    (No response.)
25       Q    Is that a "no," or are you still

1 thinking?

2    A    I'm still thinking.

3    Q    Oh, excuse me.

4    A    I'm trying to -- whose idea it was

5 to do the notebook? No, sir. I can't

6 remember whose idea it was.

7    Q    Did you keep one at your former

8 school?

9    A    Yes, sir.

10    Q    Was it Wicksburg?

11    A    Yes, sir.

12    Q    You don't know anything about

13 paragraph 7 that you haven't already told us,

14 do you? And, in particular, the last line of

15 paragraph 7. Are you aware that the

16 psychometrist was holding eligibility

17 meetings and so forth without sending out

18 notices to parents?

19    A    No.

20    Q    Is it your contention that didn't

21 occur, or are you just saying you didn't know

22 about it?

23    A    Did I know about her having

24 meetings without sending out notices?

25    Q    Right.

202

1    A    No.

2    Q    When a notice is sent out that a

3 meeting is to occur, what was the normal

4 procedure for doing that at Houston County

5 High School?

6    A    I'm not sure what the procedure was

7 at Houston County High School.

8    Q    What was the procedure at

9 Wicksburg?

10    A    Some people mailed them. Some

11 people gave them to the students.

12    Q    Was it the norm to mail them? How

13 would you verify that the parent had actually

14 received the notice?

15    A    When it came back signed.

16    Q    If the student brought it back

17 signed by the parent?

18    A    Or if the parent brought it back.

19    Q    Okay. And when you mailed it, was

20 it certified mail or regular mail?

21    A    I believe it was regular mail.

22    Q    Suppose the parent didn't bring it

23 back? What would happen next? If they

24 didn't send it back or mail it back or bring

25 it back, what would you have to do?

1    A    You wouldn't hold a meeting.

2    Q    But you're required to hold a

3 meeting at some point? Right?

4    A    Yes, sir.

5    Q    All right. And so, when you don't

6 get the acknowledgment back from the parent,

7 what would be the customary next step?

8    A    Send another one.

9    Q    Is there ever a point reached where

10 it's just clear the parent is not going to

11 cooperate? And, if so, what do you do then?

12    A    (No response.)

13    Q    That may not have ever happened.

14 Did you ever have a situation where the

15 parent just wouldn't come in to a meeting?

16    A    Sure.

17    Q    And what do you do under those

18 circumstances?

19    A    If you have a signed form stating

20 that they would not attend, then you have the

21 meeting.

22    Q    Okay. But if they don't respond at

23 all -- did you ever have that happen?

24    A    I can't remember if I've ever had

25 it happen to me or not.

204

1    Q    Look at number 8, please. And I

2 think we've already talked about most of

3 that, haven't we?

4    A    Yes, sir.

5    Q    In number 9, the assertion that you

6 had eavesdropped, if Mrs. Miller said that,

7 it's your testimony that that's just not so?

8 Correct?

9    A    That's not true.

10    Q    Let's look at Defendant's Exhibit

11 17, which is an undated letter from R. J.

12 Andrews to Pam Parris, on Houston County

13 School's letterhead, in which Mr. Andrews

14 writes to express some concerns concerning

15 Mrs. Miller. And he states, "After

16 discussions with Mr. Tim Pitchford,

17 principal, and Mr. Paul Strange, supervising

18 teacher, the concerns are as follows."

19    Do you remember having such a meeting

20 with Mr. Andrews and Mr. Pitchford?

21    A    I'm sure that we had a meeting, but

22 I don't -- I mean, to tell you when and the

23 specifics of it, I can't tell you that. I

24 don't recall that.

25    Q    I see. I would ask you to presume,

1 for purposes of my question, that this
2 occurred after the day she left campus and
3 before the date she was terminated. Do you
4 remember that to be the case?
5    A   What are you asking, now?
6    Q   In other words, this meeting that's
7 being talked about here, wouldn't it have
8 occurred between the day she left campus and
9 the day she was terminated?
10    A   I would say so.
11    Q   It's an undated letter.
12      MS. HORTBERG: And I'm going to ask
13        you not to assume or speculate
14        about things. If you don't
15        have a specific recollection --
16        and it may just be getting long
17        in the day. But I want you to
18        make sure that you do remember
19        that there was a meeting and
20        that these things were
21        discussed. To me, all it says
22        is "after discussions." It
23        doesn't say after a meeting.
24        But I want you to make sure
25        that you're understanding what

206

1        his question is, and that
2        you're not just speculating.
3    Q   Do you have any reason to doubt
4 that this is a letter from Mr. Andrews?
5    A   I don't know if it is or not.
6    Q   Well, I'm going to ask you to
7 assume it is. Do you understand, on the face
8 of it, that it's saying that he is expressing
9 some concerns about Nancy Miller, in the
10 first line? Correct?
11    A   Yes.
12    Q   And it relates discussions, plural,
13 with Tim Pitchford and you, concerning these
14 four areas. Do you recall discussions of any
15 type with Mr. Andrews concerning these four
16 areas that occurred some time after the day
17 she left campus and before the day she was
18 terminated?
19    A   I don't recall.
20    Q   Not necessarily face-to-face. It
21 could be telephone discussions. But, do you
22 recall any discussions with Mr. Andrews on
23 any of those four subjects, A through D?
24    A   I don't recall. I don't know.
25    Q   Did you, in the fall of 2004,

1 believe that there was reason to be concerned
2 about Mrs. Miller developing a better
3 understanding of the special education
4 process and the required forms, specifically
5 eligibility meetings and referral meetings?
6 Did you have any concerns at that time about
7 her developing a better understanding of that
8 process and the required forms?
9    A   As her mentor teacher, I was trying
10 to show her the forms and how to fill them
11 out.
12    Q   Well, did you, at that time,
13 consider her understanding of that to be
14 deficient in some way?
15      MS. HORTBERG: Object to the form
16        as to whatever time period it
17        is you're talking about. I
18        think you've asked him to
19        assume a time period, but --
20    Q   Between September 24 and October
21 the 19th of 2004, without regard to when this
22 letter may have been written, during that
23 time frame, did you have any particular
24 concern about Mrs. Miller's need or ability
25 to develop a better understanding of the

208

1 special education process and the required
2 forms?
3    A   Again, I don't remember any dates,
4 so I don't know.
5    Q   Well, did you have that concern at
6 any time, that she might have some deficiency
7 in being able or willing to develop an
8 adequate understanding of the special
9 education process and required forms?
10    A   Yes. I felt she needed some help.
11    Q   Okay. You felt that she needed a
12 better understanding?
13    A   Of the IEP forms.
14    Q   When it says "the special education
15 process itself," what about that?
16    A   I'm just saying I felt she needed
17 some help -- some better understanding with
18 the forms of special education.
19    Q   Okay. And be more specific than
20 that, if you would, please. What particular
21 deficiency or lack of understanding did you
22 feel she had about the required forms?
23    A   I felt that she did not know all of
24 the information that had to be included on an
25 IEP.

209

1    Q    Can you give us an example?

2    A    The necessary information to put on

3    a student profile page.

4    Q    Does the page itself call for

5    specific information?

6    A    No. Yes, it does. Yes. It does

7    call for specific information.

8    Q    So, if it calls for the specific

9    information, and you know how to read,

10    explain to us how it is that you wouldn't

11    understand what it was calling for?

12        MS. HORTBERG: Object to the form.

13    Q    You're not saying she didn't have

14    enough sense to fill these forms out, are

15    you?

16        MS. HORTBERG: Object to the form.

17    A    Could you explain yourself?

18    Q    Okay. You're saying that you had a

19    concern that she needed a better

20    understanding of how to fill out the required

21    forms to put the necessary information on it,

22    and you gave the example, I believe, of a

23    student profile. But you say the form itself

24    says on it what information it's calling for.

25    And in what respect did she seem to lack

210

1    understanding?

2    A    I was trying to show her what I

3    would put on an IEP student profile page.

4    Q    Any other examples you can think

5    of?

6    A    No, sir.

7    Q    Did you have any concern, in late

8    September or early October 2004, about Mrs.

9    Miller's being able to develop positive

10    student/teaching relationships? And, if so,

11    what were they?

12    A    I don't remember.

13    Q    Any concerns at that time about

14    working with peer teachers?

15    A    I don't know.

16    Q    You do recall the event of her

17    leaving campus? Correct?

18        MS. HORTBERG: Object to the form.

19        Asked and answered.

20    Q    Well, I'm going to assume that you

21    remember that event. Let me ask you this:

22    In your opinion, and based on your experience

23    in the Houston County School System and at

24    Houston County High School in particular,

25    tell us, please, specifically, how did Mrs.

211

1    Miller fail to follow procedure, in your

2    opinion, on the day that she left campus and

3    went to the central office?

4    A    I don't know that.

5    Q    So, that's not necessarily your

6    opinion, that she failed to follow procedure

7    in leaving campus?

8    A    No. That's not my opinion.

9        (Recess for lunch from 2:43 to

10        3:05.)

11    Q    Were you paid anything extra for

12    your mentoring of Mrs. Miller?

13    A    No, sir.

14    Q    Have you ever heard Mrs. Miller say

15    that it was her intention to take down

16    Houston County High School, or words to that

17    effect?

18    A    No, sir.

19    Q    Has anyone ever told you that Mrs.

20    Miller had said such a thing?

21    A    Not that I remember.

22    Q    Now, let me take us back to the

23    August 26, 2004 meeting between Dr. Ruediger

24    and Mrs. Miller that you had certain

25    involvement in. His first observation of

212

1    her. Okay?

2    A    Okay.

3    Q    Just trying to focus. There has

4    been testimony that after Dr. Ruediger had

5    his private critique with Mrs. Miller, that

6    he met with Mr. Pitchford to discuss her

7    concerns about the special ed program. Do

8    you recall testimony to that effect? Not

9    yours, but hers.

10    A    I mean, I don't remember.

11    Q    Let me try another route. Did Mr.

12    Pitchford, or anyone else, ever inform you

13    that, following Ruediger's critique of Miller

14    on that occasion, that Ruediger met with

15    Pitchford to discuss, among other things, her

16    concerns about the special ed program?

17    A    No.

18    Q    Do you recall a meeting the day

19    after her first observation and critique by

20    Ruediger, in which there was a meeting

21    between you, Pitchford, Stephens and Miller

22    concerning these --

23    A    No, sir. I don't recall that.

24    Q    -- concerns?

25    A    No, sir.

1    Q   Do you deny such a meeting
2  occurred, or are you just saying, if there
3  was one, I don't remember?
4    A   There was a meeting between who?
5    Q   Pitchford, Stephens and Miller,
6  that included you, at which the concerns she
7  had expressed to Ruediger were discussed.
8    A   I'm saying I don't remember a
9  meeting.
10   Q   Okay. Do you recall a meeting in
11 the conference room at Houston County High
12 School, following the time Mrs. Miller had
13 left the campus to go to the central office
14 that day? Do you recall a meeting at the
15 high school between Pam Parris, Tim
16 Pitchford, Riley Andrews and Mrs. Miller? Do
17 you have any knowledge of that meeting?
18   A   Between --
19   Q   Parris, Pitchford, Andrews and
20 Miller. Were you ever in a meeting with
21 those several people at the same time?
22   A   I was in a meeting in a conference
23 room with some other people. If those exact
24 people were there, I can't recall that.
25   Q   Do you recall anybody who was

214

1  there?
2    A   I do.
3    Q   Okay. Who do you remember being
4  there?
5    A   Ms. Parris and Mr. Pitchford.
6    Q   And do you recall the general
7  subject matter of the meeting? The purpose
8  of it?
9    A   It would have had to have been to
10 discuss Mrs. Miller. I mean, it was
11 something to do with Mrs. Miller.
12   Q   Do you remember any more about the
13 meeting than that?
14   A   No, sir.
15   Q   And you say you don't remember
16 meeting after the first observation with
17 Pitchford, Stephens and Miller?
18   A   No, sir. I'm saying I don't
19 remember that.
20   Q   On any of these meetings, do you
21 recall any preparatory meetings with Mr.
22 Pitchford or anyone else, getting ready to
23 meet with Mrs. Miller?
24   A   No.
25   Q   Is it your testimony that, in

1  general, such preparatory meetings would not
2  occur?
3    A   Would not occur?
4    Q   Right.
5    A   Yes, sir. That's right.
6    Q   I may have asked you this. If I
7  have, I apologize. After that first
8  observation, did you somehow become aware
9  that Dr. Ruediger had reported her concerns
10 to Mr. Pitchford?
11   A   No. I wasn't aware of it.
12   Q   After Mrs. Miller went to the
13 central office that day, did you, to your
14 recollection, make any special effort to try
15 to improve your relationship with her?
16   A   Not that I recall.
17   Q   At that time, did you consider that
18 there was a problem with your relationship?
19   A   Not that I recall.
20   Q   Did you ever, to your recollection,
21 state to Mrs. Miller, in substance, that you
22 regretted the events that had led to her
23 central office visit?
24   A   Not that I recall.
25   Q   Is it your testimony that you have

216

1  no recollection of any follow-up on your part
2  with Mrs. Miller, Dr. Ruediger, Pitchford and
3  others, concerning concerns that she had
4  expressed during her first observation?
5        MR. WALDING: Object to the form.
6        MS. HORTBERG: Object to the form.
7    A   I don't understand what you're
8  asking.
9    Q   All right. I'll try it again. Do
10 you have any recollection of any kind of
11 follow-up on your part with Mrs. Miller,
12 Dr. Ruediger, Mr. Pitchford or others,
13 regarding the concerns that she had expressed
14 to Ruediger in that first critique? Any kind
15 of follow-up on your part with any of those
16 people?
17   A   What -- I mean -- I don't --
18   Q   Well, you testified a minute ago, I
19 think, that you don't recall Mr. Pitchford or
20 anyone coming to you and saying, Ruediger
21 said Miller said this, this, this and this.
22   A   That's right.
23   Q   And I guess, would it be correct to
24 assume you don't have any recollection of any
25 follow-up on your part acting upon those --

1    A    That's right.

2    Q    -- expressed concerns?

3    A    Yes, sir.

4    Q    You said you are now PEPE certified

5    or -- what's the correct term for somebody

6    that's permitted to do PEPE evaluations?

7    A    That's what it is.

8    Q    Okay.  Do you agree that the

9    evaluation or observation process for interns

10   was modeled on the PEPE -- or would appear to

11   be modeled on the PEPE model for

12   observations?

13   A    Appears to be.

14        (Brief off-record.)

15   Q    Would Mrs. Miller's involvement at

16   IEP meetings have been only as that of an

17   observer rather than a true participant?

18   A    Yes, sir.

19   Q    Are there limitations, to your

20   knowledge, on what an observer could do

21   besides observe in that situation?

22        MS. HORTBERG:  Object to the form.

23   A    What are you asking?

24   Q    Well, I mean, she's not supposed to

25   interject anything in the meeting if she's

218

1    there as an observer?  Not just Mrs. Miller,

2    but any observer.  Do they actively

3    participate in some way in the meeting, or do

4    they just sit there and watch?

5    A    I guess they could participate.

6    Q    Do you know of that being the case,

7    or are you just saying it could happen?

8    A    No.  I don't know that to be the

9    case.

10        MS. HORTBERG:  Just for

11            clarification sake, are you

12            saying, does he know that it

13            was the case that Mrs. Miller

14            ever observed, but did

15            participate?

16        MR. FAULK:  That wasn't what I

17            asked, but --

18        MS. HORTBERG:  Then I just guess

19            you just --

20   Q    What I'm try to ask is, I gather

21   you're saying a guest or observer could, in

22   fact, somehow participate, but you're not

23   aware personally of any instances where

24   that's the case?  Is that correct?

25   A    (No response.)

1    Q    And it's not a case killer.  I'll

2    even withdraw it, if you want me to.

3    A    Okay.

4    Q    I mean, I'll just stand on your

5    testimony.  But, anyway --

6    A    Can you ask the question again?

7    Q    There was some testimony earlier,

8    not from you, but in earlier depositions that

9    I recall, about the idea that she was only

10   involved in IEP meetings as a, quote,

11   observer.  Is that your understanding and

12   recollection?

13        And if it is, I was just asking, does an

14   observer do anything in that context other

15   than sit there and watch and presumably learn

16   something?

17   A    I don't know.

18   Q    Are you familiar with what's called

19   a focused monitoring report that the state

20   department of education conducts concerning

21   local education agencies' compliance,

22   noncompliance, with special education

23   regulations?

24   A    I'm not.

25   Q    You're not.  Have you ever been

220

1    privy in any way to any type of monitoring or

2    investigation of the special ed program by

3    representatives from the state department of

4    education?

5    A    No.

6    Q    Let me show you -- I'm not going to

7    mark it here yet -- but, a document entitled

8    "Focused monitoring report."  It's several

9    pages.  It was produced by the Houston County

10   Board of Education as an amendment to their

11   initial disclosures.  Take a second and just

12   peruse it.  And if you've never seen one

13   before, that's fine.  If it turns out you're

14   familiar with it, I'll mark it, and we can

15   talk about it.

16   A    (Witness reviewing document.)

17   Q    Go ahead and just feel free to flip

18   through it.

19   A    (Witness reviewing document.)  No,

20   I'm not familiar with this report.

21   Q    Okay.  At any time when you served

22   as a special educator, have you ever been

23   contacted by the state department of

24   education representatives to review IEP's and

25   that type of thing?

221

1    A    No.

2    Q    Let me show you something that is
3    an exhibit, but I don't have the exhibit
4    number. Do you recall when one of the
5    lawyers, maybe your lawyer, introduced some
6    copies of Mrs. Miller's calendar from this
7    period in her deposition?

8    A    Yes.

9    Q    Okay. Let me show you what I
10   understand to be a copy from September.
11   Yeah. Because, see, it's got Labor Day here
12   on the 6th. And I don't know if you can read
13   her writing.

14      "Paul said teachers went to
15   administration (Pitchford), to complain that
16   they shouldn't have to teach the special ed
17   kids (Monday and Ezell), and that they don't
18   want special ed teachers in class." And
19   that's on the September 21, 2004 calendar
20   entry.

21      Do you recall having had a conversation
22   with Mrs. Miller to that effect around that
23   time?

24   A    No.

25   Q    Do you happen to know, whether you

222

1    talked to her about it or not, whether that
2    was a true statement, that Mrs. Ezell and Ms.
3    Monday had gone to Pitchford and said, "We
4    don't want to have to teach these kids, and
5    we don't want special ed teachers in our
6    classes"?

7    A    No. I do not know if that's a true
8    statement.

9    Q    Mr. Pitchford never told you that?

10   A    No.

11   Q    And Mrs. Ezell and Monday never
12   told you that?

13   A    No.

14   Q    After Mrs. Miller went to the
15   central office on the day we've talked about,
16   did you have any discussions with Mrs. Miller
17   about what she had discussed with Mr.
18   Andrews?

19   A    No.

20   Q    We've been here a good little while
21   today. And earlier you had told me,
22   unequivocally, I believe, that Mrs. Miller
23   did not tell you that she was leaving campus
24   on that day. Has anything we've covered
25   refreshed your memory beyond that --

223

1    A    No, sir.

2    Q    -- at this point?

3    A    No, sir.

4    Q    That's still your testimony?

5    A    Yes, sir.

6    Q    Have you had any contacts -- and
7    I'm not talking about in the context of
8    litigation preparation or anything -- but,
9    any contacts, face-to-face, telephone,
10   e-mail, memo or other writings, with any of
11   these people concerning what to do about Mrs.
12   Miller, as to whether she should fail her
13   internship or be terminated? Mr. Pitchford?
14   Did y'all ever discuss the subject of either
15   terminating Mrs. Miller or having Troy State
16   withdraw her internship?

17   A    No.

18   Q    Did you ever discuss such subject
19   with Mr. Andrews?

20   A    No.

21   Q    Ms. Singletary?

22   A    No.

23   Q    Mr. Lord?

24   A    No.

25   Q    Ms. Parris?

224

1    A    No.

2    Q    Dr. Ruediger?

3    A    No.

4    Q    Did you, prior to the termination
5    of her employment and withdrawal of her
6    internship, ever discuss the prospect of that
7    outcome with anyone in a position of
8    authority with the Houston County Board of
9    Education?

10   A    No.

11   Q    Or anyone at Troy University
12   Dothan?

13   A    No.

14   Q    And you understand I'm talking
15   about where you expressed the view that her
16   internship should be considered a failure, or
17   words to that effect?

18   A    No.

19   Q    Did any of those people ever
20   express that view to you, prior to the
21   withdrawal of her internship and the
22   termination of her employment?

23   A    No.

24   Q    When you were studying at Troy, did
25   you have any of these people, Parris or

225

1  Ruediger or Jones, involved in your education
2  at Troy?
3      A   Not that I recall, no.
4      Q   Did you intern as a special
5  education teacher?
6      A   I did.
7      Q   Whereabouts?
8      A   An elementary school in Enterprise,
9  and a high school, Carroll High School.
10     Q   In Ozark?
11     A   In Ozark.
12     Q   Do you remember who your mentors
13  were?
14     A   No.
15     Q   Was it some sort of split
16  internship, or did you have two internships?
17     A   It was split.  I know the name of
18  the elementary school.  It's College Street.
19     Q   Okay.  When you were an intern, did
20  you ever express any concerns comparable to
21  those expressed by Mrs. Miller during her
22  internship?
23         MR. WALDING:  Object to the form.
24         MS. HORTBERG:  Same objection.
25     Q   Well, did you ever express any

226

1  concerns to your mentor or other officials in
2  those schools about perceived irregularities
3  in the special ed program at those schools?
4      A   Not that I recall.
5      Q   Did you ever have any such
6  concerns, whether you expressed them or not?
7      A   Not that I recall.
8      Q   Do you feel there's anything wrong
9  with somebody in Mrs. Miller's capacity as an
10  intern expressing concerns of that nature?
11         MS. HORTBERG:  Object to the form.
12     A   About the special ed process at
13  Columbia?
14     Q   Right.  In other words, the things
15  she spoke up about, that you know of, is it
16  your view that it was somehow wrong for her
17  to speak up about it?
18         MR. WALDING:  Object to the form.
19     A   Yeah.  I don't understand what
20  you're wanting me to --
21         MR. WALDING:  The one thing he
22         testified to was that this
23         inclusion model was not being
24         followed.  And that's the only
25         concern that this gentleman, at

227

1         least in my recollection, has
2         testified to.  And you've asked
3         him about concerns.
4         MR. FAULK:  Okay.
5      Q   There's been some discussion about
6  so-called dissension among the faculty
7  members on account of Mrs. Miller's behavior.
8  Can you tell us anything about that?  Do you
9  have any knowledge of that?
10     A   No, sir.
11     Q   Did you miss any appreciable amount
12  of time from work during Mrs. Miller's
13  internship, more than maybe go to the dentist
14  or have one day sick or something?
15     A   No, sir.
16     Q   Do you have any concerns about Mrs.
17  Miller's teaching or professionalism that
18  have not been discussed here today?
19     A   No, sir.
20     Q   I want to be sure we've covered the
21  specific effects that you're aware of that
22  resulted from Mrs. Miller leaving campus on
23  the day we've discussed.
24         In addition to anything you may have
25  already told us, can you tell us any specific

228

1  adverse effects that her leaving campus had
2  on the educational process at your school on
3  that day?
4         MS. HORTBERG:  Object to the form
5         to the extent that he's already
6         testified to that.
7      Q   In addition to that.  In addition
8  to everything you've told us.
9      A   No.
10     Q   You can't.  Okay.
11         MR. FAULK:  If you'll give me just
12         a few minutes with them
13         privately.
14         (Recess in deposition.)
15     Q   Mr. Strange, I want to call your
16  attention to the period immediately in the
17  next several days following the first
18  observation by Dr. Ruediger in late August.
19  Okay?  I want to get us on the same page.
20         Do you have any knowledge of Mr. Andrews
21  having, shortly thereafter, contacted Houston
22  County High School special ed and given them
23  a set number of days to come into compliance
24  on various deficiencies?
25     A   No, sir.

