IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

NANCY MILLER,                    *
                                 *
     PLAINTIFF                   *
                                 *
vs.                              *
                                 *    CASE NO.1:06-CV-940-WKW
HOUSTON COUNTY BOARD OF          *
EDUCATION, KENNETH LORD,         *
RILEY JOE ANDREWS, TIM           *
PITCHFORD, PAUL STRANGE,         *
STACY EZELL, TROY                *
UNIVERSITY, DOTHAN, SANDRA       *
JONES, PAM PARRIS and            *
GREG RUEDIGER,                   *
                                 *
     DEFENDANTS.                 *

## BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

THE DEFENDANTS, Houston County Board of Education,

former Superintendent Lord, Superintendent Tim Pitchford and

Riley Joe Andrews, (hereinafter "Board Defendants," move the

court to enter a full, final and appealable summary judgment

in their favor as to all counts or portions of the

Plaintiff's Complaint. In the alternative, the Board

Defendants move the Court to enter one or more partial

summary judgments to them and against the Plaintiff as the

law and evidence entitle them.  In support, the Board

Defendants submit this Brief in Support, together with

Statements of Undisputed Material Facts and evidentiary

materials.

## NATURE OF THE CASE; THE ALLEGATIONS

Nancy Miller was an education student at Troy University Dothan (hereinafter "Troy") doing her student internship at Houston County High School in the fall of 2004.  Miller was also an employee of the Board because of a shortage of special education teachers and because there were no available applicants for a special education post at Houston County High at the time.

Miller files this lawsuit and alleges that the Board Defendants violated her constitutional (First Amendment) right to free speech by causing her to lose her internship and/or by causing her to lose her job at Houston County High School. (Complaint, Paragraphs 24 and 25).  Miller alleges that the Board Defendants took these actions "in order to stifle [her] willingness and ability to speak honestly about violations of law, and to retaliate against her for having made such reports."  (Complaint, Paragraph 26).  Miller believes that the Board Defendants somehow tried to stifle or suppress her right to speak freely and that the Board Defendants retaliated against her for continuing to speak freely about the special education department while at Houston County High School.  (Miller Depo. 59 Line 22-60 Line 7).

This case, then, is a First Amendment free speech constitutional claim brought pursuant to 42 U.S.C. Section 1983.  (Complaint paragraph 1).

## **THE BOARD DEFENDANTS' POSITION**

The Board Defendants contend that they, and each of them, are entitled to summary judgment.  First, Kenneth Lord did not violate Miller's free speech rights.  His undisputed testimony establishes this.  Miller also admits that she has no evidence to support her claims against Lord.

Second, Riley Joe Andrews did not violate Miller's free speech rights.  The only connection between Riley Joe Andrews and the decision made by Troy to terminate or withdraw Miller's internship is Andrews's letter to Pam Parris.  This letter does not ask Troy to terminate her internship, either directly or by implication.

Third, Tim Pitchford did not violate Miller's free speech rights.  Pitchford's testimony supports this proposition. Miller admits, also, that she assumes, but does not know for a fact, that Pitchford had some influence over Troy's decision to terminate her internship.  This assumption amounts to nothing more that speculation and conjecture.

Fourth, the Board did not violate Miller's free speech

rights.  Miller admits that she knows of no action taken by the Board as a body to violate her right to freedom of speech.  She has come forward with no evidence to support her claim against the Board.

Fifth, Miller has not shown a causal connection between some act by the Board Defendants and Troy's termination of her internship.  Without this causal connection Miller cannot succeed.

Sixth, Miller's alleged speech was not about a matter of public concern.  The test here is whether the speech is done primarily in Miller's role as a citizen or an employee.  The context and circumstances of the alleged speech support a finding that the speech was done primarily in Miller's role as an intern and employee.

Seventh and finally the Board would have made the same employment decision even in the presence of Miller's alleged speech.  Simply leaving her students unattended as she did would justify terminating Miller.  The conflicts with other employees, the crying at school and upsetting her students, and the students not wanting to be around Miller or in her classroom all would justify her termination.  More importantly, however, when Troy terminated her internship this violated or breached the Internship Agreement under

which Miller was employed, and the Board had little choice but to terminate Miller's employment.

This Court should grant summary judgment to all of the Board Defendants.

## SUMMARY JUDGMENT STANDARD

Rule 56(c), Fed. R. Civ. P. reads in pertinent part:

The judgment sought shall be rendered forthwith
if the pleadings, depositions, answers to
interrogatories, and admissions on file, together
with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of
law.

In pertinent part, Rule 56(e), Fed. R. Civ. P. reads:

When a motion for summary judgment is made and
supported as provided for in this rule, an adverse
party may not rest upon the mere allegations or
denials of the adverse party's pleading, but the
adverse party's response, by affidavits or as
otherwise provided in this rule, must set forth
specific facts showing that there is a genuine issue
for trial. If the adverse party does not so
respond, summary judgment, if appropriate, shall be
entered against the adverse party.

In *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986),

the United States Supreme Court states the movant's burden on

motion for summary judgment. In pertinent part, the Court

states:

Of course, a party seeking summary judgment
always bears the initial responsibility of informing
the district court of the basis for its motion, and
[of] identifying those portions of 'the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any,' which it believes demonstrate the absence of a
genuine issue of material fact.

\* \* \*

[T]he burden on the moving party may be
discharged by 'showing' -- that is, pointing out to

the district court -- that there is an absence of
evidence to support the nonmoving party's case.

Celotex *Corporation v. Catrett*, 477 U.S. 317, 323, 325
(1986).

A nonmovant, then, must establish each element of his
case (at least those elements upon which he bears the burden
of establishing at trial) by sufficient evidence in order to
withstand a motion for summary judgment. Celotex *Corporation
v. Catrett*, 477 U.S. 317, 322-23 (1986).   In pertinent part,
the Court states:

> In our view, the plain language of Rule 56(c)
> mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against
> a party who fails to make a showing sufficient to
> establish the existence of an element essential to
> that party's case, and on which that party will bear
> the burden of proof at trial.   In such a situation,
> there can be "no genuine issue of material fact,"
> since a complete failure of proof concerning an
> essential element of the nonmoving party's case
> necessarily renders all other facts immaterial.   The
> moving party is "entitled to a judgment as a matter
> of law" because the nonmoving party has failed to
> make a sufficient showing on an essential element of
> her case with respect to which she has the burden of
> proof.

*Celotex*, 477 U.S. at 322-323.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986),
the United States Supreme Court states that a nonmovant must
support each element of his case (upon which he will bear the
burden of proof at trial) by that quantum and quality of

evidence required for success at trial.  In other words, the nonmovant must submit more than "merely colorable" evidence or merely some evidence of each element. The nonmovant must submit evidence sufficient for a jury to render a verdict in his favor. In pertinent part, the Court states:

As Adickes, supra, [v. S.H. Kress & Co., 398 U.S. 144 (1970)], and Cities Service, supra, [First National Bank of Arizona v. Cities Service Co., 391 U.S. 253 (1968)], indicate, there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

As the Court long ago said in Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L.Ed. 867 (1872), and has several times repeated:

"Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.  * * *  [B]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

[W]e are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.  * * *  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a

jury can properly proceed to find a verdict for the
party producing it, upon whom the onus of proof is
imposed."  Munson, supra, 14 Wall., at 448.

Liberty Lobby, 477 U.S. at 249-50, 251, 252 (Citations

omitted; emphasis supplied); see also, Rollins v. Techsouth,

Inc., 833 F.2d 1525, 1527-28 (11th Cir. 1987), Samples v.

City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988), Earley

v. Champion International Corp., 907 F.2d 1077, 1080-81 (11th

Cir. 1990).

To succeed, then, against the Board Defendants on this

their properly supported motion for summary judgment, Miller

must establish each disputed element of her case by a

preponderance of the evidence.  A preponderance of the

evidence has been defined as "The greater weight of the

evidence; superior evidentiary weight that, though not

sufficient to free the mind wholly from all reasonable doubt,

is still sufficient to incline a fair and impartial mind to

one side of the issue rather than the other. ... [having] the

stronger evidence, however slight the edge may be." Black's

Law Dictionary 1201 (7th  ed. 1999).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Nancy Miller was a senior in the education department Troy in the fall of 2004. Miller attended Troy and expected to become a special education teacher. To complete the requirements for her Bachelor's degree, however, Miller had to satisfy an internship or student teaching requirement. She planned to do this by interning at Houston County High School. Miller had never taught special education before her internship began. (See Miller Depo. 29 line 16 through 31 line 11, 97 line 7 through 98 line 5).

