RECEIVED                    RECEIVED

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA        2008 JAN -4  P 6: 58
SOUTHERN DIVISION

NANCY MILLER,                          U.S. DISTRICT COURT          U.S. DISTRICT COURT
                                       MIDDLE DISTRICT ALA          MIDDLE DISTRICT ALA

    PLAINTIFF,                    *
                                  *
                                  *
v.                                *    Case No.1:06-cv-940-MEF
                                  *
                                  *
HOUSTON COUNTY BOARD OF           *        JURY DEMANDED
EDUCATION;                        *
KENNETH LORD;                     *
RILEY JOE ANDREWS;                *
TIM PITCHFORD;                    *
PAUL STRANGE;                     *
STACY EZELL;                      *
TROY UNIVERSITY, DOTHAN;          *
SANDRA JONES;                     *
PAM PARRIS;                       *
and                               *
GREG RUEDIGER,                    *
                                  *
    DEFENDANTS.                   *

PLAINTIFF'S BRIEF IN OPPOSITION
TO MOTIONS FOR SUMMARY JUDGMENT (DOCs 31, 42 & 44)

Introduction

The Plaintiff's view of this case is that the Defendants acted in such a manner that

they should be treated as concurrent or joint tortfeasors. In their testimony and in their

briefs, the Troy University (herein "TUD") related Defendants and the Houston County

Board of Education (herein "HCBOE") related Defendants seek to distant the conduct of

their group and its consequences from the other groups conduct and its consequences.

The two sets of events cannot be so easily segregated. While it is true that either group

could have acted alone to produce some injury, the actual conduct of the two groups combined, concurred or coalesced to produce the overall injury to the Plaintiff. Accordingly, each tortfeasor's act should be treated as the proximate cause of the overall injury. See, *e. g.*, *Williams v. Woodman*, 424 So.2d 611 (Ala. 1982). Moreover, the Defendant groups cannot contend that the actions of the other constitute intervening causes of the Plaintiff's injury, because neither group's actions were unforeseeable to the other, nor was either (at least, as these events actually occurred) sufficient in and of itself to have been the sole cause in fact of the overall injury of the Plaintiff. *Phillips v. Smalley Maintenance Services*, 435 So.2d 705, 712 (Ala. 1983). (It is true that HCBOE could have simply fired the Plaintiff, albeit it wrongfully, thereby making her internship untenable, but that is not what happened. In fact, the HCBOE group created a situation which made it possible for the TUD group to accommodate the design of the HCBOE group by withdrawing Plaintiff's internship, thereby providing the HCBOE group with a pretext for the firing.) Accordingly, Plaintiff's counsel has found it impracticable to respond to each of the three briefs filed by Defendants separately, which coincidentally serves to interest of judicial economy.

**Statement of Facts**

Plaintiff Nancy Miller became "employed" by the Houston County Board of Education more or less contemporaneously with the onset of her student internship sponsored by Troy University (Dothan) in the summer of 2004. The internship and the so-called employment were created separately under two different documents:    an internship agreement between the plaintiff and various representatives on behalf of TUD and HCBOE; and a teaching contract between HCBOE and Miller. (Doc 35-2, p. 27,

2

Defendants' Exhibits 6; and Other Documents Exhibit 11)  The two positions had differing purposes and imposed differing duties on the plaintiff.  However, the evidence is clear and undisputed that the only ways in which plaintiff's internship differed from any other TUD internship is reflected in two underlined statements in the internship agreement.  Those two specific deviations from the norm were: ¶ (3) (b) "Mr. Strange will visit Ms.  Miller's classroom one period each week. Ms. Miller will visit Mr. Strange's classroom one period each week."; and ¶ (3) (c) "The school administration is responsible for IEP meetings.  Ms. Miller's attendance is as that of a student intern.  She cannot be held legally responsible for the meetings." (Jones Depo., p. 12, l. 25 – p. 13, l. 16;  Defendant's Exhibit 6)

    In her capacity as an intern, Miller was entitled to the cooperation and assistance of Paul Strange, an employee of HCBOE at Houston County High School (herein "HCHS").  However, in her role as a teacher, Strange was merely a colleague of Miller. Greg Ruediger was Miller's internship supervisor, as well as her professor at TUD. Timothy Pitchford, as principal at HCHS was, in fact, the supervisor of Miller in her role as teacher.   Miller had various other HCBOE-related colleagues with whom she interacted both in her capacity as intern and as teacher, but these had not specifically undertaken any responsibility to mentor or guide Miller in connection with her internship. (Defendant's Exhibit 6)  Accordingly, the contention that certain of these colleagues, principally Starla Smith and Cathy Keasler (Strange, p. 101, ll. 21-25), were trying to mentor Miller when they tried to get her to sign things that she should not have signed has no foundation.

    The Defendants contend that all of Miller's speech, asserted by her to have been

3

protected, arose from her performance of her official duties. However, when Miller met with Dr. Ruediger on August 28, 2004, following his visit to observe her in his capacity of internship supervisor, her comments to him were in no way made pursuant to her official duties as a teacher, but rather in her role as a student. There is simply no basis in the evidence or in commonsense for supposing that it is a customary duty of a teacher at HCHS to meet privately with a TUD professor and discuss the misfeasance, malfeasance and nonfeasance of other teachers and administrators of HCBOE. Instead, Miller's report to Ruediger had no official significance and bore similarities to any private citizen disclosing her knowledge of misconduct by a public official to another citizen or official with the knowledge and wherewithal to do something about such misconduct. Moreover, even if the court should hold that the internship should be treated as employment for purposes of First Amendment analysis, it is clear that Miller had no official duty as an intern to make her reports to Ruediger, Pitchford and Andrews, given Parris' angry rebuke to Miller, "You are not her to shake things up!" (Doc 34-2, Miller Depo. July 17, 2007, p. 200, ll. 15-16) Finally, there is almost unanimous uncertainty among the HCBOE Defendants as to whether such reports by Miller were somehow required of her. (Doc 37-4, Lord Depo., p. 30, l. 2 – p. 31, l. 17; Doc 37-5, Andrews Depo. p. 53, l. 16 – p. 54, l. 10; Doc 38-3, Pitchford Depo., p. 67, l. 21 – p. 68, l. 13; Doc 39-2, Strange Depo., p. 89, l. 19 – p. 90, l. 11, and p. 94, l. 21 – p. 95, l. 10)

