RECEIVED

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

2008 JAN -4  P 6: 59

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| **NANCY MILLER,** | * | |
| | * | |
| **PLAINTIFF,** | * | |
| | * | |
| | * | |
| **v.** | * | **Case No.1:06-cv-940-MEF** |
| | * | |
| | * | |
| **HOUSTON COUNTY BOARD OF** | * | |
| **EDUCATION;** | * | |
| **KENNETH LORD;** | * | |
| **RILEY JOE ANDREWS;** | * | |
| **TIM PITCHFORD;** | * | |
| **PAUL STRANGE;** | * | |
| **STACY EZELL;** | * | |
| **TROY UNIVERSITY, DOTHAN;** | * | |
| **SANDRA JONES;** | * | |
| **PAM PARRIS;** | * | |
| **and** | * | |
| **GREG RUEDIGER,** | * | |
| | * | |
| **DEFENDANTS.** | * | |

## INDEX TO PLAINTIFF'S EVIDENTIARY SUBMISSION

**The accompanying brief contains reference to existing court documents, as well as the following:**

**DEPOSITIONS**:
1. Dr. Greg Ruediger
2. Pam Parris
3. Sandra Jones

**OTHER DOCUMENTS:**
4. December 6, 2004 meeting minutes of the Houston County Board of Education.

5. Affidavit of Nancy Miller.

6. Affidavit of James D. Sears.

7. Miller Teacher Contract, Disclosure Ex. No. 11.

1

Respectfully submitted,

  s/Winn Faulk
WINN FAULK (ASB-3091-L48W)
Attorney for Plaintiffs

FAULK & REED, L.L.P.
524 South Union Street
Montgomery, AL 36104
(334) 834-2000 (phone)
(334) 354-4442 (cellular)
(334) 834-2088 (fax)
winnfaulk@bellsouth.net

    s/Thomas K. Brantley
THOMAS K. BRANTLEY, JR.
(ASB-0595-E55T)
Attorney for Plaintiff

BRANTLEY & HAYWOOD
401 North Foster Street
Dothan AL 36303
(334) 793-9009 (phone)
(334) 793-2037
tombrantley@graceba.net

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2008, I filed the foregoing and its stated attachments with the Clerk of the Court who I understand will use the CM/EDF system, which will send notification of such filing to the following:

Jere C. Segrest, Esq.
E-mail:  jerecs@aol.com
and
James K. Walding, Esq.
E-mail:  kwalding2003@yahoo.com
Attorneys for Houston County BOE et al.

Joseph V. Musso, Esq.
E-mail:  joseph.musso@odnss.com
James C. Pennington, Esq.
James.pennington@odnss.com
and

Peyton Lacy, Jr., Esq.
Peyton.lacy@odnss.com
Ogletree, Deakins, Nash, Smoak, & Stewart
Attorneys for Troy University, et al.

Mark S. Boardman
E-mail:  mboardman@boardmancarr.com,
and
Katherine C. Hortberg
E-mail:  khortberg@boardmancarr.com,
Boardman, Carr, Hutcheson
Attorneys for Paul Strange and Stacy Ezell

Patrick Bryan Moody
E-mail:  patrickmoodylaw@hotmail.com
Attorney for Houston Co. BOE, et. al.

s/Winn Faulk
WINN FAULK (ASB-3091-L48W)
Attorney for Plaintiff

3

1

```
1            IN THE U. S. DISTRICT COURT

2            MIDDLE DISTRICT OF ALABAMA

3               SOUTHERN DIVISION

4

5   NANCY MILLER,

6       PLAINTIFF,

7       VS.             CASE NO. 1:06cv00940-MEF

8   HOUSTON COUNTY BOARD
    OF EDUCATION; KENNETH
9   LORD; RILEY JOE ANDREWS;
    TIM PITCHFORD; PAUL
10  STRANGE; STACY EZELL;
    TROY UNIVERSITY, DOTHAN;
11  SANDRA JONES; PAM PARRIS;
    and GREG RUEDIGER,
12
        DEFENDANTS.
13

14      The deposition of GREG RUEDIGER, taken

15  by the Plaintiff, pursuant to the Alabama

16  Rules of Civil Procedure, before Stacey

17  Watkins, RPR, and Notary Public, State at

18  Large, at the offices of Hardwick, Hause,

19  Segrest & Walding, Dothan, Alabama, on the

20  18th day of December, 2007, at 9:10 a.m.,

21  CST, pursuant to notice.

22

23

24

25
```

*1*

2

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF:

 4   MR. WINN FAULK
     Attorney at Law
 5   Montgomery, Alabama

 6   MR. THOMAS K. BRANTLEY
     Attorney at Law
 7   Dothan, Alabama

 8
     FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9   KENNETH LORD, RILEY JOE ANDREWS AND
     TIM PITCHFORD:
10
     MR. KEVIN WALDING
11   MR. PATRICK MOODY
     Attorneys at Law
12   Dothan, Alabama

13
     FOR PAUL STRANGE & STACEY EZELL:
14
     MS. KATHERINE HORTBERG
15   Attorney at Law
     Chelsea, Alabama
16

17   FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
     PAM PARRIS AND GREG RUEDIGER:
18
     MS. SANDY REESE
19   Attorney at Law
     Birmingham, Alabama
20

21   ALSO PRESENT:

22   KENNETH LORD
     TIM PITCHFORD
23

24

25
```

3

```
 1                      STIPULATION
 2
 3          It is stipulated by and between counsel
 4     for the parties that this deposition be taken
 5     at this time by Stacey Watkins, RPR, and
 6     Notary Public, State at Large, who is to act
 7     as commissioner without formal issuance of
 8     commission to her; that said deposition shall
 9     be taken down stenographically, transcribed,
10     and certified by the commissioner.  The
11     signature of the witness is waived.
12          Except for objections as to the form of
13     questions, no objections need be made at the
14     time of the taking of the deposition by
15     either party, but objections may be
16     interposed by either party at the time the
17     deposition is read into evidence, which
18     shall be ruled upon by the Court on the
19     trial of the cause upon the grounds of
20     objection then and there assigned.
21                                .
22
23
24
25
```

4

```
 1                    GREG RUEDIGER
 2   having been first duly sworn, testified as
 3   follows, to-wit:
 4
 5                    EXAMINATION
 6
 7   BY MR. FAULK:
 8       Q    Is this Dr. Ruediger?
 9       A    (Witness nodding head in
10   affirmative.)
11       Q    Dr. Ruediger, I'm Winn Faulk, and
12   I'm one of the lawyers for Nancy Miller, the
13   other being Tom Brantley.  If you would, give
14   us your correct name and spell it for us,
15   please, for the record?
16       A    Sure.  Gregory J. Ruediger,
17   R-u-e-d-i-g-e-r.
18       Q    Are you currently employed, Dr.
19   Ruediger?
20       A    Yes.
21       Q    And whereabouts?
22       A    Troy University.
23       Q    And in what capacity?
24       A    Associate professor.
25       Q    Of what?
```

1        A    Special education.

2        Q    I'm kind of new to special

3    education.  Is there more than one branch of

4    it?  In other words, do you have sort of a

5    sector within special education that you

6    specialize in?

7        A    Children with moderate and severe

8    disabilities.

9        Q    Okay.  And how long have you been

10   employed in that capacity?

11       A    Twenty years.

12       Q    Okay.  All at Troy?

13       A    No.

14       Q    Okay.  How long have you been at

15   Troy?

16       A    Since 1995.

17       Q    Okay.  And where were you before

18   that, and what did you do?

19       A    Pittsburgh State University, in

20   Pittsburgh, Kansas.  I was assistant

21   professor in the department of special

22   education.

23       Q    Okay.  And prior to that, what did

24   you do?

25       A    Prior to that, I was at the

6

```
 1    University of Florida as a graduate
 2    assistant.
 3        Q    Okay.  How long were you at
 4    Pittsburgh?
 5        A    Two years.
 6        Q    And, from there, straight to Troy?
 7        A    Yes.
 8        Q    The graduate assistantship, I take
 9    it that would be while you were in graduate
10    school --
11        A    Yes.
12        Q    -- at the university of Florida?
13        A    Yes.
14        Q    What years would that have been?
15        A    1990 to 1993.
16        Q    And then, you got -- what?  Was
17    that a doctorate that you were working on?
18        A    I was working on a doctorate of
19    education.
20        Q    Tell us about your academic
21    background as a student, beginning with your
22    doctorate.  You received it when?  In '93?
23        A    1994.
24        Q    Okay.  From Florida?
25        A    From the University of Florida.
```

1      Q    All right.  And where did you get

2    your master's?

3      A    Nova University, in Fort

4    Lauderdale, 1988.

5      Q    And your bachelor's?

6      A    Moorehead State University, in

7    Moorehead, Minnesota, in 1986.

8      Q    Do you have any other degrees?

9      A    No.

10     Q    Okay.  What was the field in which

11   you got your bachelor's?  What was your

12   major?

13     A    Special education.

14     Q    And then, your master's, what is it

15   in?

16     A    Special education.

17     Q    Did your doctorate pertain to a

18   particular aspect of special education?

19     A    Special education administration.

20     Q    And is that directly pertinent to

21   what you do at Troy?

22     A    Yes.

23     Q    Tell me a little about special

24   education administration, please.  If you

25   were writing a college catalog or a course

1    description, can you just give us a thumbnail

2    to help better acquaint us with it?

3        A    It's the supervision and allocation

4    of resources to provide support to

5    individuals who vary from the norm.

6        Q    When you graduated from college,

7    how old were you?  How old were you when you

8    graduated from college?

9            MS. REESE:  You mean his

10               bachelor's?

11           MR. FAULK:  Yeah.

12       Q    The reason I'm asking, I'm just

13   trying to get a feel as to what kind of work

14   experience you had.  If you were 30, then

15   that would suggest you had been in the Army

16   ten years or something like that.  I could

17   ask you, did you have any relevant work

18   experience prior to obtaining your bachelor's

19   degree?

20       A    Yes.

21       Q    Okay.  Tell us about that, please?

22       A    Can you rephrase the question?

23       Q    You were in college for a while and

24   got a bachelor's degree.

25       A    Uh-huh.

```
 1        Q    Did you work between then and the

 2   time you got your master's degree?  Did you

 3   work for a living?

 4        A    Yes.

 5        Q    Tell us what you did?

 6        A    Right.  Initially, I taught in Red

 7   Wing, Minnesota, the summer after I graduated

 8   from college in '86.  From there, I moved to

 9   Palm Beach County, in Florida, and taught in

10   Palm Beach County school district for two

11   years.  Taught children with serious

12   emotional disturbance, in Belle Glade,

13   Florida.

14        From there, in the same system, I taught

15   children with -- cognitive impairments is the

16   term today.  Back then, it was mental

17   retardation.  Then I also had an opportunity

18   to design a private school, based out of

19   Stuart, Florida.  Traveled for a year doing

20   that.

21        After that period of time, then moved to

22   Gainesville.  Prior to my graduate work at

23   Gainesville, I taught for Alachua County

24   School System.  Taught children in a center

25   school for kids with mental retardation.
```

 1    Taught high school level kids with

 2    intelligence quotient scores of 20 and less.

 3        And then, the following year, I was a

 4    full-time student at the University of

 5    Florida.

 6        Q    Okay.  What about prior to

 7    attending college to get your bachelor's

 8    degree?  Tell us about your work experience

 9    prior to that?

10        A    Well, as a native of Minnesota, my

11    first employment was actually picking rocks

12    out of a field when I was ten.  I earned

13    $88.00 for 44 hours of work.  And then, after

14    that period of time, I worked for SIDCO

15    Research.  And what it was was a sunflower

16    producing plant.  It was my first real

17    exposure to true science.

18        And what it was, is, we were trying to

19    -- I was working, as a young person, as a

20    college student, at the time, trying to

21    determine seeds that were resistant to

22    disease.  And we actually had Ph.D. level

23    people conducting research, and I was part of

24    their research in the sense of collecting

25    data and such.  So, in reflection, you know,

1    that was the first really scientific aspect.

2        Q    And was that, like, a summer job in

3    college?

4        A    Uh-huh.  Yes.

5        Q    I see.  Did you have it more than

6    one summer?

7        A    Yes.

8        Q    Any other work experience, prior to

9    coming to work at Troy, that was in the field

10   of special education?

11       A    Well, I consulted.

12       Q    Tell us a little more about that?

13       A    I consulted with local school

14   systems to try to help them to implement a

15   variety of programming options for kids with

16   disabilities.

17       Q    And did that take place in Florida?

18       A    It took place in Kansas, Missouri.

19   Basically there.

20       Q    Okay.  And that was while you still

21   had not obtained your master's degree?

22       A    No, sir.

23       Q    When was it, then?

24       A    That was the period of time when I

25   was completing my doctorate degree.

12

1     Q     At this point, do we have your

2     essential educational history as it relates

3     to special education?

4     A     Yes.

5     Q     Do we have your essential

6     professional experience as it relates to

7     special education?

8     A     Yes.

9     Q     Okay.  Do you belong to any

10    professional associations?

11    A     The Council for Exceptional

12    Children.

13    Q     Are you familiar with something

14    called a program report that the Council for

15    Exceptional Children uses or produces in

16    connection with certification -- or

17    accreditation, rather -- I may not have the

18    exact name of it -- where a program such as

19    Troy, for example, would periodically report

20    to the CEC and to the NCATE in connection

21    with accrediting special education programs?

22    A     Yes.

23    Q     Does Troy use -- does it file such

24    a report, to your knowledge?

25    A     I do not know that.

1       Q    Do you know enough about it to know

2    who at Troy would be responsible for filing

3    such a report, if Troy is required to file

4    one?

5            MS. REESE:  Object to the form.

6                 Hypothetical.  Go ahead and

7                 answer.

8       Q    Yeah.  I'm just saying, assuming

9    they are required to file one -- I don't know

10   whether they are or not.  But, if they were

11   required to file one, do you know who would

12   be responsible for that?

13           MS. REESE:  Same objection.  Go

14                ahead and answer.

15      A    No.

16      Q    What other professional

17   associations?

18      A    That's it.

19      Q    And how long have you been a member

20   of that, please?

21      A    Fifteen years.

22      Q    Any honorary associations?

23      A    No.

24      Q    When you graduated from college,

25   did you receive any particular awards or

14

1    distinctions in connection with your academic

2    work?

3        A    Yes.  I graduated magna cum laude.

4        Q    Anything else?

5        A    No.

6        Q    Okay.  Not to suggest that's not a

7    big deal.  I'm just asking, was there

8    anything else.  What about in connection with

9    your master's work?

10       A    No.

11       Q    Or your doctorate?

12       A    No.

13       Q    In the practice of your profession,

14   have you received any professional awards

15   from any organizations?

16       A    I was outstanding faculty at Troy

17   one year.

18       Q    When was that?

19       A    It was either '97 or '99.  I can't

20   recall.

21       Q    And tell me again what your level

22   of professorship is at Troy?

23       A    Associate professor.

24       Q    And pardon my ignorance, but, is

25   that higher than an assistant professor?

1      A    Yes.

2      Q    So, the next step for you, if you

3    remained at Troy, would be what, beyond an

4    associate professor?

5      A    Full professor.

6      Q    Okay.  Do you have a CV that you

7    keep up to date?  I don't mean do you have it

8    with you.  Do you happen to have one?

9      A    Yes.

10      Q    Would that include the list of

11    presentations you've made, and publications?

12      A    Yes.

13      Q    Any seminars you've taught and that

14    sort of thing?

15      A    Yes.

16      Q    If you would, please, I'm going to

17    ask you to provide that to your attorneys,

18    and let them decide whether to turn it over

19    to me, and that can reduce some of this

20    questioning.  Okay?

21      A    Sure.

22      Q    About when did you first meet Nancy

23    Miller, please?

24      A    August of 2002, I believe.

25      Q    And in what circumstances did you

16

1    meet her, that you recall?

2       A    Student/professor relationship.

3       Q    Do you recall what you were

4    teaching her?

5       A    She was my advisor -- advisee.

6    Excuse me.

7       Q    You were the faculty advisor?

8       A    Yes.

9       Q    Did you teach her in other courses

10   while she was an undergraduate at Troy?

11      A    Yes.

12      Q    What were those, if you recall?

13      A    A course entitled Introduction to

14   Moderate and Severe Disabilities, a course

15   entitled Teaching Students with Moderate and

16   Severe Disabilities, a course called

17   Transition Planning, a course called Policies

18   and Procedures in Special Education.

19      Q    And all that occurred prior to the

20   internship that we're here to talk about?

21      A    Yes.

22      Q    Do you know how you came to be

23   selected as -- well, first, let me ask, what

24   was your actual title, if you will, in

25   relation to Nancy Miller's internship?

17

1       A       Internship --

2       Q       What do they call you?

3       A       -- supervisor.

4       Q       Okay.  And how did you come to be

5    selected for that, if you know?

6       A       I do not know.

7       Q       Okay.  Do you know what the normal

8    process for selection would be?

9       A       Yes.

10       Q       Tell us that, please?

11       A       Based on workload and based on

12    accrediting bodies, the administration looks

13    at the existing number of interns that are

14    going to be interning during a given quarter

15    or semester and makes a decision who will

16    supervise.  Obviously, it's within your

17    field.

18       Q       Do you recall who notified you that

19    you were to be her supervisor?

20       A       Ms. Pam Parris.

21       Q       Now, what was Ms. Parris'

22    connection, if any -- well, let me back up a

23    minute.  Troy University has a campus at

24    Dothan?  Correct?

25       A       Yes.

```
 1      Q    Is that where you primarily worked?
 2      A    Yes.
 3      Q    What is the relationship, to your
 4    knowledge, between Troy University, Dothan,
 5    and Troy University?  Are they the same
 6    entity, or are they somehow just affiliated
 7    with each other?  What is the connection, if
 8    you know?
 9      A    Well, today, we're all one
10    university.  So, therefore, the university is
11    a comprehensive cohesive program with a
12    variety of various locations where courses
13    are offered to people.
14      Q    In the spring, summer and fall of
15    2004, was that the case then?
16      A    I believe not.
17      Q    During that period, and in the
18    three or four years leading up to the summer
19    of 2004, would you, for example, occasionally
20    teach courses in Troy rather than Dothan?
21      A    No.
22      Q    So, you were exclusively performing
23    duties for the Troy University, Dothan
24    campus?
25      A    Yes.
```

```
 1        Q    Okay.  And has that been the case

 2   throughout your tenure with Troy?

 3        A    Yes.

 4        Q    Who did you report to -- well,

 5   first of all, what was your department in the

 6   summer of 2004?

 7        A    It was called the curriculum and

 8   instruction department.

 9        Q    And is that a subdepartment of the

10   department of education?

11        A    Yes.

12        Q    Just give us an overview, if you

13   will, of the department of education at Troy,

14   in terms of, you know, how it's laid out, if

15   you will?

16        A    At that point in time --

17        Q    That's what I'm talking about.

18        A    -- we had a campus dean.  And then,

19   from there, you had an assistant dean.  Then

20   you had the curriculum instruction

21   department.  Under the curriculum

22   instruction, there was elementary ed,

23   elementary education, special education,

24   secondary education.

25        Q    That's it?
```

1      A    Uh-huh.

2      Q    All right.  And when you say you

3   were in the curriculum and instruction

4   department, were you also part of the special

5   education department?

6      A    Yes.

7      Q    Was it called a department?

8      A    Yes.

9      Q    Who was the head of that

10  department?

11     A    Dr. Victoria Morin.

12     Q    And then, who would be considered

13  in charge of the curriculum and instruction

14  department, or who would Dr. Morin have

15  reported to?

16     A    Dr. Elizabeth Fell.

17     Q    And I asked you sort of a compound

18  question.  Would Elizabeth Fell also be the

19  head of curriculum and instruction

20  department?

21     A    Yes.

22     Q    And who was the assistant dean you

23  mentioned?

24     A    Dr. Jim Windle.

25     Q    Spell his last name for me, please?

```
 1      A    W-i-n-d-l-e.

 2      Q    And who was the dean?

 3      A    Dr. Sandra Jones.

 4      Q    Okay.  Now, what was Pam Parris'

 5   connection, if any, to your department?

 6      A    She was the director of teacher

 7   education program.

 8      Q    Let me back up just a minute.  Did

 9   you have any duties at that time that related

10   to the curriculum and instruction department

11   but were not specifically special ed?

12      A    Yes.

13      Q    Okay.  What were those, please?

14      A    Program evaluation.

15      Q    What type programs were you

16   evaluating?

17      A    The entire program, in the sense --

18      Q    Troy's program?

19      A    No.  In the sense of accreditation,

20   in the sense of governing bodies,

21   contributing to different documents that were

22   needed by administrators, contributing to

23   conceptual frameworks of the university.  All

24   the accrediting issues.

25      Q    Accrediting issues for the
```

1    university or for, say, Dothan High School?

2    Are we talking about --

3        A    For the university.

4        Q    And what was Pam Parris' connection

5    to the department you were in?

6        A    She was a member of that

7    department.

8        Q    Of the curriculum and instruction

9    department?

10       A    Yes.

11       Q    Did she have duties in any of these

12   other three branches that you mentioned,

13   elementary, special and secondary?

14       A    Not to my knowledge.

15       Q    Do you know what her title was in

16   summer 2004?

17       A    Director of the teacher education

18   program.

19       Q    Do you know whether she had a

20   doctorate at that time, if you know?

21       A    She does not have a doctorate

22   degree.

23       Q    Do you know if she had a master's

24   degree?

25       A    Yes, she does.

23

```
1       Q    Did she have one at that time, if
2   you know? If you don't know, that's fine.
3       A    Yes, she did.
4       Q    Tell me again what her title was?
5       A    Director of the teacher education
6   program.
7       Q    And would her duties, so far as you
8   know, have included somehow overseeing the
9   internship program?
10      A    Yes.
11      Q    And that would be broader than
12  special education interns?  Correct?
13      A    Yes.
14      Q    Do you know if Dr. Parris had any
15  particular background in special education?
16           MS. REESE:  Object to the form.  I
17                don't think she's a doctor.
18           MR. FAULK:  I beg your pardon.
19                Thank you.
20      A    Repeat the question, please.
21      Q    Ms. Parris, do you know if she had
22  any particular background in the field of
23  special education?
24      A    Do not know.
25      Q    Are you aware that, at the time the
```

1    internship agreement for Mrs. Miller was

2    prepared, that Dr. Morin was scheduled to be

3    her intern supervisor, and was then replaced

4    by you at the outset?  Were you aware of

5    that?

6         A    Not at that time.

7         Q    Okay.  Do you recall ever having

8    reviewed the internship agreement itself?

9    And I'll show you what's already in evidence

10   as Defendant's Exhibit 6.  It's just a

11   two-page document.  I'll ask you to take a

12   look at it, please?

13        A    (Witness reviewing document.)  Yes,

14   I'm familiar with that.

15        Q    Okay.  And were you familiar with

16   it at the time you were assigned to supervise

17   this internship?

18        A    Yes.

19        Q    Were you given any other written

20   guidance or instructions pertinent to this

21   internship and pertinent to your performance

22   of your duties as supervisor?

23        A    No.

24        Q    Had you ever supervised an intern

25   in special ed prior to undertaking the

25

```
 1    supervising of Mrs. Miller?

 2        A    Yes.

 3        Q    Can you tell us about how many

 4    students, approximately?

 5        A    Approximately 30.

 6        Q    And over what period of time would

 7    that have been, approximately?

 8        A    Since '94 until current.

 9        Q    And tell me again when you went to

10    Troy?

11        A    '95.

12        Q    Now, of those 30 or so students,

13    can you tell me about how many of them were

14    actually being paid as students?

15             MS. REESE:  Object to form.

16        Q    I beg your pardon.  Paid as

17    teachers while serving their internship.

18        A    One other.

19        Q    Do you recall that person's name?

20        A    Her last name was H.  I don't

21    recall her first name.

22        Q    And was that at Troy?

23        A    Yes.

24        Q    And do you recall what school

25    system it was in?
```

26

```
 1        A     Early County, Georgia.

 2        Q     All the people you supervised were

 3   in special education internships?

 4        A     Yes.

 5        Q     Would there, to your knowledge,

 6   customarily have been some type of written

 7   agreement between a school system and Troy

 8   University that covered the terms and

 9   conditions of any given internship?

10        A     Yes.

11        Q     Where would the records of a given

12   intern be kept within the university?  Were

13   they part of the student's regular student

14   file, or were they maintained some other

15   place?

16        A     The teacher education program

17   office.

18        Q     Would that be the same place that

19   the student's file, general file, would be

20   kept?

21        A     No.

22        Q     What was the name of that office

23   again?  Teacher education program office?

24        A     Uh-huh.

25        Q     So, that's something separate from
```

```
 1    the registrar's office, I presume?

 2        A    Yes.

 3        Q    Did the teacher education program

 4    have its own registrar?

 5        A    No.

 6        Q    So, who, today, to your knowledge,

 7    would be maintaining the internship records

 8    of the teacher education program?

 9        A    Karen McGaee.

10        Q    Spell McGaee for me, please, the

11    best you can?

12        A    M-c-G-a-e-e.

13        Q    Is her office here in Dothan?

14        A    Yes.

15        Q    Would she, to your knowledge, still

16    maintain a record having to do with Nancy

17    Miller's two internships?

18        A    I do not know.

19        Q    Would it be the normal business

20    practice, to your knowledge, to maintain

21    records such as these over time, after the

22    internship has been completed?

23        A    Yes.

24        Q    Let me show you Defendant's Exhibit

25    6 again.  And as I read this, it refers to --
```

1      in number 3, it says, "Mrs. Miller will

2      complete the same requirements as all other

3      interns at Troy University with the following

4      underlined exceptions."  And there seem to be

5      two of those underlined there.

6          And what I'm going to ask you about

7      this, just so you can be looking at it with

8      this in mind, is whether all those other

9      terms that are not underlined in part 3 would

10     be the customary terms for a Troy University

11     intern in special education.  So, if you

12     would, just take a moment and look at it a

13     little more closely.

14             MS. REESE:  Just take each letter

15                 and do it one by one.

16     Q     Yeah.  And if you want to just

17     answer one letter at a time, that will be

18     fine.

19     A     Can you repeat the question?

20     Q     Okay.  What I'm trying to get at is

21     -- the agreement, of course, says what it

22     says.  And it says, as I understand it, here

23     in number 3 -- do you see where it says,

24     "Mrs. Miller will complete the same

25     requirements as all other interns at Troy

1    University, Dothan, with the following

2    underlined exceptions"?  I see two things

3    underlined, one in part B and one in part C

4    of paragraph three.  What I'm trying to ask

5    you, is, are all the parts of number 3 that

6    are not underlined, do they represent the

7    customary terms of internships at Troy, in

8    your experience?

9         A    Yes.

10         Q    Okay.  Do you need to look over on

11    the other page, please?

12         A    (Witness reviewing document.)  Yes.

13         Q    Okay.  Having reviewed this

14    document, Defendant's Exhibit 6, did you

15    notice the absence of any customary

16    requirements of interns at Troy?

17         A    Not to my knowledge.

18         Q    Okay.  Thank you.  So, it's your

19    belief -- and I know you can't testify with

20    familiarity about every intern's file at

21    Troy.  But, is it your belief that there

22    should be an agreement essentially similar,

23    without the underlined exceptions, between

24    Troy University and the various school

25    systems for other interns, as well as Mrs.

30

```
 1   Miller?

 2        A    I do not directly know.

 3        Q    Okay.  But, in every other

 4   internship you've conducted through Troy, was

 5   it your experience that there would be a

 6   written agreement?

 7        A    Yes.

 8        Q    And of those you recall seeing

 9   personally, would they have been comparable

10   in their terms and conditions to the

11   nonunderlined requirements of Mrs. Miller's

12   agreement?

13        A    Yes.

14        Q    Now, the first underlined provision

15   says that Mr. Strange will visit Mrs.

16   Miller's classroom one period each week.

17   Mrs. Miller will visit Mr. Strange's

18   classroom one period each week.  Is that not

19   a customary requirement in internships, in

20   your experience?

21        A    No, it's not.

22        Q    Okay.  How would the customary

23   relationship between the cooperating teacher

24   and the intern normally be carried out?

25        A    The cooperating teacher would be in
```

1    the physical presence of the intern at a

2    greater level, simply due to the fact that

3    they are a student.  And so, therefore, it

4    would be more like a mentorship.

5        Q    And then, part C, all of which is

6    underlined, reads, "The school administration

7    is responsible for IEP meetings.  Mrs.

8    Miller's attendance is of that as a student

9    intern.  She cannot be held legally

10   responsible for the meetings."

11       Does that provision not appear, or some

12   provision to that effect not appear in other

13   internship agreements in special education?

14       A    It does not appear.

15       Q    Do you have an opinion as to why it

16   would be necessary to insert that in this

17   agreement, Defendant's Exhibit 6, and not

18   insert it in other interns' agreements?  And

19   if you do, tell us what that opinion is,

20   please?

21       A    The opinion is that she chose to be

22   an employee of Houston County Schools, but at

23   the same time, she is a student of Troy

24   University.

25       Q    Tell me this.  Would you expect a

1    special education intern to be given

2    opportunities to sit in on IEP meetings?

3        A    If the special ed intern has the

4    permission of the parents.  And if the

5    parents choose not to have them there, then

6    they would not be there.

7        Q    Okay.  But, was there some

8    expectation, on account of Mrs. Miller's

9    teaching role, that her presence might

10   somehow be needed or desirable at the IEP

11   meetings, even though she was not legally

12   responsible for them?

13       A    Yes.

14       Q    And because of that higher level of

15   involvement as a teacher, is that what would

16   necessitate the insertion of this provision

17   in the internship agreement?  Just to make

18   clear that it wasn't truly her

19   responsibility, even though she would be

20   expected to be involved?

21       A    From the perspective of Troy

22   University, she was a student, and the

23   student responsibility would be limited.

24       Q    What would Troy State get out of

25   this relationship with the Houston County

33

1    Board of Education in placing an intern
2    there?
3         A    Would provide an opportunity for
4    the student to learn.
5         Q    Okay.  Would I be correct in
6    thinking that Troy University has to make
7    arrangements for internships as part of its
8    teacher education program?
9         A    Yes.
10         Q    What would be the source of that
11   requirement?  Would that be something
12   required for accreditation, for example?
13         A    That would be Troy's responsibility
14   in the certification process.
15         Q    But, who would impose that
16   responsibility on Troy?
17         A    The state department of education.
18         Q    Okay.  And in order to carry out
19   that responsibility, wouldn't it follow that
20   Troy has to have a place to place interns in
21   order to carry out that responsibility?
22   Correct?
23         A    Correct.
24         Q    And one place y'all send interns is
25   Houston County Schools?  Correct?

34

```
 1        A     Yes.
 2        Q     Do you know approximately how many
 3    interns y'all would have in the Houston
 4    County School System today?
 5        A     No.
 6        Q     Who would know that, do you think?
 7    Who should know that?
 8        A     The director of the teacher
 9    education program.
10        Q     And that would be Ms. Parris'
11    successor?
12        A     Yes, but --
13        Q     The lady or man --
14        A     Yes, but --
15        Q     Go ahead.
16        A     But Troy University has become all
17    one system now.  So, individuals at Troy
18    would also know.  So, Ms. McGaee took the
19    place of Ms. Parris.  She would know, in the
20    Dothan campus.  And then, Dr. Charlotte
21    Minnick, who is ultimately in charge of the
22    teacher education program in the Troy system,
23    would know today.
24        Q     Spell Minnick for me, please?
25        A     M-i-n-n-i-c-k.
```

```
 1        Q     Do you know how many students were
 2   placed as interns in the Houston County
 3   Schools -- and I'm talking about exclusive of
 4   the Dothan City System -- from Troy
 5   University, Dothan, in the fall of 2004?
 6        A     I do not know that.
 7        Q     Do you know how many students were
 8   enrolled in the teacher education program at
 9   Troy University, Dothan, in the fall of 2004?
10   Just your best judgment, an approximate
11   figure?
12        A     I have no specific information to
13   know that.
14        Q     Who should know that?  Again, Ms.
15   McGaee and Ms. Minnick?
16        A     Well, the registrar's office.
17        Q     Do you know approximately how many
18   students are in the Dothan division of Troy
19   today in the teacher education program?
20        A     No.
21        Q     Do you know how many are in the
22   special ed division of the teacher education
23   program?
24        A     Yes.
25        Q     Tell us, please?
```

36

```
1       A    Approximately 20.
2       Q    And that would be 20 students or 20
3    interns?
4       A    20 students.
5       Q    And are students in the teacher
6    education program -- does that include
7    freshmen?
8       A    Yes.
9       Q    So, you get into that program from
10   the beginning of college?
11      A    They declare their major.
12      Q    And would it be fair to presume
13   that approximately a fourth of those would be
14   seniors?
15      A    I do not know that.
16      Q    What classes are you teaching this
17   semester?
18      A    Well, we are finished for the
19   semester now.
20      Q    Okay.  Tell us the one we just
21   finished, then?
22      A    Sure.  I taught two sections of a
23   course called Diverse Learners.  I taught a
24   course entitled Educational Psychology.
25   Those are at the undergraduate level.  And at
```

37

1    the graduate level, I taught a course called

2    Teaching Students with Social and Emotional

3    Needs.

4        Q    Okay.  Let's talk about the three

5    at undergraduate level.  You had three

6    classes, two of which were sections of the

7    same course?

8        A    Uh-huh.

9        Q    How many students did you have in

10   each of those classes?

11       A    23 and -- maybe 24.  The maximum is

12   25.  So, they become full, and then, some

13   drop.

14       Q    Okay.  And what level courses are

15   those?

16       A    Those are 300 levels, which would

17   be junior and senior level.

18       Q    And would some of those students be

19   students who were not specifically majoring

20   in special education?

21       A    Yes.

22       Q    Were any of them, to your

23   recollection, people who were not part of the

24   teacher education program as a whole?

25       A    Not to my knowledge.

38

1      Q      So, that would be between 60 and 75
2    students, wouldn't it, in those three
3    courses?
4      A      Yes.
5      Q      Depending on whether there was 20
6    or 25 in a class?
7      A      Uh-huh.
8      Q      And if those 75 or 60 pupils
9    continue their progress in the teacher
10   education program in order to become
11   certified teachers in some phase of
12   education, am I correct in my understanding
13   they will have to do an internship?
14     A      Yes.
15     Q      What if there was just not space
16   available for all of your internship eligible
17   people?  Could they go to a college at their
18   hometown in Nebraska and do the internship,
19   under the auspices of Troy University,
20   Dothan?
21     A      I'm not familiar with that
22   situation ever occurring.
23     Q      Okay.  You mentioned Early County,
24   Georgia, while ago.  What part of Georgia is
25   that in?

```
 1        A    Blakely, Georgia, is the city.
 2        Q    Blakely.  That's across the river
 3    from Henry County?
 4        A    I believe so.
 5        Q    So, it's within driving distance
 6    for you, as a supervisor from Dothan?
 7        A    Uh-huh.
 8        Q    You've never supervised anybody who
 9    was outside of a reasonable driving distance
10    for you, have you?
11        A    No.
12        Q    Okay.  So, as a practical matter,
13    is it fair to say, then, that if a Troy
14    University, Dothan student is going to serve
15    an internship, ideally, it would be within,
16    at most, an hour's drive from Dothan?  For
17    the supervisor, I'm talking about.
18        A    I've driven farther than that.
19        Q    You have?  Whereabouts?
20        A    Ponce de Leon, Florida.
21        Q    That's down around Bonifay and
22    DeFuniak Springs?
23        A    Uh-huh.  Opp, Alabama.
24        Q    That's about -- what? -- 75 miles?
25        A    Uh-huh.
```

40

```
 1        Q     Okay.  Any other examples?

 2        A     No.

 3        Q     So, we can stretch it out to an

 4   hour and a half?

 5        A     Yeah, probably.

 6        Q     Other than being able to carry out

 7   its responsibility to place Mrs. Miller as an

 8   intern, what else, if you know, did Troy

 9   University, Dothan, get out of this

10   relationship with the Houston County Board of

11   Education in connection with placing her as

12   an intern, if anything?

13        A     Nothing that I know of.

14        Q     Was Troy University, to your

15   knowledge, or any of its faculty, paid any

16   kind of consulting honorarium or other

17   benefit from the Houston County Board of

18   Education in connection with this internship?

19        A     Cooperating teachers receive a

20   small stipend, I believe.

21        Q     And is that paid by Troy or paid by

22   the local board?

23        A     No.  That would be paid by Troy

24   University.

25        Q     Okay.  So, it's flowing the other
```

41

1    way, then?

2        A    Uh-huh.

3        Q    It's from Troy to the local school

4    system.  Do you happen to know whether one

5    was paid in this case to Mr. Strange?

6        A    I do not have knowledge of that.

7        Q    Do you know whether this payment,

8    which right now we'll call a hypothetical

9    payment, would be paid by Troy to the local

10   board, and then, disbursed by the board, or

11   whether it would be paid directly to the

12   cooperating teacher by Troy?

13       A    I do not have knowledge of the

14   process.

15       Q    Okay.  Who should have knowledge of

16   the process?

17       A    The dean in the college of

18   education.

19       Q    Okay.  Would you agree with me,

20   Dr. Ruediger, that if the Houston County

21   Board of Education, which is right here in

22   Dothan, should decide, okay, we've had

23   enough, and we're not going to accept any

24   more interns from Troy, would you agree that

25   that would create a substantial inconvenience

42

```
1    for Troy University --
2              MR. WALDING:  Object to the form.
3         Q    -- in that you're going to have to
4    find other places to put your interns?
5         A    Can you repeat the question,
6    please?
7         Q    Let me ask some preliminary
8    questions.  Can you tell me how many student
9    interns are currently assigned to the Houston
10   County Board of Education from your
11   department?
12        A    I don't have knowledge of that.
13        Q    Do not?
14        A    Do not.
15        Q    Or the Dothan City Board of
16   Education?
17        A    Do not have knowledge of that.
18        Q    Where is your campus within Dothan?
19        A    It's on 231 North.
20        Q    Okay.  Up around Midland City?
21        A    Yes, sir.
22        Q    Okay.  Would you agree with me it's
23   important to maintain a good working
24   relationship with the local boards where you
25   assign interns?
```

43

```
1        A    Yes.

2        Q    And why is that?

3        A    In order to benefit the children in

4   our community.

5        Q    Okay.  It doesn't have anything to

6   do with Troy carrying out its responsibility

7   to place interns?  Is that your testimony?

8        A    No.

9        Q    All right.  So, wouldn't it be fair

10   to say that another sense in which it's

11   important to maintain a good working

12   relationship between Troy and the local

13   boards is so you can more conveniently carry

14   out your responsibility to place interns?

15       A    Yes.

16       Q    Okay.  Have you had any courses or

17   attended any seminars in the subject area

18   that is generally referred to in kind of a

19   compendious way as school law or education

20   law?

21       A    Yes.

22       Q    Have you had any occasion, either

23   in those courses or just in the performance

24   of your duties -- and I'm not asking you

25   about advice you've gotten from Mr. Musso or
```

44

```
 1    Ms. Reese or anybody in connection with this

 2    case.  But, just in general, have you been

 3    advised by anyone of the legal nature of the

 4    relationship between Troy University and

 5    local boards of education and the intern in

 6    these internship agreements?

 7         A    Yes.

 8         Q    All right.  What advice have you

 9    been given in that regard?

10         A    The importance of confidentiality.

11    The importance related to Troy University

12    students and confidentiality.  The issues of

13    the Americans with Disabilities Act as it

14    relates to providing reasonable

15    accommodations for not only Troy University

16    students, but also public school students.

17    Those are the major areas.

18         Q    What I really had in mind is -- let

19    me ask you this:  Are you familiar with the

20    term "joint venture"?

21         A    Yes.

22         Q    And "partnership"?

23         A    Yes.

24         Q    And in a general way with the term

25    "contract"?
```

45

1        A     Yes.

2        Q     Okay.  Have you had occasion, in

3    connection with any of your training, whether

4    in the academic setting or the seminar

5    setting or whatever, or just in preparation

6    for serving in connection with these

7    internships, have you had occasion to be

8    advised in that sense as to the legal nature

9    of these agreements?

10       A     No.

11       Q     But Troy State gets a benefit, in

12   that they can place their interns?  Correct?

13       A     Yes.

14       Q     The local board gets some benefit,

15   in that they have at least some services from

16   these interns, whether they're paid or not?

17   Is that fair to say?

18       A     Yes.

19       Q     And the intern gets something out

20   of it, in that it's a learning opportunity?

21   Correct?

22       A     Yes.

23       Q     And there's some potential for

24   money changing hands, in terms of paying the

25   cooperating teacher, under some

46

1    circumstances, apparently?

2        A    Yes.

3        Q    Let's talk about control over the

4    intern.   And assume, if you will, an unpaid

5    situation, unlike Mrs. Miller.  What sort of

6    control, under these agreements, does the

7    local board have over directing the

8    activities of the intern at the school, at

9    the local school?

10            MS. REESE:  You said local board

11                has over?

12            MR. FAULK:  Well, the local school

13                authorities, whether it's the

14                principal or whoever does it.

15            MS. REESE:  Okay.

16        A    Troy University students are guests

17    within the public schools, and, therefore,

18    they will follow the direction of the local

19    school district leaders and agents of those

20    leaders.

21        Q    And what degree of control does

22    Troy itself retain over the student in

23    connection with the internship?

24        A    There is established criteria in

25    which the intern has to be able to exhibit in

47

 1   order to meet the requirements to

 2   successfully complete the internship.

 3       Q    Okay.  And those are dictated by

 4   Troy?

 5       A    Ultimately, they're dictated by the

 6   State Department of Education of the State of

 7   Alabama.

 8       Q    And implemented by Troy with the

 9   cooperation of the local school system?

10       A    Yes, sir.

11       Q    Okay.  Tell me, if you know,

12   whether local school systems receive any

13   state or federal funds as a result of

14   accepting interns in special ed?

15       A    I do not have knowledge of that.

16       Q    Do you have any belief as to who at

17   Troy might have some knowledge of that, or

18   who would be in a position to know, in your

19   judgment?

20       A    The dean of the college of

21   education.

22       Q    All right.  In the questions I've

23   asked you on this subject of the relationship

24   in internships, have I exhausted your

25   knowledge of the essential elements of

48

```
 1   benefits that each party derives from that
 2   relationship?
 3       A    Yes.
 4       Q    Okay.  So, I can quit asking you
 5   about it.
 6            MR. WALDING:  Can we take a break
 7                 when you get to a place?
 8            MR. FAULK:  Yeah.  That's fine.  We
 9                 can take a break right here.
10            (Recess in deposition.)
11            (Tim Pitchford not present.)
12            MR. FAULK:  I hope you'll forgive
13                 my bad manners.  Lawyers are
14                 supposed to tell a witness, at
15                 the beginning, if they need to
16                 take a break, to let us know,
17                 and we'll be glad to take a
18                 break.  If anything is creating
19                 any discomfort or you need a
20                 drink of water or coffee or
21                 whatever, I think we can
22                 prevail on our host to help you
23                 out.
24            MR. WALDING:  We'll stipulate you
25                 have bad manners.
```

49

```
1                MR. FAULK:  Thank you.
2        Q    Are you familiar, Dr. Ruediger, in
3    general, with the requirements that, under
4    ordinary circumstances, to be employed as a
5    teacher in Alabama, the teacher should be
6    certified by the state department of
7    education?
8        A    Yes.
9        Q    Are you aware that, in the present
10   case involving Mrs. Miller, she did not have
11   a regular teaching certificate at the time
12   she undertook these duties to teach in the
13   Houston County system?
14       A    Yes.
15       Q    Were you aware of that at the time
16   you were serving as her supervisor?
17       A    Yes.
18       Q    And how did that come to your
19   attention, if you recall?
20       A    Through the document that you
21   provided earlier.
22       Q    Do you know of other situations in
23   which noncertified personnel are being used
24   as paid teachers while serving as interns?
25       A    Yes.
```

```
 1        Q     Is there some exception that you're
 2    aware of that would apply in this case as to
 3    whether Mrs. Miller could perform these
 4    teaching duties, yet not be certified?
 5              MS. REESE:  Object to the form to
 6                    the extent it calls for a legal
 7                    conclusion.  Just answer what
 8                    you know.
 9        Q     Just tell us what you know.  I
10    understand you've told us about your limited
11    legal training.  I guess you have.  You're
12    not a lawyer, are you?
13        A     No.
14        Q     We understand that.  But, are you
15    aware, just from your professional
16    experience, of any exception to the
17    certification requirement that would have
18    applied in Mrs. Miller's circumstances?
19        A     No.
20        Q     Do you recall there being any
21    discussion at the time, within the Troy
22    University administration and faculty -- did
23    anyone have any misgivings or consternation
24    about having her in that situation?
25        A     As an employee?
```

51

```
 1      Q    Yes.
 2      A    I was not a part of those
 3  discussions, if there was any.
 4      Q    And you haven't been told that
 5  there were any discussions?
 6      A    I have no knowledge of that.
 7      Q    Okay.  That's fine.  Did you have
 8  any role in the supervision of a person named
 9  Amy Deese --
10      A    No.
11      Q    -- during that same semester?
12      A    No.
13      Q    Did you have any other interns to
14  supervise during that same semester, the fall
15  of 2004?
16      A    I cannot recall.
17      Q    And I may have asked you this.  If
18  I did, I apologize for asking you a second
19  time.  Do you have any recollection of having
20  supervised other special ed interns who were
21  not certified, who were being paid as
22  teachers?
23      A    Yes.
24      Q    All right.  And approximately how
25  many cases would that be?
```

52

```
 1        A    One.
 2        Q    And is that Ms. H. you mentioned
 3    earlier?
 4        A    Yes.  Blakely, Georgia.
 5        Q    Okay.  Thank you.  Sorry to be
 6    redundant.  Under ordinary circumstances with
 7    a special ed intern, would they be engaged in
 8    their activities as an intern throughout the
 9    school day, typically?
10        A    Yes.
11        Q    Okay.  And five days a week, unless
12    they had some business to tend to at the
13    university?
14        A    Yes.
15        Q    And during most work weeks, other
16    than perhaps attending a class at the
17    university or a seminar or something in
18    connection with their internship, they would
19    be engaged in their duties as interns every
20    school day?
21        A    Yes.
22        Q    At the inception of this internship
23    of Mrs. Miller in the fall of 2004, or late
24    summer, what would your first actual duties
25    have been in regard to her internship?
```

53

```
 1      A    Would be to schedule a period of
 2  time or a point in time when I would go
 3  observe her in the clinical site.
 4      Q    Okay.  So, prior to her going to
 5  the site of the internship and beginning her
 6  undertaking there, there would not have been
 7  any prior -- indoctrination is not a good
 8  word -- orientation involving you?  Is that
 9  correct?
10      A    That is correct.
11      Q    You just received some sort of
12  notice that you've been assigned as a
13  supervisor, and then, some time thereafter,
14  you make arrangements to visit the work site?
15      A    It's the student's responsibility
16  to contact their university supervisor to
17  establish a time that would be conducive to
18  them and the cooperating teacher.
19      Q    Okay.  And did that occur in this
20  case?
21      A    Yes.
22      Q    Mrs. Miller contacted you, and
23  that's how it was set up?
24      A    I believe so.
25      Q    And you would have three people
```

54

```
1    involved, at least?  You, the intern, and the
2    cooperating teacher?
3        A    Yes.
4        Q    At least to that extent, was there
5    anything out of the ordinary about your first
6    involvement as supervisor in this case?
7        A    She was an employee.  The
8    difference is that she is a student of Troy.
9    Out of the ordinary would be that she was an
10   employee of Houston County Schools.
11       Q    All right.  But, what I meant,
12   other than that, was there anything
13   extraordinary in connection with your first
14   undertaking your duties as supervisor?
15       A    No.
16       Q    No trouble setting up an
17   observation or anything like that?
18       A    No.
19       Q    Prior to that first observation,
20   had you received any news from Ms. Parris or
21   from the local school system at all about
22   Mrs. Miller's job performance?
23       A    Not to my recollection.
24       Q    Okay.  Or her performance as an
25   intern?
```

55

```
 1        A    Not to my recollection.
 2        Q    So, you go out to the school.  I
 3   believe it was in Columbia?
 4        A    (Witness nodding head in
 5   affirmative.)  Yes.
 6        Q    Another thing a good lawyer would
 7   tell you is we need you to answer "yes" or
 8   "no" --
 9        A    Yes.
10        Q    -- out loud, rather than nod your
11   head, if you can.
12        A    Sure.
13        Q    Thank you.  So, just tell us, then.
14   You get the notice, or the arrangements get
15   made.  You go out to Columbia.  What happened
16   next?
17        A    Well, the first thing is,
18   obviously, you indicate to the building level
19   administrator that you're there by going into
20   the office and signing the necessary form, a
21   visitor form, and then, naturally, get
22   direction where Mrs. Miller would be.  And
23   then, once I'm there, I basically sit down,
24   and I observe the behaviors in which the
25   intern is exhibiting.
```

1        Q     In your recollection, would that

2     have been on August 26, 2004?

3        A     Yes.

4        Q     Let me show you what's already in

5     evidence as Defendant's Exhibit 7 and 8.

6     I'll ask you to just take a look at those and

7     tell me whether you recognize them?

8        A     (Witness reviewing documents.)  I

9     do recognize them.  Yes.

10            MS. REESE:  This is 7?

11            MR. FAULK:  That's 7.

12            MS. REESE:  And then, let's look at

13               8.

14            MR. FAULK:  Flip forward.

15            MS. REESE:  Oh.  Flip forward?

16            MR. FAULK:  No. I got it backwards.

17            MS. REESE:  This is 8.  There we

18               go.  Okay.

19        A     (Witness reviewing document.  Yes.

20        Q     And are those, so far as you know,

21     the only existing records of that first

22     observation?

23        A     Yes.

24        Q     And those are what would ordinarily

25     have been prepared in connection with such an

57

1    observation by you?

2        A    Yes.

3        Q    And was that your honest evaluation

4    and report on what you observed on that

5    occasion?

6        A    Yes.

7        Q    You make the observation.  Your

8    report says what it says.  And then, about

9    how long does this last?  The whole period of

10   a class or what?

11       A    Yes.

12       Q    Then, after the observation, it's

13   my understanding there was some sort of

14   conference held with Mrs. Miller?

15       A    Yes.

16       Q    And who was present for that?

17       A    Initially, it was Mrs. Miller and

18   I.

19       Q    And y'all talked to each other some

20   during that?

21       A    Yes.

22       Q    And is that how it customarily

23   goes?

24       A    Yes.

25       Q    Tell me what you recall about that

58

```
 1    private conference between you and Mrs.
 2    Miller?
 3        A    What I recall is listening.
 4    Listening to Mrs. Miller share her
 5    experiences while at Houston County High
 6    School.
 7        Q    And where were y'all?
 8        A    We were in the room in which she
 9    was going to be working with the kids under
10    her charge.
11        Q    Are we talking about the so-called
12    resource room?
13        A    It was a classroom that perhaps was
14    labeled as a resource room.  Yes.
15        Q    And just the two of you?
16        A    Yes, initially.
17        Q    Do you know about how long that
18    phase of the observation lasted, that is,
19    where you and she were conferring alone?
20        A    Approximately 20 minutes.
21        Q    Okay, sir.  Tell me, as nearly as
22    you can recall, what was said?
23        A    Mrs. Miller indicated some of her
24    concerns that she had about her experiences,
25    and shared with me some of her insights about
```

1    those experiences.

2        Q    Is that it?

3        A    That's pretty much it.  Then we

4    moved to the classroom.

5        Q    Let's keep talking about this just

6    a minute.  Now, is this prior to the actual

7    classroom observation taking place, or is

8    this after?

9        A    This is going to be after.

10       Q    All right.  Let's talk about the

11   concerns that she expressed and insights, as

12   you put it, during that 20-minute conference.

13   Tell us, as nearly as you can recall -- and I

14   realize there may be things you don't recall.

15   But, as nearly as you can recall, just tell

16   us what the concerns were that she expressed

17   to you?

18       A    Initially, it was the physical

19   structure.

20       Q    And what was her point about that,

21   to your understanding?

22       A    Was the preparations that were

23   currently ongoing to have the physical space

24   available for her to work with the kids under

25   her charge.

1       Q    And was her concern that there was

2   currently -- well, at that time, there was

3   insufficient space?

4       A    No.  It was not adequately prepared

5   for her to work with the children.

6       Q    In what sense, if you recall?

7       A    The floors.  The floors.  The desks

8   were there.  But I think they were working in

9   their room, trying to upgrade that particular

10  space.

11      Q    Were the workmen in the way or

12  something?

13      A    Something about the floors.

14      Q    Was this something you had an

15  opportunity to observe yourself?

16      A    I observed the desks in the room in

17  a nonstructured organization.  In other

18  words, they're just piled up.

19      Q    Okay.  And did you agree that it

20  was not adequately set up for the students

21  that would be using the room?

22      A    I didn't make a judgment.

23      Q    Well, looking back on it today, do

24  you have an opinion as to whether the

25  facility that you saw was adequately prepared

1    for use by students?

2        A    It would be not prepared.

3        Q    Tell us the other concerns that she

4    expressed to you on that occasion?

5        A    She had some concerns related to

6    appropriate education for her children that

7    she was responsible for.

8        Q    And tell us specifically what you

9    recall about that?

10       A    It dealt with the individualized

11   education programs.

12       Q    In what sense?

13       A    That some of the individualized

14   education programs, in her opinion, were not

15   appropriate or missing.

16       Q    Okay.  Any other general categories

17   in which she was concerned about the IEP's,

18   that you recall?

19       A    Not that I recall, other than

20   what's been previously stated.

21       Q    If something is missing, you know,

22   obviously, it's just missing.  But, tell me,

23   in a little more detail, if you would,

24   please, as much as you can recall, about what

25   her specific concerns were about IEP's being

1    somehow inappropriate?

2        A    Some of the kids, there was no IEP

3    present for her in order to provide the

4    support that the kids needed.  That was one

5    of her concerns.  She also indicated that,

6    the ones that she did have the document, in

7    her opinion, they were not appropriate or

8    they included items that either didn't exist

9    within that school or were needed.

10        Q    You're talking about services that

11    weren't available or --

12        A    No.  I'm talking about issues of

13    least restrictive environment.

14        Q    Give us an example, please.

15    Because I'll readily admit I'm not terribly

16    familiar with this field.

17        A    Least restrictive environment is

18    the environment which maximizes the

19    interactions between children who are

20    disabled and children who are not.

21        Historically, there's been something

22    called a continuum of services.  Dino,

23    Stanley Dino and Evelyn Dino, at the

24    University of Minnesota, in 1970, indicated

25    where children can be educated that have

63

```
 1    disabilities.  The federal piece of
 2    legislation indicates to school systems that
 3    you want to maximize the interactions between
 4    kids that are disabled and those that are
 5    not.  And that's the term "least restrictive
 6    environment."
 7        Q    And was her concern that children
 8    were not being placed in the least
 9    restrictive environment or that the
10    environment they were being placed in was too
11    unrestrictive, or both?
12        A    My recollection would be both.
13        Q    What were other concerns about the
14    inappropriateness of IEP's that she expressed
15    to you on that occasion?
16        A    Nothing that I can recall other
17    than that.
18        Q    Okay.  So, when you used the word
19    "items" while ago, you're not talking about
20    pencils and paper.  You're talking about --
21    or you may be.  You're not talking about
22    supplies and that type of thing, when you
23    said "items" a while ago?  You're talking
24    about items in an IEP?
25        A    Yes.
```

1    Q    Okay.  Now, did you take a look at

2    any of these IEP's on that occasion?

3    A    No.

4    Q    Did you ask to see any on that

5    occasion?

6    A    No.

7    Q    Just tell us, then, what else

8    happened in this meeting?

9    A    That was it.  And then, we returned

10   back to a regular education classroom.  And

11   during that period of time, I observed her.

12   Q    Let me back up again.

13   A    Sure.

14   Q    When you're talking about

15   inappropriate aspects of IEP's, would that

16   include accommodations as well as goals that

17   are set in the IEP and that type thing?

18   A    She was stating that to me.

19   Q    Right.  Okay.  So, it was several

20   different types of concerns having to do with

21   the appropriateness of IEP's she said she had

22   seen?

23   A    Yes.

24   Q    Okay.  I want to be sure we've got

25   an adequate description for the Court as to.

65

```
1          What an IEP is and how it would
2     customarily come into being.  Can you just
3     give us a short lecture on that, please?
4          A     Yes.
5          Q     Please do.
6          A     An individualized education program
7     is a document in which local school systems
8     indicate the support that they are going to
9     provide children who need additional support
10    to be successful in school.  And,
11    historically, this came about initially in
12    1975.  The current one is the Individual
13    Disabilities Education Improvement Act 2004.
14    So, it's been reauthorized a number of times.
15    But the Supreme Court has various cases to
16    determine what is appropriate.
17         Q     And what is the procedure whereby
18    an IEP comes into being for a given student?
19         A     Well, the first thing is that the
20    young person has to be deemed eligible to
21    receive additional educational support.  The
22    eligibility criteria comes from the state
23    department of education.
24         So, for instance, if a teacher is
25    concerned that Jimmy, for instance, is not
```

66

```
 1    growing in a variety of areas, the teacher
 2    then would naturally collect data, and the
 3    data then would be gathered.  And in Alabama
 4    and other states, you have something called a
 5    building base student support team.
 6        So, if I was a regular ed teacher, I
 7    would see that Jimmy is not doing as well.  I
 8    would be collecting my data.  My next step
 9    would be to go to the building base student
10    support team.  And the building base student
11    support team would provide me with
12    information for interventions.
13        And those interventions, then, I would
14    take back to my regular ed classroom, and I
15    would implement them.  And in the process, I
16    would be collecting data to see if they're
17    working or not.
18        If I feel as though that I've exhausted
19    maybe all the different interventions,
20    perhaps went back to the building base
21    student support team to try to get more
22    intervention strategies, the next step would
23    be then to request permission from the
24    parents to test the young person.
25        So, simply, you're just collecting more
```

1    data to try to determine if the young person

2    is disabled.  That determination would be

3    based on the state eligibility criteria.  And

4    the State of Alabama, along with every other

5    state, has eligibility criteria.  So, the

6    local education agencies will have trained

7    people who understand the criteria.  They

8    will then determine eligibility.

9        So, either the kid, Jimmy, for instance,

10   is either eligible for special education or

11   he is not.  If he is eligible, then the next

12   process would be to design an appropriate

13   individualized education program in which he

14   would benefit from.  And then, the IEP team

15   then would be together, would take existing

16   assessment data that's available, and they

17   would draft or write an IEP.

18       Once that IEP -- a part of the IEP, as

19   you mentioned earlier, has goals.  At this

20   point in time, you still had benchmarks.

21   Today, we don't necessarily have benchmarks.

22   We have short-term objectives, because of the

23   law that's been passed.  Then it would be the

24   responsibility of the local education agency

25   and their agents, which would be a special ed

68

```
 1    teacher, regular ed, so on and so forth, to
 2    provide the support that this young person
 3    needs.
 4         But the IEP is the main vehicle to
 5    document the support you're going to provide
 6    this kid, so, therefore, he has an increased
 7    chance to learn the necessary skills to make
 8    annual yearly progress, to pass a high school
 9    exit exam, and ultimately go into the world
10    and be productive.
11         Q    Okay.  Is that it?
12         A    I can keep going, if you want.
13         Q    I'm glad for you to do it, because
14    I want the Court to understand better than I
15    do right now what this is and the process.
16         A    Yes, sir.
17         Q    Now, the IEP, then, is not just
18    something you would toss in a file and not
19    consult again during the course of the school
20    year, is it?
21         A    No.
22         Q    All right.  Is it fair to say it's
23    intended to be a working document that, in
24    fact, is used as part of an ongoing program
25    to educate the child?
```

69

```
 1      A    Yes.
 2      Q    And so, if it's not present and
 3   available to the concerned teachers, is it
 4   fair to say you might as well not have one?
 5           MR. WALDING:  Object to the form.
 6      Q    I'll acquiesce.  Let me ask it
 7   another way.  Shouldn't the IEP be available
 8   to the child's teachers on an ongoing basis?
 9      A    Yes.
10      Q    And shouldn't they consult it on an
11   ongoing basis?
12           MR. WALDING:  Object to the form.
13      Q    Unless they have photographic
14   memories or something?
15           MR. WALDING:  Object to the form.
16           MS. REESE:  You can go ahead and
17               answer.
18      A    Yes.
19      Q    Are you familiar with something
20   referred to as the Rowley standard,
21   R-o-w-l-e-y?
22      A    Yes.
23      Q    What is that, please?
24      A    It was one of the initial Supreme
25   Court rulings to determine the
```

1    appropriateness of IEP's.

2        Q    And is there some shorthand

3    rendition of that standard you can give us or

4    tell us the essence of it?

5             MS. REESE:  I'm going to object to

6                 the extent he's not a lawyer.

7                 He can explain it the best he

8                 knows.

9        Q    Well, within the scope of your

10   professional sphere, tell us what you

11   understand it to be?

12       A    The Rowley case, 1982, I believe,

13   dealt with the issue of clarifying what was

14   appropriate.  So, Amy was a little girl that

15   had modality differences, and she needed an

16   interpreter.  And she was progressing very,

17   very well with the interpreter during a

18   period of time.

19       What the parents requested, though, was

20   that the interpreter be with Amy throughout

21   the entire school day, so, therefore, they

22   could maximize Amy's educational opportunity.

23       What the court ruled -- and, obviously,

24   it went to the various courts to determine

25   what was appropriate.  Ended up in the

1    Supreme Court.  And it drew a line, in the

2    '80s -- and still today -- about educational

3    benefit.  So, in other words, Amy was

4    progressing.  Amy was progressing.  She was

5    making annual yearly progress that was

6    allowing her to move to the next grade and

7    next grade and so on and so forth.  Right

8    now, she's a college professor, by the way.

9        So, the Supreme Court ruled that the

10   intent of the law was not to maximize Amy's

11   educational experience, but rather to provide

12   an appropriate educational experience which

13   she will benefit from.

14       And Mitchell Yell, at the University of

15   South Carolina, talks about -- makes it real

16   clear.  And he's a legal scholar in my field

17   -- about you just have to provide a Chevy.

18   You don't have to provide a Cadillac.  It

19   doesn't have to be the best.  It has to be

20   appropriate.

21       And appropriate means that Amy was

22   receiving educational benefit.  And that was

23   obvious, because she was doing well in her

24   grades.  She was learning skills that

25   ultimately allowed her to graduate from high

72

1    school and such.

2        Q    Can you look at an IEP today -- I

3    mean, on the face of an IEP, if you had one

4    before you, would you be able, in a vacuum,

5    to express an opinion as to whether it was

6    appropriate in the sense that it was

7    descriptive enough to inform the teachers as

8    to what they should be doing?

9        A    Professionally, I wouldn't look at

10   one without -- because of the confidentiality

11   requirements of the law, unless a parent

12   provided written documentation that I was

13   able to look at it.

14       But, then, if that permission was

15   gained, I would also ask the parent to

16   provide all the information they could

17   provide in order for me to make a judgment if

18   that IEP is appropriate or not.  So, on face

19   value, I could not, without additional data,

20   to determine if something was appropriate or

21   not.

22       Q    Should I infer from that that it's

23   your opinion that Mrs. Miller would not have

24   had access to sufficient data, as you say, at

25   the time you had your first conference, in

```
 1    August --
 2         A     I do not think you can infer that.
 3               MS. REESE:  Let him finish the
 4                    question.
 5               THE WITNESS:  Okay.  Sorry.
 6         Q     -- that would enable her to form an
 7    opinion as to the appropriateness of these
 8    IEP's that she spoke to you about?
 9         A     She was a student of Troy
10    University.  She was an employee of Houston
11    County Schools.  So, the policies and
12    procedures of Houston County Schools, I am
13    not intimately aware of.
14         Q     Would her expression of these
15    concerns, as she related them to you on
16    August 26, 2004, would they have been typical
17    of the sorts of things that you were
18    accustomed to discussing with interns you
19    supervised, or did they go outside the normal
20    realm of the type subjects that you were
21    accustomed to discussing with interns?
22         A     They would go outside the normal
23    realm, simply due to the fact that she was an
24    employee and also a student.
25         Q     You mentioned parental involvement
```

```
 1    in connection with the Rowley case.  And I

 2    realize that type parental involvement was

 3    probably beyond what you would normally

 4    expect in terms of parents coming to school

 5    and that kind of thing.  But, in the IEP

 6    process itself, do you have an opinion as to

 7    the importance of parental involvement in the

 8    preparation of the IEP?

 9        A    IDEA 2004 requires attempts of

10    local school systems to involve parents.  And

11    there are safeguards in place to make sure

12    that parents have the opportunity and input

13    into the educational program.

14        Q    In your opinion, what should the

15    efforts to involve the parent in the planning

16    of the IEP consist of?

17        A    Well, there is legal precedent that

18    indicates that you have to notify, in

19    writing, a parent that a meeting is going to

20    occur, also indicate the date and the time

21    and such.  And then, the parent has to return

22    documentation saying that they either will

23    attend or they will not attend.

24        If they do not attend -- if, for

25    instance, they say, yes, I'm coming, and they
```

75

```
 1    don't show up, the school district cannot go
 2    forward without making another attempt.  And
 3    the law and the courts have clearly indicated
 4    you've got to make at least two attempts and
 5    have the documentation that you have made
 6    those attempts to fulfill the requirements
 7    and the intent of the law for parent and
 8    student participation.
 9         And, by the way, I teach we should try
10    three times, because parents are vital in the
11    design of the IEP because of the transfer of
12    the support they receive at school into their
13    home and into their community.
14         Q    Now, that notice, at least for the
15    IEP meeting, would not be sent to the parents
16    until the school had already determined that
17    this was a child with some type special
18    needs?  Correct?
19         A    The student would have to be deemed
20    eligible --
21         Q    Right.
22         A    -- for special ed support, based on
23    the state department of education eligibility
24    criteria.
25         Q    So, you've got a child who has
```

76

 1    already been officially determined to be

 2    eligible on account of these apparent special

 3    needs before the IEP meeting notice is ever

 4    sent out?  Correct?

 5         A    (No response.)

 6         Q    You wouldn't invite a parent to an

 7    IEP for a student, for example, who had not

 8    already been tested and found eligible?

 9         A    No.  The law clearly requires that,

10    once you determine eligibility -- the

11    eligibility is not without parents.  So, the

12    parents would be there.  And once a kid is

13    recommended for evaluation, they're perceived

14    as being a kid with disabilities, until

15    proven otherwise.

16         So, therefore, once the eligibility

17    team, which would include the parents -- they

18    would determine if this child is eligible,

19    based on the state department of education

20    criteria from a functional perspective.

21    Usually, the eligibility team will turn into

22    the IEP team.  But, legally, they have 30

23    days from the eligibility determination to

24    write an IEP.

25         Q    Depending on the severity of the

1    student's disabilities, would you agree with

2    me that, under some circumstances and in some

3    cases, simply sending the IEP meeting notice

4    or invitation by the student to the parent

5    would be inappropriate?

6        A    It depends on the processes and

7    procedures of the local school system.

8        Q    Would I be correct in understanding

9    that the school system should at least employ

10   a method that's reasonably calculated to

11   achieve actual notice to the parent that the

12   IEP meeting is being planned?

13       A    The state department of education

14   would require local school systems to have

15   processes and procedures in place to make

16   that happen.

17       Q    Do you know what the customary

18   procedure is in Alabama for giving notice to

19   the parents?

20       A    Yes.

21       Q    What is it, please?

22       A    The customary procedure is to

23   provide the form with the child.  The child,

24   historically, will bring the form home.

25   Perhaps someone at the school will contact

```
 1      the parent of that child, indicating that,

 2      "Hey, your kid is bringing home a form.  Look

 3      in his backpack."  That's commonly done.  If

 4      parents would say, "Well, we don't get that

 5      information," some school districts have

 6      decided that they will send the documents

 7      through certified mail to ensure that there

 8      is an artifact that it's been received.

 9           Q     Do you know what the procedure was

10      in place at Houston County High School in the

11      fall of 2004 for transmitting --

12           A     I have no knowledge of that.

13           Q     But you do agree that, aside from

14      it being legally required, that parental

15      participation is a desirable thing in

16      formulating an IEP?

17                 MS. REESE:  I'm going to object to

18                     the extent I believe he

19                     testified, if you can't get

20                     them to come the third time,

21                     they don't have to be there.

22           Q     Well, in addition to requiring

23      reasonable efforts to obtain parental

24      involvement, do you agree that parental

25      involvement ordinarily is a desirable thing?
```

1      A    Yes.

2      Q    Assuming the parent's not a

3   crackpot or something that's going to disrupt

4   the meeting?

5      A    Yes.

6      Q    Do you have an opinion as to the

7   customary level of parental participation in

8   IEP meetings, in terms of some percentage, in

9   actual practice?

10          MS. REESE:  Object to form.  I

11               don't think I understand the

12               question.  Could you rephrase

13               that?

14     Q    To your understanding, in your

15   experience and professional background, do

16   you have any basis for providing us with a

17   percentage of IEP meetings in which you would

18   expect to see some degree of parental

19   participation where the parents are present,

20   one or both is present?

21     A    Based on my training and practical

22   experience, I've never read any literature

23   that would answer that question.

24     Q    If you reviewed twenty-two IEP's

25   for students assigned to Mrs. Miller in the

```
 1    fall of 2004, and found that, in only seven
 2    of them, parents had actually participated in
 3    meetings, would that concern you about the
 4    level of parental involvement at the school?
 5        A    That would be representative of my
 6    professional experiences.
 7        Q    Oh, really?  There are only about a
 8    third that actually have parental
 9    involvement?
10        A    Actually, that would be higher than
11    my personal experience as a special ed
12    teacher.
13        Q    Okay.  That's what I was asking you
14    about while ago.  What is your experience,
15    then, in -- while ago, you couldn't give me a
16    percentage or figure.  But you're saying a
17    third, now, would be higher than your
18    expectation?
19        A    Uh-huh.
20        Q    What would your expectation be?
21            MS. REESE:  In this area or -- I
22                mean, I don't --
23            MR. FAULK:  Well, parental
24                involvement.
25            MS. REESE:  I think different areas
```

81

```
 1                are going to have different

 2                levels of parental

 3                participation.

 4      Q    Well, you've given an opinion now

 5   that a third would be high.

 6      A    Uh-huh.  From my experiences.

 7           MR. FAULK:  And I'm asking about

 8                the experiences he's basing

 9                that on.

10      Q    What percentage would you expect to

11   see?

12      A    Ideally, you would want 100

13   percent.

14      Q    But you're saying that a third is

15   high, in your experience, from actual

16   experience?

17      A    Yes.

18      Q    Based on that actual experience,

19   tell me, in your best judgment, and

20   approximately -- I realize this isn't

21   something you've calculated mathematically.

22   But, if you're expressing the view that a

23   third is high, what do you consider to be

24   customary, based on those same experiences?

25           MS. REESE:  I'm going to object
```

82

```
 1                     just to the extent -- are you
 2                     talking about in Dothan?  Are
 3                     you talking about with a
 4                     certain school system?  I don't
 5                     know how you're limiting it.
 6          Q    Let me ask you a couple of
 7     questions.  What experience are you talking
 8     about when you say "my experience"?
 9          A    As a public school teacher.
10          Q    Okay.  Well, based on that same
11     experience, what have you found to be the
12     norm in terms of the degree of parental
13     involvement in IEP meetings?
14          A    As a teacher in south Florida, as a
15     teacher in northern Florida, my experience
16     was less than 10 percent of the parents made
17     the choice to come to the IEP meeting, for
18     whatever reason.  I wasn't privileged to that
19     reason.
20          Q    Did you have any involvement in
21     those other school systems in the actual
22     transmission of the notice to the parents?
23          A    Yes.
24          Q    And what method did y'all use in
25     those school systems?
```

83

```
 1       A     The method that I described
 2   previously.
 3       Q     Sent it home by the child, and if
 4   you suspected there might be a problem in
 5   transmission, pick up the phone and call the
 6   parent?
 7       A     Uh-huh.
 8       Q     Is there some treatise you could
 9   point us to that would explain the degree of
10   specificity that needs to be employed in
11   drafting the IEP with respect to goals and
12   accommodations?
13       A     The document should be written in a
14   way that the members of the IEP team, which
15   would include parents and teachers and so on
16   and so forth, can understand it.  So,
17   therefore, it's a communication tool to make
18   sure that we're providing the support to the
19   children that they need in order to receive
20   an appropriate education.
21       Q     In talking about this, has any
22   other thought come to mind about what Mrs.
23   Miller expressed to you during this 20-minute
24   meeting about concerns she had about the
25   IEP's?
```

84

1      A    No.

2      Q    So, you had your approximately

3    20-minute meeting, and then, you went to the

4    classroom to do the actual observation?   Is

5    that right?

6      A    No.

7      Q    Okay.  I misunderstood, then.

8      A    Well, when I arrived, I went to the

9    classroom for a period of time and did some

10   observation, then it was time for the

11   children to go to lunch.  So, therefore, the

12   children proceeded to go to lunch.  And that

13   was the period of time that Mrs. Miller and I

14   met in her room.  And then, after a given

15   period of time, then we went back to that

16   classroom, and she continued on her

17   instruction.  So, there was a lunch in

18   between.

19     Q    Okay.  And then, your observation

20   process continued?

21     A    Right.

22     Q    Okay.  And then, when did it end?

23   When the class ended?

24     A    Yes.

25     Q    And then, what happened?

1       A    Then we went and debriefed again,

2    based on the observation.  And at that point

3    in time, Mr. Strange also was invited and

4    participated in a discussion.

5       Q    Was he present during any of the

6    observation?

7       A    Not that I recall.  The observation

8    occurred in a regular education classroom, if

9    I recall.

10      Q    And about how long would your

11   debriefing, that included Mr. Strange, have

12   taken?

13      A    Due to Mr. Strange's other

14   requirements, he was only there for perhaps

15   approximately ten minutes.

16      Q    And then, did he excuse himself, or

17   did you thank him and tell him you were

18   through with him or words to that effect?

19      A    I don't recall that.

20      Q    Tell us what was said, to the best

21   of your recollection, during the debriefing

22   with Mr. Strange and Mrs. Miller?

23      A    The first thing that I always do is

24   to ask the cooperating teacher their

25   observations.  And, in recollection, Mr.

```
 1    Strange said that she was doing okay.

 2        Q    Did he have any specific complaints

 3    or concerns about her at that time that were

 4    expressed to you on that occasion?

 5        A    Not that I can recall.

 6        Q    Okay.  Can you recall anything more

 7    specifically about the conversation with Mr.

 8    Strange?

 9        A    No.

10        Q    Would I be correct in thinking that

11    Defendant's Exhibit 7, the actual observation

12    form, would have been completed -- or at

13    least the substantive information on it would

14    have been inserted during the course of the

15    observation itself?

16        A    Yes.

17        Q    Okay.  And then, y'all went over it

18    and signed it shortly after the observation?

19        A    Yes.

20        Q    Okay.  And then, Defendant's

21    Exhibit 8, I'm presuming, would have been

22    prepared some time later by you, in that it's

23    typed.  But it may not have been.  Would you

24    have done that when you got back to your

25    office or what?
```

87

1    A    Yes.

2    Q    Okay.  And you said in it, "Mr.

3    Strange indicated that Mrs. Miller was doing

4    well despite having not completed an

5    observation."  Correct?

6    A    Yes.

7    Q    You say, "We briefly discussed

8    inclusion."  What was discussed about

9    inclusion, if you recall?

10    A    Went back to least restrictive

11    environment.

12    Q    And what about it?

13    A    The direction in which Houston

14    County was going as it relates to inclusion.

15    Q    Was that discussed when Mr. Strange

16    was present?

17    A    I do not recollect that.

18    Q    You comment here, "It was noted

19    that Mr. Strange was hesitant to communicate

20    and make eye contact."  Do you remember

21    saying that --

22    A    Yes.

23    Q    -- in your report?  Tell us the

24    background of that, please, the factual basis

25    for that statement, as you recall it?

88

```
 1        A     Just what it says.

 2        Q     Well, is it fair to say you

 3    wouldn't put something in your report that

 4    you didn't feel like was somehow germane to

 5    the report?

 6        A     Yes.

 7        Q     All right.  Why would that be

 8    germane to this report?

 9        A     That was descriptive data,

10    describing what it was.

11        Q     Okay.  You didn't put down that he

12    had on saddle oxfords and a Polo t-shirt,

13    though, did you?

14        A     No.

15        Q     Okay.  Even if he had had them on.

16    So, why would his hesitancy to communicate

17    and make eye contact -- what was the

18    significance of that to you in the context of

19    this debriefing?

20        A     The significance is the role of the

21    cooperating teacher as it relates to being a

22    mentor to the student of Troy University.

23    Because, ultimately, the mentor is to provide

24    learning opportunities for the Troy

25    University student in which they can
```

1  demonstrate their abilities.

2      Q    And how would his being hesitant to

3  communicate and make eye contact have to do

4  with that?

5      A    That would tell me, as a university

6  supervisor, the energy and the level of time

7  that perhaps I would need to interact with

8  Mr. Strange.

9      Q    Does that tell you you might need

10  more time to interact with him?

11      A    I would need more opportunities to

12  interact with him.

13      Q    And what did you do to create more

14  opportunities to interact with him?

15      A    Nothing.

16      Q    Well, what would have been your

17  expectation?  That someone else would have

18  created the opportunities for you to meet

19  with him?

20      A    No.  The expectation would have

21  been, when the student of Troy University

22  contacted me to set up the next observation,

23  I would indicate to the student to try to

24  create an opportunity where the cooperating

25  teacher would be present in a planning

 1    period, in a period of time when they weren't

 2    responsible for children.  That would

 3    increase the likelihood that I would have

 4    been able to interact with the cooperating

 5    teacher.

 6        Q    Now, you did a subsequent

 7    observation of Mrs. Miller?  Correct?

 8        A    Yes.

 9        Q    Did that additional contact with

10    Mr. Strange occur in connection with that

11    observation?

12        A    Yes.

13        Q    I'll get back to that.  But, in

14    making this comment about him, you weren't

15    trying to convey that you felt he was being

16    less than candid with you somehow?

17        A    What is written is what my

18    observation was.

19        Q    Do you recall where Mr. Strange

20    stood after he, as you say in your report,

21    left the meeting?  Do you recall him

22    remaining in the room?

23        A    I do not recollect where he was or

24    where he went or any of those things.

25        Q    So, then you had a further private

1    discussion, or ostensibly private discussion,

2    with Mrs. Miller, after Mr. Strange had

3    finished his involvement?

4        A    Yes.

5        Q    And tell me about that.  What

6    occurred?

7        A    We talked in relationship to Mrs.

8    Miller's concerns that she had.

9        Q    So, when you say, "There was

10   further discussion addressing specific intern

11   expectations, curriculum and strategies to

12   promote positive change," is that what you're

13   talking about?

14       A    Yes.

15       Q    And by "positive change," do you

16   mean positive change in her or positive

17   change in the program?

18       A    Both.

19       Q    In what respect, in your judgment,

20   based on what you had seen and been told,

21   needed to be done to promote positive change

22   in the program?

23       A    Well, one of the things that Mrs.

24   Miller indicated, that there were some

25   difficulties with the individualized

1    education programs.  So, as a student of Troy

2    University, it's my responsibility to educate

3    her or to reinforce things that she already

4    knew about the appropriate protocol to follow

5    to try to rectify that perceived difficulty.

6          Q    Okay.  And what would that have

7    been?

8          A    That would have been to go back and

9    collect data.  If she told me that the IEP's

10   were not completed or not present or whatever

11   the variables are, I would ask her to go and,

12   first of all, validate what she's saying.  Of

13   all the kids, 20 kids or whatever she was

14   responsible for, how many of the IEP's were

15   actually present, how many were not, those

16   type of things.

17        So, the first step, then, that I would

18   tell her or any other student at Troy

19   University would be to go collect additional

20   data.  And then, based on the data, to use

21   her professional judgment and her training,

22   and be aware of the existing protocol, and to

23   disseminate the information that she

24   uncovered.

25        Q    Existing protocol.  What are you

93

 1   talking about?

 2       A    Well, we're talking two things

 3   again.  We're talking about, as a student, my

 4   job is to prepare them for the future.  She

 5   was already in the future, meaning that she

 6   was already a special ed teacher.

 7       So, my job is to help them to learn the

 8   appropriate protocol and the appropriate

 9   strategy in order to rectify whatever the

10   issues might be.  And the strategy goes back

11   to collecting data, being aware of the

12   existing protocol with any school, making

13   sure, then, that she demonstrates appropriate

14   oral language skills or written language

15   skills, if need be, to communicate and to go

16   up the chain of command.

17       Q    So, that's the existing protocol

18   you're talking about, is her communicating

19   her concerns to the people she worked with

20   and for?  Is that what you mean?

21       A    No.

22       Q    Okay.  Tell me what you mean?

23       A    I mean that.  I mean that.  But I

24   want to make sure that what she's telling me

25   is true.  So, as a professor, then, my job

1   would be to go and collect data.  Go collect

2   data and make sure that what you're telling

3   me is actually the way it is.  That would be

4   any scientific process in any social science.

5   That's what anybody would do.

6      Q    And the reporting to you would have

7   been in her role as a student of Troy

8   University?  Is that fair to say?

9      A    Yes.  She is a student of Troy

10  University.  And that's the only role that I

11  saw her in, as a student.

12     Q    Okay.  Did you have any dealings

13  with Mr. Pitchford on August 26, 2004, in

14  connection with what you had been told by

15  Mrs. Miller?

16     A    Not to my recollection.

17     Q    Okay.  Did you suggest or instruct

18  Mrs. Miller to take her concerns to Mr.

19  Pitchford?

20     A    No.

21     Q    Or to Mr. Strange?

22     A    As I mentioned earlier, collect

23  data.  Shared with her the correct protocol.

24  Whoever the players are is irrelevant.  And

25  to move forward in that regard to promote

95

1    positive change.

2        Q    In your opinion, would it have been

3    reasonable, whether you mentioned his name or

4    not, for Mrs. Miller to infer from your

5    instructions that she should take these

6    concerns to someone like the principal?

7        A    No.  It would be to the cooperating

8    teacher.  That would be the first step.  She

9    would take her data, validate that her

10   perceptions are accurate.  The next step, she

11   would go to the cooperating teacher.  And

12   then, the next step would go on to the chain

13   of command.  So, it's not directly to the

14   principal at any time.

15       Q    Now, following this August 26

16   observation and debriefing and so forth, what

17   was your next personal involvement with Mrs.

18   Miller in her role as intern?

19       A    I had no other formal role until

20   she would contact me, and we would set up the

21   next observation.

22       Q    Okay.  Did you take any notes that

23   have been preserved of this first

24   observation, that are not part of Defendant's

25   Exhibits 7 and 8 that I showed you a moment

96

```
 1    ago?

 2         A    No.

 3         Q    So, when you prepared Defendant's

 4    Exhibit 8, you were doing it just from memory

 5    of the meeting?

 6         A    Yes.

 7         Q    Now, prior to having your

 8    observation on September the 30th -- is it

 9    your recollection that was the next

10    observation?

11         A    Yes, it was.

12         Q    Prior to that, tell me what you

13    actually remember about that observation

14    being arranged.  Not just what would usually

15    happen.  But, what do you remember, as we sit

16    here, about how that observation came to be

17    arranged?

18         A    I do not recollect.

19              (Recess in deposition.)

20         Q    Is it fair to say, Dr. Ruediger,

21    that as we sit here, you are not able to

22    recall the precise manner in which the

23    September observation came to be scheduled?

24         A    Yes.

25         Q    Okay.  Now, on these two occasions
```

1    of the actual observations, was Mrs. Miller

2    engaged in essentially the same type

3    activity, or were these different type

4    activities that she was engaged in?  And I

5    don't mean as between English and math or

6    that type thing.  I mean, was she doing

7    essentially the same task on each occasion?

8        A    Yes.

9        Q    Okay.  On the first one, which is

10   Plaintiff's Exhibit 7 that I showed you a

11   moment ago, I noticed that, in category 3 and

12   4 and certain others, you have "NO" beside

13   them.  Does that indicate that that was just

14   something that you were not in a position to

15   observe?

16       A    I did not observe it.

17       Q    You're not saying she was failing

18   to carry out that particular duty.  It's

19   just, whatever it was --

20       A    I did not observe it.

21       Q    -- there was not an occasion on

22   which you would have observed it?

23       A    That's correct.

24       Q    And then, Defendant's Exhibit 20,

25   is that a copy of your second observation, on

98

```
1    September the 30th?
2         A    Yes.
3         Q    And it would appear, with the
4    exception of part 3-D on evaluation, you did
5    indicate an observation of each of the fields
6    on the form?  Correct?
7         A    Yes.
8         Q    And, in particular, let me ask you
9    about number 6, which reads, "Exhibits a
10   professional demeanor."  What did you give
11   her for that?
12        A    1.
13        Q    Okay.  And what does a 1 indicate
14   in this context?
15        A    Unsatisfactory performance.
16        Q    And tell us, please, in as detailed
17   a manner as possible, what the factual basis
18   was for your giving her a 1 with respect to
19   her professional demeanor?
20        A    Yes.  The factual basis would be
21   behavior, professional behavior, or just
22   behavior in general, exhibited at the Houston
23   County High School.  More specifically, her
24   interactions with the children, her
25   interactions with other professionals, her
```

99

1     interactions with administration, and

2     specific behavior accordingly.

3          Q     Give us the examples you're talking

4     about as they relate to her interaction with

5     students?

6          A     Some of the information that was

7     obtained indicated that some students were

8     having difficulties with her.

9          Q     And where did you obtain that

10    information?

11         A     From members of Houston County High

12    School.

13         Q     Who, in particular?

14         A     Mr. Strange.

15         Q     Anyone else?

16         A     Mr. Pitchford.

17         Q     Okay.  Anyone else?

18         A     Mr. Ezell.

19         Q     Mr.?

20         A     Or Ms.  I don't know which is

21    which.

22         Q     Well, do you recall ever having met

23    someone named Stacey Ezell?

24         A     No.  I do not recall that.

25         Q     You don't even know if it's a man

1    or a woman?

2        A    Huh-uh.

3        Q    Then, how was this information from

4    Ms. Ezell, who happens to be a woman, how was

5    that transmitted to you?

6        A    Through a written document to the

7    university.

8        Q    To your recollection, would that

9    have been a typed document that had two

10   signatures on it, one of which was Stacey

11   Ezell?  Hold on just a minute.  I'm going to

12   show you what's already in evidence as

13   Defendant's Exhibit 18, and ask you if that

14   is the document that you're referring to?

15       A    Yes.

16       Q    Okay.  Had Mr. Strange, other than

17   through the document Defendant's Exhibit 18,

18   specifically conveyed to you any of these

19   concerns that you mentioned prior to your

20   completion of Defendant's Exhibit 20, other

21   than through this written document,

22   Defendant's Exhibit 18?

23       A    No.

24       Q    Okay.  And so, am I correct in

25   understanding that Defendant's Exhibit 18, or

1    a copy of it, somehow came into your

2    possession or came to your attention prior to

3    your performance of the observation indicated

4    in Defendant's Exhibit 20?

5        A    Yes.

6        Q    Okay.  It formed at least part of

7    the basis for your observation?  Correct?

8        A    Yes.

9        Q    How did Defendant's Exhibit 18 come

10   to your attention?

11       A    Administration at Troy University.

12       Q    Put a face on that for me.  Who in

13   the administration?

14       A    Either Dr. Jones or Ms. Parris.

15       Q    Were you given any other or made

16   privy to any other written documents

17   concerning the behavior of Mrs. Miller, prior

18   to your September 30 observation, that would

19   have formed part of the basis for your

20   comments?

21       A    I do not recollect any.

22       Q    Had you discussed this situation

23   with either Ms. Parris or Dr. Jones, or both,

24   prior to undertaking your September 30

25   observation?

```
1       A    Yes.
2       Q    All right.  Where did those
3    conversations or conversation take place?
4       A    At Troy University.
5       Q    Okay.  And who was present?
6       A    To the best of my recollection, it
7    was Dr. Jones and I.
8       Q    And what were you told on that
9    occasion?
10      A    I was told to collect additional
11   data.
12      Q    Okay.  How long did the meeting
13   last?
14      A    I do not recall.
15      Q    But, can I safely assume that she
16   said more to you than simply, go collect
17   additional data?  Is that the essence or
18   substance of what she conveyed to you on that
19   occasion?
20      A    I don't recall.
21      Q    But, as you sit here today, your
22   best recollection was that her instructions
23   to you on that occasion was to collect
24   additional data?
25      A    She shared the information, and she
```

103

```
 1    told me to collect additional data.
 2        Q    Okay.  And did you do that?
 3        A    Yes.
 4        Q    And what did you do toward that
 5    end?  What did you do to carry out those
 6    instructions?
 7        A    I took the time and talked to the
 8    necessary professionals at Houston County
 9    High School.
10        Q    All right.  Now, would that exclude
11    Stacey Ezell, since you didn't know her
12    gender?  Who did you talk to out there?
13        A    Mr. Pitchford, Ms. Towns, Mr.
14    Strange.
15        Q    Did you make any memorandum of
16    those discussions?
17        A    Yes, I did.
18        Q    When was that done in relation to
19    the September 30 observation?
20        A    September 30th.
21        Q    On the same day you went to the
22    school to do the observation?
23        A    Yes.
24        Q    Let me show you Defendant's Exhibit
25    17, which purports to be a letter from R. J.
```

1     Andrews to Pam Parris.  And it's undated, I

2     believe.  Were you shown that letter prior to

3     going out to the school on the 30th of

4     September?

5          A    No.

6          Q    Were you shown any other document

7     that you recall, other than Defendant's

8     Exhibit 18, prior to going out to the school?

9          A    No.

10         Q    For example, were you shown

11    Defendant's Exhibit 16, which I'm going to

12    show you, that's a list entitled "Concerns

13    expressed by Mrs. Nancy Miller," and signed

14    by Virginia Singletary?  Did they show you

15    that?

16         A    No.

17         Q    Did they show you a document also

18    signed by Virginia Singletary and labeled

19    Defendant's Exhibit 15?

20         A    No.

21         Q    So, you're satisfied the only thing

22    you were shown by Dr. Jones was Defendant's

23    Exhibit 18, and, in substance, told to go

24    collect more data?

25         A    As far as I can recollect, yes.

105

```
1        Q    And is that what led to the
2    September 30 observation?
3        A    No.  It was a scheduled
4    observation.
5        Q    Okay.  What records would there be
6    of it being scheduled?
7        A    Would be the policies and
8    procedures of Troy University College of
9    Education timelines to make observations.
10        Q    Okay.  But Mrs. Miller had not
11    contacted you to arrange it, that you can
12    recall?  Correct?
13        A    I do not recollect that
14    information.
15        Q    How do you keep track of your own
16    calendar and activities, or how did you at
17    this time, in September 2004?  Keep a
18    personal --
19        A    I have a personal calendar.
20        Q    -- data management system on the
21    computer, or a calendar?
22        A    I have a personal calendar.
23        Q    Does your calendar still exist that
24    you had in September 2004?
25        A    I do not know.
```

1       Q    But, so far as you know, there's no
2    memorandum of a phone call, no letter, no
3    memo, no e-mail?
4       A    Not to my knowledge.
5       Q    Nothing you can recall, as you sit
6    here, that would confirm that this September
7    observation was actually scheduled for
8    September 30, prior to the meeting with
9    Dr. Jones in which she disclosed to you
10   Defendant's Exhibit 18?
11      A    Not to my knowledge.
12      Q    Now, when you met with these
13   various people -- and I've seen a memo -- do
14   you recall whether you typed the comments
15   that were made to you by Ms. Towns and others
16   into some sort of memo to be filed or
17   something?
18      A    Yes.
19      Q    You don't happen to have a copy of
20   it with you today, do you?
21      A    No.
22      Q    Do you carry a laptop or anything
23   like that to these observations?
24      A    No.
25      Q    Did you make some kind of notes

1    when you talked to these different people out

2    at the high school?

3         A    Yes.

4         Q    And then, typed them up later?

5         A    Yes.

6         Q    And then, disposed of your notes?

7    Would that be your normal practice?

8         A    Yes.

9         Q    Let me show you Defendant's Exhibit

10   14, which is, on the face of it, a typed memo

11   to Mr. Pitchford from Nancy Miller, dated

12   September 24, 2004.  Were you shown that

13   document before you went out for your

14   September 30 observation?

15        A    No.

16             (Off-record discussion held.)

17        Q    Tell us, please, whether

18   Defendant's Exhibit 30 that I'm showing you

19   is the typed memo of your comments that you

20   obtained from Mr. Pitchford, Mr. Strange and

21   Ms. Towns on the occasion we've been talking

22   about?

23        A    Yes.

24        Q    Okay.  Take a look, in particular,

25   at the comments you attribute to Ms. Towns.

108

```
1     And you have several of those in quotes?

2     Correct?  In quotation marks?

3         A    I have four of them in quotation

4     marks.

5         Q    And are those things Ms. Towns

6     actually said to you on that occasion?

7         A    Yes.

8         Q    And read those for the record,

9     please?

10        A    "Enjoy her coming into my class.

11    She is willing to work.  Positive

12    relationships with kids.  Appears nervous at

13    times."

14        Q    Okay.  And then, the things that

15    you seem to attribute to her, but that are

16    not in quotation marks, would those be the

17    substance or essence of other remarks she

18    made to you on that occasion?

19        A    Yes.

20        Q    Okay.  And read those to us,

21    please?

22        A    "Collaborates well with other

23    teachers.  Comes across as overbearing.

24    Clash of personalities."

25        Q    Do you recall what -- on that last
```

1     thing, did she give you any particular basis

2     for that?  Any factual examples?

3          A     Not that I recall.

4          Q     But, nevertheless, said she

5     collaborates well?

6          A     Yes.

7          Q     And that's referring to

8     interactions between Mrs. Miller and other

9     teachers?  Correct?

10         A     Yes.

11         Q     Do you recall there being any

12    thought of that being an inconsistent

13    comment, that she collaborates well, but

14    nevertheless comes across as overbearing and

15    has a clash of personalities with other

16    teachers?

17         A     I do not recall the context.

18         Q     Okay.  In order for a person such

19    as Mrs. Miller to collaborate well with

20    general education teachers -- and that's what

21    it's talking about, isn't it?

22         A     I'm not sure.  It could be with the

23    children.

24         Q     Okay.  Doesn't Troy University have

25    a program that's actually entitled -- or a

1    major that's actually entitled something like

2    collaborative education?

3         A    That is special education.

4         Q    And that's referring to the

5    collaboration between the special ed teacher

6    and the general education teachers, isn't it?

7         A    No, it's not.

8         Q    What is it referring to?

9         A    The collaborative degree is a

10   typology or a category that the State of

11   Alabama has adopted, and it represents the

12   formal training of special educators.

13        Q    Well, those are some mighty big

14   words.  If you're being trained in a

15   collaborative activity, who are you supposed

16   to be collaborating with?  Or am I mistaken

17   as to what the word "collaborative" refers

18   to?

19        A    You're mistaken.

20        Q    Okay.  So, collaborative, in that

21   sense, has nothing to do with collaborating

22   with other people, question mark?

23        A    That's implied.

24        Q    Okay.  I have heard references in

25   this case from people involved here and there

1    as being collaborative teachers.  In this

2    context, what would that refer to?

3        A    Would you like me to clarify it?

4        Q    Please.

5        A    Within the field of special

6    education, there is a national shortage of

7    teachers.  Historically, there has been two

8    different approaches.  One is a categorical

9    approach, and the other is a generalist, or a

10   collaborative approach.

11       A categorical approach would mean that

12   you receive training to work with specific

13   populations of children, such as children

14   that are learning disabled or children who

15   are emotionally disturbed.

16       And a collaborative certification, which

17   the State of Alabama has adopted, along with

18   many other states in the country, is simply

19   to -- it's more of a generalist perspective.

20       So, in other words, students who are at

21   Troy University will receive the formal

22   education to teach any type of child with a

23   disability, where, in other states, such as

24   Georgia and Florida, for that matter, are

25   still using the categorical approach.  So, in

1     other words, if you went to the University of

2     West Florida, in comparison, they would still

3     perhaps have a categorical approach, where it

4     would say specific learning disability,

5     emotional disturbance.  In Georgia, they call

6     it emotional behavior disorders.

7         So, what's really happened is the

8     certification, which is not a Troy issue --

9     it's a state issue -- has looked at the

10    principles of supply and demand.  So,

11    therefore, Alabama has made the choice, at

12    the state level, to go for a collaborative

13    education credential.

14        Q     When you wrote down the words, and

15    typed them, "collaborates well," what did you

16    mean by that?

17        A     Interacting with children and

18    interacting with adults.  These are the words

19    of Ms. Towns.  I was the scribe or the

20    recorder.

21        Q     And is it your understanding that

22    Ms. Towns is some sort of general education

23    teacher?  A math teacher, I think?

24        A     She's a regular education teacher.

25        Q     Do you have any basis for believing

113

1    that she would have used the term

2    "collaborates" in some specialized sense

3    having to do with special education?

4          MS. REESE:  Object to the form.  Go

5              ahead and answer.

6      A    I have no idea.

7      Q    When you went out to the school to

8    gather more data, as instructed by Dr. Jones,

9    did you make any effort to gather the good

10   data about Mrs. Miller --

11         MR. WALDING:  Object to the form.

12     Q    -- or favorable information about

13   her?

14         MR. WALDING:  Object to the form.

15     A    I was collecting data.

16     Q    Okay.  Did you select the people

17   that you were to talk to out there?

18     A    I do not recall.

19     Q    Tell me what you do recall.  You

20   went out to the school?

21     A    Right.

22     Q    And then, what happened?

23     A    I was instructed by Dr. Jones to

24   collect additional data.  And at the same

25   time, I was going to observe our Troy

114

1    University student there.  And that was my

2    responsibility as a faculty member, to

3    collect the data and also to evaluate her

4    performance that day.

5         Q    You meet with Dr. Jones.  She shows

6    you a copy of Defendant's Exhibit 18, the

7    document signed by Ms. Ezell and Mr. Strange,

8    and instructs you to go collect more data?

9         A    To the best of my recollection.

10        Q    All right.  And you don't recall --

11   well, Mr. Pitchford, I assume, would be an

12   obvious candidate to talk to, since he was

13   the principal, and Mr. Strange because he was

14   the cooperating teacher.  But you don't

15   recall, as you sit here, how Ms. Towns came

16   to be interviewed by you?

17        A    Yes.

18        Q    All right.  Tell us what you do

19   recall about that?

20        A    Ms. Towns was the individual in

21   which, the first observation, that was her

22   classroom.  And that was part of the

23   inclusion, as we talked about already, about

24   least restrictive environment.  So, she had

25   the opportunity to interact with the Troy

1    student.

2        Q    So, you selected Ms. Towns, and

3    that was how you selected her?

4        A    As I mentioned, I don't recall how

5    that was disseminated to me.

6        Q    So, you don't recall whether you

7    asked to see Ms. Towns or whether Mr.

8    Pitchford or someone said, "We would like for

9    you to speak to Ms. Towns"?

10       A    I don't recall that.

11       Q    And it's fine.  If you don't, you

12   don't.

13       A    I don't.

14       Q    Okay.  So, you have these several

15   meetings, and then, you go in and do your

16   observation -- correct? -- on the 30th?

17       A    Yes.

18       Q    And was that, like, for one class

19   period?

20       A    Yes.

21       Q    Let me show you Defendant's Exhibit

22   20 again.  And on the last category on the

23   form -- I can't read the number -- it looks

24   like 9 -- says "Demonstrates reliability."

25   And you gave her a 1 on that?  Correct?

1        A    Yes.

2        Q    And what was your factual basis --

3    what did you observe that led you to give her

4    a 1 on that?

5        A    That was captured in the data that

6    was collected on that date.

7        Q    Well, was it collected there in the

8    classroom or collected somewhere else?

9        A    Somewhere else.

10       Q    And where was that?

11       A    Comments made by the school

12    administrator.

13       Q    Okay.  Let me ask you this,

14    Dr. Ruediger:  Why would it be that you

15    would, on a form that gives you an

16    opportunity to enter "Not observed" if

17    something was, in fact, not observed, give a

18    score on things you did not observe?

19       A    It goes back to the mission

20    statement of the college of education, which

21    is informed, reflective decision maker.  So,

22    the idea --

23       Q    That would be you?

24       A    No.  No.  That would be what we're

25    trying to help all Troy students become.  And

117

1      there are specific requirements in each

2      course and internship that would lead to

3      that, with ultimately Troy University

4      recommending a student to the State of

5      Alabama for certification.

6          Q      Finished?

7          A      Yes.

8          Q      Okay.  Was there anything that you

9      personally observed in the classroom with

10     Nancy Miller on September 30th that formed

11     the factual basis for the two 1's you gave

12     her in categories 6 and 9 on this observation

13     form?

14         A      No.

15         Q      Okay.  With regard to the other

16     areas -- and I'm not going to take you

17     through them one by one -- in which you gave

18     her 2's on several, for example, which

19     indicates something -- what does it say?

20     Minimally acceptable or something?

21         A      Minimally acceptable performance.

22         Q      Okay.  Were those, to any extent,

23     those 2's, based on information gathered by

24     you outside the classroom observation?

25         A      No.

1        Q      All those 2's are based exclusively

2    on what you observed in the classroom?

3        A      Yes.

4        Q      Okay.  I may need to take you

5    through them.  What's the difference,

6    Dr. Ruediger, if any, between student

7    teaching and an internship with Troy?

8        A      There's no difference.

9        Q      In cases of internships where there

10   might not be a specific agreement document,

11   as such, like we have in this case, would

12   there nevertheless usually be some

13   correspondence flowing back and forth between

14   the university and the local system that, in

15   effect, sets the terms of the internship?

16       A      Yes.

17       Q      Did Ms. Parris have any role in the

18   actual supervision of Mrs. Miller as an

19   intern, and, if so, how would her role be

20   distinguished from yours?

21       A      She is the administrator of the

22   teacher education program.  I'm the observer

23   of the student.

24       Q      And your title was supervisor?

25   Right?

119

```
 1      A    Internship supervisor.  Yes.
 2      Q    Would she have had any supervision
 3  role, as such, in an ordinary internship?
 4      A    Not to my knowledge.
 5      Q    Okay.  The report I referred to
 6  earlier in connection with the CEC, that I
 7  didn't give you the exact title of, is the
 8  program report for the preparation of special
 9  education professionals.  Are you familiar
10  with something under that name?
11      A    Yes.
12      Q    Is that a report, to your
13  knowledge, that was being filed by Troy
14  during the period we're talking about?
15      A    I have no knowledge of that.
16      Q    And who would know that, if that
17  was the case, in your opinion?
18      A    The dean of the college of
19  education.
20      Q    All right.  Were you a party to the
21  TEP meeting that occurred in mid June 2004,
22  preparatory to Mrs. Miller's internship?
23      A    Yes.
24      Q    Do you recall any reservations
25  being expressed by Dr. Morin at that meeting
```

```
 1    as to Mrs. Miller's suitability as an intern?

 2        A    Yes.

 3        Q    Do you have any basis for personal

 4    opinion, at least before the fact, as to

 5    whether those concerns were well founded?

 6        A    I have no basis for that.

 7        Q    Okay.  What about after the fact?

 8    Did you encounter anything that would

 9    specifically indicate to you that Dr. Morin's

10    June concerns were well founded?

11        A    No.

12        Q    Were you a party to the November

13    30, 2004 TEP meeting preparatory to Mrs.

14    Miller's second internship at Beverlye Middle

15    School?

16        A    I believe so.

17        Q    Following your September 30

18    observation, was there a debriefing held at

19    the high school?

20        A    No.

21        Q    Why not?

22        A    Due to the information that was

23    captured prior to the date that you

24    indicated, a decision was made at the

25    university to have the debriefing at the
```

121

```
 1   university.

 2       Q    When was that decision made?

 3   Before or after the observation?

 4       A    Before.

 5       Q    Have you had things, that is,

 6   debriefings, worked out and carried out in

 7   the same way on other occasions?

 8       A    Yes.

 9       Q    For what interns?  Tell me their

10   names?

11       A    A. I.

12       Q    Okay?

13       A    P. E.  And I can't recall one

14   other.

15       Q    So, you recall a total of four,

16   counting Mrs. Miller?

17       A    To the best of my knowledge, yes.

18       Q    Tell me the general circumstances,

19   with respect to Ms. I., as to why --

20            MS. REESE:  I'm going to object.

21                 Would this not be protected, at

22                 least?

23            MR. FAULK:  We've got a protective

24                 order in place.

25            MS. REESE:  I just want to make
```

```
 1              sure this is protected on the
 2              record.
 3    MS. HORTBERG:  I don't know that
 4              the protective order covers
 5              students at Troy University.
 6    MS. REESE:  Yeah.  Actually,
 7              doesn't it just cover the
 8              students at the high school?
 9    MS. HORTBERG:  Correct.  That's my
10              understanding.
11    MS. REESE:  I mean, you're asking
12              him to give confidential
13              information on other Troy
14              students right now.
15    MR. FAULK:  Well, we would agree
16              that any information -- and we
17              operated under this same
18              assumption in Mrs. Miller's
19              first deposition.  I mean, we
20              can agree to agree that they
21              will be identified by initials
22              in this deposition.
23    MS. REESE:  So, we'll agree to
24              agree that these Troy
25              students --
```

123

```
 1              MR. FAULK:  And then, we will agree
 2                    on a new protective order.
 3                    We're not going to go embarrass
 4                    these students.
 5              MS. REESE:  All right.  Well, let's
 6                    just use initials, then.
 7         Q    (By Mr. Faulk)  With respect to
 8    Ms. I., tell us, in a very general way, what
 9    the circumstances were that led to the
10    decision to debrief her at Troy rather than
11    on site?
12         A    She was having difficulties
13    pedagogically, in other words, her
14    instruction.  So, the idea is that we wanted
15    to remediate within a Troy University
16    classroom.
17         So, in other words, I stood up, and I
18    showed her how to do certain things that
19    would not be conducive in a public school,
20    simply due to the fact of the time
21    restraints.  And, you know, I can't move
22    chairs, you know, that type of thing.  As I
23    mentioned earlier, I'm a guest.
24         Q    What about the second lady, Ms. E.?
25         A    Very much the same.  The same,
```

124

```
 1    meaning instructional strategies, the same,

 2    talking about collaboration, working with

 3    other people, you know, those type of things.

 4        Q    What about the third person, whose

 5    name you can't remember?

 6        A    Talking specifically about her

 7    ability to manage the classroom and to be

 8    able to demonstrate strategies, once again,

 9    but also to make sure she understood what the

10    expectations were as a Troy University

11    student.

12        Q    What was the ultimate outcome of

13    Ms. I.'s internship?

14        A    To my knowledge, currently, she did

15    not successfully complete her internship.

16        Q    What about Ms. E.?

17        A    Ms. E. had another opportunity to

18    continue her internship, and she successfully

19    completed her internship.

20        Q    So, did she have another

21    opportunity for that internship, or was she

22    set up with a second internship, like Mrs.

23    Miller?

24        A    A second internship.

25        Q    And what about the third person,
```

1    whose name you don't recall?

2        A    The third person realized that she

3    did not have the ability to be a teacher, and

4    she chose to not continue, despite her desire

5    to work with the kids.

6        Q    So, the first one tried, and it

7    just didn't work out?

8        A    Yes.

9        Q    The second one, the immediate

10    internship was withdrawn or somehow

11    terminated, and she was given a second

12    internship?  E.?

13        A    Yes.

14        Q    The third simply just gave up and

15    said, "I'm not suited for this.  I quit."

16        A    She chose to stop.

17        Q    And then, we know about Mrs.

18    Miller.

19        A    Yes.

20        Q    She was given a second one.  So, in

21    each of the four cases where, for whatever

22    reason, the debriefing occurred at Troy

23    rather than at the local school, in all four

24    cases, the immediate internship turned out to

25    be unsuccessful?  Fair?

1        A    (No response.)

2        Q    Let me try it again.  In none of

3    those four cases did the candidate complete

4    that internship?  Correct?

5        A    That's correct.

6        Q    Okay.  Either didn't complete it or

7    didn't successfully complete it?

8        A    That's correct.

9        Q    What about Mrs. Miller's immediate

10   situation on September 30 necessitated the

11   debriefing being at Troy?  For example, did

12   you need to move chairs around for Mrs.

13   Miller, for her debriefing?

14       A    No.  It was the issue of being a

15   guest.

16       Q    Let me move along just a little

17   bit.  How did Dr. Lumpkin come to be invited

18   to that debriefing?

19       A    She was asked to be a part of it in

20   order to provide insight.  Prior to that

21   time, she was the dean of the college of

22   education.  She also was available and

23   willing to provide Mrs. Miller additional

24   support from her years of wisdom.  And

25   obviously, also, to document the discussions

127

1    that occurred.

2        Q    As a witness?

3        A    Yes.

4        Q    You don't turn a dean into a

5    secretary?  Right?  She was there to see what

6    happened and be able to testify to what

7    happened, wasn't she?

8        A    No.  She chose to go back to

9    faculty.  And, at that point, she was

10   faculty.  And as a faculty member, that is a

11   responsibility that you have.

12       Q    Okay.  On this debriefing, you have

13   Dr. Lumpkin involved?  Yes?

14       A    Yes.

15       Q    You don't have Strange involved.

16   And on the first one, you do not have

17   Dr. Lumpkin involved.  So, what distinguishes

18   the two situations?

19       A    Yes.  Two clear distinctions is a

20   student versus an employee.  She is a Troy

21   University student.  Dr. Lumpkin is faculty,

22   and, obviously, I am, also.  Mr. Strange is

23   an employee of Houston County.  He is not a

24   part of the Troy University system.

25       Q    But you involved him in your first

128

1    observation debriefing?  Correct?

2        A    Yes.

3        Q    And that was appropriate?  Correct?

4        A    Yes.

5        Q    So, is there any other distinction

6    you care to draw between these two occasions,

7    as to why you would involve Dr. Lumpkin, who

8    had no direct involvement in this internship

9    -- correct?

10       A    Correct.

11       Q    -- and not involve Mr. Strange in

12   the debriefing?  Is there any other

13   explanation you can give us besides what

14   you've already said?

15       A    I've already collected data from

16   Mr. Strange that day.

17       Q    Did Strange sit in on the

18   observation that you conducted on that day?

19       A    Not that I can recall.

20       Q    Okay.  And he didn't sit in on the

21   first one, either?

22       A    No.

23       Q    In any of your dealings with

24   Houston County Board of Education employees

25   leading up to the Lumpkin debriefing, did any

129

1    of those people talk to you at all about

2    concerns expressed by Mrs. Miller about these

3    inappropriate IEP's and that sort of thing?

4        A    Not to my knowledge.

5        Q    It was all more focused on her

6    interactions with other teachers and such as

7    that?

8        A    Yes.

9        Q    Okay.  As you sit here today,

10   Dr. Ruediger, do you feel like you had full

11   information going into your September 30

12   observation of Mrs. Miller?

13           MS. REESE:  Object to the form.

14               What do you mean by "full

15               information"?

16       Q    Do you feel like you had been told

17   everything you actually needed to know about

18   the circumstances leading up to that mission

19   to collect more data?

20       A    I was provided the data that I was

21   provided.  It wasn't for me to make a

22   judgment.

23       Q    Which didn't happen to include the

24   concerns she had expressed to Mr. Andrews,

25   that Ms. Singletary wrote out on that

1    document?  Correct?

2        A    That's correct.  But, once again,

3    she was an employee.  And my role was to view

4    her as a student.

5        Q    Did you have any other direct

6    dealings with either Mr. Pitchford, Mr.

7    Strange or Mr. Andrews, that you've not

8    testified to here today, concerning Mrs.

9    Miller?

10       A    Not to my knowledge.

11       Q    Did you have any direct dealings

12   concerning Mrs. Miller, that you haven't

13   already testified to today, with any other

14   employee of the Houston County Board of

15   Education?

16       A    Not to my knowledge.

17       Q    Would you agree with me that Mrs.

18   Miller would have had no business signing off

19   on any IEP-related documents concerning

20   meetings that she had not attended?

21            MS. REESE:  Object to the form to

22                IEP-related documents.  I don't

23                know how you define that.

24            MR. FAULK:  Well, on IEP's, as

25                such.

```
1       Q    Would she have had any reason, in

2   your opinion, to have been signing off on

3   IEP's if she had not attended the IEP

4   meeting?

5       A    She was trained and educated to

6   follow the special ed laws within the laws

7   that indicate that you do not sign any

8   documents that you did not participate in or

9   agree with, for that matter.

10      Q    Would that also be true of

11  eligibility documents?

12      A    Yes.

13              (Recess for lunch.)

14      Q    Dr. Ruediger, have you been shown a

15  report by James D. Sears concerning this

16  case?

17      A    No.

18      Q    (Handing document to the witness.)

19      A    (Witness reviewing document.)   No.

20      Q    You haven't seen that.  And I take

21  it you haven't seen a synopsis of it, either?

22      A    No.

23      Q    Dr. Ruediger, do you know a person

24  named Mary Brazzelle?

25      A    Yes.
```

132

1    Q    And who is she, please?

2    A    She is a former teacher, I believe,

3    in Houston County.

4    Q    Do you know what her connection

5    with Troy is, if any?

6    A    She has been an adjunct professor

7    or adjunct instructor.

8    Q    Do you recall an incident some time

9    during the internship of Nancy Miller, in the

10    fall of 2004, in which it was suggested that

11    this Ms. Brazzelle would take your place as

12    the intern supervisor for Mrs. Miller?

13    A    No.

14    Q    That was never brought to your

15    attention?

16    A    No.

17    Q    Were you ever told that someone

18    else was going to be substituted for you?

19    A    No.

20    Q    Did you ever request that someone

21    else be substituted for you?

22    A    No.

23    Q    Now, following the September 30

24    observation and the subsequent debriefing at

25    Troy that we discussed before lunch, what was

1    your next contact with Nancy Miller that you

2    recall?

3         A    A meeting at the university.   No

4    idea when it was.

5         Q    Would mid October sound about right

6    to you?

7         A    Yes.

8         Q    Maybe a couple of weeks after the

9    debriefing?

10        A    Perhaps.

11        Q    All right.  Had you been privy, in

12   the interim, between the two meetings,

13   between the debriefing and the meeting you

14   just referred to, to any discussions

15   concerning the Miller internship?

16        A    Not that I recall.

17        Q    So, Dr. Jones, for example, didn't

18   call you in and say, okay, let's see your

19   data that you've collected, or words to that

20   effect?

21        A    Not that I recall.

22        Q    Did you make any written report

23   other than the observation form itself and

24   notes concerning the meeting with Dr. Lumpkin

25   and Mrs. Miller?

134

```
 1        A     No.
 2        Q     When you filled out that form for
 3   the September 30 meeting, and you did your
 4   notes concerning the debriefing with
 5   Dr. Lumpkin, what would have become of those
 6   documents?  Would you have given them to
 7   someone else or retained them in your own
 8   file or what?
 9        A     I would have a copy of them, and my
10   responsibility would be to provide them to
11   the teacher education program office.
12        Q     And who there would have access to
13   them?
14        A     Ms. Parris.
15        Q     Okay.  So, you don't know when, if
16   ever, Dr. Jones would have seen those
17   documents?
18        A     I have no knowledge of that.
19        Q     Do you have any knowledge, just
20   based on the ordinary course of business --
21        A     No.
22        Q     -- as to what should have happened?
23        A     No.
24        Q     So, tell me about the meeting with
25   Mrs. Miller that occurred at the university
```

135

1    subsequent to the Lumpkin debriefing.  Who

2    was present at this next meeting that you

3    had?

4         A    Ms. Parris, Mrs. Miller, Mrs.

5    Miller's husband.  And I believe that was it.

6         Q    And you?

7         A    And myself.  Yes.

8         Q    Okay.  And about how long did this

9    meeting last?

10        A    Maybe an hour, at the most.

11        Q    Okay.  What preparation, if any,

12   did you go through for the meeting?

13        A    I don't recollect.

14        Q    You don't recall whether Ms. Parris

15   called you in and discussed it with you in a

16   planning session or anything prior to the

17   meeting?

18        A    I don't recall that.

19        Q    Do you recall anyone telling you

20   the purpose of the meeting?

21        A    I don't recollect that, either.

22        Q    Do you recall how the meeting came

23   to your attention, so you would know to be

24   there?

25        A    No.

1       Q       Tell us, as nearly as you can

2    recall, please, who said what during this

3    meeting?

4       A       Ms. Parris led the meeting.  This

5    was a meeting, I believe, to provide Mrs.

6    Miller a variety of different choices, with

7    ultimately her making the choice to continue

8    or to do whatever she chose to do.

9       Q       What were the choices presented to

10   her that you actually recall?

11      A       I don't recall the choices.

12      Q       Did anyone take notes, to your

13   recollection?

14      A       Not to my recollection.

15      Q       Okay.  Do you recall anything said

16   by Mrs. Miller's husband at the meeting?

17      A       No.

18      Q       Or questions asked by him?

19      A       No.

20      Q       Do you recall anything said by Mrs.

21   Miller, specifically?

22      A       No.

23      Q       Or by Pam Parris, other than, we're

24   here to discuss options, or words to that

25   effect?

137

1        A        I don't recall that meeting.

2        Q        You really don't?

3        A        I really don't.  I can see it, but

4    I don't recall what was said.

5        Q        Did you, after the fact, do

6    anything to memorialize what had happened in

7    the meeting?

8        A        No.

9        Q        I think you told me you teach a

10   policy and procedure course?

11       A        Yes.

12       Q        Do you have a course syllabus?  I

13   don't mean in your pocket.  But, does one

14   exist?

15       A        Yes.

16       Q        Would it be essentially comparable

17   to the syllabus that would have existed when

18   Mrs. Miller was a student at Troy?

19       A        (No response.)

20       Q        Well, let me ask you differently.

21   Would you still have a copy of the syllabus

22   from back when she would have taken the

23   course?

24       A        No.

25       Q        Has the course evolved in any

138

```
 1   material way since she was a student at Troy?

 2       A    Yes.

 3       Q    In what way?

 4       A    The reauthorization of the special

 5   ed law.

 6       Q    Does it have a textbook?

 7       A    Yes.

 8       Q    And what textbook do y'all

 9   currently use?

10       A    We just adopted a new one.  I don't

11   recall the author.

12       Q    Pardon me for interrupting you.

13   But, do you recall what book would have been

14   in use at the time she was a student?

15       A    Bateman & Bateman, Developing

16   IEP's, I believe.

17       Q    And would it have been appropriate

18   for that day and time?

19       A    Yes.

20       Q    Would you provide a copy of the

21   syllabus to your attorney, please, in the

22   next few days, and let them decide whether to

23   produce it to me?

24       A    Yes.

25       Q    The current syllabus.  And if you
```

1    can conveniently lay your hands on an old

2    syllabus, we would like to see a copy.  Let

3    me ask you this:  Do you prepare the syllabus

4    yourself?

5         A    I don't recall that.

6         Q    If you did, should a copy of it

7    possibly be on your hard drive?

8         A    Yes.

9         Q    Would you check your hard drive,

10   please, and just see if there happens to

11   still be a copy of the old syllabus that you

12   could give to your attorney for us?

13        A    Sure.

14        Q    Thank you.  Do you have any

15   background or knowledge beyond that of an

16   ordinary citizen about the illegality of

17   contracts for teachers who are not certified?

18        A    I do not have knowledge of that.

19        Q    Okay.  Is it your understanding,

20   though, that in order to teach in public

21   schools, a teacher is supposed to be

22   certified, in the absence of some sort of

23   emergency certificate?

24        A    Yes.

25        Q    Is it also your understanding that

140

1    a teacher is supposed to have at least a

2    baccalaureate degree in order to get an

3    emergency certificate?

4    A   Yes.

5    Q   Do you ever concern yourself in an

6    active manner with the mentoring skills of a

7    teacher such as Mr. Strange, someone in his

8    position?  Do you get involved in telling

9    him, look, you need to do this a little

10   differently or a little better?

11   A   That is not my responsibility.

12   Q   Okay.  Have you ever encountered

13   that, where you had a cooperating teacher or

14   a mentoring teacher who you just felt was not

15   doing a suitable job?

16   A   No.

17   Q   So, you never had occasion to

18   report to a principal, like Mr. Pitchford, I

19   think this guy needs to be traded out for

20   this woman over here?

21   A   That's not my responsibility.

22   Q   Okay.  But it is your

23   responsibility, isn't it, to see that the

24   intern is getting a proper learning

25   experience?  Correct?

141

```
 1        A     Correct.
 2        Q     And that does not include seeing to
 3   it that she has an appropriate mentor?
 4        A     There are standards that Troy has
 5   in order to be a mentor.
 6        Q     And are those set out in the
 7   internship handbook or somewhere else?
 8        A     I'm not 100 percent certain where
 9   they are.
10        Q     Who should know that, in your
11   opinion?
12        A     The dean of the college of
13   education.
14        Q     Okay.  So, Dr. Jones?
15        A     Uh-huh.
16        Q     And you don't, as an internship
17   supervisor, undertake to critique a mentor in
18   any way or grade his or her conduct in any
19   way?
20        A     I evaluate the experience in which
21   the student has.
22        Q     What about with respect to Paul
23   Strange and Mrs. Miller's experience?  Did
24   you undertake any particular evaluation as to
25   that relationship?
```

142

```
1        A    No.
2        Q    Would you ordinarily do that?
3        A    That would be at the end of the
4   semester.
5        Q    Okay.  And since it didn't reach a
6   conclusion, you didn't have occasion to do
7   that?
8        A    Right.  That is correct.
9        Q    On any of these other internships
10  that you mentioned, Ms. I. and Ms. E. and the
11  other person whose name you couldn't
12  remember, do you recall the approximate stage
13  of the internship at which the Troy
14  University debriefing occurred?
15       A    No.
16       Q    Do you recall ever having an
17  internship end as early in its progress as
18  Mrs. Miller's internship?
19       A    Not that I recall.
20       Q    In regard to Ms. E., do you recall
21  what the circumstances were that led to the
22  option of a second internship rather than
23  just calling it quits?  Were there some
24  extenuating circumstances there that would
25  have led Troy to allow her a second
```

143

```
 1   internship?
 2        A    No.
 3        Q    To your recollection, were either
 4   Ms. I. or the nameless intern offered the
 5   option of a second internship?
 6        A    Not to my knowledge.
 7             MR. WALDING:  Object to the form.
 8                  I'm sure the lady is not
 9                  nameless.  He couldn't remember
10                  her name.
11                  (Brief off-record.)
12        Q    Again, one of the things a good
13   lawyer is supposed to tell a witness is, if,
14   during the course of the deposition, you
15   remember something you left out, or realize
16   that you misstated something, to interrupt me
17   and let me know.  And I forgot to tell you
18   that.
19        Is there anything, like, during the
20   lunch hour, that you thought about, and you
21   realized that you misstated something, that
22   you need to correct now?
23        A    No.
24        Q    Is there anything you realize, as
25   we sit here now, that you omitted to say,
```

144

```
1    that you feel like needs to be said to

2    amplify or completely answer any of my

3    questions that you testified to earlier?

4         A    Yes.

5         Q    Okay.  Tell me about that?

6         A    The leaving of the school building.

7    When Mrs. Miller chose to leave the school

8    building was the catalyst to a lot of the

9    discussions and the struggles.  Because it's

10   wrong to leave kids unattended, regardless of

11   whatever the situation is.

12        Q    Okay.  Is that it?

13        A    Yes.

14        Q    Okay.  In regard to that, who

15   informed you that children were actually

16   unattended?

17        A    That is a given.  When a teacher is

18   responsible and plays the role of a teacher,

19   they are in charge of a group of children.

20   So, if they're not there, their teacher is

21   not there, therefore, they're unattended.

22        Q    So, no one told you the children

23   were not in anyone's care?

24        A    No.

25        Q    That's just a presumption you're
```

145

```
 1    making from the fact she's an assigned

 2    teacher, and she absented herself from

 3    school?

 4         A    Yes.

 5         Q    Okay.  Anything else?

 6         A    No, sir.

 7         Q    Were you told anything by anyone

 8    about why Mrs. Miller left the school?

 9         A    No.

10         Q    Okay.  Y'all had the meeting.  A

11    decision was made in mid October or

12    thereabouts that the internship would be

13    withdrawn.  Did you have any involvement in

14    this matter after that?

15         A    No.

16         Q    Do you recall ever stating to Mrs.

17    Miller, in substance, that if she was correct

18    about the facts concerning the IEP's, that

19    she would be right to be concerned about

20    them, or words to that effect?

21         A    Can you rephrase the question,

22    please?

23         Q    Right.  In other words, I realize

24    -- or I take it you've never actually seen

25    any of these IEP's?  Correct?
```

146

1      A    Correct.

2      Q    And, therefore, you don't have a

3    personal basis to form an opinion as to

4    whether they're properly done or not?

5      A    Correct.

6      Q    Okay.  But, at some point in your

7    dealings with Mrs. Miller, when she's telling

8    you these are missing, these are incomplete,

9    these are stale or whatever or somehow

10    inappropriate, do you recall stating to her,

11    in substance, that if her concerns had a

12    factual basis, in other words, if she was

13    right about her facts, that she would be

14    right to be concerned about the state of

15    affairs at Houston County High School, or

16    words to that effect?

17      A    Yes.

18      Q    And that would have occurred at the

19    first debriefing?

20      A    Yes.

21      Q    Okay.  Do you have any

22    recollection, personal recollection, of what

23    occurred at the second TEP meeting in late

24    November, preparatory to the Beverlye

25    internship?

```
 1        A    Yes.
 2        Q    Tell us about that, please?
 3        A    A group of people met, faculty.
 4   Mrs. Miller was there.  We discussed the
 5   expectations.  We discussed strategies to get
 6   additional help, if you needed help.  That
 7   was it.
 8        Q    Have you supervised any other
 9   interns with Houston County High School?
10        A    No.
11        Q    This is your only experience with
12   that school?
13        A    Yes.
14        Q    Do you know how the decision was
15   made to select Dr. Morin as her next
16   supervisor, rather than you?
17        A    No.
18        Q    You didn't ask not to be selected?
19        A    No, I did not.
20        Q    Do you know who made that decision?
21        A    The dean of the college of
22   education.
23        Q    Do you know, one way or the other,
24   as to whether Ms. E.'s second internship was
25   afforded her without additional cost for
```

```
 1   tuition?

 2        A    I have no knowledge of that.

 3        Q    Do you recall words being said in

 4   the second TEP meeting, in November, to the

 5   effect that the first internship was a

 6   forgotten thing?

 7        A    Not to my recollection.

 8        Q    Was it your belief that that

 9   experience would somehow be held against her

10   in the second internship?

11        A    No.

12        Q    So, we're talking about a fresh

13   start?

14        A    Yes.

15             MR. FAULK:  Thank you, Doctor.

16             DR. RUEDIGER:  Thank you.

17             MR. WALDING:  I have a few I wanted

18                 to ask.

19

20                 EXAMINATION

21

22   BY MR. WALDING:

23        Q    Dr. Ruediger, I'm Kevin Walding.

24   I'm one of the lawyers that represents the

25   Houston County Board of Education and several
```

149

1      other defendants in this matter.

2          I want to go back to some of this

3      discussion about whether IEP's were

4      appropriate, and I want to make sure that I

5      understand this correctly.  An IEP, in

6      essence, is a document that outlines the

7      educational plan for an individual student?

8      Is that accurate?

9          A    Yes.

10         Q    And the "I" in IEP stands for

11     individualized, does it not?

12         A    Yes.

13         Q    Which means that the plan itself is

14     supposed to be created for that particular

15     student and their own unique needs?  Is that

16     true?

17         A    Yes.

18         Q    And in creating an IEP, the process

19     is that you have the IEP team, which is made

20     up of the special ed teacher, the regular ed

21     teacher, a representative of the local

22     education authority, and the parents,

23     hopefully, come together and discuss the

24     child's needs?  Is that accurate?

25         A    Yes.

150

1    Q    And so, it's basically the IEP team

2    that determines the services that are

3    necessary and appropriate for that child?  Is

4    that true?

5        A    Yes.

6        Q    So, really, whatever IEP team was

7    for Jimmy, say -- I think y'all used the

8    student Jimmy earlier -- that team would

9    determine what was appropriate for Jimmy?

10    Correct?

11       A    Correct.

12       Q    So, it's really sort of

13    inappropriate to kind of second-guess what

14    that team, in their effort, decides is

15    appropriate for Jimmy?

16           MR. FAULK:  Object to the form.

17       Q    Is that true?

18           MR. FAULK:  Object to the form.

19               You can answer to the best of

20               your ability, of course.

21       A    Can you restate the question?

22       Q    Well, it's sort of inappropriate to

23    second-guess, after the fact, based simply on

24    a document, what the IEP team, who has

25    knowledge of the child and experience with

151

```
 1    the child, determines are the appropriate

 2    services for that child?

 3              MR. FAULK:  Same objection.  I'm

 4                   just talking to her, so don't

 5                   worry about what I say.

 6         Q    Do you understand my question?

 7         A    Yes.

 8         Q    You understand my question?

 9         A    Yes.

10         Q    Okay.  And would you answer it, if

11    you can?

12         A    Your statement is correct.

13         Q    Okay.  Good.  That's a sufficient

14    answer for me.  I like that.  It appears to

15    me that you had some conversations with

16    persons associated with the Houston County

17    Board of Education on or about September 30

18    of '04?  Is that right?

19         A    Yes.

20         Q    And you made some notes of those,

21    that were made contemporaneous or nearly so?

22         A    Yes.

23         Q    And is that what we've marked as

24    Defendant's 30?

25         A    Yes.
```

152

1      Q    And you put down the essential

2    information that these individuals shared

3    with you?

4      A    Yes.

5      Q    Did either of these individuals --

6    and you have notes from Tim Pitchford, who is

7    the principal at the high school, Paul

8    Strange, the cooperating teacher, and Lisa

9    Towns.  Did either of those individuals ask

10   you to withdraw Mrs. Miller's internship?

11     A    Not that I recall.

12     Q    Well, would you agree with me that

13   Defendant's 30 doesn't contain any

14   information that they asked you to do that?

15     A    Yes.

16     Q    Do you recall Kenneth Lord ever

17   asking you -- and this is Kenneth Lord over

18   here -- ever asking you to withdraw Mrs.

19   Miller's internship?

20     A    No.

21     Q    Do you recall Riley Joe Andrews

22   ever asking you to withdraw Mrs. Miller's

23   internship?

24     A    No.

25     Q    Do you recall any member of the

153

```
 1     Houston County Board of Education ever asking
 2     you to withdraw Mrs. Miller's internship?
 3          A    No.
 4          Q    There was some discussion earlier
 5     about Mrs. Miller leaving campus on whatever
 6     day it was she left.  I think September 17,
 7     but don't hold me to that date.  During this
 8     meeting that y'all had, this debriefing, the
 9     second debriefing, I believe, did Mrs. Miller
10     ever explain why it was she left campus that
11     day?
12          A    I believe she did, but I don't
13     recall specifically what was said.
14               MR. WALDING:  All right.  I think
15                    that's all I have.  Thank you,
16                    sir.
17
18                    EXAMINATION
19
20     BY MS. HORTBERG:
21          Q    Dr. Ruediger, my name is Kate
22     Hortberg, and I represent two individuals who
23     have been sued in this matter, Paul Strange,
24     the mentoring teacher, and Stacey Ezell, a
25     regular education teacher.  I want to follow
```

1    up on a question that you were just asked.

2    Do you remember Stacey Ezell ever asking you

3    to withdraw the plaintiff's internship?

4         A    No.

5         Q    Did you ever even actually speak to

6    Ms. Ezell at the school?

7         A    No.

8         Q    Or on the phone?

9         A    No.

10        Q    The only information that you ever

11   received that purportedly came from Ms. Ezell

12   was that memorandum that you discussed, that

13   you viewed prior to the September 30th

14   observation?

15        A    Yes.

16        Q    Do you have any knowledge about how

17   that memorandum came into being?

18        A    No.

19        Q    And neither Stacey Ezell nor Paul

20   Strange ever asked you to ask anyone else at

21   Troy to have Mrs. Miller's internship

22   withdrawn?  Correct?

23        A    Correct.

24             MS. HORTBERG:  That's all I have.

25

155

```
 1                    EXAMINATION
 2
 3    RESUMED BY MR. FAULK:
 4         Q    Now, once you carried out your
 5    instructions from Dr. Jones to go gather more
 6    data, do you feel like you carried out your
 7    instructions?
 8         A    Yes.
 9         Q    Once you had done that and had your
10    debriefing with Lumpkin and Miller, did you
11    make any kind of recommendation to Dr. Jones?
12         A    No.
13         Q    Did you give her any information
14    whatever, other than what is contained on the
15    face of your report?
16         A    No.
17         Q    That is, your observation, your
18    report of the debriefing.  Did you give her
19    the notes on your conversations with Ms.
20    Towns and others?
21         A    Yes.  I did provide her that
22    information.
23         Q    Okay.  Did you give her Mrs.
24    Miller's response to the debriefing?
25         A    Yes.
```

156

1       Q     Any doubt about what I'm talking

2   about?

3       A     No.

4       Q     Okay.  That was a typed response

5   Mrs. Miller provided you some time after the

6   debriefing?  Correct?

7       A     I'm not familiar with what you're

8   talking about at this point.

9       Q     All right.  Let's look at it.  I'm

10  going to show you what's marked as

11  Defendant's Exhibit 22.  Take a look at that

12  document, and tell me if you recognize that?

13      A     (Witness reviewing document.)  I do

14  not recall ever seeing that document.

15      Q     Would a document of that nature be

16  prepared, in the ordinary course of things,

17  following a debriefing, if the student

18  disagreed with your observation and comments?

19      A     No.

20      Q     You don't recall ever being

21  provided a copy of this two-page document?

22      A     No.

23      Q     So, then, you couldn't have

24  provided it to Dr. Jones?

25      A     No.  I provided her the data that I

1    collected, which were information from Ms.

2    Towns, Mr. Pitchford, my evaluation, and Mr.

3    Strange.

4        Q    When you met with Tim Pitchford and

5    Mr. Strange, did you also have occasion to

6    meet with Riley Joe Andrews concerning this

7    matter?

8        A    No.

9        Q    What was your impression, at the

10   time you met with Mr. Pitchford and Mr.

11   Strange, about their wishes with respect to

12   this internship?

13           MS. HORTBERG:  I'm going to object

14                 to the form.

15       Q    Well, you've testified that they

16   didn't ask you to get rid of her or terminate

17   her internship.  Did you have any impression

18   or form any impression as to their wishes in

19   that regard, based upon your meetings with

20   them?

21       A    No, I did not.

22       Q    Does the name Philip Exton mean

23   anything to you?

24       A    No.

25           MS. HORTBERG:  How are you spelling

158

1           Exton?

2           MR. FAULK:  E-x-t-o-n.

3       Q    On this question about whether the

4   IEP team determines what is appropriate for a

5   particular student -- do you remember that

6   line of testimony a minute ago?

7       A    Yes.

8       Q    Is it fair to say that the

9   testimony you're giving in that regard has to

10  do with customary circumstances in which you

11  have an IEP team that's actually doing its

12  job in a serious way should produce an IEP

13  that's appropriate for that student's needs?

14  Correct?

15          MR. WALDING:  Object to the form.

16      A    Correct.

17      Q    And if the IEP team is not doing

18  its job, under those circumstances, it's

19  possible you'll just have garbage in, garbage

20  out?  Right?

21          MR. WALDING:  Object to the form.

22      A    Can you rephrase it?

23      Q    Yeah.  In other words, an IEP team

24  can come up with an inappropriate IEP, can

25  they not?

159

```
 1        A    Yes.
 2        Q    And just like you can't tell Mr.
 3    Walding here, for a fact, that any of these
 4    IEP's, which you haven't seen, were
 5    inappropriate, you can't tell him that
 6    they're appropriate, either, can you, for
 7    certain?
 8        A    I cannot tell him that that is
 9    appropriate or not.
10        Q    So, the fact that they're done by
11    an IEP team is only going to result in an
12    appropriate IEP if the IEP team actually does
13    its job?  Correct?
14             MR. WALDING:  Object to the form.
15        A    Correct.
16        Q    If circumstances should change,
17    either in the way a school is being run or in
18    the student's circumstances, at some point,
19    shouldn't the IEP be revised to reflect that?
20        A    If the educational experience has
21    changed for a youngster, it is required that
22    you have to have an IEP meeting and make the
23    necessary changes.
24        Q    So, if you have a student whose IEP
25    says he's to spend the day in the resource
```

160

1      room, who, in fact, is spending the day in

2      regular classes, would it be time to change

3      that student's IEP?

4          A     You would have to amend the IEP.

5      Yes.

6          Q     And, failing that, the IEP would be

7      inappropriate, wouldn't it?

8              MR. WALDING:  Object to the form.

9              MS. REESE:  Object to the form.

10         Q     If it should be amended, and is not

11     amended, isn't it fair to characterize that

12     as inappropriate?

13             MS. REESE:  Object to the form.

14         A     I don't have enough information to

15     determine that.

16         Q     Well, I gave you the example of a

17     student whose IEP calls for him to spend the

18     day in the resource room, who is, in fact,

19     being kept in the regular classroom

20     throughout the day.  Would that be a change

21     in that child's educational situation that

22     would call for a revision of the IEP?

23         A     Yes.

24         Q     And failing such a revision,

25     wouldn't it be fair to say that that IEP

161

1    could be characterized as being inappropriate

2    at that point?

3         MR. WALDING:  Object to the form.

4    A    You couldn't make that big of a

5    leap.

6    Q    Okay.  It should be amended, but

7    it's not inappropriate?

8    A    Yes.  Could be.  Amending means

9    that you bring the people in together, you

10   review what's in place, and then, you make a

11   determination accordingly.

12   Q    If I'm a school principal, is it

13   appropriate for me to ignore what an IEP

14   says, and move a child into the regular

15   classroom on a regular basis, day in and day

16   out, without calling an IEP meeting?

17   A    You cannot do that.

18   Q    Okay.  So, what we're stumbling

19   around on is this word "inappropriate"?

20   Correct?

21   A    Yes.

22   Q    Tell me why, please.  I'm not

23   understanding.

24   A    Because there's other variables

25   that impact how school systems provide

162

1    opportunities for children.

2        Q    How would you characterize an IEP

3    that does not reflect the true educational

4    setting in which a child is being maintained?

5    There may be another word besides

6    "inappropriate" that I'm just missing.  And

7    if there is, and you can think of one, tell

8    me?

9        A    Amend.

10       Q    Okay.  It needs to be amended?

11       A    Right.  To make sure that it is

12   appropriate.

13           MR. FAULK:  Okay.  Unless they have

14               some follow-up, we're done.

15           MR. WALDING:  I don't.

16           MS. HORTBERG:  I don't.

17

18               END OF DEPOSITION

19

20

21

22

23

24

25

163

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4        I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 162, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10    taken down by me in stenograph shorthand,

11    and transcribed by me personally or under

12    my personal supervision.

13        I further certify that I have no

14    interest in this matter, financial or

15    otherwise, or how it may develop or what

16    its outcome may be.  I further certify that

17    I am not of counsel for any of the parties,

18    nor am I related to counsel or litigants or

19    associated with anyone connected with this

20    cause to my knowledge.

21        Witness my hand this 26th day of

22    December, 2007.

23

24                        RPR, Notary Public,
                          State at Large
25                        ACCR# 155

1

```
 1              IN THE U. S. DISTRICT COURT

 2             MIDDLE DISTRICT OF ALABAMA

 3                 SOUTHERN DIVISION

 4

 5   NANCY MILLER,

 6        PLAINTIFF,

 7     VS.              CASE NO. 1:06cv00940-MEF

 8   HOUSTON COUNTY BOARD
     OF EDUCATION; KENNETH
 9   LORD; RILEY JOE ANDREWS;
     TIM PITCHFORD; PAUL
10   STRANGE; STACY EZELL;
     TROY UNIVERSITY, DOTHAN;
11   SANDRA JONES; PAM PARRIS;
     and GREG RUEDIGER,
12
          DEFENDANTS.
13

14       The deposition of PAMELA PARRIS, taken

15   by the Plaintiff, pursuant to the Alabama

16   Rules of Civil Procedure, before Stacey

17   Watkins, RPR, and Notary Public, State at

18   Large, at the offices of Hardwick, Hause,

19   Segrest & Walding, Dothan, Alabama, on the

20   18th day of December, 2007, at 4:45 p.m.,

21   CST, pursuant to notice.

22

23

24

25
```

2

2

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF:

 4   MR. WINN FAULK
     Attorney at Law
 5   Montgomery, Alabama

 6   MR. THOMAS K. BRANTLEY
     Attorney at Law
 7   Dothan, Alabama

 8
     FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9   KENNETH LORD, RILEY JOE ANDREWS AND
     TIM PITCHFORD:
10
     MR. KEVIN WALDING
11   MR. PATRICK MOODY
     Attorneys at Law
12   Dothan, Alabama

13
     FOR PAUL STRANGE & STACEY EZELL:
14
     MS. KATHERINE HORTBERG
15   Attorney at Law
     Chelsea, Alabama
16

17   FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
     PAM PARRIS AND GREG RUEDIGER:
18
     MS. SANDY REESE
19   Attorney at Law
     Birmingham, Alabama
20

21   ALSO PRESENT:

22   KENNETH LORD

23

24

25
```

```
 1                    STIPULATION

 2

 3          It is stipulated by and between counsel

 4     for the parties that this deposition be taken

 5     at this time by Stacey Watkins, RPR, and

 6     Notary Public, State at Large, who is to act

 7     as commissioner without formal issuance of

 8     commission to her; that said deposition shall

 9     be taken down stenographically, transcribed,

10     and certified by the commissioner.   The

11     signature of the witness is waived.

12          Except for objections as to the form of

13     questions, no objections need be made at the

14     time of the taking of the deposition by

15     either party, but objections may be

16     interposed by either party at the time the

17     deposition is read into evidence, which

18     shall be ruled upon by the Court on the

19     trial of the cause upon the grounds of

20     objection then and there assigned.

21

22

23

24

25
```

4

```
1                    PAMELA PARRIS
2     having been first duly sworn, testified as
3     follows, to-wit:
4
5                    EXAMINATION
6
7     BY MR. FAULK:
8         Q    State your name for us, please,
9     ma'am, and spell it?
10        A    Pamela, P-a-m-e-l-a, middle initial
11    G., Parris, P-a-r-r-i-s.
12        Q    Thank you.  Ms. Parris, I
13    introduced myself a minute ago.  But, I'm
14    Winn Faulk.  Along with Tom Brantley, I
15    represent Nancy Miller in this case.  I
16    realize we're on the other side, but that
17    doesn't mean we can't be courteous to you and
18    civil.  If you need a break for any reason,
19    just tell us.  We'll be glad to take one.
20    Okay?
21        Also, if you don't understand a question
22    for any reason, please tell me before you try
23    to answer it.  One way a person can
24    misunderstand a question is if they start
25    answering it before it's finished, and you
```

```
 1    may tell me something I was too dumb to ask.
 2         A    I understand.
 3         Q    So, let me finish.  I talk kind of
 4    deliberately and slowly.  So, I appreciate
 5    your patience.  Just tell me to speak up or
 6    to ask it differently or whatever, and I'll
 7    be glad to try to do that.
 8         Where are you currently employed, Ms.
 9    Parris?
10         A    Dothan City Schools.
11         Q    Okay.  In what capacity?
12         A    2nd grade teacher at Highlands
13    Elementary.
14         Q    And how long have you been employed
15    there?
16         A    Just this year.  I began in August
17    of 2007.
18         Q    Prior to that, you had a job at
19    Troy University, Dothan?  Is that correct?
20    Maybe not immediately prior, but some time
21    prior?
22         A    Uh-huh.
23         Q    When did you leave Troy University?
24         A    The very last couple of days of
25    July 2006.
```

```
 1      Q     And what did you do in between that
 2   job and your present job?
 3      A     Our family relocated to Huntsville,
 4   where my husband was employed, and I worked
 5   for Madison County Schools.
 6      Q     In what capacity?
 7      A     2nd grade teacher.
 8      Q     Is that your certification, is
 9   elementary?
10      A     No, sir.  My certification is P-3,
11   early childhood education.
12      Q     That means primary?  What does that
13   mean?
14      A     "P" means preschool.  In fact, to
15   be honest with you, I'm old enough my
16   certificate actually says "N," nursery, to
17   3rd grade.
18      Q     Tell us about your educational
19   background beginning with graduation from
20   college.  Okay?
21      A     I graduated from Troy, Troy, with a
22   bachelor's in early childhood education.  I
23   graduated from Troy, Dothan, with a master's
24   in early childhood education.  And I
25   graduated from Troy, Dothan, with an
```

```
 1   education specialist degree in early

 2   childhood education.

 3       Q    And when you worked for Troy,

 4   before going to Huntsville, what was your

 5   job?

 6       A    I was the director of internship,

 7   professional internship, before the merger of

 8   the university in fall 2005, and my title

 9   changed to coordinator of teacher education.

10       Q    Were your duties essentially

11   similar?

12       A    Essentially.

13       Q    Any particular differences you can

14   point out for us?

15       A    The university was merging, and our

16   duties were changing.  So, to tell you that

17   that job was specifically different, I can't

18   tell you.  Not that would be relevant.

19       Q    Were your duties broader in

20   scope --

21       A    Uh-huh.

22       Q    -- in terms of the number of

23   students or number of school systems

24   involved, perhaps?

25       A    Yes.
```

8

```
 1        Q     While you were -- I don't want to

 2   say confined.  But, while your duties were

 3   confined to Troy University, Dothan, your

 4   position was director of professional

 5   internship?

 6        A     Yes, sir.

 7        Q     And were you still in that same

 8   position when Nancy Miller did an internship

 9   in the spring of 2005 at Beverlye Middle

10   School in Dothan?

11        A     Yes.

12        Q     So, during that semester, you were

13   carrying out the same duties with respect to

14   Mrs. Miller as you carried out in the fall,

15   when she was doing an internship at Houston

16   County High School?

17        A     Yes, sir.

18        Q     I realize it's late in the day, and

19   I'm going to try to skip over some stuff I've

20   already gotten out of other people.  So, if

21   you see me flipping pages, that's why.

22        A     I can be patient.

23              (Brief off-record.)

24        Q     What I'd like for you to tell me,

25   Ms. Parris, is, how would this particular
```

1    internship, in the fall of 2004, come into

2    being?  There was some process you were

3    involved in, I assume, since you signed the

4    agreement.  I mean, would you initiate all

5    this or would the student initiate it?  How

6    would it get started?

7        A    Are you asking me how a student

8    would become eligible for internship?

9        Q    Well, not necessarily what the

10   requirements are, but what you would have to

11   do in order to facilitate it coming into

12   being.  What was your role in it?

13       A    Okay.  I started with the students

14   at the junior level and worked with them

15   through the teacher education program

16   admission process.  And that is the

17   beginning.  And then, throughout their

18   programs, I would work with them on related

19   issues, GPA issues, those type things.

20       Then, when it came time for internship,

21   it was my responsibility to meet with the

22   students when they applied for internship for

23   a particular semester, and to review their

24   TEP, teacher education program, folders, to

25   be sure that they were eligible, and then,

1    discuss with them the next steps that were

2    necessary for internship.

3         Q    Okay.  Was one of your duties

4    locating available internships, that is,

5    school systems who would take an intern?

6         A    Interns, when they apply for

7    internship, fill out a card.  And on the

8    card, it asks for first and second preference

9    for placement.  And they are told, at that

10    time, that we try to respect that -- we have

11    students from all over the region -- to try

12    to place them as close to home as possible

13    for the internship, because that's where they

14    will be seeking employment, those things.

15         And so, anyway, I would go with their

16    first request, contact the school system and

17    see if they had availability.  And then,

18    sometimes, I would have to go to the second.

19    And if the second did not work, then I had to

20    go to school systems that I knew had

21    availability.  Not just slots, okay, "would

22    you take an intern?"  But the school systems

23    had to have teachers that met the criteria

24    for internship.

25         Q    Teachers who would sort of oversee

```
 1    that intern and help them?

 2        A    The cooperating teachers.

 3        Q    Okay.  Now, do you recall what Mrs.

 4    Miller's first choice was?

 5        A    No, sir, I do not.

 6        Q    Would that still be a matter of

 7    record -- do you know? -- with the school?

 8        A    It would be part of her internship

 9    folder.

10        Q    Okay.  Do you recall what you did

11    in this case in terms of helping initiate the

12    internship?

13        A    I did everything that I did with

14    all of the other interns.  The same

15    procedure.

16        Q    Okay.  Are there any school systems

17    in this area that do not accept interns?

18        A    There are teachers in the school

19    systems who do not accept interns.  But, the

20    time I was at Troy, I did not have any school

21    system turn me down unless it was lack of

22    availability of a teacher to serve as

23    cooperating teacher.

24        Q    Okay.  But a schoolteacher, in his

25    or her discretion, can simply say "no"?
```

12

```
 1        A      That is correct.  Are you asking me
 2   if classroom teachers can refuse?
 3        Q      Right.
 4        A      Yes.
 5        Q      It's not a trick question.  I'm
 6   just surprised.
 7               MR. BRANTLEY:  The answer is "yes."
 8        A      The answer is "yes."  I'm sorry.
 9   To the best of my knowledge, yes.
10        Q      Are you aware of any consideration
11   flowing from the local school systems to
12   Troy, financially, in connection with these
13   internships?
14        A      Would you be more specific?
15        Q      Well, in the sense of any kind of
16   consulting honoraria, that type thing, being
17   paid?
18        A      I am unaware of anything like that.
19        Q      What about in the other direction,
20   from Troy University to the school systems?
21   Does Troy provide any sort of financial
22   incentive to the local school systems?
23        A      Are you asking me if the
24   cooperating teachers are paid a stipend or
25   something?
```

13

```
 1       Q     Or in any respect.  Whether it's a
 2    local teacher or the school system itself
 3    given money that they can parcel out to the
 4    cooperating teachers or anything of that
 5    nature?
 6       A     Troy University, Dothan, paid a
 7    small amount of money to the cooperating
 8    teachers to serve as cooperating teachers.
 9       Q     Do you know whether that occurred
10    or not in the case of Mr. Strange in
11    connection with the present situation?
12       A     Mr. Strange was a cooperating
13    teacher serving in the capacity with one of
14    our students, and so, he was given that.  At
15    the meeting that I had, the orientation, he
16    was given all the financial information and
17    the opportunity to fill that out.  Whether or
18    not he did that, I do not remember at this
19    time.
20       Q     Okay.  Are you aware that Mrs.
21    Miller was actually paid a salary while she
22    was at Houston County High School, as a
23    teacher?
24       A     Yes.
25       Q     Do you recall whether that would
```

14

```
 1     also be true of a person who was serving an
 2     internship from Troy, Dothan, named Amy
 3     Deese?
 4          A    Yes, sir.
 5          Q    Were either of those women
 6     graduates of a baccalaureate program at the
 7     time?
 8          A    No, sir.
 9          Q    Do you know, personally, whether
10     either of them were ever issued any type of
11     emergency certificate to teach?
12          A    I was not the certification person,
13     so, no, I do not know the answer to that.
14          Q    Did Troy University, Dothan, on
15     other occasions, participate in agreements in
16     which noncertified personnel were allowed to
17     teach for a salary in a certified position,
18     to your knowledge, while you were there?
19          A    I am aware of situations where
20     students were paid substitute pay while they
21     did an internship in their own classroom
22     while I was there.
23          Q    To your recollection, would you
24     agree with me that, normally, substitute pay
25     is not comparable to regular teacher salary?
```

15

```
 1      A      I would agree with that.
 2      Q      Are you aware of any difference and
 3   meaning between the term "student teaching"
 4   and the word "internship," as Troy University
 5   uses those terms?
 6      A      No.
 7      Q      Now, in terms of supervision of
 8   Mrs. Miller's internship, would you describe
 9   for us, please, in whatever detail is
10   necessary to make it reasonably
11   understandable, what your role was and what
12   Dr. Ruediger's role was, please?
13      A      As the internship director, it was
14   my responsibility to determine how many
15   interns each term we had by major.  And then,
16   I looked at where they were going to be
17   placed geographically, and took that
18   information, and let Dr. Jones know we had
19   "X" number of teachers -- I mean, "X" number
20   of interns that were going to be in certain
21   regions.
22           And she would tell me which professors
23   needed students to finish their load, you
24   know, their teaching load, or that kind of
25   thing.  We would do that.  And she would
```

```
 1    finally approve who was associated with which
 2    intern.  I would submit a preliminary list,
 3    and she would make the adjustments to it.
 4        And Dr. Ruediger would have had no input
 5    into it other than if his course load was,
 6    you know, short, and he needed interns.  And
 7    that doesn't sound exactly right.  But it
 8    creates another course load -- I mean,
 9    another course, number of interns.  Does that
10    make sense?
11        Q    Well, it may make sense, but I'm
12    not understanding it.
13        A    Dr. Ruediger would have been
14    assigned an intern by the dean, based on data
15    that I gave her.
16        Q    Then, once Mrs. Miller was out on
17    the campus in Columbia, Houston County High
18    School, as an intern, am I correct in my
19    understanding that there were several
20    occasions or a few occasions in which you
21    went out to the high school in connection
22    with her internship?
23        A    Yes, sir.  That's correct.
24        Q    Okay.  What was the first such
25    occasion that you recall?
```

```
 1      A     I don't remember the specific

 2   order.

 3      Q     Okay.  Let me try another way,

 4   then.  Without regard to the date and such as

 5   that, do you recall an incident very shortly

 6   after Dr. Ruediger's first observation of

 7   Mrs. Miller, in which you had occasion to

 8   receive some contact from Mr. Pitchford?

 9      A     (Witness nodding head in

10   affirmative.)

11      Q     If you can answer?

12      A     Yes.

13      Q     Thank you.

14      A     I'm sorry.

15      Q     That's all right.

16      A     She doesn't do head nods.

17      Q     Tell us what you recall about that

18   contact, please?

19      A     The initial contact that I had with

20   the school was with concern over -- with Mrs.

21   Miller and one of the cooperating teachers.

22      Q     And was this in the form of a

23   telephone call from Mr. Pitchford?

24      A     Yes, it was.

25      Q     And do you recall that as being
```

18

```
 1    shortly after Dr. Ruediger's first

 2    observation in late August?

 3         A    I am not certain of the timeline.

 4    It could have been prior to Dr. Ruediger's

 5    first visit.

 6         Q    Is there any way we can establish

 7    that at this point in time, based on any

 8    records that you're aware of?

 9         A    I have not seen the file since

10    2004.  So, without looking at the whole file,

11    I could not tell you that today, at this

12    minute.

13         Q    If you had received such a call

14    from Mr. Pitchford, was there some business

15    record that you would have made routinely

16    concerning such a telephone call?

17         A    Not necessarily.

18         Q    Okay.  So, you just remember

19    getting a call, and you remember it had

20    something to do with Mrs. Miller and her

21    cooperating teacher, but you're not quite

22    sure exactly when it was?  Correct?

23         A    Correct.

24         Q    And you're not quite clear on the

25    content of it?
```

```
 1        A     I know -- I remember the content of
 2   it as it relates to the cooperating teacher.
 3        Q     Okay.  Tell us about that, please?
 4        A     Mr. Pitchford indicated that Mrs.
 5   Miller was assigned an inclusive setting, and
 6   in that setting, she was having difficulty
 7   with one of the teachers, relating to the
 8   teacher, and the teacher relating to Mrs.
 9   Miller.  And that they -- he wanted to make
10   me aware of that, that we had a situation,
11   and he had talked with his teacher, and hoped
12   to see it improve, but we had some difficulty
13   there.
14        Q     Could that have been some time
15   later, after the first observation?
16        A     Since I do not know the definite
17   timeline, I would have to say it could be.
18   But I also say it could have been prior.
19        Q     You're just not sure?
20        A     Uh-huh.  No, I'm not sure.
21        Q     Thank you.  Do you recall one or
22   more occasions where you were actually either
23   asked to come out to the school in connection
24   with this internship or felt that you should
25   go out there to check on it?
```

```
 1       A     As part of my duties as director of

 2    internship, when contacted by a cooperating

 3    teacher, a principal, a superintendent, or by

 4    the dean, I did make visits to the school,

 5    but not randomly, oh, I'm just going to go

 6    visit.   That was not part of my job

 7    responsibility.   It was because my presence

 8    was requested by someone at the university or

 9    at the school or by the intern.

10       Q     Okay.   Did Mrs. Miller ever request

11    your presence out there, that you recall?

12       A     I do not remember if she

13    specifically asked me to come, but she

14    indicated some difficulties that she was

15    having at the school.   And that's another

16    indicator, as a response to that, that I

17    would try to help facilitate a meeting to

18    improve whatever difficulty she might be

19    having.   May I add a sentence to that?

20       Q     Sure.

21       A     With the approval of the dean and

22    prior knowledge of the dean.

23       Q     You wouldn't go out there at all,

24    even at Mr. Pitchford's request, if you

25    didn't check with the dean first?
```

```
 1      A    No, sir.

 2      Q    No, sir, you would not?

 3      A    No, sir, I would not go to the

 4   school without the dean's knowledge.

 5      Q    Okay.  Now, do you remember more

 6   than one visit out there?

 7      A    Yes, sir, I do.

 8      Q    All right.  Tell me what you can

 9   recall about each of those visits.  And try

10   to treat them separately, okay, and put them

11   in context.

12      A    I remember speaking with Mr.

13   Pitchford about the difficulties.  I did a

14   follow-up, face-to-face.  The difficulties

15   with the teacher.  And making sure that we

16   were working on that.

17      I was involved in a meeting where

18   several people were present, and we discussed

19   the cooperating teacher's role in providing

20   assistance to Mrs. Miller.

21      I remember going to the school and

22   speaking with Mrs. Miller the day that her

23   internship concluded at that school.

24      Q    So, there were three meeting at the

25   school that you recall?
```

1       A     Yes, sir, that I recall.

2       Q     Now, in the course of each of those

3    meetings, on whose behalf were you there?

4    The university or Mrs. Miller?

5       A     Mrs. Miller was the university

6    student.  So, I was there on behalf of Mrs.

7    Miller as a student of the university.

8       Q     On any of those occasions, do you

9    recall sort of scolding Mrs. Miller for

10   raising objections or concerns about the

11   special ed program?

12      A     I never scolded Mrs. Miller.

13      Q     Would you characterize the

14   transaction in some other way?  And, if so,

15   what would that be?

16      A     Ask me the question again, please.

17      Q     In your dealings with Mrs. Miller

18   out at the school, did you have occasion to

19   speak with her about the fact that she had

20   raised concerns about the manner in which

21   their special education program was being

22   conducted?

23      A     Yes.

24      Q     Tell us, as nearly as you can

25   recall, about that occasion or those

23

1    occasions?

2        A    I listened to Mrs. Miller's

3    concerns.  I reminded her that she was a

4    student in the school, and there in that

5    capacity, and, as a student, we do not have

6    the overall picture.  And that was the

7    extent.

8        Q    Do you recall your general tone and

9    manner during that conversation?

10       A    Professional.

11       Q    You weren't aggravated with her in

12   any way?

13       A    No, sir.  She wasn't -- no, sir.  I

14   was not aggravated with her.  I was concerned

15   that she was upset.  And part of it was

16   trying to help her.  Well, not part of it.

17   All of it was trying to help her.  And it was

18   handled professionally, from my point of

19   view.

20       Q    You're speaking to me very kindly

21   and courteously.  I mean, were you talking to

22   her in the same tone of voice you're talking

23   to me now?

24       A    I am very matter of fact.  The way

25   I speak with you is how I speak.

```
 1        Q    Do you recall, on any occasions,

 2   ever telling Mrs. Miller, in substance, that

 3   if she didn't make Mr. Pitchford happy, she

 4   would be in danger of failing her internship?

 5        A    As a student in the internship

 6   program at Troy University, all interns are

 7   encouraged to develop professional

 8   relationships with cooperating teachers,

 9   other teachers in the school, administrators,

10   central office staff that they have occasion

11   to be in contact with.

12        And, yes, Mrs. Miller was encouraged, as

13   a student, to make positive professional

14   relationships with everyone at the school.

15        Q    And does that include keeping quiet

16   about problems she perceived with the special

17   education program?

18        A    No.  I did not tell her to keep

19   quiet about what she was seeing with the

20   special education program.

21        Q    What did you tell her in that

22   regard?

23        A    That she was a student at the

24   school, and what she was seeing was just the

25   -- interns are in school a brief time.  And
```

25

```
 1    she was there a very limited time.  And she
 2    was seeing just a snapshot of what was going
 3    on.  And we are there to learn.
 4         Q     And not ask questions?
 5               MS. REESE:  Object to the form.
 6               MR. WALDING:  Object to the form.
 7         A     I did not say that.
 8         Q     Or express concerns?  I mean, what
 9    was she doing that you were suggesting she do
10    differently in regard to the special
11    education thing?  Let me back up a minute.
12    Is it fair to say, Ms. Parris, that, at least
13    to some extent, you were seeking to alter or
14    improve her behavior as an intern?
15         A     In my capacity as director of
16    internship, it was part of my job and part of
17    how I felt about my students, wanting them to
18    succeed.  So, in that line, yes, trying to
19    help her to succeed.
20         Q     Okay.  And in order to achieve that
21    goal, what did you feel she needed to do
22    differently or not do?
23         A     That is not something that I would
24    have determined on my own.  I would not have
25    made recommendations to her or told her
```

1    specifically what to do without input from my

2    higher-ups at the university, being

3    Dr. Jones.

4       Q    When you told her that she was only

5    seeing a snapshot and so forth, like you

6    testified to a minute ago, what purpose did

7    you hope to achieve by telling her that?

8       A    That, through the learning process,

9    she would become more aware of the hows and

10   whys that things happen, in the actual

11   application of what she had learned at the

12   school with what she was doing at -- I mean,

13   what she had learned at the university and

14   what she was doing at the school, and it

15   might help her to have a better understanding

16   of what was going on.

17      Q    And was she engaged in some type

18   activity that you felt was unsuitable in her

19   internship, that you were counseling her

20   against?

21      A    I felt that, based on the program

22   requirements, that she needed to have more

23   positive relationships with the other people

24   at the school.  And that was what I was

25   counseling her with.  That included learning,

1    gathering information, processing it, and

2    applying.

3        Q    Do you recall, Ms. Parris, an

4    occasion on which Mr. Pitchford complained to

5    you about Dr. Ruediger's involvement in this

6    internship?

7        A    I recall an incident where he

8    expressed concern.

9        Q    And what was the concern that he

10   expressed?

11       A    He expressed concern with the

12   cooperating teacher providing the support

13   that Mrs. Miller might need.

14       Q    Dr. Ruediger had expressed concern

15   about the cooperating teacher?

16       A    Dr. Ruediger expressed the concern

17   about that.  And as a result of that -- I do

18   not want to put words in Mr. Pitchford's

19   mouth.  The feeling I got was maybe that

20   Dr. Ruediger was giving a negative air in the

21   school setting.

22       Q    And are you getting that impression

23   from Dr. Ruediger, or are you getting that

24   impression from Mr. Pitchford?

25       A    Mr. Pitchford.  But I'm not putting

28

```
 1    the words in his mouth.  I'm just saying that
 2    was the feeling I got from him, was that he
 3    felt like that Dr. Ruediger was maybe not
 4    supportive of what they were doing in the
 5    school.
 6         Q    And when you mentioned the
 7    cooperating teacher a minute ago, did you
 8    misspeak?  Were you talking about
 9    Dr. Ruediger or Mr. Strange?
10         A    I was talking about Mr. Strange.
11         Q    Okay.  Don't let me put words in
12    your mouth.  Okay?  I want to be sure I'm
13    understanding you.  Are you saying that you
14    got the impression that Mr. Pitchford felt
15    that Dr. Ruediger was somehow not being
16    supportive of Mr. Strange?
17         A    Not being -- yes.
18         Q    And don't just give up and agree
19    with me.
20         A    No.
21         Q    I mean, is that fair?
22         A    That's fair.
23         Q    Okay.  Can you tell me any more
24    than that, as far as specifically in what
25    respect Dr. Ruediger was failing to support
```

1      Mr. Strange, or is that the best you can do?

2      You know, I don't want to limit you, but I

3      don't want to just try to make you talk,

4      either.

5          A    Let's stop there, unless you want

6      to come back and ask me again in a few

7      minutes.

8          Q    Okay.  So, would that pretty well

9      cover your recollection of your first visit

10     out to the school in response to a problem

11     situation?

12         A    Yes.

13         Q    Okay.  What's the next occasion

14     that you recall having to visit the school to

15     attend to some problem in connection with

16     this internship?

17         A    I remember going to the school and

18     having a meeting with several of the school

19     representatives and with Mrs. Miller.  Mrs.

20     Miller had been asked to sign an IEP, which

21     is not permissible with an intern.

22         And in the -- I'm not going to speak for

23     the school.  But, somehow, she was presented

24     with an IEP to sign, and she refused, which

25     was exactly what she was supposed to do in

30

```
 1    her role as an intern.  And I went to clarify
 2    that particular thing, that she was not to be
 3    put in that position again.
 4         Q    And who did you talk with about
 5    that on that occasion?
 6         A    The counselor.
 7         Q    Would that be --
 8         A    I'm sorry.  I do not remember her
 9    name.  Mr. Pitchford was there and Mr.
10    Andrews was there.
11         Q    And was the counselor, as you call
12    her, present?
13         A    She was present, and Mr. Strange.
14         Q    Was Mrs. Miller present?
15         A    Yes.  Mrs. Miller was present.
16         Q    When you had this meeting, did they
17    offer any explanation for the reported
18    incident?
19         A    Mr. Pitchford said that he was
20    aware that she was not to sign IEP's, but
21    somehow the communication had not reached Ms.
22    Ezell, and so, Ms. Ezell -- I don't want to
23    put words in -- this is what I remember from
24    the meeting.  Okay?  I do not want to put
25    words in Mr. Pitchford's mouth or anything
```

     1    like that.  But he said, to the best of my
     2    recollection, that Ms. Ezell had not been
     3    given that particular piece of information,
     4    so she presented the IEP's, which would have
     5    been normal procedure had Mrs. Miller not
     6    been a student.  She would have signed those.
     7    And Mrs. Miller refused, and that was fine.
     8    But Mr. Pitchford indicated it was because of
     9    a lack of communication with Ms. Ezell that
    10    that even happened.
    11        Q    Let me ask you this:  If I don't, I
    12    expect this lady over here will.  Is it
    13    possible that we've got the name Ezell -- in
    14    other words, whoever this is you're referring
    15    to as Ms. Ezell was, to your understanding,
    16    actually the counselor at the school?
    17        A    Yes.  And it may not be Ms. Ezell.
    18    The only person's name I remember is the
    19    cooperating teacher, Mr. Strange.  But it's
    20    my understanding that the person who was
    21    acting in the capacity as the guidance
    22    counselor was the person at that school that
    23    handle their IEP's.  I may not be right in
    24    that chain of command.  That's something
    25    Houston County would need to clarify.

32

```
 1      Q    So, you could be mistaken about it
 2   being Ms. Ezell?
 3      A    I could be mistaken about who it
 4   is.
 5      Q    That's fine.
 6      A    I'm just saying that Nancy was
 7   presented with an IEP or two IEP's from
 8   someone at the school, asked to sign them.
 9   She refused.  And that was, as a student,
10   what she was supposed to do.
11      Q    When you went out there, was there
12   any contention by the people at the local
13   school that Mrs. Miller was simply mistaken,
14   and she hadn't really been asked to sign
15   anything?
16      A    No.
17      Q    In other words, they acknowledged
18   the incident occurred, but attributed it to a
19   lack of communication within the school?  Is
20   that fair?
21      A    It's fair.
22      Q    Is that the sum and substance of
23   that meeting?
24      A    Yes, it is.
25      Q    Okay.  Do you recall any other
```

```
 1    meetings out at Houston County High School

 2    concerning Mrs. Miller that you were

 3    participating in?

 4         A     I do not recall any at this time.

 5         Q     Do you recall any other direct

 6    dealings, whether by telephone or in person

 7    or in writing, between you and Mr. Pitchford

 8    concerning this general subject of Mrs.

 9    Miller's internship?

10         A     I spoke with him on the phone.

11         Q     Okay.  Tell us about that.  Well,

12    let me ask you this:  Was it more than one

13    occasion?

14         A     I can remember speaking to him

15    twice.

16         Q     Tell us about those circumstances?

17         A     Okay.  The first one, I've already

18    spoken about.  The second one was in

19    relationship to the fact that he did not feel

20    that Mrs. Miller was conducting herself in a

21    professional manner.  She was crying in the

22    classroom.  He had students who had requested

23    not to be taught by Mrs. Miller.  And she was

24    using the phone in the outer office to carry

25    on personal conversations, and being very
```

34

```
 1      emotional.  And he was concerned about her
 2      being upset to the extent that she would be
 3      crying in the classroom or in the outer
 4      office, and he wanted me to be aware of that.
 5          Q    Do you recall the incident in which
 6      she left campus and went to the central
 7      office?
 8          A    Yes, sir, I do.
 9          Q    Do you recall, today, whether the
10      phone call you just related to us was before
11      or after that incident?
12          A    To the best of my knowledge, it was
13      before that incident.
14          Q    Can you say that confidently, or is
15      it like the other phone call?  You're not
16      quite sure?
17              MR. WALDING:  Asked and answered.
18              MS. REESE:  Go ahead and answer.
19          Q    Just give me your best judgment?
20              MR. WALDING:  She said to the best
21                  of her knowledge.
22          A    This was prior.  To the best of my
23      knowledge, this phone call was prior to her
24      leaving school.
25          Q    Did you make any memoranda of that
```

35

1    conversation?

2         A    No.   I verbally relayed it to the

3    dean.

4         Q    And what did the dean have to say

5    about it?

6         A    That she was concerned over the

7    professionalism, and that we needed to speak

8    with Mrs. Miller about what was causing her

9    to be so upset in the internship.  We do not

10   want our students to be that distraught in an

11   internship.

12        Q    And by "the dean," we're talking

13   about Dr. Jones?

14        A    Yes, sir.

15        Q    And pursuant to that conversation

16   with the dean, what did you do about it?

17        A    I spoke with Mrs. Miller about it.

18        Q    Okay.  Under what circumstances?

19   Face-to-face?  On the phone?  What?

20        A    I asked her to come by the office.

21        Q    Your office?

22        A    Uh-huh.

23        Q    And did she do that?

24        A    Yes, sir, she did.

25        Q    And did y'all discuss the

36

```
1    situation?

2        A    Yes, we did.

3        Q    Was anybody else present?

4        A    No, sir.

5        Q    Was any kind of recording made of

6    it?

7        A    No, sir.

8        Q    Did you take notes of it?

9        A    There are no notes in the

10   internship file about that conversation.

11       Q    How do you know that?

12       A    Let me rephrase that.  When I left

13   the university, at that time, there were no

14   notes in that file about that conversation.

15       Q    And how do you know that?

16       A    Because, when we sealed her file at

17   the end of the semester, when she graduated,

18   it was put into a storage, you know,

19   situation.

20       Q    Do you know that because you know

21   there were no notes and that none were placed

22   in the file to begin with?

23       A    Yes.  I did not make notes of that

24   conversation to be put in that file.

25       Q    Did you make any report, either
```

```
 1    verbal or in writing, oral or in writing, to

 2    the dean concerning your conference with Mrs.

 3    Miller on this subject?

 4         A    Yes, sir, I did.

 5         Q    And what did you tell her?

 6         A    I told the dean that we had

 7    discussed the situation with the cooperating

 8    teacher that she was having difficulty with,

 9    and we talked about concerns that Mrs. Miller

10    had about the teacher not working with her,

11    making things accessible to her, restricting

12    her ability to implement what she had learned

13    at the university in that classroom.  And I

14    relayed those things to Dr. Jones.

15         Q    And would that be the substance of

16    the explanation Mrs. Miller gave you at your

17    office, when you asked her to come in?

18         A    That, and, on that occasion, we

19    also -- I'm not sure about timeline -- but,

20    talked about her needing -- feeling that she

21    needed more support from Mr. Strange as a

22    cooperating teacher.

23         Q    And this was an explanation of the

24    public tearfulness, if you will?

25         A    Part of that.
```

38

```
 1       Q     And what else were y'all there to
 2   talk about?
 3       A     We were there to talk about how I
 4   could support her, or how the university
 5   could support her, in having a successful
 6   internship.  That's what we were there to
 7   talk about.  And what needed to be done in
 8   order for that to happen.
 9       Q     And having explored that topic,
10   what did you do to achieve that end?
11       A     I went to the dean and discussed it
12   with her, and she told me that she would
13   speak with Dr. Ruediger, as the university
14   supervisor, and that they would take care or
15   work on that.
16       Q     All right.  Now, that covers two
17   phone calls from Mr. Pitchford.  Was there
18   another one?
19       A     I do not recall specifically at
20   this time.  I can't tell you that.
21       Q     How did it come to your attention
22   that Mrs. Miller had, on one occasion, left
23   the campus to go to the central office?
24       A     I do not remember if it was Mr.
25   Pitchford or Mr. Riley Joe Andrews who called
```

39

```
1    me and told me she had left the school

2    without permission.  It very well could have

3    been Mr. Pitchford.

4         Q     Do you recall when you learned that

5    in relation to the internship?

6         A     That afternoon.

7         Q     Well, now, if that was on a Friday

8    afternoon --

9         A     Wait a minute.  Whoa.  Back up.  I

10   cannot say beyond a shadow of a doubt that

11   they called me that day.  It could have been

12   Monday.

13        Q     Okay.  Do you recall receiving a

14   voice mail concerning the fact that she

15   planned to leave the school -- voice mail

16   from Mrs. Miller, informing you that she

17   planned to leave the school that day?

18        A     I do not remember receiving a voice

19   mail to that effect.  I received a voice mail

20   after she left the school.  And it was after

21   school hours, university hours.

22        Q     And you had received that

23   apparently some time after Friday?

24        A     Yes, sir.

25        Q     But, apparently, it was placed on
```

40

1    Friday?

2        A    It could have been on Saturday.

3        Q    Is that your first information, or

4    was your first information a call from either

5    Mr. Andrews or Mr. Pitchford, if you recall?

6        A    I don't recall.

7        Q    You don't have to remember

8    everything.  Okay?  I mean, I don't.

9        A    Well, I want to be as, you know,

10   specific and factual as I can be about it.

11       Q    I'm not trying to discourage you

12   from trying to remember.

13       A    I know.

14       Q    I'm just saying it's okay.  If you

15   don't, then you just don't.

16            (Recess in deposition.)

17       Q    Let me ask you this, please, ma'am:

18   Do you recall the incident where there was

19   discussion of substituting Mary Brazzelle for

20   Dr. Ruediger as the supervisor?

21       A    Yes.

22       Q    All right.  Would it be correct

23   that that related to the concerns expressed

24   by Mr. Pitchford about Dr. Ruediger, without

25   going into any great deal?

41

1       A       Yes.

2       Q       Okay.  Now, do you recall one or

3       more incidents in which you stated to Mrs.

4       Miller, either in these words or words

5       substantially to this effect, "Nancy, you are

6       not here to shake things up, and you better

7       do everything possible to make the principal

8       happy, because you're in jeopardy of failing

9       your internship"?  Do you recall telling her

10      anything substantially similar to that?

11      A       No.

12      Q       Do you deny telling her anything

13      substantially similar to that?

14      A       The only thing that would be

15      similar to that would be that we have to, as

16      students, have positive relationships with

17      not only the students and the parents, but

18      the classroom teachers and the

19      administration.

20      Q       Do you recall a discussion with

21      Mrs. Miller in which the fact that she was a

22      military wife and had great respect for the

23      law, where that topic came up?

24      A       I am aware of the fact that she's a

25      military wife.

42

```
 1        Q     Do you recall her pointing that out

 2   to you in the context of a discussion about

 3   her concerns about the lawfulness of the

 4   manner in which some aspects of the special

 5   ed program at Houston County High School were

 6   being carried out?

 7        A     She might have said something

 8   similar to that to me.  Yes.

 9             MR. WALDING:  Anything's possible.

10             THE WITNESS:  Thank you.

11        Q     Well, I mean, is that the spirit in

12   which you're saying that, Ms. Parris?

13        A     Mrs. Miller shared, as do many

14   interns, their backgrounds, and she very well

15   -- I do remember her saying something similar

16   to that.

17        Q     In the context of discussing her

18   concerns?

19        A     In the context of discussing her

20   concerns.  Yes.

21        Q     Okay.  Thank you.  Do you recall

22   stating to Mrs. Miller anything to the effect

23   that Mr. Pitchford would have the final say

24   as to whether she could stay at his school,

25   or words to that effect?
```

43

```
 1          A      In internship orientation, the
 2    students are made aware of different
 3    scenarios that can happen that would lead to
 4    termination of the internship, one of those
 5    being if the school principal requests that
 6    they be removed.
 7          Q      Is that orientation, I believe you
 8    said, is that reduced to writing somewhere --
 9          A      It's in writing --
10          Q      -- or any sort of talking points or
11    something?
12          A      It's in writing in the internship
13    handbook.  It was also in the presentation
14    that I gave.
15          Q      But, if I look at the internship
16    handbook, I should find words of that basic
17    import?
18          A      You should, bearing in mind that
19    has been revised numerous times.
20          Q      Okay.  You don't happen to have a
21    copy of your outline for that orientation, do
22    you?
23          A      No, sir.  When I left the
24    university, I left all university materials
25    there.
```

```
 1      Q    Okay.  Can you shed any light, Ms.
 2   Parris, on how it was that Dr. Ruediger came
 3   back to being the supervisor after Ms.
 4   Brazzelle was inserted in that role?
 5      A    Ms. Brazzelle was never officially
 6   inserted into that role, to the best of my
 7   knowledge, unless the dean made that
 8   assignment and I did not know that.
 9      Q    Are you aware of some discussion of
10   inserting her?
11      A    I was aware of some discussion.
12   Yes.
13      Q    And you don't know what negated
14   that prospect?
15      A    No, sir, I do not.
16      Q    That's fine.
17      A    That would be something for
18   Dr. Jones to answer.
19      Q    I may have asked you this, and I
20   apologize if I'm being redundant.  But, just
21   briefly, do you deny that you ever said to
22   Mrs. Miller, "You're in jeopardy of failing
23   your internship," or words substantially
24   similar to that?
25      A    In situations where interns have
```

45

```
 1    been academically unsuccessful in

 2    internships, I have made statements to them

 3    telling them that, yes, there was a

 4    possibility that the internship may not

 5    conclude successfully at the end of that

 6    semester.

 7        Q    Okay.  And do you recall saying

 8    anything to that effect at any point to Mrs.

 9    Miller?

10        A    Yes.  At some point in time, I

11    would have said to Mrs. Miller that the

12    internship may not end with graduation, but

13    may be terminated prior to that time, with

14    options.

15        Q    Do you acknowledge that you told

16    her something to that effect prior to her

17    leaving campus and going to the central

18    office on the occasion we've talked about?

19        A    After discussions with Dr. Jones

20    about information, data, that we had

21    received, I was told to have a conversation

22    with Mrs. Miller to indicate that there were

23    some problems with her internship

24    performance.

25        Q    Prior to the day of going to the
```

```
1   central office?
2       A    To the best of my recollection,
3   yes.
4       Q    Is it your feeling, Ms. Parris,
5   that once Mrs. Miller began her second
6   internship, the one at Beverlye, that
7   everybody, at least with the university, was
8   willing to kind of let bygones be bygones,
9   and not hold the prior experience against
10  her?
11      A    She started over with a brand new
12  opportunity to apply what she had learned as
13  a student.  And I am unaware of any negative
14  feelings or leftover whatever from the
15  previous internship that would have carried
16  over and had any impact on the success of her
17  second internship.
18      Q    Do you have any knowledge as to how
19  it was that Dr. Morin was selected or
20  assigned to be her supervisor at Beverlye
21  internship instead of Dr. Ruediger?
22      A    Dr. Morin had just completed some
23  work with the teachers at Beverlye, some
24  workshops, and felt it would be a good
25  placement.  And we have two university
```

47

```
 1    supervisors, faculty supervisors.  Not
 2    adjunct.  Faculty.  So, I would have to make
 3    the assumption that Dr. Jones made the
 4    decision to use Dr. Morin based on those
 5    facts, that she was faculty, and because she
 6    felt that Beverlye would be a really good
 7    placement for Mrs. Miller.  I do not know any
 8    of that to be fact.
 9         Q    Okay.  Am I understanding your
10    testimony correctly, that every action you
11    took in connection with Mrs. Miller's
12    internship at Houston County High School was
13    taken pursuant to and in accordance with
14    instructions you received from the dean?
15         A    Yes.  And in accordance with
16    university policy.
17         Q    Okay.  I need to ask you this:  Do
18    you recall, shortly after being served with
19    the summons and complaint, that you called me
20    at my office on the telephone?
21         A    Are you the one I called?
22         Q    Yeah.
23         A    Yeah.  I didn't understand the
24    papers.
25         Q    Okay.  And I want to be sure, you
```

1    know, since you're now represented, that we

2    have a clear record on that conversation.

3    Okay?  My recollection is, you telephoned,

4    and I spoke with you, and you asked, in

5    effect, "Do I need a lawyer?"  And my

6    response was, "Before you go hire one at your

7    own expense, you need to talk to the

8    university counsel and see if they'll hire

9    you one."  Do you recall that?

10        A    I do recall that, yes.

11        Q    And do you recall your comment, at

12   the end of that, of, "Well, they better,

13   because everything I did -- all I did was

14   what the deans told me to do"?

15        A    Are you sure it wasn't "all that

16   the university told me to do," in my capacity

17   with the university, which would have been

18   the same?

19        Q    I don't want to turn myself into a

20   witness.  My recollection is that you said

21   "the deans," plural, "told me to do."

22        A    Okay.  And by "deans," plural,

23   would have been Dr. Jones and Dr. Jacobs.

24   Yes.

25        Q    And would that statement be

49

```
 1    accurate?  I mean, you weren't making it up,
 2    were you?
 3        A    No.
 4        Q    Okay.  And was that the end of our
 5    -- I'm not suggesting you were.  I just want
 6    to be sure you're standing by it.  And then,
 7    was that the end of our conversation?
 8        A    Yes.  It was the end of our
 9    conversation.  Your name was on the paper.
10        Q    And we were courteous to each
11    other?  Fair to say?
12        A    Yes, sir.
13             MR. FAULK:  Okay.  Good.  Thank
14                  you.  He may have some
15                  follow-up.
16             (Recess in deposition.)
17             MR. WALDING:  I don't have any
18                  questions.
19             MS. HORTBERG:  I don't, either.
20
21                  END OF DEPOSITION
22
23
24
25
```

50

```
 1    STATE OF ALABAMA

 2    HOUSTON COUNTY

 3

 4         I, Stacey Watkins, RPR, and Notary

 5    Public, State at Large, do hereby certify

 6    that the foregoing transcript, pages 1

 7    through 49, is a true and correct transcript

 8    of the testimony and proceedings taken at

 9    said time and place; and that the same was

10    taken down by me in stenograph shorthand,

11    and transcribed by me personally or under

12    my personal supervision.

13         I further certify that I have no

14    interest in this matter, financial or

15    otherwise, or how it may develop or what

16    its outcome may be.  I further certify that

17    I am not of counsel for any of the parties,

18    nor am I related to counsel or litigants or

19    associated with anyone connected with this

20    cause to my knowledge.

21         Witness my hand this 27th day of

22    December, 2007.

23

24                        RPR, Notary Public,
                          State at Large
25                        ACCR# 155
```

1

```
 1            IN THE U. S. DISTRICT COURT

 2            MIDDLE DISTRICT OF ALABAMA

 3               SOUTHERN DIVISION

 4

 5   NANCY MILLER,

 6        PLAINTIFF,

 7      VS.            CASE NO. 1:06cv00940-MEF

 8   HOUSTON COUNTY BOARD
     OF EDUCATION; KENNETH
 9   LORD; RILEY JOE ANDREWS;
     TIM PITCHFORD; PAUL
10   STRANGE; STACY EZELL;
     TROY UNIVERSITY, DOTHAN;
11   SANDRA JONES; PAM PARRIS;
     and GREG RUEDIGER,
12
          DEFENDANTS.
13

14        The deposition of SANDRA JONES, taken

15   by the Plaintiff, pursuant to the Alabama

16   Rules of Civil Procedure, before Stacey

17   Watkins, RPR, and Notary Public, State at

18   Large, at the offices of Hardwick, Hause,

19   Segrest & Walding, Dothan, Alabama, on the

20   18th day of December, 2007, at 2:25 p.m.,

21   CST, pursuant to notice.

22

23

24

25
```

3

2

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4    MR. WINN FAULK
      Attorney at Law
 5    Montgomery, Alabama

 6    MR. THOMAS K. BRANTLEY
      Attorney at Law
 7    Dothan, Alabama

 8
      FOR HOUSTON COUNTY BOARD OF EDUCATION,
 9    KENNETH LORD, RILEY JOE ANDREWS AND
      TIM PITCHFORD:
10
      MR. KEVIN WALDING
11    MR. PATRICK MOODY
      Attorneys at Law
12    Dothan, Alabama

13
      FOR PAUL STRANGE & STACEY EZELL:
14
      MS. KATHERINE HORTBERG
15    Attorney at Law
      Chelsea, Alabama
16

17    FOR TROY UNIVERSITY, DOTHAN, SANDRA JONES,
      PAM PARRIS AND GREG RUEDIGER:
18
      MS. SANDY REESE
19    Attorney at Law
      Birmingham, Alabama
20

21    ALSO PRESENT:

22    KENNETH LORD
      PAM PARRIS
23

24

25
```

```
 1                    STIPULATION

 2

 3          It is stipulated by and between counsel

 4     for the parties that this deposition be taken

 5     at this time by Stacey Watkins, RPR, and

 6     Notary Public, State at Large, who is to act

 7     as commissioner without formal issuance of

 8     commission to her; that said deposition shall

 9     be taken down stenographically, transcribed,

10     and certified by the commissioner.  The

11     signature of the witness is waived.

12          Except for objections as to the form of

13     questions, no objections need be made at the

14     time of the taking of the deposition by

15     either party, but objections may be

16     interposed by either party at the time the

17     deposition is read into evidence, which

18     shall be ruled upon by the Court on the

19     trial of the cause upon the grounds of

20     objection then and there assigned.

21

22

23

24

25
```

4

```
 1                    SANDRA JONES
 2   having been first duly sworn, testified as
 3   follows, to-wit:
 4
 5                    EXAMINATION
 6
 7   BY MR. FAULK:
 8        Q    State your full name for us,
 9   please, ma'am?
10        A    Sandra Lee Jones.
11        Q    I believe it's Dr. Jones?  Correct?
12        A    Correct.
13        Q    Dr. Jones, have you ever testified
14   in a deposition before?
15        A    No, sir.
16        Q    I'm sure your attorney has helped
17   you prepare somewhat, but I'm going to add a
18   few things that she may have already told
19   you.  Bear with me.
20        A    All right.
21        Q    If you need a break at any time,
22   let us know.  I'll be glad to take one.  If
23   you need a drink of water, coffee, Coke,
24   whatever, let us know, and Kevin will be glad
25   to help you out.
```

5

```
 1      A    (Witness indicating.)

 2      Q    You brought your own.

 3      A    I came prepared.

 4      Q    I don't talk as loud as most

 5  lawyers.  So, if I mumble or something, just

 6  tell me to speak up.  It's not going to hurt

 7  my feelings.  I'm sure you don't care whether

 8  you do or not, since I'm suing you.  Anyway,

 9  just tell me to speak up.  If I say something

10  that just sounds stupid, doesn't make sense,

11  tell me to rephrase the question, and I'll do

12  my best to do it.  Okay?

13      A    All right.

14      Q    I seriously doubt that I will use a

15  word that's outside the scope of your

16  vocabulary.  But I tell people, if I do -- I

17  take all kind of folks' depositions.  If I

18  do, tell me.  I'll be glad to try again.

19  Okay?

20      A    All right.

21      Q    During the course of the

22  deposition, if you suddenly realize, I left

23  out something while ago, just interrupt me

24  and tell me, remember when you asked me such

25  and such, well, I forgot to tell you this,
```

6

```
1    and just insert it.  Okay?

2         A    Okay.

3         Q    If you realize that was wrong, tell

4    me, while ago, when I said this, I just

5    realized I was mistaken, and straighten it

6    out.  It's just better for you to get it

7    straight today than later on.  Okay?

8         A    Okay.

9         Q    And one other thing.  If you would

10   try -- I know, in ordinary conversation,

11   people nod and shake their head and so forth.

12   You've got a better chance of her getting it

13   right, which you want her to do, if you

14   answer out loud.  Okay?

15        A    Yes.

16        Q    I guess that's about it.  If I

17   think of something else, I'll insert it.

18   Okay?  Now, you probably don't carry a CV

19   around in your purse.  You don't have one

20   with you today, I don't guess, do you?

21        A    I don't have one with me.

22        Q    I should have asked you to bring

23   one.  Would you please provide -- do you have

24   one?

25        A    Yes, I do.
```

1      Q    Okay.  That's up to date?

2      A    Yes.

3      Q    If you would, please, send it to

4    Ms. Reese or to Mr. Musso, so they can look

5    at it and decide whether I deserve to get it.

6    Okay?

7      A    All right.

8      Q    In the meantime, though, tell us,

9    if you would, just beginning with graduation

10   from college, you know, what your degree was,

11   the approximate date, and major, and other

12   educational history to date.  Okay?

13     A    Let me ask you one question about

14   the CV.

15     Q    Sure.

16     A    Do you want the full CV, or do you

17   want the abbreviated CV?

18     Q    By "full," if you mean --

19     A    I mean 14 to 20 pages.

20     Q    That's okay.

21     A    All right.

22          (Brief off-record.)

23     Q    The full CV would include, like,

24   presentations and publications and that kind

25   of thing?  Right?

```
 1       A    Yes.
 2       Q    Yeah.  I would like that, please.
 3   Now, go ahead and let us have your
 4   educational history, beginning with, first,
 5   graduation from college.  If you have more
 6   than one baccalaureate degree, I want to know
 7   about that, too.
 8       A    Do you want the years, as well?
 9       Q    If you don't mind, or approximate
10   years.
11       A    I don't mind.  I don't mind.
12       Q    I didn't think you did.
13       A    1972, graduated from Columbus
14   College, in Columbus, Georgia.  A degree in
15   -- a bachelor of arts degree in English
16   literature, language and performing arts.
17       In 1977, I graduated from Columbus
18   College with a master's of education in
19   English education.
20       I graduated in 1991 from Auburn
21   University with a doctorate in adult and
22   vocational education.
23       In between all of those, I also attended
24   Georgia State University for the beginning of
25   that master's, and took several credits in
```

```
 1    English education.  That was in 1972 and '73.
 2         In 1981 -- excuse me -- 1980, I attended
 3    the University of Georgia, and began working
 4    on some additional hours in English
 5    education, with the intention of going on to
 6    pursue a doctorate.
 7         In 1981, I then was moved into a
 8    supervisory position and began taking
 9    supervisory courses at Valdosta State
10    College.  I entered their doctoral program --
11    it was a joint program with Georgia State --
12    some time in '82.
13         I've also taken additional English
14    graduate courses with Troy University in
15    Troy.  I've taken -- those were in the early
16    '90s.  In the mid '90s, took some additional
17    course work in education, simply to renew
18    teaching certificates.  A lot of this was to
19    do that.
20         And then, in the early 2000's some time
21    -- without looking at the CV, it's some time
22    around 2000, 2004 -- took courses in
23    educational technology.
24         Q    That's it?
25         A    That would probably be enough.
```

```
 1        Q      That sounds like enough for me,

 2    anyway.   What about your employment history

 3    beginning with graduation from college?

 4        A      When I graduated in 1972, I went to

 5    work for the Department of Defense school at

 6    Fort Benning, Georgia.  Faith Middle School.

 7    Taught English to 7th graders.

 8        Q      Where is Faith Middle School?   In

 9    Columbus?

10        A      It's in Fort Benning.  It's on the

11    military installation.  I left the school

12    when I moved.  Did not go back to teaching

13    until after I finished my master's degree.

14    At that time, went to McIntosh Middle School,

15    which was a 7th grade center in Albany,

16    Georgia.  I taught there until the early

17    '80s, when I became the supervisor for

18    language arts for the Daugherty County School

19    System.

20        In '82, we moved to this area.  I taught

21    at Carroll High School, in Ozark, Alabama,

22    for one year on a -- just a fill-in contract

23    for someone on a sabbatical.  Began later

24    that year teaching adjunct for Troy.  In 84,

25    became full time at Troy University in the
```

 1    college of arts and sciences and taught

 2    English while I began working on my doctorate

 3    in education.

 4        In '93, I applied for and received the

 5    position of assistant director for the

 6    internship program in the college of

 7    education at Troy, Dothan.  In '95, I think

 8    it was, I became the director of the

 9    internship program, again, through the

10    application process.  During that time, I was

11    also the certification officer.

12        In 2002, I applied for and became dean

13    of the college of education.  May of 2005, I

14    retired.

15        Q    And are you retired full time now?

16        A    I'm retired full time, but I teach

17    adjunct when I have the whim to teach a

18    course.  I mostly teach for Troy e-campus,

19    although I have done some teaching for the

20    college of arts and sciences in English.

21        Q    Okay.  Thanks.  Now, of course, you

22    understand we're here to talk about the Nancy

23    Miller lawsuit?

24        A    Yes, sir.

25        Q    As you know or understand, I'm

```
 1     sure, this grows out of basically a three-way
 2     agreement between Mrs. Miller, Troy
 3     University, Dothan, and the Houston County
 4     Board of Education for her to serve an
 5     internship within this system.  You know
 6     about the internship?
 7          A     I know about the internship.
 8          Q     Okay.  Now, were you a signer on
 9     that internship agreement?
10          A     Which document?
11          Q     I'm going to show you.  Just a
12     minute.  It's Defendant's Exhibit 6.  And I
13     guess I can answer my own question.  Yes, you
14     were.  Somebody signed your name.  I don't
15     know if it was you or not.  I'll show it to
16     you.
17          A     (Witness reviewing document.)  Yes,
18     I signed that.
19          Q     Do you recall the document?
20          A     Yes.
21          Q     I don't mean can you recite it.
22          A     No.
23          Q     But you remember it?
24          A     I am familiar with the document.
25          Q     With the exception of the two
```

1    underlined exceptions in this agreement, in

2    your experience, would it be typical of

3    internship agreements for Troy students in

4    terms of its requirements?

5        A    As far as I can remember, yes.

6    This is essentially a template that was used.

7        Q    You understand that all three

8    parties have certain responsibilities under

9    the agreement?  Mrs. Miller has a

10   responsibility to show up at the school and

11   act as an intern.  Y'all have some

12   responsibility to supervise the internship.

13   And the Houston County people have some

14   responsibility to help out, as well.

15       A    The typical internship requirements

16   being fulfilled.  Yes.

17       Q    Okay.  In getting your doctorate in

18   education, did you take any kind of training

19   on school law or education law?

20       A    Very limited.

21       Q    This is your signature on the

22   document, Defendant's Exhibit 6?

23       A    Yes.

24       Q    Somebody doesn't just sign your

25   name for you or something?

14

```
1       A    No.  No one signs my name.
2       Q    So, I take it, from the fact you
3   signed it, that you agreed to it?
4       A    Yes.
5       Q    Do you know how it came to be, at
6   the top of the second page of the document,
7   that -- you see the pen and ink change from
8   Dr. Morin to Dr. Ruediger?
9       A    (Witness nodding head in
10  affirmative.)
11      Q    Do you know the origin of that or
12  how that change came to be?
13      A    I do not recall.  What I do recall
14  is that we were, at the time, under very
15  strict load requirements from our accrediting
16  agencies.  And it may have been something to
17  do with that.  I really do not recall.
18      Q    Y'all just needed Dr. Morin for
19  something else, possibly?
20      A    She possibly could have had to pick
21  up another course.  He might have had a
22  course that did not make.  There would be a
23  variety of reasons for changes in
24  supervision.
25      Q    In that same vein, do you have any
```

1    recollection of a point in time during this

2    internship in which there was at least a

3    suggestion that her, that is, Mrs. Miller's

4    supervisor would be changed from Dr. Ruediger

5    to someone named Mary Brazzelle?

6         A    Yes, I do.

7         Q    Tell me what you recall about that,

8    please?

9         A    I don't recall many of the details.

10   I do recall that there was a problem stated

11   by someone in the school -- I believe it was

12   Mr. Pitchford -- that something had occurred

13   with Dr. Ruediger, and that he did not want

14   Dr. Ruediger to return to the school.

15        The decision to go with Mary Brazzelle

16   was to keep Mrs. Miller from going without

17   supervision while we sorted out who would be

18   the supervisor, whether Ms. Brazzelle would

19   continue full time, Dr. Ruediger would

20   return, or someone else.  I wanted someone in

21   place for her the full time.

22        Q    And do you recall how the

23   resolution came about that Dr. Ruediger

24   resumed his duties as supervisor?

25        A    Ms. Parris, who was the director of

16

```
1    the internship program at that time, would

2    have been the one who would have worked

3    through that in more detail.

4         Q    Were you privy to any discussions

5    or other communications with Dr. Ruediger

6    concerning Mr. Pitchford's complaints, if you

7    will, or Mr. Pitchford's concerns about

8    Dr. Ruediger?  Did you ever discuss that with

9    Dr. Ruediger?

10        A    I know we discussed it at least

11   briefly, because we discussed what was

12   happening in the internship briefly.  As far

13   as any specific things, no, I cannot recall

14   those.

15        Q    You don't recall, as we sit here,

16   what Mr. Pitchford's concerns were?

17        A    I really don't.

18        Q    Have I exhausted your recollection

19   on that topic?

20        A    Yes, sir.

21             (Brief off-record.)

22        Q    Are you aware of Ms. Brazzelle

23   actually taking any actions in her role as

24   supervisor?

25        A    No, sir.
```

```
 1        Q     Do you know how long she was a
 2   supervisor, approximately?
 3        A     I would have to guess.  I don't
 4   really have any clear idea of how long it
 5   would have been.
 6        Q     At some point during the
 7   internship, did anyone ever bring to your
 8   attention that Mrs. Miller was expressing
 9   concerns to Dr. Ruediger or to others about
10   the appropriateness of IEP's and about the
11   special ed program at the high school in
12   general?
13        A     All I recall of those conversations
14   had to do primarily with that there were
15   things that she did not think were
16   appropriate as to what she had been taught.
17        Q     And can you tell us, please -- and
18   I know you -- unless you're mighty smart,
19   which I guess you are -- a lot smarter than
20   me -- you probably can't give us an exact
21   date.  If you can, that's fine.  But I'm not
22   asking you for one.  But, can you tell us
23   approximately when, in the course of the
24   internship, either here or over here, that
25   that first came to your attention?
```

1       A      What first came to my attention?

2       Q      That is, that Mrs. Miller was

3   having something to say about the IEP's and

4   the special education program at the high

5   school.

6       A      It was early.  I want to say it was

7   toward the end of August that we knew that

8   she had some questions, had some problems.

9   And it was some time shortly after that that

10  the Dr. Ruediger and Mary Brazzelle piece

11  came in.  So, it was at the beginning,

12  probably the first -- not the first couple of

13  weeks, but maybe the first month after that.

14      Q      If you recall, how did this news of

15  her concerns or expressed concerns come to

16  your attention?

17      A      It was simply mentioned to me.  I

18  typically --

19      Q      Do you recall who mentioned it?

20      A      No.  Typically what would happen

21  with that is that Ms. Parris would brief me

22  on problems with interns, things that were

23  coming up.  And it was mentioned in a

24  briefing as, here is a situation that is

25  happening.

```
 1      Q     Do you know if Dr. Ruediger was
 2  present for that briefing?
 3      A     No.  He would not have been.
 4      Q     Just in terms of how these
 5  internships ordinarily work, would you
 6  normally be made privy to an observation --
 7  just in the routine course of business, the
 8  supervisor's observation of the intern?
 9      A     Sometimes.  As a general rule, any
10  observations that had difficulties, I ask to
11  be informed of, I ask to look at the
12  evaluations, more as a heads-up, so that I
13  would know in case the student called or
14  wanted to see me.  I would know the student
15  needs to talk to Ms. Parris or this student
16  needs to talk to this supervisor.  It was
17  more of an information basis.  Typically, I
18  would not read all or even a large percentage
19  of the evaluations.
20      Q     Following the situation there with
21  the Ruediger/Brazzelle situation, and it
22  coming to your attention that Mrs. Miller was
23  expressing concerns about the program, what
24  was the next event in regard to this
25  internship that you recall that you attached
```

```
 1    any particular significance to?
 2              MR. WALDING:  Object to the form.
 3              MS. REESE:  Go ahead and answer.
 4         A    It would be the day that she left
 5    school.
 6         Q    All right.  I think we agreed it
 7    was September 24th, I believe, was the date
 8    of that.  So, from approximately the end of
 9    August to about the third or fourth week in
10    September, you didn't hear much of anything
11    that stuck with you about this internship?
12         A    There isn't a great deal that
13    sticks with me during that period of time.
14         Q    Is that because of school cranking
15    up or something?
16         A    We were in the process of actually
17    transforming three independently accredited
18    universities into one, and the deans were
19    heavily involved in it.  And I was attending
20    meetings in Troy sometimes as much as three
21    and four days a week, meetings on our campus
22    to deal with collapsing all of the programs
23    into one program, those types of things.  And
24    so, when I think back to that year, I
25    remember my car on the road to Troy.
```

1          Q      So, you just would not have really
2     had the time to concern yourself too directly
3     in an individual internship at that juncture?
4          A      I wouldn't say that I wouldn't have
5     had time.  I would have made the time if the
6     material is brought to me and shown to me,
7     we're having a problem, we need your
8     assistance with this.  I would have had the
9     time.  And I did have the time when Ms.
10    Parris would come to me with her concerns
11    about internships and how they were
12    progressing, any other indicators that would
13    come up.
14         Q      Okay.  But the next thing that you
15    recall that struck you as significant, or the
16    next thing you recall hearing about this
17    internship, was the day Mrs. Miller left
18    school?
19         A      That would be the next thing that I
20    remember in any detail.  I know that, in that
21    period of time, I would have had briefings, I
22    would have looked at documents.  But the
23    event that I remember most clearly would be
24    the day she left school, that period of time.
25         Q      Let me just ask you this.  And I'm

```
 1    not picking on you or something.

 2        A    I understand.

 3        Q    I just want to be sure I'm getting

 4    the full blast.  You don't have any specific

 5    recollection of any events pertinent to her

 6    internship between the Ruediger/Brazzelle

 7    event and the leaving school event?

 8        A    Not in any detail at all.  It is

 9    basically the major -- what I would consider

10    the major events are the ones that have

11    remained somewhat in my memory.

12        Q    Yes, ma'am.  And how, if you

13    recall, did the departure from school come to

14    your attention?

15        A    Two things.  One was a voice mail

16    message that had been left on my phone on a

17    Friday, and the other was Ms. Parris talking

18    with me Monday morning about that event.

19    Those two things, I do remember.

20        Q    Tell me what you recall about the

21    voice mail?

22        A    Mrs. Miller sounded frantic.  She

23    sounded upset.  She said she had left the

24    school and was not -- you know, was not where

25    we thought she was supposed to be, which was
```

1    at the school.

2         Q    Did you preserve that message?

3         A    No.   I would have for a period of

4    time.   But, after a while --

5         Q    All right.  And then, the following

6    Monday, you heard from Ms. Parris?

7         A    Uh-huh.  Yes, sir.

8         Q    Tell us about that, please?

9         A    Again, I don't remember details.

10   But she came in, and we talked about what

11   happened.  Again, details, I do not remember.

12   I remember the event, that we did talk.

13        Q    But, at that point, when Ms. Parris

14   came in, your only basis of knowledge was the

15   phone message?

16        A    Of that event?

17        Q    Yes, ma'am.

18        A    That's all I recall.

19        Q    And what do you recall Ms. Parris

20   telling you, as best you recall?

21        A    As best I recall, that's when she

22   told me that Mrs. Miller left the school,

23   that she was upset over something to do with

24   the programs.  I don't recall the details of

25   what she was upset about.  But she was very

```
 1    upset about the programs, and something had
 2    happened with it.  My questions to her would
 3    have been, who was notified, who knew what
 4    was happening, those types of things.
 5         Q    Do you recall what she told you in
 6    that vein?
 7         A    Not in detail, no, sir.
 8         Q    Let me show you what's already in
 9    evidence as Defendant's Exhibit 14.  And you
10    may not have seen it before.  But, whether
11    you have or not, I wanted to ask you just to
12    read through it and tell me when you've
13    finished.  Okay?
14         A    All right.  (Witness reviewing
15    document.)  I finished.
16         Q    Okay.  And, having read it, can you
17    tell us whether the scope of that memo,
18    Defendant's Exhibit 14, is generally
19    consistent with the voice mail you received
20    later from Mrs. Miller?
21         A    It's in much more detail than what
22    was in the voice mail.  But the information
23    in it is very much similar to what I
24    remember.  Again, I don't believe that she
25    gave me that much information.
```

```
1        Q     But the general tenor and character
2    of the information would be similar to the
3    voice mail?
4        A     Less frantic, less distressed.
5        Q     Now, did you, some time thereafter,
6    receive a letter, either directly or through
7    Ms. Parris, from Riley Andrews?  And I'm
8    going to show you what's marked as
9    Defendant's Exhibit 17.  Do you recall ever
10   seeing that before?
11       A     Yes, I do recall.
12       Q     And how did that document come to
13   your attention?
14       A     I believe Ms. Parris brought it to
15   me.
16       Q     Okay.  And the document I've shown
17   you happens to be undated.  Do you remember
18   if she brought it to you on that first day,
19   on that Monday?
20             MR. WALDING:  Object to the form.
21                    What Monday are you referring
22                    to?
23             MR. FAULK:  The Monday following
24                    the phone message.
25       Q     I believe you testified Ms. Parris
```

```
1    came to see you to talk about this situation.
2         A    On Monday.
3         Q    Do you know if she brought -- and I
4    don't want to suggest it to you.  I'm just
5    trying to -- since it doesn't have a date,
6    I'm just trying to place --
7         A    I think it came later.  I do not
8    know.  I don't recall it as being part of
9    that meeting.
10        Q    Okay.  Let me show you what's
11   already been marked as Defendant's Exhibit
12   15.  And once you've looked at that, turn
13   over two pages to Defendant's Exhibit 16.
14   And I'm going to ask you if you've seen those
15   prior to this lawsuit being filed?
16        A    (Witness reviewing documents.)  I
17   have not seen that.
18        Q    That's 15?
19        A    That's 15.
20        Q    Yes, ma'am.
21        A    And this is 16.  (Witness reviewing
22   document.)  I don't recall seeing that,
23   either.
24        Q    Okay.  Do you happen to know who
25   Virginia Singletary is?
```

1         A      The name is familiar to me, but I

2    cannot place it.   I'm not sure.

3         Q      Now, when Mr. Andrews sent you --

4    or, rather, sent Ms. Parris, who transmitted

5    to you, Defendant's Exhibit 17, do you recall

6    -- and I'm going to show you 17 again, the

7    undated letter from Mr. Andrews.   Do you

8    recall whether Defendant's Exhibit 18, which

9    you're now looking at, was an enclosure to

10   that letter or accompanied it when Ms. Parris

11   brought it to you?

12        A      I don't recall if they came at the

13   same time.   I have seen this document before.

14        Q      Outside the context of this

15   lawsuit?

16        A      But I do not know -- outside of the

17   context of the lawsuit.   I have seen this

18   before.   I believe it was part of the file.

19   But I do not recall -- to the best of my

20   memory, they did not come at the same time.

21   But I can't say that with any certainty.

22             MR. WALDING:   Just for our record,

23                  which two is she referring to?

24             MR. FAULK:   She's referring to 17

25                  and 18.

```
 1        Q    Now, you talked to Ms. Parris, and
 2   at some point near in time -- you can't say
 3   exactly when -- you were presented with
 4   Defendant's Exhibit 17, and you believe also
 5   near in time, if not contemporaneously,
 6   Defendant's Exhibit 18?
 7        A    Yes.
 8        Q    Did you receive any other written
 9   information from any source concerning Mrs.
10   Miller's internship during the week that
11   followed her visit to Mr. Andrews' office?
12        A    It would have been customary
13   because of the problems that were identified
14   by leaving school, by the voice mail, by this
15   information.  I would have asked for her
16   internship file.  So, I would have looked at
17   her internship file during that week.  But I
18   can't recall receiving other outside
19   information.
20        Q    All right.  And as a matter of
21   regular business record keeping, as of that
22   point in her internship, what, other than the
23   internship agreement and the first
24   observation, would you have expected to find
25   in the internship file?
```

1       A      Calling it an internship file is

2    probably a misnomer, because while that was

3    its purpose at that point in time, all of the

4    material that Mrs. Miller would have

5    presented for her evidence of observations,

6    test scores, any labs that she had, this

7    would have been her admission to the teacher

8    education program file, as well.

9       So, it would have all of that

10   documentation, along with all of the

11   internship documents that she would have

12   prepared in applying for internship, and

13   then, anything that was prepared in the early

14   stages of the internship.

15      Q      As we sit here, can you -- let me

16   step ahead for just a second.  I'll come back

17   to that.  Do you recall -- again, near in

18   time to this contact by Ms. Parris, do you

19   recall talking to Dr. Ruediger in some

20   fashion -- I don't know if in person or by

21   phone -- and telling him, in substance, to go

22   look into things?

23      A      I don't recall what I would have

24   said to him.  I do remember talking with him

25   at some point in this span, because that

        1    would have been, again, customary procedure

        2    to talk with the supervisor to get what

        3    information I could get clarification.  I

        4    need clarification.  That would be part of my

        5    data gathering, would be to talk to the

        6    supervisor.

        7        Q    Would it be consistent with your

        8    present recollection that the discussions

        9    with Ms. Parris and the follow-up with

       10    Dr. Ruediger would have occurred within a

       11    week of Mrs. Miller leaving school?

       12        A    Within a week, maybe ten days,

       13    depending upon other factors.  Driving to

       14    Troy, for example.

       15        Q    If Dr. Ruediger's testimony is to

       16    the effect that he went out to the school on

       17    the 30th of September, and that that was

       18    subsequent to discussing the matter with you,

       19    do you have any reason to question his

       20    recollection of that?

       21        A    No.

       22        Q    And, in that interim, you would

       23    have called for and looked at what I'm

       24    calling the internship file?  Correct?

       25        A    Yes.

```
1       Q    Okay.  And as we sit here today, do

2  you have any specific recollection of seeing

3  anything in that file that you viewed as

4  being unfavorable or derogatory concerning

5  Mrs. Miller, other than Defendant's Exhibits

6  17 and 18?

7            MR. WALDING:  Object to the form.

8            MS. HORTBERG:  Same objection.

9       Q    It's okay.

10      A    It's okay?

11      Q    It's okay.  You can answer.

12      A    I believe there were some

13  evaluations in there that had 1's or 2's.

14  I'm not certain.

15      Q    Before you sent Dr. Ruediger out?

16      A    I think there was something in

17  there.  I'm, again, not certain what was in

18  there, totally.

19      Q    Well, again, of course,

20  Dr. Ruediger may be mistaken.  But, if we

21  accept his testimony that his visit on

22  September 30th was his second observation,

23  and that that occurred after a meeting with

24  you in which you instructed him, in

25  substance, I need you to go get more data on
```

32

```
1      this, it would have to be material that

2      predated September 30?  Fair enough?

3           A     Fair enough.

4           Q     Okay.  Is it possible you reviewed

5      the file more than once in the course of the

6      decision-making process?

7           A     I am fairly sure that I would have.

8           Q     And if that's the case, you may

9      have seen something after September 30th that

10     had some 1's on it and so forth?  Fair?

11          A     Fair.

12          Q     Do you recall Dr. Ruediger going to

13     the school, in accordance with your

14     directions, doing an observation, and

15     reporting back?

16          A     Specifically, no, but --

17          Q     By "reporting back," what I really

18     mean is turning in his observation form and

19     such as that.

20          A     He wouldn't have turned it in to

21     me.  He would have turned it in to Ms.

22     Parris.

23          Q     And would it have become part of

24     this file?

25          A     It would have become part of the
```

33

```
 1    file.  And so, again, if I reviewed the file
 2    multiple times after that September date,
 3    then it would have been in that file, and I
 4    would have seen it at that point.
 5        Q    Do you have any more detailed
 6    recollection of your meeting that week with
 7    Dr. Ruediger, prior to the second
 8    observation, than what I've related to you?
 9        A    No, sir.
10        Q    What's the next thing you recall
11    happening in relation to this process that
12    led up to the withdrawal of the internship?
13        A    The next event that stands out in
14    my mind, again, is not in detail, but I do
15    remember meeting with Mrs. Miller and talking
16    with her.  I do remember writing a memo that
17    stated our policy was that incompletes had to
18    be resolved within six to eight weeks, I
19    believe it was, in the term, the following
20    term.
21        I gave her some options, that she could
22    do another internship in January, she could
23    do it the following fall.  And to assist her
24    with that as she made the decision, I gave
25    her a longer period of time.  Cleared it with
```

34

1    the registrar to be sure that the incomplete

2    would be allowed to stay on the books for the

3    period of time that I gave her.

4       Q    In the case of an internship, would

5    I be correct in thinking you really couldn't

6    clear it in six to eight weeks, could you?

7       A    It would be difficult, but it would

8    depend.

9       Q    On what?

10      A    There might be someone who had

11   difficulty in the beginning of an internship,

12   nothing major, but something we could work

13   with, and we might extend the internship for

14   four weeks or six weeks beyond graduation.

15   That was something that we would do

16   occasionally with an intern.

17      Q    That wouldn't be feasible in this

18   situation?

19      A    No.

20      Q    What about, Dr. Jones, the fact

21   that Mrs. Miller was put in a situation where

22   she was in what appears on the face to have

23   amounted to a regular teaching job without

24   certification?  Do you know anything about

25   how that came about?

1      A    I know that Houston County Schools

2    would have contacted Ms. Parris to ask her

3    about graduates, recent graduates, who might

4    be available to teach.  And they may have

5    asked her -- probably did ask her for someone

6    who was interning.

7      Q    Am I correct, if you know, in

8    thinking that it's not possible to even get

9    an emergency certificate in Alabama if you

10   don't already have a baccalaureate?

11     A    I don't believe you can.

12     Q    Did anyone ask your advice about

13   putting her in a so-called teaching position

14   when she didn't have a certificate?

15     A    Ms. Parris would have come to me

16   and asked.

17     Q    In the ordinary course of affairs,

18   she should have come to you.  And do you

19   specifically recall her asking you in this

20   case?

21     A    I don't specifically recall a

22   conversation on this case, although we would

23   have had one.  Because she would not have

24   initiated the memo without discussing it with

25   me.  The document.

36

```
 1       Q    Of course, you signed off on that
 2    Defendant's Exhibit 6?
 3       A    That's right.
 4       Q    So, you were aware of it,
 5    apparently?
 6       A    Yes.
 7       Q    Was the education department
 8    accredited at this time at Troy University,
 9    Dothan?
10       A    Yes.
11       Q    Are you familiar with the NCATE?
12       A    NCATE.
13       Q    What does that stand for?
14       A    National -- let's see if I can
15    remember.  National Association for the --
16    let's see.  National Council for the
17    Accreditation of Teacher Education.
18       Q    All right.  Was there any special
19    thing that went along with that to certify
20    the special education program?
21       A    No.
22       Q    There's been some testimony along
23    about the Council for Exceptional Children or
24    something like that.  Are you familiar with
25    that?
```

```
 1      A    I am.
 2      Q    Are you familiar with something --
 3   let's see.  I had the name while ago.
 4   Program report for the preparation of special
 5   education professionals.  Is that a document
 6   you're familiar with?
 7      A    I'm familiar with it, but not
 8   because we used it at our school.  We did not
 9   use it at our school.
10      Q    So, who would certify your special
11   education program?  NCATE?
12      A    No.  The program, yes.  Alabama
13   State Department of Education is the first, I
14   guess we would say, approval of programs.
15   And then, NCATE is on top of that.
16      Q    And the internship program, as
17   such, is a necessary part of the teacher
18   education program, leading to certification?
19   Correct?
20      A    Yes.
21      Q    You can't get certified in Alabama
22   if you haven't done an internship, or can
23   you?
24      A    You can.  The State of Alabama has
25   a program called the Alternative Class B.
```

38

```
 1    It's an alternative program for those
 2    individuals who have a bachelor's degree in a
 3    field, they're in high need areas, and they
 4    don't have certification.  The state
 5    department -- the school systems actually do
 6    the employing.  They present the information
 7    to the state department.  The state
 8    department either approves or disapproves.
 9        That person then has time to take -- I
10    believe it's four courses in education, and
11    actually teach while they're doing those
12    courses.  I think they have three years,
13    then, to prove that they can apply the
14    knowledge that they've gained as students and
15    in the on-the-job training, so to speak, of a
16    Class B situation.
17        Q    And is that the so-called emergency
18    certificate?
19        A    No.
20        Q    It's something different?
21        A    That's something different.
22        Q    Okay.  Is the internship program,
23    or the existence of it, something that's
24    necessary in order for the education
25    department or the teacher education program
```

39

1    at Troy to be accredited?

2         A     Yes.   It is mandated by state law

3    to have an internship or to have employment

4    in that area.   And so, it is necessary to --

5    also necessary from a pedagogical point of

6    view that we see the student actually apply

7    what happened in the previous four years of

8    college.

9               (Recess in deposition.)

10        Q     Dr. Jones, during the break, I

11   believe you accommodated me by taking a look

12   at Defendant's Exhibits 7, 8 and 9?  Correct?

13        A     Yes, sir.

14        Q     And from the dates of those

15   documents, would I be correct in thinking

16   that they would have all been in the -- what

17   I've been calling the internship file by or

18   before September 24, 2004, or should have

19   been?

20        A     They should have been.

21        Q     Okay.   Now, have you had a chance

22   during the break to review each of these

23   documents?

24        A     Yes, I have.

25        Q     Do you see anything in any of those

40

```
 1    documents that, based on your experience and
 2    education in this field, would be predictive
 3    -- on the face of those documents, would be
 4    predictive of an unsuccessful outcome of this
 5    internship?
 6        A    No.
 7        Q    So, if anything else in the file
 8    during the week after September 24th would be
 9    predictive of an unsuccessful internship, it
10    was something other than these three
11    exhibits?  Is that fair to say?
12        A    I would say it's fair to say that.
13        Q    Thank you, ma'am.  Let me show you
14    something else.  And just for the record,
15    those three documents were Dr. Ruediger's
16    first observation, dated 8-26-04, his notes
17    concerning the observation and debriefing,
18    also dated August 26, 2004, and an
19    observation by Mr. Strange dated August 30,
20    2004.  Will you agree with me on that?
21        A    Yes, sir.
22        Q    Let me show you -- this is not
23    marked as an exhibit, but it's several pages
24    entitled "Declaration of Sandra Lee Jones."
25    Are you familiar with that?
```

```
 1        A    (Witness reviewing document.)  Yes,
 2   sir.
 3        Q    Okay.  And what I've really shown
 4   you are seven pages, I believe, including a
 5   thing that just says "Tab C" as page 1.  They
 6   say page 1 of 14 and so forth through page 7
 7   of 14.  Do you have any religious scruples
 8   about swearing?  And I'm not talking about
 9   cussing.  I'm talking about taking an oath.
10   Because this is unsworn, or at least appears
11   to be.  Do you know how that happened?
12             MS. REESE:  I'm going to object to
13                  the form to the extent it calls
14                  for a legal conclusion.  Answer
15                  if you know.
16        A    I don't really know if I would.
17        Q    Well, I mean, you didn't decline to
18   sign this under oath, did you?
19        A    No.
20        Q    And nobody asked you to sign it
21   under oath, that you recall?
22        A    No.
23        Q    Okay.  And you do not, apparently,
24   have any religious scruples against swearing?
25        A    No.
```

42

```
1                MR. FAULK:  That may be something
2                   you want to look at, because
3                   this was in support of your
4                   motion for summary judgment.
5                MS. REESE:  Thank you.
6       A    If I could interrupt, there is one
7    error in that that I noted.  There is a date
8    that's incorrect.  It says '05, I believe.
9    Let me find the date.  (Witness reviewing
10   document.)  It's in item 22.  Do you want me
11   to read?
12      Q    Please.  Just enough to identify
13   it.
14      A    Okay.  It says, "... and what I
15   consider a major event, her leaving the
16   Houston County High School campus one day in
17   September 2005."  And it should have been
18   2004.
19      Q    Yes, ma'am.  Thank you.  Did you
20   draft this yourself, or did someone draft it
21   based on information you gave them?
22      A    It was -- I received a rough draft
23   of it, but it was based on other information
24   that I had provided.  And then, I went
25   through and wanted changes to some things,
```

43

```
 1    because some things were not accurate, and,

 2    some things, I did not remember.

 3        Q    But, in the final product of the

 4    drafting, so far as you know, everything in

 5    there would be things that you viewed as true

 6    and that you would swear to, if asked?

 7        A    If asked, I would.  I would want

 8    the opportunity to review it one more time

 9    and think about it again.

10        Q    Yes, ma'am.  Once Dr. Ruediger did

11    his second observation, on September 30,

12    2004, did you have any involvement in having

13    Dr. Lumpkin join him for a debriefing

14    concerning that observation?

15        A    Yes.

16        Q    And tell us about that, please?

17        A    It was customary, when we had any

18    sort of concerns with an intern, to involve

19    other faculty members to assist.  And because

20    of the incident with Mr. Pitchford, where

21    there were some concerns -- and at that

22    point, I'm not certain that I completely

23    understood all of the pieces of that

24    disagreement or -- I'm not sure what to call

25    it, that confusion.  Dr. Lumpkin was a former
```

```
 1    dean.  Dr. Lumpkin had been an administrator.
 2    And I simply felt that it would be good for
 3    her to be there to listen and to provide some
 4    counsel, as well.
 5        Q    And when you say the concerns of
 6    Mr. Pitchford, are you referring to his
 7    earlier concerns, where you temporarily
 8    appointed Ms. Brazzelle?
 9        A    Yes.
10        Q    Are there certain internship
11    observations that are debriefed at the local
12    site and others that are debriefed at the
13    Troy campus?
14        A    There's no real requirement as to
15    which way it should be done.  Sometimes it
16    would be debriefed on the Troy campus simply
17    because the intern had a class to teach and
18    could not spend the time necessary away from
19    the students.  Because, although the
20    debriefing is extremely important, those
21    students are extremely important.  And so, we
22    did not want to take the intern away if there
23    was a lesson that had to be taught by the
24    intern.  And those were things that sometimes
25    we could work around, sometimes we couldn't.
```

45

```
 1        There were times when, if we felt like
 2    we needed resources beyond what we would have
 3    in the school, there might be a request,
 4    let's do the debriefing back at campus.
 5        There might be an instance where the
 6    professor had a class to teach coming, and
 7    felt he or she needed a longer period of time
 8    than what was permitted by debriefing at the
 9    school, and so, again, the request would be,
10    come to the school.  There would be a variety
11    of patterns and reasons.
12        Q    We've got two schools going on.
13    Most of the time you said "the school," I
14    think you were talking about --
15        A    Troy.  Troy.  Most of the time,
16    Troy.  The intern, with her school, would be,
17    is she going to have to teach, does she have
18    duties or responsibilities that would
19    interfere with being able to do the
20    debriefing right at that time.
21        With Troy, it would be, does the
22    professor have a class that has to be dealt
23    with.  And, sometimes, if an observation ran
24    long or if the professor felt that the
25    observation debriefing was going to be long,
```

46

```
 1    and a class was coming up, there might be an

 2    instance of setting it up inside the Troy

 3    campus.

 4        Q    All right.  Do you recall what

 5    occasioned the decision to hold this

 6    debriefing on campus?

 7        A    I don't recall the specifics.  But

 8    the 24th of September was the date of leaving

 9    the school.  That would have been -- in the

10    front of my mind, I would have been thinking

11    about that as an opportunity to stress that

12    professionalism of not leaving a school,

13    leaving children unattended, which would have

14    been a concern of mine.

15        Knowing that -- in the message, she told

16    me she was driving around, I believe.  Those

17    pieces right there would have caused me

18    concern.  And I would have wanted Dr.

19    Lumpkin, who had been a principal, who had

20    been an administrator, to present that point

21    of view.  Here's the way a principal would

22    look at that.  So, it would be using her as a

23    resource.

24        Q    Let me show you Defendant's Exhibit

25    20.  Do you recall seeing that before, the
```

1    September 30, 2004 observation by

2    Dr. Ruediger?

3            MS. REESE:  Object to the form.

4            MR. FAULK:  Really?  Is that not

5                what it is?

6            MS. REESE:  Do you recall seeing

7                that before the September 30th

8                observation?

9            MR. FAULK:  Yeah.  Isn't that what

10                that is?

11            MS. REESE:  Seeing what before?

12            MR. FAULK:  The document.

13            MS. REESE:  Seeing it before what

14                event?

15            MR. FAULK:  Today.  Oh, I see.

16            MS. REESE:  Yeah.

17            THE WITNESS:  I'm confused.

18    Q    (By Mr. Faulk)  The September 30

19    observation, have you seen that before?

20    A    Yes.

21    Q    And did you see it back around the

22    time it was prepared?

23    A    I would have.  Because, again, I

24    believe I mentioned earlier that, if an

25    observation had any problems in it, that Ms.

48

1    Parris was instructed to show those to me, so

2    that I would know what was happening.  2's

3    and 1's would have been considered a problem.

4    And so, I would have asked to -- I would have

5    expected to see this.

6         Q    You would have expected to have the

7    document brought to you to see?

8         A    Yes.  It would have been in the

9    internship file.  I would have expected the

10   form to be brought to me and pointed out.

11        Q    Would the same be true of

12   Defendant's Exhibit 21?

13        A    (Witness reviewing document.)  Yes.

14   I would have seen that.

15        Q    And unlike the other two

16   observations you looked at earlier, 7, 8 and

17   9, Defendant's Exhibits 7, 8 and 9, in your

18   opinion, would the information reflected in

19   20 and 21 be predictive of an unsuccessful

20   outcome for an internship?

21        A    I wouldn't say it would be

22   predictive.  It would be warning flags.  It

23   would be something that would say to me, this

24   person is struggling, this person is having

25   some trouble with things that are a piece of

49

```
 1    the application in the internship, and so, we
 2    need to watch this.
 3        This, coupled with leaving the school,
 4    would have raised major issues for me as for
 5    the ability to complete an internship,
 6    because professionalism would have been drawn
 7    into the picture with leaving the school.
 8        Q    Let me turn back to Defendant's
 9    Exhibit 20 for a minute and call your
10    attention --
11        A    Do you want to turn it around and
12    look at it?
13        Q    That's okay.  I may have read off
14    some of these numbers wrong earlier.  There
15    are two areas where she received a 1.  I
16    think I said 5 and 9 in Dr. Ruediger's.  No.
17    That's not it.  It would be 16, actually.  I
18    think I called that number 6 in his
19    deposition.  It's "Exhibits professional
20    demeanor."  And 19 is "Demonstrates
21    reliability."  And he gave her a 1 on each of
22    those.  Am I reading it right?
23        A    Yes, sir.
24        Q    Now, if his testimony is to the
25    effect that those two 1's are based upon the
```

1    incident in which she left campus, that is,

2    out at Columbia, in your opinion, was it

3    proper for him to grade her on things that he

4    did not personally observe?

5        A    Yes.

6        Q    And why is that, please?

7        A    A piece of what a supervisor does

8    is collect data.  And sources of data that

9    would have been acceptable for making

10   decisions would have been the cooperating

11   teachers, the principal, the assistant

12   principal, if the assistant principal was

13   also involved.  Those would have been

14   appropriate sources.  Data collection is much

15   broader than just sitting here looking at

16   you, and then, making a record.

17       Q    Is there any set of instructions

18   that you're aware of as to how these

19   internship observations are to be completed

20   by the supervisor?

21       A    There is an internship handbook

22   that the interns had.  There's a section in

23   it that talks about the different items.

24   There would also be verbal explanation.  The

25   director of the internship program would --

51

```
 1    prior to the observations being completed,
 2    the intern director would have held a meeting
 3    with the interns to explain the items.  But
 4    there also would have been an opportunity
 5    particularly for new supervisors to have gone
 6    through training, along with the cooperating
 7    teachers.
 8         Q    And what would their training
 9    materials consist of?
10         A    The internship handbook, which has
11    forms and the explanation of the forms.
12    There might also, at some point, be dummy
13    forms of observations to point out, here are
14    ways to fill them out.
15         Q    I don't want to sound defensive.
16    Okay?  But, can you direct me to any written
17    set of instructions, any published pamphlet
18    with Troy State or whoever, that would direct
19    a person in Dr. Ruediger's position that it
20    was acceptable on this observation form to
21    grade an intern or evaluate an intern based
22    on behavior he did not personally observe?
23         A    Other than the descriptions of the
24    forms in the internship handbook, I cannot
25    think of anything written.  It would have
```

52

```
 1    been a piece that would have been discussed
 2    in training meetings.  But I don't recall
 3    anything in writing that would have said
 4    that.
 5        Q    All right.  And, again, I'm not
 6    being smart-alecky or disrespectful.  But,
 7    are you aware of any written definition of
 8    the term "observation" or "observe," in this
 9    context, that has some special meaning as a
10    term of art to include pieces of information
11    that the evaluator or supervisor didn't gain
12    through his own direct powers of observation?
13        A    Something in writing?
14        Q    Yes, ma'am.
15        A    Other than training that one would
16    receive in supervision and leadership, I
17    can't think of anything that would be
18    written.
19        Q    Okay.  On the form itself, you
20    agree with me, don't you, that it includes an
21    option there to report "NO," meaning not
22    observed?  Correct?
23        A    Yes.
24        Q    And you recall, on the earlier
25    observation, there were certain areas that
```

Dr. Ruediger indicated "NO" as to those?
A Yes.
Q Okay. And, in fact, one on here, under the item "Evaluation," in block 3-D, I suppose it is. There's a hole punched in the paper.
A That would be D.
Q Do you recall seeing previously Defendant's Exhibit 22, back around the time this all took place?
A (Witness reviewing document.) While the content of this, for the most part, is familiar to me -- parts of it come back to me as I read it -- I can't say if I actually saw this document or if I know that information from conversations or if I know that information from other documents.
So, I can't say this document is one I've seen, but I can say that a lot of that information is information that I do remember to some degree.
Q Thank you, ma'am. For the record, it's entitled "Report of observation for Nancy Miller, visit number 2, September 30, 2004." And it's dated October 1, 2004,

54

1    consisting of two pages.

2        In reading it, do you understand that it

3    would appear to be a response from Nancy

4    Miller to this second observation?

5        A    It may be her written reaction to

6    the observation, which would have been the

7    standard that the interns were held to.

8    Following an observation, you react to the

9    observation.

10       Q    So, you're not only afforded the

11   opportunity to react, you're expected to

12   react?

13       A    Yes.

14       Q    And then, at some point,

15   Dr. Ruediger's information filters back to

16   you?  Correct?

17       A    Correct.

18       Q    And did you act upon it?

19       A    Yes.

20       Q    And what did you do?

21       A    At that point, it appeared that the

22   learning phase, the application phase, which

23   is what we consider the internship, was not

24   working.  We had the very emotional, very

25   distraught phone messages that had been left.

55

```
 1    We had the reactions to the observation.  By
 2    the time I made the decision, we had those
 3    other documents that showed that there were
 4    some problems at the school.
 5        It would have, at that point, seemed
 6    that, as a learning opportunity, the
 7    internship was lacking.  And so, that was
 8    when the decision began to be discussed to
 9    terminate the internship itself.
10        Q    And by the other documents
11    indicating there was a problem at the school,
12    I believe you are referring to the letter
13    from Mr. Andrews to Pam Parris, that we
14    talked about earlier --
15        A    Yes, sir.
16        Q    -- and that memo from Mr.
17    Pitchford, apparently, to Pam Parris, that's
18    signed off on by Ms. Ezell and Mr. Strange?
19        A    Yes.  I'm not certain that that was
20    from Mr. Pitchford or from the two
21    cooperating teachers.  I don't recall.  But I
22    believe we're talking about the same
23    document.
24        Q    (Showing document to the witness.)
25    We're talking about Defendant's Exhibit 18?
```

56

1      A    Yes.
2      Q    Okay.  I see it just says "From
3    Houston County High School."  It doesn't
4    identify Mr. Pitchford specifically.
5      A    No.  It has only the signatures of
6    the two teachers.
7            MR. WALDING:  17 and 18 is what
8                 we're talking about?
9            MR. FAULK:  Yeah.
10     Q    And Defendant's Exhibit 17, the
11   undated letter to Ms. Parris from Mr.
12   Andrews, are the documents indicating to you
13   there was a problem at the school?
14     A    Yes.
15     Q    Any other information available to
16   you at the time that you based your decision
17   on?
18     A    Whatever was in the internship
19   folder.
20     Q    And you've testified today to the
21   best of your recollection?
22     A    Yes, sir.
23     Q    I'll show you Defendant's Exhibit
24   19, which purports to be an e-mail from Nancy
25   Miller to you, carbon copied to others, dated

```
 1    September 26, 2004.  I'll ask you to look at

 2    that and tell me if you recall that?

 3         A    (Witness reviewing document.)  I

 4    don't recall the e-mail itself.  But the

 5    information in it, if I didn't get it from

 6    the e-mail, I got it from another source.

 7    The content is familiar to me.

 8         Q    Do you have any reason to believe

 9    that anything stated in Defendant's Exhibit

10    19 is not truthful?

11         A    Let me look at it one more time.

12         Q    (Handing document to the witness.)

13         A    (Witness reviewing document.)  I

14    have no reason to believe it isn't truthful.

15         Q    So, some time shortly after

16    September 30th, you reached the conclusion

17    that, for whatever reason, this internship or

18    the usefulness of it, educationally, had come

19    to an end?

20         A    Yes, sir.

21         Q    And having reached that conclusion,

22    what did you do, if anything?

23         A    The next step would have been in

24    conference with Ms. Parris, telling her that

25    I felt the internship was over.  And then,
```

58

```
1     it's her responsibility, as the director, to
2     then terminate that internship.
3          Q     Who is that, now?  Ms. Parris?
4          A     Uh-huh.  She would have been the
5     one who would handle that.  That was one of
6     her responsibilities.
7          Q     And did you leave that up to her
8     discretion?
9          A     Not discretion in that she could do
10    it or couldn't do it.  She had to -- if I
11    told her to terminate an internship, then she
12    would have to terminate it, unless she came
13    up with other evidence and could convince me
14    otherwise.
15         My concern would have been based on the
16    data that was provided to me, the various
17    forms of observations, the information that
18    was in the file, my own personal
19    observations, if I had any.  In this case, it
20    would have been the message that was left,
21    the information about leaving the school,
22    because, again, that, to me, was a very
23    important point.  And so, she would have had
24    to have come up with something compelling to
25    show me that that was not a good decision.
```

59

```
 1       Q    Okay.  Well, did Ms. Parris attempt
 2   to do that, to your recollection?
 3       A    Not to my recollection.
 4       Q    At any given time while you were
 5   dean of the education department,
 6   approximately how many interns would Troy
 7   have in the Houston County School System?
 8   Not just special ed, but in general?
 9       A    I don't think I could put a number
10   to it.  In any particular term, it could be
11   -- it could range from none to maybe six or
12   seven.  It would vary tremendously from term
13   to term, based on availability of teachers,
14   based on the subject areas of the interns,
15   based on placement.  Placement was handled
16   through Ms. Parris and central offices.  So,
17   there were a lot of factors in that.  It
18   would vary greatly from term to term.
19       Q    Do you know approximately how many
20   students were in the teacher education
21   program at Troy in the fall of 2004?  Just
22   your best judgment?
23       A    Already admitted, maybe 175, 200.
24       Q    And of that number, could as many
25   as a fourth have been seniors?
```

```
 1        A    Typically, if you're talking about

 2   admitted, then you're talking about roughly

 3   half would be moving toward an internship.

 4   Because, typically, then, that half, half

 5   would intern in the fall.  A quarter of the

 6   interns would be in the fall, a quarter of

 7   the interns would be in the spring.  And

 8   then, the others would be in their junior

 9   year.

10        Q    So, roughly 40 per semester, maybe

11   a few more?

12        A    Again, it would vary tremendously

13   from term to term.

14        Q    That term, you say you had about

15   175 in the program?

16        A    Probably in the program.

17        Q    Of whom half were either ready to

18   intern or heading toward it the next

19   semester?

20        A    Roughly.

21        Q    And in order to have those people

22   complete their academic regimen, they've got

23   to intern somewhere?  Correct?

24        A    Correct.

25        Q    And they would be supervised by
```

```
 1      someone from the faculty at Troy University,

 2      Dothan?

 3          A     Or adjunct faculty.

 4          Q     Okay.  Like Ms. Brazzelle?

 5          A     Like Ms. Brazzelle.

 6          Q     Okay.  Is it fair to say they would

 7      need to be in some school system within a

 8      reasonable distance of campus?

 9          A     We tried to keep them within a

10      close proximity of the campus.  But because

11      the boundaries for in-state tuition expanded

12      at some time in the '90s, some of our interns

13      were placed at a fairly good distance.

14          Q     Such as --

15          A     Vernon, Florida.  Ponce de Leon,

16      Florida.  Donalsonville.  We had one over

17      close to the Albany, Georgia area.

18          Q     So, within about an hour and a

19      half's drive?

20          A     That would be about maximum.

21          Q     Would you agree with me that it was

22      and is important for Troy University to

23      maintain a good working relationship with the

24      school systems where interns are placed?

25          A     I think that's a fair statement.
```

62

```
1        Q      And, presumably, vice versa?
2        A      Yes.
3        Q      It's in their interest to maintain
4    a good relationship with the university?
5    Fair?
6        A      Fair.
7        Q      Do you have any background that
8    would give you any special knowledge about
9    due process hearings in the special education
10   field?
11       A      No.  Special education is not my
12   area.
13              MR. FAULK:  Okay.  I guess that's
14                   that.  Thank you.  He probably
15                   has something.
16
17                   EXAMINATION
18
19   BY MR. WALDING:
20       Q      Dr. Jones, I'm Kevin Walding, and
21   I'm one of the attorneys for the Houston
22   County Board of Education and several of the
23   other defendants in this case.
24       You are the individual who actually made
25   the decision to terminate Mrs. Miller's
```

63

```
1    internship?  Is that true?

2        A    Yes.

3        Q    Mr. Faulk was asking you some

4    questions about this certification, this

5    affidavit that you signed.  It's really not

6    an affidavit, I take it, is his point.

7              MS. REESE:   I think it's supposed

8                    to be a declaration, but it's

9                    missing one sentence.

10             MR. WALDING:  Declaration.  All

11                   right.

12             MS. REESE:  Which we will get

13                   fixed.

14             MR. WALDING:  I was going to try

15                   and fix it right now.

16             MS. REESE:  Oh, okay.  Go ahead.

17                   Be my guest.  Let her see it

18                   again.  I think she said she

19                   wanted to see if again.

20       Q    (By Mr. Walding)  If you will,

21   Dr. Jones, look that over for me at this

22   time.  You said you wanted an opportunity to

23   review it again.

24       A    (Witness reviewing document.)

25             (Off-record discussion held.)
```

64

```
 1                MS. REESE:  We're going to
 2                     substitute this and have the
 3                     corrected language on there,
 4                     just to cross all our "t's" and
 5                     dot all our "i's."  Nobody is
 6                     going to object to that, are
 7                     they?
 8                MR. WALDING:  I have no objection.
 9                     But he raised the interesting
10                     issue.
11                MS. REESE:  Winn, you're not going
12                     to object to our substituting,
13                     are you?
14                MR. FAULK:  Listen, Joe Musso has
15                     been extremely courteous to me.
16                     I'm not going to double-cross
17                     him.
18                MS. REESE:  Okay.  Good.
19                     (Brief off-record.)
20      Q     (By Mr. Walding)  Let me just go on
21   to something else, Dr. Jones.  That way,
22   maybe we won't be here 'til midnight.
23      A     I hope not.
24      Q     Well, you certainly won't.  Dr.
25   Jones, did any member of the Houston County
```

65

```
 1    Board of Education ask you to withdraw Mrs.
 2    Miller's internship?
 3        A    I don't recall anyone asking me to
 4    do that.
 5        Q    Did Kenneth Lord, who was the
 6    superintendent of education for Houston
 7    County Schools at the time, did he ask you to
 8    withdraw Mrs. Miller's internship?
 9        A    I don't believe I even talked with
10    him concerning this.
11        Q    And this is Mr. Lord over here.
12        A    I know Mr. Lord.
13        Q    What about Tim Pitchford?  Did he
14    ask you to withdraw her internship?
15        A    No.  I don't believe I even talked
16    with Mr. Pitchford.
17        Q    Okay.  What about Riley Joe
18    Andrews?
19        A    No, sir.
20        Q    Did he ask you to withdraw her
21    internship?
22        A    I don't remember talking to him
23    about it.
24        Q    What about Stacey Ezell?  Did she
25    ask you to withdraw Mrs. Miller's internship?
```

66

```
1          A     I don't think I've ever talked with
2     her.
3          Q     And what about Paul Strange?  Did
4     he ask you to withdraw Mrs. Miller's
5     internship?
6          A     I don't think I've talked with him.
7          Q     Okay.  Did Ms. Parris ever
8     communicate to you in some way that any of
9     those individuals I just named wanted Mrs.
10    Miller's internship withdrawn?
11         A     No.  She would have brought me
12    data, but she -- no.  I don't recall that,
13    either.
14         Q     Okay.  Now, in your earlier
15    testimony, it appeared to me -- with your
16    permission, if I can come over closer to you.
17    It appeared to me that the documents you had
18    in this internship file that came from
19    someone associated with the Houston County
20    Board of Education were Defendant's Exhibit
21    17 --
22         A     Yes.
23         Q     -- and Defendant's Exhibit No. 18?
24         A     Yes.
25         Q     Do you recall any other document
```

```
 1     you might have had in that internship file
 2     that would have come from the Houston County
 3     Board of Education employees?
 4         A     I think there was an observation
 5     report from one of the cooperating teachers.
 6         Q     Okay.  Is that Defendant's Exhibit
 7     No. 9?
 8         A     Yes.
 9         Q     All right.  Defendant's Exhibit
10     No. 9, does it specifically ask you to
11     withdraw Mrs. Miller's internship?
12         A     No.
13         Q     Is there anything written on there
14     that implies to you in some way that Mr.
15     Strange is requesting you to withdraw her
16     internship?
17         A     No.
18         Q     Let's go to Defendant's No. 17.
19     That is a letter from Riley Joe Andrews to
20     Pam Parris.  Does that specifically ask you
21     to withdraw Mrs. Miller's internship?
22         A     No.
23         Q     Is there anything in there that
24     implies that Mr. Andrews wanted you to
25     withdraw her internship?
```

68

```
 1        A    There isn't anything I would

 2   interpret as an implication.

 3        Q    Okay.   Look at Defendant's Exhibit

 4   No. 18 for me.   Does that document ask you

 5   specifically to withdraw Mrs. Miller's

 6   internship?

 7        A    No.   There's nothing about

 8   withdrawing from an internship.

 9        Q    Is there anything in Defendant's 18

10   that, by implication, would request you to

11   withdraw Mrs. Miller's internship?

12        A    No.   There's nothing I see that

13   implies that.

14             MR. WALDING:  All right.  Thank

15                  you, ma'am.  I think that's all

16                  the questions I have.  Thank

17                  you, ma'am.

18             MS. HORTBERG:  I don't have

19                  anything.

20             MR. FAULK:  I have a little

21                  follow-up.

22

23

24

25
```

69

```
1                          EXAMINATION
2
3    RESUMED BY MR. FAULK:
4         Q    There's one exhibit I just
5    overlooked, and that's Defendant's Exhibit
6    30, Dr. Jones.  There's testimony from
7    Dr. Ruediger to the effect that these are a
8    typed rendition of his notes of the
9    interviews at the school with these three
10   people mentioned, Mr. Pitchford, Strange and
11   Ms. Towns, in conjunction with his September
12   30 observation.
13        Do you recall whether you saw that prior
14   to making your determination that the
15   internship had run its course?
16        A    I would have seen it if it was in
17   conjunction with the observation, because it
18   would have been attached.
19        Q    Okay.  That was his testimony.  I
20   presume it to be true.
21             MS. REESE:  I'm going to object to
22                  the extent that he said he
23                  talked to these people that
24                  day.  I don't know if it was in
25                  conjunction with the
```

```
 1                    observation, but he talked to
 2                    these people that day.
 3         Q    I'm just telling you what I
 4    remember.  You can presume it to be true, of
 5    course.  Anyway, if he did present it as part
 6    of his observation notes and so forth, you
 7    would have had access to it --
 8         A    Yes.
 9         Q    -- at the time the decision was
10    made?  Fair enough?
11         A    Fair enough.
12         Q    Okay.  Now, in light of the
13    questions you were asked a minute ago on
14    cross-examination, if you were presented, as
15    you were, with Defendant's Exhibits 17, 18
16    and 30 -- 17 being the letter from Mr.
17    Andrews to Ms. Parris, 18 being the
18    remonstrance from Ms. Ezell and Mr.
19    Strange --
20                    (Brief off-record.)
21         Q    Let me ask you just to step back.
22    I realize you're a defendant in a lawsuit,
23    and this is a serious matter for you.  But,
24    would you not agree with me that those three
25    documents, taken as a whole, could give a
```

1    person in your position a reasonable

2    inference that the people in Houston County

3    had either had it with this intern or that

4    their patience was wearing pretty thin,

5    assuming it all to be true?

6              MR. WALDING:  Object to the form.

7              MS. HORTBERG:  Object to the form.

8              MS. REESE:  You can go ahead and

9                   answer.

10   Q    You can go ahead and answer.  She's

11   your lawyer, not them.

12   A    That's why I was looking, to see if

13   she said anything.

14   Q    All right.  But, I mean, you follow

15   my question?

16   A    I would expect a school system to

17   be honest, to give me their unbiased picture

18   of what was happening in the school, just as

19   I would expect my faculty members to.  I

20   would look at it as, here are problems that

21   we're concerned with, and you need to do

22   something to help this individual to apply

23   what you've taught in the program.  I

24   wouldn't look at it as a cry for removing.

25        Because, so many times, when a

1    superintendent or a principal, when they want

2    something, they're not shy about coming right

3    out and saying to you, this is what I want.

4    And I have had a principal and I have had a

5    superintendent in that instance come right

6    out and say to me, about another intern, a

7    different intern, "We do not want this intern

8    in our schools.  You need to replace this

9    person."  And we have complied with that and

10    moved the intern to another school.

11        So, I wouldn't expect less candor on the

12    part of the school system, since my

13    experience had always been that they were

14    very direct with me, both when I was the

15    director of the internship program, as Ms.

16    Parris was when I was the dean, and as dean.

17        Q    Let me go back and make sure you're

18    understanding my question.  Okay?

19        A    Okay.

20        Q    Just on the face of those three

21    documents, would it not be reasonable for a

22    person in your position to infer that, at

23    best, the patience of these administrators of

24    the local system was wearing out?

25             MS. HORTBERG:  Object to the form.

```
 1              MR. WALDING:  Object to the form.
 2              MS. REESE:  You can go ahead and
 3                  answer.
 4         A    I think my difficulty with your
 5    question is with the word "patience."
 6    Because, again, going back to what I
 7    answered, I would expect them to come out and
 8    say to me directly.  You know, patience is
 9    bothering me.
10         Q    Let me add the dimension to this
11    equation that, if Mrs. Miller was telling the
12    truth, there were potential problems with the
13    special education program at the school, if
14    she was correct.  Would you agree with that?
15         A    I have no basis to judge that.
16         Q    I'm just saying, if she was
17    correct.
18         A    Special education is not my area,
19    and so, I would have difficulty in making the
20    judgment.  There is a fine line here.  And I
21    really want to say this.  I'm looking at Mrs.
22    Miller as my student, and I'm looking at the
23    application of what she has learned in the
24    program.  And so, the employment piece is the
25    Houston County piece.  So, when I'm looking,
```

```
 1    and this is my student, and I'm seeing not
 2    following school procedures -- we spend time
 3    talking about school procedures and how to
 4    follow them.  Working with peer teachers.  We
 5    spend time talking in the program about
 6    working with peer teachers.  Developing
 7    positive student/teacher relationships.
 8    Again, that's in the program.
 9         And so, what I'm going to be looking at
10    is from the student standpoint, that
11    something isn't -- clicking is the word that
12    comes to mind, as a student.  And so, I'm not
13    -- while I know she was an employee, and I
14    know she was a teacher of record, I'm looking
15    at her as a student, and trying to keep in
16    mind that she's demonstrating to us that what
17    she did in her academic course work can be
18    done in the school.
19         Q    Is that it?
20         A    I think so.
21         Q    I didn't mean to cut you off.  Does
22    anything about any of those three documents
23    give you the impression that they were
24    pleased with Mrs. Miller?
25         A    That's Exhibit 17.  No.  I don't
```

1    see anything pleased.  Exhibit 18, I don't

2    see anything that says pleased.  I do see

3    some things in Exhibit 30 that show positive

4    comments about her behavior, about her

5    performance.

6        Q    And some things that are not

7    positive?  Correct?

8        A    Correct.

9        Q    And that document, if we accept

10   Dr. Ruediger's testimony, is the result of

11   his interviews with each of these three

12   people.  Do you know any different?

13       A    I don't know any different from

14   that.

15       Q    So, you sent him to the school.  He

16   looked into the matter and reported back.

17   But the two documents generated by Houston

18   County, you say, don't even have a mixed

19   review.  They don't indicate that they're

20   pleased with her at all, do they?

21       A    The first two that I indicated

22   don't.  This one has limited.

23       Q    Dr. Ruediger's, at best, is at

24   least a mixed review?

25       A    It is mixed.

76

1      Q      Okay.  And that's Exhibit 30?

2      A      Yes.

3      Q      And is that the nearest you and I

4   are going to come to an agreement on what

5   these documents mean and what inferences you

6   should draw from them?

7      A      Yes.

8      Q      Okay.  In your view, did Troy

9   University have any obligation to investigate

10  Mrs. Miller's expressions of concern?

11     A      No.

12     Q      And why, unlike some unsuccessful

13  intern candidates, was Mrs. Miller offered a

14  second chance, or at least given a second

15  chance, upon request, to do an internship?

16     A      Academically, through the

17  pedagogical classes that she took, through

18  her lab experiences, through everything up to

19  the point of the internship, she had been

20  successful, in some cases, even excelled.

21         The internship was a difficulty because

22  she was employed as a classroom teacher.  And

23  where it was different was that I couldn't

24  just move her to another classroom to do the

25  internship, which we have done with other

```
 1    interns, because of the employment situation.

 2    If she had not been employed by Houston

 3    County, and the internship had gone to that

 4    point, we would have removed her, then we

 5    would have actually sat down and talked

 6    about, what's the best placement for her at

 7    this point, what are we going to do, because,

 8    again, that would be procedure.

 9        Ms. Parris would sit down.  Dr. Ruediger

10    would sit down.  We would probably have some

11    of the other instructors that had had her on

12    campus.  And we would talk about, is there a

13    better placement that we can allow her to

14    show a success.  In fact, she was given that

15    opportunity and did successfully complete her

16    internship at Beverlye.

17        So, the employment complicated our

18    normal process of simply removing her from

19    that school, finding another placement, and

20    permitting her to, in that next placement,

21    show us she can either do it or she can't.

22            MR. FAULK:  That's it.  He may have

23                some for you.

24            MR. WALDING:  I do.

25
```

78

```
1                        EXAMINATION
2
3    RESUMED BY MR. WALDING:
4        Q    Dr. Jones, let me show you a couple
5    of other documents.  Let me show you what has
6    been labeled Defendant's Exhibit No. 2, which
7    is an e-mail communication from Victoria
8    Morin to Pam Parris.  Would this document
9    have been in the internship folder?
10       A    It might have.
11       Q    Okay.  And does this document
12   indicate that Mrs. Miller did not take
13   corrective feedback well and made excuses and
14   blamed others?
15       A    That is the language in here.  It
16   is one professor's --
17       Q    Opinion?
18       A    -- description or opinion.  So, we
19   would have looked for some type of
20   corroborating evidence.
21       Q    And assuming you found some of that
22   in the internship folder, that could have
23   been part of the basis for your decision?
24       A    I really can't answer that.
25       Q    It could have been?
```

```
 1              MR. FAULK:  Object to the form.
 2              MR. BRANTLEY:  Object to the form.
 3              MR. WALDING:  Why?  You ask people
 4                   if it's possible.
 5              MR. FAULK:  It's argumentative.
 6                   You're arguing with the
 7                   witness.  She already answered.
 8              MR. BRANTLEY:  It's irrelevant.
 9                   Anything is possible.
10              MR. WALDING:  I'll remind you of
11                   that, Mr. Brantley.
12              MR. BRANTLEY:  I'm sure you will.
13         Q    (By Mr. Walding)  Let me show you
14    Defendant's Exhibit 3.  Do you recognize this
15    document?
16         A    That is the faculty recommendation
17    form that is filled out on each intern by
18    several of the professors prior to being
19    given an internship.
20         Q    And is this a document that would
21    have been in the internship folder we've been
22    talking about?
23         A    Yes, it would have.
24         Q    And does this document indicate
25    Professor Morin's reservations about Mrs.
```

1    Miller?

2         A    It states reservations as well as

3    positive comments.

4         Q    Okay.  The document does, though,

5    express -- is it Dr. Morin?

6         A    Yes, it is.

7         Q    -- Dr. Morin's opinion that she had

8    concerns about Mrs. Miller receiving and

9    using corrective feedback?

10        A    It does say that.

11        Q    Okay.  And this would have been

12   part of the folder that you looked at when

13   you made your decision?

14        A    Yes.

15             MR. WALDING:  Thank you, ma'am.

16             MR. FAULK:  Let me follow up.

17

18                      EXAMINATION

19

20   RESUMED BY MR. FAULK:

21        Q    You would have been aware of

22   Dr. Morin's original reservations from the

23   outset, wouldn't you?

24        A    It would have been in the folder.

25   Yes.

81

```
1        Q     Okay.  And whatever her

2    reservations may have been, Mrs. Miller was

3    given the internship?  Correct?

4        A     Correct.

5        Q     And are you aware that, later on,

6    after the first internship failed, and Mrs.

7    Miller was given a second internship, that

8    y'all assigned Dr. Morin to be her

9    supervisor?

10       A     Yes.

11       Q     And that that internship resulted

12   in a successful completion?

13       A     Yes.

14       Q     And would that have occurred if Dr.

15   Morin had disapproved of the successful

16   completion in the second phase of the

17   internship?  In other words, if Dr. Morin had

18   given her a bunch of 1's and 2's in her

19   observations at Beverlye, we might not have

20   had such a happy outcome?  Right?

21       A     Correct.

22             (Brief off-record.)

23       Q     I mean, it did have a successful

24   conclusion at Beverlye, didn't it?

25       A     Yes.  She graduated.
```

82

```
1        Q    And as far as you know, Dr. Morin

2    is not clairvoyant, as far as you know?

3              MS. REESE:  Object to the form.

4                   Argumentative.

5        Q    You're not aware that she is, of

6    course, are you, or a witch or something?

7              MS. REESE:  Object to the form.  I

8                   know it's getting late.

9              MR. FAULK:  Okay.  That's it.

10             MR. WALDING:  I don't have any

11                  more, Dr. Jones.

12             MR. FAULK:  Thank you, Dr. Jones.

13                  (Whereupon, Plaintiff's Exhibit 5,

14                  declaration of Sandra Lee Jones,

15                  marked for identification.)

16

17                  END OF DEPOSITION

18

19

20

21

22

23

24

25
```

83

1                    PLAINTIFF'S EXHIBIT NO. 5

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

84

1    STATE OF ALABAMA

2    HOUSTON COUNTY

3

4         I, Stacey Watkins, RPR, and Notary

5    Public, State at Large, do hereby certify

6    that the foregoing transcript, pages 1

7    through 83, is a true and correct transcript

8    of the testimony and proceedings taken at

9    said time and place; and that the same was

10   taken down by me in stenograph shorthand,

11   and transcribed by me personally or under

12   my personal supervision.

13        I further certify that I have no

14   interest in this matter, financial or

15   otherwise, or how it may develop or what

16   its outcome may be.  I further certify that

17   I am not of counsel for any of the parties,

18   nor am I related to counsel or litigants or

19   associated with anyone connected with this

20   cause to my knowledge.

21        Witness my hand this 26th day of

22   December, 2007.

23

24                        RPR, Notary Public,
                          State at Large
25                        ACCR# 155

_FOLLOWING_

THE ~~FOREGOING~~ DOCUMENTS ARE PART OF DEFENDANT
HCBOE'S INITIAL DISCLOSURES (DOCS. 1456-1459) AND WE,
THEREFORE, PRESEUME THEM TO BE SELF-AUTHENTICATING
WITHOUT THE NECCESITY OF CERTIFICATION, BUT WE WILL
SUBSTITUTE A CERTIFIED COPY IF THE COURT REQUESTS IT.

4

MEETING OF THE HOUSTON COUNTY BOARD OF EDUCATION
HELD IN THE SUPERINTENDENT'S OFFICE,DECEMBER 6, 2004, 5:30 P.M.

The meeting was called to order by Mr. Jimmy Kilgore, who presided over the meeting of the board.  Other board members present included:  Mr. Bobby Harrell, Mr. Donny Smith, Ms. Dorothy Butts, Mr. Doyle Bond, Mr. Ken Lane and Mr. Scott Thomas

Others present for the meeting included: Mr. Kenneth Lord, Superintendent, Neda Womack who was there to assist the Superintendent with records, Suzanne Wilson, Custodian of Funds.

News media present for the meeting included:  None

December 6, 2004

We, the undersigned members of the Board of Education of Houston County, Alabama, hereby accept service of the notice of a meeting of the Houston County Board of Education waiving any and all irregularities, in such service and such notice, and consent and agree that said Board of Education shall meet at the time and place stated therein and for the purpose stated therein.

/s/ Scott Thomas                          /s Doyle Bond
   Scott Thomas                              Doyle Bond

/s/ Bobby Harrell                         /s/ Dorothy Butts
   Bobby Harrell                              Dorothy Butts

/s/ Jimmy Kilgore                         /s/ Ken Lane
   Jimmy Kilgore                              Ken Lane

/s/ Donny Smith
   Donny Smith

Mr. Kilgore indicated that a quorum was present and that the meeting was legally and duly constituted for the transaction of business.

2. Prayer

Mr. Lane opened with prayer.

3.  Pledge of Allegiance

Mr. Bond led the Pledge of Allegiance.

4.  Approve agenda for meeting

Mr. Lord asked that we add Item I under other business

Defendants' Initial
Disclosures   1456

A motion was made by Mr. Lane, seconded by Mr. Harrell and carried to approve the agenda with the addition of Item I

5.   Approve Board Minutes for November 15, and Student Hearing for November 29.

A motion was made by Ms Butts, seconded by Mr. Smith and carried to approve Board Minutes, November 15 and Student Hearing, November 29

The Board Members presented Mr. Lord with a plaque

6.   Approve Personnel

I recommend approval of the following personnel items:

    1.   RECOMMENDATIONS
        a.   Amanda Laseter, Elementary Teacher at Wicksburg High School, effective November 29, 2004
        b.   Betsey Marshall, Secretary/Bookkeeper at Rehobeth Elementary/Middle School, effective December 7, 2004
        c.   Cheryl, Burke, CNP worker at Houston County High School, December 7, 2004
        d.   Tara Burch, CNP worker at Rehobeth Elementary School, effective December 7, 2004
        e.   Pam Love, Bus Driver at Ashford High School (Charles Dismuke)

    2.   TRANSFERS
        a.   Denise Maddox, from Utility Bus Driver to Head Start Bus Driver
        b.   Mary Welch, from CNP Worker to CNP Assistant Manager at Ashford High School
        c.   Viva Gordon, from Bus Aide to Bus Driver at Ashford High School
        d.   Helen Adams, from Bus Driver to Bus Aide at Ashford Elementary School
        e.   Harriet Janie Shiver, from Assistant Manager at Wicksburg to Manager

    3.   RESIGNING
        a.   David Snell, Principal at Rehobeth Middle School, effective December 31, 2004
        b.   Diane Hornsby, Elementary Teacher at Wicksburg High School, effective October 18, 2004

    4.   RETIRING
        a.   Kenneth Lord, Superintendent Houston County Schools, effective December 31, 2004

    5.   LEAVE OF ABSENCE
        a.   Penny Quattlebaum, Bus Driver at Ashford High School, medical extended leave of absence.

    6.   TERMINATION
        a.   Nancy Miller, Intership at Troy State University terminated, employment with the Houston County Board of Education will end effective November 16, 2004

Defendants' Initial
Disclosures    1457

A motion was made by Mr. Lane, seconded by Ms Butts and carried to approve personnel as presented

7.    Other Business

a.          Recommend the Houston County Board of Education adopt a resolution stating that local control is essential in developing a school-year calendar for each system in the State of Alabama. Local school boards should be free from legislative mandates and allowed freedom to make the best educational choices for the students served by their system. Starting dates and attendance days should be the sole responsibility of the local board to decide.

The starting date for the 2005-2006 school year will be August 8, 2005

A motion was made by Mr. Bond, seconded by Mr. Harrell and carried to approve the recommendation about a school calendar.

b.          Recommend the Board approve Check Care of Alabama as the company that we deal with to process and collect bad checks for our schools/system.

A motion was made by Mr. Lane, seconded by Mr. Thomas and carried to approve Check Care of Alabama to collect bad checks

c.          Recommend the Board approve policy EEA dealing with charged meals.

A motion was made by Mr. Harrell, seconded by Mr. Smith and carried to approve policy EEA

d.          Recommend the Board approve short term assignment to Camp SAYLA as a disciplinary method used for Houston County Schools. The assignment would be made by an administrator with written consent from the parent.

A motion was made by Mr. Bond, seconded by Mr. Lane and carried to approve Camp SAYLA as a disciplinary method for Houston County Schools.

e.          Recommend the Board approve the contract for incoming Superintendent Tim Pitchford, effective January 1, 2005

A motion was made by Ms Butts, seconded by Mr. Harrell and carried to approve the contract for incoming Superintendent.

f.          Presentation from Rehobeth High School

g.          Approve Technology Plan

A motion was made by Mr. Bond, seconded by Mr. Smith and carried to approve the Technology Plan

h.          Recommend the Board pay APAC for work done at Rehobeth new school campus on entrance to the school

A motion was made by Mr. Harrell, seconded by Mr. Lane and carried to approve paying APAC

i.          Metal Building at Bus Barn, low bid was Todd Smith, $34,945.00

Defendants' Initial
Disclosures    1458

A motion was made by Ms Butts, seconded by Mr. Harrell and carried to approve the Metal Building at Bus Barn.

8.    Approve December 2004 Payroll

A motion was made by Mr. Harrell, seconded by Ms Butts and carried to approve December 2004 payroll

9.    Approve Bond Issue Payment

A motion was made by Ms Butts, seconded by Mr. Lane and carried to approve Bond Issue Payment

10.    Adjourn

A motion was made by Mr. Lane, seconded by Mr. Harrell and carried to adjourn meeting

Meeting adjourned at 6:20 P.M.

APROVED THIS ___*18*___ DAY OF __*January*__, 20_*05*_.

_J.C.Kilgore_
JIMMY KILGORE, PRESIDENT

_Kenneth Lord_
KENNETH LORD, SUPERINTENDENT

Defendants' Initial
Disclosures    1459

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NANCY MILLER, | * | |
| | * | |
| **PLAINTIFF,** | * | |
| | * | |
| | * | |
| v. | * | **Case No.1:06-cv-940-MEF** |
| | * | |
| | * | |
| **HOUSTON COUNTY BOARD OF** | * | **JURY DEMANDED** |
| **EDUCATION;** | * | |
| **KENNETH LORD;** | * | |
| **RILEY JOE ANDREWS;** | * | |
| **TIM PITCHFORD;** | * | |
| **PAUL STRANGE;** | * | |
| **STACY EZELL;** | * | |
| **TROY UNIVERSITY, DOTHAN;** | * | |
| **SANDRA JONES;** | * | |
| **PAM PARRIS;** | * | |
| **and** | * | |
| **GREG RUEDIGER,** | * | |
| | * | |
| **DEFENDANTS.** | * | |

## AFFIDAVIT OF NANCY MILLER
## IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| HOUSTON COUNTY | ) |

Before me, the undersigned notary public, personally appeared Nancy Miller, who is known to me and who, having been duly sworn, deposed and said the following:

1. My name is Nancy Miller, I am above the age of majority, I am a bona fide resident citizen of the aforesaid judicial district and division, and I am the plaintiff in the above styled civil action.

2. Following my aborted internship at Houston County High School (HCHS), from which the above-captioned case arose, I successfully served an internship in the same field and under the auspices and direction of Troy University, Dothan, (TUD) at Beverly Middle School (BMS). Although, unlike the arrangement at HCHS, I was not simultaneously employed as a teacher at BMS, my access to the students' individualized

1

education plans was just as extensive as it had been at HCHS, and my day-to-day responsibilities were not materially different. The only requirements of me at HCHS which were not requirements at BMS are those underlined in the HCHS Internship Agreement, Defendants' Exhibit 6 to the depositions.

3.    In regard to the issue raised about the propriety of my having left the HCHS campus on September 24, 2004, I was not aware of any written requirement that the principal must have given express permission in person for me to leave campus, nor has any such requirement been produced during the course of discovery to my knowledge. The TUD Internship Handbook, at page 11, states: "in the event of emergency absence, the intern must notify the Director, the cooperating teacher, the principal, and any other personnel as directed by the school." (Defendants' Exhibit 29, at p. 11.) I complied with that requirement, in my view, by first attempting to see the principal, who was unavailable, leaving him a note with the school secretary, specifically informing my mentor, Mr. Strange, and leaving voice mails for the Director and responsible faculty members at TUD. The handbook does not require that this be done face-to-face. I also notified the teachers to whom the special education students were assigned.

4.    Also, I disagree with the assertion in various defendants' depositions that my leaving the campus left special education students unsupervised. The truth concerning this assertion is that all such students were assigned to and under the supervision of regular teachers at the time, and, except for Ms. Towns' math class where I would sometimes remain all period, I was expected to float back and forth between classes and obviously was not expected to be everywhere at once. Neither Ms. Towns nor the other teachers objected to my decision to go to the central office on that day. Further, there was nothing in Mr. Andrews conduct on that occasion which would indicate to me that he thought that I had done anything wrong by leaving school and coming to him. Also, according to the testimony of Ms. Singletary, Mr. Pitchford had called her about my absence prior to my first contact with her, which means that the only period of time in which he could have been unaware of my absence and, therefore, unable to make arrangements for my students (even assuming they actually needed the services of a special education teacher in that interim, since I had already made arrangements) would have been the time between my departure and his conversation with Mr. Strange. Moreover, even when I was away from school on other occasions for an entire day on school or TUD business, Mr. Pitchford never brought in a substitute. Also, I was frequently called out of every teacher's room in which I was assigned for various reasons or events. It may have been to take a phone call from Mrs. Parris, a request from Mr. Strange to come to his room for our weekly meeting, to make copies for one of the teachers, testing of special education students at the request of Central Office, meetings with Ms. Parris and Dr. Ruediger at TUD, professional development, or any number of other reasons. I am certain that no special arrangements were ever made for my students under such circumstances.

5.    Mr. Strange gave an explanation in his deposition at page 77 and at page 79, line 15 through page 80, line 6, of the assertion that I had not followed his suggestions, in which he testified that the only time this had occurred was when he suggested that I was

2

some materials referred to as "AGS books" to assist special education students with biology. The truth concerning this matter is that I, in fact, frequently resorted to these books for various purposes. I never defied or ignored any suggestion by Mr. Strange regarding these books.

6. I was never made aware that any students or parents had requested that I not be their teacher. Mr. Strange testified in his deposition that the only such student he could remember was "G. G.", who he claimed said I had asked "a bunch of questions and was making uncomfortable ...." I know of no factual basis for such a statement by that student, who, in fact, had a science with Mrs. Monday, whose students could come to my room during that time (which was my planning period) to take tests, if they needed to. Very few ever came during the 2 ½ months I was at HCHS, and G. G. was not one of them who did. Anyway, G. G. was a student who Mr. Strange told me had sued the school board, and had gotten retested and ultimately her disability was changed from mental retardation to learning disability. I did have an opportunity to sit in the meeting with her mother and her. I think the meeting happened during the 1st or 2nd week of school. Mrs. G. was a very determined woman who wanted to make sure HCHS was going to treat her daughter well. G. G. and I saw each other in the hallway now and then, our greetings were consistently cordial. Close to the time my internship was terminated, I saw her in the hall one day, and I asked her what attorney had helped her, and she told me.

7. Ms. Ezell stated in her deposition that she had been told by Amy Deese McNeal that I "planned to take down Houston County High School." I have never made such a statement to anyone.

8. It has been asserted that I had asked to teach Ms. Ezell's biology class. The truth is that I never asked to teach Ms. Ezell's class. The customary practice is to have an intern participate in actual teaching in only one class, and, in my case, that was done in Ms. Towns' class. To have the intern, or even a special education teacher, teach entire classes of students in more than one area of subject matter would not be practicable.

9. It has been asserted by Mr. Strange and Mr. Pitchford that my only expressed concern about the special education program at HCHS was to the effect that they were not following the appropriate "inclusion model." This is not true. My expressed concerns were much more comprehensive, as alleged in the complaint and as evidenced in part by Ms. Singletary's notes of my discussion with Mr. Andrews. (Defendants Exhibits 15 and 16)

10. Much has been made in this litigation of the fact that Dr. Morin at TUD had expressed reservations about my readiness to serve as an intern in the summer of 2004. (Defendants Exhibits 2 and 3) Nevertheless, Dr. Morin was also involved in my assignment to a new internship at BMS in meeting which occurred approximately two months after the withdrawal of my HCHS internship, and, despite having full knowledge of the allegations made against me in connection with the HCHS affair, Dr. Morin expressed no reservations about my being assigned to the new internship, and while

3

serving as my internship supervisor at BMS, she gave me very satisfactory ratings as evidenced by the observation reports attached hereto as exhibits "A", "B" and "C".

11. At page 137, line 25, through page 138, line 3, of my deposition taken on August 23, 2007, during the course of a rather long interrogation by Mr. Walding, attorney for the Board Defendants, concerning discussions I had had with other school personnel about certain IEPs about which I had some concern or other, the following occurred:

Q: And would you have done that as part of your duties as an intern and a teacher?

A: Some aspects, yes.

In this regard, I am informed by my attorneys that a legal issue exists in this case involving whether my complaints and expressions of concern were part of my "official duties." When I gave the above testimony, it was my intention to convey that certain discussions I had had were part of my teaching duties, for example, discussing what services were called for by a particular student's IEP with his regular education teacher. I deny that any of my expressions of concerns to Mr. Andrews or to Mr. Pitchford or to any representatives of TUD were made as part of any "official duty". That is why I qualified my answer in the manner quoted above.

12. In her deposition at page 8, lines 8 through 12, Pam Parris denies ever having scolded me for raising objections or concerns about the special education program. The truth is that when she did confront me on more than one occasion about this matter, everything about her words, tone of voice, facial expressions and general demeanor told me (myself being a fifty year old woman at the time, with normal social experience in life) that Ms. Parris was very angry with me. These were not constructive counseling sessions, but angry reprimands with specific reference to the fact that I had expressed the concerns in question.

13. There have also been allusions in testimony to my having wept publicly at HCHS. The only time I ever actually cried at the school was when I was getting ready to leave to see Mr. Andrews, which was the culmination of a very trying experience imposed on me by the misconduct of the some of defendants, and I never did so in the presence of students. Any implication that I am an unusually tearful person is simply false.

14. In regard to the second Ruediger evaluation or classroom observation, I dispute his contention that only the two grades of "1" were influenced by consideration of events not personally observed by him. My classroom skills had not declined since the first observation and nothing unusual occurred during the second evaluation which should have caused my scores to have been reduced below the level reported in his first evaluation. I do not consider that my actual performance was any less appropriate than that reported later by Dr. Morin at BMS the very next semester, in that I had not had any

intervening instruction or classroom experience between the two internships, which
would have suddenly improved my ability as an intern or teacher.

NANCY MILLER

Sworn to and subscribed before me this 2nd day of January, 2008.

Notary Public

5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| NANCY MILLER, | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | **Case Number: 1:06-CV-940-WKW** |
| | * | |
| HOUSTON CO. BD. OF EDUC, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |

## AFFIDAVIT OF JAMES D. SEARS
## IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

STATE OF ALABAMA    )
                                        )
BALDWIN COUNTY     )

    Before me, the undersigned notary public, personally appeared James D. Sears, who is known to me and who, having been duly sworn, deposed and said the following:

    1. My name is James D. Sears, I am above the age of majority, I am a bona fide resident citizen of Baldwin County, Alabama, and I have been retained as a consultant and expert witness for the plaintiff in the above styled civil action. The following report was composed by me.

## EXPERT WITNESS REPORT

Expert Witness

        James D. Sears, EdD, J.D.
        Sears Law Firm
        816 Manci Avenue
        Daphne AL 36526
        251/621-3485; Fax 866/436-3778
        Email: jdsears@searslawfirm.com

Bases of the Facts and Opinions

In addition to my education, training and experience, I relied on the following testimony, documents, and exhibits in forming my opinions.

Depositions:

| DEPONENT'S NAME | DEPONENT'S POSITION |
|---|---|
| ANDREWS, Riley Joe | Federal Programs Coordinator |
| EZELL, Stacey | Teacher |
| LORD, Kenneth | Superintendent of Houston County Board of Education through December, 2004. |
| MILLER, Nancy | Plaintiff |
| PITCHFORD, Tim | Principal of Houston County High School; Superintendent of Houston County Board of Education |
| SINGLETARY, Virginia | Assistant Special Education Coordinator; Special Education Coordinator |
| STRANGE, Paul | Special Education Teacher; Mentor and Supervisor of Plaintiff |

Documents and Exhibits

| DOCUMENT NUMBER | DOCUMENT OR EXHIBIT |
|---|---|
| 1 | Complaint. |
| 10 | Answer to Plaintiff's Complaint–Houston County Board of Education, Kenneth Lord, Tim Pitchford, Riley Joe Andrews, Paul Strange, and Stacey Ezell. |
| 14 | Answer by Defendant Troy University, Dothan Campus. |
| 28 | Order on Motion and Protective Order. |
| 30 | Defendants Paul Strange and Stacey Ezell's Motion for |

| | |
|---|---|
| | Summary Judgment. |
| 31 | Defendants Paul Strange and Stacey Ezell's Brief in support of Defendants' Motion for Summary Judgment. |
| 37-2 | Declaration of Sandra Lee Jones; Internship Agreement Between Houston County Schools and Troy University Dothan Campus; record of incidences. |
| 42 | Brief in Support of Summary Judgment by Defendants Troy University, Dr. Sandra Jones, Dr. Greg Ruediger, and Pam Parris. |
| 43-13 | Affidavit of Kenneth Lord. |
| 43-17 | Affidavit of Riley Joe Andrews. |
| 44 | Brief in Support of Motion for Summary Judgment [Defendants-Houston County Board of Education, Kenneth Lord, Tim Pitchford, and Riley Joe Andrews]. |
| Defendant's Initial Disclosure | Individual Education Programs: SB; CB; TB; JC; BG; WJ; EJ; WJ; BM; AM; JP; DP; RS; PS; ES; AT; CW; CA; KL; ML; and, JW. |
| D-EX 2 | Email from Victoria Morin to Pam Parris, dated 4/27/02. |
| D-EX 3 | Faculty recommendation for Nancy Miller from Victoria Morin, dated 4/27/04. |
| D-EX 4 | Letter to Miller from Parris, dated 6/1/04. |
| D-EX 5 | Complaint with Summons to Lord. |
| D-EX 6 | Internship agreement between Houston County Board of Education and Troy State University-Dothan. |
| D-EX 7 | Internship observation dated 8/26/04. |
| D-EX 8 | Miller observation and debriefing dated 8/26/04. |
| D-EX 9 | Internship observation dated 8/30/04. |
| D-EX 10 | Blog entry by Miller dated 9/11/04. |
| D-EX 11 | Blog entry by Miller dated 9/11/04. |
| D-EX 12 | Email from Miller to Parris with cc to Jones, dated 9/11/04. |

| D-EX 13 | Email from Miller to Parris dated 9/13/04. |
| D-EX 14 | Memo to Pitchford from Miller dated 9/24/04. |
| D-EX 15 | Typed summarization of Miller's visit with Dr. Andres and Singletary on 9/24/04. |
| D-EX 16 | Concerns expressed by Nancy Miller, recorded by Singletary. |
| D-EX 17 | Letter to Parries from Andrews. |
| D-EX 18 | Letter to Parris from HCHS, undated, signed by Ezell and Strange. |
| D-EX 19 | Email from Miller to Jones dated 9/26/04. |
| D-EX 20 | Internship observation dated 9/30/04, signed by Ruediger and Miller. |
| D-EX 21 | Miller debriefing dated 9/30/04. |
| D-EX 22 | Report of observation for Nancy Miller dated 10/1/04. |
| D-EX 24 | Email from Miller to Jones, with cc to Parris dated 10/1/04. |
| D-EX 25 | Email from Cynthia Lumpkin to Parris cc Ruediger dated 10/6/04. |
| D-EX 26 | Letter to Lord from Parris dated 10/18/04. |
| D-EX 27 | Letter to Jones from Miller, undated. |
| D-EX 28 | Letter to Miller from Lord dated 10/19/04. |
| D-EX 29 | Professional internship program handbook, Fall 2004. |
| D-EX 30 | Professional comments dated 9/30/04. |
| D-EX 31 | Blog entry by Miller dated 9/11/04. |
| D-EX 32 | Email from Miller to Parris dated 9/26/04. |
| D-EX 33 | 2004/2005 Scholastic Calendar. |
| D-EX 34 | T.E.P. meeting minutes for 11/30/04. |

Established Facts

In 2004, Nancy Miller, hereinafter referred to as "Plaintiff," was in her senior year at Troy State University-Dothan (TSUD). As a requirement for earning her degree and state education certification in special education, Plaintiff was required to successfully complete an internship program.

At the beginning of the 2004-2005 school year, the administration at Houston County High School (HCHS) realized a need to hire a special education teacher. The federal program coordinator for the Houston County Board of Education (HCBOE), Riley Joe Andrews, facilitated the hiring of Plaintiff on behalf of the HCBOE. Tim Pitchford, the principal at HCHS, apparently was not involved in the selection process.

At the time that the Plaintiff was hired by the HCBOE, the Plaintiff had no completed an undergraduate degree and was, therefore, not qualified to be certified in any area of special education or any other area of education. At the time of her hiring, personnel with the HCBOE were aware that Plaintiff was not qualified to be certified. The HCBOE did not request provisional or emergency certification for the Plaintiff. Because Plaintiff did not have an undergraduate degree, had the HCBOE requested provisional or emergency certification on behalf of the Plaintiff, said certification would not have been granted.

Representatives of the HCBOE, HCHS, TSUD, and Plaintiff entered into a contract whereby the Plaintiff was hired as a teacher during a period of time that she was also enrolled at TSUD as an intern in the field of special education. The Plaintiff was paid a teacher's salary, joined the teacher's union as a full time teacher, and in most every respect was fulfilling the responsibilities of a teacher; the one grey area was related to Plaintiff's role in participating in the IEP process. As an intern, the Plaintiff was expressly excluded from participating as a teacher in the development of a student's IEP.

Paul Strange, a teacher at HCHS, was assigned to be Plaintiff's mentor [directing teacher]. Plaintiff did not work directly with Mr. Strange, but was to observe Mr. Strange teaching, and was to be observed by Mr. Strange as she taught. Pam Parris was Plaintiff's internship supervisor, although Greg Ruediger was the faculty person at TSUD who was responsible for evaluating the Plaintiff in her position as an intern enrolled at TSUD.

Within a brief period of time after beginning her teacher/intern position, the Plaintiff perceived what she considered to be violations of federal law, *i.e.*, the Individuals with Disabilities Education Act, 1997 Reathorization. *See also*, state compliance legislation found at Alabama Administrative Code § 290-8-9, *et seq*. The Plaintiff reported these violations to her mentor, Paul Strange. The violations that Plaintiff saw included violations in the development and implementation of students' individual education plans, as well as the programmatic process of implementing a collaborative teaching model. Further, some students were found not to have IEPs. The Plaintiff also observed a certified teacher ridicule and demean children in her class who had disabilities. The Plaintiff also reported these violations to the HCHS principal, Mr. Andrews, Dr. Ruediger, Ms. Parris and Dr. Sandra Jones, another education faculty member at TSUD. Mr. Andrews indicated that an investigation of the allegations was made and that everything was done according to the applicable laws. Mr. Strange and Stacey Ezell, the teacher who allegedly ridiculed the students, authored a document listing deficiencies that they perceived the Plaintiff possessed in her teaching positions.

The Plaintiff was encouraged by Mr. Strange, Ms. Parris and Dr. Ruediger to try to get along and not be so critical about the operation of the collaborative program at HCHS. The Plaintiff was not content with

abdicating her responsibilities as a professional educator and continued to attempt to rectify the violations.

As a consequence of her persistence, Plaintiff was removed from her internship and was subsequently relieved of her duties as a teacher at HCHS.

Opinions of the Witness

Lack of certification. The Plaintiff was not only *not* certified, she was in no manner certifiable as a teacher. It has long been the standard that for an individual to receive any certification from the Alabama State Department of Education, that individual must first possess at least an undergraduate degree from a recognized college or university. That policy challenges the veracity of Tim Pitchford, Pam Parris, Greg Ruediger, and Sandra Jones that it was "just a mistake." Any one of them should have known that he or she was placing the Plaintiff in an untenable position of being neither an intern nor teacher. The need for a teacher in a "difficult to hire" field does not warrant sidestepping well-established standards. Placing the Plaintiff in this indefensible position was an invitation to what inevitably happened. The Plaintiff's vulnerability was exposed due to her dependence upon successfully completing the internship. The fact that her position as a contracted teacher was jeopardized because she could so easily be withdrawn from her internship exemplifies the danger inherent in such a relationship.

The motivation for the action taken by the collective efforts of personnel with the HCBOE and personnel with TSUD, would appear to be related to the consequences that would ensue should the Plaintiff inform the parents of the students in her special education classes of the deficiencies found in their children's educational program. Not only would there be the type of scrutiny that would lead to a formal investigation by the Office of Civil Rights, the cost to defend the individual due process hearing complaints and subsequent lawsuits would be enormous. Of the 24 IEPs reviewed by this witness, none of them would have been found to be in compliance with federal or state laws. The cost to the HCBOE for 24 due process hearings could reasonably be over $500,000.00.

Individual education plans. The IEPs as provided to this witness for his examination were some of the most poorly written that he has had the opportunity to evaluate. The deficiencies were both substantive and technical. None of them would have met the Rowley standard of "the minimum necessary to show educational benefit." An analysis of the IEPs is found in Attachment "A".

It is interesting to note the cavalier approach to the development of some of the IEPs. Ten of twenty-two IEPs were developed in one day. None of the ten had a parent present for the IEP meeting. Principal Pitchford attended all meetings, yet his testimony indicated that he knew very little about what his role was, other than to be the administrator at the meeting. Only two of the twenty-two IEPs indicated that the student had mastered any benchmark, and those two had the student simultaneously and illogically mastering most all the benchmarks on the same day. Not one measurable annual goal on the twenty-two IEPs was written according to the standards established in the Code of Federal Regulations. Several of the IEPs indicated that they were completed *after* school had begun. Of the twenty-two IEPs that were reviewed only seven (< 32%) included parental participation. Special education services were absent from all of the IEPs. Three students were placed on homebound services due to their behavior, yet none of their IEPs included a component on behavior. If the reviewed IEPs were representative of the typical IEP developed by HCBOE personnel, there is a serious failure of administrative supervision.

<u>Qualifications of the Witness</u>

See Attached Curriculum Vita.  Exhibit "B" hereto.

<u>Compensation</u>

The expert witness is being compensated at the rate of $150.00 per hour.
<u>Additional Cases</u>

The expert witness has not testified at trial or by deposition within the last four (4) years.

<u>Post-Disclosure Activity:</u>

After submitting the foregoing report with its attachments for disclosure to defense counsel by plaintiff's counsel, I was supplied with the IEPs for two additional students identified as "L. L." and "T.T", which I am informed were inadvertently overlooked during the disclosure process and were produced by defense counsel after my report was disclosed.  I have examined those and found that they suffer from the same general range of deficiencies which I reported in the original twenty-two IEPs.

The opinions expressed and the factual assertions stated, both above and in the attachments hereto, are my true observations and opinions gleaned from the materials listed as having been supplied to me or otherwise known to me.  I am qualified by education and experience to form and express such opinions as evidenced by my attached curriculum vita.

JAMES D. SEARS

Sworn and subscribed before me on this 2nd of January, 2008.

Notary Public
My commission expires: 4/28/10

## ATTACHMENT A

INDIVIDUAL EDUCATION PROGRAM ANALYSIS

| STUDENT | DATE OF IEP | ASSESSMENTS | DIPLOMA PLAN | SUBJECTS | SPECIAL EDUCATION SERVICES | GOALS WRITTEN CORRECTLY | MASTERY INDICATED | PARTICIPANTS | PARENT PARTICIPATION |
|---|---|---|---|---|---|---|---|---|---|
| AM | 11/05/04 [INCONSISTENT DATES] | WRAT | REGULAR | UNKNOWN UNKNOWN MATH | NONE | NO | NO | JACKSON SCOTT LNU PAYNE SIMS CATHY LNU OTT | YES |
| AT | 5/31/04 | WRAT | AOD | READING MATH | NONE | NO | NO | TURLEY PITCHFORD DEASE TEAT TURLEY HARRISON | YES |
| BG | 5/13/04 | WISC SAT MISC | REGULAR | MATH | NONE | NO | NO | PITCHFORD BROCKMAN WILSON GUESS HARRISON | NO |
| BM | 5/21/04 | NONE | AOD | READING MATH WRITING | NONE | NO | NO | PITCHFORD DEASE JOHNSON | NO |
| CB | 5/21/04 | NONE | AOD | READING SPELLING MATH | NONE | NO | NO | PITCHFORD DEASE CHANDLER | NO |
| CW | 5/21/04 | WRAT | AOD | MATH READING | NONE | NO | NO | PITCHFORD DEASE TEAT | NO |
| DP | 5/21/04 | WRAT | AOD | MATH READING | NONE | NO | NO | PITCHFORD DEASE GORNBURG | NO |
| EJ | 5/17/04 | NONE | AOD | READING MATH [BEHAVIOR MANAGEMENT PLAN, BUT NO BEHAVIORAL GOALS] | NONE | NO | NO | LEE PITCHFORD DEASE BEVERLY LNU | YES |
| ES | 5/21/04 | NONE | CERTIFICATE | MATH READING FIN MAN PERS MAN | NONE | NO | NO | PITCHFORD DEASE SANDERS | NO |
| JC | 5/12/04 | NONE | AOD | MATH | NONE | NO | NO | PITCHFORD DEASE MONDAY CATHY LNU SIMMONS | YES |
| JP | 5/21/04 | NONE | AOD | ENGLISH MATH | NONE | NO | NO | PITCHFORD DEASE GORNBURG | NO |
| JW | 9/4/04 | WRAT | AOD | LANGUAGE ARTS MATH | NONE | NO | NO | SCOTT LNU STRANGE CHANDLER CATHY LNU | NO |
| PS | 5/21/04 | WRAT | AOD | READING MATH | NONE | NO | NO | PITCHFORD DEASE CHANDLER | NO |

EXHIBIT

tabbies

Sears A

| RS | 10/27/04 [INCONSISTENT DATES] | WRAT | AOD | SCIENCE ENGLISH MATH | NONE | NO | YES, BUT APPARENTLY WITHOUT ANY BASIS IN FACT | PITCHFORD STRANGE GIBSON SHACKLEFORD WILLOGHBY | NO |
| SB | 11/15/04 | DAB-2 | REGULAR | MATH ENGLISH/ LANGUAGE | NONE | NO | NO | SCOTT LNU STEVE LANIER PAUL PAYNE CATHY LNU | NO |
| TB | 5/21/04 | WRAT | AOD | MATH READING | NONE | NO | NO | PITCHFORD DEASE JOHNSON | NO |
| WJ | 5/21/04 | WRAT | AOD | MATH READING | NONE | NO | NO | PITCHFORD DEASE MEADOWS | NO |
| WJ | 5/21/04 | NONE | AOD | READING MATH | NONE | NO | NO | PITCHFORD DEASE MEADOWS | NO |

## CURRICULUM VITA

JAMES D. SEARS
Sears Law Firm
816-A Manci Avenue
Daphne, Alabama 36526
(251) 621-3485; Fax 621-3486
Email: jdsears@searslawfirm.com

## EDUCATION

| 1988 | J.D. | The University of Alabama School of Law; Tuscaloosa, Alabama |
| 1975 | Ed.D. | University of Florida;  Gainesville, Florida (Special Education/Mental Retardation; Minor - Research and Statistics). |
| 1971 | M.Ed. | University of Florida; Gainesville, Florida (Special Education/Mental Retardation). |
| 1968 | B.A. | University of South Florida; Tampa, Florida (Liberal Arts/History). |

## PROFESSIONAL EXPERIENCE

| 1995-Present | Private Practice, Attorney at Law; Southwest Alabama |

Special Education Law--representing children with disabilities.

Criminal Law--representing defendants who have diagnoses of mental retardation and/or mental illness.

| Fall, 1996 | Adjunct Professor, Spring Hill College, Mobile, Alabama |

| 1988-1994 | Private Practice, Attorney at Law; Tuscaloosa, Alabama |

Special Education Law--representing children with disabilities.

–1–



|  | Criminal Law--representing defendants who have diagnoses of mental retardation and/or mental illness. |
|---|---|
| 1984-1994 | <u>Director</u>, West Alabama Comprehensive Services, The University of Alabama; Tuscaloosa, Alabama--a university affiliated program for adults who have severe disabilities. |
| 1981-1994 | <u>Associate Professor of Special Education</u><br>The University of Alabama, Area of Special Education; Appointments in the fields of Mental Retardation and Orthopedic and Other Health Impairments<br><br>(Coordinator of Programs for the Multidisabled), The University of Alabama, Area of Special Education; Tuscaloosa, Alabama |
| 1977-1981 | <u>Assistant Professor of Special Education</u>, The University of Alabama, Area of Special Education; Tuscaloosa, Alabama Appointments in the fields of Mental Retardation and Orthopedic and Other Health Impairments |
| 1975-1977 | <u>Assistant Professor of Special Education</u>, Bowling Green State University; Bowling Green, Ohio |
| Summer, 1974 | <u>Instructor</u>, University of South Alabama; Mobile, Alabama |
| 1973-1975 | <u>Graduate Assistant</u>, Department of Special Education, The University of Florida; Gainesville, Florida |
| 1971-1973 | <u>Principal</u>, Hillcrest School; Ocala, Florida |
| <u>1969-1971</u> | <u>EMR Teacher</u>, Long Branch Elementary; Jacksonville, Florida |

## PROFESSIONAL ASSOCIATIONS

Phi Delta Kappa

Alabama Bar Association

Mobile County, Alabama Bar Association

Baldwin County, Alabama Bar Association

–2–

## BAR ADMISSIONS

State of Alabama

United States Court of Appeals for the Eleventh Circuit

United States District Court, Northern District of Alabama

United States District Court, Middle District of Alabama

United States District Court, Southern District of Alabama

United States District Court, Southern District of Mississippi

United States District Court, Eastern District of Louisiana

## PROFESSIONAL AWARDS

Liberty Bell Award. Mobile Bar Association, Law Day. May 16, 2003. In recognition of providing legal representation for individuals who have disabilities.

Professional of the Year. The ARC of Alabama. June 4, 1994. In recognition of providing legal representation for individuals who have disabilities.

## PRESENTATIONS

Alabama Association of Behavior Analysts. Thirty years of special education: what went wrong? Birmingham, AL. November, 2006.

Conecuh County Board of Education. Complying with the Individuals with Disabilities Education Improvement Act (2004), Evergreen, AL. August 3, 2006.

Montgomery County Board of Education. Complying with the Individuals with Disabilities Education Improvement Act (2004), Montgomery, AL. June 14, 2006.

Conecuh County Board of Education. Legal issues associated with providing services to students who have disabilities, Evergreen, AL. June 8, 2006.

Lorman Education Services. Student discipline issues in Alabama, Montgomery, AL. May 23, 2006.

Special Education Action Committee: Symposium on Special Education and the Juvenile Justice System.   The Individuals with Disabilities Education Improvement Act, as Reauthorized in 2004 and the Juvenile Justice System, Mobile, AL.  November 8, 2005.

Alabama Association for Behavior Analysis.  Behavior: According to the Individuals with Disabilities Education Improvement Act, as Reauthorized in 2004, Birmingham, AL. October 25, 2005.

Medical Educational Services-Professional Development Network.  The Individuals with Disabilities Education Improvement Act, 2004 Reauthorization, Birmingham, AL. December 10, 2004.

Alabama Association for Behavior Analysis.  Functional Behavior Assessments, Behavior Intervention Programs, and the Individuals with Disabilities Education Act, Birmingham, AL. November 17, 2004.

Mobile County, Alabama Bar Association Criminal Practice Seminar.  Incompetency and Mental Examination--Law, Rules, and Practice, Mobile, AL.  May 7, 2004.

Lorman Education Services.  Requests for Due Process Hearings, Birmingham, AL. March 5, 2004.

Lorman Education Services.  Discipline of Students with Special Needs in Alabama, Montgomery, AL.  February 24, 2004.

International Council for Exceptional Children, Teacher Education Division.   Best Professional Practice: The Case for Redefinition of Teaching Students with Disabilities, Biloxi, MS.  November 16, 2003.

Medical Educational Services-Professional Development Network.   Legal Aspects of Student Discipline in Alabama, Birmingham, AL.  November 6, 2003.

Medical Educational Services-Professional Development Network, Legal Aspects of Student Discipline in Alabama, Birmingham, AL.  November 21, 2002.

Alabama Council of School Board Attorneys, Discipline Under IDEA, Gulf Shores, AL.  July 20, 2002.

Lorman Educational Services, Discipline of Students with Special Needs, Montgomery, AL. May 15, 2002.

Professional Development Network, Special Education Law in Alabama,  Evaluations, Eligibility Determination and IEPs, Birmingham, AL.  May 3, 2002.

Alabama Bar Institute for Continuing Legal Education, Practical Criminal Defense Law Seminar, The Criminal Defendant Who is Mentally Retarded. Tuscaloosa, AL. September 15, 2001.

Medical Educational Services, Inc. Special Education Law for the New Millennium in Alabama. Birmingham, AL. April 20, 2001.

Alabama Criminal Defense Lawyers Association. *Loosening the Death Belt Seminar V: Matters of Life and Death*. A Practical Guide to Representing People Who have Mental Retardation in Death Penalty Cases. Birmingham, AL. January 26, 2001.

Alabama State Bar Association, Disabilities Law Section Meeting, Special Education Law Update, Orange Beach, AL. July 14, 2000.
Mobile Bar Association, Continuing Legal Education, Individuals with Disabilities Education Act, as Reauthorized in 1997, 20 U.S.C. 1400, *et seq.* Mobile, AL. January 20, 2000.

Professional Development Network; Special Education Law in Alabama: Rights and Responsibilities (Individualized Education Program, Placement Decisions and Parent Participation). Birmingham, AL. Faculty, February 23, 1999.

Odyssey Program; University of South Alabama, Mobile, AL. Anatomy of a Murder Trial. Lecturer, Fall, 1998.

Odyssey Program; University of South Alabama, Mobile, AL. Overview of the Legal Process. Lecturer, Fall, 1997.

Baldwin County Friends of Special Education; Fairhope, AL. Developing IEPs. February 1997.

Baldwin County Friends of Special Education; Fairhope, AL. Parents Rights in Special Education. October 1996.

Alabama Association on Learning and Behavior Disorders; Mobile, AL. Law in the Special Education Classroom, January 1996.

University of South Alabama; Mobile, AL. Legal Aspects of an IEP, April 1995.

Alabama Council for Exceptional Children/MR Division; Tuscaloosa, AL. Legal Aspects of Mainstreaming, February 1994.

Juvenile Practice and Procedure Seminar; Birmingham, AL. How to of a 94-142 Case, November 1991.

Repton Senior High School, Reston, AL. What I would tell my son on his graduation day, Commencement Address, June 1989.

Alabama Municipal Judges Conference; Montgomery, AL. The Mentally Retarded in the Municipal Court System, March 1989.

Alabama Council for Exceptional Children SuperConference; Birmingham, AL. The Impact of Recent Litigation and Legislation on Special Education in Alabama, February 1989.

Alabama Municipal Judges Conference; Tuscaloosa, AL. The Mentally Retarded in the Municipal Court System, February 1989.

Alabama Attorney General's Commission on the Handicapped; Huntsville, AL. Providing Educational Services to the Handicapped in Alabama, October 1988.

Mississippi Band of Choctaw Indians; Philadelphia, MS. Managing the Behavior of Students Who Are Handicapped, August 1988.

University of Montevallo--Teacher Inservice Center; Talladega, AL. The Pragmatics of Mainstreaming, August 1988.

Association of Retarded Citizens of Jefferson County; Talladega, AL. The Pragmatics of Mainstreaming, August 1988.

Association of Retarded Citizens of Jefferson County; Birmingham, AL. Graduation Address; Preparing for the Future in Special Education, August 1988.

Universities of Alabama/ Livingston--Teacher Inservice Center; Tuscaloosa, AL. The Law and Special Education, July 1988.

Auburn University Student Counsel for Exceptional Children; Auburn, AL. AIDS and Special Education, April 1988.

Association for Retarded Citizens of Morgan County; Decatur, AL. Special Education in Alabama: Past, Present and Future, March 1988.

Alabama SuperConference, Council for Exceptional Children; Birmingham, AL. AIDS and Special Education, February 1988.

Association of Retarded Citizens of Jefferson County; Birmingham, AL. Due Process, January 1988.

Council for Exceptional Children, Birmingham Chapter; Birmingham, AL. The Law and Special Educators, November 1987.

Tuscaloosa City Schools; Tuscaloosa, AL. Physical Management of Aggressive Behaviors, November 1987.

–6–

University of Montevallo--Teacher Inservice Center; Montevallo, AL.    Mainstreaming
Exceptional   Children, August  1987.

Alabama SuperConference, Council for Exceptional Children; Montgomery, AL. Special
Education and the Law: Teaching the Mentally Retarded About Their Miranda Rights,
February  1987.

Decatur City Board of Education; Decatur, AL.   Physical Management of Aggressive
Behavior, January  1987.

The University of Alabama/Livingston  -- Teacher In-Service Center; Tuscaloosa, AL.

     1.     Identifying Handicapped Students in the General Education Program,
           August 1986.

     2.     Physical Management of Aggressive Behavior, July  1986.

     3.     Physical Management of Aggressive Students, February 1986.

     4.     Needs and Characteristics of Handicapped Students, January 1986.

     5.     The  Use  of  Punishment  with  Handicapped  Students  and  Legal
           Considerations Relative to Special Education, July 1985.

     6.     The Educable Mentally Retarded in Public School Programs, July 1985.

Alabama State Department of Education (State Board Hearing on Programs for
Exceptional Children and Youth, Policies and Procedures Manual; Tuscaloosa, AL. Policy
Recommendations for Mental Retardation Programs, September    1985.

Oak Hill School; Tuscaloosa, AL.  Special Education in the Future (Graduation Address),
May 1985.

Cerebral Palsy Institute; Tuscaloosa, AL.  Legal Implications for Public Law 94-142, June
1984.

Florida Developmental Disabilities Learning Resource Systems Annual Meeting; St.
Augustine, FL. Conferencing with Parents of Early Childhood Handicapped Children and
Using the IEP Meeting as a Parent Conference, 1983-1984.

     1.     Interactions with Paraprofessionals, May 1983.

     2.     Physical Management of Aggressive Behavior,  May and October
           1983; February and March 1984.

Alabama SuperConference, Council for Exceptional Children; Birmingham, AL. Utilizing Microcomputers as an Augmentative Communication Aid, February 1984.

West Alabama Consortium; Tuscaloosa, AL. Sex Education for the Mentally Retarded and Managing Aggressive Behaviors of Handicapped Students, October 1983.

Montgomery Children's Center; Montgomery, AL. Augmentative Communication Aids for the Non-Speaking, January 1983.

Tuscaloosa City Schools; Tuscaloosa, AL.    Managing Aggressive Behaviors of Handicapped Students, January 1983.

Council for Exceptional Children; National Meeting, Washington, D.C.    Providing Consulting Assistance for Least Restrictive Environments, April 1980.

Gatlinburg Conference on Research in MR/DD; Gatlinburg, TN.  Chairperson.  Self-Injurious and Stereotyped Behaviors, March 1980.

State Meeting of the American Association on Mental Deficiency; Birmingham, AL. University Programs Designed to Train Professionals to Work With the Severely and Profoundly Handicapped, December 1980.

National Conference of American Speech and Hearing Association; Detroit, MI.    A Comparison of the Use of Blissymbolics and Manual Signs When Used with Severely and Profoundly Mentally Retarded Subjects, November 1980.

National Conference of the American Association of the Severely and Profoundly Handicapped; Chicago, IL; Legal Aspects of Using Punishment with a Severely/Profoundly Handicapped Population and Defining the Severely and Profoundly Handicapped from an Educational Perspective, October 1979.

Council of Administrators of Special Education; State of Alabama Meeting; Montgomery, AL.  Programming for the Severely and Profoundly Handicapped, July 1979.

Southeastern Regional Coalition for the Preparation of Personnel to Work With the Severely Handicapped;  State Education Agency Meeting; Nashville, TN.  Certification Reciprocity for the Severely/Profoundly Handicapped Area, May 1979.

Cerebral Palsy Institute; The University of Alabama; Tuscaloosa, AL.  Programming for the Severely/Profoundly Handicapped, June 1978.

National Conference of the American Association on Mental Deficiency; Denver, CO. Residential Programming: A Model for Private Residential Institutions, May 1978.

Professional Association for the Retarded, State Meeting; Columbus, OH. Developing Programs for the Severely/Profoundly Retarded, October 1977.

International Conference of the Council for Exceptional Children; Atlanta, GA. Creative Behavior of Trainable Mentally Retarded Adolescents, April 1977.

Sunshine Children's Home; Program Committee; Toledo, OH. Program Planning for the Residential Institution, January 1977.

Professional Association for the Retarded, State Meeting; Columbus, OH. Parent Counseling, October 1976.

Lucas County Board of Mental Retardation, Orientation Meeting; Toledo, OH. Normalization of TMR Students,  September 1976.

District Meeting, Professional Association for the Retarded; Bowling Green, OH. Intermediate-Level TMR Program Training, May 1976.

Florida Council for Exceptional Children; Miami, FL. Citizens Advocacy at the University of Florida, May 1974.

Florida Association of Supervisors and Curriculum Directors; Orlando, FL. Developing a Curriculum for the Trainable Mentally Retarded in a Moderate Size County, February 1972.

## CONSULTING

Conecuh County Board of Education; Educational/Legal Consultant, 2006.

Tuscaloosa City Schools; Tuscaloosa, AL. Legal Consultant, 1998 - 1999.

Madison County Schools; Huntsville, AL. Legal Consultant, 1989.

Huntsville City Schools; Huntsville, AL. Expert Witness, 1988 - 1989.

Shelby County Board of Education; Huntsville, AL. Legal Consultant, 1988.

Mississippi Band of Choctaw Indians; Philadelphia, MS. October 1988.

Alabama Developmental Disabilities Program; Tuscaloosa, AL. Expert Witness, 1985-1994.

United States Department of Education; Washington, D.C. Grant Review; August 1987.

Alabama State Department of Mental Health; Eufala, AL. Programming for the Severely Handicapped Adult, February 1986.

Alabama Developmental Disabilities Advocacy Program; Tuscaloosa, AL. Developing Individual Education Plans, September 1984.

Guntersville School System; Guntersville, AL. Sex Education for the Handicapped, August 1984.

Jasper City School Board; Jasper, AL. Physical Management of Aggressive Behavior, March 1984.

Mobile County School Board; Mobile, AL. Conferencing with Parents of Exceptional Children: Topical Areas of Concern, February 1984.

Mobile County School Board; Mobile, AL. Conferencing with Parents of Exceptional Children: Counseling Needs, November 1983.

United States Department of Education; Washington, D. C. Grant Review, April 1983; October 1982; December 1979.

Central Mississippi Legal Services; Jackson, MS. Expert Witness, August 1980 - May 1982.

Mobile County Schools; Mobile, AL. Assessing Multihandicapped Students, September 1981.

Talladega County Schools; Talladega, AL. Programming for the Severely/Profoundly Handicapped, January 1981.

Partlow State School; Tuscaloosa, AL.    Programming for the Most Profoundly Handicapped, August 1979-1982.

Project REACT; Tuscaloosa, AL. July 1979-1982.

Jasper City Schools; Jasper, AL. Special Education Program Evaluation, June 1979.

Alabama State Department of Education; Due Process Hearing Officer, December 1978-1981.

John S. Jones Elementary School (Severe/Profound Program); Gadsden, AL. September 1978.

Tuscumbia City School Board; Tuscumbia, AL. September 1978.

Sheffield City School Board; Sheffield, AL. September 1978.

Sumter County Opportunity Center, Inc.; York, AL. April - December 1978.

Regional Education Center Classes for the Severely/Profoundly and Multiply Handicapped; Northport, AL. April 1978.

Head Start Programs of Dadeville; Montgomery and Anniston, AL. The Use of IEP=s with Young Children Who Are Handicapped, March/April 1978.

Alabama Cluster III of Head Start Programs; Montgomery, AL. Developing Individual Education Plans, November 1977.

Cuyahoga Board of Mental Retardation; Cleveland, OH. Assessments and Activities for TMR Students and Evaluation Techniques for Principals in the TMR School, March 1977. Sunshine Children's Home; Maumee, OH. Program Consultant, January - August, 1977.

Cuyahoga Board of Mental Retardation; Cleveland, OH. Philosophy of Education for TMR Centers, January 1977.

Department of Special Education, University of Florida, Gainesville, FL. Career Education for the Handicapped, December 1976.

Van Wert Board of Mental Retardation; Van Wert, OH. Teaching Trainable Mentally Handicapped Students, February 1976.

Cuyahoga Board of Mental Retardation; Cleveland, OH. Appropriate Skills for Trainable Students, March 1975.

Putnam County Public Schools; Putnam County, FL. Career Education for the Mentally Retarded, October 1974.

## PROFESSIONAL PARTICIPATION

Southeastern Regional foundation for Autism Spectrum Disorders, Board Member. Mobile, AL. 2007-Present.

Alabama Disabilities Advocacy Program, Advisory Board. The University of Alabama; Tuscaloosa, AL. 2004-Present.

Editorial Board, *Addendum*, Alabama State Bar Association. Montgomery, AL. 2001.

Board Member, Mobile Bar Association, Volunteer Lawyer Program (Pro Bono Program) 1998-Present.

Member, Program Advisory Committee, Learning Disabilities Association; Mobile, AL. 1996-1997.

Director, Tuscaloosa Area Special Olympics; Tuscaloosa, AL. 1991 - 1994.

Member, Board of Directors; Alabama State Special Olympics; Montgomery, AL. 1991-1994.

Member, Outreach Committee, Alabama State Special Olympics; Montgomery, AL. 1991 - 1994.

Member, Mayor's Council for People with Disabilities; Tuscaloosa, AL. 1992 - 1994.

Chairperson, Goals and Objectives Committee, Mayor's Council for People with Disabilities;   Tuscaloosa, AL. 1992 - 1993.

Chairperson, Southeastern American Association on Mental Retardation - Education Division; Atlanta, GA. 1991 - 1993.

Treasurer, Alabama Division, Association on Mental Retardation; Montgomery, AL. 1989 - 90.

Editorial Board, University of Alabama, School of Law,  Law and Psychology Review, Tuscaloosa, AL. 1987-1988.

Member, Professional Advisory Committee, Indian Rivers Mental Health Center; Tuscaloosa, AL. 1988 - 1994.

Member, College of Education, The University of Alabama, Leadership Review Committee; Tuscaloosa, AL. 1987 - 1988.

Chairperson, By-Law Committee, Alabama Council for Exceptional Children, 1985-1987.

President, Alabama Council for Exceptional Children/MR Division; Montgomery, AL. 1985 - 1986.

President-elect, Alabama Council for Exceptional Children/MR Division; Montgomery, AL. 1984 - 1985.

Chairperson, Evaluation and Review Subcommittee of the Tuscaloosa Association for Retarded Citizens; Tuscaloosa, AL. 1985.

Board Member, Tuscaloosa Association for Retarded Citizens; Tuscaloosa, AL. 1983 - 1993.

Chairperson, Regional Education Center Advisory Committee; Northport, AL. 1982 - 1985.

President, United Cerebral Palsy of Tuscaloosa and West Alabama; Tuscaloosa, AL. 1981 - 1982.

Board Member, United Cerebral Palsy of Tuscaloosa and West Alabama; Tuscaloosa, AL. 1979 - 1981.

Vice-President, United Cerebral Palsy of Tuscaloosa and West Alabama; Tuscaloosa, AL. 1979 - 1981.

President, Council for Exceptional Children, Chapter 244; Tuscaloosa, AL. 1978 - 1979.

Vice-President, Council for Exceptional Children; Chapter 244; Tuscaloosa, AL; 1978 - 1979.

Member, Education Committee, Executive Board, Alabama Association for Retarded Citizen; Montgomery, AL. 1979.

Member, Severely/Profoundly Handicapped Certification Committee, Alabama State Department of Education, 1977 - 1978.

Board Member, Wood County Association for Retarded Citizens; Bowling Green State University; Bowling Green, OH. 1975 - 1976.

Committee to Develop a Collaborative Model for Public Education, College of Education, University of Florida; Gainesville, FL., Fall 1973.

Principal's Committee on Comprehensive Planning, Marion County Public Schools; Marion County, FL., 1973.

Co-Chairperson, Marion County Special Olympics; Marion County, FL. 1972.

Grant Review Committee for New Hope School and Opportunity Workshop; Marion County, FL. 1972.

Representative, Systems Analysis for Education Training, Duval County Public Schools; Jacksonville, FL. Spring 1970.

Representative. Committee on Public School Desegregation, Duval County Public Schools; Jacksonville, FL. Spring 1970.

## PUBLICATIONS

1996    Educational goals for individuals with a severe disability: parental and professional preferences. *Education,* June 22, 1996. With Kenneth Coffey.

1989    Mental retardation and unconscionability. *Law and Psychology Review,* 18, 77 - 90.

   Teaching Miranda rights to students who have mental retardation. *Teaching Exceptional Children,* 21, 2, 38-43. With A. Bishop and E. Stevens.

1988    Learning disabilities, postsecondary education, and Section 504 of the Rehabilitation Act of 973. *Law and Psychology Review,* 12, 61 - 78.

   AIDS and special education. In *Proceedings, Alabama Teacher Education Division.* With E. Stevens.

1987    Toward a conceptualization of seriously emotionally disturbed. In *Proceedings of the Eighth National Institute on Legal Problems of Educating the Handicapped.* UP-10. Alexandria, VA: CRR Publishing Co. With E. Stevens.

1985    The use of punishment with handicapped students and legal considerations relative to special education. Monograph. *The University of Alabama/Livingston, Teacher In-Service Center.*

   The educational definition and classification of mental retardation in the state of Alabama. (1985). *The Alabama Council for Exceptional Children Journal,* 6(1), 4-6. With T. Russell and R. Palk.

1984    Correlates of therapeutic progress by infants with cerebral palsy and motor delay. *Perceptual and Motor Skills,* 58, 159-163. With P. Parette and L. Holder.

1983    Teacher/parent Conferencing skills: Inservice modules. Monograph. *Florida Diagnostic and Learning Resources System.*

   Assessment of early therapeutic intervention effectiveness utilizing Bayley psychomotor gains. *Capstone Journal of Education,* 3 (2), 30-38. With P. Parette and L. Holder.

1982    Guidelines for the development of personnel preparation programs designed to train personnel to teach severely handicapped individuals. *Teacher Education in Special Education,* 4, 1. With members of the Southeastern Regional Coalition of Personnel Preparation for the Severely Handicapped.

Characteristics of teachers and teacher aides of the severely and profoundly handicapped. *Education and Training of the Mentally Retarded, 17* (3), 190-195. With R. Escudero.

1981    The effect of the use of galvanic skin responses in determining the reactivity of special education majors to nonverbal career related cues. *College Student Journal*, 15 (4), 290-294. With T. Uno and R. Gargiulo.

1979    Punishment: Beyond the right to an education. (1979). *Law and Psychology Review*, 5, 79-101. With H. Stephens.

The dimensional preferences of individuals who are mentally retarded. *Bulletin of the Psychonomic Society*, 14 (3), 219-222. With R. Gargiulo and T. Uno.

1978    Communication for the severely and profoundly handicapped: new challenges. *Journal of Speech and Hearing Association of Alabama*, 8, 1.

Galvanic skin responses of special education students to relevant and nonrelevant verbal cues. (1978). *College Student Journal*, 12 (2), 204-211. With T. Uno and R. Gargiulo.

1977    Creativity in the developmentally disabled adolescent. *Psychological Reports: Perception and Motor Skills*, 40, 1207-1212. With T. Uno, R. Gargiulo, and M. Maurer.

A study of adaptive behavior scale ratings for community based TMR adults. *Mental Retardation*, 15 (1), 44-45. With J. Whorton.

1976    Creativity behavior of trainable and educable mentally retarded adolescents. *Journal of Creative Behavior*, 10 (3), 221. with T. Uno, R. Gargiulo, and M. Mauter.

## SPONSORED PROGRAMS (FUNDED)

1984 -1994    Annual renewal grants. West Alabama Comprehensive Services, Alabama State Department of Mental Health.

1984    Utilizing Microcomputers as an Augmentative Communication Aid, the University of Alabama, College of Education Research Grant.

The Use of Microcomputer Technology with a Severely Handicapped Adult, the University of Alabama, Graduate School Biomedical Research Grant.

1983     Severe/Profound Teacher Preparation, Office of Special Education, United States Department of Education.

1982     Severe/Profound Component , Area of Special Education Training Grant. Office of Special Education: Handicapped Personnel Training Program, Handicapped Teacher Education. United States Department of Education.

          Trainers of Paraprofessionals, Office of Special Education, United States Department of Education.

1981     Severe/Profound Component, Area of Special Education Training Grant. Office of Special Education: Handicapped Personnel Training Program, Handicapped Teacher Education, United States Department of Education.

1980     Severe/Profound Component, Area of Special Education Training Grant. Office of Special Education:  Handicapped Personnel Training Program, Handicapped Teacher Education, United States Department of Education.

          Trainers of Paraprofessionals, Office of Special Education, United States Department of Education.

1979     Severe/Profound Component, Area of Special Education Training Grant. Bureau of Educationally Handicapped:  Handicapped Personnel Training Program, Handicapped Teacher Education, United States Department of Education.

          Rural Education and Corrective Therapy, United Cerebral Palsy of Alabama, Inc.

          Conference on the Severely/Profoundly Handicapped, Project RESET, Bureau of Educationally Handicapped Training Grant, United States Department of Education, Department of Health, Education and Welfare.

          Alternative Forms of Communication for the Severely and Profoundly Handicapped, Venture Fund, The University of Alabama.

1978     Severe/Profound Component, Area of Special Education Training Grant. Bureau of Educationally Handicapped Training Grant, United States Department of Education, Department of Health, Education and Welfare.

1977     The Severely/Profoundly Handicapped:  In-Depth Training, Alabama State Department of Education.

–16–

Severe/Profound Component, Area of Special Education Training  Grant. Bureau of Educationally Handicapped Training Grant, United States Department of Education, Department of Health, Education and Welfare.

TMR Program Redesign, Project 419 (University Redesign ), Bowling Green State University.

1976    Characteristic Assessment of Elderly Severely Mentally Retarded Individuals. Faculty Research Committee, Bowling Green State University.

Jan 03 08 04:04p    Patsy Robertson    334-834-4111    p.1
10/28/2004  12:01    3346771634    DOTHANJRDTC    PAGE  03

P ③

b.



PUBLIC SCHOOL CONTRACT

FOR THE

SCHOLASTIC YEAR 2004-2005

STATE OF ALABAMA
COUNTY OF HOUSTON

THIS CONTRACT, ENTERED IN DUPLICATE* BETWEEN THE BOARD
OF EDUCATION OF SAID COUNTY, THE PARTY OF THE FIRST PART, AND NANCY
MILLER, THE PARTY OF THE SECOND PART.

WITNESSETH:

1.  THAT THE PARTY OF THE FIRST PART HEREBY CONTRACTS WITH THE PARTY
OF THE SECOND PART, AS A TEACHER IN AND FOR SAID COUNTY FOR A MINIMUM
TERM OF 09 SCHOLASTIC MONTHS FOR THE SCHOLASTIC YEAR 2004-2005 AT A
SALARY OF $29,834.00 FOR 12 MONTHS.

2.  THAT THE PART OF THE SECOND PART CERTIFIES = IS A LEGALLY
QUALIFIED TEACHER AS EVIDENCED BY A VALID ALABAMA TEACHER'S
CERTIFICATE, WHICH HAS BEEN CHECKED AND RECORDED IN THE OFFICE OF THE
PARTY OF THE FIRST PART.**

3.  THAT THE PARTY OF THE SECOND PART AGREES TO KEEP SUCH REGISTER,
AND MAKE SUCH REPORTS, AND FAITHFULLY COMPLY WITH ALL SUCH RULES AND
REGULATIONS AS MAY BE REQUIRED BY THE HOUSTON COUNTY BOARD OF EDUC.,
AND TO RETURN THE REGISTER TO THE COUNTY SUPERINTENDENT AFTER HAVING
MADE A COMPLETE RECORD OF ALL INFORMATION REQUIRED.

4.  THAT THE PARTY OF THE SECOND PART AGREES TO TEACH THE FULL TERM
FOR WHICH THIS CONTRACT IS MADE AND FURTHER AGREES THAT SHOULD SHE FAIL
TO TEACH OUT SUCH TERM, UNLESS EXCUSED FROM SUCH FULFILLMENT BY THE
COUNTY SUPERINTENDENT FOR THE HOUSTON COUNTY BOARD OF EDUC., THAT ANY
AND ALL SUCH FUNDS DUE SUCH TEACHER, INCLUDING ANY CHECK WHICH HAS
BEEN DRAWN BY THE TREASURER OF PUBLIC SCHOOL FUNDS BUT NOT CASHED,
SHALL REVERT TO THE GENERAL EDUCATIONAL FUNDS OF THE COUNTY.

5.  THAT THE PARTY OF THE FIRST PART HEREBY RESERVES THE RIGHT TO
ANNUL THIS CONTRACT AND TO DISMISS THE PARTY OF THE SECOND PART:(A)
IF SUCH PARTY IS NOT ON CONTINUING SERVICE STATUS, FOR INCOMPETENCY,
INSUBORDINATION, NEGLECT OF DUTY, IMMORALITY, JUSTIFIABLE DECREASE IN
THE NUMBER OF TEACHING POSITIONS, OR OTHER GOOD AND JUST CAUSE,
PROVIDED WRITTEN NOTICE OF THE INTENT TO DISMISS IS GIVEN PARTY OF THE
SECOND PART BY THE PARTY OF THE FIRST PART AT LEAST TEN DAYS IN ADVANCE
OF THE CONTEMPLATED ACTION, AND, PROVIDED THAT THE PARTY OF THE SECOND
PART MAY, IF DESIRED, CLAIM THE PRIVILEGE OF COUNSEL BEFORE FINAL
ACTION IS TAKEN, AND PROVIDED FURTHER, HOWEVER, THAT IF, IN THE
UNANIMOUS OPINION OF THE SUPERINTENDENT AND OF MEMBERS OF THE EMPLOYING
BOARD, THE CAUSE OF CANCELLATION OF ANY SUCH CONTRACT JUSTIFIES, A
TEACHER MAY BE SUSPENDED IMMEDIATELY; (B) CANCELLATION OF THIS CONTRACT
WITH A TEACHER ON CONTINUING SERVICE STATUS MAY BE MADE ONLY IN
ACCORDANCE WITH THE LAWS OF THE STATE GOVERNING THE TENURE OF TEACHERS
(SEE CODE REFERENCE BELOW).

6.  THAT IF THE PARTY OF THE SECOND PART HAS ALREADY ATTAINED
CONTINUING SERVICE STATUS BY FULFILLING THE TERMS OF THIS CONTRACT,
THEN THIS CONTRACT SHALL REMAIN IN FULL FORCE AND EFFECT UNLESS



P (4)

b.

SUPERCEDED BY A NEW CONTRACT SIGNED BY BOTH PARTIES IN ACCORDANCE WITH
THE PROVISIONS OF SECTIONS 16-24-1 THROUGH 16-24-38, CODE OF ALABAMA,
1975.

_____ TEACHER.

APPROVED BY DIRECTION OF THE COUNTY BOARD OF EDUCATION APRIL 19, 2004.

\\\\\\\ COUNTY SUPERINTENDENT OF EDUCATION
*ONE COPY OF THIS CONTRACT IS TO BE RETAINED BY EACH PARTY
*IT IS ILLEGAL FOR THE SUPERINTENDENT OF EDUCATION TO SIGN A CONTRACT
 WITH ANY PERSON WHO DOES NOT HOLD A VALID CERTIFICATE TO TEACH ISSUED
 BY THE STATE DEPARTMENT OF EDUCATION.