IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

NANCY MILLER,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        CASE NO. 1:06-cv-940-MEF
                                       )        (WO - Do not publish)
HOUSTON COUNTY BOARD                   )
OF EDUCATION, *et al.*,                )
                                       )
        Defendants.                    )
____

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on the Defendants' Motions for Summary Judgment

(Docs. # 30, 33, and 43).  Plaintiff claims that Defendants violated her First and Fourteenth

Amendment rights by terminating her internship at Houston County High School.  For the

reasons stated herein, Defendants' motions are due to be GRANTED.

### II. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises

under an act of Congress, 42 U.S.C. § 1983.  The parties do not contest venue and personal

jurisdiction, and the Court finds a sufficient basis for each.

### III. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe

2

the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## IV. FACTS AND PROCEDURAL BACKGROUND

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the following relevant facts:

### A. Background and Parties

**1.   Plaintiff**

In the fall of 2001, Plaintiff entered Defendant Troy University, Dothan ("Troy"). Dep. of Plaintiff on July 17, 2007 (Doc. # 34-2, at 29). Plaintiff majored in special education, and her goal was to become a special education teacher. (*Id.* at 30). In May 2005, Plaintiff graduated. (*Id.* at 50). In August 2005, the State of Alabama certified Plaintiff as a teacher. (*Id.* at 31). From January 2006 to May 2007, Plaintiff had a special education job at Beverlye Middle School. (*Id.* at 47-48). Plaintiff is currently unemployed and looking for a job. (*Id.* at 48).

The events that are central to this case occurred in the summer and fall of 2004. Plaintiff was a student in Troy's teacher education program. The program had two

components in the final semester: (1) an internship at a school and (2) a weekly seminar concurrent with the internship.  The seminar had an online discussion forum that allowed students to "discuss issues that might be arising in the different school systems, gain advice from each other, [and] bounce ideas off each other."  Dep. of Plaintiff on August 23, 2007 (Doc. # 36-2, at 26).  Plaintiff's internship was at Houston County High School ("HCHS"), which is operated by Defendant Houston County Board of Education ("HCBOE").  In addition to Troy and HCBOE, there are several individual defendants in this case, and all of them are or were associated with Troy or HCBOE:

### 2.    HCBOE Defendants

- Defendant Riley Joe Andrews ("Andrews") was the Federal Programs Coordinator for HCBOE during Plaintiff's internship.

- Defendant Tim Pitchford ("Pitchford") is Superintendent of Education of HCBOE, and during Plaintiff's internship, he was Principal of HCHS.

- Defendant Paul Strange ("Strange") was a teacher at HCHS who was assigned to mentor Plaintiff during her internship.

- Defendant Stacy Ezell ("Ezell") was a teacher at HCHS during Plaintiff's internship.

- Defendant Kenneth Lord ("Lord") was Superintendent of Education of HCBOE during Plaintiff's internship.

### 3.    Troy Defendants

- Defendant Sandra Jones ("Jones") was Dean of the College of Education at Troy

4

during Plaintiff's internship. Jones taught Plaintiff's seminar class.

- Defendant Greg Ruediger ("Ruediger") was an Associate Professor in the College of Education at Troy. He was Plaintiff's Troy faculty advisor during her internship. Jones was Ruediger's immediate supervisor. Decl. of Sandra Lee Jones (Doc. # 37-2, ¶ 5).

- Defendant Pam Parris ("Parris") was Director of Professional Internship Programs at Troy during Plaintiff's internship.

**B. Plaintiff obtains a teaching internship, despite a reservation**

Plaintiff met with members of Troy's teacher education program committee to discuss her fall 2004 internship. Plaintiff needed three faculty recommendations in order to obtain an internship. The committee informed Plaintiff that Professor Victor Morin, who recommended Plaintiff for an internship, expressed a reservation about Plaintiff: "My concerns are about her willingness to receive and use corrective feedback. I believe that Nancy can have a successful student internship experience if she can reflect on what her supervisors tell her about a commitment to follow through on their recommendations." (Doc. # 35-2, Ex. 3, at 13).

In the fall of 2004, HCBOE did not receive applications for a vacant special education teacher position at HCHS. Dep. of Riley Joe Andrews (Doc. # 37-5, at 16-17). Andrews asked Troy if it had anyone who could fill this position. (*Id.*). Troy informed Andrews that it did not have a teacher. Parris suggested that HCHS interview Plaintiff because she was

5

seeking an internship position. (*Id.*). Andrews interviewed Plaintiff and hired her because she was the "closest person" to a certified special education teacher available. (*Id.* at 20). During her internship and employment with HCHS, Plaintiff worked under a substitute teaching certificate, which was the only certificate for which she was eligible. Dep. of Kenneth Lord (Doc. # 37-4, at 6).