229

1  Q   Are you saying that didn't happen,
2  or are you saying you have no recollection of
3  it happening?
4  A   I'm saying I have no recollection
5  of that happening.
6  Q   Do you have any understanding, Mr.
7  Strange, as to some special classification of
8  Mrs. Miller as an instructor rather than as a
9  teacher?
10  A   Do what, now?
11  Q   The words "instructor" and
12  "teacher," do you have any understanding of
13  how either of those words should have been
14  applied to Mrs. Miller in the position she
15  was in while she was working at Houston
16  County High School?
17  A   No, sir.
18  Q   What about just in the general
19  terms within the Houston County School
20  System? Are you aware of any distinction
21  between the term "instructor" and the term
22  "teacher"?
23  A   I'm not aware of it.
24     MR. FAULK: Unless somebody else
25        has some questions, I'm

231

PLAINTIFF'S EXHIBIT NO. 1

---

230

1        finished for now.
2     MR. MUSSO: Nothing for me.
3     MR. WALDING: No questions.
4     MR. FAULK: I'll say that I've
5        reviewed your written
6        discovery, and I don't have any
7        questions based on that for
8        this gentleman.
9     MS. HORTBERG: And with that, we're
10        on the record that this
11        deposition is completed? Is
12        that a true statement?
13     MR. FAULK: Yeah. We're done.
14     MS. HORTBERG: We're done with Mr.
15        Strange.
16     MR. FAULK: Thank you, Mr. Strange.
17        I appreciate it.
18
19     END OF DEPOSITION
20
21
22
23
24
25

232

PLAINTIFF'S EXHIBIT NO. 2

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 232, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under

12   my personal supervision.

13       I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21       Witness my hand this 8th day of

22   October, 2007.

23       _____

24       _____ RPR, Notary Public,

                 State at Large

25               ACCR# 155

1

IN THE U. S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

NANCY MILLER,

    PLAINTIFF,

VS.        CASE NO.1:06-CV-940-WKW

HOUSTON COUNTY BOARD
OF EDUCATION, KENNETH
LORD, RILEY JOE ANDREWS,
TIM PITCHFORD, PAUL
STRANGE, STACY EZELL,
TROY UNIVERSITY, DOTHAN,
SANDRA JONES, PAM PARRIS
and GREG RUEDIGER,

    DEFENDANTS.

The deposition of STACEY EZELL, taken
by the Plaintiff, pursuant to the Federal
Rules of Civil Procedure, before Stacey
Watkins, RPR, and Notary Public, State at
Large, at the offices of Hardwick, Hause,
Segrest & Walding, Dothan, Alabama, on the
27th day of September 2007, at 4:05 p.m.,
CDT, pursuant to notice.

---

2

**APPEARANCES:**

**FOR THE PLAINTIFF:**
**MR. WINN FAULK**
Attorney at Law
Montgomery, Alabama

**MR. THOMAS K. BRANTLEY**
Attorney at Law
Dothan, Alabama

**FOR HOUSTON COUNTY BOARD OF EDUCATION,**
**KENNETH LORD, RILEY JOE ANDREWS AND**
**TIM PITCHFORD:**

**MR. KEVIN WALDING**
**MR. PATRICK B. MOODY**
Attorneys at Law
Dothan, Alabama

**FOR PAUL STRANGE AND STACEY EZELL:**

**MS. KATHERINE HORTBERG**
Attorney at Law
Chelsea, Alabama

**FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,**
**PAM PARRIS AND GREG RUEDIGER:**

**MR. JOSEPH V. MUSSO**
Attorney at Law
Birmingham, Alabama

**ALSO PRESENT:**

**NANCY MILLER**
**KENNETH LORD**

---

3

**STIPULATION**

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

---

4

**STACEY EZELL**

having been first duly sworn, testified as follows, to-wit:

**EXAMINATION**

BY MR. FAULK:

Q    State your name for us, please, ma'am?

A    Full name?

Q    Yes, please.

A    Stacey Christine Ezell.

Q    And, Mrs. Ezell, you've been present throughout the depositions up 'til now, haven't you?

A    I have.

Q    And I know you have other matters to attend to. I want to be sure you understand the situation. But, on the other hand, I don't want to just belabor the point.

From having attended other depositions, you understand if you need a break or don't understand something, you just need to let us know. If you want a glass of water or whatever. Okay?

1   A    Okay.

2   Q    It's not an endurance contest. You

3   know, I'm not here to boss you around or

4   trick you or anything like that. If you

5   don't understand what I say, or if it doesn't

6   make sense, tell me, and I'll try it again.

7   Okay? Have you got any questions about that?

8   A    Not at this moment.

9        (Brief off-record.)

10  Q    This morning, we kind of went

11  through the complaint and answer with Mr.

12  Strange. I need to do a little of that with

13  you, if we can find them. And there's one of

14  them.

15       In number 9, I believe they alleged

16  insufficient knowledge as to who you were.

17  Do you admit that you're Stacey Ezell, an

18  adult resident citizen of Houston County,

19  Alabama?

20  A    I am.

21  Q    And do you admit that, at the time

22  Mrs. Miller was an intern at Houston County

23  High School, you were employed there as a

24  teacher?

25  A    I am.

---

6

1   Q    Do you have any personal knowledge

2   concerning the legal status of Mrs. Miller's

3   actual contract with the Houston County Board

4   of Education? Is that something you know

5   anything about?

6   A    No, I do not.

7   Q    You've never even seen her

8   contract?

9   A    That wouldn't be in my field.

10  Q    Now, do you have any direct,

11  personal knowledge of any alleged

12  noncompliance issues that Mrs. Miller may or

13  may not have reported to Mr. Strange and

14  other people concerning the special ed

15  program?

16  A    Could you repeat that, please?

17  Restate it, please.

18  Q    I'm just trying to --

19  A    Sure.

20  Q    -- be as brief as possible. In the

21  complaint, if you'll notice in paragraphs 17

22  -- namely 17, I guess, we allege sort of a

23  laundry list of things that, at the time I

24  drafted this, I understood were her

25  complaints. They're not complaints so much

---

as expressions of concern about

2   irregularities or compliance issues at the

3   Houston County High School special education

4   program.

5        Now, do you have any personal knowledge

6   of Mrs. Miller having made complaints or

7   expressed concerns to other people, or to

8   you, for that matter, about asserted

9   deficiencies or noncompliance issues with the

10  Houston County High School special education

11  program?

12  A    I do not have any personal

13  knowledge of her complaints, nor did she ever

14  speak to me about any deficiencies in the

15  special ed program.

16  Q    Have other people told you that she

17  had complained to them or others about

18  specific issues that you recall having to do

19  with special ed?

20  A    No.

21  Q    So, any knowledge on that subject

22  that you have would be general, possibly

23  secondhand hearsay-type information?

24       MS. HORTBERG: And as you've

25       already stated, she sat in on

---

8

1        your client's deposition and

2        other depositions.

3   Q    I'm talking about, you don't have

4   any personal knowledge about that?

5   A    I answered "no."

6   Q    All right. Look at paragraph 19 of

7   the complaint, please, ma'am, and number 19

8   on the answer, as well, if you would, please.

9   A    Now, is this the form that was not

10  prepared -- this was prepared by the

11  attorneys?

12       MS. HORTBERG: Uh-huh.

13  Q    Have you read both paragraphs 19 on

14  the complaint and answer now?

15  A    Yes.

16  Q    I'm going to show you or ask your

17  attorney to show you what was previously in

18  evidence as Defendant's Exhibit 18.

19       MR. FAULK: Do you have that handy?

20       MS. HORTBERG: I'm looking for it.

21       (Showing document to the

22       witness.)

23  Q    Do you recognize that document,

24  Mrs. Ezell?

25  A    I do.

1    Q    Is that your signature underneath
2  the typed portion?
3    A    It is.
4    Q    Prior to signing it, did you read
5  it?
6    A    I scanned over it.  I did.
7    Q    Did you type it?
8    A    No, I did not.
9    Q    Do you know who did type it?
10    A    I do not.
11    Q    Do you recall where you first saw
12  it?
13    A    No, I don't.
14    Q    Do you recall the circumstances at
15  all under which you saw it, as to anyone else
16  being present, who brought it to you,
17  anything like that?
18    A    I don't recall the circumstances of
19  who brought it to me.  No.
20    Q    In signing your name, was it your
21  intention to convey to third parties reading
22  it that you, in fact, agreed with these nine
23  assertions?
24    A    In signing my name, did I agree to
25  those assertions?  That's your question?

---

                                              10

1    Q    Was it your intention to convey to
2  any reader, Pam Parris, Tim Pitchford, for
3  example, that you, in fact, agreed with these
4  nine assertions?
5    A    No.  That was not my intent.
6    Q    What was your intent, then, please?
7    A    To provide observations.
8    Q    Can you explain that to me?
9    A    To provide observations of Mrs.
10  Miller's behavior.  And I can only really
11  answer to three of those nine.
12    Q    Let's just run through them.
13    A    Sure.
14    Q    At the time you signed this, did
15  you understand that it was going to Pam
16  Parris at Troy University?
17    A    No.
18    Q    Do you see where it says, at the
19  top of the thing --
20    A    I see that.
21    Q    -- directed to her?  Do you recall
22  that not being there when you signed it?
23    A    It was three years ago.  I really
24  don't recall.
25    Q    You say there are only three of the

---

1  nine that you have personal knowledge of?
2    A    Correct.
3    Q    Which of those?
4    A    Number 3.  And I can only speak for
5  my personal experience.
6    Q    And that one reads, "Mrs. Miller
7  has difficulty in communicating with faculty
8  members."
9    A    Uh-huh.  Number 6.
10    Q    Okay.  Which reads, "Classroom
11  teachers reported that Mrs. Miller has been
12  upset and crying during class time."
13    A    And number 9.
14    Q    And number 9.  "Mrs. Miller told a
15  classroom teacher, 'I don't like being here
16  any more than you do, but I have to be here a
17  certain number of hours.'  This is in
18  response to the classroom teacher telling her
19  that she could leave the room because the
20  lesson was over.  Mrs. Miller said this in
21  front of students in the class."  Did I read
22  it correctly?  Close enough?
23    A    Close enough.
24    Q    Now, let's just go through each of
25  these.  What is your basis, your personal

---

                                              12

1  knowledge, for the assertion that Mrs. Miller
2  had difficulty in communicating with faculty
3  members?  Just tell me in detail, please, the
4  basis for that statement?
5    A    Well, I guess the lesson plan issue
6  between us.  You know.  There obviously was
7  some miscommunication there about the lesson
8  plans.
9    Q    Is that all?
10    A    That's all I can recall.
11    Q    Okay.  Explain to me, please, in
12  detail, what you're talking about about the
13  lesson plan thing.  I know Mr. Strange
14  alluded to it.
15    A    Right.
16    Q    But, tell me your version of it,
17  please?
18    A    Well, the first day that I met with
19  Mrs. Miller, we -- how did that go?  We had a
20  meeting in Mr. Stephens' office.  And she was
21  telling me, with Mr. Strange present, that
22  she needed lesson plans.  And I told her that
23  she needed lesson plans.  And I told her that
24  up a copy in the office.  That's where we had
25  to provide them every Monday morning.  And I

1  think I repeated myself twice during that
2  meeting.
3      And she also needed copies of my lecture
4  notes, which wasn't a problem for me, because
5  I had done that in years past with several of
6  my special ed students that I've taught over
7  the 15 years. And copies of my tests, which,
8  again, I've always provided for the previous
9  special ed teachers, as well as the keys to
10  the tests.
11      Q    Okay. And then, what happened?
12  How did it become an issue, once you had told
13  her to go to the office and get them?
14      A    I don't know.
15      Q    Well, help me. At some point,
16  apparently, did Mr. Pitchford or Mr. Strange
17  somehow get involved in this issue?
18      A    Yes.
19      Q    Tell me what you know about how
20  that came about and what became of it?
21      A    I would say mid September, early
22  September, I was called in to Mr. Pitchford's
23  office. And Mr. Strange was there. And he
24  asked me was I providing Nancy Miller with
25  the lesson plans. And I repeated to him what

14

1  I just told you, that I told her she could
2  pick up a copy of my lesson plans in the
3  office. And I was providing lecture notes
4  and tests and keys. You know. That was a
5  good four weeks into the nine weeks.
6      Q    So, there were some materials,
7  aside from the lesson plans, that you were
8  personally providing?
9      A    Uh-huh.
10      Q    And you had told her, "If you need
11  the lesson plans, you can go to the office
12  and get them"?
13      A    That's correct.
14      Q    And when you talked with -- was it
15  just Pitchford or Pitchford and Strange?
16      A    I want to say Mr. Strange was
17  there, but I can't be 100 percent certain.
18      Q    When you talked to them, was it
19  your impression that she was telling them
20  that she couldn't get any of these things?
21      A    It was --
22      Q    And by "things," I mean the three
23  type things you just mentioned.
24      A    It was my impression that she was
25  not receiving anything.

1      Q    That she was saying she was not
2  receiving anything?
3      A    That was my impression.
4      Q    Because if you were giving her the
5  notes and the keys and all that, you knew she
6  was getting those? Right?
7      A    Correct.
8      Q    But it was your impression she had
9  not been getting the lesson plans?
10      A    I assume, from the meeting.
11      Q    At the meeting -- and what I'm
12  tying to get at is what Pitchford told you
13  that Mrs. Miller had claimed. Was it your
14  understanding that she claimed she wasn't
15  getting any of these type materials or only
16  the lesson plans?
17      A    It was my impression that she was
18  not getting the lesson plans, specifically.
19      Q    That's your whole answer? I just
20  want to make sure I'm not cutting you off.
21      A    It is.
22      Q    Okay. Any other basis for your
23  statement that she had difficulty in
24  communicating with faculty members?
25      A    That was only my personal

16

1  experience with Mrs. Miller in regards to
2  number 3.
3      Q    Had you heard of other experiences
4  that she was having with difficulty in
5  communicating with other faculty members?
6      A    No.
7      Q    No one else had come to you and
8  said, "God, you know, I really can't
9  communicate with this Miller woman"?
10      A    I don't recall.
11      Q    Let's see. What was the next one?
12  6?
13      A    Uh-huh.
14      Q    About crying in the classroom.
15  Tell me about that?
16      A    You know, I believe that was
17  towards the -- right before she was released
18  from her internship. She was obviously
19  stressed, and she was in front of my desk.
20  And I guess I asked her what was wrong. And
21  she told me there were problems with the
22  internship. And she got teary-eyed, said she
23  may not be able to ever teach. And that was
24  basically the gist of it.
25      Q    The third one was number 9?

1   A   Yes.

2   Q   Okay. About, I don't want to be

3  here any more than you do, or words to that

4  effect. What do you know about that?

5   A   That was during fourth block,

6  biology. I gave the kids a break, which, in

7  my classroom, doesn't happen very often. I

8  told them we were going to go off task the

9  remainder of the block, and they could have

10  essentially free time, which, you know,

11  basically is all that was.

12     And I stated to Mrs. Miller that if she

13  had some other things she needed to do, that

14  we were done. And that's the response that I

15  received, that's written on the report.

16   Q   What was the reason for -- what

17  were your words? Going off task?

18   A   Yes. Going off task means, in the

19  classroom -- in my classroom, children should

20  always be on task, whether I'm giving lecture

21  notes or if they have an assignment or if

22  they're reading over their notes. And we

23  were going off task, meaning we were done,

24  and I was going to give them some free time

25  to do what --

18

1   Q   Okay. So, y'all had just

2  accomplished all that you intended to

3  accomplish during that class?

4   A   Right.

5   Q   And they were going to have a

6  little free time?

7   A   And I believe it was a Friday.

8  Yeah.

9   Q   Now, you say you don't know who

10  typed it or whose PC was used? Right?

11   A   No, I don't.

12   Q   You don't remember who gave it to

13  you to sign?

14   A   No, I don't.

15   Q   Assuming nobody out there is

16  clairvoyant, do you know how the person who

17  did type it would have known to type in three

18  things that you knew about?

19   A   No. I don't recall.

20   Q   Had you made earlier reports of

21  these three things to somebody that the

22  author could have gotten them from?

23   A   I really don't recall how this

24  letter evolved.

25   Q   Do you remember ever telling

1  anyone, prior to signing this letter, about

2  number 3, number 6 or number 9?

3   A   No. I don't recall.

4   Q   And you can't tell us how in the

5  world the typist could have gotten that

6  information?

7   A   No.

8   Q   Were any of those events witnessed

9  by anyone else, other than perhaps the -- I

10  mean, by any other faculty member, other than

11  number 3, about the lesson plans?

12   A   Students.

13   Q   Okay. So, you don't know. Did you

14  understand that this document, Defendant's

15  Exhibit 18, would likely be used to undermine

16  her internship?

17     MR. WALDING: Object to the form.

18     MS. HORTBERG: Object to the form.

19   Q   Did you have any idea that this

20  could be used to hurt her?

21     MS. HORTBERG: Object to the form.

22   A   No.

23   Q   What did you think it was for?

24   A   As I said earlier, I don't recall.

25   Q   Have you ever been involved in any

20

1  court proceedings at all?

2   A   No, I haven't.

3   Q   Did you witness the final departure

4  of Mrs. Miller from your school?

5   A   I was at Kirklin Clinic, in

6  Birmingham, the day she was -- the day she

7  was released.

8   Q   Bear in mind, of course, I'm a man,

9  and I don't understand a lot of things in

10  life. And I don't mean to be insensitive or

11  anything like that. I saw in your

12  interrogatories your reference to the Kirklin

13  Clinic.

14   A   Uh-huh.

15   Q   During this time frame here from

16  August through September and halfway into

17  October, were you taking any kind of

18  medications that, so far as you know, could

19  have influenced your behavior toward other

20  people? And I'm talking about adversely

21  influenced. And that may sound silly to you,

22  and I'm sorry if it does. But I'm just

23  ignorant of these things.

24   A   No. No. No. No. You know, I was

25  taking hormone shots. We were -- and this

1  was very common knowledge.  I talked about it
2  in biology, because it's a part of biology.
3  We were trying to get pregnant, and I was
4  giving myself fertility shots.  I can't tell
5  you the name of the hormones, but I can get
6  it from Kirklin Clinic, if you need it.
7      Q    Maybe you could get it to your
8  lawyer and let her decide whether I'm
9  entitled to it.  Okay?
10     A    Okay.  If that's what you need.
11     Q    And I'm not going to go on about
12  that.
13     A    That's fine.
14     Q    But I just felt like I had to ask.
15  You've heard, I'm sure, during Mrs. Miller's
16  depositions, as well as Mr. Strange's, that
17  there is a contention that Mrs. Miller
18  overheard you making statements in the
19  presence of students that she considered to
20  be potentially embarrassing to the students
21  or ridiculing the students, that type of
22  thing.
23         Now, whether you agree with it or not,
24  do you remember that general line of
25  testimony?

22

1      A    I --
2      Q    Just the fact that things about
3  that have been said?
4         MS. HORTBERG:  And to clarify your
5              question, that was testimony by
6              your client.  That was not
7              testimony by Paul Strange, that
8              he had --
9         MR. FAULK:  Okay.  Well, whether
10             Mr. Strange admits it or not, I
11             was asking him questions about
12             it.
13     Q    But you know the general line of
14  testimony I'm talking about?
15     A    You're asking me if I recall that
16  line of testimony?
17     Q    In the testimony.  I'm not asking
18  you to admit it, that it, in fact, happened.
19  I'm just trying to get us on the same page.
20  And I may do that from time to time during
21  your deposition.
22     A    All right.
23     Q    Do you remember this kind of
24  testimony, and, if you do, let's talk about
25  it.  Okay?

1      A    Okay.  And I was asking you if you
2  were asking me if I recall that line of
3  testimony.
4      Q    Yes.  That's what --
5      A    I recall that line of testimony.
6  Yes.
7      Q    All right.  Now, in that regard,
8  what is your testimony concerning those
9  allegations by her that you made
10  embarrassing, humiliating statements to your
11  students in class?
12     A    That's not true.
13     Q    Okay.  Now, realizing that, to some
14  extent, that could be a matter of opinion,
15  did you ever comment in a less than
16  flattering way about any student's hairdo?
17     A    No.
18     Q    Or any student's clothing?
19     A    No.
20     Q    Or any student's weight?
21     A    No.
22     Q    Or any student's apparent learning
23  ability?
24     A    No.
25     Q    Or difficulty, for that matter?

24

1      A    No.
2      Q    And so, if Mrs. Miller says you
3  did, she's either lying or grossly mistaken?
4  Is that fair to say?
5         MR. WALDING:  Object to the form.
6         MS. HORTBERG:  Same objection.
7      A    I think that's her opinion.
8         MR. WALDING:  She can just be
9              mistaken.
10        MR. FAULK:  Not just grossly
11             mistaken?
12        MR. WALDING:  I objected to your
13             form.
14     Q    Let me ask you this, Mrs. Ezell:
15  At the time you signed Defendant's Exhibit 18
16  that we talked about a minute ago, were you
17  aware that Mrs. Miller had said that sort of
18  thing to other people, about your making
19  embarrassing statements in front of your
20  children?
21     A    You know, let me be frank.  That
22  was three years ago.  And there was a lot
23  more going on in my world than what was going
24  on at school.  And I don't recall that.  All
25  I recall is a lot of trips to Kirklin Clinic.