2. During her college training, Miller read certain sections of the Individuals with Disabilities and Education Act (the IDEA). Miller read these sections as part of a class handout. She never read the entire Act. (Miller Depo. 32 line 3 through 33 line 2, 41 lines 13-16).

3. Miller's only training in the area of special education law was her training from Troy; specifically, one "policies and procedures" course taught by Dr. Greg Ruediger. (Miller Depo. 34 Line 21 through 35 Line 23).

4. This "policies and procedures" course lasted for one semester. (Miller Depo. 36 Lines 18 - 20).

5. Miller believes this "policies and procedures" class met two days per week. (Miller Depo. 37 Lines 4 - 10).

6. Miller claims that the various Defendants in this lawsuit suppressed her right to free speech and retaliated against her. In deposition Miller testifies:

Q. [By Mr. Walding]
   Okay. So, I want to make sure I'm understanding.
   How I read your Complaint is, you're basically
   saying the various Defendants somehow tried to
   stifle or suppress or squelch your right to speak
   freely?
A. [By Ms. Miller]
   Yes.
Q. And then, that the various Defendants somehow
   retaliated against you for speaking freely?
A. Yes.

(Miller Depo. 59 line 22 through 60 line 3).

7. Dr. Victoria Morin, one of the education professors at Troy, expressed reservations about recommending Miller for a student internship. Dr. Morin indicated and opined that Miller did not take corrective feedback well and that she was quick to make excuses and blame others when problems arose. (Miller Depo. 60 Line 8 through 61 Line 24, Defendant's Exhibits 2 and 3).

8. Dr. Morin submitted a "Faculty Recommendation of Prospective Internship, College of Education" recommending Miller for her internship. However, she placed a check in the box on the recommendation form correlating with the statement, "I have some reservations regarding this student's readiness for internship." (Miller Depo. 62 Line 13 through 63 Line 20, Defendant's Exhibit 3).

9.    As a result of Dr. Morin's recommendation, Miller received a letter from Pam Parris of Troy informing her that at least one of her faculty recommendation forms indicated that a faculty member had reservations about her beginning an internship.   (Miller Depo. 64 Lines 9 - 23, Defendant's Exhibit 4).

10.  Miller had a private meeting with Troy's Teacher Education Program ("TEP") Committee.  Parris, Dr. Morin and Dr. Greg Ruediger were present.  During this meeting Miller was told that there was some reservation about her not being able to receive constructive feedback.  Miller testifies in deposition:

```
Q.  [By Mr. Walding]
    Okay.
    Did you, in fact, attend some sort of meeting
    of this TEP Committee on or about June 15, 2004?
A.  [By Ms. Miller]
    Yes, I did, along with many other students.
Q.  So, the meeting was held with lots of students?
A.  Yes.  Each individual student would have their
    little time frame.
Q.  It was held privately for each student, though?
A.  Right.
Q.  Okay.  What is a TEP Committee, if you know?
A.  The Teacher Education Program at Troy University.
Q.  Oh.  And do you recall this meeting?
A.  Yes.
Q.  As it related to you, I mean?
A.  Yes.
Q.  Okay.  Tell me what happened?
A.  They asked some questions in terms of Ms. Miller,
    you know, something similar to, there is a
    reservation about you not being able to receive
    constructive feedback.  And if I remember correctly,
    there was - - they asked me if I understood that.
```

> And I said, no, not really.  Because I've never
> really had any problems with any of my classes or
> my teachers, to my - - you know, to my
> understanding.  It's never been brought across
> that way.

(Miller Depo. 65 line 25 through 67 line 7).

Miller further testifies in deposition:

Q.  [By Mr. Walding]
    Who was present for the TEP meeting as it related
    to you?
A.  [By Ms. Miller]
    Several of the faculty at Troy University.  Ms.
    Parris was there.  Of course, Dr. Morin was there.
    I believe Dr. Ruediger was there.

(Miller Depo. 68 lines 10-15).

11.  In the fall of 2004, the HCBOE did not have any
applicants for the vacant special education teacher position
at Houston County High.  Riley Joe Andrews, the Board's
Federal and Special Education Programs Coordinator, called
several surrounding school systems to see if they had any
qualified applicants.  After these calls produced no
applicants, Andrews contacted Troy and inquired if they had
anyone who could fill the position.  (Andrews Depo. 15 line
21 through 17 line 5).

12.  Troy informed Andrews that there was an education
student, Miller, who needed to do her student teaching or
internship and who could fill this position.  Andrews met with
Miller, and, because she was the closest person to a
certified special education teacher available, made

arrangements for Miller to intern at Houston County High. These arrangements included a written "Internship Agreement." (See Andrews Depo. 17 lines 5-24, 19 lines 2-7, 20 lines 4-10).

13. Miller signed the "Internship Agreement between Houston County Schools and Troy University Dothan Campus," on July 28, 2004. This document identifies her as "Intern, Troy University, Dothan campus." (Miller Depo. 73 line 6 through 74 line 11, Defendant's Exhibit 6).

14. The Internship Agreement governed the relationship between Miller, Houston County Schools and Troy University. Miller testifies in deposition:

Q. [By Mr. Walding]
Okay. Would you agree with me, Ms. Miller, that Defendant's Exhibit 6 kind of governed the relationship between you, Houston County Schools, and Troy University, Dothan, as it related to your internship?
A. [By Ms. Miller]
Yes. That's my understanding.

(Miller Depo. 82 lines 6 through 11).

15. The Internship Agreement was signed by Tim Pitchford, the principal at Houston County High, Pam Parris, the director of professional internships for Troy, Dr. Sandra Jones, the dean of Troy's education college, Paul Strange, a special education teacher at Houston County High and Miller's mentor teacher, and Miller. Miller testifies in deposition:

Q.   [By Mr. Walding]
     Okay.
     And would you agree with me that the second page
     of Defendant's Exhibit 6 is signed by basically
     all of the players in this relationship?
A.   [By Ms. Miller]
     Yes.
Q.   Okay.  It's signed by Tim Pitchford, as the
     Principal?  Correct?
A.   Yes.
Q.   It's signed by Pam Parris, as the Director of
     Professional Internship for Troy University?
A.   Yes.
Q.   Signed by Dr. Jones, Dean for Troy University?
A.   Yes
Q.   Signed by Mr. Paul Strange, a cooperating teacher?
A.   Yes.
Q.   And signed by you, also, an intern?
A.   Yes.
Q.   Okay.  Does the document refer to you as a
     certified teacher?
A.   No.
Q.   It refers to you as an intern, does it not?
A.   Yes, it does.
Q.   In fact, it refers to Mr. Strange as a teacher,
     does it not?
A.   Yes.

(Miller Depo. 83 line 21 through 84 line 24).

    15.  Miller did not possess a Bachelor's degree at the

time that she was an intern at Houston County High. (Miller

Depo. 30 lines 12-21).

    16.  Miller did not obtain her Bachelor's degree until

May 6, 2005.  (Miller Depo. 31 lines 7-9).

    17.   Miller did not become a certified teacher until

approximately August of 2005.  (Miller Depo. 31 lines 3-6).

18. Miller testifies that, sometime after she began her internship, she reported to Dr. Greg Ruediger of Troy that some students at Houston County High had individualized education plans ("IEPs") that, in her opinion, were not written correctly, were not appropriate, or were missing. Miller also expressed concern because she believed some special education students were did not have an IEP at all. (Miller Depo. 94 line 21 through 97 line 6).

19. Miller had been an intern at Houston County High School for only approximately 15 to 20 school days when she allegedly voiced these concerns. (Miller Depo. 97 line 11 through 98 line 5).

20. Miller claims that at least 2 students, R.S. and C.A., did not have an IEP in their file. (Miller Depo. 101 line 4 through 102 line 13).

21. According to Miller, 4 students at Houston County High School, C.A., R.S., and the L. brothers, did not have IEPs. (Miller Depo. 110 line 23 through 111 line 8).