Additionally, Miller was not compensated by any entity for her performance as an intern; instead, she had to pay tuition. If anything, Strange may have been entitled to some honorarium from TUD for his services as cooperating teacher (Parris Depo., p. 12, l. 21 – p. 13, l. 19), but the testimony indicates that, for unknown reasons, he was never

actually paid by TUD nor given any supplemental pay by HCBOE (Doc 40-2, Strange Depo., p. 211, ll. 11-13). Nevertheless, it is not unreasonable to propose that, to the extent that Strange acted as a cooperating teacher, he was acting on behalf of TUD, and not as a representative of HCBOE.

The question of Miller's status as a teacher-employee is further complicated by the contention of the HCBOE-related defendants that she was teaching under an illegal, unenforceable contract due to her non-certification as a teacher (Doc 10, Answer of HCBOE group, at p. 9, 5th Defense); a contention which could raise an issue of judicial estoppel as to whether HCBOE may now contend that Miller ever spoke as an employee. Nevertheless, it is quite plain that none of Miller's statements to TUD personnel were made in her capacity as an employee of HCBOE.

In any event, acting pursuant to instructions from Ruediger, Miller reported to Pitchford on or about August 27, 2004, the fact that she had shared her concerns with Ruediger, who had agreed that, if she had her facts straight, she was right to take the position that HCHS was not in compliance with various laws and regulations governing special education programs. (Doc 34-2, Miller Depo., July 17, 2007, p. 117, l. 9 – p. 30, l. 4) Pitchford immediately expressed anger toward Miller for having expressed such disclosures and toward Ruediger (behind Ruediger's back) for having sent an intern to tell him these things, rather than come to Pitchford in person. (Doc 34-2, Miller Depo., July 17, 2007, p.130, ll.5-6) Obviously, Pitchford did not view Miller's report to Ruediger as being one of her official duties. Why would he scold her for doing her job? Pitchford's consternation over the disclosures was such that he complained to TUD through Pam Parris, the Director of Internship Programs at TUD. (Parris Depo., p. 27, l.3

– p. 28, l. 22)  As a direct result, Parris visited HCHS and tried to placate Pitchford, and she angrily confronted Miller, denouncing her for her expression of concerns as an intern, telling Miller, "Nancy, you are not here to shake things up ... you better do everything possible to make your principal happy, because you are in danger of failing your internship." (Doc 34-2, Miller Depo., July 17, 2007, p. 198, l. 19 – p. 201, 19, Miller Affidavit, p. 4, ¶ 12)  It is important to note that this meeting and the attendant warning occurred before anyone had accused Miller of any of the possibly unprotected missteps which were later attributed to her by the HCBOE Defendants.  This assertion is consistent with Pam Parris' testimony that this was her first visit to the school to discuss a problem, and, among other things discussed with Andrews, Pitchford and Strange was the fact that Miller had been improperly asked to sign an IEP by the counselor.  (Ms. Parris is mistaken only in that she names Ms. Ezell as the counselor, who in reality was Cathy Keasler.)  Importantly, Parris testified, in direct contradiction of Pitchford, Strange and Andrews, that this was not a mistake of Miller's part, but that, in fact, the counselor and Pitchford acknowledged that the event occurred as Miller had reported, but they explained the counselor's misconduct to Parris on the basis that the counselor simply had not been informed by Pitchford of the limitations placed on Miller's involvement in the IEP process under her internship agreement. (Parris Depo., p. 29, l. 8 – p. 33, l. 24; note Strange's denial of any knowledge of this event, Doc 40-2, Strange Depo., p. 186, ll. 15-25.)

Also, as a result of Pitchford's complaint, Parris, in consultation with the Dean of Education at TUD, Sandra Jones temporarily replaced Ruediger with a person of local origin, Mary Brazelle, who apparently was a former school teacher with an adjunct role at

TUD. (Parris Depo., pp. 27-28 and pp. 44, ll. 1-15; compare Jones Depo., p. 14, l. 25 – p. 16, l. 3) As it happened, Brazelle never actually undertook any duties or actions with respect to Miller's internship. Again, at a stage at which the evidence is, at worst, subject to dispute (and only in the vaguest terms, at that), indicates that no arguably non-protected conduct by Miller is alleged to have occurred, Miller had been threatened with failure and Dr. Ruediger had been summarily removed as intern supervisor, based solely on Pitchford's complaints about Miller's expressions of concern about aspects of the special education program at his school.