## C. Plaintiff's internship agreement

Plaintiff's internship and employment were created separately under two documents: (1) an internship agreement between Troy and HCBOE, signed by Plaintiff and representatives of Troy and HCBOE (Doc. # 35-2, Ex. 6), and (2) a teaching contract between Plaintiff and HCBOE, signed by Plaintiff and Superintendent Lord (Doc. # 72-15).

The internship agreement listed many of Plaintiff's duties.[1] Plaintiff's agreement was the same as the agreements that governed other students' internships, except for the underlined language in paragraphs 3(b) and 3(c):

> Due to the high demand and low availability of special education teachers, Houston County Schools, specifically Superintendent Kenneth Lord, is experiencing a hardship situation. Mr. Tim Pitchford, principal of [HCHS], has requested permission for Nancy Miller to complete her internship with Troy University Dothan while employed as a special education teacher at [HCHS]. This permission is granted under the following conditions:
>
> 1.    Ms. Miller will continue to be employed throughout the internship period (August 16 – December 7, 2004).

---

[1] Plaintiff's internship differed from the internships of the majority of students in her program in that she was paid. (Doc. # 34-2, at 87). This arrangement was not unique because other students have had paid teaching internships. (*Id.* at 86).

2.    Mr. Paul Strange will serve as cooperating teacher for Ms. Miller.

3.    Ms. Miller will complete the same requirements as all other interns at Troy University Dothan with the following underlined exceptions:

a.    Internship will last a total of 70 school days.  Absences will be made-up and extend beyond December 7, 2004.

b.    Mr. Strange will visit Ms. Miller's classroom one period each week.  Ms. Miller will visit Mr. Strange's classroom one period each week.  The intern is to use the log form provided to record the time spent in Mr. Strange's classroom.  This log, signed by the intern and Mr. Strange, is to be turned in at the end of the semester.

c.    The school administration is responsible for IEP [individualized education plan] meetings.  Ms. Miller's attendance is that of a student intern.  She cannot be held legally responsible for the meetings.

d.    Mr. Strange will conduct four official evaluations during the internship.  The first observation will occur during the first two weeks of internship.  The remaining three evaluations will occur approximately every three weeks.  The white and goldenrod copies of the evaluation form are to be mailed to the Director of Profession Internship immediate as each one is completed.

e.    Mr. Strange is to review all lesson plan, handouts and notes to parents created by Ms. Miller.  The first five lesson plans taught must be in the long format shown in the *Internship Handbook*.  An additional five lessons during the term are to be written in the long format.  Lesson plans written for the university supervisor visits written in the format count as part of the required ten.  All other lesson  plans are to be written using the short form in the handbook.

f.    Dr. Greg Ruediger, the University Supervisor, will conduct the official observations and evaluations during the period.  Ms. Miller will complete the *Report of Internship* form provided in the handbook after each university supervisor visit.

g.    A daily schedule must be provided by Ms. Miller to the Internship office no later than August 30, 2004.  This is to be used to schedule visits.

h.    The intern will complete the internship records and requirements including documentation of the 485 hours of internship.

i.    All summer coursework must be completed and internships

7

pre-requisites met.

    j.    Ms. Miller must attend the Internship Seminar classes.

    k.    Ms. Miller is to e-mail Ms. Parris weekly about the internship.

    l.    The Director of Internship will contact Mr. Strange and Ms. Miller to schedule an appointment to discuss the progress of the Internship. This visit will occur near the midterm of the semester.

(Doc. # 35-2, Ex. 6, at 27-28) (underlining in original). The agreement was signed by Pitchford, Strange, Parris, Jones, and Plaintiff. (*Id.* at 28).

**D. Plaintiff's duties and complaints**

On July 28, 2004, Plaintiff started her employment at HCHS. (Doc. # 34-2, at 71). On August 16, 2004, her Troy internship officially started. (*Id.*).

**1.    Plaintiff's duties**

Plaintiff's primary duties involved assisting special education students. Plaintiff described her duties in her deposition:

I was in the role of a collaborative special education teacher. And the general education teacher gives the actual lesson, and then, I help the students. On the days that I was designated to have an observation, I would actually teach the class.

(Doc. # 34-2, at 331).

Plaintiff had between nineteen and twenty-two students on her roll. (*Id.* at 327). The school day consisted of four ninety minute blocks. (*Id.* at 325, 330). In the first block, Plaintiff had a planning period, where she sometimes worked in a resource room, which is where she worked with special education students outside of the general classroom. (*Id.* at 326). In her deposition, Plaintiff described what she did during this block:

> I had a list of teachers that I needed to cover their special ed students in [the resource room]. If they had a test, they . . . could come into my resource room and take the test . . . . [S]ometimes I'd go visit the teachers to see if they were having a problem or, you know, take something that they might need.