1    Q    Do you have any particular training
2  in either the civil rights law or school law?
3    A    No.
4    Q    Do you have any specific knowledge
5  of what Mrs. Miller's official duties were in
6  connection with her job at your school?
7    A    Could you restate that, please?
8    Q    Do you have any specific knowledge
9  of what Mrs. Miller's official duties were
10  while working at your school?
11    A    No.
12    Q    Have you ever seen a written job
13  description for Mrs. Miller?
14    A    No. I'm not in administration.
15    Q    Have you ever had other special ed
16  interns come into your class over the years?
17    A    Interns --
18    Q    Right.
19    A    -- or teachers?
20    Q    No. Interns.
21    A    I've had -- not an intern, no.
22    Q    Have you been given any explanation
23  by any administrator, starting with Mr.
24  Pitchford, on up, with the Houston County
25  Board of Education, as to the true reason for

26

1  the termination of Mrs. Miller's employment?
2    A    No.
3    Q    Have you been given any explanation
4  by anyone in an administrative capacity
5  that's a basis for the withdrawal of her
6  internship?
7    A    No.
8    Q    Do you have any personal experience
9  or recollection of teachers in this school
10  system ever working on any type of
11  provisional or emergency certificates?
12        MS. HORTBERG: I'm sorry. Working
13        on or working under?
14        Ms. FAULK: Well, whatever.
15        However you work with a
16        certificate. I don't know if
17        you're under or on it.
18    A    Provisional?
19    Q    Well, you're a certified teacher?
20    A    I am.
21    Q    And it's a regular certificate, I
22  assume?
23    A    It is.
24    Q    And do you understand there may be
25  other types of emergency certificates or some

1  type of provisional certificate issued from
2  time to time? Is that anything you know
3  anything about?
4    A    I don't know anything about that.
5    Q    All right. Who is Amy Christine
6  Ezell?
7    A    That's my daughter.
8    Q    It says, "Resides with her
9  parents." Is that you and your husband?
10    A    It is.
11    Q    And who is William G. Ezell?
12    A    My husband's son from his first
13  marriage.
14    Q    What age is he, approximately?
15    A    He'll be 11 in a couple of weeks.
16    Q    Do you have any relatives in
17  Barbour County?
18    A    No.
19    Q    Just out of curiosity. They're
20  nice people, by the way. You don't have to
21  be nervous about answering. What was your
22  connection with Scott Stephens? Was he your
23  assistant principal? Was that the
24  relationship?
25    A    Scott was the assistant principal

28

1  at that time.
2    Q    Is he in your line of supervision
3  today?
4    A    He is our principal today.
5    Q    Okay. Do you know what your
6  approximate GPA in college was?
7    A    You know, that was a long time ago.
8  A lot of beers and pizza ago.
9    Q    Did you receive any particular
10  honors or distinction upon completion of any
11  of these degrees listed in your interrogatory
12  answers?
13    A    I think I was inducted into the
14  honor society at Troy, my master's program,
15  if I'm not mistaken.
16    Q    It's your chance to brag on
17  yourself.
18    A    I guess.
19    Q    Have you discussed this case at all
20  with Lisa Towns?
21    A    Is that your question?
22    Q    Yes.
23    A    No.
24    Q    In your interrogatory answers, you
25  say that she, among others, to the best of

29

1  your knowledge, have some knowledge regarding
2  the plaintiff. Can you tell us, in a general
3  way, what your basis is for saying that about
4  Ms. Towns? I'm referring to your response to
5  interrogatory number 9.
6      A    Just what I have read in all these
7  papers and hearsay.
8      Q    Has Ms. Towns ever informed you of
9  anything concerning Mrs. Miller's performance
10 at your school that, in your judgment,
11 reflects adversely on Mrs. Miller?
12     A    Could you restate that, please?
13     Q    Has Ms. Towns, Lisa Towns, ever
14 stated anything to you about Mrs. Miller
15 that, in your judgment, reflects adversely on
16 Mrs. Miller's performance at your school?
17     A    No.
18     Q    Has Ms. Towns intimated to you in
19 any way that she knows the true basis for the
20 withdrawal of Mrs. Miller's internship or the
21 termination of her employment?
22     A    No.
23     Q    Let me ask you the same question
24 about Melissa Sims. First, who is she?
25     A    She is the English teacher at work

30

1  -- at school, Houston County High School.
2      Q    Let me ask you the same questions I
3  asked you about Ms. Towns. Has Ms. Sims ever
4  intimated to you that she has some knowledge
5  of the basis for Mrs. Miller's loss of her
6  internship and the loss of employment?
7      A    No.
8      Q    Has Ms. Sims ever informed you of
9  any facts concerning Mrs. Miller's
10 performance at the school that you would
11 consider to be, you know, adverse, that would
12 adversely reflect on Mrs. Miller's
13 performance?
14     A    No.
15     Q    Have you discussed any of those
16 same subjects with Mr. Pitchford?
17     A    No.
18     Q    Mr. Strange?
19     A    No.
20     Q    Who are Louie and Carolyn Ezell?
21     A    My in-laws.
22     Q    Sherry Breckenridge?
23     A    Sherry Breckenridge? That's my
24 mother.
25     Q    Mike?

31

1      A    Breckenridge? My baby brother.
2      Q    Let me just run through these.
3  Where is William Ezell employed?
4      A    My husband?
5      Q    Right.
6      A    He works for CLM at Fort Rucker.
7      Q    Louie Ezell, is he currently in the
8  work force?
9      A    No. He's a retired educator.
10     Q    From what system?
11     A    Houston County.
12     Q    And Carolyn Ezell?
13     A    The same.
14     Q    Larry Breckenridge?
15     A    My father.
16     Q    And status?
17     A    He's self-employed.
18     Q    Doing what?
19     A    Industrial contractor.
20     Q    Does he have a d/b/a that he does
21 business as, other than his own name?
22     A    A who?
23     Q    I'm sorry. In other words, a lot
24 of time, people don't have a corporation or a
25 partnership, but it might be Winn Faulk doing

32

1  business as Hotshot Concrete Pourers or
2  something.
3      A    I have no clue.
4      Q    So, he doesn't have a trade name
5  that you're aware of --
6      A    No.
7      Q    -- that he does business? Okay.
8  And your mother, is she employed?
9      A    No.
10     Q    Has she been employed in the last
11 ten years?
12     A    No.
13     Q    And your brother, Mike?
14     A    Yes.
15     Q    Whereabouts?
16     A    He works for my father.
17     Q    Is he married?
18     A    No.
19     Q    Larry Breckenridge, Jr.?
20     A    Is my brother.
21     Q    And does he work?
22     A    For my father.
23     Q    And Hilda Smith?
24     A    My grandmother.
25     Q    Is she still in the work force?

35

1    A    She's retired.

2    Q    From where?

3    A    The University of -- Eastern

4    Washington University.

5    Q    Does she live around here?

6    A    She does now.

7    Q    Who are Beth and Brad Kirkland?

8    A    First cousin and husband.

9    Q    And where do they work?

10    A    You know, at the moment, I couldn't

11    tell you.

12    Q    What county do they live in?

13    A    Houston.

14    Q    And John and Jean Smith?

15    A    Aunt and uncle.

16    Q    Are they in the work force?

17    A    They are.

18    Q    Whereabouts?

19    A    Lowe's and Circle Pharmacy, I

20    believe it is.

21    Q    The ladies at the pharmacy?

22    A    Yes, she is.

23    Q    And James and Sarah Moorer?

24    A    That's Bill's aunt and uncle.

25    Q    And are they still in the work

34

1    force?

2    A    They're retired.

3    Q    And do you know from where?

4    A    Not right off, no.

5    Q    And Stanley and Linda Park?

6    A    That's Bill's aunt and uncle.

7    Q    And can you tell me about their

8    employment status or retirement status?

9    A    I really don't know.

10    Q    Other than the lecture notes and

11    lesson plans and tests and test keys that

12    we've already discussed, were there any other

13    materials and support that you provided Mrs.

14    Miller with that you're referring to in your

15    answer to interrogatory number 22?

16    A    I may have provided her with a

17    teacher's edition of the biology book. I

18    can't say that for a fact. I want to say

19    that she asked for one, and I want to say

20    that I gave her one. But I can't be 100

21    percent certain.

22    Q    Do you recall the general testimony

23    while ago by Mr. Strange about some biology

24    books that he referred to as AGS books, that

25    apparently are somehow considered useful for

1    special ed students?

2    A    No, not really.

3    Q    You're not even familiar with the

4    books?

5    A    I think I've seen them before.

6    Q    Do you recall any incident such as

7    that he discussed involving your students,

8    where Mrs. Miller was to take them out of

9    class and teach them biology with other

10    materials?

11    A    I really don't recall.

12    Q    Do you recall any move or effort by

13    Mrs. Miller to actually teach your class two

14    and three days a week, as described by Mr.

15    Strange?

16    A    That was never brought to my

17    attention. It was never requested.

18    Q    As a general education teacher, did

19    you receive any kind of specific training

20    with regard to implementing special education

21    IEP's in your classroom?

22    A    Well, I mean, we have periodic

23    workshops where they keep us abreast of

24    special education law, and they have people

25    come in and talk to us. So, yes. If you can

36

1    refer to that as training, yes.

2    Q    The Houston County School System

3    does that?

4    A    They do.

5    Q    Is there any other source of it

6    that you would regularly have attended? And

7    by "regularly," I mean when it was offered,

8    whether once a year or twice a year or

9    anything.

10    A    I believe I've attended a few

11    workshops.

12    Q    Would that be reflected in your

13    personnel file? Do you know?

14    A    I guess. I'm not really sure, to

15    be honest.

16    Q    Was there ever any time, while Mrs.

17    Miller was at your school as an intern, that

18    you ever requested of anyone in authority

19    that no special ed teacher be sent to your

20    classroom?

21    A    No.

22    Q    Was there ever any time that you

23    requested of anyone in authority that special

24    ed students not be sent to your classroom?

25    A    No.

39

1    Q    You've heard, I guess, my efforts
2    to understand what full inclusion means. Can
3    you tell me what that term means to you,
4    please?
5    A    To me, would mean that the students
6    with learning disabilities are to be in the
7    classroom, in a regular classroom, in a
8    regular classroom setting, with the special
9    ed teacher there to aid in any problem they
10   may have, whether it might be lecture notes
11   or what have you.
12   Q    And were there students who were
13   subject to inclusion in your classroom who
14   were special ed students?
15        MS. HORTBERG: Object to the form.
16             Are you talking about during
17             the time period that Mrs.
18             Miller --
19        MR. FAULK: Right. Yeah.
20   A    Could you restate that?
21   Q    You did have some special ed
22   students in your biology or science classroom
23   of some sort while Mrs. Miller was at the
24   school, didn't you?
25   A    I'm sure I did. I do every year.

38

1    Q    The idea of additional special ed
2    students coming into your class, in your
3    view, did that in any way impede the
4    education of your other students or interfere
5    with it?
6    A    In my opinion, no.
7    Q    Did you ever discuss that sort of
8    thing with Mrs. Miller?
9    A    No. That I recall, no.
10   Q    Have you been made aware of any
11   allegations concerning so-called dissension
12   among faculty members that was caused by Mrs.
13   Miller somehow?
14   A    No.
15   Q    I frankly think dissension may be a
16   bad word. Have you ever heard of any
17   disruption in your school that was attributed
18   to Mrs. Miller?
19   A    Not that I recall.
20   Q    Have you ever participated in an
21   IEP meeting yourself?
22   A    As a general education teacher,
23   yes, on several occasions.
24   Q    Does that include assisting in
25   drafting the IEP's?

40

1    Q    Do you recall there being some type
2    of change with regard to inclusion in the
3    Houston County system between, like, 2003,
4    2004, in that period of time?
5    A    A change?
6    Q    Right. Toward -- I guess you would
7    say fuller inclusion?
8    A    You mean a move from the resource
9    room to the classroom setting?
10   Q    Right.
11   A    I guess that would be about the
12   correct time frame.
13   Q    And how did you feel about that?
14   A    That was fine with me.
15   Q    You didn't have any objections to
16   that?
17   A    No.
18   Q    Did it make your job more difficult
19   in any way?
20   A    No.
21   Q    In your view, did that change or
22   interfere in any material way with the
23   education that your general education
24   students were receiving?
25   A    Could you restate that, please?

1    A    No.
2    Q    Do you happen to know whether it's
3    appropriate for a person to sign an IEP who
4    did not attend a meeting, if you know?
5    A    I can't speak to that, because
6    that's not my field of knowledge.
7    Q    Have you ever been asked to sign an
8    IEP at Houston County High School where you
9    did not attend the meeting that preceded the
10   preparation of the IEP document?
11   A    No, I haven't.
12   Q    Do you recall hearing that Mrs.
13   Miller had, one day in late September, left
14   school and gone to the central office for
15   some reason?
16   A    Yes. I recall briefly. I think it
17   was a Friday.
18   Q    Do you recall the event, or do you
19   recall somebody telling you about it later?
20   A    I just had heard about it.
21   Q    Can you tell us how, if at all, her
22   behavior in connection with that event, the
23   fact that she left school -- can you tell us
24   specifically any way in which her behavior
25   adversely affected your ability to teach?

1    A    Not off the top of -- restate that,
2    please.
3    Q    Well, did her leaving school and
4    going to the central office adversely affect
5    your classroom environment in any material
6    way?
7    A    Other than the special ed teachers
8    -- the special ed students didn't have
9    someone to help them with lecture notes that
10    day or tests or quizzes that I may have been
11    giving that day. That's the only way I can
12    think of. It didn't adversely affect me, but
13    it probably adversely affected students that
14    needed her assistance.
15    Q    All right. If her absence was
16    during one of your classes where she had
17    special ed students?
18    A    Yeah. If it was during that time.
19    Yes.
20    Q    Did she, herself, have special ed
21    students in every one of your classes?
22        MS. HORTBERG:  Object to the form.
23    A    I really don't recall.
24    Q    But you recall there was more than
25    one special ed teacher at the school? Right?

42

1    A    Uh-huh.
2    Q    Paul Strange and Paul Payne?
3    A    Uh-huh.
4    Q    And Mrs. Miller. Was there anybody
5    else?
6    A    I believe it was only three.
7    Q    Did you ever give Mrs. Miller any
8    advice, as such, concerning her job
9    performance?
10    A    No.
11        (Brief off-record.)
12    Q    Do you recall, while Mrs. Miller
13    was at your school, having to make any
14    particular accommodations for special ed
15    students included in your class? And, if so,
16    what sorts of things would you have to do in
17    order to include a special ed child in your
18    class?
19    A    Could you restate that question,
20    please?
21    Q    Probably not, but I'll try.
22    A    It's late in the day.
23    Q    In other words, if you were having
24    -- and I realize there are different degrees
25    of special education eligibility.

1    A    Yes.
2    Q    Some students, apparently, is it
3    correct, with a learning disability, may be
4    fully capable of learning with a little extra
5    help, and if they're severely retarded, maybe
6    not. Is that your experience in general?
7    A    You have students with different
8    learning ability -- different learning
9    disabilities, I should say. And it would all
10    depend on their IEP.
11    Q    Would you agree with me that, since
12    that's not your field of expertise, if that
13    child did not have a current IEP, you might
14    or might not be making the right
15    accommodations for that child in your
16    classroom?
17        MS. HORTBERG:  Object to the form.
18    A    Restate that question.
19    Q    How would you know what
20    accommodations to make for a particular child
21    if he did not have a current IEP?
22    A    I would be reliant on the special
23    ed teacher.
24    Q    There's been testimony about a
25    conversation you allegedly had with Mrs.

44

1    Miller in which you had commented that Sandra
2    Jones and you were old friends. Do you
3    recall such a conversation having taken place
4    or such a comment being made by you?
5    A    I never made that comment. Sandra
6    Jones was my advisor during my master's
7    degree program, and I think I had a class --
8    I can't be 100 percent sure about that. That
9    was a long time ago. But, as far as friends,
10    no. She was my academic advisor.
11        And the only reason that even came up
12    was because Mrs. Miller told me that Sandy
13    Jones was her academic advisor, if I recall
14    correctly. And I stated that she was my
15    advisor during my master's degree program.
16    Q    And that would be at Troy-Dothan,
17    from '93 to '95?
18    A    That's correct.
19    Q    And had you stayed in touch with
20    Dr. Jones over the years?
21    A    No.
22    Q    Has she ever been to your house for
23    dinner?
24    A    No.
25    Q    Or you to her house?

45

1    A    No.

2    Q    Did Mr. Pitchford ever ask you, in

3    substance, to be more cooperative with Mrs.

4    Miller?

5    A    What do you mean, in substance?

6    Q    Well, maybe not in so many words,

7    but in words to that effect?

8    A    Yes.  He called me in for the

9    meeting that I had -- we talked about

10   earlier, to provide her with lesson plans.

11   And I explained to him that I had told her at

12   the first meeting we had that she could get a

13   copy of my lesson plans in the office.  And

14   that's how she -- after that meeting, I

15   believe she started going to the office to

16   get a copy of my lesson plans.

17   Q    Was there any time in which you

18   said to Mrs. Miller, in substance, "I hear

19   that you could fail your internship"?

20   A    No.

21   Q    Did you ever hear rumors to that

22   effect prior to the withdrawal of her

23   internship?

24   A    No.

25   Q    So, you never said that to her, and

46

1    nobody ever said that to you?

2    A    No.

3    Q    Do you recall asking her something

4    about, why was Pitchford keeping track of

5    her?

6    A    No.

7    Q    Do you recall having to sign off on

8    a log for her when she would come to your

9    class?

10   A    Not that I recall.

11   Q    The question was asked during one

12   of Mrs. Miller's depositions, I think by your

13   attorney, had she ever made the statement to

14   anyone to the effect that she planned to take

15   down Houston County High School.  Has she

16   ever said that in your presence?

17   A    Not in my presence, no.

18   Q    Has anyone ever told you that she

19   had said that?

20   A    Yes.

21   Q    And who told you that, please?

22   A    Amy McNeal.

23   Q    Who is Mrs. McNeal?

24   A    An English teacher at Houston

25   County High School.

47

1    Q    Spell McNeal for me?

2    A    Oh, gosh.

3    Q    Is it N-i-e-l or N-e-a-l?

4    A    I couldn't spell my own name at

5    this point.  I really don't know.

6    Q    Approximately when did Mrs. McNeal

7    tell you that?

8    A    It's probably been a good year,

9    maybe a year and a half ago.  I really don't

10   -- I know it's been -- it's probably been

11   about a year, year and a half ago.

12   Q    Do you know whether it was before

13   or after you were served with papers in this

14   lawsuit?

15   A    It was before.

16   Q    In the notice of your deposition,

17   we had a request for production of any and

18   all documents or tangible things that you

19   consider relevant to a fair understanding of

20   your testimony.

21       Are you aware of any documents, the

22   existence of any documents, that you have

23   access to, that you have not already produced

24   to your attorney, that have something to do

25   with this case?

48

1    A    No.  I'm not aware of any

2    documents.

3    Q    And you didn't bring any with you?

4    A    No, I did not.

5        (Brief off-record.)

6    Q    Take a look, please, at what's been

7    marked as Defendant's Exhibit 31.  I'm also

8    giving you Defendant's Exhibit 12.  And I'll

9    ask you, please, to just look over both those

10   and tell me when you've had a chance to

11   review them.

12   A    Okay.  (Witness reviewing

13   documents.)  Yes, I'm familiar with these.

14   Q    You see they're both dated

15   September the 11th?

16   A    Yes.

17   Q    Now, admittedly, that's some pretty

18   strong talk.

19   A    Yeah.  Pretty well besmirches my

20   name, doesn't it?

21   Q    Now, when is the first time you can

22   remember it coming to your attention that

23   Mrs. Miller was saying this type thing about

24   you?

25   A    When I first read this.

49

```
 1    Q    And when would that be?
 2    A    Last fall, after the lawsuit was
 3  filed.
 4    Q    Your testimony is you really did
 5  not know that she had said this sort of thing
 6  about you to other people?
 7    A    No, I was not aware.  As I said
 8  earlier -- I don't know how to put this,
 9  other than, you know, during that
10  time was not so much work as it was the
11  infertility issues that my husband and I were
12  having.  And that's where my mind was at.
13  But this is pretty damning to my name.  I can
14  tell you that.
15    Q    At the time Mrs. Miller left the
16  school, was it your impression that you and
17  she had a good relationship, a good
18  professional relationship?
19    A    You mean that Friday she left?
20  What are you talking about?
21    Q    No.  When she left for good.  By
22  the time she left for good, what was your
23  opinion of the state of your relationship
24  with Mrs. Miller?
25    A    I didn't have one.
```

50

```
 1    Q    Didn't have an opinion or didn't
 2  have a relationship?
 3    A    Didn't have an opinion.
 4    Q    Would you agree with me that the
 5  three items on Defendant's Exhibit 18 that
 6  you contributed are not flattering
 7  accusations, if you will?  It's getting late
 8  for me, too.
 9        MS. HORTBERG:  Object to the form.
10    Q    Do you want to take a look at it?
11    A    Oh, I know --
12    Q    I mean, these are adverse comments,
13  aren't they?
14        MS. HORTBERG:  Object to the form.
15    Q    It's okay.  You can answer.
16    A    It's simply my observations.
17    Q    But they're not intended to promote
18  her career, are they?
19        MS. HORTBERG:  Object to the form.
20    A    Simply my opinions.
21    Q    You don't have an opinion as to
22  whether these comments are good for her
23  career or bad for her career?
24    A    I don't think I'm in a place to
25  judge that.  I'm not in administration.
```

51

```
 1    Q    At the time you contributed to
 2  Defendant's 18, you didn't have any personal
 3  reason to feel badly toward Mrs. Miller?  You
 4  were just making professional observations --
 5    A    That is correct.
 6    Q    -- that you considered to be
 7  truthful and objective?
 8    A    That is correct.
 9    Q    If you would, please, look at
10  Defendant's Exhibit 13.
11        (Ms. Hortberg reviewing documents.)
12    Q    While she's looking for Defendant's
13  Exhibit 13, let me ask you this:  Did anyone
14  else, other than whoever asked for your
15  information on Defendant's Exhibit 18,
16  contact you or solicit information from you
17  concerning Mrs. Miller's performance?
18    A    Did anyone else contact me about
19  what, now?
20    Q    And solicit information from you
21  concerning Mrs. Miller's performance.
22    A    No.
23    Q    You've got Defendant's 13 there.
24  If you would, please, ma'am, read the first
25  paragraph there, and let me know when you've
```

52

```
 1  finished.
 2    A    (Witness reviewing document.)  Yes.
 3  I've read the first paragraph.
 4    Q    Does that appear to be referring to
 5  the meeting that Mr. Pitchford had with you
 6  about the lesson plans and so forth that you
 7  talked about earlier?
 8    A    Yes.
 9    Q    Take a look, please, ma'am, at
10  Defendant's Exhibit 30.  Take a moment,
11  please, and just read down through that
12  document.  Have you seen it before today?
13    A    Yes.
14    Q    Did you see it prior to the
15  litigation?
16    A    No.
17    Q    Look over it for just a minute, and
18  tell me when you're satisfied you can talk
19  about it.
20    A    (Witness reviewing document.)
21  Okay.
22    Q    There's certain information that
23  appears, on the face of it, to be attributed
24  to Tim Pitchford.  Let's just take them one
25  at a time.  Unprofessional behavior.  Do you
```

have any knowledge of that sort of thing on Mrs. Miller's part that you've not already testified to today?
A No, I don't.
Q Causing anxiety among teachers. Would you be one of the three teachers who had met with him expressing concerns?
A No, I was not.
Q Do you know who they were?
A No, I do not.
Q Do you know anything about that subject?
A No, I do not.
Q Not following directions of the cooperating teacher. Would you have any reason to know about that?
A No, I do not.
Q And you say you do know about the crying in the classroom?
A Only because it happened in my classroom.
Q Did she ever tell you that Mr. Strange was out to get her or anything to that effect?
A No.