22. After being an intern at HCHS for only a short time, Miller began giving advice to experienced and seasoned educators about appropriate services for students and about how they should follow special education processes. Miller testifies in deposition:

Q.   [By Mr. Walding]

```
          I'm somewhat confused, Ms. Miller.  You had been
          at Houston County High School for - - I believe
          you told me 15 to 20 class days?
     A.   [By Ms. Miller]
          Uh-huh.  Yes.
     Q.   And you were telling experienced teachers that
          IEP's were inappropriate for particular students?
     A.   Yes, I did.
     Q.   Okay.  And you were giving advice to experienced
          educators as to the special education process and
          how they should follow it?
     A.   Yes.
```

(Miller Depo. 113 line 24 through 114 line 12).

     Miller further testifies:

```
     Q.   [By Mr. Walding]
          Okay.  You have to understand what I'm struggling
          with over here.  You are a student intern, who
          doesn't even have a Bachelor's degree.
     A.   [By Ms. Miller]
          Uh-huh.
     Q.   - - And, yet, you are telling seasoned educators
          these IEP's are inappropriate as to students?
     A.   Yes.  Because when I took classes at Troy
          University, it was very clear, very clear, about
          the IEP's and how they should be written and that
          there should be some for special ed students.
          Yes.
```

(Miller Depo. 115 lines 6-18).

     23.  Miller felt that the services called for under some

student IEPs were inappropriate, although she had not been a

part of the IEP Teams developing the plans and had only

interacted with the children for approximately 15-20 days.

Miller testifies in deposition:

```
     Q.   [By Mr. Walding]
          And were you part of the IEP team that developed
          these IEPS?
     A.   [By Ms. Miller]
```

Page 17 of 58

No.

Q.   And had you interacted with these children in
     any way other than this 15 or 20 school days you
     had been there?
A.   No.

(Miller Depo. 117, Lines 2 through 8).

24.  According to Miller, some time after voicing these
concerns to Dr. Ruediger, she met with Pitchford and Strange
and expressed her concern that there were no IEPs for some
students.  Miller also claims that she was approached by
Kathy Keasler, the counselor at Houston County High, to write
an IEP for R.S. without going through the IEP process.
(Miller Depo. 117 line 17 through 118 line 21).

25.  Miller believed that the Board had adopted some type
of new policy during the summer before her arrival at Houston
County High that required all special education students be
education exclusively in the regular classroom despite their
unique and individual needs.  (Miller Depo. 118 lines 9-13).

26.  As part of her internship, Miller was required to
post discussions on Troy's "Blackboard" learning system.
"Blackboard" is a digital or electronic forum, akin to a
private email system, that allows students to share issues
and experiences that arise at the their various schools
during their internships.  (Miller Depo. 135 line 3-11).

27.  In one of Miller's Blackboard postings she writes
that a teacher at Houston County High does not want special

Page 18 of 58

education students in her classroom and embarrasses and humiliates the special education students and her. (Miller Depo. 140 line 8 through 141 line 7, Defendant's Exhibit 10).

28. None of Miller's Blackboard postings express her alleged concerns about students not having IEPs, about IEPs being inappropriate, about the need to rewrite or amend IEPs, or about Miller being approached by anyone to write an IEP illegally or after the fact. (Miller Depo. 144 lines 2-21, Defendant's Exhibits 10 and 11).

29. Miller's postings on Troy's Blackboard were part of the requirements for her internship seminar class. (Continuation of Miller Depo. 26 lines 3-18).

30. The Blackboard program requires a password for access. The only people allowed access to the forum were the other internship seminar students and Dr. Sandra Jones, the internship seminar professor. (Continuation of Miller Depo. 18 line 4 through 19 line 12).

31. Tim Pitchford is currently the Houston County Superintendent of Education. He was the principal of Houston County High during Miller's internship there. As the principal, Pitchford did not have the authority to recommend anyone for a teaching position. (Pitchford Depo. 6 lines 10 - 20, 9 lines 8-13).

32. Paul Strange was a special education teacher at

Page 19 of 58

Houston County High and Miller's mentor teacher or cooperating teacher during her internship. Miller reported to Strange that Houston County High was not following the "inclusion model" Miller believed was required by special education laws and regulations. (Strange Depo. 18 lines 5-24, 22 lines 11- 16, 67 lines 15 - 24).

33.   Strange is not aware of any change in Board policy that requires all special education students to be fully included in the regular classroom despite their unique and individual needs. (Strange Depo. 29 line 5 through 30 line 15).

34.   Strange notified Pitchford of Miller's concerns about the "inclusion model." (Strange Depo. 32 line 23 through 33 line 12, Pitchford Depo. 11 line 1 through 12 line 1).

35. Miller did not believe that HCHS was following the correct "inclusion model" because she was not able to teach an entire classroom of students at least two or three days per week. (Pitchford Depo. 11 line 10 through 12 line 6).

36. Miller also expressed concern to Pitchford about not having the lesson plans of Houston County High biology teacher Stacy Ezell.   (Pitchford Depo. 15 lines 4-18, Ezell Depo. 55 line 23 through 56 line 10,

37.   Ezell informed Miller that a copy of her lesson

Page 20 of 58

plans were in the principal's office. Ezell also informed Miller that she could provide Miller a copy of her lecture notes. Ezell provided copies of lecture notes to the other special education teachers she had worked with in her 15 years of teaching. (Ezell Depo. 12 line 11 through 13 line 10).

38.  Miller began to cry one day during Ezell's class. (Ezell Depo. 16 lines 14 - 24).

39.  Miller also cried in Strange's room. (Strange Depo. 74 lines 16 through 22).

40.  Lisa Towns, a math teacher at Houston County High, reported that Miller was crying in her room. Towns went to Pitchford's office and expressed concerns she had with Miller's performance. Towns reported that on numerous occasions Miller came into her room crying and upset. This behavior was disruptive to all of the students in the class, especially the special education students. (Pitchford Depo. 29 lines 4-13).

41.  Ms. Hamm, the Houston County High secretary, and Ms. Hammond, the Houston County High receptionist, also reported to Pitchford that they saw Miller crying in the school office on numerous occasions. (Pitchford Depo. 35 line 18 through 37 line 12).

42.  On another occasion in Ezell's class Ezell gave the

Page 21 of 58

students a break before the class period ended.  Ezell then indicated to Miller that if she had anything else to do she could leave.  Miller responded to Ezell by stating something to the effect of: "I don't want to be here anymore than you do." (Ezell Depo. 17 lines 2-11, Strange Depo. 80 lines 7-24).

43.  Towns also discussed with Pitchford her concern that Miller would not follow her suggestions regarding lesson plans.  Towns suggested that Miller teach lessons that more students could comprehend, but Miller insisted on teaching lessons that were above the students' learning ability. (Pitchford Depo. 29 line 21 through 30 line 4).

44.  Kathy Keasler, the Houston County High counselor, reported to Pitchford that some special education students told her they did not feel comfortable with Miller or in Miller's class.  These students asked not to go to Miller's class. (Pitchford Depo. 39 line 13 through 40 line 12).

45.  Strange and Towns also reported similar incidents of students asking not to be required to go into a classroom with Miller. (Pitchford Depo. 41 line 1 through 42 line 20, Strange Depo. 141 lines 9-25).

46.  One day after an eligibility meeting for a student, Strange and Starla Smith, a psychometrist for the Board, approached Miller to show her, and go over, the eligibility

Page 22 of 58

form.   Their idea was to help Miller understand the special

education process by seeing and discussing an actual special

education document.   Strange felt that Miller was not

familiar with the special education process. (Strange Depo.

181 lines 1-22).

47.   Upon seeing this document Miller stated that she

would not sign any documents and started acting erratically

and accusing Strange and Smith of asking her to do something

illegal.   Strange and Smith left the room.   Strange does not

recall him or Smith asking Miller to sign any documents.

(Strange Depo. 181 line 23 through 183 line 12).

48.   Miller left the Houston County High campus without

Pitchford's or the assistant principal's permission on

September 24, 2004.   Miller felt she needed to discuss her

concerns with Riley Joe Andrews, Federal and Special

Education Programs Coordinator, at the Board's central

office. (Miller Depo. 175 line 7 through 176 line 23, 187

line 24 through 188 line 7).