In response to the same meeting on September 1, 2004, the only apparent investigation by Andrews, who was the director of the special education program at HCBOE, was to send his assistant, Virginia Singletary, to HCHS to count the IEPs and make sure that there was an IEP in the file of every special education student without directing any critical inquiry as to whether Miller's other concerns were well founded. (Doc 37-5, Andrews Depo., pp. 25, p.26, l2 – p. 28, l. 20; Doc 38-2, Singletary Depo., p. 8, l. 3 – p. 12, l. 15)

Following the September 1 fiasco, Miller encountered a number of instances in which she was placed in uncomfortable situations by other HCBOE personnel, notably Strange in concert and, Starla Smith the HCBOE psychometrist, in which she was asked to sign such documents when she should not. (Doc 34-2, Miller Depo., July 17, 2007, p. 170, l. 7 – p. 171, l. 13, and p. 177, l. 7 – p. 178, l. 1; and Doc 35-2, p.45, Defendant's Exhibit 14.) As indicated in Defendant's Exhibit 14, which is a note Miller sent to Pitchford explaining her intention to leave the HCHS campus and visit Andrews, by September 24, she had been driven to a point at which she felt that she had no choice but

to act by reporting the situation to Andrews. Miller gives a detailed explanation of the manner in which she left campus and the practical effect of her departure from the campus on this occasion. (See Miller Affidavit, ¶s 3 and 4) She did not simply up and leave as is implied by the Defendants throughout their submissions. The TUD rule on intern attendance is at p. 11 of the TUD Internship Handbook. (Doc 35-2, p.87, Defendants' Exhibit 29, p.11)

After Miller had listed her concerns to Andrews, instead of investigating her allegations, Andrews called Pitchford and instructed him to get together a list of concerns about Miller, which was then to be transmitted to TUD. (Doc 38-3, Pitchford Depo., p. 74, ll. 12-18; p. 75, l. 4 – p. 76, l.6; Doc 37-5, Andrews Depo., p. 38, l. 21 – p. 39, l. 20) Oddly, other than in a broad reference to "Developing a better understanding of the special education process and required forms (eligibility meeting and referral meeting", when Andrews wrote to Parris supplying her with the HCHS concerns about Miller, which included only accusations of misconduct against Miller (Doc 35-2, p. 51, Defendants' Exhibit 17; and Doc 35-2, p. 53, Defendants' Exhibit 18), he did not mention the details of Miller's concerns about HCHS's special education program, which had been faithfully recorded by his assistant, Ms. Singletary. (Doc 38-2, Singletary Depo., pp. 14 -15; Doc 35-2, p. 47, Defendants' Exhibit 15; and Doc 35-2, p. 49, Defendants' Exhibit 16;) Despite the numerous concerns, Singletary was not involved in any follow up investigation; nor did she ever hear of any follow up until Mr. Lord delivered Miller's letter of termination. (Doc 38-2, Singletary Depo., p. 16, l. 17 – p. 17, l. 3; and p. 17, l. 4 – p. 18, l. 1)

Ruediger was not actively reinserted into the Miller situation, until he was

dispatched sometime between September 24 and 30, 2004, by Dr. Sandra Jones to "collect additional data" on Miller. (Ruediger Depo., p. 101, l. 22 – p. 102, l. 11) Ruediger was an old hand at data collection. He had been doing it since he was a college student collecting data on sunflower seeds to determine those that were resistant to disease, which he warmly described as "my first real exposure to true science" and "the first really scientific aspect" of his career. (Ruediger Depo., p. 10, l. 13 – p. 11, l. 1) Ruediger frequently refers to the collection of data in his deposition, and in all aspects other than the one most important to this case, his references are to the scientific method of data collecting. (See, *e. g.*, Ruediger Depo., p. 93, l. 25 – p. 94, l. 5, in which he testifies that he was urging Miller early on in her internship to collect more data and make sure that she was correct in her opinions.) On this occasion, however, Ruediger deviated from the sort of careful data collecting he has engaged in for so long and the sort he had advised Miller to pursue. Instead of making any inquiry into Miller's complaints and concerns or the possibility that she was being retaliated against, he essentially acknowledges that he went to the September 30 observation for the purpose of confirming the allegations against Miller. Ruediger did interview Pitchford and Strange, as well as a Ms. Towns and recorded their comments. Although Ms. Ezell had signed Defendants' Exhibit 18 (Doc 35-2, p. 53), there was no interview of her – indeed, at the deposition, it was apparent that Ruediger did not even know Ezell's gender. For a complete description of Dr. Ruediger's data collection during his second observation of Miller, see Ruediger Depo. at pp. 96, l. 20 – p. 104, l. 25, which any objective reader, certainly one attempting to indulge proper inferences in favor of a non-moving party, should agree evinces an eagerness to except all the bad information about Miller and

ignore the few good things her antagonists had to say about her. Without belaboring the point, Ruediger was not visiting the school on September 30 to objectively collect data; he was there to rid HCHS of Miller. In fact, he admitted that the unusual decision to hold the post-observation debriefing at TUD, rather than at HCHS, had been made before he ever went to HCHS that day. (Ruediger Depo., p. 120, l. 17 – 121, l. 4)  That such a pre-observation decision to debrief at TUD evinces pre-judgment, is illustrated by the fact that Miller was one of only four interns ever interviewed under such circumstances in Ruediger's twenty year experience at TUD, were basically walking the plank, because in every case, the immediate internship was withdrawn.  (Ruediger Depo., p. 121, l. 5 – p. 126, l. 8)