(*Id.*). During the second block, Plaintiff worked in Ms. Sims's English class or Ms. Ezell's science class. (*Id.* at 327-28). During the third block, Plaintiff worked in Ms. Towns's math class.[2] (*Id.* at 328-29). During the fourth block, Plaintiff worked in Ms. Ezell's science class. (*Id.* at 329). When she worked in Ms. Ezell's class or Ms. Towns's class, Plaintiff would sometimes take students out of the class and into the resource room to assist them. (*Id.* at 332).

Plaintiff had duties with respect to individualized education plans ("IEPs"). IEPs are written to determine a special education student's education plan. During the first fifteen to twenty days of her employment with HCHS, Plaintiff reviewed the IEPs of special education students. (*Id.* at 98). In her deposition, Plaintiff stated:

> As a team, Paul Strange, Paul Payne, and I, all together, were in a room, and we got all the IEPs together. We looked at the IEPs. We were determining who was going to get which IEPs and that sort of thing. So, we were able to look at just about every one of them. We determined that there were certain files that were missing. So, you know, we made a list.

(*Id.*). There were no files for some students. (*Id.* at 100). According to Plaintiff, each student should have had an IEP. (*Id.* at 101).

Plaintiff did not believe that she had a duty, as either an employee at HCHS or as an intern of Troy, to raise concerns that she had with her supervisors. (Doc. # 36-2, at 14).

---

[2] Plaintiff also took her lunch during this block. (Doc. # 34-2, at 330).

9

## 2.    Plaintiff complained to Ruediger and HCHS Defendants

On August 26, 2004, Ruediger visited HCHS to observe and evaluate Plaintiff's performance.  (Doc. # 34-2, at 89-90); (Doc. # 35-2, Ex. 7, at 30).  In his evaluation, Ruediger wrote that Plaintiff "stressed her concerns regarding individualized education programs and the general structure of the special education program."  (Doc. # 35-2, Ex. 8, at 32).  Plaintiff told Ruediger that some students did not have IEPs.  Also, she said that some students' IEPs were based on the students being in special education classrooms, and these IEPs required amendment because the central office subsequently decided to include all special education students in regular classrooms.  (Doc. # 34-2, at 95).  Plaintiff also reported that she was asked to write an IEP for a student, even though doing so would have been against the law and against the terms of the internship agreement.  (*Id.* at 95, 128-29).  Plaintiff refused to write the IEP.  (*Id.*).

Ruediger recommended that Plaintiff meet with Strange, her HCHS mentor, to initiate efforts to correct the problems that she observed.  (*Id.* at 115-16).  Ruediger indicated to Plaintiff that he wanted to terminate her internship at HCHS because of the lack of support at the school and the inappropriateness of the HCHS administration and Strange.  (*Id.* at 202-03).  Ruediger said, "The only thing is, you're employed, so I don't know how to handle the situation."  (*Id.*).

On August 27, 2004, Plaintiff met with Strange, Pitchford, and the assistant principal.  (*Id.* at 117, 120).  She discussed the concerns that she raised with Dr. Ruediger.  (*Id.* at 118).

Pitchford was angry that Ruediger sent Plaintiff to discuss these allegations, rather than discussing them with Pitchford directly. (*Id.* at 119).

**3.     Plaintiff complained to Parris, and Parris warned Plaintiff not to shake things up, or else she would risk failing her internship**

On August 30, 2004, Parris told Plaintiff in a phone conversation that she was not at HCHS to shake things up. (Doc. # 36-2, at 46). Plaintiff told Parris about her concerns, such as some students not having IEPs. (*Id.* at 50). Parris told Plaintiff that if Plaintiff did not stop shaking things up, then Plaintiff would be in jeopardy of failing her internship. (*Id.*).

On September 1, 2004, Plaintiff met with Parris, Pitchford, and Andrews. Parris said that there was a complaint that Plaintiff was causing dissention among the HCHS faculty and not sufficiently interacting with the faculty. (*Id.* at 50-51). Parris told Plaintiff that Plaintiff "needed to get in line with what [Parris] had been telling [Plaintiff] before, make Mr. Pitchford happy, or else [Plaintiff] was in jeopardy of losing [her] internship." (*Id.* at 51). Parris tried "to reassure Mr. Pitchford and Mr. Andrews that she valued their relationship, being able to put interns into the county system, and hoped that they would continue . . . that for a long time." (*Id.* at 52).