Q Did she ever make any statements to you about Mr. Strange that you considered to reflect adversely on Mr. Strange?
A No.
Q Did she ever display extreme disrespect for anyone else in your presence?
A No, that I can -- no.
Q Other than as might be reflected by your comments on Defendant's Exhibit 18, was she cooperative with you in your classroom?
A In the classroom and cooperative? Yeah. I thought we cooperated pretty well together in the classroom. It seemed to be the difficulty was the lesson plans.
Q Tell me a little more about that.
A The lesson plans?
Q Her saying she didn't have them or what?
A That I wasn't providing them. But there were copies in the office, as I stated earlier.
Q Okay. So, there wasn't any other problem having to do with the lesson plans, other than what you've already told me?
A As far as I know, there was no

other problem.
Q There's a statement here, "Difficulties collaborating with regular education." So, other than the thing about the lesson plans, so far as you were concerned, y'all didn't have any difficulty collaborating with each other?
A In the classroom, it seemed to be fine.
Q Well, I just have to ask. I mean, was there some interaction between y'all outside the classroom?
A Not that I recall.
Q Or outside the school environment?
A No.
Q Did you ever ask anyone what was wrong with Mrs. Miller?
A No.
Q Did you ever feel like y'all were having -- that she came across as overbearing or had a clash of personalities with you?
A I would agree with that.
Q Okay. Tell us about that, please. What's your basis for that?
A Just the lesson plans in general.

I didn't know there was a problem until a month later. You know. She never once approached me and said, "Hey, I need your lesson plans." I had told her previously in the meeting, twice, in the beginning, this is where they would be at. And then, next thing I know, I'm having a meeting with my principal because, supposedly, I'm not providing her with materials a month into the grading period.
Q Did she appear nervous to you at times, other than the one incident you told us about?
A Not that I recall.
Q You had nothing to do with the observations of her by Dr. Ruediger or Mr. Strange, did you?
A No.
Q Did either of those take place in your classroom?
A No.
Q Take a look, if you would, please, at -- I can't read the document number. Do you have that one?
A (Witness reviewing document.)

1    Q    And in particular -- I realize this
2    is a long document, and a lot of it doesn't
3    have anything to do with the school room.
4    Let me call your attention to the second
5    paragraph, about halfway down, where it says,
6    "However, I'm going to vent." Do you see
7    that?
8    A    Uh-huh.
9    Q    Start reading there, please, ma'am,
10    and tell me when you get to the end of the
11    paragraph.
12    A    (Witness reviewing document.)
13    Okay.
14    Q    Again, is it your testimony that
15    you deny having engaged in the type conduct
16    alleged in those couple of sentences?
17    A    That is correct.
18    Q    Okay. Assuming her statement to be
19    true, that she and Paul Strange had discussed
20    it, is there any basis, to your knowledge,
21    that Mr. Strange would have had for thinking
22    that you were engaging in that type of
23    behavior?
24    MS. HORTBERG: Object to the form.
25    MR. WALDING: Object to the form.

1    want to make sure I've got your correct
2    testimony on these things. When I showed you
3    Defendant's Exhibit 31, that attributes
4    certain behaviors to you, and Defendant's
5    Exhibit 12, second paragraph, which
6    attributes some behaviors to you -- and I
7    want to say there was another one somewhere.
8    MS. HORTBERG: This one that's
9    sitting right here on top?
10    MR. FAULK: What exhibit is that?
11    MS. HORTBERG: I have no idea.
12    Q    Let's see. This document that I
13    can't read the exhibit number on is a
14    two-page document from the Blackboard
15    learning system, dated September 11, 2004, at
16    1:53 p.m. It's the second half of the second
17    paragraph.
18    Am I correct in understanding that, your
19    having reviewed these documents, you're
20    unequivocally denying ever having engaged in
21    any of those behaviors attributed to you in
22    these documents? Is that correct?
23    A    That's correct.
24    Q    Now, to your knowledge, has Amy
25    McNeal ever been known by another last name?

58

1    MR. FAULK: Fine.
2    Q    The answer is "no," I take it?
3    A    No.
4    Q    Other than the thing here in
5    Defendant's Exhibit 18, was there any sort of
6    routine document that you would have filed
7    regularly or periodically concerning an
8    intern's dealings with you in the classroom,
9    as to how she was doing and that type thing?
10    A    No.
11    Q    Do you remember, Mrs. Ezell,
12    whether Plaintiff's Exhibit 18 was signed
13    before or after Mrs. Miller had made her trip
14    to the central office?
15    A    I don't recall.
16    Q    You see there in number 1 -- do you
17    see it says she left the campus without
18    informing administrative personnel?
19    A    Uh-huh.
20    Q    Are you aware of more than one such
21    absence from the campus by Mrs. Miller?
22    A    I really can't speak to that.
23    (Recess in deposition.)
24    Q    Let me back up. And your lawyer
25    will probably start screaming. But I just

60

1    A    I think her maiden name is Deese.
2    Q    Let me show you Defendant's Exhibit
3    31. Do you have a copy of that in front of
4    you?
5    MS. HORTBERG: Yes.
6    A    Okay.
7    Q    Do you know, please, ma'am, where
8    the defendants obtained this document before
9    it was first admitted into evidence? Did you
10    provide that to counsel?
11    A    I wouldn't have access to that.
12    Q    So, you never saw this document,
13    Defendant's Exhibit 31, before it was
14    introduced as an exhibit in Mrs. Miller's
15    deposition? Is that fair to say?
16    A    I never saw this document until
17    after the lawsuit was filed.
18    Q    Did you see it prior to Mrs.
19    Miller's deposition being taken?
20    A    I guess it was in discovery. I'm
21    not really sure. But I saw it after the
22    lawsuit was filed. I don't recall. I mean,
23    there's so many --
24    Q    Let me ask you this: Did you
25    obtain this document from any outside source,

1    that is, from a source outside the people in

2    this room?

3         A    No.

4         Q    Have you obtained any documents

5    pertinent to this case from Amy McNeal?

6         A    No.

7         Q    And has she directed you to any?

8         A    No.

9         Q    Are you aware, ma'am, about any

10   distinction in the terms "instructor" and

11   "teacher" as used in the Houston County

12   School System?

13        A    No.

14            MR. FAULK:  It is finished.

15

16            END OF DEPOSITION

17

18

19

20

21

22

23

24

25

                                              62

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4         I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 61, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under

12   my personal supervision.

13       I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21       Witness my hand this 8th day of

22   October, 2007.

23       _____

24       _____ RPR, Notary Public,

25       State at Large

         ACCR# 155

1

1          IN THE U. S. DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5    NANCY MILLER,

6        PLAINTIFF,

7      VS.              CASE NO.1:06-CV-940-WKW

8    HOUSTON COUNTY BOARD
     OF EDUCATION, KENNETH
9    LORD, RILEY JOE ANDREWS,
     TIM PITCHFORD, PAUL
10   STRANGE, STACY EZELL,
     TROY UNIVERSITY, DOTHAN,
11   SANDRA JONES, PAM PARRIS
     and GREG RUEDIGER,
12
         DEFENDANTS.
13

14      The deposition of VIRGINIA SINGLETARY,

15   taken by the Plaintiff, pursuant to the

16   Federal Rules of Civil Procedure, before

17   Stacey Watkins, RPR, and Notary Public, State

18   at Large, at the offices of Hardwick, Hause,

19   Segrest & Walding, Dothan, Alabama, on the

20   10th day of October 2007, at 3:20 p.m., CDT,

21   pursuant to notice.

22

23

24

25

---

3

1              STIPULATION

2

3      It is stipulated by and between counsel

4  for the parties that this deposition be taken

5  at this time by Stacey Watkins, RPR, and

6  Notary Public, State at Large, who is to act

7  as commissioner without formal issuance of

8  commission to her; that said deposition shall

9  be taken down stenographically, transcribed,

10 and certified by the commissioner. The

11 signature of the witness is waived.

12      Except for objections as to the form of

13 questions, no objections need be made at the

14 time of the taking of the deposition by

15 either party, but objections may be

16 interposed by either party at the time the

17 deposition is read into evidence, which

18 shall be ruled upon by the Court on the

19 trial of the cause upon the grounds of

20 objection then and there assigned.

21

22

23

24

25

---

2

1    APPEARANCES:
2
3    FOR THE PLAINTIFF:
4    MR. WINN FAULK
     Attorney at Law
5    Montgomery, Alabama

6    MR. THOMAS K. BRANTLEY
     Attorney at Law
7    Dothan, Alabama

8
     FOR HOUSTON COUNTY BOARD OF EDUCATION,
9    KENNETH LORD, RILEY JOE ANDREWS AND
     TIM PITCHFORD:
10
     MR. KEVIN WALDING
11   MR. PATRICK B. MOODY
     Attorneys at Law
12   Dothan, Alabama

13
     FOR PAUL STRANGE AND STACEY EZELL:
14
     MS. KATHERINE HORTBERG
15   Attorney at Law
     Chelsea, Alabama
16

17   FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
     PAM PARRIS AND GREG RUEDIGER:
18
     MR. JOSEPH V. MUSSO
19   Attorney at Law
     Birmingham, Alabama
20

21   ALSO PRESENT:

22   NANCY MILLER
     KENNETH LORD
23
24
25

---

4

1          VIRGINIA SINGLETARY

2  having been first duly sworn, testified as

3  follows, to-wit:

4

5              EXAMINATION

6

7  BY MR. FAULK:

8      Q    Is this Virginia Singletary?

9      A    Yes, sir.

10     Q    I'm Winn Faulk, Ms. Singletary. I,

11 along with Tom Brantley, represent Nancy

12 Miller in this case. I assume that you have

13 been made aware, in a general way, at least,

14 that this case involves a suit by Mrs. Miller

15 against the Houston County Board of Education

16 and others in connection with the loss of her

17 internship and ultimately the loss of her

18 employment. Are you aware of that?

19     A    Yes, sir.

20     Q    Have you ever had your deposition

21 taken before in any case?

22     A    No, sir.

23     Q    What I'm going to do, I'm going to

24 ask you questions. I want to make sure you

25 understand my questions. If I mumble or if I

1  ask a question that just doesn't make sense,
2  tell me that --
3      A    Okay.
4      Q    -- and I'll try to do it better.
5  Okay?
6      A    All right.
7      Q    If you need a break, let me know
8  that, and I'll be glad to take one. During
9  the course of your testimony, if you remember
10  something you left out of a previous answer,
11  just interrupt me, and I'll be glad to let
12  you go back and change your answer. Okay?
13      A    All right.
14      Q    To add to it, take away or
15  whatever. Have you got everything you need
16  for right now? I'm not going to be very
17  long, I hope.
18      A    I guess so.
19      Q    In the fall of 2004, Ms.
20  Singletary, what was your position with the
21  Houston County board?
22      A    Assistant special education
23  coordinator.
24      Q    And what is your position today?
25      A    Special education coordinator.

1      Q    When was that?
2      A    I graduated in '75, I believe.
3  Then I attended Auburn University in
4  Montgomery. Received my master's also in
5  special education, with an endorsement in
6  learning disabilities, and a master's degree
7  in elementary education. That was in 1979, I
8  finished that. Then, in 1990, I finished my
9  administrative certification at Troy State,
10  Dothan.
11      Q    And how long have you been employed
12  with the Houston County system?
13      A    This is 32 years.
14      Q    And the whole time, were you
15  involved in one way or another with special
16  education?
17      A    Yes, sir. One time, at Rehobeth, I
18  was assistant principal out at the elementary
19  school, but we still dealt with special
20  education issues.
21      Q    Did you have any involvement in the
22  formation of the agreement for Mrs. Miller to
23  have an internship in the system?
24      A    No, sir.
25      Q    Or in her hiring as an

6

1      Q    Same position?
2      A    No, sir. I was assistant.
3      Q    You were assistant.
4      A    And now I'm the coordinator.
5      Q    Do you have other duties besides
6  special education?
7      A    Federal programs, also. Yes, sir.
8      Q    So, have you, effectively, replaced
9  or stepped into the position held by Mr.
10  Andrews prior to his retirement?
11      A    You did say "effectively," didn't
12  you? I have stepped into the same position
13  as Mr. Andrews. I can say that honestly.
14      Q    I appreciate your modesty. But, in
15  any event, were you employed in your prior
16  capacity in the summer of 2004?
17      A    Yes, sir.
18      Q    Tell us about your educational
19  background, please, ma'am?
20      A    Okay. Starting with college?
21      Q    Yes, please.
22      A    Troy State University, in Troy.
23  That's where I received my B.S. I have a
24  double B.S. in special education and
25  elementary education.

8

1  intern/teacher?
2      A    No, sir.
3      Q    To your best recollection, Ms.
4  Singletary, what would have been the first
5  time it came to your attention that there was
6  some type of problem, for lack of a better
7  word that I can think of, involving Mrs.
8  Miller's internship at the school?
9      A    I don't know that I could answer
10  when I first heard of some problems. I was
11  not in on any of the meetings. I was asked
12  to go check some folders because of some
13  concerns. I couldn't -- I really don't know.
14  I knew very little up until that point, and
15  then, until I talked to Mrs. Miller, when she
16  came to the office.
17      Q    But you did go out to the high
18  school, Houston County High School, and
19  review some folders, prior to Mrs. Miller's
20  September 24 visit --
21      A    Yes, sir.
22      Q    -- to your office?
23      A    Yes, sir.
24      Q    And who asked you to go out to the
25  school and check things?

9

1    A    Mr. Andrews.

2    Q    Did he give you any written

3 instructions?

4    A    No, sir.

5    Q    When you finished your

6 investigation, if you will, did you make any

7 type of written report back to him?

8    A    No, sir.

9    Q    Did you have anything in writing as

10 to which students' folders were to be

11 checked?

12    A    I carried rolls with me that I

13 assume -- I can't even remember -- I guess

14 the secretary gave them to me. And I checked

15 names off if there was a folder with an IEP

16 in it.

17    Q    Is it your belief that you checked

18 the IEP of every special ed student at that

19 school?

20    A    It's my belief that I checked a

21 folder for every person on the list that I

22 was given. Yes, sir.

23    Q    Could it have exceeded 50 students?

24    A    It would have been close and

25 probably a little over, I think. I believe

10

1 there were three teachers, and I think they

2 were all under 20, I believe. But I can't --

3 I don't remember.

4    Q    When you say "under 20" --

5         MR. WALDING: Under 20 students

6              each.

7    A    Each teacher, under 20 students

8 each.

9    Q    Oh, I got you. Okay.

10    A    I don't remember how many. But, if

11 there were over 20, that usually makes you

12 remember, because we try to keep it at that,

13 or did. So, I can't say how many.

14    Q    So, somewhere between 50 and 60

15 students, in your best judgment?

16    A    I would think, yes, sir, in my best

17 judgment.

18    Q    When you would check a folder, what

19 would that check consist of?

20    A    I was simply checking to see if

21 there was an IEP in that folder.

22    Q    Were you checking to make any type

23 of determination whether the IEP in the

24 folder was up to date?

25         MR. WALDING: Object to the form.

11

1    A    I was checking to see if there was

2 an IEP in the folder. That was what I was

3 asked to do.

4    Q    But you weren't checking, for

5 example, to make some type of determination

6 as to whether that IEP was appropriate for

7 that student?

8         MR. WALDING: Object to the form.

9    Q    Is that correct?

10    A    No, sir. I was not checking for

11 appropriateness. No, sir.

12         MR. WALDING: And let me further

13              state my objection. I don't

14              think anyone can, after the

15              fact, say an IEP is appropriate

16              or inappropriate. It's up to

17              the IEP team to determine that.

18    Q    Where were these IEP's located that

19 you checked?

20    A    I don't know. They were brought to

21 me in the conference room. I did not go to

22 the classrooms.

23    Q    And who brought them to you, if you

24 recall?

25    A    And that, I can't remember. I

12

1 don't know. I could guess, but I don't

2 remember. I just remember going through the

3 folders when they were brought in there. I

4 don't know.

5    Q    Do you recall how much notice the

6 school administration had of your visit?

7    A    No, sir, I don't.

8    Q    And you've told us the full extent

9 of your review?

10    A    Sir?

11    Q    You've told us the full extent of

12 your review?

13    A    Yes, sir.

14    Q    And the full purpose of it?

15    A    Yes, sir.

16    Q    And did you have any further thing

17 to do with Mrs. Miller's internship and

18 employment between the time you did this

19 review and the time she came to your office

20 later in September?

21    A    Not that I remember, no, sir.

22    Q    Let's talk about the day in

23 September, which I think your attorney and I

24 have agreed is September 24th or

25 approximately that date.

1    A    Yes, sir.

2    Q    How did the situation of her coming

3    first come to your attention? That is, did

4    she call you, did she just show up, or what

5    happened?

6    A    I thought that Ms. Burgess, the

7    secretary, let me know she was there, but

8    I --

9    Q    You're just not sure?

10    A    No sir. And I don't remember her

11    calling. I don't remember that. I don't.

12    Q    Do you recall -- and I'm not trying

13    to put words in your mouth. But, do you

14    recall that, when you first became aware that

15    Mrs. Miller was present in the office, that

16    Mr. Andrews was out?

17    A    Yes, sir.

18    Q    Okay. And then, pending his

19    return, did you have any dealings with Mrs.

20    Miller?

21    A    I stayed -- they met at my office,

22    actually.

23    Q    But, I mean, before he got back --

24    A    Yes, sir.

25    Q    -- did you and she have any private

14

1    conversations?

2    A    Yes, sir.

3    Q    Okay. Tell us about that, please?

4    A    She was expressing some concerns

5    that she had about the program at Houston

6    County. I asked her if it would be okay if I

7    wrote down everything, because it's very

8    difficult to recall and remember. And I did.

9    I took notes as she talked. And those

10    concerns were listed in my notes.

11    Q    All right. And that's before Mr.

12    Andrews returned to the office?

13    A    Yes, sir.

14    Q    And was there a time when she left

15    and came back?

16    A    No, sir, I don't think so. I think

17    I called Mr. Andrews.

18    Q    Your best recollection is she

19    stayed there at the office until he arrived?

20    A    Yes, sir.

21    Q    So, by the time he got there, you

22    already had noted at least some concerns that

23    she was there to talk about?

24    A    Yes, sir.

25    Q    And then, after Mr. Andrews got

1    there, did you join them for their

2    conversation?

3    A    I took notes.

4    Q    Well, I meant were you present.

5    I'm sorry.

6    A    I was present. Yes, sir.

7    Q    And, see, that's an example.

8    A    Yes.

9    Q    I mean, if I don't make sense, tell

10    me.

11    A    Yes, sir. I was. I was there. It

12    actually took place in my office. We didn't

13    move.

14    Q    Was anybody else present?

15    A    Not that I recall.

16    Q    Let me show you Defendant's Exhibit

17    16, and ask you if you're familiar with that,

18    and, if so, tell us what it is, please?

19    A    Yes, sir. That looks very much

20    like my handwritten notes that I took that

21    day.

22    Q    But these, of course, are --

23    A    They were typed.

24    Q    -- typed up?

25    A    And I signed them. Yes, sir.

16

1    Q    Did anybody edit your notes in any

2    way?

3    A    It does not appear that they did.

4    No, sir.

5    Q    And then, what? Did you just give

6    this to Mr. Andrews?

7    A    I'm sure I did, after they were

8    typed.

9    Q    Do you know of anything else you --

10    A    I think I did.

11    Q    -- would have done with them?

12    A    No, sir.

13    Q    Did you have any role in following

14    up on the complaints listed on Defendant's

15    Exhibit 16?

16    A    No, sir.

17    Q    Did you have any involvement in Mr.

18    Andrews' gathering of information following

19    the September 24 meeting?

20    A    Not that I recall any. No, sir.

21    Q    Or any involvement in the

22    termination of Mrs. Miller's employment? And

23    by "involvement," I mean were you privy to

24    any discussions concerning the termination of

25    her employment, prior to or leading up to the

17

1 time of her termination?

2    A    No, sir, not that I recall.  No,

3 sir.

4    Q    Were you informed by Mr. Andrews or

5 any other responsible person in the office as

6 to the outcome of Mr. Andrews' inquiries into

7 these concerns that are listed in Defendant's

8 Exhibit 16?

9    A    At some time or another, I was.  I

10 do not know what date.  But, yes, sir.

11    Q    Tell me what you do recall about

12 that?

13    A    All I recall is that he and, I

14 think, Mr. Lord went out to the school to

15 deliver a letter to her.

16    Q    Nobody ever told you, by the way,

17 number 6 or 3 or any of these turned out to

18 be correct or incorrect?

19    A    No, sir, not that I recall.

20    Q    And the only follow-up to this that

21 you recall having been privy to, where you

22 actually heard somebody saying things and

23 doing things, was the delivery of the

24 termination notice by Mr. Lord and Mr.

25 Andrews?

18

1    A    Yes, sir.

2    Q    Thank you.  Did you have any other

3 involvement in Mrs. Miller's involvement with

4 the school system?

5    A    I believe I sat in on at least one

6 interview.  I don't know if she had more than

7 that.  But I sat in on --

8    Q    Prior to being hired?

9    A    Prior to being hired.  Yes, sir.

10    Q    That's all?

11    A    Yes, sir.

12        (Brief off-record.)

13        (Whereupon, Plaintiff's Exhibit 4

14         marked for identification.)

15    Q    I'm going to show you what we've

16 marked for identification as Plaintiff's

17 Exhibit 4, which purports to be a letter to

18 Mr. Pitchford, as superintendent, from Joseph

19 B. Morton, dated May 12, 2006, and its

20 enclosure, both which would comprise document

21 numbers 53 through 64 of the board of

22 education's production of documents in the

23 case.

24    I'll ask you to take a look at it,

25 please, and tell us whether you're familiar

19

1 with it.

2    A    (Witness reviewing documents.)  Do

3 you want me to answer am I familiar with

4 these?

5    Q    Yes, please.

6    A    Yes, sir, I am.

7    Q    Tell us what you know about how

8 that document came to be?

9    A    It's a result of the visitation

10 from the state department of education,

11 special education.  A review of our program.

12    Q    Have you been involved in reviews

13 of that nature?  Have you had any role in

14 connection with them?

15    A    Under two -- two, I have.  Yes,

16 sir.

17    Q    And would that be the one you're

18 looking at and this shown in Plaintiff's

19 Exhibit 3?

20    A    Yes, sir.

21    Q    Note the date on 3, please, is

22 March of 2004?  Correct?

23    A    Yes, sir.

24    Q    Was there any intervening focused

25 monitoring by the state department of

20

1 education in between these two reports, so

2 far as you know?