49.   Miller did not inform Pitchford or the assistant

principal that she was leaving campus.   He first learned

Miller left the when Strange notified.   Pitchford testifies

in deposition:

Q.   [By Mr. Faulk]
     You had testified that she had some students who
     were left unsupervised when she left the campus on

Page 23 of 58

       that occasion.
A.    [By Mr. Pitchford]
       Right.
Q.    Tell us about that, please. What do you know about
       that?
A.    Mr. Strange came to me.  That was how I was first
       notified that Mrs. Miller was not there.   Mr.
       Strange came to me and said, "I think Mrs. Miller's
       gone." And I said, "Why do you say that?"  He said,
       "She's not here."  He said, "There are students that
       came to me and said that Mrs. Miller is not – 'Where
       is Mrs. Miller?"
       And then, Ms. Hamm, the secretary, came and said
       that she saw Mrs. Miller go out the door, upset,
       crying, with her arms -- with a basket of materials.

(Pitchford Depo. 97 lines 2-19).

    50.  Miller discussed her concerns about Houston County

High's alleged noncompliance with special education law with

Parris and Ruediger from Troy. (Miller Depo. 197 line 18

through 198 line 18, 202 lines 17-20).

    51.  Miller contends that on two occasions Parris

threatened to make Miller fail her internship. (Miller Depo.

200 lines 9-20, 206 line 15 through 207 line 4).

    52.  Parris is the only Defendant that Miller claims

threatened to cause her to fail her internship.  Miller

admits that no member of the Board, nor any individual

defendant associated with the Board, ever said or implied

that they had the power or authority to cause Miller to fail

her internship. (Miller Depo. 209 line 14 through 210 line

11).

    53.  After meeting with Miller and learning of her

Page 24 of 58

concerns about students not having IEPs, Andrews sent
Virginia Singletary, assistant Special Education Coordinator,
to Houston County High to pull all special education student
files and make sure they all contained an IEP. Singletary's
investigation revealed that all files did contain an IEP.
(Andrews Depo. 25 line 13 through 28 line 10, Singletary
Depo. 8 line 3 through 10 line 21).

54. Sometime after meeting with Miller on September 24,
2004, and after Singletary conducted her investigation,
Andrews and Pitchford talked by telephone and Andrews assured
Pitchford that the school was complying with special
education law. Pitchford informed Andrews of the various
concerns about Miller's behavior and work performance he had
heard. Andrews asked for a list of these concerns. This
list is in evidence as Defendant's Exhibit 18. Andrews
relied upon the concerns listed in Defendant's Exhibit 18 to
draft his letter to Parris, Defendant's Exhibit 17. Andrews
intent was to notify Parris of the concerns listed so Miller
could receive help or guidance from Troy. (Andrews Depo. 38
line 21 through 39 line 22).

54. Some thereafter Andrews wrote Parris and enumerated
the concerns employees at Houston County High had with
Miller's behavior, work performance, and ability as an
intern. These concerns included Miller leaving campus

Page 25 of 58

without permission, Miller not working well with peer teachers, and Miller's lack of understanding of the special education process. This letter does not state or imply that either Andrews, the Board, or anyone associated with the Board wanted Troy to cancel Miller's internship. (Miller Depo. 229 line 8 through 231 line 4, Andrews Depo. 38 line 21 through 39 line 22, Defendant's Exhibit 17).

55. Parris was the only person associated with Troy with whom Andrews communicated concerning Miller. (Andrews Depo. 34 lines 19-23).

56. After Andrews assured Pitchford that the school was in compliance with the special education laws Pitchford called a meeting with Miller. During this meeting Pitchford explained to Miller that the Superintendent, Andrews, and Strange reported to him that the school was in full compliance with all laws. Pitchford told Miller that because all these seasoned educators assured him they were in compliance that he expected Miller to follow the plans at the school. Pitchford explained to Miller the chain of command in the school system and explained to her that other teachers in the school had been coming to him with concerns about her. (Pitchford Depo. 47 line 7 through 50 line 12).

57. Pitchford did not discuss Miller and her internship with any Troy employees other than Parris and Ruediger.

Pitchford did not make any statements to these two individuals indicating that he wanted Miller removed or that he would not allow interns at Houston County High in the future. As a principal Pitchford did not have the authority to make such a decision concerning interns; that is a decision for the Board. (Pitchford Depo. 85 line 3 through 86 line 6).

59. During her internship and employment at HCHS Miller worked under a substitute teaching certificate. At the time that was the only certificate for which she was eligible. (Lord Depo. 6 lines 6-15).

60. Miller signed a teacher's contract with the Board. However, because she was not a certified teacher at the time the use of this form contract was a mistake. (Lord Depo. 6 line 21 through 7 line 11).

61. During Miller's brief internship Andrews reported to then Superintendent Lord that various employees at Houston County High were experiencing problems with Miller. These problems included Miller's inability to work well with other faculty and her refusal to follow suggestions and directions. Lord was never told about Miller's concerns about IEPs or the special education program at the school. (Lord Depo. 10 line 7 through 12 line 21).

62. Lord does not recall any conversations with Parris

Page 27 of 58

regarding problems with Miller. (Lord Depo. 12 line 22
through 13 line 15).

63.   Lord was not aware that Miller's internship was
going to be withdrawn until he received a memo from Troy.
This memo notified him that Troy had withdrawn Miller's
internship. (Lord Depo. 14 lines 16-22).

64.   Lord took no conscious action that would have
impacted Miller's internship negatively.   Lord testifies in
deposition:

Q.   [By Mr. Faulk]
     Is it your contention that you did not consciously do
     anything that would have adversely affected Mrs.
     Miller's internship status?
A.   [By Mr. Lord]
     To the best of my recollection, no, sir. I never had
     a conversation with anybody that would have
     reflected badly on her internship or her
     relationship with us.

(Lord Depo. 16 lines 15-22).

65.   After learning of Troy's decision to withdraw
Miller's internship Lord drafted and hand delivered a letter
to Miller informing her that she would no longer be employed
by the Board. (Lord Depo. 16 line 23 through 17 line 5,
Defendant's Exhibit 28).

66.   Lord was aware that Miller left HCHS's campus
without notifying anyone in authority, which was a violation
of Board policy.   This policy is in the Board policy manual
and it is discussed every year at the first faculty meeting.

Page 28 of 58

Case 1:06-cv-00940-MEF-TFM   Document 44   Filed 11/16/2007   Page 29 of 58

(Lord Depo. 21 line 12 through 22 line 9).

67.   After delivering the termination letter to Miller Lord recommended to the Board that they terminate Miller's employment. (Lord Depo. 27 lines 3-10).

68.   Lord was not aware that Miller allegedly voiced concerns to anyone concerning the special education program at Houston County High when he recommended that the Board terminate her employment. (Lord Depo. 30 lines 13 through 24).

69.   Lord did not play any part in Troy's decision to withdraw Miller's internship and he did not take any action to violate Miller's rights.   Lord testifies in deposition:

> Q.   [By Mr. Walding]
>       " Mr. Lord, have you, yourself, personally, done anything to stifle Mrs. Miller's free speech rights?
> A.   [By Mr. Lord]
>       No, sir.
> Q.   Have you personally done anything to retaliate against her for supposedly exercising her free speech rights?
> A.   No, sir.
> Q.   Did you as superintendent of education, do anything to stifle Mrs. Miller's free speech rights?
> A.   No, sir.
> Q.   Did you, as superintendent of education, do anything to try to punish her or retaliate against her for supposedly exercising her free speech rights?
> [Mr. Smith: Object to form.]
> A.   No, sir.
> Q.   Now, did you make the decision to withdraw or terminate Mrs. Miller's internship?
> A.   No, sir.

Page 29 of 58

> Q. Did you ask anybody at Troy State to withdraw or terminate her internship?
> A. No, sir.

(Lord Depo. 32 line 4 through 33 line 3).

70. Andrews took no action in either an official or personal capacity to stifle Miller's free speech rights or to retaliate against her for supposedly exercising her free speech rights. Andrews did not have the authority to withdraw Miller's internship. Andrews did not have the authority to terminate her employment with the Board. Andrews never asked anyone at Troy to terminate or withdraw Miller's internship. (Affidavit of Riley Joe Andrews).

71. Andrews did not know that Miller's internship was being withdrawn until he received either a phone call or some other type of notification that Troy had decided to terminate Miller's internship. Andrews received a letter from Troy confirming that Troy had terminated Miller's internship sometime after this communication. (Andrews Depo. 48 lines 13-21).