Less than a week after her internship had been withdrawn by TUD, Miller was fired by HCBOE when Lord and Andrews delivered a letter to her at work informing her that her job was being terminated on account of her internship being withdrawn.  (Doc 37-4, Lord Depo., p. 36, ll. 12-20)  This "recommendation" was not formally adopted by the HCBOE until December 6, 2004, although its effective date, according to the Board minutes was November 16, 2004.  The Lord letter did not mention a later effective date. Both the letter and the minutes state the reason for the termination as being the withdrawal of the internship.  No other misconduct or unsuitability is mentioned in either document.  Lord, like all the HCBOE Defendants, testified that he never asked TUD personnel to withdraw Miller's internship.  (Doc 37-4, Lord Depo., p. 33. l. 10 – p. 36, l. 23; Doc 35-2, p. 72, Defendants' Exhibit 28, and Other Documents, Board Minutes dated December 6, 2004)  Indeed, Pitchford even claims that he pleaded with Miller before learning that the internship had been withdrawn, "Mrs. Miller let's start over. I want you

to have a successful internship here. I want you to be a good employee at Houston County High School for years to come. Let's start over. Let me call Troy State. Let me call them and just see can we start over." (Doc 38-3, Pitchford Depo., p. 61, ll. 18-25) When Miller was, according to his testimony, unresponsive, Pitchford took the extra step of calling Parris, who informed him that it was too late, because the internship had already been withdrawn. (Doc 38-3, Pitchford Depo., p. 62, ll. 1-14) Whatever else may be said about such testimony by the principal, who happened to also be Superintendent-elect (Doc 37-4, Lord Depo., p. 14, l. 23 – p. 15, l. 23), it seems uncannily at odds with the HCBOE Defendants' Answer (Doc 10, at 3rd Defense, ¶ "d"), "The HCBOE can demonstrate by a preponderance of the evidence that it would have reached the same employment decision regarding the Plaintiff in the absence of any speech the Plaintiff claims is protected."

Although Miller's HCHS internship was withdrawn, she was given a second opportunity in a different school system without paying additional tuition. (Doc 34-2, Miller Depo., July 17, 2007, p. 322, ll. 8-11) Miller completed the second internship successfully (Jones Depo., p. 76, l. 12 – p. 77, l. 16), and graduated magna cum laude (Doc 34-2, Miller Depo., July 17, 2007, p. 316, l. 2)

## ARGUMENT

In what appears to be the most recent pertinent decision by the U. S. Supreme Court, *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006), the majority opinion of the (5-4) Court provides the following accurate description of the current history of caselaw reciting the public policies affecting and principles governing claims by government

employees to First Amendment protection, insofar as the issue of whether such an

employee's speech may be so protected.

> So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. See, e.g., *Connick, supra,* at 147, 103 S.Ct. 1684 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government").

> The Court's employee-speech jurisprudence protects, of course, the constitutional rights of public employees. Yet the First Amendment interests at stake extend beyond the individual speaker. The Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion. *Pickering* again provides an instructive example. The Court characterized its holding as rejecting the attempt of school administrators to "limi[t] teachers' opportunities to contribute to public debate." 391 U.S., at 573, 88 S.Ct. 1731. It also noted that teachers are "the members of a community most likely to have informed and definite opinions" about school expenditures. *Id.*, at 572, 88 S.Ct. 1731. The Court's approach acknowledged the necessity for informed, vibrant dialogue in a democratic society. It suggested, in addition, that widespread costs may arise when dialogue is repressed. The Court's more recent cases have expressed similar concerns. See, e.g., *San Diego v. Roe,* 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam) ("Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it" (citation omitted)); cf. *Treasury Employees,* 513 U.S., at 470, 115 S.Ct. 1003 ("The large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said").

> The Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions. See, *e.g., Rankin,* 483 U.S., at 384, 107 S.Ct. 2891 (recognizing "the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment"). Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Connick,* 461 U.S., at 154, 103 S.Ct. 1684.

*Garcetti, supra,* 126 S.Ct. at 1953-1954.

## Whether Miller Spoke as a Citizen

For purposes of this argument, Plaintiff will assume that, as to the HCBOE, she was for certain purposes an employee, and for others a student, but primarily in a role amounting to an employee. As to TUD, however, she contends that she was a student and should be treated as such for purposes of First Amendment analysis. Plaintiff will address the issue of whether she spoke as a citizen, first as an employee, and second as a student.

Although Plaintiff had a signed employment contract with HCBOE, the HCBOE group now contends that such contract was illegal and unenforceable. Nevertheless, given the characteristics of the relationship, in terms of direction and control, it would seem pointless to contend that the master-servant relationship did not exist in some fashion, such that, as to HCBOE, Plaintiff would be regarded as an employee for First Amendment purposes, as well as other employment-related cases. See, *e.g.*, *State Department Of Industrial Relations And William Dudley v. .Montgomery Baptist Hospital, Inc.*, 359 So.2d 410 (Ala. Civ. App. 1978), in which the Alabama Court of Civil Appeals observed, in regard to a pharmaceutical intern, that "it is clear that a master-servant relationship exists where an employer has the right to select the employee, the power to discharge him, the right to direct the type of work to be done, and the authority to prescribe the means and methods by which the employee is to perform the work desired. *Id.*, 359 So.2d at 412.

Nevertheless, because the present case also involves an intern, and the issue of qualified immunity has been raised, we feel constrained to call the Court's attention to the case of *Watts v. Florida International University*, 495 F.3d 1289 (11th Cir. 2007).

*Watts* involved a student engaged in a practicum as a counselor at a private facility affiliated with a public university, in which the panel held that, at least as to the Free Exercise claim raised by the student, that the individual defendants enjoyed qualified immunity.

> The factual circumstances of this case are unusual. There were no decisions in 1997 addressing the free exercise rights of graduate students in a practicum. Watts seems to have admitted as much because he urged us to craft a new constitutional standard for precisely this situation, explaining that applying either employee speech or student speech cases to student internships is like trying to put "the proverbial square peg in a round hole." To decide unusual cases courts sometimes have to cut down pegs and bore out holes, but when such carpentry is necessary qualified immunity is appropriate. Because the individual defendants were not on notice that they were violating Watts' clearly established constitutional rights, the district court correctly granted them summary judgment in their individual capacities.