**4.     Plaintiff left HCHS in the middle of the school day, without permission, to meet Andrews about her concerns**

On Friday, September 24, 2004, at 11:30 a.m., Plaintiff left the HCHS campus. (Doc. # 34-2, at 176, 229); (Doc. # 35-2, Ex. 15, at 47). In her deposition, Plaintiff explained why she left the campus:

11

> For two months – for two months, I was asked to do all of these different things. My students that I had on my roll were not getting the education that they deserved or they required. They were not getting any kind of accommodations that were appropriate for them. They were not getting any kind of lessons that were appropriate for them.
>
> When you have a student with mental retardation, and he's told to answer critical thinking questions, and that it doesn't take a genius to answer those questions, that's totally inappropriate.
>
> I had had it. You can only take so much, seeing that these kids are suffering for the, in my opinion, abuse that some of these teachers are putting on them.

(Doc. # 34-2, at 252).

Plaintiff informed Defendant Strange and two other employees that she was leaving. Before leaving the HCHS campus, Plaintiff left the following memo at the office of Pitchford:

> This memo is to inform you that this morning after I attended an IEP meeting for [a HCHS student], the Pscyhometrist, in Paul Strange's presence asked me to sign 3 documents claiming that I was at IEP meetings. . . . As you know, signing the documents when I was not present at a meeting is unlawful. You also know that this is not the first time I have been approached about illegally signing IEP documents. On August 11, 2004 at approximately 3:20 p.m., Cathy Keasler approached me as I was leaving campus and said we'd need to make up, sign, and date an IEP for [a HCHS student] – without having a meeting. I told her that first, as an Intern, I am not permitted to write or sign one if I have not attended a meeting and that I wouldn't sign one because it is against the law. I have informed Dr. Jones and Mrs. Parris of the situation and I am leaving the premises.

(Doc. # 35-2, Ex. 14, at 45). Plaintiff informed Jones and Parris with a phone message that she was leaving the HCHS campus. (Doc. # 34-2, at 174-75).

The Troy handbook for intern teachers states that "[i]nterns are expected to attend the

school to which they have been assigned for the entire internship period," and"[i]n the event of emergency absence, the intern must notify the Director [Parris], the cooperating teacher [Strange], the principal [Pitchford], and any other personnel as directed by the school." Troy College of Education Professional Internship Program Handbook (Doc. # 35-2, Ex. 29, at 87). Furthermore, "[t]he absences must be excused by the Director and the principal." (*Id.*).

Plaintiff states that she complied with the absence policy by informing Strange in person, Parris with a phone message, and Pitchford with a memo. Aff. of Plaintiff (Doc. # 72-13, ¶ 3). She did not know of any written requirement that the principal must give express permission in person for her to leave campus. (*Id.*). There is no evidence that Plaintiff's absence was excused by Parris and Pitchford.

After leaving campus at 11:30 a.m., Plaintiff drove by the office of Andrews, but she did not see his truck. (Doc. # 34-2, at 188). She went to campus of Dothan High School, where her husband works. (*Id.*). At 2:45 p.m., Plaintiff went to Andrews's office, but still he was not there. (*Id.* at 181, 183). Plaintiff gave Andrews's assistant director, Virginia Singletary, a copy of the memo that she left for Pitchford. (*Id.*). Plaintiff discussed her concerns with Singletary. (*Id.* at 185-86); (Doc. # 35-2, Ex. 15, at 47). At 3:45 p.m., Andrews returned to his office, and Plaintiff discussed her concerns with Andrews and Singletary. (Doc. # 34-2, at 186). Plaintiff said that she would not feel comfortable returning to HCHS until Andrews had spoken to Parris. (Doc. # 35-2, Ex. 15, at 47). Andrews said

13

that he would speak to Parris and contact Plaintiff on the morning of Monday, September 27, 2004. (*Id.*).

**5.    Andrews asks for a list of concerns about Plaintiff**

Andrews called Pitchford and instructed him to gather a list of concerns about Plaintiff. Dep. of Tim Pitchford (Doc. # 38-3, at 75); Dep. of Riley Joe Andrews (Doc. # 37-5, at 38-39). Pitchford sent Andrews the following list of concerns:

(1)    Mrs. Miller left the school campus without informing administrative personnel. She did not return until the next school day.

(2)    Mrs. Miller accused Paul Strange of entering her locked filing cabinet and placing an IEP in a student folder. Mrs. Miller claims it was an IEP written without her knowledge. Mr. Strange and Mrs. Miller had written the IEP in her room approximately one week earlier. Mrs. Miller stated she had no recollection of that event.

(3)    Mrs. Miller has difficulty in communicating with faculty members.

(4)    Mrs. Miller questioned the lawfulness of the school systems inclusion policies.