3    A    Not special education focused

4 monitoring.  And I cannot remember if the

5 county consolidated monitoring took place

6 between this or prior to this one.  There's a

7 county federal consolidated monitoring that

8 takes place, also.  And that could have been

9 before this or --

10    Q    By "consolidated" --

11    A    And I don't remember that.

12    Q    -- does that mean it's not limited

13 to special education?

14    A    Yes, sir.

15    Q    It would include other types --

16    A    Other areas.  Yes, sir.

17        MR. WALDING:  Y'all are both

18         talking at the same time.  Let

19         him ask a question and you

20         answer.

21        THE WITNESS:  I'm sorry.

22    Q    Now, looking at Plaintiff's Exhibit

23 3 for a second, can you tell or do you happen

24 to know what schools were actually monitored

25 there?

21

1    A    There were records from all schools
2  that were pulled. They visited, this year,
3  particularly, I think, Webb Elementary.
4    Q    And by "this year," you're talking
5  about the March 2004 --
6    A    Yes, sir.
7    Q    -- Exhibit 3?
8    A    Yes, sir. I remember Webb. And it
9  will tell me in here where else they visited.
10  I think Ashford High School should be on here
11  somewhere in this one. I don't remember the
12  other one. I don't see it right this minute.
13    Q    Can you tell me how the schools
14  that are visited and monitored are selected
15  from visit to visit?
16    A    Yes, sir. The state department
17  sends us a letter telling us the records to
18  pull a few weeks before the actual visit.
19  They tell us the records to have available
20  for them in the central office to review.
21    And then, they tell us usually three --
22  it can vary, but usually three -- students
23  that they're going to do a detailed report on
24  and actually visit the school, the teachers,
25  the parents, follow the schedule, and those

22

1  kind of things. They tell us that
2  information. It's called a student select
3  review or something like that.
4    Q    Do they review all records in each
5  school or only three records in each school?
6    A    They follow three children in the
7  county. Three different schools. Usually
8  one child at each of those three schools.
9    Q    I see.
10    A    They tell us the number of records
11  to pull to have available at the central
12  office, that they review at our central
13  office.
14    Q    So, you're saying they may have
15  this more comprehensive following on three
16  individual students, but you're saying they
17  may look at more students' records, but not
18  actually have this intensive follow-up?
19    A    They look at many more records than
20  three students. Yes, sir.
21    Q    And are those preliminary letters
22  kept on file somewhere, where they tell you,
23  here's what we want?
24    A    Where they tell you the records to
25  pull?

23

1    Q    Yes, ma'am.
2    A    Yes, sir.
3    Q    And what are those? Would those
4  letters have a name or something? If I was
5  asking Kevin for them, what should I call
6  them?
7    A    It would be a list of records to be
8  reviewed for consolidated monitoring, and you
9  would give the date.
10    Q    And this is focused monitoring?
11    A    Focused.
12    Q    Right?
13    A    Excuse me.
14    Q    That's okay. I'm learning as we
15  go. But, however many records they may look
16  at, there are only going to be typically
17  three schools at any one time?
18    A    That's been the procedure in the
19  past. Three schools.
20    Q    How many schools do y'all have?
21    A    Nine.
22    Q    Now, the IEP's that they have to
23  come look at, where are they kept?
24    A    Out at the schools, when this
25  review was done.

24

1    Q    What about on the other one, number
2  4?
3    A    Is this number 4 right here?
4    Q    Yes, ma'am.
5    A    This one was a little bit
6  different, because, at this point, all IEP's
7  are in the system of the computer, and they
8  actually monitored the IEP's before they
9  came. They still told us a number of records
10  to have ready and pulled, and they looked
11  through those at the central office.
12    But the director, the leader, Ms.
13  Lovelady, told me and our committee, before
14  she started, "We have reviewed your IEP's
15  through SETS web already." It's continuously
16  monitored now. There's a difference between
17  the years for that.
18    Q    What? Are they scanned into the
19  computer or something?
20    A    They're typed in and written into
21  the computer. There's a web site that
22  teachers have to -- it's generated on the
23  computer. They're not handwritten.
24    Q    What about the signatures on them?
25    A    The signature page is separate.

25

1  You type out who should be in attendance in
2  the SETS web. The signature page, you print
3  out, and they actually sign the signature
4  page at the meeting.
5      Q    But, how does the signed signature
6  page get into the system, so the state people
7  will know it's been signed?
8      A    It doesn't. It doesn't.
9      Q    Do either of those reports, so far
10  as you can tell, pertain to Houston County
11  High School?
12      A    I think this one does.
13      Q    That's Plaintiff's Exhibit 4?
14      A    As far as one of the three
15  students, I believe it was a Houston County
16  High School student. Exhibit 4.
17      Q    May I see it, please, ma'am?
18      A    Yes, sir. (Handing documents to
19  Mr. Faulk.)
20      Q    Take a moment, please, ma'am, and
21  look at it again, and just tell me, if you
22  can, identify the parts that actually pertain
23  to Houston County High School. And if you
24  can't, that's fine. This isn't a test or
25  something. But, if you could help us, I

26

1  would appreciate it.
2      A    I'll try. (Witness reviewing
3  documents.) It's very difficult for me to
4  say without doubt, because, obviously, the
5  names have been corrected -- I mean, blacked
6  out. Let me look again. I would think that
7  this is one, from the best I can remember.
8      Q    Let me see it.
9      A    (Handing document to Mr. Faulk.)
10      Q    And you're referring to an entry on
11  page 63 --
12      A    A component was not completed.
13      Q    -- that's entitled "Implementation
14  of Improvement Strategies. Review the IEP
15  for immediate correction." Why do you
16  believe that to have to do with Houston
17  County High School?
18      A    If I can remember?
19      Q    Yes, ma'am.
20      A    It says down here, "Address the
21  components that were not completed as
22  required." There was one student at that
23  school who had turned the appropriate age
24  during that school year, and a transition
25  goal, an appropriate transition goal, had not

27

1  been addressed, because he was not that age
2  at the beginning of the school year. But it
3  should have been addressed, because he turned
4  that age during the school year.
5      Q    And what age is that?
6      A    It's 16.
7      Q    16?
8      A    Yes, sir. Used to be 14, but they
9  had changed it to 16.
10      Q    And that has to do with, as I
11  gather, making some sort of plan to help that
12  student transition into postschool life?
13      A    Yes, sir.
14      Q    Should the preliminary letters that
15  you told us about show -- really answer my
16  question as to what school we're talking
17  about? In other words, the preliminary
18  letter, prior to the monitoring evidenced by
19  Plaintiff's Exhibit 4, should say, we want
20  such and such from Houston County High
21  School? Correct?
22      A    It wouldn't have the school listed.
23      Q    It would have the child?
24      A    They just list the child.
25      Q    I see. I want to show you

28

1  Defendant's Exhibit 17. Let me just ask
2  whether you had anything to do with the
3  preparation of that letter, which is from Mr.
4  Andrews to Ms. Parris?
5      A    Not that I recall.
6      Q    Okay. And as we understand your
7  testimony, you do not have any further
8  knowledge about any of the transactions that
9  occurred leading up to Mrs. Miller's losing
10  her internship and losing her employment,
11  that you haven't already told us about?
12      A    No, sir, not that I recall.
13          MR. FAULK: Okay. Thank you. And
14          sorry we kept you most of the
15          day for a little deposition.
16          THE WITNESS: That's fine.
17          MR. FAULK: I appreciate it.
18
19          END OF DEPOSITION
20
21
22
23
24
25

29

PLAINTIFF'S EXHIBIT NO. 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

30

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 29, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under my

12   personal supervision.

13       I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21       Witness my hand this 24th day of

22   October, 2007.

23   _____

24   _____ RPR, Notary Public,

     State at Large

25   ACCR# 155

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

NANCY MILLER,                          *
                                       *
        PLAINTIFF                      *
                                       *
vs.                                    *
                                       *    CASE NO.1:06-CV-940-WKW
HOUSTON COUNTY BOARD OF                *
EDUCATION, KENNETH LORD,               *
RILEY JOE ANDREWS, TIM                 *
PITCHFORD, PAUL STRANGE,               *
STACY EZELL, TROY                      *
UNIVERSITY, DOTHAN, SANDRA             *
JONES, PAM PARRIS and                  *
GREG RUEDIGER,                         *
                                       *
        DEFENDANTS.                    *

<u>AFFIDAVIT OF KENNETH LORD</u>

STATE OF ALABAMA     )
                     )
HOUSTON COUNTY       )

Before me, the undersigned authority, personally
appeared Kenneth Jackie Lord, who, being duly sworn, deposes
and says as follows:

My name is Kenneth Jackie Lord. I am over 19 years of
age and am a resident of the State of Alabama, residing in
Dothan, Houston County, Alabama. I have personal knowledge
of the facts stated below.

I was the superintendent of education in Houston County
until December 31, 2004. I was superintendent during the
time Nancy Miller was an intern and employee at Houston
County High School. As the superintendent, I was the
custodian of records for the Houston County Board of
Education. The documents discussed below were kept in the
regular and normal course of business in the Houston County
School System.

$\mathcal{I}$

Nancy Miller signed a Public School Contract for the 2004 - 2005 scholastic year on April 19, 2004. Defendant's Initial Disclosures 5 and 6 are a true and correct copy of the contract Miller signed. My signature on this document was computer generated.

Defendant's Initial Disclosures 830 through 899 are true and correct copies of the 2007 - 2008 Houston County High School Teacher Handbook. Defendant's Initial Disclosure 843 relates to the duties of teachers in the general management of the school, including the steps a teacher must complete to leave campus. Defendant's Initial Disclosures 869 through 875 are pages from the handbook that relate to the responsibilities, qualifications and duties of staff members and teachers. Defendant's Initial Disclosures 891 through 893 relate to the grievance procedures applicable to professional and non-professional Houston County Board of Education Employees.

Much of the Teacher Handbook remains the same from year to year with small changes being made to school calenders and the like. Each year teachers and staff are provided with a copy of this handbook and the handbook is discussed before the students begin reporting for classes. The policy relating to teachers' general management duties, Defendant's Initial Disclosure 843, responsibilities, qualifications and duties of staff members and teachers, Defendant's Initial Disclosures 869 through 875, and the policy relating to grievance procedures, Defendant's Initial Disclosures 891 through 893 are true and correct copies of the same policies that were in effect during Miller's internship and employment in the fall of 2004.

The facts stated above are true and correct.

_Kenneth J. Lord_
Kenneth Lord

Sworn to and subscribed before me on this the 9th day of November, 2007.

(S E A L)

_Charlotte Mackert_
NOTARY PUBLIC

MY COMMISSION EXPIRES:
5/29/2010

PUBLIC SCHOOL CONTRACT

FOR THE

SCHOLASTIC YEAR 2004-2005

STATE OF ALABAMA
COUNTY OF HOUSTON

THIS CONTRACT, ENTERED IN DUPLICATE* BETWEEN THE BOARD OF EDUCATION OF SAID COUNTY, THE PARTY OF THE FIRST PART, AND NANCY MILLER, THE PARTY OF THE SECOND PART.

WITNESSETH:

1.  THAT THE PARTY OF THE FIRST PART HEREBY CONTRACTS WITH THE PARTY OF THE SECOND PART, AS A TEACHER IN AND FOR SAID COUNTY FOR A MINIMUM TERM OF 09 SCHOLASTIC MONTHS FOR THE SCHOLASTIC YEAR 2004-2005 AT A SALARY OF $29,834.00 FOR 12 MONTHS.

2.  THAT THE PART OF THE SECOND PART CERTIFIES = IS A LEGALLY QUALIFIED TEACHER AS EVIDENCED BY A VALID ALABAMA TEACHER'S CERTIFICATE, WHICH HAS BEEN CHECKED AND RECORDED IN THE OFFICE OF THE PARTY OF THE FIRST PART.**

3.  THAT THE PARTY OF THE SECOND PART AGREES TO KEEP SUCH REGISTER, AND MAKE SUCH REPORTS, AND FAITHFULLY COMPLY WITH ALL SUCH RULES AND REGULATIONS AS MAY BE REQUIRED BY THE HOUSTON COUNTY BOARD OF EDUC., AND TO RETURN THE REGISTER TO THE COUNTY SUPERINTENDENT AFTER HAVING MADE A COMPLETE RECORD OF ALL INFORMATION REQUIRED.

4.  THAT THE PARTY OF THE SECOND PART AGREES TO TEACH THE FULL TERM FOR WHICH THIS CONTRACT IS MADE AND FURTHER AGREES THAT SHOULD SHE FAIL TO TEACH OUT SUCH TERM, UNLESS EXCUSED FROM SUCH FULFILLMENT BY THE COUNTY SUPERINTENDENT FOR THE HOUSTON COUNTY BOARD OF EDUC., THAT ANY AND ALL SUCH FUNDS DUE SUCH TEACHER, INCLUDING ANY CHECK WHICH HAS BEEN DRAWN BY THE TREASURER OF PUBLIC SCHOOL FUNDS BUT NOT CASHED, SHALL REVERT TO THE GENERAL EDUCATIONAL FUNDS OF THE COUNTY.

5.  THAT THE PARTY OF THE FIRST PART HEREBY RESERVES THE RIGHT TO ANNUL THIS CONTRACT AND TO DISMISS THE PARTY OF THE SECOND PART:(A) IF SUCH PARTY IS NOT ON CONTINUING SERVICE STATUS, FOR INCOMPETENCY, INSUBORDINATION, NEGLECT OF DUTY, IMMORALITY, JUSTIFIABLE DECREASE IN THE NUMBER OF TEACHING POSITIONS, OR OTHER GOOD AND JUST CAUSE PROVIDED WRITTEN NOTICE OF THE INTENT TO DISMISS IS GIVEN PARTY OF THE SECOND PART BY THE PARTY OF THE FIRST PART AT LEAST TEN DAYS IN ADVANCE OF THE CONTEMPLATED ACTION, AND, PROVIDED THAT THE PARTY OF THE SECOND PART MAY, IF DESIRED, CLAIM THE PRIVILEGE OF COUNSEL BEFORE FINAL ACTION IS TAKEN, AND PROVIDED FURTHER, HOWEVER, THAT IF, IN THE UNANIMOUS OPINION OF THE SUPERINTENDENT AND OF MEMBERS OF THE EMPLOYING BOARD, THE CAUSE OF CANCELLATION OF ANY SUCH CONTRACT JUSTIFIES, A TEACHER MAY BE SUSPENDED IMMEDIATELY; (B) CANCELLATION OF THIS CONTRACT WITH A TEACHER ON CONTINUING SERVICE STATUS MAY BE MADE ONLY IN ACCORDANCE WITH THE LAWS OF THE STATE GOVERNING THE TENURE OF TEACHERS (SEE CODE REFERENCE BELOW).

6.  THAT IF THE PARTY OF THE SECOND PART HAS ALREADY ATTAINED CONTINUING SERVICE STATUS BY FULFILLING THE TERMS OF THIS CONTRACT, THEN THIS CONTRACT SHALL REMAIN IN FULL FORCE AND EFFECT UNLESS

Defendant's Initial
Disclosures                    5

SUPERCEDED BY A NEW CONTRACT SIGNED BY BOTH PARTIES IN ACCORDANCE WITH
THE PROVISIONS OF SECTIONS 16-24-1 THROUGH 16-24-38, CODE OF ALABAMA,
1975.

_____ TEACHER.

APPROVED BY DIRECTION OF THE COUNTY BOARD OF EDUCATION APRIL 19, 2004.

_____

\\\\\\\\ COUNTY SUPERINTENDENT OF EDUCATION
*ONE COPY OF THIS CONTRACT IS TO BE RETAINED BY EACH PARTY
**IT IS ILLEGAL FOR THE SUPERINTENDENT OF EDUCATION TO SIGN A CONTRACT
  WITH ANY PERSON WHO DOES NOT HOLD A VALID CERTIFICATE TO TEACH ISSUED
  BY THE STATE DEPARTMENT OF EDUCATION.

**Defendant's Initial
Disclosures**                    6

# HOUSTON COUNTY BOARD OF EDUCATION

# TEACHER'S HANDBOOK



Start of School Faculty Meeting
August 6, 2007

1. Welcome
2. Introduction of new teachers
3. Statement about responsibility of employees to read official policy of HCBOE
4. General comments about the following:
   - Purchase orders – Audit – State Examiners
   - Personal leave and other request
   - Appointments
   - Leaving campus
   - Modification for special students, esp. discipline
   - Lesson plans/ syllabus
   - Professional development
   - Hall passes
   - Punctuality--sign in/out—absences
   - Timely reports
   - Proposed fund raisers
   - Staying after 4:00
   - Criticism of other faculty members
   - Faculty meetings
   - PTO and school sponsored events
   - Evaluations
   - Calling in sick
   - Parking
   - Lockers
   - Textbooks
   - Discipline
   - Handbooks
   - Safety, violence, bullying
   - Break

CONFIDENTIAL

# Houston County High School



# Smile! You never know who is watching.

# 2007-2008

CONFIDENTIAL



CONFIDENTIAL

## TABLE OF CONTENTS

Philosophy of Houston County High School............................................. Page  2
Code of Ethics.............................................................................. Page  3
Houston County Board of Education &
Houston County High School Faculty................................................. Page  4
School Calendar........................................................................... Page  5
Scholastic Calendar, Grade Reporting & Term Exams.......................... Page  6
Club Sponsors.............................................................................. Page  7
Daily Class Schedule & Attendance.................................................. Page  8
General Management..................................................................... Page  9
Sick Leave.................................................................................. Page  10
Personal Leave Policy.................................................................... Page  11
Houston County Schools Leave Form............................................... Page  12
Houston County High Duty List....................................................... Page  13
High School Break Detention.......................................................... Page  14
High School Break Duty List........................................................... Page  15
After School Detention.................................................................. Page  16
Football Gates............................................................................. Page  17
Varsity Football Schedule.............................................................. Page  18
Jr. Varsity Football Schedule.......................................................... Page  19
Child Nutrition Program................................................................. Page  20
Guidelines for Lunch Service.......................................................... Page  21
Handling of School Monies............................................................. Page  22
Houston County School Activity Cash Control Form............................ Page  23
Requisition - Purchase Order.......................................................... Page  24
Fees for High School..................................................................... Page  25
Graduation & Promotion Policy for Students..................................... Page  26-29
Criteria for Assigning Weights........................................................ Page  30
Student Media Center Rules........................................................... Page  31
Teacher Media Center Guidelines.................................................... Page  32
Staff Rights & Responsibilities........................................................ Page  33
Teacher Rights & Responsibilities.................................................... Page  34-38
Supervision of Students................................................................. Page  39
Accidents.................................................................................... Page  40
Solicitation by Staff Members......................................................... Page  41
Visitors to the School.................................................................... Page  42-43
Grievance Procedures Professional & Non-Professional....................... Page  44-46
Campus Blueprint & Room Assignments........................................... Page  47
Fire & Tornado Drills..................................................................... Page  48
Emergency Operation Plan............................................................. Page 49-53

CONFIDENTIAL

Defendants' Initial
Disclosures     832

## PHILOSOPHY OF HOUSTON COUNTY HIGH SCHOOL

We, the Houston County High School faculty and staff, believe that each student should be guided in acquiring such knowledge, skills, attitudes, and ideas desirable to become a responsible, productive member of society. We subscribe to the idea that students acknowledge and accept their duties, rights, and privileges as worthy citizens of their democracy.

Further, we believe the school has a responsibility to nurture the development of not only basic skills such as reading, writing, speaking, and listening, but also skills in critical thinking and problem solving. These skills enable the children of today, our leaders of tomorrow, to solve the problems of this society as well as those problems posed by tomorrow's world.

Knowing that each child is unique, we believe in a flexible curriculum which will prepare our students to either accept the responsibilities of adult life or enter an institution of higher learning. In addition, we believe that students should be provided with a variety of learning experiences which will promote positive mental, physical, social, moral, and emotional growth.

We regard it the responsibility of the faculty to consider students as individuals and provide educational activities that meet their particular needs, regardless of race, creed, or economic background.

Believing that schools exist for children and that the primary focus of all school programs be planned and implemented in their best interest, the faculty and staff of Houston County High School strive to create and maintain superior educational experiences for our students.

## NON-DISCRIMINATION POLICY

It is the official policy of the Houston County Board of Education, that no person in the Houston County School System shall, on the grounds of race, color, handicap, sex, religion, creed, national origin, or age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, or employment.

CONFIDENTIAL

2

Defendants' Initial
Disclosures    833

## CODE OF ETHICS

The purpose of a Code of Ethics is to provide Houston County School personnel with basic guidelines for standards of exemplary conduct. To this end, Houston County School personnel shall subscribe to the following statements of standards:

1. Make the well-being of students the fundamental value of all decision-making actions.

2. Fulfill assigned responsibilities with honesty and integrity.

3. Faithfully implement Board rules, regulations, directions, and policies.

4. Demonstrate common professional courtesy at all times.

5. Account for all monies received, equipment and supplies issued, and textbooks listed on inventory.

6. Strive to be in regular attendance, never abusing the intent of sick leave, and completing all assignments timely.

7. Refrain from discussing the character of another employee, student, patron, or persons responsible for decisions which are duly authorized.

8. Be conservative minded and help reduce the consumption of energy within the respective schools.

9. Never knowingly or falsely abuse travel reports or any other official report submitted to the superintendent's office, state or federal agency.

CONFIDENTIAL

3

## HOUSTON COUNTY HIGH TRUSTEES
2007-2008

MR. LOWELL BRISTOW
12678 ST HWY 134
COLUMBIA, AL  36319
334-696-4392

MRS. JENNIE PARRISH
14335 HIGHWAY 52 EAST
COLUMBIA, AL  36319
334-696-4315

MR. DONNIE PRESTON
12921 EAST COUNTY ROAD 22
COLUMBIA, AL  36319
334-696-4260


## HOUSTON COUNTY BOARD MEMBERS
2007-2008

Mr Scott Thomas
401 Park St
ASHFORD, AL  36312
334 -899-5275

MR. DOYLE BOND
550 DOYLE ROAD
DOTHAN, AL  36301
334-692-3836

MRS. DOROTHY BUTTS
P.O. BOX 78
COLUMBIA, AL  36319
334-696-5549

MR. BOBBY HARRELL
768 JOHNNY MURPHY ROAD
DOTHAN, AL  36301
334-677-5828

MR. JIMMY KILGORE
320 JOHNNIE INGRAM ROAD
WEBB, AL  36376
334-899-4248

MR. KEN LANE
350 BUCKEYE RIDGE
DOTHAN, AL  36303
334-793-5416

MR Donnie Smith
1560 Silcox Rd
Ashford, Al   36312
334-677-5828

Mr. Tim Pitchford
480 County Road 60
Columbia, AL 36319

CONFIDENTIAL

Defendants' Initial
Disclosures    835

# HOUSTON COUNTY BOARD OF EDUCATION
## DOTHAN, ALABAMA

SUPERINTENDENT
Mr. Tim Pitchford

LOCAL BOARD OF TRUSTEES
Mr. Lowell Bristow
Mrs. Jennie Parrish
Mr. Donnie Preston

## HOUSTON COUNTY HIGH SCHOOL FACULTY

Mr. Scott Stephens - Principal
Mrs. Lisa Towns - Assistant Principal

HIGH SCHOOL
Patricia Kornegay
Stacey Ezell
Sandra Daniels
Frank Granberry
Jud Ethredge
Darin Freitag
Melissa Sims
Jessica Paramore
Marie Payne (Guidance Counselor)
Amy McNeill
Mary Beth Piedra
Kathleen Monday
Sean Sanders
Janet Pedroso
Melanie Pithford
Bill Enfinger
Greg Gibson
Debbie Bristow (Librarian)
Percel Gregory
Jeffery Ellison
Phillip Haynes
Dede Coe
Tambria McArdle

OFFICE
Barbara Hamm (Secretary)
Glenda Hammond (Office Aide)
Tyler Bristow (Library)

STATE SPECIAL EDUCATION
Delores Lewis (L.D.)
Harold Rogers(L.D.)
Joan Hicks (L.D.)