72. Pitchford did not have the authority to make any employment decision concerning Miller when he was the principal of Houston County High. Pitchford did not have any authority to terminate or withdraw Miller's internship. Pitchford never requested, directly or by implication, anyone at Troy to remove Miller from Houston County High or

to terminate Miller's internship.  Pitchford never made any

statements to Troy about limiting the future placement of

interns at Houston County High.  Pitchford did not have the

authority to limit the placement of interns at Houston County

High. (Pitchford Depo. 71 line 10 through 72 line 1, 85 line

3 through 86 line 6, 103 line 4 through 104 line 1).

73.  Miller has not produced any evidence that Lord

violated her speech rights.  Miller testified in deposition:

    Q.   [By Mr. Walding]
         Do you have any information about Kenneth Lord doing
         anything that you think violated your right to free
         speech?
    A.   [By Mrs. Miller]
         At this time, I have no knowledge.

(Miller Depo. 306 lines 2 - 5).

74.  Miller's only evidence that Andrews violated her

right to free speech is the letter he sent to Parris

expressing his concerns and the concerns of Houston County

High employees about Miller's performance.  Miller testifies

in deposition:

    Q.   [By Mr. Walding]
         What has Riley Joe Andrews done that you believe
         violated your right to free speech? Is that the
         letter he sent to Ms. Parris?
    A.   [By Mrs. Miller]
         I think that is
    [Mr. Faulk: Same objection.]
    Q.   Anything else that Riley Joe Andrews has done?
    [Mr. Faulk: Same objection.]
    A.   Not to my knowledge at this time.
    Q.   Is there some document or information you could look
         at to refresh your memory, that might change what

you've just told me?
A.   Not that I know of.

(Miller Depo. 307 lines 1-15).

75.   Miller's only evidence that Pitchford violated her

free speech rights is her belief or assumption that Pitchford

influenced Dr. Sandra Jones of Troy to withdraw her

internship.   Dr. Jones is the person who made the decision to

withdraw Miller's internship. (Miller Depo. 307 line 16

through 308 line 12).   Miller testifies in deposition:

    Q.   [By Mr. Walding]
         What evidence or information do you have that would
         connect Tim Pitchford with this decision made by
         Sandra Jones to terminate or administratively
         withdraw your internship?
    A.   [By Mrs. Miller]
         Because Ms. Parris said that Mr. Pitchford would be
         the person to decide whether he wanted me in that
         school or not.
    Q.   Okay. How does that connect you to the internship?
    . . .
    A.   Would you repeat the question please?
    Q.   I don't know that I can, Mrs. Miller. I'll try or
         this lady can.
    . . .
    A.   How did Mr. Pitchford connect me to the internship?
    [Mr. Walding: Let's go back to the question before that.
    . . .
    A.   It would be my logical way of thinking that if my
         internship was terminated, that Mr. Pitchford had
         made some sort of a request or had some influence in
         that decision.
    Q.   Okay. And do you know for a fact that he made that
         request or had some influence in that decision?
    A.   I don't know for a fact.

    (Miller Depo. 308 line 13 through 309 line 25).

76.   Miller does not know of any action taken by the
Board that violated her free speech rights. (See Miller Depo.
283 line 12 through 290 line 24). Miller testifies in
deposition:

Q.   [By Mr. Walding]
     Do you know or are you aware of the Houston County
     Board of Education, acting a body, having done
     anything that you say violated your right to free
     speech?  Did they take any act that you say violated
     your right to free speech?
[Mr. Faulk: Acting as a body?]
[Mr. Walding: That's what the question said, Mr. Faulk.]
[Mr. Faulk: Just say, "no," and let's move on.]
A.   [By Mrs. Miller]
     Not that I know of.

(Miller Depo. 292 line 24 through 293 line 10).

77.   Miller never attended a Board meeting to express her
alleged concerns.  According to Miller she "wanted to keep it
on the lowest level possible." (Continuation of Miller Depo.
90 line 25 through 91 line 3).

78.   The allegedly protected speech spoken by Miller was
done during work hours, at a school facility or at the
Board's central office, and even according to Miller,
herself, as at least a part of her duties as a student
intern.  (Continuation of Miller Depo. 137 line 20 through
139 line 15).

## **ARGUMENT**

In assessing an allegation of retaliation for exercise of
free speech this Circuit uses a 4 part test known sometimes
as the "Bryson" test.  This test appears to incorporate
elements from *Pickering v. Board of Education*, 391 U.S. 563
(1968), *Connick v.  Meyers*, 461 U.S. 138 (1983), and *Mt.
Healthy City School District Board of Education v. Doyle*, 429
U.S. 274 (1977).

The Court in *Morgan v. Ford*, 6 F.3d 750 (11th Cir. 1993)
states the test as follows:

> A state may not demote or discharge a public
> employee in retaliation for protected speech.
> Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th
> Cir. 1989) (citing Rankin v. McPherson, 483 U.S.
> 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).  This
> circuit has developed a four-part test to determine
> whether an employee suffered such retaliation.
> First, a court must determine "whether the
> employee's speech may be 'fairly characterized as
> constituting speech on a matter of public concern.'"
> Bryson, 888 F.2d at 1565 (quoting Rankin, 483 U.S.
> at 384, 107 S.Ct. at 2896-97 (citations omitted)).
> See also Kurtz v. Vickery, 855 F.2d 723 (11th Cir.
> 1988); Ferrara v. Mills, 781 F.2d 1508, 1512 (11[th]
> Cir. 1986).  If so, the district court must "weigh[
> ] the employee's first amendment interests against
> 'the interest of the state, as an employer, in
> promoting the efficiency of the public services it
> performs through its employees.'" Bryson, 888 F.2d
> at 1565 (quoting Pickering v. Board of Educ., 391
> U.S. 563, 568, 88 S.Ct. 1731, 1734-35 20 L.Ed.2d 811
> (1968)).  Should the employee prevail on the
> balancing test, "the fact-finder determines whether
> the employee's speech played a 'substantial part' in
> the government's decision to demote or discharge the
> employee.  Id. (citing Mt. Healthy City School Dist.

Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, "the state must prove by a preponderance of the evidence that 'it would have reached the same decision ... even in the absence of the protected conduct.'" Id. at 1566 (quoting Mt. Healthy, 429 U.S. at 286, 97 S.Ct. at 576).

*Morgan v. Ford*, 6 F.3d 750, 753-54 (11th Cir. 1993).

The Court in *Mize v. Jefferson City Board of Education*,

93 F.3d 739 (11th Cir. 1996) states:

In deciding a claim of First Amendment retaliatory discharge, a court looks to "(1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct." Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1563-64 (11th Cir. 1995) (citing Bryson v. City of Waycross, 888 F.2d 1562, 1565-66 (11th Cir. 1989)).

The third element of the "Bryson" test asks whether there is a "substantial"" causal link between the employee's speech and the adverse employment decision. Where causation is lacking, an employee's claim of retaliatory discharge must fail and it is unnecessary to consider the other three elements. Beckwith, 58 F.3d at 1564.

*Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742

(11th Cir. 1996).

In *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) the

Court states the following concerning how to analyze the

particular speech:

Absent extraordinary circumstances, however, First Amendment protection remains unavailable when "a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest...." [Connick v.  Meyers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)] at 147, 103 S.Ct. at 1690.  A court must therefore discern the purpose of the employee's speech – that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee. [Connick] at 146; 103 S.Ct. at 1690; Kurtz, 855 F.2d at 730; Ferrara, 781 F.2d at 1515-16.  To accomplish this, a court considers "the content, form and context of a given statement, as revealed by the whole record." Deremo v. Watkins, 939 F.2d 908, 910 (11th Cir. 1991) (citing Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690).  A court may consider the employee's attempts to make the concerns public, along with "the employee's motivation in speaking."  Id. at 911 (citations omitted).

* * *

[W]e must determine whether the purpose of [the Plaintiff's] speech was to raise issues of public concern, on the one hand, or to further her own private interest, on the other.   (Citations omitted).

* * *

That Morgan spoke on behalf of Sheila Parrish regarding Ford's harassing behavior does not change the outcome.  <u>An employee's speech will rarely be entirely private or entirely public.  Rather than categorize each phrase the employee uttered, we "consider whether the speech at issue was made **primarily in the employee's role as citizen, or primarily in the role of employee**."</u>   (Citations omitted).