*Id.*, 495 F.3d at 1300. The panel had earlier disposed of the plaintiff's Free Speech claim on the ground that the Court considered him an employee, and that his suggestion to a patient in counseling that he seek help from his church was private speech. *Id.*, 495 F. 3d at 1294. Accordingly, the holding on qualified immunity did not actually affect Watts' Free Speech claim. Nevertheless, in anticipation of an argument that *Watts* should bar the present claim as to the individuals, Plaintiff would point out that, if, as the *Watts* Court held, interns should be treated as employees for First Amendment purposes, the law of this circuit and of the United States is clearly established with regard to the rights of public employees asserting their right to freedom of speech, and there is no reason to grant qualified immunity in the present case.

The speech which Miller contends is protected in her role as quasi-employee is all that speech which touched upon deficiencies in the delivery of special education services at Houston County High School, regardless of whether such was spoken to HCBOE

personnel or to TUD personnel, except in the everyday functions of her job, such as discussing a particular student's IEP in a present educational context. The further away from a present educational context her speech was removed, the more likely it is that such speech would be held to be protected. That is to say, that a discussion with the math teacher, Ms. Towns, about whether a particular student could benefit from a particular service in a specific context would amount to the type speech not protected under *Garcetti, supra*, while speech to Strange, Pitchford, Singletary, Andrews and Ruediger should receive progressively more obvious First Amendment protection, even under the majority holding in *Garcetti*.

Plaintiff contends that when she spoke to Pitchford, Andrews and Ruediger, and, in many instances, Strange, on the general problems with the program itself, even as exemplified by particular IEPs, she was speaking as a citizen and not as an employee. Ceballos, the plaintiff in *Garcetti* stipulated that he was speaking pursuant to his official duties. Plaintiff Miller has made no such concession. In any event, the Supreme Court in *Garcetti* did not undertake "to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." 126 S.Ct. 1951, 1961. Further, it did not cite any cases from circuits, such as the Eleventh, which already had similar precedents. The Court did give some insight in noting certain relevant criteria: (1) "speech made pursuant to the employee's official duties", 126 S.Ct. at 1956; (2) "what the employer itself has commissioned or created", 126 S.Ct. at 1960; (3) "expressions made pursuant to official responsibilities", 126 S.Ct. at 1961; and (4) "the duties an employee is actually expected to perform", 126 S.Ct. at 1961.

If these are the indicia of what constitutes speech as an employee, rather than as a citizen, then Miller's speech was clearly that of a citizen. No one, from retired Superintendent

15

Lord, to current Superintendent Pitchford, to retired Director of Special Education Andrews, to now Assistant Principal and former special education teacher Strange could articulate any actual written expression of duties which would have required Miller to speak out – within or without the HCBOE family – on the matters they found so objectionable. Accordingly, given ordinary principles of federalism, this Court cannot be expected to fashion a job description for the Plaintiff, especially since the Court in *Garcetti* the Court cautioned even employers themselves against broadening job descriptions;

> We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. The proper inquiry is a practical one.
>     * * *
> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, at 126 S.Ct. at 1961-62.

Finally, the fact that Miller seems to have done most, if not all, of her talking of

school property and in some sense using school resources is not dispositive. In a post-

*Garcetti* opinion, the Eleventh Circuit, in holding that a certain school principal had not

been speaking as a citizen, made clear what its decision was NOT based on:

> As a final matter, we do not adopt the emphasis the district court placed on D'Angelo's use of school resources in his efforts to convert Kathleen High to charter status. Although D'Angelo often used school resources and spoke on school premises about charter conversion, we do not rely on that fact to conclude that D'Angelo did not speak as a citizen. As the Supreme Court explained in *Garcetti*,"[m]any citizens do much of their talking inside their respective workplaces." *Id.* at 1959. We also do not rely on the fact that D'Angelo's speech might be construed as "concern[ing] the subject matter of [his] employment," because that fact also "is nondispositive." *Id.*

*D'Angelo v. School Board of Polk Co., FL*, 497 F.3d 1203, 1211 (11th Cir. 2007).

D'Angelo, like Ceballos, the plaintiff in *Garcetti*, but unlike Miller, had admitted

(albeit, not in court) that he had spoken out pursuant to his official duty. Accordingly,

this court's decision in the present case should not be influenced by the fact that Miller's

16

speech occurred in school facilities or by the fact that school resources may have been used in connection with such speech. Additionally, D'Angelo teaches that the fact that Miller's speech concerned the subject matter of her employment be dispositive.

### Whether Miller Spoke on a Matter of Public Concern

The area of education in general, and special education in particular, are clearly matters of public concern. They involve both massive amounts of public funds and affect the lives of millions of parents and children. It does not appear that the Defendants are seriously contending that such matters are not matters of public concern. Further, there does not appear from the deposition testimony that, in raising her various concerns, Miller was promoting some private agenda.

### Whether the Miller's Interest in Free Speech was Outweighed the Employer's Interest in Promoting the Efficiency of Public Services it Performed Through its Employees.

The only incident which the Defendants can point to which suggests possible or potential disruption, having to do with Miller's speech, is the fact that she absented herself from school one afternoon and supposedly left her students without supervision. She disputes this, in that they had the supervision of their regular education teachers and Strange was on notice. Strange must have reported this to Pitchford before too much time had passed, because Pitchford called Ms. Singletary, who called Andrews sometime before Miller arrived at central office. Moreover, Andrews acknowledges that he had extended an open invitation to Miller to come see him if she had any problems, and significantly neither he nor Pitchford gave Miller any type of disciplinary notice, warning or rebuke for having left school to visit Andrews. Indeed, the very fact that they were all walking on eggshells and surreptitiously reporting her to Parris, instead of openly

rebuking Miller, strongly suggests that they all knew that they had committed some wrong against her, rather than she having wronged the school system. It also raises a question about Pitchford's perception as to his own authority over Miller. Similarly, his fawning pleas to Miller, even after her internship had been withdrawn (a fact which he claims he didn't know at the time, of course) is also inconsistent with the Defendants' contention that her behavior was so reprehensible that that they would have fired her even if she had not engaged in protected speech.