(5)    Some students have requested that Mrs. Miller not be their inclusion teacher.

(6)    Classroom teachers reported that Mrs. Miller has been upset and crying during class time.

(7)    Office staff members reported that Mrs. Miller was upset and crying in the office lobby during school hours.

(8)    Not following suggestions provided by Mr. Strange as related to the resource room.

(9)    Mrs. Miller told a classroom teacher, "I don't like being here any more than you do, but I have to be in here a certain number of hours. This is in response to the classroom teacher telling her that she could leave the room because the lesson was over. Mrs. Miller said this in front of the students in the class.

(Doc. # 35-2, Ex. 18, at 53).  The list was signed only by Strange and Ezell, but it also reflected concerns that other teachers shared with Pitchford. (*Id.*); (Doc. # 38-3, at 77).

Andrews mailed Parris the list of concerns and a letter that contained allegations of misconduct by Plaintiff. (Doc. # 35-2, Ex. 17, at 51); (Doc. # 35-2, Ex. 18, at 53). The letter was based on the list of concerns. The letter stated that Plaintiff was not (1) following school procedures when she left campus on September 24, (2) working with other HCHS teachers, (3) developing positive teacher-student relationships, and (4) learning more about the special education process and required forms. (Doc. # 35-2, Ex. 17, at 51). The letter did not mention any of Plaintiff's concerns about special education at HCHS. When Andrews wrote the letter to Parris, Plaintiff had a strained relationship with Strange, Pitchford, and Ezell. (Doc. # 34-2, at 231).

## 6.     Parris warns Plaintiff again

On Monday, September 27, Parris visited the HCHS campus, and told Plaintiff that Parris had been receiving phone calls. (Doc. # 36-2, at 31). Plaintiff does not know who called Parris. (*Id.* at 31-32). Parris was "very, very angry" and told Miller, "You've really done it now. I told you that you weren't supposed to shake things up here." (*Id.* at 52-53). Once again, Parris told Plaintiff that Plaintiff was in jeopardy of failing her internship. (*Id.* at 53).

## 7.     Ruediger gives Plaintiff low scores after his second observation

On September 30, 2004, Ruediger visited HCHS for his second observation of Plaintiff's internship. (Doc. # 36-2, at 39). Ruediger was upset that Plaintiff left the HCHS campus on the previous Friday. (*Id.*). Plaintiff tried to explain to Ruediger why she left the

15

campus, but he did not want to talk about her concerns. (*Id.* at 41). Plaintiff told Ruediger that Parris said that Plaintiff was in jeopardy of failing her internship. (*Id.* at 39).

Ruediger met Plaintiff on the Troy campus for a debriefing on the second observation. (*Id.* at 42-43). At this debriefing, they discussed Plaintiff's written evaluation. (Doc. # 35-2, Ex. 20, at 57). Ruediger gave Plaintiff a 1 out of 5, or "unsatisfactory performance," with respect to whether Plaintiff "exhibits a professional demeanor." (*Id.*). The only reason he gave for this score was the fact that she left the HCHS without permission. (Doc. # 36-2, at 43). Ruediger gave Plaintiff a 2 ("minimally acceptable") or a 3 ("average") in the other areas of her evaluation. (Doc. # 35-2, Ex. 20, at 57).

The decision to have Plaintiff's debriefing meeting on Troy's campus, rather than at HCHS, was made prior to Ruediger's visit to observe Plaintiff. Dep. of Greg Ruediger (Doc. # 72-5, at 32-33). This decision was made "due to information that was captured prior to" the date of the observation. (*Id.*). Only three other interns have ever had their post-observation debriefings held at Troy. (*Id.* at 33). In each of the three previous cases, the student did not complete the internship. (Doc. # 72-6, at 2).

**E.    Termination of Plaintiff's internship**

On October 14, 2004, Troy terminated Plaintiff's internship. Jones was the person who decided to terminate the internship. Jones testified that

> [i]t had become obvious to me that Ms. Miller was not achieving the pedagogical goals of her student internship, that is, to prepare her for her post-graduation teaching career. I had come to that conclusion based on a series of documented events, including information about her behavior and

> attitude in the school setting, some weak evaluations she received, and what
> I consider a major event, her leaving the Houston County High School campus
> one day in September 2004 without permission from the Houston County High
> School principal.

(Doc. # 37-2, ¶ 22). The termination of the internship resulted in Plaintiff receiving a grade

of Incomplete for the seminar class and the internship. On October 20, 2004, HCBOE

terminated Plaintiff's employment at HCHS. (Doc. # 36-2, at 92). Plaintiff continued to

work as a teacher at HCHS between the termination of her internship and the termination of

her employment at HCHS. (*Id.*).