CUSTODIANS
Larry Coachman
Bonnie Pittman

Nurse
Jana Kirkland

CHILD NUTRITION PROGRAM
Tuwanna Trammell (Manager)
Barbara Richardson (Ass't. Mgr.)
Cheryl Burke

TEACHER AIDES
Susan Phillips
Peggy Gaylor
Emmanuel Brown

BUS DRIVERS
Jennifer Lee (B-#07-55)
Teresa Hughes (B-#07-6)
Elaine Perry (B-#97-1)
Ellen Valls (B-#07-7)
Larry Phillips (B-#07-56)
Roberta Ryan (B-#01-2)
Will Pitchford (B-#04-8)

CONFIDENTIAL

4

# HOUSTON COUNTY SCHOOLS
## 180-DAY CALENDAR
### 2007 – 2008

| | |
|---|---|
| AUGUST 6 (Monday) | Teacher Workday |
| AUGUST 7 (Tuesday) | Teacher Workday /**Open House (3 pm – 6 pm)** |
| AUGUST 8 (Wednesday) | Institute (8:30 am) |
| AUGUST 9 (Thursday) | Teacher Workday |
| **AUGUST 10 (Friday)** | **SCHOOL OPENS – Full Day for Students** |
| SEPTEMBER 3 (Monday) | LABOR DAY HOLIDAY (School closed) |
| OCTOBER 12 (Friday) | First Session Ends (45 student days) Full Day for Students |
| OCTOBER 15 – 19 (Mon – Fri) | FIRST INTERSESSION (School closed) |
| | |
| **OCTOBER 22 (Monday)** | **SECOND SESSION BEGINS** |
| NOVEMBER 12 (Monday) | VETERAN'S DAY HOLIDAY (School closed) |
| NOVEMBER 19 – 23 (Mon-Fri) | THANKSGIVING HOLIDAY (School closed) |
| DECEMBER 21 (Friday) | Second Session Ends (39 student days) Full Day for Students |
| DECEMBER 24 – JANUARY 2 | SECOND INTERSESSION (School closed) |
| JANUARY 3 – 4 (Thurs – Fri) | Professional Development/Teacher Workdays |
| | |
| **JANUARY 7 (Monday)** | **THIRD SESSION BEGINS** |
| JANUARY 21 (Monday) | M.L. KING HOLIDAY (School closed) |
| MARCH 14 (Friday) | Third Session Ends (49 student days) Full Day for Students |
| MARCH 17 – 21 (Mon – Fri) | SPRING BREAK (School closed) |
| | |
| **MARCH 24 (Monday)** | **FOURTH SESSION BEGINS** |
| MAY 26 (Monday) | MEMORIAL DAY HOLIDAY |
| MAY 28 (Wednesday) | LAST DAY FOR STUDENTS (47 student days) |
| MAY 29 (Thursday) | Teacher Workday |
| MAY 30 (Friday) | Last Workday for Teachers |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>STUDENTS</u>

| | | |
|---|---|---|
| First Session | August 10 – October 12 | 45 days |
| Second Session | October 22 – December 21 | 39 days |
| Third Session | January 7 – March 14 | 49 days |
| Fourth Session | March 24 – May 28 | <u>47</u> days |
| | | 180 student days |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL

Defendants' Initial
Disclosures    837

Approved December 12, 2006

# DATES FOR DISTRIBUTING PROGRESS REPORTS

Wednesday, September 12, 2007

Friday, November 16, 2007

Monday, February 11, 2008

Wednesday, April 23, 2008

CONFIDENTIAL

Alabama Department of Education
Revised December 20, 2006

# 2007 - 2008 TESTING DATES

| TEST | TESTING PERIOD | DAYS NEEDED FOR TESTING |
|---|---|---|
| *Alabama High School Graduation Exam* (AHSGE) | July 16 – 20, 2007 | 5 days |
| DIBELS | Days 1 – 20 of school calendar (LEA selects 2 – week window) | 1 day |
| *Alabama High School Graduation Exam* (AHSGE) | September 17 – 21, 2007 | 5 days |
| *Alabama High School Graduation Exam* (AHSGE) | December 3 – 7, 2007 | 5 days |
| DIBELS | Days 80 – 100 of school calendar (LEA selects 2 – week window) | 1 day |
| ACCESS | February 15 – March 28, 2008 | 2–3 days |
| *Alabama Direct Assessment of Writing: Grade Five* | February 21 – 28, 2008 | 1 day |
| *Alabama Direct Assessment of Writing: Grade Seven* | February 21 – 28, 2008 | 1 day |
| *Alabama Direct Assessment of Writing: Grade Ten* | February 21 – 28, 2008 | 1 day |
| *Alabama High School Graduation Exam* (AHSGE) | March 3 – 7, 2008 | 5 days |
| *Alabama Alternate Assessment* | March 24 – April 11, 2008 | 1 day |
| *Stanford Achievement Test*, Tenth Edition | March 31 – April 11, 2008 | 3 days |
| *Alabama Reading and Mathematics Test* | March 31 – April 11, 2008 | 1–2 days |
| *Alabama Science Assessment: Grade Five* | April 9 – 22, 2008 | 1 day |
| *Alabama Science Assessment: Grade Seven* | April 9 – 22, 2008 | 1 day |
| DIBELS | Days 150 – 170 of school calendar (LEA selects 2 – week window) | 1 day |

Note: No student takes all the tests listed above. Nor is all day devoted to testing on the specified number of days.

CONFIDENTIAL

## GRADUATION SCHEDULE FOR
## HOUSTON COUNTY SCHOOLS

Thursday, May 29, 2008       Practice for Graduation
Friday, May 30, 2008         Graduation

| Time  | 2008 | 2009 |
|-------|------|------|
| 8:00  | Ashford High School | Rehobeth High School |
| 11:00 | Cottonwood High School | Houston County High School |
| 1:30  | Houston County High School | Wicksburg High School |
| 3:30  | Wicksburg High School | Cottonwood High School |
| 6:00  | Rehobeth High School | Ashford High School |

CONFIDENTIAL

HOUSTON COUNTY HIGH SCHOOL
DAILY CLASS SCHEDULE
2007-2008

| | |
|---|---|
| 7:30 | ----- Arrival of students.  Students may enter building. |
| 7:40 | ----- 1st Bell |
| 7:45 | ----- Second Bell |
| 7:50 | ----- Tardy Bell—First Period |
| 9:25 | ----- First Bell |
| 9:30 | ----- Tardy Bell—Second Period |
| 9:35 | ----- Break Begins |
| 11:20 | ----- 1st Bell |
| 11:25 | ----- Tardy Bell --- 3rd Period |
| 1:20 | ----- First Bell |
| 1:25 | ----- Tardy Bell—4th Period |
| 3:00 | ----- Bell For Bus Students |
| 3:05 | -----Bell For Car Riders |
| 3:10 | -----Teachers May Leave |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

All Clubs will meet after school.  Any club sponsored activities during the
school day must have prior approval by the principal.


## ATTENDANCE

All students enrolled in the Houston County School System are to be in continuous attendance.  The
principals shall enforce the compulsory attendance laws of the State of Alabama.

1. Each student is responsible for reporting to school and to each class in accordance with his
approved schedule.

2. Each teacher shall be responsible for checking rolls daily in their assigned classes and
properly recording the student's attendance.



Defendants' Initial
Disclosures    841

GENERAL MANAGEMENT

1. Every teacher should have a definite plan from 7:30 A.M. to 3:10 P.M. each day. Teachers are to be in their classroom by 7:30 A.M. each morning. Teachers may leave at 3:10.

2. It is the individual teacher's responsibility to sign in and sign out in the office each day. This also serves as an official record of the teacher's work day when payroll is made.

3. Teachers are responsible for seeing that students enter and leave the building in an orderly manner. The building is no place in which to play and should be emphasized from the beginning. Students should not enter the building before 7:30 A.M. and leave by 3:00 P.M.

4. Teachers are to stand at the door of their classroom when students are entering and leaving to see that they pass in and out quietly.

5. Each teacher must prepare lesson plans for a minimum of one week. These plans should remain available at all times for substitute teacher or review. a duplicate copy should be given the principal the Friday before the coming week.

6. Order must be kept at all times, during classes, before school, after school, at recess, at lunch, and in study halls. Each teacher must take the measures necessary to correct students. When a teacher sees a situation, action should be taken immediately.

7. All articles found on the campus should be carried to the Library. Students may inquire for them there.

8. Before leaving the building at the close of the day, each teacher should check to see that his room is in order, with the windows down, shades or blinds adjusted, air conditioner off and lights out.

9. FEES:    All fees are payable in advance. Payment is required before credits are allowed.

10. Since it is our duty to develop healthy bodies as well as minds, our school policy does not approve of smoking or the use of drugs on campus. There will be no smoking area at Houston County High School.

11. All students driving any vehicle on campus must file a permit to drive on campus with all insurance coverage information in the office.

12. All student cumulative folders will be kept on file in the Guidance Counselor's office. These records will not be carried from the office without permission.

13. Accurate grade books are to be kept with at least nine grades for each student each nine weeks.

14. A Leave Form should be completed before the day you will be out or on the day you return to work. This form should be turned in to the office at this time. Payrolls cannot be completed until this is done. If you have been out during the same pay period and have a Leave Form on file in the office, your other day's absence can be added to this form. A copy of the Leave Form is on page 12.


CONFIDENTIAL

9

Defendants' Initial
Disclosures    842

# REMINDER

1. Teachers are to sign in (morning) and sign out (afternoon) everyday.
2. Teachers are to be outside their doors during student movement.
3. Teachers are to take roll and put attendance in the computer at the first of each class period.
4. Teachers are to refrain from smoking or using any form of tobacco while on school campus or while representing the school system anywhere.
5. Teachers must insure that their students leave the tables clean and do not carry food or drinks from the cafetorium.
6. Teachers are to perform assigned duties or have another teacher substitute for them.
7. Teachers are not to allow students out of the classroom during class.
8. Teachers must follow the courses of study as published by the State Board of Education.
9. Teacher must send visitors (not identified with a visitor's badge) to the office to check in.
10. Teachers wishing to leave campus must do the following:
    a. ask permission from the principal
    b. with permission, sign out and sign in; Please do not ask to leave for whole class periods

CONFIDENTIAL

# Houston County High School

## ANNOUNCEMENT FORM
(This form must be submitted before 8:00 am for morning announcements and before
1:00 pm for afternoon announcements)

DATE(S) TO BE ANNOUNCED: _____

TIMES TO BE ANNOUNCED: _____morning _____ afternoon

Please write out the announcement **exactly** as it is to be read
(**legibly and boldly**):

_____

_____

_____

_____

_____

_____

_____

Teacher's Signature

CONFIDENTIAL

## Morning and Afternoon Duties
## First Semester 2007-2009

*Morning Duties:*

| | |
|---|---|
| Gym: | Etheridge, Gregory |
| Lunchroom: | Granberry |
| Back parking lot: | Haynes |
| Breezeway: | Enfinger, McArdle |

*Please be at your assigned post **no later than** 7:30.*

*Afternoon Duties:*

| | |
|---|---|
| Front porch: | Sims |
| Side parking lot: | Granberry |
| Front vocational building: | Paramore |
| Back parking lot: | Haynes |
| Halls: | Daniels |
| Alternative School: | Monday |

*Please be at your assigned post **no later than** 2:50.*

CONFIDENTIAL

## First Semester Break Schedule/Duties
## 2007-2008

**Break #1**          9:35-9:50

Haynes              M. Pitchford
McNeill             Paramore
Sanders             Gregory

Piedra-Break Detention
Kornegay-Canteen


**Break #2**          9:55-10:10

McArdle             Monday
Sims                Etheridge
~~J. Hicks~~        Granberry

Coe-Break Detention
Gaylor-Canteen

**Break #3**          10:15-10:30

Daniels             Gibson
Ellison             Pedroso
Ezell

Freitag-Break Detention
Enfinger-Canteen

- Teachers will escort their class to and from break.
- Teachers will remain with their class during break.
- Students are not allowed on breeze-way beside lunchroom.
- Students are not allowed near parked cars.
- Litter should be removed from break area before returning to class.
- Five minutes is allowed between each break to allow the break area to be **cleared** before the next break begins.
- If students do not return to class when break is over, their break will be canceled the next school day. Repeated offenses will result in the loss of break for three days.
- Do NOT come to break early and do NOT stay late!!


CONFIDENTIAL

Defendants' Initial
Disclosures     846

### First Semester Lunch Schedule/Duties
### 2007-2008



| | | |
|---|---|---|
| 11:25-11:45 | Gaylor | Table 1 |
| 11:30-11:50 | McArdle | Table 2 |
| | Enfinger | Table 3 |
| 11:35-11:55 | Monday | Table 4 |
| 11:40-12:00 | Paramore | Tables 5&6 |
| 11:45-12:05 | Kornegay | Table 7 |
| 11:50-12:10 | Haynes | Tables 8&9 |
| 11:55-12:15 | Piedra | Tables 10&11 |
| 12:00-12:20 | Pitchford | Tables 1&2 |
| 12:10-12:30 | McNeill | Tables 3&4 |
| 12:15-12:35 | Gibson | Tables 5&6 |
| 12:20-12:40 | Daniels | Tables 7&8 |
| 12:25-12:45 | Freitag | Table 9 |
| | Pedroso | Tables 10&11 |
| 12:30-12:50 | Granberry | Tables 1&2 |
| | Ezell | Table 12 |
| 12:35-12:55 | Coe | Tables 3&4 |
| 12:40-1:00 | Sims | Tables 5&6 |

| | | |
|---|---|---|
| Lunch Duties: | 11:30-11:50 | Sanders |
| | 11:55-12:15 | Ellison |
| | 12:15-12:35 | Gregory |
| | 12:35-12:55 | Etheridge |

- ❖ Teachers will escort their class to and from lunch.
- ❖ Teachers will remain in the lunchroom with their class.
- ❖ Please make sure the tables are clean for the next class coming in. If need be, have a student/students clean the tables each day.



CONFIDENTIAL

# 2007 Varsity Football Schedule

| DATE | OPPONENT | LOCATION |
|------|----------|----------|
| 31 AUG | ASHFORD | AWAY |
| 7 SEPT | COTTONWOOD* | AWAY |
| 14 SEPT | HOUSTON ACADEMY* | HOME |
| 21 SEPT | WICKSBURG* | AWAY |
| 28 SEPT | ABBEVILLE | HOME |
| 5 OCT | GENEVA COUNTY* | HOME |
| 12 OCT | NEW BROCKTON* | AWAY |
| 19 OCT | G.W. LONG* | HOME |
| 26 OCT | SAMSON* | HOME |
| 1 NOV | HEADLAND | AWAY |

*AREA GAMES*

CONFIDENTIAL

Defendants' Initial
Disclosures     848

## 2007 J.V. Football Schedule

| | | | |
|---|---|---|---|
| Sept 4 | Cottonwood | Home | 6:00 pm |
| Sept 11 | Dale Co. | Home | 6:00 pm |
| Sept 18 | Headland | Home | 6:00 pm |
| Sept 24 | G.W.Long | Home | 6:00 pm |
| Oct 2 | Rehobeth | There | 6:00 pm |
| Oct 9 | Cottonwood | There | 6:00 pm |

CONFIDENTIAL

Defendants' Initial
Disclosures    849

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GBRIB | 27-Mar-84 |
| | REVISED DATE: April 12, 1988 & May 9, 1994 | |

## SICK LEAVE

Employees may accumulate sick leave at the rate of one (1) day per month. This means that a teacher employed for nine months during the year may earn nine days leave per year. Sick leave is accumulated up to two hundred twenty five (225) days for certified employees and non-certified employees. In no case shall sick leave be used until it has been earned.

Sick leave is defined as the absence from regular duty by an employee because of the following:

A. Personal illness.

B. Bodily injury which incapacitates the employee.

C. Death in the immediate family of the employee (husband, wife, father, mother, son, daughter, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, nephew, niece, granddaughter, grandson, grandfather, grandmother, uncle or aunt).

D. Where unusually strong personal ties exist, due to an employee having been supported or educated by a person of some relationship other than those listed, this relationship may be recognized for leave purposes. In such cases the employee concerned shall file with his local Board of Education a written statement of the circumstances which justify an exception to the general rule.

E. Attendance upon an ill member of the immediate family (husband, wife, father, mother, son, daughter, brother, sister) of the employee or a person standing in loco parentis.

---

References:    Senate Bill 99, Act 88-261, 1988 Legislative Session
Act 94-825, 1994 Legislative Session

CONFIDENTIAL

10

Defendants' Initial
Disclosures    850

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GBRI | 27-Mar-84 |
| | REVISED DATE: May 26, 1998 / July 18, 1989 | |

## PERSONAL LEAVE POLICY (GBRI)

Teachers & Support Personnel employed by the Houston county Board of Education may be granted a maximum of five (5) days, non-cumulative, personal leave during the period of July 1 through June 30 of each year.

Personal Leave for eligible employees of the Houston county board of Education shall be governed by the following rules:

1. Two days personal leave may be taken with full pay
2. An additional three days may be taken with the substitute's daily salary deducted from the employee's salary, to be deducted whether a substitute is hired or not.

## UNUSED PERSONAL LEAVE

### TEACHERS

Teachers may choose to have unused personal leave reimbursed at the current rate of pay for a substitute; OR

Teachers may choose to have unused personal leave converted to sick leave

### SUPPORT PERSONNEL

Support Personnel may choose to have unused personal leave converted to sick leave

ALL FIVE (5) DAYS OF PERSONAL LEAVE WILL BE ELIGIBLE FOR REIMBURSEMENT OR CONVERSION TO SICK LEAVE AT THE END OF THE LEAVE YEAR. (ref. Memo from Ed Richardson, dated March 18, 1998)

References:    Code of Alabama, 16-8-26          Legislative Act 97-444



Defendants' Initial
Disclosures    851

# Houston County High School

## Request for Leave
## 2007-2008

(This form should be submitted to the office as early as possible to request leave date.)

I am requesting leave Personal_____ Sick_____ for the date(s) of

_____.

Unless an emergency arises, I plan to return to work on _____

I will call if an emergency arises.

_____
    Teacher's Signature



Defendants' Initial
Disclosures    852

# HOUSTON COUNTY SCHOOLS
# LEAVE FORM

**Please write firmly. This is a 3 part form.**

NAME:_____  DATE:_____

SCHOOL or DEPARTMENT:_____

Complete this form in ink. One copy is to be retained in the school, one copy is to be given to the employee and one copy attached to the payroll.

| DATE(S) OUT | # DAYS | TYPE OF LEAVE (*fill in) | SUBSTITUTE NAME | SUBSTITUTE NUMBER | DATE(S) WORKED |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**LEAVE SUMMARY** (Current Payroll)

_____Days Out Sick Leave

_____Days Out Personal Leave

_____Days Out Professional Leave

_____Days Out Other

**\*PROFESSIONAL LEAVE FUNDING SOURCE**

_____  **Title I**
_____  **Title II**
_____  **Foundation Professional Development**
_____  **Local School**
_____  **Vocational (Program Improvement)**

**\*MUST HAVE PRIOR APPROVAL**

Employee Signature:_____

Principal's Signature:_____

Reason: _____
           (If for Professional Leave)

Approved/Disapproved:_____
   (Professional Leave)    Superintendent's Signature                          Date

**CONFIDENTIAL**

WHITE - Attach to Payroll        YELLOW - Employee        PINK - Retain at School

'Sick, Personal, Professional, Military, Vacation, Jury Duty, Job Injury, Lost Pay, Other

Defendants' Initial Disclosures    853

# Houston County High School
## 2007-2008
## Substitute Assessment Form

Substitute_____

Date(s) worked_____

Please complete the following:

Was the room clean when you returned?    Yes_____    No_____
(as clean as you left it)

Did the sub follow your lesson plans?    Yes_____    No_____

Do you feel that the students received
as much benefit as possible with a sub?    Yes_____    No_____

Did the sub leave positive or negative
notes?    Yes_____    No_____

Were the comments about the sub ___positive or ___negative?

Were you generally pleased with the sub?    Yes_____    No_____

If you have any suggestions or comments, please feel free to note such.

_____

_____

_____

_____

_____
Teacher's Signature

CONFIDENTIAL

## CHILD NUTRITION PROGRAM

The Child Nutrition Program is a definite part of the total school program. The lunchroom Manager and Youth Advisory Council members are available to assist you in your classroom work. Each teacher is being asked to devote periods of nutrition education instruction.

Serving boys and girls a balanced lunch is the main function of our School Food Service. One half pint of milk will be offered with each paid, reduced or free lunch.

A four-digit number for meals will be issued to faculty, staff and students who purchase meals at full price, reduced price and receive free meals. Students will go to a designated area in the Cafetorium during homeroom or during break time to make their transactions for paying for reduced or full priced meals on MONDAY - FRIDAY. You will pay daily for your meals at serving time if you do not have any meals left on your account on the other days.

If you wish to purchase additional food, this will be paid for by the student at the point of service. Students select a food from the Five Food Groups; or they may select one food from only four or no less than three of the Five Food Groups.

We would like for all students, faculty and staff to participate in the lunch program. All students who bring lunches from home will go to the school cafeteria to eat. No carbonated canned or bottle drinks are permitted during lunch period.

CONFIDENTIAL

Defendants' Initial
Disclosures                855

## GUIDELINES FOR LUNCH SERVICE

In order to keep the cafeteria clean and attractive, the following guidelines must be observed:

1.  Students will go to the lunchroom with their teacher and will remain there until it is time for them to return to class.

2.  All faculty, staff and students will be issued a card with their account number. The account number must be memorized in order for the individual to "punch in" the number at the keypad for each purchase made.

3.  Teachers and students have tables assigned for them. Students are not to exchange or move from seat to seat and leave their plates at the table.