*Morgan v. Ford*, 6 F.3d 750, 754, 755 (11th Cir. 1993)

(citations omitted where noted; emphasis supplied).

The Court in *Rankin v. McPherson*, 483 U.S. 378 (1987) states:

> In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose.  <u>We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.</u>
> <u>These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise.  Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest</u>.

*Rankin*, 483 U.S. 378, 388 (1987) (Emphasis supplied).

The Eleventh Circuit Court of Appeals states "The relevant inquiry is not whether the public would be interested in the topic of this speech at issue but rather is "whether the purpose of the Plaintiff's speech is to raise issues of public concern." *Maggio v. Sipple*, 211 F. 3d 1346, 1352, (11th Cir. 2000).

In addition to the elements and burdens noted above, Miller must present evidence that each Board Defendant acted under color of some statute, ordinance, regulation, custom or usage of a state actor that subjected her to the deprivation

of some right secured by the Constitution. 42 U.S.C.A.

Section 1983.  In essence Miller cannot recover against the

individual Board Defendants in their individual capacity, but

must show that each violated her rights while acting in an

official capacity or under color of state law.

## I.   KENNETH LORD DID NOT VIOLATE MILLER'S FREE SPEECH RIGHTS.

Lord's undisputed deposition testimony is that he had no

role in the termination of Miller's internship or the alleged

violation of Miller's rights:

> Q.   [By Mr. Walding]
>      Mr. Lord, have you, yourself, personally, done
>      anything to stifle Mrs. Miller's free speech
>      rights?
> A.   [By Mr. Lord]
>      No, sir.
> Q.   Have you personally done anything to retaliate
>      against her for supposedly exercising her free
>      speech rights?
> A.   No, sir.
> Q.   Did you as superintendent of education, do
>      anything to stifle Mrs. Miller's free speech
>      rights?
> A.   No, sir.
> Q.   Did you, as superintendent of education, do
>      anything to try to punish her or retaliate
>      against her for supposedly exercising her free
>      speech rights?
> Mr. Smith: Object to form.
> I.   No, sir.
> Q.   Now, did you make the decision to withdraw or
>      terminate Mrs. Miller's internship?
> A.   No, sir.
> Q.   Did you ask anybody at Troy State to withdraw or
>      terminate her internship?
> A.   No, sir.

(Lord Depo. 32 line 4 through 33 line 3).

Miller, herself, admits that she has no evidence to prove Lord violated her rights.  Miller testifies in deposition:

Q.    [By Mr. Walding]
      Do you have any information about Kenneth Lord doing
      anything that you think violated your right to free
      speech?
A.    [By Mrs. Miller]
      At this time, I have no knowledge.

(Miller Depo. 306 lines 2 - 5).

Miller cannot prevail against Lord because she cannot show that he did anything to violate her speech rights.  She, therefore, cannot show that he acted to violate her rights under color of state law.  The Court should grant summary judgment to Kenneth Lord, both individually and in his official capacity.

## II.   RILEY JOE ANDREWS DID NOT VIOLATE MILLER'S FREE SPEECH RIGHTS.

Riley Joe Andrews did not violate Miller's free speech rights.  Miller cannot show that Andrews took any actions to violate her free speech rights.

Miller testifies in deposition concerning the one reason she feels Andrews violated her rights, that is, writing the letter to Pam Parris expressing concerns about Miller.  In relevant part Miller testifies:

Q.    [By Mr. Walding]

What has Riley Joe Andrews done that you believe
violated your right to free speech? Is that the
letter he sent to Ms. Parris?
A.  [By Mrs. Miller]
    I think that is
[Mr. Faulk: Same objection.]
Q.  Anything else that Riley Joe Andrews has done?
[Mr. Faulk: Same objection.]
A.  Not to my knowledge at this time.
Q.  Is there some document or information you could look
    at to refresh your memory, that might change what
    you've just told me?
A.  Not that I know of.

(Miller Depo. 307 lines 1 - 15).

Andrews admits that he wrote the letter to Parris.

However, the letter does not, either directly or implicitly,

ask Troy to terminate or withdraw Miller's internship.

(Miller Depo. Defendant's Exhibit 17). The letter, also, does

nothing to terminate Miller's employment with the Board.   Id.

Andrews intended for this letter to notify Parris of the

concerns raised by Houston County High faculty members and

administrators so Miller could receive help. (Andrews Depo.

38 line 21 through 39 line 22).

The fact is clear and undisputed that Andrews lacked the

authority to withdraw Miller's internship from Troy.  That

decision was made by Dr. Sandra Jones and/or Troy.  Andrews,

also, had no authority to terminate her employment with the

Board.  That decision was made by the Board after Troy

terminated Miller's internship.  Furthermore, Andrews never

asked anyone at Troy to terminate or withdraw Miller's

internship. (Affidavit of Riley Joe Andrews). Andrews never
had any contact with Dr. Sandra Jones, the Troy employee who
made the final decision to withdraw Miller's internship. (See
Andrews Depo. 34 lines 19-23, Miller Depo. 308 lines 6-17).

Miller cannot prevail against Andrews because she cannot
show that he did anything to violate her free speech rights.
She, therefore, cannot show that he acted to violate her
rights under color of state law. The Court should grant
summary judgment to Riley Joe Andrews, both individually and
in his official capacity.

## III. TIM PITCHFORD DID NOT VIOLATE MILLER'S FREE SPEECH RIGHTS.

Pitchford was the principal of Houston County High School
during Miller's internship there. (Pitchford Depo. 6 lines
13-20). As principal Pitchford had no authority to recommend
that the Board hire or fire anyone or that the Board
terminate anyone. (See Pitchford Depo. 9 lines 10-13, 71 line
10 through 72 line 1).

Pitchford never asked anyone at Troy to terminate
Miller's internship, nor did he tell anyone at Troy that he
wanted Miller removed from Houston County High. Pitchford
never implied to Ruediger or Parris that he wanted Miller's
internship terminated. Pitchford never made any statements

to Troy threatening to limit the future placement of interns,
and he lacked authority to limit any such future placements.
(Pitchford Depo. 85 line 3 through 86 line 6, 103 line 4
through 104 line 1).

Miller's only evidence that Pitchford had any influence
on Troy's decision to terminate her internship is assumption
and speculation.  Miller admits that Dr. Sandra Jones is the
Troy employee who made the decision to terminate her
internship. (Miller Depo. 308 lines 5-11).

Miller testifies in deposition:

Q.   [By Mr. Walding]
     "What evidence or information do you have that would
     connect Tim Pitchford with this decision made by
     Sandra Jones to terminate or administratively
     withdraw your internship?
A.   [By Mrs. Miller]
     Because Ms. Parris said that Mr. Pitchford would be
     the person to decide whether he wanted me in that
     school or not.
Q.   Okay. How does that connect you to the internship?
. . .
A.   Would you repeat the question please?
Q.   I don't know that I can, Mrs. Miller. I'll try or
     this lady can.
. . .
A.   How did Mr. Pitchford connect me to the internship?
[Mr. Walding: Let's go back to the question before that.
. . .
A.   **It would be my logical way of thinking that if my
     internship was terminated, that Mr. Pitchford had
     made some sort of a request or had some influence in
     that decision.**
Q.   **Okay. And do you know for a fact that he made that
     request or had some influence in that decision?**
A.   <u>**I don't know for a fact.**</u>

(Miller Depo. 308 line 13 through 309 line 25; emphasis supplied).

Miller has not produced any other evidence, other than speculation and conjecture, that Pitchford violated her rights to free speech. Miller cannot prevail against Pitchford because she cannot show that he did anything to violate her free speech rights. She, therefore, cannot show that he acted to violate her rights under color of state law. The Court should grant summary judgment to Tim Pitchford, both individually and in his official capacity.

## IV. **MILLER ADMITS THAT THE BOARD DID NOT VIOLATE HER FREE SPEECH RIGHTS.**

The Board did not take any action to violate Miller's right to free speech. Miller admits this fact in her deposition testimony:

Q.   [By Mr. Walding]
     Do you know or are you aware of the Houston County
     Board of Education, acting a body, having done
     anything that you say violated your right to free
     speech? Did they take any act that you say violated
     your right to free speech?
[Mr. Faulk: Acting as a body?]
[Mr. Walding: That's what the question said, Mr. Faulk.]
[Mr. Faulk: Just say, "no," and let's move on.]
A.   [By Mrs. Miller]
     Not that I know of.