They also allege "dissension" among the teachers attributable to Miller. Note that the resentment of Ezell (which Ezell herself downplays) is asserted by Ezell not to be related to any act of free speech. The allegation of "dissension" is simply not founded in evidence. *Webster's Seventh New Collegiate Dictionary* (1976 ed.) defines "dissension" as, "disagreement in opinion; *esp* : partisan or contentious quarreling **syn** see DISCORD." There is no evidence that there was any dissension between Miller's fellow teachers, other than to the extent that two of them were willing to sign Pitchford's remonstrance against her and others apparently were not.

### Whether the Miller's Speech Played a Substantial or Motivating Part in the Decision to Discharge Her.

To properly understand the causal links in this case, it is first necessary to understand the true nature of the overall relationship from which the case arose. The starting point is the internship agreement. There are three essential parties to the agreement TUD, HCBOE and Nancy Miller. But for the obligations imposed on Miller under the agreement, it should properly be understood as an interagency agreement or compact. If among private parties, it might be viewed as more in the nature of a partnership or joint venture. In any event, what is clear is that the defendants entered into

18

a course of conduct which a reasonable jury could find was calculated to lead to the very result which occurred. The whole affair was presaged by Parris' threats and bullying after the first complaint from Pitchford, and these treats amounted to an attempt to chill Miller's right to free expression and the overall conduct amounted to a successful suppression. It seems clear that, absent the complaint from Andrews/Pitchford, the internship would not have been withdrawn, and, based on Pitchford's seemingly crocodilian pleas to Miller that they start over, and based on the officially stated reason for the firing in Lord's letter and in the HCBOE minutes, Miller would not have been fired as a teacher, unless, of course Pitchford wants to confess to perjury now. The contention that the HCBOE actors knew good and well that their remonstrance would cause Miller's ultimate discharge is bolstered by the equivocal and obviously evasive testimony of the HCBOE defendants, claiming that they did not know why they signed the document (DX-18) or that they had no purpose or that they thought it would somehow "help" Miller, all of which would sound ridiculous to any impartial adult Alabamian on a jury. When Pitchford first learned that Miller had squealed to Ruediger and that Ruediger was apparently empathetic and had encouraged Miller to speak up on the IEP issues, Pitchford got rid of Ruediger with one phone call to Parris, who promptly substituted Mary Brazelle, who taught in the local public schools for a living and whose only connection with TUD was in an adjunct capacity. Interestingly, Ruediger's replacement never visited Miller at the school or had any other contact with her nor took any known action to supervise Miller's internship. Ruediger himself did not reappear in the equation, until he was dispatched to "collect more data" on the eve of The September 30 Massacre of Miller. In short, Pitchford got TUD out of his school and left Miller

alone: a Ruediger-less vessel in an unfriendly sea. Clearly, under the circumstances

presented by the evidence, reasonable jurors could find intentional causation.

The Eleventh Circuit has explained the manner and type of inquiries into whether

a plaintiff has produced substantial evidence of causation, as follows:

> We have stated that the plaintiff's burden in this regard is not a heavy one. *See*
> *Walker v. Schwalbe*, 112 F.3d 1127, 1131 (11th Cir.1997); *Beckwith v. City of*
> *Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir.1995). Further, "[i]t is
> neither possible nor desirable to fashion a single standard for determining when
> an employee has met her initial burden of demonstrating that a retaliatory intent
> was a 'substantial' or 'motivating factor' behind a government employment
> decision." *Beckwith,* 58 F.3d at 1564. Rather, we examine the record as a whole to
> ascertain whether Stanley presented sufficient evidence for a reasonable jury to
> conclude that his protected speech was a "substantial" motivating factor in the
> decision to terminate him. *Id.*FN20
>
> FN20. In conducting this examination in the past, we considered several factors as
> relevant. We concluded that "[w]here termination closely follows protected
> activity, it is usually reasonable to infer that the activity was the cause of the
> adverse employment decision." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739,
> 745 (11th Cir.1996). We also examined whether any other asserted reasons for the
> termination were shown to be pretextual. See *Walker*, 112 F.3d at 1131 (noting a
> question of fact as to whether the policy under which the employee was allegedly
> fired was in effect at the time of the conduct in question); *Stewart v. Baldwin*
> *County Bd. of Educ.*, 908 F.2d 1499, 1507 (11th Cir.1990) (noting evidence
> calling the asserted reason for the discharge into question). Further, we examined
> any comments made, or actions taken, by the employer indicating that the
> discharge was related to the protected speech. See *Fikes,* 79 F.3d at 1084 (noting
> the police chief's statement that he wanted the plaintiff out of the department);
> Stewart, 908 F.2d at 1507 (noting comments indicating the speech was a factor in
> the termination decision); *Morro v. City of Birmingham*, 117 F.3d 508, 516 (11th
> Cir.1997); *Beckwith*, 58 F.3d at 1565; *Schneider v. Indian River Community*
> *College Found., Inc.*, 875 F.2d 1537, 1543 (11th Cir.1989). We also looked to
> whether the asserted reason for the discharge varied. See *Fikes,* 79 F.3d at 1084
> (noting that the initial cause cited for discharge was different than the cause stated
> at an internal hearing). Finally, we considered circumstantial evidence of
> causation including such facts as who initiated any internal investigations or
> termination proceedings, whether there was any evidence of management hostility
> to the speech in question, or whether the employer had a motive to retaliate. See
> *Beckwith*, 58 F.3d at 1564-65. There is no one factor that is outcome
> determinative, but all factors must be taken into account.

*Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000).

### Burden Shifting:  Can the HCBOE Prove by a Preponderance of the Evidence that it Would have Made the Same Decision Even in the Absence of the Protected Conduct?

Apparently, not, at least according to the testimony of Pitchford and Lord.  They claim that once the internship was withdrawn, which they claim not to have sought or even implied a desire for, they had no choice, but we know that is not so, because the teaching contract was not made specifically dependent on the continuation of the internship agreement.  The possible illegality of the teaching contract never occurred to them until this litigation was filed, and Lord testified that, as far as he was concerned, Miller was a highly paid substitute, teaching legally.  (Doc 37-4, Lord Depo., p. 6, ll. 6-15, and p. 9, ll. 19-24.

### Pretext or falsity:  Miller Can Produce Substantial Evidence that the Proffered Explanation was Either False or a Mere Pretext for the Actual Retaliatory (or Chilling) Motive.

The evidence is quite plain that a symbiotic relationship existed between TUD and HCBOE in relation to the internship program.  Every TUD Defendant acknowledged this either explicitly or implicitly.  Additionally, the affidavit of James D. Sears expressed the expert opinion that, based on Miller's 22 students IEPs, alone, the HCBOE could have faced damages, fees and costs of remediation in excess of $500,000.00.  Accordingly, TUD had a motive to keep placing interns, a necessary ingredient of TUD's accreditation, and HCBOE had a motive to avoid liability.  When the specter of liability as a result of Miller gradually more public talk raised its head, Pitchford and the HCBOE

21

Defendants moved to rid themselves of her, and the TUD personnel fell right into line and cooperated in the effort.

### No Child Left Behind.

The next issue presented is whether Defendants Paul Strange and Stacy Ezell waived the affirmative defense of the "No Child Left Behind" Act by not pleading the defense in their answer to the complaint.

The Federal Rules of Civil Procedure require that, "In pleading to a preceding pleading, a party shall set forth affirmatively ... any ... matter constituting an avoidance or affirmative defense." (F.R.C.P. 8(c)). Also, The Federal Rules of Civil Procedure require that, "Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required,..." (F.R.C.P. 12(b)).

The Eleventh Circuit Court of Appeals has also addressed Rule 8(c) of the Federal Rules of Civil Procedure by stating the following,

> In general, a party's failure to raise an affirmative defense in the pleading results in a waiver of the defense. *See Steger*, 318 F.3d at 1077. In deciding waiver issues under Rule 8(c), this Court in some cases has examined whether a plaintiff had notice of the unpled defense or was prejudiced by the lack of notice. *See Sweet v. Sec'y, Dept. of Corr.*, 467 F.3d 1311, 1321 n.4 (11th Cir. 2006) (concluding that a plaintiff is not prejudiced by a defendant's failure to comply with Rule 8(c) if the plaintiff has notice of the affirmative defense by some other means), *cert. denied*, __ U.S. __, 127 S. Ct. 2139, 167 L. Ed. 2d 871 (2007); *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797-98 (11th Cir. 1989) (same); *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988) (examining whether "the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it" (citing *Blonder-Tongue Labs,. Inc. v. Univ. of Ill. Found*, 402 U.S. 313, 350, 91 S. Ct. 1434, 1453, 28 L.Ed. 2d. 788 (1971)); *Jones v. Miles,* 656 F.2d 103, 107 n. 7 (5th Cir. Unit B 1981).

*Proctor v. Fluor Enterprises*, 494 F.3d 1337 at 1350, 1351 (11th Cir. 2007).

Here, Defendants Paul Strange and Stacy Ezell failed to raise the Affirmative Defense of the "No Child Left Behind Act" in their answer to the Complaint. (Doc 10, Answer 5-9). The Defendants raise the issue for the first time in their Brief in Support of their Motion for Summary Judgment. (Doc. 31, p. 22). Rule 8(c) of the Federal Rules of Civil Procedure requires that a defendant specifically state in their reply to the complaint any affirmative defenses that they believe are at issue or else the defendant waives the affirmative defense.

The Eleventh Circuit Court of Appeals recognize that an affirmative defense is considered waived, if a Defendant does not raise the defense in their reply to the complaint, but has found an exception if the Plaintiff has notice of the affirmative defense by other means. *Proctor v. Fluor Enterprises*, 494 F.3d 1337 at 1350, 1351 (11th Cir. 2007). In this case Plaintiff Miller had no way of knowing of the affirmative defense, until served with the brief in support of summary judgment well after the deadline for amending pleadings. Because the Defendants failed to raise the affirmative defense outlined in the "No Child Left Behind Act" the Defendants have waived the defense based on Rule 8 (c) and Rule 12 (b) of the Federal Rules of Civil Procedure.

Moreover, the face of the statute, as quoted in Defendants' brief, requires that the act sued upon must, among other things be have been done "... in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;" none of which was involved in the conduct made the basis for this action. Accordingly, the statute is simply inapplicable in the present case.

### The Morin Reservation.

The issue presented is whether evidence of Plaintiff's Character or Habit is

admissible pursuant to Defendant's Motion for Summary Judgment.

The Federal Rules of Evidence in Rule 404 states,

> (a) Character evidence generally. Evidence of a person's character or
> a trait of character is not admissible for the purpose of proving action
> in conformity therewith on a particular occasion, [except in certain
> criminal cases not applicable in the present case].