**F. Aftermath**

In Spring 2005, Plaintiff completed the seminar class and an internship at Beverlye

Middle School. (Doc. # 37-2, ¶ 23). After graduating *magna cum laude* in May 2005,

Plaintiff took a position at Beverlye Middle School. (Doc. # 36-2, at 67-69).

**G. Procedural Background**

Plaintiff brought this action on October 16, 2006 against Troy, HCBOE, and several

individual defendants in the individual capacities. Plaintiff claimed that the Defendants

violated her First and Fourteenth Amendment "right to speak freely about such policies and

violations of law that she witnessed by either causing her to lose her internship or causing

her to lose her job, or both." (Doc. # 1, ¶ 25). According to Plaintiff, Defendants terminated

her internship and teaching position "to stifle [her] willingness and ability to speak honestly

about violations of law, and to retaliate against her for having made such reports." (*Id.* ¶ 26).

Plaintiff claims that she lost income, had her college education delayed, had her reputation

damaged, and suffered emotionally. (*Id.* ¶ 27). Plaintiff seeks to be reinstated in her position with HCBOE under the contract dated July 28, 2004, with all back pay and benefits. Plaintiff also seeks compensatory and punitive damages and attorneys fees and costs.

## V. DISCUSSION

### A. Plaintiff's First Amendment claim fails

Plaintiff claims that the Defendants terminated her internship in retaliation for her exercise of her right to speak freely about her concerns with HCHS's compliance with the law. To establish a First Amendment claim based on a retaliatory discharge, an employee must satisfy a five-part test:

1.   The employee spoke as a citizen, and not as an employee. *D'Angelo v. Sch. Bd. of Polk County, Fla.*, 497 F.3d 1203, 1209-10 (11th Cir. 2007).

2.   The speech was related to a matter of public concern. *Id.*

3.   The interest of the citizen commenting on matters of public concern outweighs the interest in the state employer promoting the efficiency of public services through its employees. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

4.   The speech played a substantial part in the decision to discharge the employee. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

5.   The states does not show by a preponderance of the evidence that it would have reached the same decision, even in the absence of the protected speech. *Id.* at 1566

(quoting *Mt. Healthy*, 429 U.S. at 286).

**1.    Plaintiff spoke pursuant to her official duties, and not as a citizen**

In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 126 S. Ct. 1951, 1960 (2006). In *Garcetti*, the plaintiff was a deputy district attorney. *Id.* at 1955. The plaintiff was a calendar deputy, which involved exercising some supervisory responsibilities over other lawyers. *Id.* There was a pending case in which the plaintiff believed that an affidavit used to obtain a search warrant had serious misrepresentations. *Id.* The plaintiff wrote a memo to his supervisor that expressed his concern and recommended dismissal of the case. *Id.* at 1955-56. However, his supervisors decided to continue with the prosecution. *Id.* at 1956. The plaintiff claimed that he suffered from retaliatory employment actions, including a reassignment to a position as a trial deputy, a transfer to another courthouse, and the denial of a promotion. *Id.*

The Court held that the plaintiff failed to show that he spoke as a citizen for First Amendment purposes because he "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* at 1960. The Court explained that the plaintiff

> did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, [he] acted as a government employee.

19

*Id.* The Court did not find it dispositive that the prosecutor did not make his concerns known publicly, noting that "[m]any citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like 'any member of the general public.' to hold that all speech within the office is automatically exposed to restriction." *Id.* at 1959 (quoting *Pickering*, 391 U.S. at 573).

In *D'Angelo v. School Board of Polk County, Florida*, the plaintiff was a high school principal who made efforts to convert his school to charter status. 497 F.3d 1203, 1206 (11th Cir. 2007). Under Florida law, a charter conversion application school "shall be made by the district school board, the principal, teachers, parents, and/or the school advisory council . . . ." *Id.* at 1206 (citation omitted). Charter conversion required support from at least fifty percent of the teachers at the school. *Id.* (citation omitted). Plaintiff attended charter seminars and met with faculty members of his school and principals of other local high schools. *Id.* The plaintiff testified that charter conversion was not "one of [his] assigned duties," but "[i]t was incumbent upon [him] to investigate Charter and to move towards Charter for the betterment of the students at Kathleen High School." *Id.* He admitted that he pursued charter conversion to "explore any and all possibilities to improve the quality of education at [his school]," which was his "number one duty." *Id.* at 1210.

Despite his efforts, the plaintiff did not get support from fifty percent of the teachers. He invited teachers to attend a meeting to discuss the idea of partially converting the school to charter status. *Id.* at 1207. The meeting did not occur. The superintendent and some

20

members of the school board were not happy that the plaintiff tried to partially convert the school. *Id.* Two weeks after the planned meeting, the plaintiff was called into the school district office and terminated. The plaintiff sued and alleged that the school board had terminated him in retaliation for his exercise of rights protected by the First Amendment.