4.  Talking in a conversational tone is allowed.

5.  Each table and floor area around your table will be checked by the teacher to see that all trash has been removed and placed in proper container.

6.  Each student is responsible for disposing of his/her plate and drink container.

7.  NO FOOD IS TO BE TAKEN FROM THE LUNCHROOM--FOOD MUST BE EATEN THERE.

8.  Students will report to and from the lunchroom in an orderly manner.

9.  Each student should remember that they have a set amount of time in the lunchroom and they cannot waste time and expect to get through eating.

10. For health and sanitary reasons, food should not be swapped or exchanged from one student to another.

CONFIDENTIAL

Defendants' Initial
Disclosures    856

## HANDLING OF SCHOOL MONIES

1. <u>All Monies</u> for any school project, clubs, club projects, athletics, fees, paper, etc. must be turned into Principal's Office. No money should be left in classroom overnight.

2. Monies that are turned into office should be counted and exact amount stated on outside of envelope. Transfer of Cash envelopes will be furnished. Money should be checked against receipts so that it balances before sending it to the office. Please send the CASH CONTROL FORM with your money. (copy attached)

3. Each person receiving any type of funds must write a receipt with a duplicate copy. Receipt books are furnished by office. These books are to be kept for the year's operation and turned into the office at end of school year.

4. <u>All Funds</u> that are collected must be turned into the office <u>no later than 1:00 p.m. each day</u>.

5. Records must be kept by each class or club of money received or any expenditure made by the account. A Record Book will be furnished for you. all Record Books are property of Houston County High School and must be filed in Principal's Office at end of school year. This is very important because the audit requires that these records be on file.

6. Any person that is planning a purchase from any class or club must first submit a <u>REQUISITION - PURCHASE ORDER</u> to the principal. This REQUISITION - PURCHASE ORDER must be approved by the principal or designated official <u>before any purchase can be made</u>. Official REQUISITION - PURCHASE ORDER form may be picked up in office. This form must be completed with DATE, NAME OF COMPANY, ADDRESS OF COMPANY (INCLUDING ZIP CODE), QUANTITY ORDERED, DESCRIPTION, UNIT COST, TOTAL COST, FUNDING SOURCE AND SIGNED.

   A Purchase Order NUMBER will be issued after this request is approved. <u>NO PURCHASE</u> should be made prior to the REQUISITION - PURCHASE ORDER.

7. Any organization that plans a sale for money raising project must discuss the plan with the principal, have approval, and set date. <u>NO SALES will be made in school that does not directly relate to school activity</u>. The HOUSTON COUNTY BOARD POLICY is that no fundraising can take place during class time.

8. A copy of correctly filled in REQUISITION - PURCHASE ORDER FORM is on the following page.



Defendants' Initial
Disclosures     857

(HCBOE 102)
(REV. 10/28/93)

# HOUSTON COUNTY BOARD OF EDUCATION
## SCHOOL ACTIVITY CASH CONTROL FORM

N⁰ 08120

SCHOOL: HOUSTON COUNTY HIGH SCHOOL          DATE: 7 / 30 / 98

ACTIVITY SPONSOR: A. TEACHER / Y. CLUB

RECEIPT NOS. FROM: 5          TO: 15

CHECKS TOTAL: ......................................................... $ 25.00

CASH TOTAL: ............................................................ $ 100.00

COINS TOTAL: .......................................................... $ 5.50

GRAND TOTAL: ........................................................ $ 130.50

CERTIFIED TO BY:

SPONSOR: A. TEACHER

SCHOOL BOOKKEEPER: _____

OTHER AUTHORIZED PARTY: _____

### THIS SECTION FOR SCHOOL OFFICE USE

DEPOSITED DATE: ____ / ____ / ____    GENERAL LEDGER ACCT. # _____

MASTER RECEIPT # _____    BY: _____

COMMENTS:

CONFIDENTIAL

INSTRUCTIONS: SEE ACCOUNTING PROCEDURE #102

Defendants' Initial
Disclosures     858

Southeastern Printers, Inc. 792-292

Distribution   Original-School Office, Canary-Sponsor/Depositor

# REQUISITION — PURCHASE ORDER

Date ——— July 30, 1998

To   SOUTH BUILDING SUPPLY

Deliver to   HOUSTON COUNTY HIGH

Address   123 NORTH STREET
ANYWHERE, U.S.A.   00000

Address   202 WEST CHURCH STREET
P.O. BOX C
COLUMBIA, ALABAMA 36319

How ship ———

Terms ———

| Quantity | ITEM | Unit Cost | Extension |
|---|---|---|---|
| 8 | 2x4 12' Yellow Pine | 2.40 | 19.20 |
| 2 | 4x8 Brown Oak Paneling | 12.50 | 25.00 |
| | | | |
| | | | |
| | | | |
| | Total | | $44.20 |

**TO THE PRINCIPAL:**

Please purchase from funds in our account ——— Y-Club

——— (Name of Organization)

A. Teacher

——— (Authorized Officer) ——— (Sponsor)

**TO THE VENDOR:** This is your authority to deliver the items listed above. Please furnish two copies of the invoice when merchandise is delivered.

Houston County High

——— (Name of School)

The Principal

——— (Principal)

**CERTIFICATE FOR TAX EXEMPTION:**

This is to certify that the property described above is for sole use and benefit of the above named institution and will be used under the control of said institution. It is further certified that the undersigned is authorized by the provisions of Act No. 742, Legislature of 1953, approved September 17, 1953, as principal of said institution to issue this order and to make this certificate.

CONFIDENTIAL

——— (Signature of Principal)

24

(To be prepared in triplicate. The white copy should be sent to the vendor, the pink copy should be filed in the central office, and the yellow copy sh...

Defendants' Initial
Disclosures    859

## FEES FOR HIGH SCHOOL

### 2007-2008

### ALL FEES COLLECTED MUST BE TURNED INTO OFFICE

Science teachers will collect Science Fees:

| | |
|---|---|
| Advanced Science----------------------- | $20.00 |
| Chemistry Laboratory Fee------------- | $20.00 |
| Physics Laboratory Fee----------------- | $20.00 |

---

Computer Teacher will collect Computer Fee:

| | |
|---|---|
| Computer Laboratory Fee------------- | $ 20.00 |

---

Family and Consumer Science Teacher will collect Home Economics Fee:

| | |
|---|---|
| Family and Consumer Science Laboratory Fee----- | $ 20.00 |

---

Agri - Science Teacher will collect Fee:

| | |
|---|---|
| Vocational Shop Fee------------------ | $ 20.00 |

---

Band Instructor will collect Band Fee:

| | |
|---|---|
| Band Fee------------------------------ | $ 20.00 |

---

Driver Education Instructor will collect Fee:

| | |
|---|---|
| Driver Education Fee---------------- | $30.00 |

---

Area Vocational School Instructor will collect Fee:

| | |
|---|---|
| AVS Laboratory Fee---------------- | $20.00 |

---

| | |
|---|---|
| Student Locker Rental----------------------- | $  3.00 |
| Student Parking Permit----------------------- | $  3.00 |
| Reserve Parking Permit--------------------- | $ 10.00 |



21

Defendants' Initial
Disclosures    860

## GRADUATION POLICY

Effective for pupils who begin the ninth grade in the 1996-97 school year, in order to earn an Alabama high school diploma, pupils must earn a minimum of 28 Carnegie units and either:

1. Successfully complete the <u>High School Basic Skills Exit Exam</u> and earn the requirements for the <u>Alabama High School Diploma.</u>

OR

2. Successfully complete the <u>High School Basic Skills Exit Exam</u> and earn the requirements for the <u>Alabama High School Diploma with Advanced Academic Endorsement.</u>

OR

3. Successfully complete the requirements for the <u>Alabama Occupational Diploma.</u>

Effective for pupils who begin the ninth grade in the 1997-98 school year, in order to earn an Alabama high school diploma, pupils must earn a minimum of 30 Carnegie units and complete one of the options stated above.

Required courses for the <u>Alabama High School Diploma</u> include:

4 credits of Language Arts to include English 9, English 10, English 11, and English 12
4 credits of Mathematics to include the equivalent of Algebra I and Geometry
4 credits of Science to include the equivalent of Biology and Physical Science
4 credits of Social Studies as specified by the State Board of Education
1 credit of Physical Education
1/2 credit of Health Education
1/2 credit of Fine Arts
1/2 credit of Computer Applications

Required courses for the <u>Alabama High School Diploma with Advanced Academic Endorsement</u> include:

4 credits of Language Arts to include advanced levels of English 9, English 10, English 11, and English 12
4 credits of Mathematics to include advanced levels of Algebra II with Trigonometry
4 credits of Science to include advanced levels of Biology and Physical Science
4 credits of advanced levels of Social Studies as specified by the State Board of Education
2 credits of the same foreign language
1 credit of Physical Education
1/2 credit of Health Education
1/2 credit of Fine Arts
1/2 credit of Computer Applications

A pupil who completes the necessary credits for either diploma but does not pass all sections of the <u>High School Basic Skills Exit Exam</u> is eligible to receive a certificate of completion.



26

Defendants' Initial
Disclosures    861

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | IHD | 19-Mar-98 |
| | REVISED DATE: | |

Effective for pupils with disabilities as defined by the Individuals with Disabilities Education Act (P.L. 101-476) who begin the tenth grade in the 1997-1998 school year, pupils may earn the <u>Alabama Occupational Diploma</u> by completing the courses listed below and successfully completing and approved occupational portfolio.

Required courses for the <u>Alabama Occupational Diploma</u> include:

      4 credits to include the equivalent of Employment English I, II, III, and IV
      4 credits to include the equivalent of Job Skills Math I, II, III, and IV
      4 credits to include the equivalent of Life Skills Science I, II, III, and IV
      4 credits to include the equivalent of Career Preparation I, II, III, and IV
      1 credit of Career/Technical Education
      1 credit of Cooperative Career/Technical Education
      1 credit of Physical Education
      1/2 credit of Health Education
      1/2 credit of Fine Arts
      1/2 credit of Computer Applications

Required courses for the <u>Alabama High School Diploma with Career/Technical Endorsement</u> include:

      4 credits of Language Arts to include English 9, English 10, English 11, English 12
      4 credits of Mathematics to include the equivalent of Algebra I and Geometry
      4 credits of Science to include the equivalent of Biology and Physical Science
      4 credits of Social Studies as specified by the State Board of Education
      1 credit of Physical Education
      1/2 credit of Health Education
      1/2 credit of Fine Arts
      1 credit of Computer Applications
      3 credits of Career/Technical Education as specified by the State Board of Education

Required courses for the <u>Alabama High School Diploma with Advanced Career/Technical Endorsement</u> include:

      4 credits of Language Arts to include advanced levels of English 9, English 10, English 11, English 12
      4 credits of Mathematics to include advanced levels of Algebra II with Trigonometry
      4 credits of Science to include advanced levels of Biology and Physical Science
      4 credits of advanced levels of Social Studies as specified by the State Board of Education
      1 credit of Physical Education
      1/2 credit of Health Education
      1/2 credit of Fine Arts
      1 credit of Computer Application
      3 credits of Career/Technical Education as specified by the State Board of Education



Defendants' Initial
Disclosures    862

## Certificate of Completion

Effective for pupils with disabilities who begin the ninth grade in the 1998-1999 school year and years following. pupils may earn a Certificate of Completion by:

1. Accumulating the required number of Carnegie units but not passing the Exit or Graduation Exam.

2. Passing the Exit or Graduation Exam, but not accumulating the required Carnegie units.

2. Successfully completing the prescribed program specified in his/her Individual Education Plan.

## Graduation Activities

Graduation Activities and procedures for awarding exit documents (including diplomas or certificates) shall be integrated and identical with no distinctions/differentiations made in regard to the way the exit document is awarded or presented.

## Promotion for 7th & 8th Grade

In order for a pupil to be promoted from the seventh grade to the eighth grade or from the eighth grade to the ninth grade. he/she must pass six of the eight blocks attempted, and must have an overall average of at least 70 in the four core subjects of English, Math, Science, and Social Studies. This policy does not apply if the pupil has an average of at least 65 in each course attempted.



27-A

Defendants' Initial
Disclosures     863

Promotion for grades 9 through 12

Credits required for promotion in grades 9-12:

|          | 97-98 | 98-99 | 99-2000 | 2000-2001 |
|----------|-------|-------|---------|-----------|
| grade 9  | 6     | 6     | 6       | 6         |
| grade 10 | 12    | 14    | 14      | 14        |
| grade 11 | 18    | 20    | 22      | 22        |
| grade 12 | 24    | 26    | 28      | 30        |

To be promoted from the ninth to the tenth, a pupil must have earned 1 credit each of English, Social Studies, Science, and Mathematics.

To be promoted from the tenth to the eleventh grade, a pupil must have earned 2 credits of English, Social Studies, Science, and Mathematics.

To be promoted to the twelfth grade, a pupil must have earned 3 credits of English, Social Studies, Science, and Mathematics.

Disabled pupils seeking a Certificate of Completion will be promoted based on annual Individual Education Plan (IEP) evaluation.

CONFIDENTIAL

Defendants' Initial
Disclosures    864

# GRADUATION REQUIREMENTS FOR GRADE 12

To earn a diploma in Houston County schools a student must pass a minimum of Carnegie units and pass the Alabama High School Graduation Exam. (26 Carnegie units for 11th and 24 units for 12th)

These diplomas are based on the following criteria listed by grade:

| REQUIREMENTS FOR A STANDARD DIPLOMA | REQUIREMENTS FOR AN ADVANCED DIPLOMA |
|---|---|
| **9th Grade** | **9th Grade** |
| ENGLISH | ENGLISH |
| GEOGRAPHY/WORLD HISTORY | GEOGRAPHY |
| GENERAL SCIENCE | GENERAL SCIENCE |
| HEALTH/P.E., BAND, ROTC | HEALTH/P.E., BAND, ROTC |
| MATH ELECTIVE_____ | ALGEBRA I |
| ELECTIVE_____ | ELECTIVE_____ |
| **10th Grade** | **10th Grade** |
| ENGLISH | ENGLISH |
| BIOLOGY | BIOLOGY |
| AMERICAN HISTORY I | AMERICAN HISTORY I |
| MATH ELECTIVE_____ | ALGEBRA II |
| ELECTIVE_____ | ELECTIVE_____ |
| ELECTIVE_____ | ELECTIVE_____ |
| **11th Grade** | **11th Grade** |
| ENGLISH | ENGLISH |
| AMERICAN HISTORY II | AMERICAN HISTORY II |
| ELECTIVE_____ | GEOMETRY |
| ELECTIVE_____ | SCIENCE |
| ELECTIVE_____ | ELECTIVE_____ |
| ELECTIVE_____ | ELECTIVE_____ |
| | ELECTIVE_____ |
| **12th Grade** | **12th Grade** |
| ENGLISH | ENGLISH |
| GOVERNMENT/ECONOMICS | GOVERNMENT/ECONOMICS |
| ELECTIVE_____ | ELECTIVE_____ |
| ELECTIVE_____ | ELECTIVE_____ |
| ELECTIVE_____ | ELECTIVE_____ |
| ELECTIVE_____ | ELECTIVE_____ |
| | * Electives must include Spanish I and Spanish II |

CONFIDENTIAL

Defendants' Initial Disclosures
865

## CRITERIA FOR ASSIGNING WEIGHTS
## TO HIGH SCHOOL COURSES

Beginning on November 21, 1985, the Valedictorian, Salutatorian and Honor Students will be chosen according to a numerical percentage system. A factor of .05 will be added to the numerical grade (100-65). For example: A student who receives a 100 in a weighted course will get a numerical grade of 105.

## COURSES TO BE WEIGHTED

ENGLISH                         -Honors English (9-12)
SCIENCE                         -Physics, Chemistry, Advanced Biology, Physiology
MATHEMATICS                     -Algebra I, Algebra II, Geometry, Trigonometry, Algebra III
SOCIAL STUDIES                  -Advanced American History, Advanced Government and
                                   Economics
FOREIGN LANGUAGES               -Any foreign language will be weighted
BUSINESS                        -Accounting

## GRADING SCALE

| | | |
|---|---|---|
| 90 - | 100 | A |
| 80 - | 89 | B |
| 70 - | 79 | C |
| 65 - | 69 | D |
| Below 65 | | F |

Semester Averages for 9-12 students are computed as follows: Each nine weeks grade is counted twice and the final is added to the total and the sum is divided by five.

Seventh and eighth grade students' averages are computed in the same fashion.

******PLEASE REFER TO THE HOUSTON COUNTY CODE OF CONDUCT FOR FURTHER
    INFORMATION

CONFIDENTIAL

Defendants' Initial
Disclosures    866

## STUDENT MEDIA CENTER RULES

1. Students may us the Media Center between 7:45 a.m. and 3:15 p.m.

2. Students are responsible for all items checked out in their name and will pay for all lost items.

3. Books may be checked out for three weeks and renewed once.

4. Overdue fines are $.10 per day for regular three week materials.

5. Magazines may be checked out for one hour during the day or overnight. Overnight materials are due back by 8:00 a.m. the next morning.

6. Students with overdue items and fines will be notified in homeroom. Students with overdue items and fines may not check out any other materials until fines and overdues are cleared.

7. Encyclopedias and other reference books may be checked out overnight. Reference books are due by 8:00 a.m. the next morning and have a fine of $1.00 per day.

8. Students may us the Media Center during break.

9. Students cannot bring FOOD OR DRINKS into the Media Center.

10. Students should return materials to the reference area or checkout desk before leaving the Media Center.



Defendants' Initial
Disclosures    867

## TEACHER MEDIA CENTER GUIDELINES

1. Teachers may bring entire classes to the Media Center after reserving class time with the Media Center Staff.

2. Teachers who bring an entire class to the Media Center should **remain** with their class for the class period.

3. All media materials may be checked out by teachers for an unlimited time period. Please return materials as soon as you finish so they will be available to others.

4. Teachers may request books and materials on certain subjects either for reserve use in the Media Center or to be used within the classroom.

5. Homeroom Teachers will receive a list of students with overdue items or fines. Please read these lists in homeroom to remind these students of their obligations. Students who have overdue items cannot check out materials until they clear all overdue fines and books.

6. Individual students may come to the Media Center at any time during the day. Students must have a pass issued in their name. Please do not send more than six students at one time. Students who do not work and are disruptive will be sent back to class.

7. Any teacher may request the purchase of books and media by the Media Center staff. Request forms are available in the Media Center.

8. The Media Center is open from 7:30 a.m. until 3:20 p.m. Teachers are welcome anytime during these hours.

9. Computers and printers within the Media Center may be used by Teachers and classes after scheduling with the Media Center staff.

10. Teacher suggestions and evaluations of the Media Center are requested. We want you and your students to use the center!



32

Defendants' Initial
Disclosures    868

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GAM | 27-Mar-84 |
| | REVISED DATE: | |
| | | |

## STAFF RIGHTS AND RESPONSIBILITIES

Teachers shall perform such duties as are customarily performed by instructors and as the Superintendent or his designees shall direct. They shall devote themselves faithfully and exclusively to the performance of teaching duties during school hours. They shall not employ their time outside of school hours in any manner which interferes with their efficiency or effectiveness in school.

Teachers shall follow the courses of study and use the textbooks adopted by the County and State Board of Education. Materials used for instructional purposes shall be selected with care and approved by the school principals.

Consistent with the laws of Alabama, it shall be the responsibility of teachers and principals in the Houston county Schools to implement and enforce appropriate laws and Board policies and regulations. Each employee is charged with administration of these laws, policies and regulations, and such other rules, regulations and procedures as may be established by the Superintendent or Board.

CONFIDENTIAL

Defendants' Initial
Disclosures    869

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GBBAA | 27-Mar-84 |
| | REVISED DATE: | |

## TEACHER

QUALIFICATIONS:

1. Alabama certificate appropriate for position;
2. Degree from an accredited college or university;
3. Such alternatives to the above qualifications as the Board may find appropriate and acceptable;
4. Each teacher employed in the Houston county Schools shall provide the following as a condition of employment:
   a. Valid Alabama Teacher's Certificate with endorsement in the instructional areas assigned;
   b. Copy of college or university transcript.

REPORTS TO:                Principals or his designates

SUPERVISES:                Staff members as designated, students

JOB GOAL:                  To help students learn subject matter and skills that will contribute to their development as mature, able, and responsible men and women.

PERFORMANCE RESPONSIBILITIES:

1. Meet and instruct assigned classes in the locations and at the time designated.

2. Plan a program of study that, as much as possible, meets the individual needs, interests, and abilities of the students.

3. Create a classroom environment that is conducive to learning and appropriate to the maturity and interests of the students.

4. Prepare for classes assigned, and shows written evidence of preparation upon request of immediate superior or members of supervisory staff.

5. Encourage students to set and maintain standards of classroom behavior.



34

Defendants' Initial
Disclosures     870

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GBBAA | 27-Mar-84 |
| | REVISED DATE: | |

6. Guide the learning process toward the achievement of curriculum goals and--in harmony with the goals--establish clear objectives for all lessons, units, projects and the like to communicate these objectives to students.

7. Employ a variety of instructional techniques consistent with the physical limitations of the location provided and the needs and capabilities of the individuals or student groups involved.

8. Strive to implement by instruction and action the district's philosophy of education and instructional goals and objectives.

9. Assess the accomplishments of students on a regular basis and provide progress reports as required.

10. Diagnose the learning disabilities of students on a regular basis, seeking the assistance of district specialists as required.

11. Take all necessary and reasonable precautions to protect students, equipment, materials, and facilities.

12. Maintain accurate, complete and correct records as required by law, district policy, and administrative regulation.

13. Assist the administration in implementing all policies and/or rules governing student life and conduct, and, for the classroom, develop reasonable rules of classroom behavior and procedure, and maintain order in the classroom in a fair and just manner.

14. Make provision for being available to students and parents for education related purposes outside the instructional day when required or requested to do so.

15. Plan and supervise purposeful assignments for teacher aides, if available, and/or volunteer(s).

16. Strive to maintain and improve professional competence.

17. Attend staff meetings and serve on staff committees as required.

18. Perform co-curricular and extracurricular activities as designated or assigned by the principal.

19. Prepare for and conduct parental conferences as scheduled by the teacher or principal.



Defendants' Initial
Disclosures    871

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GBBAA | 27-Mar-84 |
| | REVISED DATE: | |

20. They shall perform such duties as are customarily performed by instructors and as the Superintendent, his designees, and the principal, or either of them shall direct and the teacher shall devote themselves faithfully and exclusively to the performance of such duties during school hours. They shall not employ their time outside of school hours in any manner which interferes with their efficiency or effectiveness in school.

21. In all professional and personal relations, teachers shall be held to observance of a code of conduct consistent with the ethics of the teaching profession.

22. Teachers shall follow the courses of study, curriculum guides, and use the textbooks prescribed by the county and State Board of Education. Magazines, newspapers, pamphlets, used for instructional purposes shall be selected with care and controversial materials approved by the school principal.