(Miller Depo. 292 line 24 through 293 line 10).

The Board is a public entity and body and can only act by

majority vote.  Miller has no evidence that the Board acted
to violate her free speech rights; she admits as much.  If
she cannot show that the Board acted Miller cannot show that
the Board acted under color of state law. Miller cannot
prevail against the Board and this Court should grant summary
judgment to the Board.

## VI.  MILLER'S TERMINATION WAS NOT BASED ON HER ALLEGED EXERCISE OF FREE SPEECH.

### A.  Miller has not shown a causal link between her alleged free speech and the termination of her employment.

Miller's employment with the Board was terminated because
she was no longer a student intern at Troy.  The Internship
Agreement required Miller to participate in and complete
successfully the internship program.  When Troy withdrew or
terminated Miller's internship the Board had no alternative
but to terminate her employment.

More importantly, Miller has not shown a causal link
between any Board Defendant and Troy's decision to terminate
her internship. Pitchford only discussed Miller with two Troy
employees: Parris and Ruediger. (Pitchford Depo. 85 line 3
through 86 line 6).  Pitchford did not ask Parris or Ruediger
to terminate Miller's internship.  Id.  Pitchford did not

imply to either Parris or Ruediger that he wanted Miller's internship withdrawn or terminated. (Pitchford Depo. 85 line 3 through 86 line 6).

Andrews did not discuss Miller with anyone at Troy except Parris. (Andrews Depo. 34 lines 19-23). His letter to Parris does not ask Troy to terminate Miller's internship, nor does it imply that anyone associated with the Board desired that.

Lord does not recall having any communication with Parris or any other Troy employee about Miller. (Lord Depo. 12 line 22 through 13 line 15, 16 lines 15-22). Lord did not even know that Miller's internship was at risk until he received notice from Troy that Miller's internship was withdrawn. (Lord Depo. 14 lines 16-22).

Further, Miller alleges that only one person ever threatened to have her internship terminated, or cause her to fail the internship: Pam Parris. (Miller Depo. 200 lines 9-20, 206 line 15 through 207 line 4, 209 line 14 through 210 line 11). Miller admits that no person associated with the Board ever indicated they had the authority to have her fail her internship. (Miller Depo. 209 line 14 through 210 line 11). Miller fails to show how the Board Defendants caused her internship to be withdrawn leading to her termination as a board employee. Miller's claims cannot stand without

establishing a causal link between an action by the Board
Defendants and the alleged violation of Miller's right to
free speech. *Beckwith v. City of Daytona Beach Shores*, 58
F.3d 1554, 1564 (11th Cir. 1995).

## B.  Miller's alleged speech was not a matter of public concern.

Miller's speech was not related to a matter of public
concern.  In determining if an employee's speech is a matter
of public concern, Courts consider whether the speech was
made primarily in the employee's role as a citizen or in the
employee's role as an employee.  *Morgan*, 6 F.3d 750, 755 (11th
Cir. 1993).

Miller never mentioned any specific problems about IEPs
or any other problem with the special education program at
Houston County High to anyone not associated with the school,
the Board, Troy, or Sharon Cole, who is a Uniserve director
for the Alabama Education Association ("AEA"). (Continuation
of Miller Depo. 87 line 12 through 90 line 9, 143 line 4
through 147 line 2). Miller did discuss some of her concerns
with her husband, her Troy classmates through the required
Blackboard postings, and she had one conversation with her
neighbor, Carol Vandergeest, who was an educator in the
master's program at Troy. (Continuation of Miller Depo. 87

line 12 through 89 line 22, 101 line 8 through 102 line 16,

Defendant's Exhibits 10 and 11). This conversation, however,

came after her internship had been withdrawn or terminated,

so it could not have had an effect on that decision.

Miller testifies in deposition concerning her

conversation with Vandergeest:

> Q.   [By Mr. Musso]
>       And what the circumstances that you were talking to
>       her?
> A.   [By Ms. Miller]
>       If I remember correctly, it was when I had been
>       administratively withdrawn. And she thought that was
>       highly unusual. And I just said there were some
>       noncompliance issues at the school I was at.
> Q.   Did you tell her what those noncompliance issues
>       were?
> A.   No.
> Q.   Give her any details about what actually happened
>       other than you had been administratively withdrawn?
> A.   No.

(Continuation of Miller Depo. 101 lines 12-25).

Miller contacted Sharon Cole with the AEA because Miller

was a school employee and student member of the AEA who

needed advice. (Continuation of Miller Depo. 149 lines 9-12,

150 lines 16 - 18). Miller describes her understanding of the

AEA in deposition:

> Q.   [By Mr. Walding]
>       What's your understanding of what the organization
>       is?
> A.   [By Ms. Miller]
>       It helps teachers with all kinds of benefits and
>       help and advice.
> Q.   Employment related benefits?
> A.   I guess that is my understanding.

Q.    Okay. And that's what I'm asking you for, Mrs.
      Miller, is your understanding. You're a member of
      this organization?
A.    Yes.
Q.    So, I wanted to know what your understanding of what
      the organization is. Your attorney is objecting to
      me calling it a labor union, and I understand that.
      What would you characterize it as?
A.    An organization that promotes education, rights for
      their teachers, providing benefits for the teachers,
      that sort of thing.
Q.    And you agree with me that it helps to promote
      employment-related benefits for teachers?
A.    I believe so.

(Continuation of Miller Depo. 150 line 16 through 151 line
17).

    Miller cannot show any connection between her
communication with Cole and Troy's decision to terminate or
withdraw her internship.

    Importantly, Miller did not try to alert the public about
any alleged problems with the Houston County High School
special education program. She did not contact the media,
did not post this information or her complaints on the
internet, and she never called or contacted any
parent/teacher groups or the State Department of Education.
(Continuation of Miller Depo. 90 lines 12-24). Miller, also,
did not attend a Board meeting to express her concerns. (See
Continuation of Miller Depo. 90 line 25 through 91 line 3).

    Miller discussed her concerns over IEPs with Board
employees Pitchford, Andrews, Monday, Towns, Ezell, Strange,

another teacher Ms. Sims, during school hours and at school or Board facilities. (Continuation of Miller Depo. 135 line 12 through 139 line 15). Miller's postings on Troy's Blackboard were part of the requirements for her internship seminar class. (Continuation of Miller Depo. 26 lines 3-18). The program requires a password for access and the only people who had access were other internship seminar students and the internship seminar professor, Dr. Sandra Jones. (Continuation of Miller Depo. 18 line 4 through 19 line 12). Miller's Blackboard postings do not cover the alleged problems or concerns Miller had with the special education program at Houston County High School. (See Miller Depo. 140 line 8 through 141 line 7 and Defendant's Exhibit 10).

Based on the context and circumstances Miller's alleged speech was made primarily in her role as an intern and an employee, and not primarily in her role as a citizen. Miller cannot prevail without a showing that her speech was about a matter of public concern. The Court should grant summary judgment for the Board Defendants.

**C.    The HCBOE would have made the same decision to terminate Miller's employment even in the absence of any alleged protected speech.**

The Board had the authority to terminate Miller's employment.  See Ala. Code Section 16-8-23 (1975).

Ala. Code §16-8-23 provides that: "The County Board may suspend or dismiss for immorality, misconduct in office, insubordination, incompetency or willful neglect of duty, or whenever, in the opinion of the Board, the best interest of the school requires it...."

The Board would have made the same employment decision regarding Miller whether she spoke about IEPs and other special education concerns or not.  The Board is authorized to terminate employment for incompetency or when such is in the best interest of the school.

Here, at least three teachers, Ezell, Strange and Towns, reported seeing Miller crying on the school campus. Both the school secretary and school receptionist also reported Miller crying and being upset at school. Towns reported to Pitchford that Miller was crying and upset in her classroom and that this behavior was disruptive to all the students, especially the Special Education students in that class.  (Pitchford Depo. 29 lines 4-13).