The Federal Rules of Evidence also state in Rule 406,

> Evidence of the habit of a person or of the routine practice of an
> organization, whether corroborated or not and regardless of the presence
> of eyewitnesses, is relevant to prove that the conduct of the person or
> organization on a particular occasion was in conformity with the habit or
> routine practice.

Furthermore, the Eleventh Circuit Court of Appeals discussed Habit Evidence

versus Character Evidence in the case of *Loughan v. Firestone Tire & Rubber Co.,* 749

F.2d 1519 (11th Cir. 1985). The Court defined Character Evidence and Habit Evidence

by citing *McCormick on Evidence,* § 195 at 462-63,

> Character and habit are close akin. Character is a generalized
> description of one's disposition, or one's disposition in respect to a
> general trait, such as honesty, temperance, or peacefulness. "Habit," in
> modern usage, both lay and psychological, is more specific. It
> describes one's regular response to a repeated specific situation. If we
> speak of character for care, we think of the person's tendency to act
> prudently in all the varying situations of life, in business, in family
> life, in handling automobiles, and in walking across the street. A habit,
> on the other hand, is the person's regular practice of meeting a
> particular kind of situation with a specific type of conduct, such as the
> habit of going down a particular stairway two stairs at a time, or
> giving the hand signal for a left turn, or of alighting from railway cars
> while they are moving.
> The doing of the habitual acts may become semi-automatic.

*Loughan v. Firestone Tire & Rubber Co.,* 749 F.2d at 1524.

Here, the Board Defendants in their Brief in Support of their Motion for Summary Judgment present evidence that Plaintiff Miller does "...not take corrective feedback well..." and that there were reservations about recommending her for an internship. (Defend. Brief 11,12). The Board's description of the Plaintiff not being able to accept constructive feedback would be an example of her character and not habit. The Eleventh Circuit Court of Appeals in *Loughan* citing *McCormick on Evidence*, stated that "character is a generalized description of one's disposition, or one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness." *Loughan v. Firestone Tire & Rubber Co.,* 749 F.2d at 1524. Applying the Court of Appeal's definition to the Board Defendant's description of Plaintiff Miller's inability to accept constructive feedback would result in that description being character evidence.

Under Rule 404(a) of the Federal Rules of Evidence Character Evidence is inadmissible to prove action in conformity with such character.[1] Thus, in this case the Board Defendant's description of Plaintiff Miller's character would be barred based on the fact that it is inadmissible character evidence. Parenthetically, we would note that none of the other committee members appeared to share or adopt Dr. Morin's concern and Dr. Morin did not express it again when given the same opportunity later in connection with Miller's second internship. (See Miller Affidavit submitted herewith.)

If admissible, the absence of any reservation expressed by Morin prior o the assignment of Miller to her second internship at Beverly, despite the outcome at HCHS suggests that Morin's prior reservation had nothing to do with the performance at HCHS or that Morin knew or believed that the outcome at HCHS was rigged.

---

[1] Although Rule 404 has exceptions, which allow for character evidence to be admissible in certain instances those exceptions are only applicable in criminal prosecutions.

### Highest repository of Authority as a Practical Matter

The Defendant HCBOE contends that it had nothing to do with this matter and should be released from liability. The Supreme Court has held:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-2038 (1978).

In the present case, it seems plain that the highest repository of true decision making when it came to special education matters was either Mr. Lord or Mr. Andrews. Accordingly, the acts of Andrews, if not Lord, in this respect should be held to constitute the action of the Board.

### CONCLUSION

In light of the foregoing and the accompanying evidentiary submission, it is submitted that the motions for summary judgment ought to be denied.

Respectfully submitted,

 s/Winn Faulk
WINN FAULK (ASB-3091-L48W)
Attorney for Plaintiffs

FAULK & REED, L.L.P.
524 South Union Street
Montgomery, AL 36104
(334) 834-2000 (phone)
(334) 834-2088 (fax)
winnfaulk@bellsouth.net

s/Thomas K. Brantley
THOMAS K. BRANTLEY, JR.
(ASB-0595-E55T)
Attorney for Plaintiff


BRANTLEY & HAYWOOD
401 North Foster Street
Dothan AL 36303
(334) 793-9009 (phone)
(334) 793-2037
tombrantley@graceba.net


## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2008, I filed the foregoing with the Clerk of the Court who I understand will use the CM/EDF system, which will send notification of such filing to the following:

Jere C. Segrest, Esq.
E-mail: jerecs@aol.com
and
James K. Walding, Esq.
E-mail: kwalding2003@yahoo.com
Attorneys for Houston County BOE et al.

Joseph V. Musso, Esq.
E-mail: joseph.musso@odnss.com
James C. Pennington, Esq.
James.pennington@odnss.com
and
Peyton Lacy, Jr., Esq.
Peyton.lacy@odnss.com
Ogletree, Deakins, Nash, Smoak, & Stewart
Attorneys for Troy University, et al.

Mark S. Boardman
E-mail: mboardman@boardmancarr.com,
and
Katherine C. Hortberg
E-mail: khortberg@boardmancarr.com,
Boardman, Carr, Hutcheson
Attorneys for Paul Strange and Stacy Ezell

27

Patrick Bryan Moody
E-mail: patrickmoodylaw@hotmail.com
Attorney for Houston Co. BOE, et. al.

s/Winn Faulk
WINN FAULK (ASB-3091-L48W)
Attorney for Plaintiff

28

**Briefs, Responses, and Replies**

1:06-cv-00940-MEF-TFM Miller v. Houston County Board of Education et al

ERROR: Document is malformed or contains code which may cause an external action (such as launching an application). This PDF document cannot be accepted.

Back

*As if anything else could go wrong*