The Court first addressed the issue of whether the plaintiff spoke as a citizen. It found that he did not speak as a citizen for two reasons. First, he undertook his efforts to convert the school to charter status in his capacity as a principal. *Id.* at 1210. Second, he admitted that his efforts to convert the school were done pursuant to his duty to improve the quality of education in the school. *Id.* Although the pursuit of charter conversion was not one of the plaintiff's duties, the Court quoted *Garcetti* for the proposition that "the listing of a given task . . . is n[ot] necessary . . . to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* (quoting *Garcetti*, 126 S. Ct. at 1962). The Court rejected arguments from plaintiff and amici curiae that his statements about pursuing charter status to fulfill his duty to improve the quality of education were about his moral obligations as a human being, and not about his responsibilities as a principal. *Id.* Because the plaintiff admitted that his speech was made pursuant to his official duties, the Court declined to outline a method for defining his duties. *Id.* at 1211 ("We find ourselves in the same circumstance as the Supreme Court [in *Garcetti*] and 'have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties.'") (quoting *Garcetti*, 126 S. Ct. at 1961)).

21

In *Phillips v. City of Dawsonville*, the plaintiff was a city clerk and city treasurer. 499 F.3d 1239, 1241 (11th Cir. 2007). She was supervised by and reported directly to the mayor. *Id.* Her duties included collecting, disbursing, and accounting for city funds. *Id.* at 1242. Also, she had a duty to keep the mayor and the city council informed of the financial condition of the city. *Id.* While in office, she became aware of some misconduct by the mayor, including the use of city funds to purchase a car battery and lumber for personal use, as well as the improper use of city-owned property. *Id.* at 1240. The plaintiff reported this conduct to various city employees, including a councilperson, the city attorney, employees of the sewer and water department, and the mayor himself. *Id.* The city attorney and two councilpersons met with the mayor about the allegations, and the mayor resigned shortly thereafter. *Id.* at 1241. The new mayor sought support of the city council to replace the city staff, including the plaintiff. The council voted to not reappoint plaintiff as city clerk. The plaintiff sued the city, the city council members who did not reappoint her, the mayor who resigned, and the mayor who did not support reappointing her. She argued that her non-reappointment was an unlawful retaliation for her reports of misconduct.

The Court found that the plaintiff was not entitled to First Amendment protection because her speech was made pursuant to her official duties. *Id.* at 1242. Her "position as City Clerk gave her some control over and accountability for City funds and placed her in a supervisory role over some staff." *Id.* at 1242-43. Although "reporting the then Mayor's seeming misconduct . . . fell outside the scope of her official enumerated duties," the Court

concluded that "she was speaking in accord with her duty as the City Clerk and not as a private citizen." *Id.* at 1242.

In *Watts v. Florida International University*, a Master of Social Work student was enrolled in a field practicum, which was a "supervised educational experience in an agency setting designed to provide the student with an opportunity to develop and practice social work skills in the student's area of concentration." 495 F.3d 1289, 1291-92 (11th Cir. 2007). The plaintiff worked in a private psychiatric institution. *Id.* at 1292. The speech that led to the plaintiff's termination involved the counseling of a patient. *Id.* The plaintiff recommended that the patient join a bereavement group, and the plaintiff listed church as an option because the patient was Catholic. *Id.* The plaintiff's practicum was terminated by his FIU supervisor because of "inappropriate behavior related to patients, regarding religion." *Id.* Soon thereafter, the plaintiff was dismissed from the related FIU course, "Field Practicum II." *Id.* The plaintiff needed to complete the practicum and the course to graduate. *Id.*

The plaintiff sued FIU and alleged that his First Amendment rights were violated. The plaintiff argued that the correct legal standard for his claim was the one governing student speech, and not employee speech. *Id.* at 1293. The Court disagreed, and stated:

> Had Watts not been a student as well as a government employee, the state plainly would have been entitled to the greater leeway the *Pickering* test affords it. The fact that the state could have attempted to assert its authority over Watts as a student . . . does not prevent it from asserting authority over him as an employee, subject to the *Pickering* test instead. In any event, once Watts the employee was terminated from his employment in the practicum,

Watts the student could not complete the course which included the practicum. Without that course he could not earn his degree. The action that led to the results about which Watts complains is his termination from employment in the practicum, and to that pivotal action the *Pickering* test applies.

*Id.* at 1294.