23. Teachers shall familiarize themselves with the rules and regulations of the Board, the Superintendent, and the principal and shall observe and enforce such rules and regulations.

24. Teachers shall be responsible for:

    a. Educational advancement and growth in their pupils.
    b. Development of good character and desirable attitudes among the pupils.
    c. Protection of the pupil's health and safety.
    d. Proper protection and care of textbooks, equipment, supplies and other school property.
    e. Maintenance of discipline and good order in classroom and elsewhere through the school buildings and grounds.

25. Teachers shall attend all approved meetings to which they are called.

26. Teachers shall satisfactorily keep such records and make such reports as may be required.

CONFIDENTIAL

Defendants' Initial
Disclosures    872

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GBBAA | 27-Mar-84 |
|  | REVISED DATE: | |

27. Except as may be expressly authorized by the Superintendent, no teacher shall permit any commercial advertising to be announced, distributed, or otherwise promoted in or through the schools; furnish the name or address of teachers, pupils, or parents for other than school purposes.

28. Teachers shall report for duty each day school is in session unless prevented by personal illness or extreme emergency and in these cases the principal should be notified no later than 6:30 a.m. of the day in which the absence is to occur and earlier, if possible.

29. Teachers shall be in their classroom or in preparation for classes, within the building, at 7:30 each morning. They shall remain after school hours until 3:10 (and as long thereafter as may be necessary for conferring with parents, seeing pupils safely away from school, and preparing for the following day). On Fridays, teachers shall remain after school hours until 3:00 (and as long thereafter as may be necessary for conferring with parents, seeing pupils safely away from school).

30. No ethical staff member will criticize adversely another teacher before pupils, teachers, or other members of the community.

31. It is the full responsibility of all teachers to correct children anywhere in the halls, auditoriums, or playgrounds when they need correction.

32. If at any time a teacher cannot control any pupil or group of pupils, or feels he needs aid in controlling any pupil, it is his obligation to report the matter to his principal. No teacher shall have authority to expel or drop any pupils from a class or from a school sponsored activity without the approval of the principal.

33. Teachers shall not receive money or its equivalent for tutoring of pupils in their classes. Tutoring for any form of renumeration shall not be done during regular school hours.

34. Teachers shall furnish the Superintendent's Office a certificate issued by the State Department of Education indicating they have qualified to teach under the laws of Alabama, and a transcript of their college credits.

CONFIDENTIAL

Defendants' Initial
Disclosures    873

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GBBAA | 27-Mar-84 |
| | REVISED DATE: | |

35. Teachers, through self-involvement, shall assume the responsibility for involvement of students under their immediate instruction and supervision in extracurricular activities that enhance the instructional program.

36. Teachers shall not dismiss their pupils from any class earlier than the regularly scheduled time without permission of the principal.

TERMS OF EMPLOYMENT:  Probationary or tenure

CONFIDENTIAL

Defendants' Initial
Disclosures     874

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | JGFB | 27-Mar-84 |
| | REVISED DATE: | |

## SUPERVISION OF STUDENTS

The policy of this Board shall assure that all school personnel discharge in a reasonably prudent manner all responsibilities relative to the care, safety and welfare of pupils under their jurisdiction. The Superintendent shall direct all principals to establish faculty supervision regulations which assure that students are supervised effectively throughout the school day. In addition to classroom supervision, such regulations shall specify hall duties, recess duties and bus duties before and after school. Supervision of extracurricular activities shall also assure proper care of students. All extracurricular activities sponsored by the school shall be supervised by a staff member assigned by the principal.

The Superintendent shall instruct all principals to prepare supervision schedules and present these to assigned personnel. supervision duty assignments shall include but not be limited to (1) bus duty, (2) lunchroom duty, (3) hall duty, (4) supervision of students prior to and following dismissal of school each day, and (5) grounds duty.

CONFIDENTIAL

Defendants' Initial
Disclosures    875

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | JGFG | 27-Mar-84 |
| | REVISED DATE: | |

## ACCIDENTS

Immediate attention must be given to all accidents regardless of how insignificant they may seem. First aid treatment within the school will be limited to minor cuts and bruises. Any injury of a more serious nature should be brought promptly to the attention of parents and/or a physician.

In addition to the above, the policy of each school shall include the following:

1. All accidents must be reported immediately to the principal's office.

2. The principal will take the responsibility of notifying the parents and/or physician as quickly as possible following report of the accident.

3. Immediate steps should be taken to prevent possible recurrence of the accident.

4. All accidents occurring after school hours, such as accidents connected with athletics, band, field trips and similar activities, should be reported to the principal's office as soon as it is practical to do so.

All teachers should be aware of the legal implications with regard to supervision of students. there exists a definite legal responsibility in this area and negligent discharge of this duty of care owed to students could present serious legal complications.



Defendants' Initial
Disclosures    876

# Houston County High School
## Accident/ Incident Report
## 2007-2008

(This form is to be completed immediately and submitted to the office on the
date of the accident.)

STUDENT'S NAME_____

Class:_____ Date:_____ Time:_____

Home Address: _____

Describe accident and circumstances: _____
_____
_____
_____

Describe injuries: _____
_____
_____

Describe nature of aid rendered: _____
_____
_____

Name of person supervising student at time of accident:_____
_____

Witness (es) _____
Was parent notified?_____ How?_____ Time:_____
Were emergency personnel involved?_____ If yes, specify nature of
involvement_____
_____


_____          _____
Signature of person completing form.                          Date




| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | KDC Cf: GAIA | 27-Mar-84 |
| | REVISED DATE: | |
| | | |

## SOLICITATION BY STAFF MEMBERS

Staff members shall not solicit or sell any goods or services on school property except as may be approved by the local school principal.

All fund raising campaigns conducted by school employees in the community or away from school premises to obtain funds for the school, student body, class or club must have prior approval by the principal. Such fund raising campaigns shall not be conducted during regular school hours without the approval of the principal.

Staff members shall not sell school related supplies and/or equipment or reference books in the attendance area served by the school district during the school year.

Staff members shall not furnish or sell lists of students, parents, or employees to any commercial firm without written permission from the superintendent. Lists of names of high school seniors may be afforded groups for career recruitment purposes or for the purpose of voter registration.

No teacher shall use his position in this district to influence parents or pupils of the district to purchase books or other merchandise, except for materials approved by he Superintendent's Office for use in the classroom.

Any fund raising projects involving students shall have the approval, in writing, of the principal. There shall be no coercion for student participation; it shall be handled on a voluntary basis and it must be in accordance with policy.

Any fund raising events or projects sponsored by the school or school affiliated groups (such as P.T.A., P.T.O., booster clubs, etc.) shall have the advance written approval of the principal.



41

Defendants' Initial
Disclosures    878

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | KM | 27-Mar-84 |
| | REVISED DATE: | |

## VISITORS TO THE SCHOOL

The Board of Education is aware that normally, many visitors may be expected on the public school campus during the school day. The Board is cognizant of many problems which unnecessary visitations have created in many schools. As administrative head of the school, the principal shall design rules and regulations concerning visitors which satisfy the needs of his school. Said rules shall be reviewed by the Superintendent of Schools and submitted to the Board.

All visitors shall proceed first to the principal's office prior to visitation in the school. Loitering shall at no time be tolerated.

## SCHOOL VISITATION

1. Parents and others with business with school officials or personnel are encouraged to visit the school. However, the protection of the pupils and the need to avoid disruption of the proper atmosphere for teaching-learning activities within schools necessitates regulations concerning such visits.

2. No person shall trespass or loiter in any school building or on any school grounds under the jurisdiction of the Houston County Board of Education.

3. All persons except as hereinafter described shall, upon entering any school building of the Houston County School District, report immediately to the office of the principal and request a visitor's permit.

4. This shall not be applicable to:

   a. Students enrolled in any school building;
   b. Students entering any such building for the purpose of enrollment therein;
   c. Members of the Board of Education, faculty, staff, and employees of the Houston County School District;
   d. Persons authorized by school authorities to enter such buildings for professional events;

Defendants' Initial
Disclosures    879

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | KM | 27-Mar-84 |
| | REVISED DATE: | |

    e. Persons whose specified duties of employment clearly require their presence in such buildings or on said grounds; and

    f. Persons attending events sponsored by or authorized by school authorities and who remain in the area of the school building or grounds thereof (as appropriate to specified events) assigned for such events.

5. No person shall remain in any school building or on the grounds thereof, or on grounds owned and used by the individual school or school district after being requested to leave the school premises by a principal, counselor, teacher, any person assigned to the duties of custodian, or any member of the administrative staff of the Houston County School District.

6. Any person who fails to comply with the provisions of any of the preceding sections shall be in violation of the rules and regulations of the Houston County Board of Education and the Law of the State of Alabama and shall be punished as provided by Public School Laws of the State of Alabama.

7. A copy of these rules and regulations shall be posted <u>conspicuously</u> by the principal of each school at or near the entrance to the grounds or premises, or perimeter of such grounds or premises if there are no formal entrances, and at the main entrance of each building. Said notice of these regulations shall also be placed in student handbooks and be given wide dissemination in a variety of ways-PTA meeting, student assemblies, etc.

CONFIDENTIAL

Defendants' Initial
Disclosures    890

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GAE | 27-Mar-84 |
| | REVISED DATE: | |

## GRIEVANCE PROCEDURES
## PROFESSIONAL AND NON-PROFESSIONAL

Any certified employee of the Houston County Board of Education shall have the right to appeal the application of policies and administrative decisions which effect him or her. Each employee shall be assured freedom from restraint, interference, coercion, or any form of reprisal relative to his or her appeal with respect to complaints and grievances. At all levels specified in relation to resolution of grievances the Board shall expect both the aggrieved party (or parties) and school officials conducting hearings at each level to confer about the issue with a view toward arriving at a mutually satisfactory resolution at the lowest possible administrative level.

## PURPOSE

The purpose of this policy shall be to settle quickly, at the lowest possible administrative level, differences and issues relating to discrimination, contracts, salaries, working conditions, advancement opportunities and education opportunities of employees and students.

## DEFINITION

A grievance is a complaint by any member of the professional staff, the non-professional staff and student body. It shall be initiated in writing and should be done within a reasonable time following the act or condition which is the basis for the complaint.

## PROCEDURE

Each level shall be observed and used with normal order for proper channels. Exceptions may be made in emergencies.

CONFIDENTIAL

Defendants' Initial
Disclosures      891

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GAE | 27-Mar-84 |
| | REVISED DATE: | |

## LEVEL ONE

The aggrieved person may first discuss his written grievance with his immediate supervisor with the objective of resolving the matter informally.

The aggrieved person and his immediate supervisor shall confer on the grievance with a view toward arriving at a mutually satisfactory resolution of the complaint. certificated and non-certificated staff shall utilize this procedure.

## LEVEL TWO

Step 1 - If, as a result of the decision between the complainant and his immediate supervisor, the matter is not resolved to the satisfaction of the complainant, then within five (5) school days he shall set forth his grievance in writing to the principal specifying; (a) the nature of the grievance; (b) the nature or the extent of the injury, loss of inconvenience; (c) the results of previous discussion; and (d) dissatisfaction with decisions previously rendered.

The principal shall communicate his decision to the aggrieved person and all others involved in writing within five (5) days of receipt of written grievance.

Step 2 - If the aggrieved is not satisfied with the disposition of his grievance at Level Two, Step 1, he may within five (5) school days present his grievance to the Houston County Schools appropriate supervisor, in the area of application, 202 North Oates Street, Dothan, Alabama, phone 792-8331.

The appropriate supervisor will ascertain and compile the facts, ensure due process for the complaint and shall render a recommendation within ten (10) days after the rendered decision in Step 1.

Step 3 - The Superintendent, within five (5) days after the rendering of the recommendation by the appropriate supervisor, shall render a decision. A copy shall go to the aggrieved person and all others involved.

Step 4 - In the event the person is not satisfied with the disposition of his grievance at Level Two, Step 3, he may file the grievance in writing with the Board of Education. This must be done within five (5) school days after the decision from Level Two, Step 3. He may request a hearing before the Board of Education and request the Superintendent to submit a resume of the previous procedural process to the Board.

CONFIDENTIAL

45

| HOUSTON COUNTY BOARD OF EDUCATION | FILE CODE: | ADOPTED DATE: |
|---|---|---|
| POLICY MANUAL | GAE | 27-Mar-84 |
| | REVISED DATE: | |

<u>Step 5</u> - In the event the aggrieved person is not satisfied with the disposition of the grievance by the Board of Education, he may appeal such decision to the appropriate authorities as provided by law or seek recourse through a state or federal court system.

Reference:    Title IX of the Education Amendments of 1972 as amended and as refined by final title IX Regulations on July 21, 1975, 20 U.S.C., 1681, 1682; <u>West Virginia State Board of Education vs. Barnette</u>, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed., 1628 (1943); <u>Cox vs. Louisiana</u>, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed. 2d 471 (1964); <u>Pickering vs. Board of Education of Township High School District</u> 205, 88 S.Ct. 1731, 391 U.S. 732 (Alaska, 1969); <u>Singleton vs. Jackson Municipal Separate School District</u>, 419 F. 2d (5th Circuit, 1969), affirmed en banc, (5th Circuit, 1970).

CONFIDENTIAL

46

Defendants' Initial
Disclosures    893

## FIRE AND TORNADO DRILLS

Fire drill (Main Campus) classes will leave the building as outlined below:

Rooms 1, 2, 3, 4, 5, 6, 7 will exit through the North Junior High Door and assemble on the campus - east side of the gym.

Rooms 8, 9, 10, 11 will exit through the Breeze-Way Door and assemble on the campus - east side of the gym.

Rooms 12, 13, 14, Library, Counselor, Office, 16 will exit through the Front Door and assemble on the grass past the student parking lot.

Rooms 17, 18, 19, 20, 21, 22 will exit through the End Door (next to room 22) and assemble on the campus - east side of the gym.

Classes in the cafetorium and gym will exit and assemble on the campus - east side of gym.

Classes in the Vocational Building will exit through the front (South) Door and assemble on the grass past the student parking lot. (EXCEPTION: Class in the Agribusiness shop will exit the back of the shop and assemble on the campus - east side of the gym.

Classes in the Band and Science Buildings will exit to the parking lot in front of the main building.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TORNADO DRILL

The tornado warning signal will be the emergency bell at main campus. Classes will move into Hall area nearest their rooms, lie face down, draw your knees up under you, cove the back of your head with your hands keeping face away from window area.



Defendants' Initial
Disclosures     894

EMERGENCY OPERATION PLAN
FOR
HOUSTON COUNTY HIGH SCHOOL

IN THE EVENT OF AN ACCIDENT AT FARLEY NUCLEAR PLANT

The following is an operational plan that is to be implemented should notification come of an incident at Farley Nuclear Plant. any action taken would be at the recommendation of the Houston County Department of Emergency Management.

NON OPENING OF SCHOOL

In the event that Houston County High School is closed due to an incident at the Farley Nuclear Plant the following steps will be taken.

1. The Principal or his designee will go to the school to insure that all students, parents and school personnel are aware of the closure.

2. The Principal or his designee will then insure that the building is secure and contact the local law enforcement officials and emergency management officials to notify them of their action and inform them that she is leaving.

3. The Superintendent's office will be contacted to inform them that the above steps have been taken.

EARLY DISMISSAL OF SCHOOL

In the event that an incident at Farley Nuclear Plant requires an early dismissal of students but not an evacuation of the campus, the following steps will be taken.

1. Upon notification of a need to dismiss early by the Superintendent's office, all bus drivers will be contacted to report to the school to load their buses.

2. All children who ride buses will be dismissed to load their buses and depart from the campus as regularly scheduled each day.

3. Town students will be dismissed as soon as all buses have left the campus. The Principal and Assistant Principal along with teachers who have the responsibility for loading buses will insure a safe, orderly dismissal of buses and cars.

4. All employees will be dismissed to go home once all children have left the campus.



49

Defendants' Initial
Disclosures    895

Emergency Operation Plan

5. The Principal or his designee will insure that the campus is properly closed with all students and employees dismissed before she leaves.

## EVACUATION OF STUDENTS AND STAFF

In the event that an incident at the Farley Nuclear Plant requires that students and staff be evacuated from the campus, the following operational plan will go into effect:

1. Students will be notified through the intercom system to return to their homerooms. Roll will be checked to insure that all students are present.

2. The Principal or his designee will contact the Bus Barn to request four (4) extra buses. Drivers will be dispatched from the Bus Barn.

3. All students will proceed with their homeroom teacher to the assigned exit to load assigned buses located in the back of the campus. Homeroom teachers will bring a copy of their homeroom roll with students checked as to who will be on the bus. The bus assignments and exit assignments are listed below.

  (a) Bus 01-2 and bus from Bus Barn
      Drivers – Roberta Ryan
      Grades 7-8 and Personnel Exit through <u>NORTH DOOR.</u>

  (b) Bus 04-8 and bus from Bus Barn
      Drivers – Will Pitchford
      Grade 10 and Personnel Exit through <u>NORTH DOOR.</u>

  (c) Bus 07-55
      Driver – Jennifer Lee
      Grade 12 and Personnel load in <u>FRONT OF THE VOCATIONAL BUILDING.</u>

  (d) Bus 07-56 and bus from Bus Barn
      Drivers – Larry Phillips
      Grade 9 and Personnel load <u>AT THE GYM.</u>

  (e) Bus 07-7 and Bus 07-6
      Drivers – Ellen Valls / Teresa Hughes
      Grade 11 and Personnel load <u>IN FRONT OF THE MAIN BUILDING.</u>

  (f) Bus 97-1
      Driver – Elanie Perry
      Bus will park out back and be responsible for excess students and personnel.

  (g) Drivers to take over if regular drivers are delayed – Hamm, Ethredge, Rogers,
  (h) Gibson, Brown, Stephens



45

Defendants' Initial
Disclosures    896

Emergency Operation Plan

All students will line up single file and proceed in an orderly fashion to their assigned bus. The Homeroom teacher will check roll to account for students loading the bus. Students will load from the back of the bus seating four to a seat until all have been seated. Homeroom teachers will assist in loading and ride on the bus to the Reception Center.

All buses will await a signal from the Principal or his designee before they leave. Buses will exit the campus by traveling the paved driveway in front of the Main Building proceeding to Highway 52. Buses will proceed on Highway 52 West to the Farm Center in Dothan.

It will be the responsibility of the school secretaries to contact the Superintendent's office to report that all students and personnel have been evacuated from the campus. Also, a copy of each teacher's homeroom roll will be left at the school so that questions may be answered from parents.

The Principal or his designee will have the responsibility of directing the evacuating operation at the Main Building.

The Columbia Police Department will be called upon to provide traffic assistance to insure that all students and personnel are evacuated from the area in as safe a manner as possible. Also, the Columbia Police Department or the Houston County Sheriff's Department will be called upon to provide security fro the buildings and vehicles left behind following the evacuation.

<u>NOTIFICATION TO PARENTS</u>
The Emergency Alert System will be activated and an EAS message issued to notify parents of any Protective Actions affecting schools. This message will be coordinated with school officials through the Superintendent or School Liaison in the EOC.

<u>PLAN/TESTING</u>
An Evacuation Map and Plan of Operation will be made available to all employees with a copy remaining in the office for parents to preview. A meeting with all employees will be held to inform all employees of the evacuation plan. There will be periodic testing and updating of the procedures as recommended by the emergency management personnel.



Defendants' Initial
Disclosures    897



ROSS CLARK CIRCLE

E. COTTONWOOD ROAD

E. COTTONWOOD ROAD

HOUSTON COUNTY EMERGENCY MANAGEMENT
STUDENT RELOCATION LAYOUT
HOUSTON COUNTY FARM CENTER
1701 E. COTTONWOOD ROAD
DOTHAN, AL

BUS PARKING

| RESTROOMS | | | RESTROOMS | |
|-----------|-----------|-----------|-----------|---|
| | HOUSTON CO. ANNEX 141 | HOUSTON CO. HIGH 516 | | |
| | | | | |
| FUNSHINE DAY CARE 53 | ASHFORD ACADEMY 324 | ASHFORD HIGH 760 | ASHFORD ELEM. 846 | |
| | | | RESTROOMS | |

STUDENT PICKUP

FARM CENTER TELEPHONE #        792-5730

UPDATED 10/96
Information provided by Houston County School Central Office and Funshine Daycare.

CONFIDENTIAL

52

Defendants' Initial
Disclosures    898



DOTHAN/HOUSTON COUNTY EMERGENCY MANAGEMENT AGENCY

DIRECTIONAL MAP

FOR FARM CENTER

BUSES from Ashford will travel
US 84 to Dothan. From Columbia
buses will travel AL. 52.

CONFIDENTIAL

Defendants' Initial
Disclosures    899

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MILLER, | ★ | |
| | ★ | |
| PLAINTIFF | ★ | |
| | ★ | |
| vs. | ★ | |
| | ★ | CASE NO.1:06-CV-940-WKW |
| HOUSTON COUNTY BOARD OF | ★ | |
| EDUCATION, KENNETH LORD, | ★ | |
| RILEY JOE ANDREWS, TIM | ★ | |
| PITCHFORD, PAUL STRANGE, | ★ | |
| STACY EZELL, TROY | ★ | |
| UNIVERSITY, DOTHAN, SANDRA | ★ | |
| JONES, PAM PARRIS and | ★ | |
| GREG RUEDIGER, | ★ | |
| | ★ | |
| DEFENDANTS. | ★ | |

## AFFIDAVIT OF RILEY JOE ANDREWS

STATE OF ALABAMA    )
                    )
HOUSTON COUNTY      )

Before me, the undersigned authority, personally appeared RILEY JOE ANDREWS, who, being duly sworn, deposes and says as follows:

My name is RILEY JOE ANDREWS. I am over 19 years of age and am a resident of the State of Alabama, residing in Dothan, Houston County, Alabama. I have personal knowledge of the facts stated below.

From 1991 to 2005 I was the Federal Programs Coordinator and Special Education Programs Coordinator for Houston County Schools. I served in this position during the time of Nancy Miller's internship and employment.

As the Federal Programs Coordinator and Special Education Programs Coordinator I did not have the authority to withdraw Nancy Miller's internship from Troy University, Dothan, nor to terminate her employment with the Houston

County Board of Education.

I, personally, never took any action to stifle Ms. Miller's free speech rights or to retaliate against her for supposedly exercising her free speech rights. I never took any action to stifle Ms. Miller's free speech rights or to retaliate against her for supposedly exercising her free speech rights in my official capacity as the Federal Programs Coordinator and the Special Education Programs Coordinator.

I did not make the decision to withdraw or terminate Ms. Miller's internship and I never asked anyone at Troy University, Dothan, to withdraw or terminate Ms. Miller's internship.

The facts stated above are true and correct.

_____
Riley Joe Andrews


Sworn to and subscribed before me on this the 14th day of November, 2007.

_____
NOTARY PUBLIC

(S E A L)

MY COMMISSION EXPIRES:
5/29/2010