Miller also made confrontational and inappropriate statements to Ezell while students were present.  One day,

Page 50 of 58

when Ezell informed Miller that she could leave because the lesson was over, Miller responded to Ezell, "I don't want to be here anymore than you do," or something to that effect. (Ezell Depo. 17, lines 2 - 11, Strange Depo. 80 lines 7 - 24). Towns also reported to Pitchford that Miller would not follow suggestions concerning appropriate lesson plans for the learning levels of the students Miller was instructing. (Pitchford Depo. 29 line 21 through 30 line 4).

Pitchford received reports from Keasler, Strange and Towns that students were reporting that they did not feel comfortable around Miller or in Miller's class and they were asking that they not be forced to go into a classroom with Miller. (Pitchford Depo. 39 line 13 through 40 line 12, 41 line 1 through 42 line 20, Strange Depo. 141 line 9-25). Miller left the Houston County High campus on September 24, 2004 without notifying the principal or assistant principal of the school. (Miller Depo. 175 line 7 through 176 line 23, 187 line 24 through 188 line 7). Pitchford was not aware that Miller had left the campus until Strange notified him that unsupervised special education students were asking about Miller's location. (Pitchford Depo. 97 lines 2-19).

After learning that Troy was withdrawing Miller's internship, the Board could not retain Miller because she could not complete her course work and become a certified

Page 51 of 58

special education teacher and because the provisions of the
Internship Agreement were violated. (Lord Depo. 16 line 23
through 17 line 5, Defendant's Exhibit 28).  The Board would
have still reached the decision to terminate Miller's
employment because of her insubordinate conduct, her apparent
incompetency, her willful neglect of duty by leaving her
students unattended, and because the best interest of the
school would require it given her inability to cope and to
work well with the other employees at Houston County High.

## VI.   Any speech made by Miller was part of her official duties as an intern and Board employee.

Recently, the United States Supreme Court revisited
the issue of public employees and their protection
under the First Amendment in *Garcetti v. Ceballos*.

In *Garcetti,* the Court states, in relevant part: "We hold
that when public employees make statements pursuant to their
official duties, the employees are not speaking as citizens
for First Amendment purposes, and the Constitution
does not insulate their communications from employer
discipline."  *Garcetti v. Ceballos,* ___ U.S. ___, 126 S.Ct.
1951, 1960 (2006).

In *Garcetti,* the Court also states: "Restricting speech
that owes its existence to a public employee's professional
responsibilities does not infringe any liberties the employee

might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or  created." *Garcetti v. Ceballos,* ___ U.S. ___, 126 S.Ct. 1951, 1960 (2006).

Any knowledge that Miller has about the special education program at Houston County High came about through her official duties as an intern there and as an employee of the Board.  Miller began voicing concerns about the special education program there after only interning for 15 to 20 school days. (Miller Depo. 97 line 11 through 98 line 5). Miller alleges that 4 students did not have any IEP in their special education files. (Miller Depo. 110 line 23 through 111 line 8).  Miller would not have known this information but for her duties and responsibilities as an intern and employee.

As an intern and employee of the Board Miller had a duty to speak out about problems she perceived in the special education program so the Board and the Houston County High faculty and administration could learn of the concerns, investigate those concerns, and corrective action if needed. All Board teachers and staff were provided with a copy of the Teacher's Handbook at the beginning of the 2004 - 2005 school year. (Affidavit of Kenneth Lord).  This handbook contains a section entitled "Staff Rights and Responsibilities."

Page 53 of 58

(Defendant's Initial Disclosure 869).  The third paragraph of
this section states:

> Consistent with the laws of Alabama, it shall be the
> responsibility of teachers and principals in the Houston
> County Schools to implement and enforce appropriate laws
> and Board policies and regulations.  Each employee is
> charged with administration of these laws, policies and
> regulations, and such other rules, regulations and
> procedures as may be established by the Superintendent or
> Board.

(Defendant's Initial Disclosure 869, and see Affidavit of
Kenneth Lord).

The "Staff Rights and Responsibilities" section described
above is the same policy that was in effect during Miller's
internship. (Affidavit of Kenneth Lord).

The "Performance Responsibilities" section of the Teacher
Handbook also explains a teacher's duties. (Defendant's
Initial Disclosures 870 - 874).  While all the
responsibilities listed in this section are important, three
have special bearing to Miller's concerns.  Responsibility 3
requires teachers to "create a classroom environment that is
conducive to learning and appropriate to the maturity and
interests of the students." (Defendant's Initial Disclosure
870).  Responsibility 12 requires all teachers to "maintain
accurate, complete and correct records as required by law,
district policy, and administrative regulation. (Defendant's
Initial Disclosure 871).  In relevant part, Responsibility 20

states that teachers "shall perform such duties as are
customarily performed by instructors..." (Defandant's Initial
Disclosure 872). Responsibility 23 clearly states: "Teachers
shall familiarize themselves with the rules and regulations
of the Board, the Superintendent, and the principal and shall
observe and enforce such rules and regulations." *Id.* These
duties applied to Miller during her internship and
employment. (See Affidavit of Kenneth Lord). Miller's acts
of expressing concern about the special education program at
Houston County High were required by the duties contained in
the Teacher's Handbook.

The Board Defendants took Miller's concerns very
seriously. After learning of Miller's concerns from
Pitchford, Andrews sent Singletary to HCHS to investigate the
alleged violations. (Pitchford Depo. 47 line 13 through
Andrews Depo. 25 line 13 through 28 line 10, Singletary Depo.
8 line 3 through 10 line 21). Singletary's investigation
revealed that the special education students at HCHS did have
IEPs in their file contrary to Miller's assertions. *Id.*

After Pitchford was assured that the special education
program at Houston County High was in compliance with all
laws he called a meeting with Miller and revealed this
information to her. (Pitchford Depo. 47 line 7 through 50
line 12). During this meeting Pitchford also explained to

Miller that she should follow the chain of command at the
school and he informed her that some teachers had approached
him with issues and concerns about her.  *Id.*  Pitchford's
statements to Miller show that Pitchford was trying to
exercise control over the employees at Houston County High so
that they could go about their business of educating students
in an efficient manner.

The concerns Miller had relating to IEPs and other
aspects of the special education process owed their existence
to her duties as an intern and employee of the Board working
in the special education department at Houston County High.
Because Miller's speech on these subjects would not have
existed but for the professional responsibilities of her
internship and employment, Miller's free speech rights were
not infringed.  *See Garcetti*, ___ U.S. ___, 126 S.Ct. 1951,
1960 (2006).  Miller would not have been speaking about
alleged IEP and special education process problems at the
school if she had not been an intern and employee carrying
out her official duties.  Therefore her speech was not that
of a citizen but that of an employee and the Constitution
will not insulate her communications from any alleged
employer discipline.

## CONCLUSION AND PRAYER FOR RELIEF

The Board Defendants are entitled to summary judgment in this matter. BASED ON THE FOREGOING arguments, evidence, and authorities, this Court should GRANT SUMMARY JUDGMENT.

WHEREFORE the Board Defendants move the Court to grant them, and each of them, a full, final, and appealable summary judgment against the Plaintiff in this matter, or alternatively, as to such Defendants and counts as the evidence and law entitle them.

HARDWICK, HAUSE, SEGREST & WALDING

BY: _____
    Jere C. Segrest (SEG005)
    ASB-1759-S-80J

BY: _____
    Kevin Walding (WAL036)
    ASB-8121-I-69J

BY: _____
    Patrick B. Moody (MOO110)
    ASB 0902-T-73M
    Post Office Box 1469
    Dothan, Alabama 36302
    Phone:  (334)794-4144
    Fax:    (334)671-9330
    ATTORNEYS FOR DEFENDANTS

CERTIFICATE OF SERVICE

I hereby certify that, this date, I have served a copy of this document on the following individual(s)or attorney(s) of record by placing a copy in the United States Mail in a properly addressed envelope with adequate postage.

Winn Faulk, Esquire
FAULK & REED
524 S. Union Street
Montgomery, Alabama 36104-4626

Thomas K. Brantley, Esquire
BRANTLEY & HAYWOOD
401 N. Foster Street
Dothan, Alabama 36303

Mark S. Boardman, Esq.
Katherine Hortberg, Esq.
BOARDMAN, CARR, WEED & HUTCHESON, P.C.
400 Boardman Drive
Chelsea, Alabama 35043-2811

Mr. James C. Pennington
Mr. Joseph Vincent Musso
Mr. Peyton Lacy, Jr.
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, Alabama 35203

This the 16th day of November, 2007.

Of Counsel