In this case, the first issue is whether to apply the test for employee speech or student speech. This case differs from *Watts* because the Plaintiff in this case was terminated from her Troy seminar course before she was terminated from her employment with HCHS. However, the Court finds that the correct legal standard is the one for employee speech, and not student speech. Plaintiff's complaints were made about her employment, and not about her seminar course. Plaintiff's employment was a requirement of her seminar course, but her seminar course was not required by her employment. The Court in *Watts* did not state that the order of termination was dispositive to its analysis.

The second issue is the first step of the employee speech analysis, which is whether Plaintiff spoke as an employee or as a citizen. If she spoke pursuant to her official duties, then she spoke as an employee. Plaintiff's complaints about HCHS's noncompliance with the law were made as an employee, and not as a citizen, because there were made pursuant to her official duties. The evidence is undisputed that Plaintiff worked with other HCHS employees to review IEPs and determine which students did not have IEPs. Plaintiff reported to her supervisors that some IEPs were missing. Therefore, Plaintiff's reports of missing IEPs were made pursuant to official duties of reviewing IEPs. Similarly, Plaintiff's complaint that she was asked to write an IEP was made pursuant to her duties as a person

24

who reviewed IEPs.

Plaintiff reported that some IEPs needed to be updated because they reflected special education classroom instruction, and not general classroom instruction. In addition to reviewing IEPs, Plaintiff's duties included working in the special education classroom. Therefore, the complaints about updating IEPs were made pursuant to her official duties as a reviewer of IEPS and as a special education teacher in both the special education classroom and the general education classroom. Similarly, Plaintiff's complaints that special education students were humiliated by general education teachers were made pursuant to her duties as an assistant teacher for special education students who sat in on the general education class.

### 2.     Alternative grounds

Because the Plaintiff did not speak as a citizen, the Court does not need to consider the other parts of the First Amendment retaliatory discharge analysis. However, even if Plaintiff spoke as a citizen, her claim would fail on part five of the analysis. The evidence, even taken in the light most favorable to Plaintiff, shows that Troy and HCBOE would have terminated her internship and her employment, even if she did not speak out about alleged violations of the law by HCHS. There is undisputed evidence that Plaintiff left the HCHS campus unexcused by Parris and Pitchford, which was a requirement according to the internship handbook.

Furthermore, even if Plaintiff had a claim for First Amendment retaliatory discharge, the individual Defendants would be entitled to qualified immunity because the preexisting

law at the time of the discharge was unclear on whether the First Amendment would be violated if Plaintiff was discharged.

Furthermore, the state defendants, Troy and HCBOE, are immune from claims for money damages. "The Eleventh Amendment prohibits a federal court from exercising jurisdiction over a lawsuit against a state, except where the state has consented to be sued or waived its immunity, or where Congress has overridden the state's immunity." *Lassiter v. Ala. A&M Univ.*, 3 F.3d 1482, 1484-85 (11th Cir. 1993). Federal courts may not award money damages if a State invokes its immunity. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004).

Troy is an instrumentality of the State of Alabama, and thus it is entitled to Eleventh Amendment immunity. *Harden v. Adams*, 760 F.2d 1158, 1163-1164 (11th Cir. 1985) (citing *Massler v. Troy State Univ.*, 343 So. 2d 1 (Ala. 1977); *Ellison v. Abbot*, 337 So. 2d 756 (Ala. 1976)). Furthermore, "[c]ounty boards of education are deemed to be local agencies of the State for purposes of applying the State's sovereign immunity." *Carroll ex rel. Slaught v. Hammett*, 744 So. 2d 906, 910 (Ala. 1999).

Alabama has not waived its immunity under the Eleventh Amendment. *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1429 (11th Cir. 1997). Therefore, Plaintiff is not entitled to recover money damages from Defendants Troy or HCBOE.

**B. Plaintiff did not assert a Fourteenth Amendment claim**

Plaintiff claims that Defendants violated her Fourteenth Amendment rights.

Complaint (Doc. # 1, ¶ 24). Plaintiff does not specify whether the Fourteenth Amendment violation was with respect to substantive due process, procedural due process, or equal protection. It appears that Plaintiff mentioned the Fourteenth Amendment because the First Amendment applies to the states through the Fourteenth Amendment. The only count in the complaint is for a First Amendment claim, and Plaintiff does not dispute Defendants' legal arguments for why a Fourteenth Amendment claim, if asserted, is due to be dismissed.

## VI. CONCLUSION

It is hereby ORDERED as follows:

(1)    Defendants' Motions for Summary Judgment  (Docs. # 30, 33, and 43) are GRANTED.

(2)    Plaintiff's First Amendment claim in this case is DISMISSED WITH PREJUDICE.

(3)    This Court will enter a separate final judgment taxing costs.

Done on this the 13th day of March, 2008.

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE